# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHEOLAN KIM, Individually and On Behalf of All Others Similarly Situated, <br> (Address of Plaintiff:  330 Highland Avenue, Unit B, Palisades Park, NJ 07650) <br><br> Plaintiff, <br><br> vs. <br><br> HARMAN INTERNATIONAL INDUSTRIES INC., DR. SIDNEY HARMAN, KEVIN BROWN, and SANDRA B. ROBINSON, <br> (Address of Defendants:  1101 Pennsylvania Avenue, N.W., Suite 1010, Washington, D.C. 20004) <br><br> Defendants. | **CIVIL ACTION NO.** <br><br> CLASS ACTION COMPLAINT <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Cheolan Kim ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Harman International Industries, Inc. ("Harman" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of the common stock of Harman between April 26, 2007 and September 24, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Harman claims to be a leading manufacturer of high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets in the Americas, Europe, and Asia.  The Company operates under the brands names Harman Kardon, JBL, Revel, Mark Levinson, Infinity, Lexicon, Soundcraft-Studer, AKG, Becker, and QNX, and is traded on the New York Stock Exchange under the Symbol:  HAR.

3.      On September 21, 2007, the Company shocked investors when it announced that its previously highly touted merger with a company formed by investment funds affiliated or sponsored by Kohlberg Kravis  Roberts & Co. L.P. ("KKR") and GS Capital Partners VI Fund, L.P. ("GSCP") (KKR and GSCP are collectively referred to as the "Purchasing Companies" herein) – valued at approximately eight billion dollars ($8,000,000,000) – was no longer going to be completed and had been abandoned by the Purchasing Companies.  According to the Company, the Purchasing Companies "informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger."

4.      On this news, shares of the Company's stock fell from the previous day's closing price of $112.34 to a September 21, 2007 close of $85.00, a drop of $27.34.  Moreover, the Company's share price continued to fall and closed on September 24, 2007, the next trading day, to $80.31 per share on adverse and unexpected news about excessive research and development expenses, and the possibility that there would be no earnings growth in the 2008 fiscal year.  The Merger deal has been premised on Harman's purported dynamic future growth prospects.  Therefore, within two trading days, the Company's share price fell approximately $32 per share, or almost 30 percent, on extremely heavy trading volume.

5.      Throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company had breached the merger agreement with KKR and GSCP and thus placed the merger in serious doubt; (2) that the Company needed to sustain higher research and development ("R&D") costs primarily related to its automotive platform awards; (3) that the Company's inventory was greater than disclosed and was negatively impacting its cash flows; (4) that its relationship with Daimler-Chrysler had materially worsened; (5) that a material adverse change in Harman's business had occurred which related to capital spending; (6) that the Company's financial health had generally deteriorated; and (7) that, as a result of the foregoing, the Company's statements about its financial well-being, earnings, and future prospects were lacking in a reasonable basis when made.

6.      Before September 24, 2007, and from the commencement of the Class Period, defendants made neutral or positive statements about Harman's business and prospects and its R&D programs for new products, but revealed on September 24, 2007 for the first time that planned R&D spending associated with new products and product launches would impact Harman so severely going forward that it might not show any profit growth at all in its 2008 fiscal year, which ends June 30, 2008.

7.      Had these costs not been concealed at the time the Merger Agreement was entered, there would have been no Merger, or it would have been at a much lower price. This was so because, in part, a central component of the Merger was an offer to Harman shareholders the ability to trade some of all of their shares in Harman for shares in the new post-Merger company. The Purchasing Companies announced that they had specifically "structured the

transaction so that current Harman stockholders have the opportunity to participate in the future upside potential of the enterprise." The defendants herein knew, or recklessly disregarded, that burgeoning R&D costs inherent in developing and launching predicts in 2008 would hamper earnings growth. Defendant Dr. Harman, Harman's Chairman who controls Harman, had a strong personal motive to try to lock in a $120 million bid. Dr. Harman, now 89 years of age, holds over 3.5 million Harman shares directly and beneficially. The Merger would allow him to liquidate his shares in one fell swoop, and receive proceeds of $420 million.

8.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, Harman's principal place of business is located within this Judicial District.

12.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.    Plaintiff, Cheolan Kim, as set forth in the accompanying certification, incorporated by reference herein, purchased Harman's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

14.    Defendant Harman is a Delaware corporation with its principal executive offices located at 1101 Pennsylvania Avenue, N.W., Suite 1010, Washington, D.C. 20004.

15.    Defendant Dr. Sidney Harman ("Dr. Harman") was, at all relevant times, the Company's founder and Executive Chairman of the Board of Directors.  Dr. Harman also served as the Company's Chief Executive Officer ("CEO") from January 1, 2007 to June 30, 2007.

16.    Defendant Kevin Brown ("Brown") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer.

17.    Defendant Sandra B. Robinson ("Robinson") was, at all relevant times, the Company's Vice President of Financial Operations and Chief Accounting Officer.  Robinson also exercised and sold a significant amount of Harman stock options during the Class Period.

18.    Defendants Dr. Harman, Brown, and Robinson are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Harman's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or

cause them to be corrected.  Because of their positions and access to material non-public

information available to them, each of these defendants knew that the adverse facts specified

herein had not been disclosed to, and were being concealed from, the public, and that the positive

representations which were being made were then materially false and misleading.  The

Individual Defendants are liable for the false statements pleaded herein, as those statements were

each "group published" information, the result of the collective actions of the Individual

Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Harman claims to be a leading manufacturer of high-quality, high fidelity audio

products and electronic systems for the automotive, consumer and professional markets in the

Americas, Europe, and Asia.  The Company operates under the brands names Harman Kardon,

JBL, Revel, Mark Levinson, Infinity, Lexicon, Soundcraft-Studer, AKG, Becker, and QNX, and

is traded on the New York Stock Exchange under the Symbol:  HAR.

