## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHEOLAN KIM, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | **CIVIL ACTION NO.1-07-cv-1757-RWR** |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | FIRST AMENDED CLASS ACTION COMPLAINT |
| HARMAN INTERNATIONAL INDUSTRIES INC., DR. SIDNEY HARMAN, KEVIN BROWN, and SANDRA B. ROBINSON, | ) ) ) ) | |
| Defendants. | ) ) ) ) ) | **JURY TRIAL DEMANDED** |

Plaintiff, Cheolan Kim ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Harman International Industries, Inc. ("Harman" or the "Company"), securities analysts' reports and advisories about the Company and information readily available on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the common stock of Harman between April 26, 2007 and January 11, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Harman claims to be a leading manufacturer of high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets in the Americas, Europe, and Asia.  The Company operates under the brands names Harman Kardon, JBL, Revel, Mark Levinson, Infinity, Lexicon, Soundcraft-Studer, AKG, Becker, and QNX, and is traded on the New York Stock Exchange under the Symbol:  HAR.

3.      On September 21, 2007, the Company shocked investors when it announced that its previously highly touted merger with a company formed by investment funds affiliated or sponsored by Kohlberg Kravis  Roberts & Co. L.P. ("KKR") and GS Capital Partners VI Fund, L.P. ("GSCP") (KKR and GSCP are collectively referred to as the "Purchasing Companies" herein) – valued at approximately eight billion dollars ($8,000,000,000) – was no longer going to be completed and had been abandoned by the Purchasing Companies.  According to the Company, the Purchasing Companies "informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger."

4.      On this news, shares of the Company's stock fell from the previous day's closing price of $112.34 to a September 21, 2007 close of $85.00, a drop of $27.34.  Moreover, the Company's share price continued to fall and closed on September 24, 2007, the next trading day, to $80.31 per share on adverse and unexpected news about excessive research and development expenses, and the possibility that there would be no earnings growth in the 2008 fiscal year.  The Merger deal had been premised on Harman's purported dynamic future growth prospects.  Therefore, within two trading days, the Company's share price fell approximately $32 per share, or almost 30 percent, on extremely heavy trading volume.

5.      On January 14, 2008, prior to the market's open, Harman again shocked investors when it finally significantly reduced its previously-announced guidance and lowered projected earnings per share for fiscal 2008 to between $3.00 and $3.10 per share.  The Company's change in guidance was attributed to pricing pressures from a "major shift" in the market for portable navigation devices ("PNDs").  Harman's stock dropped precipitously from the prior trading day's, January 11, 2008, close of $68.97 to close at $43.00 per share, which constituted a 37.65% drop and a four-year low.  Since Sept. 20, Harman's stock has fallen 62%, from $112.25.

6.      Before their partial disclosure on September 24, 2007, and from the commencement of the Class Period, defendants made neutral or positive statements about Harman's business and prospects and its R&D programs for new products and its PNDs, but revealed on September 24, 2007 for the first time that planned R&D spending associated with new products and product launches would impact Harman so severely going forward that it might not show any profit growth at all in its 2008 fiscal year, which ends June 30, 2008. Notwithstanding the Company's revised guidance and R&D disclosures, on September 24, 2007, and throughout the Class Period, the Company failed to reveal significant problems relating to its PND sales forecasts, production, pricing and inventory.

7.      Had these R&D costs and pricing and other problems with PNDs not been concealed at the time the Merger Agreement was entered, there would have been no Merger, or it would have been at a much lower price.  This was so because, in part, a central component of the Merger was an offer to Harman shareholders the ability to trade some of all of their shares in Harman for shares in the new post-Merger company. The Purchasing Companies announced that they had specifically "structured the transaction so that current Harman stockholders have the opportunity to participate in the future upside potential of the enterprise." The defendants herein

knew, or recklessly disregarded, that burgeoning R&D costs inherent in developing and launching products in 2008 would hamper earnings growth. In addition, they also knew or recklessly disregarded that delays in production and extensive pricing pressure and decreased margins on the PNDs and other products that they were selling would dramatically impact fiscal 2008 earnings. Defendant Dr. Harman, Harman's Chairman who controls Harman, had a strong personal motive to try to lock in a $120 million bid. Dr. Harman, now 89 years of age, holds over 3.5 million Harman shares directly and beneficially. The Merger would allow him to liquidate his shares in one fell swoop, and receive proceeds of $420 million.

8.    Harman and the other defendants denied in late September 2007 that a material adverse change in Harman's business has occurred, or that Harman had breached the merger agreement. Providing reduced but upbeat guidance for fiscal 2008, Harman projected operating profits and earnings per share to be equal or better than fiscal 2007 results of $397 million and $4.14, respectively, and emphasized and attributed its bulging R&D costs to unanticipated new business awards. Harman also claimed that increases in material costs and ramped-up R&D resources paved the way for strengthened operating profits in addition to new infotainment platforms and substantial margin improvements in fiscal 2008. The Company specifically denied any loss of business and announced seven infotainment initiatives for fiscal 2008.

9.    Defendants also projected a 15% increase in sales for first quarter of fiscal 2008 in its automotive division as a result of growth and expansion of its PND business in Europe. But defendants knew and failed to disclose that sales had lagged well behind projections for fiscal 2007 after a significant delay in production; that inventories of PND devices had soared; and that pricing of the PND units had to be lowered well below initial forecasted prices because of increased pressure from PND competitors.

10.     After the proposed merger collapsed, KKR and GSCP terminated and settled the merger deal by infusing $400 million in capital into Harman.  Speaking on behalf of the Company, Dr. Harman stated that although he disagreed with the reasons for the termination of the merger agreement, the $400 million investment was viewed as a vote of confidence in Harman's business and its prospects for continued growth.  Dr. Harman and other defendants remained silent about the true nature of any material adverse change in the Company's business or prospects.

11.     On October 25, 2007, Harman reported results for first fiscal quarter of 2008, which ended September 30, 2007.  The Company reported a fifteen percent increase in sales for the same period the prior year, resulting from strong sales from the "ramp up" of an infotainment system for Chrysler and "robust sales" of the Company's portable navigation devices in Europe.

12.     In stark contrast to their positive October 2007 comments regarding the Company's PND sales, and their disingenuous denial of any material adverse change in Harman's business, Defendants revealed for the first time on January 14, 2008 that shifts in PND sales would adversely impact earnings per share by more than $1.00 per share in fiscal 2008 as referenced above.  Harman's belated disclosure led to a further major drop in the Company's stock price.

