## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ) | Case No. 1:07-cv-01757 (RWR) |
| IN RE HARMAN INTERNATIONAL ) | |
| INDUSTRIES, INC. SECURITIES ) | CONSOLIDATED CLASS |
| LITIGATION ) | ACTION COMPLAINT |
| ) | |
| ) | **JURY TRIAL DEMANDED** |

Lead Plaintiff Arkansas Public Employees' Retirement System ("Lead Plaintiff") alleges

the following based upon the investigation by Lead Plaintiff's counsel, which included, among

other things, interviews with former employees, a review of Defendants' public documents,

conference calls and announcements made by Defendants, United States Securities and

Exchange Commission ("SEC") filings, wire and press releases published by and regarding

Harman International Industries, Inc. ("Harman" or the "Company"), securities analysts' reports

and advisories about the Company, and information readily available on the Internet.  Lead

Plaintiff believes that substantial additional evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of purchasers of the common stock of

Harman between April 26, 2007 and February 5, 2008, inclusive (the "Class Period"), seeking to

pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Harman claims to be a leading manufacturer of high-quality, high fidelity audio

products and electronic systems for the automotive, consumer, and professional markets in the

Americas, Europe, and Asia.  The Company's products include integrated information and

entertainment systems for automobiles that sell under brand names such as Harman Kardon,

Infinity, and Becker. Harman's common stock is traded on the New York Stock Exchange under the symbol "HAR."

3.       Throughout the Class Period, Defendants knowingly or recklessly propped up Harman's stock price by issuing materially false and misleading disclosures regarding the Company's financial condition in fiscal 2007 (ending June 30, 2007) and in fiscal 2008 (beginning July 1, 2007).  During the Class Period, Defendants knowingly or recklessly failed to disclose material adverse facts about the Company's financial condition.  At the center of the Company's deteriorating financial condition were two new products produced and sold by the Automotive division, the MyGIG radio and the Personal Navigation Device ("PND").  In fiscal 2007, Harman began manufacturing and selling an important new mid-level infotainment system for Chrysler known as the MyGIG radio.  The Company's contract to manufacture the MyGIG radio for Chrysler was generating a material loss for the Company.  Similarly, Harman's Automotive division's earnings were under pressure from the introduction of PNDs and related decreased sales and margins due to aggressive price reduction by competitors, the delay of new products, mounting inventory and the sale of obsolete PND products at a substantial discount.

4.       In addition, Defendants knowingly or recklessly failed to disclose that Harman's capital expenditures were spiraling out of control; that its sales of MyGIG radios and PNDs were causing and would continue to cause operating margins to decline; and that because of delays in production and mechanical and quality control problems with the MyGIG radio, the Company's relationship with Chrysler had deteriorated.

5.       In fact, these material but undisclosed facts placed Harman in breach of the Merger Agreement relating to its previously highly-touted merger (the "Acquisition") with a company formed by Kohlberg Kravis Roberts & Co. L.P. ("KKR") and an affiliate of Goldman Sachs & Co. ("Goldman") (collectively, the "Purchasing Companies"), valued at approximately

2

$8 billion. At the time they announced the Acquisition and stated that it was in the best interest of shareholders, Defendants' forecasts for the Company's operating income and earnings generated by the Automotive segment – Harman's key division – demonstrated that the Company's business conditions had deteriorated and would continue to deteriorate during fiscal 2007 and fiscal 2008.

6.     On September 21, 2007, the Company announced that the Acquisition had been abandoned by the Purchasing Companies. According to the Company, the Purchasing Companies "informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the Merger Agreement and that they are not obligated to complete the merger."

7.     On this news, shares of the Company's stock fell from the previous day's closing price of $112.34 to a September 21, 2007 close of $85.00, a drop of $27.34. Moreover, the Company's share price continued to fall and closed on September 24, 2007, the next trading day, at $80.31 per share on adverse and unexpected news about excessive research and development ("R&D") expenses, and the possibility that there would be no earnings growth in the 2008 fiscal year (July 1, 2007 to June 30, 2008). Therefore, within two trading days, the Company's share price fell approximately $32 per share, or almost 30 percent, on extremely heavy trading volume.

8.     As fiscal 2008 began, it became increasingly difficult for Defendants to maintain the charade of their knowing and reckless false projections of operating income and earnings per share. Defendants had knowingly or recklessly presented to shareholders, analysts and the market materially false and misleading information regarding the Company's Automotive division's sales, operating income, operating margins and earnings per share during the Class Period. On January 14, 2008, prior to the market's open, Harman announced that it had significantly reduced its previously-announced guidance and lowered projected earnings per

3

share for fiscal 2008 to between $3.00 and $3.10 per share, which was over 40% lower than the $5.25 per share earnings originally forecasted by Defendants for fiscal 2008. The Company's change in guidance was attributed to pricing pressures from a "major shift" in the market for PNDs. Harman's stock dropped precipitously from the prior trading day's close of $68.97 to close at $43.00 per share, a 37.65% drop and a four-year low.

9.      But the full truth was still not disclosed. Finally, on February 5, 2008, Harman announced its financial results for the fiscal Second Quarter 2008, and disclosed that its Automotive division's earnings were "under pressure" due to decreases in PND sales and margins caused by "aggressive price reduction by competitors, the delay of new products, and the sale of older products at substantial discounts." In response, shares of the Company's stock fell from a closing price of $45.73 on February 5, 2008 to $38.70 on February 6, 2008, which was more than a 15 percent drop in the stock price per share.

10.     Until its September 21, 2007 announcement that the Acquisition would not take place, the Company had widely promoted its merger with the Purchasing Companies and had represented that the merger would occur in the calendar Third or Fourth Quarter of 2007 and was subject only to "the approval of Harman stockholders, customary closing conditions and regulatory approvals." The seemingly committed $120 per share Acquisition price had driven up the price of Harman stock to higher than $112 per share only days before the Company's announcement that the Acquisition was terminated. What Defendants knew or recklessly disregarded, but failed to disclose, was that there were significant risks that the Acquisition would never occur.

11.     In particular, the Merger Agreement between Harman and the Purchasing Companies included a) a provision which prohibited the Company from exceeding certain levels of capital expenditures (the "CapEx covenant"), and b) a provision which allowed the Purchasing

4

Companies to walk away from the Acquisition if a "material adverse effect" occurred, defined to include "[any event which] has or would be reasonably expected to have a material adverse effect on or with respect to the business, results of operations or financial condition of the Company" (the "MAC clause").

12.     What Defendants knew or recklessly disregarded, but failed to disclose to investors, was that the Company's capital expenditures were spiraling out of control, in breach of the CapEx covenant in the Merger Agreement. Indeed, Defendants later admitted that the Company's Automotive division, headquartered in Germany, had "binged on capital spending" and spent "$60 million in one month," and that there were no controls in place to prevent this exuberant spending.

13.     Additionally, Defendants failed to disclose that one of the Company's largest contracts, a contract to supply Chrysler with MyGIG radios for installation in mid-level vehicles, was underbid and was causing the Company to lose money, and, consequently, was negatively impacting profit margins. The MyGIG radio deal was also plagued with other problems from the beginning, including delays in production and mechanical issues which prevented the radios from working properly. As Chrysler decreased its orders for the MyGIG radios, a large inventory of unsold radios accumulated. Ultimately, Harman's relationship with Chrysler – on which the Company had depended for 26% of its net sales – deteriorated beyond repair.

14.     Finally, Harman belatedly disclosed that it was also experiencing disappointing sales of its PND products in Europe and high levels of PND inventory due to delays in production, competitive pricing, and newer competing models. Indeed, the Company had begun selling obsolete PNDs at deep discounts. Thus, the situation with respect to the PNDs was precisely the same as with the MyGIG radio: Harman had invested substantial sums of money in developing, manufacturing, and marketing a product which it either could not sell or was selling

at a substantial loss. Despite Defendants' knowledge or reckless disregard during the Class

Period of material adverse facts concerning the Company's PNDs – notably, a large sale and

return of PNDs in early fiscal 2008, and the fact that costs associated with the PNDs had caused

the Company to miss its First Quarter 2008 earnings forecast – Defendants did not fully disclose

these facts to investors until February 5, 2008, the end of the Class Period.

15.    Counsel for Lead Plaintiff investigated the deliberate or reckless acts giving rise

to the claims in this action.  Counsel's investigation included interviews with numerous former

employees of Harman who worked for the Company during the Class Period and had direct

responsibility for or were familiar with the products, operating costs and sales contributing to the

declining operating income and operating margins described herein.

16.    As a result of Defendants' wrongful and reckless acts and omissions, and the

precipitous decline in the market value of the Company's common stock, Lead Plaintiff and

other Class Members have suffered significant losses and damages.

## II.    <u>JURISDICTION AND VENUE</u>

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17

C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19.    Venue is proper in this judicial district pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged

herein, including the preparation and dissemination of materially false and misleading

information, occurred in substantial part in this judicial district.  Additionally, Harman's

principal place of business was at all relevant times located within this judicial district.

20.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchanges.

## III.  **PARTIES**

21.     Lead Plaintiff, as set forth in the certification filed in conjunction with its motion for appointment as lead plaintiff, incorporated by reference herein, purchased Harman's common stock at artificially-inflated prices during the Class Period and has been damaged thereby. During the Class Period, Lead Plaintiff purchased 29,800 shares of Harman common stock and lost more than $1.68 million as a direct result of such purchases.

22.     Defendant Harman is a Delaware corporation that, at all relevant times, had its executive offices located at 1101 Pennsylvania Avenue, N.W., Suite 1010, Washington, D.C. 20004.

23.     Defendant Dr. Sidney Harman ("Dr. Harman") was, at all relevant times, the Company's founder and Executive Chairman of the Board of Directors.  Dr. Harman also served as the Company's Chief Executive Officer ("CEO") from January 1, 2007 to June 30, 2007, when he relinquished the CEO title. Subsequently, in October 2007, Dr. Harman announced that he would forgo the title "Executive Chairman" effective on December 17, 2007. He continued as the Chairman of the Board of Directors.

24.     Defendant Dinesh Paliwal ("Paliwal") joined the Company as President, CEO and Vice Chairman of the Board of Directors on July 1, 2007, and he maintained these positions thereafter through the end of the Class Period.  Paliwal is only being sued for the time period from July 1, 2007 through the end of the Class Period.

25.    Defendant Kevin Brown ("Brown") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer ("CFO").

26.    Defendants Dr. Harman, Paliwal and Brown are collectively referred to hereinafter as the "Individual Defendants."

27.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control and did control the contents of Harman's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group published" information, the result of the collective actions of the Individual Defendants.

IV.    **BACKGROUND**

A.    **The Merger Announcement**

28.    On April 26, 2007, Defendants announced that Harman had agreed to be acquired by KKR and Goldman.  Defendants issued a press release to announce that the Purchasing Companies would acquire Harman for $120 per share, as follows:

8

**Harman Stockholders Can Elect to Receive $120 Per Share In
Cash or Shares in Post-Transaction Company**

**Transaction Valued at Approximately $8 Billion**

Harman International Industries, Inc. (NYSE: HAR) today
announced that it has entered into an agreement to be acquired by
affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS
Capital Partners ("GSCP") in a transaction valued at approximately
$8 billion. The transaction was unanimously approved by the
Harman Board of Directors, following the recommendation of a
Special Committee of independent directors. KKR initiated
discussions with Harman and structured the transaction so that
current Harman stockholders have the opportunity to participate in
the future upside potential of the enterprise. The company will
continue to be named Harman International Industries and Dr.
Sidney Harman, Founder and Executive Chairman, will remain
Executive Chairman.

\* \* \*

Under the terms of the agreement, Harman stockholders will be
entitled to receive $120 in cash for each share of Harman common
stock they hold. As an alternative to receiving the cash
consideration, Harman's stockholders will be offered the
opportunity to elect, on a purely voluntary basis, to exchange some
or all of their shares of Harman stock for shares in the new
corporation incorporated by KKR and Goldman in order to acquire
Harman.

29.    In the press release issued on April 26, 2007, Defendants expressly stated that the

Acquisition was expected to close in the calendar Third Quarter of 2007 (July-September 2007),

as follows:

Completion of the transaction, which is expected to occur in the
third quarter of 2007, is subject to the approval of Harman
stockholders, customary closing conditions and regulatory
approvals.

30.    In commenting on the agreement for Harman to be acquired by the Purchasing

Companies in the same press release, Dr. Harman stated:

We are pleased to reach an agreement with KKR and Goldman
that is in the best interest of our stockholders, presenting them

9

> with excellent value for their shares and the opportunity to
> participate in Harman's future growth. KKR and GSCP are two
> of the world's leading private equity investors and our Board of
> Directors strongly believes that this transaction will create
> attractive long-term opportunities for our employees, customers
> and business partners. Together, we will continue to execute our
> strategic plan, capitalize on new opportunities, and build on our
> history of product innovation and service excellence.