20.     Prior to and throughout the Class Period, Harman reported positive financial

results and projected earnings guidance based upon its strong financials.  The Company also

claimed that based on these strong financial results, the Purchasing Companies were going to

acquire all shares of the Company in a merger estimated at approximately $8 billion.

### Materially False and Misleading
### Statements Issued During the Class Period

21.     The Class Period begins on April 26, 2007.  On this day, the Company issued a

press release entitled "Harman International Industries To Be Acquired By KKR And GS Capital

Partners."  Therein, the Company, in relevant part, stated:

**Harman Stockholders Can Elect to Receive $120 Per Share In Cash or Shares in Post-Transaction Company**

**Transaction Valued at Approximately $8 Billion**

Harman International Industries, Inc. (NYSE: HAR) today announced that it has entered into an agreement to be acquired by affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners ("GSCP") in a transaction valued at approximately $8 billion. The transaction was unanimously approved by the Harman Board of Directors, following the recommendation of a Special Committee of independent directors. KKR initiated discussions with Harman and structured the transaction so that current Harman stockholders have the opportunity to participate in the future upside potential of the enterprise. The company will continue to be named Harman International Industries and Dr. Sidney Harman, Founder and Executive Chairman, will remain Executive Chairman.

\* \* \*

Under the terms of the agreement, Harman stockholders will be entitled to receive $120 in cash for each share of Harman common stock they hold. As an alternative to receiving the cash consideration, Harman's stockholders will be offered the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman stock for shares in the new corporation incorporated by KKR and GSCP in order to acquire Harman. The total amount of Harman shares that may elect to receive shares in the post-transaction corporation is approximately 8.3 million, which would represent $1.0 billion (at the $120 per share transaction value) and an approximate 27% equity stake in Harman following the transaction. If elections for post-transaction shares exceed the $1.0 billion cap, post-transaction shares will be allocated to electing stockholders on a pro-rated basis, and the remaining Harman shares will be exchanged for cash. The election process will be fully detailed in the proxy statement/prospectus that will be mailed to Harman stockholders.

Dr. Harman, who owns approximately 5% of the outstanding common stock of Harman, will participate in the same election process available to all stockholders. He has committed that he will elect to exchange half of his current holdings for post-transaction shares, subject to the same pro ration that applies to all stockholders as described above.

\* \* \*

Completion of the transaction, which is expected to occur in the third quarter of 2007, is subject to the approval of Harman stockholders, customary closing conditions and regulatory approvals. The Board of Directors of Harman has unanimously recommended that Harman stockholders vote in favor of the transaction.

22.     In commenting on the merger agreement with the Purchasing Companies in the same press release, Dr. Harman stated, in relevant part, that:

We are pleased to reach an agreement with KKR and GSCP that is in the best interest of our stockholders, presenting them with excellent value for their shares and the opportunity to participate in Harman's future growth. KKR and GSCP are two of the world's leading private equity investors and our Board of Directors strongly believes that this transaction will create attractive long-term opportunities for our employees, customers and business partners. Together, we will continue to execute our strategic plan, capitalize on new opportunities, and build on our history of product innovation and service excellence.

23.     On the same day, the Company held a conference call to discuss its third quarter 2007 results.  During the conference call, Dr. Harman stated, in part, the following:

First, a comment on the agreement we announced this morning, which merges Harman international into a new company To be financed by Kohlberg Kravis Roberts and Goldman Sachs. The new Company will carry the Harman International name. I will be its Executive Chairman and a substantial investor. We think very well of the deal.

It has been structured to provide shareholders with a substantial premium for their shares and, if they elect so, to retain a substantial portion of their investment in the Company going forward. The deal rewards our loyal shareholders, a substantial number of whom have been owners for many years, and it recognizes the dedication, hard work, and commitment of our people. Until we have moved the transaction through the SEC and other legal processes, we are constrained in what we can say. However, a few highlights may be helpful.

* * *

We begin the fourth quarter of the year and we look to fiscal '08

with a backlog of $14 billion. We continue to expect fiscal '08 Automotive OEM revenues at $2.8 billion and EPS of $5.25, subject to the probability that we will not be able to absorb the $46 million engineering bulge I identified in our previous earnings call. Let me remind that the bulge is driven by work on $1.1 billion of new business unanticipated when we first planned fiscal '08, and by continuing new work on Driver Assist. If we are unable to absorb the $46 million R&D bulge, the projected fiscal '08 EPS would become $4.79.

We have not received a major new award since our last earnings call, but there is a flow of good awards that add extra fiber to the backlog. Land Rover has committed its branded audio business to Harman Kardon for the period fiscal 2011 through 2015. The estimated annual revenue is $50 million, with total value of $250 million. This is business that we had coveted, but now has been formally awarded.

Permit me to offer a perspective going forward. Ours is a very healthy business, as we have a special place in both the automotive OEM and the professional sides of our work. But we have no conceit that this is a walk in the park. There are challenges as there are opportunities throughout the markets and throughout the technologies with which we work. Those opportunities include geographic expansion in Asia, and especially in China. They include a further expansion of Infotainment through midrange and entry-level automobiles. And they include the promising and challenging new arena of Driver Assist. We are hard at work in all three areas. We have made consequential progress in scaling our systems through the midrange and entry-level, and we are confident that our competitive and comparative advantage on the Infotainment side will serve us very well on the Driver Assist side.

* * *

As I look forward to our future in OEM, I see an interesting assembly of opportunity and challenge. I have already spoken about market opportunity. Here, I recognize and emphasize that recognition, that our growth has been accompanied by variances in efficiency. We are determined to rationalize our engineering and to reduce significantly the percentage of sales that R&D represents. I have spoken about this before. I mention it now not because I have some major new insight, but precisely to emphasize the fact that it is before us, that we have our work cut out, but we intend to get it done.