13.     Throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being and prospects. Specifically, defendants failed to disclose or indicate the following:  (1) that the Company had breached the merger agreement with KKR and GSCP and thus placed the merger in serious doubt; (2) that the Company needed to sustain higher research and development ("R&D") costs primarily related to its automotive platform awards; (3) that the Company's inventory was greater than disclosed and was negatively

impacting its cash flows; (4) that its relationship with Daimler-Chrysler had materially worsened; (5) that a material adverse change in Harman's business had occurred; (6) that its capital expenditures had spiraled out of control; (7) that the Company's sales of portable navigation devices materially suffered from a delayed release in 2007, lower than projected sales and significant price reductions; (8) that the Company's financial health had generally deteriorated; and (9) that, as a result of the foregoing, the Company's statements about its financial well being, earnings and future prospects were lacking in a reasonable basis when made.

14.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, Harman's principal place of business is located within this Judicial District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiff, Cheolan Kim, as set forth in the accompanying certification, incorporated by reference herein, purchased Harman's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

20.     Defendant Harman is a Delaware corporation with its principal executive offices located at 1101 Pennsylvania Avenue, N.W., Suite 1010, Washington, D.C. 20004.

21.     Defendant Dr. Sidney Harman ("Dr. Harman") was, at all relevant times, the Company's founder and Executive Chairman of the Board of Directors.  Dr. Harman also served as the Company's Chief Executive Officer ("CEO") from January 1, 2007 to June 30, 2007.

22.     Defendant Kevin Brown ("Brown") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer.

23.     Defendant Sandra B. Robinson ("Robinson") was, at all relevant times, the Company's Vice President of Financial Operations and Chief Accounting Officer.  Robinson also exercised and sold a significant amount of Harman stock options during the Class Period.

24.     Defendants Dr. Harman, Brown, and Robinson are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Harman's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be

corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Harman claims to be a leading manufacturer of high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets in the Americas, Europe, and Asia.  The Company operates under the brands names Harman Kardon, JBL, Revel, Mark Levinson, Infinity, Lexicon, Soundcraft-Studer, AKG, Becker, and QNX, and is traded on the New York Stock Exchange under the Symbol:  HAR.

26.     Prior to and throughout the Class Period, Harman reported positive financial results and projected earnings guidance based upon its strong financials.  The Company also claimed that based on these strong financial results, the Purchasing Companies were going to acquire all shares of the Company in a merger estimated at approximately $8 billion.

### Materially False and Misleading
### Statements Issued During the Class Period

27.     The Class Period begins on April 26, 2007.  On this day, the Company issued a press release entitled "Harman International Industries To Be Acquired By KKR And GS Capital Partners."  Therein, the Company, in relevant part, stated:

**Harman Stockholders Can Elect to Receive $120 Per Share In Cash or Shares in Post-Transaction Company**

**Transaction Valued at Approximately $8 Billion**

Harman International Industries, Inc. (NYSE: HAR) today announced that it has entered into an agreement to be acquired by affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners ("GSCP") in a transaction valued at approximately $8 billion. The transaction was unanimously approved by the Harman Board of Directors, following the recommendation of a Special Committee of independent directors. KKR initiated discussions with Harman and structured the transaction so that current Harman stockholders have the opportunity to participate in the future upside potential of the enterprise. The company will continue to be named Harman International Industries and Dr. Sidney Harman, Founder and Executive Chairman, will remain Executive Chairman.

\* \* \*

Under the terms of the agreement, Harman stockholders will be entitled to receive $120 in cash for each share of Harman common stock they hold. As an alternative to receiving the cash consideration, Harman's stockholders will be offered the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman stock for shares in the new corporation incorporated by KKR and GSCP in order to acquire Harman. The total amount of Harman shares that may elect to receive shares in the post-transaction corporation is approximately 8.3 million, which would represent $1.0 billion (at the $120 per share transaction value) and an approximate 27% equity stake in Harman following the transaction. If elections for post-transaction shares exceed the $1.0 billion cap, post-transaction shares will be allocated to electing stockholders on a pro-rated basis, and the remaining Harman shares will be exchanged for cash. The election process will be fully detailed in the proxy statement/prospectus that will be mailed to Harman stockholders.

Dr. Harman, who owns approximately 5% of the outstanding common stock of Harman, will participate in the same election process available to all stockholders. He has committed that he will elect to exchange half of his current holdings for post-transaction shares, subject to the same pro ration that applies to all stockholders as described above.

\* \* \*

Completion of the transaction, which is expected to occur in the third quarter of 2007, is subject to the approval of Harman stockholders, customary closing conditions and regulatory approvals. The Board of Directors of Harman has unanimously recommended that Harman stockholders vote in favor of the transaction.

28.     In commenting on the merger agreement with the Purchasing Companies in the same press release, Dr. Harman stated, in relevant part, that:

We are pleased to reach an agreement with KKR and GSCP that is in the best interest of our stockholders, presenting them with excellent value for their shares and the opportunity to participate in Harman's future growth. KKR and GSCP are two of the world's leading private equity investors and our Board of Directors strongly believes that this transaction will create attractive long-term opportunities for our employees, customers and business partners. Together, we will continue to execute our strategic plan, capitalize on new opportunities, and build on our history of product innovation and service excellence.

29.     On the same day, the Company held a conference call to discuss its third quarter 2007 results.  During the conference call, Dr. Harman stated, in part, the following:

First, a comment on the agreement we announced this morning, which merges Harman international into a new company To be financed by Kohlberg Kravis Roberts and Goldman Sachs. The new Company will carry the Harman International name. I will be its Executive Chairman and a substantial investor. We think very well of the deal.

It has been structured to provide shareholders with a substantial premium for their shares and, if they elect so, to retain a substantial portion of their investment in the Company going forward. The deal rewards our loyal shareholders, a substantial number of whom have been owners for many years, and it recognizes the dedication, hard work, and commitment of our people. Until we have moved the transaction through the SEC and other legal processes, we are constrained in what we can say. However, a few highlights may be helpful.

* * *

We begin the fourth quarter of the year and we look to fiscal '08

with a backlog of $14 billion. We continue to expect fiscal '08 Automotive OEM revenues at $2.8 billion and EPS of $5.25, subject to the probability that we will not be able to absorb the $46 million engineering bulge I identified in our previous earnings call. Let me remind that the bulge is driven by work on $1.1 billion of new business unanticipated when we first planned fiscal '08, and by continuing new work on Driver Assist. If we are unable to absorb the $46 million R&D bulge, the projected fiscal '08 EPS would become $4.79.