31.    The $120 per share price disclosed as the Acquisition exchange price by the

Company's April 26, 2007 press release was a 17% premium over the prior day's close of

$102.56 per share.  On April 26, 2007, over 7 million shares of Harman's common stock were

traded, which was extremely heavy trading, and the stock closed at $122.50 per share – 19%

higher than on April 25, 2007.

**B.    The Merger Agreement**

32.    To effectuate the Acquisition, the Company entered into an agreement (the

"Merger Agreement") with KKR and Goldman.  The Merger Agreement was attached to a press

release issued on April 27, 2007 by Defendants and filed with the SEC on Form 8-K, and stated

in pertinent part:

> The Company has made customary representations and warranties
> in the Merger Agreement and <u>agreed to customary covenants,
> including covenants regarding operation of the business of the
> Company and its subsidiaries prior to the closing.</u> (emphasis
> added).

**C.    The CapEx Covenant**

33.    Among the provisions of the Merger Agreement was a restriction on the

Company's capital expenditures while the proposed Acquisition was pending.  The CapEx

covenant restricted capital spending and expressly provided:  "the Company shall not, and shall

not permit any of its Subsidiaries to, without the prior written consent of Parent (not to be

unreasonably withheld or delayed):

(vi) make any capital expenditures (or authorization or commitment with respect thereto) in a manner reasonably expected to cause expenditures (x) to exceed the capital expenditure budget for the 2007 fiscal year previously provided to Parent or (y) for the 2008 fiscal year to exceed the 2008 capital expenditure budget taking into account reasonably anticipated expenditures for the balance of the year as well as expenditures already committed or made (assuming for this purpose that fiscal 2008 capital expenditure budget will not exceed 111% of the fiscal 2007 capital expenditure budget).

**D.    The MAC Clause**

34.    In addition, the Merger Agreement included a "MAC" clause that allowed the

Purchasing Companies to terminate the Acquisition in the event of a material adverse change in

Harman's business.  Specifically, in the Merger Agreement Defendants warranted that:

> (a) Since December 31, 2006, through the date of this Agreement, except for the transactions contemplated hereby, the business of the Company and its Subsidiaries has been conducted, in all material respects, in the ordinary course of business consistent with past practice.

> (b) (i) Since December 31, 2006, through the date of this Agreement, there has not been any facts, circumstances, events, changes, effects or occurrences that, individually or in the aggregate, would be reasonably expected to have, a Company Material Adverse Effect; and (ii) since the date of this Agreement there shall not have occurred any event, change, effect or occurrence that, individually or in the aggregate, would be reasonably expected to have a Company Material Adverse Effect.

35.    The Merger Agreement expressly defined the MAC clause in terms of a Material

Adverse Effect:

> "Company Material Adverse Effect" means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects, or occurrences, (1) has or would be reasonably expected to have a material adverse effect on or with respect to the business, results of operation or financial condition of the Company and its Subsidiaries taken as a whole,

or (2) that prevents or materially delays or materially impairs the ability of the Company to consummate the Merger …

### E.    **The MyGIG Radio**

36.    Prior to the Class Period, Defendants entered into a contract for Harman to manufacture MyGIG radios for Chrysler.  According to a former MyGIG radio purchasing manager (the "MyGIG Purchasing Manager") for Harman Becker's Automotive Division at Harman's Farmington Hills, Michigan facility who worked at Harman from early 2005 through early 2007, the MyGIG radio was produced as a "mid-level" infotainment system to be installed in many Chrysler vehicles, including minivans, Dodge Nitros and 300 sedans.

37.    According to the Accounting Manager, the Company entered into the mid-level market for infotainment systems to fill a revenue hole that was expected from the loss of certain revenue generated by sales to Mercedes of first generation navigation system units.  This Mercedes contract had generated $400 million annually for the Company, and according to the Company's fiscal 2006 Business Plan, which the Accounting Manager received and reviewed while he was employed at the Company, Defendants knew that Harman's revenue in fiscal 2007 and 2008 would be adversely impacted by the related loss of revenue.  Accordingly, to fill the "revenue hole," Harman entered into a contract with Chrysler that would fill the loss of revenue stream from the Mercedes navigation system units, but the Chrysler sales contributed significantly less to operating income and operating margins than the Mercedes contract had been contributing prior to fiscal 2007.  Therefore, Defendants knew or recklessly disregarded that the Company's earnings would soften in fiscal 2007 and fiscal 2008.

38.    In Harman's 2006 Annual Report, issued on September 6, 2006, the Chrysler MyGIG radio was highlighted as a state-of-the art infotainment system and very important because it was the "first true Infotainment System to be offered by one of the traditional Big 3

American automakers." The MyGIG radio rollout was supposed to take place in 2006, but it was significantly delayed until 2007 due to supply issues and Harman's inability to fulfill production needs, according to a former director of continuous improvement in Harman's Automotive Division in Farmington Hills, Michigan (the "Improvement Director") who worked at the Company in the Automotive division from 2004 through July 2007.

39.    The MyGIG Purchasing Manager stated that the MyGIG radios were built in Harman's new Washington, Missouri plant, and pilot versions of the radios were developed in Harman's Automotive corporate headquarters in Martinsville, Indiana and in Farmington Hills, Michigan. The MyGIG radios were problematic from a profitability standpoint and also were "plagued" with various technical and cosmetic issues, according to the MyGIG Purchasing Manager.

40.    The Quality Assurance Manager said that Harman Becker could not get sounds out of all of the MyGIG radios. Customers had reported that the MyGIG "locked up" on the listener. In Summer 2007, the Quality Assurance Manager attended the "MyGIG Concert," which featured Faith Hill and Tim McGraw, and after the concert, Harman employees joked at the Company's office that the entertainers "could not have been using a MyGIG radio at the concert because there was actually music coming out of the speakers." The Quality Assurance Manager also stated that Chrysler was already disappointed with the MyGIG deal because Harman Becker was one year behind in the launch date, and Harman "couldn't get the radio out" and "Chrysler had trucks parked outside the Chrysler plant waiting for the radios."

41.    The MyGIG Purchasing Manager stated that he regularly participated in Monday meetings with Chrysler's purchasing group in which Chrysler employees vented angrily about Harman's repeated delays in producing the radios and failure to explain the cause of the delays. The MyGIG Purchasing Manager stated that with respect to the MyGIG radio, a "lot of stall

tactics were being used" by Harman. The Improvement Director stated that his responsibilities at the Company included searching for areas for cost reduction, and that in 2006 and 2007, Harman was trying to reduce costs associated with the MyGIG deal, and its inability to do so was a "big deal."

42.     Compounding the problem throughout fiscal 2007, Chrysler reduced its number of orders for the MyGIG radio. Harman plant workers in Washington, Missouri complained to the MyGIG Purchasing Manager about "significant" decreases in volume orders and consequently production for the MyGIG radios. This decrease in orders and production resulted in reduced needs for parts for the MyGIG radio to be ordered by Harman, which caused suppliers to raise prices for the parts. The MyGIG Purchasing Manager stated that during fiscal 2007, the price of capacitors and a number of other commodities increased dramatically. The decrease in volume was a "huge problem for Harman" according to the MyGIG Purchasing Manager.

43.     Another former Harman employee, who was a senior quality assurance engineer at Harman's Farmington Hills, Michigan plant (the "Quality Assurance Engineer") from 2003 through September 2007, had responsibility throughout 2007 for trying to resolve quality assurance problems associated with the Chrysler MyGIG radio. The Quality Assurance Engineer stated that the contract Harman signed with Chrysler in 2005 to provide Chrysler with MyGIG radios created a loss for Harman because Harman sold each radio to Chrysler for $800, but the Company spent $964 to build each radio. Therefore, Harman was losing $164 on each radio and had committed to produce up to 200,000 annually for Chrysler.

44.     During the Class Period, Defendants reported that Harman's Automotive division's total operating income for fiscal 2007 was approximately $340 million. The Accounting Manager stated that the Company's forecasted loss resulting from the MyGIG production and sales was highly material to Harman's Automotive division. According to the

14

Accounting Manager, annual sales for the Automotive division were $450 million in North America, and the Company was "looking" at annual sales of the MyGIG radio to Chrysler of $250 million. Therefore, Harman's highly-touted MyGIG radio was slated to generate more than 50% of Automotive sales in North America at a substantial loss of approximately $32 million annually – almost 10% of Harman Automotive's total operating income, based on the commitment to provide 200,000 units to Chrysler.

45.     The Quality Assurance Engineer further stated that Defendants were unsuccessful in renegotiating the contract with Chrysler after several attempts to renegotiate it in 2006 and 2007. The MyGIG Purchasing Manager stated that he attended meetings in Winter 2005 with the Director of Purchasing for Harman (the "Purchasing Director") regarding the MyGIG radio. According to the MyGIG Purchasing Manager, a purchasing meeting was held at the Company's facility in Farmington Hills, Michigan, and the MyGIG Purchasing Manager was one of six employees present at the meeting in Winter 2005. The MyGIG Purchasing Manager stated that at this meeting, the Purchasing Director discussed Dr. Harman's personal role in negotiating the MyGIG contract. In addition, upon information and belief, Dr. Harman told all employees at the Farmington Hills facilities during a Business Award meeting at the end of 2005 that he had personally negotiated the MyGIG radio deal.

46.     One year later, Dr. Harman visited the Farmington Hills office to "give a pep talk to employees regarding the MyGIG radio." According to the MyGIG Purchasing Manager, Dr. Harman had "just come from a meeting at Chrysler" at which Dr. Harman apparently had requested a "price up" on the MyGIG radio, which the MyGIG Purchasing Manager understood was denied.

47.     The MyGIG Purchasing Manager stated that the Purchasing Director had informed him that the Purchasing Director was frustrated with the MyGIG contract negotiation

because initially there was omission of certain items that caused prices on the Company's end to increase. Specifically, the Purchasing Director told the MyGIG Purchasing Manager that Dr. Harman had negotiated a contract which failed to include costs associated with integrated circuits ("ICs"), which are very expensive electronic devices that created power for the MyGIG radios. According to the MyGIG Purchasing Manager, "ICs are the brains of the MyGIG." The MyGIG Purchasing Manager said that the Purchasing Director told him that Dr. Harman had initially negotiated a contract for the MyGIG radios that had omitted pricing for the ICs.

48. Upon information and belief, Dr. Harman told all Vice Presidents for the Company in a meeting in Plymouth, Michigan that he knew that the MyGIG had aggressive price targets and that although the Company was not going to make money on the MyGIG radio deal, it was strategically important to the Company.

### F.    The PND Sales and Margins

49. Harman brought its PND product to market in Europe as part of the "Aftermarket" division of its Automotive sector, which sold PNDs and other electronic equipment to aftermarket retailers. In early 2006, Harman began selling PNDs and initially sold 35,000 PND units in the Third Quarter of fiscal 2006 (January-April 2006). Shortly thereafter, Harman launched a new model, which the Company expected to double or triple its PND sales.

50. In October 2006, Defendants reported that the Company had enjoyed PND success in Europe and reported that Aftermarket sales were "robust" and that it had sold 95,000 PND units in fiscal First Quarter 2007 (July-August 2006). Based on fiscal First Quarter 2007 sales of PNDs, Dr. Harman stated that the Company expected to sell "well over 500,000 units" in Europe in fiscal 2007.

51. In January 2007, Dr. Harman reported that the Company had sold almost 250,000 PNDs for the first half of fiscal 2007 and claimed that Harman's PND sales were accelerating.

16

Therefore, Defendants raised projections for sales and stated that for the year, Defendants "now expect sales to exceed 650,000 units." Defendants claimed that in certain areas of Europe Harman sold the second leading PND brand and its position was strengthening "even as margin holds relatively firm." On April 26, 2007, Defendant Brown stated that the selling price in Europe on Harman's PND was approximately $350 per unit and that the Company had sold approximately 130,000 units in fiscal Second Quarter 2007.

52.     A former employee of Harman who worked in sales engineering at Harman's Martinsville, Indiana office from mid-2005 through July 2007 and for approximately seven years prior to that as an accountant at Harman (the "Sales Engineer"), stated that internal reports regarding the highly-touted PNDs presented a much more dire situation than the upbeat outlook for PNDs as publicly described by Defendants. The Sales Engineer was responsible for managing the Automotive division's business relations with certain large customers and had spoken to sales representatives at Harman in early 2007 about Harman's need to drop the price of its PNDs to remain competitive.