24.     In addition, in answering a question from an analyst, Dr. Harman made the

following remarks regarding the Company's R&D expenses:

> JEFF KESSLER: I guess the question that we have is around continuing to match R&D to the revenue structure, as you see it, given that you have programs in place that are obviously important and obviously have a lot of potential. But getting your hands around the expense levels relative to new programs, are there some -- you've mentioned one or two that are in line to produce over the next several years. <u>Is there anything that we should be aware of which is maybe going to change that R&D-to-revenue percentage, let's say, 18 months out or so?</u>

> SIDNEY HARMAN: Are you asking whether the percentage of revenue represented by R&D will increase or decrease?

> JEFF KESSLER: I'm asking, again, how are you going to get that decrease? In other words, where is the return on that R&D going to come from?

> SIDNEY HARMAN: I've got it. In two ways, really. <u>Understand first that the increase is, from our point of view, a very constructive thing</u>. The so-called bulge was generated by the receipt of awards that we did not contemplate when we were generating the plan and generating our guidance. The engineering represented in that bulge is essentially for the new BMW award and the development of Driver Assist, which we believe has very positive implications down the road. I have not yet answered your question, but I thought it useful to set that base.

> Now we believe -- and I have made this clear numbers of times -- we believe that in the growth of the Company and in the urgency of getting the job done in what was a substantially new world of technology, the primary objective was just that -- get it done and, in effect, damn the cost. We are still in that surge mood. I should be careful about the use of that word, I suppose. <u>But I am convinced, Kevin is convinced, our Board is convinced that over time -- and reasonable time -- we can rationalize that engineering so that as a percentage of sales -- and remind you, sales will be going up, so that if the engineering expense stayed fixed, the percentage would decline, so it moves us constructively in that direction -- but we believe that we can rationalize, generate efficiencies such as to permit us to improve that percentage by approximately 100 basis points a year over the next several years</u>.

25.     During the same conference call, defendant Brown stated, in part, the following:

Total Harman International R&D expenses in the third quarter were $90 million, or 10.2% of sales, compared to $74 million, or 9.2% of sales, in the same quarter of the prior year. As Sidney discussed, R&D is trending higher than we had anticipated as we work to develop new technologies and new programs. We expect fiscal 2007 R&D expenses to approximate 10% of full-year sales. In fiscal 2008, we anticipate R&D will begin to decrease as a percentage of sales. The increase in R&D explains $16 million of the $20 million increase in SG&A in the third quarter compared to the prior year. Despite the increase in R&D, total SG&A as a percent of sales remained relatively flat at 23% of sales in the quarter.

26.     On April 27, 2007, the Company filed a Form 8-K with the SEC providing additional guidance on the merger with the Purchasing Companies.  The Form 8-K was signed by Robinson and stated, in relevant part, the following:

On April 26, 2007, Harman International Industries, Incorporated, a Delaware corporation (the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement") with KHI Parent Inc., a Delaware corporation ("Parent"), and KHI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub").

The Merger Agreement provides for the merger of Merger Sub with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent. Merger Sub and Parent are affiliates of Kohlberg Kravis Roberts & Co., L.P. ("KKR") and GS Capital Partners ("GSCP", and together with KKR, the "Sponsors") formed by the Sponsors in order to acquire the Company.

* * *

The Board of Directors of the Company has unanimously determined that the Merger is in the best interests of the Company and its stockholders, and declared advisable, to enter into the Merger Agreement, approved the Merger Agreement and resolved to recommend adoption of the Merger Agreement by Company stockholders.

* * *

The closing of the Merger is subject to customary closing conditions, including adoption of the Merger Agreement by the

Company's stockholders and antitrust clearance. Closing is not subject to any financing condition but the closing may be delayed in certain circumstances to facilitate financing. The merger is expected to be completed in the third calendar quarter of 2007.

\* \* \*

The Company has made customary representations and warranties in the Merger Agreement and agreed to customary covenants, including covenants regarding operation of the business of the Company and its subsidiaries prior to the closing.

\* \* \*

The Merger Agreement has been included to provide investors and security holders with information regarding its terms. It is not intended to provide any other factual information about the Company, Parent, or their respective subsidiaries and affiliates. The Merger Agreement contains representations and warranties by the Company, on the one hand, and by Parent and Merger Sub, on the other hand, made solely for the benefit of the other. The assertions embodied in those representations and warranties are qualified by information in confidential disclosure schedules that the parties have exchanged in connection with signing the Merger Agreement. The disclosure letter delivered to Parent in connection with the Merger Agreement contain information that modifies, qualifies and creates exceptions to the representations and warranties set forth in the Merger Agreement. Moreover, certain representations and warranties in the Merger Agreement were made as of a specified date, may be subject to a contractual standard of materiality different from what might be viewed as material to stockholders, or may have been used for the purpose of allocating risk between the Company, on the one hand, and Parent and Merger Sub, on the other hand. Accordingly, the representations and warranties in the Merger Agreement should not be relied on by any persons as characterizations of the actual state of facts about the Company, Parent or Merger Sub at the time they were made or otherwise.

27.    On August 24, 2007, the Company held a conference call to discuss its fourth quarter 2007 financial results.  During the conference call, Dr. Harman stated, in part, the following:

Our dominance in the automotive space was solidified through the past year, where we had earlier confronted doubt about our ability

to move effectively beyond the luxury car market for our infotainment systems. That doubt has been erased. With earlier awards to us from PSA, Audi and Chrysler, we established our leadership in the mid-range and entry levels, with last year's major awards from BMW, we erased any remaining questions. We are moving from an era in which each new infotainment system represented a virtually original effort with all new R&D to a new era in which the major automotive makers are committing to a common electronics platform, applicable across the full range of car lines. That growing set of decisions represents a dramatic shift from the traditional emphasis by automakers on multiple suppliers, to a readiness to commit across the board to a single supplier. That dramatic decision is driven overwhelmingly by new technology, and by the advantages in cost and performance available from a common scalable electronics platform.