We have not received a major new award since our last earnings call, but there is a flow of good awards that add extra fiber to the backlog. Land Rover has committed its branded audio business to Harman Kardon for the period fiscal 2011 through 2015. The estimated annual revenue is $50 million, with total value of $250 million. This is business that we had coveted, but now has been formally awarded.

Permit me to offer a perspective going forward. Ours is a very healthy business, as we have a special place in both the automotive OEM and the professional sides of our work. But we have no conceit that this is a walk in the park. There are challenges as there are opportunities throughout the markets and throughout the technologies with which we work. Those opportunities include geographic expansion in Asia, and especially in China. They include a further expansion of Infotainment through midrange and entry-level automobiles. And they include the promising and challenging new arena of Driver Assist. We are hard at work in all three areas. We have made consequential progress in scaling our systems through the midrange and entry-level, and we are confident that our competitive and comparative advantage on the Infotainment side will serve us very well on the Driver Assist side.

\* \* \*

As I look forward to our future in OEM, I see an interesting assembly of opportunity and challenge. I have already spoken about market opportunity. Here, I recognize and emphasize that recognition, that our growth has been accompanied by variances in efficiency. We are determined to rationalize our engineering and to reduce significantly the percentage of sales that R&D represents. I have spoken about this before. I mention it now not because I have some major new insight, but precisely to emphasize the fact that it is before us, that we have our work cut out, but we intend to get it done.

\* \* \*

> I had indicated in earlier conference calls that the PND
> environment in Europe was not as margin challenged as it is in the
> United States, but that we could surely anticipate it. There was
> reasonable foresight in that observation. In the recent quarter, the
> European PND market has become extremely competitive. We are
> working extraordinarily hard to increase sales and to maintain
> adequate margins in that environment. In our earnings call three
> months ago, it was noted that Harmon/Becker PND inventories in
> Europe had grown substantially. We said then that the inventory
> had been developed to support a vigorous sales effort and that we
> planned to reduce it to normal levels at year-end. The plan forecasts
> total unit sales of 618,000 units for the fiscal '07 year, and that plan
> is proceeding. Where March 31 inventory was $75 million, we
> expect April 30 inventory to be approximately $50 million, May 31
> inventory to be approximately $30 million, and June 30 inventory
> to be approximately $15 million, that a very normal level. Overall,
> the European market for our high fidelity and multimedia products
> is a very bright spot in our consumer business.

* * *

> Inventories were $480 million at March 31, an increase of $142
> million compared to the prior year. As of the second quarter,
> inventory increases are primarily in Automotive to support the
> growing PND business. (emphasis added)

30.     Following the prepared comments on the conference call on April 27, 2007, Dr.

Harman and defendant Brown responded to analysts' questions regarding Dr. Harman's reference

to sales of PNDs and increased competition for PNDs in Europe as follows:

> JAIRAM NATHAN: Okay, just one more question. On the
> European PNDs, you said that the competition has kind of
> increased. Is it because of higher competition that you're seeing
> pricing pressure or is it because the growth is slowing and there are
> more people vying for the same growth?
>
> SIDNEY HARMAN: No, I think it is the former.
>
> JAIRAM NATHAN: It is just more competition?
>
> SIDNEY HARMAN: Oh, yes.

* * *

> PETER FRIEDLAND: Okay. And then as far as Becker PND units,

12

you said you're still on track for 618,000 units for fiscal '07. Where are we year-to-date? And then the second question on the Harman Kardon PND, what are the units there?

SIDNEY HARMAN: While Kevin is checking his records, let me just tell you that the Harman Kardon PNDs are just too early to even begin to read retail sales. They are moving into retail channels. Ask us in the next quarter.

Peter, do you have information on the --?

KEVIN BROWN: Yes, the Harman Kardon PND unit sales for the quarter were about 84,000 units. For the nine months are over 300,000 units. The Becker -- I'm sorry -- did I say Harman Kardon?

SIDNEY HARMAN: Corrected it, please.

KEVIN BROWN: The Becker -- the European PND unit sales.

PETER FRIEDLAND: Okay. So 300,000, and you still think you can do over 600,000 for the fiscal year?

SIDNEY HARMAN: We do, and we said so.

31.    In addition, in answering a question from an analyst, Dr. Harman made the

following remarks regarding the Company's R&D expenses:

JEFF KESSLER: I guess the question that we have is around continuing to match R&D to the revenue structure, as you see it, given that you have programs in place that are obviously important and obviously have a lot of potential. But getting your hands around the expense levels relative to new programs, are there some -- you've mentioned one or two that are in line to produce over the next several years. <u>Is there anything that we should be aware of which is maybe going to change that R&D-to-revenue percentage, let's say, 18 months out or so?</u>

SIDNEY HARMAN: Are you asking whether the percentage of revenue represented by R&D will increase or decrease?

JEFF KESSLER: I'm asking, again, how are you going to get that decrease? In other words, where is the return on that R&D going to come from?

SIDNEY HARMAN: I've got it. In two ways, really. <u>Understand</u>

first that the increase is, from our point of view, a very constructive thing. The so-called bulge was generated by the receipt of awards that we did not contemplate when we were generating the plan and generating our guidance. The engineering represented in that bulge is essentially for the new BMW award and the development of Driver Assist, which we believe has very positive implications down the road. I have not yet answered your question, but I thought it useful to set that base.

Now we believe -- and I have made this clear numbers of times -- we believe that in the growth of the Company and in the urgency of getting the job done in what was a substantially new world of technology, the primary objective was just that -- get it done and, in effect, damn the cost. We are still in that surge mood. I should be careful about the use of that word, I suppose. But I am convinced, Kevin is convinced, our Board is convinced that over time -- and reasonable time -- we can rationalize that engineering so that as a percentage of sales -- and remind you, sales will be going up, so that if the engineering expense stayed fixed, the percentage would decline, so it moves us constructively in that direction -- but we believe that we can rationalize, generate efficiencies such as to permit us to improve that percentage by approximately 100 basis points a year over the next several years.  (emphasis added)

32.    During the same conference call, defendant Brown stated, in part, the following:

Total Harman International R&D expenses in the third quarter were $90 million, or 10.2% of sales, compared to $74 million, or 9.2% of sales, in the same quarter of the prior year. As Sidney discussed, R&D is trending higher than we had anticipated as we work to develop new technologies and new programs. We expect fiscal 2007 R&D expenses to approximate 10% of full-year sales. In fiscal 2008, we anticipate R&D will begin to decrease as a percentage of sales. The increase in R&D explains $16 million of the $20 million increase in SG&A in the third quarter compared to the prior year. Despite the increase in R&D, total SG&A as a percent of sales remained relatively flat at 23% of sales in the quarter.  (emphasis added)

33.    On April 27, 2007, the Company filed a Form 8-K with the SEC providing additional guidance on the merger with the Purchasing Companies.  The Form 8-K was signed by Robinson and stated, in relevant part, the following:

On April 26, 2007, Harman International Industries, Incorporated, a Delaware corporation (the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement") with KHI Parent Inc., a Delaware corporation ("Parent"), and KHI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub").