53.     According to the Sales Engineer, Harman's PNDs had not been selling in the numbers that Harman had anticipated in 2006 and, consequently, many of the PNDs were being stored in a warehouse. Also according to the Sales Engineer, Harman's PNDs "did not sell to projection in 2007" and the Company had a stockpile of PNDs in inventory. The Sales Engineer further explained that Harman had dropped the price approximately $100 and made a modification to the PNDs early in 2007 that "made the PNDs in the warehouse in Germany obsolete."

54.     According to a former employee who was responsible for accounting activities at one of Harman's manufacturing facilities and worked at Harman from 2001 through late 2007 (the "Accounting Manager"), and who was familiar with Harman's PND sales during his tenure

with the Company, Harman released approximately five versions of the same PND between March 2006 and July 2007, but it was not until July 2007 that the Company sold a significant number of the devices. He further stated that Harman was about "one year late in releasing a saleable PND" and that "sales were slow because the PNDs were priced too high to compete with other PNDs."

55.     The Company had missed projected PND sales by more than 200,000 units in fiscal 2007. According to the Accounting Manager, Harman's Automotive division distributed monthly and fiscal year-end operating reports (the "Operating Reports") that were authored by executives of Harman Automotive in Germany and distributed to Harman International Executives, including Defendants Dr. Harman and Brown, and after July 1, 2007 to Defendant Paliwal, as well as to several other executives and numerous lower-level accounting or financial personnel, including the Accounting Manager. According to these Operating Reports reviewed by the Accounting Manager when he worked at Harman, the Company missed projected sales of PND units in fiscal 2007 by more than 200,000 units, notwithstanding that Defendants had engaged in aggressive price reductions to move obsolete PND inventory in June 2007.

56.     In June 2007 (immediately prior to Harman's fiscal year end), Defendants entered into an agreement to sell 100,000 PND devices to a customer called Paragon for $240 each, which was $110 lower than what Brown had publicly disclosed on April 26, 2007 as the selling price in the amount of $350 each for PNDs. According to the Accounting Manager, the Operating Reports stated that the sale of 100,000 PND units in Fourth Quarter fiscal 2007 had failed to materialize and the sale to Paragon was not completed before fiscal year end. Although the Company sold all of the 100,000 PND units to Paragon at $240 each in July 2007, the Operating Reports reflected that Defendants had missed their projected PND sales by at least $85 million in fiscal 2007.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

### A.     Third Quarter Fiscal 2007 Results

57.     On April 26, 2007, the same day the Acquisition was announced, the Company

held a conference call to discuss its fiscal Third Quarter 2007 (January 1, 2007 through March

31, 2007) results.  Dr. Harman presented a very favorable report on the Company's operations

and financial performance for fiscal 2007 (July 1, 2006 to June 30, 2007) and guidance for fiscal

2008. Specifically, Dr. Harman stated the following:

> We begin the fourth quarter of the year [fiscal fourth quarter April 1, 2007 through June 30, 2007] and we look to fiscal '08 with a backlog of $14 billion. We continue to expect fiscal '08 Automotive OEM revenues at $2.8 billion and EPS of $5.25, subject to the probability that we will not be able to absorb the $46 million engineering bulge I identified in our previous earnings call. Let me remind that the bulge is driven by work on $1.1 billion of new business unanticipated when we first planned fiscal '08, and by continuing new work on Driver Assist. If we are unable to absorb the $46 million R&D bulge, the projected fiscal '08 EPS would become $4.79.

> * * *

> There are challenges as there are opportunities throughout the markets and throughout the technologies with which we work. Those opportunities include geographic expansion in Asia, and especially in China. They include a further expansion of Infotainment through midrange and entry-level automobiles.

> * * *

> As I look forward to our future in OEM, I see an interesting assembly of opportunity and challenge. I have already spoken about market opportunity. Here, I recognize and emphasize that recognition, that our growth has been accompanied by variances in efficiency. We are determined to rationalize our engineering and to reduce significantly the percentage of sales that R&D represents. I have spoken about this before. I mention it now not because I have some major new insight, but precisely to emphasize the fact that it is before us, that we have our work cut out, but we intend to get it done.

> * * *

I had indicated in earlier conference calls that the PND environment in Europe was not as margin challenged as it is in the United States, but that we could surely anticipate it. There was reasonable foresight in that observation. In the recent quarter, the European PND market has become extremely competitive. We are working extraordinarily hard to increase sales and to maintain adequate margins in that environment. In our earnings call three months ago, it was noted that Harman/Becker PND inventories in Europe had grown substantially. We said then that the inventory had been developed to support a vigorous sales effort and that we planned to reduce it to normal levels at year-end. <u>The plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding. Where March 31 inventory was $75 million, we expect April 30 inventory to be approximately $50 million, May 31 inventory to be approximately $30 million, and June 30 inventory to be approximately $15 million, that a very normal level.</u> Overall, the European market for our high fidelity and multimedia products is a very bright spot in our consumer business.

* * *

Inventories were $480 million at March 31, an increase of $142 million compared to the prior year. <u>As of the second quarter, inventory increases are primarily in Automotive to support the growing PND business.</u>  (emphasis added).

58.    Following the prepared comments on the conference call on April 26, 2007, Dr. Harman and Defendant Brown responded to analysts' questions regarding Dr. Harman's reference to sales of PNDs and increased competition for PNDs in Europe as follows:

JAIRAM NATHAN: Okay, just one more question. On the European PNDs, you said that the competition has kind of increased. Is it because of higher competition that you're seeing pricing pressure or is it because the growth is slowing and there are more people vying for the same growth?

SIDNEY HARMAN: No, I think it is the former.

JAIRAM NATHAN: It is just more competition?

SIDNEY HARMAN: Oh, yes.

* * *

PETER FRIEDLAND: Okay. And then as far as Becker PND units, you said you're still on track for 618,000 units for fiscal '07.

20

Where are we year-to-date? And then the second question on the Harman Kardon PND, what are the units there?

SIDNEY HARMAN: While Kevin is checking his records, let me just tell you that the Harman Kardon PNDs are just too early to even begin to read retail sales. They are moving into retail channels. Ask us in the next quarter.

Peter, do you have information on the --?

KEVIN BROWN: Yes, the Harman Kardon PND unit sales for the quarter were about 84,000 units. For the nine months are over 300,000 units. The Becker -- I'm sorry -- did I say Harman Kardon?

SIDNEY HARMAN: Correct it, please.

KEVIN BROWN: The Becker -- the European PND unit sales.

PETER FRIEDLAND: Okay. So 300,000, and you still think you can do over 600,000 for the fiscal year?

SIDNEY HARMAN: We do, and we said so.  (emphasis added).

59.     In addition, in answering a question from an analyst, Dr. Harman made the following remarks regarding the Company's R&D expenses:

JEFF KESSLER: I guess the question that we have is around continuing to match R&D to the revenue structure, as you see it, given that you have programs in place that are obviously important and obviously have a lot of potential. But getting your hands around the expense levels relative to new programs, are there some -- you've mentioned one or two that are in line to produce over the next several years. Is there anything that we should be aware of which is maybe going to change that R&D-to-revenue percentage, let's say, 18 months out or so?

SIDNEY HARMAN: Are you asking whether the percentage of revenue represented by R&D will increase or decrease?

JEFF KESSLER: I'm asking, again, how are you going to get that decrease? In other words, where is the return on that R&D going to come from?

SIDNEY HARMAN: I've got it. In two ways, really. Understand first that the increase is, from our point of view, a very

21

constructive thing. The so-called bulge was generated by the receipt of awards that we did not contemplate when we were generating the plan and generating our guidance. The engineering represented in that bulge is essentially for the new BMW award and the development of Driver Assist, which we believe has very positive implications down the road. I have not yet answered your question, but I thought it useful to set that base.

Now we believe -- and I have made this clear numbers of times -- we believe that in the growth of the Company and in the urgency of getting the job done in what was a substantially new world of technology, the primary objective was just that -- get it done and, in effect, damn the cost. We are still in that surge mood. I should be careful about the use of that word, I suppose. But I am convinced, Kevin is convinced, our Board is convinced that over time -- and reasonable time -- we can rationalize that engineering so that as a percentage of sales -- and remind you, sales will be going up, so that if the engineering expense stayed fixed, the percentage would decline, so it moves us constructively in that direction -- but we believe that we can rationalize, generate efficiencies such as to permit us to improve that percentage by approximately 100 basis points a year over the next several years.

60.    During the same conference call, Defendant Brown stated, in part, the following:

Total Harman International R&D expenses in the third quarter were $90 million, or 10.2% of sales, compared to $74 million, or 9.2% of sales, in the same quarter of the prior year. As Sidney discussed, R&D is trending higher than we had anticipated as we work to develop new technologies and new programs. We expect fiscal 2007 R&D expenses to approximate 10% of full-year sales. In fiscal 2008, we anticipate R&D will begin to decrease as a percentage of sales.

61.    The market again reacted favorably to Defendants' reports on Harman's financial condition and business prospects. On April 27, 2007, the stock pushed slightly higher in very heavy trading to close at $122.59.

62.    Defendants' statements in paragraphs 57, 59, and 60 regarding sales, increasing "Automotive OEM revenues," and forecasted "EPS of $5.25" in fiscal 2008, subject to a bulge of R&D expenses, were materially false and misleading when made and/or omitted to disclose material facts necessary to make the statements made not misleading because Defendants

knowingly or recklessly failed to disclose the following material adverse facts about the

Company's business and financial prospects:

> (a)    Harman's increasing sales and operating margins in the Automotive segment were being adversely affected in fiscal 2007 by much more than bulging R&D expenses, which the Company presented as a positive indicator of Harman's financial condition and prospects.

> (b)    Defendants knowingly or recklessly projected earnings of $5.25 for fiscal 2007 when, at the time, they had no reasonable basis for their guidance and they were knowingly or recklessly deceiving the investing public by failing to disclose that in addition to increased R&D expenses, the Company was experiencing growing material losses and declining operating margins.

> (c)    Defendants had presented projected operating and earnings results to the Purchasing Companies which they knew had no reasonable basis and failed to present the Company's true financial condition and future earnings and prospects.  Upon information and belief, Defendants had presented estimates of Harman's Automotive division's operating income for fiscal 2008 in the amount of $400 million to the Purchasing Companies.  In March and April 2007, Helmut Schinagel and Mike Mauser, the Automotive Division's CEO and CFO, respectively, created internal projections and the business plan for fiscal 2008 (July 1, 2007 through June 30, 2008).  This business plan clearly demonstrated that the Automotive division would generate a maximum of $240 million in operating income in fiscal 2008, but Dr. Harman and Defendant Brown directed Schinagel and Mauser to change the estimate to $400 million because that was the number that they had provided to the Purchasing Companies, notwithstanding that Harman's Automotive division was selling mid-level MyGIG infotainment systems to Chrysler and PNDs which each generated significantly lower operating income and operating margins than the Company had generated in fiscal 2007.

63.    Defendants' statements in paragraph 57 regarding opportunities through

"expansion of Infotainment" systems through "midrange" automobiles were materially false and

misleading when made and/or omitted to disclose material facts necessary to make the

statements made not misleading because during fiscal 2007 and throughout the Class Period,

Defendants knew or recklessly disregarded that the Company's expansion into infotainment

systems for mid-level vehicles for Chrysler would increase losses for the Company and cause

material declines in the Company's operating income as a percentage of net sales during the

Class Period, for at least the following reasons:

(a)    Harman's contract to manufacture MyGIG radios for mid-level Chrysler vehicles required that Harman produce and sell each MyGIG radio to Chrysler at a <u>loss</u>. Harman was losing at least $164 on each radio, and had committed to produce up to 200,000 annually for Chrysler. Therefore, the Company was incurring and would continue to incur a $32 million annual loss on the MyGIG radio.

(b)    According to the MyGIG Purchasing Manager, Dr. Harman had been unable to renegotiate the MyGIG contract with Chrysler. Therefore, he was aware during the Class Period that the Company was taking a material loss on sales of the MyGIG radios to Chrysler.

(c)    According to the MyGIG Purchasing Manager, the MyGIG radios were "plagued" with technical problems. The gear motor that drove the faceplate of the radio and enabled the faceplate to lift upward so that a CD could be inserted, for example, "never really worked properly." In addition, the radio had software issues which, at times, prevented the radio system from even turning on.

(d)    Chrysler's relationship with Harman was rapidly deteriorating. As the MyGIG Purchasing Manager explained, the MyGIG radio rollout was supposed to take place in 2006, but was significantly delayed until 2007 due to supply issues and Harman's inability to fulfill production needs. Harman had repeatedly delayed production of the radios and gave no explanation for the delays to Chrysler.