Moving into fiscal 2008, our position is further enhanced by our developing technology partnership with Intel and the exclusive opportunity it provides us to employ Intel's powerful new mobile processor in our new designs. Implicit in that application is greater speed, significant improvement in graphic realization, and impressively useful extension of our functionality. We believe that we are in a unique position to move quickly and impressively to build our order book for the second decade of the 21st century.

28.    During the same conference call, Dinesh Paliwal, the Company's Chief Executive

Officer and President, stated, in part, the following:

During the past few weeks, I visited several key Harman business locations, and met with several hundred employees in Europe and North America. Although it is still relatively early to form opinions, several positive aspects of this company, which were the basis of my decision to join Harman, have been validated. I'm excited -- actually, I'm excited about the opportunities in the premium automotive and professional sectors of our business. I'm equally excited about the growth rates and the growing market size of the midmarket segments in the developed world, and emerging markets in eastern Europe and so-called BRIC-- Brazil, Russia, India, and China countries.

Harman is a potent global brand and I'm determined to penetrate these markets. I feel pretty strongly about it. Our product portfolio is robust and our R&D in close collaboration with leading customers will keep us ahead of competition. Converting these opportunities into profitable business will require a strong

13

management team and peer accountability at all levels.

29.     On August 29, 2007, the Company filed its year end 10-K with the SEC. The 10-K was signed by the Individual Defendants and stated, in relevant part, the following:

> On April 26, 2007, we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP. The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent. KHI Merger Sub and Parent were formed to acquire our company.
>
> If the merger agreement is adopted by our stockholders and the merger is completed, our stockholders will be entitled to receive $120.00 in cash, without interest, for each share of Harman common stock owned at the completion of the merger. As an alternative to receiving the $120.00 per share, our stockholders have the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman common stock, on a one-for-one basis, for shares of common stock of Parent. The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders. However, the number of Parent shares our stockholders and option holders will receive may be less than they request in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock. This number of Parent shares represents approximately 27% of the equity interests in Parent that will be outstanding immediately following the merger based on the expected equity financing for the merger. If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis and the remaining Harman shares and options will be converted into cash.
>
> Our Board of Directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, our company and our stockholders and resolved to recommend that our stockholders vote in favor of the adoption of the merger agreement.
>
>  Completion of the merger is subject to the approval of our stockholders and other customary closing conditions, including

regulatory approvals and antitrust clearances.   We presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007.

* * *

Selling, general and administrative ("SG&A") expenses as a percent of net sales were 23.2 percent in fiscal 2007 compared to 23.3 percent in the prior year.   Research and Development ("R&D") costs are the largest component of our SG&A expenses. In fiscal 2007, R&D costs were $356.7 million or 10.0 percent of net sales.   In fiscal 2006, R&D costs were $302.0 million, or 9.3 percent of net sales.   The increase was primarily due to costs incurred to support new infotainment system awards from automotive customers. We expect R&D costs, as a percentage of net sales, to decrease approximately 1 percentage point in fiscal 2008 due to the increasing scalability of our infotainment systems and the beginning of production for certain automotive programs. SG&A expenses also include employee compensation and benefit costs.   We have recorded stock-based compensation expense under the fair value based method since fiscal 2003, including $15.4 million, $16.6 million and $14.3 million in fiscal 2007, 2006 and 2005, respectively.

* * *

Automotive – Automotive R&D costs were $286.5 million in fiscal 2007, representing 11.5 percent of net sales.   Fiscal 2006 R&D costs were $232.2 million, or 10.4 percent of net sales.   These costs were incurred to develop audio, electronic and infotainment systems for an expanding list of automotive platforms.   Our infotainment systems are increasingly based on scalable software allowing us to efficiently design systems for luxury, mid-range and entry-level vehicles.   During fiscal 2007, we received a major infotainment systems award from BMW that will encompass virtually their entire model range.   This sophisticated system will include HD and satellite radio capabilities, second and third dimensional navigation, traffic information, voice recognition, Internet browser and wireless connectivity.   We also develop various systems for Mercedes-Benz, Audi, PSA Peugeot Citroën and Porsche in Europe.   In the United States and Asia, we develop audio systems for Toyota, Lexus, Hyundai, Chrysler and Harley-Davidson.   Automotive SG&A expenses also include restructuring costs of $5.7 million in fiscal 2007 and $7.3 million in fiscal 2006.

30.    In addition to being signed by the Individual Defendants, the Company's Form 10-K was also certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by Dr. Harman.


**The Truth Begins to Emerge**

31.    On September 21, 2007, the Company issued a press release entitled "Harman Comments On Previously Announced Merger."  The press release stated, in part, the following:

> Harman International Industries, Incorporated (NYSE: HAR) announced that it was informed this afternoon that Kohlberg Kravis Roberts & Co. L.P. (KKR) and GS Capital Partners VI Fund, L.P. (GSCP) no longer intend to complete the previously announced acquisition of Harman by a company formed by investment funds affiliated with or sponsored by KKR and GSCP. KKR and GSCP have informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger.  Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement.

32.    On this news, shares of the Company's stock fell from an opening price of $97.70 on September 21, 2007 to close at $85.00 the same day.  Thus, the Company's share price fell more than 12 percent.

33.    On the same day, an article published by Reuters stated, in part, the following regarding the failed merger between Harman and the Purchasing Companies

> Kohlberg Kravis Roberts & Co LP and Goldman Sachs Group Inc.'s (GS.N: Quote, Profile, Research) private equity arm are worried about certain financial conditions inside Harman International Industries Inc (HAR.N: Quote, Profile, Research), concerns that could threaten the $8 billion deal, a source said on Friday.
>
> The concerns stemmed less from broad credit market worries and more from internal conditions within the company, said the source, who is familiar with the matter but did not want to be identified.