The Merger Agreement provides for the merger of Merger Sub with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent. Merger Sub and Parent are affiliates of Kohlberg Kravis Roberts & Co., L.P. ("KKR") and GS Capital Partners ("GSCP", and together with KKR, the "Sponsors") formed by the Sponsors in order to acquire the Company.

* * *

The Board of Directors of the Company has unanimously determined that the Merger is in the best interests of the Company and its stockholders, and declared advisable, to enter into the Merger Agreement, approved the Merger Agreement and resolved to recommend adoption of the Merger Agreement by Company stockholders.

* * *

The closing of the Merger is subject to customary closing conditions, including adoption of the Merger Agreement by the Company's stockholders and antitrust clearance. Closing is not subject to any financing condition but the closing may be delayed in certain circumstances to facilitate financing. The merger is expected to be completed in the third calendar quarter of 2007.

* * *

The Company has made customary representations and warranties in the Merger Agreement and agreed to customary covenants, including covenants regarding operation of the business of the Company and its subsidiaries prior to the closing.

* * *

The Merger Agreement has been included to provide investors and security holders with information regarding its terms. It is not intended to provide any other factual information about the Company, Parent, or their respective subsidiaries and affiliates. The Merger Agreement contains representations and warranties by the Company, on the one hand, and by Parent and Merger Sub, on the

other hand, made solely for the benefit of the other. The assertions embodied in those representations and warranties are qualified by information in confidential disclosure schedules that the parties have exchanged in connection with signing the Merger Agreement. The disclosure letter delivered to Parent in connection with the Merger Agreement contain information that modifies, qualifies and creates exceptions to the representations and warranties set forth in the Merger Agreement. Moreover, certain representations and warranties in the Merger Agreement were made as of a specified date, may be subject to a contractual standard of materiality different from what might be viewed as material to stockholders, or may have been used for the purpose of allocating risk between the Company, on the one hand, and Parent and Merger Sub, on the other hand. Accordingly, the representations and warranties in the Merger Agreement should not be relied on by any persons as characterizations of the actual state of facts about the Company, Parent or Merger Sub at the time they were made or otherwise.

34.    On August 14, 2007, the Company held a conference call to discuss its fourth quarter 2007 financial results.  During the conference call, Dr. Harman stated, in part, the following:

Our dominance in the automotive space was solidified through the past year, where we had earlier confronted doubt about our ability to move effectively beyond the luxury car market for our infotainment systems. That doubt has been erased. With earlier awards to us from PSA, Audi and Chrysler, we established our leadership in the mid-range and entry levels, with last year's major awards from BMW, we erased any remaining questions. We are moving from an era in which each new infotainment system represented a virtually original effort with all new R&D to a new era in which the major automotive makers are committing to a common electronics platform, applicable across the full range of car lines. That growing set of decisions represents a dramatic shift from the traditional emphasis by automakers on multiple suppliers, to a readiness to commit across the board to a single supplier. That dramatic decision is driven overwhelmingly by new technology, and by the advantages in cost and performance available from a common scalable electronics platform.

Moving into fiscal 2008, our position is further enhanced by our developing technology partnership with Intel and the exclusive opportunity it provides us to employ Intel's powerful new mobile processor in our new designs. Implicit in that application is greater

speed, significant improvement in graphic realization, and impressively useful extension of our functionality. We believe that we are in a unique position to move quickly and impressively to build our order book for the second decade of the 21st century. (emphasis added)

35.    During the same conference call, defendant Brown stated, in part, the following:

Even as margins were affected in the fourth quarter, operating expenses were up $23 million or 1.3 points, quarter to quarter. Approximately half of this increase is in the R&D bulge we have reviewed in previous conference calls. Total Harman International R&D spending was $94 million, or 10.3% of sales in the quarter. That bulge was primarily generated by the need to process the engineering for the $14 billion backlog, of which a significant $1 billion-plus had been unanticipated. Furthermore, fourth quarter operating expenses reflect the costs associated with our determination to pursue vigorous a significant market share in the PND business in Europe. We spent the money in the fourth quarter which was necessary to cultivate that field for our engagement in the new year. (emphasis added)

36.    During the same conference call, Dinesh Paliwal, the Company's Chief Executive

Officer and President, stated, in part, the following:

During the past few weeks, I visited several key Harman business locations, and met with several hundred employees in Europe and North America. Although it is still relatively early to form opinions, several positive aspects of this company, which were the basis of my decision to join Harman, have been validated. I'm excited -- actually, I'm excited about the opportunities in the premium automotive and professional sectors of our business. I'm equally excited about the growth rates and the growing market size of the midmarket segments in the developed world, and emerging markets in eastern Europe and so-called BRIC-- Brazil, Russia, India, and China countries.

Harman is a potent global brand and I'm determined to penetrate these markets. I feel pretty strongly about it. Our product portfolio is robust and our R&D in close collaboration with leading customers will keep us ahead of competition. Converting these opportunities into profitable business will require a strong management team and peer accountability at all levels. (emphasis added)

17

37.     On August 29, 2007, the Company filed its year-end 10-K with the SEC.  The 10-K was signed by the Individual Defendants and stated, in relevant part, the following:

On April 26, 2007, we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP.  The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent.  KHI Merger Sub and Parent were formed to acquire our company.

If the merger agreement is adopted by our stockholders and the merger is completed, our stockholders will be entitled to receive $120.00 in cash, without interest, for each share of Harman common stock owned at the completion of the merger.  As an alternative to receiving the $120.00 per share, our stockholders have the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman common stock, on a one-for-one basis, for shares of common stock of Parent.  The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders.  However, the number of Parent shares our stockholders and option holders will receive may be less than they request in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock.  This number of Parent shares represents approximately 27% of the equity interests in Parent that will be outstanding immediately following the merger based on the expected equity financing for the merger.  If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis and the remaining Harman shares and options will be converted into cash.