(e)    In early 2007, Chrysler had reduced its number of orders for the MyGIG radio. Harman plant workers in the Washington, Missouri plant complained to the MyGIG Purchasing Manager about "significant" decreases in volume orders and consequently production for the MyGIG radios. The decrease in orders and production resulted in reduced needs for parts for the MyGIG radio to be ordered by Harman, which caused suppliers to raise prices for the parts.

(f)    The Company was changing components on the MyGIG radio without disclosing the changes to Chrysler, and ultimately caused Chrysler to have to shut down installation of the radios in certain vehicles because of quality control problems. These and other quality control problems caused a decline in the relationship between Harman and Chrysler. Upon information and belief, during the Class Period, the Company, at Schinagel's and others' direction, began to make "black" changes to Chrysler's products, which meant that Harman was making changes without telling Chrysler or getting the appropriate approvals from

Chrysler. The Company also had undertaken a program to find ways and means to try to save money to reduce operating costs and artificially boost operating income to meet the unreasonable target operating income that Defendants had presented to the Purchasing Companies for fiscal 2008 (July 1, 2007 through June 30, 2008). Upon information and belief, certain employees complained to Harman's executives and ultimately to the Audit Committee of Harman's Board of Directors about the proposed undisclosed "black" changes to Chrysler's infotainment systems.

64.    Defendants' statements in paragraph 57 and 58 regarding "growing" PND sales and related "inventory increases" and forecasted PND sales of "618,000 units" in fiscal 2007 were materially false and misleading when made in April 2007 and/or omitted to disclose material facts necessary to make the statements made not misleading for at least the following reasons:

(a)    During fiscal 2007 and throughout the Class Period, Defendants knew or recklessly disregarded that the Company's foray into PND sales in Europe would cause material declines in its operating income as a percentage of net sales during the Class Period.

(b)    Harman had a large inventory of older generation, obsolete PNDs which it could not sell or was forced to sell at a substantial loss, and prospects for future sales of PNDs were being adversely affected by increasing competition and pressures from competitive pricing.

(c)    According to the Sales Engineer, PNDs had not sold to the Company's expectations in 2006, and many of the devices, consequently, were being stored in a warehouse. Likewise, in 2007, the Sales Engineer stated that Harman's PNDs "did not sell to projection," and the Company had a stockpile of the devices in inventory.

(d)    The Sales Engineer added that, in early 2007, Harman made a modification to its PND which rendered all of the older-generation units in inventory obsolete.

(e)    According to the Accounting Manager, Harman released five versions of the same PND between March 2006 and July 2007, but it was not until July 2007 that the Company even sold a significant number of the devices.

65.    Defendants repeated their positive report on the Company's fiscal Third Quarter 2007 financial performance in the Form 10-Q filed with the SEC on May 10, 2007, which was

signed by Defendant Brown and Sandra Robinson, the Company's Chief Accounting Officer. The Company reported that net sales for the fiscal Third Quarter ended March 31, 2007 were $882.8 million, an increase of 10 percent over the same period in 2006, and that for the nine months ended March 31, 2007, net sales were $2.640 billion, an increase of 11 percent over the same period in 2006. The Company's operating income was reported as $92.1 million for the Automotive division for the quarter ended March 31, 2007, and $274.7 million for the nine months ended March 31, 2007.

66.    In the May 10, 2007 Form 10-Q, Harman disclosed that net sales to Chrysler were 26% of the Company's total net sales during that period. The Form 10-Q stated, "We anticipate that DaimlerChrysler, Toyota/Lexus, Audi/VW and BMW will continue to account for a significant portion of our net sales and accounts receivable for the foreseeable future." Notably, the Company recognized that "[t]he loss of sales to DaimlerChrysler, Toyota/Lexus, Audi/VW or BMW would have a <u>material adverse effect</u> on our total consolidated net sales, earnings and financial position." (emphasis added).

67.    Defendants also reported in the fiscal Third Quarter 2007 Form 10-Q that "sales of our aftermarket products were higher due to the introduction of Becker PNDs in Europe." The Form 10-Q further stated that cash flows from operations for the nine months ended March 31, 2007 were $47.1 million compared to $241.3 million for the same period the prior year, and attributed the decrease in part to higher working capital requirements, and more specifically to a $280.4 million increase in working capital "primarily due to higher inventory levels to support increased sales to [Harman's] automotive customers and to support [Harman's] newly developed PND market in Europe."

68.     In response to the positive news released in the fiscal Third Quarter 2007 10-Q, Harman's stock price ticked up slightly to $119.62 on May 11, 2007, from the prior day's close of $119.50.  The Company's stock continued to be driven by the anticipated Acquisition and the seemingly committed $120 per share Acquisition price.

69.     The statements in paragraphs 65-67 above, including that the Company's net sales in the Third Quarter of fiscal 2007 had exceeded sales in corresponding prior-year periods by some 11%; that Daimler-Chrysler would "continue to account for a significant portion of [Harman's] net sales and accounts receivable for the foreseeable future"; that the Company's sales were higher because of the introduction of PNDs in Europe; and that the Company had intentionally accumulated a high inventory of PNDs to support "increased sales" and the "newly developed PND market in Europe," were false and misleading when made and/or omitted to disclose material facts necessary to make the statements made not misleading because Defendants knowingly or recklessly failed to disclose material adverse facts about the Company's business and financial prospects, as described in paragraphs 62-64 above.

**B.      Fourth Quarter and Fiscal Year-End 2007 Results**

70.     On August 14, 2007, the Company filed with the SEC a Current Report on Form 8-K and released financial results for the fiscal Fourth Quarter and full-year ended June 30, 2007, stating that the Company's "Automotive net sales for the fiscal year were $2.493 billion compared to $2.238 billion a year ago, an increase of 11 percent compared to last year" and that for the Fourth Quarter compared to the prior year, "Automotive sales were $635 million, an increase of 6 percent."  In the press release, Dr. Harman was quoted as follows:

> On April 26, 2007, Harman announced that it had entered into a merger agreement with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners in a transaction valued at approximately $8 billion.  <u>We anticipate completing the</u>

transaction during the third or fourth quarter of this calendar
year." (emphasis added).

71.    The statement in paragraph 70 that Harman anticipated completing the

Acquisition during the calendar Third or Fourth Quarter of 2007 lacked a reasonable basis in fact

and was false and misleading and/or omitted to disclose material facts necessary to make the

statements made not misleading because Defendants knew or recklessly disregarded that the

Company's increased costs and decreasing profit margins had caused or likely would cause the

Company to trigger the terms of the MAC clause in the Merger Agreement and threaten its

proposed Acquisition.  The same undisclosed increased costs and decreasing operating margins

that had caused the material decline in the Company's operating income had caused or likely

would cause Harman to breach the terms of its proposed Acquisition and would continue to

result in significantly lower earnings for First, Second and Third Quarter fiscal 2008 for the

reasons described in paragraphs 62-64 above.

72.    In addition, the statement identified in paragraph 70 lacked a reasonable basis in

fact and/or omitted to disclose material facts necessary to make the statements made not

misleading because Defendants also failed to control excessive capital spending as part of the

Company's effort to ramp up the new Missouri plant, which was built to manufacture the

MyGIG radios for Chrysler.  Delays at the Missouri plant and quality control issues with the

MyGIG radio had severely strained Harman's relationship with Chrysler, and the Company was

burning through cash to build the plant and ramp it up to manufacture the MyGIG radio.

Defendants failed to disclose that cost overruns at the Missouri plant and other facilities had

caused the Company to breach the CapEx covenant in the Merger Agreement, as follows:

       (a)    Dr. Harman **admitted** that in the Fourth Quarter of fiscal 2007, the
       Company had engaged in exuberant spending.  After KKR and Goldman
       terminated the Merger Agreement, Dr. Harman stated that the Company's

Harman Becker division, the Automotive division headquartered in Germany, had "binged on capital spending" in June 2007, "spending $60 million in one month." According to a *Fortune* article dated January 24, 2008, there were no controls in place to prevent this "überschwang," or exuberance. The article quoted Defendant Paliwal as stating that "Harman lacks certain widely accepted management 'processes' and that he [Paliwal] is now busy installing them."

(b)    Dr. Harman reported to *Fortune* that this reckless spending binge caused Harman's capital expenditures to exceed $90 million in fiscal Fourth Quarter 2007 (April 1, 2007 through June 30, 2007) alone and over $174.4 million for fiscal 2007, which was more than $24 million over the $150 million forecast by Defendants three months earlier. Capital expenditures were $12.4 million, $27 million, and $45 million in the First, Second, and Third Quarters of fiscal 2007, respectively. Defendants' unbridled capital spending of $60 million in June 2007 and an additional $30 million prior to that between April and May 2007 violated known specific and quantified restrictions on capital expenditures in the Merger Agreement.  As stated in the *Fortune* article dated January 24, 2008, reporting on the terminated Acquisition and breach of the CapEx covenant, the "$25 million overrun became evidence that KKR cited as a justification to kill the deal."

73.    On August 14, 2007, Defendant Dr. Harman and others, including the Company's newly-appointed CEO and President, Defendant Paliwal, held a conference call to discuss the Fourth Quarter and fiscal year-end 2007 financial results.  On the call, Dr. Harman stated that earnings per share before restructuring, merging, and unusual tax items were $4.14.  He also stated that quarterly operating income was $81.4 million.  Defendant Brown outlined factors that adversely impacted gross profit, including "the manufacturing ramp up required to ready our automotive operations for the surge of production in the new year," which he explained as having a "one-time effect on gross profit in the quarter."  He added that "[c]ompared to a year ago, fourth quarter factory costs were up over 9%" and that "operating expenses were up $23 million or 1.3 points, quarter to quarter."  Brown attributed 50% of the increase in operating expenses to the Company's euphemistically-styled "R&D bulge" that had been disclosed in previous quarters' conference calls, as follows:

Total Harman International R&D spending was $94 million, or 10.3% of sales in the quarter. That bulge was primarily generated by the need to process the engineering for the $14 billion backlog, of which a significant $1 billion-plus had been unanticipated.

74.    During the conference call, Dr. Harman stated, in part, the following:

Our dominance in the automotive space was solidified through the past year, where we had earlier confronted doubt about our ability to move effectively beyond the luxury car market for our infotainment systems. That doubt has been erased. <u>With earlier awards to us from PSA, Audi and Chrysler, we established our leadership in the mid-range and entry levels, with last year's major awards from BMW, we erased any remaining questions.</u> We are moving from an era in which each new infotainment system represented a virtually original effort with all new R&D to a new era in which the major automotive makers are committing to a common electronics platform, applicable across the full range of car lines.  (emphasis added).

75.    Further with respect to the increase in operating expenses, Defendant Brown stated that "fourth quarter operating expenses reflect the costs associated with our determination to pursue vigorously a significant market share in the PND business in Europe.  We spent the money in the fourth quarter which was necessary to cultivate that field for our engagement in the new year."  He also stated that Harman's balance sheet was "strong" at fiscal year-end and reported that inventory was $453 million.

76.    The statements in paragraphs 73-75 above, including that the Chrysler MyGIG deal had enabled the Company to establish itself as a leading provider of infotainment systems for the mid-range market; that the increase in operating expenses during the Fourth Quarter of fiscal 2007 was necessary to secure European PND business in fiscal 2008; and that the Company's balance sheet at fiscal year-end was "strong," were materially false and misleading when made and/or omitted to disclose material facts necessary to make the statements made not misleading because Defendants knowingly or recklessly failed to disclose material adverse facts

about the Company's business and financial prospects, as described in paragraphs 62-64 and 72 above.

77.     In fiscal 2007, according to Operating Reports reviewed by the Accounting Manager, Harman fell well short of the 650,000 PND units that Defendants projected to sell in fiscal 2007, because upon information and belief Defendants had no reasonable basis to project these sales, and knowingly or recklessly provided unrealistic projections for sales, operating income and earnings to analysts and shareholders.  Defendants knowingly or recklessly stated in a conference call on April 26, 2007 that the Company would sell in the fiscal Fourth Quarter of 2007 alone (April 1, 2007 through June 30, 2007) more than double the 300,000 PND units that it had sold in the first three quarters of fiscal 2007 (July 1, 2006 through March 31, 2007).  As set forth in paragraph 64 above, Dr. Harman's and Brown's projections for PND sales lacked a reasonable basis in fact and were false and misleading and/or omitted to disclose material facts necessary to make the statements made not misleading because the Company was facing increasing pricing pressures, increasing competition and was overstocked with obsolete Generation 2 PND units that were soon going to be superseded by Generation 3 PND units released in August 2007.