34.    On the same day, Reuters issued another press release stating, in part, that:

> Trade in shares of audio equipment maker Harman International Inc (HAR.N: Quote, Profile, Research) was suspended on Friday, pending news from the company.
>
> The company is the target of an $8 billion takeover, but a source familiar with the matter said the buyers are worried about the company's financial conditions.

35.    Later on the same day, Reuters issued yet another article regarding the merger and, this time, gave additional details regarding the pullout.  The article states, in part, the following:

> NEW YORK (Reuters) - Harman International Industries Inc (NYSE:HAR - News) said its private equity buyers are pulling out of their $8 billion buyout deal, a severe blow to the company whose shares fell more than 25 percent on Friday.
>
> * * *
>
> But the Harman bail-out looks centered on the financial conditions of the company itself, not the lending agreement, and marks the first time in a two-year private equity acquisition frenzy that buyers walked out of a major deal.
>
> Merger arbitrage traders and an analyst said among the hurdles Harman faced was rising inventories and declining cash flows and sales in the last few quarters. Traders also said questions surfaced recently about Harman's relationship with Daimler-Chrysler, a customer for its audio products.
>
> * * *
>
> One analyst said Harman's inventories in February were up 40 percent, while second-half sales expectations were for an 11 percent rise.
>
> "When you've got inventories going through the roof, cash flows are going to get hit," said Alisa Guyer Galperin, an analyst covering Harman at independent research firm RiskMetrics Group.
>
> The merger proxy does have language in it on pertaining the deal being threatened in the event of certain "material adverse" effects on Harman.

<u>"The company either has to slow production, reduce prices, or
have inventories remain at elevated levels, and that deteriorates
your cash flow model,"</u> Galperin said, adding that personal
navigation devices for cars were among the items sitting in the
inventory.

<u>Traders said on Friday that a great deal of attention was being paid
to a filing showing that sales to DaimlerChrysler accounted for 25
percent of Harman's total consolidated net sales for the fiscal year
ended June 30, 2007. Cerberus Capital recently bought Chrysler
from Daimler</u>.

While Harman says in the filing that loss of sales to the customer
would have a "material adverse effect" on sales, there is no public
indication that the relationship is in jeopardy.

Harman founder Sidney Harman owned about 5 percent of the
company's stock at the time of the deal and committed to exchange
half of his holdings for stub equity.

36.    Similarly, on the same day, a Forbes article stated, in part, the following regarding

the failed merger:

### KKR and Goldman Dump Harman

Harman, it's not us, it's you. This is what the audio-manufacturing
firm claims it just heard from would-be buyers KKR and Goldman
Sachs when they backed out a deal Friday to buy the firm. Harman
then told the world the news, just slightly ahead of the closing bell
at the New York Stock Exchange.

\* \* \*

Although the exact reason for the drawback is not known yet,
Harman's fourth quarter and full year results did fall short of Wall
Street's expectations. In the fourth quarter Wall Street expected
earnings of $1.24 and Harman yielded 98 cents. Full year of fiscal
2007 Wall Street requested $4.38 and Harman yielded $4.14.

<u>According to the Associated Press, one anonymous insider said the
private equity firms sought to squash the deal over questions about
Harman's financial health, not because of any financing difficulties
in a tight credit market. The person said the effort to back out is
sincere, and not a negotiating tactic</u>.

Prior to the release, the NYSE had contacted Harman regarding its

price drop, and requested it release information pertaining to the drop.

After the company declined the NYSE then released its own report that Harman had denied its request. Shortly after its denial, Harman changed course and told the NYSE it would make a press release. In accordance with regulation, the exchange halted the stock from trading.

37.    Then, on September 24, 2007, the Company issued a press release entitled,

"Harman Provides Guidance For Fiscal 2008."  The press release stated, in part, the following:

> The Company expects fiscal 2008 performance to be impacted by a number of factors including increased R&D to support the development of several new infotainment platforms and associated launch costs.  We now expect fiscal 2008 sales to reach $4.1 billion ($3.55 billion in 2007). The Company expects operating income and diluted EPS before merger related costs to equal or exceed last year's record performance.  In 2007, operating income was $397 million and diluted EPS were $4.14 adjusted for non-recurring restructuring charges, merger costs and tax items.
>
> For the quarter ending September 30, 2007 we estimate net sales of $950 million, operating profit of $40 million and diluted EPS of $0.50 before merger-related costs.  As previously disclosed, the fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards.  We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs and begin the launching of new infotainment platforms."
>
>  "In light of increases in material costs and faster ramp-up of R&D resources to work on new business awards, equaling the record operating performance of fiscal 2007 is an achievement. The benefits of common platform synergy and scalability will be realized in fiscal 2009 and beyond. Those benefits will strengthen our operating profits," said Paliwal.

38.    On this news, shares of the Company's stock fell to $80.31 on extremely high

volume of over 14.5 million shares.

39.    Therefore, within two trading days, the Company's share price fell approximately

$32 per share, or almost 30 percent, on extremely heavy trading volume.

40.    Thus, based on the foregoing, during the Class Period, defendants misrepresented and/or failed to disclose:  (1) that the Company had breached the merger agreement with KKR and GSCP and therefore placed the Merger in serious doubt; (2) that the Company needed to sustain higher research and development ("R&D") costs primarily related to its automotive platform awards; (3) that the Company's inventory was greater than disclosed and was negatively impacting its cash flows; (4) that its relationship with Daimler-Chrysler had materially worsened; (5) that a material adverse change in Harman's business had occurred which related to capital spending; (6) that the Company's financial health had generally deteriorated; and (7) that, as a result of the foregoing, the Company's statements about its financial well-being, earnings, and future prospects were lacking in a reasonable basis when made.