Our Board of Directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, our company and our stockholders and resolved to recommend that our stockholders vote in favor of the adoption of the merger agreement.

Completion of the merger is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals and antitrust clearances.  We presently

anticipate that the merger will be completed in the fourth quarter of calendar year 2007.

\* \* \*

Selling, general and administrative ("SG&A") expenses as a percent of net sales were 23.2 percent in fiscal 2007 compared to 23.3 percent in the prior year. <u>Research and Development ("R&D") costs are the largest component of our SG&A expenses</u>. In fiscal 2007, R&D costs were $356.7 million or 10.0 percent of net sales. In fiscal 2006, R&D costs were $302.0 million, or 9.3 percent of net sales. <u>The increase was primarily due to costs incurred to support new infotainment system awards from automotive customers. We expect R&D costs, as a percentage of net sales, to decrease approximately 1 percentage point in fiscal 2008 due to the increasing scalability of our infotainment systems and the beginning of production for certain automotive programs.</u> SG&A expenses also include employee compensation and benefit costs. We have recorded stock-based compensation expense under the fair value based method since fiscal 2003, including $15.4 million, $16.6 million and $14.3 million in fiscal 2007, 2006 and 2005, respectively.

\* \* \*

Automotive – Automotive R&D costs were $286.5 million in fiscal 2007, representing 11.5 percent of net sales. Fiscal 2006 R&D costs were $232.2 million, or 10.4 percent of net sales. <u>These costs were incurred to develop audio, electronic and infotainment systems for an expanding list of automotive platforms. Our infotainment systems are increasingly based on scalable software allowing us to efficiently design systems for luxury, mid-range and entry-level vehicles</u>. During fiscal 2007, we received a major infotainment systems award from BMW that will encompass virtually their entire model range. This sophisticated system will include HD and satellite radio capabilities, second and third dimensional navigation, traffic information, voice recognition, Internet browser and wireless connectivity. We also develop various systems for Mercedes-Benz, Audi, PSA Peugeot Citroën and Porsche in Europe. In the United States and Asia, we develop audio systems for Toyota, Lexus, Hyundai, Chrysler and Harley-Davidson. Automotive SG&A expenses also include restructuring costs of $5.7 million in fiscal 2007 and $7.3 million in fiscal 2006. (emphasis added)

38.     In addition to being signed by the Individual Defendants, the Company's Form 10-K was also certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by Dr. Harman.

## The Truth Begins to Emerge

39.     On September 21, 2007, the Company issued a press release entitled "Harman Comments On Previously Announced Merger."  The press release stated, in part, the following:

> Harman International Industries, Incorporated (NYSE: HAR) announced that it was informed this afternoon that Kohlberg Kravis Roberts & Co. L.P. (KKR) and GS Capital Partners VI Fund, L.P. (GSCP) no longer intend to complete the previously announced acquisition of Harman by a company formed by investment funds affiliated with or sponsored by KKR and GSCP.  KKR and GSCP have informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger.  Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement. (emphasis added)

40.     On this news, shares of the Company's stock fell from an opening price of $97.70 on September 21, 2007 to close at $85.00 the same day.  Thus, the Company's share price fell more than 12 percent.

41.     On the same day, an article published by Reuters stated, in part, the following regarding the failed merger between Harman and the Purchasing Companies

> Kohlberg Kravis Roberts & Co LP and Goldman Sachs Group Inc.'s (GS.N: Quote, Profile, Research) private equity arm are worried about certain financial conditions inside Harman International Industries Inc (HAR.N: Quote, Profile, Research), concerns that could threaten the $8 billion deal, a source said on Friday.
>
> The concerns stemmed less from broad credit market worries and more from internal conditions within the company, said the source, who is familiar with the matter but did not want to be identified. (emphasis added)

42.     On the same day, Reuters issued another press release stating, in part, that:

<u>Trade in shares of audio equipment maker Harman International
Inc (HAR.N: Quote, Profile, Research) was suspended on Friday,
pending news from the company.</u>

The company is the target of an $8 billion takeover, but a source
familiar with the matter said the buyers are worried about the
company's financial conditions.  (emphasis added)

43.    Later on the same day, Reuters issued yet another article regarding the merger and,

this time, gave additional details regarding the pullout.  The article states, in part, the following:

NEW YORK (Reuters) - Harman International Industries Inc
(NYSE:HAR - News) said its private equity buyers are pulling out
of their $8 billion buyout deal, a severe blow to the company whose
shares fell more than 25 percent on Friday.

* * *

<u>But the Harman bail-out looks centered on the financial conditions
of the company itself, not the lending agreement, and marks the
first time in a two-year private equity acquisition frenzy that buyers
walked out of a major deal</u>.

<u>Merger arbitrage traders and an analyst said among the hurdles
Harman faced was rising inventories and declining cash flows and
sales in the last few quarters. Traders also said questions surfaced
recently about Harman's relationship with Daimler-Chrysler, a
customer for its audio products.</u>

* * *

One analyst said Harman's inventories in February were up 40
percent, while second-half sales expectations were for an 11
percent rise.

"When you've got inventories going through the roof, cash flows
are going to get hit," said Alisa Guyer Galperin, an analyst
covering Harman at independent research firm RiskMetrics Group.

The merger proxy does have language in it on pertaining the deal
being threatened in the event of certain "material adverse" effects
on Harman.

"<u>The company either has to slow production, reduce prices, or have
inventories remain at elevated levels, and that deteriorates your
cash flow model,</u>" Galperin said, adding that personal navigation

devices for cars were among the items sitting in the inventory.

<u>Traders said on Friday that a great deal of attention was being paid to a filing showing that sales to DaimlerChrysler accounted for 25 percent of Harman's total consolidated net sales for the fiscal year ended June 30, 2007. Cerberus Capital recently bought Chrysler from Daimler</u>.

While Harman says in the filing that loss of sales to the customer would have a "material adverse effect" on sales, there is no public indication that the relationship is in jeopardy.

Harman founder Sidney Harman owned about 5 percent of the company's stock at the time of the deal and committed to exchange half of his holdings for stub equity.  (emphasis added)

44.    Similarly, on the same day, a Forbes article stated, in part, the following regarding the failed merger:

### KKR and Goldman Dump Harman

Harman, it's not us, it's you. This is what the audio-manufacturing firm claims it just heard from would-be buyers KKR and Goldman Sachs when they backed out a deal Friday to buy the firm. Harman then told the world the news, just slightly ahead of the closing bell at the New York Stock Exchange.