78.     On August 29, 2007, the Company filed its year-end Annual Report on Form 10-K with the SEC.  The Form 10-K was signed by each of the Individual Defendants and presented a long explanation regarding the proposed Acquisition.  Defendants' statements regarding the Acquisition in the Form 10-K were intended to and did give the impression that the Acquisition would close, subject only to shareholder approval and regulatory and antitrust clearances, during the Fourth Quarter of calendar year 2007, as follows:

> Completion of the merger is subject to the approval of our stockholders and other customary closing conditions, including

regulatory approvals and antitrust clearances.  <u>We presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007</u>.  (emphasis added).

79.    The statement in paragraph 78 that "[w]e presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007" lacked a reasonable basis in fact and was false and misleading and/or omitted to disclose material facts necessary to make the statements made not misleading because Defendants knew or recklessly disregarded, at the time they made the statement, that Harman's financial condition and operating income and operating margins had materially declined for the reasons described in paragraphs 62-64 and 72 above, and Defendants further knew that the Company had or likely had breached the CapEx covenant of the Merger Agreement and that the Company had or likely had triggered the MAC clause of the Merger Agreement by failing to meet the operating results that Defendants had presented in writing to the Purchasing Companies for fiscal 2007 or fiscal 2008.  As set forth above in paragraph 62, Defendants had no reasonable basis in April 2007 to project operating income of $400 million in fiscal 2008.

80.    The Form 10-K for fiscal 2007 repeated much of the information that Defendants had previously reported regarding a so-called "R&D bulge," which Defendants again focused on as a positive indicator of the Automotive division's strong financial condition and prospects, as follows:

> Automotive – Automotive R&D costs were $286.5 million in fiscal 2007, representing 11.5 percent of net sales.  Fiscal 2006 R&D costs were $232.2 million, or 10.4 percent of net sales. These costs were incurred to develop audio, electronic and infotainment systems for an expanding list of automotive platforms.  <u>Our infotainment systems are increasingly based on scalable software allowing us to efficiently design systems for luxury, mid-range and entry-level vehicles.</u>  (emphasis added).

81.     In the Form 10-K, Defendants further issued a very favorable report on the

Missouri plant, that:

> During fiscal 2007 we went into full production at our new
> manufacturing facility in Washington, Missouri.  This factory will
> primarily produce infotainment systems for Chrysler.  Since our
> new Chrysler program began late in fiscal 2007, the factory's
> overhead costs were not fully leveraged during the year.  We
> anticipate our Washington, Missouri factory will operate at full
> capacity during fiscal 2008.

82.     In the Form 10-K, Defendants also stated, "Sales of aftermarket products,

particularly PNDs, were very strong during fiscal 2007."

83.     Analysts reporting on Harman's stock and financial results reacted favorably to

Defendants' reported expectation for R&D to decline as a percentage of sales in fiscal 2008,

despite a "$46 million bulge" in R&D spending.  A report issued by Bear Stearns on August 15,

2007, stated that the resumption of 16% operating margins in Harman's Automotive "OEM"

business was "not out of the question beyond fiscal 2008, especially as installation volumes

accelerate with the Chrysler programs and others. . ."  On an earnings conference call in August

2006, one year prior, Defendants had reported to analysts that Automotive sales were expected to

grow over 7%, with margins near 16% and with increased sales and growth stimulated in part by

"increased PND aftermarket sales" and increased "infotainment sales" from the MyGIG launch

late in 2007 at Chrysler.

84.     RBC Capital Markets ("RBC") issued a similar report, noting that higher R&D

and manufacturing costs had adversely impacted the Company's results.  RBC analysts projected

a 12-month stock price target of $120 for Harman's common stock based on the buyout price of

$120 per share and noted that the "premium to [Harman's] growth rate is warranted given the

company's highly unusual revenue and earnings visibility, competitive positioning, expanding margins, and large free cash flow generation."

85.    In response to the positive news regarding Harman's financial condition and prospects released by Defendants and driven by the anticipated Acquisition, Harman's stock price closed on August 29, 2007, at $113.39 per share, slightly up from the prior day's close of $112.93.

86.    The statements in paragraphs 80-82 regarding total operating income for the Automotive division in fiscal 2007; the Company's purported efficient design for mid-range infotainment systems for Chrysler; the Company's full production at its Washington, Missouri plant in fiscal 2007 and full-capacity operation in fiscal 2008; and "very strong" sales of PNDs during fiscal 2007, were false and misleading when made and/or omitted to disclose material facts necessary to make the statements made not misleading because Defendants knowingly or recklessly failed to disclose material adverse facts about the Company's business and financial prospects, as described in paragraphs 62-64 and 72 above.  Defendants also failed to disclose the following additional material adverse facts about the Company's MyGIG radios and PNDs:

(a)    The Company was burning through cash and experiencing debilitating delays in trying to ramp up its new Missouri plant to manufacture MyGIG radios – which Defendants knew would be sold at a material loss.  The Accounting Manager confirmed that the Company went "substantially over budget" for its new plant in Washington, Missouri.

(b)    Harman was not considered for the MyGIG radio contract for 2010 production of Chrysler's Jeep Grand Cherokee and Durango vehicles because of "concerns surrounding the [MyGIG radios]," as reflected in the June 2007 month-end and fiscal year-end Operating Reports received by the Accounting Manager in July 2007.

(c)    According to Operating Reports reviewed by the Accounting Manager, the Company had on hand hundreds of millions of dollars worth of obsolete Generation 2 PNDs which were being superseded by newer Generation 3 PNDs in August 2007.

34

(d)      According to Harman's monthly Operating Report for July 2007, as reviewed by the Accounting Manager, the Company had missed "aggressive" sales targets of PNDs for the fiscal year ended June 2007 by more than $85 million, which was approximately one-third of Defendants' unreasonably forecasted net sales.

(e)      According to the Accounting Manager, Harman had tried to sell 100,000 of its obsolete PND units at a substantial discount immediately prior to fiscal year-end 2007.  The sale was not pushed through until July 2007 (fiscal First Quarter 2008), and although it generated $24 million in revenues which were recognized in July 2007, the Accounting Manager stated that all 100,000 PND units sold in July 2007 were returned to Harman four months later, and the Company took a $24 million loss for return of the sale of obsolete inventory.

C.      **Aspects of The Truth Begin to Emerge**

87.      On September 21, 2007, the Company issued a press release entitled "Harman Comments On Previously Announced Merger."  The press release stated, in part, the following:

> Harman International Industries, Incorporated (NYSE: HAR) announced that it was informed this afternoon that Kohlberg Kravis  Roberts & Co. L.P. (KKR) and GS Capital Partners VI Fund, L.P. (GSCP) no longer intend to complete the previously announced acquisition of Harman by a company formed by investment funds affiliated with or sponsored by KKR and GSCP. KKR and GSCP have informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger.   Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement.

88.      On this news, shares of the Company's stock fell from a closing price of $112.34 on the prior day to close at $85.00 on September 21, 2007.  Thus, the Company's share price fell more than 24 percent that day.

89.      On the same day, an article published by Reuters stated, in part, the following regarding the failed merger between Harman and the Purchasing Companies

> Kohlberg Kravis Roberts & Co LP and Goldman Sachs Group Inc.'s (GS.N: Quote, Profile, Research) private equity arm are worried  about  <u>certain  financial  conditions  inside  Harman</u>

International Industries Inc. (HAR.N: Quote, Profile, Research), concerns that could threaten the $8 billion deal, a source said on Friday.

The concerns stemmed less from broad credit market worries and more from <u>internal conditions within the company</u>, said the source, who is familiar with the matter but did not want to be identified. (emphasis added).

90.    On the same day, Reuters issued another press release stating, in part, that:

Trade in shares of audio equipment maker Harman International Inc (HAR.N: Quote, Profile, Research) was suspended on Friday, pending news from the company.

The company is the target of an $8 billion takeover, but a source familiar with the matter said the <u>buyers are worried about the company's financial conditions.</u> (emphasis added)

91.    Later on the same day, Reuters issued yet another article regarding the merger and, this time, gave additional details regarding the pullout. The article states, in part, the following:

NEW YORK (Reuters) - Harman International Industries Inc (NYSE:HAR - News) said its private equity buyers are pulling out of their $8 billion buyout deal, a severe blow to the company whose shares fell more than 25 percent on Friday.

* * *

But the Harman bail-out looks <u>centered on the financial conditions of the company itself</u>, not the lending agreement, and marks the first time in a two-year private equity acquisition frenzy that buyers walked out of a major deal.

Merger arbitrage traders and an analyst said among the hurdles Harman faced was <u>rising inventories and declining cash flows and sales in the last few quarters. Traders also said questions surfaced recently about Harman's relationship with Daimler-Chrysler, a customer for its audio products.</u>

* * *

The merger proxy does have language in it on pertaining the deal being threatened in the event of certain "material adverse" effects

on Harman.

"The company either has to slow production, reduce prices, or have inventories remain at elevated levels, and that deteriorates your cash flow model," Galperin said, adding that personal navigation devices for cars were among the items sitting in the inventory.

Traders said on Friday that <u>a great deal of attention was being paid to a filing showing that sales to DaimlerChrysler accounted for 25 percent of Harman's total consolidated net sales for the fiscal year ended June 30, 2007.</u> Cerberus Capital recently bought Chrysler from Daimler.

<u>While Harman says in the filing that loss of sales to the customer would have a "material adverse effect" on sales, there is no public indication that the relationship is in jeopardy.</u>  (emphasis added).

92.    Similarly, on the same day, a Forbes article stated, in part, the following regarding

the failed merger:

### KKR and Goldman Dump Harman

Harman, it's not us, it's you. This is what the audio-manufacturing firm claims it just heard from would-be buyers KKR and Goldman Sachs when they backed out a deal Friday to buy the firm. Harman then told the world the news, just slightly ahead of the closing bell at the New York Stock Exchange.

* * *

Although the exact reason for the drawback is not known yet, Harman's fourth quarter and full year results did fall short of Wall Street's expectations. In the fourth quarter Wall Street expected earnings of $1.24 and Harman yielded 98 cents. Full year of fiscal 2007 Wall Street requested $4.38 and Harman yielded $4.14.

According to the Associated Press, <u>one anonymous insider said the private equity firms sought to squash the deal over questions about Harman's financial health, not because of any financing difficulties in a tight credit market</u>. The person said the effort to back out is sincere, and not a negotiating tactic.

Prior to the release, the NYSE had contacted Harman regarding its price drop, and requested it release information pertaining to the drop.

> After the company declined the NYSE then released its own
> report that Harman had denied its request. Shortly after its denial,
> Harman changed course and told the NYSE it would make a press
> release. In accordance with regulation, the exchange halted the
> stock from trading.  (emphasis added)

93.    On September 24, 2007, <u>after</u> the Acquisition was terminated, Defendants issued

a press release and significantly lowered Harman's forecasted earnings per share for fiscal 2008

from between the previously reported $4.79 and $5.25 per share to the revised $4.14 per share.

Defendants also disclosed that for the First Quarter of fiscal 2008 (ending September 30, 2007),

earnings were expected to be $0.50 per share with operating profits of $40 million, which was

less than one-half of operating profits for the same period in fiscal 2007 and roughly one-half of

expected earnings of $1.02 per share that Defendants had knowingly and recklessly projected,

notwithstanding information which they received on a monthly basis in Operating Reports which

clearly showed that operating income and operating margins were significantly declining and

would continue to decline throughout fiscal 2008.  The press release stated, in part, the

following:

### Harman Provides Guidance For Fiscal 2008

> The Company expects fiscal 2008 performance to be impacted by
> a number of factors including increased R&D to support the
> development of several new infotainment platforms and
> associated launch costs.  We now expect fiscal 2008 sales to
> reach $4.1 billion ($3.55 billion in 2007). The Company expects
> operating income and diluted EPS before merger related costs to
> equal or exceed last year's record performance.   In 2007,
> operating income was $397 million and diluted EPS were $4.14
> adjusted for non-recurring restructuring charges, merger costs and
> tax items.
>
> For the quarter ending September 30, 2007 we estimate net sales
> of $950 million, operating profit of $40 million and diluted EPS
> of  $0.50 before merger-related costs.  <u>As previously disclosed,
> the fourth quarter of fiscal 2007 and the first quarter of fiscal
> 2008 were affected by increased R&D costs, primarily related to
> recent automotive platform awards</u>.   We expect substantial

margin improvements over the course of fiscal 2008 as we work through these costs and begin the launching of new infotainment platforms.

"In light of increases in material costs and faster ramp-up of R&D resources to work on new business awards, equaling the record operating performance of fiscal 2007 is an achievement. The benefits of common platform synergy and scalability will be realized in fiscal 2009 and beyond. Those benefits will strengthen our operating profits," said Paliwal. (emphasis added)

94.    On this news, shares of the Company's stock fell to $80.31 on extremely high volume of over 14.5 million shares.

95.    Therefore, within two trading days, the Company's share price fell approximately $32 per share, or almost 30 percent, on extremely heavy trading volume.