## **Post Class Period Developments**

41.    On September 25, 2007, *The Wall Street Journal* published an article entitled "Harman Blames Increased Expenses For Expected 1st-Quarter Earnings Miss."  The articles states, in part, the following:

> Harman International Industries Inc., whose planned $8 billion buyout collapsed Friday, said its fiscal first-quarter earnings will fall below Wall Street's expectations amid increased research and development spending.
>
> The Washington company, which builds audio components for home stereos and automobiles, forecast earnings of 50 cents a share, before merger-related costs, for the quarter ending Sept. 30 and sales of $950 million. The average estimate of analysts surveyed by Thomson Financial were for earnings, excluding items, of $1.02 a share on revenue of $934.4 million.
>
> Late Friday, Kohlberg Kravis Roberts & Co. and Goldman Sachs Group Inc.'s equity arm walked away from their planned $8 billion leveraged buyout of Harman, saying they found financial conditions inside the stereo maker to be unacceptable.

The buyers also said Harman might have tripped certain covenants in the parties' merger agreement <u>related to capital spending</u>, said one person familiar with the matter.

"The fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards," said Harman Chief Executive Dinesh Paliwal. "We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs" and launch new products.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Harman between April 26, 2007 and September 24, 2007, inclusive and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

43.      The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Harman's common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Harman or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Harman; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

48.     The market for Harman's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Harman's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Harman's common stock relying upon the integrity of the market price of Harman's common stock and market information relating to Harman, and have been damaged thereby.

49.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Harman's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

50.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Harman's financial well-being and prospects.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Harman and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

51.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

52.    During the Class Period, Plaintiff and the Class purchased common stock of Harman at artificially inflated prices and were damaged thereby.  The price of Harman's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

53.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Harman, their control over, and/or receipt and/or modification of Harman's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Harman, participated in the fraudulent scheme alleged herein.

54.    Additionally, during the Class Period, and with shares of the Company's stock trading at artificially inflated prices, defendant Robinson, a high level Company insider, exercised and sold a significant amount of Company stock.

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

55.     At all relevant times, the market for Harman's common stock was an efficient market for the following reasons, among others:

(a)     Harman's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Harman filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     Harman regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Harman was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

56.     As a result of the foregoing, the market for Harman's common stock promptly digested current information regarding Harman from all publicly-available sources and reflected such information in Harman's stock price.  Under these circumstances, all purchasers of Harman's common stock during the Class Period suffered similar injury through their purchase of Harman's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Harman who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Harman's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

60.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Harman's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Harman's financial well-being, business relationships, and prospects, as specified herein.

62.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Harman's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Harman and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Harman's common stock during the Class Period.

63.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

64.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Harman's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Harman's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Harman's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Harman's common stock during the Class Period at artificially high prices and were damaged thereby.

66.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Harman was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Harman common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

67.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

69.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.    The Individual Defendants acted as controlling persons of Harman within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.    As set forth above, Harman and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

 (a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

 (b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

 (c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

 (d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 1, 2007

Respectfully submitted,

COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.

By: _____

Steven J. Toll (DC Bar #225623)
Daniel S. Sommers (DC Bar #416549)
Jason M. Leviton (DC Bar #495460)
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
            *and*
Lynda J. Grant
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Laurence D. Paskowitz, Esq.
**PASKOWITZ & ASSOCIATES**
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 685-0969
Facsimile: (212) 685-2306

Roy L. Jacobs, Esq.
**ROY JACOBS & ASSOCIATES**
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 867-1156
Facsimile: (212) 504-8343

**Attorneys for Plaintiff**

## PLAINTIFF'S CERTIFICATE

*CHEOLAN KIM* ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint of Harman International Industries Inc. and certain other defendants.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5.    Plaintiff made the following transactions during the Class Period (April 26, 2007 through September 21, 2007) in the common shares of Harman International

| Purchases | | |
|---|---|---|
| **Date(s)** | **Number of Shares** | **Price** |
| (see attached) | | |
| | | |
| | | |
| | | |
| | | |

| Sales | | |
|---|---|---|
| **Date(s)** | **Number of Shares** | **Price** |
| | | |
| | | |
| | | |
| | | |
| | | |

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.    I declare under penalty of perjury, this *28* day of September, 2007 that the information above is accurate.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 09/21/07 8:41:34 AM | STOCK | BUY | +200.0 | HAR | STOCK | $97.75 | $97.75 |
| 09/21/07 8:41:32 AM | STOCK | BUY | +100.0 | HAR | STOCK | $97.75 | $97.75 |
| 09/21/07 8:41:32 AM | STOCK | BUY | +300.0 | HAR | STOCK | $97.75 | $97.75 |
| 09/21/07 8:36:06 AM | STOCK | SELL | -200.0 | HAR | STOCK | $98.00 | $98.00 |
| 09/21/07 8:36:05 AM | STOCK | SELL | -300.0 | HAR | STOCK | $98.00 | $98.00 |
| 09/21/07 8:36:05 AM | STOCK | SELL | -400.0 | HAR | STOCK | $98.00 | $98.00 |
| 09/21/07 8:36:05 AM | STOCK | SELL | -200.0 | HAR | STOCK | $98.00 | $98.00 |
| 09/21/07 8:36:05 AM | STOCK | SELL | -1000.0 | HAR | STOCK | $98.00 | $98.00 |
| 09/21/07 8:36:05 AM | STOCK | SELL | -1000.0 | HAR | STOCK | $98.00 | $98.00 |
| 09/21/07 8:34:06 AM | STOCK | SELL | -100.0 | HAR | STOCK | $98.00 | $98.00 |
| 09/21/07 8:34:04 AM | STOCK | SELL | -300.0 | HAR | STOCK | $98.00 | $98.00 |