* * *

Although the exact reason for the drawback is not known yet, Harman's fourth quarter and full year results did fall short of Wall Street's expectations. In the fourth quarter Wall Street expected earnings of $1.24 and Harman yielded 98 cents. Full year of fiscal 2007 Wall Street requested $4.38 and Harman yielded $4.14.

<u>According to the Associated Press, one anonymous insider said the private equity firms sought to squash the deal over questions about Harman's financial health, not because of any financing difficulties in a tight credit market. The person said the effort to back out is sincere, and not a negotiating tactic</u>.

Prior to the release, the NYSE had contacted Harman regarding its price drop, and requested it release information pertaining to the drop.

After the company declined the NYSE then released its own report

that Harman had denied its request. Shortly after its denial, Harman
changed course and told the NYSE it would make a press release.
In accordance with regulation, the exchange halted the stock from
trading.  (emphasis added)

45.    Then, on September 24, 2007, the Company issued a press release entitled,

"Harman Provides Guidance For Fiscal 2008."  The press release stated, in part, the following:

> The Company expects fiscal 2008 performance to be impacted by a
> number of factors including increased R&D to support the
> development of several new infotainment platforms and associated
> launch costs.  We now expect fiscal 2008 sales to reach $4.1 billion
> ($3.55 billion in 2007). The Company expects operating income
> and diluted EPS before merger related costs to equal or exceed last
> year's record performance.  In 2007, operating income was $397
> million and diluted EPS were $4.14 adjusted for non-recurring
> restructuring charges, merger costs and tax items.
>
> For the quarter ending September 30, 2007 we estimate net sales of
> $950 million, operating profit of $40 million and diluted EPS of
> $0.50 before merger-related costs.  As previously disclosed, the
> fourth quarter of fiscal 2007 and the first quarter of fiscal 2008
> were affected by increased R&D costs, primarily related to recent
> automotive platform awards.  We expect substantial margin
> improvements over the course of fiscal 2008 as we work through
> these costs and begin the launching of new infotainment
> platforms."
>
> "In light of increases in material costs and faster ramp-up of R&D
> resources to work on new business awards, equaling the record
> operating performance of fiscal 2007 is an achievement. The
> benefits of common platform synergy and scalability will be
> realized in fiscal 2009 and beyond. Those benefits will strengthen
> our operating profits," said Paliwal.  (emphasis added)

46.    On this news, shares of the Company's stock fell to $80.31 on extremely high

volume of over 14.5 million shares.

47.    Therefore, within two trading days, the Company's share price fell approximately

$32 per share, or almost 30 percent, on extremely heavy trading volume.

48.     On September 25, 2007, *The Wall Street Journal* published an article entitled

"Harman Blames Increased Expenses For Expected 1st-Quarter Earnings Miss."  The articles

states, in part, the following:

> Harman International Industries Inc., whose planned $8 billion
> buyout collapsed Friday, said its fiscal first-quarter earnings will
> fall below Wall Street's expectations amid increased research and
> development spending.
>
> The Washington company, which builds audio components for
> home stereos and automobiles, forecast earnings of 50 cents a
> share, before merger-related costs, for the quarter ending Sept. 30
> and sales of $950 million. The average estimate of analysts
> surveyed by Thomson Financial were for earnings, excluding
> items, of $1.02 a share on revenue of $934.4 million.
>
> Late Friday, Kohlberg Kravis Roberts & Co. and Goldman Sachs
> Group Inc.'s equity arm walked away from their planned $8 billion
> leveraged buyout of Harman, saying they found financial
> conditions inside the stereo maker to be unacceptable.
>
> The buyers also said Harman might have tripped certain covenants
> in the parties' merger agreement <u>related to capital spending</u>, said
> one person familiar with the matter.
>
> "The fourth quarter of fiscal 2007 and the first quarter of fiscal
> 2008 were affected by increased R&D costs, primarily related to
> recent automotive platform awards," said Harman Chief Executive
> Dinesh Paliwal. "We expect substantial margin improvements over
> the course of fiscal 2008 as we work through these costs" and
> launch new products.  (emphasis added)

49.     On September 27, 2007, the Company held a conference call to discuss its almost-

completed first quarter fiscal 2008 financial results and expectations for the full fiscal 2008 year.

During the conference call, Dr. Harman stated, in part, the following:

> Further, as almost all other manufacturing businesses, we have
> encountered increases in material costs, which placed pressure on
> margins. During that period, we have built, staffed and opened a
> new manufacturing facility in the United States and we are ramping
> up a new plant in China. The startup of those facilities has
> represented a consequential challenge. The extraordinary time and
> attention required by senior management to advance and process the

24

KKR/Goldman merger, that entire process with which you are familiar, including the diligence and the negotiations, consumed a significant portion of management's time. The confluence of these events in a six- to eight-month period generated what might be called the perfect storm. <u>Now that storm is over and we are again in full command of our circumstances and our extraordinary future.</u>
(emphasis added)

50. During the same conference call, Dinesh Paliwal, the Company's Chief Executive Officer and President, stated, in part, the following:

> <u>In April 2007, we did offer guidance for 2008. For the full year 2008, gross profit is expected to be lower than anticipated in April 2007. On September 24, we reflected the change in modified guidance. The change is due to higher material prices, and more than expected ramp-up costs for the two new manufacturing plants in China and the U.S. These events might have been forecast better and we are improving the way we model and forecast our growing business.</u>
>
> * * *
>
> First quarter fiscal '08 sales are forecast to be $950 million, an increase of 15% compared to the first quarter of fiscal '07. Gross profit is forecast to be approximately 28% of sales, down about 7 points from the prior year's quarter. Operating expenses are forecast to be $227 million, an increase of $27 million. Operating income is forecast to be $40 million, down from $87 million in the first quarter of fiscal '07. Forecast diluted earnings per share before transaction, legal and restructuring costs of $0.50 are $0.35 below last year's first quarter of $0.85. First-quarter sales are projected to increase in each of our three operating segments compared to the prior year. <u>We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe.</u>
> (emphasis added)

51. During the same conference call, defendant Brown stated, in part, the following:

> We provided guidance for the first quarter and the full year '08 in our press release of September 24th. I will provide further detail and I note that we have not yet completed the first quarter, therefore, I am reviewing our estimates…. <u>First quarter fiscal '08 sales are forecast to be $950 million, an increase of 15% compared to the first quarter of fiscal '07.</u> Gross profit is forecast to be approximately 28% of sales, down about 7 points from the prior year's quarter. Operating expenses are forecast to be $227 million, an increase of

$27 million. Operating income is forecast to be $40 million, down from $87 million in the first quarter of fiscal '07. Forecast diluted earnings per share before transaction, legal and restructuring costs of $0.50 are $0.35 below last year's first quarter of $0.85. First-quarter sales are projected to increase in each of our three operating segments compared to the prior year. We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe.