96.    The statements in paragraphs 87 and 93 regarding Defendants' denial that they had breached the Merger Agreement; that EPS for fiscal 2008 would be $4.14 per share; and that R&D expenses would begin to decrease as a percentage of net sales, were materially false and misleading when made and/or omitted to disclose material facts necessary to make the statements made not misleading because Defendants failed to disclose material adverse facts described above in paragraphs 62-64, 72 and 86.

97.    On September 25, 2007, *The Wall Street Journal* published an article entitled "Harman Blames Increased Expenses For Expected 1st-Quarter Earnings Miss." The article states, in part, the following:

Harman International Industries Inc., whose planned $8 billion buyout collapsed Friday, said its fiscal first-quarter earnings will fall below Wall Street's expectations amid increased research and development spending.

The Washington company, which builds audio components for home stereos and automobiles, forecast earnings of 50 cents a share, before merger-related costs, for the quarter ending Sept. 30 and sales of $950 million. The average estimate of analysts

surveyed by Thomson Financial were for earnings, excluding items, of $1.02 a share on revenue of $934.4 million.

Late Friday, Kohlberg Kravis Roberts & Co. and Goldman Sachs Group Inc.'s equity arm walked away from their planned $8 billion leveraged buyout of Harman, saying they found financial conditions inside the stereo maker to be unacceptable.

The buyers also said Harman might have tripped certain covenants in the parties' merger agreement related to capital spending, said one person familiar with the matter.

<u>"The fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards,"</u> said Harman Chief Executive Dinesh Paliwal. "We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs" and launch new products.  (emphasis added)

98.    On September 27, 2007, the Company held a conference call to discuss its almost-

completed First Quarter fiscal 2008 financial results and expectations for the full 2008 fiscal

year.  During the conference call, Dr. Harman stated, in part, the following:

> Further, as almost all other manufacturing businesses, we have encountered increases in material costs, which placed pressure on margins. During that period, we have built, staffed and opened a new manufacturing facility in the United States and we are ramping up a new plant in China. The startup of those facilities has represented a consequential challenge. The extraordinary time and attention required by senior management to advance and process the KKR/Goldman merger, that entire process with which you are familiar, including the diligence and the negotiations, consumed a significant portion of management's time. The confluence of these events in a six- to eight-month period generated what might be called the perfect storm. Now that storm is over and we are again in full command of our circumstances and our extraordinary future.

99.    During the same conference call on September 27, 2007 (three days prior to the

end of the fiscal First Quarter 2007), Defendant Paliwal stated, in part, the following:

> In April 2007, we did offer guidance for 2008. For the full year 2008, gross profit is expected to be lower than anticipated in April 2007. On September 24, we reflected the change in

modified guidance. The change is due to higher material prices, and more than expected ramp-up costs for the two new manufacturing plants in China and the U.S.

100.    During the same conference call, Defendant Brown repeated the revised First

Quarter fiscal 2008 forecast for sales, operating expenses, operating income, and earnings per

share as stated in the September 24, 2007 press release.  He also stated, in part, the following:

First quarter fiscal '08 sales are forecast to be $950 million, an increase of 15% compared to the first quarter of fiscal '07. Gross profit is forecast to be approximately 28% of sales, down about 7 points from the prior year's quarter. Operating expenses are forecast to be $227 million, an increase of $27 million. Operating income is forecast to be $40 million, down from $87 million in the first quarter of fiscal '07. Forecast diluted earnings per share before transaction, legal and restructuring costs of $0.50 are $0.35 below last year's first quarter of $0.85. First-quarter sales are projected to increase in each of our three operating segments compared to the prior year. We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe.

* * *

Excluding R&D, we expect other operating expenses to be higher than last year. In particular, marketing costs will be above the prior year's quarter due to promotions associated with new infotainment system and PND introductions. There have been several recent developments that have tempered our view of fiscal '08. While our sales growth remains strong, several factors will influence our operating performance.

Full-year sales for fiscal '08 are forecast to be $4.1 billion, an increase of 16% compared to $3.5 billion in fiscal '07. . . Lower gross profit margin is forecasted Automotive, primarily due to new model and plant launch costs and increases in material prices.

* * *

Finally, we expect fiscal '08 earnings per share before transaction, legal and restructuring costs to meet or exceed the $4.14 reported for fiscal '07. We will now take your questions.

101.   In addition, in answering a question from an analyst, Defendant Brown made the following remarks regarding the Company's First Quarter fiscal 2008 revenues:

> PETER BARRY: Just one final for me. I couldn't help but observe that in what is the lowest seasonal quarter for the year historically, the $950 million of revenue expectation is the highest number you've ever achieved. One, is that observation correct? And to what degree did the spillover of C Class revenues influence that number?

> KEVIN BROWN: Yes, Peter, you are correct that that is a very strong first quarter on the top line for us, reflecting getting fully up the ramp curve on Mercedes C Class but also reflecting the fact that <u>we are bringing additional business on-stream at Chrysler as we ramp up our Missouri plant and in the PND business, where we continue the growth and expansion of that business primarily in Europe.</u>  (emphasis added)

102.   The statements in paragraphs 97-101, including Dr. Harman's statement that "The fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards"; that margins would increase in fiscal 2008; that the increased costs associated with the new Missouri plant were "over"; that Automotive sales would increase as a result of the "ramp-up of an infotainment system program and higher PND sales in Europe"; that the Company was "bringing additional business on-stream at Chrysler"; and that "growth and expansion" would "continue" in the Company's PND business, were materially false and misleading when made and/or omitted to disclose material facts necessary to make the statements made not misleading because Defendants knowingly or recklessly failed to disclose material adverse facts described above in paragraphs 62-64, 72 and 86.  Moreover, the developments that had purportedly caused Defendants to "temper" their guidance for fiscal 2008 had been known to or recklessly disregarded by Defendants throughout the Class Period.

103.    On October 22, 2007, Harman entered into a "Termination and Settlement Agreement" with the Purchasing Companies.  The Termination Agreement states in pertinent part that KKR and Goldman and their affiliates had determined that they were not obligated to proceed with the Acquisition "based on their belief that a Company Material Adverse Effect has occurred and their belief that the Company has violated the capital expenditures covenant in the Merger Agreement."

104.    On October 25, 2007, the Company issued a press release announcing results for the First Quarter of fiscal 2008 ended September 30, 2007.  Defendants Paliwal and Dr. Harman issued the following comments:

> We achieved good results during first quarter of fiscal 2008.  Sales growth was strong due to the ramp up of an infotainment system for Chrysler and robust sales of personal navigation devices in Europe.  Our initiative to develop cost saving strategies is underway and we expect to gain procurement, engineering and manufacturing efficiencies that will improve margins over the course of this fiscal year.  (emphasis added).

105.    On November 9, 2007, Harman filed its quarterly report on Form 10-Q with the SEC for the First Quarter of 2008 ended September 30, 2007.  The 10-Q was signed by Defendant Brown and stated, in relevant part, that for the quarter-ended September 30, 2007, operating income for the Automotive division was $45.98 million on net sales in the amount of $682.3 million.  The Form 10-Q further stated the following:

> We design, manufacture and market high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets. . . Our three reportable business segments, Automotive, Consumer and Professional, are based on the end-user markets we serve.

> Automotive also provides aftermarket products such as personal navigation devices ("PNDs") to customers primarily in Europe.  Our PNDs leverage many of the successful applications developed by our Automotive segment.

\* \* \*

Automotive - Net sales for the quarter ended September 30, 2007 increased $81.3 million, or 14 percent compared to the same period last year…. New introductions of infotainment systems including Chrysler's MyGIG infotainment systems in North America, the roll-out of [other systems] were primary factors contributing to the higher sales. A strong demand for Traffic Assist, our European aftermarket PND, also contributed significantly to the increase in sales over the prior year period.

\* \* \*

*Business Outlook* Our first quarter sales were a record and reflect continued top-line strength. We believe all three of our core business segments will continue to produce higher sales for the remainder of this fiscal year. For the full fiscal year ending June 30, 2008, we currently believe our net sales will be approximately $4.1 billion, an increase of 16 percent. We expect earnings per share before transaction, legal and restructuring costs to meet or exceed the prior fiscal year. (emphasis added)

106. The statements in paragraphs 104-105, regarding record sales growth in the First Quarter of fiscal 2008; "robust" PND sales in Europe; "MyGIG infotainment sales to Chrysler as a primary factor contributing to "higher sales" in the First Quarter of fiscal 2008; and projected earnings per share for fiscal 2008 being expected to "meet or exceed" fiscal 2007, were materially false and misleading when made and/or omitted to disclose material facts necessary to make the statements made not misleading because Defendants knowingly or recklessly failed to disclose material adverse facts described above in paragraphs 62-64, 72 and 86. Defendants emphasized higher net sales, but operating income for the Automotive division, as reported in the Form 10-Q for First Quarter of fiscal 2008, had decreased to 6.7% of net sales, which was substantially lower than reported operating margins in the approximate amount of 13% in fiscal 2007, and therefore Defendants had no reasonable basis to state in November 2007 that earnings in fiscal 2008 would meet or exceed the prior fiscal year.

107.    On November 13, 2007, Harman filed a Current Report on Form 8-K with the
SEC, announcing that Sandra Robinson had notified the Company that she intended to retire and
resign in connection with her retirement effective on November 12, 2007.  A former executive
administrative assistant who worked in Harman's corporate office in Washington, D.C. in
November 2007 (the "Administrative Assistant"), stated that Robinson personally told the
Administrative Assistant that Robinson was "totally forced out."  The Administrative Assistant
further stated that she thought that Defendant Paliwal made Robinson "take the fall for the KKR
deal."

108.    The Administrative Assistant also stated that she had heard that Harman had
submitted the wrong financial figures to KKR – that "they cooked the books" and that when
KKR discovered the financial misrepresentation, it backed out of the deal.

109.    On January 14, 2008, prior to the market's opening, Harman issued a press release
again revising its fiscal 2008 earnings guidance and significantly lowering estimates of earnings
per share to between $3.00 and $3.10 per share.  The Company's press release, entitled "Harman
International Revises Fiscal Year 2008 Earnings Guidance," in pertinent part states:

> The Company now expects non-GAAP diluted EPS for the 2008
> fiscal year to be between $3.00 and $3.10, before after-tax merger
> related costs of $8.0 million, or $0.13 per diluted share. . .
>
> * * *
>
> The change in guidance was prompted primarily by a major shift
> in the market for Portable Navigation Devices (PNDs). In recent
> months this sector has experienced significant pricing pressure
> which is affecting the entire industry.
>
> "While the growth fundamentals of our core business remain
> sound, the difficult PND environment presents a challenge.  As
> we have indicated previously, we will be launching a record
> number of automotive infotainment platforms in 2008.  Although,
> we are not happy with the higher than planned R&D engineering
> and material costs, the additional investment is necessary to

deliver the new platforms to our valued customers," said Dinesh
Paliwal, Vice Chairman and Chief Executive Officer.

110. During the Class Period, <u>after</u> the Acquisition was terminated, Defendants
lowered the Company's guidance more than 40% from Dr. Harman's stated projected fiscal 2008
earnings per share of $5.25 to approximately $3.00 per share. In response to the news
Defendants released in the press release, shares of the Company's stock in heavy trading fell
precipitously from the prior trading day's close of $68.97 to close at $43.00 per share, which
constituted a 37.65% drop and a four-year low.

111. The statements in paragraph 109 regarding the Company's guidance for fiscal
2008; "major shift in the market" for PNDs; and "higher than planned R&D engineering and
material costs" were false and misleading when made and/or omitted to disclose material facts
necessary to make the statements made not misleading because Defendants knowingly or
recklessly failed to disclose material adverse facts described above in paragraphs 62-64, 72 and
86.

**D.    The Truth Comes Out**

112. On February 5, 2008, Harman issued a press release announcing financial results
for fiscal Second Quarter 2008 ended December 31, 2007 (approximately three months after
KKR terminated the Acquisition). The Company disclosed that its Automotive division's
earnings were "under pressure" due to PNDs and that it had suffered a gross margin decline from
lower margins on PND products; product mix change, including higher sales of lower-margin
infotainment systems for mid-level vehicles; and higher than expected material costs.

113. Defendant Paliwal finally admitted that although sales were increasing, the
Company's "automotive earnings are under pressure due to portable navigation devices (PND),
product mix, and higher engineering and material costs. . ." Operating income for the quarter-

ended December 31, 2007 was reported at $61 million, a mere 5.7% of sales as compared to $116 million in the same period in 2006, which was 12.4% of sales.  The Company admitted that "the decrease in operating income was driven by PND, product mix, and higher engineering, material and merger costs."  Defendants further disclosed that PND sales had fallen by $29 million compared to the same period in 2006 and that PND sales and margins decreased "due to aggressive price reduction by competitors, the delay of new products, and the sale of older products at substantial discounts."