| Date/Time | Type | | Action | Quantity | Symbol | | Type | Price | Price |
|---|---|---|---|---|---|---|---|---|---|
| 09/21/07 10:47:31 AM | STOCK | | BUY | +100.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +3200.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +100.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +200.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +100.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +100.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +100.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +100.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:47:31 AM | STOCK | | BUY | +200.0 | HAR | | STOCK | $90.50 | $90.50 |
| 09/21/07 10:31:16 AM | STOCK | | SELL | -4500.0 | HAR | | STOCK | $90.94 | $90.94 |
| 09/21/07 10:20:22 AM | STOCK | | BUY | +500.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 10:20:22 AM | STOCK | | BUY | +400.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 10:20:22 AM | STOCK | | BUY | +700.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 10:20:22 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 10:20:22 AM | STOCK | | BUY | +200.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 10:20:22 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 10:20:22 AM | STOCK | | BUY | +800.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 10:20:22 AM | STOCK | | BUY | +1200.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 10:05:47 AM | STOCK | | SELL | -100.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 10:05:47 AM | STOCK | | SELL | -600.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 10:05:46 AM | STOCK | | SELL | -400.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 10:05:44 AM | STOCK | | SELL | -2000.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 10:05:39 AM | STOCK | | SELL | -1300.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +188.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +200.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +200.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +400.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +800.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +100.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +500.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:26 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:25 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:25 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:58:24 AM | STOCK | | BUY | +162.0 | HAR | | STOCK | $94.75 | $94.75 |
| 09/21/07 9:47:18 AM | STOCK | | SELL | -450.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:47:18 AM | STOCK | | SELL | -200.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:47:18 AM | STOCK | | SELL | -200.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:47:18 AM | STOCK | | SELL | -100.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:47:18 AM | STOCK | | SELL | -1100.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:47:18 AM | STOCK | | SELL | -1000.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:47:18 AM | STOCK | | SELL | -1100.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:47:18 AM | STOCK | | SELL | -200.0 | HAR | | STOCK | $95.00 | $95.00 |
| 09/21/07 9:18:32 AM | STOCK | | BUY | +41.0 | BSC | | STOCK | $115.75 | $115.75 |
| 09/21/07 9:18:30 AM | STOCK | | BUY | +300.0 | BSC | | STOCK | $115.75 | $115.75 |
| 09/21/07 8:45:15 AM | STOCK | | BUY | +400.0 | HAR | | STOCK | $97.75 | $97.75 |
| 09/21/07 8:45:15 AM | STOCK | | BUY | +400.0 | HAR | | STOCK | $97.75 | $97.75 |
| 09/21/07 8:45:15 AM | STOCK | | BUY | +500.0 | HAR | | STOCK | $97.75 | $97.75 |
| 09/21/07 8:45:14 AM | STOCK | | BUY | +300.0 | HAR | | STOCK | $97.75 | $97.75 |
| 09/21/07 8:45:14 AM | STOCK | | BUY | +200.0 | HAR | | STOCK | $97.75 | $97.75 |
| 09/21/07 8:45:14 AM | STOCK | | BUY | +700.0 | HAR | | STOCK | $97.75 | $97.75 |
| 09/21/07 8:45:13 AM | STOCK | | BUY | +400.0 | HAR | | STOCK | $97.75 | $97.75 |

## ⌄ TRADE HISTORY

| EXEC TIME | SPREAD | SIDE | QTY | SYMBOL | SPC | EXP | STRIKE | TYPE | PRICE | NET PRICE |
|---|---|---|---|---|---|---|---|---|---|---|
| 09/24/07 2:10:09 PM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $80.00 | $80.00 |
| 09/24/07 2:10:09 PM | STOCK | SELL | -600.0 | HAR | | | | STOCK | $80.00 | $80.00 |
| 09/24/07 1:32:41 PM | STOCK | SELL | -400.0 | HAR | | | | STOCK | $80.50 | $80.50 |
| 09/24/07 1:32:38 PM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $80.50 | $80.50 |
| 09/24/07 1:32:30 PM | STOCK | SELL | -200.0 | HAR | | | | STOCK | $80.50 | $80.50 |
| 09/24/07 1:29:59 PM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $80.50 | $80.50 |
| 09/24/07 1:29:59 PM | STOCK | SELL | -200.0 | HAR | | | | STOCK | $80.50 | $80.50 |
| 09/24/07 8:17:32 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $76.15 | $76.15 |
| 09/24/07 8:17:32 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $76.15 | $76.15 |
| 09/24/07 8:17:31 AM | STOCK | SELL | -600.0 | HAR | | | | STOCK | $76.15 | $76.15 |
| 09/24/07 8:17:31 AM | STOCK | SELL | -200.0 | HAR | | | | STOCK | $76.15 | $76.15 |
| 09/21/07 11:47:15 AM | STOCK | BUY | +3175.0 | HAR | | | | STOCK | $89.50 | $89.50 |
| 09/21/07 11:47:15 AM | STOCK | BUY | +500.0 | HAR | | | | STOCK | $89.50 | $89.50 |
| 09/21/07 11:47:15 AM | STOCK | BUY | +200.0 | HAR | | | | STOCK | $89.50 | $89.50 |
| 09/21/07 11:47:15 AM | STOCK | BUY | +125.0 | HAR | | | | STOCK | $89.50 | $89.50 |
| 09/21/07 11:47:13 AM | STOCK | BUY | +200.0 | HAR | | | | STOCK | $89.50 | $89.50 |
| 09/21/07 11:34:54 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.06 | $90.06 |
| 09/21/07 11:34:53 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.06 | $90.06 |
| 09/21/07 11:34:52 AM | STOCK | SELL | -200.0 | HAR | | | | STOCK | $90.06 | $90.06 |
| 09/21/07 11:34:51 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.08 | $90.08 |
| 09/21/07 11:34:51 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.08 | $90.08 |
| 09/21/07 11:34:51 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.08 | $90.08 |
| 09/21/07 11:34:51 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.03 | $90.03 |
| 09/21/07 11:34:51 AM | STOCK | SELL | -3050.0 | HAR | | | | STOCK | $90.06 | $90.06 |
| 09/21/07 11:34:51 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.04 | $90.04 |
| 09/21/07 11:34:51 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.04 | $90.04 |
| 09/21/07 11:34:50 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.04 | $90.04 |
| 09/21/07 11:34:50 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.04 | $90.04 |
| 09/21/07 11:34:50 AM | STOCK | SELL | -300.0 | HAR | | | | STOCK | $90.05 | $90.05 |
| 09/21/07 11:34:50 AM | STOCK | SELL | -100.0 | HAR | | | | STOCK | $90.05 | $90.05 |
| 09/21/07 11:31:50 AM | STOCK | BUY | +2250.0 | HAR | | | | STOCK | $89.70 | $89.70 |
| 09/21/07 11:31:50 AM | STOCK | BUY | +300.0 | HAR | | | | STOCK | $89.70 | $89.70 |
| 09/21/07 11:31:50 AM | STOCK | BUY | +1000.0 | HAR | | | | STOCK | $89.70 | $89.70 |
| 09/21/07 11:31:50 AM | STOCK | BUY | +300.0 | HAR | | | | STOCK | $89.70 | $89.70 |
| 09/21/07 11:06:49 AM | STOCK | BUY | +700.0 | HAR | | | | STOCK | $91.50 | $91.50 |
| 09/21/07 11:06:47 AM | STOCK | BUY | +100.0 | HAR | | | | STOCK | $91.50 | $91.50 |