Excluding R&D, we expect other operating expenses to be higher than last year. In particular, marketing costs will be above the prior year's quarter due to promotions associated with new infotainment system and PND introductions. There have been several recent developments that have tempered our view of fiscal '08. While our sales growth remains strong, several factors will influence our operating performance.

Full-year sales for fiscal '08 are forecast to be $4.1 billion, an increase of 16% compared to $3.5 billion in fiscal '07. We expect each of our three operating segments to produce higher sales than the prior year. Full-year gross profit margin is expected to be 31% of sales, approximately 3 percentage points lower than fiscal '07. Lower gross profit margin is forecasted Automotive, primarily due to new model and plant launch costs and increases in material prices.

\* \* \*

Finally, we expect fiscal '08 earnings per share before transaction, legal and restructuring costs to meet or exceed the $4.14 reported for fiscal '07. We will now take your questions.  (emphasis added)

52.    In addition, in answering a question from an analyst, Dr. Harman made the

following remarks regarding the Company's strong first quarter fiscal 2008 revenues:

PETER BARRY: Just one final for me. I couldn't help but observe that in what is the lowest seasonal quarter for the year historically, the $950 million of revenue expectation is the highest number you've ever achieved. One, is that observation correct? And to what degree did the spillover of C Class revenues influence that number?

KEVIN BROWN: Yes, Peter, you are correct that that is a very strong first quarter on the top line for us, reflecting getting fully up the ramp curve on Mercedes C Class but also reflecting the fact that

> we are bringing additional business on-stream at Chrysler as we
> ramp up our Missouri plant <u>and in the PND business, where we
> continue the growth and expansion of that business primarily in
> Europe.</u>  (emphasis added)

53.    On October 25, 2007, the Company issued a press release announcing results for

first fiscal 2008 quarter ended September 30, 2007.  Harman announced that net sales for the

quarter were $947 million, a 15 percent increase compared to the same period in fiscal 2007.  In

addition, Harman announced that excluding merger costs, earnings per diluted share were $0.62

and that all three divisions (Automotive, Consumer and Professional) reported double-digit sales

growth for first quarter of fiscal 2008.  Dr. Harman and the Company's CEO, Dinesh Paliwal,

issued the following comments:

> <u>We achieved good results during first quarter of fiscal 2008.  Sales growth
> was strong due to the ramp up of an infotainment system for Chrysler and
> robust sales of personal navigation devices in Europe.  Our initiative to
> develop cost saving strategies is underway and we expect to gain
> procurement, engineering and manufacturing efficiencies that will
> improve margins over the course of this fiscal year.</u>   (emphasis added)

54.    On November 9, 2007, Harman filed its quarterly report on Form 10-Q with the

SEC for its first fiscal 2008 quarter ended September 30, 2008.  The 10-Q was signed by

defendant Brown and stated, in relevant part, the following:

> We design, manufacture and market high-quality, high fidelity audio
> products and electronic systems for the automotive, consumer and
> professional markets.  We have developed, both internally and through a
> series of strategic acquisitions, a broad range of product offerings sold
> under renowned brand names in our principal markets.  These brand
> names have a heritage of technological leadership and product innovation.
> Our three reportable business segments, Automotive, Consumer and
> Professional, are based on the end-user markets we serve.
>
> Automotive also provides aftermarket products such as personal
> navigation devices ("PNDs") to customers primarily in Europe.  <u>Our
> PNDs leverage many of the successful applications developed by our
> Automotive segment.</u>

* * *

Automotive - Net sales for the quarter ended September 30, 2007 increased $81.3 million, or 14 percent compared to the same period last year. Foreign currency translation contributed approximately $36 million to the increase in sales. Since a significant percentage of our automotive sales are to customers in Europe, Automotive incurs most of our foreign currency translation exposure. New introductions of infotainment systems including Chrysler's MyGig infotainment systems in North America, the roll-out of our first mid-level infotainment system for BMW and the extension of our Multi Media Interface infotainment system for the Audi A4 and A5 were primary factors contributing to the higher sales. A strong demand for Traffic Assist, our European aftermarket PND, also contributed significantly to the increase in sales over the prior year period.

Consumer - Net sales for the quarter ended September 30, 2007 increased $26.3 million, or 28 percent, compared to the same period last year. Foreign currency translation contributed approximately $4 million to the increase in sales compared to the prior year. New product introductions and strong Harman/Kardon and multimedia sales contributed significantly to the sales increase at Consumer. Higher sales of consumer products for home applications including Harman/Kardon electronics and JBL loudspeakers, multimedia products and our consumer mobile PNDs, each contributed to the sales growth over the prior year period.

* * *

*Business Outlook*  Our first quarter sales were a record and reflect continued top-line strength. We believe all three of our core business segments will continue to produce higher sales for the remainder of this fiscal year. For the full fiscal year ending June 30, 2008, we currently believe our net sales will be approximately $4.1 billion, an increase of 16 percent. We expect earnings per share before transaction, legal and restructuring costs to meet or exceed the prior fiscal year. (emphasis added)

### The Truth Comes Out

55. On January 14, 2008, prior to the market's opening, Harman issued a press release revising its fiscal 2008 earnings guidance and significantly lowering estimates of earnings per share to between $3.00 and $$3.10 per share. The Company's press release entitled "Harman International Revises Fiscal Year 2008 Earnings Guidance" in pertinent part states:

The Company now expects non-GAAP diluted EPS for the 2008 fiscal year to be between $3.00 and $3.10, before after-tax merger related costs of $8.0 million, or $0.13 per diluted share but including the impact of the Company's ongoing accelerated share repurchase (ASR). Because the

accounting impact of previously announced restructuring charges has not been determined, it is not included in the current estimate and, therefore, no GAAP diluted EPS for the fiscal 2008 year is provided.