114.    On this news, shares of the Company's stock fell from a closing price on February 5, 2007 of $45.73 to a closing price of $38.70 on February 6, 2007, which was more than a 15 percent drop in the stock price per share.

### E.    Post-Class Period Disclosures

115.    On February 11, 2008, in the Company's Form 10-Q for the quarter ended December 31, 2007, Defendants repeated the disclosures from the earnings press release regarding PND sales and margins and further disclosed more specifically the reasons why operating income and margins had declined in the first six months of fiscal 2008 (July 1, 2007 through December 31, 2007), as follows:

> For the three and six month periods the gross margin decline was the result of lower margins on PND products, product mix change, including higher sales of lower margin infotainment systems for mid-level vehicles and higher than expected material costs.  The reduction of the PND margin is the result of three primary factors: a significant decline in average market prices, delayed introductions and lower volumes of new generation products and the inventory clearance of prior generation models at a loss.
>
> * * *
>
> In January, we announced updated earnings guidance for the fiscal year, which included a decrease in our expected operating profit of more than $100 million.  The primary driver of this deterioration is the PND market, with higher-than-expected engineering and

material costs also contributing.

The PND margin outlook for the 2008 fiscal year has declined by about $60 million. This is divided almost equally across three factors: a significant decline in average market prices; delayed introductions and lower volumes of new generation products; and the inventory clearance of prior generation models at a loss.

116.    Defendants also admitted in the Form 10-Q for the Second Quarter of fiscal 2008 that its mid-level infotainment system for Chrysler, *i.e.*, the MyGIG radio, was unprofitable as follows:

Higher sales of lower margin infotainment systems and higher than expected material costs are both exemplified in our infotainment program with Chrysler. This infotainment program award included the supply of both a high- and a mid-level system. While the Chrysler infotainment program as a whole is slightly profitable, the mid-level system is not. (emphasis added).

117.    During the Class Period, Defendants knowingly or recklessly omitted material adverse information regarding PND and MyGIG sales and margins from their SEC filings, press releases and other statements and also knowingly and recklessly omitted material information regarding the risks posed by these undisclosed material adverse effects on the Company's proposed Acquisition by KKR and Goldman. All of the undisclosed events were known to or recklessly disregarded by Defendants during the Class Period and were knowingly or recklessly concealed from KKR and Goldman and shareholders.

118.    During the Class Period, had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, they would not have purchased Harman's common stock, or would not have purchased it at artificially-inflated prices.

## VI.    CLASS ACTION ALLEGATIONS

119.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Harman between April 26, 2007 and February 5, 2008, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

120.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Harman's common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Harman or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

121.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

122.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

123.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of Harman; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

124.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.    LOSS CAUSATION

125.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Harman's stock price and misled Class Period purchasers of Harman stock. In particular, Defendants failed to disclose material adverse facts concerning the Company's financial condition, namely that its capital expenditures had exceeded the levels permitted by the Merger Agreement and that Defendants had knowingly or recklessly breached the agreement; that the Company's relationship with

Daimler-Chrysler had materially worsened during the Class Period, putting a large percentage of its net sales at risk; that the Company's financial results would be impacted by increased costs and lower operating margins in late fiscal 2007 (April–June 2007) and the First and Second Quarters of fiscal 2008 (July 1, 2007–December 31, 2007) and beyond; that its marquis mid-level infotainment system known as the MyGIG radio was generating a material loss for the Company; and that the constrained market for PNDs in Europe was materially impacting the Company's operating margins and earnings. At the end of the Class Period, when Harman disclosed the Company's deteriorating financial condition and the truth became apparent to the market, Harman stock fell sharply as the prior artificial inflation came out of the Company's stock price.

126.    Had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, they would not have purchased Harman common stock at the artificially-inflated prices they did. As a result of their purchases of Harman stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

127.    During the Class Period, Defendants knowingly or recklessly painted a misleading picture of Harman's financial condition and prospects. Instead of truthfully disclosing the Company's deteriorating financial condition, Defendants caused Harman to represent falsely, *inter alia*, that the Company was financially sound, that its research and development costs would decrease in fiscal 2008, that its relationship with Chrysler and other automakers was strong, and that it expected to occupy a significant market share in the PND business in Europe in fiscal 2007 and fiscal 2008.

128.    On September 21, 2007, Defendants began to disclose the truth to the market. Specifically, the Company disclosed that KKR and Goldman believed that a material adverse change in Harman's business had occurred and that Harman had breached the Merger Agreement.

129.    In response to this disclosure, the Company's stock price fell from a closing price of $112.34 on the prior day to close at $85.00 on September 21, 2007, falling more than 24 percent that day on extraordinary trading volume of over 22.4 million shares.

130.    Additionally, on September 24, 2007, the Company disclosed that its fiscal 2008 financial performance would be impacted by a number of factors including increased R&D costs and reported net sales of $950 million, but disappointing operating profit of $40 million and diluted EPS of $0.50 before merger-related costs, which was less than one-half of what Defendants had projected for First Quarter fiscal 2008 (ended September 30, 2007).

131.    On this news, shares of the Company's stock fell to $80.31 on extremely high volume of over 14.5 million shares.

132.    Therefore, within two trading days, the Company's share price fell approximately $32.00 per share, or almost 28.5 percent, on extremely heavy trading volume.

133.    On January 14, 2008, Harman further revealed aspects of the truth to the market by issuing a press release revising its fiscal 2008 earnings guidance and significantly lowering estimates of earnings per share from $4.14 per share to approximately $3.00 per share.

134.    On this news, on extremely heavy trading volume of over 8.3 million shares, shares of the Company's stock fell sharply from the prior trading day's close of $68.97 to $43.00 per share, a 37.65% drop and a four-year low.

135.    On February 5, 2008, Harman disclosed that its Automotive division's earnings were being adversely affected by PND sales and that the Company had suffered a gross margin decline from lower margins on PND products and higher sales of lower-margin infotainment systems for mid-level vehicles and higher than expected material costs.  The market reacted to this news as shares of the Company's stock fell from a closing price on February 5, 2007 of $45.73 to a closing price of $38.70 on February 6, 2007, which was more than a 15 percent drop in the stock price per share.

136.    During the Class Period, the stock traded as high as $112 per share on September 20, 2007, only days before Defendants' disclosure.  This decline was the result of Defendants' false and misleading statements throughout the Class Period, and when the economic impact of Defendants' fraud began to be disclosed, caused shareholders millions of dollars in losses.

137.    The greater than 65 percent decline in Harman's stock price from the Class Period high of approximately $122.50 per share on April 26, 2007 to the end of the Class Period on February 5, 2008, was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Harman's stock price decline negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

138.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class was a direct result of a) Defendants' knowing or reckless materially misleading statements and omissions and fraudulent scheme to artificially inflate Harman's stock price during the Class Period; and b) the subsequent decline in the value of the Company's stock when

Defendants' prior misstatements or omissions regarding Harman's financial condition were revealed to the market.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

139.    The Individual Defendants had strong motives to overstate the Company's financial results, condition and prospects during the Class Period.  First, the Individual Defendants collectively held more than 5 million shares (including options) for Harman's common stock, which the Purchasing Companies had agreed to buy for $120 per share.  The $120 share price was a substantial 17% premium over the trading price of Harman's stock in April 2007, when the Acquisition was publicly announced.

140.    According to Harman's October 2007 Proxy Statement (the "Proxy"), the stock, restricted stock and units, and options to purchase stock that the Individual Defendants received as compensation for their executive positions and control over the Company, would collectively have been worth over $613 million if the Acquisition had been completed.  With Harman's stock currently trading in the $40 range, the Individual Defendants' holdings are worth one-third of the amount that they would have received in cash from the purchasing Companies for their stock.  Moreover, the Individual Defendants' unvested stock options would have fully vested upon the change of control by the Company in the Acquisition.  Instead, many of the Individual Defendants' vested and unvested options are now out of the money.

141.    Apart from the proposed Acquisition, much of the Individual Defendants' personal wealth was tied to the Company's financial performance and prospects.  During the Class Period, the Individual Defendants' total compensation was tied directly to the reported financial performance of the Company, particularly the Automotive segment, which comprised approximately 70% of Harman's business and generated the bulk of the Company's revenue and

earnings.  Under annual performance-based incentive plans and long-term equity compensation programs, the Individual Defendants reaped millions of dollars in bonuses in both cash and stock compensation as a direct result of their materially false misrepresentations and omissions during the Class Period.

### A.   Dr. Sidney Harman

142.   During the Class Period, Dr. Harman served as Harman's Executive Chairman, and he also served as the Company's CEO until June 30, 2007, when he relinquished the title to Defendant Paliwal.  Dr. Harman co-founded the Company and was a veteran executive with the power to control and who did control the Company and its Board of Directors.  During the Class Period, Dr. Harman knowingly or recklessly signed and caused the Company to issue materially-false and misleading Form 8-Ks, Form 10-K for fiscal 2007 and Form 10-Qs for the Third Quarter of fiscal 2007 and First Quarter of fiscal 2008.  Dr. Harman also knowingly and recklessly caused each and all of these materially-false and misleading reports to be filed with the SEC.  In addition, in each of these reports filed with the SEC, Dr. Harman certified under the Sarbanes-Oxley Act of 2002, as the "Executive Chairman" of Harman, that the Company's disclosure controls and internal controls over financial reporting were effective and that the reports did not contain any untrue statement of material fact and fairly presented in all material respects the Company's financial condition and results of operations, which Dr. Harman knew or recklessly disregarded was untrue.

143.   Dr. Harman further knowingly or recklessly caused the Company to issue materially false and misleading statements in press releases regarding the Company's reported financial performance in each quarter during the Class Period.  Dr. Harman knowingly and recklessly made materially false and misleading statements during conference calls with analysts

and other investors throughout the Class Period.  As alleged herein, Dr. Harman knew at the time of each conference call that reports regarding the Company's financial performance and prospects were misleading and omitted material information regarding material risks to the Acquisition, including the Company's declining operating margins, spiraling costs, unresolved quality control issues, excessive inventory, exuberant capital expenditures and other material adverse events that had violated material terms of the Merger Agreement.

144.    After agreeing to relinquish control of the Company he founded to KKR and Goldman, Dr. Harman knowingly or recklessly failed to implement proper procedures and controls to ensure that the Company's capital expenditures did not exceed the limits imposed by the Merger Agreement.  After realizing that the Company had violated the CapEx covenant, Dr. Harman knowingly or recklessly failed to disclose related material risks to shareholders and the market.

145.    In each quarter during the Class Period, Dr. Harman provided guidance for the Company's earnings per share, which he knew at the time had no reasonable basis and was not achievable because of pervasive problems with PND sales and inventory; decreasing operating margins; material losses resulting from the MyGIG radio contract and related manufacturing problems at the Missouri plant; and the Company's strained relationship with Chrysler, which constituted more than 25% of the Automotive division's sales.

146.    Dr. Harman further knew or recklessly disregarded that the Company had not fully disclosed the true nature of its MyGIG contract with Chrysler to shareholders, investors, the Purchasing Companies and the market.  Dr. Harman had personally negotiated the MyGIG contract and had actual knowledge that the contract was bid at a loss and that the Company had not been able to renegotiate the MyGIG contract with Chrysler, or re-engineer the MyGIG

product to make it profitable to manufacture and sell. During the Class Period, Dr. Harman also knowingly or recklessly misrepresented the true nature of Harman's obsolete PND inventory, sales, operating margins, and earnings prospects, and artificially inflated Harman's stock price.

147.    As an octogenarian with much of his personal wealth tied to the Company's performance and stock price, Dr. Harman had strong incentives to present the Company's business and financial condition and prospects more favorably than they actually were so that he could cash out his mega-holdings of Harman stock and options in the Acquisition. According to the Proxy, Dr. Harman held more than 3.53 million shares of Harman common stock, and he also held an additional 1 million vested and unvested options for the Company's common stock. In fiscal 2007 alone, Dr. Harman was granted options worth $2.44 million, which immediately would have vested in the Acquisition. In total, Dr. Harman and his affiliates and family stood to receive over $543 million in proceeds from sales of stock to the Purchasing Companies in the Acquisition.