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| | |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>**(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>**(IN U.S. PLAINTIFF CASES ONLY)**<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
### (PLACE AN x IN ONE BOX ONLY)

1  U.S. Government
Plaintiff

2 U.S. Government
Defendant

3  Federal Question
(U.S. Government Not a Party)

4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place<br>of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place<br>of Business in Another State | 5 | 5 |
| Citizen or Subject of a<br>Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
### (Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| A. *Antitrust* | B. *Personal Injury/ Malpractice* | C. *Administrative Agency Review* | D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | **310 Airplane**<br>**315 Airplane Product Liability**<br>**320 Assault, Libel & Slander**<br>**330 Federal Employers Liability**<br>**340 Marine**<br>**345 Marine Product Liability**<br>**350 Motor Vehicle**<br>**355 Motor Vehicle Product Liability**<br>**360 Other Personal Injury**<br>**362 Medical Malpractice**<br>**365 Product Liability**<br>**368 Asbestos Product Liability** | **151 Medicare Act**<br><br>Social Security:<br>**861 HIA ((1395ff)**<br>**862 Black Lung (923)**<br>**863 DIWC/DIWW (405(g)**<br>**864 SSID Title XVI**<br>**865 RSI (405(g)**<br>Other Statutes<br>**891 Agricultural Acts**<br>**892 Economic Stabilization Act**<br>**893 Environmental Matters**<br>**894 Energy Allocation Act**<br>**890 Other Statutory Actions (If<br>Administrative Agency is Involved)** | **Any nature of suit from any category may be selected for this category of case assignment.**<br><br>**\*(If Antitrust, then A governs)\*** |

## E. *General Civil (Other)*          OR          F. *Pro Se General Civil*

| Real Property | Bankruptcy | Forfeiture/Penalty | 470 Racketeer Influenced & |
|---|---|---|---|
| **210 Land Condemnation**<br>**220 Foreclosure**<br>**230 Rent, Lease & Ejectment**<br>**240 Torts to Land**<br>**245 Tort Product Liability**<br>**290 All Other Real Property**<br><br>Personal Property<br>**370 Other Fraud**<br>**371 Truth in Lending**<br>**380 Other Personal Property Damage**<br>**385 Property Damage Product Liability** | **422 Appeal 28 USC 158**<br>**423 Withdrawal 28 USC 157**<br><br>Prisoner Petitions<br>**535 Death Penalty**<br>**540 Mandamus & Other**<br>**550 Civil Rights**<br>**555 Prison Condition**<br><br>Property Rights<br>**820 Copyrights**<br>**830 Patent**<br>**840 Trademark**<br><br>Federal Tax Suits<br>**870 Taxes (US plaintiff or<br>defendant**<br>**871 IRS-Third Party 26<br>USC 7609** | **610 Agriculture**<br>**620 Other Food &Drug**<br>**625 Drug Related Seizure<br>of Property 21 USC 881**<br>**630 Liquor Laws**<br>**640 RR & Truck**<br>**650 Airline Regs**<br>**660 Occupational<br>Safety/Health**<br>**690 Other**<br><br>Other Statutes<br>**400 State Reapportionment**<br>**430 Banks & Banking**<br>**450 Commerce/ICC<br>Rates/etc.**<br>**460 Deportation** | Corrupt Organizations<br>**480 Consumer Credit**<br>**490 Cable/Satellite TV**<br>**810 Selective Service**<br>**850 Securities/Commodities/<br>Exchange**<br>**875 Customer Challenge 12 USC<br>3410**<br>**900 Appeal of fee determination<br>under equal access to Justice**<br>**950 Constitutionality of State<br>Statutes**<br>**890 Other Statutory Actions (if<br>not administrative agency<br>review or Privacy Act** |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

15 U.S.C. §§ 78j(b) and 78t(a)

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ <br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☒  NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE  October 1, 2007    SIGNATURE OF ATTORNEY OF RECORD  _(signature)_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.