The change in guidance was prompted primarily by a major shift in the market for Portable Navigation Devices (PNDs). In recent months this sector has experienced significant pricing pressure which is affecting the entire industry.

"While the growth fundamentals of our core business remain sound, the difficult PND environment presents a challenge. As we have indicated previously, we will be launching a record number of automotive infotainment platforms in 2008. Although, we are not happy with the higher than planned R&D engineering and material costs, the additional investment is necessary to deliver the new platforms to our valued customers," said Dinesh Paliwal, Vice Chairman and Chief Executive Officer. "Harman continues to have excellent business prospects, and we are confident that we will capitalize on these opportunities as we position our Company to achieve its full potential." (emphasis added)

56.    On this news, shares of the Company's stock in heavy trading fell precipitously from the prior trading day's, January 11, 2008, close of $68.97 to close at $43.00 per share, which constituted a 37.65% drop and a four-year low.

57.    Thus, based on the foregoing, during the Class Period, defendants misrepresented and/or failed to disclose:  (1) that the Company had breached the merger agreement with KKR and GSCP and therefore placed the Merger in serious doubt; (2) that the Company needed to sustain higher research and development ("R&D") costs primarily related to its automotive platform awards; (3) that the Company's inventory was greater than disclosed and was negatively impacting its cash flows; (4) that its relationship with Daimler-Chrysler had materially worsened; (5) that a material adverse change in Harman's business had occurred; (6) that its capital expenditures had spiraled out of control; (7) that the Company's sales of personal navigation devices materially suffered from a delayed release in 2007, lower than projected sales and significant price reductions; (8) that the Company's financial health had generally deteriorated;

and (9) that, as a result of the foregoing, the Company's statements about its financial well being, earnings and future prospects were lacking in a reasonable basis when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Harman between April 26, 2007 and January 11, 2008, inclusive and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Harman's common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Harman or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

62.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Harman; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

63.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

64.    The market for Harman's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Harman's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Harman's common stock relying upon the integrity of the market price of Harman's common stock and market information relating to Harman, and have been damaged thereby.

65.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Harman's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

66.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Harman's financial well-being and prospects.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Harman and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

67.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

68.     During the Class Period, Plaintiff and the Class purchased common stock of Harman at artificially inflated prices and were damaged thereby.  The price of Harman's common stock significantly declined when the misrepresentations made to the market, and/or the

information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

69.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Harman, their control over, and/or receipt and/or modification of Harman's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Harman, participated in the fraudulent scheme alleged herein.

70.     Additionally, during the Class Period, and with shares of the Company's stock trading at artificially inflated prices, defendant Robinson, a high level Company insider, exercised and sold a significant amount of Company stock.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

71.     At all relevant times, the market for Harman's common stock was an efficient market for the following reasons, among others:

(a)     Harman's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Harman filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     Harman regularly communicated with public investors via established market

communication mechanisms, including through regular disseminations of press

releases on the national circuits of major newswire services and through other

wide-ranging public disclosures, such as communications with the financial press

and other similar reporting services; and

(d)     Harman was followed by several securities analysts employed by major brokerage

firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly

available and entered the public marketplace.

72.     As a result of the foregoing, the market for Harman's common stock promptly

digested current information regarding Harman from all publicly-available sources and reflected

such information in Harman's stock price.  Under these circumstances, all purchasers of

Harman's common stock during the Class Period suffered similar injury through their purchase of

Harman's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

73.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

defendants are liable for those false forward-looking statements because at the time each of those

forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Harman who knew that those statements were false when made.

## FIRST CLAIM

**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Harman's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

76.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Harman's common stock in violation of  Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

77.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Harman's financial well-being, business relationships, and prospects, as specified herein.

78.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Harman's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Harman and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Harman's common stock during the Class Period.

79.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the

Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

80.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Harman's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

81.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Harman's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Harman's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Harman's common stock during the Class Period at artificially high prices and were damaged thereby.

82.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Harman was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Harman common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

83.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

85.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     The Individual Defendants acted as controlling persons of Harman within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

88.    As set forth above, Harman and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 16, 2008                    Respectfully submitted,

                                           **COHEN, MILSTEIN, HAUSFELD &
                                           TOLL P.L.L.C.**


                                           By:  ___/s/  Steven J. Toll_____
                                                Steven J. Toll (DC Bar #225623)
                                                Daniel S. Sommers (DC Bar #416549)
                                                Jason M. Leviton (DC Bar #495460)
                                                1100 New York Avenue, N.W.
                                                Suite 500, West Tower
                                                Washington, DC  20005
                                                Telephone:   (202) 408-4600
                                                Facsimile:    (202) 408-4699
                                                     *and*
                                                Lynda J. Grant
                                                150 East 52nd Street
                                                Thirtieth Floor
                                                New York, NY 10022
                                                Telephone:   (212) 838-7797
                                                Facsimile:    (212) 838-7745

                                                Laurence D. Paskowitz, Esq.
                                                **PASKOWITZ & ASSOCIATES**
                                                60 East  42nd Street
                                                46th Floor
                                                New York, NY 10165
                                                Telephone:   (212) 685-0969
                                                Facsimile:    (212) 685-2306

                                                Roy L. Jacobs, Esq.
                                                **ROY JACOBS & ASSOCIATES**
                                                60 East 42nd Street
                                                46th Floor
                                                New York, NY 10165
                                                Telephone:   (212) 867-1156
                                                Facsimile:    (212) 504-8343

                                                **Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2008, I electronically sent the FIRST AMENDED CLASS ACTION COMPLAINT and CERTIFICATE OF SERVICE to the Clerk of Court using the following email address:    dcd_cmecf@dcd.uscourts.gov.    I have also sent a copy of the documents to all counsel of record via UPS Overnight mail, including:

Thomas F. Cullen
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2105
(202) 879-3939
Email: tfcullen@jonesday.com

Timothy D. Battin
STRAUS & BOIES, LLP
4041 University Avenue
Fairfax, VA 22030
(703) 764-8700
Fax: (703) 764-8704
Email: tbattin@straus-boies.com

Cheryl Hamer Mackell
POMERANTZ HAUDER BLOCK GROSSMAN & GROSS
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(202) 327-5420
Fax: (202) 327-5422
Email: chmackell@pomlaw.com

Jane Arnold Goldstein
MAGER & GOLDSTEIN LLP
1640 Town Center Circle
Suite 216
Weston, FL 33326
(954) 515-0123
Fax: (954) 515-0124.

 /s/ Jason M. Leviton_____
Jason M. Leviton, Esq.