148.    In addition, Dr. Harman also enjoyed a lucrative compensation package that was tied in large part to the Company's reported financial performance. According to the Proxy, more than one-half of Dr. Harman's compensation during the Class Period was received through awards from the Company's performance-based incentive plan (the "Incentive Plan"). His compensation under the Incentive Plan was based on whether the Company achieved certain pre-established financial and other objectives such as return on stockholder equity. Based upon the materially-false reported quarterly and annual results in fiscal 2007, Dr. Harman received cash and stock compensation of $5.35 million.

149.    Dr. Harman received monthly Operating Reports from Harman Becker executives in Germany that clearly reflected the Company's declining operating margins, discounted and

returned PND sales, pervasive quality control issues with the MyGIG radio and other products, loss of material contracts for production and sales of future MyGIG products to Chrysler, and the Company's material failure to achieve forecasted sales, revenue and earnings. Notwithstanding what he learned from the Operating Reports regarding material adverse events, Dr. Harman signed and certified SEC filings which he knew or recklessly disregarded omitted material information which was necessary under the circumstances to avoid making statements which were misleading.

150. During the Class Period, Dr. Harman knowingly and recklessly signed off on all of Harman's materially false and misleading financial reports for fiscal 2007 and the first six months of fiscal 2008, which he knew created an overall impression that was not consistent with the business realities of the Company's financial position and operations.

### B.    <u>Kevin Brown</u>

151. Defendant Brown served as Harman's Executive Vice President and CFO. During the Class Period, Brown knowingly or recklessly signed and caused the Company to issue materially false and misleading Form 8-Ks, Form 10-K for fiscal 2007 and Form 10-Qs for Third Quarter of fiscal 2007 and First Quarter of fiscal 2008. Defendant Brown also knowingly or recklessly caused each and all of these materially-false and misleading reports to be filed with the SEC.

152. Brown further knowingly or recklessly caused the Company to issue materially false and misleading statements in press releases regarding the Company's reported financial performance in each quarter during the Class Period. Brown knowingly or recklessly made materially false and misleading statements during conference calls with analysts and other investors throughout the Class Period. As alleged herein, Brown knew at the time of each

conference call that reports regarding the Company's financial performance and prospects were misleading and omitted material information regarding material risks to the Acquisition, including the Company's declining operating margins, spiraling costs, unresolved quality control issues, excessive inventory, exuberant capital expenditures and other material adverse events that had violated material terms of the Merger Agreement.

153.    After consenting to specific CapEx restrictions requested by the Purchasing Companies in the Merger Agreement, Brown knowingly or recklessly failed to implement proper procedures and controls to ensure that the Company's capital expenditures did not exceed the limits imposed by the Merger Agreement.  After realizing that the Company had violated the CapEx covenant, Defendant Brown knowingly or recklessly failed to disclose related material risks to shareholders and the market.

154.    In each quarter during the Class Period, Brown and others provided guidance for the Company's earnings per share, which Brown knew at the time had no reasonable basis and was not achievable because of pervasive problems with PND sales and inventory; decreasing operating margins; material losses resulting from the MyGIG radio contract and related manufacturing problems at the Missouri plant; and the Company's strained relationship with Chrysler, which constituted more than  25% of the Automotive division's sales.

155.    Brown further knew or recklessly disregarded that the Company had not fully disclosed the true nature of its MyGIG contract with Chrysler to investors.  Brown also knew or recklessly disregarded that the contract was bid at a loss and that the Company had not been able to renegotiate the MyGIG contract with Chrysler, or re-engineer the MyGIG product to make it profitable to manufacture and sell.  During the Class Period, Brown also knowingly or recklessly

misrepresented the true nature of Harman's obsolete PND inventory, sales, operating margins, and earnings prospects, and artificially inflated Harman's stock price.

156.    During the Class Period, Brown had strong incentives to present the Company's business and financial condition and prospects more favorably than they actually were so that he could cash out holdings of Harman stock and unvested options in the Acquisition at a premium price before the Company's materially adverse financial condition became publicly known. According to the Proxy, Brown held 29,000 shares of Harman common stock, and he also held an additional 12,000 vested and 76,000 unvested options for the Company's common stock. In fiscal 2007 alone, Brown was granted options worth more than $885,000, which immediately would have vested in the Acquisition. In total, Brown stood to receive over $14 million in proceeds from sales of stock to the Purchasing Companies in the Acquisition. Brown's options are now all out of the money.

157.    In addition, Defendant Brown also enjoyed a lucrative compensation package that was tied in large part to the Company's reported financial performance. According to the Proxy, more than one-half of Brown's compensation during the Class Period was received through awards from the Company's Incentive Plan. His compensation under the Incentive Plan was based on whether the Company achieved certain pre-established financial and other objectives such as return on stockholder equity. Based upon the materially-false reported quarterly and annual results in fiscal 2007, Brown received cash and stock compensation of $1.89 million.

158.    Throughout the Class Period, Brown received monthly Operating Reports from Harman Becker executives in Germany which clearly reflected the Company's declining operating margins, discounted and returned PND sales, pervasive quality control issues with the MyGIG radio and other products, loss of material contracts for future production and sales of

MyGIG products to Chrysler, and the Company's failure to achieve forecasted sales, revenue and earnings. Notwithstanding what he learned from the Operating Reports, Brown signed and certified SEC filings which he knew or recklessly disregarded omitted material information which was necessary under the circumstances to avoid making statements which were misleading.

159. During the Class Period, Brown knowingly and recklessly signed off on all of Harman's materially false and misleading financial reports for fiscal 2007 and the first six months of fiscal 2008, which he knew or recklessly disregarded created an overall impression that was not consistent with the business realities of the Company's financial position and operations.

## C. **Dinesh Paliwal**

160. During the Class Period, Paliwal served as Harman's Vice Chairman, CEO and President beginning on July 1, 2007, the first day of fiscal 2008 and immediately after Dr. Harman relinquished the CEO title. During the Class Period and specifically from July 1, 2007 forward, Paliwal knowingly or recklessly signed and caused the Company to issue its materially-false and misleading Form 8-Ks, Form 10-K for fiscal 2007 and Form 10-Q for the First Quarter of fiscal 2008. Paliwal also knowingly and recklessly caused each and all of these materially-false and misleading reports to be filed with the SEC. In addition, in each of these reports filed with the SEC, Dr. Paliwal certified under the Sarbanes-Oxley Act of 2002, as the "Chief Executive Officer and Vice Chairman" of Harman, that the Company's disclosure controls and internal controls over financial reporting were effective and that the reports did not contain any untrue statement of material fact and fairly presented in all material respects the Company's

financial condition and results of operations, which Paliwal knew or recklessly disregarded was untrue.

161.   Paliwal further knowingly or recklessly caused the Company to issue materially false and misleading statements in press releases regarding the Company's reported financial performance in the First and Second Quarters of fiscal 2008 during the Class Period.  Paliwal knowingly or recklessly made materially false and misleading statements during conference calls with analysts and other investors during the Class Period.  As alleged herein, Paliwal knew or recklessly disregarded at the time of each conference call he participated in that reports regarding the Company's financial performance and prospects were misleading and omitted material information regarding material risks to the Acquisition, including the Company's declining operating margins, spiraling costs, unresolved quality control issues, excessive inventory, exuberant capital expenditures and other material adverse events that had violated material terms of the Merger Agreement.

162.   Paliwal knew or recklessly disregarded that the Company had violated the CapEx covenant in the Merger Agreement, but knowingly and recklessly failed to disclose related material risks to shareholders and the market.  Paliwal himself stated on his first earnings conference call that, after joining the Company, he had made extensive due diligence visits to all of Harman's facilities and met with numerous employees to get up to speed on the Company's operations, financial performance and internal controls and procedures.

163.   Paliwal, along with other executives, provided guidance during the Class Period for the Company's earnings per share, which he knew or recklessly disregarded at the time had no reasonable basis and was not achievable because of pervasive problems with PND sales and inventory; decreasing operating margins; material losses resulting from the MyGIG radio

contract and related manufacturing problems at the Missouri plant; and the Company's strained relationship with Chrysler, which constituted more than 25% of the Automotive division's sales.

164.    Paliwal further knew or recklessly disregarded that the Company had not fully disclosed the true nature of its MyGIG contract with Chrysler to shareholders, investors, the Purchasing Companies and the market.  Paliwal had actual knowledge that the MyGIG contract was bid at a loss and that the Company had not been able to renegotiate the MyGIG contract with Chrysler, or re-engineer the MyGIG product to make it profitable to manufacture and sell. During the Class Period, Paliwal also knowingly or recklessly misrepresented the true nature of Harman's obsolete PND inventory, sales, operating margins, and earnings prospects, and artificially inflated Harman's stock price.

165.    Paliwal had strong incentives to present the Company's business and financial condition and prospects more favorably than they actually were so that he could cash out holdings of Harman stock and unvested options in the Acquisition at a premium price before the Company's materially adverse financial condition became publicly known.  According to the Proxy, in connection with his joining the Company, Paliwal was granted 100,000 stock options, 64,579 shares of restricted stock, and 32,291 restricted stock units.  In total, Paliwal stood to receive over $23.6 million in proceeds from sales of stock to the Purchasing Companies in the Acquisition.

166.    Beginning in July 2007, Paliwal received monthly Operating Reports from Harman Becker executives in Germany which clearly reflected the Company's declining operating margins, discounted and returned PND sales, pervasive quality control issues with the MyGIG radio and other products, loss of material contracts for future production and sales of MyGIG products to Chrysler, and the Company's failure to achieve forecasted sales, revenue and

earnings.  Notwithstanding what he learned from the Operating Reports, Paliwal signed and certified SEC filings which he knew or recklessly disregarded omitted material information which was necessary under the circumstances to avoid making statements which were made not misleading.

167.    During the Class Period, Paliwal knowingly or recklessly signed off on all of Harman's materially false and misleading financial reports for fiscal year-end 2007 and the First Quarter of fiscal 208, which he knew created an overall impression that was not consistent with the business realities of the Company's financial position and operations.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

168.    With respect to Lead Plaintiff's claims brought under the 1934 Act and Rule 10b-5, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in efficient markets;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiff and other members of the Class purchased Harman common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

169.    At all relevant times, the markets for Harman common stock were efficient for the following reasons, among others:

64

(a)    during the Class Period, Harman enjoyed a substantial daily trading volume of approximately 1.1 million shares;

(b)    a significant number of securities analysts followed and reported on the Company's common stock during the Class Period;

(c)    the New York stock exchange, where Harman's common stock is listed, provided a well-established national system to trade Harman common stock during the Class Period;

(d)    as a regulated issuer, Harman filed periodic public reports with the New York Stock Exchange and SEC, and was entitled to file a Form S-3 registration statement; and

(e)    as demonstrated by the events alleged herein, the movement of Harman's stock price shows a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in stock price.

170.    Had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, they would not have purchased Harman common stock at the artificially-inflated prices they did.

**X.    NO SAFE HARBOR**

171.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Harman who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of the
### Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

172.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

173.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Harman's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

174.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Harman's common stock in violation of  Section 10(b) of the Exchange Act and Rule 10b-5.

175. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Harman's financial well-being, business relationships, and prospects, as specified herein.

176. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Harman's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Harman and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Harman's common stock during the Class Period.

177. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information

about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

178.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Harman's financial well-being, business relationships, and prospects from the investing public and supporting the artificially-inflated price of its common stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

179.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Harman's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Harman's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired

Harman's common stock during the Class Period at artificially high prices and were damaged thereby.

180.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Harman was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Harman common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

181.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

182.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

183.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

184.    The Individual Defendants acted as controlling persons of Harman within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision making of the Company, including the content and dissemination of the various

statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants

were provided with or had unlimited access to copies of the Company's reports, press releases,

public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

185.    In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities

violations as alleged herein, and exercised the same.

186.    As set forth above, the Individual Defendants each violated Section 10(b) and

Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions

as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the

Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct,

Lead Plaintiff and other members of the Class suffered damages in connection with their

purchases of the Company's common stock during the Class Period.

**WHEREFORE,** Lead Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal

Rules of Civil Procedure;

70

(b)      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated:  May 2, 2008

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**

By:_____/s/ Steven J. Toll_____
    Steven J. Toll (D.C. Bar No. 225623)
    Daniel S. Sommers (D.C. Bar No. 416549)
    S. Douglas Bunch (D.C. Bar No. 974054)
    1100 New York Avenue, N.W.
    Suite 500, West Tower
    Washington, DC  20005
    (202) 408-4600

*Lead Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 2, 2008, I electronically filed THE ARKANSAS PUBLIC

EMPLOYEES' RETIREMENT SYSTEM'S CONSOLIDATED CLASS ACTION

COMPLAINT and CERTIFICATE OF SERVICE by submitting it to the Clerk of Court at

dcd_cmecf@dcd.uscourts.gov, and copying all counsel of record.


/s/ S. Douglas Bunch
S. Douglas Bunch