# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

_____
                                                    )
IN RE HARMAN INTERNATIONAL            )
INDUSTRIES, INC. SECURITIES             )          Case No. 1:07-cv-01757(RWR)
LITIGATION                                        )
                                                    )
_____)

## DEFENDANTS' MOTION TO DISMISS
## THE CONSOLIDATED CLASS ACTION COMPLAINT

Defendants Harman International Industries Incorporated ("Harman"), Dr. Sidney

Harman ("Dr. Harman"), Dinesh Paliwal ("Paliwal"), and Kevin Brown ("Brown") (together, the

"Individual Defendants" and with Harman, the "Defendants"), upon the accompanying

Statement of Points and Authorities in Support of Defendants' Motion to Dismiss the

Consolidated Class Action Complaint and the Declaration of Michael J. Will in Support of

Defendants' Motion to Dismiss the Consolidated Class Action Complaint, together with the

exhibits attached thereto, hereby move this Court for an Order dismissing with prejudice the

Consolidated Class Action Complaint ("Complaint") in its entirety pursuant to Rules 9(b) and

12(b)(6) of the Federal Rules of Civil Procedure ("Federal Rules") and the Private Securities

Litigation Reform Act of 1995 (the "PSLRA"), and granting such other and further relief as this

Court may deem just and proper.

The grounds for that proposed Order, which are set forth in full in the accompanying

Statement of Points and Authorities, are as follows:

*First*, the statements on which Plaintiff premises its claims are not actionable under the

PSLRA's "safe harbor" and the bespeaks caution doctrine because they were forward-looking in

nature and accompanied by meaningful cautionary language.  *See* 15 U.S.C. § 78u-5(c)(1)(A).

*Second*, Plaintiff has failed to satisfy the PSLRA's requirement that it plead with particularity facts giving rise to a "strong inference" of scienter. 15 U.S.C § 78u-4(b)(2). For the same reason, Plaintiff has failed to meet the heightened pleading requirements of Federal Rule 9(b).

*Third*, the Complaint fails to allege a sufficient causal nexus between actionable misconduct by the Defendants and the claimed economic losses.

*Fourth*, Plaintiff has failed to allege either a primary violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, or that the Individual Defendants culpably participated in securities fraud, sufficient to establish the Individual Defendants' liability as a matter of law.

For each of these reasons, discussed in greater detail in the accompanying Statement of Points and Authorities, Defendants respectfully request that the Court enter an Order dismissing the Complaint in its entirety with prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules and the PSLRA.

Respectfully submitted,

Dated: July 3, 2008                 JONES DAY

_____/s   Thomas F. Cullen, Jr._____
Thomas F. Cullen, Jr., D.C. Bar No. 224733
Michael J. Will, D.C. Bar. No. 503370
51 Louisiana Ave. NW,
Washington, D.C. 20001
Tel:  (202) 879-3939
Fax:  (202) 626-1700
tfcullen@jonesday.com
mwill@jonesday.com

Robert C. Micheletto
Traci L. Lovitt, D.C. Bar. No. 467222
222 East 41st Street,
New York, NY 10017

Tel:  (212) 326-3939
Fax:  (212) 755-7306
rmicheletto@jonesday.com
tlovitt@jonesday.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

_____
                                        )
IN RE HARMAN INTERNATIONAL             )
INDUSTRIES, INC. SECURITIES            )       Case No. 1:07-cv-01757(RWR)
LITIGATION                             )
                                        )
_____)

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 4

    A.    Factual Background ................................................................................. 5

    B.    Plaintiff's Allegations .............................................................................. 13

GOVERNING LEGAL STANDARD ................................................................................... 15

ARGUMENT ....................................................................................................................... 16

I.    HARMAN'S ALLEGED MISSTATEMENTS ARE NOT ACTIONABLE UNDER THE PSLRA'S "SAFE HARBOR" AND THE "BESPEAKS CAUTION" DOCTRINE ................................................................................. 16

    A.    The PSLRA And "Bespeaks Caution" Doctrine Insulate Projections, Estimates, And Anticipatory Statements Of Future Conditions And Performance From Liability ................................................................. 16

    B.    Plaintiff's Claims Rest On Forward-Looking, Anticipatory Statements Within The Scope Of The Safe Harbor And The "Bespeaks Caution" Doctrine ................................................................. 20

    C.    The Forward-Looking Statements Were Identified As Such And Accompanied By Meaningful Cautionary Language And Thus Cannot Serve As A Basis For Liability ............................................................. 23

II.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER ...................... 29

    A.    The PSLRA Requires, And Recent U.S. Supreme Court Precedent Makes Clear, That Plaintiff Must Plead With Particularity Compelling Facts Demonstrating Scienter ................................................................. 29

    B.    The Complaint Cannot Satisfy This Standard .................................... 31

III.    THE COMPLAINT FAILS TO ALLEGE A SUFFICIENT CAUSAL NEXUS BETWEEN ACTIONABLE MISCONDUCT AND THE CLAIMED ECONOMIC LOSSES ................................................................................. 34

    A.    The PSLRA Requires Specific Allegations Linking The Alleged Fraud To The Alleged Economic Loss ................................................................. 34

    B.    Plaintiff Alleges *No* Link Between Any Economic Loss And The Alleged MyGIG System Misstatements Or Harman's Disagreement With The Claim Of The Merger Agreement Breach ............................................. 36

**TABLE OF CONTENTS**
(continued)

Page

C.   The Complaint Ignores The Overwhelming Impact Of A *Wall Street Journal* Article And KKR's Decision To Seek To Terminate The Merger Agreement On Harman's Share Price On September 21, 2007, And September 24, 2007 ................................................................. 37

D.   Plaintiff Fails To Allege Economic Loss With Respect To The Later PND-Related Disclosures ............................................................... 40

IV.   PLAINTIFF'S § 20(a) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED GIVEN THE ABSENCE OF ANY CLAIM UNDER § 10(b) AND RULE 10b-5 ....................................................... 42

CONCLUSION ................................................................................................. 43

## TABLE OF AUTHORITIES

**Page**

### CASES

*In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005) ........................................28*

*Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894 (N.D. Ill. 2001)....................................................22

*In re BMC Software, Inc. Sec. Litig.*, 183 F. Supp. 2d 860 (S.D. Tex. 2001)................................4

*In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630 (S.D. Tex. 2001)......................................32*

*In re Baan Sec. Litig.*, 103 F. Supp. 2d 1 (D.D.C. 2000)..........................................................19*

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................................................30

*In re Best Buy Co. Sec. Litig.*, 2005 U.S. Dist. LEXIS 6427 (D. Minn. Apr. 12, 2005) ..............25

*Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356 (6th Cir. 2001) ................................................4

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................29

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)....................................31

*Davidoff v. Farina*, No. 04 Civ 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ................32

*DeMarco v. DepoTech Corps.*, 149 F. Supp. 2d 1212 (S.D. Cal. 2001) .........................................4

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993) ..........................................19

*Dura Pharms, Inc. v. Broudo*, 544 U.S. 336 (2005) ......................................................15, 21, 34*

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)......................................................................42

*In re eSpeed Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) .........................................41*

*In re Fed. Nat'l Mortgage Ass'n Sec. Deriv. & "ERISA" Litig.*,
     503 F. Supp. 2d 25 (D.D.C. 2007).....................................................16, 30, 31, 32, 42, 43*

*Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40 (D.D.C. 2006)...................................4

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ............................................41

*In re GeoPharma Inc. Sec. Litig.*, 399 F. Supp. 2d 432 (S.D.N.Y. 2005) ....................................32

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002)...............................................29

## TABLE OF AUTHORITIES
### (continued)

Page

*Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392 (7th Cir. 1995)...............................18

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999)....................................................................18

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) .................................................................18

*Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004) ........................................................................30

*In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261 (S.D.N.Y. 2005) ............................40*

*In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670 (D.N.J. 2006) ...........................................35, 38

*In re Interbank Funding Corp. Sec. Litig.*, 432 F. Supp. 2d 51 (D.D.C. 2006)............................16

*In re Interbank Funding Sec. Litig.*,
    329 F. Supp. 2d 84 (D.D.C. 2004), *vacated on other grounds, Belizan v. Hershon*,
    434 F.3d 579 (D.C. Cir. 2005) .......................................................................................15

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005)...................................22

*Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187 (S.D.N.Y. 2006).....................................................35

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ...................................15, 19, 22*

*Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973) .................................................................42

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007)..........................................35, 39

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)...........................34, 35, 36, 39, 41*

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................29

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117 (D. Conn. 2007).................................................32*

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2008 U.S. Dist. LEXIS 37993
    (S.D.N.Y. May 8, 2008)................................................................................................39

*Mishkin v. Ageloff*, 1998 U.S. Dist. LEXIS 14890 (S.D.N.Y. Sept. 23, 1998)............................42

*In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364 (S.D.N.Y. 2006)............................................25

*In re Omnicom Group, Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 6033
    (S.D.N.Y. Jan. 29, 2008)..........................................................................................35, 39

**TABLE OF AUTHORITIES**
(continued)

Page

*Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006) .............................................................24

*Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004) ........................................31

*Raab v. Gen. Physics Corp.*, 4 F.3d 286 (4th Cir. 1993) ...........................................................35

*Republic Prop. Trust v. Republic Props. Corp.*, 540 F. Supp. 2d 144 (D.D.C. 2008)..................42

*In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007).........................................35

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .......................................................................19

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ......................................................42

*SEC v. J.W. Barclay & Co.*, 442 F.3d 834 (3d Cir. 2006) ...........................................................42

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ...................................................................30*

*Sandmire v. Alliant Energy Corp.*, 296 F. Supp. 2d 950 (W.D. Wis. 2003)................................22

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996)......................................................................................19, 22*

*In re Silicon Graphics Inc., Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999)........................................16

*In re Synovis Life Techs., Inc., Sec. Litig.*, 2005 U.S. Dist. LEXIS 18187
    (D. Minn. Aug. 25, 2005) ........................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ........................4, 30, 31, 32*

*In re Trex Co. Sec. Litig.*, 454 F. Supp. 2d 560 (W.D. Va. 2006) .................................................22

*In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165
    (D.D.C. 2007) ..............................................................................4, 16, 18, 19, 22, 28*

*Yellen v. Hake*, 437 F. Supp. 2d 941 (S.D. Iowa 2006) .......................................................22, 25*

**TABLE OF AUTHORITIES**
(continued)

Page

## STATUTES

15 U.S.C. § 78t ...........................................................................................................15, 42

15 U.S.C. § 78u-4 ......................................................................................................16, 29, 34

15 U.S.C. § 78u-5 ...........................................................................................17, 20, 21, 23, 29

## LEGISLATIVE MATERIALS

H.R. Conf. R. No. 104-369 (1995) .............................................................................18

## MISCELLANEOUS

Dennis K. Berman & Dana Cimilluca, *Harman's Suitors Sour on Buyout*, WALL ST. J.,
    Sept. 21, 2007 ...........................................................................................10, 38

Dana Cimilluca, Deals & Dealmakers:  *KKR's Road to Offering Appears Bumpy – Costs
    for Deals Soar, Crimping Prospects of High Returns*, WALL ST. J., Aug. 14, 2007 .........38

Jason Kelly & Justin Baer, Goldman, *KKR May Abandon Harman Buyout, People Say
    (Update 3)*, BLOOMBERG, Sept. 21, 2007, *available at* www.bloomberg.com...................11

David Leiker, *Harman International Industries, Inc. (HAR):  Reiterate Outperform
    Rating and Top Supplier Idea* (Robert W. Baird & Co. Mar. 19, 2007) .............................8

Carol J. Loomis, *An Old Hand in a Strange New World*, FORTUNE, Jan. 23, 2008,
    *available at* http://money.cnn.com/2008/01/21/
    news/companies/harmon_kardon.fortune/index.htm....................................................33, 37

Henny Sender *et al.*, *Debt Crunch Hits Deals, Deal Makers and Key IPO—KKR May
    Find it Hard to Launch Stock Offer, Let Alone its Financings*, WALL ST. J.,
    July 27, 2007....................................................................................................38

Lu Wang, *Cynosure, Evergreen, Sirtris, Sonic, Terra:  U.S. Equity Movers*, BLOOMBERG,
    Sept. 21, 2007, *available at* www.bloomberg.com...........................................................10

Defendants Harman International Industries Incorporated ("Harman"), Dr. Sidney

Harman ("Dr. Harman"), Dinesh Paliwal ("Paliwal"), and Kevin Brown ("Brown") (together, the

"Individual Defendants," and with Harman, the "Defendants") respectfully submit this

Memorandum of Law in Support of their Motion to Dismiss the Consolidated Class Action

Complaint ("Complaint") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil

Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## INTRODUCTION

Many securities cases are notable for the colorful facts alleged.  This case is notable, and

legally deficient, for what is not alleged.  Plaintiff does not—and cannot—allege that Harman

has misstated earnings.  Plaintiff does not—and cannot—allege that Harman has restated

financial statements.  Plaintiff does not—and cannot—allege that the SEC has commenced a

formal investigation of, or imposed any penalties, on Harman.  There is nothing in the Complaint

that questions the veracity of Harman's stated financial results.  Indeed, the Complaint is

deficient as a matter of law for at least three reasons:  (i) the alleged misrepresentations are

forward-looking statements about the anticipated close of a merger and financial projections that

are not actionable under the PSLRA's "safe harbor"; (ii) the Complaint fails to allege that any

Defendant had the requisite scienter and tells a story that belies any inference of scienter; and,

(iii) the allegations are insufficient to prove causation.

Specifically, Plaintiff seeks to impose liability on Harman for a decision made by the

Kohlberg Kravis Roberts & Co. L.P. ("KKR") leveraged buyout firm and protested by Harman:

a decision to walk away from a merger agreement with Harman during the height of the Wall

Street credit crisis.  But, Plaintiff does not claim that Defendants knew of KKR's intentions and

failed to disclose them.  Nor can it.  Harman announced KKR's decision on the same day that

decision was communicated to Harman.  Instead, Plaintiff asserts only that Harman supposedly

"knew" that its capital expenditure projections were exceeded and "knew" it was in breach of a capital expenditures covenant in the merger agreement. Plaintiff then concludes that Harman committed fraud when it stated that it expected the merger would close.

These allegations do not state a claim actionable in securities fraud for a host of reasons. The capital expenditure projections in themselves are the very kinds of forward-looking estimates that are specifically insulated from liability under the PSLRA. Moreover, there is no causal connection between those projections and Plaintiff's asserted loss. There were far larger events afoot, namely an historic credit crisis that claimed the Harman/KKR deal as its first victim. The decline in value of Harman's stock was not caused by Harman's announcement of higher capital expenditures; it was caused by market jitters over the Harman-KKR deal in light of the credit crunch and a *Wall Street Journal* article, apparently based on KKR sources, questioning KKR's commitment to the deal.

In addition, Plaintiff's allegations of an exceeded capital expenditure limit in the merger agreement is based on a misreading of the agreement that warrants only the capital budget and not projections. That a change in projections constituted a breach of the agreement, moreover, is just an assumption, and an unwarranted one based on the terms of the agreement and the capital budget numbers. No court or other tribunal has rendered such a decision, and as demonstrated by the underlying documents Plaintiff cites, no breach occurred. Indeed, Harman believed then, and continues to believe today, that no breach occurred, and nothing other than the assertions of a bidder desperate to walk away from a deal when financing became expensive suggests otherwise.

On these facts, there is no actionable misstatement, let alone one made with the requisite scienter, or one that could constitute the legal cause of Plaintiff's alleged losses. There is simply

an attempt by Plaintiff to extort from Harman the lost value of a failed deal. The federal securities laws neither contemplate nor tolerate such a claim, and Harman does not insure the market for KKR's decisions.

When the allegations in the remainder of the Complaint are carefully examined, they reduce to a claim that Harman missed its projections and estimates. Again, the PSLRA forbids recovery for missed projections and estimates when the forecasts are identified as forward looking and accompanied by meaningful cautionary language warning the investor of their speculative nature. The reason for this rule is straightforward: forecasting is a highly inexact science, the securities markets are extraordinarily volatile today, and companies need the ability to provide projections without fear that every miss will be actionable as securities fraud. Here, every projection about which Plaintiff complains was forward-looking, repeatedly identified as such, and accompanied by meaningful and specific cautionary language. Indeed, the market risks about which Plaintiff complains were all repeatedly and specifically disclosed. Having knowingly and purposefully assumed these risks in the face of Harman's disclosures, Plaintiff cannot now claim fraud.

Finally, Plaintiff fails to adequately allege that the purported misstatements caused its asserted losses. Indeed, the Complaint is *entirely* devoid of any allegation linking *any* loss in share price to the lower operating margins associated with Harman's "MyGIG" system. Rightfully so. Harman repeatedly warned about the possibility of lower MyGIG margins and fully disclosed the declining margins as they were realized without any meaningful drop in its share price.

On the alleged breach of the Merger Agreement, there is no way to link stock losses to a failure to disclose because Harman denied a breach, continues to deny it, and has never issued

any "corrective disclosure" relating to its denial. On these facts, Plaintiff cannot identify or date a market response to alleged misrepresentations that continue to be out there. As a result, Plaintiff cannot link any purported loss to a misrepresentation as a matter of law.

Plaintiff's attempt to link missed projections of portable navigation device ("PND") sales to a stock price decline also fails as a matter of law. Harman fully disclosed that it was facing increasing competitive pressure in the European PND market, such that any drop in the share price can be attributed only to the missed projection, not any alleged underlying fraud. Accordingly, the Complaint should be dismissed with prejudice on all of these allegations.

## BACKGROUND

The following factual background is taken from the Complaint—the validity of which Defendants assume for this Motion only. In addition, this section relies on the documents cited in the Complaint and other well-publicized public announcements such as newspaper articles, publicly recorded stock prices, and public filings with the Securities and Exchange Commission ("SEC"), which are all "matters of which a court may take judicial notice" on a motion such as this. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007). As this Court has held, a court "may consider the full text of SEC filings, prospectuses, analysts' reports and statements 'integral to the complaint,' even if not attached, without converting the motion [to dismiss] into one for summary judgment under Fed. R. Civ. P. 56." *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 174 n.8 (D.D.C. 2007) (quoting *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001)). The Court may also consider compilations of historical stock prices. *See Freeland v. Iridium World Commn's, Ltd.*, 233 F.R.D. 40, 44 n.3 (D.D.C. 2006) (taking judicial notice of stock prices); *DeMarco v. DepoTech Corps.*, 149 F. Supp. 2d 1212, 1218 (S.D. Cal. 2001) (taking judicial notice of chart compiling quotes from SEC risk disclosure statements); *In re BMC Software, Inc. Sec. Litig.*, 183 F. Supp.

2d 860, 884 (S.D. Tex. 2001) (taking judicial notice of chart showing stock sold by defendants). These materials are all particularly relevant here because they round out the picture of Harman and the investing public's learning of, and responses to, critical information and disprove legal conclusions and some factual assertions in the Complaint.

### A.    Factual Background

**The Defendants**

Harman is a Delaware corporation that throughout the Class period, *see* Compl. ¶ 1, maintained its corporate headquarters at 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004. *Id.* ¶ 22. Harman is a premier designer and manufacturer of high-quality, high-fidelity audio products and electronic systems for the automotive, consumer and professional markets. Its broad range of products are sold under renowned brand names, including Harman/Kardon, JBL, Mark Levinson, Infinity, Becker, AKG, Revel, Crown, and Lexicon. *See* Harman International Industries, 2007 Annual Report (Form 10-K), at 1 (August 29, 2007) ("2007 Annual Report"), attached to the Declaration of Michael J. Will in Support of Mot. to Dismiss ("Will Decl.,") as Ex. 1. Harman's stock is traded on the New York Stock Exchange under the symbol "HAR."

Harman's automotive division designs, manufactures and markets audio, electronic and "infotainment systems" that are typically installed and sold as original equipment by automotive manufacturers. Harman's infotainment system is a central unit containing automotive information and entertainment controls, such as GPS navigation, traffic information, voice-activated telephone and climate control, rear seat entertainment, wireless Internet access, hard disk recording, MP3 playback and a high-end branded audio system. Infotainment systems also include scaleable software to allow Harman to better serve a full range of vehicles from luxury through entry-level. For example, Harman's "MyGIG system," which includes Hard Disk Drive

(HDD) GPS Navigation with real time traffic updates, a Video Entertainment System, HDD

Music Jukebox and Media Storage capabilities, a Voice Dialog System for Audio, Navigation,

and Phone, USB and Bluetooth compatibility, may be used in Chrysler, Dodge and Jeep vehicles.

*See* 2007 Annual Report at Cover Pg. 8.

      Harman also produces portable navigation devices ("PNDs") that are primarily sold in

Europe.  These are generally "aftermarket" products (not installed as original equipment by the

automobile manufacturer) that provide GPS navigation, traffic information, video and other

infotainment capabilities.  *See id.* at 21.

      Dr. Harman founded Harman in 1953 and throughout the Class period served as the

Executive Chairman of its Board of Directors ("Board").  Dr. Harman also served as the

Company's CEO until July 1, 2007.  Compl. ¶ 23.  Defendant Paliwal joined Harman on July 1,

2007, and from this date through the end of the Class period was its President and CEO, as well

as Vice Chairman of the Board.  *See id.* ¶ 24.  Defendant Brown was an Executive Vice

President and the Chief Financial Officer ("CFO") of Harman throughout the Class period.  *See

id.* ¶ 25.

**The Harman/KKR Merger Agreement & Spring 2007 Projections**

      On April 26, 2007, Harman announced that it had entered into an Agreement and Plan of

Merger with KHI Parent Inc. ("KHI" or "Parent"), a company formed by KKR and GS Capital

Partners VI Fund, L.P. and its related funds ("GSCP"), which are sponsored by Goldman Sachs

& Co.  *See* Compl. ¶ 28; Press Release, Harman International Industries, *Harman International

Industries to be Acquired by KKR and GS Capital Partners* (Apr. 26, 2007), Will Decl., Ex. 2;

Agreement and Plan of Merger ("Merger Agreement"), Will Decl., Ex. 3;  KHI Parent Inc.,

Registration Statement under the Securities Act of 1933 (Form S-4) (June 20, 2007)

("Registration Statement"), Will Decl., Ex. 4.  The Merger was valued at approximately $8

billion, and on the day of its announcement, Harman's stock price increased from $102.56 to $122.50. *See* Harman International Industries, Historical Share Price ("Stock Price Chart"), Will Decl., Ex. 5.

The Merger Agreement contained covenants—two of which are implicated here—to govern Harman's operations in the period prior to its closing. First, as is typical in merger agreements, KKR and GSCP were not obligated to complete the Merger if a material adverse change ("MAC") occurred. Again, as is typical, the Merger Agreement defined a MAC, in part, as:

> any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts . . .
>
> > (1) has or would be reasonably expected to have a material adverse effect on or with respect to the business, results of operation or financial condition of the Company and its Subsidiaries taken as a whole . . .
> >
> > *provided, however*, that a Company Material Adverse Effect shall not include facts, circumstances, events, changes, effects or occurrences
> >
> > > (i) generally affecting the consumer or professional audio, automotive audio, information, entertainment or infotainment industries, or the economy or the financial, credit or securities markets, in the United States or other countries in which the Company or its Subsidiaries operate . . .

Merger Agreement § 3.01(c) (emphasis in original).

Second, as is also customary in these kinds of agreements, the Merger Agreement restricted Harman's capital expenditures (the "Cap Ex provision") as follows:

> [T]he Company shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of Parent (not to be unreasonably withheld or delayed) . . .
>
> > (vi) make any capital expenditures (or authorization or commitment with respect thereto) in a manner reasonably expected to cause expenditures (x) to exceed the capital expenditure budget for the 2007 fiscal year previously provided to the Parent or (y) for the 2008 fiscal year to exceed the 2008 capital expenditure budget

> taking into account reasonably anticipated expenditures for the
> balance of the year as well as expenditures already committed or
> made (assuming for this purpose that the fiscal 2008 capital
> expenditure budget will not exceed 111% of the fiscal 2007 capital
> expenditure budget).

*Id.* § 5.01(b)(vi).  A material breach of either covenant entitled KHI to terminate the Agreement

without paying Harman the $225 million contractual break-up fee.  *Id.* §§ 6.03, 7.01, 8.05.

On the same day Harman announced the Merger Agreement, it released quarterly fiscal

results.  *See* Compl. ¶¶ 57, 58, 59, 60.  Harman announced that it anticipated strong revenue

growth because "[the Company] produced record sales and earnings during the third quarter and

the first nine months of fiscal 2007."  The highlights included:

> Net sales for the third quarter were $882.8 million compared to
> $801.5 million during the same period last year, an increase of 10
> percent.  Net income for the three-month period increased 11
> percent to $71.0 million.  Earnings per diluted share were $1.07
> compared to $0.94 last year, an increase of 14 percent.  For the
> nine months ended March 31, 2007, net sales were $2.640 billion,
> an increase of 11 percent above the prior year period.  Net income
> increased 10 percent to $209.0 million.  Earnings per diluted share
> were $3.14 compared to $2.80 last year, an increase of 12 percent.

*See* Press Release, Harman International Industries, *Harman International Reports Record Third

Quarter Results* (Apr. 26, 2007) ("Third Quarter Release"), Will Decl., Ex. 6.  These projections

were consistent with the contemporaneous analyst reports concerning the Company.  *See, e.g.*,

David Leiker, *Harman International Industries, Inc. (HAR): Reiterate Outperform Rating and

Top Supplier Idea* (Robert W. Baird & Co. Mar. 19, 2007) ("We believe the company has

market-leading technology that could drive 15%-plus revenue growth over several years with

increased penetration and content on existing vehicles."), Will Decl., Ex. 7.

Harman simultaneously cautioned investors that "[t]here are challenges, as there are

opportunities, throughout the markets and throughout the technologies with which we work."

Transcript of Harman International Industries Earnings Release Conference Call at 4 (Apr. 26,

2007) ("April Earnings Call"), Will Decl., Ex 8.  It identified one of those challenges as a "$46 million engineering bulge" that was "driven by work on $1.1 billion of new business unanticipated when [Harman] first planned fiscal '08 and by continuing new work on Driver Assist."  April Earnings Call at 3.  Harman also warned of increased competition in the European PND market, stating that "[i]n the recent quarter, the European PND market has become extremely competitive."  *Id.* at 7.

**<u>Summer 2007</u>**

Harman announced financial results for its 2007 fiscal year on August 14, 2007. Consistent with its January 25 and April 26, 2007 earnings calls, Harman announced that the research and development ("R&D") costs associated with new automotive infotainment platforms had increased.  *See* Compl. ¶¶ 57, 59, 73; Transcript of Harman International Industries Second Quarter Fiscal 2007 Earnings Call (Jan. 25, 2007) ("January 2007 Earnings Call"), Will Decl., Ex. 9; April Earnings Call; Press Release, Harman International Industries, *Harman International reports Fourth Quarter and Full Year Results* (Aug. 14, 2007) ("August 2007 Press Release"), Will Decl., Ex. 10.  This R&D bulge adversely impacted gross profit for fiscal 2007, particularly in the fourth quarter.  *See* Compl. ¶ 73; 2007 Annual Report at 12-13. Harman explained that the increased costs were necessary to start building next-generation infotainment systems that automobile manufacturers had awarded Harman.  *See* 2007 Annual Report at 29.

Harman also stated its expectation that "[w]e presently anticipate that the Merger will be completed in the fourth quarter of calendar year 2007."  2007 Annual Report at 3; *see also* Compl. ¶ 29; August 2007 Press Release at 2.  In August, KKR also announced its expectation that its investments, including the Merger, "will be consummated in the second half of 2007." *See* KKR & Co. L.P., Amendment No. 1 to Form S-1 (Form S-1/A) at 137 (Aug. 13, 2007)

("KKR Prospectus"), Will Decl., Ex. 11.  For example, KKR publicly advised on August 15, 2007, that "we have committed investing for all of the transactions that had been announced and although we cannot give, uh, any guarantees, we expect that all of these transactions will close." Transcript of KKR Private Equity Investors Earnings Conference Call at 2 (Aug. 15, 2007), Will Decl., Ex. 12.

## Termination of the Merger Agreement

Prior to the opening of the U.S. stock markets on September 21, 2007, *The Wall Street Journal* published an article signaling that KKR would not close the Merger.  The article, entitled *Harman's Suitors Sour on Buyout*, stated that "Mr. Kravis [of KKR] and other investors in the deal have soured on the transaction, say people familiar with the matter."  Dennis K. Berman & Dana Cimilluca, *Harman's Suitors Sour on Buyout*, WALL ST. J., Sept. 21, 2007, at A3, Will Decl., Ex. 13.  The article failed to provide any details with respect to KKR's purported change of heart.

Harman's share price plummeted that morning, opening at $97.70, down from the previous day's closing price of $112.25.  *See* Stock Price Chart.  Following *The Wall Street Journal* article, various other news agencies published similar reports, again citing KKR sources. *See* Compl. ¶¶ 87, 89, 90, 91, 92.  Harman's share price fell further, from  $97.70 to $91.55 by mid-day.  *See* Lu Wang, *Cynosure, Evergreen, Sirtris, Sonic, Terra: U.S. Equity Movers*, BLOOMBERG, Sept. 21, 2007, *available at* www.bloomberg.com, Will Decl., Ex. 14.

Later that day, KKR informed Harman that it "believe[d] that a material adverse change in Harman's business ha[d] occurred, that Harman ha[d] breached the merger agreement and that [KKR was] not obligated to complete the merger."  *See* Press Release, Harman International Industries, *Harman Comments On Previously Announced Merger* (Sept. 21, 2007) ("Termination Press Release"), Will Decl., Ex. 15.  In response, Harman notified the New York Stock

Exchange ("NYSE") of a pending announcement, which caused trading in Harman stock to cease at 2:13 p.m., at which time the stock price had dropped to $88.17.  *See* Compl. ¶ 92; Jason Kelly & Justin Baer, *Goldman, KKR May Abandon Harman Buyout, People Say (Update 3)*, BLOOMBERG, Sept. 21, 2007, *available at* www.bloomberg.com, Will Decl., Ex. 16.  Shortly before 4:00 p.m., Harman issued a press release disclosing KKR's position that a breach of the Cap Ex provision and a MAC had occurred relieving KKR of its obligation to close the deal. Harman noted its view that the Company had not breached the Cap Ex provision and that a MAC had not occurred.  *See* Termination Press Release.

## Subsequent Projections and Guidance

On September 24, 2007, Harman notified its investors that its fiscal 2008 performance would be "impacted by a number of factors including increased R&D to support the development of several new infotainment platforms and associated launch costs."  *See* Compl. ¶ 93; Press Release, Harman International Industries, *Harman Provides Guidance for Fiscal 2008* (Sept. 24, 2007) ("September 24 Press Release"), Will Decl., Ex. 17.  That day, Harman's share price increased from $78.51 at the opening bell to close at $80.31.  *See* Compl. ¶ 94; Stock Price Chart. The Company then held an analyst call on September 27, 2007, in which it explained:

> Automotive gross R&D is $20 million higher compared to the prior year, reflecting the resources added in the third and fourth quarter of fiscal '07.  The additional R&D or engineering bulge we discussed in detail in our January and April earnings calls.  It's necessary to support our many new business awards, invest in new areas of technologies such as Driver Assist and to ensure the delivery of the record number of new programs launching in the next several years.

Transcript of Harman International Industries Analyst and Investor Call at 13-14 (Sept. 27, 2007) ("September Investor Call"), Will Decl., Ex. 18.  That day, Harman's share price increased from $83.05 to close at $86.52.  *See* Stock Price Chart.

In late December 2007, as the holiday shopping season was coming to a close, Harman began to realize that substantial competition in the European PND market would reduce its operating margins.  *See* Compl. ¶ 109.  At that time, a significant decline in average selling prices in the European market affected Harman, as well as its primary competitors TomTom N.V. and Garmin Ltd., and prompted Harman to warn investors that actual fiscal second quarter (fourth calendar quarter) results would differ from expected ones.  *Id.*; Press Release, Harman International Industries, *Harman International Revises Fiscal Year 2008 Earnings Guidance* (Jan. 14. 2008) ("January 2008 Press Release"), Will Decl., Ex. 19.  After Harman issued its revised guidance, the share price fell from $68.97 to close at $43.00.  *See* Compl. ¶ 110.

Harman released complete financial results for the fiscal second quarter on February 5, 2008.  *See* Compl. ¶¶ 115, 116.  Due to risks that Harman disclosed previously (*see* April Earnings Call), Harman's overall financial results, while still positive, failed to meet the projections.  *See* Transcript of Harman International Industries Second Quarter Earnings Conference Call (Feb. 5, 2008) ("February 2008 Earnings Call"), Will Decl., Ex. 20.  Specifically, Harman advised:  "Although we continue to increase sales across all divisions, our automotive earnings are under pressure due to portable navigation devices (PND), product mix, and higher engineering and material costs during a period of record launch activity."  *See* Press Release, Harman International Industries, *Harman International Reports Higher Sales for Second Quarter Fiscal Year 2008; Earnings Down on PND, Product Mix and Costs* at 1 (Feb. 5, 2008), Will Decl., Ex. 21.  Harman also announced: "PND sales and margins decreased due to aggressive price reductions by competitors, the delay of new products, and the sale of older products at substantial discounts."  *Id.*; Compl. ¶ 113.  Engineering expenses remained high due to numerous infotainment platform launches, including new platforms, in Fiscal 2008 and 2009

for key automotive customers including Audi, BMW, Chrysler, Toyota/Lexus, and Porsche. *See* February 2008 Earnings Call at 7. Harman's share price fell that day from $45.73 to $38.70. *See* Compl. ¶ 114.

**B.    Plaintiff's Allegations**

On October 1, 2007, just 10 days after the announcement that KKR would not close the Merger, Plaintiff Cheolan Kim ("Kim") filed a class action complaint in this Court against Harman, Dr. Harman, Brown, and Sandra B. Robinson putatively on behalf of purchasers Harman common stock between April 26, 2007, and September 24, 2007. *See Kim v. Harman Int'l Indus. Inc.*, No. 1-07-cv-1757-RWR (complaint, filed Oct. 1, 2007). The Class period at issue in this complaint ran from April 26, 2007, through to September 24, 2007. *Id.* Kim broadly alleged that Harman had failed to disclose a purported breach of the Merger Agreement, its increasing R&D costs, some supposed worsening of its relationship with Daimler-Chrysler, an unnamed change in its business, and a general worsening of business conditions. *See id.* ¶ 5.

On January 16, 2008, Plaintiff Kim filed a First Amended Class Action Complaint, in which it expanded the Class period to January 11, 2008. *See Kim v. Harman Int'l Indus. Inc.*, No. 1-07-cv-1757-RWR (First Am. Complaint, filed Jan. 16, 2008). Plaintiff Kim altered the theory of the case to allege that Harman had failed to disclose alleged higher "R&D costs and pricing and other problems with PNDs" and that had these issues been disclosed, "there would have been no Merger, or it would have been at a much lower price." *Id.* ¶¶ 7, 13.

On May 2, 2008, Lead Plaintiff Arkansas Public Employees' Retirement System ("Plaintiff") filed the Consolidated Class Action Complaint at issue here (the "Complaint"), alleging claims under the securities laws in connection with alleged misstatements or failures to disclose from April 26, 2007 (the date Harman announced the Merger) to February 5, 2008 (the date Harman released financial results for the fiscal Second Quarter that ended December 31,

2007).  *See* Compl. ¶ 1.  Unlike its predecessor Kim, Plaintiff identifies two broad categories of alleged misstatements in the Complaint: (i)  those relating to Harman's expectations about the Merger closing and the absence of any breach of the Merger Agreement and (ii) those relating to Harman's expectations about future financial conditions and performance.  *Id.*

   With respect to the first category of alleged misstatements, Plaintiff asserts that Defendants failed to disclose that Harman's capital expenditures supposedly exceeded the maximum allowed under the Cap Ex provision and that the Merger Agreement had allegedly been breached.  *See* Compl. ¶¶ 70, 71, 72, 78, 79, 128-129.  In particular, Plaintiff claims for the first time that "Defendants failed to disclose that cost overruns at the Missouri plant and other facilities had caused the company to breach the CapEx Covenant in the Merger Agreement."  *See id.* ¶¶ 70, 72, 128-129 (making an allegation in connection with Harman's August 14, 2007 8-K). Plaintiff also avers that statements in Harman's September 21, 2007 and September 24, 2007 press releases were material misstatements to the extent they suggested that Harman had not breached the Merger Agreement.  *See id.* ¶¶ 87, 93, 96.

   With respect to the second category of alleged misstatements, Plaintiff asserts that Harman's financial projections were misleading, particularly in connection with Harman's estimates for future R&D costs, and revenue related to its MyGIG systems and PNDs. Projections relating to R&D, Plaintiff claims, were misleading because Harman failed to disclose that, in addition to sales and operating margins being adversely affected in fiscal 2007 by bulging R&D, the company would experience growing material losses.  *See* Compl. ¶¶ 62, 69, 71, 72, 76, 79, 86, 96, 102, 106, 111.  In addition, Plaintiff claims for the first time that projections regarding Harman's expansion in the market for its MyGIG Systems were inaccurate, because "Defendants knew or recklessly disregarded that the Company's expansion into infotainment

systems for mid-level vehicles through its contract with Chrysler would increase losses for the Company and cause material declines in the Company's operating income as a percentage of net sales during the Class period." *See id.* ¶¶ 63, 69, 71, 72, 76, 79, 86, 96, 102, 106, 111. Finally, PND forecasts were supposedly misleading due to Defendants' asserted knowledge that "the Company's foray into PND sales in Europe would cause material declines in its operating income as a percentage of net sales during the Class period." *See id.* ¶¶ 64, 69, 71, 72, 76, 77, 79, 86, 96, 102, 106, 111.

Based on these allegations, Plaintiff asserts a claim under § 10(b) of the Exchange Act and SEC Rule 10b-5. *See* Compl. ¶¶ 175, 176 & First Claim. In addition, Plaintiff asserts "control person" claims against Dr. Harman, Paliwal and Brown under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *See* Compl. ¶¶ 184, 185, 186 & Second Claim.

## GOVERNING LEGAL STANDARD

"To make out a cause of action under Section 10(b) and Rule 10b-5, a plaintiff must allege: (i) a material misrepresentation (or omission), (ii) scienter, *i.e.*, a wrongful state of mind, (iii) a connection with the purchase or sale of a security, (iv) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' (v) economic loss, and (vi) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *see also In re Interbank Funding Sec. Litig.*, 329 F. Supp. 2d 84, 89 (D.D.C. 2004), *vacated on other grounds*, *Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2005) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

The standards governing complaints under § 10(b) and Rule 10b-5 are statutorily prescribed and are more stringent than those in general civil actions. "[T]o deter opportunistic private plaintiffs from filing abusive securities fraud claims," *In re Silicon Graphics Inc., Sec.*

*Litig.*, 183 F.3d 970, 973 (9th Cir. 1999), the PSLRA requires that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *In re Interbank Funding Corp. Sec. Litig.*, 432 F. Supp. 2d 51, 89 (D.D.C. 2006) (internal quotation marks omitted). This provision is designed "to embody in the Act itself *at least* the standards of Rule 9(b) [of the Federal Rules of Civil Procedure]," *see In re Fed. Nat'l Mortgage Ass'n Sec. Deriv. & "ERISA" Litig.* ("*Fannie Mae*"), 503 F. Supp. 2d 25, 37 (D.D.C. 2007) (emphasis supplied), and requires a plaintiff to state "the time, place and content of the false misrepresentations, the fact[s] misrepresented, and what was retained or given up as a consequence of the fraud." *In re XM Satellite Radio Holdings Sec. Litig.* ("*XM Satellite Radio*"), 479 F. Supp. 2d 165, 175 (D.D.C. 2007). If these pleading requirements are not met, the PSLRA provides that "the court *shall* . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3) (emphasis supplied). The Complaint here falls so short of satisfying the PSLRA's stringent requirements that dismissal is not only appropriate but statutorily mandated.

## ARGUMENT

### I.    HARMAN'S ALLEGED MISSTATEMENTS ARE NOT ACTIONABLE UNDER THE PSLRA'S "SAFE HARBOR" AND THE "BESPEAKS CAUTION" DOCTRINE.

#### A.    The PSLRA And "Bespeaks Caution" Doctrine Insulate Projections, Estimates, And Anticipatory Statements Of Future Conditions And Performance From Liability.

Apart from a handful of allegations that simply quote truthful statements about Harman's past financial performance (Compl. ¶¶ 65, 67, 73, 97, 99, 105) and a few pieces of unmistakable puffery (*id.* ¶¶ 74, 75, 82, 87, 98)—which are addressed at *infra* notes 1, 2, and 3—the allegations in the Complaint concern only alleged misstatements of Harman's projected revenue,

sales and capital expenditures, and its estimates of future results and business conditions. *See,*
*e.g.*, *id.* ¶¶ 57 (future revenue and sales expectations), 58 (projected future sales), 59 (projected
R&D efficiencies), 60 (forecast R&D expenses), 66 (management expectation of future relations
with automotive companies), 70 (management expectation that Merger would close), 78
(management prediction of merger closing), 80 (prediction of increasing technological
efficiencies), 81 (forecast of reduction in operating costs at new plant), 93 (forecast in R&D
costs), 98 (management prediction that higher R&D cost period had passed), 99 (stating change
in future assumptions forming basis for change in guidance), 100 (providing next fiscal year
guidance and projections), 101 (management projection of increased sales and decreased
expenditures), 104 (prediction of improved future margins), 109 (future guidance and
projections). These types of "forward-looking" statements, however, are protected by the
PSLRA's "safe harbor." *See* 15 U.S.C. § 78u-5(c)(1)(A).

     The PSLRA's safe harbor provides in relevant part that:

> in any private action arising under this chapter that is based on an
> untrue statement of a material fact or omission of a material fact
> necessary to make the statement not misleading, a person referred
> to in subsection (a) of this section ***shall not be liable with respect***
> ***to any forward-looking statement***, whether written or oral, ***if*** and
> to the extent that—(A) ***the forward-looking statement is***—(i)
> ***identified as a forward-looking statement, and is accompanied by***
> ***meaningful cautionary statements*** identifying important factors
> that could cause actual results to differ materially from those in the
> forward-looking statement; or (ii) immaterial.

*Id.* § 78u-5(c) (emphasis supplied).

     The Act defines "forward-looking" statements to include:

> (A)     statements containing a projection of revenues, income
> (including income loss), earnings (including earnings loss) per
> share, capital expenditures, dividends, capital structure, or other
> financial items;

(B)    statements of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; or

(C)    statements of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D)    any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C).

*Id.* § 78u-5(i)(1).

"Meaningful cautionary language" within the meaning of the safe harbor is well understood to mean language that puts an investor "on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). A company need not list all factors that might affect financial results, *see Helwig v. Vencor, Inc.*, 251 F.3d 540, 558 (6th Cir. 2001) (citing H.R. Conf. R. No. 104-369, at 43 (1995), 1995 U.S.C.C.A.N. at 742), and "[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." H.R. Conf. Rep. 104-369, at 44.

Projections, forecasts, estimates, and other forward-looking statements are also protected by the "bespeaks caution" doctrine. "[U]nder the 'bespeaks caution' doctrine—the judicially-created counterpart of the PSLRA's safe harbor provisions—'when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading. The substantial disclosure of specific risks may render alleged misrepresentations concerning soft information immaterial and thus nonactionable as securities fraud.'" *XM Satellite Radio*, 479 F. Supp. 2d at 177 (quoting *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1404 (7th Cir. 1995)); *see also San*

*Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (holding optimistic statements about the future, such as the company "should deliver income growth" were protected).  The bespeaks caution doctrine protects statements which "reflect hope, adequately tinged with caution, [where] the total mix of information available to the market cannot reasonably be found to be misleading." *In re Baan Sec. Litig*, 103 F. Supp. 2d 1, 15 (D.D.C. 2000); *see also id.* at 12-13 (dismissing complaint and holding that "general, positive, . . . forward looking comments" concerning the defendant corporation's "strong" and "continued" growth and sound business strategy were insufficient to support a claim under § 10(b)).  "The fact that [a] company's performance did not conform to that predicted supports no inference that [the company's] statements lacked a reasonable basis when made." *Kowal*, 16 F.3d at 1278.

Thus, under the PSLRA and the bespeaks caution doctrine, statements about expectations and the future cannot be the basis of securities liability where they are accompanied by appropriate cautionary language.  *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir. 1993).  Accordingly, this Court recently opined that "[i]t is clear that not every corporate prediction that does not come to fruition is actionable as securities fraud." *XM Satellite Radio*, 479 F. Supp. 2d at 176. Particularly where the alleged fraud concerns the fact that the defendant corporation has "run[] into difficulties that ultimately prevent it from meeting its financial goals during a particular period, that is precisely the risk that every investor takes." *Id.* (internal quotation marks and citation omitted).

**B.    Plaintiff's Claims Rest On Forward-Looking, Anticipatory Statements Within The Scope Of The Safe Harbor And The "Bespeaks Caution" Doctrine.**

Almost every alleged misstatement at issue here falls squarely into the statutory definition of "forward looking." For example, the statements pertaining to the anticipated closing of the Merger, *see* Compl. ¶¶ 70, 78, on their face, constitute "statements of the plans and objectives of management for future operations" that are phrased in a manner to require caution on the part of investors. 15 U.S.C. § 78u-5(i)(1)(B). Thus, Dr. Harman and Harman were quoted as saying that "[w]e ***anticipate*** completing the transaction during the third or fourth quarter of this calendar year," Compl. ¶ 70. *See also id.* ¶ 78 (same, using the phrase "[w]e ***presently anticipate*** that the merger will be completed . . .") (all emphasis added).

In addition, the alleged erroneous projections relating to future revenue and sales of the MyGIG systems and PNDs are classic statements of "a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u-5(i)(1)(A). The alleged misstatements relating to the Third Quarter Fiscal 2007 Results are, on their face, projections and expectations about future performance. *See* Compl. ¶ 57 ("We ***continue to expect*** fiscal '08 Automotive OEM revenues at $2.8 billion and EPS of $5.25"); *id.* (discussing "plan ***forecasts***"); *id.* ¶ 58 (Harman "still ***think[s]***" it "can do over 600,000" with respect to future projected sales); *id.* ¶ 59 ("[W]e ***believe*** that we can rationalize, generate efficiencies such as to permit us to improve" the R&D bulge); *id.* ¶ 60 ("We ***expect*** fiscal 2007 R&D expenses to approximate 10% of full-year sales."); ¶ 66 ("We ***anticipate*** that DaimlerChrysler, Toyota/Lexus, Audi/VW and

BMW will continue to account for a significant portion of our net sales and accounts receivable for the foreseeable future.") (all emphasis supplied).[1]

Similarly, the alleged misstatements in Harman's Fourth Quarter and Fiscal Year-End 2007 Results and its First Quarter 2008 Results and guidance almost exclusively concern projections of future sales and capital expenditures, management's predictions for positive future performance, and management's predictions about future business operations, including the anticipated closing of the Merger.  *See* Compl. ¶¶ 80 (prediction that "[o]ur infotainment systems are *increasingly* based on scalable software"), 81 (disclosing high "overhead costs" at Missouri factory and stating that "we *anticipate* our Washington, Missouri factory will operate at full capacity during fiscal 2008"), 93 (predicting that "[t]he benefits of scalability *will be realized* in fiscal 2009 and beyond"), 100 (exclusively reporting first quarter "*forecast*[s]"), 104 ("[W]e *expect* to gain procurement, engineering and manufacturing efficiencies that will improve margins over the course of this fiscal year."), 105 (providing future guidance through mid-year 2008), 109 (containing exclusively future guidance) (all emphasis added).[2]  Or, they concern changes in assumptions underlying a projection, which are also forward looking statements under the PSLRA, 15 U.S.C. § 78u-5(i)(1)(D).  *See* Compl. ¶¶ 99 (explaining change in guidance as change in assumptions to reflect "higher material prices, and more than expected ramp-up

---

[1] Plaintiff does quote two "backwards" looking statements from results concerning past sales data and cash flow information.  *See* Compl. ¶¶ 65, 67, 73.  These statements, however, are factually true and have never been restated.  Plaintiff fails to allege, and cannot allege, otherwise.  Accordingly, there is no basis for imposing liability on these statements, and any claim based upon them must be dismissed.  *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341 (2005) (observing that a material *mis*representation is necessary for securities fraud).

[2] Here, too, Plaintiff quotes a handful of "backwards" looking statements that truthfully report past expenditures and sales that have never been restated.  *See id.* ¶ 97, 99, 105.  Accordingly, any claim based upon them should be dismissed.  *See supra* note 1.

costs"), 101 (explaining new assumptions underlying forecasts as "we are bringing additional

business on-stream").[3]

   Because each statement, on its face, involved an expression of expectation or hope about

the future, anticipated business conditions, or projections and forecasts, they were "classic

'forward looking statements' that the PSLRA protects." *Sandmire v. Alliant Energy Corp.,* 296

F. Supp. 2d 950, 957 (W.D. Wis. 2003); *see also, e.g.*, *In re Trex Co. Sec. Litig.,* 454 F. Supp.2d

560, 574-75 (W.D. Va. 2006) (concluding that gross margin guidance is not an actionable

forward-looking statement); *Yellen v. Hake,* 437 F. Supp. 2d 941, 960-61 (S.D. Iowa 2006)

(noting that reaffirmation of business strategies and guidance is not an actionable forward-

looking statement).  In addition, these statements are facially expressions of belief and "hope" to

which the bespeak caution doctrine applies.  *See San Leandro Emergency Med. Group Profit

Sharing*, 75 F.3d at 811.

---

   [3] Plaintiff also attempts to assert a claim due to several pieces of "puffery"—chest-
beating statements about "dominance in the automotive space" (Compl. ¶ 74), a "strong" balance
sheet (*id.* ¶ 75), "strong" sales (*id.* ¶ 82), a boiler plate statement denying liability (*id.* ¶ 87), and
"the perfect storm" that "is over" (*id.* ¶ 98).  Courts routinely dismiss securities fraud claims
based on statements of puffery so "vague and incapable of objective verification, they are not the
type of statement upon which a reasonable investor would rely in considering the 'total mix' of
facts available," and thereby also reject the proposition that such disclosed factual matters should
have been characterized pejoratively.  *XM Satellite Radio*, 479 F. Supp. 2d at 180 (dismissing
complaint and holding description of company's strategy as being "'cost effective' is effectively
the same as telling the reasonable investor the company plans to be a successful business" to be
non-actionable puffery and that the company had no duty to disclose that it had abandoned a cost
effective growth business strategy as plaintiffs alleged); *see also Kowal*, 16 F.3d at 1277
(dismissing a securities fraud complaint for failure to state a claim, emphasizing that "many of
plaintiffs' allegations called for pejorative characterizations of disclosed factual matters"); *In re
JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) (dismissing complaint
and recognizing that "generalizations regarding . . . fiscal discipline . . . amount to no more than
[non-actionable] puffery."); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 907 (N.D. Ill. 2001)
(holding that boilerplate denial of liability claim was not the sort of statement on which investor
could rely because "[i]nvestors can evaluate this sort of posturing for what it is worth.").

C.     **The Forward-Looking Statements Were Identified As Such And Accompanied By Meaningful Cautionary Language And Thus Cannot Serve As A Basis For Liability.**

Without question, each of the aforementioned statements about future performance was identified as forward looking and accompanied by meaningful cautionary language within the meaning of the PSLRA.  Each alleged misstatement Plaintiff identifies derives from one of three sources—(i) an earnings release, (ii) a press release, or (iii) an investor conference call—each of which contained the kind of express cautionary statements that Congress has said the courts "shall consider" when evaluating the applicability of the PSLRA safe harbor.  15 U.S.C. § 78u-5(e) ("On any motion to dismiss based upon subsection (c)(1) of this section, the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.").

Every one of the cited Harman SEC reports contained the statement that:

> [t]his report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act").  You should not place undue reliance on these statements. Forward-looking statements include information concerning possible or assumed future results of operations, capital expenditures, the outcome of pending legal proceedings and claims, including environmental matters, goals and objectives for future operations, including descriptions of our business strategies and purchase commitments from customers.  These statements are typically identified by words such as "believe," "anticipate," "expect," "plan," "intend," "estimate," and similar expressions.
>
> ***
>
> Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results, results of operations and/or the price of our common stock and could cause actual results to differ materially from those expressed in the forward-looking statements.  As a result, the foregoing factors should not be construed as exhaustive and should be read together

> with the other cautionary statements included in this and other
> reports we file with the Securities and Exchange Commission.

*See* Harman International Industries, Quarterly Financial Report (Form 10-Q) ("Third Quarter

2007 Financial Report"), at i (May 10, 2007), Will Decl., Ex. 22; Harman International

Industries, Quarterly Financial Report (Form 10-Q), at 22 (Nov. 9, 2007) ("First Quarter 2008

Financial Report"), Will Decl., Ex. 23; 2007 Annual Report.

Every cited press release contained the statement that "[e]xcept for historical information

contained herein, the matters discussed are forward-looking statements within the meaning of

Section 21E of the Securities Exchange Act," (*see, e.g.*, August Press Release; September 24

Press Release; Press Release, Harman International Industries, *Harman International Reports*

*First Quarter Results* (October 25, 2007), Will Decl., Ex. 24; January 2008 Press Release), or

"[t]his communication contains 'forward looking statements' within the meaning of the Private

Securities Litigation Reform Act of 1995." *See* Termination Press Release.

Before every conference call, the moderator warned listeners:

> Ladies and gentlemen, if I may have your attention, certain
> statements by the company during this call are forward-looking
> statements. These statements include the company's beliefs and
> expectations as to future events and trends affecting the company's
> business and are subject to risks and uncertainties. Persons
> participating on the call today are advised to review the reports
> filed by Harman International with the Securities and Exchange
> Commission regarding these risks and uncertainties.

*See* April Earnings Call; Transcript of Harman International Industries Fourth Quarter Fiscal

2007 Earnings Release Conference Call (Aug. 14, 2007) ("August Earnings Call"), Will Decl.,

Ex. 25; September Investor Call.

Numerous courts have held this precise cautionary language sufficient to satisfy the

requirements of the PSLRA safe harbor. *See, e.g*., *Payne v. DeLuca*, 433 F. Supp. 2d 547, 585

(W.D. Pa. 2006) (finding sufficient cautionary language stating that "while management believes

no additional material loss will be incurred related to these claims and change orders, as adjusted, the actual amounts realized could be materially different than the amount recorded"); *Yellen*, 437 F. Supp. 2d at 962-63 (concluding that risk disclosures in defendant corporation's quarterly reports—which warned that "the cost and availability of raw materials," "the availability and cost of energy," and "price competition" "*may* cause . . . actual results to differ materially"— constituted "meaningful" cautionary language) (emphasis added).[4]

But more, Harman specifically disclosed and warned about the very investment risks at issue here. In the Registration Statement detailing the Merger Agreement's terms, Harman specifically observed that all statements about the Merger's closing were "forward looking statements" within the meaning of the PSLRA and repeatedly warned that a failure to close the Merger was a material risk to Harman that investors should consider. *See* Registration Statement at 28-30. The 2007 Annual Report about which Plaintiff complains likewise specifically identifies statements about the anticipated closing of the Merger Agreement as forward looking statements, and identifies as "[f]actors that may cause fluctuations in our operating results and/or the price of our common stock": "the occurrence of any event or other circumstances that could give rise to termination of the merger agreement," and "the inability to complete the merger due to failure to obtain stockholder approval or the failure to satisfy other conditions to complete the merger." 2007 Annual Report at i.

---

[4] *In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 400-02 (S.D.N.Y. 2006) (holding that cautionary statements similar to those made by Harman were sufficient); *In re Synovis Life Techs., Inc., Sec. Litig.*, 2005 U.S. Dist. LEXIS 18187, at *10 (D. Minn. Aug. 25, 2005) (deeming sufficient "cautionary language in the press releases direct[ing] investors to the full discussion of factors in the company's Annual Report on Form 10-K" and other disclosure of specific risks in press releases); *In re Best Buy Co. Sec. Litig.*, 2005 U.S. Dist. LEXIS 6427, at *4 (D. Minn. Apr. 12, 2005) (considering sufficient statement that: "The Company's actual results could differ materially from those expressed in the forward-looking statements. Factors that could cause results to vary include, among others, those expressed in the Company's filings with the Securities and Exchange Commission.").

With respect to PNDs, Harman similarly identified sales projections as forward looking

and warned about the exact risks Plaintiff claims were underestimated in the Company's

projections:

> ***Our products may not satisfy shifting consumer demand or
> compete successfully with competitors' products.*** Our business is
> based on the demand for audio and video products and our ability
> to introduce distinctive new products that anticipate changing
> consumer demands and capitalize upon emerging technologies. If
> we fail to introduce new products, misinterpret consumer
> preferences or fail to respond to changes in the marketplace,
> consumer demand for our products could decrease and our brand
> image could suffer. In addition, our competitors may introduce
> superior designs or business strategies, impairing our distinctive
> image and our products' desirability. If any of these events occur,
> our sales could decline.
>
> ***We may lose market share if we are unable to compete
> successfully against our current and future competitors.*** The
> audio and video product markets that we serve are fragmented,
> highly competitive, rapidly changing and characterized by intense
> price competition. Many manufacturers, large and small, domestic
> and foreign, offer audio and video systems that vary widely in
> price and quality and are marketed through a variety of channels,
> including audio and video specialty stores, discount stores,
> department stores, mail order firms, and the Internet. Some of our
> competitors have financial and other resources greater than ours.
> We cannot assure you that we will continue to compete effectively
> against existing or new competitors that may enter our markets.

Harman International Industries, 2006 Annual Report (Form 10-K), at 9-10 (Sept. 6, 2006), Will

Decl., Ex. 26.

In October 2006, Harman also warned:

> As we entered the year, we anticipated growth in both our core
> audio business and in our multi-media businesses, and we will see
> growth. But we encounter increased competition, a stubborn
> decline in price points for multi-media products, and a slower to
> materialize multi-media niche, above $300, than we had hoped for.
> Pressure on margins has developed and it will likely intensify
> through the selling season. We will still do well, we will still be
> profitable, but our earlier enthusiasm needs to be properly
> tempered. Our mobile business will be enhanced by the

introduction of our first North American PND products in the
second half.  This too is less than a walk in the park.  The
dominant players in the space are pushing serious price reductions.

Transcript of Harman International Industries First Quarter Fiscal 2007 Earnings Release

Conference Call at 2 (Oct. 25, 2006), Will Decl., Ex. 27.

Harman further warned in April 2007, at the very time of the alleged misstated

projections:

Even as we are learning the challenges of the PND business,
anyone entering our automotive OEM world will have much to
learn.

I had indicated in earlier conference calls that the PND
environment in Europe was not as margin challenged as it is in the
United States, but that we could surely anticipate it.  There was
reasonable foresight in that observation.  In the recent quarter, the
European PND market has become extremely competitive.  We are
working extraordinarily hard to increase sales and to maintain
adequate margins in that environment.

[Call participant]     Okay.  Just one more question, on the European PND, you
said that because of higher competition, you're seeing pricing pressure, or is it
because the growth is slowing and there are more people vying for the same ...

S. Harman          No, I think it's the former.

[Call participant]     It's a small competition?

S. Harman          Yes.

April Earnings Call at 5, 7, and 14.

And, again in August 2007, Harman warned:

That significant change reflects the tremendous crowding that
developed in the multi-media portion of the business.  Crowding
that drove retail prices in [sic] margins to unacceptably low levels.

August Earnings Call at 5.

The same is true of the Chrysler relationship and the MyGIG systems.  Harman issued

multiple warnings that its expansion into the mid-level infotainment segment would result in

lower contribution margins and expressly identified its projections as forward looking.  For example, three months before the start of the alleged Class period, Harman noted: "Forecasting R&D in Automotive OEM has become one of the more difficult aspects of business planning, because we work today on projects which become realized in production a year and a half, two years or three years later.  The development of ever more sophisticated, multifunction systems add further challenge because we are so often moving into new territory."  January 2007 Earnings Call at 5.  The Company also informed shareholders in its quarterly financial reports to the SEC that:  "Factors that may cause fluctuations in our operating results and/or the price of our common stock include, but are not limited to . . . our ability to design and manufacture our products profitably under long-term contractual commitments."  Third Quarter 2007 Financial Report at 3-4; *see also* 2007 Annual Report at 55 ("We incur pre-production and development costs related to infotainment systems that we develop for automobile manufacturers pursuant to long-term supply agreements . . .  Unforeseen cost overruns or difficulties experienced during development could cause losses on these contracts.").

In light of these extensive and specific warnings, Plaintiff's basic claim of *non-disclosure* of the competitive pressures in the PND market and of the lower margins in the MyGIG systems lacks any basis in fact or law, and in all events, its attempt to remove the supposedly misleading statements from the safe harbor must fail.  *See XM Satellite Radio*, 479 F. Supp. 2d at 178 (dismissing complaint because the referenced SEC filings contained meaningful warnings and cautionary language); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 844-45 (N.D. Tex. 2005) (concluding that defendant's cautionary disclosures, "containing terms such as can, may, will, expect, plan and similar terms, are subject to various risks and uncertainties [and thus were] forward-looking and sufficient to clearly warn investors of the risks-in fact").

To be sure, Plaintiff asserts without any explanation that the statements at issue were not identified as forward looking or accompanied by meaningful cautionary language. *See* Compl. ¶ 171. Plaintiff's conclusory allegation, however, is flatly contradicted by the underlying documents on which it relies and thus must be rejected in light of 15 U.S.C. § 78u-5(e). *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555-56 (S.D.N.Y. 2004) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies."); *In re Livent*, *Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.") (citations omitted). Moreover, Plaintiff's failure to allege the basis for its assertion forecloses the argument; Plaintiff carries the burden of demonstrating that the cautionary language failed to expressly warn of, or does not directly relate to, the risk that brought about its loss. *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (plaintiffs must overcome existence of cautionary language to defeat motion to dismiss). Accordingly, under the PSLRA, the Complaint must be dismissed with prejudice.

## II.     THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER.

Even if the safe harbor and bespeaks caution doctrine were not applicable, the Complaint would still fail given the absence of particularized allegations of scienter.

### A.     The PSLRA Requires, And Recent U.S. Supreme Court Precedent Makes Clear, That Plaintiff Must Plead With Particularity Compelling Facts Demonstrating Scienter.

With respect to the scienter element, the PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In this Circuit, "the required state of mind that must be

pleaded is *at least* that of 'extreme recklessness,' meaning an 'extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *See Fannie Mae*, 503 F. Supp. 2d 25, 37 (D.D.C. 2007) (emphasis supplied) (citing *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992); *Howard v. SEC*, 376 F.3d 1136, 1148 (D.C. Cir. 2004)). In Harman's view, extreme recklessness cannot suffice under PSLRA to demonstrate scienter— only intentional conduct is actionable. *See Tellabs,* 127 S. Ct. at 2507 n.3 ("We have previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5 . . . The question *whether* and when recklessness satisfies the scienter requirement is not presented in this case.") (emphasis supplied). But, in view of the binding D.C. Circuit precedent, Harman will assume *arguendo* that extreme recklessness suffices and preserves this question for potential appellate review.

Recently, the U.S. Supreme Court concluded that in applying the PSLRA's strong inference requirement, "[a] complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. Thus, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* Moreover, in addition to being "cogent" and "at least as compelling," the Supreme Court recently held in *Bell Atlantic Corp. v. Twombly* that a plaintiffs' allegations must be factual and "plausible," not simply "conceivable." 127 S. Ct. 1955, 1974 (2007). A mere possibility that a plaintiff ultimately might prove facts to support its claim will not suffice. *See id.*

**B.    The Complaint Cannot Satisfy This Standard.**

Plaintiff falls far short of meeting its heavy burden under *Tellabs* and *Twombly*.  As a general matter, Plaintiff alleges that "Defendants knew or recklessly disregarded" information without providing factual allegations showing what ***each individual*** Defendant knew, how they knew it, and how they disregarded it.  This summary pleading, lumping all "Defendants" and general "knowledge" together, does not satisfy Plaintiff's burden under the PSLRA "that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating ***each*** defendant's state of mind regarding his or her alleged violations."  *See Fannie Mae*, 503 F.Supp. 2d at 40 (citation omitted); *see also Tellabs*, 127 S. Ct. at 2511 n.6 (stating that the Supreme Court would "not disturb" the Seventh Circuit's holding that "group pleading" was impermissible under PSLRA); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).  Such conclusory assertions, moreover, do not suffice to support even the inference of at least "extreme recklessness."  *See Fannie Mae*, 503 F.Supp. 2d at 37; *see also In re Burlington Coat Factor Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997) ("It is not enough for plaintiffs to allege generally that defendants 'knew or recklessly disregarded each of the false and misleading statements for which [they were] sued.'").

With respect to the few individual allegations Plaintiff provides (Compl. ¶¶ 142-167), Plaintiff essentially asserts that the Individual Defendants had motive to commit securities fraud because they were all corporate officers who held stock options.  Specifically, Plaintiff claims that the Individual Defendants' stock options "would collectively have been worth over $613 million" if the Merger had closed, *id.* ¶ 140, and that they received more lucrative compensation packages the more successful Harman's financial results, *id.* ¶ 141.  *See also id.* ¶¶ 147, 148, 156, 157, 165, 166 (same with respect to each Individual Defendant).

These allegations, in addition to being completely unremarkable as a matter of fact, are insufficient as a matter of law. "[S]cienter cannot be inferred solely because a defendant is a corporate officer." *See Fannie Mae*, 503 F. Supp. 2d at 40. And, the mere fact that a corporate officer holds stock options and gets better pay for better results is not a legally sufficient basis for scienter; indeed, "if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions," because almost every company in the United States grants stock options to its officers and ties executive compensation to company performance. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 158 (D. Conn. 2007). If anything, these allegations belie an inference of scienter because Plaintiff does not allege—and cannot allege—that any Individual Defendant *sold* Harman shares or cashed out options during the Class period, which specifically rebuts any inference of scienter based on a "motive" to commit fraud or knowledge of an unraveling fraud. *See, e.g.*, *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 647 (S.D. Tex. 2001). It tends to show that the Defendants believed in their expectations, not the opposite.

In addition, Plaintiff's scienter story is not compelling or cogent under *Tellabs* because it is economically irrational. It is well settled that allegedly fraudulent schemes that are irrational negate an inference of scienter. *See In re GeoPharma Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2005) (noting that the inevitable failure of a scheme negated any inference of scienter); *Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005). Plaintiff's allegations require the Court to assume that the Individual Defendants violated federal securities law even though they derived no actual benefit from the fraud and KKR and Goldman Sachs, two of the most sophisticated financial institutions in the world, were engaged in rigorous due diligence of Harman. The story is all the more fantastic, because the

Individual Defendants have substantial Harman stockholdings and were among those shareholders most harmed by the alleged fraud.  Given the swarm of KKR and Goldman Sachs representatives and corporate attorneys with access to confidential information checking every number Harman reported, the suggestion that the Individual Defendants would knowingly or extremely recklessly commit a fraud jeopardizing their own personal wealth is neither cogent nor compelling.

Finally, many of the documents Plaintiff cites undermine its scienter story with respect to specific claims.  Plaintiff alleges, for example, that Defendants acted with scienter in stating that the Merger Agreement was expected to close (Compl. ¶¶ 70, 78) and in stating Harman's view that no breach of the Merger Agreement had occurred (*id.* ¶ 87).  But, KKR's contemporaneous public statements reveal that, at the exact same time Defendants were supposedly misstating KKR's intentions, KKR was publicly proclaiming its intention to complete the Merger.  *See supra* pp. 9-10.

Plaintiff's sole support for its claim that Defendants wrongly failed to warn of, and supposedly erroneously denied, a breach of the Merger Agreement—a *Fortune* article cited in paragraph 96 of the Complaint—proves the *absence* of scienter.  *See* Carol J. Loomis, *An Old Hand in a Strange New World*, FORTUNE, Jan. 23, 2008, *available at* http://money.cnn.com/ 2008/01/21/news/companies/harmon_kardon.fortune/index.htm, Will. Decl., Ex. 28.  The article states that:  "According to [Dr. Harman], KKR maintained that the $175 [million in capital expenditures] infringed the merger agreement because it exceeded the 2007 'plan' for capital expenditures.  But neither 'plan' nor 'forecast' is the operative word in the agreement's covenants: 'budget' is.  And, assert both Sidney and Paliwal, the $175 million was within the companywide capex 'budget' for fiscal 2007.  Therefore, the two men say, the merger agreement

was not infringed." *Id.* Given this unassailable legal argument, which has never been recanted by Harman or disproved or rejected by any court, Plaintiff cannot credibly allege that the Defendants' expectations about the Merger or its defense of Harman were knowingly false or stated with extreme recklessness.

## III. THE COMPLAINT FAILS TO ALLEGE A SUFFICIENT CAUSAL NEXUS BETWEEN ACTIONABLE MISCONDUCT AND THE CLAIMED ECONOMIC LOSSES.

In all events, the Complaint should be dismissed for failure to allege "loss causation" with particularity.

### A. The PSLRA Requires Specific Allegations Linking The Alleged Fraud To The Alleged Economic Loss.

One of the most fundamental pillars of securities law is the "requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms.*, 544 U.S. at 345. This element, known as "loss causation," is critical to securing the true aim of the securities laws; their goal is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* Loss causation fulfills that goal by providing "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation marks and citation omitted).

To this end, the PSLRA requires that "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). To satisfy this statutory requirement, a plaintiff must plead that "the truth became known"—*i.e.*, that some kind of "corrective disclosure" entered the market—*before* the stock

price dropped, that this disclosure actually corrected some misstatement, and that a loss in the value of the security at issue proximately resulted. *See, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (finding that the alleged misstatements or omissions must conceal a particular risk which later materialized to caused economic losses); *Lentell*, 396 F.3d at 173 (requiring allegation that defendants "concealed something from the market that, when disclosed, negatively affected the value of the security"); *Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187, 194 (S.D.N.Y. 2006) (no loss causation alleged where the truth about demand for company products was never concealed).

Even where some corrective disclosure and a decline in share value is alleged, the Complaint must distinguish the economic impact of the alleged fraud from the "tangle of [other] factors" that might impact stock price. *Dura*, 544 U.S. at 343; *see also In re Omnicom Group, Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 6033 (S.D.N.Y. Jan. 29, 2008); *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 693-94 (D. N.J. 2006). "The market has risks; the securities laws do not serve as investment insurance." *Raab v. Gen. Physics Corp*, 4 F.3d 286, 291 (4th Cir. 1993). Rather, the securities laws protect *only* against those losses associated with the alleged fraud. *See In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007) (holding that the securities laws offer no protection for losses that are unassociated with fraud).

Thus, the U.S. Supreme Court has held that a claim that a stock's price was "artificially inflated" because of a misrepresentation and then declined after the misrepresentation was corrected, without more, fails to allege loss causation as a matter of law: "the most logic alone permits us to say is that the higher purchase price will sometimes play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation (using language the

- 35 -

Ninth Circuit used) 'touches upon' a later economic loss.  But, even if that is so, it is insufficient.

To 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." *Dura*, 544

U.S. at 343.  To prove the link between the alleged fraud and the decline in price, the plaintiff

needed to distinguish the impact of the fraud from the impact of other "changed economic

circumstances, changed investor expectations, new industry-specific or firm-specific facts,

conditions, or other events." *Id.*

The alleged misstatements and omissions here satisfy none of those requirements.

> **B.     Plaintiff Alleges *No* Link Between Any Economic Loss And The Alleged
> MyGIG System Misstatements Or Harman's Disagreement With The Claim
> Of The Merger Agreement Breach.**

The Complaint contains ***no*** allegations whatsoever linking ***any*** economic loss to the

alleged corrective disclosures that Plaintiff claims were made on September 27, 2007 (Compl. ¶¶

97, 98, 99, 100, 101, 102), October 22, 2007 (*id.* ¶ 103), October 25, 2007 (*id.* ¶¶ 104, 106),

November 9, 2007 (*id*. ¶¶ 105, 106), and February 11, 2008 (*id*. ¶¶ 115, 116).  Plaintiff cannot

remedy this defect.  As Harman's stock price history reflects, Harman's share price had very

little movement after the September 27, 2007, October 22, 2007, November 9 2007, and

February 11, 2008 alleged corrective statements, suggesting the alleged misstatements they

purportedly correct had no impact on Harman's share price whatsoever.  *See* Stock Price Chart.

Accordingly, these statements cannot form the basis of any fraud claim, and any claim for

damages relating thereto should be dismissed.  *See Lentell*, 396 F.3d at 174.

Notably, this eliminates any claim based on the alleged misstatements concerning

Harman's MyGIG system.  Harman publicly disclosed the reduced operating margins on the

MyGIG systems on October 25, 2007, and again on November 9, 2007.  *See* Transcript of

Harman International Industries Quarterly Earnings Call at 10 (Oct. 25, 2007), Will Decl., Ex. 29.

("During our September 27th conference call, we discussed automotive's challenging, changing

product mix and its effect on gross margins.  We expected gross profit to decline as we entered

the mid infotainment segment and ramped up our PND business.  However, the planned decline

was burdened by higher than expected material costs and the launch of new infotainment

programs and new manufacturing facilities."); Nov. 9, 2007 10-Q ("Gross profit as a percentage

of sales decreased 9.0 percentage points for the quarter ended September 30, 2007 compared to

the same period in the prior year.  The gross margin decline was primarily due to higher costs

incurred related to the ramp-up of mid-level infotainment systems for mass market vehicles.").

Plaintiff curiously fails to disclose this fact.

Plaintiff has also failed to allege *any* economic loss in connection with Harman's

statement that it disagreed with the claim that it had breached the Merger Agreement.  Compl.

¶ 87.  Again, it cannot.  There has never been any "corrective" statement—or any decision or

opinion by any tribunal—casting doubt on Harman's claim that no breach of the Cap Ex

provision occurred.  To the contrary, the subsequent public statements of Dr. Harman and

Paliwal explained the credible and unchallenged factual and legal basis for Harman's statement

that no breach had occurred.  *See* Carol J. Loomis, *An Old Hand in a Strange New World*,

FORTUNE, Jan. 23, 2008, *available at* http://money.cnn.com/2008/01/21/news/companies/

harmon_kardon.fortune/index.htm, Will. Decl., Ex. 28.

### C. The Complaint Ignores The Overwhelming Impact Of A *Wall Street Journal* Article And KKR's Decision To Seek To Terminate The Merger Agreement On Harman's Share Price On September 21, 2007, And September 24, 2007.

With respect to loss causation and the alleged corrective statements on September 21,

2007, and September 24, 2007 (Compl. ¶¶ 128, 129, 130, 131), Plaintiff ignores that the drop in

Harman's stock price on these days was caused, *not* by any alleged corrective disclosure by

Harman, but by a *Wall Street Journal* article published before any Harman statement that day

casting serious doubts on KKR's desire to close the Merger as the credit markets roiled in an

historic credit crisis—a market risk that had nothing to do with any Harman conduct.

Prior to the opening of the NYSE, on September 21, 2007, *The Wall Street Journal*

published an article—an article the Complaint conspicuously fails to mention—claiming that

KKR had *unspecified* reservations about the Merger. *See* Berman & Cimilluca, *Harman's*

*Suitors Sour on Buyout*, at A3. Notably, at this time, the market was realizing, and extremely

fearful of, the full impact of the current Wall Street credit crisis on pending deals, particularly

those involving KKR. *See* Henny Sender, et al., *Debt Crunch Hits Deals, Deal Makers and Key*

*IPO—KKR May Find it Hard to Launch Stock Offer, Let Alone its Financings*, WALL ST. J., July

27, 2007, at C1, Will Decl., Ex. 30 ("The ripple effects of the tightening deal and credit markets

are expected to exert large influence on KKR."); Dana Cimilluca, *Deals & Dealmakers: KKR's*

*Road to Offering Appears Bumpy --- Costs for Deals Soar, Crimping Prospects of High Returns*,

WALL ST. J., Aug. 14, 2007, at C5, Will Decl., Ex. 31 ("Investors' refusal to finance deals at the

same low rates and easy terms they extended just a few months ago will likely weigh more

heavily on KKR than any of its rivals given the sheer number of deals it has agreed to this year.").

The stock market reacted immediately to the article, pushing Harman's opening share

price down from the previous day's closing price of $112 to $97.70, on pent-up anxiety about

how the credit crisis would impact the backlog of announced private equity deals. Thus, ***before***

Harman issued the alleged corrective disclosure, indeed, at the opening bell, almost all of

Plaintiff's purported economic loss had occurred due to credit-crunch related anxiety in the

market stoked by the *Journal* article. Accordingly, the Plaintiff cannot recover for pre-market

price movement on September 21, because none of it, as a matter of law, can be attributed to

Harman. *See Intelligroup*, 468 F. Supp. 2d at 684 (ruling that if price declines for reasons

unrelated to the fraud or the circumstances are such that loss is bound to be speculative, there is no right to recover).

      The events that occurred *after* the NYSE opened are equally problematic for Plaintiff. Throughout the day on September 21, 2007, various news agencies published reports about the Merger, and Harman's share price continued to slide.  By the time trading was suspended, at 2:13 p.m., Harman's share price had ***already*** declined to $88.17.  The alleged "corrective" press release occurred ***after*** this halt in trading.  Thus, none of the movement in Harman's stock price on September 21, 2007, can be attributed to Harman's supposed corrective disclosure or untangled from market speculation about the impact of the credit crisis on KKR.  *See Lattanzio*, 476 F.3d at 158 (requiring "facts to show that . . . misstatements, among others . . . that were much more consequential and numerous, were the proximate cause of plaintiffs' loss . . ."); *Lentell*, 396 F.3d at 174 (dismissing a complaint because "it ha[d] not adequately ple[]d facts which, if proven, would show that [the] loss was caused by the alleged misstatements as opposed to intervening events").

      Failing even to cite the key *Journal* article, the Complaint makes the blanket assertion that the "timing and magnitude of Harman's stock price decline negates any inference that the loss suffered" was caused by facts unrelated to the fraud.  *See* Compl. ¶ 137.  Plaintiff's failure to account for the true events of the day, or attempt to ascribe some rough portion of the stock drop to the fraud, warrants dismissal.  *See Omnicom Group*, 2008 U.S. Dist. LEXIS 6033, at *20; *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2008 U.S. Dist. LEXIS 37993 (S.D.N.Y. May 8, 2008).

      Finally, the Complaint wrongly conflates KKR's decision to seek to abandon the Merger with the alleged fraudulent statements about capital expenditures.  That is, Plaintiff *assumes* that

had the alleged misstatements about R&D costs been "correctly" disclosed, Harman's stock price would have dropped to the same degree it dropped when reports surfaced that KKR would seek to abandon the Merger. But the two issues are very different; the possibility of increasing capital expenditures is simply not the same as a breach or as KKR deciding to call a breach.

> ### D.    Plaintiff Fails To Allege Economic Loss With Respect To The Later PND-Related Disclosures.

Plaintiff equally fails to allege loss causation adequately with respect to PND projections. Indeed, Plaintiff has failed to allege the required corrective disclosure as a matter of law.

With respect to PNDs and the January and February 2008 declines in Harman's share price, Plaintiff claims that the disclosure that Harman failed to meet its PND sales projections caused its loss. *See* Compl. ¶¶ 133-35. The announcement of a failed projection, however, cannot establish loss causation as a matter of law. As the Southern District of New York has explained: "[i]f downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses." *In re Initial Pub. Offering Sec. Litig.* ("*In re IPO I*"), 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005). In other words, while the "failure to meet earnings forecasts may have a *negative* effect on stock prices," that does not automatically make it a "*corrective* effect." *Id.* at 266 (stating that the failure to meet earnings forecasts or statements foreshadowing such failures do not constitute events disclosing schemes to defraud the market).

Rather, to establish loss causation, the loss must be caused by the "materialization of the **concealed** risk," and a missed projection is not necessarily the same as a concealed risk. *Lentell*, 396 F.3d at 173 (emphasis supplied); *see Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 616

(S.D.N.Y. 2008) (if "the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie.") (internal quotations and citations omitted). But here no risk in the PND market was concealed. To the contrary, Harman repeatedly warned of competitive pressures in the European PND market and advised investors that its projections were not a guarantee of actual results in light of this risk. *See supra* pp. 25-27; *see also* 2007 Annual Report at 32 (cautioning investors that "[a]utomotive inventories increased significantly due to our *entry* into the PND market in fiscal 2007") (emphasis supplied). The Complaint, therefore, fails because "substantial indicia of the risk that materialized [we]re unambiguously apparent on the face of the disclosures alleged to conceal the very same risk." *Lentell*, 396 F.3d at 177.

The disclosure of a financial loss or a missed projection is not the same as the disclosure of the alleged underlying cause for that loss for loss causation purposes. Thus, in *In re eSpeed, Inc. Securities Litigation*, the plaintiff shareholders alleged that the defendant corporation fraudulently concealed information about its use of software which was "detested by its customers." 457 F. Supp. 2d 266, 296 (S.D.N.Y. 2006). The shareholders further alleged that the corporation's stock price dropped precipitously immediately following its announcement that its "business was not progressing as previously anticipated." *Id.* The court dismissed the shareholders' complaint because the announcement causing injury revealed nothing about the specific fact allegedly concealed from investors, *i.e.*, that customers did not like the company's product. *Id.* Plaintiff makes the same mistake here. As in *In re eSpeed*, Plaintiff fails to demonstrate that it was more probable than not that specific disclosures about PNDs, and not the Company's negative statements about earnings in general, caused the stock price decline.

## IV.   PLAINTIFF'S § 20(a) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED GIVEN THE ABSENCE OF ANY CLAIM UNDER § 10(b) AND RULE 10b-5.

Because the Complaint fails to allege a primary violation of section 10(b), Plaintiff's control-person claims against the Individual Defendants (Compl. ¶¶ 184-86) fail as a matter of law.  As this Court has explained, "there can be no control person liability without a primary violation by the person allegedly controlled."  *Republic Prop. Trust v. Republic Props. Corp.*, 540 F. Supp. 2d 144, 163 (D.D.C. 2008) (citing 15 U.S.C. § 78t(a) (2008)); *see also Fannie Mae*, 503 F. Supp. 2d at 44 (concluding that section 20(a) liability can only exist where plaintiffs allege that individuals culpably participated in securities fraud).

In all events, § 20(a) liability cannot attach unless the alleged control person "culpably participated" in the underlying fraud.  *See Fannie Mae*, 503 F.Supp. 2d at 44 (requiring plaintiffs to plead "particularized facts of [the controlling person's] conscious misbehavior as a culpable participant in the fraud") (quoting *Mishkin v. Ageloff*, 1998 U.S. Dist. LEXIS 14890, at *25 (S.D.N.Y. Sept. 23, 1998))); *see also SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 841 (3d Cir. 2006); *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).  Here, too, the heightened pleading requirements of the PSLRA require a plaintiff to plead "culpable participation" with particularity.  *See Fannie Mae*, 503 F. Supp. 2d at 44 (citing *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973)).  Corporate directors cannot be liable based on their job titles alone: reckless conduct or conscious misbehavior is necessary.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 (1976) (noting that § 20(a) liability requires more than showing of mere negligence).

The Complaint, however, makes no such allegations.  Plaintiff relies only on the fact that the Individual Defendants had "high-level positions," (Compl. ¶ 184) and "supervisory involvement in the day-to-day operations of the Company." (Compl. ¶ 185).  The presumption of

control that Plaintiff draws from the Individual Defendants' positions "make[s] a mockery of

Congress's intent in passing the PSLRA" because the inference is not supported by specific

allegations of malfeasance by the Individual Defendants. *Fannie Mae*, 503 F. Supp. 2d at 44.

Accordingly, the Court should dismiss the Complaint's Second Claim.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

Consolidated Complaint in its entirety with prejudice.

Respectfully submitted,

Dated: July 3, 2008                JONES DAY

      /s   Thomas F. Cullen, Jr. 
Thomas F. Cullen, Jr., D.C. Bar No. 224733
Michael J. Will, D.C. Bar. No. 503370
51 Louisiana Ave. NW,
Washington, D.C. 20001
Tel:  (202) 879-3939
Fax:  (202) 626-1700
tfcullen@jonesday.com
mwill@jonesday.com

Robert C. Micheletto
Traci L. Lovitt, D.C. Bar. No. 467222
222 East 41st Street,
New York, NY 10017
Tel:  (212) 326-3939
Fax:  (212) 755-7306
rmicheletto@jonesday.com
tlovitt@jonesday.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

_____

IN RE HARMAN INTERNATIONAL
INDUSTRIES, INC. SECURITIES
LITIGATION

)
)
)
)
)

Case No. 1:07-cv-01757(RWR)

_____

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
## THE CONSOLIDATED COMPLAINT

This matter having come before the Court on Defendants' Motion to Dismiss the

Consolidated Class Action Complaint ("Complaint"), the Court having reviewed said motion,

and good cause having been shown, it is this day of _____, 2008,

ORDERED that Defendants' Motion to Dismiss the Consolidated Class Action

Complaint is hereby GRANTED; and that:

1.       The Complaint is dismissed in its entirety with prejudice pursuant to Rules 9(b)

and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform

Act of 1995.

_____
Richard W. Roberts
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE HARMAN INTERNATIONAL INDUSTRIES, INC. SECURITIES LITIGATION | ) ) ) ) )     Case No. 1:07-cv-01757(RWR) |

## DECLARATION OF MICHAEL J. WILL IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

I, MICHAEL J. WILL, hereby declare, pursuant to 28 U.S.C. § 1746, and state as follows:

1.     I am attorney at the law firm of Jones Day, counsel for Defendants Harman International Industries Incorporated ("Harman"), Dr. Sidney Harman, Dinesh Paliwal, and Kevin Brown.

2.     I submit this Declaration in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint.

3.     Attached hereto are true and correct copies of the following documents, which are referenced in Defendants' Motion to Dismiss the Consolidated Class Action Complaint.

| | |
|---|---|
| **Exhibit 1.** | **Harman International Industries, 2007 Annual Report (Form 10-K) (August 29, 2007).** |
| **Exhibit 2.** | **Press Release, Harman International Industries, *Harman International Industries to be Acquired by KKR and GS Capital Partners* (April 26, 2007).** |
| **Exhibit 3.** | **Agreement and Plan of Merger.** |
| **Exhibit 4.** | **KHI Parent, Inc., Registration Statement Under the Securities Act of 1933 (Form S-4) (June 20, 2007).** |
| **Exhibit 5.** | **Harman International Industries, Historical Share Price.** |

Exhibit 6.       Press Release, Harman International Industries, *Harman International Reports Record Third Quarter Results* (Apr. 26, 2007).

Exhibit 7.       David Leiker, *Harman International Industries, Inc. (HAR): Reiterate Outperform Rating and Top Supplier Idea* (Robert W. Baird & Co. Mar. 19, 2007).

Exhibit 8.       Transcript of Harman International Industries Earnings Release Conference Call (Apr. 26, 2007).

Exhibit 9.       Transcript of Harman International Industries Second Quarter Fiscal 2007 Earnings Call (Jan. 25, 2007).

Exhibit 10.      Press Release, Harman International Industries, *Harman International reports Fourth Quarter and Full Year Results* (Aug. 14, 2007).

Exhibit 11.      KKR & Co. L.P., Amendment No. 1 to Form S-1 (Form S-1/A) (Aug. 13, 2007).

Exhibit 12.      Transcript of KKR Private Equity Investors Earnings Conference Call (Aug. 15, 2007).

Exhibit 13.      Dennis K. Berman & Dana Cimilluca, *Harman's Suitors Sour on Buyout*, WALL ST. J., Sept. 21, 2007.

Exhibit 14.      Lu Wang, *Cynosure, Evergreen, Sirtris, Sonic, Terra: U.S. Equity Movers*, BLOOMBERG, Sept. 21, 2007.

Exhibit 15.      Press Release, Harman International Industries, *Harman Comments On Previously Announced Merger* (Sept. 21, 2007).

Exhibit 16.      Jason Kelly & Justin Baer, *Goldman, KKR May Abandon Harman Buyout, People Say (Update 3)*, BLOOMBERG, Sept. 21, 2007.

Exhibit 17.      Press Release, Harman International Industries, *Harman Provides Guidance for Fiscal 2008* (Sept. 24, 2007).

Exhibit 18.      Transcript of Harman International Industries Analyst and Investor Call (Sept. 27, 2007).

Exhibit 19.      Press Release, Harman International Industries, *Harman International Revises Fiscal Year 2008 Earnings Guidance* (Jan. 14. 2008).

| Exhibit 20. | Transcript of Harman International Industries Second Quarter Earnings Conference Call (Feb. 5, 2008). |
| Exhibit 21. | Press Release, Harman International Industries, *Harman International Reports Higher Sales for Second Quarter Fiscal Year 2008; Earnings Down on PND, Product Mix and Costs* (Feb. 5, 2008). |
| Exhibit 22. | Harman International Industries, Quarterly Financial Report (Form 10-Q) (May 10, 2007). |
| Exhibit 23, | Harman International Industries, Quarterly Financial Report (Form 10-Q) (Nov. 9, 2007). |
| Exhibit 24. | Press Release, Harman International Industries, *Harman International Reports First Quarter Results* (October 25, 2007). |
| Exhibit 25. | Transcript of Harman International Industries Fourth Quarter Fiscal 2007 Earnings Release Conference Call (Aug. 14, 2007). |
| Exhibit 26. | Harman International Industries, 2006 Annual Report (Form 10-K) (Sept. 6, 2006). |
| Exhibit 27. | Transcript of Harman International Industries First Quarter Fiscal 2007 Earnings Release Conference Call (Oct. 25, 2006). |
| Exhibit 28. | Carol J. Loomis, *An Old Hand in a Strange New World*, FORTUNE, Jan. 23, 2008. |
| Exhibit 29. | Transcript of Harman International Industries Quarterly Earnings Call (Oct. 25, 2007). |
| Exhibit 30. | Henny Sender, et al., *Debt Crunch Hits Deals, Deal Makers and Key IPO—KKR May Find it Hard to Launch Stock Offer, Let Alone its Financings*, WALL ST. J., July 27, 2007. |
| Exhibit 31. | Dana Cimilluca, *Deals & Dealmakers: KKR's Road to Offering Appears Bumpy --- Costs for Deals Soar, Crimping Prospects of High Returns*, WALL ST. J., Aug. 14, 2007. |

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  Washington, D.C.
          July 2, 2008

 

_____
Michael J. Will



**Harman International** | 2007 Annual Report



**Harman International** is a leading global provider of high-fidelity audio and infotainment systems.

Our family of legendary brands includes Harman Kardon,® JBL,® Revel,® Mark Levinson,® Infinity,® Lexicon,® Soundcraft-Studer,® AKG,® Becker® and QNX.®

Around the home, our products enrich daily lives with unmatched clarity. From portable music players to integrated home entertainment systems, the Harman name has been synonymous with a superior sound experience for more than 50 years.

On the highway, we entertain and inform the world's discriminating drivers and passengers. Our audio, DVD and navigation systems are the choice of both luxury automakers and aftermarket enthusiasts who will settle for nothing less than the Harman experience.

Our professional products help leading artists of every genre to record and to perform — from advanced studio mixing systems that capture every subtle note, to audio solutions that fill the world's premier entertainment and sporting venues with high-fidelity sound.

Our network of manufacturing, sales and service resources is staffed by more than 10,500 dedicated Harman professionals, along with leading retailers, systems integrators and channel partners. Although we hail from many cultures, we are united by a single set of values encompassing integrity, creativity, quality and human development.

Welcome to the world of Harman International.

*Cover: Harman Professional audio systems provide the perfect mix of high fidelity, command, and control for leading entertainment and sports producers.*

## Financial Highlights

**Five-Year Summary**

(in thousands, except per share data, for the fiscal years ended June 30)

|  | 03 | 04 | 05 | 06 | 07 |
|---|---|---|---|---|---|
| Net Sales | $ 2,228,519 | $ 2,711,374 | $ 3,030,889 | $ 3,247,897 | **$ 3,551,144** |
| Operating Income | 166,894 | 254,465 | 350,981 | 397,241 | **386,387** |
| Income Before Income Taxes | 142,471 | 227,520 | 335,337 | 376,187 | **382,205** |
| Net Income | 105,428 | 157,883 | 232,848 | 255,295 | **313,963** |
| Diluted EPS | 1.55 | 2.27 | 3.31 | 3.75 | **4.72** |
| Total Assets | 1,711,918 | 1,999,875 | 2,201,983 | 2,375,752 | **2,508,868** |
| Total Debt | 503,068 | 394,925 | 333,917 | 197,554 | **76,528** |
| Cash and Cash Equivalents | 109,361 | 286,708 | 291,214 | 291,758 | **106,141** |
| Shareholders' Equity | 655,785 | 874,996 | 1,060,948 | 1,228,164 | **1,494,041** |

**Net Sales**
(in billions)



**Earnings Per Share**
(diluted)







## Message from the Executive Chairman

Harman International enters the new fiscal year in firm control of its future. 2007 was a time of both achievement and challenge, as well as some significant distractions. They are behind us and we are moving forward.

On October 22, 2007, we agreed with KKR and GS Capital Partners to terminate our merger agreement and we signed a new agreement providing for a $400 million investment by KKR and GSCP. The investment is in the form of five year notes, convertible into Harman common stock at $104 per share. The notes will bear interest of 1.25%, and the investors have agreed to a one year lock up during which they may not sell or hedge the investment. We will use the new investment for a large and orderly buy-back of our company's shares through an accelerated share repurchase (ASR) program. Brian Carroll, a member of KKR whom we have come to know well in the past year, will join the Harman Board.

We do not agree with the reasons for cancellation of the original merger agreement. But when it became clear that the merger would not close, we carefully reviewed our options. A court trial seeking payment of the break-up fee would be very expensive and would absorb an enormous amount of our attention and our time – resources which our board determined are far better spent in the conduct of our business and the continued development of our company. It is a view I truly share and one I am hopeful you too will share.

Three phases of growth characterize the development of most significant companies. Typically, an entrepreneur of vision and energy creates and drives the business in its first stage. That stage is followed by a lengthy period during which the business significantly expands and discipline and processes are added. Finally, the time arrives when a large and vibrant company recognizes the need for refinement and tuning to provide the best platform for additional strong and profitable growth. Harman International is in the third stage of that

Our company enters 2008 poised to capitalize on its deep experience in every business segment.

As lifestyles evolve around the world, so will the demand grow for high-fidelity music, theater and sports.

three-stage business cycle. We have the energy and the critical mass which characterize a global leader, and we are determined to continue to create value for our shareholders.

As we fine tune our business and its processes, I am gratified to have the support of Dinesh Paliwal as Chief Executive Officer. The CEO search and transition were significant distractions, but we have concluded the process with the selection of a world-class global executive. Because of my great confidence in Dinesh, I have proposed, and our Board of Directors has agreed, that effective at our December 17, 2007 Annual Meeting, I will take the title of Chairman. In that note, I look forward to a long and close working relationship with our Chief Executive Officer.

Our company enters 2008 poised to capitalize on its deep experience in each of our business segments. Our Consumer division will benefit from the ground-breaking technology we have developed in our OEM operations over the years. The long-awaited age of seamless connectivity is arriving, and we have the tools and the determination to lead it. Our software prowess carries the promise of new market leadership, increased margins and new revenue streams.

Harman's automotive business will continue to grow as we build on our strong position in the premium markets and move further into the mid-range and entry-level vehicle segments. We expect that the shorter R&D and launch cycles that characterize this segment will tend to offset lower margins.



*Harman amplifiers, sound processors and speakers deliver the audio action as the 2006 World Series of baseball opens at Busch Stadium in St. Louis.*

*The Harman Entertainment Lounge™ provides leading retailers with proven, modular solutions for merchandising of high-definition audio and infotainment products.*

All this places our company in an enviable position. Our products have long been in demand for bookshelves, dashboards, and stages around the world. More important, our integration capabilities enable us to express the best of our technologies in scalable and highly satisfying lifestyle responsive systems.

I remember when "infotainment" was considered something of a fad. Customers and analysts wondered if the trend would last. Few now question the "legs" of the infotainment phenomenon, and even fewer would leave home without the communications, entertainment and navigation tools that have become an essential part of daily life.

In Professional audio, we are privileged to serve the world's leading artists and entertainment venues. As lifestyles evolve around the world, demand will grow for high quality audio in theater and sports venues. Our proven expertise in outfitting such facilities, combined with a growing footprint in the developing world, will spur our wonderful Professional Audio business further.

These are times of extraordinary challenge and opportunity, and we are well prepared. We are blessed with a team of extraordinary employees, suppliers and business partners. Our company is strong financially and we possess a wonderful product portfolio that carries the industry's leading names. We look forward to the future with renewed enthusiasm and confidence.

Sincerely,

Sidney Harman
*Executive Chairman*



The Harman/Becker Traffic Assist™ offers aftermarket consumers a rich infotainment experience blending audio, navigation and multimedia in one compact device.

More than 200,000 visitors attended the IFA Consumer Electronics Show in Berlin, Germany where Harman hosted customers, partners, and press from around the world.



## Message from the Chief Executive Officer

It is my sincere pleasure to lead the Harman International team, and I offer my thanks to Dr. Harman, our board of directors, and the other new colleagues whose confidence has empowered me to take this exciting role. I am committed to leveraging this dynamic corporate spirit to achieve value for our shareholders.

My decision to join Harman was influenced both by the company's powerful market legacy and by the wealth of opportunities I believe are available in the quality audio and infotainment sectors. During the past three decades, I have had the privilege to work and live in six countries while traveling to many more. The fast-changing lifestyles, infrastructure and skills which characterize today's markets represent rich opportunity for companies who are committed to innovation, operational excellence, and value-based marketing.

During my travels around the company, I have identified several areas where we can sharpen our performance. These include controlling costs, managing risks, simplifying our business processes and expanding our activities in mid-range markets.

In the area of costs, we must maintain a more predictable source of supply for the skills and materials from which we craft our products. We must become more disciplined in "shopping smart" around the world, combining the purchasing power of multiple Harman units to create a world-class supply chain that matches our world-class products. We must deploy our skilled human assets across both industrial and emerging markets.

Risk management is another key priority. Whether we're launching a new consumer product, managing a new automotive platform, or refining our global footprint, our approach will be to improve the company's processes for identifying potential risks and moving responsibility higher into the organization. I will expect my senior management team to have full visibility into this process, and to act forcefully when risk mitigation is required.

Harman's global footprint will take on a sharp focus in controlling costs and putting resources close to new customers. Like many diversified companies, Harman has grown rapidly, creating a rich but complex corporate landscape. We will simplify this landscape through restructuring actions that consolidate our manufacturing and engineering footprint – along with a wide range of internal processes.

We are proud of the Harman quality that is built into products manufactured in the industrial markets. But achieving this quality does not mean we must procure every component, service, and skill locally. Our value chain must reach across both geographic and business boundaries to maintain quality while improving agility, reliability and competitive costs.

The fast-changing lifestyles, infrastructure and skills of today's markets represent rich opportunity.



*Harman strategic partnerships add excitement to leading consumer products such as the Apple iPod® and iPhone® through modular, high-fidelity docking and speaker systems.*

I have a deep respect for the opportunities created as billions of new consumers across the global markets open their wallets to achieve lifestyle growth. We will seize these opportunities through new mid-range consumer and automotive products that improve our volume leverage, and through professional products that serve the dramatic growth expected in entertainment and sports facilities in the developing world. As evidence of the continued confidence of our OEM customers, we are launching a record seven new vehicle platforms during 2007. Our Professional systems are installed in prestigious facilities around the world, including major venues for the 2008 Beijing Summer Olympics.

As we continue this world-class tradition, we will also improve and simplify our internal processes. We will reconcile a diverse mix of activities spanning such functions as legal, human resources, finance, information systems, communications, and marketing. Our company has reached a size where significant synergies in these areas are both achievable and critical. The real focus will not be just new tools – but a culture that drives the logic for these tools. The prime objective will be lower functional costs, coupled with better reporting, greater consistency and faster communications.

A globally-networked company needs a globally-networked team. It is often said that "what gets measured gets done right," and I have agreed with my senior managers on a set of key measurements that will clearly chart our progress. The goals embodied in these measurements, along with unquestioned integrity, value orientation and innovation will be prerequisites for membership on our team.

Harman's brand legacy, quality products and passion for excellence are admired throughout the markets we serve. These factors led me to join this company, and they will lead us together to reach our full potential. I look forward to working with our stakeholders as we chart our course of sustained and increasingly profitable growth.

Sincerely,

Dinesh C. Paliwal
*President, Chief Executive Officer and Vice Chairman*



*The new MyGIG™ system developed by Harman Kardon delivers the next generation of multimedia excitement for the owners of Chrysler,® Dodge® and Jeep® vehicles.*



*The QNX® Neutrino® architecture offers product developers a robust, protected software environment for embedded systems ranging from multimedia platforms to medical instruments.*

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended June 30, 2007**
**Commission File Number 001-09764**

# Harman International Industries, Incorporated
(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **11-2534306** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C.** | **20004** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **202-393-1101**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, par value $.01 per share** | **New York Stock Exchange** |
| **Preferred Stock Purchase Rights** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes        No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes        No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one)
Large accelerated filer ☒    Accelerated filer        Non-accelerated filer

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes        No ☒

The aggregate market value of the voting common stock held by non-affiliates of the registrant as of December 29, 2006 (the last business day of the registrant's most recently completed second fiscal quarter) was $5,996,542,750 based upon the closing price of the shares on the New York Stock Exchange on that date.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: 65,240,401 shares of common stock, par value $.01 per share, as of August 27, 2007.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement relating to the 2007 Annual Meeting of Stockholders are incorporated by reference into Part III.

## INDEX

|  |  |  | Page |
|---|---|---|---|
| Forward–Looking Statements |  |  | i |
| **Part I** |  |  |  |
| Item | 1. | Business | 1 |
| Item | 1A. | Risk Factors | 9 |
| Item | 1B. | Unresolved Staff Comments | 15 |
| Item | 2. | Properties | 16 |
| Item | 3. | Legal Proceedings | 17 |
| Item | 4. | Submission of Matters to a Vote of Security Holders | 18 |
|  |  | Executive Officers of the Registrant | 18 |
| **Part II** |  |  |  |
| Item | 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19 |
| Item | 6. | Selected Financial Data | 20 |
| Item | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item | 7A. | Quantitative and Qualitative Disclosures About Market Risk | 35 |
| Item | 8. | Financial Statements and Supplementary Data | 37 |
| Item | 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 72 |
| Item | 9A. | Controls and Procedures | 72 |
| Item | 9B. | Other Information | 72 |
| **Part III** |  |  |  |
| Item | 10. | Directors, Executive Officers and Corporate Governance | 72 |
| Item | 11. | Executive Compensation | 74 |
| Item | 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 74 |
| Item | 13. | Certain Relationships and Related Transactions, and Director Independence | 74 |
| Item | 14. | Principal Accounting Fees and Services | 74 |
| **Part IV** |  |  |  |
| Item | 15. | Exhibits and Financial Statement Schedules | 75 |
| **Signatures** |  |  | 79 |

The page numbers in this Table of Contents reflect actual page numbers, not EDGAR page tag numbers.

References to "Harman International," "Harman," the "company," "we," "us" and "our" in this Form 10-K refer to Harman International Industries, Incorporated and its subsidiaries unless the context requires otherwise.

### Forward–Looking Statements

*This report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). You should not place undue reliance on these statements. Forward-looking statements include information concerning possible or assumed future results of operations, capital expenditures, the outcome of pending legal proceedings and claims, including environmental matters, goals and objectives for future operations, including descriptions of our business strategies and purchase commitments from customers. These statements are typically identified by words such as "believe," "anticipate," "expect," "plan," "intend," "estimate" and similar expressions. We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current conditions, expected future developments and other factors that we believe are appropriate under the circumstances. As you read and consider the information in this report, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. In light of these risks and uncertainties, there can be no assurance that the results and events contemplated by the forward-looking statements contained in, or incorporated by reference into, this report will in fact transpire.*

*You should carefully consider the risks described below and the other information in this report. Our operating results may fluctuate significantly and may not meet our expectations or those of securities analysts or investors. The price of our stock would likely decline if this occurs. In addition, the proposed acquisition of our company by KHI Parent Inc. ("Parent"), a company formed by investment funds affiliated with Kohlberg, Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners VI Fund, L.P. and its related funds, which are sponsored by Goldman, Sachs & Co. ("GSCP"), as reported on our current report on Form 8-K filed with the Securities and Exchange Commission on April 26, 2007, may cause the price of our stock to fluctuate significantly.*

Factors that may cause fluctuations in our operating results and/or the price of our common stock include, but are not limited to, the following:

- the occurrence of any event or other circumstances that could give rise to termination of the merger agreement and the fact that a termination under some circumstances could require our company to reimburse Parent's out-of-pocket transaction expenses up to $20 million and pay a termination fee of up to $225 million (less any transaction expenses reimbursed);

- the outcome of any litigation and judicial actions that have been or may be instituted against our company, Parent and others relating to the merger agreement;

- the inability to complete the merger due to failure to obtain stockholder approval or the failure to satisfy other conditions to complete the merger, including the inability of Parent and its affiliates to obtain regulatory approvals, as required by the merger agreement;

- the possibility that the merger may involve unexpected costs;

- the failure of Parent or its affiliates to obtain the necessary debt financing arrangements set forth in the commitment letters received in connection with the merger agreement, including as the result of the recent disruptions in the debt capital markets;

- the failure of the merger to close for any other reason or any significant delay in the expected completion of the merger;

- risks that the proposed transaction disrupts our company's current plans and operations, and the potential difficulties for our company's employee retention as a result of the announcement or completion of the merger;

- the effect of the announcement or completion of the merger on our company's customer and supplier relationships, operating results and business generally;

- the impact of the substantial indebtedness incurred to finance the merger;

- the amount of costs, fees, expenses and charges related to the merger and the actual terms of the financings to be obtained in connection with the merger;

- the diversion of our company's management's and employees' attention from day-to-day business;

- changes in laws, including increased tax rates, changes in regulations or accounting standards, third-party relations and approvals, and decisions of courts, regulators and governmental bodies;

- automobile industry sales and production rates and the willingness of automobile purchasers to pay for the option of a premium audio system and/or a multi-function infotainment system;

- changes in consumer confidence and spending;

- fluctuations in currency exchange rates and other risks inherent in international trade and business transactions;

- our ability to satisfy contract performance criteria, including technical specifications and due dates;

- our ability to design and manufacture our products profitably under our long-term contractual commitments;

- the loss of one or more significant customers, including our automotive manufacturer customers;

- competition in the automotive, consumer or professional markets in which we operate;

- model-year changeovers in the automotive industry;

- changes in general economic conditions and specific market conditions;

- our ability to enforce or defend our ownership and use of intellectual property;

- our ability to effectively integrate acquisitions made by our company;

- strikes, work stoppages and labor negotiations at our facilities, or at a facility of one of our significant customers; or work stoppages at a common carrier or a major shipping location;

- the outcome of pending or future litigation and administrative claims, including patent and environmental matters; and

- world political stability.

*Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results, results of operations and/or the price of our common stock and could cause actual results to differ materially from those expressed in the forward-looking statements. As a result, the foregoing factors should not be construed as exhaustive and should be read together with the other cautionary statements included in this and other reports we file with the Securities and Exchange Commission. For additional information regarding certain factors that may cause our actual results to differ from those expected or anticipated, see the information under the caption "Risk Factors" which is located in Item 1A of Part I of this report.*

# Part I

### Item 1.  Business

Harman International Industries, Incorporated was incorporated in Delaware in 1980.

We believe we are a worldwide leader in the development, manufacture and marketing of high-quality, high fidelity audio products and electronic systems. We have developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names in our principal markets. We believe that we are a leader in digitally integrated infotainment systems for the automotive industry. We believe our JBL, Infinity, Harman/Kardon, Mark Levinson and Becker brand names are well known worldwide for premium quality and performance. We have built these brands by developing our world-class engineering, manufacturing and marketing competences and have employed these resources to establish our company as a worldwide leader in the markets we serve.

We report our business on the basis of three segments: Automotive, Consumer and Professional. For additional information about these segments, see "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" included in Item 7 of Part II of this report and Note 13, *Business Segment Data,* to our consolidated financial statements located in Item 8 of Part II of this report.

Our Automotive segment designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications primarily to be installed as original equipment by automotive manufacturers. Our automotive products are marketed worldwide under brand names including JBL, Infinity, Mark Levinson, Harman/Kardon, Logic 7, Lexicon and Becker. Through engineering and supply agreements, our premium audio systems and infotainment product offerings are sold to a number of global automotive manufacturers including DaimlerChrysler, Mercedes-Benz, the BMW Group, Toyota/Lexus, Audi/VW, Porsche, Land Rover, Hyundai, and PSA Peugeot Citroën. We also produce a Harman/Kardon branded infotainment system for Harley-Davidson touring motorcycles. Our infotainment systems are a combination of information and entertainment components that may include or control GPS navigation, traffic information, voice-activated telephone and climate control, rear seat entertainment, wireless Internet access, hard disk recording, MP3 playback and a high-end branded audio system. These systems include scaleable software to allow us to better serve a full range of vehicles from luxury through entry-level. Our Automotive segment also produces personal navigation devices ("PNDs") that are primarily sold in Europe.

Our Consumer segment designs, manufactures and markets audio, video and electronic systems for home, mobile and multimedia applications. Our Consumer home products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Lexicon, Mark Levinson and Revel. Our audio and electronic systems are recognized throughout the world for superior sound quality and high performance. Our home product applications include systems to provide high-quality audio throughout the home and our mobile products include an array of aftermarket systems to deliver audio entertainment and navigation in the vehicle. Our home and mobile audio and electronic products are offered primarily through audio/video specialty stores and retail chain stores such as Best Buy, MediaMarkt and Fnac.  Our branded audio products for multimedia applications are primarily focused on products designed to enhance sound for Apple's iPods and iPhones, computers, headphones and other MP3 players and are sold in retail stores such as the Apple stores, Best Buy and Target.

1

Our Professional segment designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, airports, houses of worship and other public spaces. We also design products for recording, broadcast, cinema and music reproduction applications, and we provide high-quality products to the sound reinforcement, music instrument support and broadcast and recording segments of the professional audio market.  Our Professional products are marketed worldwide under brand names including JBL Professional, AKG, Crown, Soundcraft, Lexicon, DigiTech, dbx and Studer.

We offer complete systems solutions for professional installations and users around the world. Our products can be linked by our HiQnet™ network protocol providing a central digital network for audio professionals to control different aspects of a complex system.  We believe that we are uniquely equipped to provide turnkey systems solutions for professional audio applications that offer the customer improved performance, reliability, ease of installation and reduced cost.

Our results of operations depend on our sales of audio products and electronic systems in the automotive, consumer and professional markets. Our products are sold worldwide, with the largest markets being the United States and Germany. A significant portion of our revenues is Euro denominated.

We believe significant growth opportunities continue to exist with automotive manufacturers through an increase in the number of models offering our audio, navigation and infotainment systems, supply agreements with additional automakers, increases in per-vehicle content through the provision of integrated infotainment systems with premium branded audio systems, higher penetration levels of audio and infotainment systems within existing models and providing systems that will include additional functionality such as driver assist safety measures. We believe significant growth opportunities exist in the consumer electronics market as the home and multimedia technologies continue to converge. We also believe growth opportunities exist in the professional markets as we expect our HiQnet system protocol to allow us to capitalize on these opportunities as this technology simplifies the interaction of our products and provides users with an incentive to purchase complete HiQnet compatible systems.

**Proposed Agreement and Plan of Merger**

On April 26, 2007, we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP.  The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent.  KHI Merger Sub and Parent were formed to acquire our company.

If the merger agreement is adopted by our stockholders and the merger is completed, our stockholders will be entitled to receive $120.00 in cash, without interest, for each share of Harman common stock owned at the completion of the merger.  As an alternative to receiving the $120.00 per share, our stockholders have the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman common stock, on a one-for-one basis, for shares of common stock of Parent.  The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders.  However, the number of Parent shares our stockholders and option holders will receive may be less than they request in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock.  This number of Parent shares represents approximately 27% of the equity interests in Parent that will be outstanding immediately

2

following the merger based on the expected equity financing for the merger. If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis and the remaining Harman shares and options will be converted into cash.

Our Board of Directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, our company and our stockholders and resolved to recommend that our stockholders vote in favor of the adoption of the merger agreement.

Completion of the merger is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals and antitrust clearances. We presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007.

### Products

*Automotive*

We believe that we are a leader in developing and manufacturing high-quality, high fidelity digitally-integrated infotainment systems and premium branded audio systems for automobiles.

The automotive market is currently experiencing unprecedented consumer demand for information and entertainment in the car. We have developed leading technical competencies to address this demand. Our infotainment systems are a combination of information and entertainment components that may include or control GPS navigation, traffic information, voice-activated telephone and climate control, rear seat entertainment, wireless Internet access, hard disk recording, MP3 playback and a high-end branded audio system. These systems include scaleable software to allow us to better serve a full range of vehicles from luxury through entry-level. In fiscal 2007, we supplied infotainment systems for vehicles manufactured by Mercedes-Benz, BMW, Porsche, Audi, Hyundai, Chrysler, Renault, PSA Peugeot Citroën and Land Rover. Our business objective is to maintain our leadership position in the infotainment business.

We continue to leverage our expertise in the design and manufacture of premium branded audio systems, as well as the reputation for quality associated with our JBL, Infinity, Harman/Kardon, Mark Levinson, Becker and Lexicon brand names. As a result of our well-established relationships with automobile manufacturers, our engineers are engaged early in the vehicle design process to develop systems that optimize acoustic performance and minimize weight and space requirements. Our Infinity branded car audio systems are offered by DaimlerChrysler and Mitsubishi, in North America. DaimlerChrysler's Mercedes-Benz Division, the BMW Group, Land Rover, Porsche, GM and Saab provide Harman/Kardon branded audio systems in their vehicles. Our premium Mark Levinson digital audio system is offered by Lexus and Rolls Royce. Rolls Royce vehicles come standard with a Lexicon branded audio system. Toyota, PSA Peugeot Citroën and Hyundai/Kia offer our JBL branded audio systems.

In the future, we expect our infotainment systems will also provide driver assist capabilities such as pre-crash emergency braking, full speed adaptive cruise control, sleep guarding, lane departure warnings and night vision.

*Consumer*

We manufacture loudspeakers under the JBL, Infinity, Harman/Kardon and Revel brand names for the consumer home audio market. These loudspeaker lines include models designed for two-channel stereo and multi-channel surround sound applications for the home and in a wide range of performance choices, including floor standing, bookshelf, powered, low frequency, in-wall, wireless and all-weather as well as in styles and finishes ranging from high gloss lacquers to genuine wood veneers. The JBL and Infinity product lines also include car loudspeakers, amplifiers, subwoofers and crossover products sold in the aftermarket as well as marine speakers intended for use on boats.

We also offer a broad range of consumer audio electronics under the Harman/Kardon, Mark Levinson and Lexicon brand names. Our Harman/Kardon home electronics line includes audio/video receivers featuring Logic 7, Dolby Digital and DTS surround sound processing capabilities and multi-channel amplifiers, DVD players and CD players. We design and manufacture high-end electronics, including amplifiers, digital signal processors, compact disc players and transports, DVD transports and surround sound processors that we market under the renowned Mark Levinson brand. We believe that we are a leader in the design and manufacture of high-quality home theater surround sound processors and amplifiers under the Lexicon name. Lexicon was a pioneer in the development of digital signal processors for the professional audio market. We have successfully transferred Lexicon's professional audio expertise to produce excellent consumer products.

In the multimedia market, we offer branded iPod® docking devices such as JBL On Stage™ II, JBL Onstage™ Micro,® JBL Radial™, JBL Radial™ Micro, JBL® On Time™, Harman/Kardon Go +Play™, and PC related devices such as JBL Creature™ II, JBL Spot™, JBL Spyro™, JBL Duet™, and Harman/Kardon Soundsticks® II.  We also offer a wide variety of headphone devices.  Our products add greater functionality for computers and the successful iPod® by Apple as well as other MP3 players. Our new Harman/Kardon Drive + Play™ 2 provide full music control and interface with a highly visible display for the use of these devices in automobiles.  Music management allows for choice by artist, album, song, genre, composer and play list. We believe our products facilitate the transfer of music and data from the home to the car and back.  We also offer aftermarket personal navigation devices such as Guide + Play™ GPS-500, which is a portable GPS navigator and digital audio/video player.

*Professional*

Our Professional products include loudspeakers and electronic equipment that are marketed under what we believe are some of the most respected brand names in the industry, including JBL Professional, Crown, Soundcraft, Lexicon, DigiTech, AKG, BSS, dbx and Studer.

The Professional market is increasingly moving to digital technology. We believe that we are a leader in this market. Our Professional segment derives value from our ability to share research and development, engineering talent and other digital resources among its business units. Soundcraft, Studer, Crown, Lexicon, DigiTech, dbx and BSS each have substantial digital engineering resources and work together to achieve common goals by sharing resources and technical expertise.

4

Our Professional loudspeakers are well known for high-quality and superior sound. JBL Professional branded products include studio monitors, loudspeaker systems, powered loudspeakers, sound reinforcement systems, cinema systems, surround sound systems and industrial loudspeakers.

Our Professional electronic products are recognized for high quality and reliability. We market these products on a worldwide basis under various trade names, including Crown, Soundcraft, Lexicon, DigiTech, AKG, BSS, dbx and Studer. These products are often sold in conjunction with our JBL Professional loudspeakers and certain products are integrated into JBL loudspeakers.

We produce sound mixing consoles which range from automated multi-track consoles for professional recording studios to compact professional mixers for personal recording, home studios and sound reinforcement. Our consoles are sold to four main market areas: sound reinforcement, recording studios, broadcast studios and musical instrument dealers. Our mixing consoles are sold primarily under the Soundcraft and Studer brands. We produce many types of signal processing products, equalizers, and special effects devices that are used in live sound applications and in recording studios to produce sound effects and refine final mixes. These products are sold under the Lexicon, DigiTech, dbx and BSS brand names.

We produce microphones, audio headphones, surround-sound headphones and other professional audio products, which are marketed under the AKG brand name.

We also produce professional amplifiers and powered loudspeakers under the Crown and JBL brand names. We believe the integration of loudspeakers and electronics enhances our ability to provide complete systems solutions to the professional audio market. Our other professional products include switching systems, digital audio workstations and turnkey broadcasting studio installations marketed primarily under the Studer brand name.

With our HiQnet network protocol we can configure, connect and control a complete professional sound system from microphone to speaker on one unified digital network. This system provides enhanced productivity and facilitates real-time problem diagnosis and correction from a central location.

### *Manufacturing*

We believe that our world-class manufacturing capabilities are essential to maintaining and improving product quality and performance. Our manufacturing facilities are located in North America, Europe and Asia.

Our Automotive manufacturing facilities in Europe are located in Germany, the United Kingdom, Sweden, France and Hungary.  Our European facilities are primarily used to manufacture infotainment systems and automotive navigation and audio systems. In North America, we manufacture loudspeakers in Indiana, Kentucky and Mexico and manufacture electronics in California, Kentucky and Missouri.  In addition, we are currently building a new facility in Suzhou, China where we will manufacture automotive loudspeakers and amplifiers.  Production at the Suzhou facility is expected to start in June 2008.

Our Consumer manufacturing facilities are located in California, Massachusetts, Mexico and China. Our loudspeaker manufacturing capabilities include the production of high-gloss lacquer and wooden veneer

loudspeaker enclosures, wire milling, voice coil winding and the use of computer controlled lathes and other machine tools to produce precision components.

In North America, our principal Professional manufacturing facilities for loudspeakers are located in California and for electronic products, including amplifiers and effects devices, are located in Utah and Indiana. European Professional electronics manufacturing includes mixing consoles in the United Kingdom and Switzerland, professional recording and broadcast equipment in Switzerland and microphones and headphones in Austria.

Our facilities have been designed to emphasize worker safety and compliance with environmental and safety regulations.

### Suppliers

We use externally sourced microchips in many of our products. A significant disruption in our microchip supply chain and an inability to obtain alternative sources would have a material impact on our consolidated results of operations.

Several independent suppliers manufacture electronic products designed by Harman/Kardon, certain Consumer and Professional loudspeakers and electronic products and personal navigation devices.  We do not believe the loss of any one of these suppliers would have a material impact on our consolidated results of operations or consolidated financial position.

### Trademarks and Patents

We market our products under numerous brand names that are protected by both pending and registered trademarks around the world. Samples of our brands include JBL,® Infinity,® Harman/Kardon,® Lexicon,® Mark Levinson,® Revel,® Crown,® Becker,® Soundcraft,® Spirit,® DigiTech,® AKG,® Studer,® BSS® and dbx.® Our trademark registrations cover use of trademark rights in connection with various products, such as loudspeakers, speaker systems, speaker system components and other electrical and electronic devices. We have registered or taken other protective measures for many of these trademarks in substantially all major industrialized countries.

As of June 30, 2007 we had 1,885 trademark registrations and 294 pending trademark applications around the world. On that date, we also had 1,695 United States and foreign patents and 2,172 pending patent applications covering various audio, infotainment and software products.

### Seasonality

We experience seasonal fluctuations in sales and earnings. Historically, our first fiscal quarter ended September 30 is generally the weakest due to automotive model year changeovers and the summer holidays in Europe. Our sales and earnings may also vary due to customer acceptance of our products, product offerings by our competitors and general economic conditions, including fluctuations in foreign currency exchange rates.

### *Customers/Industry Concentration*

We are subject to various risks related to our dependence on key customers. Sales to DaimlerChrysler accounted for 25 percent of our total consolidated net sales for the fiscal year ended June 30, 2007. The majority of these sales were to the Mercedes-Benz division. Accounts receivable due from DaimlerChrysler accounted for 19 percent of total consolidated accounts receivable at June 30, 2007.

We anticipate that DaimlerChrysler will continue to account for a significant portion of our net sales and accounts receivables for the foreseeable future.

The loss of sales to DaimlerChrysler, or to any of our other significant automotive customers, would have a material adverse effect on our total consolidated net sales, earnings and financial position. For the fiscal year ended June 30, 2007, approximately 70 percent of our sales were to automobile manufacturers. These automotive customers are not obligated to any long-term purchase of our products.

### *Backlog Orders*

We manufacture automotive products and systems on a just-in-time basis and maintain sufficient inventories of finished goods to meet Consumer and Professional customer orders promptly; therefore, we do not consider the level of backlog to be an important indication of our future performance. Our backlog was approximately $27 million at June 30, 2007. We expect to deliver these products within the next twelve months. Our backlog was approximately $31 million at June 30, 2006.

### *Warranty Liabilities*

We warrant our products to be free from defects in materials and workmanship for periods ranging from six months to six years from the date of purchase, depending on the business segment and product. The warranty is a limited warranty, and it may impose certain shipping costs on the customer and exclude deficiencies in appearance except for those evident when the product is delivered. Dealers and warranty service providers normally perform warranty service for loudspeakers and electronics in the field, using parts we supply on an exchange basis. Estimated warranty liabilities are based upon past experience with similar types of products, the technological complexity of certain products, replacement cost and other factors. We take these factors into consideration when assessing the adequacy of our warranty provisions for periods still open to claim.

### *Competition*

The audio industry is fragmented and competitive and includes numerous manufacturers offering audio products that vary widely in price, quality and distribution methods. Consumer home, multimedia and mobile aftermarket products are offered through audio specialty stores, discount stores, department stores, mail order firms and Internet merchants. Automotive and computer manufacturers also offer branded audio products as options. Music instrument retailers, professional audio dealers, contractors and installers offer professional products and customers can also purchase these products on a contract bid basis. We concentrate primarily on the higher-quality, higher-priced segments of the audio market and compete based upon the strength of our brand names, the quality of our products, our ability to provide integrated systems and our comprehensive marketing, engineering and manufacturing resources.

In the automotive audio market, we compete with Bose, Pioneer ASK, Foster Electric and Panasonic in the sale of audio systems to automotive manufacturers and Alpine, Bosch, Panasonic, Siemens VDO, Visteon, Mitsubishi Electronics, Aisin Seiki and Denso in the sale of electronics and infotainment systems to automotive manufacturers. We compete based upon the strength of our brand names and the quality of our products.

We believe our competitive position is enhanced by our technical expertise in designing and integrating acoustics, navigation, speech recognition and human-machine interfaces into complete infotainment systems uniquely adapted to the specific requirements of each automobile model.

We believe that we currently have a significant share of the consumer market for loudspeakers, primarily as a result of the strength of our brand names and our technology. We believe JBL and Infinity are two of the most recognized loudspeaker brands in the world. By developing our high-end loudspeaker brand, Revel, over the past several years, we have extended our market position. Our principal competitors in the consumer loudspeaker market include Bose, Klipsch, Polk Audio, B&W and Boston Acoustics.

Competition in the consumer home electronics market remains intense, dominated by large Asian manufacturers. This market is characterized by the short life cycle of products and a need for continuous design and development efforts. Our competitive strategy is to compete in the higher-quality segments of this market and to continue to emphasize our ability to provide system solutions to customers, including a combination of loudspeakers, electronics products, integrated surround sound and home theater systems. Our principal electronic competitors include Yamaha, Sony, Denon, Onkyo, Pioneer and Marantz. We also compete in the luxury consumer electronics market with our Mark Levinson and Lexicon brands. Our principal competitors in this high-end market include Krell, McIntosh, Audio Research, Meridian, Linn and Accuphase.

In the multimedia market, we supply Apple stores and other retailers with JBL and Harman/Kardon speaker systems that serve Apple's successful iPod as well as other MP3 players. Our principal competitors for these products are Bose, Altec Lansing and Klipsch. We also offer Harman/Kardon and JBL speaker systems to personal computer retailers. In this market, our principal competitors are Creative Labs, Altec Lansing, Logitech, Klipsch and Cyber Acoustics. Additionally, Harman/Kardon audio technology is built into certain Toshiba laptops. The Harman/Kardon Drive + Play 2 mobile product provides full MP3 control and interface for Apple's iPod and includes a highly visible display. Our principal competitor in the MP3 mobile accessory market is Alpine. Our personal navigation devices range from simple navigation units to multi-functional units that encompass all-in-one navigation and entertainment systems for vehicle and personal use. Our principal competitors for these products are Garmin, TomTom, Magellan and Pioneer.

The market for professional sound systems is highly competitive. We believe that we have historically held a leading market position in the professional loudspeaker market and have complemented our professional loudspeaker line by adding digital professional electronic products and broadcast and recording equipment. We compete by utilizing our ability to provide systems solutions to meet the complete audio requirements of our professional customers. With our HiQnet networking protocol software, our professional brand products can communicate and operate together. We offer products for most professional audio applications.

We compete in the sound reinforcement market using many of our brand names, including JBL Professional, AKG, Crown, Soundcraft, dbx and BSS. Our principal competitors in the sound

8

reinforcement market include Telex, Electro Voice, Mackie, QSC, Meyer Sound Laboratories, Sennheiser, Peavey, Shure, Audio Technica, and Yamaha. Our Studer, AKG, Soundcraft, JBL Professional and Lexicon branded products compete in the recording and broadcast markets. Principal competitors in these markets include Yamaha, Sennheiser, Loud Technologies, Inc., Lawo, Harris Corporation, DigiDesign/M-Audio, Genelec, KRK, TC Electronics, Stagetec and Sony. In the music instrument market, competitors for our JBL Professional, DigiTech, dbx, Crown, Soundcraft and AKG products include Yamaha, Peavey, QSC, Shure, Sennheiser, Line 6, Dunlop, Zoom, Audio Technica and Roland. We also compete in the industrial and architectural sound market. Competitors within this market include Siemens, Peavey and Tannoy.

We are subject to various Federal, state, local and international environmental laws and regulations, including those governing the use, discharge and disposal of hazardous materials. We believe that our facilities are in substantial compliance with current laws and regulations. The cost of compliance with current environmental laws and regulations has not been, and is not expected to be, material.

### Research and Development

Expenditures for research and development were $356.7 million, $302.0 million and $222.6 million for the fiscal years ended June 30, 2007, 2006 and 2005, respectively.

### Number of Employees

At June 30, 2007, we had 11,688 full-time employees, including 5,611 employees located in North America and 6,077 located outside of North America.

### Website Information

Our corporate website is located at www.harman.com. Through our website we make available, free of charge, access to our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K filed or furnished by the company pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. Our website also provides access to reports filed by our directors, executive officers and certain significant stockholders pursuant to Section 16 of the Securities Exchange Act of 1934. In addition, our Corporate Governance Guidelines, Ethics Code and charters for three committees of our Board of Directors are available on our website. The information on our website is not incorporated by reference into this report. In addition, the Securities and Exchange Commission ("SEC") maintains a website, www.sec.gov, that contains reports, proxy and information statements and other information that we file electronically with the SEC.

### Item 1A.  Risk Factors

In addition to the other information included in this report, you should carefully consider the risk factors described below.

**Risks Related to Harman**

***Currency fluctuations may reduce profits on our foreign sales or increase our costs, either of which could adversely affect our financial results.***

A significant amount of our assets and operations are located outside the United States. Consequently, we are subject to fluctuations in foreign currency exchange rates, especially the Euro. Translation losses resulting from currency fluctuations may adversely affect the profits from our foreign operations and have a negative impact on our financial results. In addition, we purchase certain foreign-made products. Although we hedge a portion of our foreign currency exposure and, due to the multiple currencies involved in our business, foreign currency positions partially offset and are netted against one another to reduce exposure, we cannot assure you that fluctuations in foreign currency exchange rates will not make these products more expensive to purchase. Increases in our cost of purchasing these products could negatively impact our financial results if we are not able to pass those increased costs on to our customers.

***Failure to maintain relationships with our largest customers and failure by our customers to continue to purchase expected quantities of our products due to changes in market conditions would have an adverse effect on our operations.***

We anticipate that our automotive customers, including DaimlerChrysler, will continue to account for a significant portion of our sales for the foreseeable future. However, DaimlerChrysler, or our other automotive customers are not obligated to any long-term purchases of our products. The loss of sales to DaimlerChrysler, or to any of our other significant automotive customers, would have a material adverse effect on our consolidated sales, earnings and financial position.

***Our products may not satisfy shifting consumer demand or compete successfully with competitors' products.***

Our business is based on the demand for audio and video products and our ability to introduce distinctive new products that anticipate changing consumer demands and capitalize upon emerging technologies.  If we fail to introduce new products, misinterpret consumer preferences or fail to respond to changes in the marketplace, consumer demand for our products could decrease and our brand image could suffer.  In addition, our competitors may introduce superior designs or business strategies, impairing our distinctive image and our products' desirability. If any of these events occur, our sales could decline.

***A decrease in discretionary spending would likely reduce our sales.***

Our sales are dependent on discretionary spending by consumers, which may be adversely impacted by economic conditions affecting disposable consumer income and retail sales. In addition, our sales of audio, electronic and infotainment products to automotive customers are dependent on the overall success of the automobile industry, as well as the willingness of automobile purchasers to pay for the option of a premium branded automotive audio system or a multi-function digital infotainment system.

***Our business could be adversely affected if we are unable to obtain raw materials and components from our suppliers on favorable terms.***

We are dependent upon third party suppliers, both in the United States and other countries, for various components, parts, raw materials and finished products. Some of our suppliers may produce products that compete with our products. We use externally sourced microchips in many of our products. A significant disruption in our supply chain and an inability to obtain alternative sources could have a material impact on our consolidated results of operations.

***Our business could be adversely affected by a strike or work stoppage at one of our manufacturing plants or at a facility of one of our significant customers or at a common carrier or major shipping location.***

One of our manufacturing facilities in the United States operates under a collective bargaining agreement. This contract is scheduled to expire in March 2009. Certain of our automotive customers are unionized and may incur work stoppages or strikes. A work stoppage at our facilities or those of our automotive customers could have a material adverse effect on our consolidated sales, earnings and financial condition. In addition, a work stoppage at a common carrier or a major shipping location could also have a material adverse effect on our consolidated sales, earnings and financial condition.

***We may lose market share if we are unable to compete successfully against our current and future competitors.***

The audio and video product markets that we serve are fragmented, highly competitive, rapidly changing and characterized by intense price competition.

Many manufacturers, large and small, domestic and foreign, offer audio and video systems that vary widely in price and quality and are marketed through a variety of channels, including audio and video specialty stores, discount stores, department stores, mail order firms, and the Internet. Some of our competitors have financial and other resources greater than ours. We cannot assure you that we will continue to compete effectively against existing or new competitors that may enter our markets. We also compete indirectly with automobile manufacturers that may improve the quality of original equipment audio and electronic systems, reducing demand for our aftermarket mobile audio products, or change the designs of their cars to make installation of our aftermarket products more difficult or expensive.

***If we do not continue to develop, introduce and achieve market acceptance of new and enhanced products, our sales may decrease.***

In order to increase sales in current markets and gain entry into new markets, we must maintain and improve existing products, while successfully developing and introducing new products. Our new and enhanced products must respond to technological developments and changing consumer preferences. We may experience difficulties that delay or prevent the development, introduction or market acceptance of new or enhanced products. Furthermore, despite extensive testing, we may be unable to detect and correct defects in some of our products before we ship them. Delays or defects in new product introduction may result in loss of sales or delays in market acceptance. Even after introduction, our new or enhanced products may not satisfy consumer preferences and product failures may cause consumers to reject our

products. As a result, these products may not achieve market acceptance. In addition, our competitors' new products and product enhancements may cause consumers to defer or forego purchases of our products.

***Our operations could be harmed by factors including political instability, natural disasters, fluctuations in currency exchange rates and changes in regulations that govern international transactions.***

The risks inherent in international trade may reduce our international sales and harm our business and the businesses of our distributors and suppliers. These risks include:

- changes in tariff regulations;

- political instability, war, terrorism and other political risks;

- foreign currency exchange rate fluctuations;

- establishing and maintaining relationships with local distributors and dealers;

- lengthy shipping times and accounts receivable payment cycles;

- import and export licensing requirements;

- compliance with foreign laws and regulations, including unexpected changes in taxation and regulatory requirements;

- greater difficulty in safeguarding intellectual property than in the United States; and

- difficulty in staffing and managing geographically diverse operations.

These and other risks may increase the relative price of our products compared to those manufactured in other countries, reducing the demand for our products.

***If we are unable to enforce or defend our ownership and use of our intellectual property, our business may decline.***

Our future success will depend, in substantial part, on our intellectual property. We seek to protect our intellectual property rights, but our actions may not adequately protect the rights covered by our patents, patent applications, trademarks and other proprietary rights and prosecution of our claims could be time consuming and costly. In addition, the intellectual property laws of some foreign countries do not protect our proprietary rights, as do the laws of the United States. Despite our efforts to protect our proprietary information, third parties may obtain, disclose or use our proprietary information without our authorization, which could adversely affect our business. From time to time, third parties have alleged that we infringe their proprietary rights. These claims or similar future claims could subject us to significant liability for damages, result in the invalidation of our proprietary rights, limit our ability to use infringing intellectual property or force us to license third-party technology rather than dispute the merits of any infringement claim. Even if we prevail, any associated litigation could be time consuming and expensive and could result in the diversion of our time and resources.

***Covenants in our existing debt agreements could restrict our operations.***

Our existing revolving credit facility contains certain provisions that could restrict our operating and financing activities. They restrict our ability to, among other things:

- create or assume liens;

- enter into sale-leaseback transactions; and

- engage in mergers or consolidations.

Because of the restrictions on our ability to create or assume liens, we may have difficulty securing additional financing in the form of additional indebtedness. In addition, our revolving credit facility contains other and more restrictive covenants, including financial covenants that will require us to achieve specified financial and operating results and maintain compliance with specified financial ratios. We may have to curtail some of our operations to maintain compliance with these covenants.

***If we fail to comply with the covenants contained in our existing debt agreements, the related debt incurred under those agreements could be declared immediately due and payable, which could also trigger a default under other agreements.***

Our ability to meet the covenants or requirements in our credit facilities may be affected by events beyond our control, and we cannot assure you that we will satisfy these covenants and requirements. A breach of these covenants or our inability to comply with the financial ratios, tests or other restrictions could result in an event of default under our revolving credit facility. Upon the occurrence of an event of default under our revolving credit facility, the lenders could elect to declare all amounts outstanding under our revolving credit facility, together with accrued interest, to be immediately due and payable. If the payment of our indebtedness is accelerated, we cannot assure you that we will be able to make those payments or borrow sufficient funds from alternative sources to make those payments. Even if we were to obtain additional financing, that financing may be on unfavorable terms.

***Harman International is a holding company with no operations of its own and therefore our cash flow and ability to service debt is dependent upon distributions from our subsidiaries.***

Our ability to service our debt and pay dividends is dependent upon the operating earnings of our subsidiaries. The distribution of those earnings, or advances or other distributions of funds by those subsidiaries to Harman International, all of which could be subject to statutory or contractual restrictions, are contingent upon the subsidiaries' earnings and are subject to various business considerations.

Any of the foregoing factors could have a material adverse effect on our business, results of operations and financial condition. In light of these risks and uncertainties, there can be no assurance that the results and events contemplated by the forward-looking statements contained in this report will in fact transpire.

**Risks Related to the Merger with Parent**

***The merger may not be completed, which could adversely affect our business.***

Completion of the merger is subject to the satisfaction of various conditions, including adoption of the merger agreement by holders of a majority of the outstanding shares of our common stock, expiration or termination of applicable waiting periods under the HSR Act (the FTC granted early termination of the applicable waiting period on May 18, 2007) and other non-U.S. competition laws, and other customary closing conditions described in the merger agreement. We cannot guarantee when or if these closing conditions will be satisfied, that the required approvals will be received or that the proposed merger will be successfully completed. In the event that the proposed merger is not completed, we may be subject to several risks, including the following:

- our management's and employees' attention from day-to-day business may be diverted;

- we may lose key employees;

- our relationships with customers and vendors may be substantially disrupted as a result of uncertainties with regard to our business and prospects;

- we would still be required to pay significant transaction costs related to the merger, including legal and accounting fees, and under certain circumstances, we may be required to reimburse Parent's out-of-pocket transaction expenses up to $20 million and pay a termination fee of up to $225 million (less any reimbursed transaction expenses); and

- the market price of shares of our common stock may decline to the extent that the current market price of those shares reflects a market assumption that the proposed merger will be completed.

***Uncertainties associated with the merger may have a negative impact on employee and business relationships.***

The announcement of the proposed merger may have a negative impact on our ability to attract and retain officers and other key employees and/or maintain relationships with key customers and suppliers. These events could have a material negative impact on our results of operations and financial condition.

***As a result of the proposed acquisition, we will have substantially more debt.***

We will have substantial indebtedness if the proposed acquisition is consummated. There can be no assurance that our businesses will be able to generate sufficient cash flows from operations to meet our anticipated debt service obligations. Our level of indebtedness will have important consequences, including limiting our ability to invest operating cash flow to expand our businesses or execute our strategies, to capitalize on business opportunities and to react to competitive pressures, because we will need to dedicate a substantial portion of these cash flows to service our debt. In addition, we could be unable to refinance or obtain additional financing because of market conditions, high levels of debt and the debt restrictions expected to be included in the debt instruments executed in connection with the consummation of the proposed acquisition. This new indebtedness is expected to contain restrictive covenants, which may adversely affect our ability to operate our businesses.

14

***The downgrade in our credit ratings resulting from the announcement of the proposed merger could negatively affect our ability to access capital.***

After the announcement of the proposed merger, Standard & Poor's Rating Services (S&P) downgraded our corporate credit ratings.  The uncertainty about the effect of the merger may further adversely affect our credit rating.  Downgrades in our corporate credit ratings generally cause borrowing costs to increase, the potential pool of investors and funding sources to decrease and may have other negative consequences on our business.

Most of our large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions with us.  As our corporate credit ratings decline, particularly below investment grade, counterparties may decline to do business with us.

***In the future, we could have liquidity needs that could be difficult to satisfy under some circumstances.***

The inability to raise capital on favorable terms, particularly during times of uncertainty in the financial markets, could impact our ability to sustain and grow our businesses, which would increase our capital costs. Our access to the financial markets could be adversely impacted by the merger, the recent downgrade in our corporate credit ratings and various other factors, such as:

- changes in credit markets that reduce available credit or the ability to renew existing liquidity facilities on acceptable terms;

- changes in interest rates;

- a deterioration of our credit or a further reduction in our credit ratings;

- a material breakdown in our risk management procedures; and

- the occurrence of material adverse changes in our businesses that restrict our ability to access the credit markets.

A lack of necessary capital and cash reserves could adversely impact the evaluation of our creditworthiness by counterparties and rating agencies, and would likely increase our capital costs. An increase in our capital costs could have a material negative impact on our results of operations and financial condition.

## Item 1B.  Unresolved Staff Comments

None.

**Item 2.  Properties**

Our corporate headquarters are located at 1101 Pennsylvania Avenue, N.W., Washington, D.C. 20004.

Certain information regarding our principal facilities are described in the table below.

| Location | Segment | Size (Sq. Ft.) | Owned or leased | Percentage utilization |
|---|---|---|---|---|
| Northridge, California | Automotive Consumer Professional | 589,000 | Leased | 100% |
| Ittersbach, Germany | Automotive | 565,000 | Owned | 100% |
| Straubing, Germany | Automotive | 235,000 | Owned | 100% |
| Elkhart, Indiana | Professional | 223,000 | Owned | 86% |
| Chateau du Loir, France | Automotive Consumer | 221,000 | Owned | 75% |
| Martinsville, Indiana | Automotive | 221,000 | Owned | 100% |
| Rancho Cucamonga, California | Professional | 212,000 | Leased | 100% |
| Worth-Schaitt, Germany | Automotive | 204,000 | Owned | 100% |
| Tijuana, Mexico | Consumer | 198,000 | Leased | 78% |
| Vienna, Austria | Professional | 193,000 | Leased | 100% |
| Potters Bar, United Kingdom | Professional | 160,000 | Leased | 100% |
| Franklin, Kentucky | Automotive | 152,000 | Owned | 100% |
| Sandy, Utah | Professional | 127,000 | Leased | 100% |
| Bridgend, United Kingdom | Automotive | 125,000 | Leased | 100% |
| Szekesfehervar, Hungary | Automotive | 117,000 | Owned | 100% |
| Juarez, Mexico | Automotive | 109,000 | Leased | 100% |
| Regensdorf, Switzerland | Professional | 108,000 | Leased | 100% |
| Washington, Missouri | Automotive | 101,000 | Owned | 100% |

We also own or lease other facilities that are not considered principal properties. We believe that our facilities are suitable and adequate for our present needs and suitable additional or substitute facilities will be available, if required.

**Item 3.  Legal Proceedings**

**Litigation Related to the Merger**

On May 8, 2007, Helen Rodgers Living Trust filed a putative class action lawsuit against Harman and all of its directors in the Superior Court of the District of Columbia.  The lawsuit purports to be brought on behalf of all common stockholders of Harman and alleges that Harman's directors breached their fiduciary duties to Harman stockholders by entering into the merger agreement.  The original complaint alleged that the consideration to be offered to Harman stockholders under the merger agreement is "inadequate" and that the merger agreement "inequitably favors . . . insiders" of Harman.  The complaint also alleged that the termination fee in the merger agreement was excessive, that Harman's directors purportedly would not "fairly and adequately" evaluate any alternative bids, and that the provision in the merger agreement that allowed Harman to solicit proposals for alternative bidders during a 50-day period ending in June 2007 was "illusory."

On June 20, 2007, Parent filed a registration statement on Form S-4 with the Securities and Exchange Commission that included a proxy statement/prospectus related to the proposed merger.  Shortly thereafter, plaintiff filed its first amended complaint on June 29, 2007.  While the first amended complaint continued to raise the allegations made in the original complaint, the new focus of plaintiff's case was that the merger agreement "inequitably favors . . . insiders" of Harman by allowing such insiders to exchange otherwise worthless "underwater" options (options with an exercise price over $120 per share) for Parent shares on a "one option for one Parent share basis," and by allowing them to separately negotiate with Parent for more favorable treatment of their options.  The first amended complaint also alleged that the disclosures contained in the proxy statement/prospectus were inadequate.  Among other things, the first amended complaint sought to enjoin the merger and the conversion of the "underwater" options into Parent shares, as well as "declaratory judgments" that said "underwater" options may not participate in the merger election process and that Harman insiders may not separately negotiate with Parent "for the exchange of their [Harman] equity interests in the Acquisition."  In addition, the first amended complaint sought, among other things, unspecified damages, an order rescinding the merger agreement and a declaration that Harman's directors have breached their fiduciary duties to Harman.

On June 29, 2007, plaintiff filed a motion for preliminary injunction.  The motion sought to enjoin the conversion of the "underwater" options into Parent shares, and also sought to "unw[i]nd or otherwise cancel" the challenged options.  In the motion, plaintiff did not seek to enjoin the stockholder vote or the merger itself.  After defendants filed their opposition to the motion for preliminary injunction on July 23, 2007, plaintiff agreed to voluntarily withdraw its motion.

Thereafter, on August 15, 2007, plaintiff filed its second amended complaint, which substantially narrows plaintiff's claims by eliminating, among other things, the vast majority of its disclosure claims and the allegations relating to "underwater" options.

We believe the lawsuit is without merit and intend vigorously to defend against it.

At June 30, 2007, we were involved in several additional legal actions. The outcome of these legal actions cannot be predicted with certainty; however, management, based upon advice from legal counsel, believes such actions are either without merit or will not have a material adverse effect on our financial position or

results of operations. In fiscal 2005, we recorded a $6 million liability for probable unasserted claims. There was no change in the status of these claims at June 30, 2007.

**Item 4.  Submission of Matters to a Vote of Security Holders and Executive Officers of the Registrant**

**Submission of Matters to a Vote of Security Holders**

None.

**Executive Officers of the Registrant**

Executive officers are elected annually by our Board of Directors and hold office at the pleasure of the Board until the next annual election of officers or until their successors are elected and qualified.  Each of our current executive officers is identified below together with information about each officer's age, position and employment history for the last five years.

| Name | Position | Age |
|---|---|---|
| Sidney Harman | Executive Chairman | 89 |
| Dinesh C. Paliwal | President, Chief Executive Officer and Vice Chairman | 49 |
| Kevin L. Brown | Executive Vice President and Chief Financial Officer | 47 |
| Erich A. Geiger | Executive Vice President, Chief Strategy Officer and Chief Technology Officer | 60 |
| Helmut Schinagel | Chief Executive Officer – Automotive | 54 |
| Gina Harman | President – Consumer | 58 |
| Blake Augsburger | President – Professional | 44 |
| Sandra B. Robinson | Vice President - Financial Operations and Chief Accounting Officer | 48 |
| Edwin C. Summers | Vice President - General Counsel and Secretary | 60 |

Sidney Harman has been Executive Chairman of the Board of Directors since July 2000 and has served as Chairman of the Board and as a director of our company since 1980.  Dr. Harman also served as our Chief Executive Officer from 1980 to 1998 and from January 1, 2007 to June 30, 2007.

Dinesh Paliwal became President, Chief Executive Officer and Vice Chairman on July 1, 2007 and was elected a director on August 13, 2007.  Prior to joining our company, Mr. Paliwal served as President of Global Markets and Technology of ABB Ltd from January 2006 until June 2007 and he served as President and CEO of ABB North America from January 2004 until June 2007. He was President and CEO of ABB Automation from October 2002 to December 2005.

Kevin L. Brown joined our company in August 2003 as the Chief Financial Officer of Harman/Becker Automotive Systems. Mr. Brown was promoted to Executive Vice President and Chief Financial Officer in August 2006. He has served as Vice President, Chief Financial Officer and Assistant Secretary of Harman International since July 2005. Prior to joining our company, Mr. Brown served as Senior Vice President and Chief Financial Officer of Donnelly Corporation, an automotive parts supplier, from April 2001 to March 2003.

Erich A. Geiger joined our company in 1996 as Managing Director of Harman/Becker GmbH. He was named Chief Technology Officer of Harman International in 2003. In 2004, Dr. Geiger was named

Executive Vice President and Chief Technology Officer of Harman International and Executive Chairman of Harman/Becker Automotive Systems. He was appointed Chief Strategy Officer on September 29, 2006.

Helmut Schinagel joined our company October 1, 2006 as the Chief Executive Officer of our Automotive Group.  Prior to joining our company, Mr. Schinagel served as Senior Vice President of the BMW Group, an automotive manufacturer, from 1999 until he joined our company in 2006.

Gina Harman has served as President of the Consumer Group since 2002.  She served as President of the North America operations from 1998 to 2002 and has been with the company since 1985.  She was a member of the Board of Directors from November 2005 until she resigned from the board in August 2007.  Ms. Harman is the daughter of Dr. Harman, our Executive Chairman.

Blake Augsburger joined our company in 2001 as the President of Crown International.  In 2006, Mr. Augsburger was promoted to President of our Professional Group.  Prior to joining our company, he was Corporate Vice President and General Manager for Hubbell High Voltage Test Businesses from 1999 to 2001.

Sandra B. Robinson has been employed with our company since 1984 and has served as Vice President – Financial Operations since November 1992. Ms. Robinson became Chief Accounting Officer in July 2005.

Edwin C. Summers has been employed with our company as Vice President, General Counsel since July 1998. He became Secretary in November 2005.

# Part II

### Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

Our common stock is listed on the New York Stock Exchange and is reported on the New York Stock Exchange Composite Tape under the symbol HAR. As of August 27, 2007, there were approximately 130 record holders of our common stock.

The table below sets forth the reported high and low sales prices for our common stock, as reported on the New York Stock Exchange, for each quarterly period for fiscal years ended June 30, 2007 and 2006.

| Market Price | Fiscal 2007 | | Fiscal 2006 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| First quarter ended September 30 | $ 87.03 | 74.65 | 111.48 | 78.60 |
| Second quarter ended December 31 | 108.29 | 82.64 | 109.53 | 93.21 |
| Third quarter ended March 31 | 105.68 | 92.40 | 115.85 | 93.73 |
| Fourth quarter ended June 30 | 125.13 | 96.12 | 111.50 | 79.20 |

We paid cash dividends during fiscal 2007 and 2006 of $.05 per share, with a dividend of $.0125 per share paid in each of the four quarters.

We did not repurchase any shares of our common stock in the quarter ended June 30, 2007. Our share repurchase program was first publicly announced on June 16, 1998. In August 2005, the Board authorized the purchase of up to an additional four million shares, bringing the total number of authorized shares to 20 million. The total number of shares repurchased through June 30, 2007 was 18,198,082. Our share repurchase program has been suspended due to our proposed merger with Parent.

For a description of limitations on repurchases of shares and on the payment of dividends, see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Financial Condition" located in Item 7 of Part II of this report.

## Item 6.  Selected Financial Data

The following table presents selected historical financial data derived from the audited Consolidated Financial Statements for each of the five years presented. The information should be read in conjunction with Management's Discussion and Analysis of Financial Condition and Results of Operations and the audited Consolidated Financial Statements and the Notes thereto.

| | Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| (In thousands except per share data) | 2007 | 2006 | 2005 | 2004 | 2003 |
| Net sales | $3,551,144 | 3,247,897 | 3,030,889 | 2,711,374 | 2,228,519 |
| Operating income | $ 386,387 | 397,241 | 350,981 | 254,465 | 166,894 |
| Income before income taxes | $ 382,205 | 376,187 | 335,337 | 227,520 | 142,471 |
| Net income | $ 313,963 | 255,295 | 232,848 | 157,883 | 105,428 |
| Diluted earnings per share (a) | $ 4.72 | 3.75 | 3.31 | 2.27 | 1.55 |
| Weighted average shares outstanding – diluted (a) | 66,449 | 68,105 | 70,399 | 69,487 | 68,048 |
| Total assets (b) | $2,508,868 | 2,375,752 | 2,201,983 | 1,999,875 | 1,711,918 |
| Total debt | $ 76,528 | 197,554 | 333,917 | 394,925 | 503,068 |
| Shareholders' equity | $1,494,041 | 1,228,164 | 1,060,948 | 874,996 | 655,785 |
| Dividends per share (a) | $ 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |

(a)    Share and per share data has been adjusted to reflect the two-for-one stock split in November 2003.

(b)    Prior year amounts have been reclassified to conform to current year presentation.

20

**Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion should be read in conjunction with the information presented in other sections of this Annual Report on Form 10-K, including "Item 1. Business," "Item 6. Selected Financial Data," and "Item 8. Financial Statements and Supplementary Data." This discussion contains forward-looking statements which are based on our current expectations and experience and our perception of historical trends, current market conditions, including customer acceptance of our new products, current economic data, expected future developments, including foreign currency exchange rates, and other factors that we believe are appropriate under the circumstances. These statements involve risks and uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements. See "Risk Factors" included in Item 1A of Part I. of this report.*

We begin this discussion with an overview of our company to give you an understanding of our business and the markets we serve. We then discuss our critical accounting policies. This is followed by a discussion of our results of operations for the fiscal years ended June 30, 2007, 2006 and 2005. We include in this discussion an analysis of certain significant year-to-year variances included in our results of operations and an analysis of our restructuring activities.  We also provide specific information regarding our three reportable business segments: Automotive, Consumer and Professional. We then discuss our financial condition at June 30, 2007 with a comparison to June 30, 2006. This section contains information regarding our liquidity and capital resources and cash flows from operating, investing and financing activities.  We complete our discussion with a business outlook for future periods.

**Overview**

We design, manufacture and market high-quality, high-fidelity audio products and electronic systems for the automotive, consumer and professional markets. We have developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names in our principal markets. These brand names have a heritage of technological leadership and product innovation.  Our three reportable business segments, Automotive, Consumer and Professional, are based on the end-user markets we serve.

Automotive designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications. Our systems are generally shipped directly to our automotive customers for factory installation. Infotainment systems are a combination of information and entertainment components that may include or control GPS navigation, traffic information, voice-activated telephone and climate control, rear seat entertainment, wireless Internet access, hard disk recording, MP3 playback and a high-end branded audio system.  These systems include scaleable software to allow us to better serve a full range of vehicles from luxury through entry-level vehicles.  Automotive also provides aftermarket products such as personal navigation devices ("PND") to customers primarily in Europe.  Future infotainment systems may also provide driver safety capabilities such as lane guidance, pre-crash emergency braking, adaptive cruise control, and night vision.

Consumer designs, manufactures and markets audio, video and electronic systems for home, mobile and multimedia applications. Home product applications include systems to provide high-quality audio throughout the home and to enhance in-home video systems such as home theatres.  Our aftermarket

mobile products, such as iPod adaptors, speakers and amplifiers, deliver audio entertainment in the vehicle. Additionally, aftermarket mobile products include PNDs that provide GPS navigation, video and other infotainment capabilities. Multimedia applications include loudspeaker accessories for personal computers, music phones, and portable electronic devices such as the iPod and other MP3 players. These consumer products are primarily distributed through retail outlets.

Professional designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, airports, houses of worship and other public spaces. We also develop products for recording, broadcast, cinema, touring and music reproduction applications. In addition, we have leading shares of both the portable PA market and musician vertical markets serving small bands, DJ's and other performers. These products are increasingly linked by our proprietary HiQnet protocol which provides centralized monitoring and control of both complex and simple professional audio systems.

Our products are sold worldwide, with the largest markets being the United States and Germany. In the United States, our primary manufacturing facilities are located in California, Indiana, Kentucky, Missouri and Utah. Outside of the United States, we have significant manufacturing facilities in Germany, Austria, the United Kingdom, Mexico, Hungary, France and China. Our businesses operate using local currencies. Therefore, we are subject to currency fluctuations that are partially mitigated by the fact that we purchase raw materials and supplies locally when possible. We are especially affected by Euro exchange rates since a significant percentage of our sales are made in Euros.

We experience seasonal fluctuations in sales and earnings. Historically, our first quarter ending September 30 is generally the weakest due to the production schedules of our automotive customers and summer holidays in Europe. Our sales and earnings may also vary due to customer acceptance of our products, the timing of new product introductions, product offerings by our competitors and general economic conditions. Our reported sales and earnings may also fluctuate due to foreign currency exchange rates, especially for the Euro.

We achieved good results in fiscal 2007 and completed the year with a strong balance sheet. Each of our three reportable business segments had higher sales than the prior year and our balance sheet was strengthened by repurchasing shares of our common stock and reducing debt. We also continued our restructuring program, announced in June 2006, which is intended to increase efficiencies in manufacturing, engineering and administration.

## Recent Developments

On April 26, 2007, we announced that we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP. The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent. KHI Merger Sub and Parent were formed to acquire our company.

We anticipate completing the transaction during the fourth quarter of this calendar year.

Dinesh Paliwal joined our company on July 1, 2007 as President, Chief Executive Officer and Vice Chairman and was elected as a director on August 13, 2007.

**Critical Accounting Policies**

The methods, estimates and judgments we use in applying our accounting policies, in conformity with generally accepted accounting principles in the United States ("GAAP"), have a significant impact on the results we report in our financial statements. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. The estimates affect the carrying values of assets and liabilities. Actual results may differ from these estimates under different assumptions or conditions. Our accounting policies are more fully described in Note 1, *Summary of Significant Accounting Policies*, of our consolidated financial statements located in Item 8 of Part II. However, we believe the following policies merit discussion due to their higher degree of judgment, estimation, or complexity.

*Allowance for Doubtful Accounts*

Our products are sold to customers in many different markets and geographic locations. Methodologies for estimating bad debt reserves range from specific reserves to various percentages applied to aged receivables based on historical experience. We must make judgments and estimates regarding account receivables that may become uncollectible. These estimates affect our bad debt reserve and results of operations. We base these estimates on many factors including historical collection rates, the financial stability and size of our customers as well as the markets they serve and our analysis of accounts receivable aging. Our judgments and estimates regarding collectibility of accounts receivable have an impact on our financial statements.

*Inventory Valuation*

The valuation of inventory requires us to make judgments and estimates regarding excess, obsolete or damaged inventories including raw materials, finished goods and spare parts. Our determination of adequate reserves requires us to analyze the aging of inventories and the demand for spare parts and to work closely with our sales and marketing staff to determine future demand for our products. We make these evaluations on a regular basis and adjustments are made to the reserves as needed. These estimates and the methodologies that we use have an impact on our financial statements.

*Goodwill*

We perform a goodwill impairment test on an annual basis. At June 30, 2007, our goodwill balance of $403.7 million was not impaired. We made this determination based upon a valuation of our reporting units, as defined by Statement of Financial Accounting Standards ("SFAS") No. 142, *Goodwill and Other Intangible Assets*. The valuation took into consideration various factors such as our historical performance, future discounted cash flows, performance of our competitors and overall market conditions. We cannot, however, predict the occurrence of events that might adversely affect the reported value of goodwill. These events may include, but are not limited to, strategic decisions made in response to economic and competitive conditions, the impact of the economic environment on our customer base, or a material negative change in our relationships with significant customers. Please refer to Note 4,

*Goodwill*, of our consolidated financial statements for additional information regarding our goodwill balance and annual impairment test.

### Pre-Production and Development Costs

We incur pre-production and development costs related to infotainment systems that we develop for automobile manufacturers pursuant to long-term supply agreements. Portions of these costs are reimbursable under the separate agreements and are recorded as unbilled costs on our balance sheet in other current assets and other assets. We believe that the terms of our supply contracts and established relationship with these automobile manufacturers reasonably assure that we will collect the reimbursable portions of these contracts. Accounting for development costs under the percentage of completion method requires us to make estimates of costs to complete projects. We review these estimates on a quarterly basis. Unforeseen cost overruns or difficulties experienced during development could cause losses on these contracts. Such losses are recorded once a determination is made that a loss will occur.

### Warranty Liabilities

We warrant our products to be free from defects in materials and workmanship for periods ranging from six months to six years from the date of purchase, depending on the business segment and product. These warranties require us to make estimates regarding the amount and costs of warranty repairs we expect to make over a period of time. Several factors influence this estimate including historical analysis of warranty repair by product category, the technological sophistication of certain products, replacement costs and other factors. The estimates we use have an impact on our financial statements.

### Income Taxes

Deferred income tax assets or liabilities are computed based on the temporary differences between the financial statement and income tax basis of assets and liabilities using the statutory marginal income tax rate in effect for the years in which the differences are expected to reverse. Deferred income tax expenses or credits are based on the changes in the deferred income tax assets or liabilities from period to period. We record a valuation allowance to reduce our deferred tax assets to the amount that we believe is more likely than not to be realized. In determining the need for, and amount of, a valuation allowance, we consider our ability to forecast earnings, future taxable income, carryback losses, if any, and we consider feasible tax planning strategies. We believe the estimate of our income tax assets, liabilities and expense are critical accounting estimates because if the actual income tax assets, liabilities and expenses differ from our estimates the outcome could have a material impact on our results of operations.

### Stock-Based Compensation

On July 1, 2005, we adopted SFAS No. 123R, *Accounting for Stock-Based Compensation*, using the modified prospective method. Accordingly, prior period amounts presented herein have not been restated to reflect the adoption of SFAS No. 123R. Prior to fiscal 2006, we used a fair value based method of accounting for share-based compensation provided to our employees in accordance with SFAS No. 123R. The adoption of this revised standard did not have a material impact on our results of operations as we have recorded stock compensation expense on a fair value basis for all awards granted on or after July 1, 2002. As of June 30, 2007, there was $0.3 million of total unrecognized compensation cost related to

nonvested restricted stock compensation arrangements granted under the plans. This cost is expected to be recognized over a weighted-average period of 1.13 years. As of June 30, 2007, there was also $1.3 million of total unrecognized compensation expense related to nonvested restricted stock units granted under the plans. This cost is expected to be recognized over a weighted-average period of 2.26 years. The revised standard did require certain changes in our calculations and disclosures. See Note 11, *Stock Option and Incentive Plan*, to our consolidated financial statements included in this report for additional information regarding our stock-based compensation.

## Results of Operations

### Net Sales

Fiscal 2007 net sales were $3.551 billion, an increase of 9 percent compared to the prior year. The effects of foreign currency translation contributed approximately $144 million to the net sales increase compared to last year. Exclusive of foreign currency, net sales were 5 percent higher than the prior year. Each of our three reportable business segments had higher net sales in fiscal 2007 compared to the prior year. The growth in overall sales was primarily due to higher infotainment system sales to automotive customers, strong growth in automotive aftermarket PND sales, higher multimedia sales in the consumer market, and increased sales of our professional products enabled with the HiQnet protocol.

Net sales in fiscal 2006 increased 7 percent to $3.248 billion when compared to the prior year. The unfavorable effects of foreign currency translation reduced fiscal 2006 net sales by approximately $85 million during the year. Exclusive of foreign currency translation, net sales were 10 percent higher than fiscal 2005. The growth in net sales was primarily due to higher sales of infotainment systems to automotive customers, strong sales of multimedia products, and increased sales in the professional market.

We present below a summary of our net sales by reportable business segment:

| ($000s omitted) | Fiscal 2007 | | Fiscal 2006 | | Fiscal 2005 | |
|---|---|---|---|---|---|---|
| Automotive | $ 2,492,815 | 70% | 2,237,632 | 69% | 2,127,682 | 70% |
| Consumer | 497,673 | 14% | 492,977 | 15% | 416,231 | 14% |
| Professional | 560,656 | 16% | 517,288 | 16% | 486,976 | 16% |
| *Total* | $ 3,551,144 | 100% | 3,247,897 | 100% | 3,030,889 | 100% |

*Automotive* – Automotive net sales increased 11 percent in fiscal 2007 compared to the prior year. Foreign currency translation contributed approximately $122 million to the net sales increase compared to the prior year. Exclusive of foreign currency, net sales were 6 percent higher than last year. Since a significant percentage of our sales are to customers in Europe, the majority of our foreign currency exposure is in the Automotive segment. The growth in net sales was primarily due to higher shipments of audio systems to Lexus for the LS460 and to Toyota for the Camry. We also had higher sales of infotainment system to Audi due to a full year of production of the Q7 platform. Infotainment system sales to DaimlerChrysler were higher than last year due primarily to supplying the Mercedes-Benz GL Class. Automotive had lower sales to BMW, Landrover, Renault, Porsche and PSA Peugeot Citroën

compared to the prior year.  Sales of aftermarket products, particularly PNDs, were very strong during fiscal 2007.

In fiscal 2006, Automotive net sales increased 5 percent compared to fiscal 2005.  The unfavorable effects of foreign currency translation reduced fiscal 2006 net sales by approximately $70 million during the year.  Exclusive of foreign currency, net sales increased 9 percent compared to the previous year.  The net sales growth was primarily due to the success of an infotainment system we developed for the Mercedes-Benz S-Class.  Also in Europe, net sales to Audi were higher due to the introduction of the Q7 platform and increased shipments for the A6 compared to prior year.  BMW sales were higher primarily for the 3-Series.  Porsche and Range Rover sales were also higher than the prior year.  Strong sales of our new aftermarket PND product *Traffic Assist* also contributed to the sales growth.  In North America, we had higher sales to Toyota, Lexus and Hyundai/Kia and lower sales to Chrysler.

*Consumer* – Consumer net sales increased 1 percent to $498 million when compared to the prior year.  Foreign currency translation contributed approximately $14 million to the net sales increase compared to the prior year.  Exclusive of foreign currency, net sales were 2 percent lower than the prior year.  The sales growth was primarily due to higher multimedia sales in Europe, partially offset by lower multimedia sales in the United States.  Multimedia products include popular accessories for the iPod such as the JBL OnStage and OnTime.  Sales in the United States were adversely affected by substantial competition in this market.  Sales of Harman/Kardon home electronic products were also higher in Europe but lower in the United States.  Sales of traditional home loudspeakers were lower in both Europe and the United States.  The decrease in U.S. sales is primarily due to our decision to exit distribution through a major North American retailer.

Consumer net sales were 18 percent higher in fiscal 2006 compared to the prior year.  The sales growth was primarily due to strong demand in the United States and Europe for our multimedia products.  Consumer products for home applications such as Harman/Kardon electronics and JBL and Infinity loudspeakers were also higher compared to the prior year, partially offset by slightly lower sales of high-end Specialty Group audio systems.  New product introductions for mobile applications resulted in higher sales compared to the prior year.

*Professional* – Professional net sales were 8 percent higher than fiscal 2006.  Foreign currency translation contributed approximately $8 million to the net sales increase compared to the prior year.  Exclusive of foreign currency, net sales were 7 percent higher than the prior year. The sales increase was primarily due to the popularity of our products that incorporate the HiQnet protocol.  This system is attractive to audio professionals as it provides centralized monitoring and control of complex audio systems.  In particular, Professional sales growth was driven by new JBL Pro and Crown products as well as the introduction of new digital audio consoles.

In fiscal 2006, Professional net sales were 6 percent higher than fiscal 2005.  Sales of JBL Professional, Crown and Harman Music Group products increased compared to the prior year, partially offset by lower sales of AKG and Mixer Group products.  Our professional business units benefited from a ramp up of products utilizing the newly developed HiQnet protocol.  AKG and Mixer Group net sales were lower due to our decision to concentrate on a smaller number of higher-margin core products.

*Gross Profit*

Gross profit margin decreased 1.4 percentage points in fiscal 2007 to 34.1 percent when compared to the prior year. The decline was primarily due to competition in the Consumer multimedia market. Automotive product mix and higher manufacturing costs also contributed to the decrease in gross profit margin. These lower margins were partially offset by increased margins in our Professional business. Our restructuring program did not affect our gross profit margin since the efficiencies will primarily be obtained by workforce reductions. The costs associated with the workforce reductions are reported in our selling, general and administrative costs. The restructuring program is discussed in detail under the caption *Restructuring and Merger Costs.*

Fiscal 2006 gross profit margin increased 1.5 percentage points to 35.5 percent. The increase was primarily due to gross profit margin improvements across all of our reportable business segments. Each of these segments was able to leverage higher sales against fixed factory costs.

A summary of our gross profit by reportable business segment is presented below:

| ($000s omitted) | Fiscal 2007 | Percent of net sales | Fiscal 2006 | Percent of net sales | Fiscal 2005 | Percent of net sales |
|---|---|---|---|---|---|---|
| Automotive | $ 872,838 | 35.0% | 805,152 | 36.0% | 739,746 | 34.8% |
| Consumer | 126,392 | 25.4% | 160,212 | 32.5% | 123,983 | 29.8% |
| Professional | 216,976 | 38.7% | 193,129 | 37.3% | 172,973 | 35.5% |
| Other/Unallocated | (5,000) | --- | (5,923) | --- | (5,000) | --- |
| *Total* | $ 1,211,206 | 34.1% | 1,152,570 | 35.5% | 1,031,702 | 34.0% |

*Automotive* – Automotive gross profit margin decreased 1.0 percentage point to 35.0 percent in fiscal 2007 when compared fiscal 2006. The decrease is primarily related to higher manufacturing costs and product mix. During fiscal 2007, we went into full production at our new manufacturing facility in Washington, Missouri. This factory will primarily produce infotainment systems for Chrysler. Since our new Chrysler program began late in fiscal 2007, the factory's overhead costs were not fully leveraged during the year. We anticipate our Washington, Missouri factory will operate at full capacity during fiscal 2008. Gross profit margin was also negatively affected by lower production for the Mercedes-Benz C-Class. We expect to move into full production for the new C-Class in fiscal 2008.

In fiscal 2006, Automotive gross profit margin increased 1.2 percentage points compared to fiscal 2005. The increase was primarily due to leveraging fixed factory costs against higher sales in that year. Automotive also incurred lower warranty costs in fiscal 2006 which benefitted our gross profit margins due partially to favorable tooling cost reimbursements from our customers.

*Consumer* – Consumer gross profit margin declined 7.1 percentage points in fiscal 2007 to 25.4 percent when compared to the prior fiscal year. Gross profit margins in fiscal 2006 were particularly high due to the success of high-margin multimedia products, including the JBL OnStage and OnTour. In fiscal 2007, increased competition in the multimedia market resulted in lower prices and margins. We anticipate an improvement in margins in fiscal 2008 due to the introduction of accessory products for a new generation of MP3 players and music-enabled cell phones, such as Apple's iPhone.

Consumer gross profit margin improved 2.7 percentage points in fiscal 2006 compared to the prior year, primarily due to increased sales of high-margin multimedia products and leveraging fixed factory costs against an 18 percent sales growth in fiscal 2006. Warranty costs were lower in fiscal 2006 due primarily to costs incurred the previous year to extend claim periods on certain products and to replace a chip in one of our products.

*Professional* – Professional gross profit margin increased 1.4 percentage points to 38.7 percent when compared to the prior year. The improvement is due primarily to leveraging fixed costs against an increase in net sales. The introduction of high-margin products enabled with the HiQnet protocol in fiscal 2007 also contributed to the improvement in gross profit margin. In particular, Soundcraft/Studer introduced new digital mixing consoles that are produced in more efficient factories after significant investments in new technologies over the past few years. Professional's overall gross profit margin improvement was partially offset by higher than expected material costs at Crown. We anticipate that we will be able to maintain these higher gross margins in fiscal 2008.

Gross profit margin in fiscal 2006 was 1.8 percentage points higher than fiscal 2005. The improvement was primarily due to lower factory overhead costs and improved factory efficiencies, leveraged against higher sales. AKG and Soundcraft/Studer made significant progress over the past year to increase manufacturing efficiencies and concentrate on selling higher margin core products. In prior years, these business units had incurred substantial costs to improve factory operations and eliminate lower margin products.

### Selling, General and Administrative Expenses

Selling, general and administrative ("SG&A") expenses as a percent of net sales were 23.2 percent in fiscal 2007 compared to 23.3 percent in the prior year. Research and Development ("R&D") costs are the largest component of our SG&A expenses. In fiscal 2007, R&D costs were $356.7 million or 10.0 percent of net sales. In fiscal 2006, R&D costs were $302.0 million, or 9.3 percent of net sales. The increase was primarily due to costs incurred to support new infotainment system awards from automotive customers. We expect R&D costs, as a percentage of net sales, to decrease approximately 1 percentage point in fiscal 2008 due to the increasing scalability of our infotainment systems and the beginning of production for certain automotive programs. SG&A expenses also include employee compensation and benefit costs. We have recorded stock-based compensation expense under the fair value based method since fiscal 2003, including $15.4 million, $16.6 million and $14.3 million in fiscal 2007, 2006 and 2005, respectively.

Our fiscal 2006 SG&A expenses were 23.3 percent of net sales, an increase of 0.8 percentage points compared to fiscal 2005. The increase was primarily due to higher R&D costs to support new infotainment system programs for automakers.

Below is a summary of our SG&A expenses by reportable business segment:

| ($000s omitted) | Fiscal 2007 | Percent of net sales | Fiscal 2006 | Percent of net sales | Fiscal 2005 | Percent of net sales |
|---|---|---|---|---|---|---|
| Automotive | $ 532,722 | 21.4% | 468,357 | 20.9% | 391,912 | 18.4% |
| Consumer | 112,805 | 22.7% | 109,399 | 22.2% | 97,025 | 23.3% |
| Professional | 136,008 | 24.3% | 133,851 | 25.9% | 127,475 | 26.2% |
| Other/Unallocated | 43,284 | --- | 43,722 | --- | 64,309 | --- |
| *Total* | $ 824,819 | 23.2% | 755,329 | 23.3% | 680,721 | 22.5% |

*Automotive* – Automotive R&D costs were $286.5 million in fiscal 2007, representing 11.5 percent of net sales. Fiscal 2006 R&D costs were $232.2 million, or 10.4 percent of net sales. These costs were incurred to develop audio, electronic and infotainment systems for an expanding list of automotive platforms. Our infotainment systems are increasingly based on scalable software allowing us to efficiently design systems for luxury, mid-range and entry-level vehicles. During fiscal 2007, we received a major infotainment systems award from BMW that will encompass virtually their entire model range. This sophisticated system will include HD and satellite radio capabilities, second and third dimensional navigation, traffic information, voice recognition, Internet browser and wireless connectivity. We also develop various systems for Mercedes-Benz, Audi, PSA Peugeot Citroën and Porsche in Europe. In the United States and Asia, we develop audio systems for Toyota, Lexus, Hyundai, Chrysler and Harley-Davidson. Automotive SG&A expenses also include restructuring costs of $5.7 million in fiscal 2007 and $7.3 million in fiscal 2006.

*Consumer* – SG&A expenses as a percent of net sales increased 0.5 percentage points in fiscal 2007 when compared to the prior year due primarily to higher selling expenses. These expenses and R&D costs are the most significant SG&A cost components in the Consumer segment. Selling expenses include salaries and benefits for sales personnel, marketing costs, trade show and product literature costs. Selling expenses were higher in fiscal 2007 to market new multimedia products and PNDs. R&D costs are incurred to develop multimedia products including accessories for music players such as the iPod and music-enabled cell phones. We also develop home electronic equipment and loudspeakers for use at home and in vehicles. R&D costs were $34.2 million, $36.3 million and $29.9 million for fiscal 2007, 2006 and 2005, respectively. Fiscal 2007 and 2006 restructuring expenses included in SG&A expenses were $1.0 million and $0.4 million, respectively.

*Professional* – Professional SG&A expenses as a percent of net sales decreased 1.6 percentage points in fiscal 2007 when compared to fiscal 2006. Similar to Consumer, the primary components of Professional SG&A expenses are selling and R&D costs. Selling expenses are incurred to support a broad range of branded audio products. These products are marketed to audio professionals for use in public places such as concert halls, stadiums and houses of worship. Selling expenses were $49.6 million, $49.3 million and $47.0 million in fiscal 2007, 2006 and 2005, respectively. A significant amount of R&D costs have been incurred to develop our HiQnet networking protocol. This protocol simplifies and centralizes the monitoring and control of complex professional audio systems. R&D costs in fiscal 2007, 2006 and 2005 were $35.7 million, $33.2 million and $31.1 million, respectively. Professional also had $0.4 million of

restructuring expenses included in fiscal 2007 SG&A expenses.  Fiscal 2006 restructuring expenses were $1.7 million.

*Other* – Other SG&A expenses primarily include compensation, benefit and occupancy costs for corporate employees.  In fiscal 2007, these expenses also included costs associated with our proposed merger with Parent.

### Restructuring and Merger Costs

In June 2006, we announced a restructuring program designed to increase efficiency in our manufacturing, engineering and administrative organizations.  During fiscal 2007, restructuring expenses were $7.1 million and cash payments associated with restructuring activities were $8.0 million.  Since the restructuring program began in June 2006, we have incurred restructuring charges of $16.6 million and made cash payments of $8.4 million.

Below is a rollforward of our restructuring accrual at June 30, 2007 and June 30, 2006:

|  | June 30, | |
| --- | --- | --- |
| ($000s omitted) | 2007 | 2006 |
| Beginning accrued liability | $    8,533 | --- |
| Add:  Expense | 7,071 | 9,499 |
| Less:  Utilization | (8,077) | (966) |
| Ending accrued liability | $    7,527 | 8,533 |

On April 26, 2007, we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP.  The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent.  KHI Merger Sub and Parent were formed to acquire our company.

We anticipate completing the transaction during the fourth quarter of this calendar year.  During the fourth quarter of fiscal 2007, we incurred $3.8 million of costs associated with the merger.  These costs were primarily legal fees and are a component of SG&A expenses.

### Operating Income

Fiscal 2007 operating income was $386.4 million, or 10.9 percent of net sales.  This represents a decrease of 1.3 percentage points compared to the prior year.  The decrease in operating income was primarily driven by lower gross profit margin partially offset by lower SG&A, as a percentage of sales.

Our fiscal 2006 operating income was $397.2 million, or 12.2 percent of net sales. This represents an improvement of 0.6 percentage points above fiscal 2005.  The improvement in operating income was achieved as a result of strong growth in our Consumer and Professional business segments, partially offset by lower Automotive operating margins.

We present below a summary of our operating income by reportable business segment:

| ($000s omitted) | | Fiscal 2007 | Percent of net sales | Fiscal 2006 | Percent of net sales | Fiscal 2005 | Percent of net sales |
|---|---|---|---|---|---|---|---|
| Automotive | $ | 340,116 | 13.6% | 336,795 | 15.1% | 347,834 | 16.3% |
| Consumer | | 13,587 | 2.7% | 50,813 | 10.3% | 26,958 | 6.5% |
| Professional | | 80,968 | 14.4% | 59,278 | 11.5% | 45,498 | 9.3% |
| Other | | (48,284) | --- | (49,645) | --- | (69,309) | --- |
| *Total* | $ | 386,387 | 10.9% | 397,241 | 12.2% | 350,981 | 11.6% |

### Interest Expense

Interest expense, net, was $1.5 million compared to $13.0 million last year. Our net interest expense decreased primarily due to the repayment of debt. Our fiscal 2007 interest expense, net, included $8.1 million of interest income primarily related to interest on our cash and cash equivalents and short-term investment balances. In fiscal 2006 and 2005, interest income was $12.2 million and $7.6 million, respectively.

We had average borrowings of $170.2 million in fiscal 2007 compared to $342.0 million and $340.3 million in fiscal 2006 and 2005, respectively. We used interest rate swaps during fiscal 2006 and 2005 to effectively convert fixed rate debt to variable rate debt. The weighted average borrowings exclude the average fair value of the interest rate swaps of $2.5 million and $11.8 million in fiscal 2006 and 2005. No interest rate swaps were used in fiscal 2007.

Our weighted average interest rate in fiscal 2007 was 5.6 percent. In fiscal 2006 and 2005, the weighted average interest rates were 7.4 percent and 5.3 percent, respectively. Our fiscal 2007 weighted average interest rates have decreased compared to the prior year due to the majority of our outstanding debt shifting from higher rate senior debt to lower rate revolving credit facilities.

Our interest expense in fiscal 2008 is expected to increase substantially as a result of the financing associated with our proposed merger with Parent.

### Miscellaneous Expenses

We recorded miscellaneous expenses, net, of $2.7 million in fiscal 2007. In fiscal 2006 and 2005, we spent $8.0 million and $5.1 million, respectively. The fiscal 2007 expense was comprised primarily of bank charges. Bank charges were $2.6 million, $2.5 million and $2.7 million in fiscal 2007, 2006 and 2005, respectively. In fiscal 2006, we incurred a $4.9 million expense for repurchase premiums associated with the buyback of over 90 percent of our then-outstanding senior notes. These premiums also include a charge on the termination of interest rate swap contracts.

### Income Taxes

Our fiscal 2007 effective tax rate was 18.4 percent. This tax rate was impacted by non-recurring tax items, including a $51 million net gain resulting from a recent court decision that allows certain taxpayers to recognize foreign tax credits. The effective tax rate was also impacted by a $4 million tax charge

resulting from a dividend from South Africa.  Exclusive of these items, our fiscal 2007 tax rate was 30.4 percent.  During fiscal 2007, we made tax payments of $145.4 million, primarily in Germany.

The effective tax rates in fiscal 2006 and 2005, were 32.4 percent and 30.6 percent, respectively.  In fiscal 2006, we repatriated $500 million from our foreign subsidiaries under the "American Jobs Creation Act of 2004."  This decision resulted in a $3.4 million tax charge during fiscal 2006.

During the quarter ended March 31, 2005 we changed our method of accounting for reporting changes in interim periods to liabilities resulting from changes in judgments or settlements related to uncertain tax positions. We had previously accounted for such changes in judgments and settlements as adjustments to the estimated annual effective rate. We changed our method to account for such changes in judgments and settlements as a discrete item in the interim period of the change. This discrete method recognizes the effect of any change in reserve only in the quarter of the change. The newly adopted accounting method is preferable because it better reflects our consolidated financial position and operations at the time of the change in uncertain tax positions. The adoption of this accounting method did not have an effect on our fiscal 2005 financial statements.

**Financial Condition**

*Liquidity and Capital Resources*

We primarily finance our working capital requirements through cash generated by operations, borrowings under revolving credit facilities and trade credit, if needed.  During fiscal 2007, cash was primarily used to repurchase shares of our common stock, reduce debt, make investments in our manufacturing facilities, make tax payments primarily in Germany, and meet our working capital needs.  Cash and cash equivalents were $106.1 million at June 30, 2007 compared to $291.8 million at June 30, 2006.

We will continue to have cash requirements to support seasonal working capital needs, investments in our manufacturing facilities, interest and principal payments, and dividend payments.  We intend to use cash on hand, cash generated by operations and borrowings under our revolving credit facility to meet these requirements.  We believe that cash from operations and our borrowing capacity, if needed, will be adequate to meet our normal cash requirements over the next twelve months.  The proposed merger will result in significantly higher debt and related interest payments.

Below is a more detailed discussion of our cash flow activities during fiscal 2007.

*Operating Activities*

Net cash provided by operating activities in fiscal 2007 was $215.3 million compared to $400.0 million in fiscal 2006.  The reduction in operating cash flows was primarily due to a decrease in accrued liabilities and increases in inventories and accounts receivable.  These increases were partially offset by higher net income in fiscal 2007.

Working capital, excluding cash and short-term debt, was $329.9 million at June 30, 2007 compared to $106.7 million at June 30, 2006.  The increase is primarily due to higher inventories and accounts receivable.  Automotive inventories increased significantly due to our entry into the PND market in fiscal 2007.  Although the accounts receivable balance was higher than a year ago, days sales outstanding was

32

50.0 days, the same as the prior year. Accrued liabilities decreased primarily due to the reclassification of certain pension liabilities from accrued liabilities to other non-current liabilities upon our adoption of SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*, which is discussed further in Note 12, Retirement Benefits.

*Investing Activities*

Net cash used in investing activities was $180.0 million in fiscal 2007, compared to $146.7 million in fiscal 2006. This activity primarily reflects investments in our manufacturing facilities. Capital expenditures were $174.8 million in fiscal 2007 and $130.5 million in fiscal 2006. A substantial portion of these expenditures were made to complete our new manufacturing facility in Washington, Missouri. The facility was substantially complete at the end of fiscal 2006. In fiscal 2007, we invested in the necessary equipment and tooling to begin production of infotainment systems in the facility. We also made capital expenditures for a new manufacturing facility in China during this past year. In Europe, we invested in customer tooling and other manufacturing equipment to support infotainment system programs for automotive customers. Capital expenditures were also used for new product tooling for consumer and professional products.

*Financing Activities*

Net cash flows used in financing activities were $222.7 million in fiscal 2007 compared to $260.1 million used in fiscal 2006. During this past year, we paid $128.8 million to repurchase 1.5 million shares of our common stock and we made net payments of $107.6 million on our revolving credit facility. Since the inception of our share repurchase program in June 1998, we have acquired and placed in treasury 18.2 million shares at a cost of $639.6 million through June 30, 2007. Our share repurchase program has been suspended due to our proposed merger with Parent.

Our total debt was $76.5 million at June 30, 2007 primarily comprised of borrowings of $55.0 million under our revolving credit facility and $16.5 million in outstanding principal amount of senior notes. The senior notes had a stated interest rate of 7.32 percent and were due on July 1, 2007. These notes were paid in upon maturity. We also had capital leases and other long-term borrowings of $3.2 million at June 30, 2007. Short-term borrowings included in debt were $1.8 million.

At June 30, 2006, our total debt was $197.6 million primarily comprised of $159.9 million of borrowings under our revolving credit facility. Also included in total debt was $13.2 million principal amount of 7.125 percent senior notes due February 15, 2007 and $16.5 million principal amount of 7.32 percent senior notes due July 1, 2007. We also had capital leases and other long-term borrowings of $6.2 million at June 30, 2007. Short-term borrowings included in debt are $1.8 million at June 30, 2007.

On June 28, 2005, we entered into a $300 million multi-currency revolving credit facility with a group of banks, which under certain circumstances could have been increased to $350 million. This facility expires in June 2010 and replaces the $150 million revolving credit facility that expired on August 14, 2005. On June 22, 2006, we amended and restated our multi-currency revolving credit facility. The Restated Credit Agreement, among other things, added Harman Holding GmbH & Co. KG ("Harman Holding"), a limited partnership organized under the laws of Germany and wholly-owned subsidiary of the company, as an additional borrower. The maximum principal amount of borrowings permitted under the Restated

Agreement remains at $300 million. The Restated Agreement also amends our conditional option to increase the maximum aggregate revolving commitment amount from $350 million to $550 million. At June 30, 2007, we had $55.0 million of borrowings under this credit facility and outstanding letters of credit of $5.6 million.  Unused availability under the revolving credit facility was $239.4 million at June 30, 2007.  We expect this credit facility will be repaid in full and terminated in connection with the financing associated with the completion of our proposed merger with Parent.

Our long-term debt agreements contain financial and other covenants that, among other things, limit our ability to incur additional indebtedness, restrict subsidiary dividends and distributions, limit our ability to encumber certain assets and restrict our ability to issue capital stock of our subsidiaries. Our long-term debt agreements permit us to pay dividends or repurchase our capital stock without any dollar limitation provided that we would be in compliance with the financial covenants in our revolving credit facility after giving effect to such dividend or repurchase. We were in compliance with the terms of our long-term debt agreements at June 30, 2007, 2006 and 2005.

### Contractual Obligations

We have obligations and commitments to make future payments under debt agreements and operating leases. The following table details our financing obligations by due date:

|  | Fiscal Year Ending June 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| ($000s) | 2008 | 2009 | 2010 | 2011 | 2012 | Thereafter | Total |
| Short-term borrowings (a) | $    1,838 | --- | --- | --- | --- | --- | $    1,838 |
| Senior notes (b) | 16,486 | --- | --- | --- | --- | --- | 16,486 |
| Capital leases (c) | 459 | 477 | 495 | 408 | 412 | --- | 2,251 |
| Other long-term obligations (b) | 84 | 90 | 55,095 | 100 | 105 | 479 | 55,953 |
| Firm commitments for capital expenditures | 37,643 | --- | --- | --- | --- | --- | 37,643 |
| Purchase obligations (c) | 196,554 | 533 | 24 | --- | --- | 860 | 197,971 |
| Non-cancelable operating leases (d) | 43,517 | 40,913 | 38,511 | 23,879 | 19,198 | 22,698 | 188,716 |
| *Total contractual cash obligations* | $296,581 | 42,013 | 94,125 | 24,387 | 19,715 | 24,037 | $500,858 |

(a) See note 5 to our consolidated financial statements.
(b) See note 6 to our consolidated financial statements.
(c) Includes amounts committed under enforceable agreements for purchase of goods and services with defined terms as to quantity, price and timing of delivery.
(d) See note 7 to our consolidated financial statements.

### Business Outlook

Automotive has received significant awards to develop infotainment systems for customers including BMW, Audi, PSA Peugeot Citroën and Chrysler.  We anticipate that our infotainment systems will become increasingly scalable across a full range of luxury, mid-range and entry-level vehicles.  In the

future, we expect these systems to include additional functionality that will include driver assist safety measures. Consumer will continue to develop new products that emphasize mobility such as the emerging music-enabled cell phones. Professional will focus on expanding their lineup of products that are enabled with their HiQnet protocol.

We presently expect our proposed merger with KHI Parent to be completed in the fourth quarter of calendar 2007. Following the merger, we will be a wholly owned subsidiary of Parent. Affiliates of KKR and GSCP will hold a majority of the common stock of Parent. This transaction will result in a significant increase in our outstanding debt and we will incur substantial transaction, financing and other expenses in connection with the transaction that are expected to have a material effect on our financial condition and results of operations at and for our fiscal year ended June 30, 2008 and future periods.

**Item 7A.  Quantitative and Qualitative Disclosures About Market Risk**

We are required to include information about potential effects of changes in interest rates and currency exchange rates in our periodic reports filed with the Securities and Exchange Commission.

*Interest Rate Sensitivity/Risk*

At June 30, 2007, interest on approximately 22 percent of our borrowings was determined on a fixed rate basis. The interest rates on the balance of our debt are subject to changes in U.S. and European short-term interest rates. To assess exposure to interest rate changes, we have performed a sensitivity analysis assuming a hypothetical 100 basis point increase or decrease in interest rates across all outstanding debt and investments. Our analysis indicates that the effect on fiscal 2007 net income of such an increase or decrease in interest rates would be approximately $0.4 million. Based on June 30, 2006 positions, the impact of such changes in interest rates was approximately $0.9 million to fiscal 2006 net income.

The following table provides information as of June 30, 2007 about our financial instruments that are sensitive to changes in interest rates and debt obligations. The table presents principal cash flows and related average interest rates by contractual maturity dates. Weighted average variable rates are generally based on LIBOR as of the reset dates. The information is presented in U.S. dollar equivalents as of June 30, 2007.

**Principal Payments and Interest Rates by Contractual Maturity Dates**

| ($ millions) | Fiscal Years Ending June 30, | | | | | Thereafter | Total | Fair value (assets)/ liabilities |
|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | | | |
| Debt obligation (US$) | $18.4 | 0.1 | 55.1 | 0.1 | 0.1 | 0.5 | $ 74.3 | $ 74.3 |
| Average interest rate | 7.13% | 5.00% | 6.02% | 5.00% | 5.00% | 5.00% | --- | --- |

*Foreign Currency Risk*

We maintain significant operations in Germany, the United Kingdom, France, Austria, Hungary, Mexico, Switzerland and Sweden. As a result, we are subject to market risks arising from changes in foreign currency exchange rates, principally the change in the value of the Euro compared to the U.S. Dollar. Our

subsidiaries purchase products and raw materials in various currencies. As a result, we may be exposed to cost changes relative to local currencies in the markets to which we sell our products. To mitigate these risks, we enter into forward foreign exchange contracts. Also, foreign currency positions are partially offsetting and are netted against one another to reduce exposure.

We presently estimate the effect on projected 2008 income before income taxes, based upon a recent estimate of foreign exchange transactional exposure, of a uniform strengthening or uniform weakening of the transaction currency rates of 10 percent would be to increase or decrease income before income taxes by approximately $35 million. As of June 30, 2007, we had hedged a portion of our estimated foreign currency transactions using forward exchange contracts.

We presently estimate the effect on projected 2008 income before income taxes, based upon a recent estimate of foreign exchange translation exposure (translating the operating performance of our foreign subsidiaries into U.S. Dollars), of a uniform strengthening or weakening of the U.S. Dollar by 10 percent would be to increase or decrease income before income taxes by approximately $40 million.

Competitive conditions in the markets in which we operate may limit our ability to increase prices in the event of adverse changes in currency exchange rates. For example, certain products made in the U.S. are sold outside of the U.S. Sales of these products are affected by the value of the U.S. Dollar relative to other currencies. Any long-term strengthening of the U.S. Dollar could depress the demand for these U.S. manufactured products and reduce sales. However, due to the multiple currencies involved in our business and the netting effect of various simultaneous transactions, our foreign currency positions are partially offsetting.

Actual gains and losses in the future may differ materially from the hypothetical gains and losses discussed above based on changes in the timing and amount of interest rate and foreign currency exchange rate movements and our actual exposure and hedging transactions.

**Item 8. Consolidated Financial Statements and Supplementary Data**

<u>Management's Report on Internal Control over Financial Reporting</u>

The management of Harman International is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system was designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and the fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

We assessed the effectiveness of our internal control over financial reporting as of June 30, 2007. In making this assessment, we used the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in "Internal Control-Integrated Framework." Our assessment included an evaluation of such elements as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, overall control environment and information systems control environment. Based on our assessment, we have concluded that, as of June 30, 2007, our internal control over financial reporting was effective.

Our assessment of the effectiveness of our internal control over financial reporting, as of June 30, 2007, has been audited by KPMG LLP, an independent registered public accounting firm. KPMG's report on our internal controls over financial reporting is included herein.

<u>/s/ Kevin L. Brown</u>

Kevin L. Brown
Executive Vice President and Chief Financial Officer

<u>/s/ Sandra B. Robinson</u>

Sandra B. Robinson
Vice President – Financial Operations and Chief Accounting Officer

Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting

The Board of Directors and Shareholders
Harman International Industries, Incorporated:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control over Financial Reporting appearing under Item 8, that Harman International Industries, Incorporated maintained effective internal control over financial reporting as of June 30, 2007, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The management of Harman International Industries, Incorporated is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Harman International Industries, Incorporated maintained effective internal control over financial reporting as of June 30, 2007, is fairly stated, in all material respects, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also, in our opinion, Harman International Industries, Incorporated maintained, in all material respects, effective internal control over financial reporting as of June 30, 2007, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Harman International Industries, Incorporated and subsidiaries as of June 30, 2007 and 2006, and the related consolidated statements of operations, cash flows and shareholders' equity and comprehensive income for each of the years in the three-year period ended June 30, 2007 and our report dated August 29, 2007 expressed an unqualified opinion on those consolidated financial statements.

**/s/ KPMG LLP**


McLean, Virginia
August 29, 2007

38

<u>Report of Independent Registered Public Accounting Firm</u>

The Board of Directors and Shareholders
Harman International Industries, Incorporated:

We have audited the accompanying consolidated balance sheets of Harman International Industries, Incorporated and subsidiaries as of June 30, 2007 and 2006, and the related consolidated statements of operations, cash flows and shareholders' equity and comprehensive income for each of the years in the three-year period ended June 30, 2007. In connection with our audits of the consolidated financial statements, we also have audited the related financial statement schedule for each of the years in the three-year period ended June 30, 2007. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Harman International Industries, Incorporated and subsidiaries as of June 30, 2007 and 2006, and the results of their operations and their cash flows for each of the years in the three-year period ended June 30, 2007, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 12 to the consolidated financial statements, the Company adopted Statement of Financial Accounting Standards No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans* effective June 30, 2007.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Harman International Industries, Incorporated's internal control over financial reporting as of June 30, 2007, based on criteria established in Internal Control— Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated August 29, 2007 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

**/s/ KPMG LLP**

McLean, Virginia
August 29, 2007

39

**Consolidated Balance Sheets**
Harman International Industries, Incorporated and Subsidiaries
($000s omitted except share amounts)

|  |  | June 30, | |
|---|---|---|---|
|  |  | 2007 | 2006 |
| **Assets** | | | |
| Current assets | | | |
| Cash and cash equivalents | $ | 106,141 | 291,758 |
| Receivables (less allowance for doubtful accounts of $6,040 in 2007 and $8,738 in 2006) | | 486,557 | 444,474 |
| Inventories (note 2) | | 453,156 | 344,957 |
| Other current assets | | 187,299 | 186,778 |
| Total current assets | | 1,233,153 | 1,267,967 |
| Property, plant and equipment, net (notes 3, 6 and 7) | | 591,976 | 521,935 |
| Goodwill (note 4) | | 403,749 | 381,219 |
| Other assets | | 279,990 | 204,631 |
| Total assets | $ | 2,508,868 | 2,375,752 |
| **Liabilities and Shareholders' Equity** | | | |
| Current liabilities | | | |
| Short-term borrowings (notes 5) | $ | 1,838 | 1,751 |
| Current portion of long-term debt (note 6) | | 17,029 | 16,337 |
| Accounts payable | | 356,763 | 320,327 |
| Accrued liabilities | | 350,164 | 432,988 |
| Income taxes payable (note 10) | | 90,187 | 116,493 |
| Total current liabilities | | 815,981 | 887,896 |
| Borrowings under revolving credit facility (note 6) | | 55,000 | 159,900 |
| Senior notes (note 6) | | 2,661 | 19,566 |
| Minority interest (note 17) | | 878 | 2,716 |
| Other non-current liabilities | | 140,307 | 77,510 |
| Shareholders' equity (note 11) | | | |
| Preferred stock, $.01 par value. Authorized 5,000,000 shares; none issued and outstanding | | --- | --- |
| Common stock, $.01 par value. Authorized 200,000,000 shares; issued 83,436,983 shares in 2007 and 82,754,909 in 2006 | | 834 | 827 |
| Additional paid-in capital | | 595,853 | 544,871 |
| Accumulated other comprehensive income (loss): | | | |
| Unrealized loss on hedging derivatives | | (510) | (3,267) |
| Pension benefits | | (15,778) | (11,789) |
| Cumulative foreign currency translation adjustment | | 98,479 | 64,280 |
| Retained earnings | | 1,454,771 | 1,144,070 |
| Less common stock held in treasury (18,198,082 shares in 2007 and 16,690,182 shares in 2006) | | (639,608) | (510,828) |
| Total shareholders' equity | | 1,494,041 | 1,228,164 |
| Commitments and contingencies (notes 7 and 14) | | | |
| Total liabilities and shareholders' equity | $ | 2,508,868 | 2,375,752 |

See accompanying notes to consolidated financial statements.

**Consolidated Statements of Operations**
Harman International Industries, Incorporated and Subsidiaries
($000s omitted except per share amounts)

|  | | Years Ended June 30, | |
|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Net sales | $ 3,551,144 | 3,247,897 | 3,030,889 |
| Cost of sales | 2,339,938 | 2,095,327 | 1,999,187 |
| Gross profit | 1,211,206 | 1,152,570 | 1,031,702 |
|  |  |  |  |
| Selling, general and administrative expenses | 824,819 | 755,329 | 680,721 |
| Operating income | 386,387 | 397,241 | 350,981 |
|  |  |  |  |
| Other expenses: |  |  |  |
|   Interest expense, net | 1,500 | 13,027 | 10,516 |
|   Miscellaneous, net | 2,682 | 8,027 | 5,128 |
|  |  |  |  |
| Income before income taxes and minority interest | 382,205 | 376,187 | 335,337 |
|  |  |  |  |
| Income tax expense, net | 70,186 | 121,877 | 102,489 |
| Minority interest | (1,944) | (985) | --- |
|  |  |  |  |
| Net income | $ 313,963 | 255,295 | 232,848 |
|  |  |  |  |
| Basic earnings per share | $ 4.81 | 3.85 | 3.47 |
|  |  |  |  |
| Diluted earnings per share | $ 4.72 | 3.75 | 3.31 |
|  |  |  |  |
|  |  |  |  |
| Weighted average shares outstanding – basic | 65,310 | 66,260 | 67,120 |
|  |  |  |  |
| Weighted average shares outstanding – diluted | 66,449 | 68,105 | 70,399 |

See accompanying notes to consolidated financial statements.

**Consolidated Statements of Cash Flows**

Harman International Industries, Incorporated and Subsidiaries

($000s omitted)

| | Years Ended June 30, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| **Cash flows from operating activities:** | | | |
| Net income | $ 313,963 | 255,295 | 232,848 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 127,162 | 129,949 | 118,665 |
| Deferred income taxes | (45,563) | (8,011) | (83,057) |
| Loss on disposition of assets | 959 | 1,480 | 3,381 |
| Stock option expense | 15,418 | 16,586 | 14,318 |
| Excess tax benefits from share-based payment arrangements | (10,456) | (45,493) | 74,107 |
| Changes in operating assets and liabilities: | | | |
| Decrease (increase) in: | | | |
| Receivables | (20,314) | 4,877 | (3,015) |
| Inventories | (92,024) | (21,433) | (25,291) |
| Other current assets | (34,844) | (27,456) | (11,287) |
| Increase (decrease) in: | | | |
| Accounts payable | 26,266 | 37,274 | 35,396 |
| Accrued liabilities | (37,297) | 45,877 | 66,270 |
| Income taxes payable | (34,083) | 5,303 | (19,075) |
| Other operating activities | 6,126 | 5,731 | 16,282 |
| Net cash provided by operating activities | $ 215,313 | 399,979 | 419,542 |
| **Cash flows from investing activities:** | | | |
| Payment for purchase of companies, net of cash acquired | $ (9,229) | (13,808) | (145,680) |
| Proceeds from asset dispositions | 3,038 | 1,574 | 2,128 |
| Capital expenditures | (174,794) | (130,548) | (172,326) |
| Sale of investments | --- | --- | 91,000 |
| Other items, net | 970 | (3,898) | 4,687 |
| Net cash used in investing activities | $(180,015) | (146,680) | (220,191) |
| **Cash flows from financing activities:** | | | |
| Net increase (decrease) in short-term borrowings | $ 135 | (828) | (1,699) |
| Net (repayments) borrowings under revolving credit facility | (107,631) | 158,294 | --- |
| Repayment of long-term debt | (13,168) | (281,945) | (49,921) |
| Other decrease in long-term debt | (5,614) | (13,250) | (1,077) |
| Repurchase of common stock | (128,780) | (192,608) | (146,369) |
| Dividends paid to shareholders | (3,262) | (3,321) | (3,354) |
| Exercise of stock options | 25,115 | 27,650 | 11,278 |
| Excess tax benefits from share-based payment arrangements | 10,456 | 45,493 | --- |
| Other | --- | 462 | --- |
| Net cash used in financing activities | $(222,749) | (260,053) | (191,142) |
| Effect of exchange rate changes on cash | 1,834 | 7,298 | (3,703) |
| Net increase (decrease) in cash and cash equivalents | (185,617) | 544 | 4,506 |
| Cash and cash equivalents at beginning of period | $ 291,758 | 291,214 | 286,708 |
| Cash and cash equivalents at end of period | $ 106,141 | 291,758 | 291,214 |
| **Supplemental schedule of non-cash investing activities:** | | | |
| Fair value of assets acquired | $ --- | 12,102 | 155,939 |
| Cash paid for the assets | --- | 6,503 | 139,213 |
| Liabilities assumed | $ --- | 5,599 | 16,726 |

See accompanying notes to consolidated financial statements.

## Consolidated Statements of Shareholders' Equity and Comprehensive Income
Harman International Industries, Incorporated and Subsidiaries
Years Ended June 30, 2007, 2006 and 2005

| ($000s omitted) | Common Stock Number of shares | $0.01 Par Value | Additional paid-in capital | Accumulated other comprehensive income (loss) | Retained earnings | Treasury stock | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| **Balance, June 30, 2004** | 66,090,022 | $ 789 | 355,477 | 27,979 | 662,602 | (171,851) | 874,996 |
| Comprehensive income: | | | | | | | |
| Net income | — | — | — | — | 232,848 | — | 232,848 |
| Foreign currency translation adjustment | — | — | — | (3,477) | — | — | (3,477) |
| Unrealized gain on hedging derivatives | — | — | — | 13,369 | — | — | 13,369 |
| Minimum pension liability | — | — | — | (6,768) | — | — | (6,768) |
| Total comprehensive income | — | — | — | 3,124 | 232,848 | — | 235,972 |
| Exercise of stock options, net of shares received | 2,250,422 | 22 | 11,256 | — | — | — | 11,278 |
| Tax benefit attributable to stock options plan | — | — | 74,107 | — | — | — | 74,107 |
| Stock option compensation | — | — | 14,318 | — | — | — | 14,318 |
| Treasury shares purchased | (1,677,900) | — | — | — | — | (146,369) | (146,369) |
| Dividends ($.05 per share) | — | — | — | — | (3,354) | — | (3,354) |
| **Balance, June 30, 2005** | 66,662,544 | $ 811 | 455,158 | 31,103 | 892,096 | (318,220) | 1,060,948 |
| Comprehensive income: | | | | | | | |
| Net income | — | — | — | — | 255,295 | — | 255,295 |
| Foreign currency translation adjustment | — | — | — | 24,578 | — | — | 24,578 |
| Unrealized gain on hedging derivatives | — | — | — | (8,815) | — | — | (8,815) |
| Minimum pension liability | — | — | — | 2,358 | — | — | 2,358 |
| Total comprehensive income | — | — | — | 18,121 | 255,295 | — | 273,416 |
| Exercise of stock options, net of shares received | 1,632,883 | 16 | 27,634 | — | — | — | 27,650 |
| Tax benefit attributable to stock option plan | — | — | 45,493 | — | — | — | 45,493 |
| Stock option compensation | — | — | 16,586 | — | — | — | 16,586 |
| Treasury shares purchased | (2,230,700) | — | — | — | — | (192,608) | (192,608) |
| Dividends ($.05 per share) | — | — | — | — | (3,321) | — | (3,321) |
| **Balance, June 30, 2006** | 66,064,727 | $ 827 | 544,871 | 49,224 | 1,144,070 | (510,828) | 1,228,164 |
| Comprehensive income: | | | | | | | |
| Net income | — | — | — | — | 313,963 | — | 313,963 |
| Foreign currency translation adjustment | — | — | — | 34,199 | — | — | 34,199 |
| Unrealized gain on hedging derivatives | — | — | — | 2,757 | — | — | 2,757 |
| Minimum pension liability | — | — | — | 3,264 | — | — | 3,264 |
| Total comprehensive income | — | — | — | 40,220 | 313,963 | — | 354,183 |
| Exercise of stock options, net of shares received | 682,074 | 7 | 25,108 | — | — | — | 25,115 |
| Tax benefit attributable to stock option plan | — | — | 10,456 | — | — | — | 10,456 |
| Adoption of SFAS No. 158 (net of tax) | — | — | — | (7,253) | — | — | (7,253) |
| Stock option compensation | — | — | 15,418 | — | — | — | 15,418 |
| Treasury shares purchased | (1,507,900) | — | — | — | — | (128,780) | (128,780) |
| Dividends ($.05 per share) | — | — | — | — | (3,262) | — | (3,262) |
| **Balance, June 30, 2007** | 65,238,901 | $ 834 | 595,853 | 82,191 | 1,454,771 | (639,608) | 1,494,041 |

See accompanying notes to consolidated financial statements.

**Notes to Consolidated Financial Statements**
Harman International Industries, Incorporated and Subsidiaries

*Note 1 - Summary of Significant Accounting Policies*

**Principles of Consolidation.** The consolidated financial statements include the accounts of Harman International Industries, Incorporated and our subsidiaries (collectively, the "company") after the elimination of significant intercompany transactions and accounts. Unless the context indicates otherwise, the terms "we", "us", or "our" refer herein to Harman International Industries, Incorporated and subsidiaries.

**Reclassifications.** Where necessary, prior years' information has been reclassified to conform to the fiscal 2007 financial statement presentation.

**Use of Estimates.** The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results may differ from those estimates, and the differences may be material to the consolidated financial statements.

Among the most significant estimates used in the preparation of our financial statements are estimates associated with the valuation of inventory, depreciable lives of fixed assets, accounting for business combinations, the evaluation of the recoverability of goodwill, evaluation of the recoverability of pre-production and development contract costs, warranty liability, litigation and taxation. In addition, estimates form the basis for our reserves for sales discounts, sales allowances, accounts receivable, inventory, and postretirement and other employee benefits. Various assumptions go into the determination of these estimates. The process of determining significant estimates requires consideration of factors such as historical experience, current and expected economic conditions, and actuarial methods. We reevaluate these significant factors and makes changes and adjustments where facts and circumstances indicate that changes are necessary.

**Revenue Recognition.** Revenue is generally recognized at the time of product shipment or delivery, depending on when the passage of title to goods transfers to unaffiliated customers, when all of the following have occurred: a firm sales agreement is in place, pricing is fixed or determinable and collection is reasonably assured. Sales are reported net of estimated returns, discounts, rebates and incentives. Substantially all of our revenue transactions involve the delivery of a physical product.

**Sales Discounts.** We offer product discounts and sales incentives including prompt payment discounts, volume incentive programs, rebates and dealer order incentives. We report revenues net of discounts and other sales incentives in accordance with Emerging Issues Task Force ("EITF") Issue No. 01-09, *Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)*.

**Cost of Sales.** Cost of sales includes material, labor and overhead for products manufactured by us and cost of goods produced for us on a contract basis. Expenses incurred for manufacturing depreciation and engineering, warehousing, shipping and handling, sales commissions, warranty and customer service are also included in cost of sales.

**Allowance for Doubtful Accounts.** We reserve an estimated amount for accounts receivable that may not be collected. Methodologies for estimating allowance for doubtful accounts are primarily based on specific identification of uncollectible accounts. Historical collection rates and customer credit worthiness are considered in determining specific reserves. At June 30, 2007 and 2006, we had $6.0 million and $8.7 million, respectively, reserved for possible uncollectible accounts receivable. As with many estimates, management must make judgments about potential actions by third parties in establishing and evaluating our allowance for doubtful accounts.

**Warranty Liabilities.** We warrant our products to be free from defects in materials and workmanship for periods ranging from six months to six years from the date of purchase, depending on the business segment and product. The warranty is a limited warranty, and it may impose certain shipping costs on the customer and exclude deficiencies in appearance except for those evident when the product is delivered. Our dealers and warranty service providers normally perform warranty service for loudspeakers and electronics in the field, using parts supplied on an exchange basis by our company. Estimated warranty liabilities are based upon past experience with similar types of products, the technological complexity of certain products, replacement cost and other factors. See Note 9, *Warranty Liabilities*, for additional information regarding our warranties.

**Selling, General and Administrative Expenses.** Selling, general and administrative expenses include non-manufacturing salaries and benefits, stock option expense, occupancy costs, professional fees, research and development costs, amortization of intangibles, advertising and marketing costs and other operating expenses.

**Advertising Costs.** We expense advertising costs as incurred. When production costs are incurred for future advertising, these costs are recorded as an asset and subsequently expensed when the advertisement is first put into service.

**Amortization of Intangibles.** Amortization of intangibles primarily includes amortization of intangible assets such as patents, trademarks and distribution agreements and amortization of costs, other than interest costs. Intangibles are amortized over 10 months to 17 years. In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets ("SFAS 142")*, goodwill was not amortized after July 1, 2002.

**Research and Development.** Research and development costs are expensed as incurred. Our expenditures for research and development were $356.7 million, $302.0 million and $222.6 million for the fiscal years ending June 30, 2007, 2006 and 2005, respectively.

**Interest Expense, Net.** Interest expense, net, includes interest expense and amortization of original issue discount on debt securities, net of interest income.

**Cash and Cash Equivalents.** Cash and cash equivalents includes cash on hand and short-term investments with original maturities of less than three months.

**Inventories.** Inventories are stated at the lower of cost or market. Cost is determined principally by the first-in, first-out method. The valuation of inventory requires us to make judgments and estimates regarding obsolete, damaged or excess inventory as well as current and future demand for our products. The estimates of future demand along with analysis of usage data that we use in the valuation of

inventory are the basis for our inventory reserves and have an effect on our results of operations. See Note 2, *Inventories*, for additional information.

**Property, Plant and Equipment.** Property, plant and equipment is stated at cost or, in the case of capitalized leases, at the present value of the future minimum lease payments. Depreciation and amortization of property, plant and equipment is computed primarily using the straight-line method over useful lives estimated from 1 to 50 years or over the term of the lease, whichever is shorter. Buildings and improvements are depreciated over 1 to 50 years, machinery and equipment are depreciated over 3 to 20 years and furniture and fixtures are depreciated over 3 to 10 years. See Note 3, *Property, Plant and Equipment*, for additional information.

**Goodwill.** Goodwill was $403.7 million at June 30, 2007 compared with $381.2 million at June 30, 2006. The increase is primarily due to contingent consideration and deferred purchase price payments paid during fiscal 2007 associated with prior fiscal year acquisitions. Currency translation also contributed to the increase. Our SFAS 142 annual impairment test concluded that goodwill was not impaired as of the test date, April 30, 2007.

In fiscal 2006, goodwill increased $36.1 million, which was mainly due to the acquisition of PhatNoise and our investment in a joint venture in Korea. Contingent consideration associated with the acquisition of Innovation Systems in a prior fiscal year also contributed to the increase in goodwill.

**Pre-Production and Development Costs.** We incur pre-production and development costs primarily related to infotainment systems that we develop for automobile manufacturers pursuant to long-term supply agreements. We record certain costs incurred pursuant to these agreements as unbilled costs in accordance with EITF Issue No. 99-5, *Accounting for Pre-Production Costs Related to Long-Term Supply Agreements*, or the percentage-of-completion method of AICPA Statement of Position ("SOP") 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*. Unbilled costs at June 30, 2007 were $30.8 million, including $14.5 million of pre-production costs and $16.3 million of costs under development contracts. Unbilled costs reimbursable in the next twelve months total $10.3 million and are recorded in *Other current assets*. Unbilled costs reimbursable in subsequent years total $20.5 million and are recorded in *Other assets*. At June 30, 2007, we had fixed assets of $21.2 million for molds, dies and other tools which our customers will eventually purchase and own pursuant to long-term supply contracts.

At June 30, 2006, total unbilled costs were $34.4 million, including $4.2 million of pre-production costs and $30.2 million of costs under development contracts. At June 30, 2006, unbilled costs reimbursable in the next twelve months totaled $11.5 million and were recorded in *Other current assets*. Unbilled costs reimbursable in subsequent years totaled $22.9 million and were recorded in O*ther assets*.

**Purchased and Deferred Software Costs.** Software costs that are related to conceptual formulation and incurred prior to the establishment of technological feasibility are expensed as incurred. Costs incurred to purchase software to be sold as an integral component of a product are deferred until the product is sold. Software development costs incurred subsequent to establishment of technological feasibility and which are considered recoverable by management are deferred in compliance with SFAS No. 86, *Accounting for the Costs of Computer Software to Be Sold, Leased, or Otherwise Marketed*, and amortized over the product's life, usually three years. There were no deferred costs at June 30, 2007. At June 30, 2006,

46

deferred costs were $0.4 million, net of accumulated amortization of $35.2 million. Deferred costs, net, are included in *Other assets* on the balance sheet. Historically, deferred costs were comprised of costs to acquire or develop automotive infotainment system software.

**Income Taxes.** Deferred income tax assets or liabilities are computed based on the temporary differences between the financial statement and income tax basis of assets and liabilities using the statutory marginal income tax rate in effect for the years in which the differences are expected to reverse. Deferred income tax expenses or credits are based on the changes in the deferred income tax assets or liabilities from period to period. We record a valuation allowance to reduce our deferred tax assets to the amount that we believe is more likely than not to be realized. In determining the need for, and amount of, a valuation allowance, we consider our ability to forecast earnings, future taxable income, carryback losses, if any, and we consider feasible tax planning strategies. We believe the estimate of our income tax assets, liabilities and expense are "critical accounting estimates" because if the actual income tax assets, liabilities and expenses differ from our estimates the outcome could have a material impact on our results of operations. Additional information regarding income taxes appears in Note 10, *Income Taxes*.

**Retirement benefits.** We provide postretirement benefits to certain employees. Employees in the United States are covered by a defined contribution plan. Our contributions to this plan are based on a percentage of employee contributions and, with approval of the Board of Directors, profit sharing contributions may be made as a percentage of employee compensation. These plans are funded on a current basis. We also have a Supplemental Executive Retirement Plan (SERP) in the United States that provides retirement, death and termination benefits, as defined, to certain key executives designated by the Board of Directors.

Certain employees outside the United States are covered by non-contributory defined benefit plans. The defined benefit plans are funded in conformity with applicable government regulations. Generally, benefits are based on age, years of service, and the level of compensation during the final years of service.

Effective June 30, 2007, we adopted SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans – an amendment of FASB Statements No. 87, 88, 106 and 132(R) ("SFAS No. 158"),* which requires that the consolidated balance sheets reflect the funded status of pension plans. In future reporting periods, the difference between actual amounts and estimates based on actuarial assumptions will be recognized in other comprehensive income or loss in the period in which they occur. These benefit plans are discussed further in Note 12, *Retirement Benefits*.

**Foreign Currency Translation.** The financial statements of subsidiaries located outside of the United States generally are measured using the local currency as the functional currency. Assets, including goodwill, and liabilities of these subsidiaries are translated at the rates of exchange at the balance sheet date. The resulting translation adjustments are included in accumulated other comprehensive income (loss). Income and expense items are translated at average monthly exchange rates. Gains and losses from foreign currency transactions of these subsidiaries are included in net income.

**Derivative Financial Instruments.** We are exposed to market risks arising from changes in interest rates, commodity prices and foreign currency exchange rates. We use derivatives in our management of interest rate and foreign currency exposure. We do not utilize derivatives that contain leverage features. On the date that we enter into a derivative that qualifies for hedge accounting, the derivative is designated as a hedge of the identified exposure. We document all relationships between hedging instruments and hedged

items and assess the effectiveness of our hedges at inception and on an ongoing basis.

For each derivative instrument that is designated and qualifies as a fair value hedge, the gain or loss on the derivative instrument as well as the offsetting loss or gain on the hedged item attributable to the hedged risk are recognized in current earnings during the period of the change in fair values. For each derivative instrument that is designated and qualifies as a cash flow hedge, the effective portion of the gain or loss on the derivative instrument is reported as a component of other comprehensive income and reclassified into earnings in the period during which the hedged transaction affects earnings. For derivatives that are designated and qualify as hedges of net investments in subsidiaries located outside the United States, the gain or loss is reported in other comprehensive income as a part of the cumulative translation adjustment if the derivative is effective. For derivative instruments not designated as hedging instruments, the gain or loss is recognized in current earnings during the period of change. For additional information regarding derivatives, see Note 15, *Derivatives*.

**Interest Rate Management.** In prior years, we had in place interest rate swaps, which were designated as fair value hedges of the underlying fixed rate obligations. The fair value of the interest rate swaps were recorded in other assets or other long-term liabilities with a corresponding increase or decrease in the fixed rate obligations. The changes in the fair value of the interest rate swaps and the underlying fixed rate obligations were recorded as equal and offsetting unrealized gains and losses in interest expense. As of June 30, 2006 all interest rates swaps were terminated in connection with the repurchase of the majority of our senior debt.  For additional information, see Note 6, *Long-Term Debt and Current Portion of Long-Term Debt.*

We also have an interest rate swap to effectively convert the interest on an operating lease from a variable to a fixed rate.  At the end of each reporting period, the discounted fair value of the interest rate swap is calculated.  The fair value is recorded as an asset or liability.  The effective gain or loss is recorded as a debit or credit to accumulated other comprehensive income and any ineffectiveness is recorded immediately to rent expense.  For additional information, see Note 15, *Derivatives*.

**Foreign Currency Management.** The fair value of foreign currency related derivatives is included in the Consolidated Balance Sheet in other current assets and accrued liabilities. The earnings impact of cash flow hedges relating to forecasted purchases of inventory is generally reported in cost of sales to match the underlying transaction being hedged. Unrealized gains and losses on these instruments are deferred in other comprehensive income until the underlying transaction is recognized in earnings. The earnings impact of cash flow hedges relating to the variability in cash flows associated with foreign currency denominated assets and liabilities is reported in cost of sales or other expense depending on the nature of the assets or liabilities being hedged. The amounts deferred in other comprehensive income associated with these instruments generally relate to spot-to-spot differentials from the date of designation until the hedged transaction takes place.

**Stock-Based Compensation.** Effective July 1, 2005, we adopted SFAS No. 123R, *Accounting for Stock-Based Compensation ("SFAS No. 123R")*, using the modified prospective method. Under SFAS No. 123R, our compensation expense is recognized based on the estimated fair value of stock options and similar equity instruments awarded to employees. Prior to fiscal 2006, we accounted for stock-based compensation according to the fair-value method of stock-based compensation per SFAS No. 123,

*Accounting for Stock-Based Compensation,* for all grants made on or after July 1, 2002. As such, an expense based on service attribution recognized in accordance with Financial Accounting Standards Interpretation ("FIN") No. 28, *Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans,* and the fair value of stock options granted since 2003 have been reflected in net income. Stock-based compensation is discussed further in Note 11, *Stock Option and Incentive Plan*.

**Recent Accounting Pronouncements.**

In February 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities*. The statement permits entities to choose to measure many financial instruments and certain warranty and insurance contracts at fair value on a contract-by-contract basis. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. We are currently assessing the impact of SFAS No. 159 on our consolidated financial statements upon adoption during fiscal 2009.

In September 2006, FASB issued SFAS No. 157, *Fair Value Measurements*. The statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles in the United States of America ("GAAP"), and enhances disclosures about fair value measurements. This statement applies when other accounting pronouncements require fair value measurements. It does not require new fair value measurements. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. We do not expect SFAS No. 157 to have a material impact on our consolidated financial statements upon adoption during fiscal 2009.

In September 2006, the SEC released SEC Staff Accounting Bulletin ("SAB") No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, which addresses how uncorrected errors in previous years should be considered when quantifying errors in current-year financial statements. SAB No. 108 requires registrants to consider the effect of all carry over and reversing effects of prior-year misstatements when quantifying errors in current-year financial statements. SAB No. 108 allows registrants to record the effects of adopting the guidance as a cumulative-effect adjustment to retained earnings. We adopted SAB No. 108 for the fiscal year ended June 30, 2007. The adoption of SAB No. 108 had no effect on our consolidated financial statements.

In September 2006, FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*. This statement requires an employer to recognize on its balance sheet the overfunded or underfunded status of a defined benefit postretirement plan measured as the difference between the fair value of plan assets and the benefit obligation. Employers must also recognize as a component of accumulated other comprehensive income, net of tax, the actuarial gains and losses and the prior service costs and credits that arise during the period. We adopted SFAS No. 158 at June 30, 2007 and have disclosed the impact on our consolidated financial statements in Note 12, *Retirement Benefits*.

In June 2006, the FASB issued FAS Interpretation No. 48, *"Accounting for Uncertainty in Income Taxes — An Interpretation of FASB Statement No. 109"* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in financial statements in accordance with FASB Statement

No. 109, "Accounting for Income Taxes." FIN 48 also prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. The provisions of FIN 48 are effective for fiscal years beginning after December 15, 2006. Only tax positions that meet the more-likely-than-not recognition threshold at the effective date may be recognized or continue to be recognized upon adoption of FIN 48. The cumulative effect of applying the provisions of FIN 48 should be reported as an adjustment to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that fiscal year. We will adopt FIN 48 effective July 1, 2007. The adoption of FIN 48 is not anticipated to have a significant impact on our consolidated financial statements.

On May 2, 2007, the FASB issued FASB Staff Position No. 48-1, *Definition of Settlement in FASB Interpretation No. 48* (FIN 48-1) which amends FIN 48, to provide guidance about how an enterprise should determine whether a tax position is effectively settled for the purpose of recognizing previously unrecognized tax benefits. Under FIN 48-1, a tax position is considered to be effectively settled if the taxing authority completed its examination, the enterprise does not plan to appeal, and it is remote that the taxing authority would reexamine the tax position in the future. We will adopt FIN 48-1 effective July 1, 2007. The adoption of FIN 48-1 is not anticipated to have a significant impact on our consolidated financial statements.

### Note 2 - Inventories

Inventories consist of the following:

|  | June 30, | |
| ($000s omitted) | 2007 | 2006 |
| Finished goods | $  235,736 | 147,663 |
| Work in process | 52,682 | 45,954 |
| Raw materials and supplies | 164,738 | 151,340 |
| *Total* | $  453,156 | 344,957 |

Inventories are stated at the lower of cost or market. Cost is determined principally by the first-in, first-out method. The valuation of inventory requires us to make judgments and estimates regarding obsolete, damaged or excess inventory as well as current and future demand for our products. The estimates of future demand along with analysis of usage data that we use in the valuation of inventory are the basis for our inventory reserves and have an effect on our results of operations. We calculate inventory reserves using a combination of lower of cost or market analysis, analysis of historical usage data, forecast demand data and historical disposal rates. Lower of cost or market analysis is typically applied to those items of inventory that represent a substantial portion of the total value of inventory on-hand. The high-value units typically represent a small percentage of the total inventory items, so identification of obsolescence or valuation reserve requirements for the balance of the inventory on-hand is accomplished using either historical or forecast usage to identify slow-moving or obsolete items.

### Note 3 - Property, Plant and Equipment

Property, plant and equipment are composed of the following:

| ($000s omitted) | | June 30, | |
|---|---|---|---|
| | | 2007 | 2006 |
| Land | $ | 14,738 | 11,737 |
| Buildings and improvements | | 269,968 | 244,960 |
| Machinery and equipment | | 905,293 | 764,969 |
| Furniture and fixtures | | 41,386 | 53,187 |
| | | 1,231,385 | 1,074,853 |
| Less accumulated depreciation and amortization | | (639,409) | (552,918) |
| *Property, plant and equipment, net* | $ | 591,976 | 521,935 |

### Note 4 - Goodwill

Goodwill was $403.7 million at June 30, 2007 compared with $381.2 million at June 30, 2006. The increase is primarily due to contingent consideration and deferred purchase price payments paid during fiscal 2007 associated with prior year acquisitions.  Currency translation also contributed to the increase. Our SFAS 142 annual impairment test concluded that goodwill was not impaired as of the test date, April 30, 2007.

In fiscal 2006, goodwill increased $36.1 million, which was mainly due to the acquisition of PhatNoise and our investment in a joint venture in Korea.  Contingent consideration associated with the acquisition of Innovation Systems in a prior fiscal year also contributed to the increase in goodwill.

### Note 5 - Short-Term Borrowings

At June 30, 2007, we had outstanding short-term borrowings of $1.8 million with a weighted average interest rate of 5.5 percent. The short-term borrowings were under unsecured lines of credit totaling $18.3 million in Japan, China and the United Kingdom. We had $1.8 million of outstanding short-term borrowings with a weighted average interest rate of 5.3 percent at June 30, 2006.

**Note 6 - Long-Term Debt and Current Portion of Long Term-Debt**

Long-term debt is comprised of the following:

| ($000s omitted) | | June 30, | |
|---|---|---|---|
| | | 2007 | 2006 |
| Senior notes, unsecured, due February 15, 2007 interest due semiannually at 7.125% | $ | --- | 13,168 |
| Senior notes, unsecured, due July 1, 2007 interest due semiannually at 7.32% | | 16,486 | 16,486 |
| Revolving credit facility | | 55,000 | 159,900 |
| Obligations under capital leases (note 7) | | 2,251 | 2,555 |
| Other unsubordinated variable rate loans due through 2016, bearing interest at an average effective rate of 5.00% at June 30, 2007 | | 953 | 3,694 |
| Total | | 74,690 | 195,803 |
| Less current installments | | (17,029) | (16,337) |
| *Long-term debt* | $ | 57,661 | 179,466 |

Our long-term debt at June 30, 2007, consisted of $55.0 million in borrowings under the revolving credit facility and $2.7 million of other obligations. Our current portion of long-term debt consisted of $16.5 million principal amount of 7.32 percent senior notes due July 1, 2007 and $0.5 million of other obligations.

During the fiscal year ended June 30, 2007, we purchased and retired $13.2 million of our 7.125 percent senior notes due February 2007 at an average premium of 0.718 percent, retiring the outstanding principal amount of $13.2 million and resulting in an other non-operating expense of $0.1 million.

We are a party to a $300 million multi-currency revolving credit facility with a group of banks. This facility expires in June 2010. The interest rate on the revolving rate facility is based upon LIBOR plus 37 to 90 basis points and we pay a commitment fee of 8 to 22.5 basis points. The interest rate spread and commitment fee are determined based upon our interest coverage ratio and senior unsecured debt rating. At June 30, 2007, we had $55.0 million in borrowings under the revolving credit facility and outstanding letters of credit of $5.6 million.

Our long-term debt agreements contain financial and other covenants that, among other things, limit our ability to incur additional indebtedness, restrict subsidiary dividends and distributions, limit our ability to encumber certain assets and restrict our ability to issue capital stock of our subsidiaries. Our long-term debt agreements permit us to pay dividends or repurchase our capital stock without any dollar limitation provided that we would be in compliance with the financial covenants in our revolving credit facility after giving effect to such dividend or repurchase. At June 30, 2007 and 2006, we were in compliance with the terms of our long-term debt agreements.

Weighted average borrowings were $170.2 million, $342.0 million and $340.3 million for fiscal years ended June 30, 2007, 2006 and 2005, respectively. The weighted average interest rate was 5.6 percent, 7.4 percent and 5.3 percent in fiscal 2007, 2006 and 2005, respectively. Our average interest rates fluctuate primarily due to changes in the U.S. Dollar denominated short-term LIBOR base rates. The majority of our interest expense is linked to the U.S. Dollar short-term LIBOR rates.

Interest expense is reported net of interest income in our consolidated statement of operations. Gross interest expense was $9.6 million, $25.2 million and $18.1 million for the fiscal years ended June 30, 2007, 2006 and 2005 respectively. Interest income was $8.1 million, $12.2 million and $7.6 million for the fiscal years ended June 30, 2007, 2006 and 2005.

Cash paid for interest, net of cash received, was $2.5 million, $18.8 million, and $10.2 million during the fiscal years ended June 30, 2007, 2006 and 2005, respectively.

Long-term debt, including obligations under capital leases, maturing in each of the next five fiscal years is as follows ($000s omitted):

| | | |
|---|---|---:|
| 2008 | $ | 17,029 |
| 2009 | | 567 |
| 2010 | | 55,591 |
| 2011 | | 508 |
| 2012 | | 516 |
| Thereafter | | 479 |

## Note 7 - Leases

The following analysis represents property under capital leases:

| | June 30, | |
|---|---|---|
| ($000s omitted) | 2007 | 2006 |
| Capital lease assets | $  6,982 | 6,680 |
| Less accumulated amortization | (4,629) | (4,151) |
| *Net* | $  2,353 | 2,529 |

At June 30, 2007, we are obligated for the following minimum lease commitments under terms of noncancelable lease agreements:

| ($000s omitted) | Capital leases | Operating leases |
|---|---|---|
| 2008 | $  533 | $  43,517 |
| 2009 | 524 | 40,913 |
| 2010 | 527 | 38,511 |
| 2011 | 421 | 23,879 |
| 2012 | 411 | 19,198 |
| Thereafter | --- | 22,698 |
| Total minimum lease payments | 2,416 | $  188,716 |
| Less interest | (165) | |
| *Present value of minimum lease payments* | $  2,251 | |

Operating lease expense for the year ended June 30, 2007 was $44.3 million and operating lease expense was $42.0 million and $50.1 million for each of the fiscal years ended June 30, 2006 and 2005, respectively.

### Note 8 - Fair Value of Financial Instruments

The estimated fair value of our financial instruments was determined using market information and valuation methodologies. In the measurement of the fair value of certain financial instruments, quoted market prices were unavailable and other valuation techniques were utilized. These derived fair value estimates are significantly affected by the assumptions used.

The fair values of cash and cash equivalents, investments, receivables, accounts payable, accrued liabilities and short-term borrowings approximate their carrying values due to the short-term nature of these items.

Fair values of long-term debt are based on market prices where available. When quoted market prices are not available, fair values are estimated using discounted cash flow analysis, based on our current incremental borrowing rates for similar types of borrowing arrangements.

The fair value of long-term debt approximates the carrying value at June 30, 2007.

### Note 9 - Warranty Liabilities

Details of the estimated warranty liability are as follows:

| ($000s omitted) | Years Ended June 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| Beginning balance | $ 60,768 | 48,582 |
| Warranty provisions | 49,148 | 55,925 |
| Warranty payments (cash or in-kind) | (61,768) | (43,739) |
| *Ending balance* | $ 48,148 | 60,768 |

The warranty liabilities are included in accrued liabilities.

*Note 10 - Income Taxes*

The tax provisions and analysis of effective income tax rates are comprised of the following items:

| ($000s omitted) | | Years Ended June 30, | | |
|---|---|---|---|---|
| | | 2007 | 2006 | 2005 |
| Provision for Federal income taxes before credits at statutory rate | $ | 133,772 | 131,665 | 117,368 |
| State income taxes | | 260 | 211 | 984 |
| Difference between Federal statutory rate and foreign effective rate | | (1,305) | (2,401) | (8,551) |
| Dividend repatriation | | --- | 3,350 | --- |
| IRS settlement | | --- | (1,081) | --- |
| Permanent differences | | (330) | (524) | (4,224) |
| Tax benefit from export sales | | (1,338) | (2,186) | (2,116) |
| Change in valuation allowance | | --- | 61 | 544 |
| Change in other tax liabilities | | (1,712) | (2,611) | (2,210) |
| Reduction in deferred asset due to tax rate changes in foreign jurisdiction | | --- | --- | 3,429 |
| Difference between Federal and financial accounting for incentive stock option grants | | 432 | 853 | 895 |
| Federal income tax credits | | (59,750) | (5,168) | (3,600) |
| Other | | 157 | (292) | (30) |
| *Total* | $ | 70,186 | 121,877 | 102,489 |

We recorded a net increase in the deferred tax asset for foreign income tax credits. Income tax expense consists of the following:

| ($000s omitted) | | Years Ended June 30, | | |
|---|---|---|---|---|
| | | 2007 | 2006 | 2005 |
| Current: | | | | |
| Federal | $ | 3,991 | (3,692) | 5,226 |
| State | | 400 | 325 | 275 |
| Foreign | | 107,818 | 134,610 | 104,658 |
| | | 112,209 | 131,243 | 110,159 |
| Deferred: | | | | |
| Federal | | (43,913) | (47,105) | (80,183) |
| State | | --- | --- | 709 |
| Foreign | | (8,566) | (7,754) | (2,302) |
| | | (52,479) | (54,859) | (81,776) |
| Charge in lieu of taxes attributable to tax benefit from employee stock options | | 10,456 | 45,493 | 74,106 |
| *Total* | $ | 70,186 | 121,877 | 102,489 |

Deferred taxes are recorded based upon differences between the financial statement and tax basis of assets and liabilities and available tax loss and credit carryforwards.

The following deferred taxes are recorded:

Assets/(liabilities)

| ($000s omitted) | | June 30, | |
|---|---|---|---|
| | | 2007 | 2006 |
| Federal net operating loss carryforwards | $ | --- | 31,087 |
| Federal tax credits | | 206,110 | 26,515 |
| Inventory costing differences | | 8,816 | 8,350 |
| Capitalized research and development | | 52,925 | 45,659 |
| Foreign tax loss and credit carryforwards | | 23,475 | 13,727 |
| Non-qualified stock options – GAAP deductions | | 12,075 | 10,441 |
| Valuations and other allowances | | 64,014 | 63,550 |
| Total gross deferred tax asset | $ | 367,415 | 199,329 |
| Less valuation allowance | | (110,765) | (3,674) |
| Deferred tax asset | $ | 256,650 | 195,655 |
| Total gross deferred tax liability from fixed asset depreciation | $ | (8,545) | (7,327) |
| Foreign statutory accounting including royalty payments | | (18,907) | (15,148) |
| Total gross deferred tax liability | $ | (27,451) | (22,475) |
| Net deferred tax asset | $ | 229,199 | 173,180 |

We have Federal research credit, alternative minimum tax credit and foreign income tax credit carryforwards valued at $20.9 million, $1.4 million and $183.7 million, respectively. The research credit carryforward will begin to expire in 2021. The alternative minimum tax credit does not expire. The foreign tax credit will begin to expire in 2013. A $98.6 million valuation allowance has been recorded for U. S. Federal foreign tax credits. Additionally, we have an Austrian net operating loss carryforward valued at $5.3 million that will not expire and other foreign tax loss carryforwards before valuation allowance of $18.2 million that begin to expire in 2009. A valuation allowance has been established for certain of the foreign net operating loss carryforwards. Management believes the results of future operations will generate sufficient taxable income to realize the net deferred tax asset.

During the fourth quarter of fiscal 2007, we changed our accounting for U.S. foreign tax credits. Previously, we did not record the tax benefit of U.S. foreign tax credits resulting from German income tax. We have changed our position because recent case law has provided a probable degree of certainty regarding the treatment of these foreign tax credits. We have amended previously filed U.S. Federal income tax returns to claim foreign tax credits for German income tax for which our company is legally liable. The tax years that were amended are 2003 through 2006. For fiscal years 2008 and beyond, the Internal Revenue Service has issued proposed regulations that will preclude taxpayers from claiming foreign tax credits using the same methodology. We intend to follow the proposed regulations.

We have not provided U.S. Federal or foreign withholding taxes on foreign subsidiary undistributed earnings as of June 30, 2007, because these foreign earnings are intended to be permanently reinvested. The U.S. Federal income tax liability, if any, that would be payable if such earnings were not permanently reinvested would not be material.

Cash paid for Federal, state and foreign income taxes were $144.7 million, $135.7 million and $130.3 million, during fiscal years ended June 30, 2007, 2006 and 2005, respectively.

Accrued income taxes payable was $90.1 million and $116.5 million as of June 30, 2007 and 2006, respectively. The deferred tax asset is recorded in other current assets and other assets on the balance sheet.

During the fiscal year ended June 30, 2007, we generated income before income taxes of $29.1 million from our operations in the United States and $353.1 million from our international operations.

*Note 11 - Stock Option and Incentive Plan*

On June 30, 2007, we had one share-based compensation plan with shares available for future grants, the 2002 Option Plan, which is described below. The compensation expense for share-based compensation was $15.4 million, $16.6 million and $14.3 million for the years ended June 30, 2007, 2006 and 2005, respectively. The total income tax benefit recognized in the income statement for share-based compensation arrangements was $4.5 million, $4.8 million and $4.1 million for the years ended June 30, 2007, 2006 and 2005, respectively.

*Option Plan*

Our 2002 Option Plan permits the grant of stock options, stock appreciation rights, restricted stock and restricted stock units for up to 6,000,000 shares of our common stock. In 2006, the company's Board of Directors approved amendments to the 2002 Plan. The amendments provide for the issuance of restricted stock units under the 2002 Plan, to reduce the number of options granted annually to non-management directors from a maximum of 9,000 to a fixed number of 5,000 and increase the initial one-time grant of options to new non-management directors from 6,000 to 8,000.

Shares may be issued as original issuances, treasury shares or a combination of both. We believe that such awards better align the interests of our employees with those of our stockholders. Option awards are granted with an exercise price equal to the market price of our stock on the date of the grant. The option awards generally vest over five years of continuous service commencing one year from the date of the grant and expire after ten years. At June 30, 2007, a total of 3,556,023 shares of common stock were available for grant under the 2002 Plan.

A grant of restricted stock involves the immediate transfer of ownership of a specified number of shares of common stock with a "substantial risk of forfeiture" for a period of at least three years. A participant who receives a restricted stock grant is entitled immediately to voting, dividend and other share ownership rights associated with the underlying shares of common stock. At June 30, 2007, a total of 12,000 shares of restricted stock were outstanding under the 2002 Plan.

A grant of restricted stock units involves an agreement by the company to deliver a specified number of shares of common stock or cash to the participant when the award vests. A participant has no ownership or voting rights associated with the underlying shares of common stock. The Board may, at its discretion, authorize the payment of dividend equivalents on the restricted stock units. At June 30, 2007, a total of 25,000 restricted stock units were outstanding under the 2002 Plan.

Stock appreciation rights allow the holders to receive a predetermined percentage of the spread between the option price and the fair market value of the shares on the date of exercise. A performance unit is the equivalent of $100 and is awarded for the achievement of specified management objectives as a condition

to the payment of the award. The performance period will not be less than three years. No stock appreciation right or performance unit grants have been made under the 2002 Plan.

We also have options outstanding under our 1992 Plan. Shares under the 1992 Plan can be issued as original issuances or treasury shares or a combination of both. Options to purchase 1,275,888 shares with expiration dates ranging from November 10, 2007 to November 8, 2012 are outstanding under our 1992 Plan. The 1992 Plan was approved by our stockholders and had no shares available for grant on June 30, 2007.

*Adoption of SFAS No. 123R*

Effective July 1, 2005, we adopted SFAS No. 123R using the modified prospective method. Under SFAS No. 123R, our compensation expense is recognized based on the estimated fair value of stock options and similar equity instruments awarded to employees. The effect of adopting SFAS No. 123R was not material to our income from continuing operations and net income for the year ended June 30, 2006, and the cumulative effect of adoption using the modified-prospective method was similarly not material. Prior to fiscal 2006, we recorded compensation expense associated with stock options in accordance with SFAS No. 123 since July 1, 2002. The primary impact of SFAS No. 123R was on our disclosures and certain calculations as we now are required to use estimated forfeitures rather than actual forfeitures as we had prior to the adoption of SFAS No. 123R.

Prior to the adoption of SFAS No. 123R, we presented all tax benefits of deductions resulting from the exercise of stock options as operating cash flows in the consolidated statements of cash flows. SFAS No. 123R requires the cash flows related to tax benefits resulting from tax deductions in excess of the compensation cost recognized for those options (excess tax benefits) to be classified as financing cash flows. Accordingly, we have classified $10.5 million and $45.5 million excess tax benefit realized in the years ended June 30, 2007 and 2006, respectively, as cash flow from financing activity in the accompanying consolidated statements of cash flows.

FASB issued FSP No. FAS 123R-3, *Transition Election Related to Accounting for Tax Effects of Share-Based Payment Awards*, on November 10, 2005. We elected to adopt the alternative transition method provided in the FASB Staff Position for calculating the tax effects of stock-based compensation pursuant to SFAS No. 123R. The alternative transition method includes simplified methods to establish the beginning balance of the additional paid-in capital pool ("APIC pool") related to the tax effects of employee stock-based compensation, and to determine the subsequent impact on the APIC pool and consolidated statements of cash flows of the tax effects of employee stock-based compensation awards that are outstanding upon adoption of SFAS No. 123R.

*Fair Value Determination*

The fair value of each option award is estimated on the date of grant using the Black-Scholes option valuation model, which uses the assumptions noted in the following table.

| | Years ended June 30, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Expected volatility | 34.2% - 42.0% | 35.0% - 43.0% | 41.0% |
| Weighted-average volatility | 36.2% | 38.7% | 41.0% |
| Expected annual dividend | $0.05 | $0.05 | $0.05 |
| Expected term (in years) | 1.42 - 7.69 | 1.90 - 8.33 | 6.13 |
| Risk-free rate | 4.43% - 4.97% | 4.05% - 5.24% | 3.69% |

Groups of option holders (directors, executives and non-executives) that have similar historical behavior are considered separately for valuation purposes. Expected volatilities are based on historical closing prices of our common stock over the expected option term. We use historical data to estimate option exercises and employee terminations within the valuation model. The expected term of options granted is derived using the option valuation model and represents the estimated period of time from the date of grant that the option is expected to remain outstanding. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

*Stock Option Activity*

A summary of option activity under our stock option plans as of June 30, 2007 and changes during the year is presented below:

| | Shares | Weighted average exercise price | Weighted average remaining contractual term(years) | Aggregate intrinsic value ($000s) |
| --- | --- | --- | --- | --- |
| Outstanding at | | | | |
| July 1, 2006 | 3,299,720 | $    47.04 | | |
| Granted | 793,250 | 104.17 | | |
| Exercised | (687,992) | 38.53 | | |
| Forfeited or expired | (190,740) | 78.24 | | |
| Outstanding at | | | | |
| June 30, 2007 | 3,214,238 | 61.11 | 6.41 | $181,135 |
| Exercisable at | | | | |
| June 30, 2007 | 1,519,408 | $    31.76 | 4.31 | $129,321 |

The weighted-average grant-date fair value of options granted during the years ended June 30, 2007, 2006 and 2005 was $31.61, $31.87 and $45.49, respectively. The total intrinsic value of options exercised during the years ended June 30, 2007, 2006 and 2005 was $42.9 million, $147.2 million and $231.7 million, respectively.

A summary of the status of our nonvested restricted stock as of June 30, 2007 and changes during the year ended June 30, 2007, is presented as follows:

|  | Shares | Weighted average grant-date fair value |
|---|---|---|
| Nonvested at July 1, 2006 | 37,000 | $85.36 |
| Granted | --- | --- |
| Vested | --- | --- |
| Forfeited | (25,000) | 86.98 |
| Nonvested at June 30, 2007 | 12,000 | $82.00 |

As of June 30, 2007, there was $0.3 million of total unrecognized compensation cost related to nonvested restricted stock-based compensation arrangements granted under the plan. The weighted average recognition period is 1.13 years. No restricted stock vested in the years ended June 30, 2007, 2006 and 2005.

During fiscal 2007, 25,000 restricted stock units were granted with a zero-value exercise price and an aggregate intrinsic value of $2.9 million. As of June 30, 2007, there was $1.3 million of total unrecognized compensation cost related to restricted stock unit compensation arrangements granted under the 2002 Plan. The weighted average recognition period is 2.26 years. No restricted stock units vested or were exercisable in fiscal 2007.

*Pro Forma Disclosure*

We adopted SFAS No. 123R in July 2005 and SFAS No. 123 in July 2002. Prior to fiscal 2003, we accounted for expense under the stock option plans according to the provisions of APB No. 25 and related interpretations. During fiscal 2004 and 2005 under SFAS No. 123, options granted in fiscal years prior to fiscal 2003 were accounted for using the intrinsic value method as described in APB No. 25, *Accounting for Stock Issued to Employees.* The following table illustrates the effect on net income and earnings per share if we had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock Based Compensation*, to all of our outstanding and unvested awards in fiscal 2005.

For fiscal 2007 and 2006 we expensed all options under SFAS No. 123R.

| ($000s omitted except per share amounts) | | Year Ended June 30, 2005 |
|---|---|---|
| Reported net income | $ | 232,848 |
| Add:  Stock based employee compensation expense included in reported net income, net of tax | | 10,345 |
| Deduct:  Total stock-based employee compensation expense determined under fair value based method for all awards, net of tax | | 11,449 |
| Net income, pro forma | $ | 231,744 |
| Basic earning per share, as reported | $ | 3.47 |
| Basic earnings per share, pro forma | | 3.45 |
| Diluted earnings per share, as reported | $ | 3.31 |
| Diluted earnings per share, pro forma | | 3.29 |

## Note 12 – Retirement Benefits

### Plan Descriptions

*Retirement savings plan.* We provide a Retirement Savings Plan for certain employees in the United States. Under the plan, employees may contribute up to 50 percent of their pretax compensation subject to certain limitations. Each business unit will make a safe harbor non-elective contribution in an amount equal to three percent of a participant's eligible contribution. Upon approval of the Board of Directors, each business unit may make a matching contribution of up to three percent (50 percent on the first six percent of an employee's tax-deferred contribution) and a profit sharing contribution. Matching and profit sharing contributions vest at a rate of 25 percent for each year of service with the employer, beginning with the second year of service. Expenses related to the Retirement Savings Plan for the years ended June 30, 2007, 2006 and 2005 were $15.1 million, $13.3 million and $11.6 million, respectively.

*Pension benefits.* We provide defined pension benefits to certain eligible employees. The measurement date used for determining pension benefits is the last day of our fiscal year-end, June 30. We have certain business units in Europe that maintain defined benefit pension plans for many of our current and former employees. The coverage provided and the extent to which the retirees' share in the cost of the program vary by business unit. Generally, plan benefits are based on age, years of service, and average compensation during the final years of service. In the United States, we have a Supplemental Executive Retirement Plan ("SERP") that provides retirement, death and termination benefits, as defined, to certain key executives designated by the Board of Directors. Our expenses related to the SERP for the years ended June 30, 2007, 2006 and 2005 were $6.7 million, $6.5 million and $6.3 million, respectively.

During fiscal 2008, we expect to contribute an immaterial amount to the defined benefit pension plans. The benefits that we expect to pay in each fiscal year from 2008 to 2012 are $6.8 million, $6.9 million, $7.1 million, $7.7 million and $8.6 million, respectively. The aggregate benefits we expect to pay in the five fiscal years from 2013 to 2017 are $45.0 million.

*Summary Plan Results*

The following is a reconciliation of the benefit obligations, plan assets and funded status of the plans as well as the amounts recognized on the balance sheet:

| ($000s omitted) | | Years ended June 30, | |
|---|---|---|---|
| | | 2007 | 2006 |
| Change in benefit obligation: | | | |
| Benefit obligation at beginning of year | $ | 104,059 | 93,646 |
| Service cost | | 3,292 | 2,679 |
| Interest cost | | 6,010 | 4,354 |
| Amendments | | 12,950 | 2,380 |
| Actuarial gain | | (5,245) | (2,446) |
| Asset transfer | | --- | 3,423 |
| Benefits paid | | (4,233) | (2,731) |
| Foreign currency exchange rate changes | | 3,225 | 2,754 |
| Benefit obligation at end of year | $ | 120,058 | 104,059 |
| Change in plan assets: | | | |
| Fair value of assets at beginning of year | $ | --- | 387 |
| Asset transfer | | --- | (409) |
| Employer contributions | | 1,680 | 1,037 |
| Benefits paid | | (1,680) | (1,037) |
| Foreign currency exchange rate changes | | --- | 22 |
| Fair value of assets at end of year | $ | --- | --- |
| Reconciliation of funded status: | | | |
| Funded status | $ | (120,058) | (104,059) |
| Unrecognized prior service cost | | 7,484 | 7,100 |
| Unrecognized net loss | | 16,591 | 22,895 |
| Accrued pension cost | $ | (95,983) | (74,064) |
| Amounts recognized on the balance sheet: | | | |
| Other assets | $ | --- | 7,100 |
| Accrued liabilities | | (9,229) | (51,480) |
| Other non-current liabilities | | (110,829) | (47,853) |
| Accumulated other comprehensive loss | | 24,075 | 18,169 |
| Accrued pension cost | $ | (95,983) | (74,064) |

Presented below are the components of net periodic benefit costs:

| | | Years ending June 30, | | |
|---|---|---|---|---|
| ($000s omitted) | | 2007 | 2006 | 2005 |
| Components of net periodic benefit cost: | | | | |
| Service cost | $ | 3,292 | 2,679 | 2,683 |
| Interest cost | | 6,010 | 4,354 | 4,403 |
| Amortization of prior service cost | | 887 | 728 | 17 |
| Amortization of net loss | | 2,147 | 2,003 | 1,884 |
| Net periodic benefit cost | $ | 12,336 | 9,764 | 8,987 |

*Adoption of SFAS No. 158*

Effective June 30, 2007, we adopted SFAS No. 158, which requires that the consolidated balance sheets reflect the funded status of the pension plans. The funded status of the plans is measured as the difference between the plan assets at fair value and the projected benefit obligation. We have recognized the aggregate of all underfunded plans in either accrued liabilities or other non-current liabilities. The portion of the amount by which the actuarial present value of benefits included in the projected benefit obligation exceeds the fair value of plan assets, payable in the next 12 months, is reflected in accrued liabilities.

At June 30, 2007, previously unrecognized differences between actual amounts and estimates based on actuarial assumptions are included in accumulated other comprehensive loss in our consolidated balance sheets as required by SFAS No. 158. In future reporting periods, the difference between actual amounts and estimates based on actuarial assumptions will be recognized in other comprehensive income or loss in the period in which they occur.

The following table shows the incremental effect of applying SFAS No. 158 on individual line items in the consolidated balance sheet at June 30, 2007:

| ($000s omitted) | Before application of SFAS No. 158 | Adjustments | After application of SFAS No. 158 |
|---|---|---|---|
| Incremental impact of applying SFAS No. 158 | | | |
| Other assets | $ 15,432 | (3,777) | 11,655 |
| Total assets | 15,432 | (3,777) | 11,655 |
| | | | |
| Accrued liabilities | 101,589 | (92,360) | 9,229 |
| Other non-current liabilities | 14,993 | 95,836 | 110,829 |
| Total liabilities | 116,582 | 3,476 | 120,058 |
| | | | |
| Accumulated other comprehensive income (loss) | (8,525) | (7,253) | (15,778) |
| Total shareholders' equity | (8,525) | (7,253) | (15,778) |

Amounts recognized in accumulated other comprehensive loss at June 30, 2007 are as follows:

|  | ($000s omitted) |
|---|---|
| Amounts recorded in accumulated other comprehensive loss | |
| Prior service cost (credit) | $    7,484 |
| Net actuarial loss (gain) | 16,591 |
|  | 24,075 |
| Income tax benefits related to above items | (8,297) |
| Total recognized in accumulated other comprehensive loss | $   15,778 |

The estimated amount that will be amortized from accumulated other comprehensive loss into net periodic benefit cost in fiscal 2008 is as follows:

|  | ($000s omitted) |
|---|---|
| Amounts expected to be recognized in net periodic benefit cost | |
| Recognized net actuarial loss (gain) | $    1,775 |
| Amortization of prior service cost (credit) | 529 |
| Total | $    2,304 |

Amounts for pension plans with accumulated benefit obligations in excess of fair value of plan assets are as follows:

| ($000s omitted) | Years ended June 30, | |
|---|---|---|
|  | 2007 | 2006 |
| Projected benefit obligation | $   120,058 | 104,059 |
| Accumulated benefit obligation | 66,624 | 99,321 |

*Plan Assumptions*

The following table presents the assumptions used to determine our benefit obligations and net periodic pension and other postretirement benefit costs:

|  | June 30, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Assumptions: | | | |
| Weighted average rates used to determine benefit obligations at June 30: | | | |
| Range of discount rates for pension plans | 4.75% to 6.15% | 4.60% to 6.25% | 4.20% to 5.10% |
| Range of rates of compensation increase for pension plans | 2.0% to 4.0% | 2.0% to 4.0% | 2.0% to 4.0% |
| Weighted average rates used to determine net periodic benefit cost at June 30: | | | |
| Range of discount rates for pension plans | 4.75% to 6.25% | 4.60% to 5.10% | 4.20% to 6.15% |
| Expected long-term return on plan assets | 6.0% | 5.5% | 5.5% |
| Range of rates of compensation increase for pension plans | 2.0% to 4.0% | 2.0% to 4.0% | 2.0% to 4.0% |

We rely on historical long-term rates of return by asset class, the current long-term U.S. Treasury bond rate, and the current and expected asset allocation strategy to determine the expected long-term rate of return assumptions. The discount rate used for our European pension benefits are primarily based on yields for German federal bonds and Euro denominated bonds provided by Deutsche Bundesbank. The discount rate was also derived based on the anticipated cash flow of the plan and the spot yields on corporate bonds published in the Citigroup Pension Liability Index as of June 30, 2007. The rates used represent the single discount rate equal to the yield on a bond portfolio constructed to settle the plan's cash flows, or to use a method that approximates the yield on such a portfolio and that does not yield a materially different result.

### Note 13 – Business Segment Data

We design, manufacture and market high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets. We organize our businesses into reporting segments by the end-user markets served. Our chief operating decision maker evaluates performance and allocates resources based on net sales, operating income and working capital in each of the reporting segments. We report on the basis of three segments: Automotive, Consumer and Professional.

Our Automotive segment designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications primarily to be installed as original equipment by automotive manufacturers. Our automotive products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Becker, Logic 7 and Mark Levinson. Our premium branded audio, video, navigation and infotainment systems are offered to automobile manufacturers through engineering and supply agreements.

Net sales to DaimlerChrysler accounted for approximately 25.0 percent, 24.9 percent and 25.5 percent of consolidated net sales for the years ended June 30, 2007, 2006 and 2005, respectively. Accounts receivable due from DaimlerChrysler accounted for 19.2 percent and 19.5 percent of total consolidated accounts receivable at June 30, 2007 and 2006, respectively.

Our Consumer segment designs, manufactures and markets audio, video and electronic systems for home, computer and multimedia applications. Our Consumer home products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Lexicon, Mark Levinson and Revel. Our audio and electronic products are offered through audio/video specialty and retail chain stores. Our branded audio products for computer and multimedia applications are focused on retail customers with products designed to enhance sound for computers, Apple's iPod and other music control players.

The Professional segment designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, airports and other buildings and for recording, broadcast, cinema and music reproduction applications. Our Professional products are marketed worldwide under brand names including JBL Professional, AKG, Crown, Soundcraft, Lexicon, DigiTech, dbx and Studer. We provide high-quality products to the sound reinforcement, music instrument support and broadcast and recording segments of the professional audio market. We offer complete systems solutions for professional installations and users around the world.

The following table reports net sales, operating income (loss), assets, goodwill, capital expenditures and depreciation and amortization by each reporting segment:

| ($000s omitted) | | Years Ended June 30, | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| **Net sales:** | | | |
| Automotive | $ 2,492,815 | 2,237,632 | 2,127,682 |
| Consumer | 497,673 | 492,977 | 416,231 |
| Professional | 560,656 | 517,288 | 486,976 |
| Total | $ 3,551,144 | 3,247,897 | 3,030,889 |
| **Operating income (loss):** | | | |
| Automotive | $ 340,116 | 336,795 | 347,834 |
| Consumer | 13,587 | 50,813 | 26,958 |
| Professional | 80,968 | 59,278 | 45,498 |
| Other | (48,284) | (49,645) | (69,309) |
| Total | $ 386,387 | 397,241 | 350,981 |
| **Assets:** | | | |
| Automotive | $ 1,549,032 | 1,471,755 | 1,464,247 |
| Consumer | 291,370 | 262,136 | 215,178 |
| Professional | 310,966 | 291,155 | 250,931 |
| Other | 357,500 | 350,706 | 271,627 |
| Total | $ 2,508,868 | 2,375,752 | 2,201,983 |
| **Goodwill:** | | | |
| Automotive | $ 336,043 | 315,148 | 284,344 |
| Consumer | 21,958 | 21,882 | 17,133 |
| Professional | 45,748 | 44,189 | 43,594 |
| Total | $ 403,749 | 381,219 | 345,071 |
| **Capital expenditures:** | | | |
| Automotive | $ 150,385 | 105,777 | 138,485 |
| Consumer | 9,178 | 8,316 | 7,925 |
| Professional | 13,669 | 15,492 | 24,035 |
| Other | 1,562 | 963 | 1,881 |
| Total | $ 174,794 | 130,548 | 172,326 |
| **Depreciation and amortization:** | | | |
| Automotive | $ 98,103 | 100,872 | 89,015 |
| Consumer | 11,300 | 9,879 | 8,032 |
| Professional | 16,334 | 17,181 | 19,073 |
| Other | 1,425 | 2,017 | 2,545 |
| Total | $ 127,162 | 129,949 | 118,665 |

Other primarily includes activity related to our corporate accounts.

Below we present sales, long-lived assets and net assets by geographic area as of and for the years ended June 30, 2007, 2006 and 2005. Net sales are attributable to geographic areas based upon the location of the business unit executing the sale.

|  | | Years Ended June 30, | |
|---|---|---|---|
| ($000s omitted) | 2007 | 2006 | 2005 |
| Net sales: | | | |
| U.S. | $ 759,159 | 708,564 | 633,780 |
| Germany | 1,590,886 | 1,415,871 | 1,335,720 |
| Other Europe | 631,514 | 578,401 | 573,133 |
| Other | 569,585 | 545,061 | 488,256 |
| Total | $ 3,551,144 | 3,247,897 | 3,030,889 |
| | | | |
| Long-lived assets: | | | |
| U.S. | $ 490,069 | 383,406 | 303,806 |
| Germany | 485,222 | 444,063 | 412,979 |
| Other Europe | 125,474 | 113,288 | 118,651 |
| Other | 174,950 | 164,547 | 168,474 |
| Total | $ 1,275,915 | 1,105,304 | 1,003,910 |
| | | | |
| Net Assets | | | |
| U.S. | $ 405,588 | 385,096 | 23,706 |
| Germany | 577,142 | 353,572 | 632,383 |
| Other Europe | 324,992 | 276,738 | 211,759 |
| Other | 186,319 | 212,758 | 193,100 |
| Total | $ 1,494,041 | 1,228,164 | 1,060,948 |

*Note 14 - Commitments and Contingencies*

On May 8, 2007, Helen Rodgers Living Trust filed a putative class action lawsuit against Harman and all of its directors in the Superior Court of the District of Columbia. The lawsuit purports to be brought on behalf of all common stockholders of Harman and alleges that Harman's directors breached their fiduciary duties to Harman stockholders by entering into the merger agreement. The original complaint alleged that the consideration to be offered to Harman stockholders under the merger agreement is "inadequate" and that the merger agreement "inequitably favors . . . insiders" of Harman. The complaint also alleged that the termination fee in the merger agreement was excessive, that Harman's directors purportedly would not "fairly and adequately" evaluate any alternative bids, and that the provision in the merger agreement that allowed Harman to solicit proposals for alternative bidders during a 50-day period ending in June 2007 was "illusory."

On June 20, 2007, Parent filed a registration statement on Form S-4 with the Securities and Exchange Commission that included a proxy statement/prospectus related to the proposed merger. Shortly thereafter, plaintiff filed its first amended complaint on June 29, 2007. While the first amended complaint continued to raise the allegations made in the original complaint, the new focus of plaintiff's case was that the merger agreement "inequitably favors . . . insiders" of Harman by allowing such insiders to exchange otherwise worthless "underwater" options (options with an exercise price over $120 per share) for Parent shares on a "one option for one Parent share basis," and by allowing them to separately negotiate with Parent for more favorable treatment of their options. The first amended complaint also alleged that the

disclosures contained in the proxy statement/prospectus were inadequate. Among other things, the first amended complaint sought to enjoin the merger and the conversion of the "underwater" options into Parent shares, as well as "declaratory judgments" that said "underwater" options may not participate in the merger election process and that Harman insiders may not separately negotiate with Parent "for the exchange of their [Harman] equity interests in the Acquisition." In addition, the first amended complaint sought, among other things, unspecified damages, an order rescinding the merger agreement and a declaration that Harman's directors have breached their fiduciary duties to Harman.

On June 29, 2007, plaintiff filed a motion for preliminary injunction. The motion sought to enjoin the conversion of the "underwater" options into Parent shares, and also sought to "unw[i]nd or otherwise cancel" the challenged options. In the motion, plaintiff did not seek to enjoin the stockholder vote or the merger itself. After defendants filed their opposition to the motion for preliminary injunction on July 23, 2007, plaintiff agreed to voluntarily withdraw its motion.

Thereafter, on August 15, 2007, plaintiff filed its second amended complaint, which substantially narrows plaintiff's claims by eliminating, among other things, the vast majority of its disclosure claims and the allegations relating to "underwater" options.

We believe the lawsuit is without merit and intend vigorously to defend against it.

At June 30, 2007, we were involved in several additional legal actions. The outcome of these legal actions cannot be predicted with certainty; however, management, based upon advice from legal counsel, believes such actions are either without merit or will not have a material adverse effect on our financial position or results of operations. In fiscal 2005, we recorded a $6 million liability for probable unasserted claims. There were no changes in the status of these claims at June 30, 2007. As such, this amount continues to be accrued at June 30, 2007.

At June 30, 2007, our Board of Directors has authorized the repurchase of a total of up to 20 million shares of common stock. Through June 30, 2007, we had acquired and placed in treasury a total of 18,198,082 shares of our common stock at a total cost of $639.6 million. We have suspended the share repurchase program due to the proposed merger with Parent. See Note 16, *Proposed Agreement and Plan of Merger*.

### Note 15 - Derivatives

We use foreign currency forward contracts to hedge a portion of our forecasted third-party and intercompany foreign-currency denominated expenditures. These forward contracts are designated as foreign currency cash flow hedges and recorded at fair value in the accompanying consolidated balance sheet with a corresponding entry to accumulated other comprehensive income (loss) until the underlying forecasted foreign currency transaction occurs.

When the transaction occurs, the gain or loss from the forward contract designated as a hedge of the transaction is reclassified from accumulated other comprehensive income (loss) to the same income statement line item in which the foreign currency gain or loss on the underlying hedged transaction is recorded. When it becomes apparent that an underlying forecasted transaction will not occur, the amount

recorded in accumulated other comprehensive income (loss) related to the hedge is reclassified to the miscellaneous, net line of the income statement in the then-current period.

Changes in the fair value of the forward contracts are highly effective in offsetting changes in the cash flows of the hedged items because the amounts and the maturities of the derivatives approximate those of the forecasted exposures. Any ineffective portion of the derivative is recognized in current earnings to the same income statement line item in which the foreign currency gain or loss on the underlying hedged transaction is recorded. When it has been determined that a hedge has become ineffective, the ineffective portion of the hedge is recorded in current earnings. For the fiscal years ended June 30, 2007, 2006 and 2005 we recognized no ineffectiveness.

We elected to exclude forward points from the effectiveness assessment. At the end of the period, we calculate the fair value relating to the change in forward points which is recorded to current earnings as other non-operating income. For the twelve months ended June 30, 2007, we recognized $0.4 million in net gains related to the change in forward points.

At June 30, 2007, we had forward contracts maturing through June 2008 to sell Euros and buy U.S. Dollars of approximately $70.0 million and through December 2007 to buy Canadian Dollars and sell U.S. Dollars of approximately $4.6 million to hedge future foreign currency purchases. At June 30, 2007, the amount associated with these hedges that is expected to be reclassified from accumulated other comprehensive income (loss) to earnings within the next twelve months is a loss of approximately $0.7 million. This amount also represents the fair market value of foreign currency forward contracts at June 30, 2007. In the twelve months ended June 30, 2007 we recognized approximately $4.0 million in net losses from cash flow hedges of forecasted foreign currency transactions compared to $6.1 million in net gains in the same period last year.

As of June 30, 2007, we had forward contracts maturing through September 2007 to purchase and sell the equivalent of $48.4 million of various currencies to hedge foreign currency denominated inter-company loans. At June 30, 2007, the fair value on these contracts was a net loss of $0.2 million. Adjustments to the carrying value of the foreign currency forward contracts offset the gains and losses on the underlying loans in other non-operating income.

In February 2007, we entered into an interest rate swap contract to effectively convert interest on an operating lease from a variable rate to a fixed rate. The objective of the swap is to offset changes in rent expenses caused by interest rate fluctuations. The interest rate swap is designated as a cash flow hedge.

At the end of each reporting period, the discounted fair value of the swap is calculated and recorded to other comprehensive income. The accrued but unpaid net interest on the swap is recorded in rent expense, which is included in selling, general and administrative expenses in our consolidated statement of operations.

If the interest rate swap is determined to be ineffective, the ineffective portion will be reclassified from other comprehensive income and recorded as rent expense. For the twelve months ended June 30, 2007, we recognized no ineffectiveness.

The notional amount of the swap was $27.4 million and the amount recorded in other comprehensive income was a gain of $0.6 million as of June 30, 2007.  The amount associated with the swap that is expected to be recorded as rent expense over the next twelve months is less than $0.1 million.

### Note 16 – Proposed Agreement  and Plan of Merger

On April 26, 2007, we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP.  The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent.  Completion of the transaction is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals.

### Note 17 - Investment in Joint Venture

In October 2005, we formed Harman Navis Inc., a joint venture located in Korea, to engage in the design and development of navigation systems for Asian markets. We evaluated the joint venture agreement under FIN No. 46R, *Consolidation of Variable Interest Entities*, and determined that the newly formed joint venture was a variable interest entity requiring consolidation. We own a 50 percent equity interest in the joint venture. We are not obligated to fund any joint venture losses. At June 30, 2007, the net assets of the joint venture were approximately $16 million. The minority interest is approximately $0.9 million. Our investment in this joint venture is not material to our consolidated financial statements.

*Note 18 - Earnings Per Share Information*

| ($000s omitted except per share amounts) | Years Ended June 30, | | | | | |
| | 2007 | | 2006 | | 2005 | |
| | Basic | Diluted | Basic | Diluted | Basic | Diluted |
| Net income | $ 313,963 | 313,963 | 255,295 | 255,295 | 232,848 | 232,848 |
| Shares of common stock outstanding | 65,310 | 65,310 | 66,260 | 66,260 | 67,120 | 67,120 |
| Employee stock options | --- | 1,139 | --- | 1,845 | --- | 3,279 |
| Total average equivalent shares | 65,310 | 66,449 | 66,260 | 68,105 | 67,120 | 70,399 |
| *Earnings per share* | $     4.81 | 4.72 | 3.85 | 3.75 | 3.47 | 3.31 |

Certain options were outstanding and not included in the computation of diluted net earnings per share because the assumed exercise of these options would have been antidilutive. Options to purchase 749,434 shares of our common stock with exercise prices ranging from $78.00 to $126.94 per share at June 30, 2007 were outstanding and not included in the computation of diluted earnings per share because the exercise of these options would have been antidilutive.

Options to purchase 867,808 shares of our common stock with exercise prices ranging from $75.22 to $126.94 per share were not included at June 30, 2006; options to purchase 385,275 shares with exercise prices ranges from $75.22 to $126.94 per share were not included at June 30, 2005, in each case because the exercise of these options would have been antidilutive.

*Note 19 - Quarterly Summary of Operations (unaudited)*

The following is a summary of operations by quarter for fiscal 2007 and 2006:

| ($000s omitted except per share amounts) | Three months ended | | | |
| Fiscal 2007 | September 30 | December 31 | March 31 | June 30 |
| Net sales | $     825,543 | 931,717 | 882,771 | 911,113 |
| Gross profit | $     287,289 | 319,638 | 305,375 | 298,904 |
| Net income | $     56,608 | 81,389 | 71,043 | 104,923 |
| Earnings per share – basic | $     0.86 | 1.25 | 1.09 | 1.61 |
| Earnings per share – diluted | $     0.85 | 1.22 | 1.07 | 1.58 |
| Fiscal 2006 | | | | |
| Net sales | $     754,648 | 832,645 | 801,487 | 859,117 |
| Gross profit | $     266,295 | 305,769 | 281,617 | 298,889 |
| Net income | $     53,967 | 72,535 | 64,026 | 64,767 |
| Earnings per share – basic | $     0.82 | 1.10 | 0.96 | 0.97 |
| Earnings per share – diluted | $     0.79 | 1.07 | 0.94 | 0.95 |

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures:*

Under the supervision and with the participation of our management, including our Executive Chairman, Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934) as of the end of the period covered by this Annual Report on Form 10-K. Based on that evaluation, our Executive Chairman, Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. We note that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving our stated goals under all potential future conditions.

*Change in Internal Control Over Financial Reporting:*

There has been no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) as promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934) during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

None.

# Part III

**Item 10. Directors, Executive Officers and Corporate Governance**

*Directors and Executive Officers*

Information required by Item 10 of Part III with respect to our executive officers is included in Part I, Item 4 of this report. Information required by Item 10 of Part III with respect to our directors is set forth below.

Sidney Harman, age 89, has been Executive Chairman of the Board since July 2000 and has served as Chairman of the Board and as a director of the company since the company's founding in 1980. Dr. Harman also served as Chief Executive Officer of the company from 1980 to 1998 and from January 1, 2007 to June 30, 2007. Dr. Harman served as Deputy Secretary of Commerce of the United States from 1977 through 1978. His current term as a director expires at the 2008 Annual Meeting of Stockholders.

Dinesh Paliwal, age 49, was elected as a director of the company on August 13, 2007. He began serving as President, Chief Executive Officer and Vice Chairman on July 1, 2007. Prior to joining our company, Mr. Paliwal served as President of Global Markets and Technology of ABB Ltd from January 2006 until June 2007 and he served as President and CEO of ABB North America from January 2004 until June 2007. He was President and CEO of ABB Automation from October 2002 to December 2005. His current term as a director expires at the 2009 Annual Meeting of Stockholders.

Shirley Mount Hufstedler, age 82, has been a director of the company since September 1986. Ms. Hufstedler has been in private law practice for more than 25 years. Since 1995, she has been with the law firm of Morrison & Foerster LLP. From 1981 to 1995, Ms. Hufstedler was with the firm of Hufstedler & Kaus. She served as Secretary of Education of the United States from 1979 to 1981 and as a judge on the United States Court of Appeals for the Ninth Circuit from 1968 to 1979. Ms. Hufstedler is Director Emeritus of Hewlett Packard Company. Her current term as a director expires at the 2008 Annual Meeting of Stockholders.

Ann McLaughlin Korologos, age 65, has been a director of the company since 1995. She served as Secretary of Labor of the United States from 1987 until 1989. Ms. Korologos is a director of AMR Corporation (and its subsidiary, American Airlines, Inc.), Host Hotels & Resorts, Inc., Kellogg Company and Vulcan Materials Company, a provider of construction aggregates. In April 2004, Ms. Korologos was elected Chairman of the RAND Corporation Board of Trustees. She is also a Chairman Emeritus of the Aspen Institute and previously served as a Senior Advisor to Benedetto, Gartland & Company, Inc. from 1996 to 2005. Her current term as a director expires at the 2007 Annual Meeting of Stockholders.

Edward H. Meyer, age 80, has been a director of the company since 1990. Mr. Meyer has served as Chairman, Chief Executive Officer and Chief Investment Officer of Ocean Road Advisors, Inc., an investment management company, since January 2007. Mr. Meyer also served as Chairman, Chief Executive Officer and President of Grey Global Group, Inc., a global advertising and marketing services company, from 1970 to 2006. Mr. Meyer also serves as a director of Ethan Allen Interiors Inc. and National CineMedia, Inc, an in-theater advertising company. His current term as a director expires at the 2009 Annual Meeting of Stockholders.

### *Section 16(a) Beneficial Ownership Reporting Compliance*

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our directors and executive officers and persons who beneficially own more than 10% of the our common stock to file initial reports of ownership and reports of changes in ownership with the Securities and Exchange Commission. Based solely on a review of the copies of such forms furnished to us and written representations from our directors and executive officers, we believe that all Section 16(a) filing requirements applicable to our directors and executive officers were complied with during fiscal 2007, except that each of Dr. Harman, Mr. Brown and Dr. Geiger inadvertently filed one late Form 4 related to an option grant on August 10, 2006; Mr. Schinagel filed one late Form 3 related to his appointment as an executive officer, on October 1, 2006, and one late Form 4 related to a grant of options and restricted share units on October 2, 2006; and Blake Augsburger inadvertently filed one late Form 3 related to his appointment as an executive officer on November 2, 2006.

*Corporate Governance*

The information required by Item 10 of Part III with respect to our Code of Ethics for Executive and Financial Officers and Directors is posted on our website at www.harman.com in the Investor Relations section under "Corporate Governance – Code of Ethics for Senior Management and the Board." We will post information regarding any amendment to, or waiver from, our Code of Ethics for Executive and Financial Officers and Directors on our website in the Investor Relations section under Corporate Governance.

The Audit Committee currently consists of Ms. Hufstedler (Chairwoman), Ms. Korologos and Mr. Meyer. During fiscal year 2007, the Audit Committee held seven meetings. The Board has determined that each of the members of the Audit Committee is independent under the New York Stock Exchange listing standards and each is financially literate and experienced in financial matters. The Board has also determined that Ms. Hufstedler is an "audit committee financial expert" within the meaning of applicable Securities and Exchange Commission regulations. In making its determination, the Board considered Ms. Hufstedler's knowledge of, and experience with, financial and accounting matters gained through serving as Chair of the Audit Committee and as a member of boards and audit committees of other public companies, as well as her experience in such matters as a practicing attorney, as a judge in both California state courts and the U.S. Court of Appeals, and as Secretary of Education.

### Item 11.  Executive Compensation

The information required by Item 11 of Part III is incorporated by reference to our Proxy Statement for the 2007 Annual Meeting of Stockholders.

### Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The information required by Item 12 of Part III is incorporated by reference to our Proxy Statement for the 2007 Annual Meeting of Stockholders.

### Item 13.  Certain Relationships and Related Transactions, and Director Independence

The information required by Item 13 of Part III is incorporated by reference to our Proxy Statement for the 2007 Annual Meeting of Stockholders.

### Item 14.  Principal Accountant Fees and Services

The information required by Item 14 of Part III is incorporated by reference to our Proxy Statement for the 2007 Annual Meeting of Stockholders.

## Part IV

### Item 15.  Exhibits and Financial Statement Schedules

We will furnish you, without charge, a copy of any exhibit upon written request. Written requests to obtain any exhibit should be sent to the company's Secretary at 8500 Balboa Boulevard, Northridge, California 91329.

The following consolidated financial statements are filed as part of this report under "Part II, Item 8 – Financial Statements and Supplementary Data":

| **Financial Statements:** | **Page** |
|---|---|
| Management's Report on Internal Control over Financial Reporting | 37 |
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | 38 |
| Report of Independent Registered Public Accounting Firm | 39 |
| Consolidated Balance Sheets as of June 30, 2007 and 2006 | 40 |
| Consolidated Statements of Operations for the years ended June 30, 2007, 2006 and 2005 | 41 |
| Consolidated Statements of Cash Flows for the years ended June 30, 2007, 2006 and 2005 | 42 |
| Consolidated Statements of Shareholders' Equity and Comprehensive Income for the years ended June 30, 2007, 2006 and 2005 | 43 |
| Notes to Consolidated Financial Statements. | 44 |

**Financial Statement Schedules:**

| | |
|---|---|
| Schedule II - Consolidated Valuation and Qualifying Accounts and Reserves. | 79 |
| (Schedules I, III, IV and V are not applicable and have therefore been omitted.) | |

**Exhibits:**

2.1  Agreement and Plan of Merger, dated as of April 26, 2007, among Harman International Industries, Incorporated, KHI Parent Inc. and KHI Merger Sub Inc. (filed as Exhibit 2.1 to the Current Report on Form 8-K filed with the Commission on April 27, 2007, Commission File No. 001-09764, and hereby incorporated by reference)

3.1  Restated Certificate of Incorporation of Harman International Industries, Incorporated, as amended. (filed as Exhibit 3.1 to the Quarterly Report on Form 10-Q for the quarter ended December 31, 2003, Commission File No. 001-09764, and hereby incorporated by reference)

3.2  By-Laws of Harman International Industries, Incorporated, as amended, dated June 10, 2004. (filed as Exhibit 3.2 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2004, Commission File No. 001-09764, and hereby incorporated by reference)

4.1  Rights Agreement, dated as of December 13, 1999, between Harman International Industries, Incorporated and ChaseMellon Shareholder Services, L.L.C., as rights agent (including a Form of Certificate of Designation of Series A Junior Participating Preferred Stock, a Form of Right Certificate and a Summary of Rights to Purchase Preferred Stock). (filed as Exhibit 4.1 to the Form 8-A filed with the Commission on December 16, 1999, Commission File No. 001-09764, and hereby incorporated by reference)

4.2  Amendment No. 1, dated as of April 26, 2007, to the Rights Agreement, dated as of December 13, 1999, by and between Harman International Industries, Incorporated and ChaseMellon Shareholder Services, L.L.C. (filed as Exhibit 4.1 to the Registration Statement on Form 8-A/A filed with the Commission on April 27, 2007, Commission File No. 001-09764, and hereby incorporated by reference)

4.3     Certificate of Designation of Series A Junior Participating Preferred Stock of Harman International Industries, Incorporated, dated January 11, 2000. (filed as Exhibit 4.3 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2000, Commission File No. 001-09764, and hereby incorporated by reference)

10.1    Amended and Restated Multi-Currency, Multi-Option Credit Agreement, dated June 22, 2006, among Harman International Industries, Incorporated, Harman Holding GmbH & Co. KG and the several lenders and agents from time to time parties thereto. (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on June 26, 2006, Commission File No. 001-09764, and hereby incorporated by reference)

10.2    Guarantee, dated June 22, 2006, in favor of JPMorgan Chase Bank, N.A., as administrative agent for the several banks and other financial institutions or entities from time to time parties to the Amended and Restated Multi-Currency, Multi-Option Credit Agreement, dated as of June 22, 2006. (filed as Exhibit 10.2 to the Current Report on Form 8-K filed with the Commission on June 26, 2006, Commission File No. 001-09764, and hereby incorporated by reference)

10.3    Share Purchase Agreement, dated October 26, 2004, among Harman Canada Co. and certain shareholders of QNX Software Systems Ltd. (filed as Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, Commission File No. 001-09764, and hereby incorporated by reference)

10.4    Harman International Industries, Incorporated 1992 Incentive Plan, as amended and restated. (filed as Exhibit B to the 1999 Proxy Statement, Commission File No. 001-09764, and hereby incorporated by reference) **

10.5    Harman International Industries, Incorporated Amended and Restated 2002 Stock Option and Incentive Plan. (filed as Exhibit 10.5 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.6    Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Nonqualified Stock Option Agreement for Non-Officer Directors. (filed as Exhibit 10.11 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2005, Commission File No. 001-09764, and hereby incorporated by reference) **

10.7    Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Incentive Stock Option Agreement for Officers and Key Employees. (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on August 22, 2005, Commission File No. 001-09764, and hereby incorporated by reference) **

10.8    Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Nonqualified Stock Option Agreement for Officers and Key Employees. (filed as Exhibit 10.2 to the Current Report on Form 8-K filed with the Commission on August 22, 2005, Commission File No. 001-09764, and hereby incorporated by reference) **

10.9    Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Restricted Stock Agreement for Officers and Key Employees. (filed as Exhibit 10.3 to the Current Report on Form 8-K filed with the Commission on August 22, 2005, Commission File No. 001-09764, and hereby incorporated by reference) **

10.10   Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Restricted Share Unit Agreement for Officers and Key Employees. (filed as Exhibit 10.3 to the Current Report on Form 8-K filed with the Commission on August 15, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.11   Harman International Industries, Incorporated 2002 Key Executive Officers Bonus Plan. (filed as Exhibit A to the 2002 Proxy Statement, Commission File No. 001-09764, and hereby incorporated by reference) **

10.12   Harman International Industries, Incorporated Supplemental Executive Retirement Plan, as amended and restated as of October 1, 1999. (filed as Exhibit 10.27 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2000, Commission File No. 001-09764, and hereby incorporated by reference) **

10.13   Amendment No. 1 to the Harman International Industries, Incorporated Supplemental Executive Retirement Plan, dated September 24, 2002. (filed as Exhibit 10.5 to the Quarterly Report on Form 10-Q for the quarter ended December 31, 2002, Commission File No. 001-09764, and hereby incorporated by reference) **

10.14   Form of Benefit Agreement under the Supplemental Executive Retirement Plan. (filed as Exhibit 10.14 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.15   Harman International Industries, Inc. Deferred Compensation Plan, effective June 1, 1997. (filed as Exhibit 4 to the Registration Statement on Form S-8 (Reg. No. 333-28793) filed with the Commission June 9, 1997, and hereby incorporated by reference) **

10.16   Amendment No. 1 to the Harman International Industries, Inc. Deferred Compensation Plan dated October 1, 1999. (filed as Exhibit 10.46 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2000, Commission File No. 001-09764, and hereby incorporated by reference) **

10.17   Amendment No. 2 to the Harman International Industries, Inc. Deferred Compensation Plan, effective December 16, 2003. (filed as Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended December 31, 2003, Commission File No. 001-09764, and hereby incorporated by reference) **

10.18   Employment Agreement between Harman Management GmbH and Helmut Schinagel (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on August 15, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.19   Letter Agreement, dated June 3, 2005, between Harman International Industries, Incorporated and Kevin L. Brown (filed as Exhibit 10.19 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.20   Benefit Agreement of Kevin Brown, dated April 30, 2007, under the Supplemental Executive Retirement Plan. (filed as Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, Commission File No. 001-09764, and hereby incorporated by reference)

10.21   Employment Agreement, dated November 6, 2006, between Harman International Industries, Incorporated and Dr. Erich A. Geiger.  (filed as Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended September 30, 2006, Commission File No. 001-09764, and hereby incorporated by reference)

10.22   Consulting Agreement, dated January 15, 2007, between Harman International Industries, Incorporated and Dr. Erich A. Geiger (filed as Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended December 31, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.23   Form of Severance Agreement between Harman International Industries, Incorporated and each of Sidney Harman and Kevin L. Brown. (filed as Exhibit 10.71 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2000, Commission File No. 001-09764, and hereby incorporated by reference) **

10.24   Letter Agreement, dated April 24, 2006, between Harman International Industries, Incorporated and Douglas A. Pertz. (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on April 28, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.25   Letter Agreement, dated May 8, 2007, between Harman International Industries, Incorporated and Dinesh Paliwal. (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on May 9, 2007, Commission File No. 001-09764, and hereby incorporated by reference) **

10.26   Severance Agreement, dated May 8, 2007 between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.2 to the Current Report on Form 8-K filed with the Commission on May 9, 2007, Commission File No. 001-09764, and hereby incorporated by reference) **

10.27   Form of Nonqualified Stock Option Agreement, related to the Stock Option Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.3 to the Current Report on Form 8-K filed with the Commission on May 9, 2007, Commission File No. 001-09764, and hereby incorporated by reference) **

10.28   Form of Restricted Stock Agreement, related to the Restricted Stock Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.4 to the Current Report on Form 8-K filed with the Commission on May 9, 2007, Commission File No. 001-09764, and hereby incorporated by reference) **

10.29   Form of Restricted Stock Agreement, related to the Inducement Stock Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.5 to the Current Report on Form 8-K filed with the Commission on May 9, 2007, Commission File No. 001-09764, and hereby incorporated by reference) **

10.30   Form of Restricted Stock Agreement, related to the Equity Replacement Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.6 to the Current Report on Form 8-K filed with the Commission on May 9, 2007, Commission File No. 001-09764, and hereby incorporated by reference) **

10.31   Form of Restricted Share Unit Agreement, related to the RSU Replacement Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.7 to the Current Report on Form 8-K filed with the Commission on May 9, 2007, Commission File No. 001-09764, and hereby incorporated by reference) **

10.32   Consulting Agreement, dated December 8, 2006, between Harman International Industries, Incorporated and Floyd Toole (filed as Exhibit 10.2 to the Quarterly Report on Form 10-Q for the quarter ended December 31, 2006, Commission File No. 001-09764, and hereby incorporated by reference). **

21.1   Subsidiaries of Harman International Industries, Incorporated. +

23.1   Consent of Independent Registered Public Accounting Firm. +

31.1   Certification of Sidney Harman filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. +

31.2   Certification of Dinesh Paliwal filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. +

31.3   Certification of Kevin L. Brown filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. +

32.1   Certification of Sidney Harman, Dinesh Paliwal and Kevin L. Brown filed pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. +

**     Management contract, compensatory plan or arrangement.

+      Filed herewith.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED

Date:   August 29, 2007          By:   /s/ Dinesh Paliwal
                                        Dinesh Paliwal
                                        President, Chief Executive Officer and Vice Chairman

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant on August 29, 2007 in the capacities indicated below.

/s/ Sidney Harman                Executive Chairman of the Board
Sidney Harman


/s/ Dinesh Paliwal               President, Chief Executive Officer and Vice Chairman
Dinesh Paliwal                   (Principal Executive Officer)


/s/ Kevin L. Brown               Executive Vice President and Chief Financial Officer
Kevin L. Brown                   (Principal Financial Officer)


/s/ Sandra B. Robinson           Vice President – Financial Operations and Chief Accounting Officer
Sandra B. Robinson               (Principal Accounting Officer)


/s/ Shirley M. Hufstedler        Director
Shirley M. Hufstedler


/s/ Ann McLaughlin Korologos     Director
Ann McLaughlin Korologos


/s/ Edward H. Meyer              Director
Edward H. Meyer

**STOCK PRICE PERFORMANCE GRAPH**

The following graph compares changes in cumulative total returns (assuming reinvestment of cash dividends) on shares of the Common Stock for the five-year period ending June 30, 2007 against the S&P Composite-500 Stock Index and the S&P 500 Consumer Discretionary Index. The stock price performance graph assumes an initial investment of $100 at the market close on June 30, 2002. Dates on the chart represent the last trading day of the indicated fiscal year. The stock price performance shown on the graph below is not necessarily indicative of future performance of the shares of Common Stock.

**Comparison of Cumulative Five Year Total Return**



◇ Harman International Industries

□ S&P 500 Index

△ S&P 500 Index Consumer Discretionary

80

**Corporate Officers**

Sidney Harman
Executive Chairman

Dinesh Paliwal
President, Chief Executive Officer and
Vice Chairman

Kevin L. Brown
Executive Vice President and
Chief Financial Officer

Erich A. Geiger
Executive Vice President, Chief Strategy Officer
and Chief Technology Officer

Sandra B. Robinson
Vice President–Financial Operations and
Chief Accounting Officer

Edwin C. Summers
Vice President–General Counsel and Secretary

Blake Augsburger
President–Professional

Gina Harman
President–Consumer

Helmut Schinagel
Chief Executive Officer–Automotive

**Securities Traded**

New York Stock Exchange
Symbol: HAR

**Corporate Headquarters**

1101 Pennsylvania Avenue, NW
Suite 1010
Washington, D.C. 20004
202-393-1101
www.harman.com

**Directors**

Sidney Harman

Dinesh Paliwal

Shirley Mount Hufstedler [1] [2] [3]

Ann McLaughlin Korologos [1] [2] [3]

Edward H. Meyer [1] [2] [3]

[1] Audit Committee member
[2] Compensation and Option Committee member
[3] Nominating and Governance Committee member

**Annual Meeting**

The Annual Meeting will be held on
December 17, 2007 at 11:00 a.m.
at the JPMorgan Chase Building,
270 Park Avenue, New York, NY 10017.
A proxy statement will be sent to shareholders
on or about October 30, 2007.

**Registrar and Transfer Agent**

Mellon Investor Services
400 South Hope Street, 4th Floor
Los Angeles, CA 90071
213-553-9720

**Independent Auditor**

KPMG LLP
1660 International Drive
McLean, VA 22102 – 4848
703-286-8000

The certifications of our Executive Chairman, Chief Executive Officer and Chief Financial Officer required under Section 302 of the Sarbanes-Oxley Act have been filed as Exhibits 31.1, 31.2 and 31.3 to our Annual Report on Form 10-K for the fiscal year ended June 30, 2007. Additionally, in 2006 our then-current Chief Executive Officer submitted the required CEO Certification to the New York Stock Exchange.





**Harman International Industries, Incorporated**
1101 Pennsylvania Avenue, NW, Suite 1010
Washington, DC 20004
202-393-1101    www.harman.com

All trademarks used herein are the property of their respective owners.

Harman International
PRESS RELEASE



April 26, 2007                          FOR IMMEDIATE RELEASE
                                        Contact:  Robert C. Ryan
                                        Vice President - Treasurer
                                        Harman International Industries, Incorporated
                                        202-393-1101

## HARMAN INTERNATIONAL INDUSTRIES TO BE ACQUIRED BY KKR AND GS CAPITAL PARTNERS

### Harman Stockholders Can Elect to Receive $120 Per Share In Cash or Shares in Post-Transaction Company

### Transaction Valued at Approximately $8 Billion

WASHINGTON, April 26, 2007 – Harman International Industries, Inc. (NYSE: HAR) today announced that it has entered into an agreement to be acquired by affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners ("GSCP") in a transaction valued at approximately $8 billion.  The transaction was unanimously approved by the Harman Board of Directors, following the recommendation of a Special Committee of independent directors.  KKR initiated discussions with Harman and structured the transaction so that current Harman stockholders have the opportunity to participate in the future upside potential of the enterprise.  The company will continue to be named Harman International Industries and Dr. Sidney Harman, Founder and Executive Chairman, will remain Executive Chairman.

Dr. Harman stated: "We are pleased to reach an agreement with KKR and GSCP that is in the best interest of our stockholders, presenting them with excellent value for their shares and the opportunity to participate in Harman's future growth.  KKR and GSCP are two of the world's leading private equity investors and our Board of Directors strongly believes that this transaction will create attractive long-term opportunities for our employees, customers and business partners.  Together, we will continue to execute our strategic plan, capitalize on new opportunities, and build on our history of product innovation and service excellence."

April 26, 2007
Page 2

Henry R. Kravis, Co-Founding Member of KKR, said, "Harman is one of the world's outstanding providers of audio equipment and infotainment systems with an unparalleled portfolio of legendary brands and strong customer relationships. Since founding Harman more than 50 years ago, Dr. Sidney Harman has brought exceptional vision to the company and we are proud to work with him and the management team to continue building the value of their company."

Under the terms of the agreement, Harman stockholders will be entitled to receive $120 in cash for each share of Harman common stock they hold.  As an alternative to receiving the cash consideration, Harman's stockholders will be offered the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman stock for shares in the new corporation incorporated by KKR and GSCP in order to acquire Harman.  The total amount of Harman shares that may elect to receive shares in the post-transaction corporation is approximately 8.3 million, which would represent $1.0 billion (at the $120 per share transaction value) and an approximate 27% equity stake in Harman following the transaction.  If elections for post-transaction shares exceed the $1.0 billion cap, post-transaction shares will be allocated to electing stockholders on a pro-rated basis, and the remaining Harman shares will be exchanged for cash. The election process will be fully detailed in the proxy statement/prospectus that will be mailed to Harman stockholders.

Dr. Harman, who owns approximately 5% of the outstanding common stock of Harman, will participate in the same election process available to all stockholders.  He has committed that he will elect to exchange half of his current holdings for post-transaction shares, subject to the same pro ration that applies to all stockholders as described above.

Under the agreement, Harman may solicit proposals for alternative transactions from third parties for a 50-day period ending on June 15, 2007.  Harman's Board of Directors will work with its independent advisors to solicit proposals during this period.  There can be no assurances that this solicitation will result in an alternative transaction.  Harman does not intend to disclose developments with respect to this solicitation process unless and until its Board of Directors has made a decision regarding any alternative proposals.

Completion of the transaction, which is expected to occur in the third quarter of 2007, is subject to the approval of Harman stockholders, customary closing conditions and regulatory approvals.  The Board of Directors of Harman has unanimously recommended that Harman stockholders vote in favor of the transaction.

April 26, 2007
Page 3

The stock of the new corporation issued to current shareholders in exchange for their existing shares will be registered with the U.S. Securities and Exchange Commission.  The shares will not be listed on any exchange, although the buyers expect that there will be market makers in the stock.

Bank of America Securities LLC, Credit Suisse, Goldman Sachs and Lehman Brothers have committed debt financing for the transaction, subject to customary terms and conditions, and are also acting as financial advisors to KKR and GSCP.  Simpson Thacher & Bartlett LLP is acting as legal advisor to KKR and GSCP.  Bear, Stearns & Co. Inc. is acting as Harman's financial advisor. Wachtell, Lipton, Rosen & Katz is providing legal counsel to the Special Committee of the Harman Board of Directors, and Jones Day is providing legal counsel to Harman.

**About Harman International**

Harman International Industries, Incorporated (www.harman.com) is a leading manufacturer of high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets.  Its brands include Harman Kardon®, JBL®, Mark Levinson® and Infinity®, among others.  The company maintains a strong presence in the Americas, Europe and Asia, employing over 10,500 people.  The Company's stock is traded on the New York Stock Exchange under the Symbol: HAR.

**About KKR**

Kohlberg Kravis Roberts & Co. (KKR) is one of the world's oldest and most experienced private equity firms specializing in management buyouts. Founded in 1976, it has offices in New York, Menlo Park, London, Paris, Hong Kong and Tokyo. Throughout its history, KKR has brought a long-term investment approach to its portfolio companies, focusing on working in partnership with management teams and investing for future competitiveness and growth. Since its founding, KKR has completed more than 150 transactions with an aggregate value of over US$279 billion. (www.kkr.com).

April 26, 2007
Page 4

**About GS Capital Partners**

Founded in 1869, Goldman Sachs is one of the oldest and largest investment banking firms.  Goldman Sachs is also a global leader in private corporate equity and mezzanine investing.  Established in 1992, the GS Capital Partners family of funds is part of the firm's Principal Investment Area in the Merchant Banking Division.  Goldman Sachs' Principal Investment Area has formed 13 investment vehicles aggregating $56 billion of capital raised.  GS Capital Partners VI is the current primary investment vehicle for Goldman Sachs to make large, privately negotiated equity investments.

**Additional Information and Where To Find It**

The parties to the merger agreement intend to file a registration statement that will include a proxy statement/prospectus and other relevant documents in connection with the proposed transaction.  HARMAN INVESTORS ARE URGED TO READ THESE DOCUMENTS WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION.  Investors may obtain a free copy of the proxy statement/prospectus (when it becomes available) and other filings containing information about Harman and the merger, when available, from the SEC at the SEC's web site at http://www.sec.gov.  In addition, copies of the proxy statement/prospectus and other filings containing information about the Company and the merger can be obtained, when available, without charge, by directing a request to Harman International Industries, Incorporated; Attention: Investor Relations, 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, DC  20004, or by telephone at (202) 393-1101 or on Harman's website, www.harman.com.

**Forward-Looking Information**

This communication may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Those forward-looking statements include all statements other than those made solely with respect to historical fact.  Numerous risks, uncertainties and other factors may cause actual results to differ materially from those expressed in any forward-looking statements.

April 26, 2007
Page 5

These factors include, but are not limited to, (1) the occurrence of any event, change or other circumstance that could give rise to the termination of the merger agreement; (2) the outcome of any legal proceedings that may be instituted against Harman and others following the announcement of the merger agreement; (3) the inability to complete the merger due to the failure to obtain shareholder approval or the failure to satisfy other conditions to the merger; (4) the failure to obtain the necessary financing arrangements set forth in the commitment letter received in connection with the merger; (5) risks that the proposed transaction disrupts current plans and operations and the potential difficulties in employee retention as a result of the merger; and (6) other factors described in Harman's filings with the Securities and Exchange Commission, including its reports on Forms 10-K, 10-Q and 8-K.  Many of the factors that will determine the outcome of the subject matter of this communication are beyond Harman's ability to control or predict.  Harman undertakes no obligation to revise or update any forward-looking statements, or to make any other forward-looking statements, whether as a result of new information, future results or otherwise.

**Interests of Participants**

The Company and its directors and executive officers and certain other members of management and employees may be deemed to be participants in the solicitation of proxies from the Company's stockholders in favor of the proposed transaction.  Additional information regarding the interests of potential participants in the proxy solicitation will be included in the definitive proxy statement/prospectus and other relevant documents that Harman intends to file with the SEC in connection with the scheduled special meeting of its stockholders.

**CONTACTS:**
**For Harman International:**

Robert C. Ryan
VP and Treasurer
202-662-2215

**For KKR:**
Mark Semer/Ruth Pachman
Kekst and Company
212-521-4800

**For GS Capital Partners:**
Michael DuVally
212-902-2605

**Exhibit 2.1**

**EXECUTION VERSION**

**AGREEMENT AND PLAN OF MERGER**

**among**

**KHI PARENT INC.**

**KHI MERGER SUB INC.**

**and**

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**

**Dated as of April 26, 2007**

## TABLE OF CONTENTS

**ARTICLE I THE MERGER**                                                               **2**

Section 1.01 The Merger                                                                2
Section 1.02 Closing                                                                   2
Section 1.03 Effective Time                                                            2
Section 1.04 Effects of the Merger                                                     2
Section 1.05 Company Charter and By-laws of the Surviving Corporation                  2
Section 1.06 Directors                                                                 3
Section 1.07 Officers                                                                  3
Section 1.08 Further Assurances                                                        3

**ARTICLE II CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES**                          **3**

Section 2.01 Effect on Capital Stock                                                   3
Section 2.02 Election Procedures                                                       5
Section 2.03 Proration                                                                 7
Section 2.04 Exchange of Shares for Merger Consideration                               9
Section 2.05 Effect of the Merger on Company Stock Options, Company Restricted Shares and RSUs   11

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY**                          **12**

Section 3.01 Qualification, Organization, Subsidiaries, etc.                           13
Section 3.02 Capital Stock                                                             14
Section 3.03 Subsidiaries                                                              15
Section 3.04 Corporate Authority Relative to This Agreement; No Violation              15
Section 3.05 Reports and Financial Statements                                          17
Section 3.06 No Undisclosed Liabilities                                                17
Section 3.07 Compliance with Law; Permits                                             18
Section 3.08 Environmental Laws and Regulations                                        18
Section 3.09 Employee Benefit Plans                                                    19
Section 3.10 Interested Party Transactions                                             21
Section 3.11 Absence of Certain Changes or Events                                      21
Section 3.12 Investigations; Litigation                                                21
Section 3.13 Proxy Statement; Other Information                                        21
Section 3.14 Tax Matters                                                               22
Section 3.15 Labor Matters                                                             23
Section 3.16 Intellectual Property                                                     23
Section 3.17 Property                                                                  24
Section 3.18 Required Vote of the Company Stockholders                                 24
Section 3.19 Material Contracts                                                        24
Section 3.20 Finders or Brokers                                                        26
Section 3.21 Fairness Opinion                                                          26
Section 3.22 State Takeover Statutes; Charter Provisions; Company Rights Agreement     26
Section 3.23 No Other Representations                                                  26

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB**          **27**

Section 4.01 Qualification; Organization                                          27
Section 4.02 Corporate Authority Relative to This Agreement; No Violation         27
Section 4.03 Proxy Statement; Other Information                                   28
Section 4.04 Financing                                                            28
Section 4.05 Ownership and Operations of Merger Sub; Issuance of Parent Common Stock   29
Section 4.06 Finders or Brokers                                                   30
Section 4.07 Certain Arrangements                                                 30
Section 4.08 Investigations; Litigation                                           31
Section 4.09 Guarantees                                                           31
Section 4.10 Solvency                                                             31
Section 4.11 Access to Information; Disclaimer                                    31
Section 4.12 Investments                                                          32

**ARTICLE V COVENANTS AND AGREEMENTS**                                          **32**

Section 5.01 Conduct of Business                                                  32
Section 5.02 Acquisition Proposals                                                36
Section 5.03 Company Meeting; Preparation of Form S-4 and Proxy Statement         40
Section 5.04 Employee Matters                                                     41
Section 5.05 Reasonable Best Efforts                                              43
Section 5.06 Takeover Statute                                                     45
Section 5.07 Public Announcements                                                 45
Section 5.08 Indemnification and Insurance                                        46
Section 5.09 Financing                                                            48
Section 5.10 Access; Confidentiality                                             52
Section 5.11 Notification of Certain Matters                                      52
Section 5.12 Rule 16b-3                                                           53
Section 5.13 Affiliate Letters                                                    53
Section 5.14 Control of Operations                                               53
Section 5.15 Certain Transfer Taxes                                              53
Section 5.16 Obligations of Merger Sub                                           53
Section 5.17 Resignation of Directors                                            53
Section 5.18 Tax Free Qualification for Parent Stock Election                    54

**ARTICLE VI CONDITIONS TO THE MERGER**                                         **54**

Section 6.01 Conditions to Each Party's Obligation to Effect the Merger           54
Section 6.02 Conditions to Obligation of the Company to Effect the Merger         55
Section 6.03 Conditions to Obligation of Parent and Merger Sub to Effect the Merger   55
Section 6.04 Frustration of Closing Conditions                                    56

**ARTICLE VII TERMINATION**                                                     **56**

Section 7.01 Termination or Abandonment                                           56

-ii-

Section 7.02 Termination Fees                                              58

**ARTICLE VIII MISCELLANEOUS**                                            **60**

Section 8.01 No Survival of Representations and Warranties                60
Section 8.02 Expenses                                                     60
Section 8.03 Counterparts; Effectiveness                                  61
Section 8.04 Governing Law                                                61
Section 8.05 Jurisdiction; Enforcement                                    61
Section 8.06 WAIVER OF JURY TRIAL                                         62
Section 8.07 Notices                                                      62
Section 8.08 Assignment; Binding Effect                                   63
Section 8.09 Severability                                                 63
Section 8.10 Entire Agreement; No Third-Party Beneficiaries              63
Section 8.11 Amendments; Waivers                                          64
Section 8.12 Headings                                                     64
Section 8.13 Interpretation                                               64
Section 8.14 No Recourse                                                  64
Section 8.15 Certain Definitions                                          65

-iii-

## INDEX OF DEFINED TERMS

| | |
|---|---|
| Acceptable Confidentiality Agreement | 39 |
| Action | 46 |
| Affiliate Transaction | 21 |
| Affiliated Funds | 32 |
| Affiliates | 65 |
| Agreement | 1 |
| Authorized Preferred Stock | 14 |
| Book-Entry Shares | 9 |
| Bridge Financing | 29 |
| Business Day | 65 |
| Cancelled Shares | 4 |
| Capitalization Date | 14 |
| Cash Election Price | 4 |
| Certificate of Merger | 2 |
| Certificates | 9 |
| Change of Recommendation | 41 |
| Closing | 2 |
| Closing Date | 2 |
| Code | 1 |
| Company | 1 |
| Company Acquisition Proposal | 39 |
| Company Approvals | 16 |
| Company Benefit Plan | 19 |
| Company Charter | 2 |
| Company Common Stock | 14 |
| Company Disclosure Letter | 13 |
| Company Employees | 42 |
| Company Material Adverse Effect | 13 |
| Company Meeting | 40 |
| Company Permits | 18 |
| Company Restricted Shares | 12 |
| Company SEC Documents | 17 |
| Company Stock Option | 11 |
| Company Stock Plans | 65 |
| Company Stockholder Approval | 24 |
| Confidentiality Agreement | 65 |
| Contracts | 65 |
| control | 65 |
| Debt Commitment Letters | 29 |
| Debt Financing | 29 |
| DGCL | 2 |
| Dissenting Shares | 4 |
| Dissenting Stockholder | 4 |
| ECMR | 54 |
| Effective Time | 2 |
| Electing Share | 4 |
| Electing Stockholders | 1 |
| Election Deadline | 7 |
| Election Form | 6 |
| Election Form Record Date | 6 |
| End Date | 56 |
| Environmental Law | 19 |
| Equity Commitment Letters | 29 |
| Equity Financing | 29 |
| ERISA | 19 |
| ERISA Affiliate | 20 |
| Excess Shares | 8 |

| | |
|---|---|
| Exchange Act | 16 |
| Exchange Agent | 6 |
| Exchange Fund | 9 |
| Excluded Party | 37 |
| Filed SEC Documents | 12 |
| Financing | 29 |
| Financing Commitments | 29 |
| Form S-4 | 21 |
| GAAP | 17 |
| Governmental Entity | 16 |
| Gross Electing Option Shares | 6 |
| GS Funds | 65 |
| Guarantee | 1 |
| Guarantor | 65 |
| Guarantors | 65 |
| Hazardous Substance | 19 |
| High Yield Financing | 29 |
| Holdings | 30 |
| HSR Act | 16 |
| Indebtedness | 34 |
| Indemnified Party | 46 |
| Intellectual Property | 23 |
| Irrevocable Option Election | 6 |
| IRS | 19 |
| KKR | 65 |
| Knowledge | 65 |
| Law | 18 |
| Lien | 16 |
| Marketing Period | 49 |
| Material Contract | 24 |
| Maximum Election Number | 7 |

-iv-

|                                      | **Page** |
|--------------------------------------|----------|
| Merger                               | 1        |
| Merger Consideration                 | 3        |
| Merger Sub                           | 1        |
| Net Electing Option Shares           | 6        |
| New Financing Commitments            | 48       |
| New Plans                            | 42       |
| No-Shop Period Start Date            | 36       |
| Notice Period                        | 39       |
| Old Plans                            | 42       |
| orders                               | 65       |
| Parent                               | 1        |
| Parent Approvals                     | 28       |
| Parent Common Stock                  | 30       |
| Parent Disclosure Letter             | 27       |
| Parent Expenses                      | 59       |
| Parent Limited Partners              | 66       |
| Parent Material Adverse Effect       | 66       |
| Parent Stock Election                | 5        |
| Parent Termination Fee               | 59       |
| person                               | 66       |
| Person                               | 66       |
| Proration Factor                     | 8        |
| Proxy Statement                      | 22       |
| Recommendation                       | 16       |
| Regulatory Law                       | 45       |
| Remaining Shares                     | 3        |
| Representatives                      | 37       |
| Required Information                 | 49       |
| Rights                               | 14       |
| Rights Agreement                     | 14       |
| RSUs                                 | 12       |
| Sarbanes-Oxley Act                   | 17       |
| SEC                                  | 17       |
| SEC Filings                          | 22       |
| Securities Act                       | 16       |
| Series A Preferred Stock             | 14       |
| Share                                | 3        |
| Significant Subsidiary               | 66       |
| Solvent                              | 31       |
| Subsidiaries                         | 66       |
| Superior Proposal                    | 40       |
| Surviving Corporation                | 2        |
| Tax                                  | 23       |
| Tax Return                           | 23       |
| Taxes                                | 23       |
| Termination Date                     | 32       |
| Termination Fee                      | 58       |

-v-

## AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of April 26, 2007 (this "Agreement"), among KHI PARENT INC., a Delaware corporation ("Parent"), KHI MERGER SUB INC., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub"), and HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, a Delaware corporation (the "Company").

WHEREAS, the parties intend that Merger Sub be merged with and into the Company, with the Company surviving that merger on the terms and subject to the conditions set forth in this Agreement (the "Merger");

WHEREAS, the board of directors of the Company has (i) determined that it is in the best interests of the Company and its stockholders, and declared it advisable, to enter into this Agreement, (ii) approved the execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby, including the Merger and (iii) resolved to recommend adoption of this Agreement by the stockholders of the Company;

WHEREAS, the board of directors of each of Parent and Merger Sub have approved this Agreement and declared it advisable for Parent and Merger Sub, respectively, to enter into this Agreement;

WHEREAS, concurrently with the execution of this Agreement, and as a condition and inducement to the Company's willingness to enter into this Agreement, each of the Guarantors is entering into a guarantee (each, a "Guarantee") in favor of the Company with respect to certain of Parent's obligations under this Agreement;

WHEREAS, concurrently with the execution of this Agreement, and as a condition and inducement to Parent's and Merger Sub's willingness to enter into this Agreement, certain stockholders of the Company (the "Electing Stockholders") are entering into an Election Agreement, pursuant to which the Electing Stockholders have irrevocably agreed to make a Parent Stock Election (as defined herein) and/or an Irrevocable Option Election (as defined herein) with respect to 1,700,000 shares of Company Common Stock (as defined herein) beneficially owned by the Electing Stockholders;

WHEREAS, for U.S. federal income Tax purposes, it is intended that the exchange of Shares (as defined below) for shares of Parent Common Stock (as defined below) pursuant to the Merger and a Parent Stock Election and/or an Irrevocable Option Election, taken together with the Equity Financing (as defined below) of Parent, shall qualify as an exchange described in Section 351 of the Internal Revenue Code of 1986, as amended (the "Code"), which is undertaken pursuant to a single integrated plan; and

WHEREAS, Parent, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Merger and the transactions contemplated by this Agreement and also to prescribe certain conditions to the Merger as specified herein.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent, Merger Sub and the Company hereby agree as follows:

<div align="center">

ARTICLE I

THE MERGER

</div>

Section 1.01 <u>The Merger</u>. At the Effective Time, upon the terms and subject to the conditions set forth in this Agreement and in accordance with the applicable provisions of the General Corporation Law of the State of Delaware (the "<u>DGCL</u>"), Merger Sub shall be merged with and into the Company, whereupon the separate corporate existence of Merger Sub shall cease, and the Company shall continue as the surviving company in the Merger (the "<u>Surviving Corporation</u>") and a wholly owned subsidiary of Parent.

Section 1.02 <u>Closing</u>. The closing of the Merger (the "<u>Closing</u>") shall take place at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York at 10:00 a.m., local time, on the date (the "<u>Closing Date</u>") following the satisfaction or waiver (to the extent permitted by applicable Law) of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) that is the earlier of (a) any Business Day during the Marketing Period as may be specified by Parent on no less than three Business Days' prior notice to the Company and (b) the final day of the Marketing Period, or such other date or time specified by the parties in writing.

Section 1.03 <u>Effective Time</u>. On the Closing Date, the Company shall cause the Merger to be consummated by executing, delivering and filing a certificate of merger (the "<u>Certificate of Merger</u>") with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DGCL and shall make such other filings or recordings required under the DGCL in connection with the Merger. The Merger shall become effective at such time as the Certificate of Merger is duly filed with the Secretary of State of the State of Delaware, or at such later date or time as may be agreed by Parent and the Company in writing and specified in the Certificate of Merger in accordance with the DGCL (such time as the Merger becomes effective is referred to herein as the "<u>Effective Time</u>").

Section 1.04 <u>Effects of the Merger</u>. The Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL.

Section 1.05 <u>Company Charter and By-laws of the Surviving Corporation</u>.

(a) The certificate of incorporation of the Company (the "<u>Company Charter</u>") shall be amended as a result of the Merger so as to read in its entirety as set forth in <u>Exhibit A</u>, and, as so amended, shall be the certificate of incorporation of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law, in each case consistent with the obligations set forth in Section 5.08.

(b) The by-laws of the Company, as in effect as of immediately prior to the Effective Time, shall be amended and restated so as to read in their entirety as set forth in

<div align="center">-2-</div>

Exhibit B, and, as so amended and restated, shall be the by-laws of the Surviving Corporation until thereafter amended in accordance with the provisions thereof, hereof and of applicable Law, in each case consistent with the obligations set forth in Section 5.08.

Section 1.06 Directors. The directors of Merger Sub as of immediately prior to the Effective Time shall be the initial directors of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

Section 1.07 Officers. The officers of the Company as of immediately prior to the Effective Time Date shall be the initial officers of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

Section 1.08 Further Assurances. If at any time after the Effective Time the Surviving Corporation shall consider or be advised that any deeds, bills of sale, assignments or assurances or any other acts or things are necessary, desirable or proper (a) to vest, perfect or confirm, of record or otherwise, in the Surviving Corporation its right, title or interest in, to or under any of the rights, privileges, powers, franchises, properties or assets of either Merger Sub or the Company, or (b) otherwise to carry out the purposes of this Agreement, the Surviving Corporation and its proper officers and directors or their designees shall be authorized to execute and deliver, in the name and on behalf of either of Merger Sub and the Company, all such deeds, bills of sale, assignments and assurances and to do, in the name and on behalf of either Merger Sub or the Company, all such other acts and things as may be necessary, desirable or proper to vest, perfect or confirm the Surviving Corporation's right, title or interest in, to or under any of the rights, privileges, powers, franchises, properties or assets of Merger Sub or the Company and otherwise to carry out the purposes of this Agreement.

## ARTICLE II

## CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES

Section 2.01 Effect on Capital Stock. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent, Merger Sub or the holders of any securities of the Company, Parent or Merger Sub:

(a) Conversion of Company Common Stock. Subject to Section 2.03, each issued and outstanding share of Company Common Stock outstanding immediately prior to the Effective Time (each, a "Share"), other than (i) any Shares held by any direct or indirect wholly owned Subsidiary of the Company (the "Remaining Shares"), (ii) any Cancelled Shares (as defined herein) and (iii) any Dissenting Shares (as defined herein), shall be converted automatically into and shall thereafter represent the right to receive the following (together with any consideration provided for in Section 2.01(e), the "Merger Consideration"):

(i) for each such Share with respect to which an election to receive Parent Common Stock (as defined herein) has been effectively made and not revoked

-3-

pursuant to Section 2.02 (each, an "Electing Share"), the right to receive one fully paid and non-assessable share of Parent Common Stock; and

(ii) for each such Share other than Electing Shares, the right to receive in cash, without interest, $120.00 per Share (the "Cash Election Price").

As of the Effective Time, all Shares that have been converted into the right to receive the Merger Consideration shall be automatically cancelled and shall cease to exist, and each holder of any such Shares shall cease to have any rights with respect to such Shares other than the right to receive the Merger Consideration for each such Share.

(b) Parent, Merger Sub and Company-Owned Shares. Each Share that is owned, directly or indirectly, by Parent or Merger Sub immediately prior to the Effective Time, if any, or that is held in treasury by the Company immediately prior to the Effective Time (the "Cancelled Shares") shall, by virtue of the Merger and without any action on the part of the holder thereof, be cancelled and shall cease to exist, and no consideration shall be delivered in exchange for such cancellation.

(c) Conversion of Merger Sub Common Stock; Remaining Shares. At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, par value $0.01 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation and shall with the Remaining Shares (each of which shall be converted into and become such number of validly issued, fully paid and nonassessable shares of common stock, par value $0.01 per share, of the Surviving Corporation as shall be necessary to maintain relative ownership percentages) constitute the only outstanding shares of capital stock of the Surviving Corporation. From and after the Effective Time, all certificates representing the common stock of Merger Sub, if any, shall be deemed for all purposes to represent the number of shares of common stock of the Surviving Corporation into which they were converted in accordance with the immediately preceding sentence.

(d) Shares of Dissenting Stockholders. Notwithstanding anything in this Agreement to the contrary, any issued and outstanding Shares held by a Person (a "Dissenting Stockholder") who has not voted in favor of or consented to the adoption of this Agreement and has complied with all the provisions of the DGCL concerning the right of holders of Shares to require appraisal of their Shares ("Dissenting Shares") shall not be converted into the right to receive the Merger Consideration as described in Section 2.01(a), but shall become the right to receive such consideration as may be determined to be due to such Dissenting Stockholder pursuant to the procedures set forth in Section 262 of the DGCL. If such Dissenting Stockholder withdraws its demand for appraisal or fails to perfect or otherwise loses its right of appraisal, in any case pursuant to the DGCL, its Shares shall be deemed to be converted as of the Effective Time into the right to receive the Merger Consideration for each such Share in accordance with the provisions of this Agreement (it being understood that if such Dissenting Stockholder withdraws its demand for appraisal or fails to perfect or otherwise loses its right of appraisal, in any case pursuant to the DGCL, following the Election Deadline (as defined herein) its Shares shall be deemed to be converted as of the Effective Time into the right to receive the Cash

-4-

Election Price for each such Share, without interest). At the Effective Time, any holder of Dissenting Shares shall cease to have any rights with respect thereto, except the rights set forth in Section 262 of the DGCL and as provided in the previous sentence. The Company shall give Parent prompt notice of any demands for appraisal of Shares received by the Company, withdrawals of such demands and any other instruments served pursuant to Section 262 of the DGCL and shall give Parent the opportunity to participate in all negotiations and proceedings with respect thereto. The Company shall not, without the prior written consent of Parent (not to be unreasonably withheld), make any payment with respect to, or settle or offer to settle, any such demands.

(e) No Fractional Shares. Notwithstanding any other provision of this Agreement, neither certificates nor scrip for fractional shares of Parent Common Stock shall be issued in the Merger. Each holder of Shares who otherwise would have been entitled to a fraction of a share of Parent Common Stock shall receive in lieu thereof cash (without interest) in an amount determined by multiplying the fractional share interest to which such holder would otherwise be entitled by the Cash Election Price. No such holder shall be entitled to dividends, voting rights or any other rights in respect of any fractional share of Parent Common Stock.

(f) Adjustments. If at any time during the period between the date of this Agreement and the Effective Time, any change in the outstanding shares of capital stock of the Company, or securities convertible or exchangeable into or exercisable for shares of capital stock, shall occur as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or subdivision or combination, exchange or readjustment of shares, or any stock dividend or stock distribution with a record date during such period (excluding, in each case, normal quarterly cash dividends), merger or other similar transaction, the Merger Consideration shall be equitably adjusted, without duplication, to reflect such change; *provided* that nothing in this Section 2.01(f) shall be construed to permit the Company to take any action with respect to its securities that is prohibited by the terms of this Agreement.

Section 2.02 Election Procedures.

(a) Parent Stock Elections; Option Elections.

(i) Each Person who is a record holder of Shares on the Election Form Record Date (as defined herein), or who becomes a record holder of Shares during the period between the Election Form Record Date and the Election Deadline and has received the Election Form and related materials pursuant to Section 2.02(c), shall have the right to submit an Election Form specifying the number of Shares, if any, held by such Person that such Person desires to have converted into the right to receive Parent Common Stock (a "Parent Stock Election"). Any such record holder who fails properly to submit an Election Form on or before the Election Deadline (as defined herein) in accordance with the procedures set forth in this Section 2.02 shall be deemed to have not made a Parent Stock Election and thereby be entitled to the Cash Election Price for each such Share. Holders of record of Company Common Stock who hold such Company Common Stock as nominees, trustees or in other representative capacities may submit a separate Election Form on or before the Election Deadline with respect to each beneficial owner for whom such nominee, trustee or representative holds Company Common Stock.

-5-

(ii) Each Person who is a holder of a Company Stock Option on the Election Form Record Date, or who becomes a holder of a Company Stock Option during the period between the Election Form Record Date and the Election Deadline and has received the Election Form and related materials pursuant to Section 2.02(c), shall have the right to submit an Election Form specifying the number of Company Stock Options held by such holder, if any, that such Person irrevocably commits to exercise (subject to any requirements with respect to method of exercise imposed by the Company in order to facilitate the implementation of this Section 2.02 and Section 2.03) immediately prior to the Effective Time and the corresponding number of Shares underlying such Company Stock Options that such Person desires to have converted into the right to receive Parent Common Stock, subject to proration as described in Section 2.03(c) in the event the total number of Electing Shares and Net Electing Option Shares in the aggregate exceeds the Maximum Election Number (an "Irrevocable Option Election"). Any such holder who fails properly to submit an Election Form on or before the Election Deadline in accordance with the procedures set forth in this Section 2.02(a)(ii) shall be deemed to have not made a Irrevocable Option Election and all of such holder's Company Stock Options shall be treated in accordance with Section 2.05(a). The aggregate number of Shares subject to a Irrevocable Option Election made pursuant to this Section 2.02(a)(ii) is referred to as the "Gross Electing Option Shares", and the "Net Electing Option Shares" shall mean the aggregate number of Shares that would be issued in the event the Company Stock Options covering the Gross Electing Option Shares were exercised on a net share basis (*i.e.*, paying the exercise price of the Company Stock Options using the value of the shares of Common Stock underlying such Company Stock Options) at the Cash Election Price taking into account the exercise price and any required tax withholding. For the avoidance of doubt, and except for purposes of calculating the Proration Factor (as defined herein), Company Stock Options shall only be deemed exercised pursuant to this Section 2.02(a)(ii) (or the Election Form referred to herein) to the extent necessary to provide sufficient Net Electing Option Shares in order to satisfy the provisions of Sections 2.03(a), (b) and (c) hereof.

(b) Appointment of Exchange Agent. Prior to the mailing of the Proxy Statement (as defined herein), Parent shall appoint a bank or trust company reasonably acceptable to the Company to act as exchange agent (the "Exchange Agent") for the payment of the Merger Consideration.

(c) Mailing of Election Form; Election Deadline. Parent shall prepare and direct the Exchange Agent to mail a form of election, which form shall be subject to the reasonable approval of the Company (the "Election Form"), with the Proxy Statement to the record holders of Company Common Stock and Company Stock Options as of the record date for the Company Meeting (the "Election Form Record Date"), which Election Form shall be used by each record holder of Shares who wishes to make a Parent Stock Election and by each holder of a Company Stock Option who wishes to make a Irrevocable Option Election; *provided* that the Company and Parent shall use commercially reasonable efforts to mail or otherwise make available the Election Form and related materials to all Persons who become record holders of Company Common Stock or Company Stock Options during the period between the Election Form Record Date and the Election Deadline for use by such holders who desire to make a Parent Stock Election. Any such holder's Parent Stock Election or Irrevocable Option

-6-

Election, as the case may be, shall have been properly made only if the Exchange Agent shall have received at its designated office, by 5:00 p.m. New York City time on the Business Day preceding the date of the Stockholders Meeting (the "Election Deadline"), an Election Form properly completed and signed and, in the case of a Parent Stock Election, accompanied by certificates for the Shares (unless such Shares are uncertificated) of Company Common Stock to which such Election Form relates, duly endorsed in blank or otherwise in form acceptable for transfer on the books of the Company (or by an appropriate guarantee of delivery of such certificates as set forth in such Election Form from a firm which is a registered national securities exchange or of the National Association of Securities Dealers, Inc. or by a commercial bank or trust company in the United States as set forth in such Election Form, provided such certificates are in fact delivered to the Exchange Agent within five NYSE trading days after the date of execution of such guarantee of delivery).

(d) <u>Ability to Revoke Election Forms</u>. Any Election Form (other than in connection with an Irrevocable Option Election) may be revoked by the stockholder submitting it to the Exchange Agent only by written notice received by the Exchange Agent prior to the Election Deadline. All Election Forms shall automatically be revoked if the Exchange Agent is notified in writing by Parent and the Company the Merger has been abandoned and this Agreement has been terminated. If an Election Form is revoked, the certificate or certificates (or guarantees of delivery, as appropriate), if any, for the Shares to which such Election Form relates shall be promptly returned to the stockholder submitting the same to the Exchange Agent.

(e) <u>Determination of Exchange Agent Binding</u>. The determination of the Exchange Agent shall be binding as to whether a Parent Stock Election shall have been properly made or revoked pursuant to this Section 2.02 with respect to Shares and when elections and revocations were received by it. If the Exchange Agent determines that any Parent Stock Election was not properly made with respect to any Shares, such Shares shall be treated by the Exchange Agent as Shares which were not Electing Shares at the Effective Time, and, except as otherwise provided in this Agreement, such shares shall be exchanged in the Merger for the Cash Election Price pursuant to Section 2.01(a)(ii). If the Exchange Agent determines that any Irrevocable Option Election was not properly made with respect to any Company Stock Option, the Exchange Agent shall disregard such improper election and such Company Stock Option shall be treated in accordance with Section 2.05(a). The Exchange Agent also shall make all computations as to the allocation and the proration contemplated by Section 2.03, and any such computation shall be conclusive and binding on the holders of Shares and Company Stock Options. The Exchange Agent may, with the mutual agreement of Parent and the Company, make such rules as are consistent with this Section 2.02 for the implementation of the elections provided for herein as shall be necessary or desirable fully to effect such elections.

Section 2.03 <u>Proration</u>.

(a) Notwithstanding anything in this Agreement to the contrary, the maximum aggregate number of shares of Company Common Stock to be converted into the right to receive Parent Common Stock at the Effective Time, either pursuant to Parent Stock Elections or Irrevocable Option Elections, shall be equal to 8,333,333 (the "Maximum Election Number").

-7-

(b) If the total number of Electing Shares and Net Electing Option Shares, in the aggregate, is equal to or less than the Maximum Election Number, then (i) all Electing Shares shall be converted into the right to receive Parent Common Stock in accordance with the terms of Section 2.02(a)(i) and (ii) all Net Electing Option Shares shall be converted into the right to receive shares of Parent Common Stock through the exercise immediately prior to the Effective Time of the appropriate number of Company Stock Options subject to such holder's Irrevocable Option Election pursuant to Section 2.02(a)(ii).

(c) If the total number of Electing Shares and Net Electing Option Shares, in the aggregate, exceeds the Maximum Election Number, then the Electing Shares and the Net Electing Option Shares shall be converted into the right to receive Parent Common Stock or to receive cash in accordance with the terms of Section 2.01(a) or Section 2.05(a), as the case may be, in the following manner:

(i) A proration factor (the "Proration Factor") shall be determined by dividing the Maximum Election Number by the total number of Electing Shares and Net Electing Option Shares;

(ii) The number of Electing Shares covered by each holder's Parent Stock Election shall be converted into the right to receive such number of shares of Parent Common Stock as is equal to the product of (w) the Proration Factor *times* (x) the total number of Electing Shares covered by such holder's Parent Stock Election (subject to the proviso in the following sentence). In addition, in the event that such holder also has made an Irrevocable Option Election, such holder shall have the right to receive an additional number of shares of Parent Common Stock as is equal to the product of (y) the Proration Factor *times* (z) the total number of Net Electing Option Shares covered by such holder's Irrevocable Option Election; *provided* that in the event that the total number of shares of Parent Common Stock such holder would be entitled to receive pursuant to this Section 2.03(c)(ii) exceeds the number of Electing Shares covered by such holder's Parent Stock Election (the amount of such excess, the "Excess Shares"), then (A) all of such holder's Electing Shares shall be converted into Parent Common Stock and (B) the number of such holder's Net Electing Option Shares as is equal to the number of Excess Shares shall be converted into Parent Common Stock through the exercise of an appropriate number of Company Stock Options subject to such holder's Irrevocable Option Election pursuant to Section 2.02(a).

(iii) All Electing Shares, other than those shares converted into the right to receive Parent Common Stock in accordance with Section 2.03(b)(ii), shall be converted into cash, as if such Shares were not Electing Shares, in accordance with the terms of Section 2.01(a)(ii).

(iv) If a holder makes an Irrevocable Option Election but not a Parent Stock Election, then the number of such holder's Net Electing Option Shares as is equal to the product of (x) the Proration Factor *times* (y) the total number of such holder's Net Electing Option Shares shall be converted into Parent Common stock through the exercise of an appropriate number of Company Stock Options subject to such holder's Irrevocable Option Election pursuant to Section 2.02(a).

-8-

(d) In the event that Parent (i) changes (or establishes a record date for changing) the number of shares of Parent Common Stock issued and outstanding prior to the Effective Time as a result of a stock split, stock dividend, stock combination, recapitalization, reclassification, reorganization or similar transaction with respect to the outstanding Parent Company Stock or (ii) pays or makes an extraordinary dividend or distribution in respect of Parent Common Stock (other than a distribution referred to in clause (i) of this sentence) and, in either case, the record date therefor is prior to the Effective Time, the number of shares of Parent Common Stock included in the Merger Consideration shall be proportionately adjusted.

Section 2.04 Exchange of Shares for Merger Consideration.

(a) Exchange Agent. At or immediately subsequent to the Effective Time, Parent shall deposit, or shall cause to be deposited, with the Exchange Agent, for the benefit of holders of the Shares, (i) cash in U.S. dollars sufficient to pay the aggregate cash portion of the Merger Consideration pursuant to Section 2.01(a) and (ii) certificates representing the shares of Parent Common Stock to be issued pursuant to Section 2.01(a) (such cash and certificates for shares of Parent Common Stock, together with any dividends or distributions with respect thereto, being hereinafter referred to as the "Exchange Fund").

(b) Procedures for Surrendering Shares.

(i) As soon as reasonably practicable after the Effective Time and in any event not later than the third Business Day following the Effective Time, the Exchange Agent shall mail to each holder of record of Shares whose Shares were converted into the right to receive the Merger Consideration pursuant to Section 2.01 and whose Shares have not previously been surrendered with the Election Form (A) a letter of transmittal which shall specify that delivery shall be effected, and risk of loss and title to the certificates that immediately prior to the Effective Time represented Shares ("Certificates") shall pass, only upon delivery of Certificates to the Exchange Agent (and shall be in such form and have such other provisions as Parent and the Company may reasonably determine prior to the Effective Time) and (B) instructions for use in effecting the surrender of Certificates (or effective affidavits of loss in lieu thereof) or non-certificated Shares represented by book-entry ("Book-Entry Shares") in exchange for the Merger Consideration.

(ii) Upon surrender of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares to the Exchange Agent together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may customarily be required by the Exchange Agent, the holder of such Certificates or Book-Entry Shares shall be entitled to receive in exchange therefor the Merger Consideration into which the Shares represented by such Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares have been converted pursuant to this Agreement. In the event of a transfer of ownership of Shares that is not registered in the transfer or stock records of the Company, any cash to be paid upon, or shares of Parent Common Stock to be issued upon, due surrender of the Certificate formerly representing such Shares may be paid or issued, as the case may be, to such a transferee if such Certificate is presented to the Exchange Agent, accompanied

-9-

by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer or other similar Taxes have been paid or are not applicable.

(iii) No interest will be paid or accrued for the benefit of holders of the Shares on the Merger Consideration payable upon the surrender of Shares pursuant to this Section 2.04.

(iv) No dividends or other distributions, if any, with a record date after the Effective Time with respect to Parent Common Stock shall be paid to the holder of any unsurrendered Share which is being converted into shares of Parent Common Stock pursuant to Section 2.01(a) until such holder shall surrender such Share in accordance with this Section 2.04. After the surrender of a Share in accordance with this Section 2.04, such holder thereof shall be entitled to receive any such dividends or other distributions, without any interest thereon, which theretofore had become payable with respect to whole shares of Parent Common Stock represented by such Share.

(v) The Surviving Corporation, Parent and the Paying Agent shall be entitled to deduct and withhold from the consideration otherwise payable under this Agreement to any Person such amounts as are required to be withheld or deducted under the Code, or any provision of U.S. state, local or foreign Tax Law with respect to the making of such payment. To the extent that amounts are so withheld or deducted and paid over to the applicable Governmental Entity, such withheld or deducted amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding were made.

(vi) Until surrendered as contemplated by this Section 2.04, each Share (other than any Dissenting Shares, Cancelled Shares and Remaining Shares) shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the applicable Merger Consideration into which the Shares shall have been converted pursuant to Section 2.01.

(c) <u>Closing of Transfer Books</u>. At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the Shares that were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation or Parent for transfer, they shall be cancelled and exchanged for the proper Merger Consideration pursuant to and subject to the requirements of this Article II.

(d) <u>Termination of Exchange Fund</u>. Any portion of the Exchange Fund (including the proceeds of any investments in respect of the cash portion thereof) that remains undistributed to the former holders of Shares for one year after the Effective Time shall be delivered to the Surviving Corporation upon demand, and any former holders of Shares who have not surrendered their Shares in accordance with this Section 2.04 shall thereafter look only to the Surviving Corporation for payment of their claim for the Merger Consideration, without any interest thereon, upon due surrender of their Shares.

-10-

(e) <u>No Liability</u>. Notwithstanding anything herein to the contrary, none of the Company, Parent, Merger Sub, the Surviving Corporation, the Paying Agent or any other person shall be liable to any former holder of Shares for any amount properly delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate shall not have been surrendered prior to the date on which the related Merger Consideration would, pursuant to applicable Law, escheat to or become the property of any Governmental Entity, any such Merger Consideration shall, to the extent permitted by applicable Law, immediately prior to such time, become the property of the Surviving Corporation, free and clear of all claims or interests of any Person previously entitled thereto.

(f) <u>Investment of Exchange Fund</u>. The cash deposited with the Exchange Agent pursuant to Section 2.04(a) and any earnings thereon shall be invested by the Exchange Agent as reasonably directed by Parent; *provided, however,* that any investment of such cash shall in all events be limited to direct short-term obligations of, or short-term obligations fully guaranteed as to principal and interest by, the U.S. government, in commercial paper rated A-1 or P-1 or better by Moody's Investors Service, Inc. or Standard & Poor's Corporation, respectively, and that no such investment or loss thereon shall affect the amounts payable to holders of Certificates or Book-Entry Shares pursuant to this Article II. Any profit or loss, or interest and other income resulting from such investments shall be for the account of Parent and be paid to Parent on the earlier of one year after the Effective Time or full payment of the Exchange Fund.

(g) <u>Lost Certificates</u>. In the case of any Certificate that has been lost, stolen or destroyed, upon the making of an affidavit, in form and substance reasonably acceptable to Parent, of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent or the Paying Agent, the posting by such person of an indemnity agreement or, at the election of Parent or the Paying Agent, a bond in customary amount as indemnity against any claim that may be made against it or the Surviving Corporation with respect to such Certificate, the Paying Agent will deliver in exchange for such lost, stolen or destroyed Certificate an amount equal to the number of Shares represented by such lost, stolen or destroyed Certificate multiplied by the Merger Consideration.

(h) <u>No Further Ownership Rights</u>. All Merger Consideration paid upon the surrender of Shares (or affidavits of loss in lieu thereof) in accordance with the terms of this Article II shall be deemed to have been paid in full satisfaction of all rights pertaining to the Shares.

Section 2.05 <u>Effect of the Merger on Company Stock Options, Company Restricted Shares and RSUs</u>.

(a) Each outstanding option to acquire shares of Company Common Stock (each, a "<u>Company Stock Option</u>"), whether or not then vested or exercisable, that is outstanding immediately prior to the Effective Time shall, as of immediately prior to the Effective Time (and except for (x) Company Stock Options as to which the treatment in the Merger is hereafter separately agreed by Parent and the holder thereof in compliance with Section 5.01(c), which Company Stock Options shall be treated as so agreed and (y) Company Stock Options which are being exercised pursuant to an Irrevocable Option Election), become fully vested and, subject to

-11-

the terms of the Company Stock Plans, be converted into the right to receive a payment in cash, payable in U.S. dollars and without interest, equal to the product of (i) the excess, if any, of (x) the Cash Election Price over (y) the exercise price per share of Company Common Stock subject to such Company Stock Option, *multiplied by* (ii) the number of shares of Company Common Stock for which such Company Stock Option shall not theretofore have been exercised. The Surviving Corporation shall pay the holders of Company Stock Options the cash payments described in this Section 2.05(a) on or as soon as reasonably practicable after the date on which the Effective Time occurs, but in any event within two (2) Business Days thereafter.

(b) Immediately prior to the Effective Time, except as separately agreed by Parent and the holder thereof in compliance with Section 5.01(c), each award of restricted Company Common Stock (the "Company Restricted Shares") shall vest in full and be converted into the right to receive the Merger Consideration in accordance with Section 2.01(a).

(c) Immediately prior to the Effective Time, except as separately agreed by Parent and the holder thereof in compliance with Section 5.01(c), each restricted stock unit in respect of a share of Company Common Stock (collectively, the "RSUs") shall vest in full and be converted into the right to receive the Cash Election Price in respect thereof, and the holder of any such RSU shall be paid as soon as reasonably practicable after the date on which the Effective Time occurs, but in any event within two (2) Business Days thereafter, an aggregate amount of cash as the holder would have been entitled to receive had such RSU been vested in full and settled immediately before the Effective Time.

(d) The Surviving Corporation shall be entitled to deduct and withhold from the amounts otherwise payable pursuant to this Section 2.05 to any holder of Company Stock Options, Company Restricted Shares or RSUs such amounts as the Surviving Corporation is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, or local Tax Law, and the Surviving Corporation shall make any required filings with and payments to Tax authorities relating to any such deduction or withholding. To the extent that amounts are so deducted and withheld by the Surviving Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the Company Stock Options, Company Restricted Shares or RSUs in respect of which such deduction and withholding was made by the Surviving Corporation.

(e) The board of directors of the Company (or the appropriate committee thereof) shall take the actions necessary to effectuate the foregoing provisions of this Section 2.05.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except (i) as disclosed in, and reasonably apparent from, any report, schedule, form or other document filed with, or furnished to, the SEC and publicly available prior to the date of this Agreement (collectively, the "Filed SEC Documents") and only as and to the extent disclosed therein (other than any forward-looking disclosures set forth in any risk factor section, any disclosures in any section relating to forward-looking statements and any other similar

-12-

disclosures included therein to the extent they are primarily cautionary in nature) (*provided* that, in no event shall any disclosure in any Filed SEC Documents qualify or limit the representations and warranties of the Company set forth in Section 3.02(a), 3.04(a) or 3.11(b)(ii) of this Agreement), or (ii) as disclosed in the disclosure letter delivered by the Company to Parent immediately prior to the execution of this Agreement (the "Company Disclosure Letter", it being agreed that disclosure of any item in any section of the Company Disclosure Letter shall also be deemed disclosure with respect to any other section of this Agreement to which the relevance of such item is reasonably apparent; *provided* that no such disclosure shall be deemed to qualify or limit the representations and warranties of the Company set forth in 3.11(b)(ii) of this Agreement unless expressly set forth in Section 3.11(b) of the Company Disclosure Letter), the Company represents and warrants to Parent and Merger Sub as follows:

Section 3.01 Qualification, Organization, Subsidiaries, etc.

(a) Each of the Company and its Significant Subsidiaries (as defined below) is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization. Each of the Company and its Significant Subsidiaries has all requisite corporate, partnership or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

(b) Each of the Company and its Subsidiaries is duly qualified to do business and is in good standing as a foreign corporation (or other legal entity) in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, have a Company Material Adverse Effect. The organizational or governing documents of the Company and each of its Significant Subsidiaries are in full force and effect. Neither the Company nor any Significant Subsidiary is in violation of its organizational or governing documents.

(c) As used in this Agreement, any reference to any fact, circumstance, event, change, effect or occurrence having a "Company Material Adverse Effect" means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects, or occurrences, (1) has or would be reasonably expected to have a material adverse effect on or with respect to the business, results of operation or financial condition of the Company and its Subsidiaries taken as a whole, or (2) that prevents or materially delays or materially impairs the ability of the Company to consummate the Merger, *provided, however,* that a Company Material Adverse Effect shall not include facts, circumstances, events, changes, effects or occurrences (i) generally affecting the consumer or professional audio, automotive audio, information, entertainment or infotainment industries, or the economy or the financial, credit or securities markets, in the United States or other countries in which the Company or its Subsidiaries operate, including effects on such industries, economy or markets resulting from any regulatory and political conditions or developments in general, or any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism (other than any of the foregoing that causes any damage or destruction to or renders physically unusable or inaccessible any facility or property of the Company or any of its Subsidiaries); (ii) reflecting or resulting from changes in Law or GAAP (or authoritative interpretations thereof); (iii) resulting from actions of the Company or any of its Subsidiaries

-13-

which Parent has expressly requested or to which Parent has expressly consented; (iv) to the extent resulting from the announcement of the Merger or the proposal thereof or this Agreement and the transactions contemplated hereby, including any lawsuit related thereto or any loss or threatened loss of or adverse change or threatened adverse change, in each case resulting therefrom, in the relationship of the Company or its Subsidiaries with its customers, suppliers, employees or others; (v) resulting from changes in the market price or trading volume of the Company's securities or from the failure of the Company to meet internal or public projections, forecasts or estimates *provided* that the exceptions in this clause (v) are strictly limited to any such change or failure in and of itself and shall not prevent or otherwise affect a determination that any fact, circumstance, event, change, effect or occurrence underlying such change or such failure has resulted in, or contributed to, a Company Material Adverse Effect; or (vi) resulting from the suspension of trading in securities generally on the NYSE; except to the extent that, with respect to clauses (i) and (ii), the impact of such fact, circumstance, event, change, effect or occurrence is disproportionately adverse to the Company and its Subsidiaries, taken as a whole.

     Section 3.02 <u>Capital Stock</u>.

     (a) The authorized capital stock of the Company consists of 200,000,000 shares of common stock, $0.01 par value per share ("<u>Company Common Stock</u>"), and 5,000,000 shares of preferred stock, $0.01 par value per share ("<u>Authorized Preferred Stock</u>"), 500,000 of which have been designated as Series A Junior Participating Preferred Stock (the "<u>Series A Preferred Stock</u>") reserved for issuance in connection with the rights (the "<u>Rights</u>") issued under the Company's Rights Agreement, dated as of December 13, 1999, by and between the Company and Mellon Investor Services LLC (formerly known as ChaseMellon Shareholder Services, L.L.C.), as Rights Agent (the "<u>Rights Agreement</u>"). As of the close of business on April 24, 2007 (the "<u>Capitalization Date</u>"), (i) 65,159,777 shares of Company Common Stock were issued and outstanding, including 12,000 Company Restricted Shares outstanding pursuant to awards granted under the Company Stock Plans, (ii) 18,198,082 shares of Company Common Stock were held by the Company in its treasury, (iii) (A) there were 2,888,512 shares of Company Common Stock underlying outstanding Company Stock Options, such Company Stock Options having a weighted average exercise price as of the Capitalization Date of $50.95, (B) there were 25,000 shares of Company Common Stock underlying outstanding RSUs and (C) 3,983,873 additional shares of Company Common Stock were reserved for issuance for future grants pursuant to the Company Stock Plans and (iv) no shares of Preferred Stock were issued or outstanding. All outstanding shares of Company Common Stock, and all shares of Company Common Stock reserved for issuance as noted in clause (iii) of the foregoing sentence, when issued in accordance with the respective terms thereof, are or will be duly authorized, validly issued, fully paid and non-assessable and free of pre-emptive or similar rights. No Subsidiary of the Company owns any Company Common Stock. <u>Section 3.02(a)</u> of the Company Disclosure Letter lists, as of the date of this Agreement, each outstanding Company Stock Option and the exercise price thereof.

     (b) Except as set forth in subsection (a) above, (i) as of the date of this Agreement, the Company does not have any shares of its capital stock issued or outstanding other than shares of Company Common Stock that have become outstanding after the Capitalization Date upon exercise of Company Stock Options outstanding as of such date or upon vesting or payment with respect to RSUs and (ii) there are no outstanding subscriptions,

-14-

options, warrants, calls, convertible securities, stock-based performance units or other similar rights, agreements or commitments relating to the issuance of capital stock or other equity interests to which the Company or any of its Subsidiaries is a party obligating the Company or any of its Subsidiaries to (A) issue, transfer or sell any shares of capital stock or other equity interests of the Company or any of its Subsidiaries or securities convertible into or exchangeable for such shares or equity interests, (B) issue, grant, extend or enter into any such subscription, option, warrant, call, convertible securities or other similar right, agreement or arrangement, (C) redeem or otherwise acquire any such shares of capital stock or other equity interests or (D) provide a material amount of funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, the Company or any Subsidiary of the Company.

        (c) Except for the awards to acquire shares of Company Common Stock under the Company Stock Plans, neither the Company nor any of its Subsidiaries has outstanding bonds, debentures, notes or other obligations, the holders of which have the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the stockholders of the Company on any matter.

        (d) There are no shareholder agreements, voting trusts or other agreements or understandings to which the Company or any of its Subsidiaries is a party with respect to the voting, registration, redemption, repurchase or disposition of the capital stock or other equity interest of the Company or any of its Significant Subsidiaries.

        Section 3.03 Subsidiaries. All equity interests (including partnership interests and limited liability company interests) of the Company's Subsidiaries held by the Company or by any other Subsidiary have been duly and validly authorized and are validly issued, fully paid and non-assessable and were not issued in violation of any preemptive or similar rights, purchase option, call or right of first refusal or similar rights. All such equity interests owned by the Company or its Subsidiaries are free and clear of any Liens, other than restrictions on transfer imposed by applicable Law. Except for its interests in Subsidiaries of the Company, the Company does not own, directly or indirectly, 5% or more of the outstanding capital stock of, or other equity interests, in any Person, or any options, warrants, rights or securities convertible, exchangeable or exercisable therefor.

        Section 3.04 Corporate Authority Relative to This Agreement; No Violation.

        (a) The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement and, subject to receipt of the Company Stockholder Approval, to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the board of directors of the Company and, except for (i) the Company Stockholder Approval and (ii) the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, no other corporate proceedings on the part of the Company are necessary to authorize the consummation of the transactions contemplated hereby. Subject to Section 5.02(d), the board of directors of the Company has unanimously, by resolutions duly adopted at a meeting duly called and held, (x) approved and declared advisable this Agreement and the transactions contemplated hereby, (y) determined that the terms of this Agreement are fair to, and in the best interests of, the Company

-15-

and its stockholders and (z) resolved to recommend that the Company's stockholders vote in favor of adoption of this Agreement (the "Recommendation"). This Agreement has been duly and validly executed and delivered by the Company and, assuming this Agreement constitutes the valid and binding agreement of Parent and Merger Sub, constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at Law) and any implied covenant of good faith and fair dealing.

(b) Other than in connection or in compliance with (i) the DGCL, or any applicable Delaware anti-takeover or investor protection statute, (ii) the applicable requirements of the Securities Act of 1933, as amended (the "Securities Act"), and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and any related filings or approvals under applicable state securities Laws, (iii) the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "HSR Act") and the applicable Laws relating to antitrust matters or regulating competition of jurisdictions other than the United States set forth in Section 3.04(b) of the Company Disclosure Letter, and (iv) the approvals set forth on Section 3.04(b) of the Company Disclosure Letter (collectively, the "Company Approvals"), no authorization, consent, approval or order of, or filing with, or notice to, any United States or foreign governmental or regulatory agency, commission, court, body, entity or authority (each, a "Governmental Entity") is necessary, under applicable Law, in connection with the execution, delivery and performance of this Agreement by the Company or the consummation by the Company of the transactions contemplated hereby, except for such authorizations, consents, approvals, orders, filings or notices that, if not obtained or made, would not, individually or in the aggregate, have a Company Material Adverse Effect.

(c) The execution, delivery and performance by the Company of this Agreement does not, and the consummation of the transactions contemplated hereby and compliance with the provisions hereof by the Company will not, (i) result in any breach or violation of, or default (with or without notice or lapse of time, or both) under, require consent under, or give rise to a right of termination, cancellation, modification or acceleration of any obligation or to the loss of any benefit under any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, purchase or sale order, instrument, permit, Company Permit, concession, franchise, right or license binding upon the Company or any of its Subsidiaries or result in the creation of any liens, claims, mortgages, encumbrances, pledges, security interests, equities or charges of any kind (each, a "Lien") upon any of the properties, assets or rights of the Company or any of its Subsidiaries, (ii) conflict with or result in any violation of any provision of the Company Charter or the Company's by-laws, (iii) conflict with or result in any violation of any provision of the certificate or articles of incorporation or by-laws or other equivalent organizational document of any of the Company's Subsidiaries or (iv) assuming that the consents and approvals referred to in Section 3.04(b)(i)-(iv) are duly obtained, conflict with or violate any applicable Laws, other than, in the case of clauses (i), (iii) and (iv), as would not, individually or in the aggregate, have a Company Material Adverse Effect.

-16-

Section 3.05 <u>Reports and Financial Statements</u>.

(a) The Company has timely filed all forms, documents, statements and reports required to be filed by it with the Securities and Exchange Commission (the "<u>SEC</u>") since July 1, 2004 (the forms, documents, statements and reports filed with the SEC since July 1, 2004, including any amendments thereto, the "<u>Company SEC Documents</u>"). As of their respective dates, or, if amended or superseded by a subsequent filing made prior to the date hereof, as of the date of the last such amendment or superseding filing prior to the date hereof, the Company SEC Documents complied, and each of the Company SEC Documents filed subsequent to the date of this Agreement will comply, in all material respects with the requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act of 2002 (the "<u>Sarbanes-Oxley Act</u>"), as the case may be, and the applicable rules and regulations promulgated thereunder. As of the time of filing with the SEC, none of the Company SEC Documents so filed or that will be filed subsequent to the date of this Agreement contained or will contain, as the case may be, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except to the extent that the information in such Company SEC Document has been amended or superseded by a later Company SEC Document filed prior to the date hereof. No Subsidiary of the Company is subject to the periodic reporting requirements of the Exchange Act.

(b) The financial statements (including all related notes and schedules) of the Company and its Subsidiaries included in the Company SEC Documents complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, fairly present in all material respects the financial position of the Company and its Subsidiaries, as at the respective dates thereof, and the results of their operations and their cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments expressly described therein, including the notes thereto, none of which are expected to have a Company Material Adverse Effect) and were prepared in conformity with United States generally accepted accounting principles ("<u>GAAP</u>") (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be expressly indicated therein or in the notes thereto).

(c) To the Knowledge of the Company, as of the date of this Agreement, none of the Company SEC Documents is the subject of ongoing SEC review, outstanding SEC investigation or material outstanding SEC comment.

Section 3.06 <u>No Undisclosed Liabilities</u>. Except (i) as reflected or reserved against in the Company's consolidated balance sheet as of December 31, 2006 (or the notes thereto) included in the Company SEC Documents filed prior to the date hereof, (ii) for liabilities or obligations incurred in connection with the transactions contemplated by this Agreement or the financing of such transactions, (iii) for liabilities and obligations incurred in the ordinary course of business consistent with past practice since December 31, 2006, (iv) liabilities of a nature not required by GAAP to be set forth on a consolidated balance sheet of the Company and its Subsidiaries or the notes thereto, pursuant to any Contract or similar arrangement binding on the Company or any of its Subsidiaries, and (v) as expressly included within the scope of another

-17-

representation or warranty in this Article III or as expressly excluded from any representation or warranty in this Article III as a result of the scope of any materiality or similar qualification applicable to such representation or warranty (provided that any matter arising after the date hereof shall not be deemed to be within the scope of or excluded from any representation or warranty given at or as of the date hereof or any date prior to the date hereof), neither the Company nor any Subsidiary of the Company has any liabilities or obligations of any nature, whether or not accrued, contingent or otherwise and whether due or to become due, that would, individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.07 Compliance with Law; Permits.

(a) The Company and each of its Subsidiaries is in compliance with and is not in default under or in violation of any applicable federal, state, local or foreign or provincial law, statute, code, ordinance, rule, regulation, judgment, order, injunction, decree or agency requirement of or undertaking to or agreement with any Governmental Entity, including common law (collectively, "Laws" and each, a "Law"), except where such non-compliance, default or violation would not, individually or in the aggregate, have a Company Material Adverse Effect.

(b) The Company and its Subsidiaries are in possession of all franchises, tariffs, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Entity necessary for the Company and its Subsidiaries to own, lease and operate their properties and assets or to carry on their businesses as they are now being conducted (the "Company Permits"), except where the failure to have any of the Company Permits would not, individually or in the aggregate, have a Company Material Adverse Effect. All Company Permits are in full force and effect, except where the failure to be in full force and effect would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.08 Environmental Laws and Regulations.

(a) Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, (i) the Company and each of its Subsidiaries have conducted their respective businesses in compliance with all, and have not violated any, applicable Environmental Laws, (ii) there has been no release of any Hazardous Substance by the Company or any of its Subsidiaries in any manner that could reasonably be expected to give rise to any remedial obligation, corrective action requirement or liability under applicable Environmental Laws, (iii) since July 1, 2005, neither the Company nor any of its Subsidiaries has received in writing any claims, notices, demand letters or requests for information (except for such claims, notices, demand letters or requests for information the subject matter of which has been resolved prior to the date of this Agreement) from any federal, state, local or foreign or provincial Governmental Entity or any other Person asserting that the Company or any of its Subsidiaries is in violation of, or liable under, any Environmental Law, (iv) no Hazardous Substance has been disposed of, arranged to be disposed of, released or transported in violation of any applicable Environmental Law, or in a manner giving rise to, or that would reasonably be expected to give rise to, any liability under Environmental Law, from any current or former properties or facilities while owned or operated by the Company or any of its Subsidiaries or as a result of any operations or activities of the Company or any of its Subsidiaries at any location and, to the

-18-

Knowledge of the Company, Hazardous Substances are not otherwise present at or about any such properties or facilities in amount or condition that would reasonably be expected to result in liability to the Company or any of its Subsidiaries under Environmental Law, and (v) neither the Company, its Subsidiaries nor any of their respective properties or facilities are subject to, or to the Knowledge of the Company, are threatened to become subject to, any liabilities relating to any suit, settlement, court order, administrative order, regulatory requirement, judgment or written claim asserted or arising under any Environmental Law or any agreement relating to environmental liabilities. Notwithstanding any other representation or warranty contained in this Article III, the representations and warranties contained in this Section 3.08 constitute the sole representations and warranties of the Company relating to any Environmental Law.

(b) As used herein, "Environmental Law" means any Law relating to (i) the protection, preservation or restoration of the environment (including air, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or (ii) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Substances.

(c) As used herein, "Hazardous Substance" means any substance listed, defined, designated, classified or regulated as a waste, pollutant or contaminant or as hazardous, toxic, radioactive or dangerous or any other term of similar import under any Environmental Law, including petroleum.

Section 3.09 Employee Benefit Plans.

(a) Section 3.09(a) of the Company Disclosure Letter sets forth a true and complete list of each material Company Benefit Plan. For purposes of this Agreement, the term "Company Benefit Plan" shall mean any employee or director benefit plan, arrangement or agreement, including any such plan that is an employee welfare benefit plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), an employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) or a bonus, incentive, deferred compensation, vacation, stock purchase, stock option, severance, employment, change of control or fringe benefit plan, program or agreement that is sponsored or maintained by the Company or any of its Subsidiaries to or for the benefit of the current or former employees, independent contractors or directors of the Company and its Subsidiaries.

(b) Except as would not have a Company Material Adverse Effect: (i) each of the Company Benefit Plans has been established, operated and administered in compliance with applicable Laws, including ERISA, the Code and in each case the regulations thereunder; (ii) each of the Company Benefit Plans intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service ("IRS") or an application therefore was filed with the IRS within the applicable remedial amendment period in accordance with Section 401(b) of the Code, and to the Knowledge of the Company, there are no existing circumstances or events that have occurred that could reasonably be expected to result in the revocation of such letter; (iii) no Company Benefit Plan is subject to Title IV of ERISA; (iv) no Company Benefit Plan provides health, life insurance or disability

-19-

benefits (whether or not insured), with respect to current or former employees or directors of the Company or its Subsidiaries beyond their retirement or other termination of service, other than (A) coverage mandated by applicable Law or (B) death benefits or retirement benefits under any "employee pension plan" (as such term is defined in Section 3(2) of ERISA or any comparable pension plan within the meanings of comparable Laws applicable with respect to such plans maintained outside of the United States); (v) no liability under Title IV of ERISA has been incurred by the Company, its Subsidiaries or any ERISA Affiliate of the Company that has not been satisfied in full, and, to the Knowledge of the Company, no condition exists that presents a risk to the Company, its Subsidiaries or any ERISA Affiliate of the Company of incurring a liability thereunder; (vi) no Company Benefit Plan is a "multiemployer pension plan" (as such term is defined in Section 3(37) of ERISA) or a plan that has two or more contributing sponsors at least two of whom are not under common control, within the meaning of Section 4063 of ERISA; (vii) all contributions or other amounts payable by the Company or its Subsidiaries as of the date of this Agreement with respect to each Company Benefit Plan in respect of current or prior plan years have been paid or accrued in accordance with GAAP; (viii) neither the Company nor its Subsidiaries has engaged in a transaction in connection with which the Company or its Subsidiaries could reasonably be expected to be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a Tax imposed pursuant to Section 4975 or 4976 of the Code; and (ix) there are no pending or threatened claims (other than routine claims for benefits) by, on behalf of or against any of the Company Benefit Plans or any trusts related thereto which could reasonably be expected to result in any liability of the Company or any of its Subsidiaries. "ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

(c) Except as would not result in a material liability of the Company and its Subsidiaries, taken as a whole, no Company Benefit Plan exists that as a result of the consummation of the transactions contemplated by this Agreement will, either alone or in combination with another event, (i) entitle any employee or officer of the Company or any of its Subsidiaries to severance pay, unemployment compensation or any other payment, except as expressly provided in this Agreement or as required by applicable Law or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due any such employee, consultant or officer, except as expressly provided in this Agreement. No payments or benefits reasonably expected to be provided under any of the Company Benefit Plans are reasonably expected to fail to be deductible under Section 280G of the Code.

(d) Except as, individually or in the aggregate, would not be reasonably expected to have a Company Material Adverse Effect, with respect to any Company Benefit Plan that is maintained outside the jurisdiction of the United States, or covers any director, employee or independent contractor residing or working outside the United States: (i) all such plans that are required by applicable Law to be funded are funded to the extent required, and with respect to all other such plans, reserves sufficient under applicable accounting principles to provide for all obligations accrued through the Effective Date thereunder have been established on the accounting statements of the applicable Company or Subsidiary entity and (ii) no liability or obligation of the Company or its Subsidiaries exists with respect to such plans.

-20-

Section 3.10 <u>Interested Party Transactions</u>. Except for compensatory or employment-related Contracts filed or incorporated by reference as an exhibit to a Filed SEC Document filed prior to the date hereof or Company Benefit Plans, <u>Section 3.10</u> of the Company Disclosure Letter sets forth a correct and complete list of the contracts or arrangements that are in existence as of the date of this Agreement under which the Company has any existing or future material liabilities between the Company or any of its Subsidiaries, on the one hand, and, on the other hand, any (A) present executive officer or director of either the Company or any of its Subsidiaries or any person that has served as such an officer or director or any of such executive officer's or director's immediate family members, (B) record or beneficial owner of more than 5% of the Shares as of the date of this Agreement or (C) to the Knowledge of the Company, any Affiliate of any such executive officer, director or owner (other than the Company or any of its Subsidiaries) (each, an "<u>Affiliate Transaction</u>").

Section 3.11 <u>Absence of Certain Changes or Events</u>.

(a) Since December 31, 2006, through the date of this Agreement, except for the transactions contemplated hereby, the business of the Company and its Subsidiaries has been conducted, in all material respects, in the ordinary course of business consistent with past practice.

(b) (i) Since December 31, 2006, through the date of this Agreement, there has not been any facts, circumstances, events, changes, effects or occurrences that, individually or in the aggregate, would be reasonably expected to have, a Company Material Adverse Effect; and (ii) since the date of this Agreement there shall not have occurred any event, change, effect or occurrence that, individually or in the aggregate, would be reasonably expected to have a Company Material Adverse Effect.

Section 3.12 <u>Investigations; Litigation</u>. There are no (i) investigations or proceedings pending or, to the Knowledge of the Company, threatened by any Governmental Entity with respect to the Company or any of its Subsidiaries or any of their properties or assets, (ii) actions, suits, arbitrations, claims or proceedings pending or, to the Knowledge of the Company, threatened against or affecting the Company or any of its Subsidiaries, or any of their respective properties or assets, at Law or in equity, or (iii) orders, judgments or decrees of any Governmental Entity against the Company or any of its Subsidiaries, which, in the case of clauses (i) or (ii), individually or in the aggregate, would be reasonably expected to have a Company Material Adverse Effect.

Section 3.13 <u>Proxy Statement; Other Information</u>. None of the information supplied by the Company for inclusion or incorporation by reference in (i) the registration statement on Form S-4 to be filed with the SEC by Parent in connection with the issuance of the Parent Common Stock following the Merger (such registration statement on Form S-4, as amended or supplemented, the "<u>Form S-4</u>") will, at the time the Form S-4 is filed with the SEC, and at any time it is amended or supplemented or at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading and (ii) the Proxy Statement and any other document filed with the SEC by the Company in connection with the Merger (collectively, with

-21-

the Form S-4 and any amendments or supplements to any of the foregoing, the "SEC Filings") will, at the time of the mailing to the stockholders of the Company or at the time of the Company Meeting or at the time of any amendments thereof or supplements thereto, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided* that no representation is made by the Company with respect to the Financing or to information supplied by or related to or the sufficiency of disclosures related to, Parent, Merger Sub or any Affiliate of Parent or Merger Sub or any of their plans for the Company or any of its Affiliates after the Effective Time. The SEC Filings made by the Company will comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations of the SEC thereunder. The letter to shareholders, notice of meeting, proxy statement/prospectus, forms of proxy and any other soliciting materials to be distributed to the stockholders of the Company in connection with seeking the adoption of this Agreement and the consummation of the transactions contemplated hereby are collectively referred to herein as the "Proxy Statement."

Section 3.14 Tax Matters.

(a) Except as would not have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company and each of its Subsidiaries have prepared and timely filed (taking into account any valid extension of time within which to file) all Tax Returns required to be filed by any of them and all such Tax Returns are complete and accurate, (ii) the Company and each of its Subsidiaries have timely paid all Taxes that are required to be paid by any of them (whether or not shown on any Tax Return), except with respect to matters contested in good faith through appropriate proceedings and for which adequate reserves have been established on the financial statements of the Company and its Subsidiaries in accordance with GAAP, (iii) the U.S. consolidated federal income Tax Returns of the Company through the Tax year ending June 30, 2002 have been examined or are currently being examined by the IRS (or the period for assessment of the Taxes in respect of which such Tax Returns were required to be filed has expired), (iv) all assessments for Taxes due with respect to completed and settled examinations or any concluded litigation have been fully paid, (v) there are no audits, examinations, investigations or other proceedings pending or threatened in writing in respect of Taxes or Tax matters of the Company or any of its Subsidiaries, (vi) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than statutory Liens for Taxes not yet due and payable or Liens for Taxes that are being contested in good faith through appropriate proceedings and for which adequate reserves have been established on the financial statements of the Company and its Subsidiaries in accordance with GAAP, (vii) none of the Company or any of its Subsidiaries has been a "controlled corporation" or a "distributing corporation" in any distribution that was purported or intended to be governed by Section 355 of the Code (or any similar provision of state, local or foreign Tax Law) occurring during the two-year period ending on the date hereof, (viii) the Company and each of its Subsidiaries has timely withheld and paid to the appropriate Governmental Entity all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, independent contractor, shareholder or other third party, or amounts paid or owing among the Company and any of its Subsidiaries, (ix) neither the Company nor any of its Subsidiaries is a party to any agreement or arrangement relating to the apportionment, sharing, assignment or

-22-

allocation of any Tax or Tax asset (other than an agreement or arrangement solely among members of a group the common parent of which is the Company or a Subsidiary of the Company) or has any liability for Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulation Section 1.1502-6 (or any predecessor or successor thereof or any analogous or similar provision of Tax Law), by contract, agreement or otherwise, (x) no waivers or extensions of any statute of limitations have been granted or requested with respect to any Taxes of the Company or any of its Subsidiaries that remain in effect, (xi) none of the Company or any of its Subsidiaries has been a party to any "listed transaction" within the meaning of Treasury Regulation 1.6011-4(b)(2), and (xii) no closing agreement pursuant to Section 7121 of the Code (or any similar provision of state, local or foreign Tax Law) has been entered into by or with respect to the Company or any of its Subsidiaries.

(b) As used in this Agreement:

(i) "Tax" or "Taxes" means any and all federal, state, local or foreign or provincial taxes, imposts, levies or other like assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, and like fees, assessments and charges of any kind whatsoever, including any and all interest, penalties, additions to tax or additional amounts imposed by any Governmental Entity in connection with respect thereto; and

(ii) "Tax Return" means any return, report or similar filing (including any attached schedules, supplements and additional or supporting material) filed or required to be filed with respect to Taxes, including any information return, claim for refund, amended return or declaration of estimated Taxes (and including any amendments with respect thereto).

Section 3.15 Labor Matters. Neither the Company nor any of its Subsidiaries is a party to, or bound by, any collective bargaining agreement, or other contract with a labor union or similar labor organization that is material to the Company and its Subsidiaries taken as a whole. Neither the Company nor any of its Subsidiaries is subject to a dispute, strike or work stoppage except as would not, individually or in the aggregate, have a Company Material Adverse Effect. To the Knowledge of the Company, there are no organizational efforts with respect to the formation of a collective bargaining unit presently being made or threatened involving employees of the Company or any of its Subsidiaries except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.16 Intellectual Property. Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, either the Company or a Subsidiary of the Company owns, or is licensed or otherwise possesses adequate rights to use, all material trademarks, trade names, service marks, service names, mark registrations, logos, assumed names, domain names, registered and unregistered copyrights, software, patents or other intellectual property, and all applications and registrations used in their respective businesses as currently conducted (collectively, the "Intellectual Property"), free and clear of all Liens. Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, (i) there

-23-

are no pending or, to the Knowledge of the Company, threatened in writing claims by any person alleging infringement by the Company or any of its Subsidiaries for their use of the Intellectual Property of the Company or any of its Subsidiaries; (ii) the conduct of the business of the Company and its Subsidiaries does not infringe or violate any intellectual property rights of any person; (iii) to the Knowledge of the Company, no person is infringing any Intellectual Property of the Company or any of its Subsidiaries; (iv) the Company takes reasonable actions to protect its Intellectual Property, its ownership of proprietary Intellectual Property and the security of its software, systems and networks; and (v) the patents and registered Intellectual Property owned by the Company and its Subsidiaries is valid and enforceable.

Section 3.17 Property. Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, the Company or a Subsidiary of the Company owns and has good and valid title to all of its owned real property and good title to all its personal property and has valid leasehold interests in all of its leased properties, sufficient to conduct their respective businesses as currently conducted, free and clear of all Liens (except in all cases for Liens permissible under any applicable loan agreements and indentures and for title exceptions, defects, encumbrances, liens, charges, restrictions, restrictive covenants and other matters, whether or not of record, which in the aggregate do not materially affect the continued use of the property for the purposes for which the property is currently being used), assuming the timely discharge of all obligations owing under or related to the owned real property, the personal property and the leased property. Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, all leases under which the Company or any of its Subsidiaries lease any real or personal property are valid and in full force and effect against the Company or any of its Subsidiaries and, to the Company's Knowledge, the counterparties thereto, in accordance with their respective terms, and there is not, under any of such leases, any existing default by the Company or any of its Subsidiaries which, with notice or lapse of time or both, would become a default by the Company or any of its Subsidiaries.

Section 3.18 Required Vote of the Company Stockholders. Assuming the accuracy of the representations and warranties in Section 4.07, the affirmative vote of the holders of outstanding shares of Company Common Stock representing at least a majority of all the votes then entitled to vote at a meeting of stockholders is the only vote of holders of any class of securities of the Company which is required to approve and adopt this Agreement, the Merger and the other transactions contemplated hereby (the "Company Stockholder Approval").

Section 3.19 Material Contracts.

(a) Section 3.19 of the Company Disclosure Letter sets forth a list of all Material Contracts as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means all Contracts to which the Company or any of its Subsidiaries is a party or by which the Company, any of its Subsidiaries or any of their respective properties or assets is bound (other than Company Benefit Plans) that:

(i) are or would be required to be filed by the Company as a "material contract" pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act or disclosed by the Company on a Current Report on Form 8-K;

-24-

(ii) with respect to a joint venture, partnership, limited liability or other similar agreement or arrangement, relate to the formation, creation, operation, management or control of any partnership or joint venture that is material to the business of the Company and the Subsidiaries, taken as a whole;

(iii) relate to Indebtedness and having an outstanding principal amount in excess of $15,000,000;

(iv) were entered into after December 31, 2006 or not yet consummated, and involve the acquisition from another person or disposition to another Person, directly or indirectly (by merger or otherwise), of assets or capital stock or other equity interests of another Person for aggregate consideration under such Contract (or series of related Contracts) in excess of $30,000,000 (other than acquisitions or dispositions of inventory in the ordinary course of business);

(v) relate to an acquisition, divestiture, merger or similar transaction that contains representations, covenants, indemnities or other obligations (including indemnification, "earn-out" or other contingent obligations), that are still in effect and, individually, could reasonably be expected to result in payments in excess of $30,000,000;

(vi) relate to any guarantee or assumption of Indebtedness of any third party or reimbursement of any maker of a letter of credit, except for agreements entered into in the ordinary course of business consistent with past practice which agreements relate to obligations which do not exceed $25,000,000 in the aggregate for all such agreements;

(vii) are license, cross-license, royalty, development or other Intellectual Property agreements that involved total fees in either the current or the most recently completed fiscal year of the Company of more than $15,000,000;

(viii) with customers of the Company or any of its Subsidiaries that made gross payments to the Company or any of its Subsidiaries of $75,000,000 or more in the twelve months ended June 30, 2006 (other than "purchase orders");

(ix) prohibits the payment of dividends or distributions in respect of the capital stock of the Company or any of its wholly owned Subsidiaries, prohibits the pledging of the capital stock of the Company or any wholly owned Subsidiary of the Company or prohibits the issuance of guarantees by any wholly owned Subsidiary of the Company; or

(x) relate to an Affiliate Transaction.

(b) (i) Each Company Material Contract is valid and binding on the Company and any of its Subsidiaries to the extent such Subsidiary is a party thereto, as applicable, and to the Knowledge of the Company, each other party thereto, and is in full force and effect and enforceable in accordance with its terms, except where the failure to be valid, binding, enforceable and in full force and effect, would not, either individually or in the aggregate, have a

-25-

Company Material Adverse Effect, (ii) the Company and each of its Subsidiaries, and, to the Knowledge of the Company, any other party thereto, has performed all obligations required to be performed by it under each Company Material Contract, except where such noncompliance, would not, either individually or in the aggregate, have a Company Material Adverse Effect, and (iii) neither the Company nor any of its Subsidiaries has received written notice of, the existence of any event or condition which constitutes, or, after notice or lapse of time or both, will constitute, a default on the part of the Company or any of its Subsidiaries under any such Material Contract, except where such default would not, either individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.20 <u>Finders or Brokers</u>. Except for Bear, Stearns & Co. Inc., neither the Company nor any of its Subsidiaries has engaged any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who might be entitled to any fee or any commission in connection with or upon consummation of the Merger or the other transactions contemplated hereby.

Section 3.21 <u>Fairness Opinion</u>. The Company has received the opinion of Bear, Stearns & Co. Inc., dated the date of this Agreement, to the effect that, as of such date, the Cash Election Price is fair, from a financial point of view, to the holders of shares of the Company Common Stock, a signed copy of which opinion has been or will promptly be provided to Parent. The Company has furnished to Parent a true and complete copy of any Contract between the Company and Bear, Stearns & Co. Inc. pursuant to which Bear, Stearns & Co. Inc. could be entitled to any payment from the Company relating to the transactions contemplated hereby.

Section 3.22 <u>State Takeover Statutes; Charter Provisions; Company Rights Agreement</u>. Assuming the accuracy of the representations and warranties in Section 4.07, the board of directors of the Company has taken all actions necessary so that no anti-takeover statute or regulation, in each case under the DGCL or other applicable laws of the State of Delaware shall be applicable to the execution, delivery or performance of this Agreement, the consummation of the Merger and the other transactions contemplated by this Agreement. Prior to the execution of this Agreement, the Company has amended the Rights Agreement so that (a) neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby will (i) cause the Rights to become exercisable, (ii) cause Parent, Merger Sub or any of their Affiliates or Associates (as such terms are defined in the Rights Agreement) to become an Acquiring Person (as defined in the Rights Agreement) or (iii) give rise to a Share Acquisition Date, Distribution Date, a Flip-in-Event, a Flip-over-Event or a Triggering Event (as such terms are defined in the Rights Agreement) and (b) the Rights will expire in their entirety immediately prior to the Effective Time without any payment being made in respect thereof. The Company has made available to Parent a complete and correct copy of such amendment.

Section 3.23 <u>No Other Representations</u>. The Company acknowledges that each of Parent and Merger Sub makes no representations or warranties as to any matter whatsoever except as expressly set forth in Article IV. The representations and warranties set forth in Article IV are made solely by Parent and Merger Sub, and no Representative of Parent or Merger Sub shall have any responsibility or liability related thereto.

-26-

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Except as disclosed in the disclosure letter delivered by Parent to the Company immediately prior to the execution of this Agreement (the "Parent Disclosure Letter"), Parent and Merger Sub jointly and severally represent and warrant to the Company as follows:

Section 4.01 Qualification; Organization.

(a) Each of Parent and Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Each of Parent and Merger Sub has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

(b) Each of Parent and Merger Sub is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, have a Parent Material Adverse Effect. The organizational or governing documents of the Parent and Merger Sub, as previously provided to the Company, are in full force and effect. Neither Parent nor Merger Sub is in violation of its organizational or governing documents.

Section 4.02 Corporate Authority Relative to This Agreement; No Violation.

(a) Each of Parent and Merger Sub has all requisite corporate power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement, including the Financing. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, including the Financing (as defined herein), have been duly and validly authorized by the Boards of Directors of Parent and Merger Sub and no other corporate proceedings on the part of Parent or Merger Sub are necessary to authorize the consummation of the transactions contemplated hereby (other than the adoption of this Agreement by Parent in its capacity as sole stockholder of Merger Sub). This Agreement has been duly and validly executed and delivered by Parent and Merger Sub and, assuming this Agreement constitutes the valid and binding agreement of the Company, this Agreement constitutes the valid and binding agreement of Parent and Merger Sub, enforceable against each of Parent and Merger Sub in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at Law) and any implied covenant of good faith and fair dealing.

(b) Other than in connection with or in compliance with (i) the DGCL, or any applicable Delaware anti-takeover or investor protection statute, (ii) the applicable requirements of the Securities Act and Exchange Act and any related filings or approvals under applicable state securities Laws, (iii) the HSR Act and the applicable Laws relating to antitrust matters or

-27-

regulating competition of jurisdictions other than the United States set forth in <u>Section 3.04(b)</u> of the Company Disclosure Letter (collectively, the "<u>Parent Approvals</u>"), no authorization, consent, approval or order of, or filing with, or notification to, any Governmental Entity is necessary in connection with the execution, delivery and performance of this Agreement by Parent or Merger Sub or the consummation by Parent or Merger Sub of the transactions contemplated by this Agreement, except for such authorizations, consents, approvals, orders, filings or notices that, if not obtained or made, would not, individually or in the aggregate, have a Parent Material Adverse Effect.

(c) The execution, delivery and performance by Parent and Merger Sub of this Agreement does not, and the consummation of the transactions contemplated hereby, including the Financing, and compliance with the provisions hereof will not (i) result in any breach or violation of, or default (with or without notice or lapse of time, or both) under, require consent under, or give rise to a right of termination, cancellation, modification or acceleration of any obligation or to the loss of any benefit under any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, purchase or sale order, instrument, permit, concession, franchise, right or license binding upon Parent or any of its Subsidiaries or result in the creation of any Lien upon any of the properties, assets or rights of Parent or any of its Subsidiaries, (ii) conflict with or result in any violation of any provision of the certificate of incorporation or by-laws or other equivalent organizational document, in each case as amended, of Parent or any of its Subsidiaries or (iii) assuming that all Parent Approvals are obtained, conflict with or violate any applicable Laws, other than, (x) in the case of clauses (i) and (iii), as would not, individually or in the aggregate, have a Parent Material Adverse Effect and (y) in the case of clause (i) or (iii), to the extent relating to the Company or its Subsidiaries or a change of control thereof.

Section 4.03 <u>Proxy Statement; Other Information</u>. None of the information supplied or to be supplied by Parent or Merger Sub for inclusion or incorporation by reference in (i) the Form S-4 will, at the time the Form S-4 is filed with the SEC, and at any time it is amended or supplemented or at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading and (ii) the Proxy Statement and any other document filed with the SEC by the Company in connection with the Merger will, at the time of the mailing of the Proxy Statement to the stockholders of the Company or at the time of the Company Meeting or at the time of any amendments thereof or supplements thereto, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided* that no representation is made by Parent or Merger Sub with respect to information supplied by or related to or the sufficiency of disclosures related to, the Company or any Affiliate of the Company unless it relates to the Financing or to the Parent's or any of its Affiliates' plans for the Company after the Effective Time. The SEC Filings made by Parent will comply as to form in all material respects with the requirements of the Exchange Act and the Securities Act and the rules and regulations of the SEC thereunder.

Section 4.04 <u>Financing</u>. Section 4.04 of the Parent Disclosure Letter sets forth true, accurate and complete copies, as of the date of this Agreement, of (i) executed commitment

-28-

letters to provide equity financing to Parent in an aggregate amount set forth therein (the "Equity Commitment Letters" and the aggregate amount of equity financing, the "Equity Financing") and (ii) executed debt commitment letters and related term sheets (the "Debt Commitment Letters" and together with the Equity Commitment Letters, the "Financing Commitments") pursuant to which, and subject to the terms and conditions thereof, certain lenders have committed to provide Parent or the Surviving Corporation with funds (which may include up to $1,740,000,000 in bridge financing (the "Bridge Financing") to be utilized in the event the placement of high yield securities in a comparable amount (the "High Yield Financing") is not consummated) in the amounts described therein, the proceeds of which shall be used to consummate the Merger and the other transactions contemplated hereby (the "Debt Financing" and, together with the Equity Financing, the "Financing"). As of the date of this Agreement, each of the Financing Commitments, in the form so delivered, is a legal, valid and binding obligation of Parent or Merger Sub and, to the Knowledge of Parent, of the other parties thereto. As of the date of this Agreement, the Financing Commitments are in full force and effect and have not been withdrawn or terminated (and no party thereto has indicated an intent to so withdraw or terminate) or otherwise amended or modified in any respect and neither Parent nor Merger Sub is in breach of any of the terms or conditions set forth therein and, subject to the accuracy of the representations and warranties of the Company set forth in Article III, no event has occurred which, with or without notice, lapse of time or both, could reasonably be expected to constitute a breach or failure to satisfy a condition precedent set forth therein or a default thereunder. As of the date of this Agreement, subject to the accuracy of the representations and warranties of the Company set forth in Article III, neither Parent nor Merger Sub has any reason to believe that it will be unable to satisfy on a timely basis any term or condition contemplated to be satisfied by it contained in the Financing Commitments. The proceeds from the Financing when funded in accordance with the Financing Commitments, and together with value of the shares of Company Common Stock and shares underlying Company Stock Options with respect to which the Electing Stockholders have made a Parent Stock Election or an Irrevocable Option Election, are sufficient for the satisfaction of all of Parent's and Merger Sub's obligations under this Agreement, including the payment of the Merger Consideration and the consideration in respect of the Company Stock Options, RSUs and Company Restricted Shares under Section 2.05 and to pay all related fees and expenses. As of the date of this Agreement, Parent or Merger Sub has fully paid any and all commitment fees or other fees on the dates and to the extent required by the Financing Commitments. The Financing Commitments contain all of the conditions precedent to the obligations of the parties thereunder to make the Financing available to Parent. Notwithstanding anything in this Agreement to the contrary, the Debt Commitment Letters may be superseded at the option of Parent or Merger Sub after the date of this Agreement but prior to the Effective Time by the New Financing Commitments in accordance with Section 5.09. In such event, the term "Financing Commitment" as used herein shall be deemed to include the New Financing Commitments to the extent then in effect.

Section 4.05 Ownership and Operations of Merger Sub; Issuance of Parent Common Stock.

(a) As of the date of this Agreement, the authorized capital stock of Merger Sub consists of 1,000 shares of common stock, par value $0.01 per share, all of which are validly issued and outstanding. All of the issued and outstanding capital stock of Merger Sub is, and immediately prior to the Effective Time will be, owned by Parent.

-29-

(b) The shares of common stock, par value $0.01 per share, of Parent ("Parent Common Stock") to be issued in exchange for the Electing Shares pursuant to this Agreement have been duly authorized and when issued in the Merger pursuant to the terms of this Agreement will be validly issued, fully paid, non-assessable and free of preemptive rights, with no personal liability attaching to the ownership thereof. All other shares of Parent Common Stock to be issued on or prior to the Closing Date in connection with the consummation of the Merger and the transactions contemplated thereby have been duly authorized, will be issued in exchange for consideration per share equal to $120.00 and when issued will be validly issued, fully paid, non-assessable and free of preemptive rights, with no personal liability attaching to the ownership thereof.

(c) The authorized capital stock of Parent consists of 60,000,000 shares of Parent Common Stock and, as of the date of this Agreement, 100 shares of Parent Common Stock were issued and outstanding. Parent's authorized capital stock does not consist of any shares of preferred stock or shares of a class of common stock other than Parent Common Stock. As of the date of this Agreement, KHI Holdings LP ("Holdings") is the sole stockholder of Parent. Neither Parent nor Holdings has entered into any Contract with any other holder of Parent Common Stock which provides any special consent rights to such other holder of Parent Common Stock. True and complete copies of the certificate of incorporation and by-laws of Parent are included in Section 4.05(c) of the Parent Disclosure Letter. In the event that the amount of shares of Parent Common Stock issued to the Company's stockholders in accordance with the terms of this Agreement equals the Maximum Election Number and subject to proportionate adjustment if the equity financing at the Effective Time is greater or less than Equity Financing reflected in the Equity Commitment Letters, such amount of shares will represent approximately 27% of the outstanding shares of Parent Common Stock immediately following the Effective Time.

(d) Neither Parent nor Merger Sub has conducted any business other than incident to its formation and in relation to this Agreement, the Merger and the other transactions contemplated hereby and the financing of such transactions.

Section 4.06 Finders or Brokers. Neither Parent nor any of its Subsidiaries has engaged any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who, if the Merger is not consummated, might be entitled to any fee or any commission from the Company.

Section 4.07 Certain Arrangements. Other than the Election Agreement, there are no Contracts or other understandings or arrangements between Parent, Merger Sub or any Guarantor or any of their respective Affiliates, on the one hand, and any member of the Company's management or directors, on the other hand, as of the date hereof that relate in any way to the Company, Parent or the transactions contemplated by this Agreement. Neither Parent nor Merger Sub, alone or together with any other person, has been at any time, or became, an "interested shareholder" thereunder or has taken any action that would cause any anti-takeover statute under the DGCL to be applicable to this Agreement, the Merger, or any transactions contemplated by this Agreement.

-30-

Section 4.08 Investigations; Litigation. Except as may result from the announcement of the Merger or the proposal thereof or this Agreement and the transactions contemplated hereby, there are no suits, claims, actions, proceedings, arbitrations, mediations or investigations pending or, to the Knowledge of Parent, threatened against Parent or any of its Subsidiaries that would, individually or in the aggregate, have a Parent Material Adverse Effect. Neither Parent nor any of its Subsidiaries nor any of their respective properties is or are subject to any order, writ, judgment, injunction, decree or award that would, individually or in the aggregate, have a Parent Material Adverse Effect.

Section 4.09 Guarantees. Concurrently with the execution of this Agreement, Parent has caused the Guarantors to deliver to the Company duly executed Guarantees. The Guarantees are in full force and effect.

Section 4.10 Solvency. Immediately after giving effect to all of the transactions contemplated by this Agreement, including the Financing, any alternative financing and the payment of the aggregate Merger Consideration and the consideration in respect of the Company Stock Options, the RSUs and the Company Restricted Shares under Section 2.05 and any other repayment or refinancing of debt that may be contemplated in the Financing Commitments, assuming (a) satisfaction of the conditions to Parent's obligation to consummate the Merger as set forth herein, or the waiver of such conditions, and (b) the accuracy of the representations and warranties of the Company set forth in Article III hereof (for such purposes, such representations and warranties shall be true and correct in all material respects without giving effect to any knowledge, materiality or "Company Material Adverse Effect" qualification or exception) and (c) any estimates, projections or forecasts of the Company and its Subsidiaries have been prepared in good faith based upon reasonable assumptions, and payment of all related fees and expenses, the Surviving Corporation will be Solvent. For purposes of this Section 4.10, the term "Solvent" with respect to the Surviving Corporation means that, as of any date of determination, (a) the amount of the fair saleable value of the assets of the Surviving Corporation and its Subsidiaries, taken as a whole, exceeds, as of such date, the sum of (i) the value of all liabilities of the Surviving Corporation and its Subsidiaries, taken as a whole, including contingent and other liabilities, as of such date, as such quoted terms are generally determined in accordance with the applicable federal Laws governing determinations of the solvency of debtors, and (ii) the amount that will be required to pay the probable liabilities of the Surviving Corporation and its Subsidiaries, taken as a whole on its existing debts (including contingent liabilities) as such debts become absolute and matured; (b) the Surviving Corporation will not have, as of such date, an unreasonably small amount of capital for the operation of the business in which it is engaged or proposed to be engaged by Parent following such date; and (c) the Surviving Corporation will be able to pay its liabilities, including contingent and other liabilities, as they mature.

Section 4.11 Access to Information; Disclaimer. Parent and Merger Sub each acknowledges and agrees that it (a) has had an opportunity to discuss the business of the Company and its Subsidiaries with the management of the Company, (b) has had reasonable access to (i) the books and records of the Company and its Subsidiaries and (ii) the electronic dataroom maintained by the Company through IntraLinks, Inc. for purposes of the transactions contemplated by this Agreement, (c) has been afforded the opportunity to ask questions of and receive answers from officers of the Company, and (d) has conducted its own independent investigation of the Company and its Subsidiaries, their respective businesses and the

-31-

transactions contemplated hereby, and has not relied on any representation, warranty or other statement by any Person on behalf of the Company or any of its Subsidiaries, other than the representations and warranties of the Company expressly contained in Article III of this Agreement and that all other representations and warranties are specifically disclaimed.

Section 4.12 <u>Investments</u>. As of the date of this Agreement, other than as previously disclosed to the Company or its counsel, none of (x) KKR 2006 Fund L.P. or any of its Subsidiaries, Affiliates or Affiliated Funds or (y) any of the GS Funds, has an equity interest greater than 10% in any Person that owns, controls or operates a business engaged in the consumer or professional audio, automotive audio, information, entertainment or infotainment products or used in the production of consumer or professional audio, audio, information, entertainment or infotainment products . "<u>Affiliated Funds</u>" means the investment funds affiliated with KKR 2006 Fund L.P.

<div align="center">

**ARTICLE V**

**COVENANTS AND AGREEMENTS**

</div>

Section 5.01 <u>Conduct of Business</u>.

(a) From and after the date hereof and prior to the earlier of the Effective Time and the date, if any, on which this Agreement is terminated pursuant to Section 7.01 (the "<u>Termination Date</u>"), and except (i) as may be otherwise required by applicable Law, (ii) with the prior written consent of Parent (not to be unreasonably withheld or delayed), (iii) as expressly contemplated or required by this Agreement or (iv) as disclosed in <u>Section 5.01</u> of the Company Disclosure Letter, the Company shall, and shall cause each of its Subsidiaries to, (A) conduct its business in all material respects in the ordinary course consistent with past practices, and (B) use commercially reasonable efforts to maintain and preserve intact its business organization and business relationships, preserve its assets, rights and properties in good repair and condition and to retain the services of its key officers and key employees in each case, in all material respects.

(b) Without limiting the foregoing, the Company agrees with Parent that between the date hereof and the earlier of the Effective Time and the Termination Date, except as set forth in <u>Section 5.01(b)</u> of the Company Disclosure Letter, as otherwise expressly contemplated or expressly required by this Agreement or required by applicable Law, the Company shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of Parent (not to be unreasonably withheld or delayed):

(i) with respect to the Company, adjust, split, combine, reclassify, redeem, repurchase or otherwise acquire any capital stock or other equity interests or Rights or otherwise amend the terms of its capital stock or other equity interests or Rights;

(ii) make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire or encumber, any shares of its capital stock or other equity interests or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or

<div align="center">-32-</div>

the occurrence of certain events) into or exchangeable for any shares of its capital stock or other equity interests, except in connection with cashless exercises or similar transactions pursuant to the exercise of Company Stock Options outstanding as of the date of this Agreement, or permitted to be granted as set forth in Section 5.01(b) of the Company Disclosure Letter, or under the Company's Retirement Savings Investment Plan; *provided* that the Company may continue to pay its quarterly cash dividends in the ordinary course of its business consistent with past practices (but in no event in an amount in excess of $0.0125 per share per quarter) with record dates consistent with the record dates for comparable quarterly periods of the Company's 2006 fiscal year, and *provided further* that no quarterly dividend will be declared with respect to the quarter in which the Effective Time occurs unless the Effective Time is after the record date for such quarter; this Section 5.01(b)(ii) shall not apply to dividends or distributions paid in cash by Subsidiaries to the Company or to other wholly owned Subsidiaries in the ordinary course of business consistent with past practice;

(iii) grant any Person any right to acquire any shares of its capital stock or other equity interests;

(iv) issue or sell any additional shares of capital stock or other equity interests, any securities convertible into, or any rights, warrants or options to acquire, any such shares of capital stock or other equity interests, except pursuant to the exercise of Company Stock Options outstanding as of the date of this Agreement, or permitted to be granted as set forth in Section 5.01(b) of the Company Disclosure Letter, or settlement of RSUs outstanding as of the date of this Agreement and in accordance with the terms of such instruments or as required under any Company Benefit Plan;

(v) except as permitted by clause (vi), purchase, sell, lease, license, transfer, mortgage, abandon, encumber or otherwise subject to a Lien or otherwise dispose of, in whole or in part, any properties, rights or assets having a value in excess of $10,000,000 individually (other than (x) purchases or sales of inventory or (y) commodity, currency, purchase, sale or hedging agreements, in each case in the ordinary course of business consistent with past practice);

(vi) make any capital expenditures (or authorization or commitment with respect thereto) in a manner reasonably expected to cause expenditures (x) to exceed the capital expenditure budget for the 2007 fiscal year previously provided to Parent or (y) for the 2008 fiscal year to exceed the 2008 capital expenditure budget taking into account reasonably anticipated expenditures for the balance of the year as well as expenditures already committed or made (assuming for this purpose that fiscal 2008 capital expenditure budget will not exceed 111% of the fiscal 2007 capital expenditure budget);

(vii) except (a) ordinary course loans pursuant to the Company's Retirement Saving Plan and advances for business expenses in the ordinary course pursuant to Company Benefit Plans, and (b) for borrowings or letters of credit under the Company's existing credit facilities in the ordinary course of business and consistent with past practice or (c) that do not exceed $10,000,000 in the aggregate outstanding at any

-33-

time, incur, create, assume or otherwise become liable for, or repay or prepay, any indebtedness for borrowed money (including the issuance of any debt security), any capital lease obligations, any guarantee of any such indebtedness or debt securities of any other Person, or any "keep well" or other agreement to maintain any financial statement condition of another Person (such obligations collectively, "Indebtedness"), or amend, modify or refinance any existing Indebtedness;

     (viii) make any investment in or acquisition of another Person or business in excess of $10,000,000 individually or $25,000,000 in the aggregate, whether by merger, purchase of stock or securities, contributions to capital, loans to, property transfers, or entering into binding agreements with respect to any such investment or acquisition (including any conditional or installment sale Contract or other retention Contract relating to purchased property);

     (ix) except in the ordinary course of business consistent with past practice or on terms not materially adverse to the Company and its Subsidiaries, taken as a whole, enter into, renew, extend, materially amend or terminate any Material Contract or Contract which if entered into prior to the date hereof would be a Material Contract, in each case, other than any Contract relating to Indebtedness that would not be prohibited under clause (vii) of this Section 5.01(b);

     (x) except to the extent required by Law (including Section 409A of the Code), by Contracts in existence as of the date of this Agreement, by the Company Benefit Plans or by this Agreement, (A) increase the compensation or benefits of any of its employees, independent contractors or directors, other than merit-based increases in base salary, or immaterial increases in benefits, in each case in the ordinary course of business consistent with past practice for employees, (B) materially amend or adopt any material compensation or benefit plan, including any pension, retirement, profit-sharing, bonus or other employee benefit or welfare benefit plan (other than any such adoption or amendment that does not materially increase the annual cost to the Company or any of its Subsidiaries of maintaining the applicable compensation or benefit plan) with or for the benefit of its employees, independent contractors or directors; provided that nothing in this Agreement shall preclude the Company from (x) furnishing documents, schedules or any other information to the trustee of any trust that secures all or a part of the obligations under any Company Benefit Plan or (y) removing, changing or appointing a trustee or administrator of any trust that secures all or a part of the obligations under any Company Benefit Plan, or (C) accelerate the vesting of, or the lapsing of restrictions with respect to, any stock options or other stock-based compensation;

     (xi) (A) compromise, settle or agree to settle any suit, action, claim, proceeding or investigation (including any suit, action, claim, proceeding or investigation relating to this Agreement or the transactions contemplated hereby), or consent to the same, other than compromises, settlements or agreements in the ordinary course of business consistent with past practice that involve only the payment of monetary damages not in excess of $5,000,000 individually (or with respect to a series of related claims) and in any case without the imposition of material equitable relief on, or the admission of

-34-

wrongdoing by, the Company or any of its Subsidiaries or (B) waive any claims or rights of substantial value;

(xii) amend or waive any material provision of its Charter or its by-laws or other equivalent organizational documents or of the Rights Agreement or, in the case of the Company, enter into any agreement with any of its shareholders in their capacity as such;

(xiii) enter into any "non-compete" or similar agreement that would by its terms restrict in any material respect the businesses of the Surviving Corporation or its Subsidiaries or Affiliates following the Effective Time other than in the ordinary course of business consistent with past practice;

(xiv) enter into any new line of business outside of its existing businesses;

(xv) enter into any new lease or amend the terms of any existing lease of real property which would require payments over the remaining term of such lease in excess of $25,000,000 (excluding any renewal terms);

(xvi) adopt or enter into a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of such entity (other than among wholly owned Subsidiaries);

(xvii) implement or adopt any material change in its financial accounting principles or practices, other than as required by GAAP, applicable Law or regulatory guidelines;

(xviii) change any method of Tax accounting, enter into any closing agreement with respect to material Taxes, settle or compromise any material liability for Taxes, make, revoke or change any material Tax election, agree to any adjustment of any material Tax attribute, file or surrender any claim for a material refund of Taxes, execute or consent to any waivers extending the statutory period of limitations with respect to the collection or assessment of material Taxes, file any material amended Tax Return or obtain any material Tax ruling, in each case other than in the ordinary course of business consistent with past Tax practice; or

(xix) agree to take, make any commitment to take, or adopt any resolutions of its board of directors approving any of the actions prohibited by this Section 5.01(b).

(c) From and after the date hereof and prior to the earlier of the Effective Time or the Termination Date, and except (i) as may be otherwise required by applicable Law or (ii) as expressly contemplated or permitted by this Agreement, no party hereto shall, and each shall cause their respective Subsidiaries not to, and, in the case of Parent and Merger Sub, shall cause the Guarantors, Subsidiaries of the Guarantors and the Affiliated Funds not to, and shall use their reasonable best efforts to cause their controlled Affiliates not to, take or agree to take any action which is intended to or which would reasonably be expected to materially adversely

-35-

affect or materially delay the ability of such party from obtaining any necessary approvals of any regulatory agency or other Governmental Entity required for the transactions contemplated hereby, performing its covenants and agreements under this Agreement or consummating the transactions contemplated hereby or otherwise materially delay or prohibit consummation of the Merger or other transactions contemplated hereby.

(d) Parent shall, promptly following execution of this Agreement, adopt this Agreement in its capacity as sole stockholder of Merger Sub and provide evidence thereof to the Company. In the event Parent, Merger Sub or any Guarantor or any of their respective Affiliates, on the one hand, enters into any Contracts or other understandings or arrangements between any Company employee, on the other hand, Parent will promptly notify the Company of the existence of any such Contract or other understanding or arrangement and the material terms thereof; *provided* that neither Parent, Merger Sub or any Guarantor or any of their respective Affiliates shall enter into any such Contract or discuss or otherwise convey any proposal related thereto to any Company employee or director prior to the No-Shop Period Start Date (as defined herein). Parent agrees with the Company that between the date hereof and the earlier of the Effective Time and the Termination Date, except as otherwise expressly contemplated or expressly required by this Agreement, neither Parent nor Merger Sub shall, without the prior written consent of the Company (which will not be unreasonably withheld or delayed):

(i) adjust, split, combine, reclassify, redeem, repurchase or otherwise acquire any capital stock or other equity interests or otherwise amend the terms of its capital stock or other equity interests;

(ii) make, declare or pay any dividend, or make any other distribution on, any shares of its capital stock or other equity interests or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock or other equity interests;

(iii) in the case of Parent, amend its certificate of incorporation or bylaw (except that Parent shall, prior to the Closing Date, amend its certificate of incorporation to delete paragraph 8 thereof); or

(iv) agree to take, or make any commitment to take, any of the actions prohibited by this Section 5.01(d).

During the period following the Effective Time until the second anniversary thereof, Parent shall whether or not it is then required by the Exchange Act and the rules and regulations promulgated thereunder to make any such filing, file with the Securities and Exchange Commission the reports specified by Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder.

Section 5.02 Acquisition Proposals.

(a) Notwithstanding any other provision of this Agreement to the contrary, during the period beginning on the date of this Agreement and continuing until 11:59 p.m. (EST) on June 15, 2007 (the "No-Shop Period Start Date"), the Company and its Subsidiaries and their

-36-

respective officers, directors, employees, consultants, agents, advisors, affiliates and other representatives (collectively, "Representatives") shall have the right to directly or indirectly: (i) initiate, solicit and encourage Company Acquisition Proposals (as defined herein) (or inquiries, proposals or offers or other efforts or attempts that may lead to a Company Acquisition Proposal), including by way of providing access to non-public information pursuant to (but only pursuant to) one or more Acceptable Confidentiality Agreements (as defined herein); *provided* that the Company shall promptly provide to Parent any material non-public information concerning the Company or its Subsidiaries that is provided to any Person given such access which was not previously provided to Parent or its Representatives; and (ii) enter into and maintain discussions or negotiations with respect to Company Acquisition Proposals or otherwise cooperate with or assist or participate in, or facilitate any such inquiries, proposals, discussions or negotiations.

(b) Subject to Section 5.02(c), from the No-Shop Period Start Date until the Effective Time or, if earlier, the termination of this Agreement in accordance with Article VII, none of the Company, the Company's Subsidiaries nor any of their respective Representatives shall, directly or indirectly, (A) initiate, solicit or knowingly encourage (including by way of providing information) the submission of any inquiries, proposals or offers or any other efforts or attempts that constitute or may reasonably be expected to lead to, any Company Acquisition Proposal or engage in any discussions or negotiations with respect thereto or otherwise knowingly assist or participate in, or knowingly facilitate any such inquiries, proposals, discussions or negotiations, or (B) approve or recommend, or publicly propose to approve or recommend, a Company Acquisition Proposal or enter into any merger agreement, letter of intent, agreement in principle, share purchase agreement, asset purchase agreement or share exchange agreement, option agreement or other similar agreement providing for or relating to a Company Acquisition Proposal or enter into any agreement or agreement in principle requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations hereunder or propose or agree to do any of the foregoing. Subject to Section 5.02(c) and except with respect to any Person (or group of Persons that includes among its members one or more Persons who (x) were members of such group prior to the No-Shop Period Start Date and (y) collectively constitute at least 50% of the equity financing of such group at all times following the No-Shop Period Start Date and prior to the Termination Date) from whom the Company has received a Company Acquisition Proposal prior to the No-Shop Period Start Date with respect to which the requirements of Sections 5.02(c)(i) and (ii) have been satisfied as of the No-Shop Period Start Date (any such Person or group of Persons so submitting such a Company Acquisition Proposal, an "Excluded Party"), as determined, with respect to any Excluded Party, by the board of directors of the Company no later than the later of (i) the No-Shop Period Start Date and (ii) the Business Day following the date on which the Company received such Excluded Party's written Company Acquisition Proposal (it being understood, that with respect to any determination being made pursuant to clause (ii), that following the No-Shop Period Start Date until such time as the board of directors of the Company determines that a Person or group of Persons is an Excluded Party, the Company shall not be permitted to take any action with respect to such Person or group of Persons that it would be prohibited from taking with respect to a non-Excluded Party pursuant to Section 5.02(c)), on the No-Shop Period Start Date the Company shall immediately cease and cause to be terminated any solicitation, encouragement, discussion or negotiation with any Persons conducted theretofore by the Company, its Subsidiaries or any Representatives with respect to any Company Acquisition

-37-

Proposal. Notwithstanding anything contained in Section 5.02 to the contrary, any Excluded Party shall cease to be an Excluded Party for all purposes under this Agreement at such time as the Company Acquisition Proposal (as such Company Acquisition Proposal may be revised during the course of ongoing negotiations, in which event it may temporarily cease to satisfy the requirements of 5.02(c), so long as such negotiations are ongoing and there is not, following the No-Shop Period Start Date, a continuous period of greater than five Business Days during which it fails to satisfy the requirements of Section 5.02(c)) made by such party fails, in the reasonable judgment of the board of directors of the Company, to satisfy the requirements of Section 5.02(c).

         (c) Notwithstanding anything to the contrary contained in Section 5.02(b), if at any time following the date of this Agreement and prior to obtaining the Company Stockholder Approval, (i) the Company has received a written Company Acquisition Proposal from a third party that the board of directors of the Company believes in good faith to be bona fide, (ii) the board of directors of the Company determines in good faith, after consultation with its independent financial advisors and outside counsel, that such Company Acquisition Proposal constitutes or could reasonably be expected to result in a Superior Proposal and (iii) after consultation with its outside counsel, the board of directors of the Company determines in good faith that the failure to take such action could violate its fiduciary duties under applicable Law, then the Company may (A) furnish information with respect to the Company and its Subsidiaries to the Person making such Company Acquisition Proposal and (B) participate in discussions or negotiations with the Person making such Company Acquisition Proposal regarding such Company Acquisition Proposal; *provided*, that the Company (x) will not, and will not allow Company Representatives to, disclose any material non-public information to such Person without entering into an Acceptable Confidentiality Agreement, and (y) will promptly provide to Parent any non-public information concerning the Company or its Subsidiaries provided to such other Person which was not previously provided to Parent or its Representatives. Notwithstanding anything to the contrary contained in Section 5.02(b) or this Section 5.02(c), prior to obtaining the Company Stockholder Approval, the Company shall be permitted to take the actions described in clauses (A) and (B) above with respect to any Excluded Party. From and after the No-Shop Period Start Date, the Company shall promptly (within one Business Day) notify Parent in the event it receives a Company Acquisition Proposal from a Person or group of related Persons, including the material terms and conditions thereof, and shall keep Parent apprised as to the status and any material developments, discussions and negotiations concerning the same on a current basis (and in any event no later than 48 hours after the occurrence of such developments, discussions or negotiations). Without limiting the foregoing, the Company shall promptly (within two Business Days) notify Parent orally and in writing if it determines to begin providing information or to engage in negotiations concerning a Company Acquisition Proposal from a Person or group of related Persons pursuant to this Section 5.02(c). Within 24 hours of the No-Shop Period Start Date, the Company shall notify Parent of the number of Excluded Parties.

         (d) Notwithstanding anything in this Agreement to the contrary, if, at any time prior to obtaining the Company Stockholder Approval, the Company receives a Company Acquisition Proposal which the board of directors of the Company determines in good faith constitutes a Superior Proposal after giving effect to all of the adjustments which may be offered by Parent pursuant to clause (ii) below, the board of directors of the Company may (x) effect a

-38-

Change of Recommendation if the board of directors of the Company determines in good faith, after consultation with outside counsel, that failure to take such action could violate its fiduciary duties under applicable Law and/or (y) terminate this Agreement to enter into a definitive agreement with respect to such Superior Proposal; *provided, however* that the Company shall not terminate this Agreement pursuant to the foregoing clause (y), and any purported termination pursuant to the foregoing clause (y) shall be void and of no force or effect, unless concurrently with such termination the Company pays the Termination Fee payable pursuant to Section 7.02(a); *provided, further,* that the board of directors may not effect a Change of Recommendation pursuant to the foregoing clause (x) or terminate this Agreement pursuant to the foregoing clause (y) unless:

(i) the Company shall have provided prior written notice to Parent and Merger Sub, at least three Business Days in advance (the "Notice Period"), of its intention to effect a Change of Recommendation in response to such Superior Proposal or terminate this Agreement to enter into a definitive agreement with respect to such Superior Proposal, which notice shall specify the material terms and conditions of any such Superior Proposal (including the identity of the party making such Superior Proposal), and shall have contemporaneously provided a copy of the relevant material proposed transaction agreements with the party making such Superior Proposal; and

(ii) prior to effecting such Change of Recommendation or terminating this Agreement to enter into a definitive agreement with respect to such Superior Proposal, the Company shall, and shall cause its financial and legal advisors to, during the Notice Period, negotiate with Parent and Merger Sub in good faith (to the extent Parent and Merger Sub desire to negotiate) to make such adjustments in the terms and conditions of this Agreement so that such Company Acquisition Proposal ceases to constitute a Superior Proposal.

In the event of any material revisions to the Superior Proposal, the Company shall be required to deliver a new written notice to Parent and Merger Sub and to comply with the requirements of this Section 5.02(d) with respect to such new written notice, except that the Notice Period shall be reduced to one Business Day.

(e) The Company agrees that any violations of the restrictions set forth in this Section 5.02 by any Representative of the Company or any of its Subsidiaries, shall be deemed to be a breach of this Section 5.02 by the Company.

(f) As used in this Agreement, the term:

"Acceptable Confidentiality Agreement" means a confidentiality and standstill agreement that contains provisions that are no less favorable in the aggregate to the Company than those contained in the Confidentiality Agreement; *provided* that such confidentiality agreement shall not prohibit compliance with Section 5.02(d)(i)-(ii).

"Company Acquisition Proposal" means any inquiry, proposal or offer from any Person or group of Persons (other than Parent, Merger Sub or their respective Affiliates) relating to any direct or indirect acquisition or purchase of a business that constitutes 25% or more of the

-39-

net revenues, net income or assets of the Company and its Subsidiaries, taken as a whole, or 25% or more of any class or series of Company Securities, any tender offer or exchange offer that if consummated would result in any Person or group of Persons beneficially owning 25% or more of any class or series of capital stock of the Company, or any merger, reorganization, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company (or any Subsidiary or Subsidiaries of the Company whose business constitutes 25% or more of the net revenues, net income or assets of the Company and its Subsidiaries, taken as a whole).

"Superior Proposal" means a Company Acquisition Proposal involving (A) assets that generate more than 50% of the consolidated total revenues, or (B) assets that constitute more than 50% of the consolidated total assets of the Company and its Subsidiaries or (C) more than 50% of the total voting power of the equity securities of the Company, in each case that the board of directors of the Company in good faith determines would, if consummated, result in a transaction that is more favorable from a financial point of view to the stockholders of the Company than the transactions contemplated hereby (x) after receiving the advice of a financial advisor (who shall be a nationally recognized investment banking firm) and (y) after taking into account all appropriate legal (with the advice of outside counsel), financial (including the financing terms of any such proposal), regulatory, timing or other aspects of such proposal and any other relevant factors permitted by applicable Law.

(g) Nothing contained in this Section 5.02 or elsewhere in this Agreement shall prohibit the Company from (i) taking and disclosing to its stockholders a position contemplated by Rule 14d-9 and 14e-2(a)(2)-(3) promulgated under the Exchange Act or (ii) making any required disclosure to the Company's stockholders, if, in the good faith judgment of the board of directors of the Company, after consultation with its outside counsel, it is required to do so under applicable Law; *provided*, any such disclosure (other than a "stop, look and listen" letter or similar communication of the type contemplated by Rule 14d-9(f) under the Exchange Act) shall be deemed to be a Change of Recommendation unless the board of directors of the Company expressly publicly reaffirms at least two Business Days prior to the Company Meeting its recommendation in favor of the adoption of this Agreement.

Section 5.03 Company Meeting; Preparation of Form S-4 and Proxy Statement.

(a) The Company shall (i) take all action necessary to duly call, give notice of, convene and hold a meeting of its stockholders (the "Company Meeting") for the purpose of having this Agreement adopted by the stockholders of the Company in accordance with applicable Law as promptly as reasonably practicable after the date of mailing of the Proxy Statement, (ii) subject to the immediately succeeding sentence, use reasonable best efforts to solicit the adoption of this Agreement by the stockholders of the Company, and (iii) subject to the immediately succeeding sentence, include in the Proxy Statement the Recommendation. Neither the board of directors of the Company nor any committee thereof shall directly or indirectly (x) withdraw (or modify or qualify in a manner adverse to Parent or Merger Sub), or publicly propose to withdraw (or modify or qualify in a manner adverse to Parent or Merger Sub), the Recommendation or (y) make any other public statement in connection with the Company Meeting, or in reference to a Company Acquisition Proposal, that is contrary to such Recommendation (any action described in this clause (x) or (y) being referred to as a "Change of

-40-

Recommendation"); *provided*, that at any time prior to obtaining the Company Stockholder Approval, the board of directors of the Company may effect a Change of Recommendation (subject to the Company having complied with its obligations under Section 5.02) if such board of directors determines in good faith (after consultation with outside counsel) that failure to take such action could violate its fiduciary duties under applicable Law. Notwithstanding any Change of Recommendation, unless this Agreement is terminated pursuant to, and in accordance with, Section 7.01, this Agreement shall be submitted to the stockholders of the Company at the Company Meeting for the purpose of adopting this Agreement. If, at any time prior to the Effective Time, any information relating to the Company, Parent or Merger Sub or any of their respective Affiliates should be discovered by the Company, Parent or Merger Sub which should be set forth in an amendment or supplement to the SEC Filings so that the SEC Filings shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, the party that discovers such information shall promptly notify the other parties and, to the extent required by applicable Law, Parent and the Company shall cause an appropriate amendment or supplement describing such information to be promptly filed with the SEC and disseminated by the Company to the Company's stockholders.

(b) In connection with the transactions contemplated hereby, Parent and the Company will (i) as promptly as reasonably practicable (and, with respect to filing with the SEC, in any event within 30 Business Days from the date of this Agreement) prepare and file with the SEC the Form S-4, including the Proxy Statement, (ii) respond as promptly as reasonably practicable to any comments received from the SEC with respect to any SEC filings and will provide copies of such comments to the other promptly upon receipt, (iii) as promptly as reasonably practicable prepare and file any amendments or supplements necessary to be filed in response to any SEC comments or as required by Law, (iv) each use its respective reasonable best efforts to have the Form S-4 declared effective by the SEC under the Securities Act and thereafter mail to the Company's stockholders as promptly as reasonably practicable, the Proxy Statement and all other customary proxy or other materials for meetings such as the Company Meeting and, in the case of Parent, use its reasonable best efforts to keep the Form S-4 effective as long as necessary to consummate the Merger and the transactions contemplated hereby, (v) to the extent required by applicable Law, as promptly as reasonably practicable prepare, file and distribute to the stockholders of the Company any supplement or amendment to the SEC Filings if any event shall occur which requires such action at any time prior to the Company Meeting, and (vi) each otherwise use commercially reasonable efforts to comply with all requirements of Law applicable to the filings to be made with the SEC, the Company Meeting and the Merger, including any actions required to be taken under any applicable state securities laws in connection with the registration and qualification in connection with the Merger of the Parent Common Stock to be issued in connection with the Merger.

Section 5.04 <u>Employee Matters</u>.

(a) Upon the Effective Time, Parent will cause the Surviving Corporation to, and the Surviving Corporation will, honor all the Company Benefit Plans in accordance with their terms in effect immediately before the Effective Time and Parent will cause the Surviving Corporation to, and the Surviving Corporation will, honor all changes to the Company Benefit

-41-

Plans required by applicable Law. Parent and the Company hereby agree that the consummation of the Merger will constitute a "Change in Control," "Change in Control of the Company," or any similar or corresponding term, for purpose of any Company Benefit Plans. For the period between the Effective Time through December 31, 2008, Parent shall provide, or shall cause to be provided, to each current employee of the Company and its Subsidiaries ("Company Employees") annual base salary and base wages, cash incentive compensation opportunities (excluding equity-based compensation) and aggregate benefits, in each case, that are no less favorable than such annual base salary and base wages, cash incentive compensation opportunities (excluding equity-based compensation) and aggregate benefits provided to the Company Employees immediately prior to the Effective Time. In furtherance of, but without limiting the foregoing, Parent shall cause the Surviving Corporation to amend, reform or supplement the terms of any nonqualified deferred compensation plan (within the meaning of Section 409A of the Code and related guidance) covering any Company Employee as necessary for compliance with Section 409A, while preserving to the extent practicable the intended treatment of the original plan.

(b) For all purposes (excluding for purposes of benefit accrual under any defined benefit pension plan) under the employee benefit plans of Parent and its Subsidiaries providing benefits to any Company Employees after the Effective Time (including the Company Benefits Plans) (the "New Plans"), each Company Employee shall be credited with his or her years of service with the Company and its Subsidiaries and their respective predecessors before the Effective Time, to the same extent as such Company Employee was entitled, before the Effective Time, to credit for such service under any similar Company employee benefit plan in which such Company Employee participated or was eligible to participate immediately prior to the Effective Time, *provided* that the foregoing shall not apply to the extent that its application would result in a duplication of benefits with respect to the same period of service. In addition, and without limiting the generality of the foregoing, to the extent legally permissible, (i) each Company Employee shall be immediately eligible to participate, without any waiting time, in any and all New Plans to the extent coverage under such New Plan is replacing comparable coverage under a Company Benefit Plan in which such Company Employee participated immediately before the Effective Time (such plans, collectively, the "Old Plans"), and (ii) for purposes of each New Plan providing medical, dental, pharmaceutical and/or vision benefits to any Company Employee, Parent shall cause all pre-existing condition exclusions and actively-at-work requirements of such New Plan to be waived for such employee and his or her covered dependents, to the extent such conditions did not immediately prior to the Effective Time, apply to such employee and his or her covered dependents under the comparable Old Plans of the Company or its Subsidiaries in which such employee participated immediately prior to the Effective Time and Parent shall cause any eligible expenses incurred by such employee and his or her covered dependents during the portion of the plan year of the Old Plan ending on the date such employee's participation in the corresponding New Plan begins to be taken into account under such New Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such New Plan.

(c) Prior to the Effective Time, the Company shall take all action necessary to amend the Key Executive Officers Bonus Plan, without further liability to the Company, such that, notwithstanding anything contained herein to the contrary, the occurrence of the Closing

-42-

shall not constitute a Change in Control under the terms of the plan to the extent the Closing occurs after June 30, 2007.

(d) The Company may amend, reform or supplement the terms of any Compensation Benefit Plan as necessary for compliance with, or to avoid adverse tax consequences under Section 409A of the Code and related guidance.

(e) Upon the Effective Time, Parent shall cause the Surviving Corporation and its Subsidiaries to assume all Company Benefit Plans that require assumption by a successor to the Company in accordance with their terms as in effect immediately before the Effective Time.

(f) The provisions of this Section 5.04 are solely for the benefit of the parties to this Agreement, and no current or former employee, director or independent contractor or any other individual associated therewith shall be regarded for any purpose as a third-party beneficiary of the Agreement, and nothing herein shall be construed as an amendment to any Company Benefit Plan for any purpose.

Section 5.05 <u>Reasonable Best Efforts</u>.

(a) Subject to the terms and conditions set forth in this Agreement, each of the parties hereto shall use its reasonable best efforts to take, or to cause to be taken, all actions, to file, or cause to be filed, all documents and to do, or to cause to be done, and to assist and to cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective the Merger and the other transactions contemplated hereby, including using reasonable best efforts to accomplish the following, (i) the obtaining of all necessary actions or nonactions, waivers, consents, clearances, approvals, and expirations or terminations of waiting periods, including the Company Approvals and the Parent Approvals, from Governmental Entities and the making of all necessary registrations and filings and the taking of all steps as may be necessary to obtain an approval, clearance, or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (ii) the obtaining of all necessary consents, approvals or waivers from, or participation in other discussions or negotiations with, third parties and cooperating with the other party to obtain any consents or waivers reasonably requested by such other party in connection with the consummation of the Merger and the other transactions contemplated hereby, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Merger and the other transactions contemplated hereby and (iv) the execution and delivery of any additional instruments reasonably necessary to consummate the transactions contemplated hereby; *provided, however,* that in no event shall the Company or any of its Subsidiaries be required to pay prior to the Effective Time any fee, penalties or other consideration to any third party to obtain any consent or approval required for the consummation of the Merger under any Contract and neither the Company nor any of its Subsidiaries shall commit to the payment of any fee, penalty or other consideration in connection with obtaining any consent without the prior written consent of Parent.

(b) Subject to the terms and conditions herein provided and without limiting the foregoing, the Company and Parent shall (i) promptly, but in no event later than ten Business

-43-

Days after the date hereof, file any and all Notification and Report Forms required under the HSR Act with respect to the Merger and the other transactions contemplated hereby, and use reasonable best efforts to cause the expiration or termination of any applicable waiting periods under the HSR Act, (ii) use reasonable best efforts to cooperate with each other in (x) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers, clearances, approvals, and expirations or terminations of waiting periods are required to be obtained from any Governmental Entities in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and (y) timely making all such filings and timely obtaining all such consents, permits, authorizations or approvals, (iii) supply to any Governmental Entity as promptly as reasonably practicable any additional information or documentary material that may be requested pursuant to any Regulatory Law or by such Governmental Entity, and (iv) use reasonable best efforts to take, or cause to be taken, all other actions and do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the Merger, the Financing and the other transactions contemplated hereby, including using reasonable best efforts to (A) take all such further action as may be necessary to resolve such objections, if any, as the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction or any other person may assert under any Regulatory Law with respect to the Merger and the other transactions contemplated hereby, and (B) avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Entity with respect to the Merger so as to enable the Closing to occur no later than the End Date, including (x) proposing, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of any assets or businesses of Parent or its Subsidiaries or Affiliates or of the Company or its Subsidiaries and (y) otherwise taking or committing to take any actions that after the Closing would limit the freedom of Parent or its Subsidiaries' (including the Surviving Corporation's) or Affiliates' freedom of action with respect to, or its ability to retain, one or more of its or its Subsidiaries' (including the Surviving Corporation's) or Affiliates' businesses, product lines or assets, in each case as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding which would otherwise have the effect of preventing the Closing or delaying the Closing beyond the End Date; *provided* that, neither the Company nor any of its Subsidiaries shall, nor shall Parent or any of its Subsidiaries or Affiliates be obligated to, become subject to, or consent or agree to or otherwise take any action with respect to, any requirement, condition, understanding, agreement or order of a Governmental Entity to sell, to hold separate or otherwise dispose of, or to conduct, restrict, operate, invest or otherwise change the assets or business of the Company or any of its Subsidiaries or Parent or any of its Subsidiaries or Affiliates, as the case may be, unless such requirement, condition, understanding, agreement or order is binding on the Company or Parent, its Subsidiaries or Affiliates, respectively, only in the event that the Closing occurs; *provided further, however,* that in no event shall any member or other holder of interests in Parent, or any Affiliate or any member of Parent, be required to take any action with respect to any portfolio company or agree to undertake any divestiture or restrict its conduct with regard to any business other than the business of the Company and its Subsidiaries.

(c) Subject to applicable legal limitations and the instructions of any Governmental Entity, the Company and Parent shall keep each other reasonably apprised of the

-44-

status of matters relating to the completion of the Merger and the other transactions contemplated by this Agreement, including promptly furnishing the other with copies of notices or other written communications received by the Company or Parent, as the case may be, or any of their respective Subsidiaries or Affiliates, from any third party and/or any Governmental Entity with respect to such Merger or transactions. The Company and Parent shall permit counsel for the other party reasonable opportunity to review in advance, and consider in good faith the views of the other party in connection with, any proposed written communication to any Governmental Entity. To the extent practicable under the circumstances, each of the Company and Parent agrees not to participate in any substantive meeting or discussion, either in person or by telephone, with any Governmental Entity in connection with the proposed transactions unless it consults with the other party in advance and, to the extent not prohibited by such Governmental Entity, gives the other party the opportunity to attend and participate.

     (d) In furtherance and not in limitation of the covenants of the parties contained in this Section 5.05, if any administrative or judicial action or proceeding, including any proceeding by a private party, is instituted (or threatened to be instituted) challenging the Merger or any other transaction contemplated by this Agreement as violative of any Regulatory Law, each of the Company and Parent shall cooperate in all reasonable respects with each other and shall use its respective reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Merger or any other transaction contemplated hereby.

     (e) For purposes of this Agreement, "Regulatory Law" means any and all state, federal and foreign statutes, rules, regulations, orders, decrees, administrative and judicial doctrines and other Laws requiring notice to, filings with, or the consent, clearance or approval of, any Governmental Entity, or that otherwise may cause any restriction, in connection with the Merger and the transactions contemplated thereby, including (i) the Sherman Act of 1890, the Clayton Antitrust Act of 1914, the HSR Act, the Federal Trade Commission Act of 1914 and all other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition, (ii) any Law governing the direct or indirect ownership or control of any of the operations or assets of the Company and its Subsidiaries or (iii) any Law with the purpose of protecting the national security or the national economy of any nation.

     Section 5.06 Takeover Statute. If any "fair price," "moratorium," "business combination," "control share acquisition" or other form of anti-takeover statute or regulation shall become applicable to the Merger or the other transactions contemplated by this Agreement after the date of this Agreement, each of the Company and Parent and the members of their respective Boards of Directors shall grant such approvals and take such actions as are reasonably necessary so that the Merger and the other transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated herein and otherwise act to eliminate or minimize the effects of such statute or regulation on the Merger, and the other transactions contemplated hereby.

     Section 5.07 Public Announcements. The Company and Parent will consult with and provide each other the reasonable opportunity to review and comment upon any press release or

-45-

other public statement or comment prior to the issuance of such press release or other public statement or comment relating to this Agreement or the transactions contemplated herein and shall not issue any such press release or other public statement or comment prior to such consultation except as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange. Parent and the Company agree that the press release announcing the execution and delivery of this Agreement shall be a joint release of Parent and the Company.

Section 5.08 Indemnification and Insurance.

(a) Parent and Merger Sub agree that all rights to exculpation, indemnification and advancement of expenses for acts or omissions occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, now existing in favor of the current or former directors, officers or employees, as the case may be, of the Company or its Subsidiaries as provided in their respective certificates of incorporation or by-laws or other organization documents or in any agreement as in effect on the date hereof and which has previously been made available to Parent or its Representatives shall survive the Merger and shall continue in full force and effect to the extent provided in the following sentence. Parent and the Surviving Corporation shall maintain in effect any and all exculpation, indemnification and advancement of expenses provisions of the Company's and any of its Subsidiaries' certificates of incorporation, by-laws or similar organization documents in effect immediately prior to the Effective Time or in any indemnification agreements of the Company or its Subsidiaries with any of their respective current or former directors, officers or employees in effect as of the date of this Agreement and which has previously been made available to Parent or its Representatives, and shall not (except as otherwise required by Law), for a period of six years from the date hereof, amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any individuals who at the Effective Time were current or former directors, officers or employees of the Company or any of its Subsidiaries and all rights to indemnification or advancement of expenses thereunder in respect of any Action pending or asserted or any claim made within such period shall continue until the disposition of such Action or resolution of such claim.

(b) From and after the Effective Time, the Surviving Corporation shall, Parent shall cause the Surviving Corporation to, and in the event the coverage under the directors' and officers' liability insurance policies referred to in Section 5.08(c) below has been fully paid by all applicable carriers or is otherwise no longer available, Parent shall, in each case to the fullest extent permitted under applicable Law, indemnify and hold harmless (and advance funds in respect of each of the foregoing) each current and former director, officer or employee of the Company or any of its Subsidiaries (each, together with such person's heirs, executors or administrators, an "Indemnified Party") against any costs or expenses (including advancing reasonable attorneys' fees and expenses in advance of the final disposition of any claim, suit, proceeding or investigation to each Indemnified Party to the fullest extent permitted by Law upon the receipt of any customary undertaking required by the Surviving Corporation), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative (an "Action"), arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or

-46-

at the Effective Time in connection with such persons serving as an officer, director or other fiduciary in any entity if such service was at the request or for the benefit of the Company.

(c) For a period of six (6) years from the Effective Time, Parent shall either cause to be maintained in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its Subsidiaries or cause to be provided substitute policies or purchase or cause the Surviving Corporation to purchase, a "tail policy," in either case of at least the same coverage and amounts containing terms and conditions that are not less advantageous in the aggregate than such policy with respect to matters arising on or before the Effective Time; *provided, however,* that after the Effective Time, Parent shall not be required to pay with respect to such insurance policies in respect of any one policy year annual premiums in excess of 300% of the last annual premium paid by the Company prior to the date hereof (which annual amount the Company represents and warrants is set forth on Section 5.08(c) of the Company Disclosure Letter) in respect of the coverage required to be obtained pursuant hereto, but in such case shall purchase as much coverage as reasonably practicable for such amount; *provided, further,* that if the Surviving Corporation purchases a "tail policy" and the coverage thereunder costs more than 300% of such last annual premium, the Surviving Corporation shall purchase the maximum amount of coverage that can be obtained for 300% of such last annual premium. At the Company's option, the Company may purchase, prior to the Effective Time, a six-year pre-paid "tail policy" on terms and conditions (in both amount and scope) providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its Subsidiaries with respect to matters arising on or before the Effective Time, covering without limitation the transactions contemplated hereby.

(d) The rights of each Indemnified Party hereunder shall be in addition to, and not in limitation of, any other rights such Indemnified Party may have under the Company Charter, the by-laws or other similar organization documents of the Company or any of its Subsidiaries or the Surviving Corporation, any other indemnification agreement or arrangement, the DGCL or otherwise. The provisions of this Section 5.08 shall survive the consummation of the Merger and, notwithstanding any other provision of this Agreement that may be to the contrary, expressly are intended to benefit, and are enforceable by, each of the Indemnified Parties.

(e) In the event Parent, the Surviving Corporation or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in either such case, proper provision shall be made so that the successors and assigns of Parent or the Surviving Corporation, as the case may be, shall assume all of the obligations set forth in this Section 5.08. The agreements and covenants contained herein shall not be deemed to be exclusive of any other rights to which any Indemnified Party is entitled, whether pursuant to Law, contract or otherwise. Nothing in this Agreement is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to the Company or any of its Subsidiaries or their respective officers, directors and employees, it being understood and agreed that the indemnification

-47-

provided for in this Section 5.08 is not prior to, or in substitution for, any such claims under any such policies.

Section 5.09 <u>Financing</u>.

(a) Parent shall use its reasonable best efforts to obtain the Financing on the terms and conditions described in the Financing Commitments or terms that would not adversely impact the ability of Parent or Merger Sub to timely consummate the transactions contemplated hereby, including using its reasonable best efforts (i) to maintain in effect the Financing Commitments and to negotiate definitive agreements with respect thereto on the terms and conditions contained in the Financing Commitments (or other terms that would not adversely impact the ability of Parent or Merger Sub to timely consummate the transactions contemplated hereby), (ii) to satisfy all conditions precedent to the obligations of the parties thereunder to make the Financing in such definitive agreements available to Parent and consummate the Financing at or prior to the Closing, (iii) to comply with its obligations under the Financing Commitments and (iv) to enforce its rights under the Financing Commitments. Parent shall give the Company prompt notice upon becoming aware of any material breach by any party of the Financing Commitments or any termination of the Financing Commitments. Parent shall keep the Company informed on a reasonably current basis and in reasonable detail of the status of its efforts to arrange the Financing and provide to the Company copies of all documents related to the Financing to the extent such documents contain any additional conditions precedent not set forth in the Debt Commitment Letters to the obligations of the parties thereunder to make the Financing available to Parent and consummate the Financing at or prior to the Closing (it being understood that no such document will contain any such conditions precedent that would have any of the effects described in clauses (1)-(4) of the following sentence). In connection with its obligations under this Section 5.09, Parent shall be permitted to amend, modify or replace the Debt Commitment Letters with new Debt Commitment Letters (the "<u>New Financing Commitments</u>"), *provided* that Parent shall not permit any replacement of, or amendment or modification to be made to, or any waiver of any material provision or remedy under, the Debt Commitment Letter if such replacement, amendment, modification, waiver or remedy (1) reduces the aggregate amount of the Debt Financing below that amount required to consummate the Merger and the other transactions contemplated hereby, (2) adversely amends or expands the conditions to the drawdown of the Debt Financing in any respect that would make such conditions less likely to be satisfied by the End Date or that would expand the possible circumstances under which such conditions would not be satisfied by such date, (3) can reasonably be expected to delay the Closing, or (4) is otherwise adverse to the interests of the Company in any material respect; and *provided, further,* that nothing in this Section 5.09 shall be deemed to excuse, waive compliance with or modify any of the obligations set forth in the Confidentiality Agreement. In the event that all conditions to the Financing Commitments (other than, in connection with the Debt Financing, the availability or funding of any of the Equity Financing) have been satisfied, Parent shall, from and after the final day of the Marketing Period and subject to the satisfaction of the conditions set forth in Sections 6.01 and 6.03 hereof, use its reasonable best efforts to cause the lenders and other Persons providing such Financing to fund the Financing required to consummate the Merger on the Closing Date. In the event that Parent becomes aware of any event or circumstance that makes procurement of any portion of the Financing unlikely to occur in the manner or from the sources contemplated in the Financing Commitments or generally less likely as on the date of this Agreement, Parent shall notify the

-48-

Company and shall use its reasonable best efforts to arrange as promptly as practicable, but in no event later than one day prior to the Closing Date, any such portion from alternative debt financing sources on terms and conditions no less favorable to Parent or Merger Sub and no more adverse to the ability of Parent to consummate the transactions contemplated by this Agreement (in each case, as determined in the reasonable judgment of Parent). In the event that on the final day of the Marketing Period (1) all or any portion of the Debt Financing structured as High Yield Financing has not been consummated, (2) all closing conditions in Sections 6.01, 6.03(a) and 6.03(b) shall have been satisfied or waived (other than those conditions that by their nature will not be satisfied until the Closing) and (3) the Bridge Financing (or alternative bridge financing obtained in accordance with the preceding sentence) is available substantially on the terms and conditions described in the Debt Commitment Letters (or replacements thereof as contemplated by the preceding sentence), then Merger Sub shall borrow under and use the proceeds of the Bridge Financing (or such alternative bridge financing) to replace such affected portion of the High Yield Financing no later than the last day of the Marketing Period. For purposes of this Agreement, "Marketing Period" shall mean the first period of 20 consecutive Business Days after the date hereof throughout which (x) Parent shall have all of the Required Information (as defined below) and during which period such information shall remain compliant at all times with applicable provisions of Regulation S-X and Regulation S-K under the Securities Act and (y) the conditions set forth in Section 6.01 shall be satisfied and nothing has occurred and no condition exists that would cause any of the conditions set forth in Sections 6.03(a) or (b) to fail to be satisfied assuming the Closing were to be scheduled for any day during such 20 Business Day period; *provided* that, if the Marketing Period would not end (i) on or prior to July 31, 2007, the Marketing Period shall commence no earlier than the later of (A) September 4, 2007 and (B) the date the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2007 is filed with the SEC, and (ii) on or prior to December 20, 2007, the Marketing Period shall commence no earlier than January 2, 2008.

(b) The Company shall provide, shall cause its Subsidiaries to provide, and shall use reasonable best efforts to cause its Representatives, including legal and accounting, to provide, all cooperation reasonably requested by Parent in connection with the arrangement of the Financing and the other transactions contemplated by this Agreement (*provided* that such requested cooperation does not unreasonably interfere with the ongoing operations of the Company and its Subsidiaries), including (i) furnishing Parent and Merger Sub and their Financing sources as promptly as practicable (and in any event no later than 30 days prior to the End Date) with financial and other pertinent information regarding the Company and its Subsidiaries as may be reasonably requested by Parent, including all financial statements and financial and other data of the type required by Regulation S-X (other than Item 3-10 of Regulation S-X, but including summary guarantor/non-guarantor information of the type customarily included in offering documents used in private placements under Rule 144A of the Securities Act) and Regulation S-K under the Securities Act and of the type and form customarily included in offering documents used in private placements under Rule 144A of the Securities Act (including, to the extent applicable with respect to such financial statements, the report of the Company's auditors thereon and related management discussion and analysis of financial condition and results of operations), to consummate the offerings of debt securities contemplated by the Debt Commitment Letters at the time during the Company's fiscal year such offerings will be made (information required to be delivered pursuant to this clause (i) being referred to as, the "Required Information"), (ii) participating in meetings, presentations, road

-49-

shows, due diligence sessions, drafting sessions and sessions with rating agencies in connection with the Financing, (iii) assisting with the preparation of materials for rating agency presentations, offering documents, private placement memoranda, bank information memoranda, prospectuses and similar documents required in connection with the Financing (including the execution and delivery of one or more customary representation letters in connection therewith); *provided* that any private placement memoranda or prospectuses in relation to high yield debt securities need not be issued by the Company or any of its Subsidiaries, and *provided*, *further*, that any private placement memoranda or prospectuses shall contain disclosure and financial statements reflecting the Surviving Corporation and/or its Subsidiaries as the obligor, (iv) reasonably cooperating with the marketing efforts for any of the Financing, including providing assistance in the preparation for, and participating in, meetings, due diligence sessions and similar presentations to and with, among others, prospective lenders, investors and rating agencies, (v) providing monthly financial statements (excluding footnotes) to the extent the Company customarily prepares such financial statements, (vi) facilitating the entrance into one or more credit or other agreements satisfactory to Parent in connection with the Debt Financing to the extent direct borrowings or debt incurrences by the Company or its Subsidiaries are contemplated by the Debt Commitment Letters, provided that neither the Company nor any of its Subsidiaries shall be required to enter into any such agreement prior to the Effective Time (vii) facilitating the consummation of the Financing and the direct borrowing or incurrence of all proceeds of the Debt Financing, including any high yield financing, by the Surviving Corporation immediately following the Effective Time, (viii) taking all actions reasonably necessary to (A) permit the prospective lenders involved in the Financing to evaluate the Company's current assets, cash management and accounting systems, policies and procedures relating thereto for the purpose of establishing collateral arrangements (including conducting field examination and appraisals contemplated by the Debt Commitment Letters within the time frame described therein) and (B) establish bank and other accounts and blocked account agreements and lock box arrangements in connection with the foregoing, and (ix) executing and delivering (or using reasonable best efforts to obtain from advisors), and causing its Subsidiaries to execute and deliver (or use reasonable best efforts to obtain from advisors or such other persons, including officers), customary certificates (including a certificate of the chief financial officer of the Surviving Corporation with respect to solvency matters), accounting comfort letters, legal opinions (which may be reasoned if circumstances require), hedging agreements (which shall have no liability to the Company in the event the Merger is not consummated), surveys, title insurance policies (to the extent in possession of, or otherwise reasonably obtainable by, the Company or its Subsidiaries) or (x) facilitating the entrance into other documents and instruments relating to guarantees, the pledge of collateral and other matters ancillary to the Financing as may be reasonably requested by Parent in connection with the Financing and otherwise reasonably facilitating the pledge of collateral and providing of guarantees contemplated by the Debt Commitment Letter (provided that the Company and its Subsidiaries shall not be required to enter into any such document or instrument prior to the Effective Time); *provided, however,* that, except for fees and liabilities subject to reimbursement or indemnification pursuant to the next sentence, no obligation of the Company or any of its Subsidiaries under any such certificate, document or instrument (other than the representation letter referred to above) shall be effective until the Effective Time and, except for fees and liabilities subject to reimbursement or indemnification pursuant to the next sentence, none of the Company or any of its Subsidiaries shall be required to pay any commitment or other similar fee

-50-

or incur any other liability in connection with the Financing prior to the Effective Time. The Company hereby consents to the use of its and its Subsidiaries' logos in connection with the Financing; *provided* that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage the Company or any of its Subsidiaries or the reputation or goodwill of the Company or any of its Subsidiaries. Parent shall promptly, upon request by the Company, reimburse the Company for all reasonable out-of-pocket costs (including reasonable attorneys' fees) incurred by the Company or any of its Subsidiaries in connection with the cooperation of the Company and its Subsidiaries contemplated by this Section 5.09 and shall indemnify and hold harmless the Company, its Subsidiaries and their respective Representatives from and against any and all losses, damages, claims, costs or expenses suffered or incurred by any of them in connection with the arrangement of the Financing and any information used in connection therewith, except with respect to any information provided by the Company or any of its Subsidiaries.

        (c) In no event shall Parent, Merger Sub or any of its Affiliates (which for purposes of this Section 5.09(c) shall be deemed to include each direct or indirect investor in Parent, or any of Parent's or any such investor's financing sources or potential financing sources or other Representatives) enter into any Contract, arrangement or understanding with any bank or investment bank or other provider of debt or equity financing on an exclusive basis (or otherwise which Contract, arrangement or understanding by its terms could reasonably be expected to prevent such provider from providing or seeking to provide financing to any third party in connection with a transaction relating to the Company or its Subsidiaries); *provided, however,* that notwithstanding the foregoing or anything contained in the Confidentiality Agreement or herein to the contrary, Parent, Merger Sub and any of its Affiliates may: (i) at any time, (A) seek to obtain or obtain equity commitments and equity financing on an exclusive or non-exclusive basis from the Parent Limited Partners and Persons under common management of KKR, (B) seek to obtain or obtain equity commitments and equity financing from (x) any Person under the common management of a Person who delivered the Equity Commitment Letters attached hereto and (y) any other Person (other than Persons principally involved in the private equity business), in each case on a non-exclusive basis and (C) engage additional providers of debt financing on a non-exclusive basis as members of the syndicate; *provided* that prior to the No-Shop Period Start Date no such additional providers of debt financing may be awarded any lead book-runner, agent or arranger, book-running lead underwriter role or advisory role (it being agreed that such additional providers may, however, be given the role of senior managing agents); and (ii) following the No-Shop Period Start Date (without limiting the rights of Parent, Merger Sub or their Affiliates pursuant to the preceding clause (i)), (A) seek to obtain or obtain equity commitments and equity financing on an exclusive or non-exclusive basis from any Person other than (x) any Person who is an Excluded Party that the Company identifies in writing to Parent by name and (y) any Person principally involved in the private equity business that has aggregate uninvested equity commitments of at least $5,000,000,000, and (B) engage up to two additional providers of debt financing (such Persons may serve as lead book-runner, agent or arranger, book-running lead underwriter or financial advisor) on an exclusive basis, in each case in connection with the Merger or the other transactions contemplated hereby; *provided* that (1) in the case of each of the foregoing, taking such actions does not expand upon the conditions precedent to the Financing as set forth in the Financing Commitments or prevent, impair or materially delay the availability of the Financing under the Financing Commitments or the Closing or (2) in the case of obtaining additional sources of equity financing (which for purposes

-51-

of this clause (2) includes any transfer or assignment under any Equity Commitment Letter), the satisfaction of the condition set forth in Section 6.01(c) hereof shall not be impaired or delayed and the consummation of the transactions contemplated hereby shall not be otherwise impaired or delayed. In order to give effect to the foregoing agreement, subject to the conditions of this Section 5.09(c), the Company hereby releases KKR from its obligations under (x) the last sentence of the fourth paragraph of the Confidentiality Agreement (other than with respect to financing sources being considered a Representative of KKR (as defined in the Confidentiality Agreement)) and (y) the last sentence of numbered paragraph 3 of the Confidentiality Agreement.

(d) The Company shall use commercially reasonable efforts to deliver to Parent at least two Business Days prior to the Closing Date a payoff letter from JPMorgan Chase Bank, N.A., as administrative agent under the Amended and Restated Multi-Currency, Multi-Option Credit Agreement, dated as of June 22, 2006, among the Company, various Subsidiaries, J.P. Morgan Securities Inc, JPMorgan Chase Bank, N.A. and the syndication agents and various lenders party thereto, in form and substance reasonably satisfactory to Parent. On the Closing Date, assuming Parent has arranged for any necessary payoff funds, the Company shall and shall cause its Subsidiaries to terminate such Credit Agreement and all related agreements to which the Company and its Subsidiaries is a party.

Section 5.10 <u>Access; Confidentiality</u> The Company shall afford to Parent, and to Parent's officers, employees, accountants, counsel, consultants, financial advisors and other Representatives and financing sources, reasonable access during normal business hours during the period prior to the Effective Time or the termination of this Agreement to all of its and its Subsidiaries' properties, Contracts, books and records and to those officers, employees and agents of the Company to whom Parent reasonably requests access, and, during such period, the Company shall furnish, as promptly as practicable, to Parent all information concerning its and its Subsidiaries' business, properties, personnel and financial information as Parent may reasonably request. Except for disclosures expressly permitted by the terms of the Confidentiality Agreement, Parent shall hold, and shall cause its officers, employees, accountants, counsel, financial advisors and other Representatives and financing sources to hold, all information received from the Company or its Representatives, directly or indirectly, in confidence in accordance with the Confidentiality Agreement.

Section 5.11 <u>Notification of Certain Matters</u> The Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of (i) any notice or other communication received by such party from any Governmental Entity in connection with the Merger or the other transactions contemplated hereby or from any person alleging that the consent of such person is or may be required in connection with the Merger or the other transactions contemplated hereby, if the subject matter of such communication or the failure of such party to obtain such consent could be material to the Company, the Surviving Corporation or Parent, (ii) any actions, suits, claims, investigations or proceedings commenced or, to such party's Knowledge, threatened against, relating to or involving or otherwise affecting such party or any of its Subsidiaries which relate to the Merger or the other transactions contemplated hereby, (iii) the discovery of any fact or circumstance that, or the occurrence or non-occurrence of any event the occurrence or non-occurrence of which, would reasonably be likely to cause or result in any of the Conditions to the Merger set forth in Article VI not being satisfied or

-52-

satisfaction of those conditions being materially delayed in violation of any provision of this Agreement; *provided, however,* that the delivery of any notice pursuant to this Section 5.12 shall not (x) cure any breach of, or non-compliance with, any other provision of this Agreement or (y) limit the remedies available to the party receiving such notice; and, *provided, further,* that the failure to give prompt notice hereunder pursuant to clause (iii) shall not constitute a failure of a condition to the Merger set forth in Article VI except to the extent that the underlying fact or circumstance not so notified would standing alone constitute such a failure. The Company shall notify Parent, on a reasonably current basis, of any events or changes with respect to any regulatory investigation or action involving the Company or any of its Subsidiaries, and shall reasonably cooperate with Parent or its Affiliates in efforts to mitigate any adverse consequences to Parent or its Affiliates which may arise (including by coordinating and providing assistance in meeting with regulators).

Section 5.12 <u>Rule 16b-3</u>. Prior to the Effective Time, the Company shall be permitted to take such steps as may be reasonably necessary or advisable to cause dispositions of Company equity securities (including derivative securities) pursuant to the transactions contemplated by this Agreement by each individual who is a director or officer of the Company to be exempt under Rule 16b-3 promulgated under the Exchange Act in accordance with that certain No-Action Letter dated January 12, 1999 issued by the SEC regarding such matters.

Section 5.13 <u>Affiliate Letters</u>. Prior to the Closing Date, the Company shall deliver to Parent a letter identifying all persons who are, at the time this Agreement is submitted for approval to the stockholders of the Company, "affiliates" of the Company for purposes of Rule 145 under the Securities Act. The Company shall use its reasonable best efforts to cause each such person to deliver to Parent on or prior to the Closing Date a written agreement, in customary form, with respect to post-Merger restrictions under the Securities Act on transfers of Parent Common Stock received by such Persons in the Merger.

Section 5.14 <u>Control of Operations</u>. Without in any way limiting any party's rights or obligations under this Agreement, the parties understand and agree that (i) nothing contained in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Company's operations prior to the Effective Time, and (ii) prior to the Effective Time, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its operations.

Section 5.15 <u>Certain Transfer Taxes</u>. Any liability arising out of any real estate transfer Tax with respect to interests in real property owned directly or indirectly by the Company or any of its Subsidiaries immediately prior to the Merger, if applicable and due with respect to the Merger, shall be borne by the Surviving Corporation and expressly shall not be a liability of stockholders of the Company.

Section 5.16 <u>Obligations of Merger Sub</u>. Parent shall take all action necessary to cause Merger Sub and the Surviving Corporation to perform their respective obligations under this Agreement, the Financing Commitments and any New Financing Commitments.

Section 5.17 <u>Resignation of Directors</u>. Upon the request of Parent, as specified by Parent reasonably in advance of the Closing, the Company will use its reasonable best efforts to

-53-

deliver on or before the Closing the resignation of all directors of Subsidiaries of the Company, in each case, effective at the Effective Time.

     Section 5.18 <u>Tax Free Qualification for Parent Stock Election</u>. Parent and Company shall not, and shall not permit any of their Subsidiaries to, take or cause to be taken any action, other than any actions expressly contemplated by this Agreement or the Equity Commitment Letter, or knowingly fail to take or cause to be taken any action, which action or failure to act would reasonably be expected to prevent the exchange of Shares for Parent Common Stock pursuant to the Merger and a Parent Stock Election and/or an Irrevocable Option Election, taken together with the Equity Financing, from qualifying as an exchange described in Section 351 of the Code.

<div align="center">

**ARTICLE VI**

**CONDITIONS TO THE MERGER**

</div>

     Section 6.01 <u>Conditions to Each Party's Obligation to Effect the Merger</u>. The respective obligations of each party to effect the Merger shall be subject to the fulfillment (or waiver by all parties to the extent permitted by Law) at or prior to the Effective Time of the following conditions:

     (a) The Company Stockholder Approval shall have been obtained.

     (b) No Governmental Entity of competent jurisdiction shall have enacted, issued or entered any restraining order, preliminary or permanent injunction or similar order or legal restraint or prohibition which remains in effect that enjoins or otherwise prohibits consummation of the Merger.

     (c) (i) Any applicable waiting period under the HSR Act (and any extension thereof) and under the antitrust and anti-competition statutes of Canada and under similar legislation in the Republic of South Africa shall have expired or been earlier terminated and (ii) the European Commission shall have adopted a decision pursuant to the Council Regulation (EC) No. 139/2004 (the "<u>ECMR</u>") declaring the Merger compatible with the common market and, in the event that the European Commission does not have jurisdiction to review the Merger but the competent authorities of any EU member state has jurisdiction to review any aspect of the Merger or in the event any aspect of the Merger is referred to the competent authorities of any EU member state pursuant to Article 9 of the ECMR (or is deemed to be so referred pursuant to Article 9 of the ECMR) and effecting the Merger prior to the granting of approval by the relevant authorities of such EU member state would constitute a violation of the merger control laws applicable in that state, approval of the aspect of the Merger that lies within the jurisdiction of its review or that was so referred (or deemed to be so referred) shall have been granted pursuant to the merger control laws applicable in the relevant EU member state.

     (d) The Form S-4 shall have become effective under the Securities Act, no stop order suspending the effectiveness of the Form S-4 shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC.

<div align="center">-54-</div>

Section 6.02 <u>Conditions to Obligation of the Company to Effect the Merger</u>. The obligation of the Company to effect the Merger is further subject to the fulfillment or waiver by the Company of the following conditions:

(a) The representations and warranties of Parent and Merger Sub set forth in this Agreement shall be true and correct in all material respects (other than the representations and warranties set forth in Section 4.05 and Section 4.07, which shall be true and correct) as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (unless any such representation or warranty is made only as of a specific date, in which event such representation or warranty shall be true and correct in all material respects only as of such specific date).

(b) Parent and Merger Sub shall have in all material respects performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by them prior to the Effective Time.

(c) Parent shall have delivered to the Company a certificate, dated as of the Closing Date and signed by its Chief Executive Officer or another senior executive officer, certifying to the effect that the conditions set forth in Section 6.02(a) and 6.02(b) have been satisfied.

Section 6.03 <u>Conditions to Obligation of Parent and Merger Sub to Effect the Merger</u>. The obligation of Parent and Merger Sub to effect the Merger is further subject to the fulfillment or waiver by Parent and Merger Sub of the following conditions:

(a) The representations and warranties of the Company set forth in this Agreement (other than the representations and warranties set forth in Section 3.02 and Section 3.11(b)) shall be true and correct (disregarding all qualifications or limitations as to "materiality", "Company Material Adverse Effect" and words of similar import set forth therein) as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Company Material Adverse Effect. The representations and warranties of the Company set forth in (i) Section 3.02 shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date) and (ii) Section 3.11(b) shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on the Closing Date.

(b) The Company shall have in all material respects performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by it prior to the Effective Time.

(c) The Company shall have delivered to Parent a certificate, dated as of the Closing Date and signed by its Chief Executive Officer or another senior executive officer,

-55-

certifying to the effect that the conditions set forth in Section 6.03(a) and Section 6.03(b) have been satisfied.

Section 6.04 <u>Frustration of Closing Conditions</u>. Neither the Company nor Parent may rely, either as a basis for not consummating the Merger or terminating this Agreement and abandoning the Merger, on the failure of any condition set forth in Section 6.01, 6.02 or 6.03, as the case may be, to be satisfied if such failure was caused by such party's breach in any material respect of any provision of this Agreement or failure to use all reasonable best efforts to consummate the Merger and the other transactions contemplated hereby, as required by and subject to Section 5.05.

# ARTICLE VII

## TERMINATION

Section 7.01 <u>Termination or Abandonment</u>. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated and abandoned at any time prior to the Effective Time, whether before or after any approval of the matters presented in connection with the Merger by the stockholders of the Company:

(a) by the mutual written consent of the Company and Parent;

(b) by either the Company or Parent, if:

(i) the Effective Time shall not have occurred on or before February 11, 2008 (the "<u>End Date</u>"), and the party seeking to terminate this Agreement pursuant to this Section 7.01(b)(i) shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure to consummate the Merger on or before the End Date;

(ii) if any Governmental Entity of competent jurisdiction shall have issued or entered an injunction or similar legal restraint or order permanently enjoining or otherwise prohibiting the consummation of the Merger and such injunction, legal restraint or order shall have become final and non-appealable, *provided* that the party seeking to terminate this Agreement pursuant to this Section 7.01(b)(ii) shall have used such reasonable best efforts as may be required by Section 5.05 to prevent, oppose and remove such injunction;

(iii) if the Company Stockholder Approval shall not have been obtained at the Company Meeting or at any adjournment or postponement thereof at which a vote on the adoption of this Agreement was taken.

(c) by the Company:

(i) if Parent or Merger Sub shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform: (A) would give rise to the failure of a condition set forth in Section 6.01 or 6.02 and (B) is not capable of being cured prior to

-56-

the End Date or, if capable of being cured, shall not have been cured within 30 calendar days following receipt of written notice of such breach or failure to perform from the Company; *provided* that, the Company shall not have the right to terminate this Agreement pursuant to this Section 7.01(c)(i) if it is then in material breach of any representations, warranties, covenants or other agreements hereunder;

(ii) prior to obtaining the Company Stockholder Approval, in accordance with, and subject to the terms and conditions of, Section 5.02(d);

(iii) if the Merger shall not have been consummated on the second Business Day after the final day of the Marketing Period and all of the conditions set forth in Section 6.01, Section 6.03(a) and Section 6.03(b) have been satisfied and at the time of such termination such conditions continue to be satisfied; or

(d) by Parent, if:

(i) if the Company shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform: (A) would give rise to the failure of a condition set forth in Section 6.01 or 6.03 and (B) is not capable of being cured prior to the End Date or, if capable of being cured, shall not have been cured within 30 calendar days following receipt of written notice of such breach or failure to perform from Parent; *provided* that, Parent shall not have the right to terminate this Agreement pursuant to this Section 7.01(d)(i) if it or Merger Sub is then in material breach of any representations, warranties, covenants or other agreements hereunder; or

(ii) the board of directors of the Company (A) effects a Change of Recommendation, publicly proposes to effect a Change of Recommendation, or under Section 5.02(g) is deemed to have effected a Change of Recommendation, (B) fails to include in the Proxy Statement its recommendation to the Company's stockholders that they give the Company Shareholder Approval, (C) approves or recommends, or publicly proposes to approve or recommend, any Company Acquisition Proposal, or (D) fails to recommend against acceptance of a tender or exchange offer for any outstanding shares of capital stock of the Company that constitutes an Company Acquisition Proposal (other than by Parent or any of its Affiliates), including, for these purposes, by taking no position with respect to the acceptance of such tender offer or exchange offer by its shareholders, which shall constitute a failure to recommend against acceptance of such tender offer or exchange offer, within 10 Business Days after commencement.

In the event of termination of this Agreement pursuant to this Section 7.01, this Agreement shall forthwith become null and void and there shall be no liability or obligation on the part of the Company, Parent, Merger Sub or their respective Subsidiaries or Affiliates, except that the Confidentiality Agreement, the Guarantees (only to the extent reflected therein) and the provisions of Section 7.02, the last sentence of Section 5.09(b) and Article VIII will survive the termination hereof; *provided*, *however*, that, without limiting the right to receive any payment pursuant to Section 7.02, the Company agrees that, to the extent it has incurred losses or damages in connection with this Agreement, the maximum aggregate liability of Parent and

-57-

Merger Sub shall be limited to an amount equal to the aggregate amount of the Guarantees (to the extent any amount is payable thereunder), and in no event shall the Company seek to recover any money damages in excess of such amount from Parent, Merger Sub or any Guarantor (and with respect to any Guarantor in no event shall the Company seek to recover any money damages in excess of the maximum amount reflected in such Guarantor's Guarantee) or any of their respective Representatives or Affiliates; and *provided, further,* that except as specifically provided in the first sentence of Section 7.02 (f) of this Agreement, nothing herein shall relieve the Company from liability for willful and material breach of its covenants or agreements set forth in this Agreement prior to such termination, in which case Parent and/or Merger Sub shall be entitled to all rights and remedies available at Law or in equity.

Section 7.02 <u>Termination Fees</u>.

(a) In the event that:

(i) (A) a bona fide Company Acquisition Proposal shall have been made directly to its stockholders or any Person shall have publicly announced an intention to make an Company Acquisition Proposal, or a Company Acquisition Proposal shall have otherwise become publicly known and (B) following the occurrence of an event described in the preceding clause (A), this Agreement is terminated by the Company or Parent pursuant to Section 7.01(b)(i) or Section 7.01(b)(iii) or by Parent pursuant to Section 7.01(d)(i) and (C) the Company enters into, or submits to the stockholders of the Company for adoption, a definitive agreement with respect to any Company Acquisition Proposal, or consummates any Company Acquisition Proposal, within nine (9) months of the date this Agreement is terminated, which in each case, need not be the same Company Acquisition Proposal that shall have been publicly announced or made known at or prior to termination of this Agreement (*provided* that for purposes of clause (C) of this Section 7.02(a)(i), the references to "25%" in the definition of Company Acquisition Proposal shall be deemed to be references to "50%"); or

(ii) this Agreement is terminated by the Company pursuant to Section 7.01(c)(ii); or

(iii) this Agreement is terminated by Parent pursuant to Section 7.01(d)(ii);

then in any such event under clause (i), (ii) or (iii) of this Section 7.02(a), the Company shall pay as directed by Parent the Termination Fee (as defined below) less the amount of any Parent Expenses previously paid to Parent (if any), by wire transfer of same day funds, it being understood that in no event shall the Company be required to pay the Termination Fee on more than one occasion. "<u>Termination Fee</u>" shall mean an amount equal to $225,000,000, except (x) in the event that this Agreement is terminated by the Company pursuant to Section 7.01(c)(ii) in order to enter into a definitive agreement with respect to a Company Acquisition Proposal with an Excluded Party, or (ii) in the event that this Agreement is terminated by Parent pursuant to Section 7.01(d)(ii) in a circumstance in which the event giving rise to the right of termination is based on the submission of a Company Acquisition Proposal by an Excluded Party, in which cases the Termination Fee shall mean an amount equal to $75,000,000.

-58-

(b) In the event that:

(i) the Company shall terminate this Agreement pursuant to Section 7.01(c)(i) and at the time of such termination there is no state of facts or circumstances that would reasonably be expected to cause the conditions in Section 6.01, Section 6.03(a) or Section 6.03(b) not to be satisfied on the End Date, or

(ii) the Company shall terminate this Agreement pursuant to Section 7.01(c)(iii);

then in any such event under clause (i) or (ii) of this Section 7.02(b), Parent shall pay to the Company a termination fee of $225,000,000 in cash (the "Parent Termination Fee"), it being understood that in no event shall Parent be required to pay the Parent Termination Fee on more than one occasion.

(c) Any payment required to be made pursuant to clause (i) of Section 7.02(a) shall be made at the direction of Parent to any Person that is a U.S. person for U.S. federal income tax purposes, promptly following the earliest of the execution of a definitive agreement with respect to, submission to the stockholders of, or the consummation of, any transaction contemplated by an Company Acquisition Proposal (and in any event not later than two Business Days after delivery to the Company of notice of demand for payment); any payment required to be made pursuant to clause (ii) of Section 7.02(a) shall be made at the direction of Parent to any Person that is a U.S. person for U.S. federal income tax purposes, concurrently with, and as a condition to the effectiveness of, the termination of this Agreement by the Company pursuant to Section 7.01(c)(ii); any payment required to be made pursuant to clause (iii) of Section 7.02(a) shall be made at the direction of Parent to any Person that is a U.S. person for U.S. federal income tax purposes, promptly following termination of this Agreement by Parent pursuant to Section 7.01(d)(ii) (and in any event not later than two Business Days after delivery to the Company of notice of demand for payment), and such payment shall be made by wire transfer of immediately available funds to an account to be designated by Parent. Any payment required to be made pursuant to Section 7.02(b) shall be made to the Company promptly following termination of this Agreement by the Company (and in any event not later than two Business Days after delivery to Parent of notice of demand for payment), and such payment shall be made by wire transfer of immediately available funds to an account to be designated by the Company.

(d) In the event that this Agreement is terminated by Parent, on the one hand, or the Company, on the other hand, pursuant to Section 7.01(b)(iii) or by Parent pursuant to Section 7.01(d)(i) under circumstances in which the Termination Fee is not payable pursuant to this Section 7.02, then the Company shall promptly, but in no event later than five Business Days after being notified of such by Parent, pay Parent all of the reasonable documented out-of-pocket expenses incurred by Parent or Merger Sub in connection with this Agreement and the transactions contemplated by this Agreement (including the Financing) up to a maximum amount of $20,000,000 (the "Parent Expenses"), by wire transfer of same day funds; provided, that the existence of circumstances which could require the Termination Fee to become subsequently payable by the Company pursuant to Section 7.02(b) shall not relieve the Company of its obligations to pay the Parent Expenses pursuant to this Section 7.02(d); and provided, further that the payment by the Company of Parent Expenses pursuant to this Section 7.02(d) shall not

-59-

relieve the Company of any subsequent obligation to pay the Termination Fee pursuant to Section 7.02(b) except to the extent indicated in Section 7.02(b).

(e) In the event that the Company shall fail to pay the Termination Fee or Parent Expenses, or Parent shall fail to pay the Parent Termination Fee, required pursuant to this Section 7.02 when due, such fee and/or expenses shall accrue interest for the period commencing on the date such fee or expenses, as the case may be, became past due, at a rate equal to the rate of interest publicly announced by JPMorgan Chase Bank from time to time during such period, as such bank's prime lending rate. In addition, if either party shall fail to pay such fee or expenses when due, such owing party shall also pay to the owed party all of the owed party's costs and expenses (including reasonable attorneys' fees) in connection with efforts to collect such fee or expenses. Each of Parent and the Company acknowledges that the fees and the other provisions of this Section 7.02 are an integral part of the Merger and that, without these agreements, Parent, Merger Sub and the Company would not enter into this Agreement.

(f) Each of the parties hereto acknowledges that the agreements contained in this Section 7.02 are an integral part of the transactions contemplated by this Agreement and that neither the Termination Fee nor the Parent Termination Fee is a penalty, but rather is liquidated damages in a reasonable amount that will compensate Parent and Merger Sub or the Company, as the case may be, in the circumstances in which such Termination Fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. Notwithstanding anything to the contrary in this Agreement, the Company's right to receive payment of the Parent Termination Fee from Parent pursuant to this Section 7.02 or the guarantee thereof pursuant to the Guarantees shall be the sole and exclusive remedy of the Company and its Subsidiaries against Parent, Merger Sub, the Guarantors and any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents for the loss suffered as a result of the failure of the Merger to be consummated, and upon payment of such amount, none of Parent, Merger Sub, the Guarantors or any of their former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

## ARTICLE VIII

### MISCELLANEOUS

Section 8.01 <u>No Survival of Representations and Warranties</u>. None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the occurrence of the Merger.

Section 8.02 <u>Expenses</u>. Whether or not the Merger is consummated, all costs and expenses incurred in connection with the Merger, this Agreement and the transactions contemplated hereby shall be paid by the party incurring or required to incur such expenses, except (x) expenses incurred in connection with the printing, filing and mailing of the Form S-4 and the Proxy Statement (including applicable SEC filing fees) and all fees paid in respect of any

-60-

HSR Act or other regulatory filing shall be borne one-half by the Company and one-half by Parent and (y) as otherwise set forth in Section 5.09, Section 7.02(d) or Section 7.02(e).

Section 8.03 Counterparts; Effectiveness. This Agreement may be executed in two or more consecutive counterparts (including by facsimile), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by telecopy or otherwise) to the other parties.

Section 8.04 Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

Section 8.05 Jurisdiction; Enforcement. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement to be performed by the Company or any of its Subsidiaries were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that prior to the valid and effective termination of this Agreement in accordance with Article VII Parent and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware, other than with respect to any particular matter over which the U.S. Federal District Court has exclusive jurisdiction, which Parent and Merger Sub shall be entitled to enforce exclusively in any federal court within the State of Delaware. The parties acknowledge and agree that neither the Company nor any of its Subsidiaries shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement and their sole and exclusive remedy with respect to any such breach shall be the monetary damages set forth in Section 7.02(b). In addition, each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware, other than with respect to any particular matter over which the U.S. Federal District Court has exclusive jurisdiction, which shall be brought and determined exclusively in any federal court within the State of Delaware. Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve in accordance with this Section 8.05, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by the applicable Law, any claim that (i) the suit, action or

-61-

proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject mater hereof, may not be enforced in or by such courts.

Section 8.06 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.07 <u>Notices</u>. Any notice required to be given hereunder shall be sufficient if in writing, and sent by facsimile transmission with confirmation (*provided* that any notice received by facsimile transmission or otherwise at the addressee's location on any Business Day after 5:00 p.m. (addressee's local time) shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next Business Day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows:

(a) if to Parent or Merger Sub, to:

c/o Kohlberg Kravis Roberts & Co. L.P.
9 West 57th Street, Suite 4200
New York, New York 10019
Telecopy: (212) 750-006
Attention: Brian F. Carroll

*with a copy to:*

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Telecopy: (212) 455-2502
Attention: David J. Sorkin, Esq.

if to the Company, to:

Harman International Industries, Incorporation
1101 Pennsylvania Ave. N.W.
Suite 1010, Washington D.C. 20004
Telecopy: (202) 393-2442
Attention: Chief Executive Officer

*with a copy to:*

Jones Day
222 East 41st Street
New York, New York 10017
Telecopy: (212) 755-7306
Attention: Robert A. Profusek, Esq.
            Marilyn W. Sonnie, Esq.

-62-

*and:*

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019-6150
Telecopy: (212) 403-2000
Attention: Joshua R. Cammaker, Esq.
              Nancy B. Greenbaum, Esq.

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated and confirmed, personally delivered or mailed. Any party to this Agreement may notify any other party of any changes to the address or any of the other details specified in this paragraph; *provided, however,* that such notification shall only be effective on the date specified in such notice or five Business Days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address or facsimile of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 8.08 <u>Assignment; Binding Effect</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties, except that Parent and Merger Sub may assign, in its sole discretion, any of or all of its rights, interest and obligations under this Agreement to Parent or any of its Affiliates, but no such assignment shall relieve the assigning party of its obligations hereunder. Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. Parent shall cause Merger Sub, and any assignee thereof, to perform its obligations under this Agreement and shall be responsible for any failure of Merger Sub or such assignee to comply with any representation, warranty, covenant or other provision of this Agreement.

Section 8.09 <u>Severability</u>. Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only as broad as is enforceable.

Section 8.10 <u>Entire Agreement; No Third-Party Beneficiaries</u>. This Agreement (including the exhibits and letters hereto), the Confidentiality Agreement (subject to Section 5.09(c) of this Agreement) and the Guarantees constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the parties, or any of them, with respect to the subject matter hereof and thereof, and (except (a) as set forth in Section 5.08 hereof and (b) for the provisions of Article II concerning payment of the Merger Consideration (or the amounts set forth in Section 2.05), which following the Effective Time shall inure to the Company's stockholders and to the holders of Company Stock Options, Company Restricted Shares and RSUs but, subject to the limitations on enforcement (including Sections 7.02(f) and 8.05 hereof) provided for in this Agreement, prior to the Effective Time

-63-

may only be enforced by the Company) is not intended to and shall not confer upon any person other than the parties hereto any rights or remedies hereunder.

Section 8.11 <u>Amendments; Waivers</u>. At any time prior to the Effective Time, any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company, Parent and Merger Sub, or in the case of a waiver, by the party against whom the waiver is to be effective; *provided, however,* that after receipt of Company Shareholder Approval, if any such amendment or waiver shall be applicable Law or in accordance with the rules and regulations of the New York Stock Exchange require further approval of the stockholders of the Company, the effectiveness of such amendment or waiver shall be subject to the approval of the stockholders of the Company. Notwithstanding the foregoing, no failure or delay by the Company or Parent in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

Section 8.12 <u>Headings</u>. Headings of the Articles and Sections of this Agreement are for convenience of the parties only and shall be given no substantive or interpretive effect whatsoever. The table of contents to this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.13 <u>Interpretation</u>. When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "or" shall be deemed to mean "and/or." All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

Section 8.14 <u>No Recourse</u>. This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto, or against the Guarantors under and to the extent set forth in the Guarantees, and no past, present or future Affiliate, director, officer, employee, incorporator, member, manager, partner, shareholder, agent, attorney or representative of any

-64-

party hereto (other than the Guarantor (to the extent set forth therein)) shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

Section 8.15 Certain Definitions. For purposes of this Agreement, the following terms will have the following meanings when used herein:

(a) "Affiliates" shall mean, as to any person, any other person which, directly or indirectly, controls, or is controlled by, or is under common control with, such person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise. Without limiting the foregoing, the "Affiliates" of Parent shall include the KKR 2006 Fund L.P. and its portfolio companies.

(b) "Business Day" shall mean any day other than a Saturday, Sunday or a day on which the banks in New York, New York are authorized by Law or executive order to be closed.

(c) "Company Stock Plans" means the Harman International Industries, Incorporated Amended and Restated 2002 Stock Option and Incentive Plan and the Harman International Industries, Incorporated 1992 Incentive Plan.

(d) "Confidentiality Agreement" means the confidentiality agreement, dated as of February 9, 2007, by and between Kohlberg Kravis Roberts & Co. L.P. ("KKR") and the Company, as the same may be amended or modified from time to time.

(e) "Contracts" means any contracts, agreements, licenses (or sublicenses), notes, bonds, mortgages, indentures, commitments, leases (or subleases) or other instruments or obligations, whether written or oral.

(f) "GS Funds" means the collective reference to GS Capital Partners VI Parallel, L.P., GS Capital Partners VI GmbH & Co. KG, GS Capital Partners VI Fund, L.P. and GS Capital Partners VI Offshore Fund, L.P.

(g) "Guarantors" means each of the KKR 2006 Fund L.P. and the GS Funds (each, a "Guarantor")

(h) "Knowledge" means (i) with respect to Parent, the actual knowledge after due inquiry of the individuals listed on Section 8.15(f)(i) of the Parent Disclosure Letter and (ii) with respect to the Company, the actual knowledge after due inquiry of the individuals listed on Section 8.15(f)(ii) of the Company Disclosure Letter.

(i) "orders" means any orders, judgments, injunctions, awards, decrees, writs or other legally enforceable requirement handed down, adopted or imposed by, including any consent decree, settlement agreement or similar written agreement with, any Governmental Entity.

-65-

(j) "Parent Limited Partners" means limited partners in the active investment funds affiliated with KKR.

(k) "Parent Material Adverse Effect" means any fact, circumstance, event, change effect or occurrence that, individually or in the aggregate, prevents or materially delays or materially impairs the ability of Parent and Merger Sub to consummate the Merger on a timely basis, or would reasonably be expected to do so.

(l) "person" or "Person" shall mean an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, group (as such term is used in Section 13 of the Exchange Act) or organization, including a Governmental Entity, and any permitted successors and assigns of such person.

(m) Significant Subsidiary" has the meaning set forth in Rule 1-02(w) of Regulation S-X promulgated by the SEC (*provided* that for purposes this definition, the references to "10%" in the definition of "significant subsidiary" in such Rule 1-02(w) shall be deemed to be references to "5%").

(n) "Subsidiaries" of any party shall mean any corporation, partnership, association, trust or other form of legal entity of which (i) more than 50% of the outstanding voting securities (or other voting interests or, if there are no voting interests, equity interests) are directly or indirectly owned by such party, or (ii) such party or any Subsidiary of such party is a general partner (excluding partnerships in which such party or any Subsidiary of such party does not have a majority of the voting interests in such partnership). In addition to the foregoing, the Persons listed on Section 8.15(l) of the Company Disclosure Letter shall be deemed "Subsidiaries" of the Company.

-66-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

<div style="margin-left: 40%;">

HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED

By:   /s/ Sidney Harman
      Name: Sidney Harman
      Title: Executive Chairman and Chief Executive Officer

KHI PARENT INC.

By:   /s/ Brian Carroll
      Name: Brian Carroll
      Title: President

KHI MERGER SUB INC.

By:   /s/ Brian Carroll
      Name: Brian Carroll
      Title: President

</div>

**[SIGNATURE PAGE - MERGER AGREEMENT]**

Use these links to rapidly review the document
TABLE OF CONTENTS

As filed with the Securities and Exchange Commission on June 20, 2007

Registration No. [          ]

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM S–4
## REGISTRATION STATEMENT UNDER
## THE SECURITIES ACT OF 1933

# KHI Parent Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **3651** | **56–2663804** |
|---|---|---|
| (State of Incorporation) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**c/o Kohlberg Kravis Roberts & Co. L.P.**
**9 West 57th Street, Suite 4200**
**New York, New York 10019**
**(212) 750–8300**
(Address, including zip code, and telephone number, including area code, of registrants' principal executive offices)

**Brian F. Carroll**
**President**
**9 West 57th Street, Suite 4200**
**New York, New York 10019**
**(212) 750–8300**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*With copies to:*

| David J. Sorkin | Edwin C. Summers | Robert A. Profusek | Joshua R. Cammaker |
|---|---|---|---|
| Simpson Thacher & Bartlett LLP | Harman International Industries, Incorporated | Jones Day | Wachtell, Lipton, Rosen & Katz |
| 425 Lexington Avenue | 8500 Balboa Boulevard | 222 East 41st Street | 51 West 52nd Street |
| New York, New York 10017–3954 | Northridge, California 91329 | New York, New York 10017 | New York, New York 10019 |
| (212) 455–2000 | (818) 895–5724 | (212) 326–3939 | (212) 403–1000 |

Approximate date of commencement of proposed exchange offer: As soon as practicable after this Registration Statement is declared effective.

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, please check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post–effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

| Title of each class of securities to be registered | Amount to be registered | Proposed maximum offering price per share | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common Stock, $0.01 par value per share | 8,333,333(1) | Not Applicable(2) | $821,889,661(3) | $25,232(4) |

(1)     Represents the maximum number of shares of common stock, par value $0.01 per share, of KHI Parent Inc. to be issued upon the completion of the merger (as described in the accompanying proxy statement/prospectus) in respect of shares of common stock, par value $0.01 per share, of Harman International Industries, Incorporated ("Harman").

(2)     Omitted in reliance on Rule 457(o) under the Securities Act of 1933, as amended (the "Securities Act").

(3)     Pursuant to rules 457(f) and 457(c) under the Securities Act and solely for the purpose of calculating the registration fee, the proposed maximum aggregate offering price is equal to the product obtained by multiplying (1) $117.39, the average of the high and low sale prices of the common stock of Harman, as reported on the New York Stock Exchange, on June 18, 2007, by (2) 68,111,013, which represents the estimated number of shares of Harman common stock to be canceled in connection with the merger described in this proxy statement/prospectus assuming the exercise of Harman stock options and exchange of restricted stock units, minus $7,173,321,600, the estimated amount of cash to be paid by the registrant to Harman equity holders in the merger, assuming the maximum number of shares of common stock being registered are hereby issued upon completion of the merger in respect of shares of Harman common stock.

(4)     Determined in accordance with Section 6(b) of the Securities Act at a rate equal to $30.70 per $1,000,000 of the proposed maximum aggregate offering price.

The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until this Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.

The information in this proxy statement/prospectus is not complete and may be changed. We may not sell the securities described herein until the registration statement filed with the Securities and Exchange Commission is declared effective. This proxy statement/prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED JUNE 20, 2007**



, 2007

Dear Harman International Stockholder:

You are cordially invited to attend a special meeting of Harman International Industries, Incorporated stockholders to be held on [  •  ], 2007, starting at [  •  ] a.m., local time, at [  •  ].

At the meeting, you will be asked to consider and vote upon a proposal to adopt a merger agreement under which Harman would be acquired by KHI Parent Inc. ("Parent"), a company formed by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners VI Fund, L.P. and its related funds, which are sponsored by Goldman, Sachs & Co. ("GSCP").

If the merger agreement is adopted by our stockholders and the merger is completed, as a stockholder you will be entitled to receive $120.00 in cash, without interest, for each share of Harman common stock owned by you at the completion of the merger. As an alternative to receiving the $120.00 per share, you have the opportunity to elect, on a purely voluntary basis, to exchange some or all of your shares of Harman common stock, on a one–for–one basis, for shares of common stock of Parent, which will own Harman after the merger is completed. The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders. However, the number of Parent shares you will receive may be less than you requested in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock. This number of Parent shares represents approximately 27% of the equity interests in Parent that will be outstanding immediately following the merger based on the expected equity financing for the merger. If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis and the remaining Harman shares and options will be converted into cash.

Parent common stock issued in the merger will not be listed on any national securities exchange. Parent has agreed, however, to file certain reports with the Securities and Exchange Commission for a period of two years following the closing of the merger.

Harman's board of directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, Harman and its stockholders and resolved to recommend that Harman stockholders vote in favor of the adoption of the merger agreement.

**Accordingly, our board of directors unanimously recommends that you vote FOR the adoption of the merger agreement and FOR the adjournment of the special meeting, if necessary or appropriate to solicit additional proxies. Our board of directors is not making any recommendation as to whether any stockholder should elect to receive shares of Parent common stock instead of the cash consideration.**

**Your vote is very important, regardless of the number of shares of common stock you own.** We cannot complete the merger unless the merger agreement is adopted by the holders of a majority of the outstanding shares of our common stock. **If you do not vote on the proposal to adopt the merger agreement, this has the same effect as a vote by you against the adoption of the merger agreement.**

The enclosed proxy statement/prospectus provides you with detailed information about the special meeting, the merger agreement, the merger and other related matters. A copy of the merger agreement is included as Annex A to this document. We encourage you to read this proxy statement/prospectus and the merger agreement carefully and in their entirety. **In particular, you should carefully consider the discussion in the section of the enclosed proxy statement/prospectus entitled "Risk Factors" beginning on page 30.** You may also obtain more information about Harman from documents we file with the Securities and Exchange Commission.

Whether or not you plan to attend the special meeting, please complete, date, sign and return, as promptly as possible, the enclosed proxy card in the accompanying reply envelope, or submit your proxy through the Internet or by telephone. **If you have Internet access, we encourage you to record your vote through the Internet.** If you attend the special meeting and vote in person, your vote by ballot will revoke any proxy previously submitted.

Thank you in advance for your continued support.

Sincerely,

Sidney Harman
*Executive Chairman*

**Neither the Securities and Exchange Commission nor any state securities regulatory agency has approved or disapproved of the Parent common stock to be issued in connection with the merger or passed upon the adequacy or accuracy of this proxy statement/prospectus. Any representation to the contrary is a criminal offense.**

This proxy statement/prospectus is dated [  •  ], 2007,
and is first being mailed to Harman stockholders on or about [  •  ], 2007.

# Harman International Industries, Incorporated
### 1101 Pennsylvania Avenue, N.W., Suite 1010
### Washington, D.C. 20004

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS
### TO BE HELD ON [  •  ], 2007

To the Stockholders of Harman International Industries, Incorporated:

A special meeting of stockholders of Harman International Industries, Incorporated, a Delaware corporation ("Harman"), will be held on **[  •  ]**, 2007, starting at **[  •  ]** a.m., local time, at **[  •  ]**, for the following purposes:

    1.   To consider and vote on a proposal to adopt the Agreement and Plan of Merger, dated as of April 26, 2007, as it may be amended from time to time (the "merger agreement"), among KHI Parent Inc., a Delaware corporation ("Parent"), KHI Merger Sub Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub"), and Harman.

    2.   To consider and vote on any proposal to adjourn the special meeting to a later date or time, if necessary or appropriate to solicit additional proxies in favor of the proposal to adopt the merger agreement if there are insufficient votes at the time of such adjournment to adopt the merger agreement.

These items of business are described in the enclosed proxy statement/prospectus. Our board of directors has designated the close of business on **[  •  ]**, 2007 as the record date for the purpose of determining the stockholders who are entitled to receive notice of, and to vote at, the special meeting and any adjournments or postponements of the special meeting. Only stockholders of record at the close of business on the record date are entitled to notice of, and to vote at, the special meeting and at any adjournment or postponement thereof.

Our board of directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, Harman and its stockholders and resolved to recommend that Harman stockholders vote in favor of the adoption of the merger agreement.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE <u>FOR</u> THE ADOPTION OF THE MERGER AGREEMENT AND <u>FOR</u> THE ADJOURNMENT OF THE SPECIAL MEETING, IF NECESSARY OR APPROPRIATE TO SOLICIT ADDITIONAL PROXIES. THE BOARD OF DIRECTORS IS NOT MAKING ANY RECOMMENDATION AS TO WHETHER ANY STOCKHOLDER SHOULD ELECT TO RECEIVE SHARES OF PARENT COMMON STOCK INSTEAD OF THE CASH CONSIDERATION.**

**Your vote is important.**    The adoption of the merger agreement requires the affirmative vote of the holders of a majority of the outstanding shares of our common stock. **Your failure to vote in person at the special meeting or to submit your proxy through the Internet or by telephone or to submit a signed proxy card will have the same effect as a vote by you against the adoption of the merger agreement.** Properly executed proxy cards with no instructions indicated on the proxy card will be voted **<u>FOR</u>** the adoption of the merger agreement and **<u>FOR</u>** the adjournment of the special meeting, if necessary or appropriate to solicit additional proxies. Even if you plan to attend the special meeting in person, we request that you complete, sign, date and return the enclosed proxy, or submit your proxy through the Internet or by telephone, prior to the special meeting to ensure that your shares will be

represented at the special meeting if you are unable to attend. If you have Internet access, we encourage you to record your vote through the Internet. If you hold your shares in "street name," which means through a bank, broker or other custodian, you must obtain a legal proxy from this custodian in order to vote in person at the special meeting. Additionally, you should check the voting form used by that custodian to determine whether you will be able to submit your proxy through the Internet or by telephone.

If you attend the special meeting, you may revoke your proxy and vote in person, even if you have previously returned your proxy card or submitted your proxy through the Internet or by telephone. If your shares are held by a bank, broker, or other custodian, and you plan to attend the special meeting, please bring to the special meeting your statement evidencing your beneficial ownership of common stock. Please carefully review the instructions in the enclosed proxy statement/prospectus and the enclosed proxy card or the information forwarded by your bank, broker or other custodian regarding each of these options.

If you are a participant in the Harman Retirement Savings Plan and any part of your account under the plan is invested in Harman common stock, instructions on how to provide voting instructions to the trustee are included with the enclosed proxy statement/prospectus.

Stockholders who do not vote in favor of the adoption of the merger agreement will have the right to seek appraisal of the fair value of their shares of Harman common stock if the merger is completed, but only if they deliver a demand for appraisal before the vote is taken on the merger agreement and comply with all applicable requirements of Delaware law, which are summarized in the enclosed proxy statement/prospectus.

The list of stockholders entitled to vote at the special meeting will be available for inspection at our principal executive offices at Harman International Industries, Incorporated, 1101 Pennsylvania Avenue, N.W., Suite 1010, Washington, D.C. 20004, beginning ten days prior to the date of the special meeting and continuing through the meeting. This list will also be available for inspection at the special meeting.

By Order of the Board of Directors

Edwin C. Summers
*Secretary*

Washington, D.C.
[•], 2007

**THIS PROXY STATEMENT/PROSPECTUS INCORPORATES ADDITIONAL INFORMATION**

This proxy statement/prospectus incorporates important business, financial and other information about Harman from other documents filed by Harman with the Securities and Exchange Commission, or the SEC, that is not included in, or delivered with, this proxy statement/prospectus. For more information regarding the documents incorporated by reference into this proxy statement/prospectus, see "Where You Can Find More Information" beginning on page 135.

You may obtain copies of the documents incorporated by reference into this proxy statement/prospectus, without charge, by requesting them in writing or by telephone from Harman at the following address and telephone number:

<div align="center">

Harman International Industries, Incorporated
1101 Pennsylvania Ave., N.W., Suite 1010
Washington, D.C. 20004
Attn: Investor Relations
Telephone: (202) 393–1101

</div>

In addition, if you have questions about the merger or the special meeting, or if you need to obtain copies of this proxy statement/prospectus, proxy cards, election forms or other documents incorporated by reference into this proxy statement/prospectus, you may contact MacKenzie Partners, Inc., Harman's proxy solicitor, at the address and telephone number listed below. You will not be charged for any of the documents you request.

<div align="center">

MacKenzie Partners, Inc.
105 Madison Avenue
New York, New York 10016
Telephone: (800) 322–2885

</div>

If you are a participant in the Harman Retirement Savings Plan and any part of your account is invested in Harman common stock, and you have questions regarding how to provide voting instructions to the trustee of the plan with respect to these shares, you may contact the trustee at the address and telephone number listed below.

<div align="center">

Mercer Trust Company
Investors Way
Norwood, Massachusetts 02062
Telephone: (857) 362–6034

</div>

**To receive timely delivery of the documents before the special meeting, you must request them no later than [ • ], 2007.**

**TABLE OF CONTENTS**

QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING AND THE MERGER

SUMMARY TERM SHEET

    Parties to the Merger (Page 43)
    The Merger (Page 48)
    Merger Consideration; Election to Receive Parent Common Stock Instead of Cash (Page 81)
    Effective Time; Marketing Period (Page 80)
    The Special Meeting (Page 44)
    Election to Receive Parent Common Stock (Page 102)
    Treatment of Stock Options and Other Awards (Page 82)
    Recommendation of Harman's Board of Directors (Page 53)
    Opinion of Harman's Financial Advisor (Page 62)
    Interests of Harman's Directors and Executive Officers in the Merger (Page 57)
    Election Agreement (Page 106)
    Financing (Page 71)
    Regulatory Approvals (Page 77)
    Rights of Stockholders to Seek Appraisal (Page 111)
    Material U.S. Federal Income Tax Consequences (Page 107)
    Conditions to the Merger (Page 97)
    Restrictions on Solicitation of Other Offers (Page 90)
    Termination of the Merger Agreement (Page 98)
    Termination Fees (Page 99)
    Market Price of Harman Common Stock (Page 129)
    Stock Exchange Listing (Page 79)
    Resale of Parent Common Stock (Page 79)
    Additional Information (Page 135)

SELECTED HISTORICAL FINANCIAL DATA OF HARMAN

UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

CAUTIONARY STATEMENT REGARDING FORWARD–LOOKING STATEMENTS

RISK FACTORS

    Risks Related to the Merger and Elections to Receive Parent Common Stock
    Risks Related to the Financing of the Merger and Indebtedness
    Risks Related to the Ownership of Parent Common Stock
    Risks Related to Harman

THE PARTIES TO THE MERGER

    Harman International Industries, Incorporated
    KHI Parent Inc.
    KHI Merger Sub Inc.

THE SPECIAL MEETING

    Date, Time, Place and Purpose of the Special Meeting
    Record Date and Quorum
    Vote Required
    Common Stock Ownership of Directors and Executive Officers

Proxies and Revocation
Adjournments and Postponements
Solicitation of Proxies; Costs
Participants in Harman Retirement Savings Plan
Questions and Additional Information
Availability of Documents

THE MERGER

Background of the Merger
Reasons for the Merger; Recommendation of Harman's Board
Interests of Harman's Directors and Executive Officers in the Merger
Severance Agreements
Stock–Based Awards
Other Benefit Plans
New Arrangements with Parent and Merger Sub
Director and Officer Indemnification and Insurance
Employee Benefits
Certain Director Compensation
Opinion of Financial Advisor to Harman
Forecasted Financial Information
Financing of the Merger
Regulatory Approvals
Litigation Related to the Merger
Accounting Treatment
Delisting of Harman Common Stock
No Stock Exchange Listing of Parent Common Stock
Resale of Parent Common Stock Following the Merger; Parent SEC Filings
Amendment to Harman's Stockholder Rights Agreement

THE MERGER AGREEMENT

The Merger
Effective Time; Marketing Period
Merger Consideration; Election to Receive Parent Common Stock Instead of Cash
Dissenters' Shares
Treatment of Stock Options and Other Awards
Exchange and Payment Procedures
Representations and Warranties
Conduct of Harman's Business Pending the Merger
Conduct of Parent Pending the Merger
Stockholders' Meeting
Restrictions on Solicitation of Other Offers
Change of Recommendation/Termination in Connection with a Superior Proposal
Agreement to Take Further Action and Use Reasonable Best Efforts
Financing Commitments; Cooperation
Employee Benefits
Other Covenants and Agreements
Conditions to the Merger
Termination
Termination Fees and Expenses
Amendment and Waiver

ii

ELECTION TO RECEIVE PARENT COMMON STOCK

    General Description of Election
    Proration of Parent Common Stock
    Election Forms and Related Documents

ELECTION AGREEMENT

MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

DISSENTERS' RIGHTS OF APPRAISAL

DESCRIPTION OF PARENT COMMON STOCK

    Capitalization
    Dividends
    Voting Rights
    Liquidation
    Preemptive Rights

COMPARISON OF STOCKHOLDERS' RIGHTS

    Capitalization
    Voting Rights
    Number of Directors
    Classes and Election of Directors
    Filling Vacancies on the Board
    Removal of Directors
    Amendments to the Certificate of Incorporation
    Amendments to the By–Laws
    Stockholder Proposals
    Director Nominations by Stockholders
    Ability to Call Special Meetings of the Board
    Ability to Call Special Meetings of Stockholders
    Actions by Stockholders without a Meeting
    Limitation on Directors' Liability
    Indemnification of Directors and Officers
    Stockholder Rights Plans
    Anti–Takeover Protections

DESCRIPTION OF BUSINESS OF PARENT

CONTROL AND MANAGEMENT OF PARENT

    KHI Holdings LP
    Board of Directors of Parent
    Executive Officers of Parent
    Certain Relationships and Related Party Transactions
    Dividend Policy

MARKET PRICE OF HARMAN COMMON STOCK AND DIVIDEND DATA

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS OF HARMAN COMMON STOCK AND HARMAN MANAGEMENT

PARENT'S STOCK OWNERSHIP AFTER THE MERGER

iii

LEGAL MATTERS

STOCKHOLDER PROPOSALS FOR 2007 ANNUAL MEETING OF HARMAN STOCKHOLDERS

WHERE YOU CAN FIND MORE INFORMATION

KHI PARENT INC. CONSOLIDATED FINANCIAL STATEMENT

Annex A-–Agreement and Plan of Merger
Annex B-–Opinion of Bear Stearns
Annex C-–Certificate of Incorporation of Parent
Annex D-–Amended and Restated By–Laws of Parent
Annex E-–Section 262 of the Delaware General Corporation Law
iv

## QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING AND THE MERGER

The following questions and answers are intended to address briefly some commonly asked questions regarding the merger, the merger agreement and the special meeting. These questions and answers do not address all questions that may be important to you as a Harman stockholder. Please refer to the "Summary Term Sheet" beginning on page 7 and the more detailed information contained elsewhere in this proxy statement/prospectus, the annexes to this proxy statement/prospectus and the documents incorporated by reference into this proxy statement/prospectus, which you should read carefully. Unless otherwise indicated or the context requires otherwise, all references in this document to "Harman" refer to Harman International Industries, Incorporated and its subsidiaries; all references to "Parent" refer to KHI Parent Inc.; all references to "Merger Sub" refer to KHI Merger Sub Inc., a wholly owned subsidiary of Parent; all references to "Holdings" refer to KHI Holdings LP, a Delaware limited partnership that controls Parent; all references to the "merger agreement" refer to the Agreement and Plan of Merger, dated as of April 26, 2007, among Harman, Parent and Merger Sub, a copy of which is attached as Annex A to this proxy statement/prospectus, as it may be amended from time to time; and all references to the "merger" refer to the merger contemplated by the merger agreement.

*Q:*

### What is the proposed transaction?

*A:*

The proposed transaction is the merger of Harman with Merger Sub, a company formed by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners VI Fund, L.P. and its related funds, which are sponsored by Goldman, Sachs & Co. ("GSCP"). KKR and GSCP are collectively referred to in this document as the Sponsors. If the merger agreement is adopted by Harman stockholders and the other closing conditions to the merger are satisfied or waived, Merger Sub will merge with and into Harman. Harman will be the surviving corporation in the merger and will become a wholly owned subsidiary of Parent.

*Q:*

### What will I receive for my shares of Harman common stock in the merger?

*A:*

Under the terms of the merger agreement, you will receive $120.00 in cash, without interest and less any required withholding taxes (the "Cash Consideration"), for each share of Harman common stock that you own at the completion of the merger. Alternatively, with respect to some or all of your shares of Harman common stock, you may elect to receive, instead of the Cash Consideration, one share of common stock of Parent, the company that will own Harman upon completion of the merger, for each share of Harman common stock. The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders. However, the number of Parent shares you will receive may be less than you requested in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock. If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis and the remaining Harman shares and options will be converted into cash. If proration is necessary (a) Harman stockholders will receive the Cash Consideration for any shares of Harman common stock not converted into Parent common stock and (b) Harman option holders will receive a cash payment equal to the number of shares of Harman common stock underlying the options not converted into Parent common stock, multiplied by the amount (if any) by which $120.00 exceeds the exercise price, without interest and less any required withholding taxes. If you make an election to receive shares of Parent common stock in connection with the merger, the actual mix of consideration you will receive will not be known until after all elections have been made because only 8,333,333 shares of Parent common stock will be issued in connection with the merger.

The shares of Parent common stock will be registered with the SEC. While shares of Parent common stock will be freely transferable (subject to limitations applicable to holders deemed to be affiliates of Harman or Parent), the Parent common stock will not be listed on any national securities exchange upon completion of the merger. If you do not elect to receive any shares of

Parent common stock, you will no longer have any interest in Harman's future earnings or growth following completion of the merger.

*Q:*

**When and where is the special meeting?**

*A:*

The special meeting of stockholders of Harman will be held on [ • ], 2007, starting at [ • ] a.m., local time, at [ • ].

*Q:*

**What matters will be voted on at the special meeting?**

*A:*

You will be asked to consider and vote on the following proposals:

- to adopt the merger agreement; and

- to approve the adjournment of the special meeting, if necessary or appropriate to solicit additional proxies if there are insufficient votes at the time of the meeting to adopt the merger agreement.

*Q:*

**How does Harman's board of directors recommend that I vote on the proposals?**

*A:*

Harman's board of directors recommends that you vote:

- **FOR** the proposal to adopt the merger agreement; and

- **FOR** the adjournment proposal.

In considering the recommendation of Harman's board of directors with respect to the merger agreement, you should be aware that some of Harman's directors and executive officers have interests in the merger that are different from, or in addition to, the interests of Harman stockholders generally. See "The Merger—Interests of Harman's Directors and Executive Officers in the Merger" beginning on page 57.

**Harman's board of directors is not making any recommendation as to whether Harman stockholders or option holders should elect to receive shares of Parent common stock in the merger. You are encouraged to review all of the information included or incorporated by reference in this proxy statement/prospectus before making a decision with respect to the proposal to adopt the merger agreement and whether to elect to receive Parent common stock instead of cash. You should consult with your tax, financial or other advisors regarding these matters.**

*Q:*

**When is the merger expected to be completed?**

*A:*

Harman anticipates that the merger will be completed in the third quarter of calendar year 2007. However, Harman cannot predict the exact timing of the completion of the merger or whether the merger will be completed. In order to complete the merger, Harman stockholders must adopt the merger agreement, and other closing conditions under the merger agreement must be satisfied or waived, as permitted by law.

*Q:*

**What happens if the merger is not completed?**

*A:*

If the merger agreement is not adopted by Harman stockholders or if the merger is not completed for any other reason, stockholders will not receive any payment for their shares in connection with the merger. Instead, Harman would remain an independent public company and shares of Harman common stock would continue to be listed and traded on the New York Stock Exchange, or NYSE. Under specified circumstances, Parent may be required to pay Harman a termination fee or Harman may be required to pay the Sponsors a termination fee or reimburse the Sponsors for their out−of−pocket expenses as described under the caption "The Merger Agreement—Termination Fees and Expenses" beginning on page 99.

*Q:*

**Who is entitled to vote at the special meeting?**

*A:*

All holders of Harman common stock as of the close of business on  [   •   ], 2007, the record date for the special meeting, are entitled to vote at the special meeting. As of the record date, there were  [   •   ] shares of Harman common stock outstanding. There were approximately [   •   ]record holders of Harman common stock on the record date. Every holder of Harman common stock is entitled to one vote for each such share the stockholder held as of the record date.

Space limitations make it necessary to limit attendance at the special meeting to stockholders entitled to vote at the special meeting. Registration will begin at [   •   ] a.m., local time. If you attend, please note that you may be asked to present valid picture identification. "Street name" holders, which are holders who hold their shares through a bank, broker or other custodian, will need to bring a copy of a brokerage statement reflecting stock ownership as of the record date. Cameras, recording devices and other electronic devices are not permitted at the meeting.

*Q:*

**What vote is required for Harman stockholders to adopt the merger agreement?**

*A:*

An affirmative vote of the holders of a majority of all outstanding shares of Harman common stock entitled to vote on the matter is required to adopt the merger agreement.

*Q:*

**What vote is required for Harman stockholders to approve the proposal to adjourn the special meeting, if necessary or appropriate to solicit additional proxies?**

*A:*

The proposal to adjourn the special meeting, if necessary or appropriate to solicit additional proxies, requires the affirmative vote of the holders of a majority of the shares of Harman common stock present or represented by proxy at the meeting and entitled to vote on the matter.

*Q:*

**How and when do I make an election to receive shares of Parent common stock?**

*A:*

An election form package is being mailed with this proxy statement/prospectus to all holders of Harman common stock as of the record date. If you become a holder of Harman common stock after the record date, an election form package will be mailed to you upon request by contacting Harman or the proxy solicitor. See the page at the front of this proxy statement/prospectus immediately before the table of contents for information regarding the telephone number and address of each of Harman and the proxy solicitor.

The election form package will contain a form for you to complete in the event you would like to make an election to receive shares of Parent common stock for some or all of your shares of Harman common stock. The election form package also will contain instructions on how to complete the form, along with questions and answers relating to the election process. Holders of Harman stock options granted under Harman's benefit plans will have the ability to participate in the same election for Parent common stock.  **The deadline for making an election is 5:00 p.m., New York City time, on [   •   ], the last business day before the date of the special meeting.**

*Q:*

**May I submit an election form to receive shares of Parent common stock even if I do not vote to adopt the merger agreement?**

*A:*

Yes. You may submit an election form even if you vote against the adoption of the merger agreement or abstain or do not register any vote with respect to the adoption of the merger agreement. However, to be valid, your election form must be received by Mellon Investor Services LLC, as the exchange agent, prior to 5:00 p.m., New York City time, on  [   •   ], 2007, the last business day before the date of the special meeting.

*Q:*

**What happens if I sell my shares of Harman stock before the special meeting?**

*A:*

The record date of the special meeting is earlier than the special meeting and the date that the merger is expected to be completed. If you sell your shares of Harman common stock after the

record date but before the special meeting, you will retain your right to vote at the special meeting, but will have transferred your right to receive the merger consideration. In order to receive the merger consideration, you must hold your shares through completion of the merger.

*Q:*

**How do I vote?**

*A:*

You may have your shares voted by signing and dating each proxy card you receive and returning it in the enclosed prepaid envelope or as described below if you hold your shares in "street name." You may also vote in person at the special meeting. If you return your signed proxy card, but do not mark the boxes showing how you wish to vote, your shares will be voted **FOR** the proposal to adopt the merger agreement and **FOR** the adjournment proposal.

*Q:*

**How can I revoke or change my vote?**

*A:*

If you submit your proxy by mail, through the Internet or by telephone, you may revoke your proxy at any time before the vote is taken at the special meeting in any of the following ways:

- by submitting a subsequent later–dated proxy by mail before it is voted at the special meeting;

- through the Internet or by telephone before the deadlines for voting described in the section of this proxy statement/prospectus entitled "The Special Meeting—Proxies and Revocation" beginning on page 45;

- by giving written notice to Harman's Corporate Secretary at 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004 that is actually received by Harman's Corporate Secretary prior to the special meeting; or

- by voting in person at the special meeting.

Your attendance at the special meeting does not automatically revoke your proxy. If you have instructed your broker to vote your shares, the above–described options for revoking your proxy do not apply. Instead, you must follow the directions provided by your broker to change your vote.

*Q:*

**Can I vote through the Internet or by telephone?**

*A:*

If you hold your shares in your name as a stockholder of record, you may have your shares voted through the Internet or by telephone by following the instructions included with your proxy card. If your shares are held by your broker, bank or other custodian, often referred to as held in "street name," please check your proxy card or contact your broker, bank or other custodian to determine whether you will be able to have your shares voted through the Internet or by telephone.

*Q:*

**My shares are held in "street name" by my broker, bank or other custodian. Will my broker, bank or other custodian vote my shares for me?**

*A:*

Your broker, bank or other custodian will only be permitted to vote your shares if you instruct your broker, bank or other custodian how to vote. You should follow the procedures provided by your broker, bank or other custodian regarding the voting of your shares. If you do not instruct your broker, bank or other custodian how to vote your shares, your shares will not be voted and the effect will be the same as a vote against the adoption of the merger agreement, but will not have an effect on the proposal to adjourn the special meeting.

*Q:*

**What do I do if I have money invested in the Harman Stock Fund under the Harman Retirement Savings Plan?**

*A:*

If you participate in the Harman Stock Fund of the Harman Retirement Savings Plan, you may give voting instructions to the trustee for the plan (the "Trustee") by completing and returning the voting instructions that are included with this proxy statement/prospectus. Your instructions tell the Trustee how to vote the number of shares of Harman common stock representing your proportionate interest in the Harman Stock Fund that you are entitled to vote under the plan (the

4

"Plan Shares"). Any such instruction will be kept confidential. The Trustee will vote your Plan Shares in accordance with your duly executed and delivered voting instructions. If you do not provide the Trustee valid and timely voting instructions, the Trustee will vote your Plan Shares in the same proportion as the Plan Shares for which the Trustee received valid and timely voting instructions from the other participants in the Harman Stock Fund. For example, if an instruction to vote **FOR** the adoption of the merger agreement was received with respect to 80% of the Plan Shares for which a valid and timely election was made, the Trustee will also vote **FOR** the adoption of the merger agreement with respect to 80% of the Plan Shares for which no instructions have been received.

Your voting instructions must be received by the Trustee by 5:00 p.m., New York City time, on **[   •   ]**, 2007. Instructions on how to deliver your voting instructions are included with this proxy statement/prospectus. You may revoke previously given voting instructions prior to 5:00 p.m., New York City time, on **[   •   ]**, 2007.

*Q:*

**What do I do if I receive more than one proxy card or set of voting instructions?**

*A:*

If you hold shares in both "street name" and directly as a record holder, or if you have money invested in the Harman Stock Fund of the Harman Retirement Savings Plan, you may receive more than one proxy card and/or set of voting instructions relating to the special meeting. Please sign, date and return separately all of the proxy cards that you receive (or submit your proxy through the Internet or by telephone) to ensure that all of your shares are voted.

*Q:*

**How are votes counted?**

*A:*

For the proposal to adopt the merger agreement, you may vote **FOR**, **AGAINST** or **ABSTAIN**. Abstentions will not be counted as votes cast or shares voting on the proposal to adopt the merger agreement, but will count for the purpose of determining whether a quorum is present at the special meeting. If you abstain or fail to vote, it will have the same effect as a vote against the adoption of the merger agreement. In addition, if your shares are held in the name of a broker, bank or other custodian, your broker, bank or other custodian will not vote your shares in the absence of specific instructions from you. These non–voted shares, or "broker non–votes," will be counted for purposes of determining a quorum, but will have the same effect as a vote against the adoption of the merger agreement.

For the proposal to adjourn the special meeting, if necessary or appropriate to solicit additional proxies, you may vote **FOR**, **AGAINST** or **ABSTAIN**. Abstentions and broker non–votes will count for the purpose of determining whether a quorum is present at the special meeting, but abstentions and broker non–votes will not count as shares present and entitled to vote on the proposal to adjourn the meeting. As a result, abstentions and broker non–votes will have no effect on the vote to adjourn the meeting, which requires the vote of the holders of a majority of the shares of Harman common stock present or represented by proxy at the meeting and entitled to vote on the proposal.

If you sign your proxy card without indicating your vote, your shares will be voted **FOR** the adoption of the merger agreement and **FOR** the adjournment of the special meeting, if necessary or appropriate to solicit additional proxies.

*Q:*

**Should I send in my stock certificates now with my proxy card?**

*A:*

**No. Unless you are making an election to receive shares of Parent common stock for some or all of your shares of Harman common stock (in which case you should send your stock certificates along with your election form according to the instructions in the election form package), please DO NOT send your stock certificates in now.** After the merger is completed, you will be sent a letter of transmittal with detailed written instructions for exchanging your Harman common stock certificates for the Cash Consideration. If your shares are held in "street name" by your broker,

5

bank or other custodian, you will receive instructions from your broker, bank or other custodian as to how to effect the surrender of your "street name" shares in exchange for the merger consideration. Please do not send your certificates in now if you are not electing to receive shares of Parent common stock in the merger for some or all of your shares.

If you elect to receive Parent common stock instead of the Cash Consideration for some or all of your Harman common stock in the merger, you will be required to complete the election form and deliver the certificate or certificates representing your shares of Harman common stock as to which you make an election to the exchange agent no later than 5:00 p.m., New York City time, on  [  •  ], the last business day before the date of the special meeting. **See "Election to Receive Parent Common Stock" beginning on page 102 for more information regarding the election form and how to deliver the certificates representing your shares of Harman common stock as to which you are making an election to receive Parent common stock.**

*Q:*

**Am I entitled to exercise appraisal rights?**

*A:*

Yes. As a holder of Harman common stock you are entitled to appraisal rights under Delaware law in connection with the merger if you meet certain conditions, which are described in this proxy statement/prospectus under the caption "Dissenters' Rights of Appraisal" beginning on page 111.

*Q:*

**How can I obtain additional information about Harman?**

*A:*

Harman will provide a copy of its Annual Report on Form 10–K for the fiscal year ended June 30, 2006, excluding certain of its exhibits, and other documents incorporated by reference in this proxy statement/prospectus without charge to any stockholder who makes a request to Investor Relations, Harman International Industries, Incorporated, 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004, at (202) 393–1101. Harman's Annual Report on Form 10–K and other SEC filings also may be accessed on the Internet at http://www.sec.gov or on the Investor Information page of Harman's website at http://www.harman.com. The information provided on Harman's website is not part of this proxy statement/prospectus and is not incorporated by reference into this document. For a more detailed description of the information available, please refer to "Where You Can Find More Information" on page 135.

*Q:*

**Who can help answer my questions?**

*A:*

If you have additional questions about the merger after reading this proxy statement/prospectus, please call Harman's proxy solicitor, MacKenzie Partners, Inc., toll–free at (800) 322–2885 (banks and brokerage firms may call collect at (212) 929–5500). If your broker holds your shares, you should also call your broker for additional information.

*Q:*

**What do I need to do now?**

*A:*

You are urged to read this proxy statement/prospectus carefully, including its annexes and the information incorporated by reference, and to consider how the merger affects you. Even if you plan to attend the special meeting, if you hold your shares in your own name as the stockholder of record, please vote your shares by completing, signing, dating and returning the enclosed proxy card, using the Internet voting instructions printed on your proxy card or using the telephone number printed on your proxy card. You can also attend the special meeting and vote, or change your prior vote, in person. If you hold your shares in "street name" through a broker, bank or other custodian, then you should have received this proxy statement/prospectus from the custodian, along with the custodian's proxy card which includes voting instructions and instructions on how to change your vote.

*Please note that in order to make a valid election to receive Parent common stock in the merger for some or all of your Harman shares, you must take action before the special meeting. Please refer to the separate section of this proxy statement/prospectus which describes the procedures related to the election to receive shares of Parent common stock entitled "Election to Receive Parent Common Stock" beginning on page 102. Please also refer to the election form package being mailed with this proxy statement/prospectus as that package will have detailed instructions regarding how to make a timely and valid election for shares of Parent common stock.*

# SUMMARY TERM SHEET

*The following summary highlights selected information in this proxy statement/prospectus and may not contain all the information that may be important to you. Accordingly, you are encouraged to read this proxy statement/prospectus carefully and in its entirety, including its annexes and the documents incorporated by reference in this proxy statement/prospectus. Each item in this summary includes a page reference directing you to a more complete description of that topic. See "Where You Can Find More Information" on page 135.*

**Parties to the Merger (Page 43)**

***Harman International Industries, Incorporated***

Harman International Industries, Incorporated
1101 Pennsylvania Ave., N.W., Suite 1010
Washington, D.C. 20004
(202) 393–1101

Harman designs, manufactures and markets high–quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets. Harman has developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold in its principal markets under renowned brand names, including Harman/Kardon®, JBL®, Mark Levinson®, Infinity®, Becker®, AKG®, Revel®, Crown® and Lexicon®.

***KHI Parent Inc.***

KHI Parent Inc.
c/o Kohlberg Kravis Roberts & Co. L.P.
9 West 57th Street, Suite 4200
New York, New York 10019
(212) 750–8300

KHI Parent Inc., referred to herein as Parent, is a Delaware corporation indirectly controlled by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners VI Fund, L.P. and its related funds, which are sponsored by Goldman, Sachs & Co. ("GSCP"). KKR and GSCP are collectively referred to herein as the Sponsors. Parent was formed solely for the purpose of acquiring Harman and has not carried on any activities to date, except for activities incidental to its formation and activities undertaken in connection with the transactions contemplated by the merger agreement.

***KHI Merger Sub Inc.***

KHI Merger Sub Inc.
c/o Kohlberg Kravis Roberts & Co. L.P.
9 West 57th Street, Suite 4200
New York, New York 10019
(212) 750–8300

KHI Merger Sub Inc., referred to herein as Merger Sub, is a Delaware corporation and wholly owned subsidiary of Parent. Merger Sub was formed solely for the purpose of facilitating Parent's acquisition of Harman. Merger Sub has not carried on any activities to date, except for activities incidental to its formation and activities undertaken in connection with the transactions contemplated by the merger agreement. Upon completion of the proposed merger, Merger Sub will merge with and into Harman and will cease to exist, with Harman continuing as the surviving corporation.

7

**The Merger (Page 48)**

Under the merger agreement, Merger Sub will be merged with and into Harman. Harman will be the surviving corporation in the merger. Following the merger, Harman will cease to be an independent, publicly traded company and will become a private company and a wholly owned subsidiary of Parent. As the surviving corporation following the merger, Harman will continue to do business as "Harman International Industries, Incorporated."

**Merger Consideration; Election to Receive Parent Common Stock Instead of Cash (Page 81)**

If the merger is completed, each outstanding share of Harman common stock, other than any shares held by Harman or Parent, or shares in respect of which a Harman stockholder has validly exercised appraisal rights, will be converted into the right to receive $120.00 in cash, without interest and less any required withholding taxes. This per share cash amount is referred to as the Cash Consideration. Instead of the Cash Consideration, holders of Harman common stock have the right, with respect to some or all of their shares, to elect to receive one share of common stock of Parent (which will own Harman after completion of the merger), for each share of Harman common stock that they own. The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders. However, the number of Parent shares you will receive may be less than you requested in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock. This number of Parent shares represents approximately 27% of the equity interests in Parent that will be outstanding immediately following the merger based on the expected equity financing for the merger. If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis and the remaining Harman shares and options will be converted into cash. If proration is necessary, (a) Harman stockholders will receive the Cash Consideration for any shares of Harman common stock not converted into Parent common stock and (b) Harman option holders will receive a cash payment equal to the number of shares of Harman common stock underlying the options not converted into Parent common stock multiplied by the amount (if any) by which $120.00 exceeds the exercise price, without interest and less any required withholding taxes. If you make an election to receive shares of Parent common stock in connection with the merger, the actual mix of consideration you will receive will not be known until after all elections have been made because only 8,333,333 shares of Parent common stock will be issued to electing Harman stockholders and option holders in connection with the merger.

**Effective Time; Marketing Period (Page 80)**

Harman currently anticipates that the merger will be completed in the third quarter of calendar year 2007. However, Harman cannot predict the exact timing of the completion of the merger or whether the merger will be completed. In order to complete the merger, Harman stockholders must adopt the merger agreement, and the other closing conditions under the merger agreement must be satisfied or waived. In addition, Parent is not obligated to complete the merger until the expiration of a 20–business–day "marketing period" that it may use to complete its financing for the merger. See "The Merger Agreement—Effective Time; Marketing Period" and "The Merger Agreement—Conditions to the Merger" beginning on pages 80 and 97.

**The Special Meeting (Page 44)**

*Date, Time and Place.*    The special meeting will be held on  [   •   ], 2007, starting at [   •   ] a.m., local time, at [   •   ].

*Purpose.*    You will be asked to consider and vote upon (a) the adoption of the merger agreement and (b) the adjournment of the special meeting to a later date, if necessary or appropriate to solicit

8

additional proxies in favor of the proposal to adopt the merger agreement if there are insufficient votes at the time of the meeting to adopt the merger agreement.

*Record Date and Quorum.*    You are entitled to vote at the special meeting if you owned shares of Harman common stock at the close of business on [ • ], 2007, the record date for the special meeting. You will have one vote for each share of Harman common stock that you owned on the record date. As of the record date, there were [ • ] shares of Harman common stock outstanding and entitled to vote. A majority of the shares of Harman common stock issued and outstanding and entitled to vote at the special meeting constitutes a quorum for the purpose of considering the proposals to be voted upon at the special meeting.

*Vote Required.*    The adoption of the merger agreement requires the affirmative vote of the holders of a majority of outstanding shares of Harman common stock entitled to vote on the matter. Approval of any proposal to adjourn the special meeting requires the affirmative vote of the holders of a majority of the shares of Harman common stock present in person or represented by proxy at the special meeting and entitled to vote on the matter.

*Common Stock Ownership of Directors and Executive Officers.*    As of the record date, the directors and executive officers of Harman held and were entitled to vote, in the aggregate, [ • ] shares of Harman common stock, representing [ • ]% of the shares of Harman common stock entitled to vote at the special meeting.

*Voting and Proxies.*    If you are a record holder of shares of Harman common stock, you may submit your proxy, or vote, in any of the following ways:

- **By Internet**:  Go to the website www.[ • ].com, as shown on your proxy card, at any time until [ • ] , New York City time, on [ • ], 2007, and follow the instructions.

- **By Telephone**:  Call the toll–free number, 1–[ • ], from a touch–tone telephone in the United States or Canada at any time until [ • ], New York City time, on [ • ], 2007. Follow the instructions on your proxy card and the voice prompts on the telephone.

- **By Mail**:  Mark your vote, sign and date your proxy card and return it in the enclosed envelope. If you received more than one proxy card (which means that you have shares in more than one account), you must mark, sign, date and return each of them or use an alternative voting method.

- **In Person**:  You may vote by ballot at the special meeting or send a representative with an appropriate proxy.

If your shares of Harman common stock are held in "street name" by your broker, you should instruct your broker on how to vote your shares using the instructions provided by your broker. If you do not provide your broker with instructions, your shares will not be voted. A decision by you not to vote your shares has the same effect as a vote against the adoption of the merger agreement.

*Revocability of Proxy.*    If you submit your proxy by mail, through the Internet or by telephone, you may revoke your proxy at any time before the vote is taken at the special meeting in any of the following ways:

- by submitting a subsequent later–dated proxy by mail before it is voted at the special meeting;

- through the Internet or by telephone before the deadlines for voting described above;

- by giving written notice to Harman's Corporate Secretary at 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004 that is actually received by Harman's Corporate Secretary prior to the special meeting; or

9

• by voting in person at the special meeting.

Your attendance at the special meeting does not automatically revoke your proxy. If you have instructed your broker to vote your shares, the above–described options for revoking your proxy do not apply. Instead, you must follow the directions provided by your broker to change your vote.

***Sale of Shares.***    The record date of the special meeting is earlier than the date of the special meeting and the date that the merger is expected to be completed. If you sell your shares after the record date but before the special meeting, you will retain the right to vote at the special meeting, but you will have transferred the right to receive the merger consideration. In order to receive the merger consideration, you must own your shares through completion of the merger.

***Solicitation of Proxies; Costs.***    Harman will pay all expenses of this solicitation, except that Harman and Parent will share equally the cost of preparing and mailing this document and the filing fees for the registration statement of Parent of which this proxy statement/prospectus forms a part. This proxy solicitation is being made by Harman on behalf of the board of directors. In addition to solicitation by use of the mail, proxies may be solicited by Harman's directors, officers and employees in person or by telephone, electronic mail, facsimile transmission or other means of communication. Harman's directors, officers and other employees will not receive additional compensation for soliciting proxies. Upon request, Harman will reimburse brokers and other fiduciaries for their reasonable out–of–pocket expenses in sending proxies and proxy material to beneficial owners. Harman has retained MacKenzie Partners to assist it in the solicitation of proxies for the special meeting and will pay MacKenzie Partners a customary fee plus reimbursement of out–of–pocket expenses.

At its own cost, Parent, directly or through one or more of its affiliates or representatives, may also make additional solicitations by mail, telephone, electronic mail, facsimile transmission or other contact in connection with the merger.

**Election to Receive Parent Common Stock (Page 102)**

Parent has appointed Mellon Investor Services LLC, referred to as the exchange agent in this proxy statement/prospectus, to coordinate the payment of the applicable merger consideration following the merger. An election form package is included with this proxy statement/prospectus. In addition, the exchange agent will, upon request, send an election form package to those stockholders who acquire their shares after the record date. The election form package will contain a form you must complete in the event you would like to make an election to receive shares of Parent common stock. The election form package also will contain instructions on how to complete the form, along with questions and answers relating to the election process. Holders of Harman stock options granted under Harman's benefit plans will have the ability to participate in the same election for Parent common stock and will also receive an election form package. You are required to submit your Harman share certificates with your election form. **The deadline for making an election is 5:00 p.m., New York City time, on [   •   ], the last business day before the date of the special meeting**.

If valid elections are made by electing Harman stockholders and option holders to receive more than 8,333,333 shares of Parent common stock, the exchange agent will promptly return to electing Harman stockholders certificates representing Harman shares that will not be converted into Parent common stock based on the pro rata allocation of Parent common stock. In addition, promptly following the completion of the merger, the exchange agent will mail a letter of transmittal and instructions to those Harman stockholders who did not make a valid election to receive shares of Parent common stock in exchange for all of their shares of Harman common stock or who had a portion of their Harman shares returned to them in connection with the proration adjustment. The letter of transmittal and instructions will inform these stockholders how to surrender their remaining shares of Harman common stock in exchange for the Cash Consideration.

10

**Treatment of Stock Options and Other Awards (Page 82)**

    ***Stock Options.***   Immediately prior to the effective time of the merger, and except as set forth below, options to acquire shares of Harman common stock issued under Harman's benefit plans will become fully vested and will be converted into the right to receive a cash payment equal to the number of shares of Harman common stock underlying the options multiplied by the amount (if any) by which $120.00 exceeds the exercise price, without interest and less any required withholding taxes. Options that are exercised pursuant to an irrevocable option election for shares of Parent common stock (as described below) will not be converted into the cash payment, subject to the proration limitations. In addition, Parent and the holder of an option may agree to treat his or her option differently.

    Each person who is a holder of options on the record date for the special meeting, or becomes a holder of an option between the record date and 5:00 p.m., New York City time, on the business day before the date of the special meeting (and has received the election form package), generally has the right to submit an election form specifying:

-     the number of options held by him or her that he or she irrevocably commits to exercise immediately prior to the effective time of the merger; and

-     the corresponding number of shares of Harman common stock underlying the option that he or she desires to have converted into the right to receive Parent common stock (this number will be automatically reduced by the number of shares that would be necessary to satisfy the exercise price and any tax withholding obligations).

    If Harman stockholders and option holders elect to receive more than 8,333,333 shares of Parent common stock in the aggregate, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis.

    ***Restricted Stock.***   Immediately prior to the effective time of the merger, except as may be separately agreed by a holder and Parent in accordance with the terms of the merger agreement, each share of restricted common stock of Harman outstanding under Harman's stock incentive plans will vest in full and will be cancelled and converted into the right to receive the Cash Consideration, or, at the election of the restricted stock holder, the right to receive Parent common stock, in the same manner as all other shares of Harman common stock.

    ***Restricted Stock Units.***   Immediately prior to the effective time of the merger, except as may be separately agreed by a holder and Parent in accordance with the terms of the merger agreement, each restricted stock unit outstanding under Harman's stock incentive plans will vest in full and be converted into the right to receive the Cash Consideration.

**Recommendation of Harman's Board of Directors (Page 53)**

    Harman's board of directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, Harman and its stockholders and recommended that Harman stockholders vote in favor of the adoption of the merger agreement. Harman's board of directors unanimously recommends that Harman stockholders vote **FOR the adoption of the merger agreement** and **FOR the adjournment of the special meeting, if necessary or appropriate to solicit additional proxies**.

**Opinion of Harman's Financial Advisor (Page 62)**

    Harman's board of directors received a written opinion, dated April 26, 2007, from its financial advisor, Bear, Stearns & Co. Inc., referred to herein as Bear Stearns, to the effect that, as of the date of its opinion and subject to the matters described in its opinion, the $120.00 per share in cash

11

consideration to be paid to the holders of Harman common stock in the merger was fair to such holders from a financial point of view. The opinion is attached as Annex B to this proxy statement/prospectus.

Bear Stearns' written opinion does not address the relative merits of the merger as compared to other business strategies or transactions that might be available with respect to Harman or the underlying business decision by Harman to engage in the merger, and is not intended to and does not constitute a recommendation to any holder of Harman common stock as to how such holder should vote with respect to the merger or any other matter relating to the merger. In addition, Bear Stearns does not express an opinion, view or recommendation as to whether any Harman stockholder should make or not make an election to receive Parent common stock instead of the Cash Consideration in the merger. You are encouraged to read the opinion and the section "The Merger—Opinion of Financial Advisor to Harman" beginning on page 62 carefully and in their entirety.

## Interests of Harman's Directors and Executive Officers in the Merger (Page 57)

In considering the recommendation of Harman's board of directors, you should be aware that Harman's directors and executive officers may be considered to have interests in the merger that are different from, or in addition to, your interests as a stockholder. These interests include the treatment of shares (including restricted shares and restricted stock units) and stock options held by the directors and officers, as well as indemnification and insurance arrangements covering officers and directors, change–in–control severance benefits that may become payable to certain officers and an equity ownership in Parent if the merger is completed. These interests are described below under "The Merger—Interests of Harman's Directors and Executive Officers in the Merger" on page 57. Harman's board of directors was aware of these interests and considered them, among other matters, in approving the merger agreement and the merger. Dr. Sidney Harman, Harman's Executive Chairman, has entered into a separate Election Agreement with Parent described below.

## Election Agreement (Page 106)

Parent has entered into an Election Agreement with Dr. Sidney Harman, Harman's Executive Chairman, whereby Dr. Harman has agreed to irrevocably elect to receive shares of Parent common stock in exchange for at least 1,700,000 shares of Harman common stock he beneficially owns (subject, in the case of elections made with respect to options, to the application of a formula that effectively nets the exercise price). Dr. Harman's election to receive shares of Parent common stock in the merger is subject to the same proration applicable to all other electing Harman stockholders and option holders. As of the record date, Dr. Harman beneficially owned shares representing approximately **[   •   ]**% of the outstanding shares of Harman common stock.

## Financing (Page 71)

Assuming Harman stockholders and option holders make elections such that they would receive in total 8,333,333 shares of Parent common stock (the maximum number of shares Parent will issue pursuant to elections made by Harman stockholders and option holders), Parent estimates the total funds necessary to complete the merger to be approximately $8.3 billion. A portion of these funds will be payable to Harman stockholders and holders of other stock–based interests, with the remainder to be used to repay and refinance existing indebtedness, and to pay customary fees, premiums and expenses in connection with the merger, the financing arrangements and related transactions.

*Debt Financing.* Merger Sub has received a debt commitment letter from Bank of America, N.A., Banc of America Bridge LLC, Banc of America Securities LLC, Credit Suisse, Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., Goldman, Sachs & Co., Lehman Commercial Paper Inc., Lehman Brothers Commercial Bank and Lehman Brothers Inc. to provide (a) up to

12

$3.45 billion comprised of a senior secured term loan facility and a senior secured revolving credit facility, (b) up to $1.16 billion comprised of a senior unsecured bridge facility (in the event a corresponding amount of senior unsecured notes are not issued on or prior to completion of the merger) and (c) up to $580 million comprised of a senior subordinated bridge facility (in the event a corresponding amount of senior subordinated notes are not issued on or prior to completion of the merger).

*Equity Financing.*   Parent has received an equity commitment letter from KHI Holdings LP, the limited partnership that controls Parent, which is referred to herein as Holdings. Pursuant to the equity commitment letter and subject to the conditions contained therein, Holdings has committed to make a capital contribution equal to $3.5 billion to Parent in connection with the completion of the merger. To satisfy Holdings' commitment, Holdings has received an aggregate of $3.5 billion of equity commitments from investment funds affiliated with the Sponsors and from BAS Capital Funding Corporation (an affiliate of Bank of America, N.A.), LB I Group Inc. (an affiliate of Lehman Brothers Holdings Inc.) and Credit Suisse Management LLC. The equity commitments are subject to the satisfaction or waiver by Parent of the conditions to Parent's and Merger Sub's obligations under the merger agreement to effect the closing of the merger. These equity commitment obligations generally may be assigned to affiliates or other co–investors (provided that in the event of assignment, the assigning party will remain obligated for its commitment under the applicable equity commitment letter and the assignment does not result in a breach of certain covenants of the merger agreement). The actual amount invested by the Sponsors and their co–investors pursuant to the equity commitment letters may be reduced by the elections made by Harman stockholders and option holders as well as the final determination of the costs and expenses associated with the merger. Assuming the Harman stockholders and option holders make elections to receive 8,333,333 shares of Parent common stock in the aggregate, Parent expects that affiliates of the Sponsors will contribute equity of up to $2.7 billion in the aggregate. Assuming no Harman stockholders and option holders make an election to receive shares of Parent common stock (other than Dr. Harman), Parent expects that affiliates of the Sponsors will contribute equity of up to $3.5 billion in the aggregate.

The merger agreement does not contain a financing condition to the closing of the merger.

**Regulatory Approvals (Page 77)**

Under the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended, or the HSR Act, the merger may not be completed until notification and report forms have been filed with the U.S. Federal Trade Commission, or the FTC, and the Antitrust Division of the U.S. Department of Justice, or the Antitrust Division, and the applicable waiting period has expired or been terminated. On May 9, 2007, Harman and Holdings each filed its notification and report form under the HSR Act with the FTC and the Antitrust Division. The FTC granted early termination of the applicable waiting period on May 18, 2007.

The merger is also subject to, and the parties' obligations to complete the merger are conditioned on, review by governmental authorities in Canada, the European Union and South Africa under the antitrust laws of those jurisdictions. The competition filing required in Canada was made by the parties on May 24, 2007 and the parties received clearance in Canada on June 4, 2007. The parties expect to make the required notification to the European Commission by the end of June 2007. The initial applicable waiting period is 25 business days. The competition filing required in South Africa was made by the parties on May 31, 2007. The initial applicable waiting period is 20 business days. The merger is also subject to review by the governmental authorities of Brazil, Mexico and South Korea under the antitrust or competition laws of those jurisdictions.

**Rights of Stockholders to Seek Appraisal (Page 111)**

Under Delaware law, holders of Harman common stock who do not vote in favor of adopting the merger agreement will have the right to seek appraisal of the fair value of their shares of Harman common stock as determined by the Delaware Court of Chancery if the merger is completed, but only if they comply with all applicable requirements of Delaware law. These requirements are summarized in this proxy statement/prospectus. This appraisal amount could be more than, the same as or less than the merger consideration. Among other things, any holder of Harman common stock intending to exercise appraisal rights must submit a written demand for an appraisal to Harman prior to the vote on the adoption of the merger agreement and must not vote or otherwise submit a proxy in favor of the adoption of the merger agreement. Your failure to follow exactly the procedures specified under Delaware law will result in the loss of your appraisal rights. See "Dissenters' Rights of Appraisal" beginning on page 111 for information regarding these procedures. The provisions of Delaware law that address appraisal rights and govern the required procedures are attached as Annex E to this proxy statement/prospectus.

**Material U.S. Federal Income Tax Consequences (Page 107)**

The U.S. federal income tax consequences of the merger to each Harman stockholder will depend on the form of consideration received by that U.S. holder (as defined on page 107 of this proxy statement/prospectus) in exchange for his or her Harman common stock.

A U.S. holder's exchange of shares of Harman common stock solely for cash pursuant to the merger generally will be a taxable transaction for U.S. federal income tax purposes. Upon such an exchange, a U.S. holder generally will recognize gain or loss in an amount equal to the difference, if any, between the Cash Consideration and his or her adjusted tax basis in the shares of Harman common stock surrendered therefor. A U.S. holder's exchange of shares of Harman common stock solely for shares of Parent common stock generally will be a tax–free transaction for U.S. federal income tax purposes, except in respect of any cash that such holder receives instead of fractional shares of Parent common stock. Harman and Parent expect that a U.S. holder's exchange of shares of Harman common stock for a combination of shares of Parent common stock and the Cash Consideration generally will result in taxable gain or loss to the extent that the exchange is treated for U.S. federal income tax purposes as a redemption for cash by Harman. The exchange generally will result in recognition of gain, but not loss, to the extent that it is treated for U.S. federal income tax purposes as a contribution of Harman common stock to Parent in exchange for Parent common stock. The amount of the gain recognized by a U.S. holder will depend, in part, upon: (a) how much Parent stock and cash is received by the U.S. holder in the merger, (b) how much of the cash received by the U.S. holder is sourced to the equity financing of Parent by Holdings and (c) how much cash is sourced to other sources. This gain or loss generally will be capital gain or loss.

Tax matters are very complicated. You should be aware that the tax consequences of the merger to you may depend on your own situation. In addition, you may be subject to state, local or foreign tax laws that are not described in this proxy statement/prospectus. You should therefore consult with your own tax advisor for a full understanding of the tax consequences to you of the merger. For more information regarding the tax consequences of the merger, please see "Material U.S. Federal Income Tax Consequences" beginning on page 107.

**Conditions to the Merger (Page 97)**

***Conditions to Each Party's Obligations.***    Each party's obligation to complete the merger is subject to the satisfaction or waiver of the following mutual conditions:

- adoption of the merger agreement by Harman stockholders;

14

- absence of any legal restraint or prohibition on the completion of the merger;

- the expiration or earlier termination of the waiting period under the HSR Act and under the antitrust and anti–competition statutes of Canada (which has occurred) and South Africa (which has occurred), and the adoption by the European Commission of a decision declaring the merger compatible with the common market; and

- the SEC declaring effective the registration statement, of which this proxy statement/prospectus is a part, and the registration statement not being the subject of any stop order or threatened stop order.

*Conditions to Harman's Obligations.*     Harman's obligation to complete the merger is subject to the satisfaction or waiver of further conditions, including:

- Parent's and Merger Sub's representations and warranties must be true and correct in all material respects as of April 26, 2007, and as of the closing date of the merger; and

- Parent and Merger Sub must have performed, in all material respects, their covenants and agreements in the merger agreement.

*Conditions to Parent and Merger Sub's Obligations.*     The obligations of Parent and Merger Sub to complete the merger are subject to the satisfaction or waiver of further conditions, including:

- Harman's representations and warranties contained in the merger agreement must be true and correct without regard to the materiality thresholds specified in the merger agreement, as of April 26, 2007, and as of the closing date of the merger, except to the extent the failure of such representations and warranties to be true and correct would not constitute a "material adverse effect" (as that term is defined in the merger agreement) on Harman; and

- Harman must have performed, in all material respects, its covenants and agreements in the merger agreement.

**Restrictions on Solicitation of Other Offers (Page 90)**

The merger agreement provides that, until 11:59 p.m., New York City time, on June 15, 2007, referred to as the No–Shop Period Start Date, Harman was permitted to initiate, solicit and encourage any acquisition proposal for Harman (including by way of providing information pursuant to a confidentiality agreement), and enter into and maintain discussions or negotiations concerning an acquisition proposal for Harman or otherwise cooperate with or assist or participate in, or facilitate any such inquiries, proposals, discussions or negotiations. No acquisition proposal was received by Harman prior to the No–Shop Period Start Date.

From and after the No–Shop Period Start Date, the merger agreement restricts Harman's ability to, among other things, initiate, solicit, encourage or engage in discussions or negotiations with a third party regarding an acquisition proposal for Harman and Harman's board of directors' ability to change or withdraw its recommendation in favor of the merger agreement. Notwithstanding these restrictions, under circumstances specified in the merger agreement, in order to comply with its fiduciary duties under applicable law, Harman's board of directors may respond to certain unsolicited competing proposals or terminate the merger agreement and enter into an agreement with respect to a superior competing proposal, or withdraw its recommendation in favor of the adoption of the merger agreement.

15

**Termination of the Merger Agreement (Page 98)**

Harman and Parent may terminate the merger agreement by mutual written consent at any time before the completion of the merger (including after Harman stockholders have adopted the merger agreement). In addition, either Harman or Parent may terminate the merger agreement if:

- the merger has not been completed by February 11, 2008;

- any governmental entity of competent jurisdiction has issued or entered an injunction or similar legal restraint or order permanently enjoining or otherwise prohibiting the merger; or

- the merger agreement has been submitted to Harman stockholders for adoption and the required vote has not been obtained.

In addition, Harman may terminate the merger agreement:

- if Parent or Merger Sub has breached or failed to perform any of its representations, warranties, covenants or other agreements in the merger agreement and that breach or failure would result in the failure of a closing condition that cannot be cured by February 11, 2008 (or if capable of being cured, was not cured within 30 days following the receipt of a written notice from Harman);

- in order to enter into a superior proposal, if, prior to the receipt of the required stockholder vote and at such time Harman complied with its obligations in the merger agreement, including those described in "The Merger Agreement—Change of Recommendation/Termination in Connection with a Superior Proposal" on page 92; or

- if the merger has not been completed on the second business day after the final day of the Marketing Period (as described in "The Merger Agreement—Effective Time; Marketing Period" on page 80) and all of the mutual closing conditions and all of the conditions to the obligations of Parent and Merger Sub to close have been satisfied and at the time of the termination those conditions to closing continue to be satisfied.

In addition, Parent may terminate the merger agreement:

- if Harman has breached or failed to perform any of its representations, warranties, covenants or other agreements in the merger agreement and that breach or failure would result in the failure of a condition to Parent's and Merger Sub's obligations to close that cannot be cured by February 11, 2008 (or if capable of being cured, was not cured within 30 days following the receipt of a written notice from Parent); or

- if Harman's board of directors (a) withdraws, modifies or qualifies in a manner adverse to Parent or Merger Sub its recommendation of the merger agreement (or publicly proposes to do so); (b) fails to include in this proxy statement/prospectus its recommendation to Harman stockholders that they adopt the merger agreement; (c) approves or recommends, or publicly proposes to approve or recommend, any other acquisition proposal for Harman or (d) fails to recommend against acceptance of a tender or exchange offer for any outstanding shares of Harman's capital stock, as described in "The Merger Agreement—Restrictions on Solicitation of Other Offers" beginning on page 90.

**Termination Fees (Page 99)**

If the merger agreement is terminated under certain circumstances:

- Harman would be obligated to pay the expenses of Parent, up to $20 million;

16

- Harman would be obligated to pay a termination fee of $225 million as directed by Parent (this amount is reduced to $75 million in certain circumstances and would be reduced to the extent Harman has previously paid any expenses of Parent); or

- Parent would be obligated to pay a termination fee of $225 million to Harman.

For more information, see "The Merger Agreement—Termination Fees and Expenses" beginning on page 99. In addition, the Sponsors have agreed to guarantee the obligation of Parent to pay the termination fee that would be owed to Harman under certain circumstances, as described under "The Merger—Financing of the Merger—Guarantees; Remedies" beginning on page 77.

### Market Price of Harman Common Stock (Page 129)

The closing sale price of Harman common stock on the NYSE on April 25, 2007, the last trading day prior to the announcement of the merger, was $102.56. The $120.00 per share to be paid for each share of Harman common stock in the merger represents a premium of 17% to the closing price on April 25, 2007, and a premium of 20% to the average closing share price for the 60 trading days prior to the announcement of the merger. On  [  •  ], the last trading day before the date of this proxy statement/prospectus, the closing share price of Harman common stock on the NYSE was $[  •  ] per share.

### Stock Exchange Listing (Page 79)

Upon completion of the merger, shares of Parent common stock will not be listed on a national securities exchange, but Parent anticipates that the shares will be traded on a lower–tier market such as the Over–the–Counter Bulletin Board and the Pink Sheets. Parent has been informed that the broker–dealer affiliates of each of Bank of America, N.A., Credit Suisse and Lehman Brothers Holdings Inc. expect to provide quotation information, which may include price quotations, for Parent common stock on the Pink Sheets following the completion of the merger, subject to compliance with the applicable securities rules and regulations.

### Resale of Parent Common Stock (Page 79)

The shares of Parent common stock issued in the merger will not be subject to any restrictions on transfer under the Securities Act of 1933, as amended (the "Securities Act"), except for shares issued to any Harman stockholder who may be deemed to be an "affiliate" of Harman or Parent for purposes of Rule 144 or Rule 145 under the Securities Act.

### Additional Information (Page 135)

**For additional questions about the merger, the election to receive shares of Parent common stock, or for assistance in submitting proxies or election forms, voting shares of Harman common stock, or additional copies of this proxy statement/prospectus, the enclosed proxy card, or the election forms, please contact Harman Investor Relations at (202) 393–1101 or MacKenzie Partners, the proxy solicitor, at (800) 322–2885.**

### SELECTED HISTORICAL FINANCIAL DATA OF HARMAN

The following table summarizes certain selected historical financial data of Harman and should be read in conjunction with the consolidated financial statements and accompanying notes thereto included in Harman's Annual Report on Form 10–K for the fiscal year ended June 30, 2006, which are incorporated by reference into this proxy statement/prospectus. The selected historical financial data as of or for the nine months ended March 31, 2007 have been derived from Harman's unaudited consolidated financial statements.

| | As of or for the Nine Months Ended March 31, | | As of or for the Years Ended June 30, | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 | 2002 |
| | (In thousands except per share data) | | | | | | |
| Net sales | $ 2,640,031 | 2,388,780 | 3,247,897 | 3,030,889 | 2,711,374 | 2,228,519 | 1,826,188 |
| Operating income | $ 304,961 | 292,843 | 397,241 | 350,981 | 254,465 | 166,894 | 103,221 |
| Income before income taxes and minority interest | $ 302,096 | 279,327 | 376,187 | 335,337 | 227,520 | 142,471 | 80,177 |
| Net income | $ 209,040 | 190,528 | 255,295 | 232,848 | 157,883 | 105,428 | 57,513 |
| Diluted earnings per shares(a) | $ 3.14 | 2.80 | 3.75 | 3.31 | 2.27 | 1.55 | 0.85 |
| Weighted average shares outstanding—diluted(a) | 66,501 | 68,164 | 68,105 | 70,399 | 69,487 | 68,048 | 67,806 |
| Total assets | $ 2,399,034 | 2,371,734 | 2,354,661 | 2,187,203 | 1,988,810 | 1,703,658 | 1,480,280 |
| Total debt | $ 159,557 | 326,816 | 197,554 | 333,917 | 394,925 | 503,068 | 474,679 |
| Stockholders' equity | $ 1,363,885 | 1,209,742 | 1,228,164 | 1,060,948 | 874,996 | 655,785 | 526,629 |
| Dividends per share(a) | $ 0.04 | 0.04 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |

(a)    Share and per share data have been adjusted to reflect the two–for–one stock split in November 2003.

18

**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

The following unaudited pro forma condensed consolidated financial statements give effect to the merger of Merger Sub with and into Harman. Following the merger, Harman will be a wholly owned subsidiary of Parent. The merger will be accounted for as a purchase by Parent. The unaudited pro forma condensed consolidated balance sheet combines the historical consolidated balance sheets of Parent and Harman as of March 31, 2007, giving effect to the merger as if the merger had occurred on March 31, 2007. The unaudited pro forma condensed consolidated statements of income for the nine–month period ended March 31, 2007 and the fiscal year ended June 30, 2006 give effect to the merger as if the merger had occurred as of July 1, 2005. These unaudited pro forma condensed consolidated financial statements are for informational purposes only. These pro forma financial statements do not purport to indicate the results that would have actually been obtained had the merger been completed on the assumed date or for the periods presented, or that may be realized in the future.

To produce the unaudited pro forma financial information, Parent, as the acquiring entity, preliminarily allocated the purchase price using its best estimates of fair value. To the extent there are significant changes to Harman's business, the assumptions and estimates herein could change significantly. Furthermore, Harman may have restructuring expenses as a result of the merger. The pro forma financial information does not reflect these potential expenses. The pro forma financial statements should be read in conjunction with Harman's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the historical consolidated financial statements, including related notes covering these periods, incorporated by reference into this proxy statement/prospectus. See "Where You Can Find More Information" on page 135 of this proxy statement/prospectus.

The unaudited pro forma financial statements assume the following occurred as of March 31, 2007 in the case of the unaudited pro forma condensed consolidated balance sheet, and as of July 1, 2005, in the case of the unaudited pro forma condensed consolidated statements of operations: (a) no employees will be terminated by Parent; (b) there are no conforming accounting policy changes; (c) there are no significant changes in operations or assets that will become idle; and (d) there are no significant triggering events under either FASB No. 142, "Goodwill and Other Intangible Assets," or FASB No. 144, "Accounting for the Impairment or Disposal of Long–Lived Assets." Under the terms of the merger agreement, Harman stockholders receive $120.00 in cash for each share of Harman common stock they hold, referred to herein as the Cash Consideration. As an alternative to receiving the Cash Consideration, Harman's stockholders have the opportunity to elect to exchange some or all of their shares of Harman common stock for shares of Parent common stock. The maximum number of shares of Parent common stock issuable in the merger to electing Harman stockholders and option holders is 8,333,333, representing approximately 27% of the equity interests of Parent that will be outstanding immediately following the merger, based on the expected equity financing for the merger. For purposes of preparing the pro forma financial statements, it has been assumed that 8,333,333 shares of Parent common stock will be issued in exchange for shares of Harman common stock in the merger.

Stock–based compensation and non–recurring restructuring charges that are reflected in the historical results of Harman are included in the unaudited pro forma condensed consolidated statements of operations for the fiscal year ended June 30, 2006 and the nine–month period ended March 31, 2007. These expenses have not been adjusted in the unaudited pro forma financial statements. In addition, the pro forma selling, general and administrative expenses have not been adjusted to reflect the increased stock–based compensation expense as a result of the accelerated vesting of the stock options, restricted stock and restricted stock units due to the change in control resulting from the merger.

19

**Unaudited Pro Forma Condensed Consolidated Balance Sheet**
**As of March 31, 2007**

| | Harman | Parent | Pro Forma Adjustments | Harman and Parent Pro Forma Consolidated |
|---|---|---|---|---|
| | | | (dollars in millions) | |
| **Assets** | | | | |
| Current assets | | | | |
|   Cash and cash equivalents | $ 97.0 | $ — | $ (97.0)(a) | $ — |
|   Receivables | 529.7 | — | — | 529.7 |
|   Inventories | 480.2 | — | 96.4(e) | 576.6 |
|   Other current assets | 170.1 | — | — | 170.1 |
| Total current assets | 1,277.0 | — | (0.6) | 1,276.4 |
| Property, plant and equipment, net | 529.4 | — | 105.9(e) | 635.3 |
| Goodwill | 400.1 | — | 4,635.2(b) | 5,035.3 |
| Other assets | 192.5 | — | 3,614.2(c) | 3,806.7 |
| Total assets | $ 2,399.0 | $ — | $ 8,354.7 | $ 10,753.7 |
| **Liabilities and Shareholders' Equity** | | | | |
| Current liabilities | | | | |
|   Short–term borrowings | $ 3.1 | $ — | $ (3.1)(f) | $ — |
|   Current portion of long–term debt | 17.0 | — | (17.0)(f) | — |
|   Accounts payable | 270.4 | — | 57.6(a) | 328.0 |
|   Accrued liabilities | 396.7 | — | — | 396.7 |
|   Income taxes payable | 125.8 | — | 38.5(g) | 164.3 |
| Total current liabilities | 813.0 | — | 76.0 | 889.0 |
| Borrowings under revolving credit facility | 136.7 | — | (136.7)(f) | — |
| Long–term debt | 2.8 | — | 4,640.0(f) | 4,642.8 |
| Minority interest | 1.4 | — | — | 1.4 |
| Other non–current liabilities | 81.2 | — | 1,439.3(g) | 1,520.5 |
| Total liabilities | $ 1,035.1 | $ — | $ 6,018.6 | $ 7,053.7 |
| Total shareholders' equity | 1,363.9 | — | 2,336.1(d) | 3,700.0 |
| Total liabilities and shareholders' equity | $ 2,399.0 | $ — | $ 8,354.7 | $ 10,753.7 |

*See accompanying Notes to Unaudited Pro Forma Financial Statements.*

20

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the nine months ended March 31, 2007**

| | Harman | Parent | Pro Forma Adjustments | Harman and Parent Pro Forma Consolidated |
|---|---|---|---|---|
| | | | (dollars in millions, except per share data) | |
| Net sales | $ 2,640.0 | $ — | $ — | $ 2,640.0 |
| Cost of sales | 1,727.7 | — | 5.3(i) | 1,733.0 |
| Gross profit | 912.3 | — | (5.3) | 907.0 |
| Selling, general and administrative expenses | 607.3 | — | 216.3(i) | 823.6 |
| Operating income | 305.0 | — | (221.6) | 83.4 |
| Other expenses | | | | |
|    Interest expense, net | 1.0 | — | 304.3(h) | 305.3 |
|    Miscellaneous, net | 1.9 | — | — | 1.9 |
| Income before income taxes and minority interest | 302.1 | — | (525.9) | (223.8) |
| Income tax expense (benefit), net | 94.4 | — | (210.4)(j) | (116.0) |
| Minority interest | (1.3) | — | — | (1.3) |
| Net income | $ 209.0 | $ — | $ (315.5) | $ (106.5) |
| Basic earnings per share | $ 3.20 | | | $ (1.63) |
| Diluted earnings per share | $ 3.14 | | | $ (1.63)(k) |
| Weighted average shares outstanding—basic | 65,348 | | | 65,348 |
| Weighted average shares outstanding—diluted | 66,501 | | | 65,348(k) |

*See accompanying Notes to Unaudited Pro Forma Financial Statements.*

21

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the year ended June 30, 2006**

| | Harman | Parent | Pro Forma Adjustments | Harman and Parent Pro Forma Consolidated |
|---|---|---|---|---|
| | *(dollars in millions, except per share data)* | | | |
| Net sales | $ 3,247.9 | $ — | $ — | $ 3,247.9 |
| Cost of sales | 2,095.3 | — | 103.5(i) | 2,198.8 |
| Gross profit | 1,152.6 | — | (103.5) | 1,049.1 |
| Selling, general and administrative expenses | 755.4 | — | 288.5(i) | 1,043.9 |
| Operating income | 397.2 | — | (392.0) | 5.2 |
| Other expenses | | | | |
|    Interest expense, net | 13.0 | — | 405.7(h) | 418.7 |
|    Miscellaneous, net | 8.0 | — | — | 8.0 |
| Income before income taxes and minority interest | 376.2 | — | (797.7) | (421.5) |
| Income tax expense (benefit), net | 121.9 | — | (319.1)(j) | (197.2) |
| Minority interest | (1.0) | — | — | (1.0) |
| Net income | $ 255.3 | $ — | $ (478.6) | $ (223.3) |
| Basic earnings per share | $ 3.85 | | | $ (3.37) |
| Diluted earnings per share | $ 3.75 | | | $ (3.37)(k) |
| Weighted average shares outstanding—basic | 66,260 | | | 66,260(k) |
| Weighted average shares outstanding—diluted | 68,105 | | | 66,260 |

*See accompanying Notes to Unaudited Pro Forma Financial Statements.*

22

**Notes to Unaudited Pro Forma Financial Statements**
**(Dollars in Millions)**

*(a)*    **Cash and Cash Equivalents:** This reflects the net effect of the merger on the cash and cash equivalents balance as follows:

| | | |
|---|---|---:|
| **Sources** | | |
| *New borrowings* | | |
| Term Loan B | $ | 2,900.0 |
| Senior unsecured debt | | 1,160.0 |
| Senior subordinated debt | | 580.0 |
| New equity investment | | 2,700.0 |
| | | |
| Total sources | $ | 7,340.0 |
| | | |
| **Uses** | | |
| Cash used to repurchase Harman common stock | | 7,022.0 |
| Transaction costs | | 179.5 |
| Additional Supplemental Executive Retirement Plan ("SERP") funding | | 20.0 |
| *Extinguishment of existing debt* | | |
| Short-term borrowings | | 3.1 |
| Current portion of long-term debt | | 17.0 |
| Senior notes | | — |
| Borrowings under revolving credit facility | | 136.7 |
| Financing fees | | 116.3 |
| | | |
| Total uses | $ | 7,494.6 |
| | | |
| Total sources less total uses | | (154.6) |
| Reclassification of negative cash to accounts payable | | 57.6 |
| | | |
| Pro forma net adjustment to cash and cash equivalents | $ | (97.0) |

*(b)*    **Goodwill and Intangible Assets:** The accompanying unaudited pro forma financial statements reflect a preliminary allocation of the purchase price to the major categories of assets and liabilities. The final allocation of the purchase price may result in significant differences from the

23

pro forma amounts included herein. The following represents the estimated value attributable to goodwill and intangibles resulting from the merger:

| | | |
|---|---|---|
| Fair value of shares of Parent common stock issued to electing Harman stockholders and option holders | $ | 1,000.0 |
| Total cash used to purchase equity | | 7,022.0 |
| Transaction costs (excluding deferred financing costs) | | 179.5 |
| Equity bridge financing fees | | 19.5 |
| Total purchase price | | 8,221.0 |
| Net assets acquired | | 1,363.9 |
| Excess purchase price over historical net assets acquired | $ | 6,857.1 |
| Fair value adjustments: | | |
| Step–up of net tangible assets acquired (see Note e) | $ | (190.5) |
| Elimination of historical goodwill | | 400.1 |
| Write–off of deferred finance costs associated with repaid debt | | 0.6 |
| Elimination of historical identifiable intangible assets | | 17.2 |
| Establishment of identifiable intangible assets with finite lives | | (3,542.3) |
| Deferred income taxes associated with step–up adjustments | | 1,493.1 |
| Excess purchase price over fair value of net assets acquired | | 5,035.3 |
| Less: adjustments to remove historical goodwill | | (400.1) |
| Pro forma adjustment to goodwill | $ | 4,635.2 |

(c)    **Other Assets:** Represents transaction fees and costs attributable to the issuance of debt and the write–off of deferred debt issuance costs on existing Harman debt that will be repaid, the establishment of intangible assets and the elimination of historical intangible asset balances:

| | | |
|---|---|---|
| Debt issuance costs incurred in connection with the issuance of secured and unsecured debt | $ | 96.8 |
| Write–off of deferred debt issuance costs on debt repaid | | (0.6) |
| Elimination of historical identifiable intangible assets | | (17.2) |
| Identifiable intangible assets | | 3,542.3 |
| Elimination of other assets related to pensions (Note e) | | (7.1) |
| Pro forma adjustment to other assets | $ | 3,614.2 |

(d)    **Shareholders' Equity:** Shareholders' equity is computed as follows:

| | | |
|---|---|---|
| Contributed equity investment | $ | 2,700.0 |
| Shares of Parent common stock issued to electing Harman stockholders and option holders | | 1,000.0 |
| Less: historical shareholders' equity prior to the merger | | (1,363.9) |
| Pro forma adjustment to shareholders' equity | $ | 2,336.1 |

24

*(e)*

**Net Tangible Assets:** The following represents the estimated purchase accounting adjustments attributable to tangible assets and liabilities resulting from the merger:

| | | |
|---|---|---:|
| Inventory | $ | 96.4 |
| Property, plant and equipment | | 105.9 |
| Other assets | | (7.1) |
| Long–term liabilities (Note g) | | (4.7) |
| | $ | 190.5 |

The purchase accounting adjustment to inventory is to adjust the inventory to fair value less the estimated selling and distribution costs plus a normal profit margin. The purchase accounting adjustment to property, plant and equipment primarily relates to the step–up of land, buildings, machinery and equipment to estimated fair value. The purchase accounting adjustment to other long–term liabilities and other assets primarily relates to an adjustment to the net amount recognized for pension and other post–retirement benefit obligations to adjust the accrued benefit liability to estimated fair value.

*(f)*

**Short–Term Borrowings and Long–Term Debt:** Reflects the incurrence of new debt and repayment of debt as follows:

| | | |
|---|---|---:|
| Non–current Portion | | |
| Term Loan B | $ | 2,900.0 |
| Senior unsecured debt | | 1,160.0 |
| Senior subordinated debt | | 580.0 |
| Repayment of existing long–term debt | | — |
| Pro forma adjustment to non–current portion of long–term debt | $ | 4,640.0 |
| | | |
| Current Portion | | |
| Pro forma adjustment to current portion of long–term debt | $ | (17.0) |
| | | |
| Repayment of borrowings under revolving credit facility | $ | (136.7) |

In addition, short–term borrowings will be repaid in connection with the merger resulting in a pro forma adjustment of $3.1 million.

25

*(g)*

**Income Taxes Payable and Other Non–Current Liabilities:** Represents deferred taxes corresponding to estimated temporary differences resulting from the merger and a reduction in the SERP obligation:

| | | |
|---|---|---:|
| Identifiable intangible assets resulting from the merger | $ | 3,542.3 |
| Fair value adjustments to net long–term tangible assets resulting from the merger | | 94.1 |
| | | |
| Purchase accounting adjustments resulting in temporary tax differences | | 3,636.4 |
| Assumed statutory tax rate | | 40.0% |
| | | |
| Pro forma adjustment to other non–current liabilities for deferred taxes | $ | 1,454.6 |
| Other long–term liabilities (Note e) | | 4.7 |
| Pro forma adjustment to other non–current liabilities for additional SERP funding at the close of the merger | | (20.0) |
| | | |
| Total pro forma adjustment to other non–current liabilities | $ | 1,439.3 |

The deferred tax liability adjustment has been determined by using the assumed statutory tax rate in effect for the nine–month period ended March 31, 2007. For purposes of the unaudited pro forma financial statements, it has been assumed that goodwill is not tax deductible.

The related deferred tax liability of $38.5 million, calculated using a 40% statutory rate, has been included in income taxes payable. The fair value adjustment to net tangible assets (Note e) includes a $96.4 million step–up in inventory.

*(h)*

**Interest Expense:** The pro forma adjustment to interest expense reflects the interest expense on the Term Loan B, senior unsecured debt and senior subordinated debt and amortization of the related debt issuance costs, net of the elimination of interest expense on the repayment of Harman's existing senior unsecured notes, unsubordinated variable rate loans and the capital lease obligations. The pro forma interest expense, after giving effect to merger, would have been $405.7 million for the fiscal year ended June 30, 2006 and $304.3 million for the nine–month period ended March 31, 2007. Estimated fees and expenses of $96.8 million will be incurred relating to the debt financings. These costs were allocated to the different debt instruments based on their fair values or capacity. Those costs will be amortized on a straight line basis, which approximates the effective interest method, over the term of the related indebtedness.

The terms of the Term Loan B, senior unsecured debt and senior subordinated debt are approximately 7, 8 and 10 years, respectively. The assumed interest rates on the Term Loan B, senior unsecured debt and senior subordinated debt are 8.0%, 9.56% and 10.69%, respectively.

Actual interest rates on the debt in the merger may vary from those assumed for the purpose of these unaudited pro forma financial statements. An increase of 0.125% in the assumed interest rates on the new debt issuances would increase cash interest expense by $18.8 million and $14.1 million for the fiscal year ended June 30, 2006 and the nine–month period ended March 31, 2007, respectively.

26

(i)      **Cost of Sales and Selling, General and Administrative Expenses:** Reflects the impact of the amortization of inventory, the depreciation of property, plant and equipment, and amortization of indefinite–lived intangible assets and the impact of other ongoing fees.

| | Fiscal Year Ended June 30, 2006 | Nine–Month Period Ended March 31, 2007 |
|---|---|---|
| Pro forma amortization of inventory step–up | $ 96.4 | $ — |
| Pro forma depreciation of property, plant and equipment | 7.1 | 5.3 |
| Total pro forma adjustment to cost of goods sold | $ 103.5 | $ 5.3 |
| Professional fees | 5.3 | 4.0 |
| Pro forma amortization of customer relationship intangibles | 94.5 | 70.8 |
| Pro forma amortization of tradename intangibles | 53.1 | 39.9 |
| Pro forma amortization of other intangibles | 151.8 | 113.8 |
| Elimination of historical definite–lived intangible asset amortization expense | (16.2) | (12.2) |
| Total pro forma adjustment to selling, general and administrative expenses | $ 288.5 | $ 216.3 |

For purposes of preparing the unaudited pro forma financial statements, it has been assumed that the customer relationships, tradenames and other intangibles will have an estimated life of 15, 20 and 7 years, respectively, and that the related amortization expense would be included in selling, general and administrative expenses. In addition, it has been assumed that the pro forma adjustment to fixed assets relates to productive assets with a weighted average remaining life of 15 years and that the associated depreciation expense would be included in costs of sales.

Professional fees reflect an adjustment to selling, general and administrative expenses for incremental management and other fees that will be paid on a go–forward basis after the completion of the merger.

The pro forma selling, general and administrative expenses have not been adjusted to reflect the increased stock–based compensation expense as a result of the accelerated vesting of the stock options, restricted stock and restricted stock units due to the change in control resulting from the merger.

(j)      **Income Taxes:** The pro forma income tax adjustments consist of items that would be taxed in both the U.S. and non–U.S. jurisdictions. Accordingly, the tax impact of these adjustments was estimated using Harman's assumed statutory rate of approximately 40% for the year ended June 30, 2006 and for the nine–month period ended March 31, 2007.

(k)      **Earnings (Loss) Per Share:** There is no dilutive effect related to stock options and other potentially dilutive securities on weighted average shares outstanding as a pro forma net loss is reported for the year ended June 30, 2006 and the nine months ended March 31, 2007.

27

**CAUTIONARY STATEMENT REGARDING FORWARD–LOOKING STATEMENTS**

    This proxy statement/prospectus and the documents to which Harman or Parent refer you in this proxy statement/prospectus contain "forward–looking statements" within the meaning of Section 27A of the Securities Act and 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. You should not place undue reliance on these statements. You can identify these statements by the fact that they do not relate strictly to historical or current facts. Harman and Parent base these statements on particular assumptions that they have made in light of their industry experience, as well as their perception of historical trends, current conditions, expected future developments and other factors that they believe are appropriate under the circumstances. Further, statements that include words such as "may," "will," "project," "might," "expect," "believe," "anticipate," "intend," "could," "would," "estimate," "continue" or "pursue," or the negative or other words or expressions of similar meaning, may identify forward–looking statements. These forward–looking statements are found at various places throughout this proxy statement/prospectus. These forward–looking statements are necessarily estimates reflecting the judgment of Harman's and Parent's management and involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by the forward–looking statements. These forward–looking statements should be considered in light of various important factors set forth from time to time in Harman's filings with the SEC. In addition to other factors and matters contained or incorporated by reference in this document including those disclosed under "Risk Factors," these statements are subject to risks, uncertainties and other factors, including, among others:

-     the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement and the fact that a termination under some circumstances could require Harman to reimburse Parent's out–of–pocket transaction expenses up to $20 million and pay a termination fee of up to $225 million (less any reimbursed transaction expenses);

-     the outcome of any litigation and judicial actions that have been or may be instituted against Harman, Parent and others relating to the merger agreement;

-     the inability to complete the merger due to the failure to obtain stockholder approval or the failure to satisfy other conditions to completion of the merger, including the inability of Parent and Merger Sub to obtain regulatory approvals, as required by the merger agreement;

-     the possibility that the merger may involve unexpected costs;

-     the failure of Parent or Merger Sub to obtain the necessary debt financing arrangements set forth in the commitment letters received in connection with the merger agreement;

-     the failure of the merger to close for any other reason or any significant delay in the expected completion of the merger;

-     risks that the proposed transaction disrupts Harman's current plans and operations, and the potential difficulties for Harman's employee retention as a result of the announcement or completion of the merger;

-     the effect of the announcement or completion of the merger on Harman's customer and supplier relationships, operating results and business generally;

-     the impact of the substantial indebtedness incurred to finance the merger;

-     the amount of costs, fees, expenses and charges related to the merger and the actual terms of the financings that will be obtained in connection with the merger;

-     the diversion of Harman's management's and employees' attention from day–to–day business;

28

- changes in laws, including increased tax rates, changes in regulations or accounting standards, third–party relations and approvals, and decisions of courts, regulators and governmental bodies;

- automobile industry sales and production rates and the willingness of automobile purchasers to pay for the option of a premium audio system and/or a multi–functional infotainment system;

- changes in consumer confidence and spending;

- fluctuations in currency exchange rates and other risks inherent in international trade and business transactions;

- Harman's ability to satisfy contract performance criteria, including technical specifications and due dates;

- Harman's ability to design and manufacture Harman's products profitably under Harman's long–term contractual commitments;

- the loss of one or more significant customers, including Harman's automotive manufacturer customers;

- competition in the automotive, consumer or professional markets in which Harman operates;

- model–year changeovers in the automotive industry;

- changes in general economic conditions and specific market conditions;

- Harman's ability to enforce or defend its ownership and use of intellectual property;

- Harman's ability to effectively integrate acquisitions made by Harman;

- strikes, work stoppages and labor negotiations at Harman's facilities or at a facility of one of its significant customers; or work stoppages at a common carrier or a major shipping location;

- the outcome of pending or future litigation and administrative claims, including patent and environmental matters; and

- world political stability;

and other risks detailed in Harman's filings with the SEC, including Harman's Annual Report on Form 10–K for the fiscal year ended June 30, 2006. See "Where You Can Find More Information" on page 135 of this proxy statement/prospectus.

As you read and consider the information in this proxy statement/prospectus, you are cautioned to not place undue reliance on these forward–looking statements. These statements are not guarantees of performance or results and speak only as of the date of this proxy statement/prospectus, in the case of forward–looking statements contained in this proxy statement/prospectus, or the dates of the documents incorporated by reference into this proxy statement/prospectus, in the case of forward–looking statements made in those incorporated documents. These forward–looking statements involve risks, uncertainties and assumptions. In light of these risks and uncertainties, there can be no assurance that the results and events contemplated by the forward–looking statements contained in, or incorporated by reference into, this proxy statement/prospectus will in fact transpire. New factors emerge from time to time, and it is not possible for Harman or Parent to predict all of them. Nor can Harman or Parent assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward–looking statement.

Neither Harman nor Parent undertake any obligation to publicly update or release any revisions to these forward–looking statements to reflect events or circumstances after the date of this proxy statement/prospectus or to reflect the occurrence of unanticipated events, except as required by law.

**All subsequent written or oral forward–looking statements concerning the transaction or other matters addressed in this proxy statement/prospectus and attributable to Harman and/or Parent or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section of this proxy statement/prospectus.**

## RISK FACTORS

In addition to the other information included in, incorporated by reference into and found in the Annexes attached to this proxy statement/prospectus, including the matters addressed in "Cautionary Statement Regarding Forward–Looking Statements" beginning on page 28, you should carefully consider the following risk factors in deciding whether to vote for the adoption of the merger agreement and whether to make an election to receive shares of Parent common stock in the merger. Please see "Where You Can Find More Information" on page 135.

### Risks Related to the Merger and Elections to Receive Parent Common Stock

***The merger may not be completed, which could adversely affect Harman's business.***

Completion of the merger is subject to the satisfaction of various conditions, including adoption of the merger agreement by holders of a majority of the outstanding shares of Harman common stock, expiration or termination of applicable waiting periods under the HSR Act (the FTC granted early termination of the applicable waiting period on May 18, 2007) and other non–U.S. competition laws, and other customary closing conditions described in the merger agreement. Neither Harman nor Parent can guarantee when or if these closing conditions will be satisfied, that the required approvals will be received or that the proposed merger will be successfully completed. In the event that the proposed merger is not completed, Harman may be subject to several risks, including the following:

- Harman's management's and employees' attention from day–to–day business may be diverted;

- Harman may lose key employees;

- Harman's relationships with customers and vendors may be substantially disrupted as a result of uncertainties with regard to its business and prospects;

- Harman would still be required to pay significant transaction costs related to the merger, including legal and accounting fees, and under certain circumstances, Harman may be required to reimburse Parent's out–of–pocket transaction expenses up to $20 million and pay a termination fee of up to $225 million (less any reimbursed transaction expenses); and

- the market price of shares of Harman common stock may decline to the extent that the current market price of those shares reflects a market assumption that the proposed merger will be completed.

***The downgrade in Harman's credit ratings resulting from the announcement of the proposed merger could negatively affect its ability to access capital.***

After the announcement of the proposed merger, Standard & Poor's Rating Services (S&P) downgraded Harman's corporate credit ratings. The uncertainty about the effect of the merger on Harman may further adversely affect Harman's credit rating. Downgrades in Harman's corporate credit ratings generally cause borrowing costs to increase, the potential pool of investors and funding sources to decrease and may have other negative consequences on Harman's business.

Most of Harman's large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions with Harman. As Harman's corporate credit ratings decline, particularly below investment grade, counterparties may decline to do business with Harman.

***In the future, Harman could have liquidity needs that could be difficult to satisfy under some circumstances.***

The inability to raise capital on favorable terms, particularly during times of uncertainty in the financial markets, could impact Harman's ability to sustain and grow its businesses, which would

30

increase its capital costs. Harman's access to the financial markets could be adversely impacted by the merger, the recent downgrade in its corporate credit ratings and various other factors, such as:

- changes in credit markets that reduce available credit or the ability to renew existing liquidity facilities on acceptable terms;

- changes in interest rates;

- a deterioration of Harman's credit or a further reduction in its credit ratings;

- a material breakdown in Harman's risk management procedures; and

- the occurrence of material adverse changes in Harman's businesses that restrict its ability to access the credit markets.

A lack of necessary capital and cash reserves could adversely impact the evaluation of Harman's creditworthiness by counterparties and rating agencies, and would likely increase its capital costs. An increase in Harman's capital costs could have a material negative impact on its results of operations and financial condition.

*Uncertainties associated with the merger may have a negative impact on employee and business relationships.*

The announcement of the proposed merger may have a negative impact on Harman's ability to attract and retain officers and other key employees and/or maintain relationships with key customers and suppliers. These events could have a material negative impact on Harman's results of operations and financial condition. In addition, the success of Parent following the merger will depend in part on the ability of Harman to retain key employees.

*Harman stockholders and option holders may not receive shares of Parent common stock in accordance with their elections.*

The merger agreement provides that no more than 8,333,333 shares of Parent common stock, in the aggregate, will be issued pursuant to elections made in connection with the merger. This limitation will allow up to a maximum of approximately [ • ]% of the outstanding shares of Harman common stock as of the record date to be exchanged for Parent common stock. In the event that Harman stockholders and option holders elect to receive, in the aggregate, a greater number of shares of Parent common stock, the number of shares of Parent common stock received by electing stockholders and option holders will be reduced on a pro rata basis, and they may receive a larger portion of their consideration with respect to their electing shares or shares underlying options in the form of cash. Accordingly, if elections are made for more than 8,333,333 shares of Parent common stock in the aggregate, electing holders of Harman common stock will receive a portion of the merger consideration in a form that they did not elect. The value of the shares of Parent common stock at the time of the merger may be higher than the value of the cash consideration to Harman stockholders and option holders, and, as a result, holders may receive consideration with a lower value than what they elected to receive.

*Harman stockholders and option holders who elect to receive Parent common stock will not be able to revoke or change their election after the Election Deadline.*

Harman stockholders and option holders who would like to receive shares of Parent common stock in connection with the merger are required to make their election with respect to the merger consideration by 5:00 p.m., New York City time, on the last business day before the date of the special meeting, which is referred to as the Election Deadline. Harman stockholders and option holders who elect to receive a portion of the merger consideration payable in connection with the merger in shares of Parent common stock will not be able to revoke or change their election after the Election Deadline.

31

There may be a substantial amount of time between the Election Deadline and the time the merger is completed and shares of Parent common stock are issued to such holder. Accordingly, the value of the Parent common stock at the time of the merger and issuance may not be the same as it was at the time of the election to receive the Parent common stock, and the value of the shares of Parent common stock may be lower than the value of the cash consideration at such time.

***After submitting an election form to receive Parent common stock, a Harman stockholder will not, subsequent to delivery of shares to the exchange agent in connection with such election, be able to sell or otherwise transfer his or her shares of Harman common stock for which an election has been made, and Harman option holders will not be able to exercise any options that are subject to the election.***

Under the terms of the merger agreement, in the event that a Harman stockholder makes an election to receive shares of Parent common stock, he or she will be required to deliver his or her stock certificates or a guaranty of delivery evidencing his or her shares to be converted into shares of Parent common stock, in each case together with a properly completed election form, to the exchange agent. In order to make a valid election, a Harman stockholder must make such deliveries on or before the Election Deadline, and there may be a substantial period of time between that date and the date the merger is completed. During this period, Harman stockholders will not be able to sell or otherwise transfer any shares of Harman common stock subject to the election, and Harman option holders will not be able to exercise any options subject to an election. If the merger is abandoned, any shares of Harman common stock delivered will be promptly returned and Harman stockholders will again be able to sell or otherwise transfer such shares, although the market price for shares of Harman common stock could be significantly lower at the time such shares are returned than was the case when initial delivery was made. In addition, if valid elections are made by electing Harman stockholders and option holders to receive more than 8,333,333 shares of Parent common stock, any shares of Harman common stock that will not be converted into Parent common stock based on the proration adjustment will be promptly returned, and Harman stockholders will again be able to sell or otherwise transfer those shares. Harman option holders will again be able to exercise options that will not be converted into Parent common stock.

***There is a potential risk of greater taxable gain to U.S. holders of Harman common stock who make an election to receive, and receive, shares of Parent common stock in the merger if the Internal Revenue Service were to reclassify the merger.***

Although the matter is not free from doubt and no assurances can be given that the Internal Revenue Service (the "IRS") would not take a contrary position, Harman and Parent believe that, for purposes of determining the U.S. federal income tax consequences to U.S. holders who exchange Harman common stock for a combination of Parent common stock and cash, the transactions contemplated by the merger agreement will be treated as two separate transactions: (a) a transfer to Harman of a portion of the holders' Harman common stock solely in exchange for cash and (b) a transfer to Parent of the balance of the Harman common stock in exchange for cash and Parent common stock. See "Material U.S. Federal Income Tax Consequences" beginning on page 107. There is a risk that the IRS may not respect this characterization and may treat all cash received by holders who exchange Harman common stock for a combination of Parent common stock and cash in the merger as cash received in an exchange under Section 351 of the Internal Revenue Code of 1986, as amended (the "Code"). If the IRS does recharacterize the transactions, a U.S. holder may be required to recognize a greater amount of gain, due to an inability to offset cash received in the merger against any portion of the U.S. holder's basis in his or her Harman common stock. Accordingly, you should consult your own tax advisor regarding the potential risk of such a recharacterization.

***The costs of the merger could adversely affect Parent's operating results.***

Harman and Parent estimate the total merger–related costs to be approximately $179.5 million, primarily consisting of investment banking, legal and accounting fees and other related fees and expenses. This cost estimate is preliminary and subject to change.

**Risks Related to the Financing of the Merger and Indebtedness**

***Harman will have a high level of indebtedness following completion of the merger. This indebtedness could adversely affect Harman's ability to raise additional capital to fund its operations and react to changes in the economy or its industry.***

The level of indebtedness of Harman after completion of the merger and the related financing transactions will be substantially greater than the level of indebtedness of Harman prior to the completion of the merger. Upon completion of the merger, Harman's indebtedness is expected to be up to approximately $4.6 billion, as compared to approximately $159.6 million as of March 31, 2007. Harman would also have additional borrowing availability under the new revolving credit facility upon completion of the merger. See "The Merger—Financing of the Merger" beginning on page 71.

Harman's substantial leverage following the completion of the merger subjects Harman to risks including the following:

- a decrease in net operating cash flow or an increase in expenses of Harman could make it difficult for Harman to satisfy its debt service requirements or force it to modify its operations;

- portions of the indebtedness will be secured by pledges of Harman's interests in certain subsidiaries and security interests in, and mortgages on, substantially all assets, reducing Harman's ability to obtain additional financing;

- Harman's ability to obtain additional financing for working capital, capital expenditures, business development, debt service requirements or other purposes may be impaired or any such financing may not be available on terms favorable to Harman;

- a substantial portion of cash flows from operations will be dedicated to interest expense and the payment of principal, which will reduce the funds that would otherwise be available to Harman for its operations and future business opportunities or for dividends or other distributions to Parent;

- the substantial leverage will increase Harman's vulnerability to general economic downturns and adverse industry conditions and limit its flexibility in planning for, or reacting to, changes in its business and its industry generally;

- a substantial portion of Harman's borrowings will be at variable rates of interest, and Harman may incur additional variable rate debt in the future, exposing Harman to the risk of increased interest rates;

- the substantial leverage and the amount of funds that Harman needs to service its debt obligations may place Harman at a competitive disadvantage to its competitors that are less highly leveraged; and

- the substantial leverage may cause Harman to make non–strategic divestitures and limit its ability to make strategic acquisitions.

*Following the merger, Harman may not be able to make the required payments on its debt or refinance its debt when it comes due, and may be forced to take other actions to satisfy its obligations under its indebtedness, which may not be successful.*

Harman's ability to make scheduled payments on, or to refinance, its debt obligations depends on its financial condition and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond its control. Harman's businesses may not be able to generate sufficient cash flows from operations to meet its anticipated debt service obligations upon completion of the merger. If Harman's cash flows from operations and capital resources are insufficient to fund its debt service obligations, then Harman may be forced to reduce or delay capital and/or research and development expenditures, sell assets or operations, seek additional capital or restructure or refinance its indebtedness. These alternative measures may not be successful and may not permit Harman to meet its scheduled debt service obligations. Harman's ability to refinance any of this debt and the terms on which Harman might refinance will be limited by the terms of its financing arrangements to be entered into upon completion of the merger and will depend upon economic conditions in general, conditions in the capital markets and Harman's performance. If Harman's operating income and available cash are insufficient to meet its debt service obligations, it could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service requirements. In addition, Harman may not be able to complete any dispositions or obtain the proceeds that it could realize from these dispositions and these proceeds may not be adequate to meet any debt service obligations then due. In addition, the agreements governing the financing to be entered into upon the completion of the merger will limit the use of proceeds from any disposition. As a result, Harman may not be permitted to use proceeds from such dispositions to satisfy all current debt service requirements.

*Covenants and other restrictions in Harman's post–merger financing arrangements will limit its operations and activities.*

The financing arrangements to be entered into upon completion of the merger are expected to contain restrictions that may limit Harman's ability to finance future operations or capital needs or engage in other activities that may be in its interests. The financing documents will contain, and the terms of any future indebtedness may contain, various covenants and financial operating and other restrictions. These covenants and restrictions will affect, among other things, the ability of Harman and certain of its subsidiaries to: (a) incur or guarantee additional secured or unsecured indebtedness; (b) pay dividends, make distributions to Parent and make other payments in respect of Harman's capital stock, including the redemption or repurchase of capital stock; (c) make investments or acquisitions; (d) create liens; (e) consolidate, merge or transfer all or substantially all of Harman's assets and (f) enter into certain transactions with Harman's affiliates.

A breach of any of these covenants could result in an event of default and/or acceleration of some or all of Harman's indebtedness under the new senior secured credit facility and the indentures governing the senior unsecured notes and the senior subordinated notes Harman expects to issue upon completion of the merger. If an event of default occurs under the financing arrangements, the lenders and holders of Harman's debt could declare all borrowings outstanding, together with accrued and unpaid interest and fees, to be immediately due and payable and the lenders under the senior secured credit facility could terminate their commitments thereunder, cease making further loans and proceed against the collateral granted to them to secure such indebtedness, and Harman could be forced into bankruptcy or liquidation.

In addition, if Harman's operating performance declines, it may in the future need to obtain waivers from the required lenders under its senior secured credit facility to avoid being in default. If Harman breaches its covenants under its senior secured credit facility and seeks a waiver, it may not be able to obtain a waiver from the required lenders. If this occurred, Harman would be in default under

34

the instrument governing that indebtedness, the lenders could exercise their rights as described above, and Harman could be forced into bankruptcy or liquidation.

***Despite Harman's substantial leverage, Harman may be able to incur significant additional amounts of indebtedness. This would further exacerbate the risks described in this proxy statement/prospectus.***

Subject to the covenants and restrictions under the financing arrangements to be entered into upon completion of the merger, Harman may be able to incur substantial additional indebtedness in the future. If additional debt increases Harman's expected debt levels following the merger, the related risks that Harman faces would increase.

***Harman is a holding company with no operations of its own and therefore its cash flow and ability to service debt is dependent upon distributions from its subsidiaries.***

Harman is a holding company with no direct operations. Harman's principal assets are the equity interests that it holds in its operating subsidiaries. As a result, Harman's ability to service its debt is dependent upon the operating earnings of its subsidiaries. Harman's subsidiaries may not generate sufficient cash from operations to enable it to make principal and interest payments on its indebtedness. The distribution of those earnings, or advances or other distributions of funds by those subsidiaries to Harman, all of which could be subject to statutory or contractual restrictions, are contingent upon the subsidiaries' earnings and are subject to various business considerations. Following completion of the merger, Harman's subsidiaries will be permitted under the terms of Harman's indebtedness, to incur additional indebtedness that may restrict payments from those subsidiaries to Harman. Agreements governing current and future indebtedness of Harman's subsidiaries may not permit those subsidiaries to provide Harman with sufficient cash to fund payments on its indebtedness then due.

***Limitations on the current deductibility of interest expense under German law may negatively impact Harman's cash flows.***

Harman expects to have a significant amount of indebtedness in its German subsidiaries following the completion of the merger. Therefore, Harman could be impacted by the 2008 German Business Tax Reform passed by the German Lower House on May 25, 2007. In order to become effective, the proposed law must be passed by the German Upper House, which is anticipated to occur, with no significant changes by the German Upper House. Under the proposed law, interest expense would only be immediately deductible in an amount up to 30% of a company's earnings before interest, taxes, depreciation and amortization. Under the proposed law, this general limitation on current deductibility of interest expense on indebtedness would be subject to specified exceptions, one or more of which may apply to Harman. If, however, Harman does not qualify for any of the exceptions and is limited in the amount of interest it may currently deduct under the proposed German law, it may lead to a substantial increase in Harman's effective tax rate, have a significant negative impact on Harman's cash flows and exacerbate the risks discussed above regarding the high level of indebtedness Harman will have following completion of the merger. This proposed law, if passed, is expected to be effective beginning with first tax year ending after December 31, 2007.

## Risks Related to the Ownership of Parent Common Stock

***Shares of Parent common stock may have a value that is less than the cash consideration and the value could fluctuate significantly.***

The shares of Parent common stock for which Harman stockholders and option holders may make an election in the merger may have a value that differs from the cash consideration of $120.00 per existing share of Harman common stock. No third–party appraisal or other determination of value was

35

requested or obtained by Harman's board of directors with respect to the value of the Parent common stock. Accordingly, holders of Harman common stock who elect the right to receive shares of common stock of Parent instead of the cash consideration of $120.00 per share in connection with the merger will be subject to the risk that the value of each share of Parent common stock may be less than the amount of the cash consideration, either at the time of the merger or at some time thereafter. In addition, the value of Parent common stock could fluctuate significantly for many reasons, including:

- the risks described in this proxy statement/prospectus;

- Harman's operating and financial performance and prospects;

- changes to the competitive landscape;

- the arrival or departure of key personnel;

- speculation in the press or the investment community; and

- general market conditions.

***An investment in Parent common stock will be substantially less liquid than an investment in Harman common stock.***

Upon completion of the merger, the number of publicly held shares of Parent common stock will be substantially less than the number of publicly held shares of Harman common stock outstanding before the completion of the merger. As a result, the liquidity of Parent common stock is expected to be significantly lower than the liquidity of Harman common stock.

Unlike the shares of Harman common stock, which currently trade on the NYSE, the shares of Parent common stock will be new securities for which there is currently no public or other trading market. In addition, although the Parent common stock issued in the merger to electing stockholders will be registered with the SEC, the shares of Parent common stock will not be listed on any national securities exchange. Even if a market develops for shares of Parent common stock, which is anticipated to occur, it likely will be a lower–tier market, such as the Over–the–Counter Bulletin Board and the Pink Sheets, which are largely unregulated. The ability of holders of Parent common stock to sell the shares will likely be adversely affected because the lower–tier markets do not provide liquidity to the same extent as do the higher–tier markets such as the NYSE or Nasdaq Stock Market. Additionally, prices for securities traded solely on the Over–the–Counter Bulletin Board and the Pink Sheets may be difficult to obtain. As a result, Parent common stock may have very limited liquidity and marketability. This anticipated limited liquidity and marketability, reduced public access to quotations for Parent common stock and lack of a regular trading market for Parent common stock may depress the market price of Parent common stock.

***Shares of Parent common stock will have different rights than existing shares of Harman common stock.***

Upon completion of the merger, holders of Harman common stock and options to purchase Harman common stock who elected to receive Parent common stock will no longer be stockholders or option holders of Harman, but will instead be stockholders of Parent. There are important differences between the current rights of a Harman stockholder and the rights of a stockholder of Parent. You should carefully review Parent's certificate of incorporation, as amended, and by–laws, as amended (which will govern the common stock of Parent), copies of which are attached to this proxy statement/prospectus as Annex C and Annex D, respectively. See "Comparison of Stockholders' Rights" beginning on page 116 for a discussion of the rights associated with Parent common stock as compared to Harman common stock.

***Parent has no operating history and, following the merger, will be a holding company with no business operations of its own.***

Parent has not commenced operations and, therefore, has no operating history upon which Harman stockholders may evaluate its performance. There can be no assurance that KKR and GSCP, or their respective affiliates, will be able to implement, through Parent, their investment strategy and investment approach or that Parent stockholders will receive any return on their capital through an increase in value of Parent common stock, dividends or otherwise. In addition, following the merger, Parent will be a holding company with no business operations of its own and its principal asset will consist of Harman common stock. Harman is also a holding company whose principal assets are the equity interests that it holds in its operating subsidiaries. Past performance of Harman is not necessarily indicative of future results of Parent, particularly in light of the changes that will occur in connection with the merger, including the incurrence of indebtedness, changes in capital structure and other changes relating to Harman and its business.

***Parent's ability to pay dividends depends on Harman's performance and may be limited or otherwise restricted.***

Following the merger, Harman will be a wholly owned subsidiary of Parent, and Parent's principal asset will consist of the shares of Harman common stock. Parent's ability to pay dividends is limited by its status as a holding company and depends on Harman's financial performance and its ability, both in terms of operating results and under the financing arrangements to be entered into in connection with the merger, to pay dividends or otherwise make distributions to Parent. Harman will be permitted under the terms of the financing arrangements to incur additional indebtedness that may restrict payments to Parent. Any dividends of, or distributions by, Harman's subsidiaries could be subject to restrictions on dividends or repatriation of earnings under applicable local law and monetary transfer restrictions in the jurisdictions in which they operate. In addition, under Delaware law, Parent is permitted to pay cash dividends on its capital stock only out of its surplus, which generally means the excess of its net assets over the aggregate par value of its stock. In the event Parent has no surplus, it is permitted to pay cash dividends out of its net profits for the year in which the dividend is declared or in the immediately preceding year. The payment of dividends on Parent common stock following the merger will be at the discretion of Parent's board of directors and will depend on many factors, including Harman's results of operations, financial condition, earnings, capital requirements, limitations under its debt agreements and other legal requirements.

***Parent will be controlled by affiliates of the Sponsors and their interests may conflict with yours.***

Upon completion of the merger, approximately 73% of the outstanding shares of Parent common stock will be held by KHI Holdings LP, referred to herein as Holdings. Holdings is a Delaware limited partnership that is controlled by investment funds affiliated with the Sponsors. Accordingly, the Sponsors will control Parent and, indirectly, Harman, and will have the power to elect all of the directors of Parent, appoint new management and approve any action requiring the approval of the holders of Parent common stock, including adopting certain amendments to Parent's certificate of incorporation and approving mergers or sales of all or substantially all of Parent's assets, including the common stock of Harman. The directors elected by Holdings and, indirectly, by the Sponsors, will have the authority to make decisions affecting the capital structure of Parent, including the issuance of additional capital stock or options, the incurrence of additional indebtedness, the implementation of stock repurchase programs and the declaration of dividends. The interests of the Sponsors may not coincide with the interests of the other Parent stockholders and the business, financial and operating policies of Harman in effect prior to the completion of the merger may not continue following its completion.

37

In addition, the existence of a controlling stockholder of Parent may have the effect of making it more difficult for a third party to acquire, or discouraging a third party from seeking to acquire, a majority of the outstanding Parent common stock. A third party would be required to negotiate any such transaction with the Sponsors, and the interests of the Sponsors with respect to such transaction may be different from the interests of other Parent stockholders.

**_KKR and GSCP have other investment activities that may conflict with the interests of Harman._**

KKR and GSCP are in the business of making investments in companies and will be entitled to and may, from time to time, acquire and hold interests in businesses that are in direct or indirect competition with Harman. Harman will not have any right in or to such other business interests or activities or to the income or proceeds derived therefrom, and the pursuit of such investments or business interests or activities, even if competitive with the business of Harman, will not violate the certificate of incorporation or by–laws of Parent.

In addition, KKR and GSCP may elect not to present any particular opportunity to Harman or to conduct its other business and investment affairs in the best interests of Harman, even if such opportunity is of a character which could be taken by Harman.

**_Without notice to Parent stockholders, Holdings may sell its shares of Parent common stock to any third party at any time and the ownership of Holdings, the direct parent company of Parent, could change. The other stockholders of Parent would have no right to participate in, or receive proceeds from, any sale._**

Subject to applicable securities laws, Holdings may sell any or all of its shares of Parent common stock to any third party at any time without providing notice to, or obtaining the consent of, the other stockholders of Parent or otherwise providing an opportunity for the other stockholders of Parent to participate in such a sale. In addition, Holdings may issue additional equity interests to third parties or KKR, GSCP and other owners of Holdings may be permitted to sell their interests in Holdings to a third party without obtaining the consent of Parent stockholders. Accordingly, there could be a different controlling stockholder of Parent in the future, which may have different interests in, or plans with respect to, the business of Parent and Harman.

**_Holders of Parent common stock will receive more limited information than they currently receive with respect to their shares of Harman common stock._**

Under the merger agreement, Parent has agreed to file the reports specified in Section 13(a) of the Exchange Act and the rules thereunder for a period of two years following the completion of the merger. Parent is not required to make available any other financial or other information, including projections following completion of the merger. Subject to applicable securities laws, Parent may cease filing the reports specified in Section 13(a) of the Exchange Act and the rules thereunder after the two–year period described above.

**_There is a risk of dilution of Parent stockholders._**

Following the merger, Parent may grant or sell, or grant options to purchase, additional shares of Parent common stock or other equity interests (or instruments convertible into Parent common stock or other equity interests) to third parties, including members of Parent's management or its directors. Any such grant or sale, or exercise of any stock option, will dilute the holdings of Parent stockholders.

**Risks Related to Harman**

***Harman's operating results are subject to fluctuations and may not meet Harman's expectations or the expectations of securities analysts or investors.***

Harman's operating results may fluctuate significantly and may not meet its expectations or those of securities analysts or investors. Factors that may cause fluctuations in its operating results include, but are not limited to, the following:

- automobile industry sales and production rates and the willingness of automobile purchasers to pay for the option of a premium audio system and/or a multi–function infotainment system;

- changes in consumer confidence and spending;

- fluctuations in currency exchange rates and other risks inherent in international trade and business transactions;

- the ability to satisfy contract performance criteria, including technical specifications and due dates;

- the loss of one or more significant customers, including Harman's automotive manufacturer customers;

- competition in the automotive, consumer or professional markets in which Harman operates;

- model–year changeovers in the automotive industry;

- changes in general economic conditions and specific market conditions;

- Harman's ability to enforce or defend its ownership and use of intellectual property;

- Harman's ability to effectively integrate acquisitions;

- strikes, work stoppages and labor negotiations at Harman's facilities, or at a facility of one of its significant customers; or work stoppages at a common carrier or a major shipping location;

- the outcome of pending or future litigation and administrative claims, including patent and environmental matters; and

- world political stability.

***Currency fluctuations may reduce profits on Harman's foreign sales or increase its costs, either of which could adversely affect its financial results.***

A significant amount of Harman's assets and operations are located outside the United States. Consequently, it is subject to fluctuations in foreign currency exchange rates, especially the Euro. Translation losses resulting from currency fluctuations may adversely affect the profits from its foreign operations and have a negative impact on its financial results. In addition, Harman purchases certain foreign–made products. Although Harman hedges a portion of its foreign currency exposure and, due to the multiple currencies involved in its business, foreign currency positions partially offset and are netted against one another to reduce exposure, fluctuations in foreign currency exchange rates may make these products more expensive to purchase. Increases in Harman's cost of purchasing these products could negatively impact its financial results if it is not able to pass those increased costs on to its customers.

39

***Failure to maintain relationships with its largest customers and failure by its customers to continue to purchase expected quantities of its products due to changes in market conditions would have an adverse effect on Harman's operations.***

Harman anticipates that DaimlerChrysler, BMW, Audi/VW and Toyota/Lexus will continue to account for a significant portion of its sales for the foreseeable future. However, none of these automotive manufacturers are obligated to any long–term purchases of Harman's products. The loss of sales to DaimlerChrysler, BMW, Audi/VW or Toyota/Lexus would have a material adverse effect on Harman's consolidated net sales, earnings and financial position.

***Harman's products may not satisfy shifting consumer demand or compete successfully with competitors' products.***

Harman's business is based on the demand for audio and video products and its ability to introduce distinctive new products that anticipate changing consumer demands and capitalize upon emerging technologies. If Harman fails to introduce new products, misinterprets consumer preferences or fails to respond to changes in the marketplace, consumer demand for its products could decrease and its brand image could suffer. In addition, Harman's competitors may introduce superior designs or business strategies, impairing its distinctive image and its products' desirability. If any of these events occur, Harman's sales could decline.

***A decrease in discretionary spending would likely reduce Harman's sales.***

Harman's sales are dependent on discretionary spending by consumers, which may be adversely impacted by economic conditions affecting disposable consumer income and retail sales. In addition, Harman's sales of audio, electronic and infotainment products to automotive customers are dependent on the overall success of the automobile industry, as well as the willingness of automobile purchasers to pay for the option of a premium branded automotive audio system or a multi–function digital infotainment system.

***Harman's business could be adversely affected if Harman is unable to obtain raw materials and components from its suppliers on favorable terms.***

Harman is dependent upon third party suppliers, both in the United States and other countries, for various components, parts, raw materials and finished products. Some of Harman's suppliers may produce products that compete with its products. Harman uses externally sourced microchips in many of its products. A significant disruption in Harman's supply chain and an inability to obtain alternative sources could have a material impact on its consolidated results of operations.

***Harman's business could be adversely affected by a strike or work stoppage at one of its manufacturing plants or at a facility of one of its significant customers or at a common carrier or major shipping location.***

One of Harman's manufacturing facilities in the United States operates under a collective bargaining agreement, which was renewed in fiscal 2004. The current contract is scheduled to expire in March 2009. Certain of Harman's automotive customers are unionized and may incur work stoppages or strikes. A work stoppage at Harman's facilities or those of its automotive customers could have a material adverse effect on Harman's consolidated sales, earnings and financial condition. In addition, a work stoppage at a common carrier or a major shipping location could also have a material adverse effect on Harman's consolidated sales, earnings and financial condition.

40

***Harman may lose market share if it is unable to compete successfully against its current and future competitors.***

The audio and video product markets that Harman serves are fragmented, highly competitive, rapidly changing and characterized by intense price competition.

Many manufacturers, large and small, domestic and foreign, offer audio and video systems that vary widely in price and quality and are marketed through a variety of channels, including audio and video specialty stores, discount stores, department stores, mail order firms, and the Internet. Some of Harman's competitors have greater financial and other resources. Harman may not be able to continue to compete effectively against existing or new competitors that may enter its markets. Harman also competes indirectly with automobile manufacturers that may improve the quality of original equipment audio and electronic systems, reducing demand for Harman's aftermarket mobile audio products, or change the designs of their cars to make installation of Harman's aftermarket products more difficult or expensive.

***If Harman does not continue to develop, introduce and achieve market acceptance of new and enhanced products, its sales may decrease.***

In order to increase sales in current markets and gain entry into new markets, Harman must maintain and improve existing products, while successfully developing and introducing new products. Harman's new and enhanced products must respond to technological developments and changing consumer preferences. Harman may experience difficulties that delay or prevent the development, introduction or market acceptance of new or enhanced products. Furthermore, despite extensive testing, it may be unable to detect and correct defects in some of its products before they are shipped. Delays or defects in new product introduction may result in loss of sales or delays in market acceptance. Even after introduction, Harman's new or enhanced products may not satisfy consumer preferences and product failures may cause consumers to reject its products. As a result, these products may not achieve market acceptance. In addition, Harman's competitors' new products and product enhancements may cause consumers to defer or forego purchases of its products.

***Harman's operations could be harmed by factors including political instability, natural disasters, fluctuations in currency exchange rates and changes in regulations that govern international transactions.***

The risks inherent in international trade may reduce Harman's international sales and harm its business and the businesses of its distributors and suppliers. These risks include:

- changes in tariff regulations;

- political instability, war, terrorism and other political risks;

- foreign currency exchange rate fluctuations;

- establishing and maintaining relationships with local distributors and dealers;

- lengthy shipping times and accounts receivable payment cycles;

- import and export licensing requirements;

- compliance with foreign laws and regulations, including unexpected changes in taxation and regulatory requirements;

- greater difficulty in safeguarding intellectual property than in the United States; and

- difficulty in staffing and managing geographically diverse operations.

These and other risks may increase the relative price of Harman's products compared to those manufactured in other countries, reducing the demand for Harman's products.

41

***If Harman is unable to enforce or defend its ownership and use of its intellectual property, its business may decline.***

Harman's future success will depend, in substantial part, on its intellectual property. Harman seeks to protect its intellectual property rights, but its actions may not adequately protect the rights covered by its patents, patent applications, trademarks and other proprietary rights and prosecution of its claims could be time consuming and costly. In addition, the intellectual property laws of some foreign countries do not protect Harman's proprietary rights, as do the laws of the United States. Despite Harman's efforts to protect its proprietary information, third parties may obtain, disclose or use Harman's proprietary information without its authorization, which could adversely affect its business. From time to time, third parties have alleged that Harman infringes their proprietary rights. These claims or similar future claims could subject Harman to significant liability for damages, result in the invalidation of its proprietary rights, limit its ability to use infringing intellectual property or force it to license third–party technology rather than dispute the merits of any infringement claim. Even if Harman prevails, any associated litigation could be time consuming and expensive and could result in the diversion of Harman's time and resources.

42

## THE PARTIES TO THE MERGER

**Harman International Industries, Incorporated**

Harman International Industries, Incorporated
1101 Pennsylvania Ave., N.W., Suite 1010
Washington, D.C. 20004
(202) 393–1101

Harman designs, manufactures and markets high–quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets. Harman has developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold in its principal markets under renowned brand names, including Harman/Kardon®, JBL®, Mark Levinson®, Infinity®, Becker®, AKG®, Revel®, Crown® and Lexicon®.

For more information about Harman, please visit its website at www.harman.com. Harman's website address is provided as an inactive textual reference only. The information provided on Harman's website is not part of this proxy statement/prospectus, and is not incorporated by reference. Harman common stock is publicly traded on the NYSE under the symbol "HAR." For more information on Harman, see "Where You Can Find More Information" on page 135.

**KHI Parent Inc.**

KHI Parent Inc.
c/o Kohlberg Kravis Roberts & Co. L.P.
9 West 57th Street, Suite 4200
New York, New York 10019
(212) 750–8300

Parent is a Delaware corporation and is indirectly controlled by investment funds affiliated with the Sponsors. Parent was formed solely for the purpose of acquiring Harman and has not carried on any activities to date, except for activities incidental to its formation and activities undertaken in connection with the transactions contemplated by the merger agreement.

**KHI Merger Sub Inc.**

KHI Merger Sub Inc.
c/o Kohlberg Kravis Roberts & Co. L.P.
9 West 57th Street, Suite 4200
New York, New York 10019
(212) 750–8300

Merger Sub, a Delaware corporation and a wholly owned subsidiary of Parent, was formed solely for the purpose of facilitating Parent's acquisition of Harman. Merger Sub has not carried on any activities to date, except for activities incidental to its formation and activities undertaken in connection with the transactions contemplated by the merger agreement. Upon completion of the proposed merger, Merger Sub will merge with and into Harman and will cease to exist with Harman continuing as the surviving corporation.

43

**THE SPECIAL MEETING**

**Date, Time, Place and Purpose of the Special Meeting**

This proxy statement/prospectus is being furnished to Harman stockholders as part of the solicitation of proxies on behalf of Harman's board of directors for use at the special meeting to be held on [ • ], 2007, starting at [ • ] a.m., local time, or at any postponement or adjournment thereof. The meeting will be held at [ • ].

The purpose of the special meeting is for Harman stockholders to consider and vote upon the adoption of the merger agreement and to approve the proposal to adjourn the special meeting, if necessary or appropriate to solicit additional proxies. Harman stockholders must adopt the merger agreement in order for the merger to occur. If Harman stockholders do not adopt the merger agreement, the merger will not occur. A copy of the merger agreement is attached to this proxy statement/prospectus as Annex A. You are urged to read the merger agreement in its entirety. This proxy statement/prospectus and the enclosed form of proxy are first being mailed to Harman stockholders on or about [ • ], 2007.

**Record Date and Quorum**

Harman has fixed the close of business on [ • ], 2007, as the record date for the special meeting. Only holders of record of Harman common stock on the record date are entitled to vote at the special meeting. On the record date, there were [ • ] shares of Harman common stock outstanding and entitled to vote. Each share of Harman common stock entitles its holder to one vote on all matters to be voted upon at the special meeting.

A majority of the outstanding shares of Harman common stock constitutes a quorum for the purpose of considering the proposals to be voted upon at the special meeting. Shares of Harman common stock represented at the special meeting but not voted, including shares of Harman common stock for which proxies have been received but for which stockholders have abstained, will be treated as present at the special meeting for purposes of determining the presence or absence of a quorum for the transaction of all business. In the event that a quorum is not present at the special meeting, it is expected that the meeting will be adjourned to solicit additional proxies.

**Vote Required**

You may vote **FOR** or **AGAINST**, or you may **ABSTAIN** from voting on, the proposal to adopt the merger agreement. Abstentions will not be counted as votes cast or shares voting on the proposal to adopt the merger agreement, but will count for the purpose of determining whether a quorum is present.

Completion of the merger requires the adoption of the merger agreement by the affirmative vote of the holders of a majority of the outstanding shares of Harman common stock entitled to vote on the matter. **The failure to vote on the merger proposal or an abstention has the same effect as a vote against the adoption of the merger agreement.**

Under the rules of the NYSE, brokers who hold shares in "street name" for customers have the authority to vote on "routine" proposals when they have not received instructions from beneficial owners. However, brokers are precluded from exercising their voting discretion with respect to approving non–routine matters, such as the adoption of the merger agreement and, as a result, absent specific instructions from the beneficial owner of such shares, brokers are not empowered to vote those shares, referred to generally as "broker non–votes." **While "broker non–votes" will be counted for the purpose of determining a quorum at the special meeting, because completion of the merger requires the adoption of the merger agreement by the affirmative vote of the holders of a majority of the**

44

outstanding shares of Harman common stock, any "broker non–votes" will have the same effect as a vote <u>AGAINST</u> the adoption of the merger agreement.

**Common Stock Ownership of Directors and Executive Officers**

As of [  •  ], 2007, the record date for the special meeting, Harman's directors and executive officers held and were entitled to vote, in the aggregate, [  •  ] shares of Harman common stock, representing [  •  ]% of the shares of Harman common stock entitled to vote at the special meeting.

**Proxies and Revocation**

*Voting and Proxies.* If you are a record holder of shares of Harman common stock, you may submit your proxy, or vote, in any of the following ways:

- **By Internet:** Go to the website www.[  •  ].com, as shown on your proxy card, at any time until [  •  ] , New York City time, on [  •  ], 2007, and follow the instructions.

- **By Telephone:** Call the toll–free number, 1–[  •  ], from a touch–tone telephone in the United States or Canada at any time until [  •  ], New York City time, on [  •  ], 2007. Follow the instructions on your proxy card and the voice prompts on the telephone.

- **By Mail:** Mark your vote, sign and date your proxy card and return it in the enclosed envelope. If you received more than one proxy card (which means that you have shares in more than one account), you must mark, sign, date and return each of them or use an alternative voting method.

- **In Person:** You may vote by ballot at the special meeting or send a representative with an appropriate proxy.

*Revocability of Proxies.* If you submit your proxy by mail, through the Internet or by telephone, you may revoke your proxy at any time before the vote is taken at the special meeting in any of the following ways:

- by submitting a subsequent later–dated proxy by mail before it is voted at the special meeting;

- through the Internet or by telephone before the deadlines for voting described above;

- by giving written notice to Harman's Corporate Secretary at 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004 that is actually received by Harman's Corporate Secretary prior to the special meeting; or

- by voting in person at the special meeting.

Your attendance at the special meeting does not automatically revoke your proxy. If you have instructed your broker to vote your shares, the above–described options for revoking your proxy do not apply. Instead, you must follow the directions provided by your broker to change your vote.

*Stock Ownership Through Brokerage Accounts; Other Beneficial Stockholders.* If you are a beneficial holder of shares of Harman common stock (i.e., you hold your shares through someone else, such as a broker, trustee, bank or other custodian (other than the Harman Retirement Savings Plan)), you will receive materials, including a voting instruction form, from that firm asking how you want to vote. You may instruct that firm as to how you want to vote by marking, signing and dating that voting instruction form. Check the voting instruction form to see whether that firm offers Internet or telephone voting. Alternatively, you may vote by ballot at the special meeting, but only if you bring with you a proxy from the record holder of the shares, which you must request from the broker, trustee, bank or other custodian. Your presence at the special meeting does not revoke your instructions. If you have instructed your broker to vote your shares, the above–described options for revoking your proxy do not

45

apply. Instead, you must follow the directions provided by your broker, trustee, bank or other custodian to change your vote.

*Voting of Proxies at the Special Meeting.*   The individuals designated by Harman's board of directors will vote valid proxies that they receive with respect to the adoption of the merger agreement and the proposal to adjourn the special meeting as stated in the instructions in the proxy card, and in favor of each of these proposals if no directions are marked.

### Adjournments and Postponements

Although it is not currently expected, the special meeting may be adjourned or postponed for the purpose of soliciting additional proxies. Any adjournment may be made without notice, other than by an announcement made at the special meeting of the time, date and place of the adjourned meeting. For the proposal to adjourn the special meeting, if necessary or appropriate to solicit additional proxies, you may vote **FOR**, **AGAINST** or **ABSTAIN**. Abstentions and broker non−votes will count for the purpose of determining whether a quorum is present at the special meeting, but abstentions and broker non−votes will not count as shares present and entitled to vote on the proposal to adjourn the meeting. **As a result, abstentions and broker non−votes will have no effect on the vote to adjourn the special meeting, which requires the vote of the holders of a majority of the shares of Harman common stock present in person or represented by proxy at the special meeting and entitled to vote on the matter.** Any signed proxies received by Harman in which no voting instructions are provided on such matter will be voted **FOR** an adjournment of the special meeting, if necessary or appropriate to solicit additional proxies. Any adjournment of the special meeting for the purpose of soliciting additional proxies will allow Harman stockholders who have already sent in their proxies to revoke them at any time prior to their use at the special meeting as adjourned.

In addition, at any time prior to convening the special meeting, the special meeting may be postponed for any reason without the approval of Harman stockholders. If postponed, Harman will publicly announce the new meeting date. Although it is not currently expected, Harman may postpone the special meeting for the purpose of soliciting additional proxies if Harman concludes that by the date of the special meeting it is reasonably likely that Harman will not have received sufficient proxies to constitute a quorum or sufficient votes for the proposal to adopt the merger agreement. Similar to adjournments, any postponement of the special meeting for the purpose of soliciting additional proxies will allow Harman stockholders who have already sent in their proxies to revoke them at any time prior to their use.

### Solicitation of Proxies; Costs

Harman will pay all expenses of this solicitation, except that Harman and Parent will share equally the cost of preparing and mailing this document and the filing fees for the registration statement of Parent of which this proxy statement/prospectus forms a part. This proxy solicitation is being made by Harman on behalf of its board of directors. In addition to solicitation by use of the mail, Harman's directors, officers and employees may also solicit proxies in person or by telephone, electronic mail, facsimile transmission or other means of communication. Harman's directors, officers and employees will not receive additional compensation for soliciting proxies. Harman will also request brokers and other fiduciaries to forward proxy solicitation material to the beneficial owners of shares of Harman common stock that the brokers and fiduciaries hold of record. Upon request, Harman will reimburse them for their reasonable out−of−pocket expenses. Harman has retained MacKenzie Partners to assist it in the solicitation of proxies for the special meeting and will pay MacKenzie Partners a customary fee plus reimbursement of out−of−pocket expenses.

At its own cost, Parent, directly or through one or more of its affiliates or representatives, may also make additional solicitations by mail, telephone, electronic mail, facsimile transmission or other contact in connection with the merger.

**Participants in Harman Retirement Savings Plan**

If you participate in the Harman Stock Fund of the Harman Retirement Savings Plan, you may give voting instructions to the Trustee by completing and returning the voting instructions that are enclosed with this proxy statement/prospectus. Your instructions tell the Trustee how to vote the Plan Shares (which are those shares of Harman common stock representing your proportionate interest in the Harman Stock Fund that you are entitled to vote under the plan). Any such instruction will be kept confidential. The Trustee will vote your Plan Shares in accordance with your duly executed and delivered voting instructions. If you do not provide the Trustee valid and timely voting instructions, the Trustee will vote your Plan Shares in the same proportion as the Plan Shares for which the Trustee received valid and timely voting instructions from the other participants in the Harman Stock Fund. For example, if an instruction to vote for the adoption of the merger agreement was received with respect to 80% of the Plan Shares for which a valid and timely election was made, the Trustee will also vote for the adoption of the merger agreement with respect to 80% of the Plan Shares for which no instructions have been received. Your voting instructions must be received by the Trustee by 5:00 p.m., New York City time, on [ • ], 2007. You will be provided instructions on how to deliver your voting instructions. You may revoke previously given voting instructions prior to 5:00 p.m., New York City time, on [ • ], 2007.

**Questions and Additional Information**

If you have more questions about the merger or how to submit your proxy, or if you need additional copies of this proxy statement/prospectus or the enclosed proxy card or voting instructions, please contact Harman Investor Relations at (202) 393–1101 or Harman's proxy solicitor, MacKenzie Partners, toll–free at (800) 322–2885 (banks and brokerage firms may call collect at (212) 929–5500). If your broker holds your shares, you should also call your broker for additional information.

If you are a participant in the Harman Retirement Savings Plan and any part of your account is invested in Harman common stock, and you need to obtain information on how to provide voting instruction to the Trustee of the plan with respect to these shares, please call the Trustee at (857) 362–6034.

**Availability of Documents**

Documents incorporated by reference (excluding exhibits to those documents unless the exhibit is specifically incorporated by reference into those documents) will be provided without charge, to each person to whom this proxy statement/prospectus is delivered, upon written or oral request of such person and by first class mail. Harman's SEC filings also may be accessed on the Internet at http://www.sec.gov or on the Investor Information page of Harman's website at http://www.harman.com. Harman's website is provided as an inactive textual reference only. The information provided on Harman's website is not part of this proxy statement/prospectus and is not incorporated herein by reference. For more information, see "Where You Can Find More Information" on page 135 of this proxy statement/prospectus. In addition, the list of Harman stockholders entitled to vote at the special meeting will be available for inspection at Harman's principal executive offices beginning ten days prior to the date of the special meeting and continuing through the meeting.

## THE MERGER

The discussion of the merger in this proxy statement/prospectus is qualified in its entirety by reference to the merger agreement, which is attached to this proxy statement/prospectus as Annex A. You should read the merger agreement carefully.

### Background of the Merger

The Harman board of directors has regularly reviewed and considered Harman's future prospects, as well as its strategic position and opportunities. Over the course of the last several years, Harman has worked with its financial advisor, Bear Stearns, to explore various strategic opportunities. During that period, Harman representatives conducted preliminary conversations with selected domestic and foreign companies to explore their interest in possible strategic transactions involving Harman. However, none of these contacts led to any specific transaction proposals or detailed discussions.

On November 3, 2006, at the request of KKR, Dr. Sidney Harman, Harman's executive chairman, and Bernard A. Girod, Harman's then chief executive officer, met with senior representatives of KKR. In that meeting, the KKR representatives reviewed a variety of possible alternative transactions involving KKR for Harman to consider, including a minority investment by KKR in a publicly traded Harman, a substantial equity investment by KKR in Harman to support a leveraged recapitalization of Harman (where Harman would also borrow money and use the proceeds of the borrowing and the KKR equity investment to, on a one–time basis, repurchase outstanding shares or pay a dividend) and an acquisition of Harman by an entity sponsored by KKR.

At that November 3rd meeting, Dr. Harman and Mr. Girod indicated to KKR's representatives that they believed that Harman would not be interested in pursuing a minority investment because they believed that Harman had sufficient capital resources. Dr. Harman and Mr. Girod also indicated that careful consideration would need to be given to whether the substantial increase in leverage associated with recapitalization and acquisition transactions was in the best interests of Harman and its stockholders in light of the potential impact on the Harman's competitive position with key customers, particularly in the automotive sector, and that, if increased leverage was an attractive strategy, whether it was best done with or without a third–party private equity sponsor. Dr. Harman and Mr. Girod informed the KKR representatives that, while Harman was not exploring a business combination or other similar transaction at that time, they believed that the board of directors would not rule out the possibility of such a transaction.

No confidential information regarding Harman or its future prospects was communicated to KKR during the November 3rd meeting. Following the meeting, Dr. Harman solicited the advice of representatives of Jones Day, counsel to Harman, and Bear Stearns with respect to the potential transactions that KKR had presented for consideration.

In a number of subsequent telephone conversations during the several weeks following the November 3rd meeting, representatives of KKR informed Dr. Harman that KKR was continuing to evaluate possible transactions involving Harman, but that KKR would need access to non–public information in order to formulate a definitive proposal.

Dr. Harman reviewed these KKR discussions with Harman's board of directors at its next meeting, held on January 24, 2007. While no decision was made at that meeting, it was the consensus of the board that further discussions with KKR might be productive, and that, if a confidentiality agreement were to be signed by KKR, it would be appropriate to share non–public information regarding Harman with KKR.

On February 2, 2007, the independent directors of the Harman board conferred with representatives of Wachtell, Lipton, Rosen & Katz (referred to herein as Wachtell Lipton) regarding

48

KKR's preliminary approach. The special committee of independent directors described below subsequently retained Wachtell Lipton as its legal advisor.

In early February 2007, representatives of Jones Day and Wachtell Lipton, on behalf of Harman and the independent directors, and Simpson Thacher & Bartlett LLP (referred to herein as Simpson Thacher), on behalf of KKR, negotiated the terms of a confidentiality agreement to permit KKR to review non–public information concerning Harman. After reaching agreement on the terms of the confidentiality agreement, including provisions sought by the independent directors to preclude KKR from entering into exclusive arrangements with financing sources, Harman and KKR entered into a confidentiality agreement on February 9, 2007, and Harman began to share information with KKR.

At a February 14, 2007 meeting, the Harman board of directors discussed the status of contacts and discussions with KKR and determined to establish a special committee of independent directors to consider, negotiate and take other actions it deemed appropriate with respect to a potential transaction with KKR or a third party. The special committee is comprised of Edward H. Meyer, who was designated as the committee's chairman, Shirley Mount Hufstedler and Ann McLaughlin Korologos.

Beginning in mid–February 2007 and extending through April 2007, KKR conducted a due diligence review of Harman, in connection with which, among other things, KKR held meetings with members of Harman's senior management, visited a number of Harman facilities, met with the primary candidates Harman was considering to replace Mr. Girod as Harman's CEO and reviewed non–public information.

On March 23, 2007, KKR provided Harman's representatives with a draft of an indication of interest which contemplated that KKR would acquire a minority interest in Harman, all or a portion of the proceeds of which would be available to Harman to repurchase outstanding Harman common stock or, alternatively, an acquisition by a company sponsored by KKR of all of the outstanding stock of Harman at an indicated price between $115 and $120 per share in cash. After reviewing the matter with Harman's representatives, including members of the special committee of independent directors, a representative of Bear Stearns informed KKR that Harman was not interested in pursuing a minority investment by KKR, but would consider an acquisition of Harman by KKR, one of the alternatives presented in KKR's draft proposal.

On March 27, 2007, KKR delivered a letter to Harman in which it proposed to acquire all of the outstanding stock of Harman at a price of between $115 and $120 per share in cash, subject to, among other things, satisfactory completion by KKR and its financing sources of due diligence and KKR obtaining committed transaction financing. KKR conditioned its willingness to proceed further on Harman's agreement to negotiate exclusively with KKR for a three–week period.

The board considered the KKR proposal at a March 28, 2007 meeting at which Harman's chief financial officer and representatives of Bear Stearns, Jones Day and Wachtell Lipton were also present. At this meeting, Bear Stearns reviewed the terms and conditions of the KKR proposal and presented its preliminary valuation analysis of Harman, including a review of Harman's annual long–term business plan and mid–year update to that plan, each as described in "—Opinion of Financial Advisor to Harman—Summary of Financial Analyses" on page 64. The board discussed the advisability of proceeding with discussions with KKR on an exclusive basis, as had been indicated in KKR's proposal. In that regard, Dr. Harman shared his concerns that premature disclosure of discussions regarding a business combination transaction could substantially damage key company customer relationships, particularly in Harman's automotive business. A representative of Bear Stearns then reviewed various courses Harman might take in response to the KKR proposal and indicated that Bear Stearns believed that, based upon conditions in the automotive industry and previous preliminary discussions with the selected foreign and domestic companies over the last several years referenced above, it was not likely that a company in the industry would be interested in pursuing a business combination transaction at the price level indicated by KKR. The board considered that retaining an ability to solicit and consider

49

competing offers for a period of time after an agreement was signed, coupled with an acceptable termination fee, would allow the board to confirm whether any other potential industry acquiror would be interested in a business combination transaction involving Harman without disruption or damage to key company customer relationships. The Bear Stearns representative also expressed the view that contacting other potential financial buyers at that time would substantially increase the risk of premature disclosure that Harman was in preliminary discussions regarding a possible business combination transaction.

The special committee of independent directors met later that day separately with Wachtell Lipton and authorized Harman's proceeding with discussions with KKR. However, the committee instructed Bear Stearns to inform KKR that Harman's willingness to proceed was predicated on the assumption that any definitive agreement with KKR would permit the board to solicit and consider competing offers for a period of time after the agreement was signed and provide for a termination fee that should not materially affect the willingness or ability of third parties to consider making superior proposals, particularly during the period in which Harman could actively solicit competing offers.

Continuing into early April 2007, KKR and its advisors continued to conduct due diligence on Harman. KKR also held additional meetings with the primary candidates Harman was considering to replace Mr. Girod as Harman's CEO. In addition, during this period, a representative of Bear Stearns conveyed to KKR the special committee's request that KKR increase its proposed transaction price above the top of the range previously indicated by KKR. KKR responded that it was considering a price in the upper end of its previously indicated range, but that it would not consider a transaction at a price in excess of $120 per Harman share. In connection with these discussions, KKR indicated that it was considering making a proposal to provide Parent common stock for a portion of the aggregate consideration payable to Harman stockholders in the merger.

On April 10, 2007, the special committee met with representatives of Wachtell Lipton to discuss the status of the discussions with KKR and its advisors, including KKR's unwillingness to increase the price that it would pay in the proposed transaction beyond the upper end of its previously indicated range, and the discussions with KKR regarding the possibility of including Parent common stock for a portion of the aggregate merger consideration. On April 12, 2007, representatives of Jones Day, Wachtell Lipton and Simpson Thacher discussed the terms of a potential merger agreement. In these discussions, a representative of Simpson Thacher reiterated that KKR was considering proposing to provide Parent common stock for a portion of the aggregate merger consideration. In that regard, representatives of Jones Day and Wachtell Lipton informed representatives of Simpson Thacher that Dr. Harman, Harman's founder and a substantial stockholder, and the special committee were not willing to engage in a transaction in which the Harman stock Dr. Harman owned would be treated more favorably than shares held by other stockholders.

On April 13, 2007, representatives of Bear Stearns and Wachtell Lipton met with representatives of KKR and Simpson Thacher to discuss the possibility that a portion of the aggregate merger consideration would be payable in Parent common stock. At this meeting, these representatives agreed that, if a stock election were to be made available, the receipt of a portion of the merger consideration in Parent common stock should be solely at the election of each Harman stockholder and that this election should be available to all Harman stockholders on an equal basis.

Over the course of the next several days, the board and the special committee members conferred on a regular basis with the board's and the special committee's legal and financial advisors regarding the status of the ongoing discussions with KKR. In addition, during this period, Harman, the special committee and KKR and their respective legal advisors continued to discuss the terms and conditions of a potential merger agreement, including the special committee's requirement that the merger agreement permit the board to solicit competing offers for a period of time after entering into a merger agreement, and the amount of termination fees and expense reimbursement that would be payable by the parties in the event the merger agreement were to be terminated under specified

circumstances. The Harman and special committee representatives indicated that while they believed that a termination fee within customary ranges for transactions of this type would be appropriate after the expiration of the initial 50–day solicitation period (referred to herein as the go–shop period), a substantially lower termination fee would be required during the go–shop period.

On April 18, 2007, Harman management made a presentation regarding Harman's businesses and operations to representatives of KKR and potential debt financing sources with which KKR was having discussions. GSCP, which had previously indicated to KKR its interest in also participating in the equity financing for the proposed transaction and which Harman had authorized to so participate on a non–exclusive basis, was among the financing sources that attended this presentation.

Beginning on April 19, 2007, KKR and GSCP (collectively referred to herein as the Sponsors), Harman and their respective legal advisors negotiated the definitive terms of the merger agreement, as well as the other associated documents, including the debt and equity commitment letters and the guarantees to be provided by affiliates of the Sponsors, and the disclosure schedules related to the merger agreement. During the negotiations, the advisors to Harman and the special committee sought the Sponsors' agreement to certain rights and protections for Harman stockholders who elect to receive Parent common stock in the merger. The Sponsors agreed that Parent would file reports under Section 13(a) of the Exchange Act for a period of not less than two years following completion of the merger, even if not otherwise required, but would not agree to the other requested rights.

During the discussion of the merger agreement, Simpson Thacher indicated that KKR wanted to discuss the possibility of having members of Harman's senior management roll over a portion of their Harman stock and equity–linked rights into Parent common stock or other equity rights, and that they intended to make an equity incentive plan available to Harman management and other employees. Under the terms of the merger agreement required by Harman and the special committee, however, KKR was prohibited from having discussions with individual Harman executives with respect to their investment in, and continuing role with, Parent and the Harman business until after the expiration of the 50–day go–shop period.

During the course of the discussions, representatives of KKR requested that Dr. Harman continue as executive chairman of Harman following the merger. While Dr. Harman indicated his willingness to do so, there is no obligation that he do so or that requires Parent to continue his service in that position or any other capacity. Dr. Harman informed the board of KKR's request that he continue to serve as executive chairman and of his response to KKR. Dr. Harman also informed the board that he would be willing to continue to so serve if Harman were to be acquired by another buyer who desired that he continue in that position. During the negotiation of the definitive documentation, KKR also requested that Dr. Harman commit to elect to receive, subject to the proration provisions of the merger agreement, Parent common stock for all of the shares of Harman common stock he beneficially owned. Following negotiation, KKR agreed to lower that requirement to 1.7 million of the Harman shares Dr. Harman beneficially owned, again subject to proration. Dr. Harman agreed to be obligated to this mandatory election requirement that is not applicable to other stockholders, whose right to elect to receive Parent common stock is completely voluntary and can be revoked prior to the Election Deadline.

The Harman board of directors met on April 23, 2007 to receive an update from representatives of Bear Stearns, Jones Day and Wachtell Lipton on the status of the discussions and negotiations with the Sponsors and to review the terms and conditions of the draft of the merger agreement.

Over the course of the next few days, Harman and the Sponsors and their respective advisors continued to negotiate the terms and conditions of the transaction agreements and related documents. During the negotiations, the Sponsors agreed to reduce the amount of termination fees that the Sponsors had proposed would be payable by Harman to Parent in the event the merger agreement were to be terminated to enter into another transaction resulting from solicitations or proposals during

51

the go–shop period to $75.0 million. The Sponsors also agreed to reduce the maximum amount of expenses that would be reimbursable to Parent if the merger agreement was terminated under certain circumstances. It was also agreed that the fee that Harman would pay Parent in the event the merger agreement were to be terminated to enter into another transaction under circumstances that do not qualify for the $75 million termination fee, as well as the fee that Parent would pay Harman in the event the merger agreement were terminated because Parent could not obtain financing or because of Parent's breach, would each be $225 million.

Harman's board met on April 25, 2007, with representatives of Bear Stearns, Jones Day and Wachtell Lipton in attendance. Representatives of Bear Stearns provided the board with Bear Stearn's financial analysis and its views and advice on the financial aspects of the proposed transaction, including the contemplated financing arrangements. At the conclusion of their presentation, the representatives of Bear Stearns informed the board that Bear Stearns was prepared, at the appropriate time, to provide the board with an opinion to the effect that, as of the date of the opinion and based on and subject to the matters discussed with the board and to be set forth in a written opinion letter, the $120 per share cash merger consideration to be received by holders of shares of Harman common stock pursuant to the merger agreement was fair, from a financial point of view, to such holders. Representatives of Wachtell Lipton reviewed with the board its legal obligations in connection with its consideration of the proposed transaction, reviewed the material terms and conditions of the then–current drafts of the proposed merger agreement and related documents and reviewed the interests of management and the directors in the merger that might be different from, or in addition to, the interests of Harman stockholders generally. See "—Interests of Harman's Directors and Executive Officers in the Merger" on page 57. The board discussed with the advisors the terms still to be resolved in the merger agreement and related transaction documents, including the financing commitments to be delivered by the Sponsors which were not yet on terms and conditions acceptable to the special committee, and that the Sponsors were continuing to work on some open due diligence items.

During the board meeting, Dr. Harman and representatives of Bear Stearns left the meeting to convey to a representative of KKR the concern of the Harman board of directors regarding the completion of the Sponsors' due diligence and transaction documents, including financing commitments.

The board met again in the late afternoon on April 25, 2007, to receive an update from the advisors on the ongoing efforts by the parties to complete the transaction documents, financing commitments and due diligence. The board determined to reconvene the following morning.

Thereafter, representatives of Harman, Jones Day, Wachtell Lipton, Simpson Thacher, Bear Stearns and the Sponsors worked to resolve the remaining open issues, and the Sponsors and Simpson Thacher worked to finalize the financing commitments.

Early in the morning of April 26, 2007, the board met with representatives of Bear Stearns, Jones Day and Wachtell Lipton. The board was informed that all of the remaining issues in the merger agreement and related documents as well as the open due diligence items had been resolved and that acceptable financing commitments were in place. Representatives of Bear Stearns then delivered its oral opinion (subsequently confirmed in writing) that, as of April 26, 2007, and based on and subject to the matters discussed with the board and to be set forth in Bear Stearns' written opinion, the $120 per share cash merger consideration to be received by holders of shares of Harman common stock pursuant to the proposed merger agreement was fair, from a financial point of view, to such holders. Bear Stearns expressed no opinion to the extent a holder of Harman common stock makes an election to receive shares of Parent common stock instead of cash.

The special committee thereafter met separately with Wachtell Lipton to discuss and consider the proposed transaction. Following its consideration, the committee unanimously determined to

52

recommend to the full board of directors that the board approve and adopt the proposed merger agreement and declare its advisability.

The board of directors then reconvened. The chairman of the special committee reported the special committee's recommendation to the board that the board approve the proposed merger agreement and declare its advisability. Following further discussion, the board, by unanimous vote of all of its members, adopted the resolutions described below under "—Reasons for the Merger; Recommendation of Harman's Board."

Following the Board meeting, on April 26, 2007, the parties entered into the merger agreement and issued a joint press release announcing the transaction.

During the 50–day go–shop period following the execution of the merger agreement, representatives of Bear Stearns, on behalf of Harman, solicited or received unsolicited inquiries from a total of 40 potential strategic and private equity acquirors regarding their possible interest in pursuing a potential acquisition of Harman. A number of the potential acquirors requested publicly available information regarding Harman and its businesses and held further discussions with Bear Stearns. One of the potential acquirors, a private equity firm, entered into a confidentiality agreement with Harman. However, no confidential information was requested by or provided to any of the potential acquirors. As of the date of this proxy statement/prospectus, none of the potential acquirors has submitted a proposal to pursue a transaction with Harman. During this period, the special committee of independent directors met on six occasions with representatives of Wachtell Lipton and Bear Stearns to review this process.

### Reasons for the Merger; Recommendation of Harman's Board

The Harman board of directors, upon the recommendation of the special committee and acting with the advice and assistance of its outside legal and financial advisors, unanimously (a) approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, (b) determined that the transactions contemplated by the merger agreement are fair to, and in the best interests of, Harman and its stockholders and (c) resolved to recommend that Harman's stockholders vote in favor of the adoption of the merger agreement. **The board of directors' recommendation is based on the Cash Consideration. The board of directors makes no recommendation as to whether any stockholder should make an election to receive shares of Parent common stock instead of cash and makes no recommendation regarding the Parent common stock.**

In the course of reaching its determination, the special committee of independent directors and full board considered a number of factors. The material factors they considered that they believed supported the decision to approve the merger were:

- the value of the Cash Consideration to be paid to Harman stockholders in the merger and the board's belief that the merger consideration that would be received by Harman stockholders represented a fair price for the shares of common stock of Harman;

- the current and historical market prices of Harman's common stock and substantial increase in trading prices for Harman common stock over the past several years, as well as the fact that the $120.00 per share merger price represented a premium of approximately 17% over the market closing price of $102.56 on April 25, 2007, the last trading day prior to the announcement of the transaction, and a premium of approximately 20% over the average closing share price during the previous 60 trading days;

- the opinion of Bear Stearns that, as of April 26, 2007 and based upon and subject to the matters described in its opinion, the $120.00 per share cash merger consideration to be received by holders of Harman common stockholders pursuant to the merger was fair, from a financial point of view, to such holders;

- the fact that all Harman stockholders would have the opportunity, on a purely voluntary basis, to participate in the post–closing equity of Parent and, accordingly, have the opportunity to participate in a portion of the potential future increase in value of an investment in Harman's business;

- the fact that the consideration to be paid to Harman stockholders who do not elect to receive Parent common stock is all cash, which will provide certainty of value and the ability to monetize their investment in Harman;

- the directors' understanding of Harman's businesses, historical and current financial performance, competitive and operating environment, operations, and management strengths;

- the directors' understanding of current trends in the sectors in which Harman operates;

- the judgment of the directors regarding the prospects of Harman based on its current and historical performance and management's financial projections as reflected in Harman's annual long–term business plan and mid–year update to that plan, each as described in "—Opinion of Financial Advisor to Harman—Summary of Financial Analyses" beginning on page 64;

- financial analyses, information and perspectives provided to the board of directors by management and Harman's financial advisors;

- the terms and conditions of the merger agreement, including:

    - the provisions in the merger agreement that permit the board of directors to actively solicit alternative proposals for 50 days following signing of the merger agreement and the termination fee of $75 million (which represents less than one percent of the total transaction value) that would be payable if a superior transaction were to materialize as a result of that solicitation;

    - Harman's ability after the 50–day solicitation period, under limited circumstances, to furnish non–public information to, and conduct negotiations with, third parties regarding alternative proposals;

    - the limited number and nature of the conditions to funding set forth in the Sponsors' debt commitment letters, the obligation of Parent to use its reasonable best efforts to obtain the debt financing and, if Parent fails to effect the closing because of a failure to obtain the debt financing, the obligation of Parent to pay Harman a $225 million termination fee;

    - the provisions in the merger agreement that allow the board of directors, under certain circumstances, to change its recommendation that Harman's stockholders vote to adopt the merger agreement;

    - the limited number and nature of the conditions to Parent's and Merger Sub's obligation to complete the merger, including the absence of a financing condition;

    - the provisions in the merger agreement limiting the Sponsors' ability to enter into exclusive and other specified arrangements with potential debt and equity financing sources; and

    - the provisions in the merger agreement prohibiting the Sponsors from entering into separate arrangements with members of Harman senior management with respect to employment following the closing during the 50–day period during which Harman would be actively soliciting competing third party proposals;

- the fact that completion of the merger requires the approval of Harman's stockholders;

54

- the formation by the Harman board of directors of a special committee of independent directors in connection with the transaction, and the committee's active involvement in the process leading up to the merger agreement;

- the fact that Dr. Harman had, at the Sponsors' request, agreed to serve as Harman's executive chairman following the merger, and that Dr. Harman had advised the board of directors that he was willing to make the same commitment to any third party making a superior proposal;

- the fact that, while it was expected that Dr. Harman would continue as executive chairman, there were no undertakings requiring or guaranteeing his service for any particular period, and the requirement that the Sponsors imposed that Dr. Harman elect to receive, subject to the proration provisions of the merger agreement, Parent common stock for 1.7 million Harman shares he beneficially owns;

- the several limited guarantees provided by affiliates of the Sponsors;

- the advanced status of negotiations with Harman's CEO candidate (with whom Harman subsequently signed an employment agreement);

- the availability of appraisal rights to Harman's stockholders who comply with applicable requirements under Delaware law; and

- the board's understanding of the reputation and experience of KKR and GSCP, the current state of the capital markets, the terms of the Sponsors' financing commitments and the likelihood that Parent could successfully obtain the financing required to fully fund the payment of the merger consideration, and the board's understanding of the proposed debt and equity financing arrangements for the merger.

Harman's directors also considered a number of factors that they believed presented risks or otherwise weighed against proceeding with the merger, which were:

- the fact that Harman did not solicit alternative proposals prior to executing the merger agreement;

- the fact that, if the merger is completed, Harman stockholders who do not elect to receive Parent common stock, or who, due to proration, do not receive all of the Parent common stock covered by their election, will receive cash for their Harman common stock and, with respect to those shares converted into cash, will not participate in any potential future earnings or growth of Harman's businesses and will not benefit from any potential appreciation in its value;

- the fact that receipt of the Cash Consideration will be taxable to Harman's U.S. stockholders for U.S. federal income tax purposes;

- the fact that the Sponsors were willing to commit that Parent would file with the SEC reports under Section 13(a) of the Exchange Act for only two years and were not willing to agree to other minority stockholder rights or protections for Harman stockholders who elect to receive Parent common stock in the merger beyond those provided by law;

- the fact that the Parent common stock, if any, received by Harman stockholders and option holders in the merger would not be listed on a national securities exchange and that, accordingly, an active, liquid market for those shares may not exist at the time that a stockholder desires to sell shares of Parent common stock and that the corporate governance and other requirements applicable to listed companies will not apply to Parent;

- the fact that the merger agreement provides that a maximum of 8,333,333 shares of Parent common stock will be issued pursuant to elections made in connection with the merger and that, therefore, if Harman stockholders and option holders elect to receive, in the aggregate, a greater

55

number of shares of Parent common stock, the number of shares of Parent common stock received by electing stockholders and option holders will be reduced on a pro rata basis such that they may receive a larger portion of their merger consideration in the form of cash;

- the fact that Harman is required to reimburse Parent for up to $20 million of its incurred expenses if the merger agreement is terminated under certain circumstances, including if the merger agreement is terminated because Harman's stockholders do not vote to adopt the merger agreement;

- the fact that Harman is required to pay a termination fee of $75 million if the board terminates the merger agreement to accept a superior proposal as a result of an alternative proposal that is made during the go–shop period and meets specified criteria and of $225 million if the board terminates the merger agreement to accept a superior proposal under circumstances that do not qualify for payment of the $75 million termination fee or the merger agreement is terminated under certain other circumstances (including, in some instances, if stockholders do not vote to adopt the merger agreement);

- the restrictions contained in the merger agreement on the ability of the board of directors after the end of the go–shop period to actively solicit, furnish non–public information regarding Harman in connection with, and engage in negotiations regarding, alternative proposals;

- the fact that Harman was entering into the merger agreement with newly formed entities with essentially no assets, and that Harman's remedy in connection with a breach, even a breach that is deliberate or willful, of the merger agreement by Parent or Merger Sub is limited to a termination fee of $225 million;

- the restrictions on the conduct of Harman's businesses prior to the completion of the merger, which, subject to specific limitations, may delay or prevent Harman from taking certain actions during the time that the merger agreement remains in effect;

- the risk that while the merger is expected to be completed, there can be no assurance that all conditions to the parties' obligations to complete the merger will be satisfied, and as a result, it is possible that the merger may not be completed even if approved by Harman's stockholders;

- the risks and costs to Harman if the merger does not close, including the diversion of management and employee attention, potential effects on Harman's relationships with suppliers, vendors and other business partners, impact on trading prices for Harman shares and direct costs incurred; and

- the other risks described in "Risk Factors" beginning on page 30.

In addition, the directors were aware of and considered the interests that certain of Harman's directors and executive officers may have with respect to the merger that differ from, or are in addition to, their interests as stockholders of Harman, as described in "—Interests of Harman's Directors and Executive Officers in the Merger" on page 57.

The foregoing discussion summarizes the material factors considered by the directors in their consideration of the merger. After considering these factors, as well as others, the special committee of independent directors and the full board concluded that the positive factors relating to the merger agreement and the merger significantly outweighed the potential negative factors, and determined that the merger agreement and the merger were advisable and in the best interests of Harman and its stockholders. In view of the wide variety of factors considered by the directors, and the complexity of these matters, neither the board nor the special committee of independent directors found it practicable to quantify or otherwise assign relative weights to the foregoing factors. In addition, individual directors may have assigned different weights to various factors. The board unanimously

56

recommended the merger agreement and the merger based upon the totality of the information presented to and considered by it.

Harman's board of directors recommends that stockholders vote **FOR** the adoption of the merger agreement and **FOR** the adjournment of the special meeting, if necessary or appropriate, to solicit additional proxies.

### Interests of Harman's Directors and Executive Officers in the Merger

In considering the recommendation of Harman's board of directors to vote **FOR** the proposal to adopt the merger agreement, you should be aware that members of Harman's board of directors and its executive officers have agreements or are participants in benefit plans that result in them having interests in the merger that are different from, or in addition to, your interests as a stockholder. Harman's board of directors and the special committee of independent directors were aware of, and considered the interests of, Harman's directors and executive officers in approving the merger agreement, the merger and the transactions contemplated by the merger agreement. The dollar amounts of the benefits described below have been determined assuming that the merger is completed on September 30, 2007 at a transaction value of $120.00 per share.

### Severance Agreements

Harman is a party to severance agreements with Dr. Sidney Harman and Kevin Brown. The merger will be a change in control for purposes of each of these agreements. Each of the severance agreements provides that if, within two years following a change in control of Harman, the executive officer's employment is terminated without cause or under certain circumstances the executive officer terminates his own employment, he is entitled to (a) receive a lump sum severance payment in an amount equal to three times the sum of his highest annual base salary during any period prior to the termination of his employment plus his highest incentive pay during the three fiscal years preceding the change in control, (b) continuation of welfare benefits for a period of 24 months and (c) outplacement services at Harman's expense in an amount up to 20% of his base salary. If any amounts or benefits received under the severance agreement or otherwise are subject to the excise tax imposed under Section 4999 of the Code, an additional payment will be made to restore the executive officer to the after–tax position that he would have been in if the excise tax had not been imposed.

The table below sets forth an estimate of the amounts payable under the severance agreements assuming the executive officer's employment is terminated immediately following the completion of the merger by Harman other than for death, disability or cause, or by the executive officer under certain circumstances.

| Name | Amount of Potential Cash Severance | Estimated Value of Other Benefits | Estimated Tax Gross–Up Payment | Total |
|---|---|---|---|---|
| Sidney Harman | $ 9,150,000 | $ 236,814 | $ 0 | $ 9,386,814 |
| Kevin Brown | 2,475,000 | 138,657 | 2,014,807 | 4,628,464 |

If the executive officer receives the severance payments and benefits described above, he will be subject to certain restrictive covenants, including a covenant not to compete for a one–year period following termination of his employment.

### Stock–Based Awards

*Stock Options.*  Immediately prior to the completion of the merger, except as may otherwise be agreed to by the holder and Parent in accordance with the terms of the merger agreement, all options to acquire shares of Harman common stock outstanding under Harman's stock incentive plans will

57

become fully vested and will be cancelled and converted into the right to receive a cash payment equal to the number of shares of Harman common stock underlying the options multiplied by the amount (if any) by which $120.00 exceeds the exercise price, without interest and less any required withholding taxes. Notwithstanding the foregoing, the shares of Harman common stock issuable for options that are exercised in connection with an election to receive Parent common stock will not be converted into the right to receive cash, but will be converted into shares of Parent common stock, subject to the proration limitations described in "Election to Receive Parent Common Stock—Proration of Parent Common Stock" beginning on page 103.

The table below includes the number, weighted average exercise price and value of vested and unvested options to acquire shares of Harman common stock held by Harman's directors and executive officers as of June 18, 2007.

| | Vested Options | | | Unvested Options | | | |
|---|---|---|---|---|---|---|---|
| Name | No. of Underlying Shares(1) | Weighted Average Exercise Price | Value(2) | No. of Underlying Shares(1) | Weighted Average Exercise Price | Value(2) | Total Value(2) |
| **Executive Officers** | | | | | | | |
| Sidney Harman | 770,000 $ | 23.30 $ | 74,455,650 | 230,000 $ | 71.49 $ | 11,158,350 $ | 85,614,000 |
| Kevin Brown | 12,000 | 66.77 | 638,740 | 76,000 | 77.05 | 3,263,960 | 3,902,700 |
| Blake Augsburger | 6,800 | 79.40 | 276,088 | 17,600 | 74.71 | 797,116 | 1,073,204 |
| Erich Geiger | 111,000 | 66.18 | 5,974,235 | 284,000 | 77.69 | 12,016,260 | 17,990,495 |
| Gina Harman | 97,524 | 24.27 | 9,336,076 | 32,000 | 69.88 | 1,603,990 | 10,940,066 |
| Sandra B. Robinson | 29,400 | 19.59 | 2,951,927 | 5,600 | 68.14 | 290,398 | 3,242,325 |
| Helmut Schinagel | 0 | — | 0 | 50,000 | 83.67 | 1,816,500 | 1,816,500 |
| Edwin Summers | 3,900 | 56.61 | 247,232 | 5,200 | 62.62 | 298,352 | 545,584 |
| **Non–Officer Directors** | | | | | | | |
| Shirley M. Hufstedler | 67,400 | 22.03 | 6,602,904 | 17,600 | 85.05 | 615,174 | 7,218,078 |
| Ann M. Korologos | 57,000 | 24.05 | 5,469,304 | 17,600 | 85.05 | 615,174 | 6,084,478 |
| Edward H. Meyer | 67,400 | 22.03 | 6,602,904 | 17,600 | 85.05 | 615,174 | 7,218,078 |

(1) Excludes shares of Harman common stock underlying options with an exercise price greater than $120.00 as follows: Mr. Augsburger (25,000 shares), Ms. Harman (25,000 shares), Mr. Schinagel (25,000 shares), Ms. Hufstedler (9,000 shares), Ms. Korologos (9,000 shares), Mr. Meyer (9,000 shares), Ms. Robinson (6,000 shares) and Mr. Summers (4,000 shares).

(2) The amounts set forth in these columns are calculated based on the actual exercise prices underlying the related options.

**Restricted Stock.**    Immediately prior to the completion of the merger, except as otherwise agreed by a holder and Parent, each award of restricted shares of Harman common stock outstanding under Harman's stock incentive plans or otherwise will become fully vested and will be cancelled and converted into the right to receive a cash payment equal to the number of shares of restricted stock of Harman common stock multiplied by $120.00, without interest and less any required withholding taxes. As of June 18, 2007, Dr. Erich A. Geiger held 12,000 restricted shares of Harman common stock with an aggregate value of $1,440,000. None of Harman's other executive officers or directors holds any restricted shares of Harman common stock.

58

*Restricted Stock Units.* Immediately prior to the completion of the merger, except as may be separately agreed by a holder and Parent in accordance with the terms of the merger agreement, all restricted stock units outstanding under Harman's stock incentive plans or otherwise will become fully vested and will be cancelled and converted into the right to receive a cash payment equal to the number of restricted stock units multiplied by $120.00, without interest and less any required withholding taxes. As of June 18, 2007, Helmut Schinagel held 25,000 restricted stock units with an aggregate value of $3,000,000. None of Harman's other executive officers or directors holds any restricted stock units.

## Other Benefit Plans

*Supplemental Executive Retirement Plan.* Harman's Supplemental Executive Retirement Plan (the "SERP") provides supplemental retirement, termination and death benefits to certain of Harman's executive officers and other key employees designated by Harman's board of directors. Under the SERP, a participant who is credited with at least 15 years of service and who is not otherwise entitled to a retirement benefit or death benefit under the SERP is entitled to a termination benefit. If the participant's employment is terminated for any reason other than death within three years following a change in control of Harman, the participant will become fully vested in his or her change–in–control benefit under the SERP. The change–in–control benefit may be elected by a participant instead of any other retirement income benefit, including the termination benefit. The merger will constitute a change–in–control for these purposes. For each of Harman's executive officers who is a participant in the SERP, the table below sets forth the approximate net present value, determined as of September 30, 2007, of his or her (a) vested termination benefit under the SERP, (b) change–in–control benefit that will vest upon termination of employment as described above following completion of the merger and (c) incremental benefit, if any, attributable to the change–in–control benefit.

| Name | Net Present Value of Currently Vested Benefits | | Net Present Value of Benefits That Will Vest Upon Termination of Employment Following Completion of the Merger | | Net Present Value of Incremental Benefits | |
|---|---|---|---|---|---|---|
| Sidney Harman | $ | 10,241,710 | $ | 10,241,710 | $ | 0 |
| Kevin Brown | | 0 | | 1,442,213 | | 1,442,213 |
| Blake Augsburger | | 0 | | 485,091 | | 485,091 |
| Gina Harman | | 2,841,355 | | 1,827,648 | | 0 |
| Sandra B. Robinson | | 2,194,718 | | 1,169,969 | | 0 |
| Edwin Summers | | 0 | | 1,303,422 | | 1,303,422 |

*Deferred Compensation Plan.* Harman maintains a deferred compensation plan (the "DCP"). Prior to the beginning of each fiscal year, each DCP participant may elect to defer up to 100% of his or her annual base salary and bonus on a pre–tax basis to a deferral account. These amounts are always fully vested, subject to a 10% penalty on any unscheduled withdrawals.

59

For each of Harman's executive officers who is a participant in the DCP, the table below sets forth the approximate value, determined as of May 28, 2007, of his or her vested benefits under the DCP. None of Harman's executive officers has unvested benefits under the DCP.

| Name | Approximate Total Value |
|------|------------------------:|
| Sidney Harman | $ 0 |
| Kevin Brown | 111,240 |
| Blake Augsburger | 0 |
| Erich Geiger | 5,280,693 |
| Gina Harman | 0 |
| Sandra B. Robinson | 187,946 |
| Helmut Schinagel | 0 |
| Edwin Summers | 215,263 |

*Security for Certain Payments.*    Harman has entered into trust agreements to secure its obligations under the SERP and the DCP in the event of a potential change in control of Harman. These trust agreements required Harman, within 30 days following the occurrence of a potential change in control of Harman, to deposit in these trusts amounts sufficient to secure payment of its obligations under the SERP and the DCP and to provide for certain related expenses. Harman's entering into the merger agreement constituted a potential change in control of Harman for this purpose. As a result, Harman has contributed $19,959,417 million to secure payment of its obligations under the SERP and the DCP to these trusts for the benefit of the participants of each plan.

In the event of a change in control of Harman, Harman is required to indemnify the plan participant for any expenses incurred in enforcing his or her rights under the DCP, SERP and severance agreements. Under the SERP and the severance agreements, Harman is required to deposit at least $500,000 and at least $1,000,000, respectively, into a trust in order to secure payment of Harman's obligations to indemnify the applicable person for expenses incurred to enforce rights under the SERP and the severance agreements.

## New Arrangements with Parent and Merger Sub

The Sponsors required that Dr. Harman enter into an election agreement with Parent whereby he has agreed to irrevocably elect to receive Parent shares in exchange for at least 1,700,000 shares of Harman common stock he beneficially owns, subject to the same proration as is applicable to all other electing Harman stockholders and option holders. See "Election Agreement" on page 106 for more information regarding the election agreement.

At the Sponsors' request, Dr. Harman expects to be a director and Executive Chairman of Parent following completion of the merger. However, Dr. Harman is not obligated to serve in these positions, nor is Parent obligated to retain him in these positions or any other capacity. As of the date of this proxy statement/prospectus, Dr. Harman and the Sponsors have not discussed the terms on which he will serve as an officer or director of Parent following the completion of the merger.

On May 8, 2007, Harman entered into a letter agreement with Dinesh Paliwal pursuant to which Mr. Paliwal will become President, Chief Executive Officer and Vice Chairman of Harman effective July 1, 2007. Under this agreement, Mr. Paliwal will receive awards of options, restricted stock and restricted stock units, and become entitled to participation in various Harman benefit plans, including the SERP. The letter agreement and the related severance agreement and equity award agreements provide that Mr. Paliwal will not be entitled to severance compensation in connection with the change−in−control of Harman resulting from the merger.

60

In connection with his employment by Harman, Mr. Paliwal entered into an agreement with Parent under which Mr. Paliwal and Parent agreed to certain changes to the terms of his employment with Harman following the merger. The letter agreement between Parent and Mr. Paliwal is effective upon the merger and terminates in the event the merger agreement terminates. The board of directors of Harman was informed of the terms of the letter agreement between Parent and Mr. Paliwal prior to approving Mr. Paliwal's letter agreement with Harman. For additional information regarding the terms of Mr. Paliwal's employment with Harman following the merger, see "Control and Management of Parent—Certain Relationships and Related Party Transactions—Arrangements Between Parent and Dinesh Paliwal" beginning on page 126.

Except as described above, as of the date of this proxy statement/prospectus, none of Harman's executive officers has entered into any agreement, arrangement or understanding with KKR, GSCP or Parent or any of their respective affiliates regarding employment with, or the right to purchase or participate in the equity of, the surviving corporation. Parent has informed Harman that it intends to retain members of Harman's existing management team after the merger is completed. Parent expects that members of Harman's management will engage in discussions with representatives of Parent regarding continued employment. Harman believes that these persons are likely to enter into new arrangements with Parent, Merger Sub or their affiliates regarding employment with, and the right to purchase or participate in the equity of, Parent or the surviving corporation. Parent has informed Harman that it intends to adopt equity–based incentive compensation plans for Harman's management following completion of the merger. Parent has not yet finalized which members of Harman's management will have an opportunity to make an equity investment in Parent in addition to the opportunity given to all Harman stockholders generally to elect to receive shares of Parent common stock in the merger. Parent anticipates that any such equity investment may be made by paying cash for shares of Parent common stock, by not exercising outstanding Harman options or exchanging Harman restricted stock units but instead having them converted into options or restricted stock units with respect to Parent, or by participating in any equity–based incentive compensation plan for management of the surviving corporation. All of the foregoing matters are subject to future negotiation and no terms or conditions of these arrangements have yet been discussed or finalized.

### Director and Officer Indemnification and Insurance

For a period of six years from the date of the merger agreement, Parent has agreed to maintain all indemnification provisions in the charter documents and by–laws of Harman and its subsidiaries. Parent will also maintain all indemnification agreements of Harman and its subsidiaries with current or former directors, officers or employees. Parent has also agreed to indemnify and hold harmless, and provide advancement of expenses to, all current and former directors and officers of Harman and its subsidiaries, in their capacity as such, to the fullest extent permitted by law.

For a period of six years after completion of the merger, Parent has also agreed to maintain the current policies of directors' and officers' liability insurance maintained by Harman or policies of at least the same coverage and amounts containing terms and conditions that are no less advantageous, with respect to claims arising from facts or events that occurred on or before completion of the merger. However, Parent will not be required to pay annual premiums in any one policy year in excess of 300% of the last annual premium paid by Harman prior to the date of the merger agreement.

### Employee Benefits

Parent has agreed to provide, through December 31, 2008, Harman's current employees with non–equity based compensation that is no less favorable than Harman provides immediately prior to the completion of the merger. Parent has also agreed to cause the surviving corporation to honor all obligations under Harman's existing benefit plans and to recognize past service for purposes of

61

participation and benefit accrual generally. See "The Merger Agreement—Employee Benefits" beginning on page 95.

### Certain Director Compensation

Edward H. Meyer, Ann M. Korologos and Shirley M. Hufstedler, non–management members of Harman's board of directors, will each receive a fee for serving on a special committee formed by the Harman board to consider the proposal made by KKR that led to Harman entering into the merger agreement. Mr. Meyer will receive $150,000 for serving as chairman of the special committee and Ms. Korologos and Ms. Hufstedler will each receive $125,000. These committee fees were not contingent upon Harman entering into the merger agreement or consummating a similar transaction and are not contingent upon completion of the merger.

### Opinion of Financial Advisor to Harman

In accordance with the terms of an engagement letter between Harman and Bear Stearns, Harman engaged Bear Stearns as its financial advisor in connection with the merger. In selecting Bear Stearns, Harman's board of directors considered, among other things, the fact that Bear Stearns is an internationally recognized investment banking firm with substantial experience providing strategic advisory services and Bear Stearns' familiarity with Harman and its businesses. Bear Stearns, as part of its investment banking business, is continuously engaged in the evaluation of businesses and their debt and equity securities in connection with mergers and acquisitions; underwritings, private placements and other securities offerings; senior credit financings; valuations and general corporate advisory services.

At a meeting of Harman's board of directors held on April 26, 2007, at which the Harman board of directors considered and approved the merger agreement and the merger, Bear Stearns rendered its oral opinion (which was subsequently confirmed in a written opinion, dated April 26, 2007) that, as of such date and based upon and subject to the matters reviewed with Harman's board of directors and the assumptions and limitations contained in the written Bear Stearns opinion, the Cash Consideration was fair, from a financial point of view, to the stockholders of Harman.

**The full text of the Bear Stearns opinion is attached to this proxy statement/prospectus as Annex B. The description of the Bear Stearns opinion set forth herein is qualified in its entirety by reference to the full text of the Bear Stearns opinion. Harman stockholders are urged to read the Bear Stearns opinion in its entirety for a description of the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken by Bear Stearns in connection with the opinion. The Harman board of directors did not impose any limitations on the review undertaken by Bear Stearns. The Bear Stearns opinion is subject to the assumptions and conditions contained in the written opinion and is necessarily based on economic, market and other conditions and the information made available to Bear Stearns as of the date of the Bear Stearns opinion. Bear Stearns assumes no responsibility for updating or revising its opinion based on circumstances or events occurring after the date of the Bear Stearns opinion. The Bear Stearns opinion is intended for the benefit and use of the board of directors of Harman and does not constitute a recommendation to the board of directors of Harman or any holders of Harman common stock as to how to vote or take any other action in connection with the merger or otherwise. In addition, Bear Stearns does not express any opinion, view or recommendation as to whether any stockholder of Harman should make or not make an election to receive Parent common stock. The Bear Stearns opinion did not address Harman's underlying business decision to pursue the merger, the relative merits of the merger as compared to any alternative business strategies that might have existed for Harman, the financing of the merger or the effects of any other transaction in which Harman might engage.**

In the course of performing Bear Stearns' review and analyses for rendering its opinion, Bear Stearns:

- reviewed drafts of the merger agreement, related disclosure letters and election agreement, each dated April 25, 2007;

- reviewed Harman's Annual Reports to Stockholders and Annual Reports on Form 10–K for the fiscal years ended June 30, 2004, 2005 and 2006, its Quarterly Reports on Form 10–Q for the periods ended September 30, 2006 and December 31, 2006, its preliminary results for the quarter ended March 31, 2007 and its Current Reports on Form 8–K filed since June 30, 2006;

- reviewed certain operating and financial information relating to Harman's business and prospects, including projections for the seven years ending June 30, 2013 and any updates thereto, all as prepared and provided to Bear Stearns by Harman's management;

- met with certain members of Harman's senior management to discuss Harman's business, operations, historical and projected financial results and future prospects;

- reviewed the historical prices, trading multiples and trading volume of the common stock of Harman;

- reviewed publicly available financial data, stock market performance data and trading multiples of companies which Bear Stearns deemed generally comparable to Harman;

- reviewed the terms of recent mergers and acquisitions involving companies which Bear Stearns deemed generally comparable to Harman;

- performed discounted cash flow analyses based on the projections for Harman furnished to Bear Stearns; and

- conducted such other studies, analyses, inquiries and investigations as Bear Stearns deemed appropriate.

Bear Stearns relied upon and assumed, without independent verification, the accuracy and completeness of the financial and other information provided to or discussed with Bear Stearns by Harman or obtained by Bear Stearns from public sources, including, without limitation, the projections referred to above. With respect to the projections, Bear Stearns relied on representations that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the senior management of Harman as to the expected future performance of Harman. Bear Stearns has not assumed any responsibility for the independent verification of any such information, including the projections, and Bear Stearns has further relied upon the assurances of the senior management of Harman that they are unaware of any facts that would make the information and projections incomplete or misleading.

In arriving at its opinion, Bear Stearns has not performed or obtained any independent appraisal of the assets or liabilities (contingent or otherwise) of Harman, nor has Bear Stearns been furnished with any such appraisals. In connection with its engagement, Bear Stearns was not authorized to and did not solicit any expressions of interest from any other parties with respect to the sale of all or any part of Harman or any other alternative transaction involving Harman prior to the announcement of the merger, but Harman and its advisors were permitted in accordance with the merger agreement to do so following the execution of the merger agreement until 11:59 p.m., New York City time, on June 15, 2007, subject to the terms set forth therein. Bear Stearns has assumed that the merger will be consummated in a timely manner and in accordance with the terms of the merger agreement without any limitations, restrictions, conditions, amendments or modifications, regulatory or otherwise, that collectively would have a material effect on Harman.

Bear Stearns does not express any opinion as to the price or range of prices at which the shares of common stock of (a) Harman may trade subsequent to the announcement of the merger or (b) Parent may trade or be valued following the completion of the merger.

*Summary of Financial Analyses*

The following is a summary of the material financial and comparative analyses deemed appropriate by Bear Stearns for this type of transaction and that were performed by Bear Stearns in connection with the rendering of its fairness opinion to the Harman board of directors. Some of the financial analyses summarized below include information presented in tabular format. In order to understand fully Bear Stearns' financial analyses, the tables must be read together with the text of the summary. The tables alone are not a complete description of the financial analyses. Considering the tables alone could create a misleading or incomplete view of Bear Stearns' financial analyses.

For purposes of Bear Stearns' review, Bear Stearns utilized, among other things, projections of the future financial performance of Harman for fiscal years 2007–2012 from the annual long–term business plan prepared by the management of Harman in the ordinary course and approved by the board of directors in August 2006. Bear Stearns did not utilize in its analyses projections for financial performance for fiscal year 2013 from the annual long–term business plan based on management's explanation that the projections for fiscal year 2013 were prepared with a level of information that was less reliable than was the case with the projections for the earlier fiscal years. Bear Stearns also considered in its analysis, as it deemed appropriate, (a) the mid–year update to the annual long–term business plan, prepared by the management of Harman in the ordinary course in January 2007 with projections of certain items for fiscal years 2007–2009 and (b) other information provided by Harman management about various ongoing discussions with major customers, investments and other financial issues and senior management's preliminary assessments about potential future business opportunities, including the potential additional automotive revenue opportunities for fiscal years 2010–2013. See "—Forecasted Financial Information" beginning on page 68.

*Discounted Cash Flow Analysis.*    The "discounted cash flow," or "DCF," methodology calculates the sum of the present values of all future periodic cash flows plus an assumed terminal value of an enterprise, taking into account the amount and timing of future projected unlevered free cash flows to be generated by the enterprise. The DCF approach requires that certain assumptions be made regarding, among other things, future cash flows, discount rates and terminal values. Bear Stearns performed a DCF analysis on the annual long–term business plan projections as provided by Harman through fiscal year 2012 (the "Terminal 2012 DCF"). Bear Stearns discounted the unlevered free cash flows for the period ending June 30, 2012 to March 31, 2007 using a weighted average cost of capital, or WACC, ranging from 10.5% to 12.5%. For purposes of this analysis, Bear Stearns assumed earnings before interest, taxes, depreciation and amortization ("EBITDA") multiples ranging for 8.5x to 9.5x in calculating Harman's terminal value. Based upon the foregoing assumptions, the Terminal 2012 DCF resulted in a standalone equity value per share ranging from $94.26 to $111.02.

Bear Stearns also performed a DCF analysis on the annual long–term business plan projections through fiscal year 2010 (the "Terminal 2010 DCF") in order to assess the impact on the standalone equity value per share if Harman were to experience higher rates of growth from the end of 2010 (when growth rates in the annual long–term business plan projections used in the Terminal 2012 DCF begin to decline). Bear Stearns discounted the unlevered free cash flows at a WACC ranging from 10.5% to 12.5% and assumed a terminal 2010 EBITDA multiple range of 9.5 to 11.5x. Based upon the foregoing assumptions, the Terminal 2010 DCF resulted in a standalone equity value per share ranging from $99.07 to $122.60.

*Selected Comparable Public Companies Analysis.*    Bear Stearns reviewed and analyzed selected personal navigation device ("PND") vendors, suppliers to the automotive original equipment

64

manufacturers ("OEMs") and consumer electronics companies that it viewed as potentially relevant benchmarks based on Bear Stearns' knowledge of these markets. In performing these analyses, Bear Stearns reviewed and analyzed certain financial information including equity value, enterprise value (equity value plus debt and minority interest and less cash and unconsolidated investments), revenue, EBITDA and earnings per share ("EPS") valuation multiples and market trading data relating to Harman and compared such information to the corresponding information of the selected comparable companies.

Specifically, Bear Stearns compared Harman to PND vendors, publicly traded automotive OEM suppliers and consumer electronics companies. Bear Stearns also separately compared Harman to the three companies which Bear Stearns viewed as most comparable from within these three groups: Garmin Ltd., TomTom NV and Gentex Corporation. The selected comparable companies were:

**PND Vendors**
• Garmin Ltd.
• TomTom NV

**Selected OEM Suppliers**
• Gentex Corporation
• Alpine Electronics, Inc.
• Autoliv, Inc.
• Denso Corporation

**Selected Consumer Electronics Companies**
• Matsushita Electric Industrial Co., Ltd.
• Koninklijke Philips Electronics NV
• Apple Inc.
• D&M Holdings, Inc.
• Samsung Corporation
• Sony Corporation

Bear Stearns reviewed the enterprise value as of April 24, 2007 as a multiple of calendar year ("CY") 2007 and 2008 estimated revenue and estimated EBITDA, and reviewed share prices as of

65

April 24, 2007 as a multiple of estimated EPS, also referred to as "P/E", for each of these comparable companies.

| Company | Enterprise Value/ Revenue(1) | | Enterprise Value/ EBITDA(1) | | P/E(2) | |
|---|---|---|---|---|---|---|
| | CY 2007E | CY 2008E | CY 2007E | CY 2008E | CY 2007E | CY 2008E |
| **PND Vendors** | | | | | | |
| High | 4.44x | 3.59x | 15.4x | 14.0x | 19.3x | 17.5x |
| Low | 1.67 | 1.44 | 7.5 | 6.9 | 12.2 | 11.2 |
| Mean | 3.05 | 2.52 | 11.4 | 10.4 | 15.8 | 14.3 |
| **Selected OEM Suppliers** | | | | | | |
| High | 3.53x | 3.22x | 13.0x | 11.9x | 21.8x | 20.2x |
| Low | 0.50 | 0.48 | 6.3 | 5.8 | 14.8 | 13.0 |
| Mean | 1.47 | 1.36 | 8.1 | 7.4 | 18.0 | 16.1x |
| **Selected Consumer Electronics Companies** | | | | | | |
| High | 2.78x | 2.25x | 16.8x | 13.9x | 27.4x | 23.0x |
| Low | 0.49 | 0.48 | 5.5 | 5.1 | 11.2 | 9.9 |
| Mean | 1.17 | 1.16 | 9.9 | 8.5 | 20.5 | 17.7 |
| **Most Relevant Companies** | | | | | | |
| High | 4.44x | 3.59x | 15.4x | 14.0x | 21.8x | 20.2x |
| Low | 1.67 | 1.44 | 7.5 | 6.9 | 12.2 | 11.2 |
| Mean | 3.21 | 2.75 | 12.0 | 10.9 | 17.8 | 16.3 |
| **Cash Consideration** | 2.15x | 1.91x | 12.3x | 11.2x | 25.1x | 22.4x |

(1)      Source: Public filings of the companies and selected Wall Street research.

(2)      Source: First Call. Information with respect to companies with fiscal years not ending December 31 has been revised to reflect a calendar year.

***Selected Precedent Merger and Acquisition Transactions.***   Bear Stearns reviewed the enterprise value multiples for the acquired companies in the precedent merger and acquisition transactions referred to below as a multiple of revenue and as a multiple of EBITDA for the 12–month period (for which financial information was publicly available) preceding the announcement of the transaction ("LTM Revenue" and "LTM EBITDA") and for the 12–month period (for which financial information was publicly available) following the announcement of the transaction ("NTM Revenue" and "NTM EBITDA").

The precedent transactions and date of announcement were:

- Crestview Partners, L.P. / Key Safety Systems, Inc.—March 8, 2007

- American Real Estate Partners, L.P. / Lear Corp—February 5, 2007

- Hitachi, Ltd. / Clarion Co., Ltd. (49.2% controlling stake)—October 11, 2006

- Continental AG / Motorola, Inc. (Automotive Electronics Business)—April 3, 2006

- Bain Capital, LLC / Texas Instruments Incorporated (Sensor Business)—January 8, 2006

- Toppoly Optoelectronics Corp. / Royal Philips Electronics (Mobile Display Business)—November 10, 2005

- Hyundai Motor Co. and Siemens AG / Hyundai–Autonet Co., Ltd. (43.24% controlling stake)—December 1, 2004

- Lear Corp. / GHW Grote & Hartmann GmbH—April 5, 2004

- Siemens VDO Automotive Electronics Corporation / Chrysler Group (Huntsville Electronics Operations)—February 9, 2004

- Johnson Controls, Inc. / Borg Instruments AG—June 4, 2003

- Magna International Inc. / Donnelly Corp.—June 25, 2002

- Johnson Controls, Inc. / Sagem SA (Automotive Electronics Business)—July 25, 2001

- Delphi Corp. / Eaton Corp. VSED—March 12, 2001

Bear Stearns calculated the following multiples for the selected transactions used in this analysis:

|  | Enterprise Value/LTM | | Enterprise Value/NTM | |
|---|---|---|---|---|
|  | Revenue | EBITDA | Revenue | EBITDA |
| High | 2.8x | 10.7x | 2.6x | 9.8x |
| Low | 0.3 | 4.7 | 0.3 | 5.2 |
| Mean | 1.0 | 7.7 | 0.9 | 7.6 |
| **Cash Consideration** | **2.3** | **15.1** | **2.1** | **11.7** |

No company or transaction utilized in the selected comparable public companies or precedent transactions analysis is identical to Harman or the merger. Furthermore, based on an analysis of the recent merger and acquisition transactions, Bear Stearns believes that none of the transactions provides a direct benchmark against which to evaluate the proposed merger. Therefore, while Bear Stearns included a broader group of 13 transactions including producers of automotive electronics and other parts due to their similarities with respect to customer base, sales cycle and revenue visibility, the acquired companies had significant differences from Harman and, therefore, Bear Stearns believed these transactions to be of limited direct comparability to the merger.

In connection with rendering its opinion, Bear Stearns performed a variety of financial analyses. The preparation of a fairness opinion is a complex process and involves various judgments and determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods to the particular circumstances and, therefore, such an opinion is not readily susceptible to a partial analysis or summary description. Bear Stearns arrived at its ultimate opinion based on the results of all analyses undertaken by it and assessed as a whole and believes that the totality of the factors considered and analyses performed by Bear Stearns in connection with its opinion operated collectively to support its determination as to the fairness of the Cash Consideration to the stockholders of Harman. Accordingly, notwithstanding the analyses summarized above, Bear Stearns believes that its analyses must be considered as a whole and that selecting portions of the analyses and factors considered by them, without considering all such analyses, provides an incomplete view of the evaluation process underlying the Bear Stearns opinion. Bear Stearns did not assign any specific weight to any of the analyses described above and did not draw any specific conclusions from, or with regard to, any one method analysis.

In performing its analyses, Bear Stearns considered industry performance, general business and economic conditions and other matters, many of which are beyond the control of Harman and Bear Stearns. The analyses performed by Bear Stearns are not necessarily indicative of the actual values or actual future results, which may be significantly more or less favorable than suggested by such analyses. Accordingly, such analyses are inherently subject to substantial uncertainty. The foregoing summary does not purport to be a complete description of the analyses performed by Bear Stearns.

67

The type and amount of consideration payable in the merger were determined through negotiations between Harman and the Sponsors and approved by the Harman board of directors. The decision to enter into the merger agreement was solely that of the Harman board of directors. The Bear Stearns opinion was one of the many factors taken into consideration by Harman's board of directors. Consequently, Bear Stearns' analysis should not be viewed as determinative of the decision of Harman's board of directors with respect to the approval and adoption of the merger agreement.

Pursuant to the terms of Bear Stearns' engagement letter, Harman agreed to pay Bear Stearns (a) a $3 million "milestone fee" upon the signing of the merger agreement, (b) a fee of $30 million (less the amount of the milestone fee paid) if Harman consummates the merger on the terms currently contemplated, (c) an additional incentive fee of up to $5 million in the event that Harman completes a business combination transaction or enters into or amends an agreement to effect a business combination transaction in which the consideration to be paid for the equity interests of Harman exceeds the consideration proposed to be paid under the merger agreement and (d) 20% of any breakup fee or similar recovery that is paid in connection with the abandonment of the merger (provided that this fee payable to Bear Stearns is limited to no more than 50% of the transaction fee that would have been payable to Bear Stearns if the transaction had been completed). In addition, Harman has agreed to reimburse Bear Stearns for certain reasonable out–of–pocket expenses incurred by Bear Stearns in connection with its engagement and the transactions contemplated by the merger agreement, including reasonable fees and disbursements of its legal counsel. Harman has agreed to indemnify Bear Stearns against certain liabilities arising out of, or in connection with, Bear Stearns' engagement.

Bear Stearns (a) has previously been engaged by Harman and (b) has previously been engaged (and may currently be engaged) by Parent's affiliates, in each case to provide investment banking and other services on matters unrelated to the merger, for which we have received (or expect to receive) customary fees. Bear Stearns may seek to provide Harman and Parent and their respective affiliates certain investment banking and other services unrelated to the merger in the future. Bear Stearns and/or certain of its personnel and affiliates may have passive minority investments in certain investment funds managed directly or indirectly by Parent's affiliates, and in portfolio companies of such funds.

Consistent with applicable legal and regulatory requirements, Bear Stearns has adopted policies and procedures to establish and maintain the independence of Bear Stearns' research departments and personnel. As a result, Bear Stearns' research analysts may hold views, make statements or investment recommendations and/or publish research reports with respect to Harman, the merger and other participants in the merger that differ from the views of Bear Stearns' investment banking personnel.

In the ordinary course of business, Bear Stearns and its affiliates may actively trade for its own account and for the account of its customers equity and debt securities, bank debt and/or other financial instruments issued by Harman and its or Parent's affiliates, as well as derivatives thereof, and, accordingly, may at any time hold long or short position in such securities, bank debt, financial instruments and derivatives.

## Forecasted Financial Information

In connection with the Sponsors' due diligence review of Harman and negotiations among the parties, Harman provided the Sponsors with certain non–public business and financial information about Harman contained in Harman's annual long–term business plan and mid–year update to that plan, each of which forecasts Harman's future financial performance. Harman also provided its financial advisor, Bear Stearns, with these forecasts in connection with its financial analysis of the merger consideration and Bear Stearns considered these forecasts in preparing the financial analysis it presented to Harman's board of directors (see "—Opinion of Financial Advisor to Harman" beginning on page 62). Neither of these forecasts gives effect to the merger.

68

Harman is including a summary of these forecasts in this proxy statement/prospectus to give Harman stockholders access to certain non–public information considered by the Sponsors and their advisors for purposes of considering and evaluating the merger, and by Bear Stearns for purposes of analyzing the cash consideration. The inclusion of this information in this proxy statement/prospectus should not be regarded as an indication that Parent, Merger Sub, Harman's board of directors, the Sponsors or Harman considered, or now considers, this information to be a reliable prediction of future results.

The mid–year update forecasts are summarized below (dollars in millions, other than per share amounts; references to years are to the June 30 fiscal years of Harman):

|  | 2007E | 2008E | 2009E |
|---|---|---|---|
| Net Sales | $ 3,526 | $ 4,025 | $ 4,477 |
| Gross Profit | $ 1,228 | $ 1,274 | $ 1,379 |
| Operating Profit | $ 428 | $ 468 | $ 542 |
| Net Income | $ 288 | $ 310 | $ 359 |
| Diluted EPS | $ 4.35 | $ 4.79 | $ 5.49 |

The mid–year update was based on the following material assumptions:

- Harman used summary data submitted by its business units in January 2007 to update the 2007–2009 forecast.

- Harman prepared the forecast in January 2007 based upon information available to Harman at that time.

- Harman assumed an exchange rate of 1 Euro = 1.30 U.S. dollar.

- Harman assumed approximately 66.0 million, 64.8 million and 65.4 million shares outstanding for 2007, 2008 and 2009, respectively.

- Harman assumed it would incur approximately $46 million of research and development costs in fiscal year 2008 over the amount previously budgeted to support new business awards and development of new technologies.

The annual long–term business plan forecasts are summarized below (dollars in millions, other than per share amounts; references to years are to the June 30 fiscal years of Harman):

|  | 2006A | 2007E | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E |
|---|---|---|---|---|---|---|---|---|
| Net Sales | $ 3,248 | $ 3,519 | $ 3,996 | $ 4,458 | $ 4,895 | $ 5,297 | $ 5,700 | $ 5,923 |
| Gross Profit | $ 1,153 | $ 1,242 | $ 1,336 | $ 1,447 | $ 1,588 | $ 1,730 | $ 1,881 | $ 1,956 |
| Operating Profit | $ 397 | $ 448 | $ 520 | $ 597 | $ 672 | $ 734 | $ 810 | $ 842 |
| Net Income | $ 255 | $ 298 | $ 345 | $ 395 | $ 444 | $ 485 | $ 535 | $ 557 |
| Diluted EPS | $ 3.75 | $ 4.35 | $ 4.99 | $ 5.73 | $ 6.44 | $ 7.03 | $ 7.76 | $ 8.07 |

The annual long–term business plan was based on the following material assumptions:

- Harman used data submitted by its business units to prepare the annual long–term business plan in August 2006.

- Harman prepared the forecast in August 2006 based upon information available to Harman at that time.

- Harman assumed an exchange rate of 1 Euro = 1.25 U.S. dollar.

- Harman assumed approximately 68.5 million shares outstanding for 2007 and 69.0 million shares outstanding for 2008 through 2013.

- The forecast was prepared before Harman received automotive awards requiring it to incur additional research and development costs to support the new business.

    In addition, in the course of the Sponsors' due diligence review of Harman and negotiations among the parties, the Sponsors raised questions regarding the sales forecasts reflected in the annual long–term business plan for Harman's fiscal years 2010 through 2013, given that the more recent mid–year update only covered fiscal years 2007 through 2009. In response to these questions, management prepared and provided to the Sponsors and to Bear Stearns adjustments to forecasted automotive revenues in fiscal years 2010 through 2013 to reflect new awards that were included in the mid–year update and the declines in certain forecasted business that occurred following the preparation of the annual long–term plan. These updates showed a net reduction to the forecasted revenue amounts reflected in the annual long–term plan by approximately $(10) million, $(91) million, $(124) million and $(195) million for fiscal years 2010 through 2013, respectively. Also in response to the Sponsors' due diligence inquiries, Harman's management prepared and provided to the Sponsors and to Bear Stearns a preliminary view on possible sources of additional automotive revenue for Harman's fiscal years 2010 through 2013. In that regard, management explained their view that potential revenue opportunities could arise in the form of achieving new business from existing customers, attracting new customers and from nascent technologies that were yet to be developed. These potential incremental automotive revenue opportunities were estimated to be approximately $15 million, $185 million, $685 million and $1,738 million for fiscal years 2010 through 2013, respectively. These potential revenue opportunities are speculative. In addition to their uncertain nature, these revenue opportunities were developed during a brief period of time in the context of conducting negotiations with the Sponsors (in contrast to the long–term business plan and mid–year update, both of which were developed by management and reviewed with the board in the ordinary course of Harman's planning process), do not include any estimates of the substantial research and development, capital expenditures and other costs necessary to attempt to achieve these longer–term revenue opportunities (that would, among other things, reasonably be expected to decrease Harman's earnings below forecasted levels in the near term), do not include any analysis of offsetting potential future revenue shortfalls and do not include any estimate of the operating costs that would be associated with achieving such revenues. The Sponsors viewed these revenue opportunities in this context and therefore discounted their significance and Bear Stearns did not incorporate these revenue opportunity estimates into its discounted cash flows analysis. Harman's management did not prepare, and was not requested to prepare, any similar information with respect to the non–automotive businesses of Harman.

*Important Information About the Forecasts*

These forecasts were not prepared with a view towards public disclosure or compliance with published guidelines of the SEC, the guidelines established by the American Institute of Certified Public Accountants for Prospective Financial Information or generally accepted accounting principles in the United States (GAAP). Harman's independent registered public accounting firm has not examined or compiled any of these forecasts or expressed any conclusion or provided for any form of assurance with respect to the forecasts and, accordingly, assume no responsibility for them. You are cautioned not to place undue reliance on these forecasts.

These forecasts constitute forward–looking statements and involve numerous risks and uncertainties. While presented with numerical specificity, these forecasts reflect numerous estimates and assumptions, many of which are inherently uncertain and subject to change and may not be realized. In addition, factors such as industry performance and general business, economic, regulatory, market and financial conditions, including the factors described under the caption "Cautionary Statement Regarding Forward–Looking Statements," all of which are difficult to predict, may cause these forecasts or the underlying assumptions to be inaccurate. Accordingly, there can be no assurance that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Because the forecasts cover multiple years, this information by its nature becomes less predictive with each successive year. Neither Harman nor any of its affiliates, advisors or representatives has made or makes any representation to any stockholder regarding its ultimate performance compared to the information contained in these forecasts. Except to the extent required under applicable securities laws, Harman does not intend to update or otherwise revise any of these forecasts to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even in the event any or all of the assumptions underlying these forecasts are shown to be in error.

### Financing of the Merger

Assuming the Harman stockholders and option holders make stock elections such that they would receive 8,333,333 shares of Parent common stock in the aggregate (the maximum number of shares Parent will issue pursuant to elections made by Harman stockholders and option holders), Parent estimates that the total amount of funds necessary to complete the proposed merger and the related transactions to be approximately $7.3 billion. This amount includes approximately $7.0 billion to be paid to Harman stockholders and holders of stock options and other stock–based awards made by Harman. Assuming the Harman stockholders and option holders make no valid elections to receive shares of Parent common stock other than the 1,700,000 shares for which Dr. Harman has agreed to make an election, Parent estimates that the total amount of funds necessary to complete the proposed merger and related transactions to be $8.3 billion. This amount includes approximately $7.8 billion to be paid to Harman stockholders and holders of stock options and other stock–based awards made by Harman. The remainder, in each case, will be used to repay and refinance existing indebtedness, and to pay customary fees, premiums and expenses in connection with the merger, the financing arrangements and related transactions.

Under the merger agreement, Parent is obligated to use its reasonable best efforts to obtain the financing described below on the terms and subject to the conditions described in the related financing commitment letters or on terms that would not adversely impact the ability of Parent or Merger Sub to timely consummate the transactions contemplated by the merger agreement. In the event that Parent becomes aware of any event or circumstance that makes receipt of any portion of the financing unlikely to occur on the terms and conditions contemplated by the financing commitment letters, Parent must notify Harman and use its reasonable best efforts to arrange to obtain alternative financing for that portion from alternative debt financing sources on terms and conditions that are no less favorable to Parent and Merger Sub and no more adverse to the ability of Parent to complete the merger (in each

case, as determined in the reasonable judgment of Parent) than as contemplated by the merger agreement as promptly as practicable following the occurrence of such event but no later than one day prior to the closing date of the merger. See "The Merger Agreement—Financing Commitments; Cooperation" beginning on page 93 for more information.

The following arrangements are intended to provide the necessary financing for the merger:

### Debt Financing

Merger Sub has received a debt commitment letter from Bank of America, N.A. ("Bank of America"), Banc of America Bridge LLC ("Banc of America Bridge"), Banc of America Securities LLC ("BAS"), Credit Suisse ("CS"), Credit Suisse Securities (USA) LLC ("CS Securities"), Goldman Sachs Credit Partners L.P. ("GS Credit Partners"), Goldman, Sachs & Co. ("Goldman"), Lehman Commercial Paper Inc., Lehman Brothers Commercial Bank (collectively, including any of their affiliates, the "Lehman Lenders") and Lehman Brothers Inc. ("Lehman") (collectively, Bank of America, Banc of America Bridge, CS, GS Credit Partners and the Lehman Lenders, the "Debt Financing Sources") pursuant to which, subject to the conditions set forth therein:

- each of the Debt Financing Sources has severally and not jointly committed to provide to Merger Sub initially, and Harman as the surviving corporation in the merger, upon completion of the merger, up to $3.45 billion of senior secured credit facilities, for the purpose of financing the merger, repaying or refinancing certain existing indebtedness of Harman, paying fees, premiums and expenses incurred in connection with the merger and providing ongoing working capital and for other general corporate purposes of Harman upon completion of the merger (each of Bank of America, CS, GS Credit Partners and the Lehman Lenders committing up to 26.5%, 21.0%, 29.0% and 23.5%, respectively);

- each of the Debt Financing Sources has severally and not jointly committed to provide to Merger Sub initially, and Harman, as the surviving corporation in the merger, upon completion of the merger, if up to $1.16 billion of senior unsecured notes are not issued on or prior to the initial funding of the senior secured facilities, up to $1.16 billion of senior unsecured increasing rate loans under a bridge facility, for the purpose of financing the merger, repaying or refinancing certain existing indebtedness of Harman and paying fees, premiums and expenses incurred in connection with the merger (each of Banc of America Bridge, CS, GS Credit Partners and the Lehman Lenders committing to 26.5%, 21.0%, 29.0% and 23.5%, respectively); and

- each of the Debt Financing Sources has severally and not jointly committed to provide to Merger Sub initially, and Harman, as the surviving corporation in the merger, upon completion of the merger, if up to $580 million of senior subordinated notes are not issued on or prior to the initial funding of the senior secured facilities, up to $580 million of senior subordinated increasing rate loans under a bridge facility, for the purpose of financing the merger, repaying or refinancing certain existing indebtedness of Harman and paying fees, premiums and expenses incurred in connection with the merger (each of Banc of America Bridge, CS, GS Credit Partners and the Lehman Lenders committing to 26.5%, 21.0%, 29.0% and 23.5%, respectively).

The debt commitments expire on March 11, 2008. The documentation governing the senior secured credit facilities and the bridge facilities has not been finalized. Accordingly, the actual terms of such facilities may differ from those described in this proxy statement/prospectus. As of the date of this proxy statement/prospectus, no alternative financing arrangements or alternative financing plans have been made in the event the debt financing described herein is not available as anticipated.

***Conditions Precedent to the Debt Commitments.***    The availability of the senior secured credit facilities and the bridge facilities is subject to the satisfaction or waiver of a number of conditions, including:

- the completion of the merger in accordance with the terms of the merger agreement without any provision thereof having been waived or amended in a manner materially adverse to the lenders without the reasonable consent of the lead arrangers;

- the execution and delivery of definitive documentation, closing certificates, solvency certificates, charter documents and legal opinions with respect to the senior credit facilities and bridge facilities;

- the accuracy of certain representations made by Harman in the merger agreement that are material to the interests of the lenders, but only to the extent that Merger Sub has the right to terminate its obligations in the merger agreement as a result of a breach thereof, and the accuracy of certain representations relating to corporate existence, power and authority, enforceability of obligations, margin regulations and the Investment Company Act;

- the completion of the equity contributions;

- the expiration of a marketing period for the lead arrangers to seek to offer and sell or privately place the senior unsecured notes and senior subordinated notes consistent with the definition of "Marketing Period" in the merger agreement;

- absence of any competing issues of debt securities or commercial bank or other credit facilities being offered, placed or arranged (other than the high–yield notes) prior to and during the syndications of the senior secured credit facilities or bridge facilities if such securities or facilities would have, in the reasonable judgment of the lead arrangers, a detrimental effect upon the primary syndication;

- delivery of certain audited, unaudited and pro forma financial statements of Harman;

- delivery of documentation and information required by regulatory authorities under applicable "know your customer" and anti–money laundering rules and regulations, including without limitation, the PATRIOT Act; and

- subject to certain exceptions, the domestic guarantees having been executed by the domestic guarantors described below, and these guarantees being in full force and effect and, with respect to the senior secured facilities, all documents and instruments required to perfect security interests in collateral having been executed and delivered and (if applicable) being in proper form for filing, and none of the collateral being subject to any other pledges, security interest or mortgages, except for certain permitted liens.

***Senior Secured Credit Facilities***

    *General.*    The borrower under the senior secured credit facilities will be Merger Sub initially, and Harman, as the surviving corporation in the merger, upon completion of the merger. Any Euro–denominated tranche may be borrowed by a foreign subsidiary of the borrower organized in Germany or another jurisdiction reasonably acceptable to the Debt Financing Sources. The senior secured credit facilities will be comprised of up to a $2.9 billion senior secured term loan facility with a term of seven years, and a $550 million senior secured revolving credit facility with a term of six years and, at the option of the borrower, a receivables securitization or asset based lending facility, in an aggregate principal amount and on terms to be mutually agreed, which will reduce the aggregate principal amount of the revolving credit facility on a dollar–for–dollar basis. The senior secured term loan facility may, at the option of the borrower, include a Euro–denominated tranche in an amount to be determined (such amount, when combined with any portion of the bridge facilities and notes

73

denominated in Euros and borrowed or issued, cannot exceed 60% of the aggregate principal amount of the senior secured credit facilities and bridge facilities and the notes). The revolving credit facility will include sublimits for the issuance of letters of credit and swingline loans and will be available in U.S. dollars and (subject to the parenthetical in the immediately preceding sentence) Euros.

*Interest Rate and Fees.*    Loans under the senior secured credit facilities are expected to bear interest, at the borrower's option, at (a) a rate equal to LIBOR (London Interbank Offered Rate) (or in the case of loans denominated in Euros, EURIBOR (Euro Interbank Offered Rate)) plus an applicable margin or (b) a rate equal to the higher of (1) the prime rate of Bank of America and (2) the federal funds effective rate plus 0.50%, plus (in either case) an applicable margin. After the completion of the merger, the applicable margins will be subject to decrease pursuant to a leverage–based pricing grid.

In connection with the completion of the merger, Harman will pay customary commitment fees (subject to a decrease based on leverage) and letter of credit fees under the revolving credit facilities. Upon the initial funding of the senior secured credit facilities, Merger Sub has also agreed to pay an underwriting fee to the Debt Financing Sources.

*Prepayments and Amortization.*    The borrower will be permitted to make voluntary prepayments at any time, without premium or penalty (other than LIBOR breakage costs, if applicable), and required to make mandatory prepayments of term loans with (a) if certain leverage ratios to be determined are exceeded, net cash proceeds of non–ordinary course asset sales and insurance and condemnation proceeds (subject to reinvestment rights and other exceptions) and (b) 50% of Harman's excess cash flow (to be defined consistent with Sponsor's precedent) (such percentage subject to decrease based on decreasing leverage). The term loans will also have required interim amortization payments, payable quarterly, with the balance payable at the final maturity date of the term loans.

*Guarantors.*    All obligations under the senior secured credit facilities will be guaranteed by each existing and future direct and indirect, wholly owned domestic subsidiary of Harman (other than certain immaterial subsidiaries to be agreed upon and other subsidiaries treated as unrestricted) and also, in the case of any obligations of foreign borrowers, certain foreign subsidiaries to be determined, in each case only to the extent permitted by applicable law, regulation and contract and to the extent such guarantee would not result in adverse tax or accounting consequences. The delivery of the guarantee of any foreign subsidiary of Harman will not be a condition precedent to the availability of the senior secured credit facilities on the date on which the merger is completed.

*Security.*    The obligations of the borrowers and the guarantors under the senior secured credit facilities will be secured, subject to permitted liens and other agreed upon exceptions, (a) in the case of obligations of domestic borrowers and guarantors, by (1) all the capital stock of the direct, wholly owned subsidiaries owned by Harman and each guarantor (limited, in the case of foreign subsidiaries, to 65% of the voting stock of such subsidiaries) and substantially all present and future tangible and intangible assets of Harman and each other guarantor and (2) perfected security interests in, and mortgages on, substantially all tangible and intangible assets of each domestic borrower and guarantor (subject to certain agreed upon exceptions) and (b) in the case of obligations of foreign borrowers and guarantors, by customary collateral for the applicable jurisdiction to be mutually agreed upon. If the security (other than any domestic stock pledge and any security interest capable of perfection by the filing of a Uniform Commercial Code financing statement) is not provided on the date on which the merger is completed despite the use of commercially reasonable efforts to do so, the delivery of the security will not be a condition precedent to the availability of the senior secured credit facilities on the date on which the merger is completed, but instead will be required to be delivered following such date pursuant to arrangements to be mutually agreed upon.

74

*Other Terms.*    The senior secured credit facilities will contain customary representations and warranties and customary affirmative and negative covenants, including restrictions on indebtedness, liens, investments and acquisitions, sales of assets, mergers and consolidations, dividends and other distributions on, or redemptions of, stock and prepayments of certain subordinated indebtedness. The senior secured credit facilities will not contain a financial maintenance covenant, but the availability of certain baskets and other actions will be subject to compliance with an incurrence test. The senior secured credit facilities will also include customary events of default, including a change of control default.

### High–Yield Debt Financing

Merger Sub is expected to issue (a) $1.16 billion in aggregate principal amount of senior unsecured notes and (b) $580 million in aggregate principal amount of senior subordinated notes (collectively, the "notes"). The senior unsecured notes will be guaranteed on an unsecured senior basis, and the senior subordinated notes will be guaranteed on an unsecured senior subordinated basis, in each case, by each relevant guarantor of the senior secured credit facilities. Upon the completion of the merger, Harman will assume Merger Sub's obligations under the notes. The issuer will be able to elect to pay interest on the senior unsecured notes in cash, by issuing new senior unsecured notes ("PIK interest"), or by paying interest one–half in cash and one–half in PIK interest. At the option of the issuer, a portion of the notes will be denominated in Euros and issued in an aggregate principal amount that, when combined with any portion of the senior secured credit facilities and the bridge facilities denominated in Euros, does not exceed 60% of the aggregate principal amount of the facilities and the notes. Any Euro–denominated tranche may be issued by a foreign subsidiary of the issuer organized in Germany or another jurisdiction reasonably acceptable to the Debt Financing Sources. Initially, the notes will not be registered under the Securities Act and may not be offered or sold in the United States absent registration under, or an applicable exemption from the registration requirements of, the Securities Act. In connection with the issuance of the notes, the issuer will agree to file one or more registration statements with the SEC providing for the registration under the Securities Act of exchange notes that will be exchanged for the notes and will have substantially identical terms as the notes and will be freely tradable. The senior unsecured and senior subordinated notes will be offered to "qualified institutional buyers," as that term is defined in Rule 144A under the Securities Act, and to non–U.S. persons outside the United States in reliance on Regulation S under the Securities Act. Upon the completion of the merger, Harman will assume Merger Sub's obligations under the notes.

### Bridge Facility

If the offering of notes by either Merger Sub or Harman is not completed substantially concurrently with the completion of the merger, each of Banc of America Bridge, CS, GS Credit Partners and the Lehman Lenders severally has committed to provide to Merger Sub or Harman: (a) up to $1.16 billion in loans under a senior unsecured bridge facility and (b) up to $580 million in loans under a senior subordinated bridge facility. Upon the completion of the merger, Harman will be the borrower under the bridge facilities.

If the bridge loans are not paid in full on or before the first anniversary of the completion of the merger, the senior unsecured bridge loans will convert into senior unsecured term loans maturing on the eighth anniversary of the completion of the merger and the senior subordinated bridge loans will convert into senior subordinated term loans maturing on the tenth anniversary of the completion of the merger. Holders of any of these senior unsecured or senior subordinated term loans may choose to exchange such loans for exchange notes maturing on the eighth and tenth anniversary of the completion of the merger, respectively, and also may, if necessary for the sale of such exchange notes to an unaffiliated third party, fix the interest rate on any such exchange notes. The borrower would be

required to register any exchange notes for public resale under a registration statement in compliance with applicable securities laws.

The bridge loans will bear interest at a floating rate equal to LIBOR or EURIBOR plus a spread that increases over time (subject to a cap), and will contain covenants customary for financings of this type, including covenants restricting the ability of the borrower, among other things and subject to exceptions, to incur or repay certain debt, to make dividends, distributions or redemptions and to incur liens. The issuer will be able to elect to pay interest on the senior unsecured bridge loans in cash, by issuing new senior unsecured bridge loans or exchange notes ("PIK bridge interest") or by paying interest one–half in cash and one–half in PIK bridge interest. At the option of the borrower, a portion of the bridge loans will be denominated in Euros and borrowed in an aggregate principal amount that, when combined with any portion of the senior secured credit facilities and notes designated in Euros, does not exceed 60% of the aggregate principal amount of the facilities and notes. Any Euro–denominated tranche may be borrowed by a foreign subsidiary of the issuer organized in Germany or another jurisdiction reasonably acceptable to the Debt Financing Sources.

The borrower will be required to prepay the bridge loans, to prepay or offer to prepay the extended loans and to redeem or offer to purchase the exchange notes under specified circumstances, including upon specified non–ordinary course asset sales or specified incurrences of debt (in each case, with exceptions) and upon a change of control of Harman. The senior unsecured bridge loans will be guaranteed on an unsecured senior basis, and the senior subordinated bridge loans will be guaranteed on an unsecured senior subordinated basis, in each case, by each relevant guarantor of the senior secured credit facilities.

GS Credit Partners, BAS, CS Securities and Lehman have been appointed as joint lead arrangers and joint bookrunners for the bridge facilities. GS Credit Partners (or such other entity mutually agreed to by GS Credit Partners and Merger Sub) will act as the sole administrative agent for the bridge facilities. In addition, additional agents or co–agents for the bridge facilities may be appointed prior to completion of the merger.

*Equity Financing*

Parent has received an equity commitment letter from Holdings pursuant to which, and subject to the conditions contained therein, Holdings has committed to make a capital contribution equal to $3.5 billion to Parent in connection with the completion of the merger. To satisfy Holdings' commitment, Holdings has received an aggregate of $3.5 billion of equity commitments from investment funds affiliated with the Sponsors and from BAS Capital Funding Corporation (an affiliate of Bank of America, N.A.), LB I Group Inc. (an affiliate of Lehman Brothers Holdings Inc.) and Credit Suisse Management LLC. The equity commitments are subject to the satisfaction or waiver by Parent of the conditions to Parent's and Merger Sub's obligations under the merger agreement to effect the closing of the merger.

The actual amount invested by the Sponsors and their co–investors pursuant to the equity commitment letters may be reduced by the elections made by Harman stockholders and option holders as well as the final determination of the costs and expenses associated with the merger. Assuming the Harman stockholders and option holders make elections to receive 8,333,333 shares of Parent common stock in the aggregate, Parent expects that affiliates of the Sponsors will contribute equity of up to $2.7 billion in the aggregate. Assuming no Harman stockholders and option holders make an election to receive shares of Parent common stock (other than Dr. Harman), Parent expects that affiliates of the Sponsors will contribute equity of up to $3.5 billion in the aggregate.

The investment funds affiliated with the Sponsors and their co–investors generally have the right, however, to assign their committed amounts to affiliates and other investors (provided that in the event of assignment, the assigning party will remain obligated for its commitment under the applicable equity

76

commitment letter and the assignment does not result in a breach of certain covenants of the merger agreement). The Sponsors and their co–investors expect to assign a significant portion of their funding obligations to additional investors. As of the date of this proxy statement/prospectus, no assignments of equity commitments have been made.

The equity contributions to be made by the Sponsors and their co–investors will directly or indirectly be made through Holdings, and Holdings will then contribute the aggregate amount of contributions to Parent in exchange for shares of Parent common stock (the number of shares of Parent common stock to be issued to Holdings will be determined by dividing the aggregate amount of equity contributed by Holdings by $120.00, the same per share cash consideration amount that Harman stockholders are entitled to receive in the merger).

### Guarantees; Remedies

In connection with the merger agreement, investment funds affiliated with the Sponsors, which are referred to as the guarantors, provided Harman a guarantee of certain payment obligations of Parent and Merger Sub, including the Parent termination fee described below, up to a maximum amount equal to $225 million in the aggregate. Each of the guarantees or a portion thereof may be assigned in connection with any assignment by a guarantor of a portion of its equity commitment under the applicable equity commitment letter; however no such assignment relieves the guarantor of its obligation to Harman under the guarantee. As of the date of this proxy statement/prospectus, none of the guarantors has assigned any portion of its obligations under the guarantee. The guarantees will remain in full force and effect until the earliest to occur of (a) the effective time of the merger, (b) the one–year anniversary of any termination of the merger agreement provided that the guarantees will not terminate as to any claims that have been made prior to such date until the final resolution of such claim and (c) the termination of the merger agreement in accordance with its terms, in each case, if and when the guarantor has satisfied its obligations under its guarantee in full. However, if Harman brings certain legal claims relating to specified provisions of the guarantee, then (1) the guarantor's obligations under its guarantee will terminate, (2) the guarantor will be entitled to recover any payments made to Harman under its guarantee and (3) none of the guarantors, Parent or Merger Sub will have any liability to Harman with respect to the transactions contemplated by the merger agreement.

Harman cannot seek specific performance to require Parent or Merger Sub to consummate the merger, and Harman's exclusive remedy for the failure of Parent and Merger Sub to consummate the merger is a termination fee of $225 million payable to Harman under the circumstances described under "The Merger Agreement—Termination Fees and Expenses" beginning on page 99.

### Regulatory Approvals

Under the provisions of the HSR Act, the merger may not be completed until notification and report forms have been filed with the FTC and the Antitrust Division and the applicable waiting period has expired or been terminated. On May 9, 2007, Harman and Holdings each filed its notification and report form under the HSR Act with the FTC and the Antitrust Division. The FTC granted early termination of the applicable waiting period on May 18, 2007.

At any time before or after the merger, the Antitrust Division, the FTC, or a state attorney general could take such action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the merger or seeking the divestiture of substantial assets of Harman, Parent, or their subsidiaries and affiliates. Private parties may also bring legal actions under the antitrust laws under certain circumstances. There can be no assurance that a challenge to the merger on antitrust grounds will not be made or, if a challenge is made, of the result of such challenge. Under the terms of the merger agreement, Harman and Parent are obligated to use their respective

77

reasonable best efforts to sell, divest or otherwise dispose of, or to take any action that would limit the freedom of action with respect to, any business, product line or assets of Harman, Parent, or any of their respective subsidiaries or affiliates, in each case as may be required in order to resolve any objections under the antitrust laws to the merger or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order, or other order in any suit or proceeding, which would otherwise have the effect of preventing or delaying the completion of the merger beyond February 11, 2008, which is referred to as the end date.

The merger is also subject to review by the governmental authorities of Brazil, Canada, the European Union, Mexico, South Africa and South Korea under the antitrust laws of those jurisdictions. The competition filing required in Canada was made by the parties on May 24, 2007 and the parties received clearance in Canada on June 4, 2007. The parties expect to make the required notification to the European Commission by the end of June 2007. The initial applicable waiting period is 25 business days. The competition filing required in South Africa was made by the parties on May 31, 2007. The initial applicable waiting period is 20 business days. In addition, Harman and Parent are required to make filings with several additional foreign competition authorities. The merger may be completed without receiving any action from these authorities on the filings, and the parties' obligations to complete the merger are not conditioned on the filings being made or action being taken by these authorities.

### Litigation Related to the Merger

On May 8, 2007, a putative class action complaint was filed in the Superior Court of the District of Columbia. The lawsuit purports to be brought on behalf of all common stockholders of Harman and names Harman and all of its directors as defendants. The complaint alleges that Harman's board of directors violated its fiduciary duties to Harman stockholders by entering into the merger agreement. According to the complaint, the consideration to be offered to Harman stockholders under the merger agreement is "inadequate" and the merger agreement "inequitably favors ... insiders" of Harman. The complaint also alleges that the termination fee in the merger agreement purportedly does not serve the purposes of protecting Harman stockholders, that Harman's directors purportedly will not "fairly and adequately" evaluate any alternative bids, and that the provision in the merger agreement that Harman may solicit proposals for alternative bidders during a 50–day period ending in June 2007 is "illusory." The complaint seeks, among other things, unspecified damages, an order rescinding the merger agreement, an injunction against Harman proceeding with the transaction, and a declaration that Harman's directors have breached their fiduciary duties to Harman.

The lawsuit is in its preliminary stage. Harman believes that the lawsuit is without merit and intends to defend it vigorously.

### Accounting Treatment

The merger will be accounted for as a "purchase" by Parent of Harman, as that term is used under GAAP, for accounting and financial reporting purposes. As a result, the historical financial statements of Harman will become the historical financial statements of Parent. The assets (including identifiable intangible assets) and liabilities of Harman as of the closing of the merger will be recorded at their respective fair values and added to those of Parent. Any excess of the purchase price over the net fair values of assets and liabilities of Harman will be recorded as goodwill (excess purchase price). Financial statements of Parent issued after the merger will reflect such fair values and will not be restated retroactively to reflect the historical financial position or results of operations of Harman. The results of operations of Harman will be included in the results of operations of Parent beginning on the closing date of the merger. See "Unaudited Pro Forma Condensed Consolidated Financial Statements" beginning on page 19 for more information.

**Delisting of Harman Common Stock**

If the merger is completed, the shares of Harman common stock will be delisted from the NYSE and deregistered under the Exchange Act, and Harman will no longer file periodic reports with the SEC on account of its common stock.

**No Stock Exchange Listing of Parent Common Stock**

Upon completion of the merger, shares of Parent common stock will not be listed on a national securities exchange, such as the NYSE or Nasdaq Stock Market. It is anticipated, however, that following the merger the shares of Parent common stock will be traded on a lower–tier market, such as the Over–the–Counter Bulletin Board and the Pink Sheets.

As of the date of this proxy statement/prospectus, Parent has been informed that the broker–dealer affiliates of each of Bank of America, N.A., Credit Suisse and Lehman Brothers Holdings Inc. expect to provide quotation information, which may include price quotations, for Parent common stock on the Pink Sheets following the completion of the merger, subject to compliance with the applicable securities rules and regulations. Other "market makers" may also provide price quotations on the Pink Sheets or other lower–tier markets that do not require Parent to apply for a listing. Under the current requirements of the Pink Sheets, Parent is not required to file reports with the SEC or meet any quantitative or qualitative requirements to have its shares of common stock quoted on the Pink Sheets. In addition, the lower–tier markets such as the Pink Sheets are largely unregulated and do not provide liquidity to the same extent as do the higher–tier markets such as the NYSE and Nasdaq Stock Market. The Pink Sheets is a private company not affiliated with the National Association of Securities Dealers, or NASD, or with the SEC. See "Risk Factors—Risks Related to the Ownership of Parent Common Stock—An investment in Parent common stock will be substantially less liquid than an investment in Harman common stock" on page 36.

**Resale of Parent Common Stock Following the Merger; Parent SEC Filings**

The common stock of Parent issued in the merger will be registered with the SEC. Accordingly, the shares of Parent common stock issued in the merger will not be subject to any restrictions on transfer arising under the Securities Act, except for shares issued to any Harman stockholder who may be deemed to be an "affiliate" of Harman or Parent for purposes of Rule 144 or Rule 145 under the Securities Act. In addition, for the two years following the effective time of the merger Parent will, regardless of whether it is then required by the Exchange Act and the rules and regulations promulgated thereunder, file with the SEC the reports specified by Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder.

**Amendment to Harman's Stockholder Rights Agreement**

In connection with entering into the merger agreement, Harman's board of directors adopted and approved an amendment to the Rights Agreement, dated as of December 13, 1999, by and between Harman and Mellon Investor Services LLC, as rights agent (referred to as the Rights Agreement). The amendment amends the Rights Agreement so that (a) neither the execution, delivery or performance of the merger agreement nor the completion of the transactions contemplated thereby will (1) cause the rights (as defined in the Rights Agreement) to become exercisable, (2) cause Parent, Merger Sub or any of their affiliates or associates (as such terms are defined in the Rights Agreement) to become an acquiring person (as defined in the Rights Agreement), or (3) give rise to a share acquisition date, a distribution date, a flip–in event, a flip–over event, or a triggering event (as such terms are defined in the Rights Agreement) and (b) the rights will expire in their entirety immediately prior to the effective time of the merger without any payment being made in respect thereof.

## THE MERGER AGREEMENT

The summary of the material provisions of the merger agreement below and elsewhere in this proxy statement/prospectus is qualified in its entirety by reference to the merger agreement, a copy of which is attached to this proxy statement/prospectus as Annex A and which is incorporated by reference into this document. This summary does not purport to be complete and may not contain all of the information about the merger agreement that is important to you. Harman encourages you to read the merger agreement carefully and in its entirety.

The description of the merger agreement in this proxy statement/prospectus has been included to provide you with information regarding its terms. It is not intended to provide any factual information about Harman. This information can be found elsewhere in this proxy statement/prospectus and in the other filings Harman makes with the SEC, which are available without charge at http://www.sec.gov. See "Where You Can Find More Information" on page 135.

### The Merger

The merger agreement provides for the merger of Merger Sub with and into Harman with Harman being the surviving corporation. As a result of the merger, Harman will cease to be an independent, publicly traded company and become a private company and wholly owned subsidiary of Parent, indirectly controlled by investment funds affiliated with the Sponsors. Upon completion of the merger, the directors of Merger Sub will be the initial directors of the surviving corporation, and the officers of Harman will be the initial officers of the surviving corporation.

### Effective Time; Marketing Period

The effective time of the merger will occur at the time that Harman files a certificate of merger with the Secretary of State of the State of Delaware on the closing date of the merger (or such later time as Parent and Harman may agree and provided for in the certificate of merger). The closing date will occur on the date following the satisfaction or waiver of the conditions described under "—Conditions to the Merger" beginning on page 97 that is the earlier to occur of a date during the Marketing Period (as defined below) specified by Parent on at least three business days' notice to Harman and the final day of the Marketing Period, or such other date as Harman and Parent may agree.

For purposes of the merger agreement, "Marketing Period" means the first period of 20 consecutive business days during which (a) Parent has received certain current financial information from Harman and (b) the mutual closing conditions have all been satisfied and nothing has occurred and no condition exists that would cause certain conditions to the obligations of Parent and Merger Sub to fail to be satisfied assuming the closing date was to be scheduled at any time during this 20 business day period. If the Marketing Period would not end on or prior to July 31, 2007, the Marketing Period will commence no earlier than the later of (1) September 4, 2007 and (2) the date Harman's Annual Report on Form 10–K for the fiscal year ended June 30, 2007 is filed with the SEC. If the Marketing Period would not end on or prior to December 20, 2007, the Marketing Period will commence no earlier than January 2, 2008.

The purpose of the Marketing Period is to provide Parent a reasonable and appropriate period of time during which it can market and place the permanent debt financing contemplated by the debt financing commitment for the purposes of financing the merger. To the extent Parent determines it does not need the benefit of the Marketing Period to market and place the debt financing, it may, in its sole discretion, determine to waive the Marketing Period and close the merger prior to the expiration of the Marketing Period if all other closing conditions are otherwise satisfied or waived.

**Merger Consideration; Election to Receive Parent Common Stock Instead of Cash**

Except for Harman stockholders who elect to receive Parent common stock as described below, each share of Harman common stock issued and outstanding immediately prior to the effective time of the merger will be converted into the right to receive $120.00 in cash, without interest and less any required withholding taxes (referred to as the Cash Consideration), other than the following shares:

- shares held by any direct or indirect wholly owned subsidiary of Harman (which will remain outstanding);

- shares owned, directly or indirectly, by Parent or Merger Sub, or held in treasury by Harman (which will be cancelled without any consideration); and

- shares in respect of which a Harman stockholder has properly exercised appraisal rights, as described below in "—Dissenters' Shares."

Instead of the Cash Consideration, holders of Harman common stock who are holders of record on the record date for the special meeting, or become holders of record between the record date and the Election Deadline (and have received the election form and related materials) will also have the right, with respect to some or all of their shares, to elect to receive one share of common stock of Parent (which will own Harman after the merger) for each share of Harman common stock that they own, provided that a maximum of 8,333,333 shares of Parent common stock will be issued to Harman stockholders and option holders in the merger. If Harman stockholders elect to receive more than 8,333,333 shares of Parent common stock, in the aggregate, then the 8,333,333 shares of Parent common stock issuable to Harman stockholders and option holders in the merger will be allocated to electing stockholders on a pro rata basis. If proration is necessary, Harman stockholders will receive the Cash Consideration for any of their shares of Harman common stock that are not converted in the merger into Parent common stock. In addition, no fractional shares of Parent common stock will be issued in the merger to electing Harman stockholders and option holders. Each electing Harman stockholder and option holder who otherwise would have been entitled to a fraction of a share of Parent common stock will receive cash (without interest) in an amount determined by multiplying the fractional share interest by the Cash Consideration.

In addition, holders of options to purchase shares of Harman common stock issued under Harman's benefit plans will also have the ability to participate in the election for Parent common stock subject to the same proration limitations as the electing stockholders. See "—Treatment of Stock Options and Other Awards" on page 82. The receipt of the $120.00 per share in cash and/or one share of Parent common stock is referred to herein as the merger consideration. After the merger is effective, each holder of any shares of Harman common stock (other than the shares described above that are not converted into the right to receive the merger consideration) will no longer have any rights with respect to the shares, except for the right to receive the merger consideration.

For a full description regarding the election process, the pro rata allocation of Parent shares, and the election form, see the section of this proxy statement/prospectus entitled "Election to Receive Parent Common Stock" beginning on page 102.

**Dissenters' Shares**

Shares of Harman common stock held by any stockholder who properly demands appraisal of the stockholder's shares in connection with the merger in compliance with Section 262 of the Delaware General Corporation Law, will not be converted into the right to receive the merger consideration, but rather will be entitled to appraisal rights as further described in the section of this proxy statement/prospectus entitled "Dissenters' Rights of Appraisal" beginning on page 111. However, if any holder of Harman common stock withdraws his or her demand for appraisal in accordance with Delaware law, fails to perfect, or otherwise loses his or her right of appraisal, then that stockholder will not receive

81

appraisal rights in accordance with Delaware law, and the shares of Harman common stock held by that stockholder will generally be entitled to receive the merger consideration as described in "—Merger Consideration; Election to Receive Parent Common Stock Instead of Cash" on page 81. If such holder of Harman common stock, however, withdraws his or her demand for appraisal, fails to perfect or otherwise loses his or her right of appraisal following the Election Deadline, the shares of Harman common stock held by that stockholder will be deemed to be converted as of the effective time of the merger into the right to receive the Cash Consideration without the right to participate in the election to receive shares of Parent common stock.

## Treatment of Stock Options and Other Awards

**Stock Options.**    Immediately prior to the effective time of the merger, except as separately agreed by Parent and a holder thereof in accordance with the terms of the merger agreement, all outstanding options to acquire Harman common stock, other than those being exercised pursuant to an irrevocable exercise election, whether or not then vested or exercisable, will become fully vested and be converted into the right to receive, on or as soon as reasonably practicable after the effective time of the merger, a cash payment equal to the number of shares of Harman common stock underlying the options multiplied by the amount (if any) by which $120.00 exceeds the exercise price per share of Harman common stock subject to such option, without interest and less any required withholding taxes.

Each person who is a holder of options on the record date for the special meeting or becomes a holder of an option between the record date and the Election Deadline and has received the election form and related materials as described in the merger agreement, generally has the right to submit an election form specifying:

- the number of options held by him or her that he or she irrevocably commits to exercise immediately prior to the effective time of the merger; and

- the corresponding number of shares of Harman common stock underlying the option that he or she desires to have converted into the right to receive Parent common stock.

The number of shares of Parent common stock that will be issued in respect of any stock option for which a stock election is made will be calculated on a net basis, where the number of shares of Parent common stock is reduced to reflect the satisfaction of the exercise price and any tax withholding obligations in connection with the exercise of the stock option. The maximum aggregate number of shares of Harman common stock (either by elections related to shares of Harman common stock or by elections related to the net shares underlying options to acquire Harman common stock) that may be converted into Parent common stock is 8,333,333. If the aggregate number of shares (including net shares underlying options) electing to convert into Parent common stock exceeds 8,333,333, the shares of Harman common stock and options to purchase Harman common stock will be converted into Parent common stock using the methodology described in "Election to Receive Parent Common Stock—Proration of Parent Common Stock" on page 103.

**Restricted Stock.**    Immediately prior to the effective time of the merger, except as may be separately agreed by a holder and Parent in accordance with the terms of the merger agreement, each share of restricted common stock of Harman outstanding under Harman's stock incentive plans will vest in full and will be cancelled and converted into the right to receive the Cash Consideration, or, at the election of the restricted stock holder, the right to receive Parent common stock, in the same manner as all other shares of Harman common stock.

**Restricted Stock Units.**    Immediately prior to the effective time of the merger, except as may be separately agreed by a holder and Parent in accordance with the terms of the merger agreement, each restricted stock unit outstanding under Harman's stock incentive plans will vest in full and be converted into the right to receive the Cash Consideration.

**Exchange and Payment Procedures**

At or immediately after the effective time of the merger, Parent will deposit, or will cause to be deposited, with a bank or trust company, referred to in this proxy statement/prospectus as the exchange agent, chosen by Parent and reasonably acceptable to Harman (a) cash in U.S. dollars sufficient to pay the cash portion of the merger consideration and (b) certificates representing the shares of Parent common stock to be issued to those electing to convert their Harman common stock and/or options to acquire Harman common stock into Parent common stock.

As soon as reasonably practicable after the effective time of the merger and in any event no later than three business days following the effective time, the exchange agent will mail a letter of transmittal and instructions to all Harman stockholders who did not make a valid election to receive shares of Parent common stock in exchange for all of their shares of Harman common stock. The letter of transmittal and instructions will inform these stockholders how to surrender their common stock certificates in exchange for the Cash Consideration.

**You should not return your stock certificates with the enclosed proxy card, and you should not forward your stock certificates to the exchange agent without a letter of transmittal. Please see "Election to Receive Parent Common Stock—General Description of Election" beginning on page 102.**

You will not be entitled to receive the merger consideration until you surrender your stock certificate or certificates to the exchange agent, together with a duly completed and executed letter of transmittal and any other documents as may be required by the letter of transmittal. The merger consideration may be paid to a person other than the person in whose name the corresponding certificate is registered if the certificate is properly endorsed or is otherwise in the proper form for transfer. In addition, the person who surrenders such certificate must either pay any transfer or other applicable taxes or establish to the satisfaction of the surviving corporation that such taxes have been paid or are not applicable.

No interest will be paid or will accrue on the cash payable upon surrender of the certificates. The exchange agent will be entitled to deduct, withhold, and pay to the appropriate taxing authorities, any applicable taxes from the merger consideration. Any sum that is withheld or deducted and paid to a taxing authority by the exchange agent will be deemed to have been paid to the person with regard to whom it is withheld.

At the effective time of the merger, Harman's stock transfer books will be closed and there will be no further transfers on Harman's stock transfer books of shares of Harman common stock that were outstanding immediately prior to the effective time of the merger. If, after the effective time of the merger, certificates are presented to the surviving corporation or to Parent for transfer, they will be cancelled and exchanged for the merger consideration.

Any portion of the merger consideration deposited with the exchange agent that remains undistributed to former holders of Harman common stock for one year after the effective time of the merger will be delivered, upon demand, to the surviving corporation. Former holders of Harman common stock who have not complied with the above–described exchange and payment procedures may thereafter only look to the surviving corporation for payment of the merger consideration. None of Harman, Parent, Merger Sub, the exchange agent or any other person will be liable to any former holders of Harman common stock for any cash delivered to a public official pursuant to any applicable abandoned property, escheat or similar laws.

If you have lost a certificate, or if it has been stolen or destroyed, then before you will be entitled to receive the merger consideration, you will have to make an affidavit, in form and substance reasonably acceptable to Parent, regarding the loss, theft or destruction, and if required by Parent or the exchange agent, post an indemnity agreement or, at the election of Parent or the exchange agent, a bond in a customary amount as indemnity against any claim that may be made against it or the

surviving corporation with respect to that certificate. These procedures will be described in the letter of transmittal that you will receive, which you should read carefully in its entirety.

All merger consideration paid upon the surrender of certificates in accordance with the above terms will be deemed to have been paid in full satisfaction of all rights pertaining to the shares of Harman common stock formerly represented by such certificates.

## Representations and Warranties

The merger agreement contains representations and warranties by each of the parties to the merger agreement to each other as of a specific date. These representations and warranties (and the assertions embodied therein) have been made solely for the benefit of the other parties to the merger agreement and may be intended not as statements of fact, but rather as a way of allocating the risk to one of the parties if those statements prove to be inaccurate. The representations and warranties have been qualified by certain disclosures that were made to the other party in connection with the negotiation of the merger agreement, which disclosures are not reflected in the merger agreement. In general, certain standards of materiality may apply in a way that is different from what may be viewed as material to you or other investors. The representations and warranties were made only as of the date of the merger agreement or such other date or dates as may be specified in the merger agreement and are subject to more recent developments. Accordingly, these representations and warranties may not describe the actual state of affairs as of the date they were made or at any other time. For the foregoing reasons, you should not rely on the representations and warranties as statements of factual information.

In the merger agreement, Harman made representations and warranties relating to, among other things:

- Harman and Harman's subsidiaries' organization, good standing and qualification to do business;

- Harman's capitalization, including in particular the number of shares of Harman common stock, stock options and other equity–based interests;

- Harman's subsidiaries and Harman's equity interests in them;

- Harman's corporate power and authority to enter into the merger agreement and to consummate the transactions contemplated by the merger agreement;

- the approval and recommendation of Harman's board of directors of the merger, the merger agreement and the other transactions contemplated by the merger agreement;

- the enforceability of the merger agreement against Harman;

- the required consents and approvals of governmental entities in connection with the transactions contemplated by the merger agreement;

- the absence of conflicts with or defaults under Harman's or Harman's subsidiaries' governing documents, applicable laws or certain agreements as a result of entering into the merger agreement and the completion of the merger;

- Harman's SEC filings since July 1, 2004, including financial statements contained therein;

- the absence of undisclosed liabilities;

- Harman's and Harman's subsidiaries' permits and compliance with applicable legal requirements;

- environmental matters;

- matters relating to Harman's and Harman's subsidiaries' employee benefit plans;

84

- the absence of related–party transactions;

- the absence of certain changes relating to Harman or its subsidiaries, including the absence of a material adverse effect, since December 31, 2006 through and including April 26, 2007;

- the absence of investigations, legal proceedings and governmental orders;

- the accuracy and compliance with applicable securities law of the information supplied by Harman for inclusion in this proxy statement/prospectus and other filings made with the SEC in connection with the merger and the other transactions contemplated by the merger agreement;

- tax matters;

- employment and labor matters affecting Harman or its subsidiaries;

- intellectual property;

- real property and personal property;

- the vote of Harman stockholders required in connection with the adoption of the merger agreement and the approval of the merger and the other transactions contemplated by the merger agreement;

- material contracts and performance of obligations thereunder;

- the absence of undisclosed brokers' fees;

- the receipt by the board of directors of a fairness opinion from Bear Stearns; and

- state takeover statutes and Harman's Rights Agreement.

Many of Harman's representations and warranties are qualified by a Company Material Adverse Effect standard (that is, they will not be deemed to be untrue or incorrect unless their failure to be true or correct, individually or in the aggregate, would have a Company Material Adverse Effect). A "Company Material Adverse Effect" means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects or occurrences, (a) has, or would be reasonably expected to have, a material adverse effect on or with respect to business, results of operation or financial condition of Harman and its subsidiaries taken as a whole, or (b) that prevents or materially delays or materially impairs the ability of Harman to consummate the merger.

A Company Material Adverse Effect will not have occurred, however, as a result of any facts, circumstances, events, changes, effects or occurrences:

- generally affecting the consumer or professional audio, automotive audio, information, entertainment or infotainment industries, or the economy or financial, credit or securities markets in the United States or any other country in which Harman or any of its subsidiaries operates (including effects on such industries, economy or markets resulting from regulatory or political changes, or any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism (other than any of the foregoing that causes any damage or destruction to or renders physically unusable or inaccessible any facility or property of Harman or any of its subsidiaries));

- reflecting or resulting from changes in law or GAAP;

- resulting from actions by Harman or any of its subsidiaries that Parent has expressly requested, or to which Parent has expressly consented;

- resulting from the announcement of the merger or the proposal thereof or the merger agreement and the transactions contemplated thereby;

85

- resulting from changes in the market price or trading volume of Harman's securities or from the failure to meet internal or public projections, forecasts or estimates (strictly limited to changes in market price or failure to meet projections, forecasts or estimates in and of itself, and not the underlying cause of such change or failure); or

- resulting from the suspension of trading in securities generally on the NYSE;

except to the extent that, in the case of the first two bullets above, the impact of such fact, circumstance, event, change, effect or occurrence is disproportionately adverse to Harman and its subsidiaries, taken as a whole.

The merger agreement also contains various representations and warranties made by Parent and Merger Sub that are subject, in some cases, to specified exceptions and qualifications. The representations and warranties relate to, among other things:

- Parent's and Merger Sub's organization, valid existence, good standing and qualification to do business;

- Parent's and Merger Sub's corporate or other power and authority to enter into the merger agreement and to consummate the transactions contemplated by the merger agreement;

- the authorization of the merger agreement and the transactions contemplated thereby by the boards of directors of Parent and Merger Sub;

- the enforceability of the merger agreement against Parent and Merger Sub;

- the required consents and approvals of governmental entities in connection with the transactions contemplated by the merger agreement;

- the absence of any violation of or conflict with their governing documents, applicable law or certain agreements as a result of entering into the merger agreement and consummating the merger;

- the accuracy and compliance with applicable securities law of the information supplied by Parent or Merger Sub for inclusion in this proxy statement/prospectus and other filings made with the SEC in connection with the merger and the other transactions contemplated by the merger agreement;

- the validity of debt and equity financing commitments and sufficiency of commitments for satisfaction of Parent's and Merger Sub's obligations under the merger agreement;

- the capitalization and ownership of Merger Sub;

- Parent's capitalization;

- the lack of prior operations of Parent and Merger Sub;

- the absence of undisclosed brokers' fees;

- the absence of contracts, as of the date of the merger agreement, between Parent, Merger Sub and the guarantors on the one hand and Harman's officers and directors on the other hand relating to the transactions contemplated by the merger agreement;

- the absence of investigations, legal proceedings and governmental orders;

- each guarantor's delivery of the guarantee;

- the solvency of the surviving corporation (assuming various matters, including that Harman's projections were prepared in good faith based upon reasonable assumptions);

- Parent's and Merger Sub's access to information about Harman; and

- the absence of ownership by certain affiliates of the Sponsors in any person engaged in the consumer or professional audio, automotive audio, information, entertainment or infotainment products industries.

Some of Parent's and Merger Sub's representations and warranties are qualified by a Parent Material Adverse Effect standard. For the purposes of the merger agreement, "Parent Material Adverse Effect" means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate, prevents or materially delays or materially impairs the ability of Parent and Merger Sub to consummate the merger on a timely basis, or would be reasonably expected to do so.

The representations and warranties of all of the parties to the merger agreement will expire upon the effective time of the merger.

**Conduct of Harman's Business Pending the Merger**

Under the merger agreement, Harman has agreed that, subject to specified exceptions and unless Parent gives its prior written consent, between April 26, 2007 and the earlier of the effective time of the merger and the date, if any, on which the merger agreement is terminated, Harman will, and will cause each of its subsidiaries to:

- conduct business in all materials respects in the ordinary course consistent with past practice; and

- use commercially reasonable efforts to maintain and preserve intact Harman's respective business organization and business relationships, preserve Harman's respective assets, rights and properties in good repair and condition and to retain the services of Harman's respective key officers and key employees, in each case, in all material respects.

Harman has also agreed that, between April 26, 2007 and the earlier of the effective time of the merger and the date, if any, on which the merger agreement is terminated, subject to specified exceptions or unless Parent gives its prior written consent, it will not, and will cause each of its subsidiaries not to:

- with respect to Harman, adjust, split, combine, reclassify, redeem, repurchase or otherwise acquire any capital stock or other equity interests or rights under the Rights Agreement or otherwise amend the terms of Harman's capital stock or other equity interests or rights under the Rights Agreement;

- make, declare or pay any dividend, or make any other distribution on, or indirectly redeem, repurchase or otherwise acquire or encumber, any shares of Harman's capital stock or other equity interests, except (1) cashless exercises pursuant to the exercise of options to acquire Harman common stock outstanding as of April 26, 2007 or permitted to be granted after that date by the merger agreement, or under the Harman Retirement Savings Plan and (2) quarterly cash dividends not to exceed $0.0125 per share, consistent with past practice as to timing, except that no quarterly dividend will be declared with respect to the quarter in which the effective time of the merger occurs unless the effective time of the merger is after the record date for such quarter;

- grant any person any right to acquire any shares of its capital stock or other equity interests;

- issue or sell any additional shares of capital stock or other equity interests, any securities convertible into, or any rights, warrants or options to acquire, any such shares of capital stock or other equity interests, except upon exercise of stock options or settlement of restricted stock units outstanding as of April 26, 2007 (or permitted to be granted after that date by the merger agreement) or as required under any Harman benefit plan;

87

- except as permitted by the next bullet, purchase, sell, lease, license, transfer, mortgage, abandon, encumber or otherwise subject to a lien or otherwise dispose of, in whole or in part, any properties, rights or assets having value in excess of $10,000,000 individually (other than (a) purchases or sales of inventory or (b) commodity, currency, purchase, sale or hedging agreements, in each case in the ordinary course of business consistent with past practice);

- make capital expenditures (or authorization or commitment with respect thereto) in a manner reasonably expected to cause expenditures to exceed the capital expenditure budget for the fiscal years 2007 or 2008 (taking into account reasonably anticipated expenditures for the balance of the fiscal year 2007 as well as expenditures already committed or made and assuming, for this purpose, a budget for fiscal year 2008 that is 111% of the 2007 fiscal capital expenditure budget);

- except (a) ordinary course loans pursuant to the Harman Retirement Savings Plan and advances for business expenses in the ordinary course pursuant to Harman benefit plans, (b) borrowings or letters of credit under Harman's existing credit facilities in the ordinary course of business consistent with past practice, or (c) borrowings that do not exceed $10,000,000 in the aggregate outstanding at any time, incur, create, assume or otherwise become liable for, repay or prepay, any indebtedness for borrowed money (including the issuance of any debt security), any capital lease obligations, any guarantee of any such indebtedness or debt securities of any other person, or any "keep well" or other agreement to maintain any financial statement condition of another person, or amend, modify or refinance any existing indebtedness;

- make any investment in or acquisition of another person or business in excess of $10,000,000 individually or $25,000,000 in the aggregate, whether by merger, purchase of stock, contributions to capital, loans to, property transfers, or entering into binding agreements with respect to any such investment or acquisition (including any conditional or installment sale contract or other retention contract relating to purchased property);

- except in the ordinary course of business consistent with past practice or on terms not materially adverse to Harman and its subsidiaries, taken as a whole, enter into, renew, extend, materially amend or terminate any material contract;

- except to the extent required by law or by contracts in existence as of April 26, 2007, by Harman benefit plans or the merger agreement:

  - accelerate the vesting of, or the lapsing of restrictions with respect to, any stock options or other stock–based compensation;

  - increase the compensation or benefits of any of its employees, independent contractors or directors, other than merit–based increases in base salary or immaterial increases in benefits, in the ordinary course of business consistent with past practice for employees; or

  - materially amend or adopt any material compensation or benefit plan, including any pension, retirement, profit–sharing, bonus or other employee benefit or welfare benefit plan (other than any such adoption or amendment that does not materially increase the annual cost to Harman or any of its subsidiaries of maintaining the applicable compensation or benefit plan) with or for the benefit of its employees, independent contractors or directors;

- (a) compromise, settle or agree to settle any suit, action, claim, proceeding or investigation (including any suit, action, claim, proceeding or investigation relating to the merger agreement or the transactions contemplated by the merger agreement), or consent to the same, other than those in the ordinary course of business consistent with past practice that involve only the payment of monetary damages not in excess of $5,000,000 individually (or with respect to a series of related claims), and in any case without the imposition of material equitable relief on,

88

or the admission of wrongdoing by, Harman or any of its subsidiaries, or (b) waive any claims or rights of substantive value;

- amend or waive any material provision of Harman's charter or by–laws or other equivalent organizational documents or Harman's rights agreement or, in the case of Harman, enter into any agreement with any of its stockholders in their capacity as such;

- enter into any "non–compete" or similar agreement that would by its terms restrict in any material respect the businesses of the surviving corporation or its subsidiaries or affiliates following the effective time of the merger other than in the ordinary course of business consistent with past practice;

- enter into any new line of business outside of Harman's existing businesses;

- enter into any new lease or amend the terms of any existing lease of real property which would require payments over the remaining term of such lease in excess of $25,000,000 (excluding any renewal terms);

- adopt or enter into a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of such entity (other than among wholly owned subsidiaries of Harman);

- implement or adopt any material change in its financial accounting principles or practices, other than as required by GAAP, applicable law or regulatory guidelines;

- change any method of tax accounting, enter into any closing agreement with respect to material taxes, settle or compromise any material liability for taxes, make, revoke or change any material tax election, agree to any adjustment of any material tax attribute, file or surrender any claim for a material refund of taxes, execute or consent to any waivers extending the statutory period of limitations with respect to the collection or assessment of material taxes, file any material amended tax return or obtain any material tax ruling, in each case other than in the ordinary course of business consistent with past tax practice; or

- agree to take, make any commitment to take, or adopt any resolutions of its board of directors approving any of the actions prohibited by any of the foregoing.

**Conduct of Parent Pending the Merger**

Parent has agreed to promptly notify Harman of the existence of any contract or other understanding between Parent, Merger Sub or any guarantor or any of their respective affiliates on the one hand, and any Harman employee on the other hand, and also agreed not to enter into any such contract or understanding prior to 11:59 p.m., New York City time, on June 15, 2007. Moreover, Parent and Merger Sub have agreed that between April 26, 2007 and the earlier of the effective time of the merger and the date, if any, on which the merger agreement is terminated, subject to certain exceptions or unless Harman gives its prior written consent, they will not:

- adjust, split, combine, reclassify, redeem, repurchase or otherwise acquire any capital stock or other equity interests or otherwise amend the terms of Parent's or Merger Sub's capital stock or other equity interests;

- make, declare or pay any dividend, or make any other distribution on, any shares of its capital stock or other equity interests or any securities or obligations convertible into or exchangeable for any shares of its capital stock or other equity interests;

- in the case of Parent, amend its certificate of incorporation or by–laws (other than in specified circumstances); or

89

- agree to take, or make any commitment to take, any of the actions prohibited by any of the foregoing.

In addition, for two years following the effective time of the merger Parent will, regardless of whether it is then required to do so by the Exchange Act and the rules and regulations promulgated thereunder, file with the SEC the reports specified by Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder.

Except as required by applicable law or contemplated by the merger agreement, the parties have agreed not to, and to cause their respective subsidiaries (and, in the case of Parent and Merger Sub, to cause the guarantors, subsidiaries of the guarantors, and investment funds affiliated with KKR 2006 Fund L.P.) not to take any action between April 26, 2007 and the earlier of the effective time of the merger and the date, if any, on which the merger agreement is terminated which is intended to or which would reasonably be expected to materially adversely affect or materially delay the ability of such party to (a) obtain any governmental or regulatory approvals required for the transactions contemplated by the merger agreement, (b) perform its covenants and agreements under the merger agreement or (c) consummate the transactions contemplated by the merger agreement, or that would otherwise materially delay or prohibit completion of the merger and the other transactions contemplated by the merger agreement.

## Stockholders' Meeting

The merger agreement requires Harman, as promptly as reasonably practicable, to call, give notice of and hold a meeting of Harman stockholders for the purpose of obtaining the vote of Harman stockholders necessary to satisfy the vote condition described in "—Conditions to the Merger" beginning on page 97. Subject to Harman's board of directors withdrawing or modifying its recommendation that Harman stockholders vote in favor of the adoption of the merger agreement and the transactions contemplated by the merger agreement as described in "—Restrictions on Solicitation of Other Offers" below, Harman is required to use reasonable best efforts to solicit proxies from its stockholders in favor of the adoption of the merger agreement. Unless the merger agreement has been terminated prior to the meeting of stockholders, Harman is required to submit the merger agreement to a vote of stockholders even if its board has withdrawn, modified or amended its recommendation, or made any other public statement in connection with the meeting of stockholders, or in reference to an acquisition proposal, that is contrary to such recommendation, as described in "—Change of Recommendation/Termination in Connection with a Superior Proposal" on page 92, that its stockholders vote in favor of the adoption of the merger agreement.

## Restrictions on Solicitation of Other Offers

The merger agreement provides that, until 11:59 p.m., New York City time, on June 15, 2007, or the No–Shop Period Start Date, Harman was permitted to:

- initiate, solicit and encourage any acquisition proposal for Harman including by way of providing non–public information pursuant to a confidentiality and standstill agreement that contains provisions that are no less favorable in the aggregate to Harman than those contained in the confidentiality agreement entered into with KKR, provided that Harman must promptly provide to Parent any material non–public information concerning Harman or its subsidiaries that is provided to any person given such access which was not previously provided to Parent or its representatives; and

- enter into and maintain discussions or negotiations concerning an acquisition proposal for Harman or otherwise cooperate with or assist or participate in, or facilitate any such inquiries, proposals, discussions or negotiations.

90

From and after the No–Shop Period Start Date, Harman has agreed not to:

- initiate, solicit or knowingly encourage (including by way of providing information) the submission of any inquiries, proposals or offers or any other efforts or attempts that constitute or may reasonably be expected to lead to, any acquisition proposal for Harman or engage in any discussions or negotiations with respect thereto or otherwise knowingly assist or participate in, or knowingly facilitate any such inquiries, proposals, discussions or negotiations; or

- approve or recommend, or publicly propose to approve or recommend, any acquisition proposal for Harman or enter into any merger agreement, letter of intent, agreement in principle, share purchase agreement, asset purchase agreement or share exchange agreement, option agreement or other similar agreement providing for or relating to any acquisition proposal for Harman or enter into any agreement or agreement in principle requiring Harman to abandon, terminate or fail to consummate the transactions contemplated by the merger agreement or breach Harman's obligations under the merger agreement or propose or agree to do any of the foregoing.

In addition, as of the No–Shop Period Start Date, Harman agreed to immediately cease and terminate with all persons any solicitation, encouragement, discussion or negotiations existing at such time, unless the acquisition proposal for Harman offered by such person meets the requirements in the first two bullet points of the following paragraph.

Notwithstanding the aforementioned restrictions, at any time prior to the adoption of the merger agreement by Harman stockholders, Harman is permitted to engage in discussions or negotiations with, or provide information to any party to the extent that:

- Harman receives from such party an acquisition proposal for Harman, which the board of directors of Harman believes in good faith to be bona fide;

- Harman's board of directors determines in good faith, after consultation with its independent financial advisors and outside counsel, that the acquisition proposal constitutes or could reasonably be expected to result in a superior proposal; and

- after consultation with its outside counsel, Harman's board of directors determines in good faith that the failure to take such action could violate its fiduciary duties under applicable law.

In such cases, Harman (a) will not, and will not allow its representatives to, disclose any material non–public information to such person without entering into a confidentiality and standstill agreement that contains provisions that are no less favorable in the aggregate to Harman than those contained in the confidentiality agreements entered into with KKR, and (b) will promptly provide to Parent any non–public information concerning Harman or its subsidiaries provided to such other person which was not previously provided to Parent or its representatives.

From and after the No–Shop Period Start Date, Harman is required to promptly (within one business day) notify Parent in the event Harman receives an acquisition proposal from a person or group of related persons, including the material terms and conditions thereof, and is required to keep Parent apprised as to the status and any material developments, discussions and negotiations concerning the same on a current basis (and in any event no later than 48 hours after the occurrence of such developments, discussions or negotiations). In addition, Harman has agreed to promptly (within two business days) notify Parent orally and in writing if Harman determines to begin providing information or to engage in negotiations concerning an acquisition proposal from a person or group of related persons.

An "acquisition proposal" means any inquiry, proposal or offer from any person or group of persons (other than Parent, Merger Sub or their respective affiliates) relating to any direct or indirect acquisition or purchase of a business that constitutes 25% or more of the net revenues, net income or assets of Harman and its subsidiaries, taken as a whole, or 25% or more of any class or series of

91

Harman's securities, any tender offer or exchange offer that if consummated would result in any person or group of persons beneficially owning 25% or more of any class or series of Harman's capital stock, or any merger, reorganization, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Harman (or any of its subsidiaries whose business constitutes 25% or more of Harman's and its subsidiaries' net revenues, net income or assets, taken as a whole).

A "superior proposal" means an acquisition proposal involving (a) assets that generate more than 50% of the consolidated total revenues, or (b) assets that constitute more than 50% of the consolidated total assets of Harman and its subsidiaries or (c) more than 50% of the total voting power of Harman's equity securities, in each case that Harman's board of directors in good faith determines would, if consummated, result in a transaction that is more favorable from a financial point of view to Harman stockholders than the transactions contemplated by the merger agreement (1) after receiving the advice of a financial advisor (who must be a nationally recognized investment banking firm) and (2) after taking into account all appropriate legal (with the advice of outside counsel), financial (including the financing terms of any such proposal), regulatory, timing or other aspects of such proposal and any other relevant factors permitted by applicable law.

### Change of Recommendation/Termination in Connection with a Superior Proposal

Harman's board of directors may also, at any time prior to the adoption of the merger agreement by Harman stockholders, withdraw (or modify or qualify in a manner adverse to Parent or Merger Sub), or publicly propose to withdraw (or modify or qualify in a manner adverse to Parent or Merger Sub), its recommendation that the stockholders of Harman adopt the merger agreement or make any other public statement in connection with the special meeting that is contrary to such recommendation, if the board of directors determines in good faith, after consultation with outside counsel, that failure to take such action could violate its fiduciary duties under applicable law, or terminate the merger agreement and enter into a definitive agreement which the board of directors determines in good faith constitutes a superior proposal after giving effect to the adjustments which may be offered by Parent. Harman's board may do so only after (a) giving written notice to Parent and Merger Sub at least three business days in advance of its intention to do so, (b) prior to effecting such action or terminating the merger agreement to enter into a definitive agreement with respect to such superior proposal, during such three–business day period, negotiating with Parent and Merger Sub in good faith (to the extent Parent and Merger Sub desire to negotiate) to make such adjustments in the terms and conditions of the merger agreement so that the acquisition proposal ceases to constitute a superior proposal and (c) in the event of the termination of the merger agreement, Harman pays to Parent the $225 million or $75 million termination fee, as applicable, as described in further detail below in "—Termination Fees and Expenses" beginning on page 99.

### Agreement to Take Further Action and Use Reasonable Best Efforts

Each of the parties to the merger agreement has agreed to use its reasonable best efforts to do anything necessary, proper or advisable to make effective the merger and the other transactions contemplated by the merger agreement. In particular, the parties have agreed to use their reasonable best efforts to make necessary filings and obtain necessary governmental consents and approvals, including those required under the HSR Act. To the extent necessary to obtain such antitrust approvals, the parties have agreed to sell, divest or dispose of any assets or businesses to the extent necessary to avoid an injunction or other order which would prevent or delay the closing beyond February 11, 2008 (except that Harman will only agree to dispose of any of its assets or its businesses if such disposition is conditional on the closing, and affiliates and other members of Parent will not be required to take such action with respect to any portfolio company). Harman has also agreed to use its reasonable best efforts to obtain necessary consents or waivers from third parties (although no party is required to pay

any consideration or incur any liability in connection with obtaining such consents or waivers), to defend any lawsuit challenging the merger or the merger agreement, and to execute and deliver any additional documents necessary to complete the merger.

The parties have agreed to keep each other reasonably apprised of the status of matters relating to the completion of the merger and the other transactions contemplated by the merger agreement, including promptly furnishing each other with copies of notices or other written communications received from any third party and/or any governmental entity. The parties have also agreed to give each other a reasonable opportunity to review in advance, and will consider in good faith the views of the other party in connection with, any proposed written communication to a governmental entity. To the extent practicable under the circumstances, the parties will not participate in any substantive meeting or discussion with a governmental entity in connection with the proposed transactions without consulting with the other party in advance and, to the extent permitted, giving the other party the opportunity to attend and participate. If any administrative or judicial proceeding is instituted (or threatened to be instituted) challenging the merger or any other transaction contemplated by the merger agreement, the parties will cooperate in all reasonable respects with each other and use their reasonable best efforts to contest and resist the proceeding and any other order, whether temporary, preliminary or permanent, prohibiting the merger or any related transaction.

## Financing Commitments; Cooperation

Parent has agreed to use its reasonable best efforts to arrange the financing in connection with the merger on terms described in the equity and debt financing commitment letters delivered in connection with the signing of the merger agreement or other terms that would not adversely impact the ability of Parent or Merger Sub to timely consummate the merger and the other transactions contemplated by the merger agreement, including using its reasonable best efforts to:

- maintain in effect the financing commitment letters and to negotiate definitive documents on the terms contained in the financing commitment letters (or other terms that would not adversely impact the ability of Parent or Merger Sub to timely consummate the transactions contemplated by the merger agreement);

- satisfy the conditions applicable to Parent in the definitive financing documents and consummate the financing at or before closing;

- comply with its obligations under the financing commitment letters; and

- enforce its rights under the financing commitment letters.

Parent has agreed to give Harman prompt notice upon learning of any material breach or any termination by any party of the financing commitment letters. Parent has also agreed to keep Harman informed on a reasonably current basis and in reasonable detail of the status of its efforts to arrange the financing (including providing Harman with copies of documents related to the financing to the extent they contain new conditions applicable to Parent).

Under the confidentiality letter entered into between Harman and Parent, in general, Parent may not enter into any arrangements relating to financing on an exclusive basis. The merger agreement, however, permits Parent, following the No–Shop Period Start Date, to engage two additional providers of debt financing on an exclusive basis and obtain equity commitments or equity financing on an exclusive basis from any person other than (a) persons who submitted an acquisition proposal prior to the No–Shop Period Start Date and (b) persons principally involved in the private equity business that have aggregate uninvested equity commitments of at least $5 billion. In addition, prior to the No–Shop Period Start Date, subject to specified limitations, Parent is permitted to engage additional providers of debt and equity financing on a non–exclusive basis and in specified limited circumstances with respect to equity financing on an exclusive basis.

93

Parent will be permitted to amend, modify or replace the debt commitment letters delivered in connection with the signing of the merger agreement with new financing commitments, so long as the change to the new commitment:

- does not reduce the aggregate amount of the debt financing below the amount required to consummate the merger and the related transactions;

- does not adversely amend or expand the conditions to the drawdown of the debt financing in any respect that would make the conditions to closing the merger less likely to be satisfied by February 11, 2008 or that would expand the possible circumstances under which the conditions would not be satisfied by February 11, 2008;

- is not reasonably expected to delay the closing of the merger; or

- is not otherwise adverse to Harman's interests in any material respect.

In the event that all conditions to the financing commitments (other than, in connection with the debt financing, the availability or funding of any of the equity financing) have been satisfied, Parent has agreed to, from and after the final day of the Marketing Period and subject to the satisfaction of the mutual closing conditions and the conditions to the obligation of Parent and Merger Sub to effect the merger, as described in "—Conditions to the Merger" beginning on page 97, use its reasonable best efforts to cause the lenders and other persons providing such financing to fund the financing required to consummate the merger on the closing date.

In the event that Parent becomes aware of any event or circumstance that makes procurement of any portion of the financing unlikely to occur as contemplated in the financing commitment letters or generally less likely as on the date of the merger agreement, Parent has agreed to notify Harman and to use its reasonable best efforts to obtain, as promptly as practicable but in no event later than one day prior to the closing date, replacement financing from alternative debt financing sources on terms no less favorable to Parent or Merger Sub and no more adverse to the ability of Parent to consummate the merger and related transactions (in each case, as determined in the reasonable judgment of Parent).

In the event that on the final day of the Marketing Period:

- all or any portion of the debt financing to be accomplished through the placement of high yield securities has not been consummated;

- all mutual closing conditions and all closing conditions pertaining to Parent's and Merger Sub's obligations described in "—Conditions to the Merger" beginning on page 97 have been satisfied or waived (other than those conditions that by their nature will not be satisfied until the closing); and

- the bridge financing is available substantially on the terms and conditions described in the debt commitment letters;

then Merger Sub will borrow under and use the proceeds of the bridge financing to replace such affected portion of the high yield financing no later than the last day of the Marketing Period.

Harman has agreed to provide, and to cause its subsidiaries to provide, and to use reasonable best efforts to cause its representatives, including legal and accounting representatives, to provide, all cooperation reasonably requested by Parent in obtaining financing (so long as the requested cooperation does not unreasonably interfere with the ongoing operations of Harman and its subsidiaries), including:

- providing financial and other information as Parent reasonably requests in order to consummate the debt financing, including Harman's financial statements and other financial data;

94

- participating in meetings, presentations, road shows, due diligence sessions, drafting sessions and sessions with rating agencies;

- assisting in the preparation of materials required in connection with the financing (including the execution and delivery of one or more customary representation letters), so long as Harman and its subsidiaries are not required to issue any private placement memoranda or prospectuses in relation to high yield debt securities, and any such private placement memorandum or prospectuses will contain disclosure and financial statements reflecting the surviving corporation and/or its subsidiaries as the obligor;

- reasonably cooperating with the marketing efforts for any of the financing, including helping to prepare for and participating in meetings, and due diligence sessions with prospective lenders, investors and rating agencies;

- providing monthly financial statements to the extent Harman customarily prepares such financial statements;

- facilitating the entrance into one or more credit or other agreements on terms satisfactory to Parent in connection with the debt financing to the extent direct borrowings or debt incurrences by Harman or its subsidiaries are contemplated by the debt commitment letters (however, neither Harman nor any of its subsidiaries will be required to enter into any such agreement prior to the effective time of the merger);

- facilitating the completion of the debt financing and the direct borrowing or incurrence of all proceeds of the debt financing, including any high yield financing, by the surviving corporation immediately following the effective time;

- taking all actions reasonably necessary to permit potential lenders to evaluate Harman's current assets, cash management and accounting systems, policies and procedures relating thereto for the purpose of establishing collateral agreements and to establish bank accounts and other accounts and blocked account agreements and lock box arrangements;

- executing and delivering (or using reasonable best efforts to obtain from advisors and other persons) customary certificates, accounting comfort letters, legal opinions, hedging agreements, surveys, title insurance policies; and

- facilitating the entrance into other documents and instruments relating to guarantees, the pledge of collateral and other matters ancillary to the financing as may be reasonably requested by Parent.

The merger agreement limits Harman's obligation to incur any fees or liabilities with respect to the debt financing prior to the effective time of the merger. Parent has also agreed to reimburse Harman for all reasonable out–of–pocket costs (including reasonable attorneys' fees) incurred in connection with Harman's cooperation, and to indemnify Harman against losses Harman incurs in connection with the arrangement of the financing and any information used in connection therewith, except with respect to any information provided by Harman.

## Employee Benefits

The parties have agreed that, after the completion of the merger through December 31, 2008, Parent is to provide Harman's current employees with annual base salary and base wages, cash incentive compensation opportunities (excluding equity–based compensation) and aggregate benefits, in each case, that are no less favorable than those that Harman provides (excluding equity–based compensation) as of immediately prior to the effective time of the merger.

95

Upon the effective time of the merger, Parent will cause the surviving corporation to honor all obligations under Harman's benefit plans in accordance with their terms as in effect immediately before the effective time of the merger and that the completion of the merger will constitute a "change in control" or similar corresponding term under Harman's benefit plans. For any plans providing benefits to Harman's employees following the merger, Parent and its subsidiaries will recognize past service for purposes of participation and benefit accrual generally.

Prior to the effective time of the merger, Harman has agreed to amend its 2002 Key Executive Officers Bonus Plan such that if the merger occurs after June 30, 2007, it will not constitute a "change in control" under the terms of the plan.

**Other Covenants and Agreements**

The merger agreement contains additional agreements among Harman, Parent and Merger Sub relating to, among other things:

- the filing of this proxy statement/prospectus with the SEC, and cooperation in preparing this proxy statement/prospectus and in responding to any comments received from the SEC on those documents;

- actions necessary to exempt the transactions contemplated by the merger agreement and related agreements from the effect of any takeover statutes;

- coordination of press releases and other public statements about the merger and the merger agreement;

- indemnification and insurance of directors, officers and employees, including prohibiting amendments to Harman's and its subsidiaries' respective charter and by–laws providing for exculpation, indemnification, and advancement of expenses, and maintaining, or providing a "tail policy," to Harman's directors' and officers' liability insurance with a claims period of six years following the effective time of the merger;

- giving Parent and its advisors reasonable access to Harman's properties, contracts, books, records, officers, employees and agents;

- notices of certain events, and consultation to mitigate any adverse consequences of those events;

- actions necessary to exempt dispositions of equity securities by Harman's directors and officers pursuant to the merger under Rule 16b–3 under the Exchange Act;

- obtaining affiliate letters from certain persons regarding post–merger restrictions under the Securities Act on transfers of Parent common stock received by such persons;

- the maintenance by Harman of control over its operations until the effective time of the merger;

- the payment of real estate transfer taxes;

- obtaining resignations of certain directors of Harman's subsidiaries as requested by Parent;

- actions by Parent to cause Merger Sub to fulfill its obligations; and

- prohibiting any actions that would be expected to prevent the exchange of Harman shares for Parent common stock (as described under "—Merger Consideration; Election to Receive Parent Common Stock Instead of Cash" on page 81) from qualifying as a tax–free transaction for U.S. federal income tax purposes.

**Conditions to the Merger**

The obligations of each of the parties to complete the merger are subject to the satisfaction or waiver of the following mutual conditions:

- ***Stockholder Approval.***   The merger agreement must be adopted by the vote of holders of at least a majority of the outstanding shares of Harman common stock entitled to vote on the matter.

- ***No Legal Prohibition or Orders.***   No governmental entity of competent jurisdiction has enacted, issued or entered any restraining order, preliminary or permanent injunction or similar order or legal restraint or prohibitions which remains in effect that enjoins or otherwise prohibits completion of the merger.

- ***Regulatory Approvals.***   The waiting period under the HSR Act (and any extension thereof) and under the antitrust and anti–competition statutes of Canada and under similar legislation in South Africa must have expired or been earlier terminated, and the European Commission must have adopted a decision pursuant to the Council Regulation (EC) No. 139/2004 declaring the merger compatible with the common market (or approval by each European Union member state with proper jurisdiction if the European Union does not have jurisdiction).

- ***Form S–4.***   The registration statement on Form S–4 to be filed with the SEC by Parent, of which this proxy statement/prospectus constitutes a part, in connection with the issuance of Parent common stock following the merger must have become effective, and no stop–order or proceeding suspending the effectiveness of the Form S–4 has been initiated or threatened by the SEC.

Harman's obligation to complete the merger is subject to the satisfaction or waiver of the following additional conditions:

- ***Representations and Warranties.***   Parent's and Merger Sub's representations and warranties must be true and correct in all material respects (other than Parent's and Merger Sub's representations and warranties as to the ownership and operations of Parent and Merger Sub and the absence of contracts between Parent, Merger Sub and the guarantor on the one hand and Harman's officers and directors on the other hand, both of which must be true and correct in all respects) as of April 26, 2007 and as of the closing date of the merger (unless any such representation or warranty is made only as of a specific date, in which event that representation or warranty must be true and correct only as of that specific date).

- ***Performance of Covenants.***   Parent and Merger Sub must have performed, in all material respects, their covenants and agreements in the merger agreement.

- ***Officer's Certificate.***   Parent must deliver to Harman at closing a certificate, dated as of the closing date and signed by a senior executive officer of Parent, with respect to the satisfaction of the conditions relating to Parent's and Merger Sub's representations, warranties, covenants and agreements.

The obligations of Parent and Merger Sub to complete the merger are subject to the satisfaction or waiver of the following additional conditions:

- ***Representations and Warranties.***   Harman's representations and warranties (other than Harman's representations and warranties with respect to capitalization and absence of any Company Material Adverse Effect) must be true and correct (disregarding all qualifications or limitations as to "materiality," "Company Material Adverse Effect" and words of similar import set forth therein) as of April 26, 2007 and as of the closing date of the merger (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except where the failure of such representations and warranties to be true and

97

correct would not, individually or in the aggregate, have a Company Material Adverse Effect. Harman's representations and warranties with respect to (a) capitalization must be true and correct in all material respects as of April 26, 2007 and as of the closing date of the merger (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date) and (b) absence of any Company Material Adverse Effect must be true and correct as of April 26, 2007 and as of the closing date.

- ***Performance of Covenants.***   Harman must have performed, in all material respects, its covenants and agreements in the merger agreement.

- ***Officer's Certificate.***   Harman must deliver to Parent at closing a certificate, dated as of the closing date and signed by a senior executive officer of Harman, with respect to the satisfaction of the conditions relating to its representations, warranties, covenants and agreements.

## Termination

Harman and Parent may terminate the merger agreement by mutual written consent at any time before the completion of the merger (including after Harman stockholders have adopted the merger agreement). In addition, either Harman or Parent may terminate the merger agreement at any time before the completion of the merger if:

- the merger has not been completed by February 11, 2008, so long as the party seeking to terminate has not breached in any material respect its obligations under the merger agreement in any manner that has proximately caused the failure to consummate the merger on or before such date;

- any governmental entity of competent jurisdiction has issued or entered an injunction or similar legal restraint or order permanently enjoining or otherwise prohibiting the completion of the merger, so long as the party seeking to terminate has used its reasonable best efforts as may be required by the merger agreement to prevent, oppose and remove such injunction; or

- the merger agreement has been submitted to Harman stockholders for adoption and the required vote has not been obtained.

In addition, Harman may terminate the merger agreement at any time before the completion of the merger:

- if Parent or Merger Sub has breached or failed to perform any of its representations, warranties, covenants or other agreements in the merger agreement and that breach or failure would result in the failure of a closing condition that cannot be cured by February 11, 2008 (or if capable of being cured, was not cured within 30 days following the receipt of a written notice from Harman), and Harman is not in material breach of its representations, warranties, covenants or other agreements in the merger agreement;

- in order to enter into a superior proposal, if, prior to the receipt of the required stockholder vote and at such time, Harman complied with its obligations in the merger agreement regarding such termination (including those described in "—Change of Recommendation/Termination in Connection with a Superior Proposal" on page 92; or

- if the merger has not been completed on the second business day after the final day of the Marketing Period and all of the mutual closing conditions and all of the conditions to the obligations of Parent and Merger Sub to close have been satisfied and at the time of such termination such conditions continue to be satisfied.

98

In addition, Parent may terminate the merger agreement at any time before the completion of the merger if:

- Harman has breached or failed to perform any of its representations, warranties, covenants or other agreements in the merger agreement and that breach or failure would result in the failure of a closing condition that cannot be cured by February 11, 2008 (or if capable of being cured, was not cured within 30 days following the receipt of a written notice from Parent), and Parent and Merger Sub are not in material breach of their representations, warranties, covenants or other agreements in the merger agreement; or

- Harman's board of directors:

  - withdraws (or modifies or qualifies in a manner adverse to Parent or Merger Sub), or publicly proposes to withdraw (or modify or qualify in a manner adverse to Parent or Merger Sub), its recommendation that the stockholders of Harman adopt the merger agreement or make any other public statement in connection with the special meeting that is contrary with such recommendation;

  - fails to include in this proxy statement/prospectus its recommendation to Harman stockholders that they adopt the merger agreement;

  - approves or recommends, or publicly proposes to approve or recommend, any acquisition proposal, as described in "—Restrictions on Solicitation of Other Offers" beginning on page 90; or

  - fails to recommend against acceptance of a tender or exchange offer for any outstanding shares of Harman's capital stock that constitutes an acquisition proposal (other than by Parent or any of its affiliates), including, for these purposes, by taking no position with respect to the acceptance of such tender offer or exchange offer by its stockholders, which will constitute a failure to recommend against acceptance of such tender offer or exchange offer, within ten business days after commencement.

## Termination Fees and Expenses

In general, all expenses incurred by a party to the merger agreement will be paid by that party (except for certain expenses incurred by Harman in connection with the debt financing, as described above in "—Financing Commitments; Cooperation" beginning on page 93). However, if the merger agreement is terminated in certain circumstances described below, Harman may be required to pay as directed by Parent certain termination fees or expenses, or alternatively, Parent may be required to pay to Harman a termination fee.

### *Fees and Expenses Payable by Harman*

*Reimbursement of Expenses.*    Harman has agreed to reimburse Parent's and Merger Sub's out–of–pocket expenses up to a maximum amount of $20 million, if:

- either Harman or Parent terminates the merger agreement because of the failure of Harman stockholders to adopt the merger agreement at the special meeting or any adjournment or postponement thereof; or

- Parent or Merger Sub terminates the merger agreement in the event Harman has breached or failed to perform any of its representations, warranties, covenants or other agreements in the merger agreement and that breach or failure would result in the failure of a closing condition that cannot be cured by February 11, 2008 (or if capable of being cured, was not cured within 30 days following receipt of a written notice from Parent), and Parent is not otherwise entitled to a termination fee.

99

*Payment of Termination Fee.*    If the merger agreement is terminated by either Harman or Parent under the conditions described in further detail below, Harman will pay a termination fee at the direction of Parent. The amount of the termination fee if the merger agreement is terminated under these conditions is $225 million unless the merger agreement is terminated in connection with the submission of a superior proposal by an "excluded party" in which case the termination fee which Harman must pay is $75 million. An excluded party is defined in the merger agreement as a party that submitted a bona fide acquisition proposal prior to the No–Shop Period Start Date that the Harman board of directors determines in good faith constitutes or could reasonably be expected to constitute a superior proposal, and which acquisition proposal does not cease to meet these qualifications after the No–Shop Period Start Date for a continuous period of more than five business days. On June 16, 2007, Harman notified Parent, in accordance with the notice requirements of the merger agreeement, that there are no excluded parties. In addition, the amount of the termination fee will be reduced by any amounts of Parent's and Merger Sub's out–of–pocket expenses previously paid by Harman as described above.

Harman must pay a termination fee if:

- Harman terminates the merger agreement to enter into a definitive agreement with respect to a superior proposal as described above in "—Change of Recommendation/Termination in Connection with a Superior Proposal" on page 92 (in which case Harman will pay the termination fee concurrently with the termination of the merger agreement); or

- Parent terminates the merger agreement in the event Harman's board of directors:

  - withdraws (or modifies or qualifies in a manner adverse to Parent or Merger Sub), or publicly proposes to withdraw (or modify or qualify in a manner adverse to Parent or Merger Sub), its recommendation that the stockholders of Harman adopt the merger agreement or make any other public statement in connection with the special meeting that is contrary with such recommendation;

  - fails to include in this proxy statement/prospectus its recommendation to Harman stockholders that they adopt the merger agreement;

  - approves or recommends, or publicly proposes to approve or recommend, any acquisition proposal, as described in "—Restrictions on Solicitation of Other Offers" beginning on page 90; or

  - fails to recommend against acceptance of a tender or exchange offer for any outstanding shares of Harman's capital stock that constitutes an acquisition proposal (other than by Parent or any of its affiliates), including, for these purposes, by taking no position with respect to the acceptance of such tender offer or exchange offer by its stockholders, which will constitute a failure to recommend against acceptance of such tender offer or exchange offer, within ten business days after commencement.

Harman will also have to pay the termination fee promptly following the earlier of the execution of a definitive agreement with respect to, or the completion of, any transaction contemplated by an acquisition proposal if:

- a bona fide acquisition proposal has been made, or an intention to make an acquisition proposal must have been publicly announced or an acquisition proposal must have otherwise become publicly known;

- following such acquisition proposal or announcement, the merger agreement is terminated by Harman or Parent because the merger has not been completed by February 11, 2008 (as described in further detail in "—Termination" above) or after the merger agreement has been submitted to Harman stockholders for adoption and the required vote has not been obtained (as

100

described in further detail in "—Termination" above) or by Parent for Harman's breach of its representations, warranties, covenants or other agreements in the merger agreement (as described in further detail in "—Termination" above); and

• within nine months of the termination of the merger agreement, Harman enters into, or submits to the Harman stockholders for adoption, or consummates an acquisition proposal for Harman, which need not be the same as the acquisition proposal for Harman that was publicly announced or otherwise made known (for the acquisition proposal for Harman referred to in this bullet, the "25%" levels in the definition of "acquisition proposal" beginning on page 91 are replaced with "50%").

### *Fees Payable by Parent*

Parent has agreed to pay Harman a termination fee of $225 million in cash promptly following termination of the merger agreement if it is terminated by Harman because either:

• Parent or Merger Sub has breached or failed to perform any of its representations, warranties, covenants or other agreements in the merger agreement and such breach or failure would result in the failure of a closing condition that cannot be cured by February 11, 2008 (or if capable of being cured, was not cured within 30 days following the receipt of a written notice from Harman), provided that Harman is not in material breach of its representations, warranties, covenants or other agreements in the merger agreement and, at the time of the termination, there are no states of facts or circumstances that would reasonably be expected to cause the mutual closing conditions and the conditions to the obligation of Parent and Merger Sub to close not to be satisfied by February 11, 2008; or

• the merger has not been completed on the second business day after the final day of the Marketing Period and all of the mutual closing conditions and all of the conditions to the obligation of Parent and Merger Sub to close have been satisfied and, at the time of the termination, such conditions continue to be satisfied.

The merger agreement provides that Harman's right to receive payment of the $225 million termination fee in the circumstances described above is the sole and exclusive remedy available to Harman, its affiliates and subsidiaries against Parent, Merger Sub, the guarantors and any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, affiliates or agents for the loss suffered as a result of the failure of the merger to be completed.

### Amendment and Waiver

The merger agreement may be amended by a written agreement signed by Harman, Parent and Merger Sub at any time prior to the completion of the merger, whether or not Harman stockholders have adopted the merger agreement. However, no amendment that requires further approval of Harman stockholders will be made without obtaining that approval. At any time prior to the completion of the merger, Harman, Parent or Merger Sub may waive the other party's compliance with certain provisions of the merger agreement.

## ELECTION TO RECEIVE PARENT COMMON STOCK

**General Description of Election**

Each person who is a record holder of Harman common stock on [ • ], 2007 (which is referred to as the Election Form Record Date), or who becomes a record holder during the period between the Election Form Record Date and the Election Deadline, instead of receiving the Cash Consideration of $120.00 per share of Harman common stock, has the right to submit an election form specifying the number of Harman shares that such holder desires to have converted into the right to receive Parent common stock subject to the proration procedures described below. Harman stockholders may make this election with respect to some or all of their shares. All shares of Harman common stock, other than the electing shares (which may be reduced on a pro rata basis pursuant to the proration procedures described below), will be converted into the right to receive the Cash Consideration.

Additionally, each person who is a holder of an option to acquire shares of Harman common stock on the Election Form Record Date or who becomes an option holder between the Election Form Record Date and the Election Deadline may elect to submit an election form specifying the number of Harman stock options that such holder irrevocably commits to exercise immediately prior to the effective time of the merger and the corresponding number of shares underlying these options that the option holder desires to have converted into the right to receive Parent common stock (subject to the proration procedures described below) instead of the cash consideration they would otherwise receive, if any.

**All elections to convert Harman common stock or options to purchase Harman common stock into Parent common stock in connection with the merger must be submitted on the election form that is being mailed to stockholders and option holders together with this proxy statement/prospectus. All election forms must be received by Mellon Investor Services LLC, as the exchange agent, by the Election Deadline (5:00 p.m., New York City time, on the last business day before the date of the special meeting).**

If you elect to convert some or all of your Harman common stock into Parent common stock, you must submit, along with your election form, the certificates representing the shares of Harman common stock that you desire to have converted into Parent common stock, duly endorsed in blank or otherwise in form acceptable for transfer on the books of Harman. Alternatively, along with the election form, you may submit an appropriate guarantee of delivery of such certificates from a firm that is a member of a registered national securities exchange or the NASD or by a commercial bank or trust company in the United States as set forth in the election form, provided that the certificates representing the shares of Harman common stock are in fact delivered to the exchange agent within five NYSE trading days after the date of execution of such guarantee of delivery.

The election form for stock options contains instructions relating to the procedures you must follow to convert your stock options into the right to receive Parent common stock.

Any election form relating to Harman common stock may be revoked by the stockholder submitting it by written notice to the exchange agent prior to the Election Deadline. Any election form relating to options to acquire Harman common stock is irrevocable. All election forms will automatically be revoked if the merger is abandoned and the merger agreement is terminated. If an election form is revoked, the certificate or certificates (or guarantees of delivery, as appropriate) representing the shares of Harman common stock to which such election form relates, will be promptly returned to the Harman stockholder having submitted it to the exchange agent.

Harman's board of directors is not making any recommendation as to whether Harman stockholders or option holders should elect to receive shares of Parent common stock in the merger. In addition, Bear Stearns does not express any opinion, view or recommendation as to whether any Harman stockholder should make or not make an election to receive Parent common stock instead of the Cash Consideration in the merger.

102

**Proration of Parent Common Stock**

The maximum aggregate number of shares of Harman common stock that may be converted into Parent common stock is 8,333,333 (either by elections related to shares of Harman common stock or by elections related to options to acquire Harman common stock). If the aggregate number of shares of Harman common stock (including options to purchase Harman common stock) electing to convert into Parent common stock exceeds 8,333,333, the shares of Harman common stock and options to purchase Harman common stock will be converted to Parent common stock using the following methodology:

- The proration factor will be determined by dividing (a) 8,333,333 by (b) the aggregate number of shares of Parent common stock that would have been issued to Harman stockholders and option holders if all elections had been accepted in full.

- Each person's Harman common stock and shares underlying options to acquire Harman common stock that he or she is electing to convert into Parent common stock (as reduced by the number of shares that would be necessary to satisfy the exercise price and any tax withholding obligations) will be multiplied by the proration factor to calculate the total amount of Parent common stock the person will be entitled to receive.

- If, after giving effect to the proration factor, the total number of shares of Parent common stock a person is entitled to receive exceeds the amount of Harman common stock (excluding shares underlying options) such person elected to convert into Parent common stock, then all shares of Harman common stock such person elected to convert into Parent common stock will be converted, and the number of shares underlying options permitted to convert will be reduced by an equal amount. Under these circumstances, a person's shares will be given preference for purposes of the conversion over such person's options to acquire Harman common stock. The total number of shares of Parent common stock such person is entitled to receive will not change.

All Harman common stock and shares underlying options to acquire Harman common stock not converted into Parent common stock in accordance with the above proration methodology will be converted into the right to receive cash as if an election to convert such shares of Harman common stock and shares of Harman common stock underlying options was not made. In addition, no fractional shares of Parent common stock will be issued in the merger to electing Harman stockholders and option holders. Each electing Harman stockholder and option holder who otherwise would have been entitled to a fraction of a share of Parent common stock will receive cash (without interest and less any required withholding taxes) in an amount determined by multiplying the fractional share interest by the Cash Consideration. See "The Merger Agreement—Merger Consideration; Election to Receive Parent Common Stock Instead of Cash" on page 81 and "The Merger Agreement—Treatment of Stock Options and Other Awards" on page 82.

If valid elections are made by electing Harman stockholders and option holders to receive more than 8,333,333 shares of Parent, the exchange agent will promptly return to electing Harman stockholders any certificates representing Harman shares that will not be converted into Parent common stock based on the pro rata allocation of Parent common stock to electing Harman stockholders and option holders.

103

The following table illustrates the application of proration on the issuance of Parent common stock in the merger, assuming the election by Harman stockholders and option holders to receive the numbers of shares of Parent common stock shown in the far–left column.

| Total Number of Elected Parent Shares | Proration Percentage | Number of Parent Shares Issued | Number of Elected Parent Shares Converted into Cash Consideration |
|---|---|---|---|
| 5,000,000 | 100.0% | 5,000,000 | 0 |
| 8,333,333 | 100.0% | 8,333,333 | 0 |
| 10,000,000 | 83.3% | 8,333,333 | 1,666,667 |
| 15,000,000 | 55.6% | 8,333,333 | 6,666,667 |
| 20,000,000 | 41.7% | 8,333,333 | 11,666,667 |
| 25,000,000 | 33.3% | 8,333,333 | 16,666,667 |

*Some examples of the effects of the proration of the merger consideration are illustrated below (all percentages are approximate). The percentage of electing shares of Harman common stock and elections related to shares underlying options to acquire Harman common stock are shown for illustrative purposes only. The actual elections are likely to differ, perhaps significantly.*

*Example 1—No Proration Necessary.*    Assume Harman stockholders and option holders elect to receive 5,000,000 total shares of Parent common stock. Because the number of electing shares is less than 8,333,333, no proration will be required. As a result, all electing shares will be converted into the right to receive 5,000,000 shares of Parent common stock. All non–electing shares will be converted into the right to receive the Cash Consideration.

*Example 2—Proration Necessary.*    Assume Harman stockholders and option holders elect to receive 10,000,000 total shares of Parent common stock. Because the number of electing shares exceeds 8,333,333, the number of shares of Parent common stock to be issued in the merger will be prorated. The proration percentage will be 83.3%. As a result, 8,333,333 of the electing shares will be converted into the right to receive Parent common stock and 1,667,667 electing shares will be converted into the right to receive the Cash Consideration. The following describes the application of proration in this example for a partial and complete election for shares of Parent common stock.

- *Partial Election.*    Assume a Harman stockholder holds 6,000 shares and makes a valid election with respect to 3,000 of his shares. Under the proration described above, 2,499 of his 3,000 electing shares will be converted into the right to receive Parent common stock. The stockholder will receive the Cash Consideration for his 3,000 non–electing shares as well as the 501 electing shares that were not converted due to proration.

- *Complete Election.*    Assume a Harman stockholder holds 6,000 shares and makes a valid election with respect to all of her shares. Under the proration described above, 4,999 of her 6,000 shares will be converted into the right to receive Parent common stock and the remaining 1,001 shares will be converted into the right to receive the Cash Consideration.

Harman and Parent expect to publicly announce whether electing shares are subject to proration as soon as practicable following the Election Deadline.

## Election Forms and Related Documents

Parent has appointed the exchange agent to coordinate the payment of the applicable merger consideration following the merger. An election form package is being mailed with this proxy statement/prospectus to all holders of Harman common stock as of the record date. In addition, the exchange agent will send, upon request by contacting Harman or the proxy solicitor, an election form package to those stockholders who acquire their shares after the record date. The election form package will contain a form for you to complete in the event you would like to make an election to

receive shares of Parent common stock. The election form package also will contain detailed instructions on how to complete the form, along with various questions and answers relating to the election process.

As further described in the election form package, holders of Harman common stock who wish to make an election will be required to properly complete, execute and return the documents described below, in the manner described below, by the Election Deadline:

- *Election Form.*    Complete the election form according to the instructions provided in the election form package.

- *Stock Certificates.*    Submit duly endorsed Harman stock certificates for those shares subject to the election, or the notice of guaranteed delivery.

- *Form W–9.*    Complete the Substitute Form W–9 provided with the election form package, or if you are a non–U.S. person, request from the exchange agent, and complete, sign and return an appropriate Form W–8.

Please carefully read the documents contained in the election form package, including the information booklet provided in that package.

105

## ELECTION AGREEMENT

As a condition to the Sponsors entering into the merger agreement, Dr. Sidney Harman, Harman's Executive Chairman, has entered into an agreement with Parent regarding his election to receive Parent common stock instead of $120.00 per share in cash, as described in "The Merger Agreement—Merger Consideration; Election to Receive Parent Common Stock Instead of Cash" on page 81. Under the election agreement, Dr. Harman has agreed to irrevocably elect to receive shares of Parent common stock in exchange for at least 1,700,000 shares of Harman common stock he beneficially owns, subject, in the case of elections made with respect to any Harman stock options, to the application of a formula that effectively nets the exercise price and subject to the same proration procedures applicable to all other electing Harman stockholders and option holders.

The merger agreement provides that all elections related to Harman common stock may be revoked before the Election Deadline. Under the election agreement, however, the election made by Dr. Harman for both his shares of Harman common stock and his Harman stock options is irrevocable. In the event that Parent and Dr. Harman enter into an agreement providing for any options to acquire Harman common stock held by Dr. Harman to be converted into options or other equity awards of Parent, the total amount of his electing shares (1,700,000) will be reduced by the number of shares subject to these options (calculated net of any exercise price of these options).

In addition, Dr. Harman has agreed that during the period beginning on April 26, 2007 and ending at the effective time of the merger and subject to certain exceptions he will not sell, transfer, pledge, encumber, assign or otherwise dispose of (including by gift), or enter into any voting agreements or other similar arrangements regarding, any Harman common stock or take any action that would have the effect of preventing Dr. Harman from irrevocably electing 1,700,000 shares as required under the election agreement. Nothing under the election agreement, however, prohibits Dr. Harman from taking any action (a) he determines in good faith, after consulting with counsel, needs to be taken as an officer or director of Harman or under applicable law, or (b) with respect to a separate acquisition proposal.

Under the election agreement, Dr. Harman has further agreed that, for a period of two years following the effective time of the merger and subject to certain exceptions, he will not sell, transfer, pledge, encumber, assign or otherwise dispose of (including by gift), or enter into any voting agreements or other similar arrangements regarding, any of the shares of Parent common stock he received in the merger as a result of his irrevocable election pursuant to the election agreement.

The election agreement will terminate upon the termination of the merger agreement.

106

## MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

The following is a discussion of the material U.S. federal income tax consequences of the merger to "U.S. holders" (as defined below) of Harman common stock. This discussion is based on the provisions of the Code, Treasury regulations promulgated thereunder, judicial authorities and administrative rulings and pronouncements, all as in effect as of the date hereof, all of which are subject to change, possibly with retroactive effect. This discussion assumes that the merger will be completed in accordance with the terms of the merger agreement. No ruling has been or will be sought from the IRS as to the U.S. federal income tax consequences of the merger, and the following summary is not binding on the IRS or the courts. As a result, the IRS could adopt a contrary position, and such a contrary position could be sustained by a court.

For purposes of this discussion, the term "U.S. holder" means a beneficial owner of shares of Harman common stock that, for U.S. federal income tax purposes, is:

- an individual who is a citizen or resident of the United States;

- a corporation (including any entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States or any political subdivisions thereof;

- a trust that (1) is subject to the supervision of a court within the United States and the control of one or more U.S. persons or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person; or

- an estate that is subject to U.S. federal income tax on its income regardless of its source.

Holders of Harman common stock who are not U.S. holders may be subject to different tax consequences than those described below and are urged to consult their tax advisors regarding the tax consequences of the merger to them under U.S. and non–U.S. tax laws.

The following does not purport to consider all aspects of U.S. federal income taxation of the merger that might be relevant to U.S. holders in light of their particular circumstances, or those U.S. holders that may be subject to special rules (for example, dealers in securities or currencies, brokers, banks, financial institutions, insurance companies, mutual funds, tax–exempt organizations, stockholders subject to the alternative minimum tax, partnerships or other flow–through entities and their partners or members, persons whose functional currency is not the U.S. dollar, stockholders who hold Harman common stock as part of a hedge, straddle, constructive sale or conversion transaction or other integrated investment, stockholders who acquired Harman common stock pursuant to the exercise of an employee stock option or otherwise as compensation or receive the merger consideration with respect to employee stock options, or U.S. holders who exercise statutory appraisal rights), nor does it address the U.S. federal income tax consequences to U.S. holders that do not hold Harman common stock as "capital assets" within the meaning of Section 1221 of the Code (generally, property held for investment). In addition, the discussion does not address any aspect of foreign, state, local, estate, gift or other tax law that may be applicable to a U.S. holder.

The tax consequences to stockholders that hold Harman common stock through a partnership or other pass–through entity, generally, will depend on the status of the stockholder and the activities of the partnership. Partners in a partnership or other pass–through entity holding Harman common stock should consult their tax advisors.

**This summary of material U.S. federal income tax consequences is for general information only and is not tax advice. Holders are urged to consult their tax advisors with respect to the application of U.S. federal income tax laws to their particular situations as well as any tax consequences arising under the U.S. federal estate or gift tax rules, or under the laws of any state, local, foreign or other taxing jurisdiction or under any applicable tax treaty.**

*U.S. Federal Income Tax Consequences to U.S. Holders of Harman Common Stock.*    At the time that a U.S. holder makes an election to receive Parent common stock, such holder will not know if, and to what extent, the proration procedures will alter the mix of consideration to be received. As a result, the tax consequences to each U.S. holder will not be ascertainable with certainty until such holder knows the precise amount of Parent common stock that will be received in the merger.

*Exchange of Harman Common Stock Solely for Cash.*    A U.S. holder whose shares of Harman common stock are converted into the right to receive cash in the merger will recognize capital gain or loss in an amount equal to the difference, if any, between the amount of cash received and the U.S. holder's adjusted tax basis in the shares surrendered therefor. Gain or loss will be determined separately for each block of shares (i.e., shares acquired at the same cost in a single transaction) surrendered for cash pursuant to the merger. Such gain or loss will be long–term capital gain or loss provided that a U.S. holder's holding period for such shares is more than one year at the effective time of the merger. Long–term capital gains of individuals are generally eligible for preferential rates of taxation. The deductibility of capital losses is subject to certain limitations.

*Exchange of Harman Common Stock Solely for Parent Common Stock (and Cash Instead of Fractional Shares).*    Harman and Parent believe that the exchange of shares of Harman common stock solely for shares of Parent common stock (and, as applicable, cash for fractional shares) will be treated as an exchange described in Section 351 of the Code. Therefore, a U.S. holder who exchanges shares of Harman common stock solely for shares of Parent common stock (and, as applicable, cash for fractional shares) in the merger will not recognize any gain or loss upon the exchange, except to the extent that cash is received instead of fractional shares. Such U.S. holder will have an aggregate tax basis in the Parent common stock received equal to the aggregate tax basis of the Harman common stock surrendered therefor, excluding any tax basis allocated to fractional shares, provided either that the Harman common stock exchanged does not have a tax basis that exceeds its fair market value or, if it does, that a certain election to reduce the tax basis of the Parent common stock received to its fair market value is not made. The holding period for the Parent common stock received will include the holding period for the Harman common stock surrendered therefor. Harman and Parent intend to take the position that the receipt of cash instead of a fractional share of Parent common stock will be treated as if a U.S. holder received the fractional share in the merger and then received the cash in redemption of the fractional share. Accordingly, the U.S. holder will be treated as recognizing capital gain or loss equal to the difference between the amount of cash received with respect to the fractional share and the ratable portion of the U.S. holder's tax basis in the Harman common stock that is allocated to such fractional share. Such gain or loss will be long–term capital gain or loss provided that a U.S. holder's holding period for such share is more than one year at the effective time of the merger. Long–term capital gains of individuals are generally eligible for preferential rates of taxation. The deductibility of capital losses is subject to certain limitations.

*Exchange of Harman Common Stock for a Combination of Parent Common Stock and Cash.*    Although the matter is not free from doubt and no assurances can be given that the IRS would not take a contrary position, Harman and Parent believe that for purposes of determining the U.S. federal income tax consequences to U.S. holders who exchange Harman common stock for a combination of Parent common stock and cash, the transactions contemplated by the merger agreement will be treated as two separate transactions—a transfer to Harman of a portion of the holders' Harman common stock solely in exchange for cash (the "Deemed Redemption") and a transfer to Parent of the balance of the Harman common stock in exchange for cash and Parent common stock (the "Deemed Exchange"). Harman and Parent further believe that the Deemed Exchange will be treated as an exchange described in Section 351 of the Code.

Consistent with the characterization as a Deemed Redemption and a Deemed Exchange, a U.S. holder should be required to bifurcate the Cash Consideration received in exchange for the Harman

108

common stock between two sources: (a) the cash attributable to the equity financing of Parent by Holdings ("Holdings Cash") and (b) the remaining Cash Consideration ("Harman Cash").

***Deemed Redemption.*** The Harman Cash portion of the total cash received by a U.S. holder in the merger with respect to its Harman common stock will be treated as received in the Deemed Redemption and thus should be treated as capital gain or loss in an amount equal to the difference, if any, between the amount of cash received and the U.S. holder's adjusted tax basis in the shares surrendered therefor in the Deemed Redemption. Such gain or loss will be long–term capital gain or loss provided that a U.S. holder's holding period for such shares is more than one year at the effective time of the merger. Long–term capital gains of individuals are generally eligible for preferential rates of taxation. The deductibility of capital losses is subject to certain limitations.

The Harman Cash received by a U.S. holder should be equal to the total cash received by such holder in the merger with respect to its Harman common stock multiplied by a fraction, the numerator of which is the amount of Harman Cash received by all holders in the merger and the denominator of which is the total cash received by all holders in the merger with respect to Harman common stock. This fraction cannot be computed accurately until after the effective time of the merger. Harman intends to report its computation of such fraction to the holders as supplemental information to the IRS Form 1099–B, or other appropriate information reporting. With respect to any U.S. holder, the number of shares of Harman common stock treated as redeemed by Harman in the Deemed Redemption will equal the Harman Cash received by such holder divided by the per share Cash Consideration.

***Deemed Exchange.*** Any shares of Harman common stock of a U.S. holder that are not treated as redeemed pursuant to the Deemed Redemption will be treated as exchanged for shares of Parent common stock and Holdings Cash in the Deemed Exchange. A U.S. holder will recognize capital gain, but not capital loss, on the Deemed Exchange in an amount equal to the lesser of:

- the amount of gain realized in respect of the Deemed Exchange, which would be the excess, if any, of the sum of the fair market value of the Parent common stock and the Holdings Cash received by such U.S. holder over such U.S. holder's tax basis in Harman common stock surrendered in the Deemed Exchange; and

- the amount of Holdings Cash received in the Deemed Exchange.

The Holdings Cash received by a U.S. holder should be equal to the total cash received by such holder in the merger multiplied by a fraction, the numerator of which is the amount of Holdings Cash received by all holders in the merger and the denominator of which is the total cash received by all holders in the merger with respect to Harman common stock. This fraction cannot be computed accurately until after the effective time of the merger. Harman intends to report its computation of such fraction to the holders as supplemental information to the IRS Form 1099–B, or other appropriate information reporting.

For this purpose, the Holdings Cash and the Parent common stock received by a U.S. holder generally will be allocated among the blocks of Harman common stock surrendered in the merger proportionately based upon the fair market value of such blocks of Harman common stock. Because no loss will be recognized on the Deemed Exchange, a U.S. holder will not be able to offset gain recognized on one block of Harman common stock by loss attributable to another block of stock. Such gain will be long–term capital gain provided that a U.S. holder's holding period for such shares is more than one year at the effective time of the merger. Long–term capital gains of individuals are generally eligible for preferential rates of taxation.

The aggregate tax basis of the Parent common stock received by a U.S. holder in the Deemed Exchange will be equal to the U.S. holder's aggregate tax basis in the Harman common stock surrendered in the Deemed Exchange, decreased by the amount of Holdings Cash received by the U.S.

holder and increased by the amount of gain recognized by the U.S. holder in connection with the Deemed Exchange, provided either that the Harman common stock surrendered does not have a tax basis that exceeds its fair market value or, if it does, that a certain election to reduce the tax basis of the Parent common stock received to its fair market value is not made. The holding period for the Parent common stock received will include the holding period for the Harman common stock surrendered therefor.

*Recharacterization of the Merger by the IRS.*    There is a risk that the IRS may recharacterize the tax treatment of the Harman Cash as additional cash consideration received in a Code Section 351 exchange. If the merger were recharacterized in this manner, a U.S. holder who exchanged Harman common stock for a combination of cash and Parent common stock would recognize capital gain, but not capital loss, calculated separately for each identifiable block of Harman common stock surrendered, and determine its tax basis in Parent common stock, as described above with respect to the Deemed Exchange.

Under such a characterization, certain U.S. holders could recognize a greater amount of gain. The greater amount of gain would be due to the fact that the full amount of Cash Consideration received in the merger would be attributed to a Code Section 351 exchange and as a result of the inability to recognize capital loss in any such Code Section 351 exchange. In addition, because no loss will be recognized, a U.S. holder will not be able to offset gain recognized on one block of Harman common stock by loss attributable to another block of stock. Such gain will be long–term capital gain provided that a U.S. holder's holding period for such shares is more than one year at the effective time of the merger. Long–term capital gains of individuals are generally eligible for preferential rates of taxation.

*Information on the Merger to be Filed with Stockholders' Returns.*    U.S. holders who receive Parent common stock, and following the effective time of the merger own Parent common stock representing at least five percent of the total combined voting power or value of the total outstanding Parent common stock, are required to attach to their tax returns for the year in which the merger is consummated, and maintain a permanent record of, a complete statement that contains the information listed in Treasury Regulation Section 1.351–3T. Such statement must include their aggregate fair market value and tax basis in their Harman common stock surrendered in the exchange.

*Backup Withholding and Information Reporting.*    A U.S. holder may be subject to backup withholding at the applicable rate (currently 28 percent) on the cash payments to which such U.S. holder is entitled pursuant to the merger, unless the U.S. holder properly establishes an exemption or provides its correct taxpayer identification number and certifies that no loss of exemption from backup withholding has occurred. A U.S. holder who provides an incorrect taxpayer identification number may be subject to penalties imposed by the IRS. Each U.S. holder should complete and sign the substitute IRS Form W–9 included as part of the letter of transmittal and return it to the exchange agent, in order to provide the information and certification necessary to avoid backup withholding, unless an applicable exemption applies and is established in a manner satisfactory to the exchange agent. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules generally will be allowable as a refund or a credit against a U.S. holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

Tax matters are very complicated, and the tax consequences of the merger to you will depend upon the facts of your particular situation. Accordingly, Harman and Parent strongly urge you to consult with a tax advisor to determine the particular U.S. federal, state, local or foreign income or other tax consequences to you of the merger.

110

## DISSENTERS' RIGHTS OF APPRAISAL

Under Delaware law, you have the right to dissent from the merger and to receive payment in cash for the fair value of your shares of Harman common stock as determined by the Delaware Court of Chancery, together with a fair rate of interest, if any, as determined by the court, in lieu of the consideration you would otherwise be entitled to pursuant to the merger agreement. These rights are known as appraisal rights. Stockholders electing to exercise appraisal rights must comply with the provisions of Section 262 of the Delaware General Corporation Law, referred to as Section 262, in order to perfect their rights. Harman and Parent will require strict compliance with the statutory procedures.

The following is intended as a brief summary of the material provisions of the Delaware statutory procedures required to be followed by a stockholder in order to dissent from the merger and perfect appraisal rights.

This summary, however, is not a complete statement of all applicable requirements and is qualified in its entirety by reference to Section 262, the full text of which appears in Annex E to this proxy statement/prospectus. Failure to precisely follow any of the statutory procedures set forth in Section 262 may result in a termination or waiver of your appraisal rights.

Section 262 requires that stockholders be notified that appraisal rights will be available not less than 20 days before the stockholders' meeting to vote on the merger. A copy of Section 262 must be included with such notice. This proxy statement/prospectus constitutes Harman's notice to its stockholders of the availability of appraisal rights in connection with the merger in compliance with the requirements of Section 262. If you wish to consider exercising your appraisal rights, you should carefully review the text of Section 262 contained in Annex E to this proxy statement/prospectus because failure to timely and properly comply with the requirements of Section 262 will result in the loss of your appraisal rights under Delaware law.

If you elect to demand appraisal of your shares, you must satisfy each of the following conditions:

- You must deliver to Harman a written demand for appraisal of your shares before the vote with respect to the merger is taken. This written demand for appraisal must be in addition to and separate from any proxy or vote abstaining from or voting against the adoption of the merger agreement. Voting against or failing to vote for the adoption of the merger agreement by itself does not constitute a demand for appraisal within the meaning of Section 262.

- You must not vote in favor of the adoption of the merger agreement. A vote in favor of the adoption of the merger agreement, by proxy, through the Internet, by telephone or in person, will constitute a waiver of your appraisal rights in respect of the shares so voted and will nullify any previously filed written demands for appraisal. A proxy which does not contain voting instructions will, unless revoked, be voted in favor of the merger agreement. **Therefore, a stockholder who votes by proxy and who wishes to exercise appraisal rights must vote against the merger agreement or abstain from voting on the merger agreement.** If you fail to comply with either of these conditions and the merger is completed, you will be entitled to receive the cash payment for your shares of Harman common stock as provided for in the merger agreement, but you will have no appraisal rights with respect to your shares of Harman common stock.

All demands for appraisal should be addressed to Harman International Industries, Incorporated, 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004, Attention: Corporate Secretary, and must be delivered before the vote on the merger agreement is taken at the special meeting, and should be executed by, or on behalf of, the record holder of the shares of Harman common stock. The demand must reasonably inform Harman of the identity of the stockholder and the intention of the stockholder to demand appraisal of his or her shares.

111

To be effective, a demand for appraisal by a holder of Harman common stock must be made by, or in the name of, such registered stockholder, fully and correctly, as the stockholder's name appears on the stockholder's stock certificate(s). **Beneficial owners who do not also hold the shares of record may not directly make appraisal demands to Harman. The beneficial holder must, in such cases, have the registered owner, such as a broker, bank or other custodian, submit the required demand in respect of those shares.** If shares are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, execution of a demand for appraisal should be made by or for the fiduciary; and if the shares are owned of record by more than one person, as in a joint tenancy or tenancy in common, the demand should be executed by or for all joint owners. An authorized agent, including an authorized agent for two or more joint owners, may execute the demand for appraisal for a stockholder of record; however, the agent must identify the record owner or owners and expressly disclose the fact that, in executing the demand, he or she is acting as agent for the record owner. A record owner, such as a broker, who holds shares as a custodian for others, may exercise the record owner's right of appraisal with respect to the shares held for one or more beneficial owners, while not exercising this right for other beneficial owners. In that case, the written demand should state the number of shares as to which appraisal is sought. Where no number of shares is expressly mentioned, the demand will be presumed to cover all shares held in the name of the record owner. In addition, the stockholder must continuously hold the shares of record from the date of making the demand through the effective time of the merger.

**If you hold your shares of Harman common stock in a brokerage account or in other custodian form and you wish to exercise appraisal rights, you should consult with your bank, broker or other custodian to determine the appropriate procedures for the making of a demand for appraisal by the custodian.**

Within 10 days after the effective time of the merger, the surviving corporation must give written notice that the merger has become effective to each stockholder who has properly filed a written demand for appraisal and who did not vote in favor of the merger agreement. At any time within 60 days after the effective time, any stockholder who has demanded an appraisal has the right to withdraw the demand and to accept the cash payment specified by the merger agreement for his or her shares of common stock.

**If, following a demand for appraisal, you have withdrawn such demand for appraisal in accordance with Section 262, you will have the right to receive the merger consideration. However, if you have not made a valid election to receive Parent common stock and you withdraw your demand for appraisal following the Election Deadline, your shares of Harman common stock will be deemed to be converted as of the effective time of the merger into the right to receive the Cash Consideration.**

Within 120 days after the effective date of the merger, any stockholder who has complied with Section 262 will, upon written request to the surviving corporation, be entitled to receive a written statement setting forth the aggregate number of shares not voted in favor of the merger agreement and with respect to which demands for appraisal rights have been received and the aggregate number of holders of such shares. Such written statement will be mailed to the requesting stockholder within 10 days after such written request is received by the surviving corporation or within 10 days after expiration of the period for delivery of demands for appraisal, whichever is later. Within 120 days after the effective time, either the surviving corporation or any stockholder who has complied with the requirements of Section 262 may file a petition in the Delaware Court of Chancery demanding a determination of the fair value of the shares held by all stockholders entitled to appraisal. Upon the filing of the petition by a stockholder, service of a copy of such petition shall be made upon the surviving corporation. The surviving corporation has no obligation to file such a petition in the event there are dissenting stockholders. Accordingly, the failure of a stockholder to file such a petition within the period specified could nullify the stockholder's previously written demand for appraisal.

112

If a petition for appraisal is duly filed by a stockholder and a copy of the petition is delivered to the surviving corporation, the surviving corporation will then be obligated, within 20 days after receiving service of a copy of the petition, to provide the Delaware Court of Chancery with a duly verified list containing the names and addresses of all stockholders who have demanded an appraisal of their shares and with whom agreements as to the value of their shares have not been reached by the surviving corporation. After notice to dissenting stockholders who demanded appraisal of their shares, the Delaware Court of Chancery is empowered to conduct a hearing upon the petition, and to determine those stockholders who have complied with Section 262 and who have become entitled to the appraisal rights provided thereby. The Delaware Court of Chancery may require the stockholders who have demanded appraisal for their shares to submit their stock certificates to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with that direction, the Delaware Court of Chancery may dismiss the proceedings as to that stockholder.

After determination of the stockholders entitled to appraisal of their shares of common stock, the Delaware Court of Chancery will appraise the shares owned by those stockholders, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger, together with a fair rate of interest, if any, upon the amount determined to be the fair value. When the value is determined, the Delaware Court of Chancery will direct the payment of such value, with interest thereon accrued during the pendency of the proceeding, if the Delaware Court of Chancery so determines, to the stockholders entitled to receive the same, upon surrender by such holders of the certificates representing those shares.

In determining fair value, and, if applicable, a fair rate of interest, the Delaware Court of Chancery is required to take into account all relevant factors. In *Weinberger v. UOP, Inc.*, the Delaware Supreme Court discussed the factors that could be considered in determining fair value in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered, and that "fair price obviously requires consideration of all relevant factors involving the value of a company."

Section 262 provides that fair value is to be "exclusive of any element of value arising from the accomplishment or expectation of the merger." In *Cede & Co. v. Technicolor, Inc.*, the Delaware Supreme Court stated that such exclusion is a "narrow exclusion [that] does not encompass known elements of value," but which rather applies only to the speculative elements of value arising from such accomplishment or expectation. In *Weinberger*, the Delaware Supreme Court construed Section 262 to mean that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered."

**You should be aware that the fair value of your shares as determined under Section 262 could be more than, the same as, or less than the value that you are entitled to receive under the terms of the merger agreement.**

Costs of the appraisal proceeding may be imposed upon the surviving corporation and the stockholders participating in the appraisal proceeding by the Delaware Court of Chancery as the Court deems equitable in the circumstances. Upon the application of a stockholder, the Delaware Court of Chancery may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorneys' fees and the fees and expenses of experts, to be charged pro rata against the value of all shares entitled to appraisal. In the absence of such a determination of assessment, each party bears its own expenses. Any stockholder who had demanded appraisal rights will not, after the effective time of the merger, be entitled to vote shares subject to that demand for any purpose or to receive payments of dividends or any other distribution

113

with respect to those shares, other than with respect to payment as of a record date prior to the effective time; however, if no petition for appraisal is filed within 120 days after the effective time of the merger, or if the stockholder delivers a written withdrawal of his or her demand for appraisal and an acceptance of the terms of the merger within 60 days after the effective time of the merger, then the right of that stockholder to appraisal will cease and that stockholder will be entitled to receive the Cash Consideration for shares of his or her Harman common stock pursuant to the merger agreement, but will not have the right to elect to convert his or her Harman common stock into shares of Parent common stock. Any withdrawal of a demand for appraisal made more than 60 days after the effective time of the merger may only be made with the written approval of the surviving corporation. No appraisal proceeding in the Delaware Court of Chancery will be dismissed as to any stockholder without the approval of the Court.

**In view of the complexity of Section 262, stockholders who may wish to dissent from the merger and pursue appraisal rights should consult their legal advisors.**

## DESCRIPTION OF PARENT COMMON STOCK

*The following discussion summarizes the material features and rights of the common stock of Parent following the completion of the merger. Harman and Parent urge you to read the applicable provisions of Delaware law and Parent's certificate of incorporation, as amended, and by−laws, as amended, which are attached to this proxy statement/prospectus as Annex C and Annex D.*

**Capitalization**

Parent will be authorized to issue 60,000,000 shares of common stock having a par value of $0.01 per share. Each share of Parent common stock will have the same relative rights as, and is identical in all respects to, each other share of Parent common stock.

**Dividends**

Parent can pay dividends out of statutory surplus or from certain net profits if, as and when declared by its board of directors. Funds for Parent dividends generally will be provided through dividends and distributions from Harman, its wholly owned subsidiary following completion of the merger. The payment of dividends or distributions by Harman will be subject to limitations that are imposed by the financing arrangements entered into in connection with the completion of the merger and applicable law. Following the completion of the merger, the holders of Parent common stock will be entitled to receive and share equally in such dividends as may be declared by the board of directors of Parent out of funds legally available for this purpose.

**Voting Rights**

Holders of Parent common stock will be entitled to one vote per share, and, in general, a majority of Parent's issued and outstanding shares of common stock will be sufficient to authorize action upon routine matters submitted for a vote. Directors are to be elected by a plurality of the votes cast at the annual meeting of the stockholders, and stockholders of Parent do not have the right to cumulate their votes in the election of directors. Any action required or permitted to be taken at any stockholders meeting may, except as otherwise required by the certificate of incorporation of Parent or by applicable law, be taken without a meeting, without prior notice and without a vote, upon written consent signed by holders of Parent common stock representing the number of votes necessary to authorize such action at a stockholders meeting at which all shares of Parent common stock were present and voted.

**Liquidation**

In the event of liquidation, dissolution or winding up of Parent, the holders of its common stock would be entitled to receive, after payment or provision for payment of all of its debts and liabilities, all of the assets of Parent available for distribution.

**Preemptive Rights**

Holders of common stock of Parent are not entitled to preemptive rights with respect to any shares which may be issued.

## COMPARISON OF STOCKHOLDERS' RIGHTS

The rights of Harman stockholders are governed by the Delaware General Corporation Law, or the DGCL, and Harman's restated certificate of incorporation, as amended, and by–laws. If, pursuant to the terms of the merger agreement, you elect to receive shares of common stock of Parent, your rights as stockholder of Parent will be governed by the DGCL and by Parent's certificate of incorporation, as amended, and by–laws, as amended.

*The following discussion summarizes the material differences between the rights of Harman and Parent stockholders. This summary contains a list of the material differences, but is not meant to be relied upon as an exhaustive list or a detailed description of the provisions discussed and is qualified in its entirety by reference to the governing instruments of Harman and Parent. We urge you to read the governing instruments of each company and the provisions of the DGCL, which are relevant to a full understanding of the governing instruments, carefully and in their entirety.*

### Capitalization

*Harman*

The authorized capital stock of Harman currently consists of 200,000,000 shares of common stock, par value $0.01 per share, and 5,000,000 shares of preferred stock, par value $0.01 per share.

*Parent*

The authorized capital stock of Parent currently consists of 60,000,000 shares of common stock, par value $0.01 per share, and no shares of preferred stock.

### Voting Rights

*Harman*

Each outstanding share of common stock of Harman is entitled to one vote on each matter submitted to a vote at a meeting of stockholders, including the election of directors.

*Parent*

Each outstanding share of Parent common stock is entitled to one vote on all matters submitted to a vote of Parent stockholders, including the election of directors.

### Number of Directors

*Harman*

Harman's restated certificate or incorporation and by–laws provide that the number of directors is fixed from time to time exclusively by the board of directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time such resolution is presented to the board of directors for adoption). The current size of the board of directors is five.

*Parent*

Parent's by–laws currently provide for a minimum of one director and a maximum of 15 directors, with the number of directors within this range determined from time to time by the Parent board of directors or the stockholders of Parent. The current size of the Parent board of directors is three.

116

**Classes and Election of Directors**

*Harman*

Harman's restated certificate of incorporation currently provides that the board of directors is divided into three classes, with each class to be as nearly equal in number as possible. The directors in each class currently serve three–year terms of office.

Directors will be elected by a plurality of the votes of shares present in person, by means of remote communication or represented by proxy and entitled to vote on the election of directors. Harman's restated certificate of incorporation does not permit cumulative voting.

*Parent*

Directors will be elected by a plurality of the votes cast at the annual meeting of the stockholders.

**Filling Vacancies on the Board**

*Harman*

Harman's restated certificate of incorporation and by–laws provide that newly created directorships resulting from any increase in the number of directors and any vacancies resulting from death, resignation, disqualification, removal or other cause may be filled only by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum of the board of directors. Any director so chosen will hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor has been elected and qualified.

*Parent*

Parent's by–laws provide that any vacancy occurring on the board of directors for any reason (including any newly created directorships resulting from any increase in the authorized number of directors) may be filled by the board of directors, acting by a majority of the directors then in office, although less than a quorum, or by the sole remaining director or by the stockholders. Any director so chosen will hold office until such director's successor is elected and qualified or until such director's earlier resignation or removal.

**Removal of Directors**

*Harman*

Under Harman's restated certificate of incorporation and the by–laws, a director may be removed only for cause and by the affirmative vote of the holders of at least two–thirds of the voting power of the outstanding shares of common stock of Harman entitled to vote on the election of directors.

*Parent*

Under the by–laws of Parent, a director may be removed with or without cause by a vote of the holders of a majority of Parent's issued and outstanding common stock.

**Amendments to the Certificate of Incorporation**

*Harman*

Under the DGCL, amendments to Harman's restated certificate of incorporation must be proposed by a resolution of Harman's board of directors and adopted by the affirmative vote of a majority of all outstanding shares of common stock of Harman. Harman's restated certificate of

117

incorporation, however, requires the affirmative vote of the holders of at least two–thirds of the voting power of the outstanding shares of common stock of Harman entitled to vote on the election of directors in order to amend the provisions relating to (a) the power of the board of directors to amend or repeal the by–laws; (b) the taking of any stockholder action without a meeting; (c) director elections, nominations, vacancies or removal; and (d) transactions with an interested stockholder.

*Parent*

Under the DGCL, amendments to Parent's certificate of incorporation must be proposed by a resolution of Parent's board of directors and adopted by the affirmative vote of a majority of all outstanding shares of Parent common stock.

**Amendments to the By–Laws**

*Harman*

Harman's by–laws may be amended either through a resolution of the board of directors of Harman, acting by a majority vote, or upon the vote of a majority of the voting power of Harman's common stock. Harman's by–laws, however, require the affirmative vote of the holders of at least two–thirds of the voting power of the outstanding shares of common stock of Harman entitled to vote on the election of directors in order to amend (a) the provisions relating to director elections, nominations, vacancies or removal, or (b) such voting requirement.

*Parent*

Parent's by–laws may be amended either through a resolution of the board of directors of Parent, acting by a majority vote, or upon the vote of the holders of a majority of Parent's issued and outstanding common stock.

**Stockholder Proposals**

*Harman*

Harman's by–laws provide that in order for a stockholder to bring business before an annual meeting of stockholders, the stockholder must give timely written notice to the Corporate Secretary of Harman. Generally, the notice must be delivered to, or mailed and received at, Harman's principal offices not less than 60 days no more than 90 days before the first anniversary date on which Harman first mailed its proxy materials for the immediately preceding annual meeting.

The notice must set forth with respect to each stockholder proposal all of the following:

- a description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting;

- the name and address, as they appear in Harman's books, of the stockholder or beneficial owner proposing such business;

- the class and number of shares which are beneficially owned and of record by the stockholder or beneficial owner;

- a description of all arrangements or understandings between the stockholder and any other person in connection with the proposal of such business and any material interest of the stockholder in such business; and

- a representation that the stockholder intends to appear in person or by proxy at the meeting to bring the proposal before the meeting.

118

In addition, a stockholder must also comply with applicable requirements of the Exchange Act (and the rules and regulations promulgated thereunder) and the NYSE.

*Parent*

The organizational documents of Parent do not contain any provisions related to the procedures for any stockholder proposals.

## Director Nominations by Stockholders

*Harman*

Harman's by–laws provide that in order for a stockholder to nominate a director for election by the stockholders, the stockholder must give written notice to the Corporate Secretary of Harman either by personal delivery or by U.S. mail. For annual meetings, the notice must be delivered no later than 90 days before such meeting. For special meetings, the notice must be delivered by the close of business on the seventh day following the date on which notice of such special meeting is first given to stockholders.

The notice must set forth all of the following information:

- the name and address of the stockholder who intends to make the nomination and of the person(s) to be nominated;

- a representation that the nominating stockholder is a holder of record of Harman entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to nominate the person(s) specified in the notice;

- a description of all arrangements or understandings between the stockholder, each nominee and any other person in connection with the nomination;

- any other information regarding each nominee that is required under the rules of the SEC had the nominee been nominated by the board of directors; and

- the consent of each nominee to serve as a director if elected.

*Parent*

The organizational documents of Parent do not contain any provisions related to director nominations by stockholders.

## Ability to Call Special Meetings of the Board

*Harman*

Harman's by–laws provide that special meetings of the board of directors of Harman may be called by the Chairman of the board, the Chief Executive Officer, the President or a majority of the board of directors. The Chairman of the board of directors (or, if none, the Chief Executive Officer) or Secretary is required to call a special meeting of the board of directors of Harman upon the written request of two directors unless the board of directors consists of only one director in which case the special meeting is required to be called in like manner upon the written request of the sole director.

*Parent*

Parent's by–laws provide that special meetings of the board of directors of Parent may be called by the President. The President or Secretary is required to call a special meeting of the board of directors of Parent if directed by the board of directors.

119

**Ability to Call Special Meetings of Stockholders**

*Harman*

Harman's by–laws provide that special meetings of stockholders may be called at any time by the Chairman of the board of directors, the Chief Executive Officer, the President or the Secretary within 10 days after receipt of a written request of a majority of the board of directors.

*Parent*

Parent's by–laws provide that special meetings of stockholders may be called by the President. In addition, the President or the Secretary is required to call a special meeting of stockholders if directed by Parent's board of directors or requested in writing by the holders of not less than 25 percent of the common stock of Parent.

**Actions by Stockholders without a Meeting**

*Harman*

Under Harman's restated certificate of incorporation, no action required or permitted to be taken at any meeting of stockholders may be taken by written consent without a meeting.

*Parent*

Under Parent's by–laws, any action required or permitted to be taken at any stockholders meeting may, except as otherwise required by the certificate of incorporation of Parent or by applicable law, be taken without a meeting, without prior notice and without a vote, upon written consent signed by holders of Parent common stock representing the number of votes necessary to authorize such action at a stockholders meeting at which all shares of Parent common stock were present and voted.

**Limitation on Directors' Liability**

*Harman*

Harman's restated certificate of incorporation provides that, to the full extent permitted by the DGCL or any other applicable laws, no director will be personally liable to Harman or its stockholders for any acts or omissions in the performance of his or her duties as a director of Harman.

Section 102 of the DGCL provides that a corporation can limit the personal liability of a director for breach of fiduciary duty as a director, but may not limit or eliminate liability for (a) any breach of the director's duty of loyalty, (b) any act or omission not in good faith or which involves intentional misconduct or a knowing violation of law, (c) breaches under Section 174 of the DGCL or (d) any transaction from which the director derived an improper personal benefit.

*Parent*

Parent's certificate of incorporation provides that no director will be personally liable to Parent or its stockholders for monetary damages for breach of his or her fiduciary duty as a director, except to the extent that such exemption from liability or limitation thereof is not permitted under the DGCL.

**Indemnification of Directors and Officers**

*Harman*

Harman's by–laws provide that each person who is or was or had agreed to become a director or officer of Harman, or each such person who is or was serving or had agreed to serve at the request of the board of directors or an officer of Harman as a director, officer, employee or agent of another

120

corporation, partnership, joint venture, trust or other enterprise (including the heirs, executors, administrators or estate of such person), will be indemnified (including provision for advancement of expenses) by Harman to the full extent permitted by the DGCL or any other applicable laws.

Under the DGCL, other than actions brought by or on behalf of a corporation, indemnification would apply in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, where the indemnitee has served in any capacity at the request of the corporation, if the proposed indemnitee acted in good faith and in a manner that such person reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful. In actions brought by or on behalf of the corporation, the DGCL permits indemnification by a corporation under similar circumstances for expenses (including attorneys' fees) actually and reasonably incurred in connection with the defense or a settlement of any such action, except that no indemnification may be made in respect of any claim, issue or matter as to which the person is adjudged to be liable to the corporation unless in the case of a judicial finding that despite such adjudication of liability but in view of all the circumstances of the case the person is fairly and reasonably entitled to indemnity for such portion of the expenses as the court deems proper.

To the extent a director, officer, employee or agent is successful in the defense of such an action, suit or proceeding, the corporation is required by the DGCL to indemnify such person for reasonable expenses incurred thereby. Expenses (including attorneys' fees) incurred by an officer or director in defending any action, suit or proceeding may be paid in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay the amount if it is ultimately determined that that person is not entitled to be so indemnified.

*Parent*

Parent's certificate of incorporation provides that Parent will indemnify and hold harmless any person who was or is a party or is threatened to be made a party to, or testifies in, any threatened, pending or completed action, claim, suit or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that such person is or was a director or officer of Parent, or is or was serving at the request of Parent as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against all claims, losses, liabilities, expenses (including attorneys' fees and disbursements), damages, judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding to the fullest extent permitted under the DGCL. In addition, to the extent that a director or officer of Parent has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in the immediately preceding sentence, or in defense of any claim, issue or matter therein, such person will be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

Parent's certificate of incorporation also requires Parent to pay such director or officer any expenses (including attorneys' fees) incurred in defending or testifying in any such action, claim, suit or proceeding in advance of the final disposition of such action, claim, suit or proceeding within 20 business days of Parent's receipt of a request for advancement of such expense from such director or officer and, to the extent required by law, upon receipt of an undertaking by or on behalf of any such director or officer to repay such amount if it is ultimately determined that such director or officer is not entitled to be indemnified by Parent against such expenses as authorized by the relevant sections of the DGCL.

121

**Stockholder Rights Plans**

*Harman*

Harman has a stockholder rights plan, pursuant to which Harman has issued a right to purchase 1/100 [th] of a share of Series A Junior Participating Preferred Stock at a purchase price of $250.00, subject to adjustment. The rights expire on December 27, 2009, unless earlier exercised by a holder or redeemed by Harman.

*Parent*

Parent does not have, and is not expected to have, a stockholder rights plan.

**Anti–Takeover Protections**

*Harman*

*Harman's Restated Certificate of Incorporation.*    Under Harman's restated certificate of incorporation the following transactions may not be effected unless specified conditions are met:

- any merger or consolidation of Harman or any of its majority owned subsidiaries with (a) any interested stockholder or (b) any other corporation which is, or after such merger or consolidation would be, an affiliate of an interested stockholder;

- any sale, lease, exchange, mortgage, pledge, transfer or other disposition to or with any interested stockholder of any affiliate of an interested stockholder of any assets of Harman or any of its majority owned subsidiaries having an aggregate fair market value of $10.0 million or more;

- the issuance or transfer by Harman or any of its majority owned subsidiaries of any securities of Harman or any of its majority owned subsidiaries to any interested stockholder or any affiliate of an interested stockholder in exchange for cash, securities or other property (or a combination thereof) having an aggregate fair market value of $10.0 million or more;

- the adoption of any plan or proposal for the liquidation or dissolution of Harman proposed by or on behalf of an interested stockholder or an affiliate of an interested stockholder; or

- any reclassification of securities, recapitalization of Harman, any merger or consolidation of Harman with any of its majority owned subsidiaries or any other transaction which has the effect of increasing the proportionate share of the outstanding shares of any class of equity or convertible securities of Harman or any of its majority owned subsidiaries which is owned by an interested stockholder or any affiliate of an interested stockholder.

For purposes of the preceding paragraph, "interested stockholder" means any person (including any affiliate thereof) other than Harman or any of its subsidiaries and other than any profit sharing, employee stock ownership or other employee benefit plan of Harman or any of its subsidiaries or any trustee of or fiduciary with respect to any such plan when acting in such capacity, which beneficially owns or controls, directly or indirectly, 20% or more of the outstanding shares of common stock of Harman.

*DGCL Business Combinations.*    Under the DGCL, a corporation is prohibited from engaging in any business combination with an interested stockholder or any entity if the transaction is caused by the interested stockholder within three years after the person or entity first becomes an interested stockholder, unless:

- the transaction that caused the person to become an interested stockholder was approved by the board of directors prior to the transaction;

- after the completion of the transaction in which the person becomes an interested stockholder, the interested stockholder holds at least 85 percent of the outstanding voting stock of the corporation not including (a) shares held by persons who are both officers and directors of the corporation and (b) shares held by specified employee benefit plans; or

- after the person becomes an interested stockholder, the business combination is approved by the board of directors and holders of at least $66^2/3$ percent of the outstanding voting stock, excluding shares held by the interested stockholder.

The DGCL defines the term "business combination" to include transactions such as mergers, sales and leases of assets, issuances of securities and similar transactions. The DGCL defines the term "interested stockholder" generally as any person or entity who, together with certain affiliates and associates, beneficially owns 15% or more of the corporation's outstanding voting stock.

A corporation can expressly elect not to be governed by the DGCL's business combination provisions in its certificate of incorporation or by–laws, but Harman has not done so.

### Parent

In its certificate of incorporation, Parent has elected not to be governed by the DGCL's business combination provisions.

<div align="center">123</div>

### DESCRIPTION OF BUSINESS OF PARENT

Parent was formed by the Sponsors in April 2007 in anticipation of the merger for the sole purpose of owning the equity securities of Harman. Parent has had no business or operations prior to this time, except for activities incidental to its formation and activities undertaken in connection with the transactions contemplated by the merger agreement. Following completion of the merger, Harman will become a direct wholly owned subsidiary of Parent. As a result, the assets and business of Parent will consist exclusively of those of Harman.

CONTROL AND MANAGEMENT OF PARENT

**KHI Holdings LP**

Holdings will hold approximately 73 percent of the outstanding shares of Parent common stock following completion of the merger (assuming elections to convert shares of Harman common stock or shares underlying options to acquire Harman common stock are made with respect to at least 8,333,333 shares of Harman common stock and/or shares underlying options to acquire Harman common stock). Holdings is managed by its general partner, KHI Manager LLC, a Delaware limited liability company.

The general partner is governed by its board of managers. Subject to the right of GSCP to designate up to two members of the board of managers in the event that it maintains an equity interest in Holdings in excess of specified thresholds, KKR has the right to designate all members of the board of managers and to determine the size of the board of managers. The board of managers acts by a majority vote subject to GSCP's consent to specified actions so long as it has the right to designate a member to the board of managers. Each of Holdings and KHI Manager LLC was formed solely for the purpose of acquiring Harman and has not carried on any activities to date, except for activities incidental to its formation and activities undertaken in connection with the transactions contemplated by the merger agreement. The sole member of KHI Manager LLC is KKR 2006 Fund L.P., a Delaware limited partnership.

**Board of Directors of Parent**

Upon completion of the merger, Holdings, as owner of a majority of the outstanding shares of Parent common stock, will have the right to elect all of the members to Parent's board of directors. Parent anticipates that its board of directors will be comprised of seven individuals following the completion of the merger. The following table sets forth information regarding the persons expected to be directors of Parent upon the completion of the merger:

| Name | Age |
|------|-----|
| Henry R. Kravis | 63 |
| Brian F. Carroll | 35 |
| Stephen Ko | 33 |
| William J. Janetschek | 44 |
| Adrian Jones | 43 |
| Sidney Harman | 88 |
| Dinesh Paliwal | 49 |

*Henry R. Kravis.*    Mr. Kravis is a Founding Partner of KKR. Effective January 1, 1996, he became a managing member of the Executive Committee of the limited liability company which serves as the general partner of KKR. Prior to founding KKR, Mr. Kravis was a Partner in the Corporate Finance Department of Bear Stearns & Company. Mr. Kravis is also a member of the board of directors of Tarkett, KKR Private Equity Investors, Accel–KKR Company and U.S. Natural Resources.

*Brian F. Carroll.*    Mr. Carroll has been a Member of KKR since January 2006 and before that, an executive of KKR since July 1999. Prior to joining KKR, Mr. Carroll was with Donaldson, Lufkin & Jenrette. Mr. Carroll is also a member of the board of directors of Rockwood Specialties Group, Inc. and Sealy Corporation.

*Stephen Ko.*    Mr. Ko has been a Principal of KKR since 2005. Prior to joining KKR, Mr. Ko was with the Private Equity Group of The Blackstone Group from 2002 to 2005, and prior to being with The Blackstone Group, Mr. Ko was with Clayton, Dubilier & Rice and the Investment Banking Division of Goldman, Sachs & Co.

*William J. Janetschek.*    Mr. Janetschek is KKR's chief financial officer. Prior to joining KKR in 1997, he was a tax partner with the New York office of Deloitte & Touche LLP. Mr. Janetschek was with Deloitte & Touche for 13 years. He is also a director of KKR PEI GP Limited.

*Adrian Jones.*    Mr. Jones joined Goldman, Sachs & Co. in 1994 and has been a Managing Director of Goldman, Sachs & Co. since 2002. Before joining Goldman Sachs, Mr. Jones served as a lieutenant in the Irish Army and worked at Bank of Boston. Mr. Jones currently serves on the boards of directors of Burger King Corporation, Education Management Corporation, HeathMarkets, Inc. and Signature Hospital Holding.

*Sidney Harman.*    Dr. Sidney Harman has been Executive Chairman of the Board of Directors of Harman since July 2000 and has served as Chairman of the Board and as a director of Harman since Harman's founding in 1980. Dr. Harman also served as Chief Executive Officer of Harman from 1980 to 1998 and from January 1, 2007 to present. Dr. Harman served as Deputy Secretary of Commerce of the United States from 1977 through 1978.

*Dinesh Paliwal.*    Mr. Paliwal will become the President, Chief Executive Officer and Vice Chairman of Harman effective July 1, 2007. Mr. Paliwal is currently president, global markets and technology, and a member of the executive committee of ABB Group. Mr. Paliwal joined ABB in 1985 as a systems engineer and held various positions at ABB before being elected to his current position in 2006. Prior to joining ABB, Mr. Paliwal served with Ballarpur Industries in Yamunanagar, India, AccuRay Corporation in Columbus, Ohio, and Combustion Engineering, in Melbourne, Australia and Singapore. He is a member of the U.S. Business Roundtable and a director of the U.S. India Business Council and the International Swimming Hall of Fame. He is also chairman of the National Foreign Trade Council, a U.S.–based non–profit free trade organization, and serves as a director of Embarq Corporation.

## Executive Officers of Parent

Upon completion of the merger, Parent anticipates that the current executive officers of Harman will be appointed as officers of Parent by the board of directors of Parent.

## Certain Relationships and Related Party Transactions

### Arrangements Between Parent and Dinesh Paliwal

On May 8, 2007, in connection with Dinesh Paliwal's entering into a letter agreement with Harman by which he agreed to become President, Chief Executive Officer and Vice Chairman of Harman effective July 1, 2007, Mr. Paliwal entered into a letter agreement with Parent pursuant to which Mr. Paliwal and Parent agreed to certain changes to the terms of his employment with Harman following the merger. The Parent letter agreement is effective upon completion of the merger and will terminate in the event that the merger agreement terminates.

In accordance with the terms of the Parent letter agreement, upon the completion of the merger, options to purchase Harman stock to be granted to Mr. Paliwal when he commences employment with Harman will become fully vested and converted into the right to receive a cash payment for these options, in accordance with the terms of the merger agreement. In addition, upon the completion of the merger, Mr. Paliwal will receive a grant of options to purchase 100,000 shares of Parent common stock, which will have a per share exercise price equal to the fair market value of one share of Parent common stock on the date of grant. The new options awarded to Mr. Paliwal will vest 20% per year over five years from the date of grant, subject to Mr. Paliwal's continued employment and the achievement by Harman of annual performance targets agreed to between Mr. Paliwal and Parent.

126

The Parent letter agreement also provides that upon completion of the merger, 32,291 restricted stock units of Harman stock awarded to Mr. Paliwal upon the commencement of his employment with Harman will be converted into a cash award equal to the product of 32,291 multiplied by the $120.00 per share merger consideration. This cash award will vest on March 1, 2008 and will be paid to Mr. Paliwal, with interest at a market rate from the date of the merger through the payment date, no later than March 3, 2008, so long as Mr. Paliwal's employment has not been terminated for cause by Harman, or by Mr. Paliwal without good reason (each as defined in his employment agreement with Harman), prior to that time. All other outstanding Harman equity awards held by Mr. Paliwal will otherwise remain outstanding in accordance with their original terms, subject to modification in accordance with the terms and conditions of definitive agreements to be entered into between Mr. Paliwal and Parent following the merger.

Under the Parent letter agreement, the terms of Mr. Paliwal's severance upon a termination of his employment by Harman without cause, or by Mr. Paliwal for good reason, will be unchanged, with the exception of the accelerated vesting of certain restricted shares held by Mr. Paliwal. Under the terms of Mr. Paliwal's current employment agreement with Harman, a minimum of 30,000 of the restricted shares granted to Mr. Paliwal upon the commencement of his employment with Harman would become fully vested and unrestricted upon a termination of his employment by Harman without cause, or by Mr. Paliwal for good reason (less any restricted shares that vested prior to such termination). Mr. Paliwal and Parent have agreed to a reduction of that number such that only 25,000 restricted shares (less any restricted shares that vested prior to such termination) will become vested upon any such termination.

### Sponsor Management Agreement

Following the completion of the merger, Parent will enter into a management agreement with one or more affiliates of the Sponsors pursuant to which the Sponsors or their affiliates will provide management services to Parent and Harman. Pursuant to this agreement, the affiliate(s) of the Sponsors will receive an aggregate annual management fee equal to 1% of Parent's earnings before interest, taxes, depreciation and amortization, or EBITDA. Parent expects EBITDA to be defined in a manner consistent with the definition of EBITDA contained in the indentures governing the notes that are expected to be issued in connection with the debt financing arranged to complete the merger, but assumes (a) the management fee had not been paid for purposes of calculating EBITDA, and (b) reimbursement for out–of–pocket expenses incurred by the Sponsors and their affiliates in connection with the provision of services pursuant to the management agreement. In addition, pursuant to this management agreement, Parent will also pay the Sponsors transaction fees of approximately $83 million in the aggregate in connection with services provided by the Sponsors relating to the merger. It is also expected that the management agreement will provide that affiliates of the Sponsors will be entitled to receive a fee in connection with certain subsequent financing, acquisition, disposition and change in control transactions based on the gross transaction value of those transactions, as well as a termination fee based on the net present value of future payment obligations under the management agreement in the event of an initial public offering or under certain other circumstances. The management agreement also will include customary exculpation and indemnification provisions in favor of the Sponsors and their affiliates.

### Other Relationships

The Sponsors, Holdings or any of their affiliates may from time to time enter into other arrangements with Parent, Harman or its subsidiaries. These arrangements may be subject to the prior approval of Parent's board of directors and may be subject to restrictions on affiliate transactions contained in agreements entered into in connection with the financing arranged to complete the merger. For example, it is expected that the senior secured credit facility will contain covenants that

127

generally will require Harman to conduct transactions with affiliates on terms as favorable to it as it would obtain in a comparable arm's length transaction with a non–affiliate. Parent expects this covenant will provide for specified exceptions, including an exception for the payment of fees pursuant to the management agreement discussed above.

**Dividend Policy**

Parent currently does not intend to pay regular quarterly cash dividends on the shares of Parent common stock to be outstanding after the merger. Parent may from time to time decide to pay dividends to holders of Parent common stock, which dividends may be substantial. If Parent pays a dividend to holders of its common stock, the dividend will be paid pro rata to all holders of shares of Parent common stock. Parent's ability to declare a dividend will be subject to covenants and other restrictions in Harman's post–merger financing arrangements. See "Risk Factors—Risks Related to the Financing of the Merger and Indebtedness" beginning on page 33.

128

### MARKET PRICE OF HARMAN COMMON STOCK AND DIVIDEND DATA

Harman common stock is listed for trading on the NYSE under the symbol "HAR." The following table sets forth, for the fiscal quarters indicated, dividends and the high and low intra–day sales price per share of Harman common stock as reported on the NYSE composite tape.

| | High | | Low | | Dividends Declared | |
|---|---|---|---|---|---|---|
| **Fiscal Year Ended June 30, 2006** | | | | | | |
| First Quarter | $ | 111.48 | $ | 78.60 | $ | .0125 |
| Second Quarter | $ | 109.53 | $ | 93.21 | $ | .0125 |
| Third Quarter | $ | 115.85 | $ | 93.73 | $ | .0125 |
| Fourth Quarter | $ | 111.50 | $ | 79.20 | $ | .0125 |
| | | | | | | |
| **Fiscal Year Ended June 30, 2007** | | | | | | |
| First Quarter | $ | 87.03 | $ | 74.65 | $ | .0125 |
| Second Quarter | $ | 108.29 | $ | 82.64 | $ | .0125 |
| Third Quarter | $ | 105.68 | $ | 92.40 | $ | .0125 |
| Fourth Quarter (through June 18, 2007) | $ | 125.13 | $ | 96.12 | $ | .0125 |

The closing price of Harman common stock on the NYSE on April 25, 2007, the last trading day prior to the announcement of the merger was $102.56. The $120.00 per share to be paid for each share of Harman common stock in the merger represents a premium of 17% to the closing price on April 25, 2007, and a premium of 20% to the average closing share price for the 60 trading days prior to the announcement of the merger.

On [  •  ], the most recent practicable date before this proxy statement/prospectus was printed, the closing price for Harman common stock on the NYSE was $[  •  ] per share. Your are encouraged to obtain current market quotations for Harman common stock in connection with voting your shares.

Harman paid cash dividends during fiscal years 2006 and 2007 of $.05 per share, with a dividend of $.0125 per share paid in each quarter.

The historical trading prices of Harman common stock may not be indicative of the trading price of Parent common stock following the merger. See "Risk Factors—Risks Related to the Ownership of Parent Common Stock" beginning on page 35. In addition, Parent does not intend to pay regular quarterly cash dividends on Parent common stock after the merger. See "Control and Management of Parent—Dividend Policy" on page 128.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS OF
## HARMAN COMMON STOCK AND HARMAN MANAGEMENT

The following table shows, as of June 18, 2007, the beneficial ownership of shares of Harman common stock for (a) all stockholders known by Harman to beneficially own more than 5% of the shares of Harman common stock, (b) each of the current directors of Harman, (c) Harman's named executive officers and (d) all of Harman's directors and executive officers as a group. Unless otherwise noted, these persons have sole voting and investment power over the shares listed below. Some of the information in the table is based on information included in filings made by the beneficial owners with the SEC.

| Name | Amount and Nature of Beneficial Ownership(1) | Percentage(2) |
|------|-----------------------------------------------|---------------|
| T. Rowe Price Associates, Inc. | 9,077,457(3) | 13.9% |
| Capital Research and Management Company | 7,671,000(4) | 11.8% |
| FMR Corp. | 6,918,877(5) | 10.6% |
| The Growth Fund of America, Inc. | 3,760,000(4) | 5.8% |
| Sidney Harman | 3,467,408(6) | 5.3% |
| Gina Harman | 257,864 | * |
| Shirley M. Hufstedler | 147,607(7) | * |
| Edward H. Meyer | 83,336 | * |
| Ann M. Korologos | 67,020 | * |
| Kevin Brown | 29,000 | * |
| Erich A. Geiger | 163,000(8) | * |
| Dinesh Paliwal | [•](9) | * |
| All directors and executive officers as a group (11 persons) | 4,295,644 | 6.5% |

\*        Less than 1%

(1)      As required by the rules of the SEC, the table includes shares of common stock that may be acquired pursuant to stock options exercisable within 60 days from June 18, 2007 as follows: Dr. Harman (790,000 shares), Ms. Harman (102,524 shares), Ms. Hufstedler (71,000 shares), Dr. Geiger (151,000 shares), Mr. Meyer (71,000 shares), Ms. Korologos (60,600 shares), Mr. Brown (29,000 shares) and all directors and executive officers as a group (1,317,824 shares). The table also includes shares of common stock held in the Harman Retirement Savings Plan by all directors and executive officers as a group (612 shares). The table excludes shares of common stock underlying stock options and restricted stock units not exercisable within 60 days from June 18, 2007. These options and restricted stock units will immediately vest upon the completion of the merger. See "The Merger Agreement—Treatment of Stock Options and Other Awards" beginning on page 82 for information regarding the accelerated vesting of these options and restricted stock units.

(2)      Based on 65,233,501 shares of common stock outstanding as of June 18, 2007.

(3)      Information with respect to T. Rowe Price Associates, Inc. ("T. Rowe") is based on the Schedule 13G/A filed with the SEC on February 13, 2007 by T. Rowe. T. Rowe has sole dispositive power with respect to 9,031,557 shares of common stock and sole voting power with respect to 2,574,535 shares of common stock as of December 31, 2006. The address of T. Rowe is 100 E. Pratt Street, Baltimore, Maryland 21202.

(4)      Information with respect to Capital Research and Management Company ("CRMC") and The Growth Fund of America, Inc. ("GFA") is based on the Schedule 13G filed jointly by CRMC and GFA with the SEC on April 10, 2007. CRMC has sole dispositive power with respect to 7,671,000

shares of common stock and sole voting power with respect to 3,911,000 shares of common stock as of March 30, 2007. GFA has sole voting power with respect to 3,760,000 shares of common stock as of March 30, 2007. The address of CRMC is 333 South Hope Street, Los Angeles, California 90071 and the address of GFA is One Market, Steuart Tower, Suite 1800, San Francisco, California 94105.

(5)

Information with respect to FMR Corp. is based on the Schedule 13G/A filed with the SEC on February 14, 2007 by FMR Corp. FMR Corp. had sole dispositive power with respect to 6,918,877 shares of common stock and sole voting power with respect to 1,867,934 shares of common stock as of December 31, 2006. Edward C. Johnson III, Chairman of FMR Corp. is also deemed to be the beneficial owner of 6,685,814 of the 6,918,877 shares of common stock beneficially owned by FMR Corp. by virtue of his position with, and ownership of, FMR Corp. The address for FMR Corp. is 82 Devonshire Street, Boston, Massachusetts 02109.

(6)

Includes 1,514,860 shares held in a trust for which Dr. Harman has sole dispositive and sole voting power; 154,416 shares held in an irrevocable trust for various family members for which Dr. Harman has sole voting power but shared dispositive power; 171,164 shares held by the Sidney Harman Charitable Remainder Trust for which Dr. Harman has sole dispositive power and sole voting power; and 427,522 shares held by family members for which Dr. Harman has sole voting power pursuant to revocable proxies. Also includes 409,446 shares held in trust for which Dr. Harman's spouse has sole dispositive and sole voting power and for which Dr. Harman disclaims beneficial ownership. Dr. Harman's address is c/o Harman International Industries, Incorporated, 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004.

(7)

Includes 72,407 shares held by the Hufstedler Family Trust for which Ms. Hufstedler acts as co–trustee and for which she has shared dispositive power and shared voting power.

(8)

Includes 12,000 unvested shares of restricted common stock for which Dr. Geiger has sole voting power but no dispositive power.

(9)

Mr. Paliwal was appointed as Harman's President, Chief Executive Officer and Vice Chairman effective July 1, 2007. Information regarding the equity interests in Harman to be granted to Mr. Paliwal is set forth in Harman's Current Report on Form 8–K filed with the SEC on May 9, 2007.

131

## PARENT'S STOCK OWNERSHIP AFTER THE MERGER

Following the completion of the merger and depending upon the number of shares of Parent common stock that are issued to Harman stockholders and option holders in connection with the merger, the outstanding capital stock of Parent will be owned as follows:

- up to approximately 27% of Parent's common stock and voting power will be issued to, and held by, former Harman stockholders and/or option holders who have elected to receive shares of Parent common stock in connection with the merger; and

- the remaining shares of Parent common stock (approximately 73% assuming that Harman stockholders and option holders elect to receive the maximum number of shares of Parent common stock issuable to Harman stockholders and option holders in the merger) will be issued to Holdings (and will be indirectly held by affiliates of the Sponsors and their co−investors).

In addition, Parent anticipates providing members of Harman management with an opportunity to make an equity investment in Parent. Parent has also informed us that it intends to set up equity−based incentive compensation plans for management of the surviving corporation (see "The Merger—New Arrangements with Parent and Merger Sub" beginning on page 60).

132

**LEGAL MATTERS**

The validity of the shares of Parent common stock offered by this proxy statement/prospectus will be passed upon for Parent by Simpson Thacher & Bartlett LLP. Certain partners of Simpson Thacher & Bartlett LLP, members of their respective families and related persons have an interest in certain of KKR's private equity funds, including KKR 2006 Fund L.P., in each case constituting less than 1% of the fund commitments.

**STOCKHOLDER PROPOSALS FOR 2007 ANNUAL MEETING OF HARMAN STOCKHOLDERS**

If the merger is completed Harman will not have public stockholders, and there will be no public participation in any future meetings of stockholders of Harman. However, if the merger is not completed, Harman expects to hold a 2007 annual meeting of stockholders. In order to be included in Harman's proxy materials for the 2007 annual meeting of stockholders, if held, a stockholder proposal must have been received in writing by Harman at 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004 by May 14, 2007, and otherwise comply with all requirements of the SEC for stockholder proposals.

Harman's by-laws provide that any stockholder who desires to bring a proposal before an annual meeting must give timely written notice of the proposal to Harman's Corporate Secretary. To be timely, the notice must be delivered to the above address not less than 60 nor more than 90 days before the first anniversary of the date on which Harman first mailed its proxy materials for the immediately preceding annual meeting. Stockholder proposals for the 2007 annual meeting of stockholders, if held, must be received no later than July 13, 2007. However, Harman's by-laws also provide that if an annual meeting is called for a date that is not within 30 days before or after the anniversary of the prior year's annual meeting, then stockholder proposals for that annual meeting must be received no later than the close of business on the 10th day following the day on which public announcement is first made of the date of the upcoming annual meeting. The notice must also describe the stockholder proposal in reasonable detail and provide certain other information required by the by-laws.

Notice of a stockholder's intent to make a nomination for director at the 2007 annual meeting of stockholders, if held, must be received by Harman's Corporate Secretary 90 days in advance of the annual meeting. The notice must include certain information regarding the nominees as required by Harman's by-laws. A copy of Harman's by-laws is available upon request from Harman's Corporate Secretary.

134

**WHERE YOU CAN FIND MORE INFORMATION**

Harman files annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document Harman files at the SEC's public reference room located at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1–800–SEC–0330 for further information on the public reference room. Harman's SEC filings are also available to the public at the SEC's website at http://www.sec.gov. You also may obtain free copies of the documents Harman files with the SEC by going to the "Investor Information" section of Harman's website at http://www.harman.com. Harman's website address is provided as an inactive textual reference only. The information provided on Harman's website is not part of this proxy statement/prospectus, and is not incorporated herein by reference.

Reports, proxy statements or other information concerning Harman may also be inspected at the offices of the NYSE at 20 Broad Street, New York, New York 10005.

Statements contained in this proxy statement/prospectus, or in any document incorporated by reference in this proxy statement/prospectus regarding the contents of any contract or other document, are not necessarily complete, and each such statement is qualified in its entirety by reference to that contract or other document filed as an exhibit with the SEC. The SEC allows Harman to "incorporate by reference" into this proxy statement/prospectus documents it files with the SEC. This means that Harman can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this proxy statement/prospectus, and later information that Harman files with the SEC will update and supersede that information. Harman incorporates by reference the documents listed below and any documents filed by Harman pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this proxy statement/prospectus and before the date of the special meeting:

- Annual Report on Form 10–K for the fiscal year ended June 30, 2006;

- Quarterly Reports on Form 10–Q for the periods ended September 30, 2006, December 31, 2006 and March 31, 2007; and

- Current Reports on Form 8–K filed with the SEC on July 7, 2006, August 15, 2006, August 22, 2006, October 2, 2006, January 5, 2007, April 26, 2007, April 27, 2007 and May 9, 2007.

Any person, including any beneficial owner, to whom this proxy statement/prospectus is delivered may request copies of this proxy statement/prospectus and any of the documents incorporated by reference in this document or other information concerning Harman, without charge, by written or telephonic request directed to Investor Relations, Harman International Industries, Incorporated, 1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C. 20004, telephone: (202) 393–1101, on the "Investor Relations" section of Harman's website at http://www.harman.com or from the SEC through the SEC's website at the address provided above. Documents incorporated by reference are available without charge, excluding any exhibits to those documents unless the exhibit is specifically incorporated by reference into those documents.

THIS PROXY STATEMENT/PROSPECTUS DOES NOT CONSTITUTE THE SOLICITATION OF A PROXY IN ANY JURISDICTION TO OR FROM ANY PERSON TO WHOM OR FROM WHOM IT IS UNLAWFUL TO MAKE SUCH PROXY SOLICITATION IN THAT JURISDICTION. YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED OR INCORPORATED BY REFERENCE IN THIS PROXY STATEMENT/PROSPECTUS TO VOTE YOUR SHARES AT THE SPECIAL MEETING. HARMAN HAS NOT AUTHORIZED ANYONE TO PROVIDE YOU WITH INFORMATION THAT IS DIFFERENT FROM WHAT IS CONTAINED IN THIS PROXY STATEMENT/PROSPECTUS. THIS PROXY STATEMENT/PROSPECTUS IS DATED [  •  ], 2007. YOU SHOULD NOT ASSUME THAT THE INFORMATION CONTAINED IN THIS PROXY STATEMENT/PROSPECTUS IS ACCURATE AS OF ANY DATE OTHER THAN THAT DATE, AND THE MAILING OF THIS PROXY STATEMENT/PROSPECTUS TO STOCKHOLDERS DOES NOT CREATE ANY IMPLICATION TO THE CONTRARY.

**KHI PARENT INC.**

**CONSOLIDATED FINANCIAL STATEMENT**
**As of June 15, 2007**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–2 |
| Consolidated Balance Sheet | F–3 |
| Notes to Consolidated Balance Sheet | F–4 |

F–1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors
KHI Parent Inc.:

We have audited the accompanying consolidated balance sheet of KHI Parent Inc. and subsidiary as of June 15, 2007. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this consolidated financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the balance sheet is free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit of a balance sheet also includes examining, on a test basis, evidence supporting the amounts and disclosures in that balance sheet, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall balance sheet presentation. We believe that our audit of the consolidated balance sheet provides a reasonable basis for our opinion.

In our opinion, the consolidated balance sheet referred to above presents fairly, in all material respects, the financial position of KHI Parent Inc. and subsidiary as of June 15, 2007, in conformity with U.S. generally accepted accounting principles.

/s/ KPMG LLP

McLean, VA
June 18, 2007

F–2

**KHI PARENT INC.**

**CONSOLIDATED BALANCE SHEET**

**JUNE 15, 2007**

| ASSETS | | |
|---|---|---|
| Total assets | $ | — |

| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
|---|---|---|
| Liabilities | $ | — |
| Stockholders' equity: | | |
| Common stock, $0.01 par value, 60,000,000 shares authorized, 100 shares issued and outstanding | | 1.00 |
| Stock subscription receivable | | (1.00) |
| Total stockholders' equity | | — |
| Total liabilities and stockholders' equity | $ | — |

See accompanying Notes to Consolidated Balance Sheet.

F–3

## KHI PARENT INC.

### NOTES TO CONSOLIDATED BALANCE SHEET

**Note 1. Organization and Basis of Presentation**

KHI Parent Inc., referred to herein as Parent, was incorporated in the state of Delaware on April 25, 2007. Parent was formed in connection with the contemplated merger of its wholly owned subsidiary, KHI Merger Sub Inc., referred to herein as Merger Sub, and Harman International Industries, Incorporated, referred to herein as Harman. Upon completion of the merger, Merger Sub will merge with and into Harman with Harman being the surviving corporation and becoming a wholly owned subsidiary of Parent. Other than its formation, Parent and its subsidiary have not conducted any activities.

The consolidated balance sheet includes the accounts of Parent and its wholly owned subsidiary, Merger Sub. Intercompany accounts have been eliminated.

The preparation of financial statements in conformity with accounting principles generally accepted in the United States required management to make estimates and assumptions that affect the amounts reported in the consolidated balance sheet.

**Note 2. Stockholders' Equity**

The authorized capital stock of Parent currently consists of 60,000,000 shares of common stock, par value $0.01 per share, and no shares of preferred stock. One hundred shares of common stock are issued and outstanding.

**Note 3. Agreement and Plan of Merger**

On April 26, 2007, Parent entered into an Agreement and Plan of Merger with Harman and Merger Sub. The transaction is expected to be completed in the third quarter of calendar year 2007 and is subject to the approval of Harman's stockholders and other customary closing conditions, including regulatory approvals.

**AGREEMENT AND PLAN OF MERGER**

among

**KHI PARENT INC.**

**KHI MERGER SUB INC.**

and

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**

**Dated as of April 26, 2007**

**TABLE OF CONTENTS**

**ARTICLE I THE MERGER**                                                                 A–1

Section 1.01     The Merger                                                              A–1
Section 1.02     Closing                                                                 A–2
Section 1.03     Effective Time                                                          A–2
Section 1.04     Effects of the Merger                                                   A–2
Section 1.05     Company Charter and By–laws of the Surviving Corporation                A–2
Section 1.06     Directors                                                               A–2
Section 1.07     Officers                                                                A–2
Section 1.08     Further Assurances                                                      A–2

**ARTICLE II CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES**                            A–3

Section 2.01     Effect on Capital Stock                                                 A–3
Section 2.02     Election Procedures                                                     A–4
Section 2.03     Proration                                                               A–6
Section 2.04     Exchange of Shares for Merger Consideration                             A–8
Section 2.05     Effect of the Merger on Company Stock Options, Company Restricted Shares and RSUs   A–10

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY**                            A–11

Section 3.01     Qualification, Organization, Subsidiaries, etc.                         A–11
Section 3.02     Capital Stock                                                           A–12
Section 3.03     Subsidiaries                                                            A–13
Section 3.04     Corporate Authority Relative to This Agreement; No Violation            A–13
Section 3.05     Reports and Financial Statements                                        A–14
Section 3.06     No Undisclosed Liabilities                                              A–15
Section 3.07     Compliance with Law; Permits                                            A–15
Section 3.08     Environmental Laws and Regulations                                      A–15
Section 3.09     Employee Benefit Plans                                                  A–16
Section 3.10     Interested Party Transactions                                           A–18
Section 3.11     Absence of Certain Changes or Events                                    A–18
Section 3.12     Investigations; Litigation                                              A–18
Section 3.13     Proxy Statement; Other Information                                      A–18
Section 3.14     Tax Matters                                                             A–19
Section 3.15     Labor Matters                                                           A–20
Section 3.16     Intellectual Property                                                   A–20
Section 3.17     Property                                                                A–20
Section 3.18     Required Vote of the Company Stockholders                               A–21
Section 3.19     Material Contracts                                                      A–21
Section 3.20     Finders or Brokers                                                      A–22
Section 3.21     Fairness Opinion                                                        A–22
Section 3.22     State Takeover Statutes; Charter Provisions; Company Rights Agreement   A–22
Section 3.23     No Other Representations                                                A–22

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB**     A–23

Section 4.01    Qualification; Organization     A–23
Section 4.02    Corporate Authority Relative to This Agreement; No Violation     A–23
Section 4.03    Proxy Statement; Other Information     A–24
Section 4.04    Financing     A–24
Section 4.05    Ownership and Operations of Merger Sub; Issuance of Parent Common Stock     A–25
Section 4.06    Finders or Brokers     A–26
Section 4.07    Certain Arrangements     A–26
Section 4.08    Investigations; Litigation     A–26
Section 4.09    Guarantees     A–26
Section 4.10    Solvency     A–26
Section 4.11    Access to Information; Disclaimer     A–27
Section 4.12    Investments     A–27

**ARTICLE V COVENANTS AND AGREEMENTS**     A–27

Section 5.01    Conduct of Business     A–27
Section 5.02    Acquisition Proposals     A–31
Section 5.03    Company Meeting; Preparation of Form S–4 and Proxy Statement     A–34
Section 5.04    Employee Matters     A–35
Section 5.05    Reasonable Best Efforts     A–36
Section 5.06    Takeover Statute     A–38
Section 5.07    Public Announcements     A–38
Section 5.08    Indemnification and Insurance     A–39
Section 5.09    Financing     A–40
Section 5.10    Access; Confidentiality     A–44
Section 5.11    Notification of Certain Matters     A–44
Section 5.12    Rule 16b–3     A–45
Section 5.13    Affiliate Letters     A–45
Section 5.14    Control of Operations     A–45
Section 5.15    Certain Transfer Taxes     A–45
Section 5.16    Obligations of Merger Sub     A–45
Section 5.17    Resignation of Directors     A–45
Section 5.18    Tax Free Qualification for Parent Stock Election     A–45

**ARTICLE VI CONDITIONS TO THE MERGER**     A–46

Section 6.01    Conditions to Each Party's Obligation to Effect the Merger     A–46
Section 6.02    Conditions to Obligation of the Company to Effect the Merger     A–46
Section 6.03    Conditions to Obligation of Parent and Merger Sub to Effect the Merger     A–47
Section 6.04    Frustration of Closing Conditions     A–47

**ARTICLE VII TERMINATION**     A–47

Section 7.01    Termination or Abandonment     A–47
Section 7.02    Termination Fees     A–49

A–ii

**ARTICLE VIII MISCELLANEOUS** A–51

| | | |
|---|---|---|
| Section 8.01 | No Survival of Representations and Warranties | A–51 |
| Section 8.02 | Expenses | A–51 |
| Section 8.03 | Counterparts; Effectiveness | A–51 |
| Section 8.04 | Governing Law | A–51 |
| Section 8.05 | Jurisdiction; Enforcement | A–51 |
| Section 8.06 | WAIVER OF JURY TRIAL | A–52 |
| Section 8.07 | Notices | A–52 |
| Section 8.08 | Assignment; Binding Effect | A–53 |
| Section 8.09 | Severability | A–53 |
| Section 8.10 | Entire Agreement; No Third–Party Beneficiaries | A–54 |
| Section 8.11 | Amendments; Waivers | A–54 |
| Section 8.12 | Headings | A–54 |
| Section 8.13 | Interpretation | A–54 |
| Section 8.14 | No Recourse | A–55 |
| Section 8.15 | Certain Definitions | A–55 |

INDEX OF DEFINED TERMS

Acceptable Confidentiality Agreement    A–33
Action    A–39
Affiliate Transaction    A–18
Affiliated Funds    A–27
Affiliates    A–55
Agreement    A–1
Authorized Preferred Stock    A–12
Book–Entry Shares    A–8
Bridge Financing    A–24
Business Day    A–55
Cancelled Shares    A–3
Capitalization Date    A–12
Cash Election Price    A–3
Certificate of Merger    A–2
Certificates    A–8
Change of Recommendation    A–34
Closing    A–2
Closing Date    A–2
Code    A–1
Company    A–1
Company Acquisition Proposal    A–33
Company Approvals    A–14
Company Benefit Plan    A–16
Company Charter    A–2
Company Common Stock    A–12
Company Disclosure Letter    A–11
Company Employees    A–35
Company Material Adverse Effect    A–11
Company Meeting    A–34
Company Permits    A–15
Company Restricted Shares    A–10
Company SEC Documents    A–14
Company Stock Option    A–10
Company Stock Plans    A–55
Company Stockholder Approval    A–21
Confidentiality Agreement    A–55
Contracts    A–55
control    A–55
Debt Commitment Letters    A–24
Debt Financing    A–24
DGCL    A–1
Dissenting Shares    A–4
Dissenting Stockholder    A–4
ECMR    A–46
Effective Time    A–2
Electing Share    A–3
Electing Stockholders    A–1
Election Deadline    A–6
Election Form    A–5
Election Form Record Date    A–5
End Date    A–47
Environmental Law    A–16
Equity Commitment Letters    A–24
Equity Financing    A–24
ERISA    A–16
ERISA Affiliate    A–17
Excess Shares    A–7
Exchange Act    A–13
Exchange Agent    A–5
Exchange Fund    A–8
Excluded Party    A–31
Filed SEC Documents    A–11
Financing    A–24
Financing Commitments    A–24
Form S–4    A–18
GAAP    A–15
Governmental Entity    A–14
Gross Electing Option Shares    A–5
GS Funds    A–55
Guarantee    A–1
Guarantor    A–55
Guarantors    A–55
Hazardous Substance    A–16
High Yield Financing    A–24
Holdings    A–25
HSR Act    A–14
Indebtedness    A–28
Indemnified Party    A–39
Intellectual Property    A–20
Irrevocable Option Election    A–5
IRS    A–17
KKR    A–55

Knowledge ....................................................... A–55
Law ............................................................. A–15
Lien ............................................................ A–14
Marketing Period ............................................... A–41
Material Contract .............................................. A–21
Maximum Election Number ........................................ A–6

A–iv

| | |
|---|---|
| Merger | A–1 |
| Merger Consideration | A–3 |
| Merger Sub | A–1 |
| Net Electing Option Shares | A–5 |
| New Financing Commitments | A–41 |
| New Plans | A–35 |
| No–Shop Period Start Date | A–31 |
| Notice Period | A–33 |
| Old Plans | A–35 |
| orders | A–55 |
| Parent | A–1 |
| Parent Approvals | A–23 |
| Parent Common Stock | A–25 |
| Parent Disclosure Letter | A–23 |
| Parent Expenses | A–50 |
| Parent Limited Partners | A–55 |
| Parent Material Adverse Effect | A–55 |
| Parent Stock Election | A–4 |
| Parent Termination Fee | A–50 |
| person | A–56 |
| Person | A–56 |
| Proration Factor | A–7 |
| Proxy Statement | A–19 |
| Recommendation | A–13 |
| Regulatory Law | A–38 |
| Remaining Shares | A–3 |
| Representatives | A–31 |
| Required Information | A–42 |
| Rights | A–12 |
| Rights Agreement | A–12 |
| RSUs | A–10 |
| Sarbanes–Oxley Act | A–14 |
| SEC | A–14 |
| SEC Filings | A–18 |
| Securities Act | A–13 |
| Series A Preferred Stock | A–12 |
| Share | A–3 |
| Significant Subsidiary | A–56 |
| Solvent | A–26 |
| Subsidiaries | A–56 |
| Superior Proposal | A–33 |
| Surviving Corporation | A–2 |
| Tax | A–19 |
| Tax Return | A–20 |
| Taxes | A–19 |
| Termination Date | A–27 |
| Termination Fee | A–49 |

**AGREEMENT AND PLAN OF MERGER**

AGREEMENT AND PLAN OF MERGER, dated as of April 26, 2007 (this "*Agreement*"), among KHI PARENT INC., a Delaware corporation ("*Parent*"), KHI MERGER SUB INC., a Delaware corporation and a wholly owned subsidiary of Parent ("*Merger Sub*"), and HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, a Delaware corporation (the "*Company*").

WHEREAS, the parties intend that Merger Sub be merged with and into the Company, with the Company surviving that merger on the terms and subject to the conditions set forth in this Agreement (the "*Merger*");

WHEREAS, the board of directors of the Company has (i) determined that it is in the best interests of the Company and its stockholders, and declared it advisable, to enter into this Agreement, (ii) approved the execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby, including the Merger and (iii) resolved to recommend adoption of this Agreement by the stockholders of the Company;

WHEREAS, the board of directors of each of Parent and Merger Sub have approved this Agreement and declared it advisable for Parent and Merger Sub, respectively, to enter into this Agreement;

WHEREAS, concurrently with the execution of this Agreement, and as a condition and inducement to the Company's willingness to enter into this Agreement, each of the Guarantors is entering into a guarantee (each, a "*Guarantee*") in favor of the Company with respect to certain of Parent's obligations under this Agreement;

WHEREAS, concurrently with the execution of this Agreement, and as a condition and inducement to Parent's and Merger Sub's willingness to enter into this Agreement, certain stockholders of the Company (the "*Electing Stockholders*") are entering into an Election Agreement, pursuant to which the Electing Stockholders have irrevocably agreed to make a Parent Stock Election (as defined herein) and/or an Irrevocable Option Election (as defined herein) with respect to 1,700,000 shares of Company Common Stock (as defined herein) beneficially owned by the Electing Stockholders;

WHEREAS, for U.S. federal income Tax purposes, it is intended that the exchange of Shares (as defined below) for shares of Parent Common Stock (as defined below) pursuant to the Merger and a Parent Stock Election, taken together with the Equity Financing (as defined below) of Parent, shall qualify as an exchange described in Section 351 of the Internal Revenue Code of 1986, as amended (the "*Code*"), which is undertaken pursuant to a single integrated plan; and

WHEREAS, Parent, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Merger and the transactions contemplated by this Agreement and also to prescribe certain conditions to the Merger as specified herein.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Parent, Merger Sub and the Company hereby agree as follows:

**ARTICLE I**

**THE MERGER**

Section 1.01   *The Merger.*   At the Effective Time, upon the terms and subject to the conditions set forth in this Agreement and in accordance with the applicable provisions of the General Corporation Law of the State of Delaware (the "*DGCL*"), Merger Sub shall be merged with and into the Company, whereupon the separate corporate existence of Merger Sub shall cease, and the Company shall

A–1

continue as the surviving company in the Merger (the "*Surviving Corporation*") and a wholly owned subsidiary of Parent.

Section 1.02    *Closing.*    The closing of the Merger (the "*Closing*") shall take place at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York at 10:00 a.m., local time, on the date (the "*Closing Date*") following the satisfaction or waiver (to the extent permitted by applicable Law) of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) that is the earlier of (a) any Business Day during the Marketing Period as may be specified by Parent on no less than three Business Days' prior notice to the Company and (b) the final day of the Marketing Period, or such other date or time specified by the parties in writing.

Section 1.03    *Effective Time.*    On the Closing Date, the Company shall cause the Merger to be consummated by executing, delivering and filing a certificate of merger (the "*Certificate of Merger*") with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DGCL and shall make such other filings or recordings required under the DGCL in connection with the Merger. The Merger shall become effective at such time as the Certificate of Merger is duly filed with the Secretary of State of the State of Delaware, or at such later date or time as may be agreed by Parent and the Company in writing and specified in the Certificate of Merger in accordance with the DGCL (such time as the Merger becomes effective is referred to herein as the "*Effective Time*").

Section 1.04    *Effects of the Merger.*    The Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL.

Section 1.05    *Company Charter and By–laws of the Surviving Corporation.*

(a)

The certificate of incorporation of the Company (the "*Company Charter*") shall be amended as a result of the Merger so as to read in its entirety as set forth in Exhibit A, and, as so amended, shall be the certificate of incorporation of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law, in each case consistent with the obligations set forth in Section 5.08.

(b)

The by–laws of the Company, as in effect as of immediately prior to the Effective Time, shall be amended and restated so as to read in their entirety as set forth in Exhibit B, and, as so amended and restated, shall be the by–laws of the Surviving Corporation until thereafter amended in accordance with the provisions thereof, hereof and of applicable Law, in each case consistent with the obligations set forth in Section 5.08.

Section 1.06    *Directors.*    The directors of Merger Sub as of immediately prior to the Effective Time shall be the initial directors of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

Section 1.07    *Officers.*    The officers of the Company as of immediately prior to the Effective Time Date shall be the initial officers of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

Section 1.08    *Further Assurances.*    If at any time after the Effective Time the Surviving Corporation shall consider or be advised that any deeds, bills of sale, assignments or assurances or any other acts or things are necessary, desirable or proper (a) to vest, perfect or confirm, of record or otherwise, in the Surviving Corporation its right, title or interest in, to or under any of the rights, privileges, powers, franchises, properties or assets of either Merger Sub or the Company, or (b) otherwise to carry out the purposes of this Agreement, the Surviving Corporation and its proper officers and directors or their designees shall be authorized to execute and deliver, in the name and on behalf of either Merger Sub and the Company, all such deeds, bills of sale, assignments and assurances and to do, in the name and on behalf of either Merger Sub or the Company, all such other

acts and things as may be necessary, desirable or proper to vest, perfect or confirm the Surviving Corporation's right, title or interest in, to or under any of the rights, privileges, powers, franchises, properties or assets of Merger Sub or the Company and otherwise to carry out the purposes of this Agreement.

## ARTICLE II

### CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES

Section 2.01  *Effect on Capital Stock.*    At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent, Merger Sub or the holders of any securities of the Company, Parent or Merger Sub:

(a)  *Conversion of Company Common Stock.* Subject to Section 2.03, each issued and outstanding share of Company Common Stock outstanding immediately prior to the Effective Time (each, a "*Share*"), other than (i) any Shares held by any direct or indirect wholly owned Subsidiary of the Company (the "*Remaining Shares*"), (ii) any Cancelled Shares (as defined herein) and (iii) any Dissenting Shares (as defined herein), shall be converted automatically into and shall thereafter represent the right to receive the following (together with any consideration provided for in Section 2.01(e), the "*Merger Consideration*"):

(i)  for each such Share with respect to which an election to receive Parent Common Stock (as defined herein) has been effectively made and not revoked pursuant to Section 2.02 (each, an "*Electing Share*"), the right to receive one fully paid and non–assessable share of Parent Common Stock; and

(ii)  for each such Share other than Electing Shares, the right to receive in cash, without interest, $120.00 per Share (the "*Cash Election Price*").

As of the Effective Time, all Shares that have been converted into the right to receive the Merger Consideration shall be automatically cancelled and shall cease to exist, and each holder of any such Shares shall cease to have any rights with respect to such Shares other than the right to receive the Merger Consideration for each such Share.

(b)  *Parent, Merger Sub and Company–Owned Shares.* Each Share that is owned, directly or indirectly, by Parent or Merger Sub immediately prior to the Effective Time, if any, or that is held in treasury by the Company immediately prior to the Effective Time (the "*Cancelled Shares*") shall, by virtue of the Merger and without any action on the part of the holder thereof, be cancelled and shall cease to exist, and no consideration shall be delivered in exchange for such cancellation.

(c)  *Conversion of Merger Sub Common Stock; Remaining Shares.* At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, par value $0.01 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation and shall with the Remaining Shares (each of which shall be converted into and become such number of validly issued, fully paid and nonassessable shares of common stock, par value $0.01 per share, of the Surviving Corporation as shall be necessary to maintain relative ownership percentages) constitute the only outstanding shares of capital stock of the Surviving Corporation. From and after the Effective Time, all certificates representing the common stock of Merger Sub, if any, shall be deemed for all purposes to represent the number of shares of common stock of the Surviving Corporation into which they were converted in accordance with the immediately preceding sentence.

A–3

(d)   *Shares of Dissenting Stockholders.* Notwithstanding anything in this Agreement to the contrary, any issued and outstanding Shares held by a Person (a "*Dissenting Stockholder*") who has not voted in favor of or consented to the adoption of this Agreement and has complied with all the provisions of the DGCL concerning the right of holders of Shares to require appraisal of their Shares ("*Dissenting Shares*") shall not be converted into the right to receive the Merger Consideration as described in Section 2.01(a), but shall become the right to receive such consideration as may be determined to be due to such Dissenting Stockholder pursuant to the procedures set forth in Section 262 of the DGCL. If such Dissenting Stockholder withdraws its demand for appraisal or fails to perfect or otherwise loses its right of appraisal, in any case pursuant to the DGCL, its Shares shall be deemed to be converted as of the Effective Time into the right to receive the Merger Consideration for each such Share in accordance with the provisions of this Agreement (it being understood that if such Dissenting Stockholder withdraws its demand for appraisal or fails to perfect or otherwise loses its right of appraisal, in any case pursuant to the DGCL, following the Election Deadline (as defined herein) its Shares shall be deemed to be converted as of the Effective Time into the right to receive the Cash Election Price for each such Share, without interest). At the Effective Time, any holder of Dissenting Shares shall cease to have any rights with respect thereto, except the rights set forth in Section 262 of the DGCL and as provided in the previous sentence. The Company shall give Parent prompt notice of any demands for appraisal of Shares received by the Company, withdrawals of such demands and any other instruments served pursuant to Section 262 of the DGCL and shall give Parent the opportunity to participate in all negotiations and proceedings with respect thereto. The Company shall not, without the prior written consent of Parent (not to be unreasonably withheld), make any payment with respect to, or settle or offer to settle, any such demands.

(e)   *No Fractional Shares.* Notwithstanding any other provision of this Agreement, neither certificates nor scrip for fractional shares of Parent Common Stock shall be issued in the Merger. Each holder of Shares who otherwise would have been entitled to a fraction of a share of Parent Common Stock shall receive in lieu thereof cash (without interest) in an amount determined by multiplying the fractional share interest to which such holder would otherwise be entitled by the Cash Election Price. No such holder shall be entitled to dividends, voting rights or any other rights in respect of any fractional share of Parent Common Stock.

(f)   *Adjustments.* If at any time during the period between the date of this Agreement and the Effective Time, any change in the outstanding shares of capital stock of the Company, or securities convertible or exchangeable into or exercisable for shares of capital stock, shall occur as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or subdivision or combination, exchange or readjustment of shares, or any stock dividend or stock distribution with a record date during such period (excluding, in each case, normal quarterly cash dividends), merger or other similar transaction, the Merger Consideration shall be equitably adjusted, without duplication, to reflect such change; *provided* that nothing in this Section 2.01(f) shall be construed to permit the Company to take any action with respect to its securities that is prohibited by the terms of this Agreement.

Section 2.02   *Election Procedures.*

(a)   *Parent Stock Elections; Option Elections.*

(i)   Each Person who is a record holder of Shares on the Election Form Record Date (as defined herein), or who becomes a record holder of Shares during the period between the Election Form Record Date and the Election Deadline and has received the Election Form and related materials pursuant to Section 2.02(c), shall have the right to submit an Election Form specifying the number of Shares, if any, held by such Person that such Person desires to have converted into the right to receive Parent Common Stock (a "*Parent Stock Election*").

Any such record holder who fails properly to submit an Election Form on or before the Election Deadline (as defined herein) in accordance with the procedures set forth in this Section 2.02 shall be deemed to have not made a Parent Stock Election and thereby be entitled to the Cash Election Price for each such Share. Holders of record of Company Common Stock who hold such Company Common Stock as nominees, trustees or in other representative capacities may submit a separate Election Form on or before the Election Deadline with respect to each beneficial owner for whom such nominee, trustee or representative holds Company Common Stock.

(ii)    Each Person who is a holder of a Company Stock Option on the Election Form Record Date, or who becomes a holder of a Company Stock Option during the period between the Election Form Record Date and the Election Deadline and has received the Election Form and related materials pursuant to Section 2.02(c), shall have the right to submit an Election Form specifying the number of Company Stock Options held by such holder, if any, that such Person irrevocably commits to exercise (subject to any requirements with respect to method of exercise imposed by the Company in order to facilitate the implementation of this Section 2.02 and Section 2.03) immediately prior to the Effective Time and the corresponding number of Shares underlying such Company Stock Options that such Person desires to have converted into the right to receive Parent Common Stock, subject to proration as described in Section 2.03(c) in the event the total number of Electing Shares and Net Electing Option Shares in the aggregate exceeds the Maximum Election Number (an "*Irrevocable Option Election*"). Any such holder who fails properly to submit an Election Form on or before the Election Deadline in accordance with the procedures set forth in this Section 2.02(a)(ii) shall be deemed to have not made a Irrevocable Option Election and all of such holder's Company Stock Options shall be treated in accordance with Section 2.05(a). The aggregate number of Shares subject to a Irrevocable Option Election made pursuant to this Section 2.02(a)(ii) is referred to as the "*Gross Electing Option Shares*", and the "*Net Electing Option Shares*" shall mean the aggregate number of Shares that would be issued in the event the Company Stock Options covering the Gross Electing Option Shares were exercised on a net share basis (*i.e.*, paying the exercise price of the Company Stock Options using the value of the shares of Common Stock underlying such Company Stock Options) at the Cash Election Price taking into account the exercise price and any required tax withholding. For the avoidance of doubt, and except for purposes of calculating the Proration Factor (as defined herein), Company Stock Options shall only be deemed exercised pursuant to this Section 2.02(a)(ii) (or the Election Form referred to herein) to the extent necessary to provide sufficient Net Electing Option Shares in order to satisfy the provisions of Sections 2.03(a), (b) and (c) hereof.

(b)    *Appointment of Exchange Agent.* Prior to the mailing of the Proxy Statement (as defined herein), Parent shall appoint a bank or trust company reasonably acceptable to the Company to act as exchange agent (the "*Exchange Agent*") for the payment of the Merger Consideration.

(c)    *Mailing of Election Form; Election Deadline.* Parent shall prepare and direct the Exchange Agent to mail a form of election, which form shall be subject to the reasonable approval of the Company (the "*Election Form*"), with the Proxy Statement to the record holders of Company Common Stock and Company Stock Options as of the record date for the Company Meeting (the "*Election Form Record Date*"), which Election Form shall be used by each record holder of Shares who wishes to make a Parent Stock Election and by each holder of a Company Stock Option who wishes to make a Irrevocable Option Election; *provided* that the Company and Parent shall use commercially reasonable efforts to mail or otherwise make available the Election Form and related materials to all Persons who become record holders of Company Common Stock or Company Stock Options during the period between the Election Form Record Date and the Election

A–5

Deadline for use by such holders who desire to make a Parent Stock Election. Any such holder's Parent Stock Election or Irrevocable Option Election, as the case may be, shall have been properly made only if the Exchange Agent shall have received at its designated office, by 5:00 p.m. New York City time on the Business Day preceding the date of the Stockholders Meeting (the "*Election Deadline*"), an Election Form properly completed and signed and, in the case of a Parent Stock Election, accompanied by certificates for the Shares (unless such Shares are uncertificated) of Company Common Stock to which such Election Form relates, duly endorsed in blank or otherwise in form acceptable for transfer on the books of the Company (or by an appropriate guarantee of delivery of such certificates as set forth in such Election Form from a firm which is a registered national securities exchange or of the National Association of Securities Dealers, Inc. or by a commercial bank or trust company in the United States as set forth in such Election Form, provided such certificates are in fact delivered to the Exchange Agent within five NYSE trading days after the date of execution of such guarantee of delivery).

(d)   *Ability to Revoke Election Forms.* Any Election Form (other than in connection with an Irrevocable Option Election) may be revoked by the stockholder submitting it to the Exchange Agent only by written notice received by the Exchange Agent prior to the Election Deadline. All Election Forms shall automatically be revoked if the Exchange Agent is notified in writing by Parent and the Company the Merger has been abandoned and this Agreement has been terminated. If an Election Form is revoked, the certificate or certificates (or guarantees of delivery, as appropriate), if any, for the Shares to which such Election Form relates shall be promptly returned to the stockholder submitting the same to the Exchange Agent.

(e)   *Determination of Exchange Agent Binding.* The determination of the Exchange Agent shall be binding as to whether a Parent Stock Election shall have been properly made or revoked pursuant to this Section 2.02 with respect to Shares and when elections and revocations were received by it. If the Exchange Agent determines that any Parent Stock Election was not properly made with respect to any Shares, such Shares shall be treated by the Exchange Agent as Shares which were not Electing Shares at the Effective Time, and, except as otherwise provided in this Agreement, such shares shall be exchanged in the Merger for the Cash Election Price pursuant to Section 2.01(a)(ii). If the Exchange Agent determines that any Irrevocable Option Election was not properly made with respect to any Company Stock Option, the Exchange Agent shall disregard such improper election and such Company Stock Option shall be treated in accordance with Section 2.05(a)). The Exchange Agent also shall make all computations as to the allocation and the proration contemplated by Section 2.03, and any such computation shall be conclusive and binding on the holders of Shares and Company Stock Options. The Exchange Agent may, with the mutual agreement of Parent and the Company, make such rules as are consistent with this Section 2.02 for the implementation of the elections provided for herein as shall be necessary or desirable fully to effect such elections.

Section 2.03   *Proration.*

(a)   Notwithstanding anything in this Agreement to the contrary, the maximum aggregate number of shares of Company Common Stock to be converted into the right to receive Parent Common Stock at the Effective Time, either pursuant to Parent Stock Elections or Irrevocable Option Elections, shall be equal to 8,333,333 (the "*Maximum Election Number*").

(b)   If the total number of Electing Shares and Net Electing Option Shares, in the aggregate, is equal to or less than the Maximum Election Number, then (i) all Electing Shares shall be converted into the right to receive Parent Common Stock in accordance with the terms of Section 2.02(a)(i) and (ii) all Net Electing Option Shares shall be converted into the right to receive shares of Parent Common Stock through the exercise immediately prior to the Effective

Time of the appropriate number of Company Stock Options subject to such holder's Irrevocable Option Election pursuant to Section 2.02(a)(ii).

(c)    If the total number of Electing Shares and Net Electing Option Shares, in the aggregate, exceeds the Maximum Election Number, then the Electing Shares and the Net Electing Option Shares shall be converted into the right to receive Parent Common Stock or to receive cash in accordance with the terms of Section 2.01(a) or Section 2.05(a), as the case may be, in the following manner:

(i)    A proration factor (the "*Proration Factor*") shall be determined by dividing the Maximum Election Number by the total number of Electing Shares and Net Electing Option Shares;

(ii)    The number of Electing Shares covered by each holder's Parent Stock Election shall be converted into the right to receive such number of shares of Parent Common Stock as is equal to the product of (w) the Proration Factor *times* (x) the total number of Electing Shares covered by such holder's Parent Stock Election (subject to the proviso in the following sentence). In addition, in the event that such holder also has made an Irrevocable Option Election, such holder shall have the right to receive an additional number of shares of Parent Common Stock as is equal to the product of (y) the Proration Factor *times* (z) the total number of Net Electing Option Shares covered by such holder's Irrevocable Option Election; *provided* that in the event that the total number of shares of Parent Common Stock such holder would be entitled to receive pursuant to this Section 2.03(c)(ii) exceeds the number of Electing Shares covered by such holder's Parent Stock Election (the amount of such excess, the "*Excess Shares*"), then (A) all of such holder's Electing Shares shall be converted into Parent Common Stock and (B) the number of such holder's Net Electing Option Shares as is equal to the number of Excess Shares shall be converted into Parent Common Stock through the exercise of an appropriate number of Company Stock Options subject to such holder's Irrevocable Option Election pursuant to Section 2.02(a).

(iii)    All Electing Shares, other than those shares converted into the right to receive Parent Common Stock in accordance with Section 2.03(b)(ii), shall be converted into cash, as if such Shares were not Electing Shares, in accordance with the terms of Section 2.01(a)(ii).

(iv)    If a holder makes an Irrevocable Option Election but not a Parent Stock Election, then the number of such holder's Net Electing Option Shares as is equal to the product of (x) the Proration Factor *times*(y) the total number of such holder's Net Electing Option Shares shall be converted into Parent Common stock through the exercise of an appropriate number of Company Stock Options subject to such holder's Irrevocable Option Election pursuant to Section 2.02(a).

(d)    In the event that Parent (i) changes (or establishes a record date for changing) the number of shares of Parent Common Stock issued and outstanding prior to the Effective Time as a result of a stock split, stock dividend, stock combination, recapitalization, reclassification, reorganization or similar transaction with respect to the outstanding Parent Company Stock or (ii) pays or makes an extraordinary dividend or distribution in respect of Parent Common Stock (other than a distribution referred to in clause (i) of this sentence) and, in either case, the record date therefor is prior to the Effective Time, the number of shares of Parent Common Stock included in the Merger Consideration shall be proportionately adjusted.

Section 2.04    *Exchange of Shares for Merger Consideration.*

(a)    *Exchange Agent.* At or immediately subsequent to the Effective Time, Parent shall deposit, or shall cause to be deposited, with the Exchange Agent, for the benefit of holders of the Shares, (i) cash in U.S. dollars sufficient to pay the aggregate cash portion of the Merger Consideration pursuant to Section 2.01(a) and (ii) certificates representing the shares of Parent Common Stock to be issued pursuant to Section 2.01(a) (such cash and certificates for shares of Parent Common Stock, together with any dividends or distributions with respect thereto, being hereinafter referred to as the "*Exchange Fund*").

(b)    *Procedures for Surrendering Shares.*

(i)    As soon as reasonably practicable after the Effective Time and in any event not later than the third Business Day following the Effective Time, the Exchange Agent shall mail to each holder of record of Shares whose Shares were converted into the right to receive the Merger Consideration pursuant to Section 2.01 and whose Shares have not previously been surrendered with the Election Form (A) a letter of transmittal which shall specify that delivery shall be effected, and risk of loss and title to the certificates that immediately prior to the Effective Time represented Shares ("*Certificates*") shall pass, only upon delivery of Certificates to the Exchange Agent (and shall be in such form and have such other provisions as Parent and the Company may reasonably determine prior to the Effective Time) and (B) instructions for use in effecting the surrender of Certificates (or effective affidavits of loss in lieu thereof) or non–certificated Shares represented by book–entry ("*Book–Entry Shares*") in exchange for the Merger Consideration.

(ii)    Upon surrender of Certificates (or effective affidavits of loss in lieu thereof) or Book–Entry Shares to the Exchange Agent together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may customarily be required by the Exchange Agent, the holder of such Certificates or Book–Entry Shares shall be entitled to receive in exchange therefor the Merger Consideration into which the Shares represented by such Certificates (or effective affidavits of loss in lieu thereof) or Book–Entry Shares have been converted pursuant to this Agreement. In the event of a transfer of ownership of Shares that is not registered in the transfer or stock records of the Company, any cash to be paid upon, or shares of Parent Common Stock to be issued upon, due surrender of the Certificate formerly representing such Shares may be paid or issued, as the case may be, to such a transferee if such Certificate is presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer or other similar Taxes have been paid or are not applicable.

(iii)    No interest will be paid or accrued for the benefit of holders of the Shares on the Merger Consideration payable upon the surrender of Shares pursuant to this Section 2.04.

(iv)    No dividends or other distributions, if any, with a record date after the Effective Time with respect to Parent Common Stock shall be paid to the holder of any unsurrendered Share which is being converted into shares of Parent Common Stock pursuant to Section 2.01(a) until such holder shall surrender such Share in accordance with this Section 2.04. After the surrender of a Share in accordance with this Section 2.04, such holder thereof shall be entitled to receive any such dividends or other distributions, without any interest thereon, which theretofore had become payable with respect to whole shares of Parent Common Stock represented by such Share.

(v)    The Surviving Corporation, Parent and the Paying Agent shall be entitled to deduct and withhold from the consideration otherwise payable under this Agreement to any Person

A–8

such amounts as are required to be withheld or deducted under the Code, or any provision of U.S. state, local or foreign Tax Law with respect to the making of such payment. To the extent that amounts are so withheld or deducted and paid over to the applicable Governmental Entity, such withheld or deducted amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding were made.

(vi)   Until surrendered as contemplated by this Section 2.04, each Share (other than any Dissenting Shares, Cancelled Shares and Remaining Shares) shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the applicable Merger Consideration into which the Shares shall have been converted pursuant to Section 2.01.

(c)   *Closing of Transfer Books.* At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the Shares that were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation or Parent for transfer, they shall be cancelled and exchanged for the proper Merger Consideration pursuant to and subject to the requirements of this Article II.

(d)   *Termination of Exchange Fund.* Any portion of the Exchange Fund (including the proceeds of any investments in respect of the cash portion thereof) that remains undistributed to the former holders of Shares for one year after the Effective Time shall be delivered to the Surviving Corporation upon demand, and any former holders of Shares who have not surrendered their Shares in accordance with this Section 2.04 shall thereafter look only to the Surviving Corporation for payment of their claim for the Merger Consideration, without any interest thereon, upon due surrender of their Shares.

(e)   *No Liability.* Notwithstanding anything herein to the contrary, none of the Company, Parent, Merger Sub, the Surviving Corporation, the Paying Agent or any other person shall be liable to any former holder of Shares for any amount properly delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate shall not have been surrendered prior to the date on which the related Merger Consideration would, pursuant to applicable Law, escheat to or become the property of any Governmental Entity, any such Merger Consideration shall, to the extent permitted by applicable Law, immediately prior to such time, become the property of the Surviving Corporation, free and clear of all claims or interests of any Person previously entitled thereto.

(f)   *Investment of Exchange Fund.* The cash deposited with the Exchange Agent pursuant to Section 2.04(a) and any earnings thereon shall be invested by the Exchange Agent as reasonably directed by Parent; *provided, however,* that any investment of such cash shall in all events be limited to direct short–term obligations of, or short–term obligations fully guaranteed as to principal and interest by, the U.S. government, in commercial paper rated A–1 or P–1 or better by Moody's Investors Service, Inc. or Standard & Poor's Corporation, respectively, and that no such investment or loss thereon shall affect the amounts payable to holders of Certificates or Book–Entry Shares pursuant to this Article II. Any profit or loss, or interest and other income resulting from such investments shall be for the account of Parent and be paid to Parent on the earlier of one year after the Effective Time or full payment of the Exchange Fund.

(g)   *Lost Certificates.* In the case of any Certificate that has been lost, stolen or destroyed, upon the making of an affidavit, in form and substance reasonably acceptable to Parent, of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent or the Paying Agent, the posting by such person of an indemnity agreement or, at the election of Parent or the Paying Agent, a bond in customary amount as indemnity against any

A–9

claim that may be made against it or the Surviving Corporation with respect to such Certificate, the Paying Agent will deliver in exchange for such lost, stolen or destroyed Certificate an amount equal to the number of Shares represented by such lost, stolen or destroyed Certificate multiplied by the Merger Consideration.

(h)    *No Further Ownership Rights.* All Merger Consideration paid upon the surrender of Shares (or affidavits of loss in lieu thereof) in accordance with the terms of this Article II shall be deemed to have been paid in full satisfaction of all rights pertaining to the Shares.

Section 2.05    *Effect of the Merger on Company Stock Options, Company Restricted Shares and RSUs.*

(a)    Each outstanding option to acquire shares of Company Common Stock (each, a "*Company Stock Option*"), whether or not then vested or exercisable, that is outstanding immediately prior to the Effective Time shall, as of immediately prior to the Effective Time (and except for (x) Company Stock Options as to which the treatment in the Merger is hereafter separately agreed by Parent and the holder thereof in compliance with Section 5.01(c), which Company Stock Options shall be treated as so agreed and (y) Company Stock Options which are being exercised pursuant to an Irrevocable Option Election), become fully vested and, subject to the terms of the Company Stock Plans, be converted into the right to receive a payment in cash, payable in U.S. dollars and without interest, equal to the product of (i) the excess, if any, of (x) the Cash Election Price over (y) the exercise price per share of Company Common Stock subject to such Company Stock Option, *multiplied by* (ii) the number of shares of Company Common Stock for which such Company Stock Option shall not theretofore have been exercised. The Surviving Corporation shall pay the holders of Company Stock Options the cash payments described in this Section 2.05(a) on or as soon as reasonably practicable after the date on which the Effective Time occurs, but in any event within two (2) Business Days thereafter.

(b)    Immediately prior to the Effective Time, except as separately agreed by Parent and the holder thereof in compliance with Section 5.01(c), each award of restricted Company Common Stock (the "*Company Restricted Shares*") shall vest in full and be converted into the right to receive the Merger Consideration in accordance with Section 2.01(a).

(c)    Immediately prior to the Effective Time, except as separately agreed by Parent and the holder thereof in compliance with Section 5.01(c), each restricted stock unit in respect of a share of Company Common Stock (collectively, the "*RSUs*") shall vest in full and be converted into the right to receive the Cash Election Price in respect thereof, and the holder of any such RSU shall be paid as soon as reasonably practicable after the date on which the Effective Time occurs, but in any event within two (2) Business Days thereafter, an aggregate amount of cash as the holder would have been entitled to receive had such RSU been vested in full and settled immediately before the Effective Time.

(d)    The Surviving Corporation shall be entitled to deduct and withhold from the amounts otherwise payable pursuant to this Section 2.05 to any holder of Company Stock Options, Company Restricted Shares or RSUs such amounts as the Surviving Corporation is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, or local Tax Law, and the Surviving Corporation shall make any required filings with and payments to Tax authorities relating to any such deduction or withholding. To the extent that amounts are so deducted and withheld by the Surviving Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the Company Stock Options, Company Restricted Shares or RSUs in respect of which such deduction and withholding was made by the Surviving Corporation.

(e)    The board of directors of the Company (or the appropriate committee thereof) shall take the actions necessary to effectuate the foregoing provisions of this Section 2.05.

A–10

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except (i) as disclosed in, and reasonably apparent from, any report, schedule, form or other document filed with, or furnished to, the SEC and publicly available prior to the date of this Agreement (collectively, the "*Filed SEC Documents*") and only as and to the extent disclosed therein (other than any forward–looking disclosures set forth in any risk factor section, any disclosures in any section relating to forward–looking statements and any other similar disclosures included therein to the extent they are primarily cautionary in nature) (*provided* that, in no event shall any disclosure in any Filed SEC Documents qualify or limit the representations and warranties of the Company set forth in Section 3.02(a), 3.04(a) or 3.11(b)(ii) of this Agreement), or (ii) as disclosed in the disclosure letter delivered by the Company to Parent immediately prior to the execution of this Agreement (the "*Company Disclosure Letter*", it being agreed that disclosure of any item in any section of the Company Disclosure Letter shall also be deemed disclosure with respect to any other section of this Agreement to which the relevance of such item is reasonably apparent; *provided* that no such disclosure shall be deemed to qualify or limit the representations and warranties of the Company set forth in 3.11(b)(ii) of this Agreement unless expressly set forth in Section 3.11(b) of the Company Disclosure Letter), the Company represents and warrants to Parent and Merger Sub as follows:

Section 3.01    *Qualification, Organization, Subsidiaries, etc.*

(a)    Each of the Company and its Significant Subsidiaries (as defined below) is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization. Each of the Company and its Significant Subsidiaries has all requisite corporate, partnership or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

(b)    Each of the Company and its Subsidiaries is duly qualified to do business and is in good standing as a foreign corporation (or other legal entity) in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, have a Company Material Adverse Effect. The organizational or governing documents of the Company and each of its Significant Subsidiaries are in full force and effect. Neither the Company nor any Significant Subsidiary is in violation of its organizational or governing documents.

(c)    As used in this Agreement, any reference to any fact, circumstance, event, change, effect or occurrence having a "*Company Material Adverse Effect*" means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects, or occurrences, (1) has or would be reasonably expected to have a material adverse effect on or with respect to the business, results of operation or financial condition of the Company and its Subsidiaries taken as a whole, or (2) that prevents or materially delays or materially impairs the ability of the Company to consummate the Merger, *provided, however,* that a Company Material Adverse Effect shall not include facts, circumstances, events, changes, effects or occurrences (i) generally affecting the consumer or professional audio, automotive audio, information, entertainment or infotainment industries, or the economy or the financial, credit or securities markets, in the United States or other countries in which the Company or its Subsidiaries operate, including effects on such industries, economy or markets resulting from any regulatory and political conditions or developments in general, or any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism (other than any of the foregoing that causes any damage or destruction to or renders physically unusable or inaccessible any facility or property of the Company or any of its Subsidiaries); (ii) reflecting or resulting from changes in Law or GAAP (or authoritative interpretations thereof); (iii) resulting from actions of

A–11

the Company or any of its Subsidiaries which Parent has expressly requested or to which Parent has expressly consented; (iv) to the extent resulting from the announcement of the Merger or the proposal thereof or this Agreement and the transactions contemplated hereby, including any lawsuit related thereto or any loss or threatened loss of or adverse change or threatened adverse change, in each case resulting therefrom, in the relationship of the Company or its Subsidiaries with its customers, suppliers, employees or others; (v) resulting from changes in the market price or trading volume of the Company's securities or from the failure of the Company to meet internal or public projections, forecasts or estimates *provided* that the exceptions in this clause (v) are strictly limited to any such change or failure in and of itself and shall not prevent or otherwise affect a determination that any fact, circumstance, event, change, effect or occurrence underlying such change or such failure has resulted in, or contributed to, a Company Material Adverse Effect; or (vi) resulting from the suspension of trading in securities generally on the NYSE; except to the extent that, with respect to clauses (i) and (ii), the impact of such fact, circumstance, event, change, effect or occurrence is disproportionately adverse to the Company and its Subsidiaries, taken as a whole.

Section 3.02   *Capital Stock.*

    (a)   The authorized capital stock of the Company consists of 200,000,000 shares of common stock, $0.01 par value per share ("*Company Common Stock*"), and 5,000,000 shares of preferred stock, $0.01 par value per share ("*Authorized Preferred Stock*"), 500,000 of which have been designated as Series A Junior Participating Preferred Stock (the "*Series A Preferred Stock*") reserved for issuance in connection with the rights (the "*Rights*") issued under the Company's Rights Agreement, dated as of December 13, 1999, by and between the Company and Mellon Investor Services LLC (formerly known as ChaseMellon Shareholder Services, L.L.C.), as Rights Agent (the "*Rights Agreement*"). As of the close of business on April 24, 2007 (the "*Capitalization Date*"), (i) 65,159,777 shares of Company Common Stock were issued and outstanding, including 12,000 Company Restricted Shares outstanding pursuant to awards granted under the Company Stock Plans, (ii) 18,198,082 shares of Company Common Stock were held by the Company in its treasury, (iii) (A) there were 2,888,512 shares of Company Common Stock underlying outstanding Company Stock Options, such Company Stock Options having a weighted average exercise price as of the Capitalization Date of $50.95, (B) there were 25,000 shares of Company Common Stock underlying outstanding RSUs and (C) 3,983,873 additional shares of Company Common Stock were reserved for issuance for future grants pursuant to the Company Stock Plans and (iv) no shares of Preferred Stock were issued or outstanding. All outstanding shares of Company Common Stock, and all shares of Company Common Stock reserved for issuance as noted in clause (iii) of the foregoing sentence, when issued in accordance with the respective terms thereof, are or will be duly authorized, validly issued, fully paid and non–assessable and free of pre–emptive or similar rights. No Subsidiary of the Company owns any Company Common Stock. *Section 3.02(a)* of the Company Disclosure Letter lists, as of the date of this Agreement, each outstanding Company Stock Option and the exercise price thereof.

    (b)   Except as set forth in subsection (a) above, (i) as of the date of this Agreement, the Company does not have any shares of its capital stock issued or outstanding other than shares of Company Common Stock that have become outstanding after the Capitalization Date upon exercise of Company Stock Options outstanding as of such date or upon vesting or payment with respect to RSUs and (ii) there are no outstanding subscriptions, options, warrants, calls, convertible securities, stock–based performance units or other similar rights, agreements or commitments relating to the issuance of capital stock or other equity interests to which the Company or any of its Subsidiaries is a party obligating the Company or any of its Subsidiaries to (A) issue, transfer or sell any shares of capital stock or other equity interests of the Company or any of its Subsidiaries or securities convertible into or exchangeable for such shares or equity

A–12

interests, (B) issue, grant, extend or enter into any such subscription, option, warrant, call, convertible securities or other similar right, agreement or arrangement, (C) redeem or otherwise acquire any such shares of capital stock or other equity interests or (D) provide a material amount of funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, the Company or any Subsidiary of the Company.

(c)    Except for the awards to acquire shares of Company Common Stock under the Company Stock Plans, neither the Company nor any of its Subsidiaries has outstanding bonds, debentures, notes or other obligations, the holders of which have the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the stockholders of the Company on any matter.

(d)    There are no shareholder agreements, voting trusts or other agreements or understandings to which the Company or any of its Subsidiaries is a party with respect to the voting, registration, redemption, repurchase or disposition of the capital stock or other equity interest of the Company or any of its Significant Subsidiaries.

Section 3.03    *Subsidiaries.*    All equity interests (including partnership interests and limited liability company interests) of the Company's Subsidiaries held by the Company or by any other Subsidiary have been duly and validly authorized and are validly issued, fully paid and non–assessable and were not issued in violation of any preemptive or similar rights, purchase option, call or right of first refusal or similar rights. All such equity interests owned by the Company or its Subsidiaries are free and clear of any Liens, other than restrictions on transfer imposed by applicable Law. Except for its interests in Subsidiaries of the Company, the Company does not own, directly or indirectly, 5% or more of the outstanding capital stock of, or other equity interests, in any Person, or any options, warrants, rights or securities convertible, exchangeable or exercisable therefor.

Section 3.04    *Corporate Authority Relative to This Agreement; No Violation.*

(a)    The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement and, subject to receipt of the Company Stockholder Approval, to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the board of directors of the Company and, except for (i) the Company Stockholder Approval and (ii) the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, no other corporate proceedings on the part of the Company are necessary to authorize the consummation of the transactions contemplated hereby. Subject to Section 5.02(d), the board of directors of the Company has unanimously, by resolutions duly adopted at a meeting duly called and held, (x) approved and declared advisable this Agreement and the transactions contemplated hereby, (y) determined that the terms of this Agreement are fair to, and in the best interests of, the Company and its stockholders and (z) resolved to recommend that the Company's stockholders vote in favor of adoption of this Agreement (the "*Recommendation*"). This Agreement has been duly and validly executed and delivered by the Company and, assuming this Agreement constitutes the valid and binding agreement of Parent and Merger Sub, constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at Law) and any implied covenant of good faith and fair dealing.

(b)    Other than in connection or in compliance with (i) the DGCL, or any applicable Delaware anti–takeover or investor protection statute, (ii) the applicable requirements of the Securities Act of 1933, as amended (the "*Securities Act*"), and the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), and any related filings or approvals under applicable state

A–13

securities Laws, (iii) the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "*HSR Act*") and the applicable Laws relating to antitrust matters or regulating competition of jurisdictions other than the United States set forth in *Section 3.04(b)* of the Company Disclosure Letter, and (iv) the approvals set forth on *Section 3.04(b)* of the Company Disclosure Letter (collectively, the "*Company Approvals*"), no authorization, consent, approval or order of, or filing with, or notice to, any United States or foreign governmental or regulatory agency, commission, court, body, entity or authority (each, a "*Governmental Entity*") is necessary, under applicable Law, in connection with the execution, delivery and performance of this Agreement by the Company or the consummation by the Company of the transactions contemplated hereby, except for such authorizations, consents, approvals, orders, filings or notices that, if not obtained or made, would not, individually or in the aggregate, have a Company Material Adverse Effect.

(c)   The execution, delivery and performance by the Company of this Agreement does not, and the consummation of the transactions contemplated hereby and compliance with the provisions hereof by the Company will not, (i) result in any breach or violation of, or default (with or without notice or lapse of time, or both) under, require consent under, or give rise to a right of termination, cancellation, modification or acceleration of any obligation or to the loss of any benefit under any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, purchase or sale order, instrument, permit, Company Permit, concession, franchise, right or license binding upon the Company or any of its Subsidiaries or result in the creation of any liens, claims, mortgages, encumbrances, pledges, security interests, equities or charges of any kind (each, a "*Lien*") upon any of the properties, assets or rights of the Company or any of its Subsidiaries, (ii) conflict with or result in any violation of any provision of the Company Charter or the Company's by–laws, (iii) conflict with or result in any violation of any provision of the certificate or articles of incorporation or by–laws or other equivalent organizational document of any of the Company's Subsidiaries or (iv) assuming that the consents and approvals referred to in Section 3.04(b)(i)–(iv) are duly obtained, conflict with or violate any applicable Laws, other than, in the case of clauses (i), (iii) and (iv), as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.05    *Reports and Financial Statements.*

(a)   The Company has timely filed all forms, documents, statements and reports required to be filed by it with the Securities and Exchange Commission (the "*SEC*") since July 1, 2004 (the forms, documents, statements and reports filed with the SEC since July 1, 2004, including any amendments thereto, the "*Company SEC Documents*"). As of their respective dates, or, if amended or superseded by a subsequent filing made prior to the date hereof, as of the date of the last such amendment or superseding filing prior to the date hereof, the Company SEC Documents complied, and each of the Company SEC Documents filed subsequent to the date of this Agreement will comply, in all material respects with the requirements of the Securities Act, the Exchange Act and the Sarbanes–Oxley Act of 2002 (the "*Sarbanes–Oxley Act*"), as the case may be, and the applicable rules and regulations promulgated thereunder. As of the time of filing with the SEC, none of the Company SEC Documents so filed or that will be filed subsequent to the date of this Agreement contained or will contain, as the case may be, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except to the extent that the information in such Company SEC Document has been amended or superseded by a later Company SEC Document filed prior to the date hereof. No Subsidiary of the Company is subject to the periodic reporting requirements of the Exchange Act.

<div align="center">A–14</div>

(b)    The financial statements (including all related notes and schedules) of the Company and its Subsidiaries included in the Company SEC Documents complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto, fairly present in all material respects the financial position of the Company and its Subsidiaries, as at the respective dates thereof, and the results of their operations and their cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year–end audit adjustments and to any other adjustments expressly described therein, including the notes thereto, none of which are expected to have a Company Material Adverse Effect) and were prepared in conformity with United States generally accepted accounting principles ("*GAAP*") (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be expressly indicated therein or in the notes thereto).

(c)    To the Knowledge of the Company, as of the date of this Agreement, none of the Company SEC Documents is the subject of ongoing SEC review, outstanding SEC investigation or material outstanding SEC comment.

Section 3.06    *No Undisclosed Liabilities.*    Except (i) as reflected or reserved against in the Company's consolidated balance sheet as of December 31, 2006 (or the notes thereto) included in the Company SEC Documents filed prior to the date hereof, (ii) for liabilities or obligations incurred in connection with the transactions contemplated by this Agreement or the financing of such transactions, (iii) for liabilities and obligations incurred in the ordinary course of business consistent with past practice since December 31, 2006, (iv) liabilities of a nature not required by GAAP to be set forth on a consolidated balance sheet of the Company and its Subsidiaries or the notes thereto, pursuant to any Contract or similar arrangement binding on the Company or any of its Subsidiaries, and (v) as expressly included within the scope of another representation or warranty in this Article III or as expressly excluded from any representation or warranty in this Article III as a result of the scope of any materiality or similar qualification applicable to such representation or warranty (provided that any matter arising after the date hereof shall not be deemed to be within the scope of or excluded from any representation or warranty given at or as of the date hereof or any date prior to the date hereof), neither the Company nor any Subsidiary of the Company has any liabilities or obligations of any nature, whether or not accrued, contingent or otherwise and whether due or to become due, that would, individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.07    *Compliance with Law; Permits.*

(a)    The Company and each of its Subsidiaries is in compliance with and is not in default under or in violation of any applicable federal, state, local or foreign or provincial law, statute, code, ordinance, rule, regulation, judgment, order, injunction, decree or agency requirement of or undertaking to or agreement with any Governmental Entity, including common law (collectively, "*Laws*" and each, a "*Law*"), except where such non–compliance, default or violation would not, individually or in the aggregate, have a Company Material Adverse Effect.

(b)    The Company and its Subsidiaries are in possession of all franchises, tariffs, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Entity necessary for the Company and its Subsidiaries to own, lease and operate their properties and assets or to carry on their businesses as they are now being conducted (the "*Company Permits*"), except where the failure to have any of the Company Permits would not, individually or in the aggregate, have a Company Material Adverse Effect. All Company Permits are in full force and effect, except where the failure to be in full force and effect would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.08    *Environmental Laws and Regulations.*

(a)    Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, (i) the Company and each of its Subsidiaries have conducted their respective businesses in

A–15

compliance with all, and have not violated any, applicable Environmental Laws, (ii) there has been no release of any Hazardous Substance by the Company or any of its Subsidiaries in any manner that could reasonably be expected to give rise to any remedial obligation, corrective action requirement or liability under applicable Environmental Laws, (iii) since July 1, 2005, neither the Company nor any of its Subsidiaries has received in writing any claims, notices, demand letters or requests for information (except for such claims, notices, demand letters or requests for information the subject matter of which has been resolved prior to the date of this Agreement) from any federal, state, local or foreign or provincial Governmental Entity or any other Person asserting that the Company or any of its Subsidiaries is in violation of, or liable under, any Environmental Law, (iv) no Hazardous Substance has been disposed of, arranged to be disposed of, released or transported in violation of any applicable Environmental Law, or in a manner giving rise to, or that would reasonably be expected to give rise to, any liability under Environmental Law, from any current or former properties or facilities while owned or operated by the Company or any of its Subsidiaries or as a result of any operations or activities of the Company or any of its Subsidiaries at any location and, to the Knowledge of the Company, Hazardous Substances are not otherwise present at or about any such properties or facilities in amount or condition that would reasonably be expected to result in liability to the Company or any of its Subsidiaries under Environmental Law, and (v) neither the Company, its Subsidiaries nor any of their respective properties or facilities are subject to, or to the Knowledge of the Company, are threatened to become subject to, any liabilities relating to any suit, settlement, court order, administrative order, regulatory requirement, judgment or written claim asserted or arising under any Environmental Law or any agreement relating to environmental liabilities. Notwithstanding any other representation or warranty contained in this *Article III*, the representations and warranties contained in this *Section 3.08* constitute the sole representations and warranties of the Company relating to any Environmental Law.

(b)    As used herein, "*Environmental Law*" means any Law relating to (i) the protection, preservation or restoration of the environment (including air, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or (ii) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Substances.

(c)    As used herein, "*Hazardous Substance*" means any substance listed, defined, designated, classified or regulated as a waste, pollutant or contaminant or as hazardous, toxic, radioactive or dangerous or any other term of similar import under any Environmental Law, including petroleum.

Section 3.09    *Employee Benefit Plans.*

(a)    *Section 3.09(a)* of the Company Disclosure Letter sets forth a true and complete list of each material Company Benefit Plan. For purposes of this Agreement, the term "*Company Benefit Plan*" shall mean any employee or director benefit plan, arrangement or agreement, including any such plan that is an employee welfare benefit plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), an employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) or a bonus, incentive, deferred compensation, vacation, stock purchase, stock option, severance, employment, change of control or fringe benefit plan, program or agreement that is sponsored or maintained by the Company or any of its Subsidiaries to or for the benefit of the current or former employees, independent contractors or directors of the Company and its Subsidiaries.

(b)    Except as would not have a Company Material Adverse Effect: (i) each of the Company Benefit Plans has been established, operated and administered in compliance with applicable Laws, including ERISA, the Code and in each case the regulations thereunder; (ii) each of the Company Benefit Plans intended to be "qualified" within the meaning of Section 401(a) of the Code has

A–16

received a favorable determination letter from the Internal Revenue Service ("*IRS*") or an application therefore was filed with the IRS within the applicable remedial amendment period in accordance with Section 401(b) of the Code, and to the Knowledge of the Company, there are no existing circumstances or events that have occurred that could reasonably be expected to result in the revocation of such letter; (iii) no Company Benefit Plan is subject to Title IV of ERISA; (iv) no Company Benefit Plan provides health, life insurance or disability benefits (whether or not insured), with respect to current or former employees or directors of the Company or its Subsidiaries beyond their retirement or other termination of service, other than (A) coverage mandated by applicable Law or (B) death benefits or retirement benefits under any "employee pension plan" (as such term is defined in Section 3(2) of ERISA or any comparable pension plan within the meanings of comparable Laws applicable with respect to such plans maintained outside of the United States); (v) no liability under Title IV of ERISA has been incurred by the Company, its Subsidiaries or any ERISA Affiliate of the Company that has not been satisfied in full, and, to the Knowledge of the Company, no condition exists that presents a risk to the Company, its Subsidiaries or any ERISA Affiliate of the Company of incurring a liability thereunder; (vi) no Company Benefit Plan is a "multiemployer pension plan" (as such term is defined in Section 3(37) of ERISA) or a plan that has two or more contributing sponsors at least two of whom are not under common control, within the meaning of Section 4063 of ERISA; (vii) all contributions or other amounts payable by the Company or its Subsidiaries as of the date of this Agreement with respect to each Company Benefit Plan in respect of current or prior plan years have been paid or accrued in accordance with GAAP; (viii) neither the Company nor its Subsidiaries has engaged in a transaction in connection with which the Company or its Subsidiaries could reasonably be expected to be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a Tax imposed pursuant to Section 4975 or 4976 of the Code; and (ix) there are no pending or threatened claims (other than routine claims for benefits) by, on behalf of or against any of the Company Benefit Plans or any trusts related thereto which could reasonably be expected to result in any liability of the Company or any of its Subsidiaries. "*ERISA Affiliate*" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

(c)    Except as would not result in a material liability of the Company and its Subsidiaries, taken as a whole, no Company Benefit Plan exists that as a result of the consummation of the transactions contemplated by this Agreement will, either alone or in combination with another event, (i) entitle any employee or officer of the Company or any of its Subsidiaries to severance pay, unemployment compensation or any other payment, except as expressly provided in this Agreement or as required by applicable Law or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due any such employee, consultant or officer, except as expressly provided in this Agreement. No payments or benefits reasonably expected to be provided under any of the Company Benefit Plans are reasonably expected to fail to be deductible under Section 280G of the Code.

(d)    Except as, individually or in the aggregate, would not be reasonably expected to have a Company Material Adverse Effect, with respect to any Company Benefit Plan that is maintained outside the jurisdiction of the United States, or covers any director, employee or independent contractor residing or working outside the United States: (i) all such plans that are required by applicable Law to be funded are funded to the extent required, and with respect to all other such plans, reserves sufficient under applicable accounting principles to provide for all obligations accrued through the Effective Date thereunder have been established on the accounting statements of the applicable Company or Subsidiary entity and (ii) no liability or obligation of the Company or its Subsidiaries exists with respect to such plans.

A–17

Section 3.10    *Interested Party Transactions.*    Except for compensatory or employment–related Contracts filed or incorporated by reference as an exhibit to a Filed SEC Document filed prior to the date hereof or Company Benefit Plans, *Section 3.10* of the Company Disclosure Letter sets forth a correct and complete list of the contracts or arrangements that are in existence as of the date of this Agreement under which the Company has any existing or future material liabilities between the Company or any of its Subsidiaries, on the one hand, and, on the other hand, any (A) present executive officer or director of either the Company or any of its Subsidiaries or any person that has served as such an officer or director or any of such executive officer's or director's immediate family members, (B) record or beneficial owner of more than 5% of the Shares as of the date of this Agreement or (C) to the Knowledge of the Company, any Affiliate of any such executive officer, director or owner (other than the Company or any of its Subsidiaries) (each, an "*Affiliate Transaction*").

Section 3.11    *Absence of Certain Changes or Events.*

    (a)    Since December 31, 2006, through the date of this Agreement, except for the transactions contemplated hereby, the business of the Company and its Subsidiaries has been conducted, in all material respects, in the ordinary course of business consistent with past practice.

    (b)    (i) Since December 31, 2006, through the date of this Agreement, there has not been any facts, circumstances, events, changes, effects or occurrences that, individually or in the aggregate, would be reasonably expected to have, a Company Material Adverse Effect; and (ii) since the date of this Agreement there shall not have occurred any event, change, effect or occurrence that, individually or in the aggregate, would be reasonably expected to have a Company Material Adverse Effect.

Section 3.12    *Investigations; Litigation.*    There are no (i) investigations or proceedings pending or, to the Knowledge of the Company, threatened by any Governmental Entity with respect to the Company or any of its Subsidiaries or any of their properties or assets, (ii) actions, suits, arbitrations, claims or proceedings pending or, to the Knowledge of the Company, threatened against or affecting the Company or any of its Subsidiaries, or any of their respective properties or assets, at Law or in equity, or (iii) orders, judgments or decrees of any Governmental Entity against the Company or any of its Subsidiaries, which, in the case of clauses (i) or (ii), individually or in the aggregate, would be reasonably expected to have a Company Material Adverse Effect.

Section 3.13    *Proxy Statement; Other Information.*    None of the information supplied by the Company for inclusion or incorporation by reference in (i) the registration statement on Form S–4 to be filed with the SEC by Parent in connection with the issuance of the Parent Common Stock following the Merger (such registration statement on Form S–4, as amended or supplemented, the "*Form S–4*") will, at the time the Form S–4 is filed with the SEC, and at any time it is amended or supplemented or at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading and (ii) the Proxy Statement and any other document filed with the SEC by the Company in connection with the Merger (collectively, with the Form S–4 and any amendments or supplements to any of the foregoing, the "*SEC Filings*") will, at the time of the mailing to the stockholders of the Company or at the time of the Company Meeting or at the time of any amendments thereof or supplements thereto, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided* that no representation is made by the Company with respect to the Financing or to information supplied by or related to or the sufficiency of disclosures related to, Parent, Merger Sub or any Affiliate of Parent or Merger Sub or any of their plans for the Company or any of its Affiliates after the Effective Time. The SEC Filings made by the Company will comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations

A–18

of the SEC thereunder. The letter to shareholders, notice of meeting, proxy statement/prospectus, forms of proxy and any other soliciting materials to be distributed to the stockholders of the Company in connection with the Merger and the transactions contemplated thereby to be filed with the SEC in connection with seeking the adoption of this Agreement and the consummation of the transactions contemplated hereby are collectively referred to herein as the "*Proxy Statement*."

     Section 3.14   *Tax Matters.*

     (a)   Except as would not have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company and each of its Subsidiaries have prepared and timely filed (taking into account any valid extension of time within which to file) all Tax Returns required to be filed by any of them and all such Tax Returns are complete and accurate, (ii) the Company and each of its Subsidiaries have timely paid all Taxes that are required to be paid by any of them (whether or not shown on any Tax Return), except with respect to matters contested in good faith through appropriate proceedings and for which adequate reserves have been established on the financial statements of the Company and its Subsidiaries in accordance with GAAP, (iii) the U.S. consolidated federal income Tax Returns of the Company through the Tax year ending June 30, 2002 have been examined or are currently being examined by the IRS (or the period for assessment of the Taxes in respect of which such Tax Returns were required to be filed has expired), (iv) all assessments for Taxes due with respect to completed and settled examinations or any concluded litigation have been fully paid, (v) there are no audits, examinations, investigations or other proceedings pending or threatened in writing in respect of Taxes or Tax matters of the Company or any of its Subsidiaries, (vi) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than statutory Liens for Taxes not yet due and payable or Liens for Taxes that are being contested in good faith through appropriate proceedings and for which adequate reserves have been established on the financial statements of the Company and its Subsidiaries in accordance with GAAP, (vii) none of the Company or any of its Subsidiaries has been a "controlled corporation" or a "distributing corporation" in any distribution that was purported or intended to be governed by Section 355 of the Code (or any similar provision of state, local or foreign Tax Law) occurring during the two–year period ending on the date hereof, (viii) the Company and each of its Subsidiaries has timely withheld and paid to the appropriate Governmental Entity all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, independent contractor, shareholder or other third party, or amounts paid or owing among the Company and any of its Subsidiaries, (ix) neither the Company nor any of its Subsidiaries is a party to any agreement or arrangement relating to the apportionment, sharing, assignment or allocation of any Tax or Tax asset (other than an agreement or arrangement solely among members of a group the common parent of which is the Company or a Subsidiary of the Company) or has any liability for Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulation Section 1.1502–6 (or any predecessor or successor thereof or any analogous or similar provision of Tax Law), by contract, agreement or otherwise, (x) no waivers or extensions of any statute of limitations have been granted or requested with respect to any Taxes of the Company or any of its Subsidiaries that remain in effect, (xi) none of the Company or any of its Subsidiaries has been a party to any "listed transaction" within the meaning of Treasury Regulation 1.6011–4(b)(2), and (xii) no closing agreement pursuant to Section 7121 of the Code (or any similar provision of state, local or foreign Tax Law) has been entered into by or with respect to the Company or any of its Subsidiaries.

     (b)   As used in this Agreement:

        (i)   "*Tax*" or "*Taxes*" means any and all federal, state, local or foreign or provincial taxes, imposts, levies or other like assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp,

occupation, property and estimated taxes, customs duties, and like fees, assessments and charges of any kind whatsoever, including any and all interest, penalties, additions to tax or additional amounts imposed by any Governmental Entity in connection with respect thereto; and

(ii)   "*Tax Return*" means any return, report or similar filing (including any attached schedules, supplements and additional or supporting material) filed or required to be filed with respect to Taxes, including any information return, claim for refund, amended return or declaration of estimated Taxes (and including any amendments with respect thereto).

Section 3.15   *Labor Matters.*   Neither the Company nor any of its Subsidiaries is a party to, or bound by, any collective bargaining agreement, or other contract with a labor union or similar labor organization that is material to the Company and its Subsidiaries taken as a whole. Neither the Company nor any of its Subsidiaries is subject to a dispute, strike or work stoppage except as would not, individually or in the aggregate, have a Company Material Adverse Effect. To the Knowledge of the Company, there are no organizational efforts with respect to the formation of a collective bargaining unit presently being made or threatened involving employees of the Company or any of its Subsidiaries except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.16   *Intellectual Property.*   Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, either the Company or a Subsidiary of the Company owns, or is licensed or otherwise possesses adequate rights to use, all material trademarks, trade names, service marks, service names, mark registrations, logos, assumed names, domain names, registered and unregistered copyrights, software, patents or other intellectual property, and all applications and registrations used in their respective businesses as currently conducted (collectively, the "*Intellectual Property*"), free and clear of all Liens. Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, (i) there are no pending or, to the Knowledge of the Company, threatened in writing claims by any person alleging infringement by the Company or any of its Subsidiaries for their use of the Intellectual Property of the Company or any of its Subsidiaries; (ii) the conduct of the business of the Company and its Subsidiaries does not infringe or violate any intellectual property rights of any person; (iii) to the Knowledge of the Company, no person is infringing any Intellectual Property of the Company or any of its Subsidiaries; (iv) the Company takes reasonable actions to protect its Intellectual Property, its ownership of proprietary Intellectual Property and the security of its software, systems and networks; and (v) the patents and registered Intellectual Property owned by the Company and its Subsidiaries is valid and enforceable.

Section 3.17   *Property.*   Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, the Company or a Subsidiary of the Company owns and has good and valid title to all of its owned real property and good title to all its personal property and has valid leasehold interests in all of its leased properties, sufficient to conduct their respective businesses as currently conducted, free and clear of all Liens (except in all cases for Liens permissible under any applicable loan agreements and indentures and for title exceptions, defects, encumbrances, liens, charges, restrictions, restrictive covenants and other matters, whether or not of record, which in the aggregate do not materially affect the continued use of the property for the purposes for which the property is currently being used), assuming the timely discharge of all obligations owing under or related to the owned real property, the personal property and the leased property. Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, all leases under which the Company or any of its Subsidiaries lease any real or personal property are valid and in full force and effect against the Company or any of its Subsidiaries and, to the Company's Knowledge, the counterparties thereto, in accordance with their respective terms, and there is not, under any of such leases, any existing default by the Company or any of its Subsidiaries which, with notice or lapse of time or both, would become a default by the Company or any of its Subsidiaries.

A–20

Section 3.18   *Required Vote of the Company Stockholders.*    Assuming the accuracy of the representations and warranties in Section 4.07, the affirmative vote of the holders of outstanding shares of Company Common Stock representing at least a majority of all the votes then entitled to vote at a meeting of stockholders is the only vote of holders of any class of securities of the Company which is required to approve and adopt this Agreement, the Merger and the other transactions contemplated hereby (the "*Company Stockholder Approval*").

Section 3.19   *Material Contracts.*

(a)    *Section 3.19* of the Company Disclosure Letter sets forth a list of all Material Contracts as of the date of this Agreement. For purposes of this Agreement, "*Material Contract*" means all Contracts to which the Company or any of its Subsidiaries is a party or by which the Company, any of its Subsidiaries or any of their respective properties or assets is bound (other than Company Benefit Plans) that:

(i)    are or would be required to be filed by the Company as a "material contract" pursuant to Item 601(b)(10) of Regulation S–K under the Securities Act or disclosed by the Company on a Current Report on Form 8–K;

(ii)    with respect to a joint venture, partnership, limited liability or other similar agreement or arrangement, relate to the formation, creation, operation, management or control of any partnership or joint venture that is material to the business of the Company and the Subsidiaries, taken as a whole;

(iii)    relate to Indebtedness and having an outstanding principal amount in excess of $15,000,000;

(iv)    were entered into after December 31, 2006 or not yet consummated, and involve the acquisition from another person or disposition to another Person, directly or indirectly (by merger or otherwise), of assets or capital stock or other equity interests of another Person for aggregate consideration under such Contract (or series of related Contracts) in excess of $30,000,000 (other than acquisitions or dispositions of inventory in the ordinary course of business);

(v)    relate to an acquisition, divestiture, merger or similar transaction that contains representations, covenants, indemnities or other obligations (including indemnification, "earn–out" or other contingent obligations), that are still in effect and, individually, could reasonably be expected to result in payments in excess of $30,000,000;

(vi)    relate to any guarantee or assumption of Indebtedness of any third party or reimbursement of any maker of a letter of credit, except for agreements entered into in the ordinary course of business consistent with past practice which agreements relate to obligations which do not exceed $25,000,000 in the aggregate for all such agreements;

(vii)    are license, cross–license, royalty, development or other Intellectual Property agreements that involved total fees in either the current or the most recently completed fiscal year of the Company of more than $15,000,000;

(viii)    with customers of the Company or any of its Subsidiaries that made gross payments to the Company or any of its Subsidiaries of $75,000,000 or more in the twelve months ended June 30, 2006 (other than "purchase orders");

(ix)    prohibits the payment of dividends or distributions in respect of the capital stock of the Company or any of its wholly owned Subsidiaries, prohibits the pledging of the capital stock of the Company or any wholly owned Subsidiary of the Company or prohibits the issuance of guarantees by any wholly owned Subsidiary of the Company; or

A–21

(x)    relate to an Affiliate Transaction.

(b)    (i) Each Company Material Contract is valid and binding on the Company and any of its Subsidiaries to the extent such Subsidiary is a party thereto, as applicable, and, to the Knowledge of the Company, each other party thereto, and is in full force and effect and enforceable in accordance with its terms, except where the failure to be valid, binding, enforceable and in full force and effect, would not, either individually or in the aggregate, have a Company Material Adverse Effect, (ii) the Company and each of its Subsidiaries, and, to the Knowledge of the Company, any other party thereto, has performed all obligations required to be performed by it under each Company Material Contract, except where such noncompliance, would not, either individually or in the aggregate, have a Company Material Adverse Effect, and (iii) neither the Company nor any of its Subsidiaries has received written notice of, the existence of any event or condition which constitutes, or, after notice or lapse of time or both, will constitute, a default on the part of the Company or any of its Subsidiaries under any such Material Contract, except where such default would not, either individually or in the aggregate, have a Company Material Adverse Effect.

Section 3.20    *Finders or Brokers.*    Except for Bear, Stearns & Co. Inc., neither the Company nor any of its Subsidiaries has engaged any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who might be entitled to any fee or any commission in connection with or upon consummation of the Merger or the other transactions contemplated hereby.

Section 3.21    *Fairness Opinion.*    The Company has received the opinion of Bear, Stearns & Co. Inc., dated the date of this Agreement, to the effect that, as of such date, the Cash Election Price is fair, from a financial point of view, to the holders of shares of the Company Common Stock, a signed copy of which opinion has been or will promptly be provided to Parent. The Company has furnished to Parent a true and complete copy of any Contract between the Company and Bear, Stearns & Co. Inc. pursuant to which Bear, Stearns & Co. Inc. could be entitled to any payment from the Company relating to the transactions contemplated hereby.

Section 3.22    *State Takeover Statutes; Charter Provisions; Company Rights Agreement.*    Assuming the accuracy of the representations and warranties in Section 4.07, the board of directors of the Company has taken all actions necessary so that no anti–takeover statute or regulation, in each case under the DGCL or other applicable laws of the State of Delaware shall be applicable to the execution, delivery or performance of this Agreement, the consummation of the Merger and the other transactions contemplated by this Agreement. Prior to the execution of this Agreement, the Company has amended the Rights Agreement so that (a) neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby will (i) cause the Rights to become exercisable, (ii) cause Parent, Merger Sub or any of their Affiliates or Associates (as such terms are defined in the Rights Agreement) to become an Acquiring Person (as defined in the Rights Agreement) or (iii) give rise to a Share Acquisition Date, Distribution Date, a Flip–in–Event, a Flip–over–Event or a Triggering Event (as such terms are defined in the Rights Agreement) and (b) the Rights will expire in their entirety immediately prior to the Effective Time without any payment being made in respect thereof. The Company has made available to Parent a complete and correct copy of such amendment.

Section 3.23    *No Other Representations.*    The Company acknowledges that each of Parent and Merger Sub makes no representations or warranties as to any matter whatsoever except as expressly set forth in Article IV. The representations and warranties set forth in Article IV are made solely by Parent and Merger Sub, and no Representative of Parent or Merger Sub shall have any responsibility or liability related thereto.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Except as disclosed in the disclosure letter delivered by Parent to the Company immediately prior to the execution of this Agreement (the "*Parent Disclosure Letter*"), Parent and Merger Sub jointly and severally represent and warrant to the Company as follows:

Section 4.01    *Qualification; Organization.*

(a)    Each of Parent and Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Each of Parent and Merger Sub has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

(b)    Each of Parent and Merger Sub is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, have a Parent Material Adverse Effect. The organizational or governing documents of the Parent and Merger Sub, as previously provided to the Company, are in full force and effect. Neither Parent nor Merger Sub is in violation of its organizational or governing documents.

Section 4.02    *Corporate Authority Relative to This Agreement; No Violation.*

(a)    Each of Parent and Merger Sub has all requisite corporate power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement, including the Financing. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, including the Financing (as defined herein), have been duly and validly authorized by the Boards of Directors of Parent and Merger Sub and no other corporate proceedings on the part of Parent or Merger Sub are necessary to authorize the consummation of the transactions contemplated hereby (other than the adoption of this Agreement by Parent in its capacity as sole stockholder of Merger Sub). This Agreement has been duly and validly executed and delivered by Parent and Merger Sub and, assuming this Agreement constitutes the valid and binding agreement of the Company, this Agreement constitutes the valid and binding agreement of Parent and Merger Sub, enforceable against each of Parent and Merger Sub in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at Law) and any implied covenant of good faith and fair dealing.

(b)    Other than in connection with or in compliance with (i) the DGCL, or any applicable Delaware anti–takeover or investor protection statute, (ii) the applicable requirements of the Securities Act and Exchange Act and any related filings or approvals under applicable state securities Laws, (iii) the HSR Act and the applicable Laws relating to antitrust matters or regulating competition of jurisdictions other than the United States set forth in *Section 3.04(b)* of the Company Disclosure Letter (collectively, the "*Parent Approvals*"), no authorization, consent, approval or order of, or filing with, or notification to, any Governmental Entity is necessary in connection with the execution, delivery and performance of this Agreement by Parent or Merger Sub or the consummation by Parent or Merger Sub of the transactions contemplated by this Agreement, except for such authorizations, consents, approvals, orders, filings or notices that, if not obtained or made, would not, individually or in the aggregate, have a Parent Material Adverse Effect.

(c)    The execution, delivery and performance by Parent and Merger Sub of this Agreement does not, and the consummation of the transactions contemplated hereby, including the Financing,

A–23

and compliance with the provisions hereof will not (i) result in any breach or violation of, or default (with or without notice or lapse of time, or both) under, require consent under, or give rise to a right of termination, cancellation, modification or acceleration of any obligation or to the loss of any benefit under any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, purchase or sale order, instrument, permit, concession, franchise, right or license binding upon Parent or any of its Subsidiaries or result in the creation of any Lien upon any of the properties, assets or rights of Parent or any of its Subsidiaries, (ii) conflict with or result in any violation of any provision of the certificate of incorporation or by–laws or other equivalent organizational document, in each case as amended, of Parent or any of its Subsidiaries or (iii) assuming that all Parent Approvals are obtained, conflict with or violate any applicable Laws, other than, (x) in the case of clauses (i) and (iii), as would not, individually or in the aggregate, have a Parent Material Adverse Effect and (y) in the case of clause (i) or (iii), to the extent relating to the Company or its Subsidiaries or a change of control thereof.

Section 4.03    *Proxy Statement; Other Information.*    None of the information supplied or to be supplied by Parent or Merger Sub for inclusion or incorporation by reference in (i) the Form S–4 will, at the time the Form S–4 is filed with the SEC, and at any time it is amended or supplemented or at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading and (ii) the Proxy Statement and any other document filed with the SEC by the Company in connection with the Merger will, at the time of the mailing of the Proxy Statement to the stockholders of the Company or at the time of the Company Meeting or at the time of any amendments thereof or supplements thereto, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided* that no representation is made by Parent or Merger Sub with respect to information supplied by or related to or the sufficiency of disclosures related to, the Company or any Affiliate of the Company unless it relates to the Financing or to the Parent's or any of its Affiliates' plans for the Company after the Effective Time. The SEC Filings made by Parent will comply as to form in all material respects with the requirements of the Exchange Act and the Securities Act and the rules and regulations of the SEC thereunder.

Section 4.04    *Financing.*    Section 4.04 of the Parent Disclosure Letter sets forth true, accurate and complete copies, as of the date of this Agreement, of (i) executed commitment letters to provide equity financing to Parent in an aggregate amount set forth therein (the "*Equity Commitment Letters*" and the aggregate amount of equity financing, the "*Equity Financing*") and (ii) executed debt commitment letters and related term sheets (the "*Debt Commitment Letters*" and together with the Equity Commitment Letters, the "*Financing Commitments*") pursuant to which, and subject to the terms and conditions thereof, certain lenders have committed to provide Parent or the Surviving Corporation with funds (which may include up to $1,740,000,000 in bridge financing (the "*Bridge Financing*") to be utilized in the event the placement of high yield securities in a comparable amount (the "*High Yield Financing*") is not consummated) in the amounts described therein, the proceeds of which shall be used to consummate the Merger and the other transactions contemplated hereby (the "*Debt Financing*" and, together with the Equity Financing, the "*Financing*"). As of the date of this Agreement, each of the Financing Commitments, in the form so delivered, is a legal, valid and binding obligation of Parent or Merger Sub and, to the Knowledge of Parent, of the other parties thereto. As of the date of this Agreement, the Financing Commitments are in full force and effect and have not been withdrawn or terminated (and no party thereto has indicated an intent to so withdraw or terminate) or otherwise amended or modified in any respect and neither Parent nor Merger Sub is in breach of any of the terms or conditions set forth therein and, subject to the accuracy of the representations and warranties of the Company set forth in Article III, no event has occurred which, with or without notice, lapse of

A–24

time or both, could reasonably be expected to constitute a breach or failure to satisfy a condition precedent set forth therein or a default thereunder. As of the date of this Agreement, subject to the accuracy of the representations and warranties of the Company set forth in Article III, neither Parent nor Merger Sub has any reason to believe that it will be unable to satisfy on a timely basis any term or condition contemplated to be satisfied by it contained in the Financing Commitments. The proceeds from the Financing when funded in accordance with the Financing Commitments, and together with value of the shares of Company Common Stock and shares underlying Company Stock Options with respect to which the Electing Stockholders have made a Parent Stock Election or an Irrevocable Option Election, are sufficient for the satisfaction of all of Parent's and Merger Sub's obligations under this Agreement, including the payment of the Merger Consideration and the consideration in respect of the Company Stock Options, RSUs and Company Restricted Shares under Section 2.05 and to pay all related fees and expenses. As of the date of this Agreement, Parent or Merger Sub has fully paid any and all commitment fees or other fees on the dates and to the extent required by the Financing Commitments. The Financing Commitments contain all of the conditions precedent to the obligations of the parties thereunder to make the Financing available to Parent. Notwithstanding anything in this Agreement to the contrary, the Debt Commitment Letters may be superseded at the option of Parent or Merger Sub after the date of this Agreement but prior to the Effective Time by the New Financing Commitments in accordance with Section 5.09. In such event, the term "Financing Commitment" as used herein shall be deemed to include the New Financing Commitments to the extent then in effect.

Section 4.05    *Ownership and Operations of Merger Sub; Issuance of Parent Common Stock.*

(a)    As of the date of this Agreement, the authorized capital stock of Merger Sub consists of 1,000 shares of common stock, par value $0.01 per share, all of which are validly issued and outstanding. All of the issued and outstanding capital stock of Merger Sub is, and immediately prior to the Effective Time will be, owned by Parent.

(b)    The shares of common stock, par value $0.01 per share, of Parent ("*Parent Common Stock*") to be issued in exchange for the Electing Shares pursuant to this Agreement have been duly authorized and when issued in the Merger pursuant to the terms of this Agreement will be validly issued, fully paid, non–assessable and free of preemptive rights, with no personal liability attaching to the ownership thereof. All other shares of Parent Common Stock to be issued on or prior to the Closing Date in connection with the consummation of the Merger and the transactions contemplated thereby have been duly authorized, will be issued in exchange for consideration per share equal to $120.00 and when issued will be validly issued, fully paid, non–assessable and free of preemptive rights, with no personal liability attaching to the ownership thereof.

(c)    The authorized capital stock of Parent consists of 60,000,000 shares of Parent Common Stock and, as of the date of this Agreement, 100 shares of Parent Common Stock were issued and outstanding. Parent's authorized capital stock does not consist of any shares of preferred stock or shares of a class of common stock other than Parent Common Stock. As of the date of this Agreement, KHI Holdings LP ("*Holdings*") is the sole stockholder of Parent. Neither Parent nor Holdings has entered into any Contract with any other holder of Parent Common Stock which provides any special consent rights to such other holder of Parent Common Stock. True and complete copies of the certificate of incorporation and by–laws of Parent are included in *Section 4.05(c)* of the Parent Disclosure Letter. In the event that the amount of shares of Parent Common Stock issued to the Company's stockholders in accordance with the terms of this Agreement equals the Maximum Election Number and subject to proportionate adjustment if the equity financing at the Effective Time is greater or less than Equity Financing reflected in the Equity Commitment Letters, such amount of shares will represent approximately 27% of the outstanding shares of Parent Common Stock immediately following the Effective Time.

A–25

(d)   Neither Parent nor Merger Sub has conducted any business other than incident to its formation and in relation to this Agreement, the Merger and the other transactions contemplated hereby and the financing of such transactions.

Section 4.06   *Finders or Brokers.*   Neither Parent nor any of its Subsidiaries has engaged any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who, if the Merger is not consummated, might be entitled to any fee or any commission from the Company.

Section 4.07   *Certain Arrangements.*   Other than the Election Agreement, there are no Contracts or other understandings or arrangements between Parent, Merger Sub or any Guarantor or any of their respective Affiliates, on the one hand, and any member of the Company's management or directors, on the other hand, as of the date hereof that relate in any way to the Company, Parent or the transactions contemplated by this Agreement. Neither Parent nor Merger Sub, alone or together with any other person, has been at any time, or became, an "interested shareholder" thereunder or has taken any action that would cause any anti–takeover statute under the DGCL to be applicable to this Agreement, the Merger, or any transactions contemplated by this Agreement.

Section 4.08   *Investigations; Litigation.*   Except as may result from the announcement of the Merger or the proposal thereof or this Agreement and the transactions contemplated hereby, there are no suits, claims, actions, proceedings, arbitrations, mediations or investigations pending or, to the Knowledge of Parent, threatened against Parent or any of its Subsidiaries that would, individually or in the aggregate, have a Parent Material Adverse Effect. Neither Parent nor any of its Subsidiaries nor any of their respective properties is or are subject to any order, writ, judgment, injunction, decree or award that would, individually or in the aggregate, have a Parent Material Adverse Effect.

Section 4.09   *Guarantees.*   Concurrently with the execution of this Agreement, Parent has caused the Guarantors to deliver to the Company duly executed Guarantees. The Guarantees are in full force and effect.

Section 4.10   *Solvency.*   Immediately after giving effect to all of the transactions contemplated by this Agreement, including the Financing, any alternative financing and the payment of the aggregate Merger Consideration and the consideration in respect of the Company Stock Options, the RSUs and the Company Restricted Shares under Section 2.05 and any other repayment or refinancing of debt that may be contemplated in the Financing Commitments, assuming (a) satisfaction of the conditions to Parent's obligation to consummate the Merger as set forth herein, or the waiver of such conditions, and (b) the accuracy of the representations and warranties of the Company set forth in Article III hereof (for such purposes, such representations and warranties shall be true and correct in all material respects without giving effect to any knowledge, materiality or "Company Material Adverse Effect" qualification or exception) and (c) any estimates, projections or forecasts of the Company and its Subsidiaries have been prepared in good faith based upon reasonable assumptions, and payment of all related fees and expenses, the Surviving Corporation will be Solvent. For purposes of this Section 4.10, the term "Solvent" with respect to the Surviving Corporation means that, as of any date of determination, (a) the amount of the fair saleable value of the assets of the Surviving Corporation and its Subsidiaries, taken as a whole, exceeds, as of such date, the sum of (i) the value of all liabilities of the Surviving Corporation and its Subsidiaries, taken as a whole, including contingent and other liabilities, as of such date, as such quoted terms are generally determined in accordance with the applicable federal Laws governing determinations of the solvency of debtors, and (ii) the amount that will be required to pay the probable liabilities of the Surviving Corporation and its Subsidiaries, taken as a whole on its existing debts (including contingent liabilities) as such debts become absolute and matured; (b) the Surviving Corporation will not have, as of such date, an unreasonably small amount of capital for the operation of the business in which it is engaged or proposed to be engaged by Parent following such date; and (c) the Surviving Corporation will be able to pay its liabilities, including contingent and other liabilities, as they mature.

A–26

Section 4.11   *Access to Information; Disclaimer.*    Parent and Merger Sub each acknowledges and agrees that it (a) has had an opportunity to discuss the business of the Company and its Subsidiaries with the management of the Company, (b) has had reasonable access to (i) the books and records of the Company and its Subsidiaries and (ii) the electronic dataroom maintained by the Company through IntraLinks, Inc. for purposes of the transactions contemplated by this Agreement, (c) has been afforded the opportunity to ask questions of and receive answers from officers of the Company, and (d) has conducted its own independent investigation of the Company and its Subsidiaries, their respective businesses and the transactions contemplated hereby, and has not relied on any representation, warranty or other statement by any Person on behalf of the Company or any of its Subsidiaries, other than the representations and warranties of the Company expressly contained in Article III of this Agreement and that all other representations and warranties are specifically disclaimed.

Section 4.12   *Investments.*   As of the date of this Agreement, other than as previously disclosed to the Company or its counsel, none of (x) KKR 2006 Fund L.P. or any of its Subsidiaries, Affiliates or Affiliated Funds or (y) any of the GS Funds, has an equity interest greater than 10% in any Person that owns, controls or operates a business engaged in the consumer or professional audio, automotive audio, information, entertainment or infotainment products or used in the production of consumer or professional audio, audio, information, entertainment or infotainment products. "*Affiliated Funds*" means the investment funds affiliated with KKR 2006 Fund L.P.

## ARTICLE V

## COVENANTS AND AGREEMENTS

Section 5.01   *Conduct of Business.*

(a)   From and after the date hereof and prior to the earlier of the Effective Time and the date, if any, on which this Agreement is terminated pursuant to Section 7.01 (the "*Termination Date*"), and except (i) as may be otherwise required by applicable Law, (ii) with the prior written consent of Parent (not to be unreasonably withheld or delayed), (iii) as expressly contemplated or required by this Agreement or (iv) as disclosed in *Section 5.01* of the Company Disclosure Letter, the Company shall, and shall cause each of its Subsidiaries to, (A) conduct its business in all material respects in the ordinary course consistent with past practices, and (B) use commercially reasonable efforts to maintain and preserve intact its business organization and business relationships, preserve its assets, rights and properties in good repair and condition and to retain the services of its key officers and key employees in each case, in all material respects.

(b)   Without limiting the foregoing, the Company agrees with Parent that between the date hereof and the earlier of the Effective Time and the Termination Date, except as set forth in *Section 5.01(b)* of the Company Disclosure Letter, as otherwise expressly contemplated or expressly required by this Agreement or required by applicable Law, the Company shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of Parent (not to be unreasonably withheld or delayed):

(i)   with respect to the Company, adjust, split, combine, reclassify, redeem, repurchase or otherwise acquire any capital stock or other equity interests or Rights or otherwise amend the terms of its capital stock or other equity interests or Rights;

(ii)   make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire or encumber, any shares of its capital stock or other equity interests or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock or other equity interests, except in connection with cashless exercises or similar transactions pursuant to the exercise of Company Stock Options outstanding as of the date of this Agreement, or permitted to be granted as set

A–27

forth in Section 5.01(b) of the Company Disclosure Letter, or under the Company's Retirement Savings Investment Plan;  *provided* that the Company may continue to pay its quarterly cash dividends in the ordinary course of its business consistent with past practices (but in no event in an amount in excess of $0.0125 per share per quarter) with record dates consistent with the record dates for comparable quarterly periods of the Company's 2006 fiscal year, and *provided further* that no quarterly dividend will be declared with respect to the quarter in which the Effective Time occurs unless the Effective Time is after the record date for such quarter; this Section 5.01(b)(ii) shall not apply to dividends or distributions paid in cash by Subsidiaries to the Company or to other wholly owned Subsidiaries in the ordinary course of business consistent with past practice;

(iii)    grant any Person any right to acquire any shares of its capital stock or other equity interests;

(iv)    issue or sell any additional shares of capital stock or other equity interests, any securities convertible into, or any rights, warrants or options to acquire, any such shares of capital stock or other equity interests, except pursuant to the exercise of Company Stock Options outstanding as of the date of this Agreement, or permitted to be granted as set forth in Section 5.01(b) of the Company Disclosure Letter, or settlement of RSUs outstanding as of the date of this Agreement and in accordance with the terms of such instruments or as required under any Company Benefit Plan;

(v)    except as permitted by clause (vi), purchase, sell, lease, license, transfer, mortgage, abandon, encumber or otherwise subject to a Lien or otherwise dispose of, in whole or in part, any properties, rights or assets having a value in excess of $10,000,000 individually (other than (x) purchases or sales of inventory or (y) commodity, currency, purchase, sale or hedging agreements, in each case in the ordinary course of business consistent with past practice);

(vi)    make any capital expenditures (or authorization or commitment with respect thereto) in a manner reasonably expected to cause expenditures (x) to exceed the capital expenditure budget for the 2007 fiscal year previously provided to Parent or (y) for the 2008 fiscal year to exceed the 2008 capital expenditure budget taking into account reasonably anticipated expenditures for the balance of the year as well as expenditures already committed or made (assuming for this purpose that fiscal 2008 capital expenditure budget will not exceed 111% of the fiscal 2007 capital expenditure budget);

(vii)    except (a) ordinary course loans pursuant to the Company's Retirement Saving Plan and advances for business expenses in the ordinary course pursuant to Company Benefit Plans, and (b) for borrowings or letters of credit under the Company's existing credit facilities in the ordinary course of business and consistent with past practice or (c) that do not exceed $10,000,000 in the aggregate outstanding at any time, incur, create, assume or otherwise become liable for, or repay or prepay, any indebtedness for borrowed money (including the issuance of any debt security), any capital lease obligations, any guarantee of any such indebtedness or debt securities of any other Person, or any "keep well" or other agreement to maintain any financial statement condition of another Person (such obligations collectively, "*Indebtedness*"), or amend, modify or refinance any existing Indebtedness;

(viii)    make any investment in or acquisition of another Person or business in excess of $10,000,000 individually or $25,000,000 in the aggregate, whether by merger, purchase of stock or securities, contributions to capital, loans to, property transfers, or entering into binding agreements with respect to any such investment or acquisition (including any conditional or installment sale Contract or other retention Contract relating to purchased property);

(ix)    except in the ordinary course of business consistent with past practice or on terms not materially adverse to the Company and its Subsidiaries, taken as a whole, enter into, renew, extend, materially amend or terminate any Material Contract or Contract which if

A–28

entered into prior to the date hereof would be a Material Contract, in each case, other than any Contract relating to Indebtedness that would not be prohibited under clause (vii) of this Section 5.01(b);

(x)  except to the extent required by Law (including Section 409A of the Code), by Contracts in existence as of the date of this Agreement, by the Company Benefit Plans or by this Agreement, (A) increase the compensation or benefits of any of its employees, independent contractors or directors, other than merit–based increases in base salary, or immaterial increases in benefits, in each case in the ordinary course of business consistent with past practice for employees, (B) materially amend or adopt any material compensation or benefit plan, including any pension, retirement, profit–sharing, bonus or other employee benefit or welfare benefit plan (other than any such adoption or amendment that does not materially increase the annual cost to the Company or any of its Subsidiaries of maintaining the applicable compensation or benefit plan) with or for the benefit of its employees, independent contractors or directors; provided that nothing in this Agreement shall preclude the Company from (x) furnishing documents, schedules or any other information to the trustee of any trust that secures all or a part of the obligations under any Company Benefit Plan or (y) removing, changing or appointing a trustee or administrator of any trust that secures all or a part of the obligations under any Company Benefit Plan, or (C) accelerate the vesting of, or the lapsing of restrictions with respect to, any stock options or other stock–based compensation;

(xi)  (A) compromise, settle or agree to settle any suit, action, claim, proceeding or investigation (including any suit, action, claim, proceeding or investigation relating to this Agreement or the transactions contemplated hereby), or consent to the same, other than compromises, settlements or agreements in the ordinary course of business consistent with past practice that involve only the payment of monetary damages not in excess of $5,000,000 individually (or with respect to a series of related claims) and in any case without the imposition of material equitable relief on, or the admission of wrongdoing by, the Company or any of its Subsidiaries or (B) waive any claims or rights of substantial value;

(xii)  amend or waive any material provision of its Charter or its by–laws or other equivalent organizational documents or of the Rights Agreement or, in the case of the Company, enter into any agreement with any of its shareholders in their capacity as such;

(xiii)  enter into any "non–compete" or similar agreement that would by its terms restrict in any material respect the businesses of the Surviving Corporation or its Subsidiaries or Affiliates following the Effective Time other than in the ordinary course of business consistent with past practice;

(xiv)  enter into any new line of business outside of its existing businesses;

(xv)  enter into any new lease or amend the terms of any existing lease of real property which would require payments over the remaining term of such lease in excess of $25,000,000 (excluding any renewal terms);

(xvi)  adopt or enter into a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of such entity (other than among wholly owned Subsidiaries);

(xvii)  implement or adopt any material change in its financial accounting principles or practices, other than as required by GAAP, applicable Law or regulatory guidelines;

(xviii)  change any method of Tax accounting, enter into any closing agreement with respect to material Taxes, settle or compromise any material liability for Taxes, make, revoke or change any material Tax election, agree to any adjustment of any material Tax attribute, file or surrender any claim for a material refund of Taxes, execute or consent to any waivers

A–29

extending the statutory period of limitations with respect to the collection or assessment of material Taxes, file any material amended Tax Return or obtain any material Tax ruling, in each case other than in the ordinary course of business consistent with past Tax practice; or

     (xix)  agree to take, make any commitment to take, or adopt any resolutions of its board of directors approving any of the actions prohibited by this Section 5.01(b).

    (c)  From and after the date hereof and prior to the earlier of the Effective Time or the Termination Date, and except (i) as may be otherwise required by applicable Law or (ii) as expressly contemplated or permitted by this Agreement, no party hereto shall, and each shall cause their respective Subsidiaries not to, and, in the case of Parent and Merger Sub, shall cause the Guarantors, Subsidiaries of the Guarantors and the Affiliated Funds not to, and shall use their reasonable best efforts to cause their controlled Affiliates not to, take or agree to take any action which is intended to or which would reasonably be expected to materially adversely affect or materially delay the ability of such party from obtaining any necessary approvals of any regulatory agency or other Governmental Entity required for the transactions contemplated hereby, performing its covenants and agreements under this Agreement or consummating the transactions contemplated hereby or otherwise materially delay or prohibit consummation of the Merger or other transactions contemplated hereby.

    (d)  Parent shall, promptly following execution of this Agreement, adopt this Agreement in its capacity as sole stockholder of Merger Sub and provide evidence thereof to the Company. In the event Parent, Merger Sub or any Guarantor or any of their respective Affiliates, on the one hand, enters into any Contracts or other understandings or arrangements between any Company employee, on the other hand, Parent will promptly notify the Company of the existence of any such Contract or other understanding or arrangement and the material terms thereof; *provided* that neither Parent, Merger Sub or any Guarantor or any of their respective Affiliates shall enter into any such Contract or discuss or otherwise convey any proposal related thereto to any Company employee or director prior to the No–Shop Period Start Date (as defined herein). Parent agrees with the Company that between the date hereof and the earlier of the Effective Time and the Termination Date, except as otherwise expressly contemplated or expressly required by this Agreement, neither Parent nor Merger Sub shall, without the prior written consent of the Company (which will not be unreasonably withheld or delayed):

     (i)  adjust, split, combine, reclassify, redeem, repurchase or otherwise acquire any capital stock or other equity interests or otherwise amend the terms of its capital stock or other equity interests;

     (ii)  make, declare or pay any dividend, or make any other distribution on, any shares of its capital stock or other equity interests or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock or other equity interests;

     (iii)  in the case of Parent, amend its certificate of incorporation or bylaw (except that Parent shall, prior to the Closing Date, amend its certificate of incorporation to delete paragraph 8 thereof); or

     (iv)  agree to take, or make any commitment to take, any of the actions prohibited by this Section 5.01(d).

During the period following the Effective Time until the second anniversary thereof, Parent shall whether or not it is then required by the Exchange Act and the rules and regulations promulgated thereunder to make any such filing, file with the Securities and Exchange Commission the reports specified by Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder.

Section 5.02   *Acquisition Proposals.*

    (a)   Notwithstanding any other provision of this Agreement to the contrary, during the period beginning on the date of this Agreement and continuing until 11:59 p.m. (EST) on June 15, 2007 (the "*No–Shop Period Start Date*"), the Company and its Subsidiaries and their respective officers, directors, employees, consultants, agents, advisors, affiliates and other representatives (collectively, "*Representatives*") shall have the right to directly or indirectly: (i) initiate, solicit and encourage Company Acquisition Proposals (as defined herein) (or inquiries, proposals or offers or other efforts or attempts that may lead to a Company Acquisition Proposal), including by way of providing access to non–public information pursuant to (but only pursuant to) one or more Acceptable Confidentiality Agreements (as defined herein); *provided* that the Company shall promptly provide to Parent any material non–public information concerning the Company or its Subsidiaries that is provided to any Person given such access which was not previously provided to Parent or its Representatives; and (ii) enter into and maintain discussions or negotiations with respect to Company Acquisition Proposals or otherwise cooperate with or assist or participate in, or facilitate any such inquiries, proposals, discussions or negotiations.

    (b)   Subject to Section 5.02(c), from the No–Shop Period Start Date until the Effective Time or, if earlier, the termination of this Agreement in accordance with Article VII, none of the Company, the Company's Subsidiaries nor any of their respective Representatives shall, directly or indirectly, (A) initiate, solicit or knowingly encourage (including by way of providing information) the submission of any inquiries, proposals or offers or any other efforts or attempts that constitute or may reasonably be expected to lead to, any Company Acquisition Proposal or engage in any discussions or negotiations with respect thereto or otherwise knowingly assist or participate in, or knowingly facilitate any such inquiries, proposals, discussions or negotiations, or (B) approve or recommend, or publicly propose to approve or recommend, a Company Acquisition Proposal or enter into any merger agreement, letter of intent, agreement in principle, share purchase agreement, asset purchase agreement or share exchange agreement, option agreement or other similar agreement providing for or relating to a Company Acquisition Proposal or enter into any agreement or agreement in principle requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations hereunder or propose or agree to do any of the foregoing. Subject to Section 5.02(c) and except with respect to any Person (or group of Persons that includes among its members one or more Persons who (x) were members of such group prior to the No–Shop Period Start Date and (y) collectively constitute at least 50% of the equity financing of such group at all times following the No–Shop Period Start Date and prior to the Termination Date) from whom the Company has received a Company Acquisition Proposal prior to the No–Shop Period Start Date with respect to which the requirements of Sections 5.02(c)(i) and (ii) have been satisfied as of the No–Shop Period Start Date (any such Person or group of Persons so submitting such a Company Acquisition Proposal, an "*Excluded Party*"), as determined, with respect to any Excluded Party, by the board of directors of the Company no later than the later of (i) the No–Shop Period Start Date and (ii) the Business Day following the date on which the Company received such Excluded Party's written Company Acquisition Proposal (it being understood, that with respect to any determination being made pursuant to clause (ii), that following the No–Shop Period Start Date until such time as the board of directors of the Company determines that a Person or group of Persons is an Excluded Party, the Company shall not be permitted to take any action with respect to such Person or group of Persons that it would be prohibited from taking with respect to a non–Excluded Party pursuant to Section 5.02(c)), on the No–Shop Period Start Date the Company shall immediately cease and cause to be terminated any solicitation, encouragement, discussion or negotiation with any Persons conducted theretofore by the Company, its Subsidiaries or any Representatives with respect to any Company Acquisition Proposal. Notwithstanding anything contained in Section 5.02 to the contrary, any Excluded Party shall cease to be an Excluded Party for all purposes under this Agreement at such time as the Company Acquisition Proposal (as such Company Acquisition Proposal may be revised during the course of ongoing

A–31

negotiations, in which event it may temporarily cease to satisfy the requirements of 5.02(c), so long as such negotiations are ongoing and there is not, following the No–Shop Period Start Date, a continuous period of greater than five Business Days during which it fails to satisfy the requirements of Section 5.02(c)) made by such party fails, in the reasonable judgment of the board of directors of the Company, to satisfy the requirements of Section 5.02(c).

(c)    Notwithstanding anything to the contrary contained in Section 5.02(b), if at any time following the date of this Agreement and prior to obtaining the Company Stockholder Approval, (i) the Company has received a written Company Acquisition Proposal from a third party that the board of directors of the Company believes in good faith to be bona fide, (ii) the board of directors of the Company determines in good faith, after consultation with its independent financial advisors and outside counsel, that such Company Acquisition Proposal constitutes or could reasonably be expected to result in a Superior Proposal and (iii) after consultation with its outside counsel, the board of directors of the Company determines in good faith that the failure to take such action could violate its fiduciary duties under applicable Law, then the Company may (A) furnish information with respect to the Company and its Subsidiaries to the Person making such Company Acquisition Proposal and (B) participate in discussions or negotiations with the Person making such Company Acquisition Proposal regarding such Company Acquisition Proposal; *provided*, that the Company (x) will not, and will not allow Company Representatives to, disclose any material non–public information to such Person without entering into an Acceptable Confidentiality Agreement, and (y) will promptly provide to Parent any non–public information concerning the Company or its Subsidiaries provided to such other Person which was not previously provided to Parent or its Representatives. Notwithstanding anything to the contrary contained in Section 5.02(b) or this Section 5.02(c), prior to obtaining the Company Stockholder Approval, the Company shall be permitted to take the actions described in clauses (A) and (B) above with respect to any Excluded Party. From and after the No–Shop Period Start Date, the Company shall promptly (within one Business Day) notify Parent in the event it receives a Company Acquisition Proposal from a Person or group of related Persons, including the material terms and conditions thereof, and shall keep Parent apprised as to the status and any material developments, discussions and negotiations concerning the same on a current basis (and in any event no later than 48 hours after the occurrence of such developments, discussions or negotiations). Without limiting the foregoing, the Company shall promptly (within two Business Days) notify Parent orally and in writing if it determines to begin providing information or to engage in negotiations concerning a Company Acquisition Proposal from a Person or group of related Persons pursuant to this Section 5.02(c). Within 24 hours of the No–Shop Period Start Date, the Company shall notify Parent of the number of Excluded Parties.

(d)    Notwithstanding anything in this Agreement to the contrary, if, at any time prior to obtaining the Company Stockholder Approval, the Company receives a Company Acquisition Proposal which the board of directors of the Company determines in good faith constitutes a Superior Proposal after giving effect to all of the adjustments which may be offered by Parent pursuant to clause (ii) below, the board of directors of the Company may (x) effect a Change of Recommendation if the board of directors of the Company determines in good faith, after consultation with outside counsel, that failure to take such action could violate its fiduciary duties under applicable Law and/or (y) terminate this Agreement to enter into a definitive agreement with respect to such Superior Proposal; *provided*, *however* that the Company shall not terminate this Agreement pursuant to the foregoing clause (y), and any purported termination pursuant to the foregoing clause (y) shall be void and of no force or effect, unless concurrently with such termination the Company pays the Termination Fee payable pursuant to Section 7.02(a); *provided*, *further*, that the board of directors may not effect a Change of

A–32

Recommendation pursuant to the foregoing clause (x) or terminate this Agreement pursuant to the foregoing clause (y) unless:

(i)    the Company shall have provided prior written notice to Parent and Merger Sub, at least three Business Days in advance (the "*Notice Period*"), of its intention to effect a Change of Recommendation in response to such Superior Proposal or terminate this Agreement to enter into a definitive agreement with respect to such Superior Proposal, which notice shall specify the material terms and conditions of any such Superior Proposal (including the identity of the party making such Superior Proposal), and shall have contemporaneously provided a copy of the relevant material proposed transaction agreements with the party making such Superior Proposal; and

(ii)    prior to effecting such Change of Recommendation or terminating this Agreement to enter into a definitive agreement with respect to such Superior Proposal, the Company shall, and shall cause its financial and legal advisors to, during the Notice Period, negotiate with Parent and Merger Sub in good faith (to the extent Parent and Merger Sub desire to negotiate) to make such adjustments in the terms and conditions of this Agreement so that such Company Acquisition Proposal ceases to constitute a Superior Proposal.

In the event of any material revisions to the Superior Proposal, the Company shall be required to deliver a new written notice to Parent and Merger Sub and to comply with the requirements of this Section 5.02(d) with respect to such new written notice, except that the Notice Period shall be reduced to one Business Day.

(e)    The Company agrees that any violations of the restrictions set forth in this Section 5.02 by any Representative of the Company or any of its Subsidiaries, shall be deemed to be a breach of this Section 5.02 by the Company.

(f)    As used in this Agreement, the term:

"*Acceptable Confidentiality Agreement*" means a confidentiality and standstill agreement that contains provisions that are no less favorable in the aggregate to the Company than those contained in the Confidentiality Agreement; *provided* that such confidentiality agreement shall not prohibit compliance with Section 5.02(d)(i)–(ii)).

"*Company Acquisition Proposal*" means any inquiry, proposal or offer from any Person or group of Persons (other than Parent, Merger Sub or their respective Affiliates) relating to any direct or indirect acquisition or purchase of a business that constitutes 25% or more of the net revenues, net income or assets of the Company and its Subsidiaries, taken as a whole, or 25% or more of any class or series of Company Securities, any tender offer or exchange offer that if consummated would result in any Person or group of Persons beneficially owning 25% or more of any class or series of capital stock of the Company, or any merger, reorganization, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company (or any Subsidiary or Subsidiaries of the Company whose business constitutes 25% or more of the net revenues, net income or assets of the Company and its Subsidiaries, taken as a whole).

"*Superior Proposal*" means a Company Acquisition Proposal involving (A) assets that generate more than 50% of the consolidated total revenues, or (B) assets that constitute more than 50% of the consolidated total assets of the Company and its Subsidiaries or (C) more than 50% of the total voting power of the equity securities of the Company, in each case that the board of directors of the Company in good faith determines would, if consummated, result in a transaction that is more favorable from a financial point of view to the stockholders of the Company than the transactions contemplated hereby (x) after receiving the advice of a financial advisor (who shall be a nationally recognized investment banking firm) and (y) after taking into account all appropriate legal (with the advice of outside

counsel), financial (including the financing terms of any such proposal), regulatory, timing or other aspects of such proposal and any other relevant factors permitted by applicable Law.

(g)  Nothing contained in this Section 5.02 or elsewhere in this Agreement shall prohibit the Company from (i) taking and disclosing to its stockholders a position contemplated by Rule 14d−9 and 14e−2(a)(2)−(3) promulgated under the Exchange Act or (ii) making any required disclosure to the Company's stockholders, if, in the good faith judgment of the board of directors of the Company, after consultation with its outside counsel, it is required to do so under applicable Law; *provided*, any such disclosure (other than a "stop, look and listen" letter or similar communication of the type contemplated by Rule 14d−9(f) under the Exchange Act) shall be deemed to be a Change of Recommendation unless the board of directors of the Company expressly publicly reaffirms at least two Business Days prior to the Company Meeting its recommendation in favor of the adoption of this Agreement.

Section 5.03   *Company Meeting; Preparation of Form S−4 and Proxy Statement.*

(a)  The Company shall (i) take all action necessary to duly call, give notice of, convene and hold a meeting of its stockholders (the "*Company Meeting*") for the purpose of having this Agreement adopted by the stockholders of the Company in accordance with applicable Law as promptly as reasonably practicable after the date of mailing of the Proxy Statement, (ii) subject to the immediately succeeding sentence, use reasonable best efforts to solicit the adoption of this Agreement by the stockholders of the Company, and (iii) subject to the immediately succeeding sentence, include in the Proxy Statement the Recommendation. Neither the board of directors of the Company nor any committee thereof shall directly or indirectly (x) withdraw (or modify or qualify in a manner adverse to Parent or Merger Sub), or publicly propose to withdraw (or modify or qualify in a manner adverse to Parent or Merger Sub), the Recommendation or (y) make any other public statement in connection with the Company Meeting, or in reference to a Company Acquisition Proposal, that is contrary to such Recommendation (any action described in this clause (x) or (y) being referred to as a "*Change of Recommendation*"); *provided*, that at any time prior to obtaining the Company Stockholder Approval, the board of directors of the Company may effect a Change of Recommendation (subject to the Company having complied with its obligations under Section 5.02) if such board of directors determines in good faith (after consultation with outside counsel) that failure to take such action could violate its fiduciary duties under applicable Law. Notwithstanding any Change of Recommendation, unless this Agreement is terminated pursuant to, and in accordance with, Section 7.01, this Agreement shall be submitted to the stockholders of the Company at the Company Meeting for the purpose of adopting this Agreement. If, at any time prior to the Effective Time, any information relating to the Company, Parent or Merger Sub or any of their respective Affiliates should be discovered by the Company, Parent or Merger Sub which should be set forth in an amendment or supplement to the SEC Filings so that the SEC Filings shall not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, the party that discovers such information shall promptly notify the other parties and, to the extent required by applicable Law, Parent and the Company shall cause an appropriate amendment or supplement describing such information to be promptly filed with the SEC and disseminated by the Company to the Company's stockholders.

(b)  In connection with the transactions contemplated hereby, Parent and the Company will (i) as promptly as reasonably practicable (and, with respect to filing with the SEC, in any event within 30 Business Days from the date of this Agreement) prepare and file with the SEC the Form S−4, including the Proxy Statement, (ii) respond as promptly as reasonably practicable to any comments received from the SEC with respect to any SEC filings and will provide copies of such comments to the other promptly upon receipt, (iii) as promptly as reasonably practicable prepare and file any amendments or supplements necessary to be filed in response to any SEC comments or as required by Law, (iv) each

A−34

use its respective reasonable best efforts to have the Form S–4 declared effective by the SEC under the Securities Act and thereafter mail to the Company's stockholders as promptly as reasonably practicable, the Proxy Statement and all other customary proxy or other materials for meetings such as the Company Meeting and, in the case of Parent, use its reasonable best efforts to keep the Form S–4 effective as long as necessary to consummate the Merger and the transactions contemplated hereby, (v) to the extent required by applicable Law, as promptly as reasonably practicable prepare, file and distribute to the stockholders of the Company any supplement or amendment to the SEC Filings if any event shall occur which requires such action at any time prior to the Company Meeting, and (vi) each otherwise use commercially reasonable efforts to comply with all requirements of Law applicable to the filings to be made with the SEC, the Company Meeting and the Merger, including any actions required to be taken under any applicable state securities laws in connection with the registration and qualification in connection with the Merger of the Parent Common Stock to be issued in connection with the Merger.

Section 5.04   *Employee Matters.*

(a)   Upon the Effective Time, Parent will cause the Surviving Corporation to, and the Surviving Corporation will, honor all the Company Benefit Plans in accordance with their terms in effect immediately before the Effective Time and Parent will cause the Surviving Corporation to, and the Surviving Corporation will, honor all changes to the Company Benefit Plans required by applicable Law. Parent and the Company hereby agree that the consummation of the Merger will constitute a "Change in Control," "Change in Control of the Company," or any similar or corresponding term, for purpose of any Company Benefit Plans. For the period between the Effective Time through December 31, 2008, Parent shall provide, or shall cause to be provided, to each current employee of the Company and its Subsidiaries ("*Company Employees*") annual base salary and base wages, cash incentive compensation opportunities (excluding equity–based compensation) and aggregate benefits, in each case, that are no less favorable than such annual base salary and base wages, cash incentive compensation opportunities (excluding equity–based compensation) and aggregate benefits provided to the Company Employees immediately prior to the Effective Time. In furtherance of, but without limiting the foregoing, Parent shall cause the Surviving Corporation to amend, reform or supplement the terms of any nonqualified deferred compensation plan (within the meaning of Section 409A of the Code and related guidance) covering any Company Employee as necessary for compliance with Section 409A, while preserving to the extent practicable the intended treatment of the original plan.

(b)   For all purposes (excluding for purposes of benefit accrual under any defined benefit pension plan) under the employee benefit plans of Parent and its Subsidiaries providing benefits to any Company Employees after the Effective Time (including the Company Benefits Plans) (the "*New Plans*"), each Company Employee shall be credited with his or her years of service with the Company and its Subsidiaries and their respective predecessors before the Effective Time, to the same extent as such Company Employee was entitled, before the Effective Time, to credit for such service under any similar Company employee benefit plan in which such Company Employee participated or was eligible to participate immediately prior to the Effective Time, *provided* that the foregoing shall not apply to the extent that its application would result in a duplication of benefits with respect to the same period of service. In addition, and without limiting the generality of the foregoing, to the extent legally permissible, (i) each Company Employee shall be immediately eligible to participate, without any waiting time, in any and all New Plans to the extent coverage under such New Plan is replacing comparable coverage under a Company Benefit Plan in which such Company Employee participated immediately before the Effective Time (such plans, collectively, the "*Old Plans*"), and (ii) for purposes of each New Plan providing medical, dental, pharmaceutical and/or vision benefits to any Company Employee, Parent shall cause all pre–existing condition exclusions and actively–at–work requirements of such New Plan to be waived for such employee and his or her covered dependents, to the extent such conditions did not immediately prior to the Effective Time, apply to such employee and his or her

A–35

covered dependents under the comparable Old Plans of the Company or its Subsidiaries in which such employee participated immediately prior to the Effective Time and Parent shall cause any eligible expenses incurred by such employee and his or her covered dependents during the portion of the plan year of the Old Plan ending on the date such employee's participation in the corresponding New Plan begins to be taken into account under such New Plan for purposes of satisfying all deductible, coinsurance and maximum out–of–pocket requirements applicable to such employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such New Plan.

(c)    Prior to the Effective Time, the Company shall take all action necessary to amend the Key Executive Officers Bonus Plan, without further liability to the Company, such that, notwithstanding anything contained herein to the contrary, the occurrence of the Closing shall not constitute a Change in Control under the terms of the plan to the extent the Closing occurs after June 30, 2007.

(d)    The Company may amend, reform or supplement the terms of any Compensation Benefit Plan as necessary for compliance with, or to avoid adverse tax consequences under Section 409A of the Code and related guidance.

(e)    Upon the Effective Time, Parent shall cause the Surviving Corporation and its Subsidiaries to assume all Company Benefit Plans that require assumption by a successor to the Company in accordance with their terms as in effect immediately before the Effective Time.

(f)    The provisions of this Section 5.04 are solely for the benefit of the parties to this Agreement, and no current or former employee, director or independent contractor or any other individual associated therewith shall be regarded for any purpose as a third–party beneficiary of the Agreement, and nothing herein shall be construed as an amendment to any Company Benefit Plan for any purpose.

Section 5.05    *Reasonable Best Efforts.*

(a)    Subject to the terms and conditions set forth in this Agreement, each of the parties hereto shall use its reasonable best efforts to take, or to cause to be taken, all actions, to file, or cause to be filed, all documents and to do, or to cause to be done, and to assist and to cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective the Merger and the other transactions contemplated hereby, including using reasonable best efforts to accomplish the following, (i) the obtaining of all necessary actions or nonactions, waivers, consents, clearances, approvals, and expirations or terminations of waiting periods, including the Company Approvals and the Parent Approvals, from Governmental Entities and the making of all necessary registrations and filings and the taking of all steps as may be necessary to obtain an approval, clearance, or waiver from, or to avoid an action or proceeding by, any Governmental Entity, (ii) the obtaining of all necessary consents, approvals or waivers from, or participation in other discussions or negotiations with, third parties and cooperating with the other party to obtain any consents or waivers reasonably requested by such other party in connection with the consummation of the Merger and the other transactions contemplated hereby, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Merger and the other transactions contemplated hereby and (iv) the execution and delivery of any additional instruments reasonably necessary to consummate the transactions contemplated hereby; *provided, however,* that in no event shall the Company or any of its Subsidiaries be required to pay prior to the Effective Time any fee, penalties or other consideration to any third party to obtain any consent or approval required for the consummation of the Merger under any Contract and neither the Company nor any of its Subsidiaries shall commit to the payment of any fee, penalty or other consideration in connection with obtaining any consent without the prior written consent of Parent.

(b)    Subject to the terms and conditions herein provided and without limiting the foregoing, the Company and Parent shall (i) promptly, but in no event later than ten Business Days after the date

hereof, file any and all Notification and Report Forms required under the HSR Act with respect to the Merger and the other transactions contemplated hereby, and use reasonable best efforts to cause the expiration or termination of any applicable waiting periods under the HSR Act, (ii) use reasonable best efforts to cooperate with each other in (x) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers, clearances, approvals, and expirations or terminations of waiting periods are required to be obtained from any Governmental Entities in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and (y) timely making all such filings and timely obtaining all such consents, permits, authorizations or approvals, (iii) supply to any Governmental Entity as promptly as reasonably practicable any additional information or documentary material that may be requested pursuant to any Regulatory Law or by such Governmental Entity, and (iv) use reasonable best efforts to take, or cause to be taken, all other actions and do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the Merger, the Financing and the other transactions contemplated hereby, including using reasonable best efforts to (A) take all such further action as may be necessary to resolve such objections, if any, as the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction or any other person may assert under any Regulatory Law with respect to the Merger and the other transactions contemplated hereby, and (B) avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Entity with respect to the Merger so as to enable the Closing to occur no later than the End Date, including (x) proposing, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of any assets or businesses of Parent or its Subsidiaries or Affiliates or of the Company or its Subsidiaries and (y) otherwise taking or committing to take any actions that after the Closing would limit the freedom of Parent or its Subsidiaries' (including the Surviving Corporation's) or Affiliates' freedom of action with respect to, or its ability to retain, one or more of its or its Subsidiaries' (including the Surviving Corporation's) or Affiliates' businesses, product lines or assets, in each case as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding which would otherwise have the effect of preventing the Closing or delaying the Closing beyond the End Date; *provided* that, neither the Company nor any of its Subsidiaries shall, nor shall Parent or any of its Subsidiaries or Affiliates be obligated to, become subject to, or consent or agree to or otherwise take any action with respect to, any requirement, condition, understanding, agreement or order of a Governmental Entity to sell, to hold separate or otherwise dispose of, or to conduct, restrict, operate, invest or otherwise change the assets or business of the Company or any of its Subsidiaries or Parent or any of its Subsidiaries or Affiliates, as the case may be, unless such requirement, condition, understanding, agreement or order is binding on the Company or Parent, its Subsidiaries or Affiliates, respectively, only in the event that the Closing occurs; *provided further*, *however*, that in no event shall any member or other holder of interests in Parent, or any Affiliate or any member of Parent, be required to take any action with respect to any portfolio company or agree to undertake any divestiture or restrict its conduct with regard to any business other than the business of the Company and its Subsidiaries.

(c)   Subject to applicable legal limitations and the instructions of any Governmental Entity, the Company and Parent shall keep each other reasonably apprised of the status of matters relating to the completion of the Merger and the other transactions contemplated by this Agreement, including promptly furnishing the other with copies of notices or other written communications received by the Company or Parent, as the case may be, or any of their respective Subsidiaries or Affiliates, from any third party and/or any Governmental Entity with respect to such Merger or transactions. The Company and Parent shall permit counsel for the other party reasonable opportunity to review in advance, and consider in good faith the views of the other party in connection with, any proposed written communication to any Governmental Entity. To the extent practicable under the circumstances, each of

the Company and Parent agrees not to participate in any substantive meeting or discussion, either in person or by telephone, with any Governmental Entity in connection with the proposed transactions unless it consults with the other party in advance and, to the extent not prohibited by such Governmental Entity, gives the other party the opportunity to attend and participate.

(d)   In furtherance and not in limitation of the covenants of the parties contained in this Section 5.05, if any administrative or judicial action or proceeding, including any proceeding by a private party, is instituted (or threatened to be instituted) challenging the Merger or any other transaction contemplated by this Agreement as violative of any Regulatory Law, each of the Company and Parent shall cooperate in all reasonable respects with each other and shall use its respective reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Merger or any other transaction contemplated hereby.

(e)   For purposes of this Agreement, "*Regulatory Law*" means any and all state, federal and foreign statutes, rules, regulations, orders, decrees, administrative and judicial doctrines and other Laws requiring notice to, filings with, or the consent, clearance or approval of, any Governmental Entity, or that otherwise may cause any restriction, in connection with the Merger and the transactions contemplated thereby, including (i) the Sherman Act of 1890, the Clayton Antitrust Act of 1914, the HSR Act, the Federal Trade Commission Act of 1914 and all other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition, (ii) any Law governing the direct or indirect ownership or control of any of the operations or assets of the Company and its Subsidiaries or (iii) any Law with the purpose of protecting the national security or the national economy of any nation.

Section 5.06   *Takeover Statute.*   If any "fair price," "moratorium," "business combination," "control share acquisition" or other form of anti–takeover statute or regulation shall become applicable to the Merger or the other transactions contemplated by this Agreement after the date of this Agreement, each of the Company and Parent and the members of their respective Boards of Directors shall grant such approvals and take such actions as are reasonably necessary so that the Merger and the other transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated herein and otherwise act to eliminate or minimize the effects of such statute or regulation on the Merger, and the other transactions contemplated hereby.

Section 5.07   *Public Announcements.*   The Company and Parent will consult with and provide each other the reasonable opportunity to review and comment upon any press release or other public statement or comment prior to the issuance of such press release or other public statement or comment relating to this Agreement or the transactions contemplated herein and shall not issue any such press release or other public statement or comment prior to such consultation except as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange. Parent and the Company agree that the press release announcing the execution and delivery of this Agreement shall be a joint release of Parent and the Company.

Section 5.08   *Indemnification and Insurance.*

(a)   Parent and Merger Sub agree that all rights to exculpation, indemnification and advancement of expenses for acts or omissions occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, now existing in favor of the current or former directors, officers or employees, as the case may be, of the Company or its Subsidiaries as provided in their respective certificates of incorporation or by–laws or other organization documents or in any agreement as in effect on the date hereof and which has previously been made available to Parent or its Representatives shall survive the Merger and shall continue in full force and effect to the extent provided in the following sentence. Parent and the Surviving Corporation shall maintain in effect any and all exculpation, indemnification and advancement of expenses provisions of the Company's and any of its Subsidiaries' certificates of incorporation, by–laws or similar organization documents in effect immediately prior to the Effective Time or in any indemnification agreements of the Company or its Subsidiaries with any of their respective current or former directors, officers or employees in effect as of the date of this Agreement and which has previously been made available to Parent or its Representatives, and shall not (except as otherwise required by Law), for a period of six years from the date hereof, amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any individuals who at the Effective Time were current or former directors, officers or employees of the Company or any of its Subsidiaries and all rights to indemnification or advancement of expenses thereunder in respect of any Action pending or asserted or any claim made within such period shall continue until the disposition of such Action or resolution of such claim.

(b)   From and after the Effective Time, the Surviving Corporation shall, Parent shall cause the Surviving Corporation to, and in the event the coverage under the directors' and officers' liability insurance policies referred to in Section 5.08(c) below has been fully paid by all applicable carriers or is otherwise no longer available, Parent shall, in each case to the fullest extent permitted under applicable Law, indemnify and hold harmless (and advance funds in respect of each of the foregoing) each current and former director, officer or employee of the Company or any of its Subsidiaries (each, together with such person's heirs, executors or administrators, an "*Indemnified Party*") against any costs or expenses (including advancing reasonable attorneys' fees and expenses in advance of the final disposition of any claim, suit, proceeding or investigation to each Indemnified Party to the fullest extent permitted by Law upon the receipt of any customary undertaking required by the Surviving Corporation), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative (an "*Action*"), arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or at the Effective Time in connection with such persons serving as an officer, director or other fiduciary in any entity if such service was at the request or for the benefit of the Company.

(c)   For a period of six (6) years from the Effective Time, Parent shall either cause to be maintained in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its Subsidiaries or cause to be provided substitute policies or purchase or cause the Surviving Corporation to purchase, a "tail policy," in either case of at least the same coverage and amounts containing terms and conditions that are not less advantageous in the aggregate than such policy with respect to matters arising on or before the Effective Time;  *provided, however,* that after the Effective Time, Parent shall not be required to pay with respect to such insurance policies in respect of any one policy year annual premiums in excess of 300% of the last annual premium paid by the Company prior to the date hereof (which annual amount the Company represents and warrants is set forth on *Section 5.08(c)* of the Company Disclosure Letter) in respect of the coverage required to be obtained pursuant hereto, but in such case shall purchase as much coverage as reasonably practicable for such amount;  *provided, further,* that if the Surviving Corporation

A–39

purchases a "tail policy" and the coverage thereunder costs more than 300% of such last annual premium, the Surviving Corporation shall purchase the maximum amount of coverage that can be obtained for 300% of such last annual premium. At the Company's option, the Company may purchase, prior to the Effective Time, a six–year pre–paid "tail policy" on terms and conditions (in both amount and scope) providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its Subsidiaries with respect to matters arising on or before the Effective Time, covering without limitation the transactions contemplated hereby.

(d)   The rights of each Indemnified Party hereunder shall be in addition to, and not in limitation of, any other rights such Indemnified Party may have under the Company Charter, the by–laws or other similar organization documents of the Company or any of its Subsidiaries or the Surviving Corporation, any other indemnification agreement or arrangement, the DGCL or otherwise. The provisions of this Section 5.08 shall survive the consummation of the Merger and, notwithstanding any other provision of this Agreement that may be to the contrary, expressly are intended to benefit, and are enforceable by, each of the Indemnified Parties.

(e)   In the event Parent, the Surviving Corporation or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in either such case, proper provision shall be made so that the successors and assigns of Parent or the Surviving Corporation, as the case may be, shall assume all of the obligations set forth in this Section 5.08. The agreements and covenants contained herein shall not be deemed to be exclusive of any other rights to which any Indemnified Party is entitled, whether pursuant to Law, contract or otherwise. Nothing in this Agreement is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to the Company or any of its Subsidiaries or their respective officers, directors and employees, it being understood and agreed that the indemnification provided for in this Section 5.08 is not prior to, or in substitution for, any such claims under any such policies.

Section 5.09   *Financing.*

(a)   Parent shall use its reasonable best efforts to obtain the Financing on the terms and conditions described in the Financing Commitments or terms that would not adversely impact the ability of Parent or Merger Sub to timely consummate the transactions contemplated hereby, including using its reasonable best efforts (i) to maintain in effect the Financing Commitments and to negotiate definitive agreements with respect thereto on the terms and conditions contained in the Financing Commitments (or other terms that would not adversely impact the ability of Parent or Merger Sub to timely consummate the transactions contemplated hereby), (ii) to satisfy all conditions precedent to the obligations of the parties thereunder to make the Financing in such definitive agreements available to Parent and consummate the Financing at or prior to the Closing, (iii) to comply with its obligations under the Financing Commitments and (iv) to enforce its rights under the Financing Commitments. Parent shall give the Company prompt notice upon becoming aware of any material breach by any party of the Financing Commitments or any termination of the Financing Commitments. Parent shall keep the Company informed on a reasonably current basis and in reasonable detail of the status of its efforts to arrange the Financing and provide to the Company copies of all documents related to the Financing to the extent such documents contain any additional conditions precedent not set forth in the Debt Commitment Letters to the obligations of the parties thereunder to make the Financing available to Parent and consummate the Financing at or prior to the Closing (it being understood that no such document will contain any such conditions precedent that would have any of the effects described in clauses (1)–(4) of the following sentence). In connection with its obligations under this Section 5.09, Parent shall be permitted to amend, modify or replace the Debt Commitment Letters with new Debt

A–40

Commitment Letters (the "*New Financing Commitments*"), *provided* that Parent shall not permit any replacement of, or amendment or modification to be made to, or any waiver of any material provision or remedy under, the Debt Commitment Letter if such replacement, amendment, modification, waiver or remedy (1) reduces the aggregate amount of the Debt Financing below that amount required to consummate the Merger and the other transactions contemplated hereby, (2) adversely amends or expands the conditions to the drawdown of the Debt Financing in any respect that would make such conditions less likely to be satisfied by the End Date or that would expand the possible circumstances under which such conditions would not be satisfied by such date, (3) can reasonably be expected to delay the Closing, or (4) is otherwise adverse to the interests of the Company in any material respect; and *provided, further,* that nothing in this Section 5.09 shall be deemed to excuse, waive compliance with or modify any of the obligations set forth in the Confidentiality Agreement. In the event that all conditions to the Financing Commitments (other than, in connection with the Debt Financing, the availability or funding of any of the Equity Financing) have been satisfied, Parent shall, from and after the final day of the Marketing Period and subject to the satisfaction of the conditions set forth in Sections 6.01 and 6.03 hereof, use its reasonable best efforts to cause the lenders and other Persons providing such Financing to fund the Financing required to consummate the Merger on the Closing Date. In the event that Parent becomes aware of any event or circumstance that makes procurement of any portion of the Financing unlikely to occur in the manner or from the sources contemplated in the Financing Commitments or generally less likely as on the date of this Agreement, Parent shall notify the Company and shall use its reasonable best efforts to arrange as promptly as practicable, but in no event later than one day prior to the Closing Date, any such portion from alternative debt financing sources on terms and conditions no less favorable to Parent or Merger Sub and no more adverse to the ability of Parent to consummate the transactions contemplated by this Agreement (in each case, as determined in the reasonable judgment of Parent). In the event that on the final day of the Marketing Period (1) all or any portion of the Debt Financing structured as High Yield Financing has not been consummated, (2) all closing conditions in Sections 6.01, 6.03(a) and 6.03(b) shall have been satisfied or waived (other than those conditions that by their nature will not be satisfied until the Closing) and (3) the Bridge Financing (or alternative bridge financing obtained in accordance with the preceding sentence) is available substantially on the terms and conditions described in the Debt Commitment Letters (or replacements thereof as contemplated by the preceding sentence), then Merger Sub shall borrow under and use the proceeds of the Bridge Financing (or such alternative bridge financing) to replace such affected portion of the High Yield Financing no later than the last day of the Marketing Period. For purposes of this Agreement, "*Marketing Period*" shall mean the first period of 20 consecutive Business Days after the date hereof throughout which (x) Parent shall have all of the Required Information (as defined below) and during which period such information shall remain compliant at all times with applicable provisions of Regulation S–X and Regulation S–K under the Securities Act and (y) the conditions set forth in Section 6.01 shall be satisfied and nothing has occurred and no condition exists that would cause any of the conditions set forth in Sections 6.03(a) or (b) to fail to be satisfied assuming the Closing were to be scheduled for any day during such 20 Business Day period; *provided* that, if the Marketing Period would not end (i) on or prior to July 31, 2007, the Marketing Period shall commence no earlier than the later of (A) September 4, 2007 and (B) the date the Company's Annual Report on Form 10–K for the fiscal year ended June 30, 2007 is filed with the SEC, and (ii) on or prior to December 20, 2007, the Marketing Period shall commence no earlier than January 2, 2008.

(b)   The Company shall provide, shall cause its Subsidiaries to provide, and shall use reasonable best efforts to cause its Representatives, including legal and accounting, to provide, all cooperation reasonably requested by Parent in connection with the arrangement of the Financing and the other transactions contemplated by this Agreement (*provided* that such requested cooperation does not unreasonably interfere with the ongoing operations of the Company and its Subsidiaries), including (i) furnishing Parent and Merger Sub and their Financing sources as promptly as practicable (and in

any event no later than 30 days prior to the End Date) with financial and other pertinent information regarding the Company and its Subsidiaries as may be reasonably requested by Parent, including all financial statements and financial and other data of the type required by Regulation S–X (other than Item 3–10 of Regulation S–X, but including summary guarantor/non–guarantor information of the type customarily included in offering documents used in private placements under Rule 144A of the Securities Act) and Regulation S–K under the Securities Act and of the type and form customarily included in offering documents used in private placements under Rule 144A of the Securities Act (including, to the extent applicable with respect to such financial statements, the report of the Company's auditors thereon and related management discussion and analysis of financial condition and results of operations), to consummate the offerings of debt securities contemplated by the Debt Commitment Letters at the time during the Company's fiscal year such offerings will be made (information required to be delivered pursuant to this clause (i) being referred to as, the "*Required Information*"), (ii) participating in meetings, presentations, road shows, due diligence sessions, drafting sessions and sessions with rating agencies in connection with the Financing, (iii) assisting with the preparation of materials for rating agency presentations, offering documents, private placement memoranda, bank information memoranda, prospectuses and similar documents required in connection with the Financing (including the execution and delivery of one or more customary representation letters in connection therewith); *provided* that any private placement memoranda or prospectuses in relation to high yield debt securities need not be issued by the Company or any of its Subsidiaries, and *provided, further*, that any private placement memoranda or prospectuses shall contain disclosure and financial statements reflecting the Surviving Corporation and/or its Subsidiaries as the obligor, (iv) reasonably cooperating with the marketing efforts for any of the Financing, including providing assistance in the preparation for, and participating in, meetings, due diligence sessions and similar presentations to and with, among others, prospective lenders, investors and rating agencies, (v) providing monthly financial statements (excluding footnotes) to the extent the Company customarily prepares such financial statements, (vi) facilitating the entrance into one or more credit or other agreements satisfactory to Parent in connection with the Debt Financing to the extent direct borrowings or debt incurrences by the Company or its Subsidiaries are contemplated by the Debt Commitment Letters, provided that neither the Company nor any of its Subsidiaries shall be required to enter into any such agreement prior to the Effective Time (vii) facilitating the consummation of the Financing and the direct borrowing or incurrence of all proceeds of the Debt Financing, including any high yield financing, by the Surviving Corporation immediately following the Effective Time, (viii) taking all actions reasonably necessary to (A) permit the prospective lenders involved in the Financing to evaluate the Company's current assets, cash management and accounting systems, policies and procedures relating thereto for the purpose of establishing collateral arrangements (including conducting field examination and appraisals contemplated by the Debt Commitment Letters within the time frame described therein) and (B) establish bank and other accounts and blocked account agreements and lock box arrangements in connection with the foregoing, and (ix) executing and delivering (or using reasonable best efforts to obtain from advisors), and causing its Subsidiaries to execute and deliver (or use reasonable best efforts to obtain from advisors or such other persons, including officers), customary certificates (including a certificate of the chief financial officer of the Surviving Corporation with respect to solvency matters), accounting comfort letters, legal opinions (which may be reasoned if circumstances require), hedging agreements (which shall have no liability to the Company in the event the Merger is not consummated), surveys, title insurance policies (to the extent in possession of, or otherwise reasonably obtainable by, the Company or its Subsidiaries) or (x) facilitating the entrance into other documents and instruments relating to guarantees, the pledge of collateral and other matters ancillary to the Financing as may be reasonably requested by Parent in connection with the Financing and otherwise reasonably facilitating the pledge of collateral and providing of guarantees contemplated by the Debt Commitment Letter (provided that the Company and its Subsidiaries shall not be required to enter into any such document or instrument prior to the Effective Time); *provided, however,* that, except for fees and liabilities subject to reimbursement or

A–42

indemnification pursuant to the next sentence, no obligation of the Company or any of its Subsidiaries under any such certificate, document or instrument (other than the representation letter referred to above) shall be effective until the Effective Time and, except for fees and liabilities subject to reimbursement or indemnification pursuant to the next sentence, none of the Company or any of its Subsidiaries shall be required to pay any commitment or other similar fee or incur any other liability in connection with the Financing prior to the Effective Time. The Company hereby consents to the use of its and its Subsidiaries' logos in connection with the Financing; *provided* that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage the Company or any of its Subsidiaries or the reputation or goodwill of the Company or any of its Subsidiaries. Parent shall promptly, upon request by the Company, reimburse the Company for all reasonable out−of−pocket costs (including reasonable attorneys' fees) incurred by the Company or any of its Subsidiaries in connection with the cooperation of the Company and its Subsidiaries contemplated by this Section 5.09 and shall indemnify and hold harmless the Company, its Subsidiaries and their respective Representatives from and against any and all losses, damages, claims, costs or expenses suffered or incurred by any of them in connection with the arrangement of the Financing and any information used in connection therewith, except with respect to any information provided by the Company or any of its Subsidiaries.

(c)   In no event shall Parent, Merger Sub or any of its Affiliates (which for purposes of this Section 5.09(c) shall be deemed to include each direct or indirect investor in Parent, or any of Parent's or any such investor's financing sources or potential financing sources or other Representatives) enter into any Contract, arrangement or understanding with any bank or investment bank or other provider of debt or equity financing on an exclusive basis (or otherwise which Contract, arrangement or understanding by its terms could reasonably be expected to prevent such provider from providing or seeking to provide financing to any third party in connection with a transaction relating to the Company or its Subsidiaries); *provided, however,* that notwithstanding the foregoing or anything contained in the Confidentiality Agreement or herein to the contrary, Parent, Merger Sub and any of its Affiliates may: (i) at any time, (A) seek to obtain or obtain equity commitments and equity financing on an exclusive or non−exclusive basis from the Parent Limited Partners and Persons under common management of KKR, (B) seek to obtain or obtain equity commitments and equity financing from (x) any Person under the common management of a Person who delivered the Equity Commitment Letters attached hereto and (y) any other Person (other than Persons principally involved in the private equity business), in each case on a non−exclusive basis and (C) engage additional providers of debt financing on a non−exclusive basis as members of the syndicate; *provided* that prior to the No−Shop Period Start Date no such additional providers of debt financing may be awarded any lead book−runner, agent or arranger, book−running lead underwriter role or advisory role (it being agreed that such additional providers may, however, be given the role of senior managing agents); and (ii) following the No−Shop Period Start Date (without limiting the rights of Parent, Merger Sub or their Affiliates pursuant to the preceding clause (i)), (A) seek to obtain or obtain equity commitments and equity financing on an exclusive or non−exclusive basis from any Person other than (x) any Person who is an Excluded Party that the Company identifies in writing to Parent by name and (y) any Person principally involved in the private equity business that has aggregate uninvested equity commitments of at least $5,000,000,000, and (B) engage up to two additional providers of debt financing (such Persons may serve as lead book−runner, agent or arranger, book−running lead underwriter or financial advisor) on an exclusive basis, in each case in connection with the Merger or the other transactions contemplated hereby; *provided* that (1) in the case of each of the foregoing, taking such actions does not expand upon the conditions precedent to the Financing as set forth in the Financing Commitments or prevent, impair or materially delay the availability of the Financing under the Financing Commitments or the Closing or (2) in the case of obtaining additional sources of equity financing (which for purposes of this clause (2) includes any transfer or assignment under any Equity Commitment Letter), the satisfaction of the condition set forth in Section 6.01(c) hereof shall not be impaired or delayed and the consummation of the transactions contemplated hereby shall not be

A−43

otherwise impaired or delayed. In order to give effect to the foregoing agreement, subject to the conditions of this Section 5.09(c), the Company hereby releases KKR from its obligations under (x) the last sentence of the fourth paragraph of the Confidentiality Agreement (other than with respect to financing sources being considered a Representative of KKR (as defined in the Confidentiality Agreement)) and (y) the last sentence of numbered paragraph 3 of the Confidentiality Agreement.

(d)   The Company shall use commercially reasonable efforts to deliver to Parent at least two Business Days prior to the Closing Date a payoff letter from JPMorgan Chase Bank, N.A., as administrative agent under the Amended and Restated Multi–Currency, Multi–Option Credit Agreement, dated as of June 22, 2006, among the Company, various Subsidiaries, J.P. Morgan Securities Inc, JPMorgan Chase Bank, N.A. and the syndication agents and various lenders party thereto, in form and substance reasonably satisfactory to Parent. On the Closing Date, assuming Parent has arranged for any necessary payoff funds, the Company shall and shall cause its Subsidiaries to terminate such Credit Agreement and all related agreements to which the Company and its Subsidiaries is a party.

Section 5.10   *Access; Confidentiality.*    The Company shall afford to Parent, and to Parent's officers, employees, accountants, counsel, consultants, financial advisors and other Representatives and financing sources, reasonable access during normal business hours during the period prior to the Effective Time or the termination of this Agreement to all of its and its Subsidiaries' properties, Contracts, books and records and to those officers, employees and agents of the Company to whom Parent reasonably requests access, and, during such period, the Company shall furnish, as promptly as practicable, to Parent all information concerning its and its Subsidiaries' business, properties, personnel and financial information as Parent may reasonably request. Except for disclosures expressly permitted by the terms of the Confidentiality Agreement, Parent shall hold, and shall cause its officers, employees, accountants, counsel, financial advisors and other Representatives and financing sources to hold, all information received from the Company or its Representatives, directly or indirectly, in confidence in accordance with the Confidentiality Agreement.

Section 5.11   *Notification of Certain Matters.*    The Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of (i) any notice or other communication received by such party from any Governmental Entity in connection with the Merger or the other transactions contemplated hereby or from any person alleging that the consent of such person is or may be required in connection with the Merger or the other transactions contemplated hereby, if the subject matter of such communication or the failure of such party to obtain such consent could be material to the Company, the Surviving Corporation or Parent, (ii) any actions, suits, claims, investigations or proceedings commenced or, to such party's Knowledge, threatened against, relating to or involving or otherwise affecting such party or any of its Subsidiaries which relate to the Merger or the other transactions contemplated hereby, (iii) the discovery of any fact or circumstance that, or the occurrence or non–occurrence of any event the occurrence or non–occurrence of which, would reasonably be likely to cause or result in any of the Conditions to the Merger set forth in Article VI not being satisfied or satisfaction of those conditions being materially delayed in violation of any provision of this Agreement; *provided, however,* that the delivery of any notice pursuant to this Section 5.12 shall not (x) cure any breach of, or non–compliance with, any other provision of this Agreement or (y) limit the remedies available to the party receiving such notice; and, *provided, further,* that the failure to give prompt notice hereunder pursuant to clause (iii) shall not constitute a failure of a condition to the Merger set forth in Article VI except to the extent that the underlying fact or circumstance not so notified would standing alone constitute such a failure. The Company shall notify Parent, on a reasonably current basis, of any events or changes with respect to any regulatory investigation or action involving the Company or any of its Subsidiaries, and shall reasonably cooperate with Parent or its Affiliates in efforts to mitigate any adverse consequences to Parent or its Affiliates which may arise (including by coordinating and providing assistance in meeting with regulators).

A–44

Section 5.12   *Rule 16b–3.*   Prior to the Effective Time, the Company shall be permitted to take such steps as may be reasonably necessary or advisable to cause dispositions of Company equity securities (including derivative securities) pursuant to the transactions contemplated by this Agreement by each individual who is a director or officer of the Company to be exempt under Rule 16b–3 promulgated under the Exchange Act in accordance with that certain No–Action Letter dated January 12, 1999 issued by the SEC regarding such matters.

Section 5.13   *Affiliate Letters.*   Prior to the Closing Date, the Company shall deliver to Parent a letter identifying all persons who are, at the time this Agreement is submitted for approval to the stockholders of the Company, "affiliates" of the Company for purposes of Rule 145 under the Securities Act. The Company shall use its reasonable best efforts to cause each such person to deliver to Parent on or prior to the Closing Date a written agreement, in customary form, with respect to post–Merger restrictions under the Securities Act on transfers of Parent Common Stock received by such Persons in the Merger.

Section 5.14   *Control of Operations.*   Without in any way limiting any party's rights or obligations under this Agreement, the parties understand and agree that (i) nothing contained in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Company's operations prior to the Effective Time, and (ii) prior to the Effective Time, the Company shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its operations.

Section 5.15   *Certain Transfer Taxes.*   Any liability arising out of any real estate transfer Tax with respect to interests in real property owned directly or indirectly by the Company or any of its Subsidiaries immediately prior to the Merger, if applicable and due with respect to the Merger, shall be borne by the Surviving Corporation and expressly shall not be a liability of stockholders of the Company.

Section 5.16   *Obligations of Merger Sub.*   Parent shall take all action necessary to cause Merger Sub and the Surviving Corporation to perform their respective obligations under this Agreement, the Financing Commitments and any New Financing Commitments.

Section 5.17   *Resignation of Directors.*   Upon the request of Parent, as specified by Parent reasonably in advance of the Closing, the Company will use its reasonable best efforts to deliver on or before the Closing the resignation of all directors of Subsidiaries of the Company, in each case, effective at the Effective Time.

Section 5.18   *Tax Free Qualification for Parent Stock Election.*   Parent and Company shall not, and shall not permit any of their Subsidiaries to, take or cause to be taken any action, other than any actions expressly contemplated by this Agreement or the Equity Commitment Letter, or knowingly fail to take or cause to be taken any action, which action or failure to act would reasonably be expected to prevent the exchange of Shares for Parent Common Stock pursuant to the Merger and a Parent Stock Election and/or an Irrevocable Option Election, taken together with the Equity Financing, from qualifying as an exchange described in Section 351 of the Code.

A–45

## ARTICLE VI

## CONDITIONS TO THE MERGER

Section 6.01  *Conditions to Each Party's Obligation to Effect the Merger.*    The respective obligations of each party to effect the Merger shall be subject to the fulfillment (or waiver by all parties to the extent permitted by Law) at or prior to the Effective Time of the following conditions:

(a)  The Company Stockholder Approval shall have been obtained.

(b)  No Governmental Entity of competent jurisdiction shall have enacted, issued or entered any restraining order, preliminary or permanent injunction or similar order or legal restraint or prohibition which remains in effect that enjoins or otherwise prohibits consummation of the Merger.

(c)  (i) Any applicable waiting period under the HSR Act (and any extension thereof) and under the antitrust and anti–competition statutes of Canada and under similar legislation in the Republic of South Africa shall have expired or been earlier terminated and (ii) the European Commission shall have adopted a decision pursuant to the Council Regulation (EC) No. 139/2004 (the "*ECMR*") declaring the Merger compatible with the common market and, in the event that the European Commission does not have jurisdiction to review the Merger but the competent authorities of any EU member state has jurisdiction to review any aspect of the Merger or in the event any aspect of the Merger is referred to the competent authorities of any EU member state pursuant to Article 9 of the ECMR (or is deemed to be so referred pursuant to Article 9 of the ECMR) and effecting the Merger prior to the granting of approval by the relevant authorities of such EU member state would constitute a violation of the merger control laws applicable in that state, approval of the aspect of the Merger that lies within the jurisdiction of its review or that was so referred (or deemed to be so referred) shall have been granted pursuant to the merger control laws applicable in the relevant EU member state.

(d)  The Form S–4 shall have become effective under the Securities Act, no stop order suspending the effectiveness of the Form S–4 shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC.

Section 6.02  *Conditions to Obligation of the Company to Effect the Merger.*    The obligation of the Company to effect the Merger is further subject to the fulfillment or waiver by the Company of the following conditions:

(a)  The representations and warranties of Parent and Merger Sub set forth in this Agreement shall be true and correct in all material respects (other than the representations and warranties set forth in Section 4.05 and Section 4.07, which shall be true and correct) as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (unless any such representation or warranty is made only as of a specific date, in which event such representation or warranty shall be true and correct in all material respects only as of such specific date).

(b)  Parent and Merger Sub shall have in all material respects performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by them prior to the Effective Time.

(c)  Parent shall have delivered to the Company a certificate, dated as of the Closing Date and signed by its Chief Executive Officer or another senior executive officer, certifying to the effect that the conditions set forth in Section 6.02(a) and 6.02(b) have been satisfied.

Section 6.03    *Conditions to Obligation of Parent and Merger Sub to Effect the Merger.*    The obligation of Parent and Merger Sub to effect the Merger is further subject to the fulfillment or waiver by Parent and Merger Sub of the following conditions:

(a)    The representations and warranties of the Company set forth in this Agreement (other than the representations and warranties set forth in Section 3.02 and Section 3.11(b)) shall be true and correct (disregarding all qualifications or limitations as to "materiality", "Company Material Adverse Effect" and words of similar import set forth therein) as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Company Material Adverse Effect. The representations and warranties of the Company set forth in (i) Section 3.02 shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date) and (ii) Section 3.11(b) shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on the Closing Date.

(b)    The Company shall have in all material respects performed all obligations and complied with all covenants required by this Agreement to be performed or complied with by it prior to the Effective Time.

(c)    The Company shall have delivered to Parent a certificate, dated as of the Closing Date and signed by its Chief Executive Officer or another senior executive officer, certifying to the effect that the conditions set forth in Section 6.03(a) and Section 6.03(b) have been satisfied.

Section 6.04    *Frustration of Closing Conditions.*    Neither the Company nor Parent may rely, either as a basis for not consummating the Merger or terminating this Agreement and abandoning the Merger, on the failure of any condition set forth in Section 6.01, 6.02 or 6.03, as the case may be, to be satisfied if such failure was caused by such party's breach in any material respect of any provision of this Agreement or failure to use all reasonable best efforts to consummate the Merger and the other transactions contemplated hereby, as required by and subject to Section 5.05.

## ARTICLE VII

### TERMINATION

Section 7.01    *Termination or Abandonment.*    Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated and abandoned at any time prior to the Effective Time, whether before or after any approval of the matters presented in connection with the Merger by the stockholders of the Company:

(a)    by the mutual written consent of the Company and Parent;

(b)    by either the Company or Parent, if:

(i)    the Effective Time shall not have occurred on or before February 11, 2008 (the "*End Date*"), and the party seeking to terminate this Agreement pursuant to this Section 7.01(b)(i) shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure to consummate the Merger on or before the End Date;

(ii)    if any Governmental Entity of competent jurisdiction shall have issued or entered an injunction or similar legal restraint or order permanently enjoining or otherwise prohibiting the consummation of the Merger and such injunction, legal restraint or order shall have

become final and non–appealable, *provided* that the party seeking to terminate this Agreement pursuant to this Section 7.01(b)(ii) shall have used such reasonable best efforts as may be required by Section 5.05 to prevent, oppose and remove such injunction;

(iii)  if the Company Stockholder Approval shall not have been obtained at the Company Meeting or at any adjournment or postponement thereof at which a vote on the adoption of this Agreement was taken.

(c)  by the Company:

(i)  if Parent or Merger Sub shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform: (A) would give rise to the failure of a condition set forth in Section 6.01 or 6.02 and (B) is not capable of being cured prior to the End Date or, if capable of being cured, shall not have been cured within 30 calendar days following receipt of written notice of such breach or failure to perform from the Company; *provided* that, the Company shall not have the right to terminate this Agreement pursuant to this Section 7.01(c)(i) if it is then in material breach of any representations, warranties, covenants or other agreements hereunder;

(ii)  prior to obtaining the Company Stockholder Approval, in accordance with, and subject to the terms and conditions of, Section 5.02(d);

(iii)  if the Merger shall not have been consummated on the second Business Day after the final day of the Marketing Period and all of the conditions set forth in Section 6.01, Section 6.03(a) and Section 6.03(b) have been satisfied and at the time of such termination such conditions continue to be satisfied; or

(d)  by Parent, if:

(i)  if the Company shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform: (A) would give rise to the failure of a condition set forth in Section 6.01 or 6.03 and (B) is not capable of being cured prior to the End Date or, if capable of being cured, shall not have been cured within 30 calendar days following receipt of written notice of such breach or failure to perform from Parent; *provided* that, Parent shall not have the right to terminate this Agreement pursuant to this Section 7.01(d)(i) if it or Merger Sub is then in material breach of any representations, warranties, covenants or other agreements hereunder; or

(ii)  the board of directors of the Company (A) effects a Change of Recommendation, publicly proposes to effect a Change of Recommendation, or under Section 5.02(g) is deemed to have effected a Change of Recommendation, (B) fails to include in the Proxy Statement its recommendation to the Company's stockholders that they give the Company Shareholder Approval, (C) approves or recommends, or publicly proposes to approve or recommend, any Company Acquisition Proposal, or (D) fails to recommend against acceptance of a tender or exchange offer for any outstanding shares of capital stock of the Company that constitutes an Company Acquisition Proposal (other than by Parent or any of its Affiliates), including, for these purposes, by taking no position with respect to the acceptance of such tender offer or exchange offer by its shareholders, which shall constitute a failure to recommend against acceptance of such tender offer or exchange offer, within 10 Business Days after commencement.

In the event of termination of this Agreement pursuant to this Section 7.01, this Agreement shall forthwith become null and void and there shall be no liability or obligation

A–48

on the part of the Company, Parent, Merger Sub or their respective Subsidiaries or Affiliates, except that the Confidentiality Agreement, the Guarantees (only to the extent reflected therein) and the provisions of Section 7.02, the last sentence of Section 5.09(b) and Article VIII will survive the termination hereof; *provided, however*, that, without limiting the right to receive any payment pursuant to Section 7.02, the Company agrees that, to the extent it has incurred losses or damages in connection with this Agreement, the maximum aggregate liability of Parent and Merger Sub shall be limited to an amount equal to the aggregate amount of the Guarantees (to the extent any amount is payable thereunder), and in no event shall the Company seek to recover any money damages in excess of such amount from Parent, Merger Sub or any Guarantor (and with respect to any Guarantor in no event shall the Company seek to recover any money damages in excess of the maximum amount reflected in such Guarantor's Guarantee) or any of their respective Representatives or Affiliates; and *provided, further*, that except as specifically provided in the first sentence of Section 7.02(f) of this Agreement, nothing herein shall relieve the Company from liability for willful and material breach of its covenants or agreements set forth in this Agreement prior to such termination, in which case Parent and/or Merger Sub shall be entitled to all rights and remedies available at Law or in equity.

Section 7.02   *Termination Fees.*

(a)   In the event that:

(i)   (A) a bona fide Company Acquisition Proposal shall have been made directly to its stockholders or any Person shall have publicly announced an intention to make an Company Acquisition Proposal, or a Company Acquisition Proposal shall have otherwise become publicly known and (B) following the occurrence of an event described in the preceding clause (A), this Agreement is terminated by the Company or Parent pursuant to Section 7.01(b)(i) or Section 7.01(b)(iii) or by Parent pursuant to Section 7.01(d)(i) and (C) the Company enters into, or submits to the stockholders of the Company for adoption, a definitive agreement with respect to any Company Acquisition Proposal, or consummates any Company Acquisition Proposal, within nine (9) months of the date this Agreement is terminated, which in each case, need not be the same Company Acquisition Proposal that shall have been publicly announced or made known at or prior to termination of this Agreement (*provided* that for purposes of clause (C) of this Section 7.02(a)(i), the references to "25%" in the definition of Company Acquisition Proposal shall be deemed to be references to "50%"); or

(ii)   this Agreement is terminated by the Company pursuant to Section 7.01(c)(ii); or

(iii)   this Agreement is terminated by Parent pursuant to Section 7.01(d)(ii);

then in any such event under clause (i), (ii) or (iii) of this Section 7.02(a), the Company shall pay as directed by Parent the Termination Fee (as defined below) less the amount of any Parent Expenses previously paid to Parent (if any), by wire transfer of same day funds, it being understood that in no event shall the Company be required to pay the Termination Fee on more than one occasion. "*Termination Fee*" shall mean an amount equal to $225,000,000, except (x) in the event that this Agreement is terminated by the Company pursuant to Section 7.01(c)(ii) in order to enter into a definitive agreement with respect to a Company Acquisition Proposal with an Excluded Party, or (ii) in the event that this Agreement is terminated by Parent pursuant to Section 7.01(d)(ii) in a circumstance in which the event giving rise to the right of termination is based on the submission of a Company Acquisition Proposal by an Excluded Party, in which cases the Termination Fee shall mean an amount equal to $75,000,000.

(b)   In the event that:

(i)   the Company shall terminate this Agreement pursuant to Section 7.01(c)(i) and at the time of such termination there is no state of facts or circumstances that would reasonably be expected to cause the conditions in Section 6.01, Section 6.03(a) or Section 6.03(b) not to be satisfied on the End Date, or

(ii)   the Company shall terminate this Agreement pursuant to Section 7.01(c)(iii);

then in any such event under clause (i) or (ii) of this Section 7.02(b), Parent shall pay to the Company a termination fee of $225,000,000 in cash (the "*Parent Termination Fee*"), it being understood that in no event shall Parent be required to pay the Parent Termination Fee on more than one occasion.

(c)   Any payment required to be made pursuant to clause (i) of Section 7.02(a) shall be made at the direction of Parent to any Person that is a U.S. person for U.S. federal income tax purposes, promptly following the earliest of the execution of a definitive agreement with respect to, submission to the stockholders of, or the consummation of, any transaction contemplated by a Company Acquisition Proposal (and in any event not later than two Business Days after delivery to the Company of notice of demand for payment); any payment required to be made pursuant to clause (ii) of Section 7.02(a) shall be made at the direction of Parent to any Person that is a U.S. person for U.S. federal income tax purposes, concurrently with, and as a condition to the effectiveness of, the termination of this Agreement by the Company pursuant to Section 7.01(c)(ii); any payment required to be made pursuant to clause (iii) of Section 7.02(a) shall be made at the direction of Parent to any Person that is a U.S. person for U.S. federal income tax purposes, promptly following termination of this Agreement by Parent pursuant to Section 7.01(d)(ii) (and in any event not later than two Business Days after delivery to the Company of notice of demand for payment), and such payment shall be made by wire transfer of immediately available funds to an account to be designated by Parent. Any payment required to be made pursuant to Section 7.02(b) shall be made to the Company promptly following termination of this Agreement by the Company (and in any event not later than two Business Days after delivery to Parent of notice of demand for payment), and such payment shall be made by wire transfer of immediately available funds to an account to be designated by the Company.

(d)   In the event that this Agreement is terminated by Parent, on the one hand, or the Company, on the other hand, pursuant to Section 7.01(b)(iii) or by Parent pursuant to Section 7.01(d)(i) under circumstances in which the Termination Fee is not payable pursuant to this Section 7.02, then the Company shall promptly, but in no event later than five Business Days after being notified of such by Parent, pay Parent all of the reasonable documented out–of–pocket expenses incurred by Parent or Merger Sub in connection with this Agreement and the transactions contemplated by this Agreement (including the Financing) up to a maximum amount of $20,000,000 (the "*Parent Expenses*"), by wire transfer of same day funds; *provided*, that the existence of circumstances which could require the Termination Fee to become subsequently payable by the Company pursuant to Section 7.02(b) shall not relieve the Company of its obligations to pay the Parent Expenses pursuant to this Section 7.02(d); and *provided, further* that the payment by the Company of Parent Expenses pursuant to this Section 7.02(d) shall not relieve the Company of any subsequent obligation to pay the Termination Fee pursuant to Section 7.02(b) except to the extent indicated in Section 7.02(b).

(e)   In the event that the Company shall fail to pay the Termination Fee or Parent Expenses, or Parent shall fail to pay the Parent Termination Fee, required pursuant to this Section 7.02 when due, such fee and/or expenses shall accrue interest for the period commencing on the date such fee or expenses, as the case may be, became past due, at a rate equal to the rate of interest publicly announced by JPMorgan Chase Bank from time to time during such period, as such

A–50

bank's prime lending rate. In addition, if either party shall fail to pay such fee or expenses when due, such owing party shall also pay to the owed party all of the owed party's costs and expenses (including reasonable attorneys' fees) in connection with efforts to collect such fee or expenses. Each of Parent and the Company acknowledges that the fees and the other provisions of this Section 7.02 are an integral part of the Merger and that, without these agreements, Parent, Merger Sub and the Company would not enter into this Agreement.

(f)    Each of the parties hereto acknowledges that the agreements contained in this Section 7.02 are an integral part of the transactions contemplated by this Agreement and that neither the Termination Fee nor the Parent Termination Fee is a penalty, but rather is liquidated damages in a reasonable amount that will compensate Parent and Merger Sub or the Company, as the case may be, in the circumstances in which such Termination Fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. Notwithstanding anything to the contrary in this Agreement, the Company's right to receive payment of the Parent Termination Fee from Parent pursuant to this Section 7.02 or the guarantee thereof pursuant to the Guarantees shall be the sole and exclusive remedy of the Company and its Subsidiaries against Parent, Merger Sub, the Guarantors and any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents for the loss suffered as a result of the failure of the Merger to be consummated, and upon payment of such amount, none of Parent, Merger Sub, the Guarantors or any of their former, current or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    *No Survival of Representations and Warranties.*    None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the occurrence of the Merger.

Section 8.02    *Expenses.*    Whether or not the Merger is consummated, all costs and expenses incurred in connection with the Merger, this Agreement and the transactions contemplated hereby shall be paid by the party incurring or required to incur such expenses, except (x) expenses incurred in connection with the printing, filing and mailing of the Form S–4 and the Proxy Statement (including applicable SEC filing fees) and all fees paid in respect of any HSR Act or other regulatory filing shall be borne one–half by the Company and one–half by Parent and (y) as otherwise set forth in Section 5.09, Section 7.02(d) or Section 7.02(e).

Section 8.03    *Counterparts; Effectiveness.*    This Agreement may be executed in two or more consecutive counterparts (including by facsimile), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by telecopy or otherwise) to the other parties.

Section 8.04    *Governing Law.*    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

Section 8.05    *Jurisdiction; Enforcement.*    The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement to be performed by the Company or any of its

A–51

Subsidiaries were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that prior to the valid and effective termination of this Agreement in accordance with Article VII Parent and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware, other than with respect to any particular matter over which the U.S. Federal District Court has exclusive jurisdiction, which Parent and Merger Sub shall be entitled to enforce exclusively in any federal court within the State of Delaware. The parties acknowledge and agree that neither the Company nor any of its Subsidiaries shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement and their sole and exclusive remedy with respect to any such breach shall be the monetary damages set forth in Section 7.02(b). In addition, each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware, other than with respect to any particular matter over which the U.S. Federal District Court has exclusive jurisdiction, which shall be brought and determined exclusively in any federal court within the State of Delaware. Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve in accordance with this Section 8.05, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by the applicable Law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject mater hereof, may not be enforced in or by such courts.

Section 8.06  *WAIVER OF JURY TRIAL.*  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.07  *Notices.*  Any notice required to be given hereunder shall be sufficient if in writing, and sent by facsimile transmission with confirmation (*provided* that any notice received by facsimile transmission or otherwise at the addressee's location on any Business Day after 5:00 p.m. (addressee's local time) shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next Business Day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first–class postage prepaid), addressed as follows:

   *(a)*         if to Parent or Merger Sub, to:

              c/o Kohlberg Kravis Roberts & Co. L.P.
              9 West 57th Street, Suite 4200
              New York, New York 10019
              Telecopy: (212) 750–006
              Attention: Brian F. Carroll

<div align="center">A–52</div>

*with a copy to:*

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Telecopy: (212) 455–2502
Attention: David J. Sorkin, Esq.

if to the Company, to:

Harman International Industries, Incorporation
1101 Pennsylvania Ave. N.W.
Suite 1010, Washington D.C. 20004
Telecopy: (202) 393–2442
Attention: Chief Executive Officer

*with a copy to:*

Jones Day
222 East 41st Street
New York, New York 10017
Telecopy: (212) 755–7306
Attention: Robert A. Profusek, Esq.
Marilyn W. Sonnie, Esq.

*and:*

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019–6150
Telecopy: (212) 403–2000
Attention: Joshua R. Cammaker, Esq.
Nancy B. Greenbaum, Esq.

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated and confirmed, personally delivered or mailed. Any party to this Agreement may notify any other party of any changes to the address or any of the other details specified in this paragraph; *provided, however,* that such notification shall only be effective on the date specified in such notice or five Business Days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address or facsimile of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 8.08  *Assignment; Binding Effect.*  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties, except that Parent and Merger Sub may assign, in its sole discretion, any of or all of its rights, interest and obligations under this Agreement to Parent or any of its Affiliates, but no such assignment shall relieve the assigning party of its obligations hereunder. Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. Parent shall cause Merger Sub, and any assignee thereof, to perform its obligations under this Agreement and shall be responsible for any failure of Merger Sub or such assignee to comply with any representation, warranty, covenant or other provision of this Agreement.

Section 8.09  *Severability.*  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such

A–53

invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only as broad as is enforceable.

Section 8.10  *Entire Agreement; No Third–Party Beneficiaries.*  This Agreement (including the exhibits and letters hereto), the Confidentiality Agreement (subject to Section 5.09(c) of this Agreement) and the Guarantees constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the parties, or any of them, with respect to the subject matter hereof and thereof, and (except (a) as set forth in Section 5.08 hereof and (b) for the provisions of Article II concerning payment of the Merger Consideration (or the amounts set forth in Section 2.05), which following the Effective Time shall inure to the Company's stockholders and to the holders of Company Stock Options, Company Restricted Shares and RSUs but, subject to the limitations on enforcement (including Sections 7.02(f) and 8.05 hereof) provided for in this Agreement, prior to the Effective Time may only be enforced by the Company) is not intended to and shall not confer upon any person other than the parties hereto any rights or remedies hereunder.

Section 8.11  *Amendments; Waivers.*  At any time prior to the Effective Time, any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company, Parent and Merger Sub, or in the case of a waiver, by the party against whom the waiver is to be effective; *provided, however,* that after receipt of Company Shareholder Approval, if any such amendment or waiver shall by applicable Law or in accordance with the rules and regulations of the New York Stock Exchange require further approval of the stockholders of the Company, the effectiveness of such amendment or waiver shall be subject to the approval of the stockholders of the Company. Notwithstanding the foregoing, no failure or delay by the Company or Parent in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

Section 8.12  *Headings.*  Headings of the Articles and Sections of this Agreement are for convenience of the parties only and shall be given no substantive or interpretive effect whatsoever. The table of contents to this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.13  *Interpretation.*  When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "or" shall be deemed to mean "and/or." All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

Section 8.14    *No Recourse.*    This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto, or against the Guarantors under and to the extent set forth in the Guarantees, and no past, present or future Affiliate, director, officer, employee, incorporator, member, manager, partner, shareholder, agent, attorney or representative of any party hereto (other than the Guarantor (to the extent set forth therein)) shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

Section 8.15    *Certain Definitions.*    For purposes of this Agreement, the following terms will have the following meanings when used herein:

(a)   "*Affiliates*" shall mean, as to any person, any other person which, directly or indirectly, controls, or is controlled by, or is under common control with, such person. As used in this definition, "*control*" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise. Without limiting the foregoing, the "Affiliates" of Parent shall include the KKR 2006 Fund L.P. and its portfolio companies.

(b)   "*Business Day*" shall mean any day other than a Saturday, Sunday or a day on which the banks in New York, New York are authorized by Law or executive order to be closed.

(c)   "*Company Stock Plans*" means the Harman International Industries, Incorporated Amended and Restated 2002 Stock Option and Incentive Plan and the Harman International Industries, Incorporated 1992 Incentive Plan.

(d)   "*Confidentiality Agreement*" means the confidentiality agreement, dated as of February 9, 2007, by and between Kohlberg Kravis Roberts & Co. L.P. ("*KKR*") and the Company, as the same may be amended or modified from time to time.

(e)   "*Contracts*" means any contracts, agreements, licenses (or sublicenses), notes, bonds, mortgages, indentures, commitments, leases (or subleases) or other instruments or obligations, whether written or oral.

(f)   "*GS Funds*" means the collective reference to GS Capital Partners VI Parallel, L.P., GS Capital Partners VI GmbH & Co. KG, GS Capital Partners VI Fund, L.P. and GS Capital Partners VI Offshore Fund, L.P.

(g)   "*Guarantors*" means each of the KKR 2006 Fund L.P. and the GS Funds (each, a "*Guarantor*")

(h)   "*Knowledge*" means (i) with respect to Parent, the actual knowledge after due inquiry of the individuals listed on *Section 8.15(f)(i)* of the Parent Disclosure Letter and (ii) with respect to the Company, the actual knowledge after due inquiry of the individuals listed on *Section 8.15(f)(ii)* of the Company Disclosure Letter.

(i)   "*orders*" means any orders, judgments, injunctions, awards, decrees, writs or other legally enforceable requirement handed down, adopted or imposed by, including any consent decree, settlement agreement or similar written agreement with, any Governmental Entity.

(j)   "*Parent Limited Partners*" means limited partners in the active investment funds affiliated with KKR.

(k)   "*Parent Material Adverse Effect*" means any fact, circumstance, event, change effect or occurrence that, individually or in the aggregate, prevents or materially delays or materially impairs

the ability of Parent and Merger Sub to consummate the Merger on a timely basis, or would reasonably be expected to do so.

(l)   "*person*" or "*Person*" shall mean an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, group (as such term is used in Section 13 of the Exchange Act) or organization, including a Governmental Entity, and any permitted successors and assigns of such person.

(m)  "*Significant Subsidiary*" has the meaning set forth in Rule 1–02(w) of Regulation S–X promulgated by the SEC (*provided* that for purposes this definition, the references to "10%" in the definition of "significant subsidiary" in such Rule 1–02(w) shall be deemed to be references to "5%").

(n)   "*Subsidiaries*" of any party shall mean any corporation, partnership, association, trust or other form of legal entity of which (i) more than 50% of the outstanding voting securities (or other voting interests or, if there are no voting interests, equity interests) are directly or indirectly owned by such party, or (ii) such party or any Subsidiary of such party is a general partner (excluding partnerships in which such party or any Subsidiary of such party does not have a majority of the voting interests in such partnership). In addition to the foregoing, the Persons listed on *Section 8.15(l)* of the Company Disclosure Letter shall be deemed "Subsidiaries" of the Company.

A–56

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED

By:    /s/ SIDNEY HARMAN
_____

Name: Sidney Harman
Title: Executive Chairman and Chief Executive Officer

KHI PARENT INC.

By:    /s/ BRIAN CARROLL
_____

Name: Brian Carroll
Title: President

KHI MERGER SUB INC.

By:    /s/ BRIAN CARROLL
_____

Name: Brian Carroll
Title: President

A−57

ANNEX B



**Bear, Stearns & Co. Inc.**
383 Madison Avenue
New York, NY 10179
Tel (212) 272–2000
www.bearstearns.com

April 26, 2007

The Board of Directors
Harman International Industries, Inc.
1101 Pennsylvania Avenue N.W.
Washington, D.C. 20004

Ladies and Gentlemen:

We understand that Harman International Industries, Inc. ("Harman"), KHI Parent, Inc. ("Parent") and KHI Merger Sub, Inc. ("Merger Sub") intend to enter into an Agreement and Plan of Merger to be dated as of April 26, 2007 (the "Agreement"), pursuant to which Merger Sub, a wholly owned subsidiary of Parent, will merge with and into Harman and Harman will become a wholly owned subsidiary of Parent (the "Merger"). Pursuant to the Agreement, each of the issued and outstanding shares of the common stock of Harman (including the associated stockholder rights), subject to certain customary exceptions, will be converted into the right to receive (i) $120.00 in cash (the "Cash Election Price") or (ii) at the election of the holder thereof (the "Parent Stock Election") and subject to proration, one share of the common stock of Parent. We further understand that, concurrent with the execution of the Agreement, certain stockholders of Harman (the "Electing Stockholders") are entering into an Election Agreement (collectively with the Agreement and the exhibits thereto, the "Transaction Documentation"), pursuant to which the Electing Stockholders have irrevocably agreed to make a Parent Stock Election with respect to 1,700,000 shares of Harman common stock. You have provided us with a copy of the Transaction Documentation in substantially final form.

You have asked us to render our opinion as to whether the Cash Election Price is fair, from a financial point of view, to the holders of shares of Harman common stock.

In the course of performing our review and analyses for rendering this opinion, we have:

- reviewed a draft of the Transaction Documentation, dated April 25, 2007;

- reviewed Harman's Annual Reports to Stockholders and Annual Reports on Form 10–K for the fiscal years ended June 30, 2004, 2005 and 2006, its Quarterly Reports on Form 10–Q for the periods ended September 30, 2006 and December 31, 2006, its preliminary results for the quarter ended March 31, 2007 and its Current Reports on Form 8–K filed since June 30, 2006;

- reviewed certain operating and financial information relating to Harman's business and prospects, including projections for the seven years ended June 30, 2013 and any updates thereto, all as prepared and provided to us by Harman's management;

- met with certain members of Harman's senior management to discuss Harman's business, operations, historical and projected financial results and future prospects;

- reviewed the historical prices, trading multiples and trading volume of the common stock of Harman;

- reviewed publicly available financial data, stock market performance data and trading multiples of companies which we deemed generally comparable to Harman;

B–1

- reviewed the terms of recent mergers and acquisitions involving companies which we deemed generally comparable to Harman;

- performed discounted cash flow analyses based on the projections for Harman furnished to us; and

- conducted such other studies, analyses, inquiries and investigations as we deemed appropriate.

We have relied upon and assumed, without independent verification, the accuracy and completeness of the financial and other information provided to or discussed with us by Harman or obtained by us from public sources, including, without limitation, the projections referred to above. With respect to the projections, we have relied on representations that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the senior management of Harman as to the expected future performance of Harman. We have not assumed any responsibility for the independent verification of any such information, including, without limitation, the projections, and we have further relied upon the assurances of the senior management of Harman that they are unaware of any facts that would make the information and projections incomplete or misleading.

In arriving at our opinion, we have not performed or obtained any independent appraisal of the assets or liabilities (contingent or otherwise) of Harman, nor have we been furnished with any such appraisals. We were not authorized to and did not solicit any expressions of interest from any other parties with respect to the sale of all or any part of Harman or any other alternative transaction involving Harman, but we note that Harman and its advisors have the right in accordance with the Agreement to do so for a prescribed period of time following the execution of the Agreement, subject to the terms set forth therein. We have assumed that the Merger will be consummated in a timely manner and in accordance with the terms of the Agreement without any limitations, restrictions, conditions, amendments or modifications, regulatory or otherwise, that collectively would have a material effect on Harman.

We do not express any opinion as to the price or range of prices at which the shares of common stock of (i) Harman may trade subsequent to the announcement of the Merger or (ii) Parent may trade or be valued subsequent to the consummation of the Merger. In addition, we express no opinion herein to the extent a holder of Harman common stock makes a Parent Stock Election.

We have acted as a financial advisor to Harman in connection with the Merger and will receive a customary fee for such services, a substantial portion of which is contingent on successful consummation of the Merger. In addition, Harman has agreed to reimburse us for certain expenses and to indemnify us against certain liabilities arising out of our engagement. Bear Stearns (i) has previously been engaged by Harman and (ii) has previously been engaged (and may currently be engaged) by Parent's affiliates, in each case to provide investment banking and other services on matters unrelated to the Merger, for which we have received (or expect to receive) customary fees. Bear Stearns may seek to provide Harman and Parent and their respective affiliates certain investment banking and other services unrelated to the Merger in the future. Bear Stearns and/or certain of its personnel and affiliates may have passive minority investments in certain investment funds managed directly or indirectly by Parent's affiliates, and in portfolio companies of such funds.

Consistent with applicable legal and regulatory requirements, Bear Stearns has adopted policies and procedures to establish and maintain the independence of Bear Stearns' research departments and personnel. As a result, Bear Stearns' research analysts may hold views, make statements or investment recommendations and/or publish research reports with respect to Harman, the Merger and other participants in the Merger that differ from the views of Bear Stearns' investment banking personnel.

In the ordinary course of business, Bear Stearns and its affiliates may actively trade for its own account and for the accounts of its customers equity and debt securities, bank debt and/or other

B–2

financial instruments issued by Harman or Parent and their respective affiliates, as well as derivatives thereof, and, accordingly, may at any time hold long or short positions in such securities, bank debt, financial instruments and derivatives.

It is understood that this letter is intended for the benefit and use of the Board of Directors of Harman and does not constitute a recommendation to the Board of Directors of Harman or any holders of Harman common stock as to how to vote in connection with the Merger or otherwise. In addition, we do not express any opinion, view or recommendation as to whether any stockholder of Harman should make or not make the election pursuant to Section 2.02 of the Agreement to receive shares of Parent. This opinion does not address Harman's underlying business decision to pursue the Merger, the relative merits of the Merger as compared to any alternative business strategies that might exist for Harman, the financing of the Merger or the effects of any other transaction in which Harman might engage. Unless otherwise specified in our engagement letter, this letter is not to be used for any other purpose, or be reproduced, disseminated, quoted from or referred to at any time, in whole or in part, without our prior written consent; provided, however, that this letter may be included in its entirety in any proxy statement/prospectus to be distributed to the holders of Harman common stock in connection with the Merger. Our opinion is subject to the assumptions, limitations, qualifications and other conditions contained herein and is necessarily based on economic, market and other conditions, and the information made available to us, as of the date hereof. We assume no responsibility for updating or revising our opinion based on circumstances or events occurring after the date hereof.

Based on and subject to the foregoing, it is our opinion that, as of the date hereof, the Cash Election Price is fair, from a financial point of view, to the holders of shares of Harman common stock.

Very truly yours,

BEAR, STEARNS & CO. INC.

By:      /s/  CHARLES S. EDELMAN

_Senior Managing Director_

B–3

### CERTIFICATE OF INCORPORATION
### OF
### KHI PARENT INC.
#### As Amended, as of June 14, 2007

1.    The name of the Corporation is KHI Parent Inc. (the "*Corporation*").

2.    The address of the Corporation's registered office in the state of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

3.    The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

4.    The total number of shares of stock which the Corporation is authorized to issue is sixty million (60,000,000) shares of common stock, par value $0.01 per share (the "*Common Stock*").

5.    The name and address of the incorporator is Sebastian Tiller, 425 Lexington Ave., New York, NY 10017.

6.    The board of directors of the Corporation, acting by majority vote, may alter, amend or repeal the By–laws of the Corporation. Election of directors need not be by written ballot unless the bylaws provide otherwise.

7.    (a) No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of his or her fiduciary duty as a director, except to the extent that such exemption from liability or limitation thereof is not permitted under the General Corporation Law of the State of Delaware as currently in effect or as the same may hereafter be amended. Any repeal or modification of this paragraph (a) of this Section 7 by the stockholders of the Corporation shall not adversely affect any right or protection of a director, officer or the Corporation existing at the time of such repeal or modification. If the General Corporation Law of the State of Delaware is amended after the filing of this Certificate of Incorporation to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware, as so amended.

(b)    The Corporation shall indemnify and hold harmless any person who was or is a party or is threatened to be made a party to, or testifies in, any threatened, pending or completed action, claim, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against all claims, losses, liabilities, expenses (including attorneys' fees and disbursements), damages, judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding to the fullest extent permitted under the General Corporation Law of the State of Delaware, and the Corporation may adopt bylaws or enter into agreements with any such person for the purpose of providing for such indemnification.

(c)    To the extent that a director or officer of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in paragraph (b) of this Section 7,

C–1

or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(d)    Expenses (including attorneys' fees) incurred by an officer or director in defending or testifying in a civil, criminal, administrative or investigative action, claim, suit or proceeding by reason of the fact that such person is or was an officer or director of the Corporation (or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise) shall be paid by the Corporation in advance of the final disposition of such action, claim, suit or proceeding within twenty business days of the Corporation's receipt of a request for advancement of such expenses from such director or officer and, to the extent required by law, upon receipt of an undertaking by or on behalf of any such director or officer to repay such amount if it shall ultimately be determined that such director or officer is not entitled to be indemnified by the Corporation against such expenses as authorized by the relevant sections of the General Corporation Law of the State of Delaware, and the Corporation may adopt bylaws or enter into agreements with such persons for the purpose of providing for such advances.

(e)    The indemnification permitted by this Section 7 shall not be deemed exclusive of any other rights to which any person may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding an office, and shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of the heirs, executors and administrators of such person. To assure indemnification under this Section 7 of all current and former directors and officers who are determined by the Corporation or otherwise to be or to have been "fiduciaries" of any employee benefit plan of the Corporation which may exist from time to time, Section 145 of the General Corporation Law of the State of Delaware shall, for the purposes of this Section 7, be interpreted as follows: "other enterprise" shall be deemed to include such an employee benefit plan, including without limitation, any plan of the Corporation which is governed by the Act of Congress entitled "Employee Retirement Income Security Act of 1974," as amended from time to time; the Corporation shall be deemed to have requested a person to serve an employee benefit plan where the performance by such person of his duties to the Corporation also imposes duties on, or otherwise involves services by, such person to the plan or participants or beneficiaries of the plan; and excise taxes assessed on a person with respect to an employee benefit plan pursuant to such Act of Congress shall be deemed "fines."

(f)    The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Section 7 or otherwise.

8.    [Intentionally omitted.]

9.    In accordance with Section 203(b)(3) of the General Corporation Law of the State of Delaware, the Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

<div align="center">C–2</div>

**KHI PARENT INC.**
**AMENDED AND RESTATED BY–LAWS**

### ARTICLE I
### MEETING OF STOCKHOLDERS

Section 1.    *Place of Meeting and Notice.*    Meetings of the stockholders of the Corporation shall be held at such place either within or without the State of Delaware as the Board of Directors may determine.

Section 2.    *Annual and Special Meetings.*    Annual meetings of stockholders shall be held, at a date, time and place fixed by the Board of Directors and stated in the notice of meeting, to elect a Board of Directors and to transact such other business as may properly come before the meeting. Special meetings of the stockholders may be called by the President for any purpose and shall be called by the President or Secretary if directed by the Board of Directors or requested in writing by the holders of not less than 25% of the capital stock of the Corporation. Each such stockholder request shall state the purpose of the proposed meeting.

Section 3.    *Notice.*    Except as otherwise provided by law, at least 10 and not more than 60 days before each meeting of stockholders, written notice of the time, date and place of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given to each stockholder.

Section 4.    *Quorum.*    At any meeting of stockholders, the holders of record, present in person or by proxy, of a majority of the Corporation's issued and outstanding capital stock shall constitute a quorum for the transaction of business, except as otherwise provided by law. In the absence of a quorum, any officer entitled to preside at or to act as secretary of the meeting shall have power to adjourn the meeting from time to time until a quorum is present.

Section 5.    *Voting.*    Except as otherwise provided by law, the Certificate of Incorporation or these By–Laws, all matters submitted to a meeting of stockholders shall be decided by vote of the holders of record, present in person or by proxy, of a majority of the Corporation's issued and outstanding capital stock. Any action required or permitted to be taken at any meeting of stockholders may, except as otherwise required by law or the Certificate of Incorporation, be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of record of a number of the issued and outstanding shares of capital stock of the Corporation representing the number of votes necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

### ARTICLE II
### DIRECTORS

Section 1.    *Number, Election and Removal of Directors.*    The number of Directors that shall constitute the Board of Directors shall be not less than one nor more than fifteen. The first Board of Directors shall consist of three Directors. Thereafter, within the limits specified above, the number of Directors shall be determined by the Board of Directors or by the stockholders. The Directors shall be elected by a plurality of the votes cast at the annual meeting of the stockholders. Vacancies and newly

created directorships resulting from any increase in the number of Directors may be filled by a majority of the Directors then in office, although less than a quorum, or by the sole remaining Director or by the stockholders. A Director may be removed with or without cause by the stockholders.

Section 2.   *Meetings.*   Regular meetings of the Board of Directors shall be held at such times and places as may from time to time be fixed by the Board of Directors or as may be specified in a notice of meeting. Special meetings of the Board of Directors may be held at any time upon the call of the President and shall be called by the President or Secretary if directed by the Board of Directors. Telegraphic, facsimile or written notice of each special meeting of the Board of Directors shall be sent to each Director not less than two hours before such meeting. A meeting of the Board of Directors may be held without notice immediately after the annual meeting of the stockholders. Notice need not be given of regular meetings of the Board of Directors.

Section 3.   *Quorum.*   A majority of the total number of Directors shall constitute a quorum for the transaction of business. If a quorum is not present at any meeting of the Board of Directors, the Directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until such a quorum is present. Except as otherwise provided by law, the Certificate of Incorporation of the Corporation, these By–Laws or any contract or agreement to which the Corporation is a party, the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board of Directors.

Section 4.   *Committees of Directors.*   The Board of Directors may, by resolution adopted by a majority of the whole Board, designate one or more committees, including without limitation an Executive Committee, to have and exercise such power and authority as the Board of Directors shall specify. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he/she or they constitute a quorum, may unanimously appoint another Director to act at the meeting in place of any such absent or disqualified member.

### ARTICLE III
### OFFICERS

The officers of the Corporation shall consist of one or more Presidents or Co–Presidents, one or more Vice Presidents, a Secretary, a Treasurer, and such other additional officers with such titles as the Board of Directors shall determine, all of whom shall be chosen by and shall serve at the pleasure of the Board of Directors. Such officers shall have the usual powers and shall perform all the usual duties incident to their respective offices. All officers shall be subject to the supervision and direction of the Board of Directors. The authority, duties or responsibilities of any officer of the Corporation may be suspended by the President with or without cause. Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors with or without cause.

### ARTICLE IV
### GENERAL PROVISIONS

Section 1.   *Notices.*   Whenever any statute, the Certificate of Incorporation or these By–Laws require notice to be given to any Director or stockholder, such notice may be given in writing by mail, addressed to such Director or stockholder at his address as it appears on the records of the Corporation, with postage thereon prepaid. Such notice shall be deemed to have been given when it is deposited in the United States mail. Notice to Directors may also be given by facsimile or telegram.

Section 2.   *Fiscal Year.*   The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

### SECTION 262 OF THE DELAWARE GENERAL CORPORATION LAW

**§ 262. Appraisal rights.**

(a)  Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a stock corporation and also a member of record of a nonstock corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words and also membership or membership interest of a member of a nonstock corporation; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in one or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository.

(b)  Appraisal rights shall be available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation to be effected pursuant to § 251 (other than a merger effected pursuant to § 251(g) of this title), § 252, § 254, § 257, § 258, § 263 or § 264 of this title:

(1)  Provided, however, that no appraisal rights under this section shall be available for the shares of any class or series of stock, which stock, or depository receipts in respect thereof, at the record date fixed to determine the stockholders entitled to receive notice of and to vote at the meeting of stockholders to act upon the agreement of merger or consolidation, were either (i) listed on a national securities exchange or designated as a national market system security on an interdealer quotation system by the National Association of Securities Dealers, Inc. or (ii) held of record by more than 2,000 holders; and further provided that no appraisal rights shall be available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in subsection (f) of § 251 of this title.

(2)  Notwithstanding paragraph (1) of this subsection, appraisal rights under this section shall be available for the shares of any class or series of stock of a constituent corporation if the holders thereof are required by the terms of an agreement of merger or consolidation pursuant to §§ 251, 252, 254, 257, 258, 263 and 264 of this title to accept for such stock anything except:

a.  Shares of stock of the corporation surviving or resulting from such merger or consolidation, or depository receipts in respect thereof;

b.  Shares of stock of any other corporation, or depository receipts in respect thereof, which shares of stock (or depository receipts in respect thereof) or depository receipts at the effective date of the merger or consolidation will be either listed on a national securities exchange or designated as a national market system security on an interdealer quotation system by the National Association of Securities Dealers, Inc. or held of record by more than 2,000 holders;

c.  Cash in lieu of fractional shares or fractional depository receipts described in the foregoing subparagraphs a. and b. of this paragraph; or

E–1

d.   Any combination of the shares of stock, depository receipts and cash in lieu of fractional shares or fractional depository receipts described in the foregoing subparagraphs a., b. and c. of this paragraph.

(3)   In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under § 253 of this title is not owned by the parent corporation immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.

(c)   Any corporation may provide in its certificate of incorporation that appraisal rights under this section shall be available for the shares of any class or series of its stock as a result of an amendment to its certificate of incorporation, any merger or consolidation in which the corporation is a constituent corporation or the sale of all or substantially all of the assets of the corporation. If the certificate of incorporation contains such a provision, the procedures of this section, including those set forth in subsections (d) and (e) of this section, shall apply as nearly as is practicable.

(d)   Appraisal rights shall be perfected as follows:

(1)   If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders who was such on the record date for such meeting with respect to shares for which appraisal rights are available pursuant to subsection (b) or (c) hereof that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section. Each stockholder electing to demand the appraisal of such stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such stockholder's shares. A proxy or vote against the merger or consolidation shall not constitute such a demand. A stockholder electing to take such action must do so by a separate written demand as herein provided. Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

(2)   If the merger or consolidation was approved pursuant to § 228 or § 253 of this title, then either a constituent corporation before the effective date of the merger or consolidation or the surviving or resulting corporation within 10 days thereafter shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section. Such notice may, and, if given on or after the effective date of the merger or consolidation, shall, also notify such stockholders of the effective date of the merger or consolidation. Any stockholder entitled to appraisal rights may, within 20 days after the date of mailing of such notice, demand in writing from the surviving or resulting corporation the appraisal of such holder's shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such holder's shares. If such notice did not notify stockholders of the effective date of the merger or consolidation, either (i) each such constituent corporation shall send a second notice before the effective date of the merger or consolidation notifying each of the holders of any class or series of stock of such constituent corporation that are entitled to appraisal rights of the effective date of the merger or consolidation or (ii) the surviving or resulting corporation shall send such a second notice to all such holders on or within 10 days after such effective date; provided, however, that if

E–2

such second notice is sent more than 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder's shares in accordance with this subsection. An affidavit of the secretary or assistant secretary or of the transfer agent of the corporation that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For purposes of determining the stockholders entitled to receive either notice, each constituent corporation may fix, in advance, a record date that shall be not more than 10 days prior to the date the notice is given, provided, that if the notice is given on or after the effective date of the merger or consolidation, the record date shall be such effective date. If no record date is fixed and the notice is given prior to the effective date, the record date shall be the close of business on the day next preceding the day on which the notice is given.

(e)   Within 120 days after the effective date of the merger or consolidation, the surviving or resulting corporation or any stockholder who has complied with subsections (a) and (d) hereof and who is otherwise entitled to appraisal rights, may file a petition in the Court of Chancery demanding a determination of the value of the stock of all such stockholders. Notwithstanding the foregoing, at any time within 60 days after the effective date of the merger or consolidation, any stockholder shall have the right to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation. Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) hereof, upon written request, shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation and with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such written statement shall be mailed to the stockholder within 10 days after such stockholder's written request for such a statement is received by the surviving or resulting corporation or within 10 days after expiration of the period for delivery of demands for appraisal under subsection (d) hereof, whichever is later.

(f)   Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the surviving or resulting corporation, which shall within 20 days after such service file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the surviving or resulting corporation. If the petition shall be filed by the surviving or resulting corporation, the petition shall be accompanied by such a duly verified list. The Register in Chancery, if so ordered by the Court, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving or resulting corporation and to the stockholders shown on the list at the addresses therein stated. Such notice shall also be given by 1 or more publications at least 1 week before the day of the hearing, in a newspaper of general circulation published in the City of Wilmington, Delaware or such publication as the Court deems advisable. The forms of the notices by mail and by publication shall be approved by the Court, and the costs thereof shall be borne by the surviving or resulting corporation.

(g)   At the hearing on such petition, the Court shall determine the stockholders who have complied with this section and who have become entitled to appraisal rights. The Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with such direction, the Court may dismiss the proceedings as to such stockholder.

(h)   After determining the stockholders entitled to an appraisal, the Court shall appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take

E–3

into account all relevant factors. In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, permit discovery or other pretrial proceedings and may proceed to trial upon the appraisal prior to the final determination of the stockholder entitled to an appraisal. Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

(i)    The Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. Interest may be simple or compound, as the Court may direct. Payment shall be so made to each such stockholder, in the case of holders of uncertificated stock forthwith, and the case of holders of shares represented by certificates upon the surrender to the corporation of the certificates representing such stock. The Court's decree may be enforced as other decrees in the Court of Chancery may be enforced, whether such surviving or resulting corporation be a corporation of this State or of any state.

(j)    The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.

(k)    From and after the effective date of the merger or consolidation, no stockholder who has demanded appraisal rights as provided in subsection (d) of this section shall be entitled to vote such stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date which is prior to the effective date of the merger or consolidation); provided, however, that if no petition for an appraisal shall be filed within the time provided in subsection (e) of this section, or if such stockholder shall deliver to the surviving or resulting corporation a written withdrawal of such stockholder's demand for an appraisal and an acceptance of the merger or consolidation, either within 60 days after the effective date of the merger or consolidation as provided in subsection (e) of this section or thereafter with the written approval of the corporation, then the right of such stockholder to an appraisal shall cease. Notwithstanding the foregoing, no appraisal proceeding in the Court of Chancery shall be dismissed as to any stockholder without the approval of the Court, and such approval may be conditioned upon such terms as the Court deems just.

(l)    The shares of the surviving or resulting corporation to which the shares of such objecting stockholders would have been converted had they assented to the merger or consolidation shall have the status of authorized and unissued shares of the surviving or resulting corporation. (8 Del. C. 1953, § 262; 56 Del. Laws, c. 50; 56 Del. Laws, c. 186, § 24; 57 Del. Laws, c. 148, §§ 27 29; 59 Del. Laws, c. 106, § 12; 60 Del. Laws, c. 371, §§ 3 12; 63 Del. Laws, c. 25, §14; 63 Del. Laws, c. 152, §§ 1, 2; 64 Del. Laws, c. 112, §§ 46 54; 66 Del. Laws, c. 136, §§ 30 32; 66 Del. Laws, c. 352, § 9; 67 Del. Laws, c. 376, §§ 19, 20; 68 Del. Laws, c. 337, §§ 3, 4; 69 Del. Laws, c. 61, § 10; 69 Del. Laws, c. 262, §§ 1–9; 70 Del. Laws, c. 79, § 16; 70 Del. Laws, c. 186, § 1; 70 Del. Laws, c. 299, §§ 2, 3; 70 Del. Laws, c. 349, § 22; 71 Del. Laws, c. 120, § 15; 71 Del. Laws, c. 339, §§ 49 52; 73 Del. Laws, c. 82, § 21.)

## PART II

### INFORMATION NOT REQUIRED IN THE PROSPECTUS

**Item 20. Indemnification of Directors and Officers**

Section 145 of the Delaware General Corporation Law, or DGCL, provides for, among other things:

a.   permissive indemnification for expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by designated persons, including directors and officers of a corporation, in the event such persons are parties to litigation other than stockholder derivative actions if certain conditions are met;

b.   permissive indemnification for expenses (including attorneys' fees) actually and reasonably incurred by designated persons, including directors and officers of a corporation, in the event such persons are parties to stockholder derivative actions if certain conditions are met;

c.   mandatory indemnification for expenses (including attorneys' fees) actually and reasonably incurred by designated persons, including directors and officers of a corporation, in the event such persons are successful on the merits or otherwise in defense of litigation covered by a. and b. above; and

d.   that the indemnification provided for by Section 145 is not deemed exclusive of any other rights which may be provided under any by–law, agreement, stockholder or disinterested director vote, or otherwise.

Section 7 of Parent's Certificate of Incorporation provides that Parent will indemnify any person who was or is a party or is threatened to be made a party to, or testifies in, any threatened, pending or completed action, claim, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director or officer of Parent, or is or was serving at the request of Parent as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against all claims, losses, liabilities, expenses (including attorneys' fees and disbursements), damages, judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding to the fullest extent permitted under the DGCL.

In addition, Section 7 of Parent's Certificate of Incorporation provides that Parent will advance any expenses incurred by a director or officer within 20 business days of Parent's receipt of a request for advancement of such expenses upon receipt of an undertaking by such director or officer to repay such amount if it is ultimately determined that such director or officer is not entitled to indemnification against such expenses under the DGCL.

As permitted by the DGCL, Parent's Certificate of Incorporation authorizes Parent to adopt bylaws and enter into agreements providing for indemnification and expense advances with any person that would be eligible for indemnification under Section 7.

Under Section 7 of Parent's Certificate of Incorporation, a director of Parent will not be personally liable to Parent or its stockholders for monetary damages for breach of his or her fiduciary duty as a director, except to the extent that such exemption from liability or limitation thereof is not permitted under the DGCL. Under Section 102 of the DGCL, an exemption from director liability or any limitation thereof will not apply (i) for any breach of the director's duty of loyalty to Parent and its stockholders, (ii) for acts or omissions that are not in good faith or involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL (certain illegal distributions) or (iv) for any transaction from which the director derived an improper personal benefit.

II–1

Finally, Section 7 of Parent's Certificate of Incorporation provides that Parent may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of Parent, or is or was serving at the request of Parent as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity or arising out of such persons' status as such, whether or not Parent would have the power to indemnify such person against such liability.

## Item 21. Exhibits and Financial Statements

The exhibits listed below in the "Exhibit Index" are part of this Registration Statement and are numbered in accordance with Item 601 of Regulation S–K.

## Item 22. Undertakings

The undersigned registrant hereby undertakes to file, during any period in which offers or sales are being made, a post–effective amendment to this registration statement: (i) to include any propectus required by section 10(a)(3) of the Securities Act, (ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post–effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement and (iii) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

The undersigned registrant hereby undertakes: (i) that, for the purpose of determining any liability under the Securities Act, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof, and (ii) to remove from registration by means of a post–effective amendment any of the securities being registered which remain unsold at the termination of the offering.

The undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

- any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

- any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

- the portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

- any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act, each filing of the registrant's annual report pursuant to Section 13(a) or 15(d) of the Exchange Act (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Exchange Act) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

The undersigned registrant undertakes as follows: that prior to any public reoffering of the securities registered hereunder through use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), the issuer undertakes that such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other items of the applicable form.

The registrant undertakes that every prospectus: (i) that is filed pursuant to the paragraph immediately preceding, or (ii) that purports to meet the requirements of Section 10(a)(3) of the Securities Act and is used in connection with an offering of securities subject to Rule 415, will be filed as a part of an amendment to the registration statement and will not be used until such amendment is effective, and that, for purposes of determining any liability under the Securities Act, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by Parent of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes to respond to requests for information that is incorporated by reference into the prospectus pursuant to Item 4, 10(b), 11, or 13 of this form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means. This includes information contained in documents filed subsequent to the effective date of the registration statement through the date of responding to the request.

The undersigned registrant hereby undertakes to supply by means of a post–effective amendment all information concerning a transaction, and the company being acquired involved therein, that was not the subject of and included in the registration statement when it became effective.

II–3

## SIGNATURES

Pursuant to the requirements of the Securities Act, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the city of New York, state of New York, on June 19, 2007.

KHI PARENT INC.

By:    /s/  BRIAN F. CARROLL

Name:    Brian F. Carroll
Title:    President

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated. Each person whose signature appears below hereby appoints Brian F. Carroll, Stephen Ko and Brian W. Dillard, and each of them singly, such person's true and lawful attorneys–in–fact, with full power to them and each of them to sign, for such person and in such person's name and capacity indicated below, any and all amendments and post–effective amendments to this registration statement, and generally to do all things in their names in their capacities as officers and directors to enable the registrant to comply with the provisions of the Securities Act of 1933 and all requirements of the Securities and Exchange Commission.

| Name | Title | Date |
|---|---|---|
| /s/  BRIAN F. CARROLL<br>Name: Brian F. Carroll | Director and President | June 19, 2007 |
| /s/  STEPHEN KO<br>Name: Stephen Ko | Director and Vice President | June 19, 2007 |
| /s/  BRIAN W. DILLARD<br>Name: Brian W. Dillard | Director, Vice President and Treasurer | June 19, 2007 |

II–4

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of April 26, 2007, among Harman International Industries, Incorporated, KHI Parent Inc. and KHI Merger Sub Inc. (attached as Annex A to the proxy statement/prospectus which is part of this registration statement) |
| 3.1 | Certificate of Incorporation of KHI Parent Inc., as amended as of June 14, 2007 (attached as Annex C to the proxy statement/prospectus which is part of this registration statement) |
| 3.2 | Amended and Restated By–Laws of KHI Parent Inc. (attached as Annex D to the proxy statement/prospectus which is part of this registration statement) |
| *4.1 | Form of certificate of common stock of KHI Parent Inc. |
| *5.1 | Opinion of Simpson Thacher & Bartlett LLP regarding legality of common stock being registered |
| 10.1 | Election Agreement, dated as of April 26, 2007, between Dr. Sidney Harman and KHI Parent Inc. (filed as Exhibit 99.1 to the Schedule 13–D/A filed with the Commission by Dr. Sidney Harman on April 27, 2007, and hereby incorporated by reference) |
| *10.2 | Management Agreement between KHI Parent Inc. and the other parties thereto |
| 10.3 | Letter Agreement dated May 8, 2007 between KHI Parent Inc. and Dinesh Paliwal |
| 10.4 | Letter Agreement dated May 8, 2007 between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.1 to Harman's Current Report on Form 8–K filed with the Commission on May 9, 2007, and hereby incorporated by reference) |
| 10.5 | Severance Agreement dated May 8, 2007 between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.2 to Harman's Current Report on Form 8–K filed with the Commission on May 9, 2007, and hereby incorporated by reference) |
| 10.6 | Form of Nonqualified Stock Option Agreement, related to the Stock Option Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.3 to Harman's Current Report on Form 8–K filed with the Commission on May 9, 2007, and hereby incorporated by reference) |
| 10.7 | Form of Restricted Stock Agreement, related to the Restricted Stock Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.4 to Harman's Current Report on Form 8–K filed with the Commission on May 9, 2007, and hereby incorporated by reference) |
| 10.8 | Form of Restricted Stock Agreement, related to the Inducement Stock Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.5 to Harman's Current Report on Form 8–K filed with the Commission on May 9, 2007, and hereby incorporated by reference) |
| 10.9 | Form of Restricted Stock Agreement, related to the Equity Replacement Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.6 to Harman's Current Report on Form 8–K filed with the Commission on May 9, 2007, and hereby incorporated by reference) |

| 10.10 | Form of Restricted Share Unit Agreement, related to the Stock Option Award, between Harman International Industries, Incorporated and Dinesh Paliwal (filed as Exhibit 10.7 to Harman's Current Report on Form 8–K filed with the Commission on May 9, 2007, and hereby incorporated by reference) |
| *23.1 | Consent of Simpson Thacher & Bartlett LLP (included as part of its opinion filed as Exhibit 5.1) |
| 23.2 | Consent of KPMG, independent accountants for KHI Parent Inc. |
| 23.3 | Consent of KPMG, independent accountants for Harman International Industries, Incorporated |
| 23.4 | Consent of Bear Stearns & Co. Inc. |
| 24.1 | Power of Attorney (included on signature page to this registration statement) |
| *99.1 | Form of Proxy Card |
| *99.2 | Form of Election Form to be used for common stock in connection with the merger |
| *99.3 | Form of Election Form to be used for stock options in connection with the merger |
| 99.4 | Consent of Sidney Harman to be named as a director nominee of KHI Parent Inc. |
| 99.5 | Consent of Dinesh Paliwal to be named as a director nominee of KHI Parent Inc. |
| 99.6 | Consent of Henry R. Kravis to be named as a director nominee of KHI Parent Inc. |
| 99.7 | Consent of William J. Janetschek to be named as a director nominee of KHI Parent Inc. |
| 99.8 | Consent of Adrian Jones to be named as a director nominee of KHI Parent Inc. |

---

\*

    To be filed by amendment

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–10.3

**EXHIBIT 10.3**
**S–4 Filed on 06/20/2007**
File Number 333–143892



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**Exhibit 10.3**

May 8, 2007

Mr. Dinesh Paliwal

Dear Dinesh:

Reference is made to that certain letter agreement dated May 8, 2007, by and between you and Harman International Industries ("**Harman**"), regarding your new employment with Harman as its President, Chief Executive Officer and Vice Chairman (the "**Harman Letter**").

On behalf of KHI Parent Inc., an affiliate of Kohlberg Kravis Roberts & Co. ("**KHI**"), this letter constitutes our agreement with you regarding your continued service under the Harman Letter as of and after the closing of the acquisition of Harman by KHI announced on April 26, 2007 (the "**KHI Transaction**"). By this letter agreement, KHI and you each agree that, subject to the closing of, and on and after the closing of the KHI Transaction (the "**Closing**"), the Harman Letter will continue to govern the terms and conditions of your employment with Harman, except that, effective as of the Closing, the Harman Letter shall be deemed amended to reflect the agreements contained herein. All terms not defined in this letter agreement will have the meaning set forth in the Harman Letter and, if no such term is defined therein, as set forth in that certain Agreement and Plan of Merger among KHI, KHI Merger Sub Inc. and Harman, dated April 26, 2007 (the "**Merger Agreement**").

Stock Options: The one–time stock option award ("**Stock Option Award**") of 100,000 shares of Harman common stock at a per share exercise price equal to the fair market value of Harman common stock on your Start Date, will, on the Closing, be fully vested and converted into the right to receive a payment in cash in accordance with the terms of the Merger Agreement. Thereafter, on the Closing Date you will receive a grant of options to purchase 100,000 shares of Parent Common Stock, which will have a per share exercise price equal to the fair market value of one share of Parent Common Stock on the date of grant (the "**New Options**"). The New Options will vest 20% per year over five years from the date of grant, subject to your continued employment and the achievement by the Surviving Corporation of annual EBITDA targets. These EBITDA targets shall be those previously provided to you, to be adjusted as you and the Board of Directors of Harman as in existence after the KHI Transaction deem appropriate. The material terms of the New Options are set forth on the Summary of Equity Participation Arrangements attached to this letter agreement (the "**Summary**"). You further acknowledge and agree that after the Closing Date, there will be no guaranteed annual stock option grants awarded to any employee (including yourself) under any stock incentive plan maintained by KHI or the Surviving Corporation.

RSU Replacement Award: Effective as of the Closing Date, the amount payable in respect of your RSU Replacement Award will be fixed, and will commence earning interest at a market rate of interest through March 1, 2008. On March 1, 2008, you will be entitled to receive a cash payment equal to the product of (x) 32,291 and (y) the Cash Election Price (as such term is defined in the Merger Agreement), payable no later than March 3, 2008 (so long as your employment has not been terminated for Cause by Harman or by you without Good Reason prior to such time). Your RSU Replacement Award, Equity Replacement Award, Inducement Stock

Award and Restricted Stock Award shall otherwise remain outstanding in accordance with their terms, subject to modification by the terms and conditions of definitive agreements to be entered into by and between you and KHI (or the Surviving Corporation, as applicable), the material terms of which are set forth in the Summary.

<u>Severance</u>:  The entitlements that you may have upon a termination of your employment by Harman without Cause or by you for Good Reason will be the same as set forth in the Harman Letter, <u>except</u> that with respect to your Restricted Stock Award, the minimum number of such shares that will become fully vested and unrestricted shall only be 25,000 (less any shares of such Restricted Stock Award previously vested).  For the avoidance of doubt, KHI and you each acknowledges and agrees that, although the Severance Agreement will provide that the KKR Transaction shall not constitute a Change in Control for purposes thereof, the provisions contained in Section 5 of the Severance Agreement shall apply with respect to any payments and benefits you may receive in connection with the KKR Transaction, and further, that the Severance Agreement shall, following the KKR Transaction, remain in full force and effect.

<u>Reporting and Office</u>.  You will report to the Executive Chairman of the Board of Directors of Harman and KHI (together, the "**Board**") and the Board itself.  If Dr. Sidney Harman ceases for any reason to be Executive Chairman, you will report solely to the Board.

This letter shall be subject to reasonable modifications to the extent necessary to bring the terms set forth herein into compliance with Section 409A of the Internal Revenue Code of 1986, as amended, and the regulation promulgated thereunder.  During the period between the date of this letter and the Closing, the provisions of Section 20 of the Harman Letter pertaining to dispute resolution are incorporated herein by reference, with all references to "Harman" deemed to refer to "KHI."

<u>Indemnification</u>.  KHI hereby agrees to indemnify and hold you harmless from and against any losses, claims, damages, liabilities and expenses (including reasonable attorney's fees, which shall be advanced promptly as incurred) ("**Losses**") in the event that you become involved in any claim, suit, action, proceeding, investigation or inquiry (including any shareholder or derivative action or arbitration) arising out of your entering into, and performance under, this agreement while entering into, and performing under, an employment agreement with Harman as its chief executive officer, president, vice–chairman and/or a director thereof; <u>provided</u>, <u>however</u>, that to the extent the foregoing indemnification applies and you have any rights against Harman for indemnification pursuant to its certificate of incorporation, bylaws or otherwise or under any directors and officers liability insurance policy covering the officer or directors of Harman, KHI shall only provide such indemnity in the event Harman or the relevant insurance carrier, as the case may be, declines or otherwise refuses or otherwise is unable to provide such indemnification (or in event that you are required to repay any amounts advanced to you or paid on your behalf by Harman or any such insurance carrier in connection with such Losses), in which case KHI shall provide such indemnity and be subrogated to your rights under such indemnification or insurance policy to the maximum extent permitted by law with regard to our indemnification of you (it being understood that nothing herein shall be deemed to require you to file any suit or claim against Harman or any insurance carrier in connection with any indemnity

2

claim you may have or otherwise to take any action in advance of seeking indemnification from KHI beyond making the appropriate request of Harman and/or such insurance carrier and agreeing to any reasonable and customary undertakings that Harman and/or such insurance carrier may request). Prior to the Closing KKR 2006 Fund L.P. (the "**Fund**"), by its execution hereof, hereby guarantees the full and complete performance by KHI of its indemnification obligations under this letter agreement, any such obligations to be considered an obligation and expense of the Fund incurred in connection with this letter agreement and the transactions contemplated by the Merger Agreement (it being understood that from and after the Closing any indemnification obligations pursuant to this paragraph shall be obligations solely of KHI, and the Fund shall have no further obligations or other liability of any kind hereunder). Merger Agreement. Finally, KHI and you acknowledge and agree that in the event that the Merger Agreement terminates prior to the completion of the Merger, this letter agreement (other than the Indemnification obligations in the prior paragraph) shall also terminate and be of no further force and effect at the time the Merger Agreement terminates. In addition, KHI and you acknowledge and agree that nothing contained in this letter agreement shall in any way prevent you from having (or compel you to have) discussions or other negotiations with any third party in connection with any Company Acquisition Proposal (as defined in the Merger Agreement) pursuant to and in accordance with the Merger Agreement or from entering into or not entering into agreements with any such party.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

3

We look forward to working with you and to our shared further development of this outstanding company.

Sincerely,
KHI PARENT INC.

By:     /s/ Brian F. Carroll
Name: Brian F. Carroll
Title: President


and, solely for purposes of the indemnification provided hereunder:
KKR 2006 FUND, L.P.
   By:  KKR Associates 2006 L.P., its general partner
      By:  KKR 2006 GP LLC its general partner

By:     /s/ Brian F. Carroll
Name: Brian F. Carroll
Title: Member


I accept and agree to the provisions stated in this letter.  I acknowledge and agree that this letter and the other documents referred to herein constitutes the entire agreement between KHI and me and supersedes all prior verbal or written agreements, arrangements or understandings pertaining to my employment with Harman, to the extent that the terms of this letter agreement conflicts with the terms of the Harman Letter.  I understand that I will be employed at will and that my employment can be terminated at any time, with or without cause, at the option of either Harman or me.
ACCEPTED AND AGREED:
/s/ Dinesh Paliwal
Dinesh Paliwal

Date:     May 8, 2007

**4**

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–23.2

**EXHIBIT 23.2**
**S–4 Filed on 06/20/2007**
File Number 333–143892



QuickLinks —— Click here to rapidly navigate through this document

Exhibit 23.2

**Consent of Independent Registered Public Accounting Firm**

Board of Directors
KHI Parent Inc.:

We consent to the use of our report dated June 18, 2007 with respect to the consolidated balance sheet of KHI Parent Inc. and subsidiary as of June 15, 2007, included herein.

/s/ KPMG LLP

McLean, VA
June 18, 2007

QuickLinks

Exhibit 23.2
Consent of Independent Registered Public Accounting Firm

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–23.3

**EXHIBIT 23.3**
**S–4 Filed on 06/20/2007**
File Number 333–143892



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks –– Click here to rapidly navigate through this document

Exhibit 23.3

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
Harman International Industries, Incorporated:

    We consent to the use of our reports dated September 6, 2006 with respect to the consolidated balance sheet of Harman International Industries, Incorporated and subsidiaries as of June 30, 2006 and 2005, the related consolidated statements of operations, cash flows, and shareholders' equity and comprehensive income, for each of the years in the three–year period ended June 30, 2006, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting as of June 30, 2006, incorporated herein by reference.

/s/ KPMG LLP

McLean, VA
June 18, 2007

QuickLinks

Exhibit 23.3
Consent of Independent Registered Public Accounting Firm

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–23.4

**EXHIBIT 23.4**
**S–4 Filed on 06/20/2007**
File Number 333–143892



QuickLinks –– Click here to rapidly navigate through this document

**Exhibit 23.4**

### CONSENT OF BEAR, STEARNS & CO. INC.

We hereby consent to (i) the inclusion of our opinion letter, dated April 26, 2007, to the Board of Directors of Harman International Industries, Inc. (the "Opinion") as Annex B to the proxy statement included in the initially filed Registration Statement on Form S–4 of Harman International Industries, Inc. (the "Company") filed on June 19, 2007 (the "Registration Statement") relating to the merger of the Company and KHI Parent, Inc., a company formed by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners, an affiliate of Goldman, Sachs & Co. and (ii) all references to Bear, Stearns & Co. Inc. and all summaries of, or excerpts from, the Opinion, in each case in the sections captioned "Opinion of Financial Advisor to Harman," "Opinion of Harman's Financial Advisor," "The Merger—Background of the Merger" and "The Merger—Reasons for the Merger; Recommendation of Harman's Board," "Forecasted Financial Information," and "The Merger Agreement—Representations and Warranties" in the proxy statement which forms a part of the Registration Statement.

Notwithstanding the foregoing, it is understood that our consent is being delivered solely in connection with the filing of the above–mentioned version of the Registration Statement and that our opinion is not to be used, circulated, quoted or otherwise referred to in whole or in part in any registration statement (including any subsequent amendments to the above–mentioned Registration Statement), proxy statement or any other document, except in accordance with our prior written consent. In giving such consent, we do not admit that we come within the category of persons whose consent is required under, and we do not admit that we are "experts" for purposes of, the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

BEAR, STEARNS & CO. INC.

By:   /s/  CHARLES S. EDELMAN

Charles S. Edelman
Senior Managing Director

New York, New York
June 19, 2007

QuickLinks

Exhibit 23.4
CONSENT OF BEAR, STEARNS & CO. INC.

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–99.4

**EXHIBIT 99.4**
**S–4 Filed on 06/20/2007**
File Number 333–143892



QuickLinks —— Click here to rapidly navigate through this document

**Exhibit 99.4**

**Consent of Director Nominee**

I hereby consent to the use of my name, disclosure regarding my agreement to join the Board of Directors of KHI Parent, Inc. (the "Parent") upon the consummation of the merger of Harman International Industries, Incorporated with KHI Merger Sub Inc., a wholly owned subsidiary of Parent, and the disclosure of my biographical information included under the heading "Control and Management of Parent" and elsewhere in the Parent's Registration Statement on Form S–4 to be filed with the Securities and Exchange Commission on or about June 19, 2007, and in all amendments or supplements thereto.

/s/ Sidney Harman

Sidney Harman

Dated: June 19, 2007

QuickLinks

[Exhibit 99.4](#)
[Consent of Director Nominee](#)

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–99.5

**EXHIBIT 99.5**
**S–4 Filed on 06/20/2007**
File Number 333–143892



QuickLinks —— Click here to rapidly navigate through this document

**Exhibit 99.5**

### Consent of Director Nominee

I hereby consent to the use of my name, disclosure regarding my agreement to join the Board of Directors of KHI Parent, Inc. (the "Parent") upon the consummation of the merger of Harman International Industries, Incorporated with KHI Merger Sub Inc., a wholly owned subsidiary of Parent, and the disclosure of my biographical information included under the heading "Control and Management of Parent" and elsewhere in the Parent's Registration Statement on Form S–4 to be filed with the Securities and Exchange Commission on or about June 19, 2007, and in all amendments or supplements thereto.

/s/ Dinesh Paliwal
_____
Dinesh Paliwal

Dated: June 18, 2007

QuickLinks

[Exhibit 99.5](#)
[Consent of Director Nominee](#)

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–99.6

**EXHIBIT 99.6**
**S–4 Filed on 06/20/2007**
File Number 333–143892



QuickLinks —— Click here to rapidly navigate through this document

**Exhibit 99.6**

**Consent of Director Nominee**

   I hereby consent to the use of my name, disclosure regarding my agreement to join the Board of Directors of KHI Parent, Inc. (the "Parent") upon the consummation of the merger of Harman International Industries, Incorporated with KHI Merger Sub Inc., a wholly owned subsidiary of Parent, and the disclosure of my biographical information included under the heading "Control and Management of Parent" and elsewhere in the Parent's Registration Statement on Form S–4 to be filed with the Securities and Exchange Commission on or about June 19, 2007, and in all amendments or supplements thereto.

                                        /s/  HENRY R. KRAVIS

                                        Henry R. Kravis
Dated: June 19, 2007

QuickLinks

Exhibit 99.6
Consent of Director Nominee

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–99.7

**EXHIBIT 99.7**
**S–4 Filed on 06/20/2007**
File Number 333–143892



QuickLinks —— Click here to rapidly navigate through this document

**Exhibit 99.7**

### Consent of Director Nominee

I hereby consent to the use of my name, disclosure regarding my agreement to join the Board of Directors of KHI Parent, Inc. (the "Parent") upon the consummation of the merger of Harman International Industries, Incorporated with KHI Merger Sub Inc., a wholly owned subsidiary of Parent, and the disclosure of my biographical information included under the heading "Control and Management of Parent" and elsewhere in the Parent's Registration Statement on Form S–4 to be filed with the Securities and Exchange Commission on or about June 19, 2007, and in all amendments or supplements thereto.

/s/  WILLIAM J. JANETSCHEK

William J. Janetschek

Dated: June 19, 2007

QuickLinks

Exhibit 99.7
Consent of Director Nominee

# KHI Parent Inc.

C/O KOHLBERG KRAVIS ROBERTS & CO. L.P.
9 WEST 57TH STREET, SUITE 4200
NEW YORK, NY 10019
(212) 750–83

# EX–99.8

**EXHIBIT 99.8**
**S–4 Filed on 06/20/2007**
File Number 333–143892



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks –– Click here to rapidly navigate through this document

**Exhibit 99.8**

### Consent of Director Nominee

I hereby consent to the use of my name, disclosure regarding my agreement to join the Board of Directors of KHI Parent, Inc. (the "Parent") upon the consummation of the merger of Harman International Industries, Incorporated with KHI Merger Sub Inc., a wholly owned subsidiary of Parent, and the disclosure of my biographical information included under the heading "Control and Management of Parent" and elsewhere in the Parent's Registration Statement on Form S–4 to be filed with the Securities and Exchange Commission on or about June 19, 2007, and in all amendments or supplements thereto.

/s/  ADRIAN JONES

Adrian Jones

Dated: June 19, 2007

QuickLinks

[Exhibit 99.8](#)
[Consent of Director Nominee](#)

| Harman International Industries Incorporated (NYSE:HAR) Historical Share Price[1] | | | | | |
|---|---|---|---|---|---|
| **Date** | **Open** | **High** | **Low** | **Close** | **Volume** |
| 25-Apr-07 | $102.10 | $103.05 | $101.70 | $102.56 | 334,700 |
| 26-Apr-07 | $121.21 | $125.13 | $121.00 | $122.50 | 7,306,900 |
| 20-Sept-07 | $112.34 | $112.46 | $111.76 | $112.25 | 753,100 |
| 21-Sept-07 | $97.70 | $112.25 | $85.00 | $85.00 | 22,411,100 |
| 24-Sept-07 | $78.51 | $83.04 | $75.52 | $80.31 | 14,536,900 |
| 25-Sept-07 | $80.30 | $81.81 | $79.83 | $80.62 | 2,094,100 |
| 26-Sept-07 | $80.31 | $82.77 | $79.62 | $80.40 | 2,761,100 |
| 27-Sept-07 | $82.41 | $83.37 | $81.76 | $83.05 | 2,065,500 |
| 28-Sept-07 | $85.56 | $87.75 | $85.29 | $86.52 | 4,132,400 |
| 22-Oct-07 | $86.00 | $86.45 | $85.05 | $85.87 | 488,600 |
| 23-Oct-07 | $86.20 | $86.60 | $83.94 | $84.99 | 577,700 |
| 24-Oct-07 | $84.81 | $85.03 | $82.93 | $84.06 | 837,700 |
| 25-Oct-07 | $83.01 | $83.88 | $81.86 | $82.90 | 559,400 |
| 26-Oct-07 | $83.64 | $85.90 | $82.36 | $84.12 | 995,200 |
| 8-Nov-07 | $80.50 | $80.50 | $76.70 | $78.00 | 723,800 |
| 9-Nov-07 | $76.90 | $78.49 | $73.05 | $75.52 | 1,405,400 |
| 12-Nov-07 | $75.54 | $75.66 | $73.10 | $73.53 | 590,600 |
| 11-Feb-08 | $39.75 | $41.42 | $39.59 | $41.37 | 903,300 |
| 12-Feb-08 | $41.87 | $42.93 | $40.77 | $41.25 | 1,032,000 |

---

[1] Google Finance, Historical Prices, Harman International Industries Inc./DE/ (NYSE:HAR), *available at* http://finance.google.com/finance/historical?q=NYSE:HAR.

Harman International
PRESS RELEASE



April 26, 2007                          FOR IMMEDIATE RELEASE
                                        Contact:  Robert C. Ryan
                                        Vice President - Treasurer
                                        Harman International Industries, Incorporated
                                        202-393-1101

### HARMAN INTERNATIONAL
### REPORTS RECORD THIRD QUARTER RESULTS
### INVESTOR CONFERENCE CALL CHANGED TO 9:30 AM EDT

Washington, D.C. – April 26, 2007 - Harman International Industries, Incorporated
(NYSE:  HAR) today announced record results for the three and nine months ended
March 31, 2007.  Net sales for the third quarter were $882.8 million compared to $801.5
million during the same period last year, an increase of 10 percent.  Net income for the
three-month period increased 11 percent to $71.0 million.  Earnings per diluted share
were $1.07 compared to $0.94 last year, an increase of 14 percent.

For the nine months ended March 31, 2007, net sales were $2.640 billion, an increase of 11
percent above the prior year period.  Net income increased 10 percent to $209.0 million.
Earnings per diluted share were $3.14 compared to $2.80 last year, an increase of 12 percent.

Sales for the third quarter increased consistently across each of our operating segments
compared to the prior year period.  Automotive sales were $624.9 million for the third
quarter, an increase of 10 percent versus the same period last year.  Consumer sales and
Professional sales also increased 10 percent to $118.0 million and $139.9 million,
respectively.

Dr. Sidney Harman, Executive Chairman and Chief Executive Officer, commented:

"We produced record sales and earnings during the third quarter and the first nine months
of fiscal 2007.  Automotive continues to invest in research and development to support
recently awarded business and Driver Assist technologies.  Consumer sales exceeded
prior year's quarter but increased competition continues to impede operating profits.
Professional delivered higher sales propelled by products utilizing our HiQnet
networking protocol.  We have identified video presentation as the next major
Professional opportunity for us to integrate audio and video controlled from a single
remote location."

April 26, 2007
Page 2

At 9:30 a.m. EDT today, Harman International will host an analyst and investor conference call to discuss the results for the three and nine months ended March 31, 2007.  To participate in the conference call, please dial (888) 428-4480 or for international calls dial (612) 332-0725 prior to 9:30 a.m. EDT.  Please let the operator know that you would like to join the Harman International call.

A replay of the conference call will be available following the completion of the call at approximately 1:00 p.m. EDT.  The replay will be available through May 3, 2007.  Please call (800) 475-6701 to access the replay.  For international calls please call (320) 365-3844.  The access code number is 870147.

AT&T will also be web-casting the presentation.  The web-cast can be accessed at http://65.197.1.5/att/confcast, enter the Conference ID:  870147, then enter the pass code: Harman and click Go.  There will also be a link to the web-cast at www.harman.com. Participation through the web-cast will be in listen-only mode.

Harman International Industries, Incorporated (www.harman.com) is a leading manufacturer of high-quality, high-fidelity audio products and electronic systems for the automotive, consumer and professional markets.  The Company's stock is traded on the New York Stock Exchange under the symbol:  HAR.

*Note:  Except for historical information contained herein, the matters discussed are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act.  You should not place undue reliance on these statements.  We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current market conditions, current economic data, expected future developments and other factors that we believe are appropriate under the circumstances.  These statements involve risks and uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements, including but not limited to the effect of changes in consumer confidence, a rise in interest rates affecting consumer spending, automobile industry sales and production rates, the loss of one or more significant customers, including our automotive customers, model-year changeovers and customer acceptance in the automotive industry, our ability to satisfy contract performance criteria, availability of key components to the products we manufacture, competitive products, customer acceptance of our consumer and professional products, fluctuations in currency exchange rates, the outcome of pending or future litigation and other claims, labor disputes at our facilities and those of our customers or common carriers, general economic conditions and other risks detailed in filings made by Harman International with the Securities and Exchange Commission.*

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(000s omitted except per share amounts)**

| | Three Months Ended March 31, | | Nine Months Ended March 31, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Net sales | $ 882,771 | 801,487 | 2,640,031 | 2,388,780 |
| Cost of sales | 577,396 | 519,870 | 1,727,729 | 1,535,099 |
| Gross profit | 305,375 | 281,617 | 912,302 | 853,681 |
| Selling, general and administrative expenses | 203,052 | 182,827 | 607,341 | 560,838 |
| Operating income | 102,323 | 98,790 | 304,961 | 292,843 |
| Other expenses: | | | | |
| Interest expense, net | 340 | 2,492 | 977 | 10,889 |
| Miscellaneous, net | 543 | 857 | 1,888 | 2,627 |
| Income before income taxes and minority interest | 101,440 | 95,441 | 302,096 | 279,327 |
| Income tax expense | 30,895 | 31,775 | 94,369 | 89,516 |
| Minority interest | (498) | (360) | (1,313) | (717) |
| Net income | $ 71,043 | 64,026 | 209,040 | 190,528 |
| Basic earnings per share | $ 1.09 | 0.96 | 3.20 | 2.88 |
| Diluted earnings per share | $ 1.07 | 0.94 | 3.14 | 2.80 |
| Shares outstanding – Basic | 65,239 | 66,428 | 65,348 | 66,103 |
| Shares outstanding – Diluted | 66,327 | 68,109 | 66,501 | 68,164 |

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS**
**(000s omitted)**

|  | March 31, 2007 | March 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 96,961 | $ 397,099 |
| Accounts receivable | 529,719 | 440,191 |
| Inventories | 480,179 | 337,685 |
| Other current assets | 170,114 | 158,864 |
| **Total current assets** | 1,276,973 | 1,333,839 |
| Property, plant and equipment, net | 529,456 | 479,815 |
| Goodwill | 400,123 | 356,005 |
| Other assets | 192,482 | 202,075 |
| **Total assets** | $ 2,399,034 | $ 2,371,734 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short-term borrowings | $ 3,084 | $ 1,746 |
| Current portion of long-term debt | 17,020 | 174,961 |
| Accounts payable | 270,421 | 243,388 |
| Accrued liabilities | 522,516 | 520,160 |
| **Total current liabilities** | 813,041 | 940,255 |
| Borrowings under revolving credit facility | 136,702 | 0 |
| Long-term debt | 2,751 | 150,109 |
| Other non-current liabilities | 82,655 | 71,628 |
| **Total shareholders' equity** | 1,363,885 | 1,209,742 |
| **Total liabilities and shareholders' equity** | $ 2,399,034 | $ 2,371,734 |

**Auto & Truck Suppliers Research**
March 19, 2007

**BAIRD**

# Harman International Industries, Inc. (HAR)

Reiterate Outperform Rating and Top Supplier Idea

| Price: (03/16/07) | 97.31 | Rating: | Outperform | FY Jun | 2006A | 2007E | 2008E |
|---|---|---|---|---|---|---|---|
| 52WK H-L: | 116 - 75 | | | Q1 | 0.79A | 0.85A | 1.15E |
| Market Cap (mil): | 6,471.11 | Suitability: | Higher Risk | Q2 | 1.07A | 1.22A | 1.41E |
| Shares Out (mil): | 65.5 | | | Q3 | 0.94A | 1.10E | 1.35E |
| Float (mil): | 61.8 | | | Q4 | 0.95A | 1.23E | 1.49E |
| Avg. Daily Vol (mil): | 0.59 | | | Total | 3.75A | 4.40E | 5.40E |
| | | Price Target: | 138 | FY P/E | 25.9x | 22.1x | 18.0x |
| Dividend: | 0.07 | | | EPS Cal | 3.97A | 4.89E | 5.97E |
| Yield: | 0.07 | | | P/E | 24.5x | 19.9x | 16.3x |

David Leiker, CFA
dleiker@rwbaird.com
414.298.7535

Keith R. Schicker
kschicker@rwbaird.com
414.298.7351

David Tsui
dtsui@rwbaird.com
414.298.7699

Please refer to Appendix - Important Disclosures and Analyst Certification.

## Action

Reiterate Top Supplier Idea. Believe market-leading technology could drive 15%-plus revenue growth over several years (increased penetration/content with existing customers, initial shipments for mid-market vehicles and "next leg" of growth from integrating driver-assist functions). We also discuss what QNX means to the company, highlight flow of new business and update outlook for consumer business. Also, believe downside risk to guidance diminishing. We feel valuation remains compelling. Recommend purchase up to $120.

## Summary

- Reiterate Top Supplier Idea. Believe market-leading technology could drive 15%-plus revenue growth over several years -- increased penetration/content on existing vehicles, initial shipments for mid-market vehicles; and "next leg" of growth from integrating several driver-assist functions into single unit.
- 2004 QNX acquisition proving more valuable than expected. Provides significant competitive advantage (Harman controls operating system and applications) and future growth opportunities to drive strong growth beyond 2015. QNX being used in professional business and eventually consumer business.
- Estimated three-year book of new business (nearly double the 2003 book) set to accelerate growth (19% annual automotive revenue growth).
- Consumer business launching the largest new product upgrade cycle.
- Updated 2007-08 and initial 2009 guidance expected with fiscal third-quarter results (June fiscal year). With higher-than-expected R&D costs (new business/technology) there is some risk to June-2008 EPS estimate of $5.40 (guidance is $5.25). Expect restructuring actions to offset most of these costs. Expectations are that $5.25 guidance is likely to move lower.
- Potential ownership change of Chrysler (about 10% of revenue and meaningful piece of new business) not likely to be negative. Market moving towards Harman's technology and Chrysler is a leader in adopting it.
- Since 2003, investors had few opportunities to buy at lower valuation; now, 11.4x LTM EBITDA, 27th percentile of three-year range. Downside risk (using the low-water valuation on current results) appears to be in low $80s; potential upside near $140 (target price is $138).
- Buyer of stock up to $120. Believe $138 target price could exceed $150 by year-end.

**Harman International Industries, Inc.**
March 19, 2007

# Details

### Recommendation

We are reiterating our Top Supplier Idea recommendation on Harman. We believe the company has market-leading technology that could drive 15%-plus revenue growth over several years with increased penetration and content on existing vehicles, initial shipments for several mid-market vehicles and "next leg" of growth as the company develops an integrated solution to consolidate several driver-assist functions into a single unit.

With the stock trading near $100, we are a buyer of the stock up to $120 as we believe our $138 target price could exceed $150 by year-end. Importantly, since 2003, investors have had few opportunities to buy the stock at lower valuation than today; it trades at about 11.5x LTM EBITDA, the 27th percentile of the three-year range). In the September 2003 quarter, the stock traded as low as 11.0x EBITDA ($39 at the time). In the June and September 2005 quarters the stock traded at 10-11x EBITDA ($70-80 at the time). Also, over the last year the stock has traded around this same valuation representing a stock price around $80 on EBITDA at the time. Thus the downside risk, using the low-water valuation on current results, would result in a stock price in the low $80s (or, downside of $10-15) compared with our target price near $140.

Below, we discuss QNX, the 2004 acquisition, and what it means for the company's competitive advantage and future growth opportunities, the flow of new business and a quick update on the consumer business. Our valuation charts and investment these can be found near the end of this research note.

### QNX Operating System - Key Competitive Edge

In 2004 Harman purchased QNX, a developer of the real-time operating system used to run MOST and its applications (radio, DVD, cell phone, navigation, etc.). MOST (Media-Oriented System Transport) is an open-architecture software used for fiber-optic digital networks in automotive applications, in particular "infotainment" systems. The QNX operating system is proving to be just not a key competitive advantage (Harman controls the operating system and develops applications putting them in what we believe is a position similar to Microsoft on the desktop) but also the foundation for additional growth opportunities within automotive and other end markets.

The competitive advantage comes from being able to more fully understand (and exploit) what the operating system is capable of while also developing applications (navigation, cell phone, DVD, voice recognition, etc.) that provide a more robust product offering and more "bang for the buck" in terms of performance/cost relationship versus traditional hard-wired, copper-based systems (think of multiple discrete devices with dedicated user interfaces, or buttons, instead of a fully integrated system in one box with a common user interface).

Penetration of MOST and the QNX operating system remain small (less than 5% of the vehicles sold each year) with significant upside potential. Today, this technology is predominantly found on German-luxury vehicles; however, over the next several quarters/years, the company' will launch new business with Chrysler, Hyundai and Peugeot that will firmly move this technology into middle-market vehicles.

This technology also forms the foundation of the company's next avenue of growth. In addition to using a common head unit/interface to control numerous functions for driver information, entertainment and comfort, the company is developing a comparable "head unit" for numerous driver assist functions. While this is more "blue sky" development today with orders not expected for a few years and revenue sometime early next decade, this is virtually identical to where the infotainment business was in the mid-to-late 1990s. Specifically, at that time there were separate units and interfaces for the stereo, navigation, climate control, cell phone and other functions; today, in Harman's offering

**Harman International Industries, Inc.**
March 19, 2007

these are effectively integrated into a single head unit with a common user interface eliminating the redundant power supplies, software engineering and wiring.

Some functions that could be included are lane departure warning, adaptive speed control, back-up/park assist, night vision, blind spot detection, heads-up display, etc. Today, these are discrete systems with redundant sensors, software engineering and power. It is a logical move to integrate these into a common "head unit" reducing complexity and cost. We look for the company to make technology-focused acquisitions to build out its internal capability of supplying these functions. This is similar to the path followed in building its infotainment capability - speech recognition, noise cancellation, video, telematics, microphone, etc.). This market could be as large as the infotainment market (currently less than 5% penetrated) and see both products potentially integrated into one head unit.

Looking even further on the horizon, while not part of the current development effort, there are two other major systems in the vehicle composed of multiple discrete functions that could (we stress the word "could" is our word) be integrated into a common unit. These are safety (pre-crash, crash and post-crash) as well as vehicle control (especially as drive/steer/brake/shift-by-wire technologies emerge). Thinking really big (and way out there), QNX has the potential to become the operating system of the entire vehicle.

Looking at other markets, Harman has launched a series of HiQnet products for the professional audio market that integrate numerous components (sound board, microphone, speakers, etc.) to ease complexity. Additionally, we believe the company is working home audio products that would also integrate multiple components (TV, stereo,DVD/DVR, etc.) in a one box, one remote system.

### New Business Pipeline - Automotive

Harman's new business growth is set to accelerate over the next several quarters. When we initiated research coverage of Harman in 2003, we estimated the company had a three-year book of new business totaling about $900 million (15% annual revenue growth for the automotive business); today, this three-year book of new business is estimated to nearly double, representing 19% annual growth from a much higher sales base. We estimate fiscal 2008 currently represents the strongest growth at 24%. Importantly, we believe much of the company's current infotainment business is locked up well into the next decade, some of it past 2015. Lastly, the company continues to secure new branded audio business with the most recent growth from Harman-Kardon taking over all of the audio business at Mercedes from Bose.

As detailed in the table below (provided by the company in June 2006), we expect several vehicle launches in upcoming quarters to accelerate new business growth in the automotive segment. The new Mercedes C-Class is set to launch this summer and represents nearly $100 million of new business. Harman content is just launching for the Chrysler Sebring and will launch on the Chrysler's minivans and Grand Cherokee for the 2008 model year and additional vehicles in 2009, with potential annualized revenue in excess of $500 million once fully launched.

### New Business Pipeline

**Harman International Industries, Inc.**
March 19, 2007

| OEM | Fiscal Year | | | | Total |
|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | |
| Mercedes | S Class Sedan ($175) | S Class Coupe ($20) | C Wagon Mid ($15) | E Class Mid ($55) | $445 |
| | M Class Europe ($50) | C Class Sedan Mid ($65) | | | |
| | B Class ($25) | | | | |
| | R Class ($40) | | | | |
| BMW | 3 Series Wagon ($17) | 3 Series Coupe ($25) | | L6 ($65) | $137 |
| | | 3 Series Conv ($18) | | Rear Seat ($12) | |
| Audi | Q7 Europe ($17) | Q7 US ($15) | All ($350) | | $382 |
| Chrysler | | Mid/High ($350) | Entry ($200) | | $550 |
| Peugeot | | | | All ($250) | $250 |
| Porsche | | | Carerra ($35) | | $80 |
| | | | Cayenne ($45) | | |
| Hyundai | | Dynasty ($70) | | Equus ($55) | $125 |
| Ssangyong Motors | | | | Chairman ($40) | $40 |
| Harley Davidson | Touring ($35) | | | | $35 |
| Total | $359 | $563 | $645 | $477 | $2,044 |

Represents year in which program is introduced and contract value in millions after fully launched.

In addition to the awards in the table, the company recently announced a contract at BMW to supply all mid-level and 70% of high-level infotainment systems (with an integration fee on the remaining 30%) across the entire BMW product offering well into the next decade; currently, on the vehicles offering an integrated solution, Harman splits this business with Siemens. Production begins in fiscal 2009, representing approximately $200 million of annual revenue, with us "guessing" about one-half of this is incremental volume.

In addition to new business awards, we also see rising penetration rates bolstering revenue growth in the future. Penetration has steadily increased on all of the company's major map-based systems, both over a vehicle's life cycle and at each major refresh. High-level luxury vehicles (S-Class, 7-Series, A8 etc.) have seen take rates rise to essentially 100% versus 80-90% in the past, and rates on certain mid-luxury vehicles have risen above 75% in recent quarters versus historical levels around 50%. We believe a similar trend could emerge among lower-luxury and mass-market models as consumers increasingly demand navigation and other infotainment capabilities in new vehicles. In total, we estimate total automotive revenue will grow to nearly $4 billion by fiscal 2009 from $2.2 billion in 2006 (a CAGR of over 20%).

**Consumer Business**
After struggling in each of the last two quarters, Harman's consumer business is currently receiving an infusion of fresh product across the entire product range. Twelve new products were introduced ahead of the holiday season and another twelve are expected to launch in the second half of the fiscal year.

Representing the first substantial product refresh since entering the multimedia market, the first wave of products is expected to contribute to revenue in the March quarter, while the second wave will begin contributing by year-end. This stronger launch cadence is vitally important in the highly-competitive consumer electronics market, where product cycles are short and price points can quickly come under pressure.

Looking further out, Harman's symbiotic relationship with the Apple and the iPod will continue to be a driver of results, with further opportunities presented by the introduction of the iPhone in June 2007.

**Valuation**
The first chart below tracks enterprise value and LTM EBITDA. The lighter lines represent the high and low enterprise value in each quarter (driven by quarterly market value); the dark line represents LTM EBITDA drawn at the three-year median EV-to-EBITDA with the diamonds representing LTM EBITDA and our estimates for calendar years 2007, 2008 and 2009.

The second chart below tracks the enterprise value to EBITDA multiple. The lighter lines represent the high and low EBITDA multiples for each quarter (driven by quarterly market value); the dark line represents the three-year median EBITDA multiple with the

**Harman International Industries, Inc.**
March 19, 2007

diamonds representing the current valuation based on the LTM EBITDA and our estimates for calendar years 2007, 2008 and 2009.

**Enterprise Value to LTM EBITDA**



**EV-to-EBITDA Multiple**



# Investment Thesis

- We believe Harman is well positioned to grow as fiber-optic networks (MOST, or Media Oriented System Transport) find their way into vehicles to fully integrate multiple digital devices (CD, radio, DVD, navigation, cell phone, and climate control and more) with a common user interface.
- The company is a leading developer of this technology and is (as far as we know) one of only a few external supplier to deliver a fully integrated unit.
- Currently, the company is benefiting from the move by the German automakers to fully integrate these networks across multiple vehicle platforms (with replacement business running well into the next decade).
- Additionally, Chrysler is moving to make this technology available on its vehicles in fiscal 2007 and 2008 (June) with Hyundai and Peugeot also adopting this technology.

**Harman International Industries, Inc.**
March 19, 2007

We are expecting other Asian and European OEMs to adopt this technology in the coming years.

- Revenue growth in the automotive business is accelerating and looks to be a major driver of growth over the next few years.
- Free cash flow is substantial (estimated to exceed $500 million in 2007-08) with essentially no debt. This provides the capability to make accretive acquisitions of technology-oriented businesses QNX (operating system), TEMIC (speech recognition), Wave Maker (speech recognition), PhatNoise (integration of portable devices). Look for incremental acquisitions to be focused on technology-oriented companies supplying systems for driver assistance.
- Potential upside: revenue growth in automotive, recovery in consumer margins, new business awards.
- Key risks: timing new program launches, weak consumer business, investor psychology regarding navigation market.
- Recommend investors aggressively buy the stock to $120 as we believe our target price is likely to reach $150-160 by year-end. Timing the purchase is always a challenge given the stock price volatility (both ways) around earnings releases.
- Price target of $138 is based on the stock trading at 13.5 times our 2008 estimate of EBITDA, the median valuation over the last three years.
- Catalyst: new business awards, earnings surprises, completion of CEO search.

# Risks & Caveats

- **MOST.** Revenue growth is tied to the growing use of MOST, a new technology. If the adoption rate is slower than anticipated, there could be an adverse impact on revenue and earnings.
- **Launch of New Business.** Harman is launching $1.2 billion of new business in the next three years, with five to six major programs each year. Any delay of a vehicle program (by an OEM) could have a negative impact on sales and earnings. Additionally, integration of MOST and MOST devices requires "debugging." Greater-than-expected costs could impact profits.
- **Premium Valuation.** Harman's stock trades at a premium to the supplier group at 10.7 times LTM EBITDA. This valuation could contract with a slowdown in growth, disappointing earnings, or change in the market's opinion of the business model.
- **Automotive Environment.** The automotive industry is cyclical and therefore highly impacted by economic downturn. If vehicle sales decline significantly, OEMs could make production cuts, which could lead to downward estimate revisions. However, Harman has no exposure to Ford or GM, and would be somewhat insulated from an overall decline in US sales.
- **Major Customers and Programs.** Major customers include DaimlerChrysler, BMW, Toyota, Mitsubishi, Audi, and Porsche. A business disruption at these or other major customers could have an adverse impact on sales and earnings. Key programs include the BMW 5 Series and 7 Series, Audi A8, and Mercedes E Class and C Class. A significant decrease in demand for these vehicles could have an adverse impact on revenues and earnings.
- **Non-Automotive End Markets.** Approximately 30% of sales come from non-automotive end markets, consumer home audio (12%) and professional audio (18%). These markets are cyclical and highly competitive.
- **Currency.** Approximately 60% of sales come from outside the United Sates. The impact of a 10% change in the value of the dollar impacts EPS by $0.35.
- **Post-Retirement Liabilities.** The company has no post-retirement liabilities.

**Harman International Industries, Inc.**
March 19, 2007

# Company Description

Harman International Industries, Inc. is a leading supplier of high-fidelity audio products and electronics systems for the consumer and professional end markets. In the consumer segment, Harman sells audio and integrated multimedia systems for vehicles and loudspeakers and electronics for home audio systems under several brand names including JBL, Harman Kardon, Mark Levinson, Lexicon, Infinity and Revel. While the company was not officially ranked, we estimate Harman was the 66th largest global supplier to the automotive OEMs in 2003, based on automotive revenue. In the professional segment, Harman sells loudspeakers and electronics for use in stadiums, concert halls, recording and broadcasting studios and musical instrument stores. Professional brands include JBL, AKG, Crown, Digitech and Soundcraft. Harman employs more than 10,000 people throughout North America and Europe.

**BAIRD**  777 EAST WISCONSIN AVENUE  MILWAUKEE, WI 53302
David Leiker, CFA • (414) 298-7535 • dleiker@rwbaird.com
Keith R. Schicker • (414) 298-7351 • kschicker@rwbaird.com
David Tsui • (414) 298-7699 • dtsui@rwbaird.com

*(in $ thousands)*

## Harman International Industries Inc. (HAR • $97.31)

March 19, 2007
*Summary Earnings Model*

**12-Month Target Price (13.5x Cal-2008E EBITDA - Three-year Median): $138**
3-Yr Range is 9.4-21.7x LTM EBITDA. Median is 13.5x
Current Multiple = 11.5x LTM EBITDA (27th percentile), 10.0x Cal-2007E and 8.2x Cal-2008E.

| Year | NA Lt. Veh. Build (000) | Chg | Revenues $ | Chg | Gross Profit $ | % | Chg | EBITDA $ | % | Chg | Operating Income $ | % | Chg | Tax Rate | Net Income $ | Chg | F.D. EPS $ | Chg | GAAP EPS $ | Chg | First Call* | Avg. Shares |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-91 | 11,384 | - | 604,454 | - | 164,622 | 27.2% | - | 50,982 | 8.4% | - | 27,547 | 4.6% | - | 40.8% | 3,487 | 0.6% | $0.09 | - | - | - | - | 37,484 |
| Jun-92 | 12,225 | 7.4% | 664,913 | 10.0% | 190,563 | 28.7% | 15.8% | 65,628 | 9.9% | 15.8% | 41,255 | 7.6% | 28.7% | 39.4% | 11,246 | 1.7% | $0.23 | 144.4% | | 67.4% | 0.40 | 45,468 |
| Jun-93 | 13,265 | 8.5% | 702,147 | 31.2% | 219,347 | 31.2% | 21.2% | 99,136 | 11.5% | 51.1% | 65,584 | 7.6% | 59.0% | 38.7% | 25,664 | 3.0% | $0.45 | 96.6% | | 53.8% | 0.78 | 50,169 |
| Jun-94 | 14,600 | 10.1% | 807,032 | 29.7% | 250,992 | 31.1% | 35.3% | 132,919 | 11.4% | 34.1% | 87,175 | 7.4% | 64.0% | 31.7% | 41,161 | 3.5% | $0.63 | 41.8% | | 43.2% | 0.78 | 63,921 |
| Jun-95 | 15,247 | 4.4% | 1,170,224 | 35.7% | 351,595 | 30.0% | 31.2% | 157,390 | 10.6% | 18.4% | 105,378 | 7.7% | 20.9% | 29.4% | 52,042 | 3.8% | $0.79 | 24.6% | | 33.1% | 0.94 | 65,896 |
| Jun-96 | 14,825 | -2.8% | 1,361,595 | 16.4% | 408,125 | 28.5% | 30.0% | 156,159 | 10.6% | -0.8% | 101,973 | 6.9% | -3.2% | 31.7% | 54,832 | 3.7% | $0.73 | -8.1% | | | | 75,576 |
| Jun-97 | 15,260 | 2.9% | 1,474,094 | 8.3% | 420,480 | 28.5% | 26.8% | 162,839 | 11.5% | 4.3% | 100,325 | 6.6% | -1.6% | 28.9% | 53,826 | 3.6% | $0.71 | -1.6% | | | | 75,376 |
| Jun-98 | 15,529 | 1.8% | 1,513,255 | 2.7% | 405,026 | 26.8% | 36.8% | 171,807 | 11.5% | 5.5% | 105,027 | 7.0% | 4.7% | 28.9% | 57,587 | 3.8% | $0.80 | 11.8% | | | | 72,244 |
| Jun-99 | 16,387 | 5.5% | 1,500,135 | -0.9% | 397,735 | 26.8% | -3.4% | 186,340 | 11.5% | 8.5% | 121,722 | 7.3% | 15.9% | 29.1% | 72,838 | 4.3% | $1.03 | 29.6% | | | | 70,571 |
| Jun-00 | 17,527 | 7.0% | 1,677,939 | 11.9% | 469,336 | 28.0% | 12.0% | 189,606 | 11.5% | 1.7% | 107,528 | 6.3% | -11.7% | 28.3% | 63,413 | 3.4% | $0.87 | -16.2% | | | | 66,826 |
| Jun-01 | 15,993 | -8.8% | 1,826,168 | 8.9% | 499,871 | 27.4% | 6.5% | 255,439 | 10.4% | 14.4% | 151,521 | 6.1% | 7.5% | 28.3% | 105,428 | 4.7% | $0.94 | 8.1% | | | | 67,681 |
| Jun-02 | 15,950 | -0.3% | 2,228,519 | 22.0% | 660,672 | 29.6% | 32.2% | 360,497 | 13.3% | 34.7% | 166,894 | 7.5% | 9.4% | 28.0% | 157,883 | 5.8% | | | | | | 68,070 |
| Jun-03 | 16,049 | 0.6% | 2,711,374 | 21.7% | 888,592 | 32.8% | 34.5% | | 13.3% | | 254,465 | | 52.5% | 30.6% | | | $1.02 | | $1.02 | | | 69,487 |
| Jun-04 | 15,882 | -1.0% | 3,030,746 | -2.2% | 1,031,569 | 34.0% | 16.1% | 469,503 | 15.5% | 16.1% | 350,838 | | 39.7% | | 232,705 | 7.7% | $1.55 | 52.4% | $1.55 | 52.4% | | 70,315 |
| | | | | | | | | | | | | | | | | | $2.27 | 46.7% | $2.27 | 46.7% | | |
| Q1 | 3,637 | -0.7% | 691,706 | 15.8% | 221,399 | 32.0% | 22.4% | 95,597 | 13.8% | 63.0% | 61,925 | 9.0% | 86.1% | 28.8% | 33,672 | 4.9% | $0.48 | | $0.48 | 67.4% | | |
| Q2 | 3,956 | -2.7% | 788,444 | 14.0% | 278,347 | 35.3% | 26.9% | 127,195 | 16.1% | 50.8% | 99,369 | 12.6% | 50.8% | 32.0% | 65,282 | 8.3% | $0.90 | | $0.90 | 53.8% | | |
| Q3 | 3,956 | 0.0% | 740,932 | 7.6% | 249,992 | 33.7% | 9.2% | 118,483 | 16.0% | 21.3% | 88,757 | 12.0% | 30.6% | 28.3% | 63,516 | 8.6% | $0.80 | | $0.80 | 43.2% | | |
| Q4 | 4,137 | -0.9% | 809,032 | 10.6% | 281,817 | 34.9% | 8.6% | 128,228 | 15.9% | 14.4% | 100,787 | 12.5% | 15.4% | 28.3% | 70,235 | 8.7% | $1.01 | | $1.01 | 33.1% | | |
| **Jun-05** | 15,525 | -2.2% | 3,030,746 | 16.1% | 1,031,569 | 34.0% | 16.1% | 469,503 | 15.5% | 30.2% | 350,838 | 11.6% | 37.9% | 30.2% | 232,705 | 7.7% | $3.31 | 45.7% | $3.31 | 45.7% | | 70,315 |
| | | | | | | | | | | | | | | | | | | | Cal-2004 - $2.79 | | | |
| Q1 | 3,735 | 2.7% | 754,648 | 9.1% | 266,295 | 35.3% | 20.3% | 110,764 | 14.7% | 15.9% | 78,193 | 10.4% | 26.3% | 28.8% | 53,967 | 7.2% | $0.79 | 63.5% | $0.79 | 63.5% | 0.65 | 68,477 |
| Q2 | 3,924 | 3.4% | 832,645 | 5.6% | 305,769 | 36.7% | 9.9% | 147,685 | 17.7% | 16.1% | 115,860 | 13.9% | 16.6% | 33.4% | 72,535 | 8.7% | $1.07 | 16.0% | $1.07 | 16.0% | 1.03 | 67,948 |
| Q3 | 4,131 | 4.4% | 801,487 | 7.9% | 281,617 | 35.1% | 12.7% | 131,566 | 16.5% | 11.1% | 98,790 | 12.3% | 11.3% | 33.4% | 64,026 | 8.0% | $0.94 | 4.8% | $0.94 | 4.8% | 0.97 | 68,109 |
| Q4 | 4,104 | -0.8% | 859,117 | 6.3% | 328,889 | 34.8% | 6.1% | 141,921 | 16.5% | 10.7% | 104,398 | 12.2% | 3.6% | 33.4% | 64,767 | 7.5% | $0.95 | -5.6% | $0.95 | -5.6% | 1.07 | 67,984 |
| **Jun-06** | 15,894 | 2.4% | 3,247,897 | 7.2% | 1,152,570 | 35.5% | 11.7% | 527,190 | 16.2% | 11.7% | 397,241 | 12.2% | 13.2% | 32.4% | 255,295 | 7.9% | $3.75 | 13.2% | $3.75 | 13.2% | | 68,130 |
| | | | | | | | | | | | | | | | | | | | Cal-2005 - $3.76 | | | |
| Q1 | 3,356 | -9.1% | 825,543 | 9.4% | 287,289 | 34.8% | 7.9% | 116,781 | 14.1% | 5.4% | 86,918 | 10.5% | 11.2% | 34.5% | 56,608 | 6.9% | $0.86 | 7.7% | $0.86 | 7.7% | 0.80 | 66,676 |
| Q2 | 3,555 | -8.4% | 931,717 | 11.9% | 319,638 | 34.3% | 4.5% | 147,363 | 15.8% | -0.2% | 115,720 | 12.4% | -0.1% | 29.5% | 81,389 | 8.7% | $1.20 | 12.2% | $1.10 | 14.0% | 1.20 | 66,525 |
| Q3 | 3,944 | -4.5% | 861,967 | 7.5% | 304,713 | 34.2% | 8.2% | 153,562 | 16.0% | 9.8% | 108,480 | 12.3% | 9.8% | 33.5% | 72,979 | 8.4% | $1.10 | 14.0% | $1.10 | 14.0% | 1.12 | 66,525 |
| Q4E | 4,025 | -1.9% | 961,390 | 11.9% | 332,071 | 34.5% | 1.1% | 153,562 | 16.0% | 8.1% | 120,565 | 12.5% | 15.5% | 33.3% | 81,780 | 8.5% | $1.23 | 29.0% | $1.23 | 29.0% | 1.28 | 66,525 |
| **Jun-07E** | 14,960 | -5.9% | 3,610,617 | 11.2% | 1,243,711 | 34.4% | 7.9% | 559,183 | 15.5% | 6.1% | 431,683 | 12.0% | 8.7% | 32.5% | 292,755 | 8.1% | $4.40 | 14.7% | $4.40 | 17.4% | 4.45 | 66,563 |
| | | | | | | | | | | | | | | | | | | | Cal-2006 - $3.97 | | | |
| Q1E | 3,605 | 6.2% | 1,005,408 | 21.8% | 349,242 | 34.8% | 21.6% | 146,096 | 14.5% | 15.9% | 112,971 | 11.2% | 30.0% | 32.5% | 76,797 | 7.6% | $1.15 | 36.0% | $1.15 | 36.0% | 1.01 | 66,525 |
| Q2E | 3,826 | 6.4% | 1,101,035 | 18.2% | 379,899 | 34.5% | 18.9% | 170,797 | 15.5% | 15.9% | 137,672 | 12.5% | 19.0% | 32.5% | 93,850 | 8.5% | $1.41 | 15.3% | $1.41 | 15.3% | 1.42 | 66,525 |
| Q3E | 4,065 | 3.1% | 1,069,132 | 19.9% | 366,221 | 34.3% | 20.2% | 164,137 | 15.4% | 16.0% | 144,312 | 12.6% | 15.7% | 32.5% | 89,734 | 8.4% | $1.35 | 23.0% | $1.35 | 23.0% | 1.39 | 66,525 |
| Q4E | 4,098 | 1.8% | 1,144,055 | 19.0% | 396,004 | 34.6% | 19.3% | 177,437 | 15.5% | 15.5% | 130,996 | 12.5% | 12.6% | 32.5% | 99,092 | 8.7% | $1.49 | 21.2% | $1.49 | 21.2% | 1.52 | 66,525 |
| **Jun-08E** | 15,594 | 4.2% | 4,319,630 | 19.6% | 1,491,365 | 34.5% | 19.9% | 658,466 | 15.2% | 17.8% | 525,956 | 12.2% | 21.8% | 32.5% | 359,472 | 8.3% | $5.40 | 22.9% | $5.40 | 22.9% | 5.44 | 66,525 |
| | | | | | | | | | | | | | | | | | | | Cal-2007 - $4.69 | | | |
| | | | | | | | | | | | | | | | | | | | Cal-2008 - $5.97 | | | |
| **Jun-09E** | 15,734 | 0.9% | 5,192,399 | 20.2% | 1,795,835 | 34.6% | 20.4% | 775,430 | 14.9% | 17.8% | 637,930 | 12.3% | 21.3% | 32.5% | 438,910 | 8.5% | $6.60 | 22.1% | $6.60 | 22.1% | 6.51 | 66,525 |
| **Jun-10E** | 15,881 | 0.9% | 5,996,453 | 15.5% | 2,076,254 | 34.6% | 15.6% | 881,544 | 14.7% | 13.7% | 739,044 | 12.3% | 15.9% | 32.5% | 512,090 | 8.5% | $7.70 | 16.7% | $7.70 | 16.7% | | 66,525 |

Cal-2006 Assumptions: US LV Sales = 16.5 million, Europe LV Build = flat, euro = $1.30
Cal-2007 Assumptions: US LV Sales = 16.4 million, Europe LV Build = flat, euro = $1.30
Cal-2008 Assumptions: US LV Sales = 16.7 million, Europe LV Build = flat, euro = $1.30

Jan-25 Guidance: Cal-2007 EPS = $4.35 with revenue of $3.5 billion (excludes potential $0.10-0.15 change)
Jan-25 Guidance: Cal-2008 = $25 (assumes absorption of incremental $0.45 boost in R&D)

**Sensitivity Analysis:**
Every 1.5-million unit change (+/- 10%) in North American light vehicle production changes EPS by $0.10 per share and target price by $2.

**New Business Growth***

| Fiscal | Rev | Change |
|---|---|---|
| 2004 | 400 | 29% |
| 2005 | 400 | 16% |
| 2006 | 300 | 14% |
| 2007 | 300 | 13% |
| 2008 | 600 | 24% |
| 2009 | 800 | 20% |
| 2007-09 | 1,700 | 19% |

* Revenue growth with flat NA Build

**Shares Outstanding (Sep-06)**
As of January 26, 2007

| | |
|---|---|
| Basic Shares | 65,517 |
| Options (Diluted) | 1,159 |
| Convertible Securities | - |
| Diluted Shares | 66,676 |
| Insiders Own | 11% |
| Headquarters: | Washington D.C. |

© 2007 | Please refer to Appendix - Important Disclosures and Analyst Certification.

Printed on: 3/18/2007 9:11 PM

HAR_Model.xls Page1

BAIRD 777 EAST WISCONSIN AVENUE  MILWAUKEE, WI 53202

David Leiker, CFA • (414) 298-7535 • dleiker@rwbaird.com
Keith R. Schicker • (414) 298-7351 • kschicker@rwbaird.com
David Tsui • (414) 298-7699 • dtsui@rwbaird.com

Harman International Industries Inc. (HAR ♦ $97.31)
March 19, 2007
Balance Sheet & Cash Flow

*(in $ thousands)*

## Balance Sheet

| | Jun-01 | Jun-02 | Jun-03 | Jun-04 | Jun-06 | Estimate Jun-07E | Estimate Jun-08E | Interim Dec-06 |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| Cash & Equivalents | 2,748 | 116,253 | 147,911 | 377,708 | 291,214 | 478,586 | 669,358 | 171,108 |
| Receivables | 315,817 | 335,019 | 363,121 | 426,211 | 433,041 | 494,605 | 591,730 | 480,408 |
| Inventory | 317,500 | 329,935 | 349,626 | 291,710 | 312,950 | 385,792 | 461,550 | 454,682 |
| Other | 72,806 | 86,556 | 106,966 | 108,406 | 146,088 | 168,168 | 168,168 | 172,915 |
| Total Current | 708,871 | 876,763 | 967,624 | 1,204,035 | 1,183,293 | 1,527,151 | 1,890,806 | 1,279,113 |
| Fixed Assets | 204,136 | 325,812 | 393,920 | 434,091 | 491,619 | 569,435 | 631,935 | 511,618 |
| Goodwill & Intangible Assets | 145,238 | 199,239 | 221,579 | 251,722 | 345,071 | 381,219 | 396,219 | 396,063 |
| Other Assets | 44,120 | 78,466 | 120,535 | 98,962 | 167,220 | 202,150 | 202,150 | 196,063 |
| Total Assets | 1,162,366 | 1,480,280 | 1,703,568 | 1,988,810 | 2,187,203 | 2,679,966 | 3,106,110 | 2,383,013 |
| **LIAB. & EQUITY** | | | | | | | | |
| Current Debt | 24,938 | 4,255 | 5,309 | 7,309 | 3,126 | 18,098 | 18,098 | 20,999 |
| Payables | 151,478 | 193,110 | 176,846 | 238,663 | 274,145 | 320,327 | 356,116 | 293,677 |
| Other | 173,739 | 236,106 | 305,255 | 416,382 | 451,799 | 530,586 | 530,586 | 540,585 |
| Total Current | 350,155 | 433,471 | 487,410 | 662,354 | 729,070 | 904,780 | 904,720 | 855,251 |
| L/T Debt & Lease | 343,822 | 470,424 | 487,759 | 387,616 | 330,791 | 179,466 | 179,466 | 121,377 |
| Deferred Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Liabilities | 44,557 | 47,523 | 62,704 | 63,844 | 66,394 | 78,030 | 78,030 | 81,237 |
| Minority Interest | 929 | 2,233 | 0 | 0 | 0 | 0 | 0 | 0 |
| Preferred Stock | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Common Equity | 422,942 | 526,629 | 655,785 | 874,996 | 1,060,948 | 1,517,689 | 1,073,894 | 1,325,148 |
| Total | 1,162,366 | 1,480,280 | 1,703,568 | 1,988,810 | 2,187,203 | 2,679,966 | 3,106,110 | 2,383,013 |

### Working Capital Management (Non-Cash)

| | Jun-01 | Jun-02 | Jun-03 | Jun-04 | Jun-06 | Jun-07E | Jun-08E | Interim |
|---|---|---|---|---|---|---|---|---|
| Working Capital (Non-Cash) | 380,906 | 331,294 | 337,612 | 171,282 | 164,136 | 106,686 | 161,363 | 273,743 |
| Change | 53,120 | (49,612) | 6,218 | (166,330) | (69,449) | (35,147) | 66,177 | 107,608 |
| Current Ratio | 2.0 | 2.0 | 2.0 | 1.8 | 1.6 | 1.4 | 1.7 | 1.5 |
| Avg. Working Cap/Revenues | 20.6% | 19.5% | 15.0% | 9.4% | 5.6% | 2.2% | 4.9% | 6.1 |
| Inventory Turns (COGS/Inventory) | 4.0 | 4.0 | 4.5 | 6.2 | 6.4 | 6.1 | 6.1 | 6.1 |

### Days Investment (Days Sales)

| | Jun-01 | Jun-02 | Jun-03 | Jun-04 | Jun-06 | Jun-07E | Jun-08E | Interim |
|---|---|---|---|---|---|---|---|---|
| Account Receivables | 67.2 | 67.0 | 59.5 | 57.4 | 52.2 | 50.0 | 50.0 | 51.3 |
| + Inventory | 67.5 | 65.9 | 57.3 | 39.3 | 37.7 | 38.8 | 39.0 | 48.6 |
| = Total | 134.7 | 122.9 | 116.7 | 96.6 | 89.8 | 88.7 | 89.0 | 99.9 |
| - Payables | 32.2 | 38.6 | 29.0 | 32.1 | 33.0 | 36.0 | 36.0 | 31.4 |
| = Net Investment | 102.5 | 84.3 | 87.8 | 64.6 | 56.8 | 52.7 | 53.0 | 68.6 |
| (in dollars) | 481,939 | 471,844 | 535,501 | 479,258 | 498,104 | 524,281 | 627,224 | 641,413 |
| change | 8.6% | -2.1% | 13.6% | -10.6% | -1.5% | 11.8% | 19.6% | 23.0% |

### Capital Structure

| | Jun-01 | Jun-02 | Jun-03 | Jun-04 | Jun-06 | Jun-07E | Jun-08E | Interim |
|---|---|---|---|---|---|---|---|---|
| Net Debt | 366,012 | 358,426 | 345,167 | 17,217 | 42,703 | (584,204) | (281,052) | (28,742) |
| Change | (93,883) | (7,586) | (13,259) | (337,949) | 25,486 | (136,907) | (186,828) | (66,462) |
| Net Debt/Capital | 46.4% | 40.5% | 34.5% | 1.9% | 3.9% | -8.3% | -22.7% | -2.2% |
| Net Debt/EBITDA | 2.1 | 1.7 | 1.2 | 0.0 | 0.1 | (0.9) | (0.3) | (0.1) |
| EBITDA/Interest Expense | 7.0 | 8.5 | 11.3 | 21.0 | 44.6 | 40.5 | 63.5 | 23.0% |

## Cash Flow Statement

| | Jun-01 | Jun-02 | Jun-03 | Jun-04 | Jun-06 | Estimate Jun-07E | Estimate Jun-08E | Interim Dec-06 |
|---|---|---|---|---|---|---|---|---|
| Net Income | 57,914 | 63,413 | 105,428 | 157,883 | 232,705 | 255,295 | 292,755 | 359,474 |
| Depreciation | 52,168 | 59,504 | 88,545 | 106,032 | 118,665 | 129,949 | 127,500 | 132,500 |
| Amortization | 15,033 | 18,580 | | | | | | |
| Working Capital | (61,336) | (12,379) | (10,528) | (17,119) | (83,057) | (8,011) | (55,177) | (102,952) |
| Deferred Taxes | 12,480 | | 43,555 | 201,538 | 59,462 | 50,068 | | |
| Other Non-cash Items | 3,234 | 11,066 | 23,064 | 34,119 | 91,948 | (27,427) | | |
| **Cash Flow from Operations** | 79,493 | 196,271 | 260,062 | 482,461 | 419,744 | 399,874 | 346,078 | 389,032 |
| Dividend Payments | (3,222) | (3,227) | (3,227) | (3,289) | (3,321) | (3,354) | (3,250) | |
| Capital Expenditures | (105,764) | (125,144) | (116,448) | (135,493) | (172,328) | (130,548) | (175,000) | (195,000) |
| Acquisitions / Divestitures | 4,135 | | (25,233) | (145,552) | (13,608) | | | |
| Share Repurchase / Issuance | (63,168) | | 10,358 | (166,966) | | | | |
| Other Sources / Uses | 10,642 | 5,351 | 7,237 | (46,630) | 91,782 | 51,024 | | |
| **Change in Net Debt** | (77,886) | 48,086 | 87,646 | 282,164 | 67,203 | 138,273 | 186,828 | 190,772 |
| Change in Debt | 101,818 | 71,319 | (55,888) | (104,817) | (52,697) | (137,729) | | 190,772 |
| **Change in Cash & Equivalents** | 23,933 | 119,406 | 31,658 | 177,347 | 4,606 | 644 | 186,828 | 17,006 |
| Minimum Debt Payments (Estimates) | | 45 | 461 | 441 | 763 | | | 16,337 |
| Pension / OPEB Contributions | | | | | | | | |
| **'Free Cash Flow' (NI+D&A-Cap. Ex.)** | 19,351 | 16,363 | 77,626 | 128,422 | 179,044 | 254,696 | 245,086 | 296,874 |
| Percent of Net Income | 33.4% | 25.8% | 73.5% | 81.3% | 76.9% | 99.8% | 83.8% | 82.6% |
| Depreciation (% of Revenue) | 3.0% | 3.3% | 4.0% | 4.0% | 3.9% | 4.0% | 3.5% | 3.1% |
| Capital Expenditures (% of Revenue) | 6.2% | 6.9% | 5.2% | 5.0% | 5.7% | 4.0% | 4.5% | 4.5% |

**Free Cash Flow & Net Income** *(in $ Thousands)*

Legend: ■ Free Cash Flow  —◆— Percent of Net Income

| | 2001 | 2002 | 2003 | 2004 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Calendar EBITDA | 164,634 | 216,294 | 297,566 | 432,676 | 608,160 | 632,886 | 611,932 |

9

HAR_Model.xls Page2

© 2007 | Please refer to Appendix - Important Disclosures and Analyst Certification.

BAIRD  777 EAST WISCONSIN AVENUE  MILWAUKEE, WI 53202

David Leiker, CFA ♦ (414) 298-7535 ♦ dleiker@rwbaird.com
Keith R. Schicker ♦ (414) 298-7351 ♦ kschicker@rwbaird.com
David Tsui ♦ (414) 298-7699 ♦ dtsui@rwbaird.com

*(in $ thousands)*

Harman International Industries Inc. (HAR ♦ $97.31)

March 19, 2007
*Segment Detail*

## Revenues

| Year | Lt. Vehicle Build (000) | Chg | Automotive $ | Automotive % | Automotive Chg | Consumer $ | Consumer % | Consumer Chg | Professional $ | Professional % | Professional Chg | Other $ | Total $ | Total Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-92 | 12,225 | 7.4% | | | | | | | | | | | | |
| Jun-93 | 13,265 | 8.5% | | | | | | | | | | | | |
| Jun-94 | 14,600 | 10.1% | | | | | | | | | | | | |
| Jun-95 | 15,247 | 4.4% | | | | | | | | | | | | |
| Jun-96 | 14,825 | -2.8% | | | | | | | | | | | | |
| Jun-97 | 15,260 | 2.9% | | | | 993,358 | 67.4% | | 474,985 | 32.2% | | 5,751 | 1,474,094 | |
| Jun-98 | 15,529 | 1.8% | | | | 1,050,169 | 69.4% | 5.7% | 439,474 | 29.0% | -7.5% | 23,612 | 1,513,255 | 2.7% |
| Jun-99 | 16,387 | 5.5% | | | | 1,086,358 | 71.1% | 1.5% | 433,744 | 28.9% | -1.3% | 33 | 1,500,135 | -0.9% |
| Jun-00 | 17,527 | 7.0% | | | | 1,201,642 | 71.6% | 12.7% | 476,287 | 28.4% | 9.8% | | 1,677,939 | 11.9% |
| Jun-01 | 15,994 | -8.7% | | | | 1,267,358 | 73.8% | 5.5% | 449,189 | 26.2% | -5.7% | | 1,716,547 | 2.3% |

*Results below the line represent live segment reporting. Above the line, Automotive and Consumer segments were combined to Consumer segment reporting.*

| Year | Lt. Vehicle Build (000) | Chg | Automotive $ | Automotive % | Automotive Chg | Consumer $ | Consumer % | Consumer Chg | Professional $ | Professional % | Professional Chg | Other $ | Total $ | Total Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-02 | 15,950 | -0.3% | 968,261 | 53.0% | | 433,185 | 23.7% | | 424,742 | 23.3% | | | 1,826,188 | 6.4% |
| Jun-03 | 16,049 | | 1,382,676 | 62.0% | 42.8% | 399,845 | 17.9% | -7.7% | 445,998 | 20.0% | 5.0% | | 2,228,519 | 22.0% |
| Jun-04 | 15,882 | -1.0% | 1,873,047 | 69.1% | 35.5% | 356,611 | 13.2% | -10.8% | 481,716 | 17.8% | 8.0% | | 2,711,374 | 21.7% |
| Q1 | 3,637 | | 494,484 | 71.5% | 22.9% | 85,318 | 12.3% | -2.8% | 111,904 | 16.2% | 4.5% | | 691,706 | 15.8% |
| Q2 | 3,795 | -2.7% | 537,275 | 68.1% | 14.5% | 127,480 | 16.2% | 24.6% | 123,689 | 15.7% | 3.1% | | 788,444 | 14.0% |
| Q3 | 3,956 | -4.6% | 522,513 | 70.4% | 7.3% | 100,252 | 13.5% | 28.1% | 119,799 | 16.1% | -4.3% | | 742,564 | 7.6% |
| Q4E | 4,137 | -5.9% | 571,339 | 72.0% | 13.0% | 43,561 | 5.4% | 19.1% | 131,542 | 16.3% | 1.6% | | 809,032 | 10.4% |
| Jun-05 | 15,525 | -2.2% | 2,125,611 | 70.1% | 13.5% | 418,201 | 13.8% | 13.6% | 486,934 | 16.1% | | | 3,030,746 | 11.5% |
| Q1 | 3,735 | 2.7% | 520,296 | 68.9% | 6.8% | 111,368 | 14.8% | 30.5% | 122,984 | 16.3% | 9.9% | | 754,648 | 9.1% |
| Q2 | 3,924 | 3.4% | 547,630 | 65.8% | 1.9% | 155,008 | 18.6% | 21.6% | 130,007 | 15.6% | 5.1% | | 832,645 | 5.5% |
| Q3 | 4,131 | 4.4% | 567,340 | 70.8% | 8.6% | 106,810 | 13.3% | 6.5% | 127,337 | 15.9% | 6.3% | | 801,487 | 7.9% |
| Q4 | 4,104 | -0.8% | 601,631 | 70.0% | 5.3% | 120,814 | 14.1% | 14.9% | 136,672 | 15.9% | 3.9% | | 859,117 | 6.3% |
| Jun-06 | 15,894 | 2.4% | 2,236,897 | 68.9% | 5.2% | 494,000 | 15.2% | 18.1% | 517,000 | 15.9% | 6.2% | | 3,247,897 | 7.2% |
| Q1 | 3,396 | -9.1% | 600,988 | 72.8% | 15.5% | 93,126 | 11.3% | -16.4% | 131,419 | 15.9% | 6.9% | | 825,543 | 9.4% |
| Q2 | 3,595 | -8.4% | 632,303 | 67.9% | 15.5% | 163,011 | 17.5% | 5.2% | 145,981 | 15.7% | 12.3% | | 931,717 | 11.9% |
| Q3E | 3,944 | -4.5% | 679,226 | 76.1% | 19.7% | 117,491 | 13.2% | 10.0% | 136,251 | 15.3% | 7.0% | | 891,967 | 11.3% |
| Q4E | 4,025 | -1.9% | 679,225 | 70.6% | 14.0% | 150,916 | 15.7% | 24.9% | 136,239 | 15.2% | 7.0% | | 961,390 | 11.9% |
| Jun-07E | 14,960 | -5.9% | 2,550,762 | 70.6% | 14.0% | 509,544 | 14.1% | 3.1% | 550,312 | 15.2% | 6.4% | | 3,610,617 | 11.2% |
| Q1E | 3,605 | 6.2% | 767,008 | 76.6% | 27.6% | 92,782 | 9.7% | 5.0% | 145,617 | 14.0% | 7.0% | | 1,005,408 | 21.8% |
| Q2E | 3,826 | 6.4% | 783,922 | 71.2% | 24.0% | 171,162 | 15.5% | 5.0% | 145,951 | 13.3% | 0.0% | | 1,101,035 | 18.2% |
| Q3E | 4,065 | 3.1% | 794,104 | 73.0% | 24.2% | 129,240 | 12.1% | 10.0% | 145,788 | 13.5% | 7.0% | | 1,069,132 | 19.9% |
| Q4E | 4,098 | 1.8% | 834,674 | 73.0% | 22.8% | 152,905 | 13.4% | 12.5% | 156,476 | 13.7% | 7.0% | | 1,144,055 | 19.0% |
| Jun-08E | 15,594 | 4.2% | 3,179,708 | 73.4% | 24.7% | 551,089 | 12.8% | 8.2% | 596,833 | 13.6% | 6.4% | | 4,319,630 | 19.6% |
| Jun-09E | 15,734 | 0.9% | 3,942,372 | 75.9% | 24.0% | 619,975 | 11.9% | 12.5% | 630,052 | 12.1% | 7.5% | | 5,192,399 | 20.2% |
| Jun-10E | 15,881 | 0.9% | 4,624,825 | 77.1% | 17.3% | 697,472 | 11.6% | 12.5% | 674,155 | 11.2% | 7.0% | | 5,996,453 | 15.5% |

## Operating Income

| Year | Automotive $ | Automotive % | Automotive Chg | Consumer $ | Consumer % | Consumer Chg | Professional $ | Professional % | Professional Chg | Other $ | Total $ | Total % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-97 | | | | 28,148 | | | 16,802 | 5.9% | | (4,447) | 101,973 | 6.9% |
| Jun-98 | 78,272 | 7.9% | | 94,603 | 9.0% | 20.9% | 18,862 | 4.3% | -33.0% | (13,140) | 100,325 | 6.6% |
| Jun-99 | | | | 88,929 | 8.3% | -6.0% | 27,005 | 6.2% | 43.2% | (10,907) | 105,027 | 7.0% |
| Jun-00 | | | | 97,567 | 8.1% | 9.7% | 36,148 | 7.6% | 33.9% | (11,993) | 121,722 | 7.3% |
| Jun-01 | | | | 89,728 | 7.5% | -8.0% | 39,739 | 8.8% | 9.9% | (27,637) | 107,528 | 6.3% |
| Jun-02 | 143,643 | 14.8% | | (33,198) | -7.7% | -134.8% | 16,802 | 4.0% | -57.7% | (24,026) | 103,221 | 5.7% |
| Jun-03 | 212,596 | 15.4% | 48.0% | (21,709) | -5.5% | -34.3% | 15,398 | 3.5% | -8.4% | (39,301) | 166,984 | 7.5% |
| Jun-04 | 312,145 | 16.7% | 46.8% | (13,029) | -3.7% | -40.2% | 8,581 | 1.8% | -44.3% | (53,232) | 254,465 | 9.4% |
| Q1 | 70,515 | 14.3% | 43.8% | (340) | -0.4% | -91.1% | 9,602 | 8.6% | 237.0% | (17,852) | 61,925 | 9.0% |
| Q2 | 108,892 | 20.3% | 24.4% | 7,695 | 6.2% | -216.4% | 10,005 | 8.4% | 246.8% | (25,185) | 99,512 | 12.6% |
| Q3 | 84,232 | 16.1% | 4.3% | 7,249 | 7.2% | 267.2% | 9,782 | 8.2% | 389.8% | (21,500) | 89,757 | 12.0% |
| Q4E | 84,461 | 14.8% | -11.0% | 11,896 | 11.3% | 530.4% | 18,206 | 13.8% | 99.6% | (20,201) | 94,362 | 11.7% |
| Jun-05 | 348,100 | 16.4% | 11.5% | 26,700 | 6.4% | 304.9% | 45,500 | 9.3% | 430.2% | (75,744) | 344,556 | 11.4% |
| Q1 | 73,937 | 14.2% | 4.9% | 10,578 | 9.5% | | 12,867 | 10.5% | 34.0% | (19,189) | 76,193 | 10.4% |
| Q2 | 88,161 | 16.1% | -19.0% | 6,576 | 4.2% | 176.6% | 14,984 | 11.5% | 49.8% | (19,278) | 115,660 | 13.9% |
| Q3 | 91,003 | 16.0% | 8.0% | 5,215 | 4.9% | -28.1% | 13,528 | 10.6% | 38.3% | (19,316) | 98,790 | 12.3% |
| Q4 | 92,100 | 15.3% | 9.0% | 12,500 | 10.3% | 5.1% | 19,600 | 14.3% | 7.7% | (19,802) | 104,398 | 12.1% |
| Jun-06 | 345,201 | 15.4% | -0.8% | 50,286 | 10.2% | 88.3% | 60,977 | 11.8% | 34.0% | (59,223) | 397,241 | 12.2% |
| Q1 | 80,168 | 15.0% | 8.4% | (4,449) | -4.8% | -142.1% | 17,075 | 13.0% | 32.7% | (15,876) | 86,918 | 10.5% |
| Q2 | 92,408 | 14.6% | 4.8% | 14,701 | 9.0% | -33.2% | 23,124 | 15.8% | 34.1% | (11,487) | 115,720 | 12.4% |
| Q3E | 95,993 | 15.0% | 5.5% | 5,851 | 5.0% | 12.2% | 18,553 | 13.6% | 37.2% | (11,516) | 108,481 | 12.2% |
| Q4E | 105,240 | 15.5% | 15.4% | 8,255 | 6.1% | -34.0% | 20,379 | 14.7% | 29.1% | (19,228) | 114,645 | 12.5% |
| Jun-07E | 384,409 | 15.1% | 11.4% | 24,358 | 4.8% | -51.6% | 81,023 | 14.7% | 32.9% | (56,107) | 431,683 | 12.0% |
| Q1E | 106,922 | 13.9% | 18.6% | 4,867 | 5.1% | -209.4% | 17,455 | 12.4% | 2.2% | (16,273) | 112,971 | 11.2% |
| Q2E | 111,035 | 14.2% | 21.3% | 8,666 | 5.1% | -41.1% | 22,124 | 15.6% | 5.0% | (11,774) | 130,051 | 11.8% |
| Q3E | 116,473 | 14.7% | 27.3% | 6,526 | 5.0% | -11.5% | 19,817 | 13.6% | 6.8% | (11,804) | 131,012 | 12.3% |
| Q4E | 129,583 | 15.5% | 22.0% | 7,605 | 5.0% | -7.9% | 87,228 | 14.8% | 6.1% | (19,708) | 144,312 | 12.6% |
| Jun-08E | 470,630 | 14.8% | 22.4% | 27,663 | 5.0% | 13.6% | 87,228 | 14.8% | 7.7% | (59,560) | 525,962 | 12.2% |
| Jun-09E | 577,529 | 14.9% | 22.7% | 31,108 | 5.0% | 12.5% | 91,816 | 14.6% | | (62,538) | 637,916 | 12.3% |
| Jun-10E | 674,898 | 14.6% | 16.9% | 34,983 | 5.0% | 12.5% | 94,805 | 14.1% | 3.3% | (65,665) | 739,020 | 12.3% |

### New Business Growth*

| Fiscal | Rev. | Change |
|---|---|---|
| 2004 | 400 | 29% |
| 2005 | 300 | 16% |
| 2006 | 300 | 14% |
| 2007 | 300 | 13% |
| 2008 | 600 | 24% |
| 2009 | 800 | 20% |
| 2007-09 | | 19% |

* Revenue with flat NA build (ex-price of -2%)

40% MOST / 60% branded audio

© 2007 | Please refer to Appendix - Important Disclosures and Analyst Certification.

Printed on: 3/18/2007 9:11 PM

11

HAR_Model.xls Page4

# BAIRD  777 EAST WISCONSIN AVENUE  MILWAUKEE, WI 53202

David Leiker, CFA • (414) 298-7535 • dleiker@rwbaird.com
Keith R. Schicker • (414) 298-7351 • kschicker@rwbaird.com
David Tsui • (414) 298-7699 • dtsui@rwbaird.com

## Harman International Industries Inc. (HAR ♦ $97.31)

March 19, 2007
*EBITDA Valuation Model*

### Enterprise Value and LTM EBITDA



### EV to EBITDA Multiple

### Net Debt



| (in millions) | Using EV Multiple of: | | | | |
|---|---|---|---|---|---|
| | 12.5 | 13.0 | 13.5 | 14.0 | 14.5 |
| Cal-08 EBITDA | 714.3 | 714.3 | 714.3 | 714.3 | 714.3 |
| | | | | | |
| Enterprise Value | 8,929.0 | 9,286.2 | 9,643.3 | 10,000.5 | 10,357.7 |
| less Net Debt | (590.0) | (590.0) | (590.0) | (590.0) | (590.0) |
| Equity Value | 9,519.0 | 9,876.2 | 10,233.3 | 10,590.5 | 10,947.7 |
| | | | | | |
| 12-Mo. Target Price* | $129 | $133 | $138 | $143 | $148 |
| Current Price | $97 | $97 | $97 | $97 | $97 |
| Change | 32% | 37% | 42% | 47% | 52% |

| (in millions) | $85 | $90 | $95 | $100 | $105 |
|---|---|---|---|---|---|
| Equity Value | 6,290.8 | 6,660.8 | 7,030.9 | 7,400.9 | 7,771.0 |
| plus Net Debt | (590.0) | (590.0) | (590.0) | (590.0) | (590.0) |
| Enterprise Value | 5,700.8 | 6,070.8 | 6,440.8 | 6,810.9 | 7,180.9 |
| | | | | | |
| Cal-08 EBITDA | 714.3 | 714.3 | 714.3 | 714.3 | 714.3 |
| | | | | | |
| Cal-08 EV | 8.0 | 8.5 | 9.0 | 9.5 | 10.1 |

*Discounted at 15%

© 2007 | Please refer to Appendix - Important Disclosures and Analyst Certification.

**BAIRD  777 EAST WISCONSIN AVENUE  MILWAUKEE, WI 53202**

David Leiker, CFA ◆ (414) 298-7535 ◆ dleiker@rwbaird.com
Keith R. Schicker ◆ (414) 298-7351 ◆ kschicker@rwbaird.com
David Tsui ◆ (414) 298-7699 ◆ dtsui@rwbaird.com

**Harman International Industries Inc. (HAR ◆ $101.85)**

January 25, 2007

*Fiscal Second-Quarter Variance Report*

### Income Statement

| Income Statement (In $Thousands) | Dec-06 $ | % | Change | Dec-05 $ | % | RWB Est. $ | % | Var. % | Var. Per Share |
|---|---|---|---|---|---|---|---|---|---|
| NA Light Vehicle Production | 3,595 | | (8%) | 3,924 | | 3,548 | | 1% | |
| Dollar Content | 259.17 | | 22% | 212.19 | | 263.90 | | (2%) | |
| Consumer (est.) | 163,000 | 17.5% | 5.2% | 155,008 | 18.6% | 162,758 | 17.4% | 0.1% | |
| Automotive (est.) | 632,317 | 67.9% | 15.5% | 547,630 | 65.8% | 634,452 | 67.8% | (0.3%) | |
| Professional (est.) | 136,400 | 14.6% | 4.9% | 130,007 | 15.6% | 139,107 | 14.9% | (1.9%) | |
| Revenue | 931,717 | 100.0% | 11.9% | 832,645 | 100.0% | 936,318 | 100.0% | (0.5%) | (0.02) |
| Gross Profit | 319,638 | 34.3% | 4.5% | 305,769 | 36.7% | 338,555 | 36.2% | (6.6%) | (0.17) |
| Selling, General, Admin. | 203,918 | 21.9% | 7.4% | 189,909 | 22.8% | 210,672 | 22.5% | (3.2%) | 0.07 |
| Operating Income | 115,720 | 12.4% | (0.1%) | 115,860 | 13.9% | 127,883 | 13.7% | (9.4%) | (0.12) |
| Interest Income (Expense) | (498) | (0.1%) | 89.1% | (4,558) | (0.5%) | 961 | 0.1% | 151.8% | (0.01) |
| Other Income | (484) | (0.1%) | 58.1% | (1,156) | (0.1%) | (500) | (0.1%) | NM | 0.01 |
| Pretax Income | 114,738 | 12.3% | 4.2% | 110,146 | 13.2% | 128,344 | 13.7% | (10.6%) | (0.13) |
| Income Taxes (Rate) | 33,839 | 29.5% | (10.9%) | 37,968 | 34.5% | 44,279 | 34.5% | (23.6%) | |
| Minority Interest | (480) | (0.1%) | (1.4%) | (357) | NM | | | NM | |
| Net Income | 81,309 | 8.7% | 12.2% | 72,535 | 8.7% | 84,065 | 9.0% | (3.2%) | (0.04) |
| **Memo:** | | | | | | | | | |
| Depreciation | 31,600 | 3.4% | (0.7%) | 31,825 | 3.8% | 33,379 | 3.6% | (5.3%) | 0.03 |
| EBITDA | 147,320 | 15.8% | (0.2%) | 147,685 | 17.7% | 161,262 | 17.2% | (8.6%) | (0.14) |
| First Call EPS (FC Est. = $1.20) | 1.22 | | 14.0% | 1.07 | | 1.26 | | (3%) | (0.04) |
| Diluted Shares Outstanding | 66,525 | | (2.1%) | 67,948 | | 66,676 | | | |
| RWB Adjusted EPS (operations) | 1.22 | | 14.6% | 1.07 | | 1.26 | | (3%) | (0.04) |
| + Restructuring | 0.00 | | NM | 0.00 | | 0.00 | | NM | 0.00 |
| + Impairment | 0.00 | | NM | 0.00 | | 0.00 | | NM | 0.00 |
| + Gains/Losses | 0.00 | | NM | 0.00 | | 0.00 | | NM | 0.00 |
| + Other | 0.00 | | NM | 0.00 | | 0.00 | | NM | 0.00 |
| + Interest-related | 0.00 | | NM | 0.00 | | 0.00 | | NM | 0.00 |
| + Tax-related | 0.00 | | NM | 0.00 | | 0.00 | | NM | 0.00 |
| GAAP EPS | 1.22 | | 14.6% | 1.07 | | 1.26 | | (3.0%) | (0.04) |

### Cash Flow Statement – Estimate

| Cash Flow Statement – Estimate (In $Thousands) | Three Months Dec-06 | Dec-05 | Change | Year-to-Date Dec-06 | Dec-05 | Change |
|---|---|---|---|---|---|---|
| **Cash from Operations** | | | | | | |
| Net Income | 81,389 | 72,535 | 12% | 137,997 | 126,502 | 9% |
| Depreciation & Amortization | 31,634 | 31,825 | (1%) | 61,497 | 64,396 | (5%) |
| Working Capital Dec. (Inc.) | (25,204) | 70,225 | (136%) | (161,363) | 11,065 | 435% |
| Other Non-Cash (est.) | 4,808 | (1,981) | 343% | 9,883 | 1,846 | 435% |
| **Total CFO** | 92,627 | 172,604 | (46%) | 48,014 | 203,809 | (76%) |
| **Cash from Investing** | | | | | | |
| Capital Expenditures | (27,017) | (23,931) | (13%) | (44,323) | (45,323) | |
| Acquisitions | (2,395) | (1,811) | (32%) | (4,525) | (9,333) | 52% |
| Other Investing | (2,044) | (3,211) | 36% | 490 | (4,341) | 111% |
| **Total CFI** | (31,456) | (28,953) | (9%) | (43,482) | (58,997) | 26% |
| Dividends | (816) | (823) | 1% | (1,635) | (1,650) | 1% |
| Increase (Decrease) in Debt | (35,873) | 10,516 | (441%) | (68,762) | 7,623 | (79%) |
| Share Repurchase (net of options) | 4,781 | (39,995) | 112% | (67,606) | (11,605) | |
| Other | | | | | 6,109 | (100%) |
| **Total CFF** | (31,908) | (24,193) | (32%) | (128,196) | (37,124) | (245%) |
| Effect of Exchange Rates | 6,862 | (28,231) | (69%) | (61,698) | 28,263 | (318%) |
| Change in Cash/Equivalents | 36,125 | 115,582 | (69%) | (120,650) | (4,403) | (217%) |
| Estimated Change in Net Debt | 105,007 | | | (61,047) | | 168% |
| Free Cash Flow (NI+D&A-Capex) | 86,006 | 80,429 | 7% | 160,047 | 145,575 | 10% |
| Percent of Net Income | 105.7% | 110.9% | | 116.0% | 115.1% | |
| Depreciation (% of Revenue) | 3.4% | 3.8% | | 3.5% | 4.1% | |
| Cap. Ex. (% of Revenue) | 2.9% | 2.9% | | 2.2% | 2.2% | |

### EPS Reconciliation Detail (Pretax)

Restructuring: None.
Impairment: None.
Gain/Losses: None.
Headcount: None.
Other: None.
Interest-related: None.
Tax-related: None.
*No variance between adjusted EPS as reported and First Call EPS.*

### ROIC – Last Twelve Months

| ROIC – Last Twelve Months (In $Thousands) | Dec-06 | Sep-06 | Jun-06 | Mar-06 | Dec-05 |
|---|---|---|---|---|---|
| Revenue | 3,417,864 | 3,318,792 | 3,247,897 | 3,196,812 | 3,137,889 |
| Operating Profit | 405,626 | 405,966 | 397,241 | 393,630 | 383,597 |
| Operating Margin | 11.9% | 12.2% | 12.2% | 12.3% | 12.2% |
| **Average Invested Capital** | | | | | |
| Accounts Receivables | 199,896 | 170,467 | 166,967 | 181,830 | 195,089 |
| Working Capital Turnover | 17.10 | 19.47 | 19.45 | 17.58 | 16.08 |
| Fixed Assets | 503,704 | 494,139 | 489,310 | 481,731 | 481,034 |
| Fixed Asset Turnover | 6.79 | 6.72 | 6.64 | 6.64 | 6.52 |
| Other Assets | 578,195 | 559,003 | 541,963 | 524,194 | 507,144 |
| Other Asset Turnover | 5.91 | 5.94 | 5.99 | 6.10 | 6.19 |
| Total Capital | 1,281,795 | 1,223,608 | 1,198,240 | 1,187,754 | 1,183,266 |
| Total Capital Turnover | 2.67 | 2.71 | 2.71 | 2.69 | 2.65 |
| Pre-Tax ROIC | 31.7% | 33.2% | 33.2% | 33.1% | 32.4% |
| Tax Rate | 32.5% | 33.9% | 32.4% | 31.1% | 29.4% |
| After-Tax ROIC | 21.4% | 21.9% | 22.4% | 22.8% | 22.9% |

### Balance Sheet

| Balance Sheet (In $Thousands) | Dec-06 | Dec-05 | Change |
|---|---|---|---|
| Cash & Equivalents | 171,108 | 394,499 | (57%) |
| Receivables | 480,408 | 418,579 | 15% |
| Inventory | 454,682 | 321,331 | 41% |
| Other Current Assets | 172,915 | 158,168 | 9% |
| Total Current Assets | 1,279,113 | 1,292,577 | (1%) |
| Net Fixed Assets | 515,618 | 473,356 | 9% |
| Goodwill | 396,219 | 350,707 | 13% |
| Other Assets | 195,063 | 164,805 | 18% |
| Total Assets | 2,383,013 | 2,281,445 | 4% |

| (In $Thousands) | Dec-06 | Dec-05 | Change |
|---|---|---|---|
| Current Debt | 20,989 | 4,736 | 343% |
| Payables | 293,677 | 218,247 | 35% |
| Other Current Liabilities | 540,585 | 523,802 | 3% |
| Total Current Liabilities | 855,251 | 746,785 | 15% |
| Long Term Debt | 121,377 | 397,893 | (69%) |
| Other Liabilities | 81,237 | 66,015 | 23% |
| Minority Interest | | 3,037 | NM |
| Preferred Stock | | | NM |
| Common Equity | 1,325,148 | 1,067,715 | 24% |
| Total Liabilities & Equity | 2,383,013 | 2,281,445 | 4% |

| Days Investment (LTM) | Dec-06 | Dec-05 | Change |
|---|---|---|---|
| Accounts Receivables | 51.3 | 48.7 | 5% |
| + Inventory | 48.6 | 37.4 | 30% |
| = Total | 99.9 | 86.1 | 16% |
| - Payables | 31.4 | 25.4 | 24% |
| = Net Investment | 68.5 | 60.7 | 13% |
| (in dollars) | 641,413 | 521,663 | 23% |

| | Dec-06 | Dec-05 | Change |
|---|---|---|---|
| Net Debt (Total Debt - Cash) | (28,742) | 8,130 | (454%) |
| Percent of Capital | (2.2%) | 0.8% | (297 bp) |
| Multiple of LTM EBITDA | -0.1 | 0.0 | NM |
| Sequential Change (%) | (176.0%) | (93.0%) | NM |
| Sequential Change ($) | (32,915) | (158,106) | NM |
| Working Capital | 271,743 | 156,000 | 75% |
| Percent of LTM Revenue | 8.0% | 5.0% | +304 bp |
| Sequential Change (%) | 11.3% | (32.7%) | NM |
| Sequential Change ($) | 27,782 | (75,933) | NM |

© 2007 | Please refer to Appendix - Important Disclosures and Analyst Certification.

BAIRD  777 EAST WISCONSIN AVENUE  MILWAUKEE, WI 53202
David Leiker, CFA • (414) 298-7535 • dleiker@rwbaird.com
Keith R. Schicker • (414) 298-7351 • kschicker@rwbaird.com
David Tsui • (414) 298-7699 • dtsui@rwbaird.com

**Harman International Industries Inc. (HAR • $97.31)**

March 19, 2007
*Source of Revenue*

(in $ Thousands)

| Year | New Business / Mix — New $ | New Chg | Mix $ | Net $ | Net Chg | Production $ | Prod Chg | Currency Euro | Currency $ | Curr Chg | Acq $ | Div $ | Net $ | Net Chg | Price $ | Price Chg | Automotive $ | Auto Chg | Consumer $ | Cons Chg | Professional $ | Prof Chg | Total $ | Total Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-92 | | | | | | | | | | | | | | | | | | | | | | | 604,454 | |
| Jun-93 | 84,024 | 13.9% | 0 | 84,024 | 13.9% | 9,745 | 1.6% | | (24,716) | -4.1% | 0 | 0 | 0 | 0.0% | (8,593) | -1.4% | 60,459 | 10.0% | 0 | 0.0% | 0 | 0.0% | 664,913 | 10.0% |
| Jun-94 | 110,279 | 16.6% | 0 | 110,279 | 16.5% | 12,687 | 1.9% | | 8,720 | 1.3% | 75,000 | 0 | 75,000 | 11.3% | (9,453) | -1.4% | 197,234 | 29.7% | 0 | 0.0% | 0 | 0.0% | 862,147 | 29.7% |
| Jun-95 | 211,178 | 24.5% | 0 | 211,178 | 24.5% | 18,300 | 2.1% | | 15,856 | 1.8% | 75,000 | 0 | 75,000 | 8.7% | (12,257) | -1.4% | 308,077 | 35.7% | 0 | 0.0% | 0 | 0.0% | 1,170,524 | 35.7% |
| Jun-96 | 207,019 | 17.7% | 0 | 207,019 | 17.7% | 3,458 | 0.3% | | (2,470) | -0.2% | 0 | 0 | 0 | 0.0% | (16,636) | -1.4% | 191,371 | 16.3% | 0 | 0.0% | 0 | 0.0% | 1,361,595 | 16.4% |
| Jun-97 | 136,674 | 10.0% | 0 | 136,674 | 10.0% | 17,901 | 1.3% | | (22,720) | -1.7% | 0 | 0 | 0 | 0.0% | (19,357) | -1.4% | 112,499 | 8.3% | 0 | 0.0% | 0 | 0.0% | 1,474,064 | 8.3% |
| Jun-98 | 67,767 | 4.6% | 0 | 67,767 | 4.6% | 27,455 | 1.9% | | (35,105) | -2.4% | 0 | 0 | 0 | 0.0% | (20,956) | -1.4% | 39,161 | 2.7% | 0 | 0.0% | 0 | 0.0% | 1,513,255 | 2.7% |
| Jun-99 | (45,961) | -3.0% | 0 | (45,961) | -3.0% | 47,848 | 3.2% | | 7,419 | 0.5% | 0 | 0 | 0 | 0.0% | (22,026) | -1.5% | (13,120) | -0.9% | 0 | 0.0% | 0 | 0.0% | 1,500,135 | -0.9% |
| Jun-00 | 181,384 | 12.1% | 0 | 181,384 | 12.1% | 26,319 | 1.8% | | (48,951) | -3.3% | 0 | 0 | 0 | 0.0% | (22,990) | -1.5% | 135,762 | 9.0% | 0 | 0.0% | 42,042 | 2.8% | 1,677,939 | 11.9% |
| Jun-01 | 145,384 | 8.7% | 0 | 145,384 | 8.7% | (26,552) | -1.6% | | (53,867) | -3.2% | 0 | 0 | 0 | 0.0% | (25,982) | -1.5% | 38,984 | 2.3% | 0 | 0.0% | (376) | -0.0% | 1,716,547 | 2.3% |
| Jun-02 | 167,081 | 9.7% | 0 | 167,081 | 9.7% | (24,219) | -1.4% | | 19,000 | 1.1% | 0 | 0 | 0 | 0.0% | (27,721) | -1.6% | 134,141 | 7.8% | 0 | 0.0% | (24,500) | -1.4% | 1,826,188 | 6.4% |
| Jun-03 | 221,525 | 12.1% | 0 | 221,525 | 12.1% | 15,256 | 0.8% | | 184,600 | 10.1% | 0 | 0 | 0 | 0.0% | (29,048) | -1.6% | 392,334 | 21.5% | (11,300) | -0.6% | 21,297 | 1.2% | 2,228,519 | 22.0% |
| Jun-04 | 316,869 | 14.2% | 0 | 316,869 | 14.2% | (5,280) | -0.2% | | 202,500 | 9.1% | 0 | 0 | 0 | 0.0% | (40,818) | -1.8% | 473,271 | 21.2% | (25,944) | -1.2% | 35,528 | 1.6% | 2,711,374 | 21.7% |
| Q1 | 75,000 | 18.6% | (22,551) | 52,449 | 13.0% | 3,186 | 0.8% | 1.25 | 39,000 | 9.7% | 0 | 0 | 0 | 0.0% | (11,029) | -2.7% | 83,626 | 20.8% | 6,000 | 6.6% | 4,786 | 4.5% | 691,706 | 15.8% |
| Q2 | 75,000 | 16.0% | 527 | 75,527 | 14.7% | (1,923) | -0.4% | 1.30 | 44,000 | 9.4% | 0 | 0 | 0 | 0.0% | (14,675) | -3.1% | 93,233 | 19.9% | 19,883 | 25.4% | 3,600 | 3.0% | 788,444 | 14.0% |
| Q3 | 75,000 | 15.4% | (34,592) | 40,408 | 8.3% | 6,447 | 1.4% | 1.31 | 23,000 | 4.7% | 0 | 0 | 0 | 0.0% | (14,414) | -3.0% | 41,080 | 8.4% | 16,893 | 19.1% | (8,831) | -7.1% | 742,564 | 7.6% |
| Q4 | 75,000 | 14.6% | (21,395) | 53,605 | 11.1% | (2,057) | -0.4% | 1.26 | 20,800 | 4.0% | 0 | 0 | 0 | 0.0% | (15,429) | -3.0% | 56,918 | 11.1% | 0 | | 2,184 | 1.7% | 808,032 | 10.4% |
| Jun-05 | 300,000 | 14.1% | (28,939) | 271,061 | 11.9% | 5,653 | 0.6% | 1.30 | 126,800 | 6.8% | 0 | 0 | 0 | 0.0% | (55,448) | -3.0% | 274,657 | 14.7% | 42,776 | 12.0% | 1,739 | 0.4% | 3,030,746 | 11.8% |
| Q1 | 75,000 | 15.2% | (19,066) | 55,934 | 11.3% | (3,122) | -0.6% | 1.22 | (59,200) | -11.0% | 0 | 0 | 0 | 0.0% | (14,420) | -2.9% | 39,591 | 8.0% | 12,254 | 14.4% | 11,097 | 9.9% | 754,648 | 9.1% |
| Q2 | 75,000 | 14.0% | 4,241 | 79,241 | 14.7% | (21,652) | -4.0% | 1.19 | (36,576) | -7.0% | 0 | 0 | 0 | 0.0% | (16,118) | -3.0% | 10,370 | 1.9% | 27,520 | 21.6% | 7,558 | 6.3% | 832,645 | 5.6% |
| Q3 | 75,000 | 14.4% | 4,313 | 79,313 | 15.2% | 27,447 | 4.8% | 1.20 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (15,675) | -3.0% | 44,827 | 8.6% | 5,558 | 6.5% | 6,291 | 6.9% | 801,487 | 7.9% |
| Q4 | 75,000 | 13.1% | (18,426) | 56,574 | 11.1% | (4,652) | -0.8% | 1.25 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (17,140) | -3.0% | 30,292 | 5.3% | 15,663 | 14.9% | 5,130 | 3.9% | 859,117 | 6.3% |
| Jun-06 | 300,000 | 13.4% | 26,764 | 326,764 | 12.8% | (1,979) | -0.2% | 1.26 | (95,776) | -4.5% | 0 | 0 | 0 | 0.0% | (63,354) | -3.0% | 125,080 | 5.9% | 61,995 | 14.8% | 30,076 | 6.2% | 3,247,897 | 7.2% |
| Q1 | 75,000 | 14.4% | 7,433 | 82,433 | 15.8% | (3,122) | -0.6% | 1.27 | 17,000 | 3.3% | 0 | 0 | 0 | 0.0% | (15,609) | -3.0% | 80,702 | 15.5% | 8,435 | 6.9% | | | 825,543 | 9.4% |
| Q2 | 75,000 | 13.7% | 12,753 | 87,753 | 16.0% | (21,652) | -4.0% | 1.30 | 35,000 | 6.4% | 0 | 0 | 0 | 0.0% | (16,429) | -3.0% | 84,673 | 15.5% | 8,003 | 4.9% | | | 931,717 | 11.9% |
| Q3E | 75,000 | 13.3% | (4,269) | 70,731 | 12.5% | 22,447 | 4.8% | 1.30 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (17,020) | -3.0% | 70,885 | 12.5% | 10,681 | 10.0% | | | 891,967 | 11.3% |
| Q4E | 75,000 | 12.5% | 10,847 | 85,847 | 14.3% | (4,652) | -0.8% | 1.30 | 14,439 | 2.4% | 0 | 0 | 0 | 0.0% | (18,024) | -3.0% | 77,604 | 12.9% | 15,102 | 12.5% | | | 961,390 | 11.9% |
| Jun-07E | 300,000 | 13.1% | 53,144 | 353,144 | 14.6% | (6,979) | -0.6% | 1.30 | 93,887 | 4.2% | 0 | 0 | 0 | 0.0% | (67,082) | -3.0% | 313,865 | 14.0% | 15,544 | 14.0% | 33,312 | 6.2% | 3,610,617 | 11.2% |
| Q1E | 150,000 | 25.0% | 10,726 | 160,726 | 26.7% | 14,795 | 2.5% | 1.30 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (18,030) | -3.0% | 166,009 | 27.6% | 4,656 | 5.0% | 9,199 | 7.0% | 1,005,408 | 21.8% |
| Q2E | 150,000 | 23.7% | 4,337 | 154,337 | 24.4% | 16,252 | 2.6% | 1.30 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (18,999) | -3.0% | 151,620 | 24.0% | 8,151 | 5.0% | 9,548 | 7.0% | 1,101,035 | 18.2% |
| Q3E | 150,000 | 23.5% | 17,193 | 167,193 | 26.2% | 7,832 | 1.2% | 1.30 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (19,147) | -3.0% | 155,438 | 24.4% | 11,749 | 10.0% | 9,538 | 7.0% | 1,069,132 | 19.9% |
| Q4E | 150,000 | 22.1% | 20,888 | 170,888 | 25.2% | 4,928 | 0.7% | 1.30 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (20,377) | -3.0% | 155,879 | 22.9% | 16,989 | 12.5% | 10,237 | 7.0% | 1,144,055 | 19.0% |
| Jun-08E | 600,000 | 23.5% | 53,144 | 653,144 | 25.6% | 43,806 | 1.7% | 1.30 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (76,523) | -3.0% | 628,946 | 24.7% | 41,545 | | 38,522 | | 4,319,630 | 19.6% |
| Jun-09E | 800,000 | 25.2% | 46,620 | 846,620 | 26.6% | 11,435 | 0.4% | 1.30 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (95,391) | -3.0% | 762,664 | 24.0% | 68,886 | 12.5% | 41,218 | 12.5% | 5,192,399 | 20.2% |
| Jun-10E | 700,000 | 17.8% | 85,990 | 785,990 | 19.9% | 14,735 | 0.4% | 1.30 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | (118,271) | -3.0% | 682,454 | 17.3% | 77,497 | 12.5% | 44,104 | 12.5% | 5,996,453 | 15.5% |

**Macro Assumptions**

| | 2006 | 2007 | 2008 |
|---|---|---|---|
| US LV Sales | 16,500 | 16,400 | 16,700 |
| NA LV Build | 15,200 | 15,600 | 16,500 |
| Dom. OEM Build | 9,500 | 9,400 | 9,204 |
| EU LV Build | 16,500 | 16,500 | 16,500 |
| Euro | $1.30 | $1.30 | $1.30 |

**End Market Mix**

| Automotive | 70% |
|---|---|
| Consumer | 14% |
| Professional | 16% |
| Total | 100% |

**New Business Growth\***

| Fiscal | Rev. | Change |
|---|---|---|
| 2004 | 400,000 | 29% |
| 2005 | 300,000 | 16% |
| 2006 | 300,000 | 16% |
| 2007 | 400,000 | 13% |
| 2008 | 600,000 | 24% |
| 2009 | 800,000 | 20% |
| 2007-09 | | 19% |

\* Revenue with flat NA build (ex-price of -2%)

© 2007 | Please refer to Appendix – Important Disclosures and Analyst Certification.

Printed on 3/18/2007 9:11 PM

HAR_Model.xls Page 7 - Revenue

# BAIRD  777 EAST WISCONSIN AVENUE  MILWAUKEE, WI 53202

David Leiker, CFA • (414) 298-7535 • dleiker@rwbaird.com
Keith R. Schicker • (414) 298-7351 • kschicker@rwbaird.com
David Tsui • (414) 298-7699 • dtsui@rwbaird.com

March 19, 2007

**Harman International Industries Inc. (HAR • $97.31)**

ROIC and Working Capital Management

(in $ Thousands)

Columns under **Return on Invested Capital (LTM Average)**: Working Capital $, Working Capital T/O, Fixed Assets $, Fixed Assets T/O, Other Assets $, Other Assets T/O, Total Capital $, Total Capital T/O. Columns under **Days Investment (LTM Average)**: A/R, Inv., Total, A/P, Net.

| Year | Revenue $ | Op Income $ | Op Margin % | Tax Rate % | WC $ | WC T/O | Fixed Assets $ | FA T/O | Other Assets $ | OA T/O | Total Capital $ | TC T/O | ROIC Pre-Tax | ROIC After-Tax | Working Cap $ | Working Cap Chg | A/R | Inv. | Total | A/P | Net | Net Inv* $ | Net Inv Chg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun-96 | 1,361,595 | 105,378 | 7.7% | 31.7% | 374,242 | 3.6 | 195,699 | 7.0 | 146,089 | 9.3 | 716,030 | 1.9 | 14.7% | 10.1% | 409,798 | - | 80 | 83 | 162 | 29 | 133 | 496,596 | |
| Jun-97 | 1,474,094 | 101,973 | 6.9% | 29.5% | 462,027 | 3.2 | 205,216 | 7.2 | 136,326 | 10.8 | 803,568 | 1.8 | 12.7% | 8.9% | 463,578 | 13.1% | 76 | 79 | 155 | 26 | 129 | 522,211 | 5.2% |
| Jun-98 | 1,513,255 | 100,325 | 6.6% | 28.9% | 476,880 | 3.2 | 237,532 | 6.4 | 182,576 | 8.3 | 896,988 | 1.7 | 11.2% | 8.0% | 425,742 | -8.2% | 72 | 74 | 146 | 27 | 119 | 493,703 | -5.5% |
| Jun-99 | 1,500,135 | 105,027 | 7.0% | 28.7% | 466,083 | 3.2 | 246,004 | 6.1 | 185,804 | 8.1 | 897,891 | 1.7 | 11.7% | 8.3% | 387,986 | -8.9% | 74 | 68 | 142 | 29 | 113 | 463,370 | -6.1% |
| Jun-00 | 1,677,939 | 121,722 | 7.3% | 29.1% | 377,772 | 4.4 | 241,087 | 7.0 | 198,542 | 8.5 | 817,400 | 2.1 | 14.9% | 10.6% | 327,786 | -15.5% | 67 | 65 | 132 | 35 | 96 | 443,536 | -4.3% |
| Jun-01 | 1,716,547 | 107,528 | 6.3% | 28.8% | 408,006 | 4.2 | 256,385 | 6.7 | 196,245 | 8.7 | 860,635 | 2.0 | 12.5% | 8.9% | 380,906 | 16.2% | 67 | 68 | 135 | 32 | 102 | 481,839 | 8.6% |
| Jun-02 | 1,826,188 | 111,521 | 6.1% | 28.3% | 386,602 | 4.7 | 291,256 | 6.3 | 224,553 | 8.1 | 902,410 | 2.0 | 12.4% | 8.9% | 331,294 | -13.0% | 67 | 66 | 133 | 39 | 94 | 471,844 | -2.1% |
| Jun-03 | 2,228,519 | 166,894 | 7.5% | 26.0% | 361,088 | 6.2 | 363,492 | 6.1 | 316,157 | 7.0 | 1,040,737 | 2.1 | 16.0% | 11.9% | 337,612 | 1.9% | 59 | 57 | 117 | 29 | 88 | 535,901 | 13.6% |
| Jun-04 | 2,711,374 | 254,465 | 9.4% | 30.6% | 253,010 | 10.7 | 429,358 | 6.3 | 369,977 | 7.3 | 1,052,345 | 2.6 | 24.2% | 16.8% | 171,282 | -49.3% | 57 | 39 | 97 | 32 | 65 | 479,258 | -10.6% |
| Q1 | 2,805,786 | 263,109 | 10.1% | 32.6% | 223,414 | 12.6 | 439,674 | 6.4 | 362,325 | 7.7 | 1,025,412 | 2.7 | 27.6% | 18.6% | 203,513 | -36.8% | 56 | 42 | 97 | 25 | 73 | 557,866 | -0.3% |
| Q2 | 2,902,619 | 316,587 | 10.9% | 32.7% | 202,452 | 14.3 | 453,193 | 6.4 | 394,100 | 7.4 | 1,049,745 | 2.8 | 30.2% | 20.3% | 198,244 | -29.7% | 51 | 41 | 92 | 21 | 70 | 558,579 | 0.9% |
| Q3 | 2,954,751 | 337,362 | 11.4% | 31.3% | 199,817 | 14.8 | 464,380 | 6.4 | 423,267 | 7.0 | 1,087,464 | 2.7 | 31.0% | 21.3% | 226,230 | -4.5% | 53 | 42 | 95 | 25 | 71 | 572,237 | 7.0% |
| Q4 | 3,030,746 | 350,838 | 11.6% | 30.6% | 198,531 | 15.3 | 478,762 | 6.3 | 463,669 | 6.5 | 1,140,961 | 2.7 | 30.7% | 21.3% | 166,135 | -3.0% | 52 | 38 | 90 | 33 | 57 | 471,846 | -1.5% |
| Jun-05 | 3,030,746 | 350,838 | 11.6% | 30.6% | 198,531 | 15.3 | 478,762 | 6.3 | 463,669 | 6.5 | 1,140,961 | 2.7 | 30.7% | 21.3% | 166,135 | -3.0% | 52 | 38 | 90 | 33 | 57 | 471,846 | -1.5% |
| Q1 | 3,093,688 | 367,106 | 11.9% | 28.5% | 205,643 | 15.0 | 486,500 | 6.4 | 505,116 | 6.1 | 1,197,259 | 2.6 | 30.7% | 21.9% | 231,962 | 14.0% | 51 | 39 | 90 | 26 | 63 | 538,175 | -3.5% |
| Q2 | 3,137,869 | 383,597 | 12.2% | 29.4% | 195,089 | 16.1 | 481,034 | 6.2 | 507,142 | 6.5 | 1,183,265 | 2.7 | 32.4% | 22.9% | 156,029 | -21.3% | 49 | 37 | 86 | 25 | 61 | 521,663 | -6.6% |
| Q3 | 3,196,812 | 393,630 | 12.3% | 31.1% | 181,830 | 17.6 | 481,731 | 6.6 | 524,192 | 6.1 | 1,187,752 | 2.7 | 33.1% | 22.8% | 173,192 | -23.4% | 50 | 39 | 89 | 28 | 61 | 534,476 | -6.6% |
| Q4 | 3,247,897 | 397,241 | 12.2% | 32.4% | 166,967 | 19.5 | 489,310 | 6.6 | 541,961 | 6.0 | 1,198,238 | 2.7 | 33.2% | 22.4% | 106,686 | -35.8% | 50 | 39 | 89 | 36 | 53 | 469,104 | -0.6% |
| Jun-06 | 3,247,897 | 397,241 | 12.2% | 32.4% | 166,967 | 19.5 | 489,310 | 6.6 | 541,961 | 6.0 | 1,198,238 | 2.7 | 33.2% | 22.4% | 106,686 | -35.8% | 50 | 39 | 89 | 36 | 53 | 469,104 | -0.6% |
| Q1 | 3,417,792 | 405,966 | 12.2% | 33.7% | 170,467 | 19.5 | 494,139 | 6.7 | 559,003 | 5.9 | 1,223,608 | 2.7 | 33.2% | 22.0% | 245,961 | 6.0% | 51 | 42 | 92 | 28 | 65 | 589,933 | 9.6% |
| Q2 | 3,417,864 | 405,826 | 11.9% | 32.2% | 170,467 | 17.1 | 503,704 | 6.8 | 578,195 | 5.9 | 1,281,795 | 2.7 | 31.7% | 21.5% | 273,743 | 75.4% | 51 | 49 | 100 | 31 | 68 | 641,413 | 23.0% |
| Q3E | 3,508,344 | 431,516 | 11.8% | 32.2% | | | | | | | | | | | | | | | | | | | |
| Q4E | 3,610,617 | 431,683 | 12.0% | 32.5% | 210,858 | 17.1 | 537,984 | 6.7 | 584,517 | 6.2 | 1,333,359 | 2.7 | 32.4% | 21.9% | 161,863 | 51.7% | 50 | 39 | 89 | 36 | 53 | 524,281 | 11.8% |
| Jun-07E | 3,610,617 | 431,683 | 12.0% | 32.5% | 210,858 | 17.1 | 537,984 | 6.7 | 584,517 | 6.2 | 1,333,359 | 2.7 | 32.4% | 21.9% | 161,863 | 51.7% | 50 | 39 | 89 | 36 | 53 | 524,281 | 11.8% |
| Q1E | 3,790,482 | 457,736 | 12.1% | 33.0% | | | | | | | | | | | | | | | | | | | |
| Q2E | 3,959,801 | 479,688 | 12.1% | 32.7% | | | | | | | | | | | | | | | | | | | |
| Q3E | 4,136,866 | 502,219 | 12.1% | 32.5% | | | | | | | | | | | | | | | | | | | |
| Q4E | 4,319,630 | 525,966 | 12.2% | 32.5% | | | | | | | | | | | | | | | | | | | |
| Jun-08E | 4,319,630 | 525,966 | 12.2% | 32.5% | 264,816 | 16.3 | 631,935 | 6.8 | 583,369 | 7.4 | 1,480,120 | 2.9 | 35.5% | 24.0% | 264,816 | 63.6% | 50 | 39 | 89 | 36 | 53 | 627,234 | 19.6% |
| Jun-09E | 5,192,399 | 637,930 | 12.3% | 32.5% | 328,181 | 15.8 | 668,185 | 7.8 | 583,369 | 8.9 | 1,579,735 | 3.3 | 40.4% | 27.3% | 391,547 | 47.9% | 50 | 39 | 89 | 36 | 53 | 753,965 | 20.2% |
| Jun-10E | 5,996,543 | 739,044 | 12.3% | 32.5% | 449,923 | 13.3 | 745,685 | 10.3 | 583,369 | 10.3 | 1,778,977 | 3.4 | 41.5% | 28.0% | 508,300 | 29.8% | 50 | 39 | 89 | 36 | 53 | 870,718 | 15.5% |

ROIC = After-tax Operating Income / (Working Capital + Fixed Assets + Other Assets)

* Quarter End AR/Inv/AP / LTM Revenue

© 2007 | Please refer to Appendix - Important Disclosures and Analyst Certification.

Printed on 3/18/2007 9:11 PM

HAR_Model.xls Page 8 - ROIC

BAIRD  777 EAST WISCONSIN AVENUE  MILWAUKEE, WI 53202

David Leiker, CFA ♦ (414) 298-7535 ♦ dleiker@rwbaird.com
Keith R. Schicker ♦ (414) 298-7351 ♦ kschicker@rwbaird.com
David Tsui ♦ (414) 298-7699 ♦ dtsui@rwbaird.com

Harman International Industries Inc. (HAR ♦ $97.31)

March 19, 2007
*Performance Charts*



Historic Earnings Curve



Return on Invested Capital

Working Capital Management



LTM Revenue & Earnings

© 2007 | Please refer to Appendix - Important Disclosures and Analyst Certification.

Printed on: 3/18/2007 9:11 PM

16

HAR_Model.xls Page 9 - Charts

**Harman International Industries, Inc.**
March 19, 2007

# Appendix - Important Disclosures and Analyst Certification



Robert W. Baird & Co. and/or its affiliates expect to receive or intend to seek investment banking related compensation from the company or companies mentioned in this report within the next three months.

**Investment Ratings: Outperform (O)** - Expected to outperform on a total return, risk-adjusted basis the broader U.S. equity market over the next 12 months. **Neutral (N)** - Expected to perform in line with the broader U.S. equity market over the next 12 months. **Underperform (U)** - Expected to underperform on a total return, risk-adjusted basis the broader U.S. equity market over the next 12 months.

**Risk Ratings: L - Lower Risk** - Higher-quality companies for investors seeking capital appreciation or income with an emphasis on safety. Company characteristics may include: stable earnings, conservative balance sheets, and an established history of revenue and earnings. A - **Average Risk** - Growth situations for investors seeking capital appreciation with an emphasis on safety. Company characteristics may include: moderate volatility, modest balance-sheet leverage, and stable patterns of revenue and earnings. **H - Higher Risk** - Higher-growth situations appropriate for investors seeking capital appreciation with the acceptance of risk. Company characteristics may include: higher balance-sheet leverage, dynamic business environments, and higher levels of earnings and price volatility. **S - Speculative Risk** - High-growth situations appropriate only for investors willing to accept a high degree of volatility and risk. Company characteristics may include: unpredictable earnings, small capitalization, aggressive growth strategies, rapidly changing market dynamics, high leverage, extreme price volatility and unknown competitive challenges.

**Valuation, Ratings and Risks:** The recommendation and price target contained within this report are based on a time horizon of 12 months but there is no guarantee the objective will be achieved within the specified time horizon. Price targets are determined by a subjective review of fundamental and/or quantitative factors of the issuer, its industry, and the security type. A variety of methods may be used to determine the value of a security including, but not limited to, discounted cash flow, earnings multiples, peer group comparisons, and sum of the parts. Overall market risk, interest rate risk, and general economic risks impact all securities. Specific information regarding the price target and recommendation is provided in the text of our most recent research report.

**Distribution of Investment Ratings:** As of February 28, 2007, Baird U.S. Equity Research covered 500 companies, with 43% rated Outperform, 54% rated Neutral and 3% rated Underperform. Within these rating categories, 15% of Outperform-rated, 6% of Neutral-rated companies and 21% of Underperform-rated companies have compensated Baird for investment banking services in the past 12 months and/or Baird managed or

Robert W. Baird & Co.                                                                                                    17

**Harman International Industries, Inc.**
March 19, 2007

co-managed a public offering of securities for these companies in the past 12 month.

**Analyst Compensation:** Analyst compensation is based on: 1) The correlation between the analyst's recommendations and stock price performance; 2) Ratings and direct feedback from our investing clients, our sales force and from independent rating services; and 3) The analyst's productivity, including the quality of the analyst's research and the analyst's contribution to the growth and development of our overall research effort. This compensation criteria and actual compensation is reviewed and approved on an annual basis by Baird's Research Oversight Committee.

Analyst compensation is derived from all revenue sources of the firm, including revenues from investment banking. Baird does not compensate research analysts based on specific investment banking transactions.

A complete listing of all companies covered by Baird U.S. Equity Research and applicable research disclosures can be accessed at http://www.rwbaird.com/researchdisclosure/. You can also call 1-800-792-2473 or write: Robert W. Baird & Co., Equity Research, 24th Floor, 777 E. Wisconsin Avenue, Milwaukee, WI 53202.

## Analyst Certification

The senior research analyst(s) certifies that the views expressed in this research report and/or financial model accurately reflect such senior analyst's personal views about the subject securities or issuers and that no part of his or her compensation was, is, or will be directly or indirectly related to the specific recommendations or views contained in the research report.

## Disclaimers

**Baird prohibits analysts from owning stock in companies they cover.**

This is not a complete analysis of every material fact regarding any company, industry or security. The opinions expressed here reflect our judgment at this date and are subject to change. The information has been obtained from sources we consider to be reliable, but we cannot guarantee the accuracy.

**ADDITIONAL INFORMATION ON COMPANIES MENTIONED HEREIN IS AVAILABLE UPON REQUEST**

The Dow Jones Industrial Average, S&P 500, S&P 400 and Russell 2000 are unmanaged common stock indices used to measure and report performance of various sectors of the stock market; direct investment in indices is not available.

Baird is exempt from the requirement to hold an Australian financial services license. Baird is regulated by the United States Securities and Exchange Commission, NASD, NYSE, and various other self-regulatory organizations and those laws and regulations may differ from Australian laws. This report has been prepared in accordance with the laws and regulations governing United States broker-dealers and not Australian laws.

**Copyright 2007 Robert W. Baird & Co. Incorporated**

## Other Disclosures

**UK disclosure requirements for the purpose of distributing this research into the UK and other countries for which Robert W Baird Limited holds an ISD passport.**

This report is for distribution into the United Kingdom only to persons who fall within Article 19 or Article 49(2) of the Financial Services and Markets Act 2000 (financial promotion) order 2001 being persons who are investment professionals and may not be distributed to private clients. Issued in the United Kingdom by Robert W Baird Limited, which has offices at Mint House 77 Mansell Street, London, E1 8AF, and is a company authorized and

**Harman International Industries, Inc.**
March 19, 2007

regulated by the Financial Services Authority. For the purposes of the Financial Services Authority requirements, this investment research report is classified as objective.

Robert W Baird Limited ("RWBL") is exempt from the requirement to hold an Australian financial services license. RWBL is regulated by the Financial Services Authority ("FSA") under UK laws and those laws may differ from Australian laws. This document has been prepared in accordance with FSA requirements and not Australian laws.

Ask the analyst a question                              Click here to unsubscribe

## HARMAN INTERNATIONAL INDUSTRIES

**April 26, 2007**
**9:30 a.m. EDT**

| | |
|---|---|
| Moderator | Ladies and gentlemen, thank you for standing by.  Good morning, and welcome to the Harman International Industries Third Quarter Fiscal 2007 Earnings Release conference call.  Now, at this point, all your phones lines are muted or in a listen-only mode.  However, later during the conference, there will be opportunities for questions.  As a reminder, today's conference is being recorded.

Ladies and gentlemen, if I may have your attention, certain statements by the company during this call are forward-looking statements.  These statements include the company's beliefs and expectations as to future events and trends affecting the company's business and are subject to risks and uncertainties.  Persons participating on the call today are advised to review the reports filed by Harman International with the Securities and Exchange Commission regarding these risks and uncertainties.

With that being said, here with our opening remarks is Harman International Industries' Executive Chairman and Chief Executive Officer, Dr. Sidney Harman.  Please go ahead, Dr. Harman. |
| S. Harman | Good morning.  Joining me in Washington, D.C., are Kevin Brown, our CFO, and Rob Ryan, our principal officer for Investor Relations. We report today on our third quarter results, and we will provide perspective on the balance of the year and the year ahead.

First to comment on the agreement we announced this morning, which merges Harman International into a new company to be |

financed by Kohlberg Kravis Roberts (KKR) and Goldman Sachs. The new company will carry the Harman International name. I will be its executive chairman and a substantial investor.

We think very well of the deal. It has been structured to provide shareholders with a substantial premium for their shares and, if they elect to do so, to retain a substantial portion of their investment in the company going forward. The deal rewards our loyal shareholders, a substantial number of whom have been … for many years, and it recognizes the dedication, hard work and commitment of our people.

Until we have moved the transaction through the SEC and other legal processes, we are constrained in what we can say. However, a few highlights may be helpful. The company formed by KKR and Goldman will pay $120 cash for each Harman share in the merger transaction. Shareholders will have the right to elect to retain a portion of their Harman stock up to a maximum of 8.3 million shares in total. If shareholders elect to keep more than 8.3 million shares, the elections will be prorated. If shareholders elect fewer than 8.3 million shares, the remaining shares will be available to those shareholders who wish to pick up the unsubscribed shares in proportion to their original elections.

The agreement includes a go-shop provision under which the company is free for 50 days to consider without significant restriction any alternative bids. If a topping bid were received and successful during the 50-day period, the company would pay the KKR/Goldman group a $75 million break-up fee. After the 50-day period, a typical so-called no-shop structure and break-up fee would apply. We expect to file a copy of the agreement on a Form 8-K later today.

The KKR/Goldman Sachs group has asked me to continue as chairman of the board, and I am happy to do so.  I have, as I have indicated, also committed to continue my proportionate ownership of Harman stock.  If another bidder materializes, we will provide the opportunity to make an alternative proposal in accordance with the merger agreement.  In the meantime, I assure you that management is committed to the continued growth and development of the company.

We had a good third quarter.  Consolidated sales totaled $882,771,000, a 10% increase above the third quarter last year.  Earnings per share were $1.07 compared to $0.94 last year.  We enter the final quarter of the year with $3.14 EPS through the first nine months.  To reach our target of $4.35, we will need a strong fourth quarter, producing EPS of $1.21.

At our mid-year earnings call, I stated we hoped to achieve that target, despite the expectation that R&D costs would exceed plan by $30 million.  Our analysis in R&D continues unchanged, but I am less certain that we will be able to absorb it all.  It is too early to know with certainty, but I estimate that we should be able to absorb 60% or $0.18 of the $0.30.

We begin the fourth quarter of the year and we look to fiscal '08 with a backlog of $14 billion.  We continue to expect fiscal '08 automotive OEM revenues at $2.8 billion and EPS of $5.25, subject to the probability that we will not be able to absorb the $46 million engineering bulge I identified in our previous earnings call.  Let me remind that the bulge is driven by work on $1.1 billion of new business unanticipated when we first planned fiscal '08 and by continuing new work on Driver Assist.  If we are unable to absorb the $46 million R&D bulge, the projected fiscal '08 EPS would become $4.79.

We have not received a major new award since our last earnings call, but there is a flow of good awards that add extra fiber to the backlog.  Land Rover has committed its branded audio business to Harman Kardon for the period of fiscal 2011 through 2015.  The estimated annual revenue is $50 million with total value of $250 million.  This is business that we had coveted, but now has been formally awarded.

Let me offer a perspective going forward.  Ours is a very healthy business, and we have a special place in both the automotive OEM and the professional sides of our work, but we have no conceit that this is a walk in the park.  There are challenges, as there are opportunities, throughout the markets and throughout the technologies with which we work.  Those opportunities include geographic expansion in Asia, and especially in China.  They include a further expansion of infotainment through mid-range and entry-level automobiles, and they include the promising and challenging new arena of Driver Assist.  We are hard at work in all three areas.  We have made consequential progress in scaling our systems through the mid-range and entry level, and we are confident that our competitive and comparative advantage on the infotainment side will serve us very well on the Driver Assist side.

A year ago in our earnings call, I said, "Within one year, we expect to unveil the most advanced multimedia system architecture for OEM and consumer applications this industry has seen.  It will provide simultaneous and seamless transport of audio from hard disks, CDs and USB memory sticks from any computer to any other computer.  It will accommodate several iPods, each playing music and displaying its playlist in less than one second.  Similarly, the system will stream three DVDs across the network in real time."

I said then that we had conducted a series of exclusive presentations and focus groups to review and evaluate the new developments, and the unfailing reaction had been, "That knocked our socks off." Today, a year later, it is fair to say that the connectivity and graphic advances implicit in that expression have been realized. The modules of multi-system architecture are incorporated in the L-6 platform to be used throughout the BMW line, and they are used throughout the Audi line. Our media software pack has been developed at QNX, and we plan to offer the modules to our competitors.

I have reviewed the opportunities in Driver Assist in earlier calls. We believe, if we get our job done, that by the year 2014 or 2015, it can represent as much as a 50% enhancement of our revenues in OEM. We have a solid fix on what that means, and we believe that our experience in debugging and integrating will prove again a unique advantage in the Driver Assist world.

It is interesting to note that in the time since our most recent earnings calls, Siemens Video appears to have determined to leave the business, and TomTom appears to have decided to seek a place in it. That shifting, if it comes about, would come as no surprise to us and should come as no surprise to anyone. Even as we are learning the challenges of the PND business, anyone entering our automotive OEM world will have much to learn. We know that it is not a world that everyone will simply leave to us. We know that we have to continue to build on what is becoming our legacy and that we can take nothing for granted.

As I look forward to our future in OEM, I see an interesting assembly of opportunity and challenge. I've already spoken about market opportunity. Here I recognize and emphasize that recognition that our growth has been accompanied by variances in

efficiency.  We are determined to rationalize our engineering and to reduce significantly the percentage of sales that R&D represents.  I have spoken about this before.  I mention it now not because I have some major new insight, but precisely to emphasize the fact that it is before us that we have our work cut out, but we intend to get it done.

Our professional business continues to develop very well.  We have a deep bench and an appetite to match it.  Our technology competence is growing, and we are translating that competence into products and services people want to buy.  We have turned around the two laggards in our portfolio, and I look to continuing growth, especially as we move forward on the video side of the professional world.

Video presentation is, in my view, the next major pro opportunity.  The video signal chain has fundamentally four parts.  One is control; two is content service; three, the backbone or hardware; and, four, the projectors.  That video chain includes digital video conversion, storage and play-out technology for digital cinema; and digital cinema, after many delays, is now beginning to develop.

Christie/AIX and Technicolor are now funded to service over 7,000 screens through 2008.  The movie studios are providing the funding on a basic print fee model, and that domain presents itself as opportunity.  Even as it is implicitly good for our pro audio, it provides opportunity for an expanded engagement in pro video.  In essence, the opportunity is for us to integrate audio and video so that it will be possible to monitor and control both from a single remote location.

We continue to support our consumer business.  We have all the good traditional reasons to do so, the value of our brands as they

facilitate our work in the OEM field, for example, but there are other reasons. Foremost perhaps is our conviction that there is so much potential value in our R&D work that can and should be translated into leading-edge consumer products. There is so much in both the supply chain and the manufacturing programs that encourage us to look for genuine synergies and savings. We know that the production of attractive margins in this arena is challenging, and we are determined to win that struggle.

I had indicated in earlier conference calls that the PND environment in Europe was not as margin challenged as it is in the United States, but that we could surely anticipate it. There was reasonable foresight in that observation. In the recent quarter, the European PND market has become extremely competitive. We are working extraordinarily hard to increase sales and to maintain adequate margins in that environment.

In our earnings call three months ago, it was noted that Harman Becker PND inventories in Europe had grown substantially. We said then that the inventory had been developed to support a vigorous sales effort and that we plan to reduce it to normal levels at year-end. The plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding. Where March 31 inventory was $75 million, we expect April 30 inventory to be approximately $50 million, May 31 inventory to be approximately $30 million, and June 30 inventory to be approximately $15 million; that a very normal level.

Overall, the European market for our high-fidelity and multimedia products is a very bright spot in our consumer business. Our position everywhere is strengthening, and I remain optimistic about our future.

Finally, I can report that we have reached a decision on the new CEO.  We are now in that unavoidably complicated process of negotiating terms of employment.  We will identify the person and indicate the date of his arrival just as quickly as we bring the negotiations to a conclusion.  Now here is Kevin.

K. Brown          Thank you, Sidney.  Net sales for the third quarter were $882.8 million, an increase of $81.3 million, or 10% compared to the same quarter of last year.  Gross profit margin was 34.6%.  Operating income was $102.3 million.  Earnings per share were $1.07, compared to $0.94 in the prior year, an increase of 14%.

Net sales for the first nine months were $2.64 billion, an increase of 11%, compared to $2.39 billion in the prior nine-month period.  Gross profit margin was 34.6%.  Operating income was $305 million.  Earnings per share were $3.14 for the nine months, compared to $2.80 last year, an increase of 12%.

Foreign currency translation had a favorable effect on our third quarter results compared to the prior year.  This was due to the strengthening of the euro versus the U.S. dollar.  The euro averaged $1.31 during the quarter compared to $1.20 during the same period last year.  This contributed approximately $45 million to third quarter sales and improved EPS by $0.08 per share.

Automotive sales were $624.9 million, an increase of $57.5 million, or 10% compared to the third quarter of last year.  Foreign currency translation is primarily incurred in the automotive operations and improved automotive sales by $39 million compared to the prior year.  Automotive operating income was 14.7% of sales.  Automotive operating income margins are impacted by the increased R&D expenses Sidney spoke of.

Total Harman International R&D expenses in the third quarter were $90 million, or 10.2% of sales compared to $74 million, or 9.2% of sales in the same quarter of the prior year. As Sidney discussed, R&D is trending higher than we had anticipated as we work to develop new technologies and new programs. We expect fiscal 2007 R&D expenses to approximate 10% of full-year sales. In fiscal 2008, we anticipate R&D will begin to decrease as a percentage of sales.

The increase in R&D explains $16 million of the $20 million increase in SG&A in the third quarter compared to the prior year. Despite the increase in R&D, total SG&A as a percent of sales remained relatively flat at 23% of sales in the quarter.

Consumer sales were $118 million in the quarter, $11.2 million, or 10.4% ahead of the third quarter last year. Consumer operating profit was 1.5% of sales. Operating margins were lower than the prior-year quarter, primarily due to increased competition in the multimedia segment.

Professional sales of $140 million were $12.6 million, or 9.9% better than the third quarter of last year. Professional operating income was 13.5% of sales, 290 basis points above the year-ago period. Professional benefited from higher sales of products utilizing the HiQnet protocol from the well-received introduction of the JBL Pro and Crown line of powered speakers and from recently introduced digital consoles from Soundcraft and Studer.

The tax rate for the quarter was 30.5% compared to the 33.3% for the third quarter of last year. The tax rate for the prior-year third quarter included a $1.7 million charge for the repatriation of cash from the company's foreign subsidiaries under the American Job Creation Act of 2004.

Inventories were $480 million at March 31st, an increase of $142 million compared to the prior year.  As in the second quarter, inventory increases are primarily at automotive to support the growing PND business.  Higher sales and new product launches at consumer and pro, as well as currency translation, also impacted inventories.

Accounts payable at March 31st were $270 million and accounts receivable were $530 million.  Capital expenditures during the third quarter were $45 million, while depreciation and amortization was $32 million.  Cash at March 31st was $97 million and total debt was $160 million.

The company repurchased 586,800 shares during the third quarter for $56 million.  We have spent $129 million for 1.5 million shares during the nine-month period.  Due to the merger agreement, we will suspend our share repurchase program.  The company has expensed employee stock options since fiscal year 2003.  We expensed $3.6 million for stock options during the third quarter, equivalent to $0.04 per share.

In our January 25, 2007, earnings call, we indicated that we were considering actions centered on rationalizing both engineering and manufacturing, and we expected those actions would results in a restructuring charge in the fourth quarter of fiscal '07 in the range of $0.10 to $0.15 per share.  That expectation has not changed.  We will now take your questions.

Moderator          Our first question comes from the line of Jeff Kessler with Lehman Brothers.  Please go ahead.

| J. Kessler | Sure.  The first comment is, Sidney, congratulations.  It's been a long time, and hopefully we can continue to contact each other. |
|---|---|
| S. Harman | Thank you, Jeff. |
| J. Kessler | A lot of years. |
| S. Harman | Yes, indeed. |
| J. Kessler | I guess the question that we have is around continuing to match R&D to the revenue structure as you see it, given that you have programs in place that are obviously important and obviously have a lot of potential, but getting your hands around the expense levels relative to new programs.  You've mentioned one or two that are in line to produce over the next several years.  Is there anything that we should be aware of which is maybe going to change that R&D to revenue percentage, let's say 18 months out or so? |
| S. Harman | Are you asking whether the percentage of revenue represented by R&D will increase or decrease? |
| J. Kessler | Yes.  I'm asking again, how are you going to get that decreased?  In other words, where is the return on that R&D going to come from? |
| S. Harman | I've got it.  In two ways, really.  Understand first that the increase is, from our point of view, a very constructive thing.  The so-called bulge was generated by the receipt of awards that we did not contemplate when we were generating the plan and generating our guidance.  The engineering represented in that bulge is essentially for the new BMW award and the development of Driver Assist, which we believe has very positive implications down the road. I |

have not yet answered your question, but I thought it useful to set that base.

Now we believe, and I have made this clear numbers of times, we believe that, in the growth of the company and in the urgency of getting the job done in what was a substantially new world of technology, the primary objective was just that: get it done and, in effect, damn the cost.  We are still in that surge mood.  I should be careful about the use of that word, I suppose.  But I am convinced; Kevin is convinced; our board is convinced that over time, and reasonable time, we can rationalize that engineering so that, as a percentage of sales—and remind you, sales will be going up—so that if the engineering expense stayed fixed, the percentage would decline.  It moves us constructively in that direction, but we believe that we can rationalize, generate efficiencies, such as to permit us to improve that percentage by approximately 100 basis points a year over the next several years.

J. Kessler     All right.  One other question, and that is the changing landscape of your competition.  Given the potential dropout of what was assumed to be your major competitor and the emergence obviously of a smaller competitor who clearly people thought was waiting in the wings for a while, do you believe this gives you a window of opportunity to essentially solidify what's already an obviously large position in the industry?  Can you take advantage of this to solidify that position further?

S. Harman     In fairness, Jeff, we've been taking advantage of the very material that might have driven that decision if, in fact, it is a decision by Siemens.  We've been taking advantage of it in the sense that that was a good competitive landscape for us.

You know us and you've known me long enough to know that I come at this stuff with that traditional paranoia that says, "I look behind every tree." There is no guarantee where new vigorous competition may or may not arise, but my judgment today is that our role in that firmament remains unique. We are the strongest player in that space, and our job is to stay there.

J. Kessler    Okay. Final question, and that is your margins in consumer have obviously bounced around anywhere from 1% to 14% over the last couple of years, depending on product introductions and the competition out there. We've asked in the past, is there some type of middle point that you can foresee these margins coalescing around realizing that we're never going to get a consistent 5% margin or 6% margin every quarter. Has your position changed on where consumer margins should be able to let's just say get a median line through over the next couple of years instead of us trying to guess that it's going to be 10% one quarter or 2% the next quarter, because obviously modeling this division has been very hard?

S. Harman    Fair question, and my position has not changed. I think that 6% to 7% is the reasonable and realizable consistent target.

J. Kessler    Okay. Sidney, once again, congratulations, and please my regards to everybody who I've known at the company for all these years.

S. Harman    Jeff, thank you very much. I remember that you were there very, very early, no forgetting that, buddy.

J. Kessler    Okay, thanks. Take it easy, Sidney.

S. Harman    Good-bye.

| | |
|---|---|
| Moderator | Thank you.  Next we'll go to the line of Ronald Tadross with Bank of America Securities.  Please go ahead. |
| N. Faron | Hello.  This is General Nathan Faron.  How did the transaction come about, and are there any interested parties as of now? |
| S. Harman | I'm sorry.  I have to ask you to repeat the question.  I had difficulty hearing. |
| N. Faron | I'm sorry.  Regarding the KKR/Goldman transaction, I was wondering, how did this come about?  Can you tell us that, and are there any other interested parties at present? |
| S. Harman | It came about, because they contacted us; and I cannot answer the second part of your question, because I do not know. |
| N. Faron | Okay.  Just one more question, on the European PND, you said that because of higher competition, you're seeing pricing pressure, or is it because the growth is slowing and there are more people vying for the same ... |
| S. Harman | No, I think it's the former. |
| N. Faron | It's a small competition? |
| S. Harman | Yes. |
| N. Faron | Okay.  Thank you. |
| S. Harman | You're welcome. |
| Moderator | Thank you.  We'll go to the line of Jon Rogers with Citigroup.  Please go ahead. |

J. Rogers

Good morning.  I'm just wondering, it looks to me, according to our analysis, that this bid is a little light.  Congratulations nonetheless, but is there something, Dr. Harman, as you're sort of at the base of your growth curve; is there something that these partners give you that you couldn't have gotten from the public market?

S. Harman

Jon, it's a fair question, and I answer that in personal terms as well as generally.  I think there is a very great deal.  This particular organization carries with it, in my judgment, numbers of elements that I think of as gravitas.  They are superbly funded.  Lots of other organizations could make the same claim, but I think very, very well of the personnel in this organization.  I think very well of their business acuteness.  I think very well of the network that becomes available to us that is the consequence of their history and their competence.  I must say that I think very well of the fact that Henry Kravis in particular will be a member of this board and actively engaged.

Now, beyond that somewhat personal comment, I'm a vigorous guy.  I think you'd agree that I'm a vigorous guy, but you would damn well agree I'm a vigorous guy for a man three months removed from his 89th birthday.  I have said that we have identified our CEO and we are in the process of negotiating the terms of his arrangements.  There is neither certainty that that will get done, and all experience makes it clear that one cannot be absolutely certain that the consequence of that is going to be an easy path.

As I consider all of that, I consider it an obligation to find, if it is available in really solid terms, what I would think of as a safe, supportive harbor for the company and for its employees and for its customers and its suppliers.  I think I have indicated to you in the

early part of my answer that that is the reason I respond well to this particular firm.

| J. Rogers | Okay. Thank you very much. Congratulations again. |

| S. Harman | Thank you, Jon, and it's been good working with you. |

| J. Rogers | Absolutely. |

| Moderator | Thank you. We do have a question from the line of Peter Friedland with Soleil. Please go ahead. |

| P. Friedland | Any feedback on initial adoption for the MiGig system at Chrysler? |

| S. Harman | Not in the detail that you might like, Peter, but I think that Kevin may have some data that would be useful here. Do you? |

| K. Brown | Yes. Peter, as you know, it's just rolling out in this quarter. Total sales from us to Chrysler were in the range of $4 million. We won't see meaningful volume until the 2008 models start to ramp up in the coming quarter and into the first quarter of fiscal '08, so we just really started is the answer. |

| P. Friedland | Okay. Then as far as Becker PND units, you said you're still on track for 618,000 units for fiscal '07. Where are we year to date? Then the second question, on the Harman Kardon PND, what are the units there? |

| S. Harman | Kevin is checking his records. Let me just tell you that the Harman Kardon PNDs are just too early to even begin to read retail sales. They are moving into retail channels. Ask us in the next quarter. Do you have information? |

| K. Brown | Yes.  The Harman Kardon PND unit sales for the quarter were about 84,000 units; for the nine months, they're over 300,000 units. |
| --- | --- |
| S. Harman | You said, "Harmon Kardon." |
| K. Brown | The Becker, I'm sorry.  Did I say Harman Kardon? |
| S. Harman | Correct it, please. |
| K. Brown | The Becker -- the European PND unit sales. |
| P. Friedland | Okay.  So 300,000, and you still think you can do over 600,000 for the fiscal year? |
| S. Harman | We do, and we said so. |
| P. Friedland | Okay, great.  Thank you. |
| S. Harman | Thank you. |
| Moderator | Thank you.  We'll go to the line of Peter Cyrus with Gorilla Capital.  Please go ahead. |
| P. Cyrus | Hi, Sidney. |
| S. Harman | Hello, Peter. |
| P. Cyrus | I just realized this is the second time you've done this to me.  The first time was at Jervas and then it came back. |
| S. Harman | Come on, Peter.  Jervas was before the Civil War.  No one can check on whether your recollection is correct. |

P. Cyrus
I owned it.  I owned it, and I just want to say that I originally started covering your stock when I was an analyst back in the early '80s and have owned the stock since then.  I really just wanted to take the opportunity to congratulate you.  Just a personal comment, since you're however old you said you were, 62 years old or something, that you guys have taken this company, you and the entire team, some of whom are still here, some of whom are not anymore, and just done an absolutely sensational job.  It's been an honor for the last almost 20 years being a shareholder in your company.

S. Harman
Peter, thank you.  Not to discourage any other questions, but if there are none, that would be a lovely benediction to the call.

P. Cyrus
Thanks, Sidney.

Moderator
Thank you.  We'll go to the line of David Leiker with Robert W. Baird.  Please go ahead.

D. Leiker
Good morning.

S. Harman
Hello, David.

D. Leiker
On the R&D side, quarter by quarter, as you've been going, you've found incremental opportunities to invest in future business opportunities.  Has that happened here again in this quarter or are the R&D costs you're talking about comparable to a level you would have expected three to six months ago?

K. Brown
They're the same, David.  They're comparable to the level that we discussed when we first discussed the bulge back in January.

| | |
|---|---|
| D. Leiker | Okay.  So those haven't moved higher here over that time period?  Then at Mercedes, two different things; just kind of an update on how things are going there, ahead of the launch of that in terms of how you're doing, how Malco's doing, and then a follow-up question on that. |
| K. Brown | You're referring to the new C-Class at Mercedes.  That's just starting.  There were no shipments in the quarter we're reporting. |
| D. Leiker | What's your sense of where your system is development-wise throughout the Mercedes line versus what Malco is being able to deliver? |
| S. Harman | It's a bit difficult for us to speak about how Malco is doing.  I think anything you heard from us would be surmise.  I don't think we ought to do that. |
| D. Leiker | Okay.  Then the last item here on Mercedes; is there any sense there that they're willing to take the BMW/Audi route and go across platform with a single system, or do they continue to have this desire of dual sourcingness? |
| S. Harman | I think, David, because you are as knowledgeable as you are about this industry, you'll understand that's an extraordinarily difficult question to answer not because we don't have insights, not because we're not in touch, but because you're talking about a dynamic company with a dynamic situation.<br><br>I believe that there's a somewhat inexorable quality or character to the technology that drove Audi, drove BMW and is essentially going to be inescapable in others.  I believe that the progress made by Mercedes in its S-Class probably encourages those within the |

|  |  |
|---|---|
|  | company who have an instinct to go that way to be more aggressive in expressing that instinct, but that's internal material. |
| D. Leiker | Okay.  Well, it's been a pleasure working with you.  You've built a great company here, and I look forward to seeing where you guys go in the future. |
| S. Harman | I thank you for that and I recognize, and I want to even before you get off the line, that your coverage has been so very well informed.  I've learned a great deal more from your coverage than you've learned from me. |
| D. Leiker | You're very kind.  Thank you. |
| Moderator | Thank you.  We have one last question from the line of David Neederman with Pacific Crest Securities.  Please go ahead. |
| D. Neederman | Good morning.  I'm hoping you could comment on the pace of discussions with incremental OEMs regarding ADAS.  Thank you. |
| S. Harman | You are talking about Driver Assist? |
| D. Neederman | That's right. |
| S. Harman | Those discussions are ongoing.  They are characteristic of this industry.  They're about at the same level with respect to Driver Assist that they were for infotainment six, seven years ago.  Some of the discussions are more intimate in the sense that we are more aggressively and actively engaged; others are still exploratory.  It's the very natural process at the beginning of something that I believe over time-- |

| D. Neederman | Even faster than the rollout of infotainment in the automakers outside of the German OEMs? |
| --- | --- |
| S. Harman | I was talking, as you were, and so I think we crossed each other. |
| D. Neederman | Sorry about that. |
| S. Harman | Would you ask it again? |
| D. Neederman | Sure.  I was curious as to whether you feel that ADAS, the Driver Assist, could rollout potentially faster than infotainment is rolling out? |
| S. Harman | Probably yes.  You know this is all speculation. |
| D. Neederman | Sure. |
| S. Harman | But my "probably yes" simply reflects the fact that we have the relationships with the automakers today that we were building as infotainment was starting.  That suggests a better platform, and I think it's not unreasonable to infer from that that it might move more quickly. |
| D. Neederman | Great.  Thank you. |
| S. Harman | You bet. |
| Moderator | Thank you.  Dr. Harman, I'll turn it back to you for closing remarks. |
| S. Harman | I thank you all very much.  I appreciate most especially those observations that were commenting positively on our history.  I think we're entering an important and constructive new chapter, so thank you, all. |

Moderator        Thank you.  Very nicely said, Dr. Harman.  Ladies and gentlemen, your host is making today's conference available by digitalized replay for one week by Web replay for seven days.  The digitalized replay is available starting at 1 p.m., Eastern Time, April 26, 2007.  Simply dial 1-800-475-6701.  At the voice prompt, enter conference access code 870147.  International participants may dial 320-365-3844, with the access code 870147.  Alternatively, you may go to www.harman.com to listen to the Web replay.  You will need then to enter the access code 870147.

That does conclude our press release call for this quarter.  Thank you very much for your participation as well as for using AT&T TeleConference Service.  You may now disconnect.

# HARMAN INTERNATIONAL INDUSTRIES

### January 25, 2007
### 4:30 p.m. EST

Moderator           Ladies and gentlemen, thank you very much for standing by.  Good

afternoon, welcome to Harman International Industries' Second Quarter

Fiscal 2007 Earnings release.  At this point, we do have all of your phones

muted or in a listen-only mode.  However, after management's prepared

remarks there will be opportunities for your questions.  As a reminder,

today's call is being recorded.


Ladies and gentlemen, if I may have your full attention, certain statements

made by the company today during this call are forward-looking

statements.  These statements include the company's beliefs and

expectations as to future events and trends affecting the company's

business and are subject to risks and uncertainties.  Person's participating

on the call today are advised to review the reports filed by Harman

International with the Securities & Exchange Commission regarding these risks and uncertainties.

With that being said, let's get right to this second quarter agenda. Here with our opening remarks is Harman International Industries' Executive Chairman and CEO, Dr. Sidney Harman. Happy New Year, Doctor. And please go ahead, sir.

Dr. Harman    Thank you. Good afternoon. I am joined in Washington, D.C. today by Kevin Brown, our CFO and Rob Ryan, our Principle Officer for Investor Relations. We report today on our second quarter and first half results, and we will provide perspective on the balance of the year and the year's ahead.

Consolidated sales in the second quarter totaled $931.717 million. On those sales, we generated operating profit of $115.720 million, equal to 12.4%. We earned $1.22 per share in the quarter as a consequence. We complete the first half of the year with record sales of $1,757,260,000; record operating profit of $202.638 million, equal to 12%; and record EPS of $2.07.

Five elements define and influence our work. The first is the growing strength of our Automotive OEM division. The second and very important is the arc of our R&D expense. The third is the nature of our Consumer business. The fourth, is the developing power of our Professional business. And the fifth is the affects of currency.

Although automotive sales in Europe in the first six months were modestly accelerated by anticipation of increased German VAT beginning the first of the calendar year, we see fundamental and continued strength among our primary clients and, for some, serious enhancement of their market position. We are free today to confirm that the significant award we reviewed in our last conference call is from BMW. That award, I remind you, represents incremental business of $800 million over four years, with production starting in fiscal '09. Put simply, one of the most progressive automakers in the world has committed itself to us across the board.

I see this as a very consequential award. When we were given the original BMW L6 platform business in 2005, it was for the 7-Series only. We were asked then to develop a replacement platform for the BMW 6-Series only. But with this new award, we replace BMW's traditional supplier. It

is across car line replacement of all existing BMW high infotainment systems, including the 5, the 3 and the 1-Series, the X5 and the X3.

BMW has now specified a common worldwide solution based on our Harman Becker platform. Now, we and an Asian support supplier will share 100% of the BMW high infotainment system business; we with 70% of the $800 million that I spoke of earlier; the Asian supplier with 30%.

We are to receive a software systems integration fee on all systems work done by the Asian supplier. The functionality often in these new systems represents current state-of-the-art, but we are now working with BMW to develop the next state-of-the-art generation. In October, I spoke of a new automotive paradigm; a paradigm in which more automotive companies overcome their historic reluctance to concentrate a serious majority of their business in one source. The advantages of doing so with a house such as ours are simply too attractive to ignore and we understand fully the obligations and the responsibilities that follow from such a choice. The BMW award is not the first time we have received such an endorsement. I remind you that we are in similar position at Audi and at PSA. And we are flat out determined to fulfill our obligations in a manner that reassures and confirms the wisdom of those decisions.

The second factor is R&D expense. Forecasting R&D in Automotive OEM has become one of the more difficult aspects of business planning, because we work today on projects which become realized in production a year and a half, two years or three years later. The development of ever more sophisticated, multi-functional systems add further challenge because we are so often moving into new territory.

We realize that the growth in demand for our services has compelling growth in our engineering capacity, but it has also brought unwelcome inefficiencies. R&D has grown year by year over the course of the past ten years and it has consistently exceeded budget in recent years. Last year, OEM gross R&D represented 12% of sales. We said then that that percentage would continue in fiscal '07, but that we expected to see it begin to decline in fiscal '08. In fact, we now expect gross engineering costs in '07 to exceed our business plan by as much as $33 million. Where we had projected total R&D of $276 million, we now believe it will reach $309 million.

Despite that bulge of over $30 million, we expect to achieve the $4.35 EPS, which has been our consistent guidance. In doing so, we will have

accommodated the $0.30 engineering bulge and the also unanticipated

$0.04 of cost generated by the departure of a CEO; a total absorption of

$0.34.

When we first planned fiscal '08, our expectation was that total

Automotive gross R&D would decline to $269 million. Our current

expectation is that in fiscal '08 it will reach $315 million; some $46

million higher than we had planned. As a percentage of sales, $315

million would still represent an encouraging decline from fiscal '07,

moving from 12.5% of sales to 11.3%. Our expectation that we would

effect a consequential reduction in R&D as a percentage of sales

continues, but we are obliged to recognize that it will be at a somewhat

slower pace than we had originally expected.

Part of the unexpected, unanticipated increase in R&D dollars in fiscal '08

is driven by the early development of the driver assistance capabilities,

which we referenced in previous conference calls. The more we work in

this area, the better understanding we develop of the necessary R&D costs

associated with it. These were not costs we anticipated for fiscal '08 when

developing our out year forecasts and guidance. We are determined to

fulfill our order book obligations, rationalize our engineering and build

our future. To do so, we are contemplating changes that could result in a

modest restructuring charge as we move to the end of the current fiscal '07

year; a year we estimate in the range of $0.10 to $0.15, centered on

rationalizing both the engineering and an increasingly inapplicable

manufacturing facility.

While this should help us achieve our projected earnings of $5.25 per

share in fiscal '08, earnings will be burdened by the engineering bulge of

$46 million I mentioned earlier. It is an amount, it is too early for us to

assume that we will be able to fully absorb. We recognize that there is

serious earnings leverage available to us if we succeed in reducing R&D

expenses as a percentage of sales in each of the next several years. When

we apply that leverage to a $14 billion plus backlog, we will reap

significant margin improvement. As of today, our OEM book is full for

fiscal '07 and fiscal '08. It is virtually full for fiscal '09 and growing for

fiscal '10 and beyond.

In previous calls, we spoke about success in the European PND market.

For the first half of the year we sold almost 250,000 Harman Becker

Traffic Assist PND's and sales are accelerating. For the year, we now

expect sales to exceed 650,000 units. In the German-speaking areas of

Europe, we are now the second leading PND brand and our position is strengthening, even as margin holds relatively firm.

In the United States, as you well know, PND activity is chaotic with prices from the major suppliers sharply falling. The strategy among the American leaders appears to be directed at reducing the prices of the current navigation-only models with the expectation that new models will appear this year at somewhat restored prices. As our first shipments of U.S.-centric PND devices is scheduled for March, we will undoubtedly be among the higher priced units on the market. A $500 PND is clearly a rich one, but the high end shops, including Apple, remain very interested. Consistent with our overall consumer electronic strategy, we expect to find our place in the North American PND world at respectable margins.

In our October 25, 2006 conference call, I said that, "Awkward days are manifesting consumer group operations for the first quarter. As we entered the year, we anticipated growth in both our core audio business and our multi media businesses, but we encountered increased competition, a stubborn decline in price points for multi media products, and a slow to materialize multi media niche above $300." That is what I said in our October 25th conference call. We said, "Further, that pressures

on margins have developed and it will likely intensify through the selling season. We still do well, we will still be profitable, but our earlier enthusiasm needs to be properly tempered." That assessment has not changed.

In the second quarter, we generated operating profit of 9%, but for the first half of the year, operating profit was 4% in the Consumer Group and it is our expectation that the second half of the year will display similar performance. In general, a tough, demanding market these days, and one in which a 4% to 5% profit margin rather than a 7% to 10% margin is the prospect. We don't regard that as great, but it is profitable.

Our professional business, on the other hand, is prospering. Each unit in the group is progressing and most gratifying that two units, Studer and AKG, which had been burdensome, are now operating profitably and at increasing rates of profitability. Through the first half of the year, the group produced operating profit of 13.9%. We see opportunity for further enhancement going forward.

With respect to currency, we noted a year ago our expectation that the euro would rebound to the range of $1.30 and we were right. Still, we

built our fiscal '07 plan on the basis of $1.25 and currency was therefore a help.

Finally, let me report that our CEO search is nearing completion. I am confident that we will identify our man within the next 30 to 45 days, and you can be assured, he will be a world-class choice. Here is Kevin Brown.

K. Brown       Thank you, Sidney. Net sales for the second quarter were $931.7 million, an increase of $99.1 million or 12% compared to the same quarter of last year. Gross profit margin was 34.3%. Operating income was $115.7 million. Earnings per share were $1.22 compared to $1.07 in the prior year, an increase of 14%.

Net sales for the first six months were $1.757 billion, an increase of 11% compared to $1.587 billion last year. Gross profit margin was 34.5%. Operating income was $202.6 million. Earnings per share were $2.07 for the six months compared to $1.86 last year, an increase of 11%.

Foreign currency translation had a favorable impact on our second quarter results compared to the prior year. This was due to the strengthening of the euro versus the U.S. dollar. The euro averaged $1.29 during the

second quarter compared to $1.19 during the same period last year. This contributed approximately $43 million to second quarter sales and improved EPS by $0.07 per share.

Automotive sales were $632.3 million, an increase of $84.5 million or 15% compared to the second quarter of last year. The increasing strength of our PND business in Europe and strong sales to Mercedes, Lexus and Audi drove the sales improvements. Automotive operating income was 14.6% of sales. Automotive operating income margins are, of course, impacted by the R&D increases that Sidney spoke of.

Sidney detailed gross automotive R&D, which represents the total expenditures at our Automotive Group. I typically speak of consolidated Harman net R&D expenses as reported in our SEC filings. These include the expenditures at OEM, Consumer and Pro, plus the effects of U.S. GAAP accounting adjustments for customer reimbursements, capitalization and amortization. Harman consolidated net engineering expenses in the second quarter were $90 million or 9.7% of sales compared to $75 million or 9% of sales in the second quarter of fiscal '06. We now expect consolidated fiscal '07 R&D expenses to be 10% of sales.

We expect R&D as a percent of sales to decline by about one percentage point in fiscal '08 and to continue declining in fiscal '09 and beyond.

The increase in R&D more than explains the $14 million increase in SG&A in the second quarter compared to the prior year. Despite the increase in R&D, total SG&A as a percent of sales declined 0.9 points to 21.9% in the quarter.

Consumer sales were $163 million in the quarter, $8.2 million or 5% above the record second quarter of last year. Consumer operating profit was 9% of sales, a significant improvement over the first quarter's operating loss. Operating margins were lower than the prior year due primarily to increased competition in the multi media market.

Professional sales of $136.4 million were $6.4 million or 5% better than the second quarter of last year. Professional operating income was 14.7% of sales. Our Professional Group benefited from higher sales of products utilizing the IQ Net protocol, from strong JBO Pro Vertex speaker sales, and from recently introduced new digital consoles from Soundcraft and Studer.

The tax rate for the quarter was 29.5% compared to 34.5% for the second quarter of last year. During the quarter, Congress reinstated the R&D tax credit, resulting in a $4 million tax benefit for the company. Last year's tax rate for the second quarter was unusually high due to a $1.1 million charge for the repatriation of cash from the company's foreign subsidiaries under the American Jobs Creation Act of 2004. With the reinstatement of the R&D tax credit, we now expect the full year tax rate to be between 32% and 33%.

The balance sheet remains strong at December 31st. Inventory was $454.7 million and accounts receivable were $480.4 million. Accounts payable were $293.7 million. Capital expenditures during the second quarter were $27 million, while depreciation and amortization were $31.6 million.

Cash at December 31st was $171.1 million and total debt was $142.4 million. The company did not repurchase shares during the second quarter; however, we did repurchase shares during the first quarter and have spent $73 million for 921,100 shares for the six month period. There are 2.4 million shares remaining under our board approved share repurchase program and we expect to buy many of them and seek additional buyback authorization in the months ahead.

The company has expensed employee stock options since fiscal year 2003. We expensed $4.6 million for stock options during the second quarter, equivalent to $0.05 per share. We will now take your questions.

Moderator            Thank you. Our first question comes from Jon Rogers of Citigroup.

J. Rogers            Good afternoon. I was just wondering, Dr. Harman, if you go into the increased R&D expenses, I just want to make sure that that's basically because of new opportunities that you have, not necessarily the same business that you had forecast R&D for last year is now, the R&D is now running for the same businesses is now more expensive. Am I look at that the right way?

Dr. Harman           Yes, you're looking at it in exactly the right way. Take it year-by-year. In '07, we're looking at approximately $30 million of bulge. The bulk of that $30 million is driven by the preparatory work for totally new business that had not been anticipated at the time that we did our original forecast for the year.

When you look at '08, it is even more dramatic in two respects. First, I indicated that the bulge in engineering in that year would be in the range of $45 million to $46 million. In point of fact, as it was first detailed, it looked more like $70 million. We are really making progress in generating a more efficient total R&D institution.

One hundred percent of that $46 million of engineering cost beyond what had been built into the plan for '08 is driven by essentially two things. First, $1.1 billion of unanticipated new business; $800 million represented by the BMW award; $300 million represented by the S-Class upgrade. And the rest of that bulge in '08 is directed at the development of for us the very, very important driver assistance technologies, which I believe will be critical to our progress in the next ten years.

J. Rogers          When do you think you can have your first driver assistance award?

Dr. Harman          It really depends on how you think about it, Jon. If you're talking about a function, the likelihood is that we will see that very, very quickly in one form or another. We've, as I've indicated, begun to do some serious work in this area. But the important thing to recognize with respect to driver assistance, the situation today is really very reminiscent of the situation ten

years ago in infotainment. Today, driver assist and safety functions are typically expressed in several discreetly separate electronic control units in the car. I'm talking about ECU's for long range radar, short range radar, stereo/video camera, rearview camera. Every one of these ECU's essentially a separate function, much as the functions which today define an infotainment system where eight, nine, ten years ago totally disaggregated, separate functions.

In Lexus, Mercedes, S-Class today, you'll find as many as seven to ten discreetly separate ECU's, employing heterogeneous connections and many different BUS systems. The point for us is not to get an award that we can label driver assist, but to move forward with our most fundamental strength, the ability to integrate these many now disparate, disaggregated, though still developing, driver assist functions. That's our strength, that's what I believe will simply drive the additional development of our OEM Automotive world.

J. Rogers       Kevin, one last question. It looked like Automotive, the OEM business margin was a little softer than we were looking for. Is there anything specifically that was going on there or was that just a function of slightly lower volume?

| | |
|---|---|
| Dr. Harman | Are you talking about the OEM business? |
| J. Rogers | Yes. |
| Dr. Harman | If you make the appropriate adjustment for the amount of R&D expense beyond the budget, I believe that we show a very attractive OEM operating margin, probably in the range of 17%. |
| J. Rogers | Okay, so that's the R&D expense, too. Thank you. |
| Moderator | Next, we go to the line of Chris Ceraso from Credit Suisse. |
| C. Ceraso | Good afternoon. A few things. First, can you talk about the progress on the Chrysler award, have you begun shipping the My Gig components yet? Will you feel that in your fiscal third quarter or are we still looking at the fourth quarter before you start to see those revenues? |
| Dr. Harman | You'll see some revenue in the third quarter. We have been shipping REW, which is the European version of My Gig. Quantities have been small. We, within the past few days, released for production for domestic |

production, so you'll see some in the third quarter. But really, no serious

shipments until the fourth quarter.

C. Ceraso         Some questions on pricing and margin expectations. As you win these

broader mandates where OEM's are consolidating their business with you,

are you giving up any price to get those kinds of mandates? Do you still

think longer term as you work through the extra costs here that the margin

for your automotive business stays in the 16% or can you make an

argument that it should be higher because you've got leverage over a

greater amount of business? Or is it going to be lower because you may

chronically end up spending more on R&D? What are your thoughts.

Dr. Harman        Chris, you've given me every option imaginable. I would say that we

have every continuing expectation that a typical margin will be 16%.

That's what we stated in the past and that continues to be our view.

To answer more specifically your question about how negotiation goes,

when you are talking about across the board assignment, if you were the

buyer you would insist on some price recognition for that and there is not

a serious automotive company in the world that doesn't do it. So of

course that is a pressure on margin. On the other hand, we're getting

better at doing this stuff, and if you make the adjustments, which I think you really should do in pro forma fashion if you're looking for a real figure of merit here, if you make the adjustments in R&D expenditures, if you recognize that the bulge that we're talking about in '07, the bulge we're talking about in '08 builds the future and is responsive to the new unanticipated awards, you're looking at very steady, go ahead at the level that we have been predicting for a lengthy time.

C. Ceraso          Can you give us an update on the restructuring efforts that you initiated within the last couple of quarters?

K. Brown           I think you're referring, we had a restructuring program in the fourth quarter of fiscal '06. It was $0.14 per share. It was intended at rationalizing some manufacturing and engineering activities, primarily based in Europe. What we said at that time last summer was because of the notice periods required and the negotiation periods required with the unions in Europe, that we would not begin to see benefits from that restructuring until the second half of the fiscal year, which will be these upcoming quarters, the third and the fourth quarter. And that we expected a one-year payback, in essence, and that remains our expectation today. So, in the second quarter results, there really was no material impact from

that, but we expect that to begin to accrue to us and that's in our forecast in the third and the fourth quarter.

C. Ceraso      Just lastly, if I can, Dr. Harman, can you just clarify your comments on the fiscal '08 guidance of $5.25? You mentioned that it's maybe too early to make a change there, but you've got a big hurdle with the R&D expense. How exactly are you asking us to look at this?

Dr. Harman      I'm not asking you to look at it in any particular way. I mean, that, after all, I mean, it's with all respect, that's the work you do. I'm presenting the information as well as we have it. We see ourselves earning the $5.25 as we anticipated. We also point out, even as we had in '07 or will have had in '07, an engineering bulge in '07 of $30 million, in '08 $45-46 million, we were able to accommodate that bulge in '07. What I'm saying today is we are 18 months away, it's impossible for us to determine how much, how large a percentage of that bulge we'll be able to accommodate in '08.

C. Ceraso      Fair enough. Thank you.

Moderator      Representing Bank of America Securities, we go to the line of Ronald Tadross.

R. Tadross        Just two quick questions.  On the PND market, have you changed your

                  U.S. PND target, I think it was roughly 500,000 units a year, due to the

                  pricing environment?  Maybe you could just contrast what's going on in

                  North America and Europe in PND's.  Then I have one other quick

                  question.

Dr. Harman        You want me to answer that before you go to your second question?  Let

                  me do it.

R. Tadross        Please.

Dr. Harman        For good reasons, we distinguish between American PDN, European

                  PND.  The products are different.  They're not cosmetically different, they

                  are substantially different in virtually every respect – in industrial design

                  and software application, in the very nature of the human machine

                  interface.  So there are really two PND businesses for us to consider.

                  In Europe, as I indicated in my prepared remarks, we're doing just fine.

                  We expect that we will sell darn close to a million units this year.  That's

                  pretty darned substantial.  In America, it is far too early for us to wrap any

serious numbers around it. So what I'd like to do is to emphasize the

marketing approach that we're taking here and to identify the influences

that are significant.

First, we are staying out of that very difficult race for volume that

characterizes the highly competitive, low margin PND business in the

States. We presented at CES an absolutely lovely new product in

industrial design, in human interface, in speed of operation and very

particularly in terms of ease of operation. The really remarkable truth of it

is that in the new Harman Kardon PND, the last thing you want is an

instruction book. It is that transparent.

It's a $500 product. We're eschewing the $200 and $300 PND market.

We believe, and at CES and subsequently our conviction has been

confirmed, that there is, will be a market for a superior product and that a

large enough group of dealers, including what we regard as the best

regional dealers, it is our expectation that Apple and others, will embrace

this product and sell it well and will find it appealing for the reasons I just

indicated – not just interface, but margin.

Now let me identify what I regard as a significant influence. As you well know, at Mac World Apple introduced its iPhone. A rather similar attitude implicit in iPhone to that which I've just identified for the Harman Kardon PND. Apple has said, there are going to be a billion music enabled phones sold in the year, …that for 1%. That's a mere 10 million units. We believe that this provides a beautiful opportunity for us in a related area, and that is our audio systems for iPod now developed for iPhones and other music-enabled phones. So what I am suggesting to you, Ron, is that there is a cup of the market that we are targeting and which I expect we will do quite nicely in. If we, for example, can manage as modest as 5% application rates of our multi media products for the iPhone, we're looking at an incremental 500,000 units there.

K. Brown          Ron, can I come back and clarify one question that you have on your numbers. You referenced our prior guidance of 500,000 PND units for the year. That was guidance for European PND's. And as Sidney said in his prepared remarks, we now expect that to be over 600,000 this year.

R. Tadross       You didn't have any guidance for the U.S.?

K. Brown          No.

R. Tadross        Just quickly on inventory, they seemed a bit high.  I was just wondering

what drove that and do you expect them to come down?

K. Brown        The inventory buildup, and there was an inventory increase this quarter,

was primarily at OEM, at Automotive, and it was the ramping up of our

PND business in Europe.  So that will remain for a while as we get that

business ramped up.

Moderator        Representing Robert W. Baird, we go to the line of David Leiker now.

D. Leiker        Good afternoon, everyone.  I guess a numbers question here first, Kevin.

Do you have a cash from operations number for the quarter or six months?

K. Brown        I have the quarter I have on the tip of my tongue.  It was about $100

million in round numbers, David.

D. Leiker        That's fine.  A couple of other items here.  As you look at your

Automotive business as the revenues ramp up here and you've got this

book of business that you have ahead of you, should we expect that the

revenue run rate that we've been seeing here, the percent changes, or is

there a period where we see a lull before it accelerates again?  I try to get a

gauge of how smooth that ramp up is of new business coming.


K. Brown          I would expect, David, in the second half of this year it probably isn't

quite as robust as it was.  We're looking at 15% growth in the first couple

of quarters this year and that's related to the pause, a little bit of a pause in

the new model introduction cycle.  But certainly as we get into '08 with

the Chrysler introductions and then later '08 and into '09 with the other

new business that we have won that comes on stream at BMW, at Peugeot,

at Audi, we'll see solid double-digit increases through that period.


D. Leiker          Your R&D or engineering costs run through your SG&A line, correct?


K. Brown          That's correct.


D. Leiker          If you look at the gross profit here in the quarter, the contribution margins

a lot less than what we've seen the past.  I want to get a sense of what was

going on in the cost of goods sold line.  Is that something that returns back

to normal rates or is there something that we should be expecting there in

the near-term?

K. Brown            The gross profit in the quarter was 34.3%. That was compared to 36.7%

                    in what was probably a record quarter in the second quarter of last year.

                    Most of that impact came from our consumer side of the business where

                    we have lower multi media margins than we experienced last year and the

                    competitive landscape in that multi media business has certainly changed

                    over the past year.


D. Leiker           That compares then, it looks like it continues somewhat here in the Q3 and

                    then normalizes somewhat in Q4, in terms of the negative impact of that?


K. Brown            I believe our year, to think about it another way, our year's probably going

                    to be in that range, maybe slightly higher, but it's not going to be back in

                    the 36-37% range.


D. Leiker           One last broader question here, and Sidney you may be the best to answer

                    this, if you look at the competitive landscape, you clearly are a leader out

                    there. You've captured a significant amount of market share and you've

                    got more business than anyone who does what you do. We see Ford with

                    Microsoft linking up, Siemen, I was going to say, seems to be somewhat

                    of a competitor, but given the comment on BMW, that seems to be going

                    away. But just talk a little bit about the competitive landscape and where,

if you kind of score your competitors and where you think they are

relative to where you are today.

Dr. Harman          I think you were asking me to answer that.  I'm happy to.  I just want to

make sure you've got the right guy.

D. Leiker           I think you'd be great to answer that.

Dr. Harman          Okay.  The situation competitively has not changed at all.  I think it is fair

for you to recognize, as you have, that the BMW award carries a pretty

significant message.  But candidly, I've been expecting that.  It's not

anything we spoke about publicly, but my sense from here, combining my

comments with what's the competitive landscape, that's an action, that's a

consequence I rather expected.

I also expected and expect that from time to time we will see a bubble of

news or noise about some new development.  You've identified one, the

Ford Sync.  I don't see that as, to be quite candid about it, a significant

competitive development.  It's attached to the name Microsoft and so that

catches a great deal of attention.  But Microsoft is providing the operating

system and that's it.  It's also providing a certain aura.  The system itself is

a pretty modest system, one that we are really familiar with because two years ago in a similar construct associated with the Microsoft name, the system was being developed for Fiat. I don't have the actual numbers, but I know with confidence that the sales of that system have been very, very modest.

There's a new one that you haven't mentioned. You can read in the next few days, I think, about a Chrysler development with Hughes. That's not competition for us, although I have little doubt somebody will raise the question and so I anticipate it. There is Chrysler, committed to a test program in the year 2010. The full cost of the program being borne by the supplier who will in effect provide the module without cost, looking because this is an expression, if you will, of concierge service quite similar to General Motors OnStar. So the supplier in that case will be looking for revenue through subscribers. That's not competitive to us. That's not the business we are in.

Those who have been seen as competitors in the past are those we look at as competitors today. They're good companies, they include Alpine, they include Melco and others that you're familiar with, but there is no new

wave of competition.  That, I hope you realize does not put us in a position

of any smugness.  We're looking for that competitor every damn hour.


Moderator          Our next question is from Scott Merlis from Thomas Weisel Partners.


S. Merlis          Looking at the BMW award of $800 million, does a lion share of that

come in '09 or does it get spread into 2010 and beyond?


K. Brown           It's really over three to four years that begins to come on stream in '09.

So I would think of it in terms of 200, or a little more than 200 a year for

three to four years.


S. Merlis          Incrementally.  Yep.


K. Brown           Yep.


S. Merlis          Good.  You said that it represents state-of-the-art.  When does that state-

of-the-art manifest itself and can it really be better than the current S-

Class?  I assume you mean more advanced than the current S-Class when

you say state-of-the-art.

| | |
|---|---|
| Dr. Harman | No, what I did say literally was that we are working today to advance. This is beyond the award we are now referencing. What I said was we are working with BMW to move beyond the current state-of-the-art. It represents, this award represents current state-of-the-art. |
| S. Merlis | And when you discuss driver assist technology, is that development contracts with OEM's, are you working hand-in-hand with OEM's or are you working just independently? |
| Dr. Harman | We're working hand-in-hand with OEM's. And though there is in the making what I regard as a kind of modest development contract, fundamentally, we're building that capacity ourselves, as we should. |
| Moderator | Next in queue we go to the line of Doug Pratt representing Galleon Group. |
| D. Pratt | A couple quick questions on the tax rate. I'm not sure I heard correctly, so we should be looking for 32% going forward? |
| K. Brown | Thirty-two to thirty-three percent for the year. |

D. Pratt                So it will be higher than at some point to make up for the low tax rate this

                        quarter?


K. Brown                Yes, because of the way the R&D tax credit, in the late hour that it was

                        approved, this quarter actually includes some retroactive piece or pickup

                        that's reflected in this quarter. So, our previous guidance had been 33% to

                        34% for the year. The R&D tax credit moves it down to 32% to 33% for

                        the year.


D. Pratt                Maybe you said, I didn't hear it, the breakout of Auto as a percent of total

                        sales that you always put out. I'm interested, it looks like you no longer

                        break out of Audi/VW as you had previously when it was about 8% to

                        10% of sales or 8% to 10% of sales and receivables. Are you still going to

                        continue to break that out or do we need to adjust everything to throw that

                        back into other Auto?


K. Brown                I think you're referring to the detail we include in our SEC 10-Q, which

                        does not detail, if I'm understanding you correctly.


D. Pratt                Yes, that's correct. In the past, you've occasionally included Audi/VW as

                        a breakout, even though it's not been above 10%.

HARMAN INTERNATIONAL INDUSTRIES
Host: Dr. Sidney Harman
January 25, 2007/4:30 p.m. EST
Page 32

K. Brown    It depends on, in the period, the size of the business. As we go forward, Audi/VW will be included as one of the significant customers. Because once we get into fiscal '08 and '09 and launch the new Audi business, they're going to increase significantly.

Moderator    Next, we go to the line of Peter Friedland representing the Soleil Group.

P. Friedland    A few questions. First, on the BMW business, what's the current run rate of infotainment business with BMW? Then what does that look like starting in fiscal '09, fiscal 2010?

K. Brown    Well, the current business depends widely on the type of platform that it is. When you talk about the luxury or the high line platforms like the 7-Series and the 6-Series, it's close to 100% penetration for high end infotainment systems. As you get down to the mid platforms that drops and as you get down to the 3-Series, that drops further.

What we have seen fairly consistently over time, and especially as next generation systems and vehicle platforms come out, is that those penetration rates do grow over time. We track our top ten vehicles very

closely. Eight out of the top ten vehicles have stable or increasing penetration rates for infotainment. The ones that aren't increasing are old generation turn-by-turn technology that's being phased out and will be replaced. When those get replaced, we expect they will move up significantly as well. So the trend is pretty clear in our eyes.

P. Friedland
Could you put some dollar numbers around that? So if you look at what you're supplying to BMW today in infotainment, what does that look like once the $200 million a year starts kicking in?

K. Brown
It increases it significantly. I won't get into specific dollars by OEM here, but it increases our BMW business significantly.

P. Friedland
As far as the charge you referenced, which quarter is that going to come in and is that included in your guidance?

Dr. Harman
What charge are you referring to, Peter?

P. Friedland
That you mentioned an engineering charge.

Dr. Harman
An engineering charge? Will you please clarify the question?

P. Friedland          I thought you mentioned something to that effect in your prepared

remarks.

Dr. Harman            What I spoke of in the prepared remarks was that our total engineering in

this year would exceed by approximately $30 million the budgeted

amount.  And I said we would absorb that and still deliver, it is our

expectation, $4.35 EPS for the year.

P. Friedland          So you're not anticipating any charges?

Dr. Harman            Again, we say not anticipating any charges, I don't want to misunderstand

your comment.  If it is a question, please frame it so I do understand it.

P. Friedland          ...in your prepared remarks.  Why don't we just leave it at that?

Dr. Harman            Sure.

Moderator             Next, we go to Jeff Kessler, representing Lehman Brothers.

| | |
|---|---|
| J. Kessler | Thank you. By the way, congratulations on Studer and AKG. It's been a while. |
| | Some quick questions because most of mine have been answered. First, the 4x anticipation, is that rate going to be, that's the rate you're going to be holding for all of fiscal 2007? |
| K. Brown | To answer your question, we built our 2007 plans on the euro at $1.25. |
| J. Kessler | That's what I'm saying. All of 2007 is based on $1.25? |
| K. Brown | Yes. Of course we reflect the actual as we realize it each quarter. So now we're halfway through 2005 and we've been doing, the euro's been stronger than $1.25 and we've benefitted somewhat by that. |
| J. Kessler | Do you have any estimate of approximately how much you believe new car sales in Europe were accelerated early on by the anticipation of the VAT tax? |
| K. Brown | I really don't have an estimate for you other than we did see some impact or influence. Sales were very strong in the first, at the end of the first |

|            | quarter and the beginning of the second quarter. It appears they slowed some later in the quarter; whether there's going to be any payback I think is anyone's guess. |
|------------|----|
| J. Kessler | That was basically the gist of my question. You don't know if there's any cannibalization of European sales out of the first quarter or out of the first calendar quarter of 2007 because of anticipation of VAT? |
| K. Brown   | We don't know and we haven't seen yet. |
| J. Kessler | With regard to the new platforms in BMW, you've talked about what perhaps some expected take rates are. What about whether or not these options versus standard on 3, 5, 1-Series and what levels of systems are you going to be offering on those various Series? |
| K. Brown   | The award that we talked about is a high system. And on most of the other BMW vehicles there is a mid infotainment system and then in some cases the low end offering is just a base radio. We will have almost across the board the mid and the high offerings. |

HARMAN INTERNATIONAL INDUSTRIES
Host: Dr. Sidney Harman
January 25, 2007/4:30 p.m. EST
Page 37

Dr. Harman       And we expect the application rates, which I believe is the purpose of your question, Jeff, to be pretty high on those models. It's remarkable, the application rates of these optional systems, infotainment systems, are multiples higher than the audio systems ever were. I'm talking about 25 and 35 times.

J. Kessler       Final question. Sidney, I know you're asked this from time to time. Progress in negotiating, let's just say a technological understandings with Toyota, is there any more acceptance in your eyes on their part of toward moving out of audio and towards infotainment?

Dr. Harman       You certainly don't mean to move out of audio. You mean to add…

J. Kessler       …well, to evolve, we'll call it that.

Dr. Harman       I see that as a long, hard sludge. I see no real difference today from the last time I spoke. I remind you that Toyota has undertaken a multi-year effort to develop its own operating system. By multi-year, I imagine that this is a five, six year very costly undertaking. While that is going on, we continue to work with them, we continue to make every effort to engage

them in the work that we are doing.  But what progress there is in that
respect is slow.

J. Kessler        Because the reason I asked that is your experience with Ford in audio in
                  the past.

Dr. Harman        I beg your pardon?

J. Kessler        The reason I asked the question was in historically your experience with
                  Ford.  Hopefully that you'll have a more positive experience with Toyota
                  than you did with Ford.

Dr. Harman        Well let's hope so.

J. Kessler        That's all my questions.  Thank you.

Moderator         The next participant in queue is Scott Ciccarelli representing RBC Capital
                  Markets.

S. Ciccarelli     What is your selling price on your European PND's?  Can you give us a
                  rough estimate on that?

HARMAN INTERNATIONAL INDUSTRIES
Host: Dr. Sidney Harman
January 25, 2007/4:30 p.m. EST
Page 39

K. Brown          It's about $350.

S. Ciccarelli     And that's in the OEM segment?

K. Brown          Yes.

S. Ciccarelli     So if I assume, that's $350 and it's about 155,000 units incorporated into the OEM, plus I assume…

Dr. Harman        Wait a minute, Scott.  What was the quantity you used?

S. Ciccarelli     I used 155,000 units.

Dr. Harman        For what period?

S. Ciccarelli     In the second quarter.

K. Brown          No, it's about 130,000 units in the second quarter.

S. Ciccarelli    Okay. And is it fair to assume that the OEM business benefited by about $30 million to $35 million from currency?

K. Brown    Yes. The majority of our currency translation occurs in the OEM business. So yes, that's a good estimate.

S. Ciccarelli    So I guess what I'm trying to figure out is, did the OEM business really grow much? Because it seems if I incorporated the PND business in there and I benefit from currency, it seems like, at least on an organic basis, there was pretty moderate growth or pretty modest growth in the OEM segment. If that is the case and we have Mercedes up nicely, Audi, Lexus, I guess what I'm trying to figure out is what was the offset to that? Maybe I'm just not doing my math right, but it seems like if you picked up say 40 something million on the PND's and another 30-35 from currency, you're up about $85 million year-over-year, it seems like it was pretty modest.

K. Brown    What I will tell you, and every point that you made I think is spot on – and once again, we do track our top ten platforms – they were up double-digit percentage for the quarter. So our major vehicle platforms we saw pretty good growth. We obviously have some offsets in some of the lower

volume platforms.  But overall, $85 million up in the quarter is nothing to sneeze at.

S. Ciccarelli    But it's not, though, Kevin, right?  I mean, if it's $45 million from PND plus the currency benefit, which, yes, it impacts the revenue but it's not really economic value added, if you will, that's not really growing the business by $85 million.

K. Brown    You can't assume that all of the PND is purely incremental.  Remember, the PND is in our after market business.  We've had an after market business.  There is a base of business that has been there in the past.

S. Ciccarelli    Okay, so maybe that's what I'm missing then.  Fair enough.  Any updates on the Chrysler program at all, either from a technology standpoint or kind of when we might start seeing these hit the production lines?  Is there any change at all in either your side or Chrysler's side?

Dr. Harman    No, there's no change, Scott.  In fact, I think I spoke to that earlier.  We have been shipping the REW, which is the European version of My Gig, and we have just been released for the American version.  So you will see

some modest expression of the Chrysler program in the third quarter

ramping up in the fourth.


S. Ciccarelli          So the same basic timeline that we've been looking at.


Dr. Harman          Right.


Moderator          Next, we go to the line of Steve Lidberg representing Pacific Crest

Securities.


David          This is David in for Steve. Quick question. Looking at the new R&D

expenses that you outlined today, could you comment that the mix of hires

that you ...specifically hardware engineers versus software engineers?


Dr. Harman          I'm very sorry, Steve. We just could not hear you. Would you ask the

question again a bit louder?


David          Sure. Again, this is David in for Steve. So the question was, looking at

the new R&D expenses that you've outlined today, could you maybe

detail the mix that you anticipate for the hires, specifically software

engineer hires versus other types?

| | |
|---|---|
| Dr. Harman | It's going to be fairly typical of our experience, increasing percentage of the total in software. And I would think that you would not go wrong if you were to estimate it on a basis of 2/3 software, 1/3 hardware. |
| | One more question. I'm looking for the last question to come from the Don. Is he on board? |
| Moderator | Dr. Harman, your crystal ball does not fail you once again. Peter Barry, please go ahead, sir. |
| Dr. Harman | Come on Don Barry, make it good. |
| P. Barry | First of all, I want to make sure I heard you right on PND's. You said 650,000 units in Europe for the current fiscal year, correct? |
| Dr. Harman | Correct. |
| P. Barry | Did you reference a million units somewhere in responding to a question? |

Dr. Harman    I think what I said was that, I did not speak of a million units of PND, but I was referring to the market similarity of our PND introduction into the United States and the iPhone introduction by iPod. Each of them – remember, the iPod, interestingly enough, the iPhone will sell for approximately the price that our Harman Kardon PND will sell. Each of them targeted at a pretty snappy marketplace. And I indicated that Apple has said they'd be content with one percent of the billion music-enabled phones that are expected to be sold annually. That's a neat $10 million. If we got something like 10% of that in terms of the audio systems that we make for the music-enabled phones from iPod, that would be the addition of another million units. Five percent would obviously be $500,000. I made no estimate of PND sales in the United States. It is too early. But it is not too early to tell you that we're enormously encouraged by the response to our first showing of this product at CES.

P. Barry    Let me just take that one step further. The 14.6% operating margin in the quarter in OEM, was that in any way influenced positively or negatively by PND? And for modeling purposes, should we stay in this 14.5-15% range for the next four to six quarters perhaps?

| K. Brown | The larger influence on the operating prof in the quarter as we spoke about was the increased R&D expense, and it's up $15 million both for Automotive and the company year-over-year in the quarter. There is a much lesser influence from the PND business, which is a very good margin, but doesn't always approach the margin of some of our high end historical business. But the real question in the quarter relates to R&D and as we discussed, until we get to the launch of these new programs that we're investing in right now, we expect to see R&D continue to stay high, however, start to come down. If you remember, Peter, we talked about R&D coming down one point in '08 and continuing to come down as a percent of revenue in '09 and beyond. |
|---|---|
| Dr. Harman | And that, of course, is where we see very significant earnings leverage, Peter. |
| P. Barry | Going back to Peter Friedland's question, I think he was referencing your reference to a restructuring charge perhaps by yearend of $0.10 to $0.15. |
| Dr. Harman | Well, he may have been. That's why I asked him to put it as a question. Would you like to frame a question? |

P. Barry    Yes, sir.  Does your guidance include a $0.10 to $0.15 restructuring

charge?


Dr. Harman    No, it does not.  What I said was that we are considering such a charge and

that's what we're doing.


P. Barry    Finally, is QNX still penalizing EPS by about $0.04 a quarter?


Dr. Harman    It is, but that's the least important thing somebody can say about QNX.  It

is the very heart of what we are doing in infotainment and it will be

critical as we develop the new integrated driver assistance systems.


P. Barry    When might that penalty go away given the obvious contribution that

QNX is making to all of this?


Dr. Harman    I don't think you ought to plan for it to go away.  It's part of the total

R&D expense.


P. Barry    Let me just close by asking for one more clarification.  My age is showing,

Sidney, I'm sorry.  Kevin, when you were reviewing the revenue ramp,

I'm not sure whether you were referencing calendar quarters or fiscal

HARMAN INTERNATIONAL INDUSTRIES
Host: Dr. Sidney Harman
January 25, 2007/4:30 p.m. EST
Page 47

quarters. Could you just run through that one more time so everybody is on that same page?

K. Brown    Which revenue ramp are you referring to?

P. Barry    That is when Chrysler begins to kick in and top line begins to accelerate.

K. Brown    Okay. I was talking about our fiscal quarters. What we have said was we expect $15 million to $20 million of revenue from Chrysler in the second half, so the third and fourth fiscal quarter of '07. As Sidney detailed, we're starting to ship that product now. We'll see a little influence in our fiscal third quarter, more influence in our fiscal fourth quarter, but it really starts to ramp up in fiscal '08 when that broadens and moves across a number of Chrysler vehicle lines.

P. Barry    That's all I wanted to hear. Thanks.

Moderator    Dr. Harman, I'll turn it back to you for any closing remarks.

Dr. Harman    Thank you. I think it's fair to say that, in summary, we're in process of an excellent year with record results. Our OEM R&D cost is both our

**HARMAN INTERNATIONAL INDUSTRIES**
Host: Dr. Sidney Harman
January 25, 2007/4:30 p.m. EST
Page 48

challenge and our strength. The challenge to us is to manage it well, to keep it increasingly efficient. I think it fair to point out that as a company has grown so dramatically over the last number of years, the emphasis has necessarily been on engineering, on R&D, and the attitude has been in effect whatever it takes. We are now at the stage where managing that and getting the advantage of the leverage that a point reduction each year, and hopefully that's about the trend that we can anticipate will bring to us, that's the challenge.

The strength-wise in the fact that it permits us, that same R&D, to service that very large backlog, to stay ahead of our competitors and to prepare us for the new growth opportunities represented by driver assist. We're the dominant firm in the OEM field. That seems widely acknowledge. We intend to maintain and strengthen our position across the entire automotive world and across all vehicle lines – entry, mid-level, luxury. We expect to do it at a reduced percentage of R&D to sales.

I'll conclude by suggesting first that our Consumer Electronic business can be difficult, it can vary in performance year-to-year, but we've got a solid franchise and we've got really wonderful control of operations. Vary, yes, but always within a profitable range. And our Pro business

continues to broaden and to improve. Margins are excellent. They're going to get better. This is a field of marvelous opportunity for us, even as we do increasingly well today. We intend to take full advantage of that opportunity.

And finally, our organization will soon be complete with the addition of a world-class CEO. We've been painstaking, we've been patient. That effort will soon be rewarded. I thank you all for your contributions of the meeting today.

Moderator         And we thank you for the privilege of spending time with you, Doctor. Excitement on the horizon and very nicely said, as always. And ladies and gentlemen, Dr. Harman is making today's conference available for replay for one full week and also by the Web for seven days. The ...is available starting at 8:00 p.m. EST, January 25th. To access it, please dial 800-475-6701 and at the voice prompt enter today's conference ID of 859917. Alternatively, you may go to www.harman.com to listen to the Web replay. And again, enter the access code of 859917.

HARMAN INTERNATIONAL INDUSTRIES
Host: Dr. Sidney Harman
January 25, 2007/4:30 p.m. EST
Page 50

That does conclude our press release for this quarter. Thank you very

much for your participation as well as for using AT&T's Executive

Teleconference Service.  You may now disconnect.

Harman International
PRESS RELEASE

August 14, 2007                          FOR IMMEDIATE RELEASE
                                         Contact:   Robert C. Ryan
                                         Vice President – Treasurer
                                         Harman International Industries, Incorporated
                                         202-393-1101

## HARMAN INTERNATIONAL REPORTS FOURTH QUARTER AND FULL YEAR RESULTS

Washington, D.C. – Harman International Industries, Incorporated (NYSE:  HAR) today announced results for the fiscal year ended June 30, 2007.  Net sales were $3.551 billion, an increase of 9 percent compared to last year.  Net income increased 23 percent to $314 million for the year.  Earnings per diluted share were $4.72 compared to $3.75 a year ago, a 26 percent increase.  After non-recurring restructuring charges, merger costs and tax items, earnings per diluted share were $4.14 compared to $3.89 last year.

Automotive net sales for the fiscal year were $2.493 billion compared to $2.238 billion a year ago, an increase of 11 percent compared to last year.  Consumer net sales were $498 million compared to $493 million a year ago, a 1 percent increase.  Professional net sales were $561 million compared to $517 million a year ago, an increase of 8 percent compared to the prior year.

Net sales for the fourth quarter were $911 million, an increase of 6 percent compared to the prior year.  Net income was $105 million compared to $65 million a year ago, a 62 percent increase.  Earnings per diluted share were $1.58 compared to $0.95 in the fourth quarter last year, a 66 percent increase.  After fourth quarter non-recurring restructuring charges, merger costs and tax items, earnings per diluted share were $0.98.

All three operating segments reported higher sales for the fourth quarter compared to the prior year.  Automotive sales were $635 million, an increase of 6 percent.  Consumer sales grew 2 percent to $124 million.  Professional sales were $153 million, 12 percent higher than last year's quarter.

Dr. Sidney Harman, Executive Chairman, and Dinesh Paliwal, Chief Executive Officer, commented:

August 14, 2007
Page 2

"We achieved good results in fiscal 2007 and completed the year with a strong balance
sheet. Automotive expanded its Infotainment Systems offerings from luxury to mid-range and entry-
level cars. Professional continues to grow through development of new technologies enabling
simplified and centralized control of complex audio systems. Consumer sales were higher than last
year but tremendous competition in the multimedia market had an adverse effect on operating
margins. Our balance sheet was strengthened by repurchasing $129 million of our common stock
during the year and reducing debt by $121 million.

On April 26, 2007, Harman announced that it had entered into a merger agreement with affiliates of
Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners in a transaction valued at approximately
$8 billion. We anticipate completing the transaction during the third or fourth quarter of this calendar
year."

At 4:30 p.m. EDT today, Harman International will host an analyst and investor conference call to
discuss the results for the three and twelve months ended June 30, 2007. To participate in the
conference call, please dial (877) 777-1968 or for international calls dial (612) 332-1025 prior to 4:30
p.m. EDT. Please let the operator know that you would like to join the Harman International call.


A replay of the conference call will be available following the completion of the call at approximately
8:00 p.m. EDT. The replay will be available through August 21, 2007. Please call (800) 475-6701 to
access the replay. For international calls please call (320) 365-3844. The access code number is
882301.


Harman International will be web-casting the conference call. The web-cast can be accessed
at http://65.197.1.5/att/confcast as well as www.harman.com, in the Investor Relations
section. Conference I.D. is 1112828117 with a Passcode of Harman. Participation through the web-
cast will be in listen-only mode. You will need Windows Media Player or Real Player to listen to the
presentation. An archive will be available for 7 days following the presentation.

August 14, 2007


Page 3


Harman International Industries, Incorporated (www.harman.com) is a leading manufacturer of high-quality, high-fidelity audio products and electronic systems for the automotive, consumer and professional markets.  The Company's stock is traded on the New York Stock Exchange under the symbol:  HAR.

> *Note:  Except for historical information contained herein, the matters discussed are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act.  You should not place undue reliance on these statements.  We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current market conditions, current economic data, expected future developments and other factors that we believe are appropriate under the circumstances.  These statements involve risks and uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements, including but not limited to our failure to complete the transaction with affiliates of Kohlberg Kravis Roberts & Co., L.P. and GS Capital Partners, the effect of changes in consumer confidence, a rise in interest rates affecting consumer spending, automobile industry sales and production rates, the loss of one or more significant customers, including our automotive customers, model-year changeovers and customer acceptance in the automotive industry, our ability to satisfy contract performance criteria, availability of key components to the products we manufacture, competitive products, customer acceptance of our consumer and professional products, fluctuations in currency exchangerates, the outcome of pending or future litigation and other claims, labor disputes at our facilities and those of our customers or common carriers, general economic conditions and other risks detailed in filings made by Harman International with the Securities and Exchange Commission.*

# HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED
## GAAP CONDENSED CONSOLIDATED
## STATEMENTS OF OPERATIONS
### (000s omitted except per share amounts)
### (unaudited)

|  | Three Months Ended June 30, | | Twelve Months Ended June 30, | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
| Net sales | $ 911,113 | 859,117 | 3,551,144 | 3,247,897 |
| Cost of sales | 612,209 | 560,228 | 2,339,938 | 2,095,327 |
| Gross profit | 298,904 | 298,889 | 1,211,206 | 1,152,570 |
| Selling, general and administrative expenses | 217,478 | 194,491 | 824,819 | 755,329 |
| Operating income | 81,426 | 104,398 | 386,387 | 397,241 |
| Other expenses: | | | | |
| Interest expense, net | 523 | 2,138 | 1,500 | 13,027 |
| Miscellaneous, net | 794 | 5,400 | 2,682 | 8,027 |
| Income before income taxes and minority interest | 80,109 | 96,860 | 382,205 | 376,187 |
| Income tax expense | (24,183) | 32,361 | 70,186 | 121,877 |
| Minority interest | (631) | (268) | (1,944) | (985) |
| Net income | $ 104,923 | 64,767 | 313,963 | 255,295 |
| Basic earnings per share | $ 1.61 | 0.97 | 4.81 | 3.85 |
| Diluted earnings per share | $ 1.58 | 0.95 | 4.72 | 3.75 |
| Shares outstanding – Basic | 65,196 | 66,733 | 65,310 | 66,260 |
| Shares outstanding – Diluted | 66,352 | 67,984 | 66,449 | 68,105 |

Case 1:07-cv-01757-RWR     Document 21-14     Filed 07/03/2008     Page 5 of 13

## HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED
## GAAP CONDENSED CONSOLIDATED BALANCE SHEETS
### (000s omitted)

|  | (unaudited) June 30, 2007 | June 30, 2006 |
|---|---:|---:|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 106,141 | 291,758 |
| Accounts receivable | 486,557 | 444,474 |
| Inventories | 453,156 | 344,957 |
| Other current assets | 187,299 | 186,778 |
| Total current assets | 1,233,153 | 1,267,967 |
| Property, plant and equipment | 591,976 | 521,935 |
| Goodwill | 403,749 | 381,219 |
| Other assets | 279,990 | 204,631 |
| Total assets | $ 2,508,868 | 2,375,752 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Short-term borrowings | $ 1,838 | 1,751 |
| Current portion of long-term debt | 17,029 | 16,337 |
| Accounts payable | 356,763 | 320,327 |
| Accrued liabilities | 440,351 | 549,481 |
| Total current liabilities | 815,981 | 887,896 |
| Borrowings under revolving credit facility | 55,000 | 159,900 |
| Long-term debt | 2,661 | 19,566 |
| Other non-current liabilities | 141,185 | 80,226 |
| Total shareholders' equity | 1,494,041 | 1,228,164 |
| Total liabilities and shareholders' equity | $ 2,508,868 | 2,375,752 |

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND**
**RECONCILIATION OF GAAP TO NON-GAAP RESULTS**
**(000s omitted except per share amounts)**
**(unaudited)**

|  | Three Months Ended June 30, 2007 | | | Three Months Ended June 30, 2006 |
|---|---|---|---|---|
|  | GAAP | Adjustments | Non-GAAP | GAAP |
| Net sales | $911,113 | --- | 911,113 | 859,117 |
| Cost of sales | 612,209 | --- | 612,209 | 560,228 |
| Gross profit | 298,904 | --- | 298,904 | 298,889 |
| Selling, general and administrative expenses | 217,478 | (8,388)  (a) | 209,090 | 194,491 |
| Operating income | 81,426 | 8,388 | 89,814 | 104,398 |
| Other expenses: |  |  |  |  |
| Interest expense, net | 523 | --- | 523 | 2,138 |
| Miscellaneous, net | 794 | --- | 794 | 5,400 |
| Income before income taxes and minority interest | 80,109 | 8,388 | 88,497 | 96,860 |
| Income tax expense | (24,183) | 48,530  (b) | 24,347 | 32,361 |
| Minority interest | (631) | --- | (631) | (268) |
| Net income | $104,923 | (40,142) | 64,781 | 64,767 |
| Basic earnings per share | $    1.61 | (0.62) | 0.99 | 0.97 |
| Diluted earnings per share | $    1.58 | (0.60) | 0.98 | 0.95 |

Case 1:07-cv-01757-RWR    Document 21-14    Filed 07/03/2008    Page 9 of 13

| | | | | |
|---|---|---|---|---|
| Shares outstanding – Basic | 65,196 | 65,196 | 65,196 | 66,733 |
| Shares outstanding – Diluted | 66,352 | 66,352 | 66,352 | 67,984 |

(a) **Restructuring charges in the amount of $4.6 million were recorded during the fourth quarter to increase efficiency in manufacturing and engineering. Merger costs related to our proposed transaction with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners were incurred during the fourth quarter in the amount of $3.8 million.**

(b) **Income tax expense includes $46.7 million of tax items, net, resulting from a recent court decision that allows certain tax payers to recognize foreign tax credits. The tax effects of the restructuring charges and merger costs were $1.6 million and $0.2 million, respectively.**

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND**
**RECONCILIATION OF GAAP TO NON-GAAP RESULTS**
**(000s omitted except per share amounts)**
**(unaudited)**

| | Year Ended June 30, 2007 | | | Year Ended June 30, 2006 |
| | GAAP | Adjustments | Non-GAAP | GAAP |
|---|---|---|---|---|
| Net sales | $3,551,144 | --- | 3,551,144 | 3,247,897 |
| Cost of sales | 2,339,938 | --- | 2,339,938 | 2,095,327 |
| Gross profit | 1,211,206 | --- | 1,211,206 | 1,152,570 |
| Selling, general and administrative expenses | 824,819 | (10,879) (a) | 813,940 | 755,329 |
| Operating income | 386,387 | 10,879 | 397,266 | 397,241 |
| Other expenses: | | | | |
| Interest expense, net | 1,500 | --- | 1,500 | 13,027 |
| Miscellaneous, net | 2,682 | --- | 2,682 | 8,027 |
| Income before income taxes and minority interest | 382,205 | 10,879 | 393,084 | 376,187 |
| Income tax expense | 70,186 | 49,413 (b) | 119,599 | 121,877 |
| Minority interest | (1,944) | --- | (1,944) | (985) |
| Net income | $ 313,963 | (38,534) | 275,429 | 255,295 |
| Basic earnings per share | $    4.81 | (0.59) | 4.22 | 3.85 |
| Diluted earnings per share | $    4.72 | (0.58) | 4.14 | 3.75 |
| Shares outstanding – Basic | 65,310 | 65,310 | 65,310 | 66,260 |

Shares outstanding – Diluted          66,449          66,449          66,449          68,105

Case 1:07-cv-01757-RWR     Document 21-14     Filed 07/03/2008     Page 11 of 13

(a)  **Restructuring charges in the amount of $7.1 million were recorded during fiscal 2007 to increase efficiency in manufacturing and engineering. Merger costs related to our proposed transaction with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners were incurred during the fourth quarter in the amount of $3.8 million.**

(b)  **Income tax expense includes $46.7 million of tax items, net, resulting from a recent court decision that allows certain tax payers to recognize foreign tax credits. The tax effects of the restructuring charges and merger costs were $2.5 million and $0.2 million, respectively.**

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**STATEMENT REGARDING GAAP AND NON-GAAP RESULTS**

Harman International has provided a reconciliation of non-GAAP measures in order to provide the users of these financial statements with a better understanding of our fiscal 2007 restructuring charges, merger costs and tax items. These non-GAAP measures are not measurements under accounting principles generally accepted in the United States. These measurements should be considered in addition to, but not as a substitute for, the information contained in our financial statements prepared in accordance with GAAP.

QuickLinks -- Click here to rapidly navigate through this document

As filed with the Securities and Exchange Commission on August 13, 2007.

Registration No. 333-144335

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Amendment No. 1
## to
## FORM S-1

REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

# KKR & CO. L.P.

(Exact name of Registrant as specified in its charter)

| Delaware | 6282 | 26-0426107 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

9 West 57 th Street, Suite 4200
New York, NY 10019
Telephone: (212) 750-8300
(Address, including zip code, and telephone number,
including area code, of Registrant's principal executive offices)

William J. Janetschek
Chief Financial Officer
KKR & Co. L.P.

9 West 57 th Street, Suite 4200
New York, NY 10019
Telephone: (212) 750-8300
(Name, address, including zip code, and telephone number,
including area code, of agent for service)

Copies to :

| Joseph H. Kaufman, Esq. | Richard D. Truesdell, Jr., Esq. |
|---|---|
| Simpson Thacher & Bartlett LLP | Davis Polk & Wardwell |
| 425 Lexington Avenue | 450 Lexington Avenue |
| New York, New York 10017-3954 | New York, New York 10017 |
| Telephone: (212) 455-2000 | Telephone: (212) 450-4000 |
| Facsimile: (212) 455-2502 | Facsimile: (212) 450-4800 |

Approximate date of commencement of the proposed sale of the securities to the public: As soon as practicable after the Registration Statement becomes effective.

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

**CALCULATION OF REGISTRATION FEE**

| Title Of Each Class Of Securities To Be Registered | Proposed Maximum Aggregate Offering Price(1)(2) | Amount of Registration Fee |
| --- | --- | --- |
| Common Units Representing Limited Partner Interests | $1,250,000,000 | $38,375(3) |

(1)    Estimated solely for the purpose of calculating the amount of the registration fee pursuant to Rule 457(o) under the Securities Act.

(2)    Includes units subject to the underwriters' option to purchase additional common units.

(3)    Previously paid.

    The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED AUGUST 13, 2007**

**PRELIMINARY PROSPECTUS**



## Common Units
## Representing Limited Partner Interests

This is the initial public offering of our common units, which represent limited partner interests in our partnership. We are selling all of the common units in this offering. None of our existing owners is selling any common units or will otherwise receive any of the net proceeds from this offering.

Prior to this offering, there has been no public market for our common units. We expect the public offering price will be between $       and $       per common unit. We intend to list our common units on the New York Stock Exchange under the symbol "KKR."

**Investing in our common units involves a high degree of risk. See "Risk Factors" beginning on page 30 of this prospectus. These risks include the following:**

- We are managed by a general partner, which we refer to as our Managing Partner, and do not have our own directors or officers. Unlike the holders of common stock in a corporation, our unitholders will have only limited voting rights and will have no right to elect or remove our Managing Partner or its directors. Immediately following this offering, our principals will generally have sufficient voting power to determine the outcome of any matters that may be submitted for a vote of our unitholders.

- We believe that we will be treated as a partnership for U.S. federal income tax purposes and you therefore will be required to take into account your allocable share of items of our income, gain, loss and deduction in computing your U.S. federal income tax liability. You may not receive cash distributions equal to your allocable share of our net taxable income or even the tax liability that results from that income.

- Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes under the rules governing publicly traded partnerships and would require that we be treated as a corporation for U.S. federal income tax purposes. Separately, legislation has been introduced that would, if enacted, treat income received by a partner with respect to an investment services partnership interest as ordinary income received for the performance of services. If the above or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units.

|  | Per Common Unit | Total |
|---|---|---|
| Initial public offering price | $ | $ |

| | | |
|---|---|---|
| **Underwriting discount** | $ | $ |
| **Proceeds, before expenses, to us** | $ | $ |

To the extent that the underwriters sell more than            common units, the underwriters have the option to purchase up to an additional        common units from us at the initial public offering price less the underwriting discount.

Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

The underwriters expect to deliver the common units to purchasers on or about                   , 2007.

**Morgan Stanley**                    **Citi**

The date of this prospectus is                   , 2007.



Contractual Life of Our Investment Capital at Fund Inception



Amount Invested Since Inception and Total Value



Our Assets Under Management



Our Cumulative Distributions to Investors From 2002 to Present

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Summary | 1 |
| Risk Factors | 30 |
|    Risks Related to Our Business | 30 |
|    Risks Relating to the Investments We Manage | 38 |
|    Risks Related to Our Organizational Structure | 46 |
|    Risks Related to Our Common Units and this Offering | 53 |
|    Risks Relating to U.S. Taxation | 54 |
| Use of Proceeds | 58 |
| Distribution Policy | 59 |
| Capitalization | 61 |
| Dilution | 62 |
| Organizational Structure | 63 |
| Unaudited Pro Forma Financial Information | 69 |
| Selected Historical Financial and Other Data | 81 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 82 |
| Private Equity Valuations and Related Data | 120 |
| Industry | 122 |
| Business | 128 |
| Management | 163 |
| Security Ownership | 168 |
| Certain Relationships and Related Party Transactions | 169 |
| Conflicts of Interest and Fiduciary Responsibilities | 175 |
| Description of Our Common Units | 181 |
| Description of Our Limited Partnership Agreement | 182 |
| Common Units Eligible for Future Sale | 192 |
| Material U.S. Federal Tax Considerations | 194 |
| Underwriting | 209 |
| Legal Matters | 213 |
| Experts | 213 |
| Where You Can Find More Information | 213 |
| Index to Financial Statements | F-1 |
| Appendix A: Form of Amended and Restated Limited Partnership Agreement | A-1 |

You should rely only on the information contained in this prospectus or in any free writing prospectus we may authorize to be delivered to you. Neither we nor the underwriters have authorized anyone to provide you with additional or different information. We and the underwriters are offering to sell, and seeking offers to buy, our common units only in jurisdictions where offers and sales are permitted. The information in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or any sale of our common units.

We have prepared this prospectus using a number of conventions, which you should consider when reading the information contained herein. Unless the context suggests otherwise, references in this prospectus to "KKR," "we," "us," "our" and "our partnership" refer:

- prior to our reorganization into a holding company structure, to the KKR Group, which comprises certain consolidated and combined entities under the common control of our senior principals, and

i

under the common ownership of our principals and certain other individuals who have been involved in our business, whom we refer to collectively as our existing owners, and

- after our reorganization into a holding company structure, to KKR & Co. L.P. and its consolidated subsidiaries, which will continue to be under the common control of our senior principals.

The KKR Group is considered our predecessor for accounting purposes and its combined financial statements will be our historical financial statements following our reorganization and this offering. We will not acquire all of the interests in the KKR Group in connection with our reorganization and, accordingly, the combined financial statements of the KKR Group may not be indicative of the results of operations and financial condition that we will have following the completion of this offering. In addition, we will not be allocated any of the capital contributions made by the general partners of our funds prior to the completion of our reorganization and this offering or any returns generated on those contributions. See "Organizational Structure," "Unaudited Pro Forma Financial Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

References in this prospectus to "KFN" are to KKR Financial Holdings LLC, a publicly traded credit strategy fund whose limited liability company interests are listed on the New York Stock Exchange under the symbol "KFN."

References in this prospectus to our (i) "principals" are to our senior investment and other professionals who hold interests in our Group Partnerships and (ii) "senior principals" are to those identified as senior principals in "Business—Employees." References in this prospectus to our "traditional private equity funds" are to our private equity funds other than KKR Private Equity Investors (our private equity-oriented permanent capital fund).

In this prospectus, we also periodically refer to our "assets under management," which represent the assets as to which we are entitled to receive a fee or carried interest. We calculate the amount of assets under management as of any date as the sum of:

- the fair value of the investments of our traditional private equity funds and our carry-paying co-investment vehicles plus the capital that we are entitled to call from investors in our traditional private equity funds with respect to their unfunded capital commitments;

- the net asset value, or "NAV," of KKR Private Equity Investors and the KKR Strategic Capital Funds (our three private side-by-side credit opportunity funds);

- the equity of KFN; and

- the capital raised by structured finance vehicles that we manage.

Unless otherwise indicated, our assets under management as of March 31, 2007 have been adjusted to include unfunded capital commitments that have been made to the 2006 Fund and our newly-formed Asian Fund and capital raised by our structured finance vehicles since that date. You should bear in mind that our calculation of assets under management may differ from the calculations of other asset managers and, as a result, our measurements of our assets under management may not be comparable to similar measures presented by other asset managers. Our definition of assets under management is not based on any definition of assets under management that is set forth in the agreements governing the investment funds that we manage. See "Private Equity Valuations and Related Data" for more information.

Unless indicated otherwise, the information included in this prospectus assumes no exercise by the underwriters of the option to purchase up to an additional         common units from us and that the common units to be sold in this offering will be sold at a price of $         per common unit, which is the midpoint of the price range indicated on the front cover of this prospectus.

ii

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

^ This prospectus contains forward-looking statements, which reflect our current views with respect to, among other things, our operations and financial performance. You can identify these forward-looking statements by the use of words such as "outlook," "believe," "expect," "potential," "continue," "may," "should," "seek," "approximately," "predict," "intend," "will," "plan," "estimate," "anticipate" or the negative version of these words or other comparable words. Forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. We believe these factors include, but are not limited to, those described under "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." These factors should not be construed as exhaustive and should be read in conjunction with the other cautionary statements that are included in this prospectus. We undertake no obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments or otherwise.

**MARKET AND INDUSTRY DATA**

This prospectus includes market and industry data and forecasts that we have derived from independent reports, publicly available information, various industry publications, other published industry sources and our internal data and estimates. Independent reports, industry publications and other published industry sources generally indicate that the information contained therein was obtained from sources believed to be reliable. Our internal data and estimates are based upon information obtained from investors in our funds, trade and business organizations and other contacts in the markets in which we operate and our understanding of industry conditions. Although we believe that such information is reliable, we have not had this information verified by any independent sources.

iii

# SUMMARY

*This summary highlights information contained elsewhere in this prospectus and does not contain all the information you should consider before investing in our common units. You should read this entire prospectus carefully, including the section entitled "Risk Factors" and the historical financial statements and related notes included elsewhere herein, before you decide to invest in our common units.*

## Our Company

Founded in 1976, we are a leading global alternative asset manager. Our 399 employees, including our 139 investment professionals, are led by our founders, Henry Kravis and George Roberts, who are pioneers of the leveraged buyout industry. Our history of landmark achievements in private equity includes the first leveraged buyout in excess of $1 billion, several of the largest leveraged buyouts announced worldwide to date, the first buyout of a public company by tender offer and the largest leveraged buyouts completed or announced in each of the United States, the Netherlands, Denmark, India, Australia, Singapore and France. We have continued our history of innovation by establishing new debt and public equity strategies that leverage the power of our brand and the intellectual capital in our private equity business.

Today, through our offices in New York, Menlo Park, San Francisco, London, Paris, Hong Kong and Tokyo, we sponsor and manage funds that make investments worldwide in private equity and debt transactions on behalf of third-party investors and our firm. We also manage substantial investments in public equity. During our 31-year history, we have raised 16 funds and received approximately $59.7 billion of capital and capital commitments from investors. We have grown our assets under management significantly, from approximately $18.3 billion as of December 31, 2002 to approximately $53.4 billion as of March 31, 2007, representing a compounded annual growth rate of 28.7%. Of our total assets under management, approximately $6.8 billion is "permanent capital," which is not required to be returned to investors and is able to be re-deployed as investments are realized.

As a global alternative asset manager, we earn ongoing management fees for providing management and other services to our funds as well as transaction, monitoring, incentive and other potential fees in connection with our private equity and other investments. We also earn investment income from investing our own capital alongside fund investors and from our carried interest in fund investments, which provides us with a disproportionate share of the investment gains generated on third-party capital invested by our private equity funds. We are also selectively pursuing opportunities to develop new investment structures and products that we believe will help us increase the amount of managed capital that we are able to commit to individual transactions, grow our assets under management and capture additional income streams.

In connection with this offering, we will complete a series of transactions pursuant to which our business will be reorganized into a holding company structure. Following our reorganization and this offering, we will have a right to the management, transaction, monitoring and other fees from our existing and future private equity funds and their portfolio companies. In addition, we will have the right to carried interest earned by the general partners of our existing and future private equity funds (other than the 1996 Fund and earlier funds) as well as any returns generated on capital contributions made by the general partners of these funds after the completion of this offering. We will also have a right to the management, incentive and other potential fees for managing our existing and future credit strategy funds as well as incentive fees from these funds. Although our principals have invested their own personal capital in our credit strategy funds, we have not made any direct capital contributions to those funds as a general partner or fund manager.

## Our Investment Approach

We approach our business and our investments as industrialists. We seek to invest in high quality companies that have strong business franchises, attractive growth prospects, leading market positions and the ability to generate superior returns. When we make investments, we partner with highly motivated

1

management teams to design and implement strategic and operational changes that create value in the businesses we acquire and we align our interests with other stakeholders by putting our own capital at risk. We believe that our leading position in the alternative asset management industry is due to the strategies we have created for sourcing investments and creating value for stakeholders.

*Sourcing Advantage*

We source new investments through our internal deal generation strategies and business relationships with leaders in the business and financial communities. We believe that we have a number of advantages for sourcing investments that differentiate our firm. These advantages include:

- *Industry Team Focus.*     Our investment professionals are organized into global industry teams. Each team conducts its own primary research and is responsible for developing a list of industry themes and trends, identifying companies that will benefit from those themes and trends, determining which companies would make an attractive investment and building relationships with industry leaders and management teams. Through the work of our industry teams, we have developed a detailed understanding of the economic drivers, inherent risks and opportunities for value creation across the industries in which we invest.

- *Direct Contacts with Business Leaders.*     We have consistently focused on making investments in large companies. Over our 31-year history, we have focused on cultivating direct relationships with key decision-makers at major companies throughout the world, which often provides us with direct investment opportunities. We believe that we currently have direct relationships with the chief executive officers or members of the boards of directors of two-thirds of the companies in the S&P 500 and the S&P Global 100.

- *Strong Relationships with Financial Leaders.*     We actively cultivate our relationships with major investment banking firms and other financial intermediaries and are among those firms' most significant clients. We believe our repeated and consistent dealings with major financial services firms over a long period of time, and our completion of a significant number of large transactions, have led to our being one of the first parties considered for potential investments.

By combining our industry team efforts with our established network of relationships, we believe we have a differentiated capability to source investments in large global companies.

*Value Creation*

We have developed an institutionalized process for creating value in the companies in which we invest by focusing on the operational and strategic aspects of their businesses. We are a patient investor and we have consistently approached the management of our investments with the goal of creating value over the long-term rather than realizing short-term gains through rapid dispositions. Our value creation process begins before we commit to make an investment and continues until the investment is fully realized. Important components of this process include:

- *Operationally Focused Investment Professionals.*     Our investment professionals focus on the operations of our portfolio companies and the ways in which we can improve their businesses. Given our operational focus, our recruiting efforts have emphasized hiring executives with significant operating experience, including former chief executive officers, chief financial officers and managers of companies operating in a wide range of industry sectors.

- *Capstone Consultants.*     Our value-creation efforts are supported by Capstone Consulting, a team of approximately 25 operational consultants who work exclusively with our investment professionals and portfolio companies. Capstone works to address issues relating to top-line growth, cost optimization, efficient capital allocation and other challenges and opportunities that arise during the life of an investment.

- **Senior Advisors.**     To complement the expertise of our investment professionals and operational consultants, we have retained a team of 19 senior advisors who have held leading positions in major corporations and public agencies worldwide. Our senior advisors provide us with additional operational and strategic insights, serve on the boards of our portfolio companies, help us evaluate individual investment opportunities and assist our portfolio companies with operational matters.

- **Disciplined Value Creation Process.**     Before we invest in a company, our investment professionals identify the measures we will take to create new value for stakeholders. Because we believe that value creation must begin from the first day of an investment, our investment professionals and Capstone prepare "100-Day Plans" for investments that detail specific changes our portfolio company managers, investment professionals and operational consultants will implement during the first 100 days following our investment to drive value creation. We closely monitor our investments during and after the first 100 days with the goal of measuring progress, identifying additional opportunities for value creation and addressing any issues or challenges that may arise.

### Private Equity

We are a world leader in private equity, having sponsored and managed 14 private equity funds that have received more than $56.9 billion of capital and capital commitments during our 31-year history. Our private equity funds focus on investing in large capitalization companies. We believe this focus allows us to invest in industry-leading franchises with global operations, attract world class management teams, deploy large amounts of capital in individual transactions and optimize amounts of income that we earn on a per transaction basis. Our approach leverages our capital base, infrastructure, skill set, global network and industry and operating expertise, which we believe sets us apart from others.

As of March 31, 2007, our private equity funds had investments in 40 companies with more than $100 billion of annual revenues and more than 560,000 employees worldwide. Those portfolio companies were based in more than 10 countries and operated in 11 industry sectors. The following charts present information concerning the amount of capital invested by our private equity funds by geography and industry from January 1, 1996 through March 31, 2007.

**Dollars Invested by Geography Since 1996**          **Dollars Invested by Industry Since 1996**



When we make private equity investments, we adhere to a disciplined investment approach that seeks to generate large multiples of invested capital and attractive gross internal rates of return, or IRRs, by focusing on fundamentals and implementing operational and strategic changes that allow us to create and realize long-term value in our portfolio companies. We place significant emphasis on selecting high-quality investments that may be made at attractive prices, working with management to design and implement changes that drive value creation, and making informed decisions when developing investment exit strategies.

3

The following charts present information concerning the amount of capital invested and the amounts of realized and unrealized returns generated by our traditional private equity funds from our inception through March 31, 2007. Our traditional private equity funds consist of our private equity funds other than our private equity-oriented permanent capital fund.



From our inception through March 31, 2007, our first ten traditional private equity funds (representing all of our private equity funds that have invested for at least 30 months) achieved a multiple of invested capital of 2.7x and a cumulative gross IRR of 26.3%, compared to the 13.6% gross IRR achieved by the S&P 500 Index over the same period. The table below presents information as of March 31, 2007 relating to the historical performance of each of our traditional private equity funds since our inception, which we believe illustrates the benefits of our approach to making private equity investments. This data has been adjusted to give effect to subsequent commitments to the 2006 Fund and the Asian Fund, but does not otherwise reflect acquisitions or disposals of investments, changes in investment values or distributions occurring after March 31, 2007.

We encourage you to review the cautionary note below for a description of reasons why the future results of our private equity funds may differ from the historical results of our private equity funds. You should also see "Private Equity Valuations and Related Data" for a description of how the values in the table below were calculated.

| Private Equity Fund(1) | Amount Committed | Invested | Fair Value of Investments Realized | Unrealized | Total | Gross IRR | Net IRR | Multiple of Invested Capital |
|---|---|---|---|---|---|---|---|---|
| | | | *($ in millions)* | | | | | |
| **Historical Excluded Funds(2):** | | | | | | | | |
| 1976 Fund | $ 31 | $ 31 | $ 537 | $ — | $ 537 | 39.5% | 35.4% | 17.1x |
| 1980 Fund | 357 | 357 | 1,828 | — | 1,828 | 29.0 | 25.8 | 5.1 |
| 1982 Fund | 328 | 328 | 1,290 | — | 1,290 | 48.1 | 39.2 | 3.9 |
| 1984 Fund | 1,000 | 1,000 | 5,963 | — | 5,963 | 34.6 | 28.9 | 6.0 |
| 1986 Fund | 672 | 672 | 9,081 | — | 9,081 | 34.4 | 28.9 | 13.5 |
| 1987 Fund | 6,130 | 6,130 | 14,746 | 252 | 14,997 | 12.2 | 9.0 | 2.5 |
| 1993 Fund | 1,946 | 1,946 | 4,124 | 33 | 4,157 | 23.6 | 16.8 | 2.1 |
| 1996 Fund | 6,012 | 6,012 | 10,183 | 2,039 | 12,222 | 18.5 | 13.8 | 2.0 |
| **Included Funds:** | | | | | | | | |
| European Fund (1999)(3) | 3,085 | 3,085 | 3,942 | 3,694 | 7,636 | 30.9 | 23.3 | 2.5 |
| Millennium Fund (2002) | 6,000 | 5,881 | 4,264 | 6,991 | 11,255 | 53.6 | 40.6 | 1.9 |
| European Fund II (2005)(4) | 5,650 | 3,857 | — | 4,218 | 4,218 | * | * | * |
| 2006 Fund | 16,625 | 1,236 | — | 1,236 | 1,236 | * | * | * |
| Asian Fund (2007) | 4,000 | — | — | — | — | * | * | * |
| Total Funds(5) | $ 51,836 | $ 30,535 | $ 55,958 | $ 18,463 | $ 74,421 | 26.3% | 20.2% | 2.7x |
| Total Funds in Accounting | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Predecessor(2) | $ 41,372 | $ 20,071 | $ 18,389 | $ 18,178 | 36,567 | 23.9% | 18.3% | 1.8x |

4

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total Included Funds | $ 35,360 | $ 14,059 | $ 8,206 | $ 16,139 | $ 24,345 | 36.5% | 27.5% | 1.7x |

(1) The predecessor combined financial statements included in this prospectus consolidate the 1996 Fund and subsequent traditional private equity funds. We will not acquire interests in the 1996 Fund and prior funds in connection with our reorganization and this offering, because the general partners of those funds are not expected to receive meaningful proceeds from further realizations. In addition, we will not be allocated any of the capital contributions made by the general partners of our funds prior to the completion of our reorganization and this offering or any returns generated on those contributions. See "Organizational Structure" and "Unaudited Pro Forma Financial Information."

(2) The last investment for each of the 1976 Fund, the 1980 Fund, the 1982 Fund, the 1984 Fund and the 1986 Fund was liquidated on May 14, 2003, July 11, 2003, August 15, 1988, July 17, 1998 and December 29, 2004, respectively. The 1987 Fund and the 1993 Fund currently each have one investment, and it is not known when those funds will be liquidated.

(3) The European Fund's capital commitments include euro-denominated commitments of €196.5 million. We have converted these amounts into U.S. dollars based on the exchange rate prevailing on the dates on which capital was called.

(4) The European Fund II's capital commitments include euro-denominated commitments of €2,597,160,000. We have converted these amounts into U.S. dollars based on the exchange rate prevailing on (i) the dates on which capital was called in the case of funded commitments and (ii) March 31, 2007 in the case of unfunded commitments.

(5) The gross IRRs, net IRRs, and multiples of invested capital are calculated based on our first ten traditional private equity funds, which represent all of our private equity funds that have invested for at least 30 months.

Additionally, because our private equity approach has produced significant distributions for our fund investors, we believe that it has been an important contributor to the extended relationships that we have developed with our investor base. The following table presents information concerning the total distributions made by our traditional private equity funds during the periods indicated.

| | Year Ended December 31, | | | | | 2007 (through March 31) | Total |
|---|---|---|---|---|---|---|---|
| Year | 2002 | 2003 | 2004 | 2005 | 2006 | | |
| | | | ($ in millions) | | | | |
| Distributions to Investors | $ 897 | $ 3,016 | $ 7,035 | $ 3,569 | $ 5,251 | $ 780 | $ 20,548 |

Since March 31, 2007, we have completed an additional eight acquisitions with an aggregate transaction value of $56.9 billion. We also have entered into agreements relating to three pending acquisitions that have an aggregate transaction value of $83.5 billion and which are expected to close during the second half of 2007. We anticipate that our total equity investment will be approximately $5.25 billion for those pending acquisitions. We have received contractual commitments from financial institutions to provide the requisite debt financing for these transactions. However, whether and when those acquisitions will be consummated depends on a number of other factors, such as shareholder or regulatory approvals, some or all of which may be outside of our control.

KKR Private Equity Investors, which is not reflected in the foregoing tables, is an entity listed on Euronext Amsterdam focused primarily on making private equity investments through and alongside our private equity funds but with the flexibility to make other types of opportunistic investments, including credit and public equity investments. Unlike our other private equity funds, the fund has a perpetual investment period and is considered by us to be a permanent capital vehicle, in that fund investors

5

generally are not entitled to have their capital returned. As of March 31, 2007, KKR Private Equity Investors had a net asset value of $5.2 billion, which includes amounts invested in our traditional private equity funds. KKR Private Equity Investors consists of an upper-tier limited partnership, which we refer to as the feeder fund, that makes all of its investments through a lower-tier limited partnership, which we refer to as the master fund, of which it is the sole limited partner. Following our reorganization and this offering, we will have an economic interest in the general partner of the KKR Private Equity Investors master fund, which will entitle us to the carry received with respect to the fund's direct investments.

## Credit

We believe the intellectual capital of our people, our integrated global investment platform and our ability to effectively adapt our investment strategies to market conditions allow us to capitalize on investment opportunities at every level of a company's capital structure. Commencing in 2004, we began to actively pursue debt investments as a separate asset class and we now sponsor and manage a group of private and publicly traded investment funds that invest primarily in corporate debt investments and manage structured finance vehicles. These funds, which we refer to as credit strategy funds, currently consist of KFN, a New York Stock Exchange-listed debt vehicle, and the KKR Strategic Capital Funds, comprised of three private credit strategy funds that operate together, or side-by-side.

As of March 31, 2007, our credit strategy funds had approximately $8.2 billion of corporate debt investments, $11.9 billion of residential mortgage investments, and $297.3 million of equity investments. We earn a management fee for managing our credit strategy funds based on the amount of capital under management in each fund. As of March 31, 2007, our credit strategy funds had $2.8 billion of capital, of which $1.6 billion related to KFN and consisted of permanent capital, and our credit strategy funds currently manage $6.5 billion in structured finance vehicles. We have a right to earn management fees for managing our structured finance vehicles based on the amount of investments under management within each vehicle.

The table below presents information relating to the historical performance of our credit strategy funds as of March 31, 2007. We encourage you to review the cautionary note below for a description of reasons why the future results of our credit strategy funds may differ from the historical results of our credit strategy funds.

| | Inception | Assets Under Management | Annualized Gross IRR | Annualized Net IRR(1) | Total Investments(2) | Annualized Benchmark Return | |
| | | | | | | Lehman Aggregate Bond Index | Merrill Lynch High Yield Index |
|---|---|---|---|---|---|---|---|
| | | | | ($ in millions) | | | |
| KFN(3) | 2004 | $ 1,610.4 | 19.5% | 17.1% | $ 5,692.7 | 3.7% | 9.1% |
| KKR Strategic Capital Funds | 2006 | 1,141.0 | 41.3 | 34.8 | 2,809.5 | 5.6 | 14.7 |
| Total | | $ 2,751.4 | | | $ 8,502.2 | | |

(1)     The annualized Net IRR represents the return on invested equity after giving effect to payments of management fees, incentive fees and carried interest, as applicable, assumes reinvestment of all distributions and excludes non-investment expenses. Returns for the KKR Strategic Capital Funds, which were organized in October 2006, have been annualized based on actual returns from inception through March 31, 2007 of 15.8%, which compares to actual returns for the Lehman Aggregate Bond Index and the Merrill Lynch High Yield Index of 2.8% and 7.0%, respectively, for the same period.

(2)     Total investments include investments held directly and synthetically through total rate of return swaps and credit default swaps and also includes both funds' pro rata interest in the holdings of an unconsolidated affiliate.

6

(3)     Excludes investments by KFN in residential mortgage-backed securities, which totaled $11.9 billion as of March 31, 2007. In connection with its May 2007 restructuring, KFN has announced that it is evaluating various alternatives to reduce these types of investments.

<p style="text-align:center"><strong>New Business Initiatives</strong></p>

Our principal growth strategy throughout our firm's 31-year history has been to expand our existing private equity businesses and to enter attractive new businesses. While most of our recent growth has come from our private equity and debt activities, we believe significant growth opportunities exist for developing new business areas.

### Public Equity

Although our funds have historically focused on private equity and debt investments, we have managed investments in public equity throughout our history. Initially, our public equity investments consisted of minority and structured investments in public companies that were made by our private equity funds. More recently, our private equity-oriented permanent capital fund and our two credit strategy funds have provided us with more investment flexibility than traditional private equity funds and an additional capital base for making equity investments in public companies. Using this capital base, we have been able to build a portfolio of public equity and equity-linked securities that had a market value of $1.3 billion as of March 31, 2007.

Our public equity strategies generally seek to leverage the intellectual capital developed in the course of our traditional private equity business, which may otherwise not be utilized if a private equity transaction is not consummated, to make public equity investments. We generally invest in companies whose market prices we believe significantly understate the quality of their assets. We believe that significant opportunities exist for us to expand our public equity activities and take advantage of the increasing number of suitable public equity investments that we identify. To achieve these results, we recently hired additional investment personnel who have specialized experience in the public equity markets.

### Capital Markets Activities

Capital markets activities represent an opportunity to efficiently increase our available investment capital, capture certain financing fees otherwise paid to third parties and earn incremental margins on committed capital. We are currently building this business in the United States, Europe and Asia with the objective of increasing the amount of third-party capital that we are able to commit to individual transactions, thereby growing our third-party assets under management and capturing additional income streams. We have hired experienced professionals with long-standing investor relationships to help us build this business. We expect that our capital markets activities initially will focus on syndicating to a broader base of investors a portion of the equity that we commit to provide in our larger private equity transactions, which we believe will help us reduce the need to partner with large consortiums of private equity firms on large leveraged buyouts, retain greater operational control over our portfolio companies and capture a greater portion of the economics that are generated by our private equity investments. Over time, we may expand our capital markets activities in a manner that similarly complements our other business activities. We have not yet commenced our capital markets activities, but expect to do so shortly after we receive all appropriate regulatory approvals and licenses.

<p style="text-align:center"><strong>Our Values</strong></p>

When our founders started KKR in 1976, leveraged buyouts were a novel form of corporate finance. With no financial services firm to model ourselves on and with little interest in copying an existing formula, we sought to build a firm based on principles and values that would provide a proper institutional foundation for years to come.

<p style="text-align:center">7</p>

We believe that our success to date has been largely attributable to our culture and values. As we continue to grow, our future performance will depend on both our ability to protect and remain true to our culture and our willingness to hire new people with different work experiences. We believe that adhering to the following values is critical to extending our record of success:

- **Honesty.**     We believe that integrity is the value upon which all other values are built. We are honest with one another and everyone with whom we work outside of our firm. We invest in companies and work with people with whom we are proud to associate ourselves.

- **Respect.**     We believe a collegial culture fostering a positive working environment benefits our firm as a whole. A guiding principle of our firm is to treat others as we would like to be treated. We believe in the importance of being fair, courteous and respectful to all.

- **Teamwork.**     We operate as a single worldwide team, working together to create the best outcome for our firm, our investors, the managers with whom we partner and other stakeholders. We seek solutions that benefit the businesses in which we invest, the people they employ and the constituencies they serve. We maintain a "flat" organizational structure in which our people help one another irrespective of where an issue or opportunity resides within our firm or our offices.

- **Excellence and Innovation.**     We strive to be the best at what we do. We believe that creativity is a competitive advantage and endeavor to put innovative ideas to work to solve problems. We are not afraid to assume prudent risks.

- **Accountability.**     We believe in the importance of firm-wide accountability. If an investment does not perform, we do not point fingers or assign blame. Rather, we collectively take responsibility, learn from our mistakes and improve our performance as individuals and as a team.

- **Fortitude.**     We believe in having the courage to say "no" to a deal—even at a late stage—if we become uncomfortable with any aspect of the transaction.

- **Sharing.**     We share financial results throughout our firm and we share the credit for our successes. No one in our firm claims sole possession of any idea or successful transaction.

These values are easy to write down, but hard to live by. They are, however, a healthy antidote to overconfidence, internal politics and other behaviors that could otherwise jeopardize our long-term success. We do not intend to change our values or the way we conduct our business as a result of this offering. Indeed, we would not be proceeding with this offering if we felt that it would move us away from our principles. We believe that if we continue to live by these values we will be able to maintain our industry leadership far into the future.

<div align="center">

**Our Strengths**

</div>

We believe that we possess a number of strengths that differentiate us from other alternative asset managers and provide us with competitive advantages for raising capital, securing investment opportunities, obtaining financing for transactions, consummating investments, creating value in our portfolio companies and generating attractive investment returns. These strengths include the following:

**One Firm with a Global Reach and Best-in-Class Processes**

With offices in seven major financial centers located on three continents, we are truly a global firm. Our global and diversified operations are supported by our sizeable capital base and extensive local market knowledge, which allow us to deploy capital across a number of geographical markets in a broad range of companies, industry sectors and asset classes. As of March 31, 2007, 34% of our investment professionals were based outside the United States and 63% of the unrealized value of our private equity portfolio consisted of investments in companies outside the United States. Although our operations span multiple continents and business lines, we are still managed as one firm with a common culture and are focused on

8

sharing knowledge, experience, resources and best practices throughout our offices and across our various investment classes. Our investment processes are overseen by three committees that operate globally, which consist of our equity investment committee, which reviews all investments made by our private equity funds, our debt investment committee, which reviews all investments made by our credit strategy funds, and our portfolio management committee, which monitors the performance of our private equity investments. Our founders, Henry Kravis and George Roberts, are active members of each of these committees. We believe that operating as a centrally managed firm that is both global and diversified enhances the growth and stability of our business and helps us make informed decisions across asset classes and geographies.

### Distinguished Track Record Across Economic Cycles

During our 31-year history, we have successfully invested under all types of economic and financial conditions, developing a track record that we believe distinguishes our firm. From our inception through March 31, 2007, our ten private equity funds that had invested for at least 30 months had achieved a cumulative gross IRR of 26.3%. During 2007, we were named "Best Private Equity Firm" by *Global Finance* and "European Large Buyout Firm of the Year" by *Financial New* s and the KKR Strategic Capital Funds were named "Hedge Fund Launch of the Year" by *Alternative Investment News.*

### Alignment of Interests

One of our fundamental philosophies has been to align our interests and the interests of our people with those of our fund investors. Since our inception, our investment professionals, senior advisors and other executives have invested or committed to invest approximately $1.5 billion of their personal capital in or alongside our funds. In structuring this offering, we have sought to achieve the same alignment of interests between our unitholders and our people through their significant and long-term ownership of our equity. Our principals will not receive any of the proceeds from this offering and will collectively own more than        % of the equity in our business immediately following this offering. To promote long-term alignment of interests, the equity directly or indirectly held by our principals and employees will be subject to significant forfeiture and transfer restrictions that require such persons to remain actively employed by us in order to realize the full value of their equity interests.

### Experienced Investment Professionals and Continuity of Senior Leadership

We have built our firm with the intellectual capital of our people, and we are guided daily by the diversity, depth and breadth of their collective knowledge and experience. Our 139 investment professionals, who are led by our founders, Henry Kravis and George Roberts, are supported by 19 senior advisors and 25 Capstone consultants. Our investment professionals have demonstrated an ability to address the challenges of cyclical markets by effectively adapting our investment strategies, financial structures and operational resources to existing market conditions, which provides us with a significant competitive advantage. We have also benefited from a high degree of continuity in our senior leadership.

### Distinct Ability to Source Proprietary Investments

We believe that we are able to source new investment opportunities as a result of our internal deal generation strategies and our global network of business relationships. Our investment professionals are organized into global industry teams that work across our offices to develop a list of industry themes and trends, to identify companies that will benefit from those trends and to determine which of those companies would make an attractive investment. When team members identify an investment opportunity, they leverage our network of global relationships with the goal of winning exclusive or limited access to the investment. We believe that our industry focus, when combined with our global network and the industry-

9

specific knowledge that we have developed over time, provides us with an important source of proprietary investments.

### Strong Relationships With Financial Leaders

We actively cultivate our relationships with major investment banking firms and other financial intermediaries and are among those firms' most significant clients. We believe that because of our repeated and consistent dealings with these firms and our completion of a significant number of large transactions, we are one of the first parties considered for potential investments and are often able to obtain financing for our transactions at attractive prices and with favorable terms.

### Focus on Value Creation

We have developed an institutionalized process for creating value in our investments. As part of our effort, we utilize the services of Capstone Consulting, a team of operational consultants that works exclusively with our investment professionals and portfolio company management teams. In addition, we have hired senior advisors to assist us, including the former chairmen or chief executive officers of Proctor & Gamble, Wells Fargo, HSBC, Eastman Kodak and Accenture. Our investment professionals, senior advisors and consultants work with our portfolio companies to address financial and operational issues in order to drive value creation. In most cases, the work initially involves developing operating and financial metrics but ultimately shifts to capitalizing on business opportunities to drive value creation over the long term.

### Long-Standing Investor Relationships

Over our 31-year history, we have established strong relationships with investors that have allowed us to raise significant amounts of capital for investment in a broad range of asset classes. Our fund investors consist of a diversified group of some of the largest public and private pension plans, global financial institutions, university endowments, funds of funds and high net worth individuals, many of whom have invested with us for decades across multiple funds. More recently, through the listing of two of our funds, we have expanded our investor base to include public market investors, such as mutual funds and hedge funds, providing us with an additional source of capital. We believe that the strength, breadth, duration and diversity of our investor relationships provide us with a significant advantage for raising capital from existing and new sources and will help us continue to grow our assets under management.

### Long-Term Capital Base with a Significant Amount of Permanent Capital

As of March 31, 2007, we had $53.4 billion of assets under management, making us one of the largest independent alternative asset managers in the world. These assets were invested or available for investment in private equity, debt and public equity transactions. We have created two listed permanent capital funds that are able to grow organically through the continuous investment and reinvestment of capital, which we believe provides us with stability and with a valuable potential source of long-term income.

### Proven Ability to Innovate

We pioneered the development of the leveraged buyout and have worked throughout our history on creating innovative financing structures that allow us to compete aggressively for transactions while maintaining ongoing financial flexibility. Examples of recent innovative financing structures include using a complex power hedging program in connection with our acquisition of Texas Genco and structuring our acquisition of Capmark Financial Group in a manner that allowed the company to achieve an investment grade credit rating. More recently, our ability to innovate has allowed us to grow our permanent capital

10

base and diversify our operations through the establishment of two permanent capital vehicles that have the flexibility to invest across asset classes.

## Our Growth Strategy

We believe the "KKR" name is associated with the successful execution of many of the largest and most complex private equity transactions worldwide; a focus on operational value creation; a strong investor base; a global network of strong business relationships; a reputation for integrity and fair dealing; and a distinguished track record of generating attractive investment returns. We intend to capitalize on the name recognition that we have developed and leverage the strength of our brand as we seek to grow our business.

### Deliver Attractive Returns Through Strong Investment Performance

We intend to adhere to the disciplined investment approach that we have developed over our 31-year history, focusing in particular on driving value creation from the time an investment is made. We believe that by maintaining investment discipline and taking a "hands-on" approach to our investments, we will be best positioned to continue to generate attractive returns for our funds and create long-term value for our unitholders.

### Grow Globally Across Existing Asset Classes

We intend to pursue opportunities within North America to increase the amount of managed capital that we are able to deploy in private equity and debt investments, while continuing to grow our public equity business. Outside of North America, we intend to focus on increasing the amount of private equity investments that we make in Europe and Asia, while building out our debt and public equity operations in those regions. Since October 2005, we have raised five new funds that received approximately $32.4 billion of capital and capital commitments from investors, including approximately $5.1 billion of permanent capital and a new $4.0 billion private equity fund that is focused on investment opportunities in Asia.

### Selectively Pursue Opportunities to Expand Our Investment Structures and Products

We believe that opportunities exist to develop and sponsor new investment vehicles and structures, including co-investment vehicles, and to raise new types of funds, such as long-oriented public equity funds, structured product funds and industry- or geography-specific funds, that allow us to deploy a greater amount of managed capital in our investments and thereby capture a greater share of the economics generated by these investments. To support these initiatives, we are currently developing a capital markets business in the United States, Europe and Asia, which we believe will provide us with new alternatives and capabilities for distributing our investment products to investors worldwide and to further broaden our investor base.

### Maintain Our Long-Term Focus

We have consistently approached the management of our business and our investments with the goal of creating and realizing value over the long term and we intend to maintain this long-term focus after we become a public company even though this may lead to increased volatility in our results from period to period. We do not intend to permit the short-term perspectives of some public market investors to influence our investment, operational or strategic decisions, our duties or commitments to our fund investors or our focus on creating long-term value for our unitholders.

## Why We Are Going Public

None of our existing owners is selling any common units in this offering or will otherwise receive any of the net proceeds that we raise. Our decision to go public is based on our conclusion that the offering will

11

benefit our firm and stakeholders over the long term by enabling us to grow in a manner that complements our businesses. In particular, we are going public for the following reasons:

- ***We Want to Leverage Our Industry and Company Research Efforts by Building New Businesses.*** We believe that significant opportunities exist for us to build new businesses by leveraging the intellectual capital of our firm and increasing the utilization of our people. While our private equity teams conduct in-depth research and have developed specific views on trends and participants in their industries, a large number of our private equity efforts do not result in actual private equity transactions. Historically, when we were unable to complete a private equity transaction, much of the work that we had completed remained unutilized. With our integrated efforts in debt and public market investing, we have in recent years been able to leverage the work and contacts of our private equity teams and deploy capital behind our ideas. We believe that becoming a public company will enable us to invest more heavily behind these activities and the ideas that we develop in the normal course of our business.

- ***We Want to Reduce Our Reliance on Third Party Sources of Capital.*** Since our inception, we have completed or announced more than $410 billion in private equity transactions, while investing or agreeing to invest approximately $42 billion of our own funds' equity in those transactions. The balance of the financing consisted of debt and equity that was syndicated to others, including other private equity firms. We recently launched a new capital markets initiative to capture a greater share of the economics in the transactions we originate and increase the operational control that we are able to exercise over our private equity investments. We expect to expand these capital markets activities utilizing a portion of the proceeds from this offering.

- ***Going Public Will Provide Us with a Currency for Potential Future Acquisitions.*** We believe that our strong brand name in the financial services industry will support growth through acquisitions or combinations with similarly strong franchises that will complement our existing activities. By adding our products and brand to the products of acquired companies, we believe we will be well positioned to create significant value for our stakeholders. While we do not have any current acquisition plans, becoming a public company will provide us with a currency that we may use to pursue those alternatives when attractive opportunities arise.

We place a strong emphasis on our culture and our values, and we intend to continue to operate our firm in the same manner we have throughout our 31-year history. In structuring this offering, we have sought to preserve and enhance our culture and values by continuing the approach we have followed over time for compensating and managing our people. Our founders and other principals do not want our people to be advantaged or disadvantaged as a result of their title or tenure at our firm at the time we complete this offering.

## Investment Risks

An investment in our common units involves substantial risks and uncertainties. Some of the more significant challenges and risks relating to an investment in our partnership include:

- risks associated with our susceptibility to economic and financial conditions;

- our dependence on our principals, including our founders and other key personnel;

- the volatility of our net income and cash flow;

- our ability to attract, retain and motivate high quality employees who will bring value to our operations;

- our ability to develop and sponsor new investment vehicles and structures, including co-investment vehicles, and to raise new types of funds;

- the strain on our resources due to the requirements of being a public entity;

12

- the potential for our investments to underperform, which would cause a decline in our net income and cash flow, and could obligate us to repay some carried interest that we previously received;

- competition in the asset management industry;

- the limited ability of our unitholders to influence decisions regarding our business;

- the historical returns of our funds may not be indicative of the future results of our funds;

- extensive regulation of and the possibility of increased regulatory focus on our businesses;

- the valuation methodologies for certain assets in our funds are subject to significant subjectivity; and

- potential conflicts of interest among our Managing Partner, its affiliates and us.

In addition, members of the U.S. Congress have introduced legislation that would, if enacted, preclude us from qualifying for treatment as a partnership for U.S. federal income tax purposes under the publicly traded partnership rules. Separately, members of the U.S. Congress have introduced legislation that would, if enacted, treat income received for performing investment management services as ordinary income received for the performance of services, which would also preclude us from qualifying for treatment as a partnership for U.S. federal income tax purposes. If any of these pieces of legislation or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability, which could result in a reduction in the value of our common units. Please see "Risk Factors" for a discussion of additional factors you should consider before making an investment in our common units.

### Cautionary Note Regarding Historical Fund Performance

The historical results for our private equity and credit strategy funds included above may not be indicative of the future results that you should expect from us. In particular, our funds' future results may differ significantly from their historical results for the following reasons:

- the rates of returns of our funds reflect unrealized gains as of the applicable valuation date that may never be realized, which may adversely affect the ultimate value realized from those funds' investments;

- you will not benefit from any value that was created in our funds prior to your investment in our common units to the extent such value has been realized;

- the historical returns of our funds and their future performance has been and will be affected by macroeconomic factors, including factors that may not have been prevalent in the periods relevant to the return data above;

- in the past few years, the rates of returns of some of our funds have been positively influenced by a number of investments that experienced a substantial decrease in the average holding period of such investments and rapid and substantial increases in value following the dates on which those investments were made, trends and rates of return that are not expected to continue;

- our funds' returns have benefited from investment opportunities and general market conditions that may not repeat themselves, including favorable borrowing conditions in the debt markets, and there can be no assurance that our current or future funds will be able to avail themselves of comparable investment opportunities or market conditions or that such market conditions will continue; and

- we may create new funds in the future that reflect a different asset mix in terms of allocations among funds, investment strategies, and geographic and industry exposure.

13

**Our Common Units Are Not Intended for Investors with a Short-Term Focus**

We have substantially grown our business, particularly during the past several years, due largely to the successful investment performance of our funds. While we believe that the long-term growth trends in our businesses are favorable, our financial results are subject to significant volatility and we are unable to predict our financial performance from quarter to quarter or year to year. Our asset management activities have benefited from high levels of investments in alternative asset classes in recent years. These activity levels may continue, but they could also decline at any time.

When managing our business, we focus closely on actual and expected changes in economic and financial conditions and we seek to adjust our activities in response to those developments. In the past, changing economic and financial conditions have led to variations in the level of our investment activities during any particular time period. We expect such variations to occur in future periods, which may lead to significant volatility in our net income and cash flow from period to period. However, we believe that by continuing to adhere to the disciplined investment approach that we have developed over our 31-year history rather than focusing on short-term financial results, we will be best positioned to continue to grow and prosper over the long term. We also believe that continuing to follow our long-term investment philosophy will allow us to continue to build the value of each of our existing portfolio companies, whether or not such growth produces distributable cash flow in a particular period. Because of the nature of our businesses and our long-term focus, our common units should be purchased only by investors who expect to remain unitholders for an extended period of time.

14

## Organizational Structure

The following diagram illustrates the ownership and organizational structure that we will have upon the completion of this offering.



Case 1:07-cv-01757-RWR       Document 21-15       Filed 07/03/2008       Page 27 of 199

15

**Notes:**

\*          Except for KKR Management Holdings Corp., all entities are taxable as partnerships for U.S. federal income tax purposes. KKR Management Holdings Corp. will be taxable as a corporation for U.S. federal income tax purposes. For a discussion of pending legislation that may preclude us from qualifying for treatment as a partnership for U.S. federal income tax purposes, see "Risk Factors—Risks Related to Our Business—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units."

\*\*          In connection with the Reorganization Transactions, the Group Partnerships will not acquire any interests in the 1996 Fund or the general partners of the 1996 Fund, and will acquire only an economic (but not controlling) interest in the general partner of the KKR Private Equity Investors master fund. The KKR Group consists of the management companies for our funds, the general partners of the 1996 Fund and subsequently formed private equity funds, the general partners of two entities that constitute the KKR Strategic Capital Funds and the consolidated subsidiaries of the foregoing and is our predecessor for accounting purposes. See "Organizational Structure—The KKR Group."

\*\*\*          We have not yet commenced our capital markets activities, but expect to do so shortly after we receive all appropriate regulatory approvals and licenses.

## Reorganization Transactions

          We are a Delaware limited partnership. As is commonly the case with limited partnerships, our partnership agreement provides for the management of our business and affairs by a general partner rather than a board of directors. Our general partner, which we refer to as our Managing Partner, is controlled by Henry Kravis and George Roberts, our founders, and will have a board of directors that is co-chaired by our founders and officers that are appointed by its board. Messrs. Kravis and Roberts will serve as Co-Chief Executive Officers of our Managing Partner. Upon completion of this offering, the board will consist of a majority of independent directors and will have an audit committee and a conflicts committee each composed entirely of independent directors. Our Managing Partner will not have an economic interest in our partnership except for one common unit.

          Prior to the completion of this offering, we will complete a series of transactions, which we refer to as the Reorganization Transactions, pursuant to which our business will be reorganized into a holding company structure. After the completion of the Reorganization Transactions, our business will be conducted through two limited partnerships, which we refer to as the Group Partnerships, as described below. We will control the business and affairs of the Group Partnerships, and we will be entitled to a pro rata share of their assets, liabilities, profits, losses and distributions. As a result, we will become the parent company for the Group Partnerships and the businesses that they conduct.

          Each Group Partnership will have an identical number of partner interests and, when held together, one partner interest in each of the Group Partnerships will represent a Group Partnership unit. We will indirectly hold a number of Group Partnership units that is equal to the number of our outstanding common units, and the balance of the outstanding Group Partnership units initially will be owned by KKR Holdings, which is owned by our founders, principals and certain of our former personnel and controlled by our founders. Accordingly, we will indirectly own          % of the outstanding Group Partnership units upon the completion of this offering, and KKR Holdings will own the remaining          % of the outstanding Group Partnership units. See "—About KKR Holdings." Except with respect to priority distributions for the benefit of unitholders as described under "Distribution Policy," all of the Group Partnership units will confer the same rights on the holders thereof and holders of Group Partnership units generally will be entitled to receive equivalent distributions pro rata based on their partner interests in the Group Partnerships.

16

Following the Reorganization Transactions, the Group Partnerships will own the following components of our historical businesses:

- controlling and economic interests in the management companies that provide management and other services to our funds;

- controlling and economic interests in the general partners of our traditional private equity funds, other than the 1996 Fund and our earlier funds; and

- an economic (but not controlling) interest in the general partner of the KKR Private Equity Investors master fund.

The Group Partnerships will not acquire all of the interests in the KKR Group, our predecessor for accounting purposes, in connection with the Reorganization Transactions and, accordingly, the combined financial statements of the KKR Group may not be indicative of the results of operations and financial condition that we will have following the completion of this offering. The KKR Group consists of the management companies for our funds, the general partners of the 1996 Fund and subsequently formed private equity funds, the general partners of two entities that constitute the KKR Strategic Capital Funds and the consolidated subsidiaries of the foregoing.

In addition to the "principals' interests" that will result from KKR Holdings' ownership of Group Partnership units, certain minority investors who have been or are involved in our business also will retain economic interests in some or all of the above entities following the completion of the Reorganization Transactions. Those retained interests, which will be accounted for as "non-controlling interests in consolidated entities," will consist of:

- economic interests in the general partners of our consolidated private equity funds that will entitle certain principals and former principals to          % of the capital invested by or on behalf of those general partners before the completion of the offering and any profit thereon;

- interests in our management company for our private equity funds and the general partners of our consolidated funds that will entitle certain minority investors to          % of the net income earned by the management company and          % of the carried interest received by those general partners with respect to the funds' investments for a specified period of time; and

- a 35% interest in the management company for our credit strategy funds that will allocate to other members of that management company their share of the management company's net income.

### Distributions to Existing Owners and Unitholders

For the year ended December 31, 2006 and the three months ended March 31, 2007, we distributed $1.06 billion and $318.8 million, respectively, to our existing owners. Prior to this offering, we intend to make one or more cash and in-kind distributions to certain of our existing owners representing substantially all of the cash-on-hand and certain personal property of the management company for our private equity funds. If the offering had occurred on March 31, 2007, we estimate that the aggregate amount of such distributions would have been $          million. However, the actual amount of such distributions will depend on the amount of the management company's cash-on-hand at the time of the offering.

Following this offering, we intend to make quarterly cash distributions to our unitholders in amounts that in the aggregate are expected to constitute substantially all of our adjusted cash flow from operations each year in excess of amounts determined by our Managing Partner to be necessary or appropriate to provide for the conduct of our business, to make appropriate investments in our business and our funds, to comply with applicable law, any of our debt instruments or other agreements or to provide for future distributions to our unitholders for any one or more of the ensuing four quarters. The partnership agreements of the Group Partnerships will provide that until          , our principals will not receive

17

distributions, other than tax distributions, in respect of Group Partnership units held by KKR Holdings with respect to a given year unless and until our unitholders receive aggregate distributions of $          per common unit on an annualized basis for such year. After                   , all the income of the Group Partnerships will be distributed pro rata to holders of Group Partnership units in accordance with their respective partner interests. See "Distribution Policy."

## Exchange Agreement

In connection with the offering, we will enter into an exchange agreement with KKR Holdings pursuant to which KKR Holdings and certain of its transferees may up to four times each year exchange Group Partnership units held by them (together with corresponding special voting units) for our common units on a one-for-one basis. The Group Partnership units are also subject to transfer restrictions, and will not be exchangeable before                    .

## Tax Receivable Agreement

The acquisition by our intermediate holding company of Group Partnership units from KKR Holdings is expected to result in an increase in our intermediate holding company's share of the tax basis of the tangible and intangible assets of KKR Management Holdings L.P., primarily attributable to a portion of the goodwill inherent in our business, that would not otherwise have been available. This increase in tax basis may increase depreciation and amortization for U.S. federal income tax purposes and therefore reduce the amount of income tax that our intermediate holding company would otherwise be required to pay in the future. We will enter into a tax receivable agreement with KKR Holdings requiring our intermediate holding company to pay to KKR Holdings or transferees of its Group Partnership units 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax that the intermediate holding company actually realizes as a result of this increase in tax basis, as well as 85% of the amount of any such savings the intermediate holding company actually realizes as a result of increases in tax basis that arise due to payments under the tax receivable agreement. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement."

## About KKR Holdings

Our principals and certain former personnel will hold equity interests in our business through KKR Holdings, which will hold the Group Partnership units not held by us. As a result, those individuals will receive financial benefits from our business in the form of distributions and payments received from KKR Holdings and the appreciation in the value of the Group Partnership units that KKR Holdings owns. The Group Partnership units held by KKR Holdings will be subject to applicable transfer restrictions, and will not be exchangeable for our common units before                    .

18

## The Offering

Common units offered by us

          common units.

Common units to be outstanding after the offering

        common units (or      common units if all Group Partnership units, other than those held by us, are exchanged for newly-issued common units on a one-for-one basis).

Use of proceeds

We estimate that we will receive approximately $    of net proceeds from this offering after deducting estimated underwriting discounts and offering expenses, or $    if the underwriters exercise in full their option to purchase an additional    common units from us. We intend to contribute the net proceeds we receive from the offering to the Group Partnerships in exchange for newly issued units in the Group Partnerships. The Group Partnerships are expected to use approximately   % to   % of the net proceeds that they receive from us to grow our existing business, approximately   % to   % of the net proceeds to expand into new related businesses, approximately   % to   % of the net proceeds to make additional capital commitments to our funds and portfolio companies, and approximately   % to   % of the net proceeds for general corporate purposes. None of our principals are selling any common units or will otherwise receive any of the net proceeds from this offering.

Voting rights; special voting units

Our Managing Partner, which serves as our sole general partner, will manage all of our business and affairs. You will not hold securities of our Managing Partner. Unlike the holders of common stock in a corporation, you will have only limited voting rights relating to certain matters affecting your investment and you will not have the right to elect or remove our Managing Partner or its directors, who will be appointed by certain of our senior principals.

Immediately following this offering, KKR Holdings, which is owned by our principals and certain of our former personnel and controlled by our founders, will beneficially own   % of the equity in our business. KKR Holdings will also hold an equivalent amount of special voting units in our partnership, which will entitle it to cast an equivalent number of votes on those few matters that may be submitted to a vote of our unitholders. Due to the foregoing, our founders generally will have sufficient voting power to determine the outcome of any matter that may be submitted to a unitholder vote. See "Description of Our Partnership Agreement—Meetings; Voting."

Distribution policy

We intend to make quarterly cash distributions to our unitholders in amounts that in the aggregate are expected to constitute substantially all of our adjusted cash flow from operations each year in excess of amounts determined by our Managing Partner to be necessary or appropriate to provide for the conduct of our business, to make appropriate investments in our business and our funds, to comply with applicable law, any of our debt instruments or other agreements or to provide for future distributions to our unitholders

19

for any one or more of the ensuing four quarters. We expect that our first quarterly distribution will be paid in            in respect of the period from the completion of this offering through                  . Because we will not know what our available adjusted cash flow from operations will be for any year until the end of such year, we expect that our first three quarterly distributions in respect of any given year will generally be smaller than the final quarterly distribution in respect of such year.

Our distribution policy reflects our belief that distributing substantially all of our adjusted cash flow from operations will provide transparency for our unitholders and impose on us an investment discipline with respect to the businesses and strategies that we pursue. The actual amount and timing of distributions on our common units will be subject to the discretion of our Managing Partner's board of directors, and we cannot assure you that we will in fact make distributions as intended, or at all. See "Distribution Policy."

We are a holding company and will have no material assets other than our ownership of Group Partnership units held directly and indirectly through our direct subsidiary, KKR Management Holdings Corp., which we refer to as our intermediate holding company. We intend to cause the Group Partnerships to make distributions on the Group Partnership units in order to fund any distributions that we may declare on our common units. If the Group Partnerships make such distributions, holders of Group Partnership units generally will be entitled to receive equivalent distributions pro rata based on their partner interests in the Group Partnerships, except as described under "—Priority distributions for the benefit of unitholders prior to          ."

If distributions from the Group Partnerships would otherwise be insufficient to cover the tax liabilities of a holder of a Group Partnership unit, the partnership agreement of each Group Partnership will provide for tax distributions to the holders of Group Partnership units. Generally, these tax distributions will be computed based on our estimate of the net taxable income of the relevant partnership allocable to a holder of a Group Partnership unit multiplied by an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax rate prescribed for an individual or corporate resident in New York, New York (taking into account the nondeductibility of certain expenses and the character of our income). A portion of any such tax distributions received by us, net of amounts used by our subsidiaries to pay their tax liability, will be distributed to our unitholders. Such amounts are generally expected to be sufficient to permit our U.S. unitholders to fund their estimated U.S. tax obligations (including any federal, state and local income taxes) with respect to their distributive shares of net income or gain, after taking into account any withholding tax imposed on us. We cannot assure you that, for any particular unitholder, such distributions will be sufficient to pay the unitholder's actual U.S. or non-U.S. tax liability.

Priority distributions for the benefit of unitholders prior to

The partnership agreements of the Group Partnerships will

20

provide that until      , the distributions of the Group Partnerships each year will be as follows:

- first, to our partnership and our intermediate holding company until sufficient amounts have been so distributed to permit us to make aggregate distributions to our unitholders of $      per common unit on an annualized basis for such year;

- second, to the other holders of Group Partnership units until an equivalent amount on a per unit basis has been distributed to such other holders for such year; and

- thereafter, pro rata to all holders of Group Partnership units in accordance with their respective percentage interests.

Accordingly, until              , our principals will not receive distributions, other than tax distributions, in respect of Group Partnership units held by KKR Holdings with respect to a given year unless and until our unitholders receive aggregate distributions of $      per common unit on an annualized basis for such year. We do not intend to maintain this priority distribution after       . After           , all the income of the Group Partnerships will be distributed pro rata to holders of Group Partnership units in accordance with their respective partner interests.

| | |
|---|---|
| Distributions prior to this offering | Prior to this offering, we intend to make one or more cash and in-kind distributions to certain of our existing owners representing substantially all of the cash-on-hand and certain personal property of the management company for our private equity funds. If the offering had occurred on March 31, 2007, we estimate that the aggregate amount of such distributions would have been $      million. However, the actual amount of such distributions will depend on the amount of the management company's cash on hand at the time of the offering. |
| Exchange rights relating to Group Partnership units | Prior to this offering, we will enter into an exchange agreement with KKR Holdings in connection with the Reorganization Transactions pursuant to which KKR Holdings or transferees of its Group Partnership units may up to four times each year (subject to the terms of the exchange agreement) exchange Group Partnership units held by them (together with corresponding special voting units) for our common units on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and reclassifications. The Group Partnership units are also subject to transfer restrictions, and will not be exchangeable before             . We have not yet determined how any such future exchange will be accounted for in our consolidated financial statements. |
| Tax receivable agreement | The acquisition by our intermediate holding company of Group Partnership units from KKR Holdings or transferees of its Group Partnership units from time to time pursuant to the exchange agreement is expected to result in an increase in our intermediate holding company's share of the tax basis of the tangible and |

21

intangible assets of KKR Management Holdings L.P., primarily attributable to a portion of the goodwill inherent in our business, that would not otherwise have been available. This increase in tax basis may increase (for tax purposes) depreciation and amortization and therefore reduce the amount of income tax that our intermediate holding company would otherwise be required to pay in the future. This increase in tax basis may also decrease gain (or increase loss) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets. We will enter into a tax receivable agreement with KKR Holdings requiring our intermediate holding company to pay to KKR Holdings or transferees of its Group Partnership units 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax that the intermediate holding company actually realizes (or is deemed to realize, in the case of an early termination payment by our intermediate holding company or a change of control) as a result of this increase in tax basis, as well as 85% of the amount of any such savings the intermediate holding company actually realizes (or is deemed to realize) as a result of increases in tax basis that arise due to future payments under the tax receivable agreement. Although we are not aware of any issue that would cause the IRS to challenge a tax basis increase, our existing owners will not reimburse us for any payments previously made under the tax receivable agreement if such tax basis increase were successfully challenged by the IRS. In the event that other of our current or future subsidiaries become taxable as corporations and acquire Group Partnership units in the future, or if we become taxable as a corporation for U.S. federal income tax purposes, we expect that each will become subject to a tax receivable agreement with substantially similar terms. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement."

| | |
|---|---|
| Risk factors | See "Risk Factors" for a discussion of risks you should carefully consider before deciding to invest in our common units. |
| Proposed New York Stock Exchange symbol | "KKR" |

22

———

In this prospectus, unless otherwise indicated, the number of common units outstanding and the other information that is based thereon does not reflect:

- common units issuable upon exchange of Group Partnership units that will be held by KKR Holdings or transferees of its Group Partnership units following the completion of the Reorganization Transactions, which Group Partnership units (together with a corresponding amount of special voting units) are exchangeable up to four times each year for our common units on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and reclassifications and compliance, as well as significant transfer restrictions, and will therefore not be exchangeable before                    ;

- common units that are issuable upon exercise of the underwriters' option to purchase additional common units from us;

- unvested restricted common units that we intend to grant to employees who are not our principals at the time of this offering under our 2007 Equity Incentive Plan; and

- additional common units that have been reserved for issuance under our 2007 Equity Incentive Plan.

———

KKR & Co. L.P. was formed as a Delaware limited partnership on June 25, 2007. Our Managing Partner was formed as a Delaware limited liability company on June 25, 2007. Our principal executive offices are located at 9 West 57th Street, 42nd Floor, New York, New York 10019, and our telephone number is (212) 750-8300. Our website is located at www.kkr.com. The information on our website is not part of this prospectus or the registration statement of which this prospectus forms a part and is not being incorporated by reference into either such document.

23

## Summary Historical Financial Data

The following summary historical combined financial information and other data of the KKR Group should be read together with "Organizational Structure," "Unaudited Pro Forma Financial Information," "Selected Historical Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the historical predecessor combined financial statements and related notes included elsewhere in this prospectus. We derived the summary historical combined financial data of the KKR Group as of December 31, 2005 and 2006 and for the years ended December 31, 2004, 2005 and 2006 from our audited predecessor combined financial statements included elsewhere in this prospectus. We derived the summary historical combined financial data of the KKR Group as of and for the three months ended March 31, 2006 and 2007 from our unaudited predecessor combined financial statements which are included elsewhere in this prospectus. The KKR Group consists of (i) the management companies for our funds, (ii) the general partners of the 1996 Fund and our subsequently formed private equity funds, (iii) the general partners of two of the entities that constitute the KKR Strategic Capital Funds and (iv) the consolidated subsidiaries of the foregoing. The KKR Group is considered our predecessor for accounting purposes and its combined financial statements will be our historical financial statements following the Reorganization Transactions and this offering. We will not acquire all of the interests in the KKR Group in connection with the Reorganization Transactions and, accordingly, the combined financial statements of the KKR Group may not be indicative of the results of operations and financial condition that we will have following the completion of this offering.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | | | ($ in thousands) | | |
| **Statements of Income Data:** | | | | | |
| **Revenues** | | | | | |
| Fee income | $ 183,462 | $ 232,945 | $ 410,329 | $ 93,798 | $ 68,840 |
| **Expenses** | | | | | |
| Employee compensation and benefits | 69,956 | 79,643 | 131,667 | 22,601 | 27,345 |
| Occupancy and related charges | 10,688 | 13,534 | 19,295 | 6,482 | 4,624 |
| General, administrative and other | 36,931 | 54,336 | 78,154 | 15,934 | 31,555 |
| Fund expenses | 16,470 | 20,778 | 38,350 | 4,778 | 16,810 |
| Total expenses | 134,045 | 168,291 | 267,466 | 49,795 | 80,334 |
| **Investment Income** | | | | | |
| Net gains from investment activities | 3,026,396 | 2,984,504 | 3,105,523 | 933,407 | 1,482,054 |
| Dividend income | 14,611 | 729,926 | 714,069 | 51,725 | 19,471 |
| Interest income | 54,060 | 27,166 | 210,872 | 11,119 | 68,269 |
| Interest expense | (524) | (697) | (29,542) | (1,366) | (15,593) |
| Total investment income | 3,094,543 | 3,740,899 | 4,000,922 | 994,885 | 1,554,201 |
| Income before non-controlling interests in income of consolidated entities and income taxes | 3,143,960 | 3,805,553 | 4,143,785 | 1,038,888 | 1,542,707 |
| Non-controlling interests in income of consolidated entities | 2,364,309 | 2,861,186 | 3,026,913 | 777,505 | 1,161,162 |
| Income before taxes | 779,651 | 944,367 | 1,116,872 | 261,383 | 381,545 |
| Income taxes | 6,265 | 2,900 | 4,163 | 767 | 627 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Net income | $ | 773,386 | $ | 941,467 | $ | 1,112,709 | $ | 260,616 | $ | 380,918 |

24

**Statements of Financial Condition Data (period end):**

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Total assets | $ 13,369,412 | $ 23,292,783 | | $ 25,887,304 | |
| Total liabilities | 418,778 | 1,281,923 | | 2,079,731 | |
| Non-controlling interests in consolidated entities | | 11,413,885 | 20,201,548 | | 21,907,784 |
| Total partners' capital | | 1,536,749 | 1,809,312 | | 1,899,789 |

**Statement of Cash Flow Data:**

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Net Cash Provided By (Used In) Operating Activities | $ 1,799,767 | $ (106,448) | $ (5,531,144) | $ 390,582 | $ (593,269) |
| Net Cash Used in Investing Activities | $ (2,575) | $ (5,052) | $ (130,110) | $ (2,933) | $ (71,432) |
| Net Cash (Used in) Provided By Financing Activities | $ (1,737,509) | $ 134,271 | $ 5,657,952 | $ (403,974) | $ 668,879 |

**Other Data:**

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Total Segment fee related earnings (1) | $ 58,790 | $ 89,611 | $ 197,061 | $ 38,289 | $ 64,224 |
| Adjusted cash flow from operations (2) | 716,976 | 666,755 | 1,108,874 | 411,556 | 161,556 |
| Assets under management (period end) | 15,147,300 | 23,350,700 | 43,873,400 | 22,294,000 | 53,418,200 |
| Private equity dollars invested(3) | 2,065,603 | 2,913,427 | 6,661,698 | 1,183,957 | 1,748,602 |
| Uncalled private equity commitments (period end)(4) | 4,846,500 | 7,341,600 | 17,597,400 | 18,639,900 | 21,334,600 |

(1)    "Total segment fee related earnings" is the aggregate of a profit measure that is reported by our two reportable business segments. See "Management's Discussion and Analysis of Financial Condition and Results of Operations— Key Operating and Performance Measures—Segment Operating and Performance Measures—Fee Related Earnings" and Note 9 to the audited predecessor combined financial statements included elsewhere in this prospectus. The difference between total segment fee related earnings and income before taxes presented in accordance with generally accepted accounting principles in the United States, or GAAP, is that total segment fee related earnings represents income before taxes adjusted to (i) exclude the expenses of consolidated funds, (ii) include management fees earned from consolidated funds that were eliminated in consolidation, (iii) exclude investment income and (iv) exclude non-controlling interests in income of consolidated entities.

Management uses total segment fee related earnings as a supplemental non-GAAP measure of operating performance. Management makes operating decisions and assesses the performance of our business based on financial and operating metrics and data that are presented without the consolidation of any of our investment funds. Our current operations are managed based in part on total segment fee related earnings, which consist primarily of the management, transaction and monitoring fees that we earn as the sponsor of our private equity funds and the management fees, incentive fees and carried interest, as applicable, that we earn as the sponsor of our credit strategy funds, after payment of our operating expenses. It has been and remains a key objective of our firm to maximize total segment fee related earnings, because those amounts directly affect our profits. As a public entity, we will continue to focus on positive fee earnings generation and use total segment fee related earnings levels to make operating decisions and assess the performance of our business, because those amounts will directly affect the returns to our investors. However, unlike net income presented in accordance with GAAP, a limitation of total segment fee related earnings is that it is not a complete view of amounts that will ultimately accrue to investors as it excludes investment income and expenses of consolidated funds and their respective management companies, which could be significant.

Case 1:07-cv-01757-RWR     Document 21-15     Filed 07/03/2008     Page 39 of 199

The following table presents a reconciliation of our total segment fee related earnings to income before taxes calculated in accordance with GAAP for the periods indicated. Total segment fee related earnings should not be considered in isolation or as an alternative to income before taxes.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | *($ in thousands)* | | | | |
| Total segment fee related earnings | $ 58,790 | $ 89,611 | $ 197,061 | $ 38,289 | $ 64,224 |
| Investment income | 3,094,543 | 3,740,899 | 4,000,922 | 994,885 | 1,554,201 |
| Non-controlling interests in income of consolidated entities | (2,364,309) | (2,861,186) | (3,026,913) | (777,505) | (1,161,162) |
| Expenses of consolidated funds | (9,942) | (11,312) | (22,334) | (3,251) | (149) |
| Fee income (earned from) paid to consolidated funds | 569 | (13,645) | (31,864) | 8,965 | (75,569) |
| Income before taxes | $ 779,651 | $ 944,367 | $ 1,116,872 | $ 261,383 | $ 381,545 |

(2)     "Adjusted cash flow from operations" is a supplemental non-GAAP measure that we use to assess liquidity and amounts available for distribution to our equity holders. See "Distribution Policy." Under GAAP, a significant number of our investment funds have been and will continue to be consolidated in our financial statements notwithstanding the fact that we hold only a minority economic interest in these funds. Consequently, our historical predecessor combined financial statements reflect, and our future consolidated financial statements will continue to reflect, the cash flows of our consolidated funds on a gross basis rather than the cash flows attributable to us.

Adjusted cash flow from operations is intended to reflect the actual cash flow attributable to us and is equal to cash flow from operations presented in accordance with GAAP, adjusted to exclude cash flow relating to (i) the investment activities of our consolidated funds, (ii) the realized and unrealized income attributable to non-controlling interests in our consolidated funds and (iii) changes in our operating assets and liabilities. We believe that adjusted cash flow from operations provides investors with useful information with respect to cash flows relating to our required capital investments and our ability to make annual cash distributions in accordance with our distribution policy. However, adjusted cash flow from operations should not be considered in isolation or as an alternative to cash flow from operations or income before taxes presented in accordance with GAAP.

26

The following table presents a reconciliation of our adjusted cash flow from operations to our net cash (used in) provided by operating activities presented in accordance with GAAP for the periods indicated.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | ($ in thousands) | | | | |
| **Net Cash Provided By (Used In) Operating Activities** | $ 1,799,767 | $ (106,448) | $ (5,531,144) | $ 390,582 | $ (593,269) |
| Change in operating assets and liabilities | (124,626) | 10,280 | 74,003 | 85,230 | (136,549) |
| KKR Funds related investment and cash activities | (1,577,741) | 907,294 | 6,475,177 | (379,406) | 776,373 |
| Net realized gains on investments | 2,932,802 | 1,567,312 | 3,244,931 | 1,651,340 | 417,997 |
| Change in unrealized (gains) losses on investments allocable to non-controlling interests | 37,184 | 1,142,480 | (143,243) | (566,991) | 844,695 |
| Non-controlling interests in income of consolidated entities | (2,364,309) | (2,861,186) | (3,026,913) | (777,505) | (1,161,162) |
| Other non-cash adjustments | 13,899 | 7,023 | 16,063 | 8,308 | 13,471 |
| **Adjusted cash flow from operations** | $ 716,976 | $ 666,755 | $ 1,108,874 | $ 411,558 | $ 161,556 |

(3)    "Private equity dollars invested" is the aggregate amount of capital invested by our private equity funds and carry-paying co-investment vehicles in private equity transactions. Such amounts include both capital contributed by fund investors and carry-paying co-investors with respect to which we are entitled to a carried interest and capital contributed by us as the general partner of a private equity fund with respect to which we are entitled to returns generated on the invested capital. From our inception through March 31, 2007, our first ten traditional private equity funds (representing all of our private equity funds that have invested for at least 30 months) achieved a multiple of invested capital of 2.7x the amount of capital they invested in private equity investments.

(4)    "Uncalled private equity commitments" represent unfunded commitments by limited partners of our traditional private equity funds to contribute capital to fund the purchase price to be paid for future portfolio company investments made by the funds. Such amounts do not include capital of our private equity-oriented permanent capital fund or our credit strategy funds that may be used to make private equity investments.

27

**Summary Pro Forma Financial Data**

The following table presents our summary condensed unaudited pro forma financial data, which has been derived from the unaudited pro forma financial information included under "Unaudited Pro Forma Financial Information." This data gives pro forma effect to the Reorganization Transactions, this offering and transactions relating to this offering, all as described under "Unaudited Pro Forma Financial Information," as if such transactions had occurred on January 1, 2006 for purposes of the unaudited pro forma statement of income data and as of March 31, 2007 for purposes of the unaudited pro forma statement of financial condition.

The pro forma adjustments principally give effect to the Reorganization Transactions, the elimination of the consolidated financial results of the general partners of the 1996 Fund, the deconsolidation of the KKR Private Equity Investors master fund and its general partner, and other transactions described under "Unaudited Pro Forma Financial Information."

These adjustments are based on available information and upon assumptions that our management believes are reasonable in order to reflect, on a pro forma basis, the impact of the transactions described above. The adjustments are described in more detail in the notes to the unaudited pro forma statements of income and the unaudited pro forma statement of financial condition included under "Unaudited Pro Forma Financial Information." Because information relating to these transactions is currently not determinable, this data is subject to completion and may change. In addition, this pro forma financial data has been included for informational purposes only and does not purport to reflect the results of operations or financial position that would have occurred had the transactions referred to above occurred on the dates indicated or had we operated as a public company during the periods presented or for any future period or date.

|  | Year Ended December 31, 2006 | Three Months Ended March 31, 2007 |
|---|---|---|
|  | *($ in thousands)* | |
| **Pro Forma Statements of Income Data:** | | |
| **Revenues** | | |
| Fee income | $ | $ |
| **Expenses** | | |
| Employee compensation and benefits | | |
| Occupancy and related charges | | |
| General, administrative and other | | |
| Fund expenses | | |
| Total expenses | | |
| **Investment Income** | | |
| Net gains from investment activities | | |
| Dividend income | | |
| Interest income | | |
| Interest expense | | |
| Total investment income | | |
| Income before non-controlling and principals' interests in income of consolidated entities and income taxes | | |
| Non-controlling interests in income of consolidated entities | | |
| Principals' interests in income of consolidated entities | | |
| Net income | | |

28

|  | Year Ended December 31, 2006 | Three Months Ended March 31, 2007 |
|---|---|---|
| ***Net Income Per Common Unit*** | | |
| Basic | | |
| Diluted | | |
| ***Weighted Average Common Units*** | | |
| Basic | | |
| Diluted | | |

|  | As of March 31, 2007 |
|---|---|
|  | *($ in thousands)* |
| **Pro Forma Statement of Financial Condition Data:** | |
| Total assets | $ |
| Total liabilities | |
| Non-controlling interests in consolidated entities | |
| Principals' interests in consolidated entities | |
| Total partners' capital | |

29

# RISK FACTORS

*An investment in our common units involves risks. You should carefully consider the following information about these risks, together with the other information contained in this prospectus, before investing in our common units.*

## Risks Related to Our Business

***Difficult market conditions can adversely affect our business in many ways, including by reducing the value or performance of the private equity, debt and public equity investments that we manage or by reducing the ability of our funds to raise or deploy capital, each of which could negatively impact our net income and cash flow and adversely affect our financial condition.***

Our business is materially affected by conditions in the financial markets and economic conditions throughout the world, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation), trade barriers, commodity prices, currency exchange rates and controls and national and international political circumstances (including wars, terrorist acts or security operations). These factors are outside our control and may affect the level and volatility of securities prices and the liquidity and the value of investments, and we may not be able to or may choose not to manage our exposure to these conditions. The market conditions surrounding each of our businesses, and in particular our private equity business, have been quite favorable for a number of years. Market conditions may not continue to be as favorable. For example, the cost of financing leveraged buyout transactions by issuing high-yield debt securities in the public capital markets has recently increased significantly. If conditions in the debt markets do not become more favorable to us in the near term, we may need to rely on financing commitments provided directly by investment banks or other sources in order to consummate pending transactions or finance future transactions. Such financing may be significantly more costly, with terms that may be significantly more restrictive, than financing that was, until recently, available to us in the public capital markets. More costly and restrictive financing may adversely impact the returns of our leveraged buyout transactions and, therefore, adversely affect our results of operations and financial condition. In addition, in the event of a prolonged market downturn, our business could be affected in different ways. Our profitability may also be adversely affected by our fixed costs and the possibility that we would be unable to scale back other costs within a time frame sufficient to match any decreases in net income relating to changes in market and economic conditions.

Our funds may be affected by reduced opportunities to exit and realize value from their investments and by the fact that we may not be able to find suitable investments for the funds to effectively deploy capital, which could adversely affect our ability to raise new funds. During periods of difficult market conditions or slowdowns in a particular sector, companies in which we invest may experience decreased revenues, financial losses, difficulty in obtaining access to financing and increased funding costs. During such periods, these companies may also have difficulty in expanding their businesses and operations and be unable to meet their debt service obligations or other expenses as they become due, including expenses payable to us. In addition, during periods of adverse economic conditions, we may have difficulty accessing financial markets, which could make it more difficult or impossible for us to obtain funding for additional investments and harm our assets under management and operating results. A general market downturn, or a specific market dislocation, may result in lower investment returns for our funds, which would adversely affect our net income. Furthermore, such conditions would also increase the risk of default with respect to private equity, credit and public equity investments that we manage.

***Our earnings and cash flow are highly variable due to the nature of our business and we do not intend to provide earnings guidance, each of which may cause the price of our common units to be volatile.***

Our earnings are highly variable from quarter to quarter due to the volatility of investment returns of most of our funds and other investment vehicles and the fee income earned from our funds. We recognize earnings on investments in our funds based on our allocable share of realized and unrealized gains (or

30

losses) reported by such funds, and a decline in realized or unrealized gains, or an increase in realized or unrealized losses, would adversely affect our net income. Fee income, which we recognize when contractually earned, can vary due to fluctuations in assets under management, the number of investment transactions made by our funds and the number of portfolio companies we manage. We may also experience fluctuations in our results from quarter to quarter due to a number of other factors, including changes in the amount of dividends or interest earned in respect of investments, changes in our operating expenses, the degree to which we encounter competition and general economic and market conditions. Such variability may lead to variability in the trading price of our common units and can cause our results for a particular period not to be indicative of our performance in future periods. It may be difficult for us to achieve steady growth in net income and cash flow on a quarterly basis, which could in turn lead to large adverse movements in the price of our common units or increased volatility in our common unit price generally.

The timing and receipt of carried interest from our private equity funds are unpredictable and will contribute to the volatility of our cash flows. Carried interest from private equity investments depends on our funds' performance and opportunities for realizing gains, which may be limited. It takes a substantial period of time to identify attractive private equity investment opportunities, to raise all the funds needed to make an investment and then to realize the cash value (or other proceeds) of an investment through a sale, public offering or other exit. Even if a private equity investment proves to be profitable, it may be several years before any profits can be realized in cash. We cannot predict when, or if, any realization of investments will occur. If we were to have a realization event in a particular quarter, the event may have a significant impact on our cash flows during the quarter that may not be replicated in subsequent quarters. A decline in realized or unrealized gains, or an increase in realized or unrealized losses, would adversely affect our investment income, which could further increase the volatility of our quarterly results. In addition, in our traditional private equity funds, if the performance of one of the fund's later investments results in the fund failing to achieve overall profitability over the life of the fund, we may be obligated to repay any excess profits previously distributed to us in respect of a carried interest. This may require some repayment of carried interest previously received.

Because our earnings and cash flow can be highly variable from quarter to quarter and year to year, we do not plan to provide any guidance regarding our expected quarterly and annual operating results and cash flows. The lack of guidance may affect the expectations of public market analysts and could cause increased volatility in the price of our common units.

***We depend on our founders and other key personnel, the loss of whose services would have a material adverse effect on our business, results and financial condition.***

We depend on the efforts, skill, reputations and business contacts of our principals, including our founders, Henry Kravis and George Roberts, and other key personnel, the information and deal flow they and others generate during the normal course of their activities and the synergies among the diverse fields of expertise and knowledge held by our professionals. Accordingly, our success will depend on the continued service of these individuals, who are not obligated to remain employed with us. The loss of the services of any of them could have a material adverse effect on our revenues, net income and cash flows and could harm our ability to maintain or grow assets under management in existing funds or raise additional funds in the future.

Our principals and other key personnel possess substantial experience and expertise and have strong business relationships with investors in our funds and other members of the business community. As a result, the loss of these personnel could jeopardize our relationships with investors in our funds and members of the business community and result in the reduction of assets under management or fewer investment opportunities. For example, if any of our principals were to join or form a competing firm, our business, results and financial condition could suffer.

31

*Our structure involves complex provisions of U.S. federal income tax laws for which no clear precedent or authority may be available. Our structure also is subject to potential legislative, judicial or administrative change and differing interpretations, possibly on a retroactive basis.*

The U.S. federal income tax treatment of unitholders depends in some instances on determinations of fact and interpretations of complex provisions of U.S. federal income tax laws for which no clear precedent or authority may be available. You should be aware that the U.S. federal income tax rules are constantly under review by persons involved in the legislative process, the Internal Revenue Service, or IRS, and the U.S. Treasury Department, frequently resulting in revised interpretations of established concepts, statutory changes, revisions to regulations and other modifications and interpretations. The present U.S. federal income tax treatment of an investment in our common units may be modified by administrative, legislative or judicial interpretation at any time, and any such action may affect investments and commitments previously made. Changes to the U.S. federal tax laws and interpretations thereof could make it more difficult or impossible to be treated as a partnership that is not taxable as a corporation for U.S. federal income tax purposes, affect or cause us to change our investments and commitments, affect the tax considerations of an investment in us, change the character or treatment of portions of our income (including, for instance, the treatment of carried interest as ordinary income rather than capital gain) and adversely affect an investment in our common units. On June 22, 2007, legislation was introduced to treat all or part of the capital gain and dividend income that is recognized by an investment partnership and allocable to a partner affiliated with the sponsor of the partnership (a portion of the carried interest) as ordinary income to such partner for U.S. federal income tax purposes, which would have the effect of precluding us from qualifying as a partnership for U.S. federal income tax purposes. In addition, on June 14, 2007, legislation was introduced that would tax as a corporation any publicly traded partnership that directly or indirectly derives income from investment adviser or asset management services. If either of these pieces of legislation or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units. See the discussions below under "—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units."

Our organizational documents and agreements permit our Managing Partner to modify our amended and restated partnership agreement from time to time, without the consent of the unitholders, to address certain changes in U.S. federal income tax regulations, legislation or interpretation. In some circumstances, such revisions could have a material adverse impact on some or all unitholders. Moreover, we will apply certain assumptions and conventions in an attempt to comply with applicable rules and to report income, gain, deduction, loss and credit to unitholders in a manner that reflects such unitholders' beneficial ownership of partnership items, taking into account variation in ownership interests during each taxable year because of trading activity. However, those assumptions and conventions may not be in compliance with all aspects of applicable tax requirements. It is possible that the IRS will assert successfully that the conventions and assumptions used by us do not satisfy the technical requirements of the Internal Revenue Code and/or Treasury regulations and could require that items of income, gain, deductions, loss or credit, including interest deductions, be adjusted, reallocated or disallowed in a manner that adversely affects unitholders.

*Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units.*

On June 14, 2007, the Chairman and the Ranking Republican Member of the U.S. Senate Committee on Finance introduced legislation that would tax as corporations publicly traded partnerships that directly or indirectly derive income from investment adviser or asset management services. In addition, they concurrently issued a press release stating that they do not believe that proposed public offerings of private

32

equity and hedge fund management firms are consistent with the intent of the existing rules regarding publicly traded partnerships because the majority of their income is derived from the active provision of services to investment funds and limited partner investors in such funds. Further, they have sent letters to the Secretary of the Treasury and the Chairman of the U.S. Securities and Exchange Commission, or the SEC, regarding these tax issues in which they express a view that recent initial public offerings of private equity and hedge funds "raise serious tax questions that if left unaddressed have the potential to jeopardize the integrity of the tax code and the corporate tax base over the long term." As explained in the technical explanation accompanying the proposed legislation:

> Under the bill, the exception from corporate treatment for a publicly traded partnership does not apply to any partnership that, directly or indirectly, has any item of income or gain (including capital gains or dividends), the rights to which are derived from services provided by any person as an investment adviser, as defined in the Investment Advisers Act of 1940, or as a person associated with an investment adviser, as defined in that Act. Further, the exception from corporate treatment does not apply to a partnership that, directly or indirectly, has any item of income or gain (including capital gains or dividends), the rights to which are derived from asset management services provided by an investment adviser, a person associated with an investment adviser, or any person related to either, in connection with the management of assets with respect to which investment adviser services were provided. For purposes of the bill, these determinations are made without regard to whether the person is required to register as an investment adviser under the Investment Advisers Act of 1940.

If enacted, the proposed legislation would be effective as of the date it was introduced, with transition relief that would not apply to us.

On June 20, 2007, similar legislation was introduced in the House of Representatives. If the proposed legislation survives the legislative and executive process in its proposed form and were to be enacted into law, we would incur a material increase in our tax liability. If we were taxed as a corporation, our effective tax rate would increase significantly. The federal statutory rate for corporations is currently 35%, and the state and local tax rates, net of the federal benefit, aggregate approximately        %. If a variation of this proposed legislation or any other change in the tax laws, rules, regulations or interpretations preclude us from qualifying for treatment as a partnership for U.S. federal income tax purposes under the publicly traded partnership rules, our tax liability would materially increase, which could result in a reduction in the value of our common units.

On June 22, 2007, legislation was introduced by a member of the House Ways and Means Committee, co-sponsored by the committee chairs, eleven other members and the chair of the House Financial Services Committee, that would treat income received by a partner with respect to an investment services partnership interest as ordinary income received for the performance of services. The enactment of such legislation would cause such income to be non-qualifying income under the publicly traded partnership rules, which would preclude us from qualifying as a partnership for U.S. federal income tax purposes, thereby materially increasing our tax liability, which could result in a reduction of the value of our common units.

***Our transition to a publicly-traded structure may adversely affect our ability to retain and motivate our principals and other key personnel and to recruit, retain and motivate new principals and other key personnel, both of which could adversely affect our business, results and financial condition.***

Our most important asset is our people, and our continued success is highly dependent upon the efforts of our principals and other professionals. Our future success and growth depends to a substantial degree on our ability to retain and motivate our principals and other key personnel and to strategically recruit, retain and motivate new talented personnel, including new principals. However, we may not be successful in our efforts to recruit, retain and motivate the required personnel as the market for qualified investment professionals is extremely competitive.

33

In connection with the Reorganization Transactions and this offering, our current principals and certain of our former personnel will receive interests in KKR Holdings, which will hold Group Partnership units. Moreover, transfer restrictions to which interests in KKR Holdings are subject in certain instances lapse over time, may not be enforceable in all cases and can be waived. There is no guarantee that the non-competition, non-solicitation and confidentiality agreements to which our principals will be subject, together with our other arrangements with them, will prevent them from leaving us, joining our competitors or otherwise competing with us or that these agreements will be enforceable in all cases. In addition, these agreements will expire after a certain period of time, at which point each of our principals would be free to compete against us and solicit investors in our funds, clients and employees. See "Management—Non-Competition, Non-Solicitation and Confidentiality Agreements."

Our ability to recruit, retain and motivate our professionals is dependent on our ability to offer highly attractive incentive opportunities. If legislation were to be enacted by the U.S. Congress to treat carried interest as ordinary income rather than as capital gain for U.S. federal income tax purposes, such legislation would materially increase the amount of taxes that we and possibly our unitholders would be required to pay, thereby adversely affecting our ability to offer such attractive incentive opportunities. See "—Our structure involves complex provisions of U.S. federal income tax laws for which no clear precedent or authority may be available. Our structure also is subject to potential legislative, judicial or administrative change and differing interpretations, possibly on a retroactive basis," and "—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units."

We strive to maintain a work environment that reinforces our culture of collaboration, motivation and alignment of interests with investors. If we do not continue to develop and implement the right processes and tools to manage our changing enterprise and maintain our culture, our ability to compete successfully and achieve our business objectives could be impaired, which could negatively impact our business, financial condition and results of operations.

***The requirements of being a public entity and sustaining our growth may strain our resources.***

As a public company, we will be subject to the reporting requirements of the Securities Exchange Act of 1934, or the Exchange Act, and requirements of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act. These requirements may place a strain on our systems and resources. The Exchange Act will require that we file annual, quarterly and current reports with respect to our business and financial condition. The Sarbanes-Oxley Act will require that we maintain effective disclosure controls and procedures and internal controls over financial reporting, which are discussed below. In order to maintain and improve the effectiveness of our disclosure controls and procedures, significant resources and management oversight will be required. We will be implementing additional procedures and processes for the purpose of addressing the standards and requirements applicable to public companies. In addition, sustaining our growth will also require us to commit additional management, operational and financial resources to identify new professionals to join our firm and to maintain appropriate operational and financial systems to adequately support expansion. These activities may divert management's attention from other business concerns, which could have a material adverse effect on our business, financial condition, results of operations and cash flows. We will also incur costs that we have not previously incurred for director fees, investor relations expenses, expenses for compliance with the Sarbanes-Oxley Act and rules of the SEC and the New York Stock Exchange, and various other costs relating to being a public company. Operational risks may disrupt our businesses, result in losses or limit our growth.

We rely heavily on our financial, accounting and other data processing systems. If any of these systems does not operate properly or is disabled, we could suffer financial loss, a disruption of our businesses, liability to our funds, regulatory intervention or reputational damage. In addition, we operate in businesses that are highly dependent on information systems and technology. Our information systems and

34

technology may not continue to be able to accommodate our growth, and the cost of maintaining such systems may increase from its current level. Such a failure to accommodate growth, or an increase in costs related to such information systems, could have a material adverse effect on us. Furthermore, we depend on our principal offices in New York City, where most of our administrative personnel are located, for the continued operation of our business. A disaster or a disruption in the infrastructure that supports our businesses, including a disruption involving electronic communications or other services used by us or third parties with whom we conduct business, or directly affecting our principal offices, could have a material adverse impact on our ability to continue to operate our business without interruption. Our disaster recovery programs may not be sufficient to mitigate the harm that may result from such a disaster or disruption. In addition, insurance and other safeguards might only partially reimburse us for our losses, if at all.

### *We have not evaluated our internal controls over financial reporting for purposes of compliance with Section 404 of the Sarbanes-Oxley Act.*

We have not previously been required to comply with requirements of the Sarbanes-Oxley Act, including the internal control evaluation and certification requirements of Section 404 of that statute, and we will not be required to comply with all of those requirements until after we have been subject to the reporting requirements of the Exchange Act for a specified period of time. Accordingly, we have not determined whether or not our existing internal controls over financial reporting systems comply with Section 404. The process of determining whether internal controls over financial reporting comply with Section 404 will divert internal resources and will take a significant amount of time, effort and expense to complete. If it is determined that we are not in compliance with Section 404, we will be required to implement remedial procedures and re-evaluate our internal control over financial reporting. We may experience higher than anticipated operating expenses as well as higher independent auditor and consulting fees during the implementation of these changes and thereafter. Further, we may need to hire additional qualified personnel in order for us to comply with Section 404. If we are unable to implement any necessary changes effectively or efficiently, our operations, financial reporting or financial results could be adversely affected and we could obtain an adverse report on internal controls from our independent registered public accountants.

### *Our use of leverage to finance our business will expose us to substantial risks, which are exacerbated by our funds' investments in leveraged companies.*

It is our intention over time to use borrowings in order to finance our business operations as a public company. Using a significant degree of leverage will expose us to the typical risks associated with the use of substantial leverage, including those discussed below under "—Dependence on significant leverage in investments by our funds could adversely affect our ability to achieve attractive rates of return on those investments." These risks are exacerbated by our funds' use of leverage to finance investments.

### *The time and attention that our principals and other employees devote to assets that are not being contributed to the Group Partnerships will not financially benefit us and may reduce the time and attention these individuals devote to our business.*

We currently manage three private equity funds (the 1987 Fund, the 1993 Fund and the 1996 Fund) whose investment periods have ended. As of March 31, 2007, the unrealized value of the investments held by these funds totaled $2.3 billion. Because we believe the general partners of these funds will not receive meaningful proceeds from further realizations, we will not acquire general partner interests in them in connection with the Reorganization Transactions. We will, however, continue to provide the funds with management and other services until their liquidation. While we will not receive meaningful fees for providing these services, our principals and other employees will be required to devote a portion of their time and attention to the management of those entities. The devotion of the time and attention of our principals and employees to those activities will not financially benefit us and may reduce the time and attention they devote to our business.

35

*We face risks and uncertainties in developing our new business initiatives.*

Part of our growth strategy is to develop new business areas, including sponsoring new investment vehicles and structures, including co-investment vehicles, and raising new types of funds, such as long-oriented public equity funds, structured product funds and industry- or geography-specific funds. In addition, to support these initiatives, we are currently developing a capital markets business in the United States, Europe and Asia. As a result, we are subject to all of the risks and uncertainties associated with the expansion into any new line of business, including the risk that these new business initiatives will not assist us in achieving our objectives. Any failure of these initiatives to meet or exceed expectations could have an adverse effect on our results of operations.

*Extensive regulation of our businesses affects our activities and creates the potential for significant liabilities and penalties. The possibility of increased regulatory focus could result in additional burdens on our business. Changes in tax laws and other legislative or regulatory changes could adversely affect us.*

Our business is subject to extensive regulation. See "Business—Regulation." We are subject to regulation by governmental and self-regulatory organizations in the jurisdictions in which we operate around the world. Many of these regulators, including U.S. and foreign government agencies and self-regulatory organizations, are empowered to conduct investigations and administrative proceedings that can result in fines, suspensions of personnel or other sanctions, including censure, the issuance of cease-and-desist orders or the suspension or expulsion of applicable licenses and memberships. Even if an investigation or proceeding does not result in a sanction or the sanction imposed against us or our personnel by a regulator were small in monetary amount, the adverse publicity relating to the investigation, proceeding or imposition of these sanctions could harm our reputation and cause us to lose existing clients or fail to gain new clients.

We regularly rely on exemptions in the United States from various requirements of the Securities Act of 1933, or the Securities Act, the Exchange Act, the Investment Company Act of 1940, or the Investment Company Act, the Investment Advisers Act of 1940, or the Investment Advisers Act, and the U.S. Employee Retirement Income Security Act of 1974, or ERISA, in conducting our asset management activities. These exemptions are sometimes highly complex and may in certain circumstances depend on compliance by third parties whom we do not control. If for any reason these exemptions were to become unavailable to us, we could become subject to regulatory action or third-party claims and our business could be materially and adversely affected. See "—Risks Related to Our Organizational Structure—If we were deemed to be an "investment company" under the Investment Company Act, applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business." Lastly, the requirements imposed by our regulators are designed primarily to ensure the integrity of the financial markets and to protect investors in our funds and are not designed to protect our unitholders. Consequently, these regulations often serve to limit our activities. In addition, the regulatory environment in which our fund investors operate may affect our business. For example, changes in state laws may limit investment activities of state pension plans.

The regulatory environment in which we operate may become more burdensome. We are in the process of registering as an investment adviser under the Investment Advisers Act. As a registered investment advisor, we will be subject to the requirements and regulations of the Investment Advisers Act, which relate to, among other things, recordkeeping and reporting requirements, disclosure requirements, limitations on agency and principal transactions between an advisor and advisory clients. We may also be adversely affected as a result of new or revised legislation or regulations imposed by the SEC, other governmental regulatory authorities or self-regulatory organizations that supervise the financial markets. In addition, we may be adversely affected by changes in the interpretation or enforcement of existing laws and rules by these governmental authorities and self-regulatory organizations. It is impossible to determine the extent of the impact of any new laws, regulations or initiatives that may be proposed, or whether any of

36

the proposals will become law. Compliance with any new laws or regulations could make compliance more difficult and expensive and affect the manner in which we conduct business.

Legislative proposals have recently been introduced in Denmark and Germany that would limit the tax deductibility of interest expense incurred by companies in those countries. If adopted, these measures would adversely affect Danish and German companies in which our private equity funds have investments and limit the benefits of additional investments in those countries. Our private equity business is subject to the risk that similar measures might be introduced in other countries in which it currently has investments or plans to invest in the future, or that other legislative or regulatory measures might be promulgated in any of the countries in which we operate that adversely affect our business.

In the United Kingdom, the Financial Services Authority recently published a discussion paper on the impact that the growth in the private equity market has had on the markets in the United Kingdom and the suitability of its regulatory approach in addressing risks posed by the private equity market.

We have received a request for certain documents and other information from the Antitrust Division of the United States Department of Justice, or the DOJ, in connection with the DOJ's investigation of private equity firms to determine whether they have engaged in conduct prohibited by United States antitrust laws. We are fully cooperating with the DOJ's investigation.

***We are subject to substantial litigation risks and may face significant liabilities and damage to our professional reputation as a result of litigation allegations and negative publicity.***

The investment decisions we make in our asset management business and the activities of our investment professionals on behalf of our portfolio companies may subject them and us to the risk of third-party litigation arising from investor dissatisfaction with the performance of those funds, the activities of our portfolio companies and a variety of other litigation claims. For example, in early 2007, thirteen private equity firms, including us, were named as defendants in a purported class action complaint by shareholders in public companies recently acquired by private equity firms. In June 2007 this suit was dismissed by the plaintiffs without prejudice.

To the extent investors in our private equity funds suffer losses resulting from fraud, gross negligence, willful misconduct or other similar misconduct, investors may have remedies against us, our private equity funds, our principals or our affiliates under the federal securities law and state law. Investors in our funds do not have legal remedies against us, the general partners of our funds, our funds, our principals or our affiliates solely based on their dissatisfaction with the investment performance of those funds. While the general partners and investment advisers to our private equity funds, including their directors, officers, other employees and affiliates, are generally indemnified to the fullest extent permitted by law with respect to their conduct in connection with the management of the business and affairs of our private equity funds, such indemnity does not extend to actions determined to have involved fraud, gross negligence, willful misconduct or other similar misconduct.

If any lawsuits were brought against us and resulted in a finding of substantial legal liability, the lawsuit could materially adversely affect our business, financial condition or results of operations or cause significant reputational harm to us, which could seriously impact our business. We depend to a large extent on our business relationships and our reputation for integrity and high-caliber professional services to attract and retain investors and to pursue investment opportunities for our funds. As a result, allegations of improper conduct by private litigants or regulators, whether the ultimate outcome is favorable or unfavorable to us, as well as negative publicity and press speculation about us, our investment activities or the private equity industry in general, whether or not valid, may harm our reputation, which may be more damaging to our business than to other types of businesses.

In addition, with a workforce composed of many highly paid professionals, we face the risk of litigation relating to claims for compensation, which may, individually or in the aggregate, be significant in amount. The cost of settling any such claims could negatively impact our business, financial condition and results of operations.

37

***Employee misconduct could harm us by impairing our ability to attract and retain clients and subjecting us to significant legal liability and reputational harm.***

There is a risk that our employees could engage in misconduct that adversely affects our business. We are subject to a number of obligations and standards arising from our business and our authority over the assets we manage. The violation of these obligations and standards by any of our employees would adversely affect our clients and us. Our business often requires that we deal with confidential matters of great significance to companies in which we may invest. If our employees were improperly to use or disclose confidential information, we could suffer serious harm to our reputation, financial position and current and future business relationships, as well as face potentially significant litigation. It is not always possible to detect or deter employee misconduct, and the extensive precautions we take to detect and prevent this activity may not be effective in all cases. If any of our employees were to engage in misconduct or were to be accused of such misconduct, our business and our reputation could be adversely affected.

## Risks Relating to the Investments We Manage

***Poor performance of the investments we manage would cause a decline in our net income and cash flow, may obligate us to repay some carried interest previously paid to us, and could adversely affect our ability to raise capital for future funds.***

In the event that any of the significant investments we manage were to perform poorly, our net income and cash flow would decline because the value of our assets under management would decrease, which would result in a reduction in some of our management fees, and our investment returns would decrease, resulting in a reduction in the carried interest we earn. Moreover, we could experience losses on our investments of our own capital as a result of poor performance by the investments we manage. Furthermore, if, as a result of poor performance of later investments in one of our traditional private equity funds' life, the fund does not achieve overall profitability, we will be obligated to repay the amount by which carried interest that was previously distributed to us exceeds amounts to which we are ultimately entitled. These repayment obligations may be related to amounts previously distributed to our principals prior to the completion of this offering, with respect to which our unitholders did not receive any benefit. Poor performance of our funds could make it more difficult for us to raise new capital. Investors in funds might decline to invest in future funds we raise. Investors and potential investors in our funds continually assess our funds' performance, and our ability to raise capital for existing and future funds will depend on our funds' continued satisfactory performance.

***Valuation methodologies for certain assets in our funds can be subject to significant subjectivity and the fair value of assets established pursuant to such methodologies may never be realized, which could result in significant losses for our funds.***

There are no readily ascertainable market prices for a substantial majority of illiquid investments of our funds. When determining fair values of investments, we use the last reported market price as of the statement of financial condition date for investments that have readily observable market prices. When an investment does not have a readily available market price, the fair value of the investment represents the value, as determined by us in good faith, at which the investment could be sold in an orderly disposition over a reasonable period of time between willing parties other than in a forced or liquidation sale. There is no single standard for determining fair value in good faith and in many cases fair value is best expressed as a range of fair values from which a single estimate may be derived. When making fair value determinations, we typically use a market multiples approach that considers a specified financial measure (such as EBITDA) or a discounted cash flow or liquidation analysis. We also consider a range of additional factors that we deem relevant, including the price at which the investment was acquired, the nature of the investment (such as whether it is a controlling interest), local market conditions, market prices for comparable securities and financing transactions and internal models that consider the current and expected operating performance and cash flows of the company in which the investment was made.

38

Because valuations, and in particular valuations of investments for which market quotations are not readily available, are inherently uncertain, may fluctuate over short periods of time and may be based on estimates, determinations of fair value may differ materially from the values that would have resulted if a ready market had existed. Even if market quotations are available for our investments, such quotations may not reflect the value that we would actually be able to realize because of various factors, including possible illiquidity. Our partners' capital could be adversely affected if the values of investments that we record are materially higher than the values that are ultimately realized upon the disposal of the investments and changes in values attributed to investments from quarter to quarter may result in volatility in our assets under management and such changes could materially affect the results of operations that we report from period to period. We cannot assure you that the investment values that we record from time to time will ultimately be realized. We also cannot assure you that you will be able to realize the investment values that are presented in this prospectus.

Because there is significant uncertainty in the valuation of, or in the stability of the value of, illiquid investments, the fair values of investments reflected in a fund's NAV do not necessarily reflect the prices that would actually be obtained by us on behalf of the fund when such investments are realized. Realizations at values significantly lower than the values at which investments have been reflected in prior fund NAVs would result in losses for the applicable fund and the loss of potential carried interest and other fees. Also, if realizations of our investments produce values materially different than the carrying values reflected in prior fund NAVs, investors may lose confidence in us, which would in turn result in difficulty in raising additional funds.

Even if market quotations are available for our investments, such quotations may not reflect the value that could actually be realized because of various factors, including the possible illiquidity associated with a large ownership position, subsequent illiquidity in the market for a company's securities, future market price volatility or the potential for a future loss in market value based on poor industry conditions or the market's view of overall company and management performance.

In addition, because we value our investments on a quarterly basis only, subsequent events that may have a material impact on those valuations will not be reflected until the next quarterly valuation date.

***The historical returns attributable to our funds, including those presented in this prospectus, should not be considered as indicative of the future results of our funds or of our future results or of any returns expected on an investment in our common units.***

We have presented in this prospectus net and gross IRRs, multiples of invested capital and realized and unrealized investment values for funds that we have sponsored and managed. The historical and potential future returns of the funds that we manage are not directly linked to returns on our common units. In connection with the Reorganization Transactions and this offering, we will not acquire all of the interests in the KKR Group, our accounting predecessor, and we will not acquire an interest in two legacy funds that are not included in the KKR Group. Specifically, following the Reorganization Transactions and this offering, we will have controlling and economic interests in the management companies of our funds and the general partners of our traditional private equity funds (other than the 1996 Fund and earlier funds) and future funds. We will also have an economic (but not controlling) interest in the general partner of the KKR Private Equity Investors master fund. Therefore, you should not conclude that continued positive performance of the funds that we manage will necessarily result in positive returns on an investment in our common units. However, poor performance of the funds that we manage would cause a decline in our income from such funds and would therefore have a negative effect on our performance and in all likelihood the returns on an investment in our common units.

Moreover, with respect to the historical returns of our funds:

•     the rates of returns of our funds reflect unrealized gains as of the applicable valuation date that may never be realized, which may adversely affect the ultimate value realized from those funds' investments;

39

- you will not benefit from any value that was created in our funds prior to your investment in our common units to the extent such value has been realized;

- the historical returns of our funds and their future performance has been and will be affected by macroeconomic factors, including factors that may not have been prevalent in the periods relevant to the return data above;

- in the past few years, the rates of returns of some of our funds have been positively influenced by a number of investments that experienced a substantial decrease in the average holding period of such investments and rapid and substantial increases in value following the dates on which those investments were made, trends and rates of return that are not expected to continue;

- our funds' returns have benefited from investment opportunities and general market conditions that may not repeat themselves, including favorable borrowing conditions in the debt markets, and there can be no assurance that our current or future funds will be able to avail themselves of comparable investment opportunities or market conditions or that such market conditions will continue; and

- we may create new funds in the future that reflect a different asset mix in terms of allocations among funds, investment strategies, geographic and industry exposure and vintage year.

In addition, future returns will be affected by the risks described elsewhere in this prospectus, including risks of the industry sectors and businesses in which a particular fund invests.

***Dependence on significant leverage in investments by our funds could adversely affect our ability to achieve attractive rates of return on those investments.***

Because many of our funds' investments rely heavily on the use of leverage, our ability to achieve attractive rates of return on investments will depend on our continued ability to access sufficient sources of indebtedness at attractive rates. For example, our credit strategy funds use varying degrees of leverage when making investments. Similarly, in many private equity investments, indebtedness may constitute 70% or more of a portfolio company's total debt and equity capitalization, including debt that may be incurred in connection with the investment. An increase in either the general levels of interest rates or in the risk spread demanded by sources of indebtedness would make it more expensive to finance those investments. In addition, increases in interest rates could also decrease the value of fixed-rate debt investments that our funds make. Increases in interest rates could also make it more difficult to locate and consummate private equity investments because other potential buyers, including operating companies acting as strategic buyers, may be able to bid for an asset at a higher price due to a lower overall cost of capital. In addition, a portion of the indebtedness used to finance private equity investments often includes high-yield debt securities issued in the capital markets. Availability of capital from the high-yield debt markets is subject to significant volatility, and there may be times when we might not be able to access those markets at attractive rates, or at all, when completing an investment.

Investments in highly leveraged entities are also inherently more sensitive to declines in revenues, increases in expenses and interest rates and adverse economic, market and industry developments. The incurrence of a significant amount of indebtedness by an entity could, among other things:

- subject the entity to a number of restrictive covenants, terms and conditions, any violation of which would be viewed by creditors as an event of default and could materially impact our ability to realize value from our investment;

- give rise to an obligation to make mandatory prepayments of debt using excess cash flow, which might limit the entity's ability to respond to changing industry conditions to the extent additional cash is needed for the response, to make unplanned but necessary capital expenditures or to take advantage of growth opportunities;

40

- limit the entity's ability to adjust to changing market conditions, thereby placing it at a competitive disadvantage compared to its competitors who have relatively less debt;

- limit the entity's ability to engage in strategic acquisitions that might be necessary to generate attractive returns or further growth; and

- limit the entity's ability to obtain additional financing or increase the cost of obtaining such financing, including for capital expenditures, working capital or other general corporate purposes.

A leveraged company's income and equity also tend to increase or decrease at a greater rate than would otherwise be the case if money had not been borrowed. As a result, the risk of loss associated with a leveraged company is generally greater than for companies with comparatively less debt.

Any of the foregoing circumstances could have a material adverse effect on our financial condition, results of operations and cash flow.

***The asset management business is intensely competitive.***

We compete as an alternative asset manager for both investors and investment opportunities. Our competitors consist primarily of sponsors of public and private investment funds, business development companies, investment banks, commercial finance companies and operating companies acting as strategic buyers. We believe that competition for investors is based primarily on investment performance; business reputation; the duration of relationships with investors; the quality of services provided to investors; pricing; and the relative attractiveness of the types of investments that have been or are to be made. We believe that competition for investment opportunities is based primarily on the pricing, terms and structure of a proposed investment and certainty of execution. A number of factors serve to increase our competitive risks:

- a number of our competitors in some of our businesses have greater financial, technical, marketing and other resources and more personnel than we do;

- several of our competitors have recently raised, or are expected to raise, significant amounts of capital, and many of them have similar investment objectives to ours, which may create additional competition for investment opportunities and may reduce the size and duration of pricing inefficiencies that many alternative investment strategies seek to exploit;

- some of these competitors may also have a lower cost of capital and access to funding sources that are not available to us, which may create competitive disadvantages for us with respect to investment opportunities;

- some of our competitors may have higher risk tolerances, different risk assessments or lower return thresholds, which could allow them to consider a wider variety of investments and to bid more aggressively than us for investments;

- our competitors that are corporate buyers may be able to achieve synergistic cost savings in respect of an investment, which may provide them with a competitive advantage in bidding for an investment;

- there are relatively few barriers to entry impeding the formation of new funds, including a relatively low cost of entering these businesses, and the successful efforts of new entrants into our various lines of business, including major commercial and investment banks and other financial institutions, have resulted in increased competition;

- some investors may prefer to invest with an investment manager that is not publicly traded; and

- other industry participants will from time to time seek to recruit our investment professionals and other employees away from us.

41

We may lose investment opportunities in the future if we do not match investment prices, structures and terms offered by competitors. Alternatively, we may experience decreased investment returns and increased risks of loss if we match investment prices, structures and terms offered by competitors. In addition, if interest rates were to rise or if market conditions for competing investment products improve and such products begin to offer rates of return superior to those achieved by our funds, the attractiveness of our funds relative to investments in other investment products could decrease. This competitive pressure could adversely affect our ability to make successful investments and limit our ability to raise future funds, either of which would adversely impact our business, results of operations and cash flow.

***The due diligence process that we undertake in connection with our investments may not reveal all facts that may be relevant in connection with an investment.***

Before making our investments, we conduct due diligence that we deem reasonable and appropriate based on the facts and circumstances applicable to each investment. The objective of the due diligence process is to identify attractive investment opportunities based on the facts and circumstances surrounding an investment and, in the case of private equity investments, and to prepare a framework that may be used from the date of an acquisition to drive operational achievement and value creation. When conducting due diligence, we typically evaluate a number of important business, financial, tax, accounting, environmental and legal issues in determining whether or not to proceed with an investment. Outside consultants, legal advisers, accountants and investment banks are involved in the due diligence process in varying degrees depending on the type of investment. Nevertheless, when conducting due diligence and making an assessment regarding an investment, we rely on resources available to us, including information provided by the target of the investment and, in some circumstances, third-party investigations. The due diligence process may at times be subjective with respect to newly organized companies for which only limited information is available. Accordingly, we cannot be certain that the due diligence investigation that we will carry out with respect to any investment opportunity will reveal or highlight all relevant facts that may be necessary or helpful in evaluating such investment opportunity. We also cannot be certain that our due diligence investigations will result in investments being successful.

***Our asset management activities involve investments in relatively high-risk, illiquid assets, and we may fail to realize any profits from these activities for a considerable period of time or lose some or all of the capital invested.***

Our funds hold investments in securities that are not publicly traded. In many cases, our funds may be prohibited by contract or by applicable securities laws from selling such securities for a period of time. Our funds will generally not be able to sell these securities publicly unless their sale is registered under applicable securities laws, or unless an exemption from such registration is available. The ability of many of our funds to dispose of investments is heavily dependent on the public equity markets. For example, the ability to realize any value from an investment may depend upon the ability to complete an initial public offering of the portfolio company in which such investment is made. Even if the securities are publicly traded, large holdings of securities can often be disposed of only over a substantial length of time, exposing our investment returns to risks of downward movement in market prices during the intended disposition period. Accordingly, under certain conditions, our funds may be forced to either sell securities at lower prices than they had expected to realize or defer sales that they had planned to make, potentially for a considerable period of time. We have made and expect to continue to make significant capital investments in our current and future funds. Contributing capital to these funds is risky, and we may lose some or all of the principal amount of our investments.

42

*The investments of our funds are subject to a number of inherent risks.*

Our results are highly dependent on our continued ability to generate attractive returns from our investments. Investments made by our private equity funds involve a number of significant risks inherent to private equity investing, including the following:

- companies in which private equity investments are made may have limited financial resources and may be unable to meet their obligations under their securities, which may be accompanied by a deterioration in the value of their equity securities or any collateral or guarantees provided with respect to their debt;

- companies in which private equity investments are made are more likely to depend on the management talents and efforts of a small group of persons and, as a result, the death, disability, resignation or termination of one or more of those persons could have a material adverse impact on their business and prospects and the investment made;

- companies in which private equity investments are made generally have less predictable operating results, may from time to time be parties to litigation, may be engaged in rapidly changing businesses with products subject to a substantial risk of obsolescence and may require substantial additional capital to support their operations, finance expansion or maintain their competitive position; and

- executive officers, directors and employees of an equity sponsor may be named as defendants in litigation involving a company in which a private equity investment is made or is being made.

*Our private equity investments are typically among the largest in the industry, which involve certain complexities and risks that are not encountered in small- and medium-sized investments.*

Our private equity funds make investments primarily in companies with large capitalizations, which involves certain complexities and risks that are not encountered in small- and medium-sized investments. For example, larger transactions may be more difficult to finance and exiting larger deals may present incremental challenges. In addition, larger transactions may pose greater challenges in implementing changes in the company's management, culture, finances or operations, and may entail greater scrutiny by regulators, labor unions and other third parties. Recently, labor unions have been more active in opposing certain larger investments by our private equity funds and private equity firms generally.

In recent years, the amount of equity capital that is required to complete a large capitalization private equity transaction has increased significantly, which has resulted in some of the largest private equity transactions being structured as "consortium transactions." A consortium transaction involves an equity investment in which two or more other private equity firms serve together or collectively as equity sponsors. While we have sought to limit where possible the amount of consortium transactions in which we have been involved, we have participated in a significant number of those transactions. Ten out of 40 of the investments in our current private equity portfolio were acquired through consortium transactions. Consortium transactions generally entail a reduced level of control by our firm over the investment because governance rights must be shared with the other private equity sponsors. Accordingly, we may not be able to control decisions relating to a consortium investment, including decisions relating to the management and operation of the company and the timing and nature of any exit, which could result in the risks described in "—Our funds have made investments in companies that we do not control, exposing us to the risk of decisions made by others with which we may not agree." Any of these factors could increase the risk that our larger investments could be less successful. The consequences to our investment funds of an unsuccessful larger investment could be more severe given the size of the investment.

43

*Our funds have made investments in companies that we do not control, exposing us to the risk of decisions made by others with which we may not agree.*

Our funds hold investments that include debt instruments and equity securities of companies that we do not control. Such instruments and securities may be acquired by our funds through trading activities or through purchases of securities from the issuer. In addition, our funds may acquire minority equity interests, particularly when sponsoring investments as part of a large investor consortium, and may also dispose of a portion of their majority equity investments in portfolio companies over time in a manner that results in the funds retaining a minority investment. Those investments will be subject to the risk that the company in which the investment is made may make business, financial or management decisions with which we do not agree or that the majority stakeholders or the management of the company may take risks or otherwise act in a manner that does not serve our interests. If any of the foregoing were to occur, the value of investments by our funds could decrease and our financial condition, results of operations and cash flow could suffer as a result.

*We expect to make investments in companies that are based outside of the United States, which may expose us to additional risks not typically associated with investing in companies that are based in the United States.*

Many of our funds invest a significant portion of their assets in the equity, debt, loans or other securities of issuers that are based outside of the United States. A substantial amount of these investments consist of private equity investments made by our private equity funds. For example, as of March 31, 2007, approximately 59.7% of the fair value of those investments of those funds was attributable to foreign investments. Investing in companies that are based outside of the United States, particularly in countries characterized as having emerging markets, involves risks and considerations that are not typically associated with investments in companies established in the United States. These risks may include the following:

- the possibility of exchange control regulations, political and social instability, nationalization or expropriation of assets;

- the imposition of non-U.S. taxes;

- less liquid markets;

- reliance on a more limited number of commodity inputs, service providers and/or distribution mechanisms;

- adverse fluctuations in currency exchange rates;

- higher rates of inflation;

- less available current information about an issuer;

- higher transaction costs;

- less government supervision of exchanges, brokers and issuers;

- less developed bankruptcy laws;

- difficulty in enforcing contractual obligations;

- lack of uniform accounting, auditing and financial reporting standards;

- less stringent requirements relating to fiduciary duties;

- fewer investor protections; and

44

- greater price volatility.

Although we expect that most of our funds' capital commitments will be denominated in U.S. dollars, investments that are denominated in a foreign currency will be subject to the risk that the value of a particular currency will change in relation to one or more other currencies. Among the factors that may affect currency values are trade balances, levels of short-term interest rates, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments. We may employ hedging techniques to minimize these risks, but we can offer no assurance that such strategies will be effective. If we engage in hedging transactions, we may be exposed to additional risks associated with such transactions. See "—Risk management activities may adversely affect the return on our investments."

***Our equity investments and many of our debt investments often rank junior to investments made by others, exposing us to greater risk of losing our investment.***

In most cases, the companies in which our funds invest have, or are permitted to have, outstanding indebtedness or equity securities that rank senior to our fund's investment. By their terms, such instruments may provide that their holders are entitled to receive payments of dividends, interest or principal on or before the dates on which payments are to be made in respect of our investment. Also, in the event of insolvency, liquidation, dissolution, reorganization or bankruptcy of a company in which an investment is made, holders of securities ranking senior to our investment would typically be entitled to receive payment in full before distributions could be made in respect of our investment. After repaying senior security holders, the company may not have any remaining assets to use for repaying amounts owed in respect of our investment. To the extent that any assets remain, holders of claims that rank equally with our investment would be entitled to share on an equal and ratable basis in distributions that are made out of those assets. Also, during periods of financial distress or following an insolvency, the ability of our funds to influence a company's affairs and to take actions to protect their investments may be substantially less than that of the senior creditors.

***Risk management activities may adversely affect the return on our investments.***

When managing our exposure to market risks, we frequently use hedging strategies or certain forms of derivative instruments to limit our exposure to changes in the relative values of investments that may result from market developments, including changes in prevailing interest rates and currency exchange rates. The scope of risk management activities undertaken by us varies based on the level and volatility of interest rates, prevailing foreign currency exchange rates, the types of investments that are made and other changing market conditions. The use of hedging transactions and other derivative instruments to reduce the effects of a decline in the value of a position does not eliminate the possibility of fluctuations in the value of the position or prevent losses if the value of the position declines. However, such activities can establish other positions designed to gain from those same developments, thereby offsetting the decline in the value of the position. Such transactions may also limit the opportunity for gain if the value of a position increases. Moreover, it may not be possible to limit the exposure to a market development that is so generally anticipated that a hedging or other derivative transaction cannot be entered into at an acceptable price.

The success of any hedging or other derivative transactions that we enter into generally will depend on our ability to correctly predict market changes. As a result, while we may enter into such transactions in order to reduce our exposure to market risks, unanticipated market changes may result in poorer overall investment performance than if the hedging or other derivative transaction had not been executed. In addition, the degree of correlation between price movements of the instruments used in connection with hedging activities and price movements in a position being hedged may vary. Moreover, for a variety of reasons, we may not seek or be successful in establishing a perfect correlation between the instruments used in a hedging or other derivative transactions and the position being hedged. An imperfect correlation

45

could prevent us from achieving the intended result and could give rise to a loss. In addition, it may not be possible to fully or perfectly limit our exposure against all changes in the value of our investments, because the value of investments is likely to fluctuate as a result of a number of factors, some of which will be beyond our control or ability to hedge.

***Certain of our funds may make a limited number of investments, or investments that are concentrated in certain geographic regions or asset types, which could negatively affect their performance to the extent those concentrated investments perform poorly.***

The governing agreements of our funds contain only limited investment restrictions and only limited requirements as to diversification of fund investments, either by geographic region or asset type. During periods of difficult market conditions or slowdowns in these sectors or geographic regions, decreased revenues, difficulty in obtaining access to financing and increased funding costs may be exacerbated by this concentration of investments, which would result in lower investment returns.

***Our funds may make investments that could give rise to a conflict of interest.***

Our funds invest in a broad range of asset classes throughout the corporate capital structure. These investments include investments in corporate loans and debt securities, preferred equity securities and common equity securities. In certain cases, we may manage separate funds that invest in different parts of the same company's capital structure. For example, our credit strategy funds may invest in different classes of the same company's debt and may make debt investments in a company that is owned by one of our private equity funds. In those cases, the interests of the funds may not always be aligned, which could create actual or potential conflicts of interest or the appearance of such conflicts. For example, one of our private equity funds could have an interest in pursuing an acquisition, divestiture or other transaction that, in our judgment, could enhance the value of the private equity investment, even though the proposed transaction would subject one of our credit strategy fund's debt investments to additional or increased risks. Similarly, our ability to effectively implement our public equity strategies may be limited to the extent that contractual obligations entered into in the ordinary course of our traditional private equity business impose restrictions on our engaging in transactions that we may be interested in otherwise pursuing. Appropriately dealing with conflicts of interest is complex and difficult and we could suffer reputational damage or potential liability if we fail, or appear to fail, to deal appropriately with conflicts as they arise.

### Risks Related to Our Organizational Structure

***Our unitholders do not control our Managing Partner or vote in the election or removal of its directors and will have limited ability to influence decisions regarding our business.***

Our Managing Partner, which serves as our sole general partner and manages our business and affairs, is owned by our senior principals, including our founders. Pursuant to its limited liability company agreement, our Managing Partner has established a board of directors that will be responsible for the oversight of our business and operations. The board of directors, co-chaired by our founders, appoints the officers of the Managing Partner. Our unitholders do not control our Managing Partner or its board of directors and, unlike the holders of common stock in a corporation, they will have only limited voting rights under our partnership agreement and generally will be unable to influence decisions regarding our business. Our unitholders also will not have the right to remove our Managing Partner as the general partner of our partnership without our Managing Partner's consent.

***Our founders will be able to determine the outcome of any matter that may be submitted for a vote of the limited partners.***

Immediately following this offering, KKR Holdings, which is owned by our principals and certain of our former personnel and controlled by our founders, will beneficially own    % of the equity in our business. KKR Holdings will also hold an equivalent amount of special voting units in our partnership, which will entitle it to cast an equivalent number of votes on those few matters that may be submitted to a

46

vote of our unitholders. Due to the foregoing, immediately following this offering, our founders, who will have the power to vote the special voting units held by KKR Holdings, will generally have sufficient voting power to determine the outcome of those few matters that may be submitted for a vote of our unitholders, including amendments to our partnership agreement that may be materially adverse to our unitholders. In addition, our partnership agreement contains provisions that enable us to take actions that would materially and adversely affect all unitholders or a particular class of unitholders upon the majority vote of all outstanding voting units, and since        % of our voting units will be controlled by our founders immediately following this offering, our founders will have the ability to take actions that could materially and adversely affect unitholders either as a whole or as a particular class.

Our unitholders' voting rights are further restricted by provisions in our partnership agreement stating that any common units held by a person that beneficially owns        % or more of any class of our common units then outstanding (other than our Managing Partner or its affiliates, or a direct or subsequently approved transferee of our Managing Partner or its affiliates) cannot be voted on any matter. Our partnership agreement also contains provisions limiting the ability of our unitholders to call meetings, to acquire information about our operations, and to influence the manner or direction of our management. Our partnership agreement also does not restrict our Managing Partner's ability to take actions that may result in our being treated as an entity taxable as a corporation for U.S. federal (and applicable state) income tax purposes. Furthermore, unitholders are not entitled to dissenters' rights of appraisal under our partnership agreement or applicable Delaware law in the event of a merger or consolidation, a sale of substantially all of our assets or any other transaction or event.

In addition, as a result of these matters and the provisions referred to under "—Our unitholders do not control our Managing Partner or vote in the election or removal of its directors and will have limited ability to influence decisions regarding our business," our unitholders may be deprived of an opportunity to receive a premium for their common units in the future through a sale of our partnership, and the trading prices of our common units may be adversely affected by the absence or reduction of a takeover premium in the trading price.

**We are permitted to repurchase all of the outstanding common units under certain circumstances, and this repurchase may occur at an undesirable time or price.**

We have the right to acquire all of our then-outstanding common units at the then-current trading price either if   % or less of our common units are held by persons other than our Managing Partner and its affiliates or if we, the Managing Partner or its directors, officers, trustees or agents are in any manner subjected to the provisions of the Investment Company Act. As a result of our Managing Partner's right to purchase outstanding common units, a holder of common units may have his common units purchased at an undesirable time or price.

**We are a limited partnership and as a result will qualify for and intend to rely on some exemptions from the corporate governance and other requirements of the New York Stock Exchange.**

We are a limited partnership and will qualify for exceptions from certain corporate governance and other requirements of the rules of the New York Stock Exchange. Pursuant to these exceptions, limited partnerships may elect not to comply with certain corporate governance requirements of the New York Stock Exchange, including the requirements (i) that a majority of the board of directors of the listed company consist of independent directors, (ii) that the listed company have a nominating and corporate governance committee that is composed entirely of independent directors and (iii) that the listed company have a compensation committee that is composed entirely of independent directors. In addition, as a limited partnership, we will not be required to hold annual unitholder meetings. While our Managing Partner's board of directors will consist of a majority of directors who are independent under New York Stock Exchange Rules and have a nominating and governance committee, our nominating and governance committee will not consist entirely of independent directors or meet other substantive requirements that would be applicable absent such an exemption, and we do not intend to have a compensation committee. Accordingly, you will not have the same protections afforded to equity holders of entities that are subject to all of the corporate governance requirements of the New York Stock Exchange.

47

***Potential conflicts of interest may arise among our Managing Partner, its affiliates and us. Our Managing Partner and its affiliates have limited fiduciary duties to us and our unitholders, which may permit them to favor their own interests to the detriment of us and our unitholders.***

Conflicts of interest may arise among our Managing Partner and its affiliates, on the one hand, and us and our unitholders, on the other hand. As a result of these conflicts, our Managing Partner may favor its own interests and the interests of its affiliates over the interests of our unitholders. These conflicts include, among others, the following:

- our Managing Partner determines the amount and timing of our investments and dispositions, indebtedness, issuances of additional partner interests and amounts of reserves, each of which can affect the amount of cash that is available for distribution to you;

- our Managing Partner is allowed to take into account the interests of parties other than our partnership in resolving conflicts of interest, which has the effect of limiting its duties, including fiduciary duties, to our unitholders. For example, our affiliates that serve as the general partners of our funds have fiduciary and contractual obligations to our fund investors, and such obligations may cause such affiliates to regularly take actions that might adversely affect our near-term results of operations or cash flow. Our Managing Partner would have no obligation to intervene in, or to notify our unitholders of, such actions by such affiliates;

- because our principals will indirectly hold Group Partnership units that are not subject to corporate income taxation and we will hold some of our Group Partnership units through a wholly-owned subsidiary that is taxable as a corporation, conflicts may arise between our principals and our partnership relating to the selection and structuring of investments;

- as discussed below, our Managing Partner has limited its liability and reduced or eliminated its duties, including fiduciary duties, under our partnership agreement, while also restricting the remedies available to our unitholders for actions that, without these limitations, might constitute breaches of duty, including fiduciary duties. In addition, we have agreed to indemnify our Managing Partner and its affiliates to the fullest extent permitted by law, except with respect to conduct involving bad faith, fraud or willful misconduct. By purchasing our common units, you will have agreed and consented to the provisions set forth in our partnership agreement, including the provisions regarding conflicts of interest situations that, in the absence of such provisions, might constitute a breach of fiduciary or other duties under applicable state law;

- our partnership agreement does not restrict our Managing Partner from causing us to pay it or its affiliates for any services rendered, or from entering into additional contractual arrangements with any of these entities on our behalf, so long as the terms of any such additional contractual arrangements are fair and reasonable to us as determined under the partnership agreement;

- our Managing Partner determines how much debt we incur and that decision may adversely affect our credit ratings;

- our Managing Partner determines which costs incurred by it and its affiliates are reimbursable by us;

- other than as set forth in the non-competition, non-solicitation and confidentiality agreements to which our principals will be subject, which may not be enforceable, affiliates of our Managing Partner and existing and former personnel employed by our Managing Partner are not prohibited from engaging in other businesses or activities, including those that might be in direct competition with us;

- our Managing Partner controls the enforcement of obligations owed to us by it and its affiliates; and

- our Managing Partner decides whether to retain separate counsel, accountants or others to perform services for us.

48

See "Certain Relationships and Related Party Transactions" and "Conflicts of Interest and Fiduciary Responsibilities."

***Our partnership agreement will contain provisions that reduce or eliminate duties (including fiduciary duties) of our Managing Partner and limit remedies available to unitholders for actions that might otherwise constitute a breach of duty. It will be difficult for a unitholder to successfully challenge a resolution of a conflict of interest by our Managing Partner or by its conflicts committee.***

Our partnership agreement will contain provisions that require our unitholders to waive or consent to conduct by our Managing Partner and its affiliates that might otherwise raise issues about compliance with fiduciary duties or applicable law. For example, our partnership agreement will provide that when our Managing Partner is acting in its individual capacity, as opposed to in its capacity as our Managing Partner, it may act without any fiduciary obligations to us or our unitholders whatsoever. When our Managing Partner, in its capacity as our general partner, is permitted to or required to make a decision in its "sole discretion" or "discretion" or that it deems "necessary or appropriate" or "necessary or advisable," then our Managing Partner will be entitled to consider only such interests and factors as it desires, including its own interests, and will have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting us or any unitholders and will not be subject to any different standards imposed by the partnership agreement, the Delaware Revised Uniform Limited Partnership Act, which we refer to as the Delaware Limited Partnership Act, or under any other law, rule or regulation or in equity.

The above modifications of fiduciary duties are expressly permitted by Delaware law. Hence, we and our unitholders will only have recourse and be able to seek remedies against our Managing Partner if our Managing Partner breaches its obligations pursuant to our partnership agreement. Unless our Managing Partner breaches its obligations pursuant to our partnership agreement, we and our unitholders will not have any recourse against our Managing Partner even if our Managing Partner were to act in a manner that was inconsistent with traditional fiduciary duties. Furthermore, even if there has been a breach of the obligations set forth in our partnership agreement, our partnership agreement provides that our Managing Partner and its officers and directors will not be liable to us or our unitholders for errors of judgment or for any acts or omissions unless there has been a final and non-appealable judgment by a court of competent jurisdiction determining that the Managing Partner or its officers and directors acted in bad faith or engaged in fraud or willful misconduct. These provisions are detrimental to the unitholders because they restrict the remedies available to unitholders for actions that without those limitations might constitute breaches of duty including fiduciary duties.

Whenever a potential conflict of interest exists between us and our Managing Partner, our Managing Partner may resolve such conflict of interest. If our Managing Partner determines that its resolution of the conflict of interest is on terms no less favorable to us than those generally being provided to or available from unrelated third parties or is fair and reasonable to us, taking into account the totality of the relationships between us and our Managing Partner, then it will be presumed that in making this determination, our Managing Partner acted in good faith. A unitholder seeking to challenge this resolution of the conflict of interest would bear the burden of overcoming such presumption. This is different from the situation with Delaware corporations, where a conflict resolution by an interested party would be presumed to be unfair and the interested party would have the burden of demonstrating that the resolution was fair.

Also, if our Managing Partner obtains the approval of the conflicts committee of our Managing Partner, the resolution will be conclusively deemed to be fair and reasonable to us and not a breach by our Managing Partner of any duties it may owe to us or our unitholders. This is different from the situation with Delaware corporations, where a conflict resolution by a committee consisting solely of independent directors may, in certain circumstances, merely shift the burden of demonstrating unfairness to the plaintiff. If you choose to purchase a common unit, you will be treated as having consented to the provisions set forth in the partnership agreement, including provisions regarding conflicts of interest

49

situations that, in the absence of such provisions, might be considered a breach of fiduciary or other duties under applicable state law. As a result, unitholders will, as a practical matter, not be able to successfully challenge an informed decision by the conflicts committee. See "Conflicts of Interest and Fiduciary Responsibilities."

***The control of our Managing Partner may be transferred to a third party without unitholder consent.***

Our Managing Partner may transfer its general partner interest to a third party in a merger or consolidation or in a transfer of all or substantially all of its assets without the consent of our unitholders. Furthermore, at any time, the members of our Managing Partner may sell or transfer all or part of their limited liability company interests in our Managing Partner without the approval of the unitholders, subject to certain restrictions as described elsewhere in this prospectus. A new general partner may not be willing or able to form new funds and could form funds that have investment objectives and governing terms that differ materially from those of our current funds. A new owner could also have a different investment philosophy, employ investment professionals who are less experienced, be unsuccessful in identifying investment opportunities or have a track record that is not as successful as our track record. If any of the foregoing were to occur, we could experience difficulty in making new investments, and the value of our existing investments, our business, our results of operations and our financial condition could materially suffer.

***We intend to pay periodic distributions to our unitholders, but our ability to do so may be limited by our holding company structure, applicable provisions of Delaware law and contractual restrictions.***

Following the completion of this offering, we intend to pay cash distributions on a quarterly basis. We are a holding company and will have no material assets other than the Group Partnership units that we will hold through wholly-owned subsidiaries and will have no independent means of generating income. Accordingly, we intend to cause the Group Partnerships to make distributions on the Group Partnership units, including Group Partnership units that we directly or indirectly hold, in order to provide us with sufficient amounts to fund distributions we may declare on our common units. If the Group Partnerships make such distributions, other holders of Group Partnership units, including KKR Holdings, will be entitled to receive equivalent distributions pro rata based on their Group Partnership units, except that we will be entitled to priority distributions of income through          as described under "Distribution Policy."

The declaration and payment of any future distributions will be at the sole discretion of our Managing Partner, which may change our distribution policy at any time. Our Managing Partner will take into account general economic and business conditions, our strategic plans and prospects, our business and investment opportunities, our financial condition and operating results, working capital requirements and anticipated cash needs, contractual restrictions and obligations, including payment obligations pursuant to the tax receivable agreement, legal, tax and regulatory restrictions, restrictions or other implications on the payment of distributions by us to our unitholders or by our subsidiaries to us and such other factors as our Managing Partner may deem relevant. Under the Delaware Limited Partnership Act, we may not make a distribution to a partner if after the distribution all our liabilities, other than liabilities to partners on account of their partner interests and liabilities for which the recourse of creditors is limited to specific property of the partnership, would exceed the fair value of our assets. If we were to make such an impermissible distribution, any limited partner who received a distribution and knew at the time of the distribution that the distribution was in violation of the Delaware Limited Partnership Act would be liable to us for the amount of the distribution for three years. In addition, the Group Partnerships' cash flow from operations may be insufficient to enable it to make required minimum tax distributions to its partners, in which case the Group Partnerships may have to borrow funds or sell assets, and thus our liquidity and financial condition could be materially adversely affected.

Furthermore, by paying cash distributions rather than investing that cash in our businesses, we risk slowing the pace of our growth, or not having a sufficient amount of cash to fund our operations, new investments or unanticipated capital expenditures, should the need arise.

50

Our ability to characterize such distributions as capital gains or qualified dividend income may be limited, and you should expect that some or all of such distributions may be regarded as ordinary income.

***We will be required to pay our principals for most of the benefits relating to any additional tax depreciation or amortization deductions we may claim as a result of the tax basis step-up we receive in connection with subsequent exchanges of our common units and related transactions.***

We and our intermediate holding company may be required to acquire Group Partnership units from time to time pursuant to our exchange agreement with KKR Holdings. To the extent this occurs, the exchanges are expected to result in an increase in our intermediate holding company's share of the tax basis of the tangible and intangible assets of KKR Management Holdings L.P., primarily attributable to a portion of the goodwill inherent in our business, that would not otherwise have been available. This increase in tax basis may increase (for tax purposes) depreciation and amortization and therefore reduce the amount of income tax our intermediate holding company would otherwise be required to pay in the future. This increase in tax basis may also decrease gain (or increase loss) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

We will enter into a tax receivable agreement with KKR Holdings requiring our intermediate holding company to pay to KKR Holdings or transferees of its Group Partnership units 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax that the intermediate holding company actually realizes (or is deemed to realize, in the case of an early termination payment by our intermediate holding company or a change of control) as a result of this increase in tax basis, as well as 85% of the amount of any such savings the intermediate holding company actually realizes (or is deemed to realize) as a result of increases in tax basis that arise due to future payments under the agreement. This payment obligation will be an obligation of our intermediate holding company and not of either Group Partnership. In the event that other of our current or future subsidiaries become taxable as corporations and acquire Group Partnership units in the future, or if we become taxable as a corporation for U.S. federal income tax purposes, we expect that each such entity will become subject to a tax receivable agreement with substantially similar terms. While the actual increase in tax basis, as well as the amount and timing of any payments under this agreement, will vary depending upon a number of factors, including the timing of exchanges, the price of our common units at the time of the exchange, the extent to which such exchanges are taxable and the amount and timing of our taxable income, we expect that as a result of the size of the increases in the tax basis of the tangible and intangible assets of our Group Partnerships, the payments that we may be required to make to our existing owners will be substantial. The payments under the tax receivable agreement are not conditioned upon our existing owners' continued ownership of us. We may need to incur debt to finance payments under the tax receivable agreement to the extent our cash resources are insufficient to meet our obligations under the tax receivable agreement as a result of timing discrepancies or otherwise.

Although we are not aware of any issue that would cause the IRS to challenge a tax basis increase, our existing owners will not reimburse us for any payments previously made under the tax receivable agreement if such tax basis increase is successfully challenged by the IRS. As a result, in certain circumstances payments to our existing owners under the tax receivable agreement could be in excess of the intermediate holding company's cash tax savings. The intermediate holding company's ability to achieve benefits from any tax basis increase, and the payments to be made under this agreement, will depend upon a number of factors, as discussed above, including the timing and amount of our future income.

51

***If we were deemed to be an "investment company" under the Investment Company Act, applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business.***

A person will generally be deemed to be an "investment company" for purposes of the Investment Company Act if:

- it is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities; or

- absent an applicable exemption, it owns or proposes to acquire investment securities having a value exceeding 40% of the value of its total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis.

We believe that we are engaged primarily in the business of providing asset management services and not in the business of investing, reinvesting or trading in securities. We regard ourselves as an asset management firm and do not propose to engage primarily in the business of investing, reinvesting or trading in securities. Accordingly, we do not believe that we are, or following this offering will be, an "orthodox" investment company as defined in section 3(a)(1)(A) of the Investment Company Act and described in the first bullet point above. Further, following the completion of this offering, we will have no material assets other than our equity interest as general partner of one of the Group Partnerships and our equity interest in a wholly-owned subsidiary, which in turn will have no material assets other than the equity interest as general partner of the other Group Partnership. Through these interests, we will directly or indirectly be the sole general partners of the Group Partnerships and will be vested with all management and control over the Group Partnerships. We do not believe our equity interest in our wholly-owned subsidiary or our equity interests directly or through our wholly-owned subsidiary in the Group Partnerships are investment securities. Moreover, because we believe that the capital interests of the general partners of our funds in their respective funds are neither securities nor investment securities, we believe that less than 40% of our partnership's total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis after this offering will be comprised of assets that could be considered investment securities. Accordingly, we do not believe we are, or following this offering will be, an inadvertent investment company by virtue of the 40% test in Section 3(a)(1)(C) of the Investment Company Act as described in the second bullet point above. In addition, we believe we are not an investment company under Section 3(b)(1) of the Investment Company Act because we are primarily engaged in a non-investment business.

The Investment Company Act and the rules thereunder contain detailed parameters for the organization and operation of investment companies. Among other things, the Investment Company Act and the rules thereunder limit or prohibit transactions with affiliates, impose limitations on the issuance of debt and equity securities, generally prohibit the issuance of options and impose certain governance requirements. We intend to conduct our operations so that we will not be deemed to be an investment company under the Investment Company Act. If anything were to happen which would cause our partnership to be deemed to be an investment company under the Investment Company Act, requirements imposed by the Investment Company Act, including limitations on our capital structure, ability to transact business with affiliates (including us) and ability to compensate key employees, could make it impractical for us to continue our business as currently conducted, impair the agreements and arrangements between and among our partnership, the Group Partnerships and KKR Holdings, or any combination thereof, and materially adversely affect our business, financial condition and results of operations. In addition, we may be required to limit the amount of investments that we make as a principal or otherwise conduct our business in a manner that does not subject us to the registration and other requirements of the Investment Company Act.

**Risks Related to Our Common Units and this Offering**

*There may not be an active trading market for our common units, which may cause our common units to trade at a discount from the initial offering price and make it difficult to sell the common units you purchase.*

Prior to this offering, there has not been a public trading market for our common units. It is possible that after this offering an active trading market will not develop or continue, which would make it difficult for you to sell your common units at an attractive price or at all. The initial public offering price per common unit will be determined by agreement among us and the representatives of the underwriters and may not be indicative of the price at which our common units will trade in the public market after this offering.

*Our common unit price may decline due to the large number of common units eligible for future sale and for exchange.*

The market price of our common units could decline as a result of sales of a large number of common units in the market after the offering or the perception that such sales could occur. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell common units in the future at a time and at a price that we deem appropriate. Upon completion of this offering, we will have          common units outstanding or          common units outstanding assuming the underwriters exercise in full their option to purchase additional common units from us. All of the common units will have been sold in this offering and will be freely tradable without restriction or further registration under the Securities Act by persons other than our "affiliates." See "Common Units Eligible for Future Sale." Subject to lock-up restrictions described under "Underwriting," we may issue and sell in the future additional common units.

In addition, upon completion of this offering, KKR Holdings, which is owned by our principals and certain of our former personnel and controlled by our founders, will own an aggregate of          Group Partnership units. Over time, KKR Holdings may distribute to its members these Group Partnership units. These members would then have the right to compel the Group Partnerships to redeem these Group Partnership units for cash or our common units, at the option of the Group Partnerships. When a member of KKR Holdings gives the Group Partnerships notice of his or her intention to compel a redemption, our partnership, with respect to our direct interests in KKR Fund Holdings L.P., and our intermediate holding company with respect to interests in KKR Management Holdings L.P., will have superseding rights to instead acquire Group Partnership units for cash or our common units. The common units issued upon such exchanges would be "restricted securities," as defined in Rule 144 under the Securities Act, unless we register such issuances. However, we will enter into a registration rights agreement with KKR Holdings that will require us to register these common units under the Securities Act. While we intend to contractually restrict our existing owners' ability to transfer Group Partnership units or common units that they may hold, these contractual provisions may lapse over time or be waived, modified or amended at any time.

In addition, our partnership agreement authorizes us to issue an unlimited number of additional partnership securities and options, rights, warrants and appreciation rights relating to partnership securities for the consideration and on the terms and conditions established by our Managing Partner in its sole discretion without the approval of our unitholders, including awards under the 2007 Equity Incentive Plan. In accordance with the Delaware Limited Partnership Act and the provisions of our partnership agreement, we may also issue additional partner interests that have designations, preferences, rights, powers and duties that are different from, and may be senior to, those applicable to our common units.

*The market price of our common units may be volatile, which could cause the value of your investment to decline.*

Securities markets worldwide experience significant price and volume fluctuations. This market volatility, as well as general economic, market or political conditions, could reduce the market price of common units in spite of our operating performance. In addition, our operating results could be below the

53

expectations of public market analysts and investors due to a number of potential factors, including variations in our quarterly operating results or distributions to unitholders, additions or departures of key management personnel, failure to meet analysts' earnings estimates, publication of research reports about our industry, changes or proposed changes in laws or regulations or differing interpretations or enforcement thereof affecting our business, adverse market reaction to any indebtedness we may incur or securities we may issue in the future, changes in market valuations of similar companies or speculation in the press or investment community, and in response the market price of our common units could decrease significantly. You may be unable to resell your common units at or above the initial public offering price.

### Risks Relating to U.S. Taxation

*If we were treated as a corporation for U.S. federal income tax or state tax purposes, then our distributions to you would be substantially reduced and the value of our common units could be adversely affected.*

The value of your investment in us depends in part on our being treated as a partnership for U.S. federal income tax purposes, which requires that 90% or more of our gross income for every taxable year consist of qualifying income, as defined in Section 7704 of the Internal Revenue Code, and that our partnership not be registered under the Investment Company Act. Qualifying income generally includes dividends, interest, capital gains from the sale or other disposition of stocks and securities and certain other forms of investment income. We may not meet these requirements or current law may change so as to cause, in either event, us to be treated as a corporation for U.S. federal income tax purposes or otherwise subject to U.S. federal income tax. We have not requested, and do not plan to request, a ruling from the IRS, on this or any other matter affecting us.

If we were treated as a corporation for U.S. federal income tax purposes, we would pay U.S. federal, state and local income tax on our taxable income at the applicable tax rates. Distributions to you would generally be taxed again as corporate distributions, and no income, gains, losses, deductions or credits would otherwise flow through to you. Because a tax would be imposed upon us as a corporation, our distributions to you would be substantially reduced which could cause a reduction in the value of our common units.

Current law may change, causing us to be treated as a corporation for U.S. federal or state income tax purposes or otherwise subjecting us to entity level taxation. See "—Risks Related to Our Business—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units." Because of widespread state budget deficits, several states are evaluating ways to subject partnerships to entity level taxation through the imposition of state income, franchise or other forms of taxation. If any state were to impose a tax upon us as an entity, our distributions to you would be reduced.

*You will be subject to U.S. federal income tax on your share of our taxable income, regardless of whether you receive any cash dividends from us.*

As long as 90% of our gross income for each taxable year constitutes qualifying income as defined in Section 7704 of the Internal Revenue Code, we are not required to register as an investment company under the Investment Company Act on a continuing basis, and assuming there is no change in law (see "—Risks Related to Our Business—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units"), we will be treated, for U.S. federal income tax purposes, as a partnership and not as an association or a publicly-traded partnership taxable as a corporation. As a result, you will be subject to U.S. federal, state, local and possibly, in some cases, foreign income taxation on your allocable share of our items of income, gain, loss, deduction and credit (including

54

our allocable share of those items of any entity in which we invest that is treated as a partnership or is otherwise subject to tax on a flow through basis) for each of our taxable years ending with or within your taxable year, regardless of whether or not you receive cash dividends from us.

You may not receive cash dividends equal to your allocable share of our net taxable income or even the tax liability that results from that income, although we intend to make tax distributions, a portion of which will be distributed to our unitholders. See "Distribution Policy." In addition, certain of our holdings, including holdings, if any, in a controlled foreign corporation, or a CFC, and a passive foreign investment company, or a PFIC, may produce taxable income prior to the receipt of cash relating to such income, and unitholders that are U.S. taxpayers will be required to take such income into account in determining their taxable income. In the event of an inadvertent termination of our partnership status for which the IRS has granted us limited relief, each holder of our common units may be obligated to make such adjustments as the IRS may require to maintain our status as a partnership. Such adjustments may require persons holding our common units to recognize additional amounts in income during the years in which they hold such units.

In addition, because of our methods of allocating income and gain among our unitholders, you may be taxed on amounts that accrued economically before you became a unitholder. See "Material U.S. Federal Tax Considerations."

***Our interest in certain of our businesses will be held through the intermediate holding company, which will be treated as a corporation for U.S. federal income tax purposes; such corporation will be liable for significant taxes and may create other adverse tax consequences, which could potentially adversely affect the value of your investment.***

In light of the publicly-traded partnership rules under U.S. federal income tax laws and other requirements, we will hold our interest in certain of our businesses through the intermediate holding company which will be treated as corporations for U.S. federal income tax purposes. The intermediate holding company will be liable for significant U.S. federal income taxes and applicable state, local and other taxes that would not otherwise be incurred, which could adversely affect the value of your investment, and which could be increased if the IRS were to successfully reallocate deductions or income of the related entities conducting our business. Those additional taxes have not applied to our existing owners in our organizational structure in effect before this offering and will not apply to our existing owners following this offering to the extent they own equity interests directly or indirectly in the Group Partnerships.

***Complying with certain tax-related requirements may cause us to invest through foreign or domestic corporations subject to corporate income tax or enter into acquisitions, borrowings, financings or arrangements we may not have otherwise entered into.***

In order for us to be treated as a partnership for U.S. federal income tax purposes and not as an association or publicly traded partnership taxable as a corporation, we must meet the qualifying income exception discussed below on a continuing basis and we must not be required to register as an investment company under the Investment Company Act. In order to effect such treatment, we or our subsidiaries may be required to invest through foreign or domestic corporations subject to corporate income tax, or enter into acquisitions, borrowings, financings or other transactions we may not have otherwise entered into.

***Tax gain or loss on disposition of our common units could be more or less than expected.***

If you sell your common units, you will recognize a gain or loss equal to the difference between the amount realized and the adjusted tax basis in those common units. Prior distributions to you in excess of the total net taxable income allocated to you, which decreased the tax basis in your common units, will in effect become taxable income to you if the common units are sold at a price greater than your tax basis in

55

those common units, even if the price is less than the original cost. A portion of the amount realized, whether or not representing gain, may be ordinary income to you.

***We do not intend to make, or cause to be made, an election under Section 754 of the Internal Revenue Code to adjust our asset basis or the asset basis of certain of the Group Partnerships. Thus, a holder of common units could be allocated more taxable income in respect of those common units prior to disposition than if such an election were made.***

We currently do not intend to make, or cause to be made, an election to adjust asset basis under Section 754 of the Internal Revenue Code with respect to us. If no such election is made, there will generally be no adjustment for a transferee of common units even if the purchase price of those common units is higher than the common units' share of the aggregate tax basis of our assets immediately prior to the transfer. In that case, on a sale of an asset, gain allocable to a transferee could include built-in gain allocable to the transferee at the time of the transfer, which built-in gain would otherwise generally be eliminated if a Section 754 election had been made. See "Material U.S. Federal Tax Considerations—U.S. Taxes—Consequences to U.S. Holders of Common Units—Section 754 Election."

***We may hold or acquire certain investments through an entity classified as a PFIC or CFC for U.S. federal income tax purposes.***

Certain of our funds' investments may be in foreign corporations or may be acquired through a foreign subsidiary that would be classified as a corporation for U.S. federal income tax purposes. Such an entity may be a PFIC or a CFC for U.S. federal income tax purposes. Unitholders indirectly owning an interest in a PFIC or a CFC may experience adverse U.S. tax consequences. See "Material U.S. Federal Tax Considerations—U.S. Taxes—Consequences to U.S. Holders of Common Units—Passive Foreign Investment Companies" and "—Controlled Foreign Corporations."

***Non-U.S. persons face unique U.S. tax issues from owning common units that may result in adverse tax consequences to them.***

We may be, or may become, engaged in a U.S. trade or business for U.S. federal income tax purposes, including by reason of investments in U.S. real property holding corporations, in which case some portion of our income would be treated as effectively connected income with respect to non-U.S. holders, or ECI. To the extent our income is treated as ECI, non-U.S. holders generally would be subject to withholding tax on distributions they receive of such income, would be required to file a U.S. federal income tax return for such year reporting their allocable share of income effectively connected with such trade or business and any other income treated as ECI, and would be subject to U.S. federal income tax at regular U.S. tax rates on any such income (state and local income taxes and filings may also apply in that event). Non-U.S. holders that are corporations may also be subject to a 30% branch profits tax on their distributions of such income. In addition, certain income from U.S. sources that is not ECI allocable to non-U.S. holders will be reduced by withholding taxes imposed at the highest effective applicable tax rate.

***Tax-exempt entities face unique tax issues from owning common units that may result in adverse tax consequences to them.***

In light of our intended investment activities, we are likely to derive income that constitutes unrelated business taxable income, or UBTI, because we will likely incur acquisition indebtedness. Consequently, a holder of common units that is a tax-exempt organization will likely be subject to unrelated business income tax to the extent that its allocable share of our income consists of UBTI. A tax-exempt partner of a partnership would be treated as earning UBTI if the partnership regularly engages in a trade or business that is unrelated to the exempt function of the tax-exempt partner, if the partnership derives income from debt-financed property or if the partner interest itself is debt-financed.

56

***We cannot match transferors and transferees of common units, and we will therefore adopt certain income tax accounting conventions that may not conform with all aspects of applicable tax requirements. The IRS may challenge this treatment, which could adversely affect the value of our common units.***

Because we cannot match transferors and transferees of common units, we will adopt depreciation, amortization and other tax accounting positions that may not conform with all aspects of existing Treasury regulations. A successful IRS challenge to those positions could adversely affect the amount of tax benefits available to our unitholders. It also could affect the timing of these tax benefits or the amount of gain on the sale of common units and could have a negative impact on the value of our common units or result in audits of and adjustments to our unitholders' tax returns.

***The sale or exchange of 50% or more of our capital and profit interests will result in the termination of our partnership for U.S. federal income tax purposes.***

We will be considered to have been terminated for U.S. federal income tax purposes if there is a sale or exchange of 50% or more of the total interests in our capital and profits within a 12-month period. A termination of our partnership would, among other things, result in the closing of our taxable year for all unitholders. See "Material U.S. Federal Tax Considerations" for a description of the consequences of our termination for U.S. federal income tax purposes.

***Unitholders may be subject to state and local taxes and return filing requirements as a result of investing in our common units.***

In addition to U.S. federal income taxes, our unitholders may be subject to other taxes, including state and local taxes, unincorporated business taxes and estate, inheritance or intangible taxes that are imposed by the various jurisdictions in which we do business or own property now or in the future, even if our unitholders do not reside in any of those jurisdictions. Our unitholders may be required to file state and local income tax returns and pay state and local income taxes in some or all of these jurisdictions. Further, unitholders may be subject to penalties for failure to comply with those requirements. It is the responsibility of each unitholder to file all U.S. federal, state and local tax returns that may be required of such unitholder. Our counsel has not rendered an opinion on the state or local tax consequences of an investment in our common units.

***We do not expect to be able to furnish to each unitholder specific tax information within 90 days after the close of each calendar year, which means that holders of common units who are U.S. taxpayers should anticipate the need to file annually a request for an extension of the due date of their income tax return.***

As a publicly traded partnership, our operating results, including distributions of income, dividends, gains, losses or deductions, and adjustments to carrying basis, will be reported on Schedule K-1 and distributed to each unitholder annually. It will require longer than 90 days after the end of our fiscal year to obtain the requisite information from all lower-tier entities so that K-1s may be prepared for the Partnership. For this reason, holders of common units who are U.S. taxpayers should anticipate the need to file annually with the IRS (and certain states) a request for an extension past April 15 or the otherwise applicable due date of their income tax return for the taxable year. See "Material U.S. Federal Tax Considerations—U.S. Taxes—Administrative Matters—Information Returns."

57

## USE OF PROCEEDS

We estimate that we will receive approximately $        of net proceeds from this offering after deducting estimated underwriting discounts and offering expenses, or $        if the underwriters exercise in full their option to purchase additional common units from us, in each case at the assumed offering price of $           based on the midpoint of the price range indicated on the cover page of this prospectus. We intend to contribute the net proceeds we receive from this offering to the Group Partnerships in exchange for newly issued units in the Group Partnerships. We anticipate that the Group Partnerships will use approximately     % to     % of the net proceeds that they receive from us to grow our existing business, approximately     % to     % of the net proceeds to expand into new related businesses, approximately     % to     % of the net proceeds to make additional capital commitments to our funds and portfolio companies and approximately     % to     % of the net proceeds for general corporate purposes. None of our principals are selling any common units or will otherwise receive any of the net proceeds from this offering.

58

# DISTRIBUTION POLICY

We intend to make quarterly cash distributions to our unitholders in amounts that in the aggregate are expected to constitute substantially all of our adjusted cash flow from operations each year in excess of amounts determined by our Managing Partner to be necessary or appropriate to provide for the conduct of our business, to make appropriate investments in our business and our funds, to comply with applicable law and any of our debt instruments or other agreements or to provide for future distributions to our unitholders for any one or more of the ensuing four quarters. Our distribution policy reflects our belief that distributing substantially all of our adjusted cash flow from operations will provide transparency for our unitholders and impose on us an investment discipline with respect to the businesses and strategies that we pursue.

Adjusted cash flow from operations is intended to reflect the actual cash flow attributable to us and is equal to cash flow presented in accordance with GAAP, adjusted to exclude cash flow relating to (i) the investment activities of our consolidated funds, (ii) the realized and unrealized income attributable to non-controlling interests in consolidated funds and (iii) changes in our operating assets and liabilities. We expect that our first quarterly distribution will be paid in                  in respect of the period from the completion of this offering through                  . Because we will not know what our available adjusted cash flow from operations will be for any year until the end of such year, we expect that our first three quarterly distributions in respect of any given year will generally be smaller than the final quarterly distribution in respect of such year.

Because we are a holding company and do not own any material cash-generating assets other than our direct and indirect interests in the Group Partnerships, we will depend on cash distributions that we receive on the Group Partnership units that we hold directly or through our intermediate holding company to fund any distributions that we make on our common units. Our Managing Partner intends to cause the Group Partnerships to make cash distributions on the Group Partnership units that we directly and indirectly hold in amounts that are sufficient to allow us to fund any distributions that are declared on our common units. We will fund distributions, if any, in three steps:

• first, the Managing Partner will cause the Group Partnerships to make distributions to holders of Group Partnership units pro rata in accordance with their respective percentage interests in the Group Partnerships (except as set forth in the following paragraph);

• second, we will cause our intermediate holding company to distribute to us its share of such distributions, after deducting taxes and amounts payable under the tax receivable agreement; and

• third, we will distribute our net share of such distributions to our unitholders on a pro rata basis.

The partnership agreements of the Group Partnerships will provide that until          , distributions from the Group Partnerships, if any, will be allocated each year in three steps:

• first, to us and our intermediate holding company until sufficient amounts have been so allocated to permit us to make aggregate distributions to our unitholders of $      per common unit on an annualized basis for such year;

• second, to the other holders of Group Partnership units until an equivalent amount on a per unit basis has been distributed to such other holders for such year; and

• thereafter, pro rata to all holders of Group Partnership units.

Accordingly, until          , our principals will not receive distributions, other than tax distributions, in respect of their Group Partnership units for a year unless and until our unitholders receive aggregate distributions of $      per common unit on an annualized basis for such year. We do not intend to maintain this priority distribution after          . After          , all the income (and accordingly distributions) of

59

the Group Partnerships will be allocated pro rata to holders of Group Partnership units in accordance with their respective percentage interests in the Group Partnerships.

The actual amount and timing of distributions on our common units will be subject to the discretion of our Managing Partner's board of directors, and we cannot assure you that we will in fact make distributions as intended. In particular, the amount and timing of distributions will depend upon a number of factors, including, among others, our available cash and current and anticipated cash needs; general economic and business conditions; our strategic plans and prospects; our results of operations and financial condition; our capital requirements; legal, contractual and regulatory restrictions on the payment of distributions by us or our subsidiaries and such other factors as the board of directors of our Managing Partner considers relevant. In addition, under Section 17-607 of the Delaware Limited Partnership Act, we will not be permitted to make a distribution if, after giving effect to the distribution, our liabilities would exceed the fair value of our assets. To the extent that we enter into one or more credit facilities from time to time, the terms of such facilities may also limit our ability to make distributions to unitholders under certain circumstances.

If the general partners of the Group Partnerships determine that distributions from the Group Partnerships would otherwise be insufficient to cover the tax liabilities of a holder of a Group Partnership unit, the partnership agreement of each Group Partnership will provide for tax distributions to the holders of Group Partnership units. Generally, these tax distributions will be computed based on our estimate of the net taxable income of the relevant Group Partnership allocable to a holder of a Group Partnership unit multiplied by an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax rate prescribed for an individual or corporate resident in New York, New York (taking into account the non-deductibility of certain expenses and the character of the income). If we had completed the Reorganization Transactions and this offering on January 1, 2006, the assumed effective tax rate for the tax year ended December 31, 2006 would have been approximately 46%. A portion of any such tax distributions received by us, net of amounts used by our subsidiaries to pay their tax liability, will be distributed to our unitholders. Such amounts are generally expected to be sufficient to permit our U.S. unitholders to fund their estimated U.S. tax obligations (including any federal, state and local income taxes) with respect to their distributive shares of net income or gain, after taking into account any withholding tax imposed on us. We cannot assure you that, for any particular unitholder, such distributions will be sufficient to pay the unitholder's actual U.S. or non-U.S. tax liability.

Historically, we typically have made cash distributions to our existing owners when we received significant distributions from our funds. In addition, we have historically made cash distributions to our senior principals annually in connection with the payment to us of management and other fees. These distributions were not made pursuant to any agreement. For the fiscal years ended December 31, 2005 and 2006 and the three months ended March 31, 2007, we distributed $561.8 million, $1.1 billion and $318.8 million, respectively, to our existing owners. Prior to this offering, we intend to make one or more cash and in-kind distributions to certain of our existing owners representing substantially all of the cash-on-hand and certain personal property of the management company for our private equity funds. If the offering had occurred on March 31, 2007, we estimate that the aggregate amount of such distributions would have been $          million. However, the actual amount of such distributions will depend on the amount of the management company's cash-on-hand at the time of the offering.

60

## CAPITALIZATION

The following table presents our combined cash and cash equivalents and capitalization as of March 31, 2007:

- on an actual basis; and

- on a pro forma basis giving effect to the Reorganization Transactions, this offering, our use of the proceeds from this offering and the other transactions described under "Unaudited Pro Forma Financial Information."

You should read this information together with the information included elsewhere in this prospectus, including the information set forth under "Organizational Structure," "Use of Proceeds," "Unaudited Pro Forma Financial Information," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our predecessor combined financial statements and related notes thereto.

|  | March 31, 2007 | |
|  | Actual | Pro Forma(1) |
|  | ($ in thousands) | |
| Cash and cash equivalents | $ 97,169 | $ |
| Cash and cash equivalents held at consolidated entities | 1,851,718 | |
| Restricted cash and cash equivalents | 174,141 | |
| Total cash, cash equivalents and restricted cash | $ 2,123,028 | $ |
| Debt obligations | $ 1,685,687 | $ |
| Accounts payable, accrued expenses and other liabilities | 394,043 | |
| Total liabilities | 2,079,730 | |
| Non-controlling interests in consolidated entities | 21,907,784 | |
| Principals' interests in consolidated entities | — | |
| Partners' capital | 1,892,527 | |
| Accumulated other comprehensive income | 7,262 | |
| Total partners' capital | 1,899,789 | |
| Total capitalization | $ 25,887,303 | $ |

(1)     A $1.00 increase or decrease in the assumed initial public offering price of $      per common unit, based on the midpoint of the price range indicated on the cover page of this prospectus, would increase or decrease cash and cash equivalents, total cash, cash equivalents and restricted cash, partners' capital, total partners' capital and total capitalization by $      million, $      million, $      million $      million and $      million, respectively, assuming the number of common units offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting the estimated underwriting discounts and estimated expenses payable by us.

61

## DILUTION

If you invest in our common units, your interest will be diluted to the extent of the difference between the initial public offering price per common unit and the pro forma net tangible book value per common unit after this offering. Dilution results from the fact that the offering price per common unit is substantially in excess of the book value per common unit attributable to existing equity holders.

Our pro forma net tangible book value as of March 31, 2007 was approximately $    , or $    per common unit. Pro forma net tangible book value represents the amount of total tangible assets less total liabilities, after giving effect to the Reorganization Transactions, and pro forma net tangible book value per common unit represents pro forma net tangible book value divided by the number of common units outstanding, after giving effect to the Reorganization Transactions and assuming that all holders of Group Partnership units (other than our intermediate holding company) exchanged their Group Partnership units for newly-issued common units on a one-for-one basis.

After giving effect to the Reorganization Transactions and the sale of    common units in this offering at an assumed initial public offering price of $    per common unit, representing the midpoint of the price range on the cover of this prospectus, our pro forma net tangible book value would have been $    , or $    per common unit. This represents an immediate increase in net tangible book value of $    per common unit to existing equity holders and an immediate dilution in net tangible book value of $    per common unit to new investors.

The following table illustrates this dilution on a per common unit basis assuming the underwriters do not exercise their option to purchase additional common units.

| | | |
|---|---:|---:|
| Assumed initial public offering price per common unit | | $ |
|    Pro forma net tangible book value per common unit as of March 31, 2007 | $ | |
|    Increase in pro forma net tangible book value per common unit attributable to new investors | | |
| Pro forma net tangible book value per common unit after the offering | | |
| Dilution in pro forma net tangible book value per common unit to new investors | | $ |

The following table summarizes, on the same pro forma basis as of March 31, 2007, the total number of common units purchased from us, the total cash consideration paid to us and the average price per common unit paid by existing equity holders and by new investors purchasing common units in this offering, assuming that all of the holders of Group Partnership units (other than our intermediate holding company) exchanged their Group Partnership units for newly-issued common units on a one-for-one basis.

| | Common Units Purchased | | Total Consideration | | Average Price Per Common Unit |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing equity holders | | | | | |
| New investors | | | | | |
|    Total | | | | | |

62

**ORGANIZATIONAL STRUCTURE**

The following diagram illustrates the ownership and organizational structure that we will have immediately after the completion of the Reorganization Transactions and this offering.



63

**Notes:**

\*          Except for KKR Management Holdings Corp., all entities are taxable as partnerships for U.S. federal income tax purposes. KKR Management Holdings Corp. will be taxable as a corporation for U.S. federal income tax purposes. For a discussion of pending legislation that may preclude us from qualifying for treatment as a partnership for U.S. federal income tax purposes, see "Risk Factors—Risks Related to Our Business—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units."

\*\*        In connection with the Reorganization Transactions, the Group Partnerships will not acquire any interests in the 1996 Fund or the general partners of the 1996 Fund, and will acquire only an economic (but not controlling) interest in the general partner of the KKR Private Equity Investors master fund. The management companies for our funds, the general partners of the 1996 Fund and subsequently formed private equity funds, the general partners of two entities that constitute the KKR Strategic Capital Funds and the consolidated subsidiaries of the foregoing comprise the KKR Group, our predecessor for accounting purposes. See "Organizational Structure—The KKR Group."

\*\*\*      We have not yet commenced our capital markets activities, but expect to do so shortly after we receive all appropriate regulatory approvals and licenses.

**The KKR Group**

Prior to the Reorganization Transactions, our business was comprised of certain consolidated and combined entities under the common control of our senior principals, and under the common ownership of our principals and our other existing owners. These entities, which we refer to as the KKR Group, consist of:

•          the management companies for our funds;

•          the general partners of the 1996 Fund and our subsequently formed private equity funds;

•          the general partners of two of the entities that constitute the KKR Strategic Capital Funds; and

•          the consolidated subsidiaries of the foregoing.

The KKR Group is considered our predecessor for accounting purposes and its combined financial statements will be our historical financial statements following the Reorganization Transactions and this offering. Because the legal entities that comprise the KKR Group are under the common control of our senior principals and will continue to be under their common control following the completion of the Reorganization Transactions and this offering, we will account for the Reorganization Transactions and this offering as a transfer of interests under common control. You should note, however, that we will not acquire all of the interests in the KKR Group in connection with the Reorganization Transactions and, accordingly, that the combined financial statements of the KKR Group may not be indicative of the results of operations and financial condition that we will have following the completion of this offering. See "—Group Partnerships," "Unaudited Pro Forma Financial Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Our Partnership**

We were formed as a Delaware limited partnership on June 25, 2007 to act as a holding company for the Group Partnerships following the completion of the Reorganization Transactions. We will directly or indirectly serve as sole general partner of each of the Group Partnerships, which will provide us with control over their business and affairs. In addition, we will use the net proceeds that we receive from this offering to directly or indirectly acquire a number of Group Partnership units that is equal to our outstanding common units, which will entitle us to share ratably (along with our principals through KKR

64

Holdings) in the assets, liabilities, profits, losses and distributions of the Group Partnerships. Assuming that the underwriters do not exercise their option to purchase additional common units from us, we will directly and indirectly own an aggregate of          % of the outstanding Group Partnership units upon the completion of this offering assuming the midpoint of the price range indicated on the cover page of this prospectus. We will account for the portion of outstanding Group Partnership units that we do not own as principals' interests in our consolidated financials statements.

KKR Holdings will initially own all of the outstanding Group Partnership units that we do not acquire in connection with the offering. It will also hold an equivalent amount of special voting units in our partnership, which will entitle it to cast an equivalent number of votes on any matters that may be submitted to a vote of our unitholders. We will enter into an exchange agreement with KKR Holdings in connection with the Reorganization Transactions pursuant to which KKR Holdings or certain of the transferees of its Group Partnership units may up to four times each year (subject to the terms of the exchange agreement) exchange Group Partnership units held by them (together with corresponding special voting units) for our common units on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and reclassifications and compliance with other applicable transfer restrictions. We have not yet determined how any such future exchanges will be accounted for in our consolidated financial statements. To the extent that Group Partnership units held by KKR Holdings or its transferees are exchanged for our common units, our interests in the Group Partnerships will be correspondingly increased. Any common units received upon such an exchange will be subject to any restrictions that were applicable to the exchanged Group Partnership units, including any applicable transfer restrictions.

After the completion of this offering, our Managing Partner intends to cause the Group Partnerships to make distributions on their outstanding Group Partnership units in amounts that are sufficient to allow us to fund any distributions that we make on our common units. See "Distribution Policy." To the extent that we receive any distributions on the Group Partnership units that we hold, KKR Holdings and any other holder of Group Partnership units will be entitled to receive pro rata distributions on their Group Partnership units, except that we will be entitled to priority distributions of income through          as described under "Distribution Policy."

## Our Managing Partner

As is commonly the case with limited partnerships, our partnership agreement provides for the management of our business and affairs by a general partner rather than a board of directors. Our Managing Partner, which serves as our sole general partner, has a board of directors that is co-chaired by our founders Henry Kravis and George Roberts and officers that are appointed by its board. Upon completion of this offering, we expect our Managing Partner's board to consist of a majority of independent directors and to have an audit committee and a conflicts committee composed entirely of independent directors. Our Managing Partner will not have an economic interest in our partnership, except for one common unit. Messrs. Kravis and Roberts will serve as Co-Chief Executive Officers of our Managing Partner.

Our unitholders do not hold securities of our Managing Partner and are not entitled to vote in the election of its directors or other matters affecting its governance. Accordingly, only those persons holding limited liability company interests in our Managing Partner will be entitled to vote in the election or removal of its directors, on proposed amendments to its charter documents or on other matters that require approval of its equity holders. Our Managing Partner's outstanding limited liability company interests consist of Class A shares, which are entitled to vote on the election and removal of directors and all other matters that have not been delegated to the board of directors or reserved for the vote of Class B shareholders, and Class B shares, which are entitled to vote only with respect to the manner in which our subsidiaries vote any voting interests that they hold in the general partners of our foreign funds. All of our Managing Partner's outstanding Class A shares and Class B shares will be held by our senior principals upon the completion of the Reorganization Transactions and this offering. See "Management—Managing Partner Board Structure and Practices—Election and Removal of Directors" and "Security Ownership—Our Managing Partner."

**Group Partnerships**

Following the Reorganization Transactions, the Group Partnerships will consist of the following components of our business:

- controlling and economic interests in our management companies, allowing us to control our management companies and their respective subsidiaries (including the entities through which we conduct capital markets activities) as well as share ratably in the management, monitoring, transaction and other potential fees paid by all of our funds, portfolio companies and investment targets and other amounts paid by our credit strategy funds;

- controlling and economic interests in the general partners of our traditional private equity funds (other than the 1996 Fund and our earlier funds, as the general partners of those funds are not expected to receive meaningful proceeds from further realizations), which will allow us to control those entities and share ratably in the carried interest received from those funds as well as any returns on investments made by or on behalf of those general partners after the completion of the offering; and

- an economic (but not controlling) interest in the general partner of the KKR Private Equity Investors master fund, which will allow us to share ratably in the carried interest paid by that fund.

In addition to the principals' interests that will result from KKR Holdings' ownership of Group Partnership units, certain minority investors who have been or are involved in our business also will retain economic interests in some or all of the above entities following the completion of the Reorganization Transactions. Those retained interests, which will be accounted for as "non-controlling interests in consolidated entities," will consist of:

- economic interests in the general partners of our private equity funds that will entitle certain principals and former principals to       % of the capital invested by or on behalf of those general partners before the completion of the offering and any profit thereon;

- interests in our management company for our private equity funds and the general partners of our funds that will entitle certain minority investors to       % of the net profits of our management company and       % of the carried interest received from those general partners with respect to the funds' investments for a specified period of time; and

- a 35% interest in the management company for our credit strategy funds that will allocate to the members of that management company their allocable share of the management company's net income.

The Group Partnerships will not acquire any interests in the 1987 Fund, the 1993 Fund or the 1996 Fund (as the general partners of those private equity funds are not expected to receive meaningful proceeds from further realizations) or the KKR Private Equity Investors feeder fund or control over the KKR Private Equity Investors master fund, although they will acquire an economic interest in the general partner of the KKR Private Equity Investors master fund. In accordance with GAAP, we have included the 1996 Fund and the KKR Private Equity Investors master fund in our predecessor combined financial statements, because both funds were under the common control of our senior principals and were significant to our operations during the periods for which historical financial information has been presented in this prospectus. Because we will not control the 1996 fund and the KKR Private Equity Investors master fund following the completion of the offering, we will not consolidate them in our financial statements for future periods, although we will account for our economic interest in the KKR Private Equity Investors master fund under the equity method of accounting. For information concerning the pro forma impact that the elimination or deconsolidation of these entities would have had on our historical predecessor combined financial statements, please see "Unaudited Pro Forma Financial Information."

66

**Tax Receivable Agreement**

The acquisition by our intermediate holding company of Group Partnership units from KKR Holdings or transferees of its Group Partnership units from time to time pursuant to the exchange agreement is expected to result in an increase in our intermediate holding company's share of the tax basis of the tangible and intangible assets of KKR Management Holdings L.P., primarily attributable to a portion of the goodwill inherent in our business, that would not otherwise have been available. This increase in tax basis may increase (for tax purposes) depreciation and amortization and therefore reduce the amount of tax our intermediate holding company would otherwise be required to pay in the future. This increase in tax basis may also decrease gain (or increase loss) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets. We will enter into a tax receivable agreement with KKR Holdings requiring our intermediate holding company to pay to KKR Holdings or transferees of its Group Partnership units 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax that the intermediate holding company actually realizes (or is deemed to realize, in the case of an early termination payment by our intermediate holding company or a change of control) as a result of this increase in tax basis, as well as 85% of the amount of any such savings the intermediate holding company actually realizes (or is deemed to realize) as a result of increases in tax basis that arise due to future payments under the agreement. Although we are not aware of any issue that would cause the IRS to challenge a tax basis increase, our existing owners will not reimburse us for any payments previously made under the tax receivable agreement if such tax basis increase were successfully challenged by the IRS. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." In the event that other of our current or future subsidiaries become taxable as corporations and acquire Group Partnership units in the future, or if we become taxable as a corporation for U.S. federal income tax purposes, we expect that each will become subject to a tax receivable agreement with substantially similar terms.

**Other Tax Matters**

As discussed in "Material U.S. Federal Tax Consequences," under existing laws and regulations our partnership will be treated as a partnership and not as a corporation for U.S. federal income tax purposes. An entity that is treated as a partnership for U.S. federal income tax purposes is not a taxable entity and incurs no U.S. federal income tax liability. Instead, each partner is required to take into account its allocable share of items of income, gain, loss and deduction of the partnership in computing its U.S. federal income tax liability, regardless of whether cash distributions are made. Distributions of cash by a partnership to a partner are generally not taxable unless the amount of cash distributed to a partner is in excess of the partner's adjusted basis in its partner interest. However, our partnership agreement does not restrict our ability to take actions that may result in us being treated as an entity taxable as a corporation for U.S. federal (and applicable state) income tax purposes. See "Material U.S. Federal Tax Consequences" for a summary discussing certain U.S. federal tax considerations related to the purchase, ownership and disposition of our common units as of the date of this prospectus. Also see "Risk Factors—Risks Related to Our Business—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units."

We believe that the Group Partnerships will also be treated as partnerships and not as corporations for U.S. federal income tax purposes. Accordingly, the holders of Group Partnership units, including our intermediate holding company, will incur U.S. federal, state and local income taxes on their proportionate share of any net taxable income of the Group Partnerships. Subject to the priority distribution rights, net profits and net losses of a Group Partnership will generally be allocated to its partners (including our partnership and our intermediate holding company) pro rata in accordance with the percentages of their respective partner interests. Because we will directly and indirectly own an aggregate of        % of the outstanding Group Partnership units upon completion of this offering, our partnership will initially be

67

indirectly allocated        % of the net profits and net losses of the Group Partnerships, subject to priority distribution rights in favor of our partnership and our intermediate holding company through        as described under "Distribution Policy." The remaining net profits and net losses will be allocated to the other holders of Group Partnership units, which will initially consist of KKR Holdings. These percentages are subject to change, including upon an exchange of Group Partnership units for our common units and upon issuance of additional common units by our partnership.

If the general partners of the Group Partnerships determine that distributions from the Group Partnerships would otherwise be insufficient to cover the tax liabilities of a holder of a Group Partnership unit, the partnership agreement of each Group Partnership will provide for cash distributions, which we refer to as tax distributions, to the holders of Group Partnership units. Generally, these tax distributions will be computed based on our estimate of the net taxable income of the relevant partnership allocable to a holder of a Group Partnership unit multiplied by an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax rate prescribed for an individual or corporate resident in New York, New York (taking into account the non-deductibility of certain expenses and the character of the income). If we had completed the Reorganization Transactions and this offering on January 1, 2006, the assumed effective tax rate for the year ended December 31, 2006 would have been approximately 46%. A portion of any such tax distributions received by us, net of amounts used by our subsidiaries to pay their tax liability, will be distributed to our unitholders. Such amounts are generally expected to be sufficient to permit our U.S. unitholders to fund their estimated U.S. tax obligations (including any federal, state and local income taxes) with respect to their distributive shares of net income or gain, after taking into account any withholding tax imposed on us. We cannot assure you that, for any particular unitholder, such distributions will be sufficient to pay the unitholder's actual U.S. or non-U.S. tax liability.

## KKR Holdings

Our principals and certain former personnel will hold equity interests in our business through KKR Holdings, which will hold the Group Partnership units not held by us. As a result, those individuals will receive financial benefits from our business in the form of distributions and payments received from KKR Holdings and the appreciation in the value of the Group Partnership units that KKR Holdings owns. The Group Partnership units held by KKR Holdings will be subject to applicable transfer restrictions, and will not be exchangeable for our common units before        .

## IPO Date Equity Awards

At the time of this offering, we intend to grant to our employees who are not principals an aggregate of        restricted common units under our 2007 Equity Incentive Plan, which restricted common units will be allocated based on each employee's seniority. We will settle the restricted common units granted to these employees in the form of unrestricted common units or in cash. Holders of restricted common units will not be entitled to any voting rights or distributions with respect to their restricted common units. See "Management—IPO Date Equity Awards."

68

## UNAUDITED PRO FORMA FINANCIAL INFORMATION

*The unaudited pro forma financial information contained in this prospectus is subject to completion due to the fact that information relating to the Reorganization Transactions and this offering currently is not determinable. We intend to complete this pro forma financial information, including amounts relating to the pro forma adjustments set forth in the accompanying unaudited condensed pro forma statement of financial condition and unaudited condensed pro forma statements of income, as and when we update this prospectus and such information becomes available.*

The following unaudited condensed pro forma statements of income for the year ended December 31, 2006 and three months ended March 31, 2007 and the unaudited condensed pro forma statement of financial condition as of March 31, 2007 are based upon the historical combined financial statements of the KKR Group, our accounting predecessor, included elsewhere in this prospectus. In addition, the following pro forma measure of economic net income for the year ended December 31, 2006 and the three months ended March 31, 2007, which represents a supplemental measure used by management to make operating decisions, assess performance and allocate resources, is based upon historical measures included elsewhere in this prospectus. These pro forma financial statements and supplemental financial measure present our consolidated results of operations and financial position giving pro forma effect to the Reorganization Transactions, this offering and the other transactions described below as if such transactions had been completed as of January 1, 2006 with respect to the unaudited condensed pro forma statements of income and as of March 31, 2007 with respect to the unaudited pro forma statement of financial condition. You should read this information together with "Organizational Structure," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the historical predecessor combined financial statements and related notes included elsewhere in this prospectus.

The KKR Group is considered our predecessor for accounting purposes and its combined financial statements will be our historical financial statements following the completion of the Reorganization Transactions and this offering. Because the legal entities that comprise the KKR Group are under the common control of our senior principals and will be under the common control of our senior principals following the completion of the Reorganization Transactions and this offering, we will account for the Reorganization Transactions as a transfer of interests under common control. Accordingly, we will carry forward into our consolidated financial statements the value of assets, liabilities and non-controlling interests in the combined entities recognized in the KKR Group's combined financial statements, except as described below.

The pro forma adjustments described under "Reorganization Adjustments" principally give effect to:

- the deconsolidation of both the 1996 Fund (a private equity fund whose general partners are not expected to receive meaningful proceeds from further realizations) and the fund's general partners, because the Group Partnerships will not acquire an interest in those general partners in connection with the Reorganization Transactions;

- the deconsolidation of both the KKR Private Equity Investors master fund, our private equity-oriented permanent capital fund, and the master fund's general partner and the accounting for the Group Partnerships' interest in the master fund general partner instead under the equity method of accounting (which accounting treatment will not impact our consolidated net income or partners' capital), because the Group Partnerships will acquire an economic (but not controlling) partner interest in the master fund general partner;

- the inclusion of non-controlling interests in consolidated entities representing the economic interests that certain principals and former principals will retain in the general partners of our private equity funds following the acquisition of general partner interests in those entities by the Group Partnerships, which economic interests will allocate to certain principals and former principals        % of the capital

69

invested by or on behalf of those general partners before the completion of the offering and any profits thereon; and

- the inclusion of non-controlling interests in consolidated entities representing the economic interests that certain minority investors will retain in the management company of our private equity funds and general partners of our funds following the acquisition of general partner or controlling interests in those entities by the Group Partnerships, which economic interests will allocate to certain minority investors          % of the net profits earned by the management company and          % of the carried interest received by those general partners with respect to the funds' investments, in each case for a specified period of time.

The pro forma adjustments described under "Other Adjustments" principally give effect to:

- the issuance of          common units in this offering at an assumed initial public offering price of $          per common unit, representing the midpoint of the price range indicated on the front cover of this prospectus, and the use of proceeds therefrom as described under "Use of Proceeds;"

- the inclusion of principals' interests representing the Group Partnership units that KKR Holdings will hold in the Group Partnerships, which principals' interests will allocate to KKR Holdings          % of the equity in the Group Partnerships upon completion of this offering, assuming the underwriters do not exercise their option to purchase additional common units from us;

- one or more cash and in-kind distributions that we intend to make to certain of our existing owners prior to the completion of the offering, which distributions will consist of substantially all of the cash-on-hand and certain personal property of the management company for our private equity funds;

- our recognition of non-cash employee compensation charges associated with the vesting of interests in KKR Holdings that are held by our principals, which non-cash charges will be offset in full by corresponding credits to our income statement attributable to principals' interests in income of consolidated entities and other income and will not impact our income before taxes or net income;

- our recognition of cash and non-cash employee compensation charges associated with grants of restricted common units under our 2007 Equity Incentive Plan at the time of this offering; and

- a provision for corporate income taxes on the income of our intermediate holding company, which will indirectly hold our interests in the management companies for our funds and our capital markets companies and will be taxable as a corporation for U.S. federal income tax purposes.

As a public company, our costs for such items as insurance, accounting and legal advice may increase. We will also incur costs which we have not previously incurred for director fees, additional investor relations expenses, expenses for compliance with the Sarbanes-Oxley Act and new rules implemented by the SEC and the New York Stock Exchange, and various other costs associated with being a public company. We have not made any pro forma adjustments relating to these costs, because estimates of those expenses are not objectively determinable.

This unaudited pro forma financial information is included for informational purposes only and does not purport to reflect the results of operations or financial position that would have occurred had the above transactions occurred on the dates indicated or had we operated as a public company during the periods presented or for any future period or date. In addition, the pro forma adjustments described herein are based on available information and upon assumptions that management believes are reasonable in order to reflect, on a pro forma basis, the impact of the above transactions on the historical financial information of the KKR Group. You are cautioned not to place undue reliance on this unaudited pro forma financial information.

70

**Unaudited Pro Forma Condensed Statement of Financial Condition**

**As of March 31, 2007**

| | KKR Group Combined Historical | Reorganization Adjustments | KKR Group after the Reorganization Adjustments | Other Adjustments | KKR & Co. L.P. Consolidated Pro Forma |
|---|---|---|---|---|---|
| | | | *($ in thousands)* | | |
| **Assets** | | | | | |
| Cash and cash equivalents | $ 97,169 | | | | |
| Cash and cash equivalents held at consolidated entities | 1,851,718 | | | | |
| Restricted cash and cash equivalents | 174,141 | | | | |
| Investments, at fair value | 23,568,572 | | | | |
| Due from affiliates | 78,163 | | | | |
| Other assets | 117,541 | | | | |
| Total assets | $ 25,887,304 | | | | |
| | | | | | |
| **Liabilities and partners' capital** | | | | | |
| Debt obligations | $ 1,685,687 | | | | |
| Accounts payable, accrued Expenses and other liabilities | 394,044 | | | | |
| Total liabilities | 2,079,731 | | | | |
| | | | | | |
| Commitments and contingencies | | | | | |
| | | | | | |
| Non-controlling interests in consolidated entities | 21,907,784 | | | | |
| Principals' interests in consolidated entities | — | | | | |
| | | | | | |
| Partners' capital | | | | | |
| Partners' capital | 1,892,527 | | | | |
| Accumulated other comprehensive income | 7,262 | | | | |
| Total partners' capital | 1,899,789 | | | | |
| Total liabilities and partners' capital | $ 25,887,304 | | | | |

71

**Unaudited Pro Forma Condensed Consolidated Statement of Income**
**Year Ended December 31, 2006**

| | KKR Group Combined Historical | Reorganization Adjustments | KKR Group after the Reorganization Adjustments | Other Adjustments | KKR & Co. L.P. Consolidated Pro Forma |
|---|---|---|---|---|---|
| | | | *($ in thousands)* | | |
| ***Revenues*** | | | | | |
| Fee income | $     410,329 | | | | |
| | | | | | |
| ***Expenses*** | | | | | |
| Employee compensation and benefits | 131,667 | | | | |
| Occupancy and related charges | 19,295 | | | | |
| General, administrative and other | 78,154 | | | | |
| Fund expenses | 38,350 | | | | |
| Total expenses | 267,466 | | | | |
| ***Investment Income*** | | | | | |
| Net gains from investment activities | 3,105,523 | | | | |
| Dividend income | 714,069 | | | | |
| Interest income | 210,872 | | | | |
| Interest expense | (29,542) | | | | |
| Total investment income | 4,000,922 | | | | |
| Income before non-controlling and principals' interests in income of consolidated entities and income taxes | 4,143,785 | | | | |
| Non-controlling interests in income of consolidated entities | 3,026,913 | | | | |
| Principals' interests in income of consolidated entities | — | | | | |
| Income before taxes | 1,116,872 | | | | |
| Income taxes | 4,163 | | | | |
| Net income | $   1,112,709 | | | | |
| ***Net Income Per Common Unit*** | | | | | |
| Basic | | | | | |
| Diluted | | | | | |
| ***Weighted Average Common Units*** | | | | | |
| Basic | | | | | |
| Diluted | | | | | |

**Unaudited Pro Forma Condensed Consolidated Statement of Income**
**Three Months Ended March 31, 2007**

| | KKR Group Combined Historical | Reorganization Adjustments | KKR Group after the Reorganization Adjustments | Other Adjustments | KKR & Co. L.P. Consolidated Pro Forma |
|---|---|---|---|---|---|
| | | | *($ in thousands)* | | |
| **Revenues** | | | | | |
| Fee income | $ 68,840 | | | | |
| **Expenses** | | | | | |
| Employee compensation and benefits | 27,345 | | | | |
| Occupancy and related charges | 4,624 | | | | |
| General, administrative and other | 31,555 | | | | |
| Fund expenses | 16,810 | | | | |
| Total expenses | 80,334 | | | | |
| **Investment Income** | | | | | |
| Net gains from investment activities | 1,482,054 | | | | |
| Dividend income | 19,471 | | | | |
| Interest income | 68,269 | | | | |
| Interest expense | (15,593) | | | | |
| Total investment income | 1,554,201 | | | | |
| Income before non-controlling and principals' interests in income of consolidated entities and income taxes | 1,542,707 | | | | |
| Non-controlling interests in income of consolidated entities | 1,161,162 | | | | |
| Principals' interests in income of consolidated entities | — | | | | |
| Income before taxes | 381,545 | | | | |
| Income taxes | 627 | | | | |
| Net income | $ 380,918 | | | | |
| **Net Income Per Common Unit** | | | | | |
| Basic | | | | | |
| Diluted | | | | | |
| **Weighted Average Common Units** | | | | | |
| Basic | | | | | |
| Diluted | | | | | |

73

<div align="center">**Notes to Unaudited Pro Forma Condensed Financial Information**</div>

**1.    Reorganization Adjustments.**

The Reorganization Adjustments present the effects of the elimination of the financial results of non-contributed entities and the reorganization of our business into a holding company structure as described under "Organizational Structure."

(a)    The adjustments reflect the elimination of the consolidated financial results of the general partners of the 1996 Fund because the Group Partnerships will not acquire an interest in those general partners in connection with the Reorganization Transactions. In addition, the adjustments reflect the deconsolidation of the KKR Private Equity Investors master fund and its general partner and the accounting for the Group Partnerships' interest in the the master fund general partner instead under the equity method of accounting, because the Group Partnerships will acquire an economic (but not controlling) partner interest in the master fund general partner in connection with the Reorganization Transactions. The above general partners are entitled to carried interests that entitle them to a percentage of the net profits generated on the funds' investments, subject to certain requirements. The above funds pay management fees to us in exchange for providing them with management and other services.

The 1996 Fund general partners consolidate the 1996 Fund, and the KKR Private Equity Investors master fund general partner consolidates the KKR Private Equity Investors master fund, under EITF 04-5, "Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights," or EITF 04-5, notwithstanding the fact that they hold only minority economic interests in those funds, as a result of their substantive, controlling general partner interests. Those consolidated funds have been combined in the historical combined financial statements of the KKR Group for the periods presented in this prospectus. When funds are consolidated, the KKR Group's combined financial statements reflect the assets, liabilities, revenues, expenses and cash flows of the consolidated funds on a gross basis, and the majority of the economic interests in the consolidated funds, which are held by third-party investors, are reflected as non-controlling interests. All inter-company transactions are eliminated in consolidation.

The elimination of the 1996 Fund general partners' consolidated financial results resulted in a $          decrease in partners' capital as of March 31, 2007, representing the excess of eliminated assets of $          over eliminated liabilities of $          and eliminated non-controlling interests of $          . For the year ended December 31, 2006 and the three months ended March 31, 2007, the elimination of the 1996 Fund general partners' consolidated results resulted in the recognition of $          million and $          million, respectively, of fee income from management fees paid by the 1996 Fund that had been eliminated in consolidation as inter-company transactions as well as eliminations of $          and $          of expenses, $          and $          of investment income and $          and $          of non-controlling interests in income from consolidated entities, respectively, because those items will no longer be reflected in our consolidated financial statements following the completion of the Reorganization Transactions. The foregoing adjustments resulted in reductions in income before taxes of $          and $          and reductions in net income of $          and $          for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively.

The deconsolidation of the KKR Private Equity Investors master fund and its general partner and the accounting for the Group Partnerships' interest in the master fund general partner instead under the equity method of accounting did not impact partners' capital as of March 31, 2007, because the elimination of previously consolidated assets was offset by the elimination of a corresponding amount of liabilities and non-controlling interests. The economic interest that the Group Partnerships will hold in the master fund general partner upon the completion of the Reorganization Transactions will

<div align="center">74</div>

be accounted for as an investment in our consolidated statement of financial condition. That interest will allocate to the Group Partnerships          % of the carried interest received by the master fund general partner pursuant to its carried interests once the fund's capitalization costs have been recouped in accordance with the fund's governing instruments. Because the fund's capitalization costs had not been recouped as of March 31, 2007, the master fund general partner would not be entitled to receive any amounts pursuant to this interest in the event of a termination of the master fund. The investment has therefore been reflected at a value of zero.

For the year ended December 31, 2006 and the three months ended March 31, 2007, the deconsolidation of the KKR Private Equity Investors master fund and its general partner and the accounting for the Group Partnerships' interest in the master fund general partner instead under the equity method of accounting resulted in the recognition of $          million and $          million, respectively, of fee income from management fees paid by the fund that had been eliminated in consolidation as inter-company transactions as well as eliminations of $          and $          of expenses, $          and $          of investment income and $          and $          of non-controlling interests of fund investors in income from consolidated entities, respectively, because those items will no longer be reflected in our financial statements following the deconsolidation of the master fund general partner. For the year ended December 31, 2006 and the three months ended March 31, 2007, no expense or investment income was allocable to the economic interest that the Group Partnerships will have in the master fund general partner upon the completion of the Reorganization Transactions and this offering.

(b)     The adjustments reflect the inclusion of non-controlling interests in consolidated entities representing the economic interests that certain principals and former principals will retain in the general partners of our private equity funds that will be consolidated by the Group Partnerships, which economic interests will allocate to certain principals and former principals          % of the capital invested by or on behalf of those general partners before the completion of the offering and any profits thereon. As of March 31, 2007, these non-controlling interests were valued at $          and reduced partners' capital by a corresponding amount. For the year ended December 31, 2006 and the three months ended March 31, 2007, the inclusion of non-controlling interests resulted in net charges accounted for as non-controlling interests in income of consolidated subsidiaries of $          and $          , respectively, representing amounts of expenses and investment income attributable to the non-controlling interests. The foregoing adjustments resulted in reductions in income before taxes of $          and $          and reductions in net income of $          and $          for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively.

(c)     The adjustments reflect the inclusion of non-controlling interests in consolidated entities representing the economic interests that certain minority investors will retain in the management company of our private equity funds and general partners of our consolidated funds following the acquisition of interests in those entities by the Group Partnerships, which economic interests will allocate to certain minority investors          % of the net profits earned by the management company and          % of the carried interest received by those general partners with respect to the funds' investments, in each case, for a specified period of time. As of March 31, 2007, these non-controlling interests were recorded at $          and reduced partners' capital by a corresponding amount. For the year ended December 31, 2006 and the three months ended March 31, 2007, the inclusion of non-controlling interests resulted in net charges accounted for as non-controlling interests in income of consolidated subsidiaries of $          and $          , respectively, representing amounts of fee income, expenses and investment income attributable to the non-controlling interests. The foregoing adjustments resulted in reductions in income before taxes of $          and $          and reductions in net income of $          and $          for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively.

75

2.    **Other Adjustments**

The Other Adjustments present the effects of the other transactions that will be entered into in connection with the Reorganization Transactions, this offering and the other transactions described in this section.

(d)    The adjustments reflect the receipt of $          of net proceeds from the issuance of          common units in this offering at an assumed initial offering price of $          per common unit, representing the midpoint of the price range indicated on the front cover of this prospectus, after deducting $          of estimated underwriting discounts and offering expenses. We intend to contribute the net proceeds that we receive from this offering to the Group Partnerships in exchange for newly issued Group Partnership units, which will use the proceeds that they receive from us to grow our existing business, to expand into new related businesses and for other general corporate purposes. The issuance of          common units described above resulted in a $          net increase in cash and cash equivalents and a $          net increase in partners' capital as of March 31, 2007.

(e)    The adjustments reflect our use of $          of assumed net proceeds from the issuance of common units in this offering to acquire newly issued Group Partnership units from the Group Partnerships. Assuming that the underwriters do not exercise their option to purchase additional common units from us, we will directly and indirectly own          % of the outstanding Group Partnership units upon the completion of this offering and the balance of the outstanding Group Partnership units will be owned by KKR Holdings and reflected in our consolidated financial statements as principals' interests. As of March 31, 2007, these non-controlling interests were recorded at $          and reduced partners' capital by a corresponding amount. For the year ended December 31, 2006 and the three months ended March 31, 2007, the inclusion of principals' interests resulted in net charges accounted for as principals' interests in income of consolidated entities of $          and $          , respectively, representing amounts of fee income, expenses and investment income attributable to the principals' interests. The foregoing adjustments resulted in reductions in income before taxes of $          and $          and reductions in net income of $          and $          for the year ended December 31, 2006 and the three months ended March 31, 2007, respectively.

We will enter into an exchange agreement with KKR Holdings in connection with the Reorganization Transactions pursuant to which KKR Holdings or certain transferees of its Group Partnership units may up to four times each year (subject to the terms of the exchange agreement) exchange Group Partnership units held by them (together with corresponding special voting units) for our common units on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and reclassifications. The Group Partnership units are also subject to transfer restrictions, and will therefore not be exchangeable before          . We have not yet determined the manner in which such future exchanges will be accounted for in our consolidated financial statements.

(f)    The adjustments reflect the effect of one or more cash and in-kind distributions to certain of our existing owners representing substantially all of the cash-on-hand and certain personal property of the management company for our private equity funds in an assumed aggregate amount of $          million as of March 31, 2007. The actual amount of such distributions will depend on the amount of the management company's cash on hand at the time of the offering.

(g)    The adjustments reflect the impact of the vesting of interests in KKR Holdings and the vesting of restricted common units issued under our 2007 Equity Incentive Plan on our income.

Our principals and certain former personnel will hold equity interests in our business through KKR Holdings, which will hold the Group Partnership units not directly or indirectly held by us. As a result, those individuals will receive financial benefits from our business in the form of distributions and payments received from KKR Holdings and the appreciation in the value of the Group Partnership units that KKR Holdings owns. A portion of the equity interests held by our principals in KKR

76

Holdings are subject to vesting. We will be required to record periodic non-cash employee compensation charges over time with respect to the vesting of interests in KKR Holdings that are held by our principals. When incurred, however, those non-cash charges will be offset in full by corresponding credits in our statements of income attributable to principals' interests in income of consolidated entities and other income and, as a result, will not impact our income before taxes, our net income or amounts that are available for distribution to our unitholders.

In addition, at the time of this offering, we will grant to our employees who are not principals an aggregate of        unvested restricted common units under our 2007 Equity Incentive Plan. We may settle these restricted common units with unrestricted common units or in cash. The vesting of these restricted common units will result in cash and non-cash charges as the restricted common units vest.

The following table summarizes the pro forma effects of the above items on the KKR Group's combined statements of income for the year ended December 31, 2006 and the three months ended March 31, 2007.

|  | Year Ended December 31, 2006 | Three Months Ended March 31, 2007 |
|---|---|---|
|  | *($ in thousands)* | |
| Historical employee compensation and benefits expense | $        131,667 | $        27,345 |
| Addition of non-cash charges relating to vesting of interests in KKR Holdings(1) | | |
| Addition of cash and non-cash charges relating to vesting of restricted common units issued to other employees(2) | | |
| Total change in employee compensation and benefits expense | | |
| Employee compensation and benefits expense attributable to principals' interests in income of consolidated entities | (        ) | (        ) |
| Other income | (        ) | (        ) |
| Change in income before taxes | | |

(1)   Upon completion of the Reorganization Transactions and this offering, our principals will hold an aggregate of        interests in KKR Holdings, of which        will be vested and        will be unvested. The unvested interests will vest over periods ranging in duration from        to        years. We intend to reflect the vesting of unvested interests in KKR Holdings as non-cash employee compensation charges in accordance with Statement of Financial Accounting Standards No. 123(R), Share-Based Payment.

(2)   At the time of this offering, we will grant our employees        unvested restricted common units that may be settled with unrestricted common units and        unvested restricted common units that may be settled with cash. We will account for awards that may be settled with unrestricted common units as equity awards with the fair value of the award determined at the service inception date, which will be concurrent with the completion of this offering. We will account for awards that may be settled in cash as a liability at each reporting date subsequent to the service inception date, which will be concurrent with the completion of this offering. The fair value of these awards will be charged to compensation expense over the applicable service periods. The amounts presented above have been derived based upon an assumed initial offering price of        per common unit, representing the midpoint of the price range indicated on the front cover of this prospectus, multiplied by the number of restricted common units to be granted, expensed over the assumed service periods, which range from

77

to            years. In addition, the calculation of the expense assumes a forfeiture rate of            %, which is based upon historical turnover rates.

(h)   We have historically operated as a group of partnerships for U.S. federal income tax purposes and, in the case of certain entities located outside the United States, corporate entities for foreign income tax purposes. Because most of the entities in our consolidated group are taxed as partnerships, our income is generally allocated to, and the resulting tax liability is generally borne by, our partners and we generally are not taxed at the entity level. Accordingly, income tax provisions shown on our historical combined statements of income of $            million for the year ended December 31, 2006 and $            million for the three months ended March 31, 2007 were primarily attributable to the New York City unincorporated business tax and foreign income taxes imposed on certain entities located outside the United States.

Following the Reorganization Transactions and this offering, the Group Partnerships and their subsidiaries will continue to operate as partnerships for U.S. federal income tax purposes and, in the case of certain entities located outside the United States, corporate entities for foreign income tax purposes. Accordingly, those entities will continue to be subject to New York City unincorporated business taxes or foreign income taxes. In addition, our intermediate holding company will be subject to additional entity-level taxes that will be reflected in our consolidated financial statements. For a discussion of pending legislation that may preclude us from qualifying for treatment as a partnership for U.S. federal income tax purposes, see "Risk Factors—Risks Related to Our Business—Legislation has been introduced that would, if enacted, prelude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units."

In calculating the pro forma income tax provision for the periods presented, the following assumptions were made:

• The amount of net income before taxes was attributed to the entities subject to corporate taxes (income of $            million for the year ended December 31, 2006 and income of $            million for the three months ended March 31, 2007) with the remainder attributed to the entities not subject to corporate income taxes. Net income was attributed to these entities based on income or losses of the subsidiaries of the entities. Please see "Material U.S. Federal Tax Considerations" for a discussion of the different tax requirements of our subsidiaries.

• Income before taxes attributed to entities subject to corporate tax was adjusted to add back expenses of $            million for the year ended December 31, 2006 and $            million for the three months ended March 31, 2007, which are not deductible for corporate income tax purposes. Such expenses relate primarily to compensation charges recognized for book purposes that will not be deductible for tax.

• The resulting balances of $            million for the year ended December 31, 2006 and $            million for the three months ended March 31, 2007 were then multiplied by a blended statutory tax rate of            % and such amounts were added to the estimated foreign jurisdiction tax provisions to arrive at the aggregate tax provisions of $            million for the year ended December 31, 2006 and $            million for the three month period ended March 31, 2007. The blended statutory rate reflects statutory rate of            % for federal taxes and the blended state rate (net of federal benefit) of            %.

• The amount of the adjustment reflects the difference between the actual tax provision for the historical organizational structure and the estimated tax provision that would have resulted had the Reorganization Transactions and the offering been effected on January 1, 2006.

78

3.    **Determination of Earnings Per Common Unit**

(i)    For the purposes of the pro forma net income per common unit computation, the weighted average common units outstanding, basic and diluted, were calculated in the following manner.

|  | Year Ended December 31, 2006 | Three Months Ended March 31, 2007 |
|---|---|---|
|  | Basic and Diluted | Basic and Diluted |
| Common units to be outstanding immediately following the completion of the Reorganization Transactions and this offering |  |  |
| Restricted common units to be outstanding immediately following the completion of the Reorganization Transactions and this offering |  |  |
| Group Partnership units to be outstanding immediately following the completion of the Reorganization Transactions and this offering(1) |  |  |
| Weighted average common units outstanding |  |  |

(1)    We will enter into an exchange agreement with KKR Holdings in connection with the Reorganization Transactions pursuant to which KKR Holdings or transferees of its Group Partnership units may up to four times each year (subject to the terms of the exchange agreement) exchange Group Partnership units held by them (together with corresponding special voting units) for our common units on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and reclassifications and compliance with other applicable transfer restrictions. Group Partnership units are not included in the calculation of weighted average common units outstanding because to do so would have been anti-dilutive for the periods presented. If these Group Partnership units were to be exchanged for common units, net income available to holders of common units would increase due to the elimination of the principals' interests associated with the Group Partnership units (offset by the associated tax effect) by a greater proportion than the corresponding increase in weighted average common units outstanding. As a result, diluted net income per common unit calculated assuming the exchange of all exchangeable Group Partnership units for common units would be greater than basic net income per common unit. We have not yet determined how any such future exchanges will be accounted for in our consolidated financial statements.

(j)    Pro forma basic and diluted net income per common unit were computed in the following manner.

|  | Year Ended December 31, 2006 | Three Months Ended March 31, 2007 |
|---|---|---|
|  | Basic and Diluted | Basic and Diluted |
| Net income available to holders of common units | $ | $ |
| Weighted average common units outstanding |  |  |
| Net income per common unit |  |  |

Our special voting units are not entitled to receive distributions from our partnership. Those units do not share in our earnings and no earnings are allocable to that class. Accordingly, pro forma basic and diluted net income per special voting unit has not been presented.

**Economic Net Income**

Economic net income represents net income excluding the impact of income taxes and the impact of non-cash employee compensation charges associated with equity interests in our business and charges

79

relating to the amortization of intangible assets. Adjustments relating to income tax expense and amortization are customary in the calculation of supplemental measures of performance. In addition, we believe that the exclusion of non-cash compensation expense provides investors with a more meaningful indication of our performance as this non-cash charge relates to the equity portion of our capital structure and not our core operating performance. We believe such adjustments are meaningful because they are indicators of our core operating results and our management uses them to evaluate our business and allocate resources.

We find economic net income to be useful as a measure for understanding the performance of our operations from period to period and although not every company in our industry defines these metrics in precisely the same way that we do, we believe that this metric, as we use it, facilitates comparisons with other companies in our industry. While we use segment economic net income to evaluate the performance of our business segments, consolidated economic net income is also utilized by management in evaluating our performance as a whole as well as for compensation and other purposes. We also believe that analysts and investors use economic net income as a supplemental measure to evaluate our company's overall operating performance. However, economic net income has material limitations as an analytical tool and you should not consider this in isolation, or as a substitute for analysis of our results as reported under GAAP.

The items we eliminate in calculating economic net income are significant to our business: (i) income tax expense represents a necessary element of our costs and our ability to generate revenue because ongoing revenue generation is expected to result in future income tax expense, (ii) amortization may be a necessary element of our costs following the reorganization and (iii) non-cash compensation expense is expected to be a recurring component of our costs and we may be able to incur lower cash compensation costs to the extent that we grant non-cash compensation. Furthermore, any measure that eliminates compensation costs and the carrying costs associated with assets on our balance sheet has material limitations as a performance measure. In light of the foregoing limitations, we do not rely solely on economic net income as a performance measure and also consider our GAAP results. Economic net income is not a measurement of our financial performance under GAAP and should not be considered as an alternative to net income or any other measures prepared in accordance with GAAP. Because economic net income is not calculated in the same manner by all companies, it may not be comparable to other similarly titled measures used by other companies.

Because our historical combined financial statements do not include any non-cash employee compensation charges or charges relating to the amortization of intangible assets, economic net income is the equivalent of income before taxes for the historical periods presented. However, amounts of pro forma economic net income for the year ended December 31, 2006 and the three months ended March 31, 2007 include the impact of non-cash employee compensation charges described in Note (g) above and, accordingly, are not equivalent to pro forma income before taxes. The following table presents the adjustments to pro forma income before taxes used to derive pro forma economic net income for the year ended December 31, 2006 and the three months ended March 31, 2007.

|  | Year Ended December 31, 2006 | Three Months Ended March 31, 2007 |
|---|---|---|
| Pro forma income before taxes | $ | $ |
| Adjustment for non-cash employee compensation expense |  |  |
| Adjustment for amortization expense |  |  |
| Pro forma economic net income |  |  |

### SELECTED HISTORICAL FINANCIAL AND OTHER DATA

The following tables set forth the selected historical combined financial data of the KKR Group as of and for the years ended December 31, 2002, 2003, 2004, 2005 and 2006 and as of and for the three months ended March 31, 2006 and 2007. We derived the selected historical combined data of the KKR Group as of December 31, 2005 and 2006 and for the years ended December 31, 2004, 2005 and 2006 from the audited predecessor combined financial statements included elsewhere in this prospectus. We derived the selected historical combined data of the KKR Group as of March 31, 2006 and 2007 and for the three months ended March 31, 2006 and 2007 from the unaudited predecessor combined financial statements included elsewhere in this prospectus. We derived the selected historical combined data of the KKR Group as of December 31, 2002, 2003 and 2004 and for the years ended December 31, 2002 and 2003 from our unaudited predecessor combined financial statements which are not included in this prospectus. Our unaudited predecessor combined financial statements have been prepared on substantially the same basis as our audited predecessor combined financial statements and include all adjustments that we consider necessary for a fair presentation of our combined financial position and results of operations for all periods presented. We will not acquire all of the interests in the KKR Group in connection with the Reorganization Transactions and, accordingly, the combined financial statements of the KKR Group may not be indicative of the results of operations and financial condition that we will have following the completion of this offering. You should read the following data together with the "Organizational Structure," "Unaudited Pro Forma Financial Information," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the predecessor combined financial statements and related notes included elsewhere in this prospectus.

| | Year Ended December 31, | | | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | | *($ in thousands)* | | | | |
| **Income Statement Data:** | | | | | | | |
| **Revenues** | | | | | | | |
| Fee income | $ 67,850 | $ 50,516 | $ 183,462 | $ 232,945 | $ 410,329 | $ 93,798 | $ 68,840 |
| **Expenses** | | | | | | | |
| Employee compensation and benefits | 38,510 | 46,724 | 69,956 | 79,643 | 131,667 | 22,601 | 27,345 |
| Occupancy and related charges | 8,013 | 8,858 | 10,688 | 13,534 | 19,295 | 6,482 | 4,624 |
| General, administrative and other | 27,315 | 35,315 | 36,931 | 54,336 | 78,154 | 15,934 | 31,555 |
| Fund expenses | 7,340 | 26,024 | 16,470 | 20,778 | 38,350 | 4,778 | 16,810 |
| Total expenses | 81,178 | 116,921 | 134,045 | 168,291 | 267,466 | 49,795 | 80,334 |
| **Investment Income** | | | | | | | |
| Net gains from investment activities | (189,813) | 2,325,294 | 3,026,396 | 2,984,504 | 3,105,523 | 933,407 | 1,482,054 |
| Dividend income | 129 | 32,285 | 14,611 | 729,926 | 714,069 | 51,725 | 19,471 |
| Interest income | 11,730 | 36,807 | 54,060 | 27,166 | 210,872 | 11,119 | 68,269 |
| Interest expense | (299) | (234) | (524) | (697) | (29,542) | (1,366) | (15,593) |
| Total investment income (loss) | (178,253) | 2,394,152 | 3,094,543 | 3,740,899 | 4,000,922 | 994,885 | 1,554,201 |
| Income (loss) before non-controlling interests in income of consolidated entities and income taxes | (191,581) | 2,327,747 | 3,143,960 | 3,805,553 | 4,143,785 | 1,038,888 | 1,542,707 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Non-controlling interests in income of consolidated entities | (293,440) | 1,846,073 | 2,364,309 | 2,861,186 | 3,026,913 | 777,505 | 1,161,162 |
| Income before taxes | 101,859 | 481,674 | 779,651 | 944,367 | 1,116,872 | 261,383 | 381,545 |
| Income taxes | 1,745 | 2,425 | 6,265 | 2,900 | 4,163 | 767 | 627 |
| Net income | $ 100,114 | $ 479,249 | $ 773,386 | $ 941,467 | $ 1,112,709 | $ 260,616 | $ 348,151 |

**Statement of Financial Condition (period end):**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total assets | $ 7,379,763 | $ 8,142,353 | $ 9,701,478 | $ 13,369,412 | $ 23,292,783 | | $ 25,887,304 |
| Total liabilities | 19,243 | 124,338 | 313,672 | 418,778 | 1,281,923 | | 2,079,730 |
| Non-controlling interests in consolidated entities | 6,683,047 | 7,188,088 | 8,257,063 | 11,413,885 | 20,201,548 | | 21,907,784 |
| Total partners' capital | 677,473 | 829,927 | 1,130,743 | 1,536,749 | 1,809,312 | | 1,899,789 |

81

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis should be read in conjunction with the predecessor combined financial statements and the related notes included elsewhere in this prospectus. The historical combined financial data discussed below reflects the historical results and financial position of the KKR Group, which is considered our predecessor for accounting purposes. While the historical combined financial statements of the KKR Group will be our historical financial statements following the completion of this offering, the data does not give effect to the Reorganization Transactions or this offering and is not necessarily representative of our future results and financial condition. See "Organizational Structure" and "Unaudited Pro Forma Financial Information." In addition, this discussion and analysis contains forward-looking statements and involves numerous risks and uncertainties, including those described under "Risk Factors" and "Forward-Looking Statements." Actual results may differ materially from those contained in any forward-looking statements.*

### Overview

Founded in 1976, we are a leading global alternative asset manager. Our 399 employees, including our 139 investment professionals, are led by our founders, Henry Kravis and George Roberts, who are pioneers of the leveraged buyout industry. Our history of landmark achievements in private equity includes the first leveraged buyout in excess of $1 billion, several of the largest leveraged buyouts announced worldwide to date, the first buyout of a public company by tender offer and the largest leveraged buyouts completed or announced in each of the United States, the Netherlands, Denmark, India, Australia, Singapore and France. We have continued our history of innovation by establishing new debt and public equity strategies that leverage the power of our brand and the intellectual capital in our private equity business.

Today, through our offices in New York, Menlo Park, San Francisco, London, Paris, Hong Kong and Tokyo, we sponsor and manage funds that make investments worldwide in private equity and debt transactions on behalf of third-party investors and our firm. We also manage substantial investments in public equity. During our 31-year history, we have raised 16 funds and received approximately $59.7 billion of capital and capital commitments from investors. We have grown our assets under management significantly, from approximately $18.3 billion as of December 31, 2002 to approximately $53.4 billion as of March 31, 2007, representing a compounded annual growth rate of 28.7%. Of our total assets under management, approximately $6.8 billion is permanent capital, which is not required to be returned to investors and is able to be re-deployed as investments are realized.

As a global alternative asset manager, we earn ongoing management fees for providing management and other services to our funds as well as transaction, monitoring and other potential fees in connection with our private equity and other investments. We also earn investment income from investing our own capital alongside fund investors and from our carried interest in fund investments, which provides us with a disproportionate share of the funds' investment gains. We are also selectively pursuing opportunities to develop new investment structures and products that we believe will help us increase the amount of managed capital that we are able to commit to individual transactions, grow our assets under management and capture additional income streams.

### *Business Segments*

For management reporting purposes, we operate through two reportable business segments: private equity and credit.

### *Private Equity*

Through our private equity segment, we sponsor and manage a number of traditional private equity funds and a private equity-oriented permanent capital fund that make primarily control-oriented

<div align="center">82</div>

investments in connection with leveraged buyouts and other similar investment opportunities. Our private equity funds focus on investing in large capitalization companies, which we believe allows us to invest in industry-leading franchises with global operations, attract world class management teams, deploy large amounts of capital in individual transactions and optimize amounts of income that we earn on a per transaction basis. Our private equity segment had $44.1 billion of assets under management as of March 31, 2007 and generated approximately $1.1 billion and $369.0 million of economic net income during the year ended December 31, 2006 and the three months ended March 31, 2007. Though our private equity funds focus on investments in equity, they may also make a small percentage of their investments in debt and other asset classes and the results of such investments are included in the results of our private equity segment.

*Credit*

We believe the intellectual capital of our people, our integrated global investment platform and our ability to effectively adapt our investment strategies to market conditions allow us to capitalize on investment opportunities at every level of a company's capital structure. Commencing in 2004, we began to actively pursue debt investments as a separate asset class and, through our credit segment, we now sponsor and manage a group of private and publicly traded credit strategy funds that invest primarily in corporate debt investments and manage structured finance vehicles. Our credit strategy funds currently consist of KFN, a New York Stock Exchange listed finance company, and the KKR Strategic Capital Funds, consisting of three side-by-side private credit strategy funds. As of March 31, 2007, our credit strategy funds had $2.8 billion of capital, including $1.6 billion of permanent capital, and our credit strategy funds currently manage $6.5 billion of structured finance vehicles. During the year ended December 31, 2006 and the three months ended March 31, 2007, our credit segment generated $34.5 million and $12.6 million of economic net income, respectively. Though our credit strategy funds focus on investments in debt, these funds may also make a small percentage of their investments in equity and other asset classes and the results of such investments are included in the results of our credit segment.

**Business Environment**

As a global alternative asset manager, we are affected by financial and economic conditions in the United States, Europe, Asia and elsewhere in the world. The diversity of our operations and product lines has allowed us to generate attractive returns in different business climates. Generally, business conditions characterized by low inflation, low or declining interest rates and strong equity markets provide a positive environment for us to generate attractive returns on existing investments. We also benefit, however, from periods of market volatility and disruption which allow us to use our large capital base and our experience with troubled companies and distressed securities to make investments at attractive prices and on favorable terms.

**Market Conditions**

Our ability to grow our revenue and net income depends on our ability to continue to attract capital and investors, secure investment opportunities, obtain financing for transactions, consummate investments and deliver attractive investment returns. These factors are impacted by a number of market conditions, including:

- ***The strength and competitive dynamics of the alternative asset management industry, including the amount of capital invested in, and withdrawn from, alternative investments.*** Our share of the capital that is allocated to alternative assets depends on the strength of our investment performance relative to the investment performance of our competitors. The amount of capital that we attract and our investment returns directly affect the level of our assets under management, which in turn affects the fees, carried interest and other amounts that we are able to earn in connection with our asset management activities.

83

- ***The strength and liquidity of debt markets.*** Our private equity funds use debt financing to fund portfolio company acquisitions. Our credit strategy funds make significant investments in debt instruments and use varying degrees of leverage in order to enhance investment returns and to fund working capital requirements. As a result, our business generally benefits from strong and liquid debt markets that support our funds' investment activities, although periods of market volatility and disruption may create attractive investment opportunities. Recently, the cost of financing leveraged buyout transactions in the public capital markets has increased significantly, which may adversely impact the returns of our leveraged buyout transactions and our ability to finance future transactions.

- ***The strength and liquidity of equity markets.*** Strong equity market conditions enable our private equity funds to increase the value of and to effect realizations of their portfolio company investments. Equity market conditions also affect the carried interest that we receive. In addition, recent general increases in stock market prices have made it more difficult to find businesses that may be acquired at attractive prices and have resulted in higher purchase prices for portfolio companies, which has increased the amount of equity and debt financing that is required to complete an acquisition.

- ***Market volatility.*** Volatility within the debt and equity markets increases both the opportunities and risks within our segments and directly affects the performance of our funds. Similarly, fluctuations in interest rates and foreign currency exchange rates, if not suitably hedged, may affect the performance of our funds. Historical trends in these markets are not necessarily indicative of our future performance.

We believe market conditions during recent years have created a favorable environment for our two reportable business segments and our business as a whole. In particular:

- The U.S. economy has grown rapidly and the U.S. capital markets have seen increased activity and rising market indices during recent years, creating a favorable environment for making private equity investments and growing and realizing value from such investments, as well as for the expansion of our credit activities. We have also successfully identified and capitalized on opportunities to expand into Europe, Asia and elsewhere where trends have been favorable for investment, and we continue to identify what we believe to be attractive opportunities in new markets globally.

- Institutions and other investors have increased their capital allocations to the alternative asset management industry. As a leader in this industry, we have been and expect to continue to be able to attract a significant amount of new capital for our funds. In addition, we believe that strong capital flows to the alternative asset sector have played, and will continue to play, an important role in our new business initiatives, including our capital markets initiative.

- The U.S. and other debt markets have been particularly strong during recent years, contributing to our ability to finance portfolio company acquisitions at attractive rates, at attractive leverage ratios and on attractive terms. In addition, historically low interest rates and tight credit spreads during recent years have enhanced the ability of our credit strategy funds to employ leverage to increase investment returns. Recently, however, the cost of financing leveraged buyout transactions by issuing high-yield debt securities in the public capital markets has increased significantly. Increases in rates and spreads could have a negative impact on our returns as the incremental cash

    flow required to service debt would reduce cash flow available to investors in our funds and could lead to higher equity contribution requirements by our fund investors to effect future transactions. A reduction in leverage ratios or more restrictive covenants and other credit terms could also negatively impact our business.

84

- The allocation of capital to the alternative asset management industry depends in part on the performance of alternative assets relative to other asset classes. The primary markets in which we conduct our business have experienced relatively steady growth. The performance of our funds has continued to exceed various traditional benchmarks of market performance enabling us to raise increasingly larger pools of capital.

The market conditions discussed above have been generally favorable to our performance over the periods presented. Future market conditions may not continue to be as favorable and could adversely affect our business. For a more detailed description of the manner in which economic and financial market conditions may materially affect our results of operations and financial condition, see "Risk Factors—Risks Related to Our Business."

### Legal and Regulatory Environment

Members of the U.S. Congress have introduced legislation that would, if enacted, preclude us from qualifying for treatment as a partnership for U.S. federal income tax purposes under the rules governing publicly traded partnerships and would require that we be treated as a corporation for U.S. federal income tax purposes. Separately, members of the U.S. Congress have introduced legislation that would, if enacted, treat income received for performing investment management services as ordinary income received for the performance of services, which would have a similar effect. If any of these pieces of legislation or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability, which could result in a reduction in the value of our common units. See "Risk Factors—Risks Related to Our Business—Legislation has been introduced that would, if enacted, prelude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units."

### Becoming a Public Company

As a privately owned firm, we have consistently approached the management of our business and our investments with the goal of creating and realizing value over the long term. Both in building and expanding our business and in determining the types of investments to make, we have focused on the best outcomes for our business and fund investors measured over a period of years rather than on short-term financial performance. Our long-term approach encourages us to continue to build value in all of our portfolio companies, including those with a long period remaining before producing distributable cash flow. However, our results of operations are affected by the timing of our investments and changes in the value of our investments, each of which may vary significantly in the short term.

We nonetheless intend to maintain our long-term focus after we become a public company even though this approach may lead to significant and unpredictable variations in our results from period to period. In addition, while a significant portion of the management and monitoring fees paid by our funds and portfolio companies are earned pursuant to multi-year contracts, other amounts that we earn, such as transaction fees and carried interest, are subject to significant variability based on transaction volume and size, as well as investment performance. We do not intend to permit the short-term perspectives of some public market investors to influence our investment, operational or strategic decisions, our duties or commitments to our fund investors or our focus on creating long-term value for our unitholders.

### Impact of the Reorganization Transactions, this Offering and Related Transactions

The KKR Group is considered our predecessor for accounting purposes and its combined financial statements will be our historical financial statements following the completion of the Reorganization Transactions and this offering. This historical combined financial data does not give effect to the Reorganization Transactions, the completion of this offering or other related transactions. Because the legal entities that comprise the KKR Group are under the common control of our senior principals and

85

will be under the common control of our senior principals following the completion of the Reorganization Transactions, we will account for the Reorganization Transactions and this offering as a transfer of interests under common control. Accordingly, we will carry forward into our combined financial statements the value of assets, liabilities and non-controlling interests in the combined entities recognized in the KKR Group's historical combined financial statements, except as described below.

While the combined financial statements of the KKR Group will be our historical financial statements following the completion of the Reorganization Transactions and this offering, our financial statements for future periods will differ from the financial statements of the KKR Group in many significant respects. In particular, following the completion of the Reorganization Transactions and this offering:

- we will deconsolidate both the 1996 Fund and the fund's general partners, because the Group Partnerships will not acquire an interest in those general partners in connection with the Reorganization Transactions;

- we will deconsolidate both the KKR Private Equity Investors master fund and the master fund's general partner and account for the Group Partnerships' interest in the master fund general partner instead under the equity method of accounting (which accounting treatment will not impact our consolidated net income or partners' capital), because the Group Partnerships will acquire an economic (but not controlling) partner interest in the master fund general partner;

- we will include non-controlling interests in consolidated entities representing the economic interests that our existing owners will retain in the general partners of our consolidated private equity funds following the acquisition of general partner interests in those entities by the Group Partnerships, which economic interests will allocate to the existing owners        % of the capital invested by or on behalf of those general partners before the completion of the offering and any profits thereon;

- we will include non-controlling interests in consolidated entities representing the economic interests that certain minority investors will retain in the management company for our private equity funds and general partners of our consolidated funds following the acquisition of general partner or controlling interests in those entities by the Group Partnerships, which economic interests will allocate to certain minority investors        % of the net profits earned by the management company and        % of the carried interest received by those general partners with respect to the funds' investments, in each case for a specified period of time;

- we will issue        common units in this offering at an assumed initial public offering price of $        per common unit, representing the midpoint of the price range indicated on the front cover of this prospectus, which issuance will increase our partners' capital;

- we will include principals' interests representing the Group Partnership units that KKR Holdings will hold in the Group Partnerships, which principals' interests will allocate to KKR Holdings        % of the equity in the Group Partnerships upon completion of this offering, assuming the underwriters do not exercise their option to purchase additional common units from us;

- we will make one or more cash and in-kind distributions to certain of our existing owners prior to the completion of the offering, which distributions will consist of substantially all of the cash-on-hand and certain personal property of the management company for our private equity funds;

- we will recognize non-cash employee compensation charges associated with the vesting of interests in KKR Holdings that are held by our principals, which non-cash charges will be offset in full by corresponding credits to our income statement attributable to principals' interests in consolidated entities and other income and will not impact our income before taxes, net income or partners' capital;

- we will recognize employee compensation charges associated with the vesting of grants of restricted common units and other awards under our 2007 Equity Incentive Plan; and

86

- we will record a provision for corporate income taxes on the income of our intermediate holding company, which will indirectly hold our interest in the management companies for our funds and our capital markets companies and will be taxable as a corporation for U.S. federal income tax purposes.

Due to the differences described above, the predecessor combined financial statements and related historical data included in this prospectus are not necessarily representative of our future results of operations and financial condition. To provide additional information illustrating the impact that the changes described above will have on our results of operations and financial condition, we have presented elsewhere in this prospectus unaudited pro forma financial information for the year ended December 31, 2006 and as of and for the three months ended March 31, 2007. The pro forma data give effect to the Reorganization Transactions, this offering and related transactions as if such transactions had occurred on January 1, 2006 for purposes of the unaudited pro forma statement of income data and as of March 31, 2007 for purposes of the unaudited pro forma statement of financial condition. Such information has been presented for informational purposes only and does not purport to present the results of operations or financial condition that we would have achieved if those transactions had occurred on such dates or that we may achieve in the future. See "Unaudited Pro Forma Financial Information."

## Basis of Financial Presentation

### *Combined Results*

#### *Impact of the Consolidation of Our Funds on Our Financial Presentation*

In accordance with GAAP, a substantial number of our funds are consolidated in our predecessor combined financial statements notwithstanding the fact that we hold only a minority economic interest in those funds. In particular, we have consolidated (i) those entities in which our predecessor, through the ownership interests of our senior principals, has majority ownership and had control over significant operating, financial and investing decisions of the entities and (ii) those funds, which we refer to as our consolidated funds, in which our predecessor, through the ownership interests of our senior principals, held a general partner or managing member interest, which gave our predecessor substantive controlling rights over such funds. With respect to our consolidated funds, we generally have operational discretion and control over the funds and fund investors do not hold any substantive rights that would enable them to impact the funds' ongoing governance and operating activities.

As noted above, in connection with the Reorganization Transactions and this offering, we will deconsolidate the 1996 Fund and the KKR Private Equity Investors master fund, but will continue to consolidate the other funds that are currently consolidated in our combined financial statements. Those consolidated funds consist of the European Fund, the Millennium Fund, the European Fund II, the 2006 Fund and two of the side-by-side funds that constitute the KKR Strategic Capital Funds. See "Unaudited Pro Forma Financial Information." In addition, because we expect to continue to maintain a controlling interest in funds that we sponsor and manage, we expect to consolidate additional funds in future periods, including our recently formed Asian Fund, which is expected to have its final closing in the third quarter of 2007.

When we consolidate a fund, our combined financial statements reflect the assets, liabilities, revenues, expenses and cash flows of the consolidated fund on a gross basis. The majority of the economic interests in the consolidated fund, which are held by third-party investors, are reflected as non-controlling interests in our combined financial statements. Substantially all of the management fees and certain other amounts that we earn from the consolidated fund are eliminated in combination. However, because those amounts are earned from non-controlling interest holders, our allocable share of the net income from the consolidated fund is increased by the amounts eliminated. Accordingly, the consolidation of a fund does not have a net effect on the amounts of income before taxes, net income or partners' capital that we report. The consolidation does, however, significantly impact other aspects of our financial statement presentation, because the assets, liabilities, income and expense of the consolidated funds are reflected on

87

a gross basis while the allocable share of those amounts that are attributable to non-controlling interest holders are reflected as single line items on our statement of financial condition (non-controlling interests in consolidated entities) and in our statement of income (non-controlling interests in income of consolidated entities).

### Segment Results

We present the results of our two reportable business segments in accordance with Statement of Financial Accounting Standards No. 131, "Disclosures about Segments of an Enterprise and Related Information." This standard is based on a management approach, which requires segment presentation based on internal organization and the internal financial reporting used by management to make operating decisions, assess performance and allocate resources. Our management makes operating decisions, assesses performance and allocates resources based on financial and operating data and measures that are presented without giving effect to the consolidation of any of the funds that we manage. As a result, unlike the reporting in our predecessor combined financial statements, our segment reporting does not give effect to the consolidation of our funds. The deconsolidation of our funds in our segment reporting results in the inclusion in fee income of management fees that would otherwise be eliminated in consolidation, the elimination of investment income and expense that is attributable to non-controlling interests held by third-party fund investors and the elimination of corresponding charges and credits that we account for as non-controlling interests in the income of consolidated entities. See "—Combined Results—Impact of the Consolidation of Our Funds on Our Financial Presentation" and "—Key Operating and Performance Measures—Segment Operating and Performance Earnings."

### Key Financial Measures

### Revenues

#### Fee Income

Our combined fee income consists primarily of transaction and monitoring fees that we receive from our portfolio companies and the management and incentive fees that we receive directly from our unconsolidated funds, including both the base management fees and incentive fees that are paid by our unconsolidated credit strategy funds. These fees are based upon the contractual terms of the management and other agreements that we enter into with the applicable funds and portfolio companies. For a description of these management and other agreements, see "Business."

Our combined fee income does not include the management fees that we charge our consolidated funds, because those fees are eliminated in consolidation as transactions between consolidated entities. However, because those management fees are earned from, and funded by, third-party fund investors who hold non-controlling interests in the consolidated funds, our allocable share of the net income from the consolidated funds is increased by the amount of the management fees that are eliminated in consolidation. Accordingly, while the consolidation of our funds impacts the amount of fee income that we recognize on a combined basis, it does not affect the ultimate amount of income before taxes, net income, or partners' capital that we recognize in our combined financial statements.

### Expenses

#### Employee Compensation and Benefits Expense

Our employee compensation and benefits expense historically has consisted primarily of the cash salaries and bonuses that we have paid personnel who are not senior principals. Because our compensation arrangements with those individuals have involved a significant performance-based bonus component, our employee compensation and benefits expense has increased as our net income has grown. Our employee compensation and benefits expense has also grown in recent years as a result of the expansion of our business, which has increased the number of our salaried employees. Our employee compensation and

88

benefits expense is not borne by fund investors and is not offset by credits attributable to our fund investors' non-controlling interests in our consolidated funds.

Unlike our other personnel, our senior principals historically have not been paid any cash salaries or bonuses for their services to us. Instead, these individuals have relied on cash distributions that they have received on their equity interests in our business. Because those cash distributions have been paid to senior principals in their capacities as owners of our business, the distributions have been accounted for as distributions of partners' capital rather than employee compensation and benefits expense and, accordingly, we have not reflected those amounts as employee compensation and benefits expense in our statements of income.

Our principals will hold equity interests in our business through KKR Holdings, which will hold the Group Partnership units not held by us. As a result, those individuals will receive financial benefits from our business in the form of distributions and payments received from KKR Holdings and the appreciation in the value of the Group Partnership units that KKR Holdings owns. The Group Partnership units held by KKR Holdings will be subject to applicable transfer restrictions, and will not be exchangeable for our common units before               .

A portion of the equity interests held by our principals in KKR Holdings are subject to vesting. We will be required to record periodic non-cash employee compensation charges over time with respect to the vesting of interests in KKR Holdings that are held by our principals. When incurred, however, those non-cash charges will be offset in full by corresponding credits in our statements of income attributable to principals' interests in income of consolidated entities and other income and, as a result, will not impact our income before taxes, our net income or amounts that are available for distribution to our unitholders. See "—Principals' Interests in the Income of Consolidated Entities" and "Unaudited Pro Forma Financial Information."

At the time of this offering, we intend to grant to our employees who are not principals an aggregate of              restricted common units under our 2007 Equity Incentive Plan as described under "Management—2007 Equity Incentive Plan." We will record periodic employee compensation charges in our statements of income associated with the grants and vesting of these awards, as well as any future awards that we may grant under our 2007 Equity Incentive Plan.

*General, Administrative and Other Expense*

Our general, administrative and other expense consists primarily of professional fees paid to legal advisors, accountants, senior advisors and consultants; insurance costs; travel and related expenses; communications and information services; depreciation and amortization charges and other general and operating expenses. These expenses have increased in recent years due to fees paid to our senior advisors that are based in part on returns generated by our investments, which have increased significantly during recent periods, as well as increases in overhead resulting from the expansion and growth of our business. A substantial portion of our general, administrative and other expense is not borne by fund investors and is not offset by credits attributable to our fund investors' non-controlling interests in our consolidated funds.

As a public company our costs for such items as insurance, accounting and legal advice may increase. We will also incur costs which we have not previously incurred for director fees, investor relations expenses, expenses for compliance with the Sarbanes-Oxley Act and rules of the Securities and Exchange Commission and the New York Stock Exchange, and various other costs associated with being a public company.

*Fund Expenses*

Our fund expenses consist primarily of costs that we incur in connection with potential investments that do not result in completed transactions (such as travel expenses, professional fees and research costs),

89

costs incurred in connection with the placement of limited partner interests in our private equity funds and costs relating to holding our annual investor conference.

### Investment Income

We recognize investment income with respect to our carried interests in investments of our private equity funds, the capital invested by or on behalf of the general partners of our private equity funds and the non-controlling interests that third party fund investors hold in our consolidated funds. Grants of restricted equity interests in our publicly listed credit strategy fund, KFN, are not included as investment income. When the equity interests vest, however, we include the interests as investments on our statement of financial condition and thereafter recognize investment income or loss with respect to changes in their fair value and any dividends or distributions paid thereon. See "Business—Credit—KFN."

#### Net Gains from Investment Activities

Our net gains from investment activities consist primarily of the unrealized and realized gains and losses on investments that are made by our funds. Unrealized gains or losses result from changes in the fair value of these investments during a period. Upon disposition of an investment, previously recognized unrealized gains or losses are reversed and an offsetting realized gain or loss is recognized in the current period. While this reversal does not affect the amount of net gains that we recognize from investment activities, it does impact the cash flows that we record.

When determining the fair values of investments, we use the last reported market price as of the statement of financial condition date for investments that have readily available market prices. When an investment does not have a readily available market price, the fair value of the investment represents the value, as determined by us in good faith, at which the investment could be sold in an orderly disposition over a reasonable period of time between willing parties other than in a forced or liquidation sale. There is no single standard for determining fair value in good faith and in many cases fair value is best expressed as a range of fair values from which a single estimate may be derived. When making fair value determinations, we typically use a market multiples approach that considers a specified financial measure (such as EBITDA) or a discounted cash flow or liquidation analysis. We also consider a range of additional factors that we deem relevant, including the price at which the investment was acquired, the nature of the investment (such as whether it is a controlling interest), local market conditions, market prices for comparable securities and financing transactions and internal models that consider the current and expected operating performance and cash flows of the company in which the investment was made.

A significant portion of our funds' investments consists of private equity investments that do not have readily observable market prices and, accordingly, have been valued by us in good faith using the valuation methodologies described above. With regard to our valuations of those investments, since December 31, 2005, on a quarterly basis, Duff & Phelps, LLC, an independent valuation firm, has provided us with third-party assistance, which consisted of limited procedures that we identified and asked them to perform, as described under "Private Equity Valuations and Related Data." Our determinations of the fair values of these investments may differ materially from the values that would have resulted if readily available market prices had existed. Additional external factors may cause those values, and the values of investments for which readily observable market prices exist, to increase or decrease over time, which may create volatility in our net income and the amounts of assets and partners' capital that we report from time to time. See "Risk Factors—Risks Relating to the Investments We Manage—Valuation methodologies for certain assets in our funds can be subject to significant subjectivity and the fair value of assets established pursuant to such methodologies may never be realized, which could result in significant losses for our funds" and "—Critical Accounting Policies—Fair Value of Investments."

<center>90</center>

*Dividend Income*

Our dividend income consists primarily of the dividends and distributions that our private equity funds receive from the portfolio companies in which they invest. Typically, our private equity funds recognize dividend income primarily in connection with dispositions of operations by portfolio companies and other significant portfolio company transactions. Our dividend income has increased substantially in recent periods as a result of distributions by our portfolio companies following such dispositions or other transactions.

*Interest Income*

Our interest income consists primarily of interest that is paid on the fixed income instruments in which our consolidated funds invest and, to a lesser extent, interest payments that our private equity funds are paid when they provide bridge financing to a portfolio company in connection with a portfolio company acquisition. See "Private Equity Valuations and Related Data—Bridge Financing Provided by Private Equity Funds." Our interest income has increased substantially in recent periods as a result of interest earned from cash management activities carried out by our private equity-oriented permanent capital fund, which began operations in May 2006 and made significant fixed income investments in connection with its cash management activities.

*Interest Expense*

Our interest expense consists primarily of interest that is payable by our funds or their general partners in connection with indebtedness that they incur to finance investments. A significant portion of our interest expense relates to long-term indebtedness that is used by our credit strategy funds to leverage their investments. The balance of this expense consists of short-term borrowings that are used by the general partners of our private equity funds and indebtedness that is used by our private equity-oriented permanent capital fund to leverage its investments in public companies. Given the degree of leverage in the capital structures of our portfolio companies (which leverage is not reflected in our statements of income), our private equity funds do not incur debt at the fund level.

*Impact of the Consolidation of Our Funds on the Presentation of Investment Income*

Due to the consolidation of a majority of our funds, the amount of our funds' investment income that is allocable to our carried interests and capital investments is not readily shown in our combined financial statements. Instead, the portion of investment income that is allocable to us, after allocating amounts to non-controlling interests, is reflected in our net income. Because the substantial majority of our funds are consolidated and because we hold only a minority economic interest in our funds' investments, our allocable share of our funds' investment income is significantly less than the total amount of investment income presented in our predecessor combined financial statements.

*Income Taxes*

We have historically operated as a group of partnerships for U.S. federal income tax purposes and, in the case of certain entities located outside the United States, corporate entities for foreign income tax purposes. Because most of the entities in our consolidated group are taxed as partnerships, our income is generally allocated to, and the resulting tax liability is generally borne by, our principals and we generally are not taxed at the entity level. The income taxes included in our predecessor combined financial statements are attributable to the New York City unincorporated business tax and foreign income taxes imposed on certain entities located outside the United States.

Following the Reorganization Transactions and this offering, the Group Partnerships and their subsidiaries will continue to operate as partnerships for U.S. federal income tax purposes and, in the case of certain entities located outside the United States, corporate entities for foreign income tax purposes. Accordingly, those entities will continue to be subject to New York City unincorporated business taxes or

91

foreign income taxes, as the case may be. In addition, our intermediate holding company will be subject to additional entity-level taxes that will be reflected in our combined financial statements.

*Non-Controlling Interests in the Income of Consolidated Entities*

Non-controlling interests in the income of consolidated entities represent the ownership interests that unaffiliated third parties hold in entities that are consolidated in our financial statements. The allocable share of income and expense attributable to those interests is accounted for as non-controlling interests in the income of consolidated entities.

Historically, the amount of non-controlling interests in consolidated entities that we have recognized has been substantial and has resulted in significant charges and credits in our statements of income. As of March 31, 2007, non-controlling interests in consolidated entities represented approximately 85% of our combined total assets and consisted primarily of:

- economic interests that fund investors held in our consolidated funds, which economic interests allocated to the fund investors approximately 85% of our combined total assets as of March 31, 2007 and resulted in approximately $1.2 billion and $0.8 billion of net charges in our statements of income during the three months ended March 31, 2007 and 2006, respectively; and

- an interest in the management company for our credit strategy funds that currently allocates 35% of the net income of that management company to other members of that management company.

We expect to continue to recognize substantial non-controlling interests in the income of consolidated entities following the completion of the Reorganization Transactions and this offering and anticipate that those non-controlling interests will continue to give rise to significant charges and credits in our statements of income. In particular, non-controlling interests in the income of consolidated entities are expected to consist primarily of:

- economic interests that fund investors hold in our consolidated funds (which will exclude the 1996 Fund and the KKR Private Equity Investors master fund as a result of the deconsolidation of those funds as described under "Basis of Financial Presentation—Combined Results");

- the 35% interest that other members of the management company of our credit strategy funds will hold in the management company for our credit strategy funds as described above;

- economic interests in the general partners of our consolidated private equity funds that will entitle our existing owners to 100% of the capital invested by or on behalf of those general partners before the completion of this offering and any profits thereon; and

- interests in our management company for our private equity funds and general partners of our consolidated funds that will entitle certain minority investors to          % of the net income earned by the management company and          % of the carried interest received by the general partners, in each case with respect to the funds' investments for a specified period of time.

*Principals' Interests in the Income of Consolidated Entities*

In addition to the non-controlling interests in consolidated entities described above, our principals will retain substantial economic interests in our business following the completion of this offering through KKR Holdings' ownership of Group Partnership units. Assuming that the underwriters do not exercise their option to purchase additional common units from us, these interests will represent approximately          % of our total assets that are not allocable to holders of non-controlling interests upon completion of the offering. We will account for these interests in the same manner that we account for non-controlling interests in consolidated entities that are held by unaffiliated third parties, except that our principals' interests will be classified separately for financial reporting purposes in order to provide investors with a more meaningful financial presentation. See "Unaudited Pro Forma Financial Information."

92

**Key Operating and Performance Measures**

The alternative asset management business is complex and unusual in its ability to support rapid growth without requiring substantial capital investment. However, there may also be volatility associated with the net income and cash flow of alternative asset managers as a result of changes in market conditions and other factors described in this prospectus. In order to assess and monitor the effectiveness of our value creation strategies and operating performance, we have developed and use the following supplemental operating metrics. As a public company, we expect to continue to use these supplemental operating and performance metrics, in addition to traditional financing measures, because we believe that the supplemental measures represent the best measures of the productivity of our investment activities.

*Assets Under Management*

Our assets under management represent the assets with respect to which we are entitled to receive a fee or carried interest. We calculate the amount of assets under management as of any date as the sum of: (i) the fair value of the investments of our traditional private equity funds and our carry-paying co-investment vehicles plus the capital that we are entitled to call from investors in our traditional private equity funds with respect to their unfunded capital commitments; (ii) the NAV of KKR Private Equity Investors and the KKR Strategic Capital Funds; (iii) the equity of KFN; and (iv) the capital raised by structured finance vehicles that we manage. As a result of raising new funds with sizeable capital commitments and increases in the NAV of our permanent capital funds and their retained profits, our assets under management have increased significantly over the periods discussed below.

Increases in assets under management relating to our unconsolidated funds will generally result in increases in our fee income, as the amount of the management fees that we receive from these funds is calculated based on the amount of these assets. Similarly, increases in assets under management relating to our consolidated funds will generally result in increases in our allocable share of the net income from these consolidated funds. To the extent that increases in assets under management consist of permanent capital, the related increases in fee income would be expected to continue during future periods. With respect to our traditional private equity funds, management fees are calculated based on the amount of capital committed to a fund during the investment period (typically the first four years of a fund's life) and thereafter on the cost basis of the fund's investments, which causes the fees to be reduced over time as investments are liquidated. As of March 31, 2007, approximately 74.8% of our assets under management relating to our traditional private equity funds were associated with funds in their investment period.

*Segment Operating and Performance Measures*

*Fee Related Earnings*

Fee related earnings is a profit measure that is reported by our two reportable business segments. The difference between fee related earnings and income before taxes presented in accordance with GAAP is that fee related earnings represent income before taxes adjusted to (i) exclude the expenses of consolidated funds; (ii) include management fees earned from consolidated funds that were eliminated in consolidation; (iii) exclude investment income and (iv) exclude non-controlling interests in income of consolidated entities. Our current operations are managed based in part on our reported levels of fee related earnings, which consist primarily of the management, transaction and monitoring fees that we earn as the sponsor of our private equity funds and our allocable share of the management and incentive fees that we earn as the sponsor of our credit strategy funds. It has been and remains a key objective of our firm to maximize our fee related earnings, because those amounts directly affect our net income.

*Segment Economic Net Income*

Segment economic net income is a key performance measure used by management when making operating decisions, assessing operating performance and allocating resources. Economic net income represents net income excluding the impact of income taxes, the impact of non-cash employee

93

compensation charges and the impact of amortization of intangible assets. Because our predecessor combined financial statements do not include any non-cash employee benefits and compensation charges, economic net income is the equivalent of income before taxes for the historical periods presented. See "Unaudited Pro Forma Financial Information."

*Private Equity Dollars Invested*

Private equity dollars invested is the aggregate amount of capital invested by our private equity funds and carry-paying co-investment vehicles in private equity transactions during a reporting period. Such amounts include both capital contributed by fund investors and co-investment vehicles with respect to which we are entitled to a carried interest and capital contributed by us as the general partner of a private equity fund with respect to which we are entitled to profits generated on the invested capital. We use private equity dollars invested as a measure of the productivity of our investment activities and as an indicator of potential returns that we may realize in future periods from our current private equity investments. From our inception through March 31, 2007, our first ten traditional private equity funds (representing all of our private equity funds that have invested at least 30 months) achieved returns equal to 2.7x the amount of private equity dollars invested.

**Combined Results of Operations**

The following is a discussion of our predecessor combined results of operations for the years ended December 31, 2004, 2005 and 2006 and the three months ended March 31, 2006 and 2007. You should read this discussion in conjunction with the information included under "—Basis of Financial Presentation—Combined Results" and the predecessor combined financial statements and related notes included elsewhere in this prospectus. For a more detailed discussion of the factors that affected the results of operations of our two business segments in these periods, see "—Segment Analysis."

94

The following tables set forth information regarding our combined results of operations for the years ended December 31, 2004, 2005 and 2006 and for the three months ended March 31, 2006 and 2007.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | ($ in thousands) | | | ($ in thousands) | |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Fee income | $ 183,462 | $ 232,945 | $ 410,329 | $ 93,798 | $ 68,840 |
| **Expenses** | | | | | |
| Employee compensation and benefits | 69,956 | 79,643 | 131,667 | 22,601 | 27,345 |
| Occupancy and related charges | 10,688 | 13,534 | 19,295 | 6,482 | 4,624 |
| General, administrative and other | 36,931 | 54,336 | 78,154 | 15,934 | 31,555 |
| Fund expenses | 16,470 | 20,778 | 38,350 | 4,778 | 16,810 |
| Total expenses | 134,045 | 168,291 | 267,466 | 49,795 | 80,334 |
| **Investment Income** | | | | | |
| Net gains from investment activities | 3,026,396 | 2,984,504 | 3,105,523 | 933,407 | 1,482,054 |
| Dividend income | 14,611 | 729,926 | 714,069 | 51,725 | 19,471 |
| Interest income | 54,060 | 27,166 | 210,872 | 11,119 | 68,269 |
| Interest expense | (524) | (697) | (29,542) | (1,366) | (15,593) |
| Total investment income | 3,094,543 | 3,740,899 | 4,000,922 | 994,885 | 1,554,201 |
| Income before non-controlling interests in income of consolidated entities and income taxes | 3,143,960 | 3,805,553 | 4,143,785 | 1,038,888 | 1,542,707 |
| Non-controlling interests in income of consolidated entities | 2,364,309 | 2,861,186 | 3,026,913 | 777,505 | 1,161,162 |
| Income before taxes | 779,651 | 944,367 | 1,116,872 | 261,383 | 381,545 |
| Income taxes | 6,265 | 2,900 | 4,163 | 767 | 627 |
| Net income | $ 773,386 | $ 941,467 | $ 1,112,709 | $ 260,616 | $ 380,918 |
| Assets under management (period end) | $ 15,147,300 | $ 23,350,700 | $ 43,873,400 | | $ 53,418,200 |

**Three Months Ended March 31, 2007 Compared to Three Months Ended March 31, 2006**

*Fee Income*

Fee income was $68.8 million for the three months ended March 31, 2007, a decrease of $24.9 million, or 26.6%, from the three months ended March 31, 2006. The decrease was primarily due to a $35.4 million decrease in transaction fees earned in our private equity segment, which resulted from the fact that our transaction fee-generating investments during the first quarter of 2007 had a combined total transaction value of $4.9 billion while our transaction fee-generating investments during the first quarter of 2006 had a total transaction value of $33.3 billion. The effect of the decrease in transaction fees was offset, in part, by a $3.1 million increase in management fees relating to the formation of the KKR Strategic Capital

Funds in the third quarter of 2006, as well as an $8.5 million increase in incentive and management fees received from KFN resulting from its favorable operating performance. As of March 31, 2007, we had announced 11 pending transactions, each of which will generate transaction fees in the periods in which they close.

95

*Expenses*

Expenses were $80.3 million for the three months ended March 31, 2007, an increase of $30.5 million, or 61.3%, from the three months ended March 31, 2006. The increase was primarily due to a $15.6 million increase in general, administrative and other expenses resulting from the growth of our business, including the opening of our Tokyo office subsequent to March 31, 2006, a $4.7 million increase in employee compensation and benefits resulting from the hiring of an additional 105 employees after March 31, 2006, and a $12.0 million increase in fund expenses, which resulted from expenses incurred in our private equity segment in connection with the placement of limited partner interests in connection with newly formed funds.

*Net Gains from Investment Activities*

Net gains from investment activities were $1.5 billion for the three months ended March 31, 2007, an increase of $548.6 million, or 58.8%, from the three months ended March 31, 2006. The increase was primarily attributable to unrealized appreciation in the value of 18 private equity investments across a variety of industries within our portfolio. While we recognized $422.3 million of realized gains from the sale of private equity investments, which positively impacted our cash flow during the three months ended March 31, 2007, a corresponding amount of unrealized gains on those investments had been recognized in prior periods resulting in no net impact on net gains from investment activities for the current period from these realizations. Substantially all of our realized gains related to our private equity investments.

*Dividend Income*

Dividend income was $19.5 million for the three months ended March 31, 2007, a decrease of $32.3 million, or 62.4%, from the three months ended March 31, 2006. Our dividends are generally earned in connection with sales of significant operations or other restructuring transactions undertaken by our portfolio companies that result in available cash that is distributed to our private equity funds. During the three months ended March 31, 2007, we received $10.0 million of dividends from one portfolio company and an aggregate of $9.5 million of comparatively smaller dividends from three portfolio companies. During the three months ended March 31, 2006, we received $38.8 million of dividends from one portfolio company and an aggregate of $13.0 million of comparatively smaller dividends from two portfolio companies.

*Interest Income*

Interest income was $68.3 million for the three months ended March 31, 2007, an increase of $57.2 million from the three months ended March 31, 2006. The increase primarily reflects $35.3 million of interest earned from cash management activities carried out by our private equity-oriented permanent capital fund, which began operations in May 2006, as well as a $28.8 million increase in interest income earned in our credit segment that was attributable to an increase in the amount of assets under management.

*Interest Expense*

Interest expense was $15.6 million for the three months ended March 31, 2007, compared to $1.4 million for the three months ended March 31, 2006. The increase was primarily due to an increase in the amount of assets under management in our credit segment, which utilized additional leverage to enhance returns.

*Non-Controlling Interests in Income of Consolidated Entities*

Non-controlling interests in income of consolidated entities were $1.2 billion for the three months ended March 31, 2007, an increase of $383.7 million, or 49.3%, from the three months ended March 31, 2006. The increase primarily reflects an increase in the total investment income that was allocable to

96

non-controlling interests, which increase was driven by the overall changes in the components of investment income described above.

*Income before Taxes*

Due to the factors described above, income before taxes was $381.5 million for the three months ended March 31, 2007, an increase of $120.2 million, or 46.0%, from the three months ended March 31, 2006.

**Year Ended December 31, 2006 Compared to Year Ended December 31, 2005**

*Fee Income*

Fee income was $410.3 million for the year ended December 31, 2006, an increase of $177.4 million, or 76.1%, from the year ended December 31, 2005. The increase was primarily due to a $122.7 million increase in the transaction fees earned in our private equity segment, which resulted from an increase in total completed transaction value from $31.6 billion for the year ended December 31, 2005 to $104.3 billion for the year ended December 31, 2006. Additionally, monitoring fees increased $23.7 million in our private equity segment, which was attributable to monitoring fees received from three additional portfolio companies as well as an increase in the average monitoring fee paid. Our fee income was also positively affected by an $8.9 million increase in management and incentive fees following the formation of the KKR Strategic Capital Funds in the third quarter of 2006, as well as a $21.9 million increase in management fees and incentive fees from KFN, which resulted from its favorable operating performance.

*Expenses*

Expenses were $267.5 million for the year ended December 31, 2006, an increase of $99.1 million, or 58.9%, from the year ended December 31, 2005. The increase was primarily due to a $52.0 million increase in employee compensation and benefits, which was attributable to an increase in the amount of incentive compensation paid to existing personnel reflecting our favorable financial performance and the hiring of 112 additional personnel to support the growth of our business segments. General, administrative and other expenses increased $23.8 million, primarily as a result of our continued geographical expansion, which included the opening of our Tokyo office and a full year of operations for our Hong Kong office during the year ended December 31, 2006. Additionally, fund expenses increased $17.6 million as a result of an increase in transaction related expenses that were attributable to unconsummated transactions during the period.

*Net Gains from Investment Activities*

Net gains from investment activities were $3.1 billion for the year ended December 31, 2006, an increase of $121.0 million, or 4.1%, from the year ended December 31, 2005. The increase was primarily attributable to unrealized appreciation in the value of 22 private equity investments across a variety of industries within our portfolio. While we recognized $3.2 billion of realized gains from the sale of private equity investments that positively impacted our cash flow during the year ended December 31, 2006 a corresponding amount of unrealized gains on those investments had been recognized in prior periods resulting in no net impact on income for the current period from these realizations. Substantially all of our realized gains related to our private equity investments.

*Dividend Income*

Dividend income was $714.1 million for the year ended December 31, 2006, a decrease of $15.9 million, or 2.2%, from the year ended December 31, 2005. During the year ended December 31, 2006, we received an aggregate of $546 million of dividends from three portfolio companies and an aggregate of $168.1 million of comparatively smaller dividends from five portfolio companies. During the

year ended December 31, 2005, we received an aggregate of $479 million of dividends from two portfolio companies and $251 million of comparatively smaller dividends from two portfolio companies.

*Interest Income*

Interest income was $210.9 million for the year ended December 31, 2006, an increase of $183.7 million from the year ended December 31, 2005. The increase primarily reflects $143.3 million of interest earned from cash management activities carried out by our private equity-oriented permanent capital fund, which began operations in May 2006, and to a lesser extent a $25.2 million increase in interest income earned in our credit segment that was attributable to an increase in the amount of assets under management.

*Interest Expense*

Interest expense was $29.5 million for the year ended December 31, 2006, compared to less than $1 million for the year ended December 31, 2005. The increase was primarily due to an increase in the amount of assets under management in our credit segment, which utilized additional leverage to enhance returns.

*Non-Controlling Interests in Income of Consolidated Entities*

Non-controlling interests in income of consolidated entities were $3.0 billion for the year ended December 31, 2006, an increase of $165.7 million, or 5.8%, from the year ended December 31, 2005. The increase primarily reflects an increase in the total investment income that was allocable to non-controlling interests, which increase was driven by the overall changes in the components of investment income described above.

*Income before Taxes*

Due to the factors described above, income before taxes was $1.1 billion for the year ended December 31, 2006, an increase of $172.5 million, or 18.3%, from the year ended December 31, 2005.

*Assets Under Management*

Our assets under management were $43.9 billion as of December 31, 2006, an increase of $20.5 billion, or 87.9%, from December 31, 2005. The increase was due primarily to our formation of the 2006 Fund, which received $16.1 billion of capital commitments from fund investors, and KKR Private Equity Investors, which had $5.0 billion of permanent capital as of December 31, 2006, and the formation of the KKR Strategic Capital Funds, which received $0.5 billion of capital commitments from investors. Additionally, the total capital of structured finance vehicles that we manage increased by $1.0 billion. Our assets under management were also positively affected during the period by a $3.2 billion net increase in the value of the investments of our traditional private equity funds, which offset $5.3 billion of distributions of realized value from those funds.

**Year Ended December 31, 2005 Compared to Year Ended December 31, 2004**

*Fee Income*

Fee income was $232.9 million for the year ended December 31, 2005, an increase of $49.5 million, or 27.0%, from the year ended December 31, 2004. The increase was partially due to a $22.5 million increase in the monitoring fees earned in our private equity segment, which resulted from an increase in the monitoring fees paid by certain portfolio companies during the period. Our reported fee income was also positively affected by an approximately $31.2 million increase in the base management and incentive fees earned in our credit segment, which was due to the formation of KFN during 2004.

98

*Expenses*

Expenses were $168.3 million for the year ended December 31, 2005, an increase of $34.2 million, or 25.5%, from the year ended December 31, 2004. The increase was partially due to a $9.7 million increase in employee compensation and benefits, which was attributable to an increase in the amount of incentive compensation paid to existing personnel reflecting our favorable financial performance and the hiring of 55 additional personnel to support the growth of our business segments. General, administrative and other expenses increased $17.4 million primarily as a result of our continued geographical expansion which included the opening of our Paris and Hong Kong offices during the year ended December 31, 2005.

*Net Gains from Investment Activities*

Net gains from investment activities were $3.0 billion for the year ended December 31, 2005, a decrease of $41.9 million, or 1.4%, from the year ended December 31, 2004. The decrease in net gains from investment activities was due partially to the fact that a significant number of the investments that we held during the year ended December 31, 2005 had only recently been made and, accordingly, were still carried at cost. While we recognized approximately $1.6 billion of realized gains from the sale of private equity investments that positively impacted our cash flow during the year ended December 31, 2005, a corresponding amount of unrealized gains on those investments had been recognized in prior periods resulting in no net impact on our income for the current period from these realizations. Substantially all of our realized gains related to our private equity investments.

*Dividend Income*

Dividend income was $729.9 million for the year ended December 31, 2005, an increase of $715.3 million from $14.6 million for the year ended December 31, 2004. The increase in the amount of dividend income was due to an increase in dividends received from portfolio companies in our private equity segment. During the year ended December 31, 2005, we received an aggregate of $479 million of dividends from two portfolio companies and an aggregate of $251 million of comparatively smaller dividends from two portfolio companies. During the year ended December 31, 2004, we received an aggregate of $10.8 million of dividends from one portfolio company and an aggregate of $3.8 million of comparatively smaller dividends from two portfolio companies.

*Interest Income*

Interest income was $27.2 million for the year ended December 31, 2005, a decrease of $26.9 million, or 49.7%, from the year ended December 31, 2004. The decrease reflects a reduction in interest received from portfolio companies in our private equity segment that was attributable to a reduction in bridge financing provided by our private equity funds.

*Interest Expense*

We did not record a significant amount of interest expense during the years ended December 31, 2004 or 2005.

*Non-Controlling Interests in Income of Consolidated Entities*

Non-controlling interests in income of consolidated entities were $2.9 billion for the year ended December 31, 2005, an increase of $496.9 million, or 21.0%, from the year ended December 31, 2004. The increase primarily reflects an increase in the total investment income allocable to non-controlling interests, which increase was driven by the overall changes in the components of investment income described above.

*Income before Taxes*

Due to the factors described above, income before taxes was $944.4 million for the year ended December 31, 2005, an increase of $164.7 million, or 21.1%, from the year ended December 31, 2004.

99

*Assets under Management*

    Our assets under management were $23.4 billion as of December 31, 2005, an increase of $8.2 billion, or 54.2%, from December 31, 2004. The increase was due primarily to our formation of the European Fund II, which received $5.7 billion of capital commitments from fund investors, and a $3.4 billion increase in the value of the investments of our traditional private equity funds, which offset $3.6 billion of distributions of realized value from those funds. Our assets under management were also positively affected during the period by the initial public offering of KFN, which raised $0.8 billion of additional permanent capital for our credit segment, and $2.0 billion of capital raised by structured finance vehicles that we manage.

**Segment Analysis**

    The following is a discussion of the results of our two reportable business segments for the years ended December 31, 2004, 2005 and 2006 and the three months ended March 31, 2006 and 2007. You should read this discussion in conjunction with the information included under "—Basis of Financial Presentation—Segment Results" and the predecessor combined financial statements and related notes included elsewhere in this prospectus.

*Private Equity Segment*

    The following tables set forth information regarding the results of operations and certain key operating metrics for our private equity segment for the years ended December 31, 2004, 2005 and 2006 and the three months ended March 31, 2006 and 2007.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | **2004** | **2005** | **2006** | **2006** | **2007** |
| | | *($ in thousands)* | | | |
| Fee income | $ 172,808 | $ 202,106 | $ 361,467 | $ 69,364 | $ 117,288 |
| Expenses | (119,744) | (139,098) | (214,277) | (40,734) | (71,004) |
| Fee related earnings | 53,064 | 63,008 | 147,190 | 28,630 | 46,284 |
| Investment income | 723,700 | 864,812 | 935,136 | 227,078 | 322,687 |
| Income before non-controlling interests in income of consolidated entities and income taxes | 776,764 | 927,820 | 1,082,326 | 255,708 | 368,971 |
| Non-controlling interests in income of consolidated entities | — | — | — | — | — |
| Economic net income | $ 776,764 | $ 927,820 | $ 1,082,326 | $ 255,708 | $ 368,971 |
| Assets under management (period end) | $ 14,391,300 | $ 19,696,600 | $ 38,722,700 | | $ 44,145,500 |
| Private equity dollars invested | $ 2,065,603 | $ 2,913,427 | $ 6,661,698 | $ 1,183,957 | $ 1,748,602 |

***Three Months Ended March 31, 2007 Compared to Three Months Ended March 31, 2006***

*Fee Income*

    Fee income in our private equity segment was $117.3 million for the three months ended March 31, 2007, an increase of $47.9 million, or 69.1%, from the three months ended March 31, 2006. The increase was primarily due to an increase in the management fees that we earned from our private equity funds of $55.2 million, which resulted from the inclusion of new

management fees from the 2006 Fund and our private equity-oriented permanent capital fund following the closing of those funds during the second

100

quarter of 2006. The inclusion of these additional fees more than offset an $11.1 million decrease in transaction fees, which resulted from two transactions closing during the first quarter of 2007 with a total transaction value of $4.9 billion compared to three transactions closing during the first quarter of 2006 with a total transaction value of $33.3 billion.

*Expenses*

Expenses in our private equity segment were $71.0 million for the three months ended March 31, 2007, an increase of $30.3 million, or 74.3%, from the three months ended March 31, 2006. The increase was primarily due to a $17.7 million increase in general, administrative and other expenses resulting from the growth of our business, including the opening of our Tokyo office occurring after March 31, 2006, and an increase of $12 million in fund expenses, which resulted from expenses incurred in connection with the placement of limited partner interests in connection with newly formed funds.

*Fee Related Earnings*

Due to the factors described above, fee related earnings in our private equity segment were $46.3 million for the three months ended March 31, 2007, an increase of $17.7 million, or 61.7%, from the three months ended March 31, 2006.

*Investment Income*

Investment income in our private equity segment was $322.7 million for the three months ended March 31, 2007, an increase of $95.6 million, or 42.1%, from the three months ended March 31, 2006. The increase was due primarily to the effect of increases in our allocated share of gains from investment activities relating to appreciation in the fair value of 18 portfolio companies.

*Economic Net Income*

Due to the factors described above, economic net income in our private equity segment was $369.0 million for the three months ended March 31, 2007, an increase of $113.3 million, or 44.3%, from the three months ended March 31, 2006.

*Private Equity Dollars Invested*

Private equity dollars invested were $1.7 billion for the three months ended March 31, 2007, an increase of $564.6 million, or 47.7%, from the three months ended March 31, 2006. The increase reflected an increase in the average enterprise value of the companies that we acquired. As of March 31, 2007, our traditional private equity funds had $16.8 billion of remaining unused capital commitments (excluding subsequent commitments to the 2006 Fund and the Asian Fund) that could be called for investment in new private equity commitments.

***Year Ended December 31, 2006 Compared to Year Ended December 31, 2005***

*Fee Income*

Fee income in our private equity segment was $361.5 million for the year ended December 31, 2006, an increase of $159.4 million, or 78.9%, from the year ended December 31, 2005. The increase was partially due to a $60.0 million increase in transaction fees, which resulted from an increase in total completed transaction value from $31.6 billion for the year ended December 31, 2005 to $104.3 billion for the year ended December 31, 2006. Our segment fee income was also positively affected by a $90.7 million increase in the management fees earned from our private equity funds, which was due to an increase in the amount of assets under management resulting from the formation of the 2006 Fund during the year and the fact that we received a full year of management fees from the European Fund II, which closed during the fourth quarter of 2005.

101

*Expenses*

Expenses in our private equity segment were $214.3 million for the year ended December 31, 2006, an increase of $75.2 million, or 54.0%, from the year ended December 31, 2005. The increase was primarily due to an increase of $47.6 million in employee compensation and benefits, which was attributable to an increase in the amount of incentive compensation paid to existing personnel reflecting our favorable financial performance, and the hiring of 101 additional personnel to support the growth of our private equity segment and our continued geographical expansion. Other expense categories collectively increased by $27.6 million as a result of the growth of our business, including the opening of our Tokyo office and a full year of operations for our Hong Kong office, as well as an increase in transaction related expenses resulting from unconsummated transactions during the period.

*Fee Related Earnings*

Due to the factors described above, fee related earnings in our private equity segment were $147.2 million for the year ended December 31, 2006, an increase of $84.2 million, or 133.6%, from the year ended December 31, 2005.

*Investment Income*

Investment income in our private equity segment was $935.1 million for the year ended December 31, 2006, an increase of $70.3 million, or 8.1%, from the year ended December 31, 2005. The increase was due primarily to the effect of increases in our allocated share of gains from investment activities relating to appreciation in the fair value of 18 portfolio companies offset by our allocated share of mark-to-market adjustments on foreign exchange forward contracts.

*Economic Net Income*

Due to the factors described above, economic net income in our private equity segment was $1.1 billion for the year ended December 31, 2006, an increase of $154.5 million, or 16.7%, from the year ended December 31, 2005.

*Assets Under Management*

Assets under management in our private equity segment were $38.7 billion as of December 31, 2006, an increase of $19.0 billion, or 96.4%, from December 31, 2005. The increase was due primarily to our formation of the 2006 Fund, which had received $16.1 billion of capital commitments from fund investors as of December 31, 2006, and KKR Private Equity Investors, which provided us with an additional $5.0 billion of permanent capital as of December 31, 2006, and a $3.2 billion net increase in the value of the investments of our traditional private equity funds, which offset $5.3 billion of distributions of realized value from those funds.

*Private Equity Dollars Invested*

Private equity dollars invested were $6.7 billion for the year ended December 31, 2006, an increase of $3.7 billion, or 128.7%, from the year ended December 31, 2005. The increase reflected an increase in the average enterprise value of the companies that we acquired. As of December 31, 2006, our traditional private equity funds had $17.6 billion of remaining unused capital commitments that could be called for investment in new private equity commitments, compared to $7.3 billion of remaining capital commitments that were uncalled as of December 31, 2005.

*Year Ended December 31, 2005 Compared to Year Ended December 31, 2004*

*Fee Income*

Fee income in our private equity segment was $202.1 million for the year ended December 31, 2005, an increase of $29.3 million, or 17.0%, from the year ended December 31, 2004. The increase was primarily due to a $28.1 million increase in the amount of management fees earned from our private equity funds, which was due to an increase in the amount of assets under management resulting from the formation of the European Fund II during the year.

*Expenses*

Expenses in our private equity segment were $139.1 million for the year ended December 31, 2005, an increase of $19.4 million, or 16.2%, from the year ended December 31, 2004. The increase was primarily due to an increase in general, administrative and other expenses of approximately $14.4 million, which was attributable to the growth of our business, including the opening of our Paris and Hong Kong offices as well as an increase in transaction related expenses resulting from unconsummated transactions during the period.

*Fee Related Earnings*

Due to the factors described above, fee related earnings in our private equity segment were $63.0 million for the year ended December 31, 2005, an increase of $9.9 million, or 18.7%, from the year ended December 31, 2004.

*Investment Income*

Investment income in our private equity segment was $864.8 million for the year ended December 31, 2005, an increase of $141.1 million, or 19.5%, from the year ended December 31, 2004. The increase was primarily due to the effect of an increase of $157 million in our allocated share of dividend income, partially offset by our allocated share of decreases in gains from investment activities.

*Economic Net Income*

Due to the factors described above, economic net income in our private equity segment was $927.8 million for the year ended December 31, 2005, an increase of $151.1 million, or 19.4%, from the year ended December 31, 2004.

*Assets Under Management*

Assets under management in our private equity segment were $19.7 billion as of December 31, 2005, an increase of $5.3 billion, or 36.9%, from December 31, 2004. The increase was due primarily to our formation of the European Fund II, which received $5.5 billion of capital commitments from fund investors, and a $3.4 billion increase in the value of the investments of our traditional private equity funds, which offset $3.6 billion of distributions of realized value from those funds.

*Private Equity Dollars Invested*

Private equity dollars invested were $2.9 billion for the year ended December 31, 2005, an increase of $0.8 billion, or 41.0%, from the year ended December 31, 2004. The increase reflected an increase in the average enterprise value of the companies that we acquired. As of December 31, 2005, our traditional private equity funds had $7.3 billion of remaining unused capital commitments that could be called for investment in new private equity commitments, compared to $4.8 billion of remaining capital commitments that were uncalled as of December 31, 2004.

*Credit Segment*

The following tables set forth information regarding the results of operations and certain key operating metrics for our credit segment for the years ended December 31, 2004, 2005 and 2006 and the three months ended March 31, 2006 and 2007.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | *($ in thousands)* | | | | |
| Fee income | $ 10,085 | $ 44,484 | $ 80,726 | $ 15,469 | $ 27,121 |
| Expenses | (4,359) | (17,881) | (30,855) | (5,810) | (9,181) |
| Fee related earnings | 5,726 | 26,603 | 49,871 | 9,659 | 17,940 |
| Investment income | — | 3,268 | 10,103 | 456 | 2,490 |
| Income before non-controlling interests in income of consolidated entities and income taxes | 5,726 | 29,871 | 59,974 | 10,115 | 20,430 |
| Non-controlling interests in income of consolidated entities(1) | (2,839) | (13,324) | (25,428) | (4,440) | (7,856) |
| Economic net income | $ 2,887 | $ 16,547 | $ 34,546 | $ 5,675 | $ 12,574 |
| Assets under management (period end) | $ 754,507 | $ 3,614,261 | $ 5,140,909 | | $ 9,272,700 |

(1)  Non-controlling interests represent the minority interest that other members of the management company for our credit strategy funds have in that management company's net income.

**Three Months Ended March 31, 2007 Compared to Three Months Ended March 31, 2006**

*Fee Income*

Fee income in our credit segment was $27.1 million for the three months ended March 31, 2007, an increase of $11.7 million, or 75.3%, from the three months ended March 31, 2006. The increase was primarily due to increased management fees of $3.1 million resulting from the formation of the KKR Strategic Capital Funds during the fourth quarter of 2006 and an increase in incentive fees of $5.7 million resulting from the favorable performance of KFN.

*Expenses*

Expenses in our credit segment were $9.2 million for the three months ended March 31, 2007, an increase of $3.4 million, or 58.0%, from the three months ended March 31, 2006. The increase was primarily due to an increase in employee compensation and benefits of $2.6 million, which was attributable to an increase in the amount of incentive compensation paid to existing personnel reflecting our favorable financial performance, and the hiring of ten additional personnel to support the growth of our credit segment.

*Fee Related Earnings*

Due to the factors described above, fee related earnings in our credit segment were $17.9 million for the three months ended March 31, 2007, an increase of $8.3 million, or 85.7%, from the three months ended March 31, 2006.

*Investment Income*

Investment income in our credit segment was $2.5 million for the three months ended March 31, 2007, an increase of $2.0 million from the three months ended March 31, 2006. The increase was due primarily to

104

the the appreciation in the fair value of vested KFN shares we receive as compensation for management services to that fund.

*Non-Controlling Interests in Income of Consolidated Entities*

Non-controlling interests in income of consolidated entities were $7.9 million for the three months ended March 31, 2007, an increase of $3.4 million, or 76.9%, from the three months ended March 31, 2006. The increase primarily reflects an increase in segment fee related earnings that were allocable to other members of the management company for our credit strategy funds, and the increase in investment income described above.

*Economic Net Income*

Due to the factors described above, economic net income in our credit segment was $12.6 million for the three months ended March 31, 2007, an increase of $6.9 million, or 121.6%, from the three months ended March 31, 2006.

**Year Ended December 31, 2006 Compared to Year Ended December 31, 2005**

*Fee Income*

Fee income in our credit segment was $80.7 million for the year ended December 31, 2006, an increase of $36.2 million, or 81.5%, from the year ended December 31, 2005. The increase was primarily due to a $10.6 million increase in incentive and management fees resulting from the formation of the KKR Strategic Capital Funds during the year ended December 31, 2006 and increased incentive and management fees earned from KFN of $25.6 million as a result of its favorable performance during the year.

*Expenses*

Expenses in our credit segment were $30.9 million for the year ended December 31, 2006, an increase of $13.0 million, or 72.6%, from the year ended December 31, 2005. The increase was primarily due to an increase in employee compensation and benefits of $6.4 million, which was attributable to an increase in the amount of incentive compensation paid to existing personnel reflecting our favorable financial performance, and the hiring of eleven additional personnel to support the growth of our credit segment.

*Fee Related Earnings*

Due to the factors described above, fee related earnings in our credit segment were $49.9 million for the year ended December 31, 2006, an increase of $23.3 million, or 87.5%, from the year ended December 31, 2005.

*Investment Income*

Investment income in our credit segment was $10.1 million for the year ended December 31, 2006, an increase of $6.8 million from the year ended December 31, 2005. The increase was due primarily to the appreciation in the fair value of vested KFN shares we receive as compensation for management services to that fund.

105

*Economic Net Income*

Due to the factors described above, economic net income in our credit segment was $34.5 million for the year ended December 31, 2006, an increase of $18.0 million, or 108.8%, from the year ended December 31, 2005.

*Assets Under Management*

Assets under management in our credit segment were $5.1 billion as of December 31, 2006, an increase of $1.5 billion, or 42.2%, from December 31, 2005. The increase was due primarily to $1.0 billion of additional capital raised by structured finance vehicles and our formation of the KKR Strategic Capital Funds, which raised an additional $0.4 billion of capital.

### Year Ended December 31, 2005 Compared to Year Ended December 31, 2004

*Fee Income*

Fee income in our credit segment was $44.5 million for the year ended December 31, 2005, an increase of $34.4 million from the year ended December 31, 2004. The increase was primarily due to increased management fees resulting from KFN commencing significant business activity during the year ended December 31, 2005.

*Expenses*

Expenses in our credit segment were $17.9 million for the year ended December 31, 2004, an increase of $13.5 million from the year ended December 31, 2004. The increase was primarily due to increases in employee compensation and benefits of $10.0 million, which was attributable to an increase in the amount of incentive compensation paid to existing personnel reflecting our favorable financial performance and the hiring of thirty additional personnel to support the growth of our credit strategy segment.

*Fee Related Earnings*

Due to the factors described above, fee related earnings in our credit segment were $26.6 million for the year ended December 31, 2005, an increase of $20.9 million from the year ended December 31, 2004.

*Investment Income*

There was no significant investment income in our credit segment for the years ending December 31, 2004 or the year ended December 31, 2005.

*Economic Net Income*

Due to the factors described above, economic net income in our credit segment was $16.5 million for the year ended December 31, 2005, an increase of $13.7 million from the year ended December 31, 2004.

*Assets Under Management*

Assets under management in our credit segment were $3.6 billion as of December 31, 2005, an increase of $2.9 billion from December 31, 2004. The increase was due primarily to the initial public offering of KFN, which raised $0.8 billion of additional permanent capital, and $2.0 billion of additional capital that we raised in structured finance vehicles.

**Liquidity and Capital Resources**

*Historical Liquidity and Capital Resources*

We require capital to fund investments, grow our business and support our working capital requirements. Historically, we have funded investments using the capital resources of our existing owners, capital committed by our fund investors and indebtedness incurred by our credit strategy funds or our portfolio companies. We generally have used the capital resources of our existing owners and accumulated net income from our business activities to fund our working capital requirements and to support our new business and growth initiatives.

Our combined statements of cash flows include the cash flows of our consolidated funds despite the fact that we have only a minority economic interest in those funds. The assets of our consolidated funds, on a gross basis, are substantially larger than the assets of our business and, accordingly, have a substantial effect on the cash flows reflected in our combined statements of cash flows. The assets of our consolidated funds have grown significantly during the periods reflected in our combined financial statements due to an increase in the number and size of the funds that we have raised, the amount of capital that we have invested and the appreciation in the value of our funds' investments.

The growth in the assets of our consolidated funds has significantly increased their cash flows and, in turn, has been the primary cause of the increase in the gross cash flows that are reflected in our combined statements of cash flows. In particular, the primary cash flow activities of our consolidated funds involve (i) raising capital from fund investors; (ii) using the capital of fund investors to make investments; (iii) financing certain investments with indebtedness; (iv) generating cash flows through the realization of investments; and (v) distributing cash flows from the realization of investments to fund investors. Because our consolidated funds are treated as investment companies for accounting purposes, these cash flow amounts are included in our cash flows from operations.

We have managed our historical liquidity and capital requirements by focusing on our cash flows before the consolidation of our funds and the effect of normal changes in assets and liabilities, which we anticipate will be settled for cash within one year. Our primary cash flow activities on a deconsolidated basis involve (i) generating cash flow from operations; (ii) funding capital commitments that we make to our funds as general partners (which amounts are eliminated when we consolidate funds); (iii) generating income from investment activities; (iv) funding our growth and new business initiatives; and (v) distributing cash flow to our owners. Normal movements in our short-term assets and liabilities do not affect our distribution decisions given our current and historically available borrowing capability.

We use adjusted cash flow from operations as a supplemental non-GAAP measure to assess and manage our liquidity and amounts that we have available for distribution to our owners. See "Distribution Policy." Adjusted cash flow from operations is intended to reflect our actual cash flows on a deconsolidated basis and is equal to cash flow from operations presented in accordance with GAAP, adjusted to exclude cash flow relating to (i) the investment activities of our consolidated funds; (ii) the realized and unrealized income attributable to non-controlling interests in consolidated funds; and (iii) changes in our operating assets and liabilities. We believe that adjusted cash flow from operations provides investors with useful information with respect to cash flows relating to our required capital investments and our ability to make annual cash distributions in accordance with our distribution policy. However, adjusted cash flow from operations should not be considered in isolation or as an alternative to cash flow from operations or income before taxes presented in accordance with GAAP.

107

The following table presents a reconciliation of our adjusted cash flow from operations to our net cash (used in) provided by operating activities presented in accordance with GAAP for the periods indicated.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2006 | 2007 |
| | ($ in thousands) | | | | |
| **Net Cash Provided By (Used In) Operating Activities** | $ 1,799,767 | $ (106,448) | $ (5,531,144) | $ 390,582 | $ (593,269) |
| Change in operating assets and liabilities | (124,626) | 10,280 | 74,003 | 85,230 | (136,549) |
| KKR Funds related investment activities | (1,577,741) | 907,294 | 6,475,177 | (379,406) | 776,373 |
| Net realized gains on investments | 2,932,802 | 1,567,312 | 3,244,931 | 1,651,340 | 417,997 |
| Change in unrealized (gains) losses on investments allocable to non-controlling interests | 37,184 | 1,142,480 | (143,243) | (566,991) | 844,695 |
| Non-controlling interests in income of consolidated entities | (2,364,309) | (2,861,186) | (3,026,913) | (777,505) | (1,161,162) |
| Other non-cash adjustments | 13,899 | 7,023 | 16,063 | 8,308 | 13,471 |
| **Adjusted cash flow from operations** | $ 716,976 | $ 666,755 | $ 1,108,874 | $ 411,558 | $ 161,556 |

### Three Months Ended March 31, 2007 and 2006

*Net Cash Flow (Used in) Provided by Operating Activities*

Our net cash flow (used in) provided by operating activities was $(0.6) billion and $0.4 billion during the three months ended March 31, 2007 and 2006, respectively. These amounts primarily included (i) purchases of investments by our consolidated funds, net of proceeds from sales of investments, of $(1.2) billion and $0.5 billion during the three months ended March 31, 2007 and 2006, respectively, (ii) net realized gains on investments of the consolidated funds of $0.4 billion and $1.7 billion during the three months ended March 31, 2007 and 2006, respectively, (iii) change in unrealized (gains) losses on investments allocable to us and non-controlling interests of $(1.1) billion and $0.7 billion during the three months ended March 31, 2007 and 2006, respectively, and (iv) non-controlling interests in income of consolidated entities of $1.2 billion and $0.8 billion during the three months ended March 31, 2007 and 2006, respectively. These amounts are reflected as operating activities in accordance with investment company accounting.

*Net Cash Flow Used in Investing Activities*

Our net cash flow used in investing activities was $71.4 million and $2.9 million during the three months ended March 31, 2007 and 2006, respectively. Our investing activities included the purchases of furniture, fixtures, equipment and leasehold improvements, as well as changes in restricted cash and cash equivalents of $65.8 million for the three months ended March 31, 2007.

*Net Cash Flow Provided by (Used in) Financing Activities*

Our net cash flow provided by (used in) financing activities was $0.7 billion and $(0.4) billion during the three months ended March 31, 2007 and 2006, respectively. Our financing activities primarily included (i) contributions made by, net of distributions made to, the investors in our consolidated funds, reflected in our historical combined financial statements as non-controlling interests in consolidated entities, of

$0.5 billion and $0.1 billion during the three months ended March 31, 2007 and 2006, respectively, (ii) net proceeds (repayments) of borrowings of our consolidated funds of $386.9 million and $(248.8) million for the three months ended March 31, 2007 and 2006, respectively, and (iii) distributions to, net of contributions by, our equity holders of $(249.6) million and $(259.1) million during the three months ended March 31, 2007 and 2006, respectively.

### *Years Ended December 31, 2006, 2005 and 2004*

#### *Net Cash Flow Provided by (Used in) Operating Activities*

Our net cash flow provided by (used in) operating activities was $(5.5) billion, $(0.1) billion and $1.8 billion during the years ended December 31, 2006, 2005, and 2004, respectively. These amounts primarily included (i) purchases of investments by our consolidated funds, net of proceeds from sales of investments, of $(4.4) billion, $(0.8) billion and $1.6 billion during the years ended December 31, 2006, 2005, and 2004, respectively, (ii) net realized gains on investments of the consolidated funds of $3.2 billion, $1.6 billion and $2.9 billion during the years ended December 31, 2006, 2005 and 2004, respectively, (iii) change in unrealized losses (gains) on investments allocable to KKR Group and non-controlling interests of $0.1 billion, $(1.4) billion and $(0.1) billion for the years ended December 31, 2006, 2005 and 2004, respectively, and (iv) non-controlling interests in income of consolidated entities of $3.0 billion, $2.9 billion and $2.4 billion during the years ended December 31, 2006, 2005 and 2004, respectively. These amounts are reflected as operating activities in accordance with investment company accounting.

#### *Net Cash Flow Used in Investing Activities*

Our net cash flow used in investing activities was $130.1 million, $5.0 million and $2.6 million during the years ended December 31, 2006, 2005, and 2004, respectively. Our investing activities included the purchases of furniture, fixtures, equipment and leasehold improvements, as well as changes in restricted cash and cash equivalents of $108.3 million for the year ended December 31, 2006.

#### *Net Cash Flow Provided by (Used in) Financing Activities*

Our net cash flow provided by (used in) financing activities was $5.7 billion, $0.1 billion, and $(1.7) billion during the years ended December 31, 2006, 2005, and 2004, respectively. Our financing activities primarily included (i) contributions made by, net of distributions made to, the investors in our consolidated funds, reflected in our historical combined financial statements as non-controlling interests in consolidated entities, of $5.8 billion, $0.3 billion and $(1.3) billion during the years ended December 31, 2006, 2005, and 2004, respectively, (ii) meeting net capital requirements of our consolidated funds of $699.4 million, $249.4 million, and $0 for the years ended December 31, 2006, 2005 and 2004, respectively, and (iii) distributions to, net of contributions by, our equity holders of $(796.4) million, $(415.5) million and $(442.2) million during the years ended December 31, 2006, 2005 and 2004, respectively.

### *Future Sources of Cash and Liquidity Needs*

#### *Liquidity Needs*

We expect that our primary liquidity needs will consist of cash required to (i) continue to grow our asset management business, including funding capital commitments that we make, as general partner, to our funds; (ii) finance our new business initiatives, including any net capital requirements of our capital markets companies; (iii) fund our cash operating expenses, including cash salaries and bonuses of employees; (iv) pay amounts that may become due under our tax receivable agreement with KKR Holdings; and (v) fund distributions to our unitholders and holders of Group Partnership units in accordance with our distribution policy. See "Distribution Policy." We believe that the sources of liquidity described below will be sufficient to fund our working capital requirements for the next 12 months.

109

The following table presents our unfunded general partner capital commitments to our private equity funds as of March 31, 2007, as adjusted to reflect the capital commitment we made to the Asian Fund subsequent to that date:

| Private Equity Funds | Original Commitment | | Unfunded Commitment | |
|---|---|---|---|---|
| | *($ in thousands)* | | | |
| Millennium Fund | $ | 150,000 | $ | 2,898 |
| European Fund II | | 121,271 | | 37,486 |
| 2006 Fund | | 375,000 | | 345,692 |
| Asian Fund | | 100,000 | | 100,000 |
| Total | $ | 746,271 | $ | 486,076 |

As described under "Business," the agreements governing our traditional private equity funds generally require the general partners of the funds to make minimum capital commitments to the funds, which usually range from 2% to 3% of a fund's total capital commitments at final closing. Historically these capital contributions have been funded with cash from operations that otherwise would be distributed to our principals and by our principals. Following the completion of this offering, we expect to fund any capital contributions that the general partners are required to make to a fund with future operating cash flows, and we will be entitled to receive our allocable share of the gain thereon.

In addition to the above capital commitments, we have entered into an investment agreement with KKR Private Equity Investors, our private equity oriented permanent capital fund, pursuant to which we have agreed to periodically acquire limited partner interests in the fund in an amount equal to 25% of the pre-tax distributions on the fund's investments that are allocated to us or our affiliates pursuant to a carried interest. As a result of the investment agreement, we expect to periodically acquire newly issued limited partner interests in the fund from time to time with a portion of the distributions that we receive from the fund.

The agreements governing our traditional private equity funds include clawback provisions that require the general partner of a fund to repay any excess amounts previously received in respect of its carried interest if, upon liquidation of the fund, the general partner has received carried interest distributions in excess of the amount to which it is entitled under the governing documents of the relevant fund. As of March 31, 2007, approximately $1.0 billion of carried interest previously paid to the general partners of our traditional private equity funds remained subject to a potential future clawback obligation. However, based on the investment performance of our traditional private equity funds as of March 31, 2007, none of the general partners of those funds would have had to make any payment under such clawback obligation as of such date. If, as a result of poor performance of later investments in the life of one of our traditional private equity funds, the fund does not achieve overall profitability, the general partners of those funds could potentially be required to make a payment under such a clawback obligation.

At the time of formation of each of our traditional private equity funds, our senior principals, including Messrs. Kravis and Roberts, personally guaranteed, on a several basis and subject to a cap, the clawback obligation of the general partner of the relevant private equity fund. In connection with the Reorganization Transactions and this offering, we will enter into an agreement with each of our personnel who has entered into such a guarantee pursuant to which we will indemnify such person for any liabilities incurred with respect to the guarantee. See "Certain Relationships and Related Party Transactions—Guarantee of Contingent Obligations to Fund Partners; Indemnification."

In connection with the Reorganization Transactions and this offering, we will enter into an exchange agreement with KKR Holdings pursuant to which KKR Holdings or transferees of its Group Partnership units may up to four times each year (subject to the terms of the exchange agreement) exchange Group Partnership units (together with corresponding special voting units) for our common units on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and

reclassifications. We will also enter into a tax receivable agreement with KKR Holdings or certain transferees of its Group Partnership units pursuant to which our subsidiaries, in particular our intermediate holding company, will be required to pay 85% of the amount of cash savings, if any, in U.S. federal, state and local income taxes that it realizes as a result of increases in the tax basis of certain of the assets of our subsidiaries arising from any exchanges of Group Partnership units for our common units. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." This payment obligation will be an obligation of our subsidiaries and not of either Group Partnership. While the actual increase in tax basis and amount and timing of any payments under our tax receivable agreement will vary depending upon a number of factors, including the timing of exchanges, the price of our common units at the time of the exchange, the extent to which such exchanges are taxable and the amount and timing of our taxable income, we expect that as a result of the size of the increases in the tax basis of the tangible and intangible assets of the Group Partnerships, the payments that we may be required to make could be substantial.

We intend to make quarterly cash distributions to our unitholders in amounts that in the aggregate are expected to constitute substantially all of our adjusted cash flow from operations each year in excess of amounts determined by our Managing Partner to be necessary or appropriate to provide for the conduct of our business, to make appropriate investments in our business and our funds, to comply with applicable law, any of our debt instruments or other agreements or to provide for future distributions to our unitholders for any one or more of the ensuing four quarters. Our distribution policy reflects our belief that distributing substantially all of our adjusted cash flow from operations will provide transparency for our unitholders and impose on us an investment discipline with respect to the businesses and strategies that we pursue.

Adjusted cash flow from operations is intended to reflect the actual cash flow attributable to us and is equal to cash flow presented in accordance with GAAP, adjusted to exclude cash flow relating to (i) the investment activities of our consolidated funds; (ii) the realized and unrealized income attributable to non-controlling interests in consolidated funds; and (iii) changes in our operating assets and liabilities. We expect that our first quarterly distribution will be paid in　　　　　　in respect of the period from the completion of this offering through　　　　　　. Because we will not know what our available adjusted cash flow from operations will be for any year until the end of such year, we expect that our first three quarterly distributions in respect of any given year will generally be smaller than the final quarterly distribution in respect of such year.

*Sources of Cash*

Our initial source of cash will consist of the net proceeds that we receive from this offering. Based on the midpoint of the price range set forth on the cover page of this prospectus, we estimate that we will receive approximately $　　　of net proceeds from this offering after deducting estimated underwriting discounts and offering expenses, or $　　　if the underwriters exercise in full their option to purchase additional common units from us. We will also receive cash from time to time from (i) our operating activities, including management, transaction and monitoring fees that we earn under the management and other agreements that we enter into with our funds and portfolio companies; (ii) gains on investments that are allocated to us in respect of our carried interests; and (iii) realized returns that are generated on investments that are made with capital invested by or on behalf of the general partners of our funds. We may also issue additional common units and other securities to investors with the objective of increasing our available capital.

In addition, as a public company, we intend to use leverage to create the most efficient capital structure for our partnership and our public unitholders. In furtherance of this objective, we intend to enter into a revolving credit facility with one or more financial institutions that we may draw down from time to time to optimize our capital structure. We may also borrow from other sources. We do not anticipate approaching significant levels of leverage during the first one or two years following this

111

offering, because we believe that the net proceeds that we will receive from this offering will initially provide us with the principal source of financing for our business. This strategy may change, however, depending on our liquidity requirements.

**Contractual Obligations, Commitments and Contingencies**

In the ordinary course of our business, we and our consolidated funds enter into contractual arrangements that may require future cash payments. The following table sets forth information relating to the anticipated future cash payments that were associated with those contractual obligations as of March 31, 2007.

| Type of Contractual Obligations | Payments due by Period | | | | |
|---|---|---|---|---|---|
| | <1 Year | 1 to 3 Years | 3 to 5 Years | >5 Years | Total |
| | ($ in millions) | | | | |
| **Before Consolidation of Funds:** | | | | | |
| Capital commitments to traditional private equity funds(1) | $ 486.1 | $ — | $ — | $ — | $ 486.1 |
| Lease obligations | 14.9 | 28.6 | 24.8 | 48.4 | 116.7 |
| Total | $ 501.0 | $ 28.6 | $ 24.8 | $ 48.4 | $ 602.8 |
| **After Consolidation of Funds:** | | | | | |
| Equity commitments(2) | $ 4,914.0 | $ — | $ — | $ — | $ 4,914.0 |
| Lease obligations | 14.9 | 28.6 | 24.8 | 48.4 | 116.7 |
| Debt payment obligations(3) | 1,335.7 | — | 350.0 | — | 1,685.7 |
| Total(4) | $ 6,264.6 | $ 28.6 | $ 374.8 | $ 48.4 | $ 6,716.4 |

(1)   These capital commitments represent commitments by the general partners of our traditional private equity funds to contribute capital to fund a portion of the purchase price paid for each portfolio company investment made by the fund. Because these amounts are due on demand, they have been presented as falling due within one year. However, given the size of our funds' capital commitments and the rates at which our funds make investments, we expect that the capital commitments presented above will be called over a period of several years, if not longer. The amounts presented above do not, however, include amounts that may become due to KKR Private Equity Investors under our investment agreement with it, because those amounts will depend on the fund's returns and are not objectively determinable. See "—Future Sources of Cash and Liquidity Needs—Liquidity Needs."

(2)   These equity commitments represent contractual commitments entered into by our private equity funds to fund a portion of the purchase price of unconsummated portfolio company investments. Our funds pay amounts due with respect to these commitments using capital contributed by fund investors and capital provided by us and, in the case of our larger transactions, with amounts funded by third-party co-investors or financial intermediaries to whom a portion of the equity commitment is syndicated. Whether and when the transactions regarding which we have entered into commitments will be consummated depends on a number of factors, some or all of which may be outside of our control, and we cannot assure you that any of these commitments will be funded. As a result, the equity commitments presented above do not necessarily reflect our fund's actual future cash outflows.

(3)   Debt payment obligations include interest to be paid over the maturity of the related debt obligation, which has been calculated assuming no prepayments are made and the debt is held until its final maturity date. Future interest rates have been calculated using rates in effect as of March 31, 2007, including both variable and fixed rates provided for by the relevant debt agreements.

(4)   Our contractual obligations table does not give effect to the potential obligations described in the paragraphs below.

112

Case 1:07-cv-01757-RWR     Document 21-15     Filed 07/03/2008     Page 138 of 199

In the normal course of business, we also enter into contractual arrangements that contain a variety of representations and warranties and that include general indemnification obligations. Our maximum exposure under these arrangements is unknown due to the fact that the exposure would relate to claims that may be made against us in the future. Accordingly, no amounts have been included in our combined financial statements as of March 31, 2007 relating to indemnification obligations.

The instruments governing our traditional private equity funds include clawback provisions that require the general partner of a fund to repay any excess amounts previously received in respect of its carried interest if, upon liquidation of the fund, the general partner has received carried interest distributions in excess of the amount to which it is entitled under the governing documents of the relevant fund. As of March 31, 2007, $1.0 billion of carried interest previously paid to the general partners of our traditional private equity funds remained subject to a potential future clawback obligation. Based on the investment performance of our traditional private equity funds as of March 31, 2007, none of the general partners of those funds had a clawback obligation as of such date. Accordingly, no provisions, reserves or other amounts have been included in our combined financial statements as of March 31, 2007 relating to clawback obligations.

## Off Balance Sheet Arrangements

Other than contractual commitments and other legal contingencies incurred in the normal course of our business, we do not have any off-balance sheet financings or liabilities.

## Critical Accounting Policies

The preparation of our financial statements in accordance with GAAP requires our management to make estimates and judgments that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities, and reported amounts of revenues, income and expense. Our management bases these estimates and judgments on available information, historical experience and other assumptions that we believe are reasonable under the circumstances. These estimates, judgments and assumptions, however, are often subjective and may be impacted negatively based on changing circumstances or changes in our analyses. If actual amounts are ultimately different from those estimated, judged or assumed, revisions are included in our combined financial statements for the period in which the actual amounts become known. We believe the following critical accounting policies could potentially produce materially different results if we were to change underlying estimates, judgments or assumptions. Please see the notes to the predecessor combined financial statements included elsewhere in this prospectus for further detail regarding our critical accounting policies.

### Fair Value of Investments

Our consolidated funds are treated as investment companies under the AICPA Audit and Accounting Guide, "Investment Companies," for the purposes of GAAP and, as a result, reflect their investments on our predecessor combined statement of financial condition at fair value, with unrealized gains or losses resulting from changes in fair value reflected as a component of investment income in our predecessor combined statements of income. We have retained the specialized accounting of the our consolidated funds pursuant to EITF Issue No. 85-12, Retention of Specialized Accounting for Investments in Consolidation.

When determining fair values of investments, we use the last reported market price as of the statement of financial condition date for investments that have readily observable market prices. If no sales occurred on such day, we use the "bid" price at the close of business on that date and, if sold short, the "asked" price at the close of business on that date day. Forward contracts are valued based on market rates or prices obtained from recognized financial data service providers. When an investment does not have a readily available market price, the fair value of the investment represents the value, as determined by us in

113

good faith, at which the investment could be sold in an orderly disposition over a reasonable period of time between willing parties other than in a forced or liquidation sale.

There is no single standard for determining fair value in good faith and in many cases fair value is best expressed as a range of fair values from which a single estimate may be derived. When making fair value determinations, we typically use a market multiples approach that considers a specified observable financial measure (such as EBITDA) or a discounted cash flow or liquidation analysis. We also consider a range of additional factors that we deem relevant, including the price at which the investment was acquired, the nature of the investment (such as whether it is a controlling interest), local market conditions, market prices for comparable securities and financing transactions and models that consider the current and expected operating performance and cash flows of the company in which the investment was made. Fair values of investments that do not have readily observable market prices are based on the best information available in light of the circumstances and may incorporate or involve significant assumptions or judgments by management.

Approximately 33%, or $6.6 billion, and 28%, or $5.0 billion, of the value of the investments in our consolidated private equity funds were valued using quoted market prices, which have not been adjusted, as of March 31, 2007 and December 31, 2006, respectively.

Approximately 67%, or $13.4 billion, and 72%, or $12.9 billion, of the value of the investments in our consolidated private equity funds were valued in the absence of readily observable market prices as of March 31, 2007 and December 31, 2006, respectively. Substantially all of these investments were valued using internal models with significant unobservable market parameters and our determinations of the fair values of these investments may differ materially from the values that would have resulted if readily observable market prices had existed. Additional external factors may cause those values, and the values of investments for which readily observable market prices exist, to increase or decrease over time, which may create volatility in our earnings and the amounts of assets and partners capital that we report from time to time.

Changes in the fair value of the investments of our consolidated private equity funds may impact our results of operations as follows:

- The management fees that we are paid by our private equity-oriented permanent capital fund are based on the approximate net asset value of the fund, which in turn is impacted by the fair values of its investments. A change in the fair values of the fund's investments during a reporting period would affect the amount of management fees that are payable following the completion of the reporting period, but would not have an immediate impact on our results. We estimate that an immediate 10% decrease in the fair value of the fund's private equity investments as of March 31, 2007 would decrease the management fee that is payable by the fund by approximately $2.1 million. The management fees paid by our traditional private equity funds are calculated based on the amount of capital committed to, or invested by, the funds and are not directly affected by changes in the fair value of the funds' investments.

- The net gains from investment activities of our private equity funds are directly affected by changes in the fair values of the funds investments as described under "—Key Financial Measures—Investment Income—Net Gains from Investment Activities." Based on the investments of our private equity funds as of March 31, 2007, we estimate that an immediate 10% decrease in the fair value of the funds' investments generally would result an a 10% immediate change in net gains from the funds' investment activities (including carried interest), regardless of whether the investment was valued using observable market prices or internal models with significant unobservable market parameters. However, we estimate the impact that the consequential decrease in investment income would have on our reported amounts of income before taxes and net income would be significantly less than the amount presented above, given that a substantial majority of the change in fair value would be absorbed by fund investors who hold non-controlling interests in the funds.

114

An aggregate of 27 of the private equity investments that we valued as of the valuation date (representing approximately $13.4 billion, or 67%, of the total unrealized value of all private equity investments valued as of the valuation date) did not have a readily available market and were valued using fair value pricing. Our calculations of the fair values of private equity investments were reviewed by Duff & Phelps, LLC, an independent valuation firm, who provided third-party valuation assistance to us, which consisted of certain limited procedures that we identified and requested it to perform. Upon completion of such limited procedures, Duff & Phelps, LLC concluded that the fair value, as determined by us, of those investments subjected to their limited procedures did not appear to be unreasonable. The limited procedures did not involve an audit, review, compilation or any other form of examination or attestation under generally accepted auditing standards. The general partners of our funds are ultimately and solely responsible for determining the fair value of the investments in good faith. Duff & Phelps, LLC is not responsible for determining the fair value of any individual investment or portfolio of investments, nor are the limited procedures performed by Duff & Phelps, LLC intended to be used to determine fair value of any investment or portfolio of investments. The limited procedures performed by Duff & Phelps, LLC are supplementary to the inquiries and procedures that the general partner of each fund is required to undertake to determine the fair value of the investments in good faith. See "Private Equity Valuations and Related Data" for a further discussion of our private equity investment valuations.

Substantially all of the value of the investments in our consolidated credit strategy funds were valued using observable market parameters, which may include quoted market prices, as of March 31, 2007 and December 31, 2006. Quoted market prices, when used, are not adjusted.

The management fees that are paid by the KKR Strategic Capital Funds are based on their respective net asset values. Accordingly, a 10% decrease in the fair value of the funds' investments as of March 31, 2007 would have resulted in no incentive fee being earned and a reduction in management fees for the quarter ended March 31, 2007 of $0.9 million. KFN's base management and incentive fees are indirectly impacted by changes in the fair values of assets, and a decline in the fair value of assets that results in a 10% decrease in the shareholder's equity of KFN would have resulted in a reduction of $0.2 million and $6.3 million, respectively, in management and incentive fees for the three months ended March 31, 2007.

### Revenue Recognition

Fee income consists primarily of transaction and monitoring fees that we receive from our portfolio companies and the management and other fees that we receive directly from our unconsolidated funds, including both the base management fees and the incentive fees that are paid by our unconsolidated credit strategy funds. These fees are based upon the contractual terms of the management and other agreements that we enter into with the applicable funds and portfolio companies. We recognize fee income in the period during which the related services are performed and the amounts have been contractually earned in accordance with the relevant management or other agreements. Incentive fees are accrued either annually or quarterly, after all contingencies have been removed, based on performance to date versus the performance benchmark stated in the management agreement.

### Recognition of Investment Income

Investment income consists primarily of the unrealized and realized gains on investments, dividend and interest income received from investments and foreign currency gains as reduced by unrealized and realized losses on investments, interest expense incurred in connection with investment activities and foreign currency losses on investments. Unrealized gains or losses result from changes in the fair value of our funds' investments during a period. Upon disposition of an investment, previously recognized unrealized gains or losses are reversed and a corresponding realized gain or loss is recognized in the current period. While this reversal does not impact the net amounts of gains that we recognize from investment activities, it affects the manner in which we classify our gains and losses for reporting purposes.

115

We recognize investment income with respect to our carried interests in investments of our private equity funds, the capital invested by or on behalf of the general partners of our private equity funds and the non-controlling interests that third-party fund investors hold in our consolidated funds. A carried interest entitles us to a percentage of the gain generated on third-party capital invested by a private equity fund, subject in the case of our traditional private equity funds to the fund achieving a profit on all investments as a whole. The instruments governing our traditional private equity funds include clawback provisions that require the general partner of a fund to repay any excess amounts previously received in respect of its carried interest if, upon liquidation of the fund, the general partner has received carried interest distributions in excess of the amount to which it is entitled under the governing documents of the fund. This feature operates only with respect to the investments of an individual fund and does not provide for netting of gains and losses across funds.

Because carried interests allocate to us a disproportionate share of our private equity funds' earnings relative to our capital contributions, those interests reduce the amount of our funds' earnings that are allocated to fund investors' non-controlling interests in consolidated funds. We recognize investment income attributable to a carried interest in a fund to the extent that the fund's investment returns are positive. When a carried interest is subject to a clawback provision, we recognize the related investment income based on the terms of the fund's instruments assuming that the fund was terminated on that date and that the fair value of the fund's investments were then realized in full. Given the long durations during which our private equity funds hold investments, management believes that this approach results in income recognition that best reflects our performance in any given period as the manager of our private equity funds.

Due to the consolidation of the majority of our funds, the share of our funds' investment income that is allocable to our carried interests and capital investments is not shown in our combined financial statements. Instead, the investment income that we retain in our net income, after allocating amounts to non-controlling interests, represents the portion of our investment income that is allocable to us. Because the substantial majority of our funds are consolidated and because we hold only a minority economic interest in our funds' investments, our share of the investment income generated by our investment activities is significantly less than the total amount of investment income presented in our predecessor combined financial statements.

## Recent Accounting Pronouncements

In December 2004, the Financial Accounting Standards Board issued SFAS No. 123 (R), "Share-Based Payment" ("SFAS 123 (R)"), which requires all equity-based payments to employees to be recognized using a fair value based method. On January 1, 2006, we adopted SFAS No. 123 (R) using the prospective method and therefore there was no impact on prior period amounts. The adoption of SFAS 123 (R) did not impact our combined financial statements.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments," ("SFAS 155"). Key provisions of SFAS No. 155 include: (1) a broad fair value measurement option for certain hybrid financial instruments that contain an embedded derivative that would otherwise require bifurcation; (2) clarification that only the simplest separations of interest payments and principal payments qualify for the exception afforded to interest-only strips and principal-only strips from derivative accounting under paragraph 14 of SFAS No. 133, thereby narrowing such exception; (3) a requirement that beneficial interests in securitized financial assets be analyzed to determine whether they are freestanding derivatives or whether they are hybrid instruments that contain embedded derivatives requiring bifurcation; (4) clarification that concentrations of credit risk in the form of subordination are not embedded derivatives; and (5) elimination of the prohibition on a qualifying special purpose entity holding passive derivative financial instruments that pertain to beneficial interests that are or contain a derivative financial instrument. In general, these changes will reduce the operational complexity associated with bifurcating embedded derivatives, and increase the number of beneficial interests in securitization transactions, including interest-only strips and principal-only strips, required to be accounted for in

116

accordance with SFAS No. 133. SFAS 155 is effective for all financial instruments acquired, issued or subject to remeasurement after the beginning of an entity's first fiscal year that begins after September 15, 2006. The adoption of SFAS 155 did not have a material impact on our combined financial statements.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value, and expands disclosures about fair value measurements. SFAS 157 applies to reporting periods beginning after November 15, 2007. We are currently assessing the impact of adopting SFAS 157 on the combined financial statements.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS 159"). SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value, with changes in fair value recognized in earnings. SFAS 159 applies to reporting periods beginning after November 15, 2007. We are currently assessing the impact of adopting SFAS 159 on the combined financial statements.

In June 2007, the AICPA issued Statement of Position No. 07-1, "Clarification of the Scope of the Audit and Accounting Guide Investment Companies and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies" ("SOP 07-1"), for issuance. SOP 07-1 addresses whether the accounting principles of the AICPA Audit and Accounting Guide Investment Companies may be applied to an entity by clarifying the definition of an investment company and whether those accounting principles may be retained by a parent company in consolidation or by an investor in the application of the equity method of accounting. Generally, in order for an entity to retain investment company accounting for a subsidiary or equity method investee, (i) the subsidiary or equity method investee should meet the definition of an investment company pursuant to the guidance in SOP 07-1, (ii) the entity should follow established policies that effectively distinguish the nature and type of investments made by the investment company from the nature and type of investments made by other entities within the consolidated group that are not investment companies, and (iii) the entity (through the investment company) should be investing for current income, capital appreciation, or both, rather than for strategic operating purposes. SOP 07-1 applies to the later of (i) reporting periods beginning on or after December 15, 2007 or (ii) the first permitted early adoption date of the FASB's fair value option statement. We are currently assessing the impact of adopting SOP 07-1 on our combined financial statements including the potential impact if we were unable to retain investment company accounting.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 requires companies to recognize the tax benefits of uncertain tax positions only where the position is "more likely than not" to be sustained assuming examination by tax authorities. The tax benefit recognized is the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. FIN 48 is effective for fiscal years beginning after December 15, 2006. The adoption of FIN 48 did not have a material impact on our combined financial statements.

### Qualitative and Quantitative Disclosures About Market Risk

Our exposure to market risks primarily relates to our role as general partner or manager of our funds and sensitivities to movements in the fair value of their investments, including the effect that those movements have on the management fees and carried interests that we receive. The fair value of our funds' investments may fluctuate in response to changes in the value of securities, foreign currency exchange rates and interest rates.

Although our funds share many common themes, we generally maintain separate investment and risk management processes for monitoring and managing market risks in our private equity and credit segments. In particular:

- The investment process for our private equity funds involves a detailed analysis of potential acquisitions and industry-specific investment teams are assigned to oversee the operations, strategic development, financing and capital deployment decisions of our funds' portfolio companies. Investment decisions are subject to approval by our equity investment committee, which consists of

117

a group of our senior principals, and portfolio company investments are monitored by our portfolio management committee, which consists of a group of our senior principals and senior advisors.

- Our approach to making debt investments focuses on creating investment portfolios that generate attractive leveraged risk-adjusted returns on invested capital, allocating capital across multiple asset classes, selecting high-quality investments that may be made at attractive prices, applying rigorous standards of due diligence when making investment decisions, subjecting investments to regular monitoring and oversight and making buy and sell decisions based on price targets and relative value parameters. We employ both "top-down" and "bottom-up" analyses when making debt investments. Our top-down analysis involves a macro analysis of relative asset valuations, long-term industry trends, business cycles, interest rate expectations, credit fundamentals and technical factors to target specific industry sectors and asset classes in which to invest. Our bottom-up analysis includes a rigorous analysis of the credit fundamentals and capital structure of each credit considered for investment and a thorough review of the impact of credit and industry trends and dynamics and dislocations events on such potential investment.

### Market Risk

Our consolidated funds hold investments that are reported at fair value. Net changes in the fair value of investments impact the net gains from investments in our combined statements of income. Based on the investments of our funds as of March 31, 2007, we estimate that a 10% decrease in the fair value of our funds' investments would result in a corresponding reduction in investment income. However, we estimate the impact that the consequent decrease in investment income would have on our reported amounts of income before taxes and net income would be significantly less than the amount presented above, given that a substantial majority of the change in fair value would be absorbed by fund investors who hold non-controlling interests in our funds.

Our base management fees are calculated based on the amount of capital committed or invested by a fund or the NAV of a fund's investments, as described under "Business—Private Equity—Traditional Private Equity Funds." In the case of our credit strategy funds, our incentive fees are calculated based on the performance of a fund's investments, which in the case of one of our credit strategy funds is calculated based on the appreciation in the NAV of the fund's investments. To the extent that base management or other amounts are calculated based on the NAV of the fund's investments, the amount of fees that we may charge will be increased or decreased in direct proportion to the effect of changes in the fair value of the fund's investments. The proportion of our management and other amounts that are based on NAV depends on the number and type of funds in existence. For a discussion of the impact of market risks on our fair value of investments, see "—Critical Accounting Policies—Fair Value of Investments."

### Exchange Rate Risk

Our private equity funds make investments from time to time in currencies other than those in which their capital commitments are denominated. Those investments expose us and our fund investors to the risk that the value of the investments will be affected by changes in exchange rates between the currency in which the capital commitments are denominated and the currency in which the investments are made. Our policy is to minimize these risks by employing hedging techniques, including using foreign exchange contracts to reduce exposure to future changes in exchange rates when our funds have invested a meaningful amount of capital in currencies other than the currencies in which their capital commitments are denominated.

Because most of the capital commitments to our funds are denominated in U.S. dollars, our primary exposure to exchange rate risk relates to movements in the value of exchange rates between the U.S. dollar and other currencies in which our investments are denominated (primarily euro and Australian dollars). We estimate that a simultaneous parallel movement by 10% in the exchange rates between the U.S. dollar and all of the foreign currencies in which our funds' investments were denominated as of March 31, 2007 would result in net gains or losses from investment activities of our funds of $250 million. However, we estimate that the effect on our income before taxes and our net income from such a change would be

118

significantly less than the amount presented above, because a substantial majority of the gain or loss would be absorbed by fund investors who hold non-controlling interests in our funds.

### Interest Rate Risk

Interest rate risk is defined as the sensitivity of our current and future earnings to interest rate volatility, variability of spread relationships, and the effect that interest rates may have on our cash flows. Our credit strategy funds and our private equity-oriented permanent capital fund have outstanding indebtedness that accrues interest at variable rates. As a result, changes in interest rates affect the amount of interest payments that those funds are required to make, which may impact the earnings and cash flows of those funds. However, we estimate the effect on our income before taxes and our net income from such an increase would be substantially allocated to fund investors in proportion to their non-controlling interests in the funds.

In addition, our credit strategy funds and our private equity-oriented permanent capital fund make investments in floating rate investments that are primarily financed with variable rate borrowings. Interest rates on our floating rate investments and our variable rate borrowings do not reset on the same day or with the same frequency and, as a result, we are exposed to basis risk with respect to index reset frequency. Our floating rate investments may reprice on indices that are different than the indices that are used to price our variable rate borrowings and, as a result, we are exposed to basis risk with respect to repricing indices.

We manage interest rate risk and make interest rate decisions by evaluating our projected earnings under selected interest rate scenarios. During periods of increasing interest rates we tend to purchase floating rate investments. We manage our interest rate risk using various techniques ranging from the purchase of floating rate investments to the use of interest rate derivatives. We generally fund our floating rate investments with variable rate borrowings with similar interest rate reset frequencies. We also may use interest rate derivatives to hedge the variability of cash flows associated with existing or forecasted variable rate borrowings.

### Credit Risk

Certain of our funds enter into derivative instruments that subject us to the risk that the counterparties may be unable to meet their obligations under those agreements. We seek to minimize our risk exposure by limiting the counterparties with which we enter into contracts to highly rated major financial institutions with strong credit ratings.

119

## PRIVATE EQUITY VALUATIONS AND RELATED DATA

This prospectus presents valuation and related data, such as net and gross IRRs and multiples of invested capital, relating to our traditional private equity funds. Unless otherwise indicated, this data is presented as of March 31, 2007, which we refer to as the valuation date, and has been prepared using the methodologies described below. Please keep this in mind as you read this prospectus.

### Realized Values

We calculated the aggregate realized value of a traditional fund's portfolio investments as the historical amount of the net cash and other marketable securities actually received by the fund from all of the investments made from the date of the fund's formation through the valuation date. Such amounts do not give effect to the allocation of any realized returns to the fund's general partner or manager pursuant to a carried interest, or the payment of any applicable management fees to the fund's manager. Where the value of an investment was only partially realized, we classified the actual cash and other consideration received by the fund as realized value and classified the balance of the value of the investment as unrealized value, which is valued using the methodology described below under "—Unrealized Values."

### Unrealized Values

#### *Methodology*

We calculated the aggregate unrealized value of a traditional private equity fund's investments by adding together the individual unrealized values of the fund's investments.

When determining fair values of investments, we use the last reported market price as of the statement of financial condition date for investments that have readily observable market prices. If no sales occurred on such day, we use the "bid" price at the close of business on that date and, if sold short, the "asked" price at the close of business on that date day. Forward contracts are valued based on market rates or prices obtained from recognized financial data service providers. When an investment does not have a readily available market price, the fair value of the investment represents the value, as determined by us in good faith, at which the investment could be sold in an orderly disposition over a reasonable period of time between willing parties other than in a forced or liquidation sale.

There is no single standard for determining fair value in good faith and in many cases fair value is best expressed as a range of fair values from which a single estimate may be derived. When making fair value determinations, we typically use a market multiples approach that considers a specified financial measure (such as EBITDA) or a discounted cash flow or liquidation analysis. We also consider a range of additional factors that we deem relevant, including the price at which the investment was acquired, the nature of the investment (such as whether it is a controlling interest), local market conditions, market prices for comparable securities and financing transactions and models that consider the current and expected operating performance and cash flows of the company in which the investment was made. Fair values of investments that do not have readily available market prices are based on the best information available in light of the circumstances and may incorporate or involve significant assumptions or judgments by management. Because we valued our investments as of March 31, 2007, subsequent events that may have a material impact on those valuations are not reflected.

#### *Independent Valuation Firm*

An aggregate of 27 of the private equity investments that we valued as of the valuation date (representing approximately $13.4 billion, or 67%, of the total unrealized value of all private equity investments valued as of the valuation date) did not have a readily available market and were valued using fair value pricing. Our calculations of the fair values of private equity investments were reviewed by Duff & Phelps, LLC, an independent valuation firm, who provided third-party valuation assistance to us, which consisted of certain limited procedures that we identified and requested it to perform. Upon completion of such limited procedures, Duff & Phelps, LLC concluded that the fair value, as determined by us, of those investments subjected to their limited procedures did not appear to be unreasonable. The limited

120

procedures did not involve an audit, review, compilation or any other form of examination or attestation under generally accepted auditing standards. The general partners of our funds are ultimately and solely responsible for determining the fair value of the investments in good faith. Duff & Phelps, LLC is not responsible for determining the fair value of any individual investment or portfolio of investments, nor are the limited procedures performed by Duff & Phelps, LLC intended to be used to determine fair value of any investment or portfolio of investments. The limited procedures performed by Duff & Phelps, LLC are supplementary to the inquiries and procedures that the general partner of each fund is required to undertake to determine the fair value of the investments in good faith.

## IRRs

IRRs measure the aggregate annual compounded returns generated by a fund's investments over a holding period. We calculated net IRRs after giving effect to the allocation of realized and unrealized returns on a fund's investments to the fund's general partner pursuant to a carried interest and the payment of any applicable management fees. These amounts measure returns based on amounts that, if distributed, would be paid to fund investors. We calculated gross IRRs before giving effect to the allocation of realized and unrealized returns on a fund's investments to the fund's general partner or manager pursuant to a carried interest and the payment of any applicable management fees. These amounts measure the returns on the fund's investments as a whole without regard to whether all of the returns would, if distributed, be payable to fund investors. In all cases, we computed IRRs using what is known as a "dollar-weighted" IRR, which takes into account the timing of cash flows and amounts invested at any given time, and we determined realized and unrealized returns using the methodologies described above.

## Multiples of Invested Capital

The multiples of invested capital measure the aggregate returns generated by a fund's investments in absolute terms. We calculated each multiple of invested capital by adding together the total realized and unrealized values of a fund's investments and dividing by the total amount of capital invested by the fund. Such amounts do not give effect to the allocation of any realized and unrealized returns on a fund's investments to the fund's general partner or manager pursuant to a carried interest or the payment of any applicable management fees. In all cases, we determined the realized and unrealized values of a fund's investments using the methodologies described above.

## Bridge Financing Provided by Private Equity Funds

In certain instances, our traditional private equity funds may provide temporary or "bridge" financing to a portfolio company in connection with a portfolio company investment. This financing, which may be in the form of debt or equity, is designated as bridge financing prior to the time that the investment is made. If bridge financing that is extended by a private equity fund is not repaid within eighteen months from the date the financing was extended, the bridge financing is considered to be permanent financing and is included in the amount of the fund's portfolio company investment. If the bridge financing is repaid within eighteen months from the date the financing was extended, the repayment is considered a repayment of principal and any additional amounts received are treated as interest income from the portfolio company. For the purposes of calculating IRRs and multiples of invested capital, we disregarded both the principal amount of any bridge financing that was not considered permanent financing and any related interest income.

## Calculation of Dollar Weighted Average Holding Periods

We measure the length of time during which our funds hold portfolio investments on a dollar weighted basis. We calculated the dollar weighted average holding period for a fund's portfolio investments by dividing (i) the holding period of each of the fund's investments multiplied by the cost basis of such investment by (ii) the aggregate cost basis of all of the fund's investments. An investment's holding period is equal to the period of time between the date on which the investment was made and the date on which the amount invested was realized or, if the investment was held as of the valuation date, the valuation date. The cost basis of an investment is equal to the amount of capital invested by the fund. Where the value of an investment was only partially realized as of the valuation date, we considered the holding periods and cost bases of the realized and unrealized portions of the investment separately for the purposes of the calculation.

121

# INDUSTRY

## Overview

Asset management is the professional management of investments by third-party portfolio managers on behalf of investors. Asset managers earn a contracted fee by employing various strategies to meet the investment goals of their investors. These strategies are generally considered to be either "traditional" or "alternative." Traditional asset management generally involves the use of equity, debt and/or derivative securities while alternative asset management utilizes a variety of investment strategies. The asset management industry has grown significantly over the past ten years, with the total value of assets under management worldwide estimated at greater than $50 trillion in 2006. This growth has been driven by aging populations in both developed and emerging markets around the world which have increased the pools of savings and particularly pension assets. Alternative asset management strategies have been the fastest-growing sector of the industry as investors have sought to diversify their investment portfolios, and alternative asset managers have often delivered superior returns when compared to traditional asset managers.

Traditional asset managers manage portfolios of securities by investing through investment companies registered under the Investment Company Act (for example, mutual funds and exchange traded funds) or through separate unregistered accounts managed on behalf of individuals or institutions. Investment objectives generally include total return, capital appreciation, current income and/or replicating the performance of a particular index. Investors in these funds generally have unrestricted access to their funds either through market transactions (in the case of closed-end mutual funds and exchange traded funds) or through withdrawals (in the case of open-end mutual funds and separately managed accounts). Traditional asset managers are generally compensated on a monthly or quarterly basis with fees that are calculated as a percentage of assets under management. Managers of such portfolios in the United States are typically registered with the SEC under the Investment Advisers Act.

Alternative asset managers utilize a variety of investment strategies to deliver investment performance on an absolute return basis within certain predefined risk parameters and investment guidelines. These investment returns tend to have a lower correlation to the broader market than traditional asset management strategies. Alternative asset managers include private equity funds, real estate funds, venture capital funds, hedge funds, funds of funds (that is, funds that invest in investment funds), and mezzanine and structured debt funds. Many alternative asset vehicles, particularly private equity funds, require investors to fund committed capital over the investment period of the vehicle and limit investors' access to invested capital until such time as investments yield returns or are realized. Nearly all alternative asset management fee arrangements include a significant performance component. Generally, depending upon, among other things, the composition of the investor base and the nature of investment activities, alternative asset vehicles may not be required to register as investment companies under the Investment Company Act, and managers of such funds may not be required to register with the SEC under the Investment Advisers Act.

A further discussion of private equity funds, structured debt funds and hedge funds is set forth below.

## Alternative Asset Management

### *Private Equity Funds*

Private equity funds are managed pools of capital invested in non-public, non-actively traded common equity, preferred stock, or mezzanine or distressed debt securities. In certain cases, private equity funds engage in the acquisition and delisting of public companies or invest in publicly listed companies. Private equity fund managers often seek to exploit dislocations in the market where other investors do not recognize the value of, or may lack the required expertise to generate additional value from, a certain

122

company or security. These investments may include significant changes to a company's capital structure through the use of borrowed capital, a strategy referred to as a "leveraged buyout."

Private equity funds are generally fixed-lived vehicles, with provisions to extend their term under certain circumstances, and are generally organized as unregistered limited partnerships or limited liability companies. The business, affairs and investment decisions of private equity firms are usually controlled by a general partner. The fund obtains capital commitments from certain qualified investors that are high net-worth individuals or institutions who thereafter become passive limited partners in the fund partnership. At such time as the general partner identifies an appropriate investment opportunity, it is entitled to call the capital on an "as needed" basis (typically over the first three to six years of the fund's term) from its investors, and this capital is returned through distributions upon realizations of the underlying investments (typically within five to eight years). General partners are typically compensated with a combination of management fees (based on committed or contributed capital), transaction and monitoring fees (paid by portfolio companies for advisory and other services rendered) and carried interest (based on the net profits generated by the fund). Private equity fund managers typically commit a portion of their own capital to the funds they manage.

Private equity fund-raising has experienced significant growth over the last several years, reaching record levels in 2006. According to *DowJones,* there has been more than $400 billion of capital raised in the United States since the beginning of 2002, and according to the *Russell Investment Group* , allocations to private equity funds are forecast to reach record levels in all markets in 2007. The growth of private equity funds can be observed in how private equity sponsor-led deals become a much more significant portion of overall mergers and acquisitions ("M&A") volume. Sponsor-led deals represented more than 25% of the global M&A volume in 2006, up from 5% in 1999.



**U.S. Corporate Private Equity Funds Raised**

Source: DowJones

**Private Equity Global M&A Volume and Percentage of Total M&A**

Source: Thomson Financial

Note:   Compound Annual Growth Rate, or "CAGR," represents the annual rate of growth over a period, assuming growth at a steady rate.

*Returns for Private Equity*

Private equity fund managers have, on average, historically outperformed the broader stock indices over the past 20 years. High risk-adjusted returns are the driving attraction of private equity and provide incentive in the face of the illiquidity and administrative complexity associated with the asset class.

123

**Private Equity and Public Market Returns**
**As of December 31, 2006**

| Private Equity | 1 Yr | 3 Yr | 5 Yr | 10 Yr | 20 Yr |
|---|---|---|---|---|---|
| *U.S. Buyouts* | 24.0% | 14.1% | 10.3% | 8.5% | 12.2% |
| *European Buyouts* | 29.6 | 15.3 | 8.3 | 14.3 | 14.4 |

| Public Equity | | | | | |
|---|---|---|---|---|---|
| *NASDAQ* | 9.5% | 6.4% | 4.4% | 6.5% | 10.2% |
| *S&P 500 Index* | 13.7 | 8.5 | 4.3 | 6.7 | 9.2 |

Note:     Past performance is not indicative of future results. Buyouts represent returns from
          private equity funds that tend to acquire companies with established markets and
          current revenue streams.

Source:   From Thomson Financial and Bloomberg; includes Thomson Financial U.S. Buyouts
          and Mezzanine Index, Thomson Financial European Buyouts and Mezzanine Index,
          NASDAQ and S&P 500 Index.

*Structured Debt Funds*

     Structured debt funds are investment vehicles backed by a diversified pool of fixed income assets that may include
senior secured loans, high-yield notes, investment grade bonds, mezzanine securities and other debt and credit-linked
securities. These funds take a variety of forms and often target specific assets classes, such as portfolios of primarily non-
investment grade senior credit facilities or portfolios of investment grade and high-yield bonds to create a new set of fixed
income securities. These funds finance their purchases of debt securities through issuances of multiple tranches of debt and
equity securities that are structured to achieve specific credit ratings. Structured debt vehicles seek to earn a return for
investors by borrowing funds at a lower cost than the yield the vehicles earn on their underlying investments. A collateralized
debt obligation is a type of structured debt fund that invests in leveraged portfolios of fixed income investments of various
types, including collateralized bond obligations, or CBOs, collateralized mortgage obligations, or CMOs, collateralized fund
obligations, or CFOs, among other structures. An arbitrage collateralized debt obligation, or CDO, is typically backed by a
pool of high yield corporate bonds and/or loans and is designed to take advantage of the difference between the CDO's
investment grade funding costs and the underlying assets' investment returns. Set forth below are charts that show total global
CDO issuance and total U.S. leveraged loan arbitrage CDO activity over the last eight years.



**Global CDO Issuance**                    **U.S. Leveraged Loan Arbitrage CDO Activity**

Source: Thomson Financial                  Source: Standard & Poor's

124

*Hedge Funds*

The term hedge fund generally refers to an investment vehicle that seeks to generate positive risk-adjusted returns under various market conditions. Unlike a traditional asset management fund, a hedge fund invests in diverse asset classes and employs a variety of investment strategies to exploit market opportunities. Some of these strategies include various forms of arbitrage, long/short equity, event driven, global macro and other quantitative and fundamental strategies. In light of their often superior risk-adjusted performance and for diversification purposes, hedge funds have been utilized by an increasing number of institutional asset managers, and, as a result, have experienced significant inflows in recent years. Global assets under management in the hedge fund industry, as reported by *HFR Industry Reports,* have grown from approximately $456 billion at December 31, 1999 to an estimated $1.4 trillion at December 31, 2006, a 17.7% compound annual growth rate.

Hedge funds are typically structured as limited partnerships or limited liability companies that are generally exempt from registration under the Investment Company Act. Advisers to such hedge funds are often not registered under the Investment Advisers Act and can pursue investment strategies not typically available via registered investment companies. Usually the manager of a hedge fund will receive both a base management fee and a performance fee. The base management fee is based on the net asset value of the fund, and the performance fee is computed as a percentage of the fund's profits (i.e., the net realized and unrealized gains in the portfolio). Some hedge funds set a "hurdle rate" under which the fund manager does not earn a performance fee until the fund's performance exceeds a benchmark rate. Another feature common to hedge funds is the "high water mark" under which a fund manager does not receive its performance fees until the fund's net asset value exceeds the highest historical value on which performance fees were last paid. Typical hedge fund investors are high net worth individuals and institutions that are permitted to invest and withdraw funds periodically in accordance with the terms of the funds. Hedge fund managers typically commit a portion of their own capital in the funds they manage.



Source: HFR Industry Reports                        Source: HFR Industry Reports

## Industry Trends

*Growing Investor Demand and Increased Institutional Investor Allocations*

Growth in assets under management is driven by appreciation in the value of managed assets and net inflows of capital from investors. The industry has experienced significant growth in worldwide assets under management over the past ten years, primarily fueled by net capital inflows from an aging population. Within the U.S., approximately half of assets under management are retirement-related assets. Total pension assets in the United States grew from $6.8 trillion at the end of 1996 to $14.0 trillion at the end of 2006. Shifting demographics and the drive towards "privatization" of retirement planning present an opportunity for the asset management industry. These investors are expected to seek products with absolute return and greater risk management characteristics, and demand more investment advice.

125

Alternative asset management vehicles have been the fastest growing segment of the industry as investors have sought to achieve greater portfolio diversification and improve the risk adjusted return profile of their portfolios. However, despite these alternative products becoming a more significant source of industry growth, these strategies still account for a relatively small portion of total institutional assets. For example, the average allocation to alternative investments by U.S. corporate and public defined benefit pension plans was 4.4% and 4.3%, respectively, in 2006.

### Product Innovation

The alternative asset management industry is highly competitive, and asset managers compete for both investors and investment opportunities. Leading alternative asset managers have developed new investment strategies and structures which have enabled them to attract additional capital from existing investors as well as new capital from investors who have not invested with them previously. Some of these newer fund offerings include investing in distressed securities, the development of mezzanine and infrastructure funds and expansion into new geographic regions. Opportunities also exist to develop new investment vehicles and structures, including co-investment vehicles, and to raise new types of funds, such as proprietary hedge funds and structured product funds, allowing asset managers to deploy more managed capital and capture a greater share of the economics generated by the new investments. Further, the managers of some private equity funds are seeking to expand their investor base by creating publicly-traded permanent capital vehicles which co-invest in their funds, giving public investors exposure to these asset classes. These publicly-traded vehicles provide asset managers with permanent capital that may be organically grown through continuous reinvestment in a broad range of asset classes, and, as a result, offer stability and a valuable potential source of long-term income.

### Convergence of Private Equity and Hedge Funds

In recent years, hedge funds have increasingly become activist investors in public companies, functioning as transaction catalysts with the goal of maximizing shareholder value. This trend, together with private equity funds' continued focus on finding undervalued public companies to pursue leveraged buyout opportunities have brought the two types of alternative asset managers into closer proximity and frequent overlap. An increasing number of hedge funds have taken controlling positions in companies while private equity funds have from time to time made minority investments in public companies.

Large alternative asset managers are increasingly expanding their operations to include both private equity and hedge fund businesses. Combining the businesses within one entity can lead to significant operational efficiencies as hedge funds and private equity funds often compete for capital and talent. The intellectual capital and complementary skill set of hedge funds and private equity managers also can be leveraged within one combined organization to identify and realize new investment opportunities.

### Growth and Returns of Larger Funds

Institutional investors are attracted to larger funds with well-established track records, systems and operations, and advanced risk management capabilities. Managers of larger funds typically control multiple funds with various strategies. As a result, the number of larger funds in the private equity fund sector has increased in recent years. According to *Thomson Financial* , the percentage of new private equity buyout funds with more than $1 billion in capital raised increased from 4% of all new private equity buyout funds formed in 1996 to 25% by the end of 2006.

Further, "mega" private equity funds (typically private equity funds with over $5 billion in assets under management) have benefited from the increased fund size as the average annual returns for such mega funds are increasingly outperforming the returns of their smaller counterparts. Based on the data compiled by *Thomson Financial* , during the three year span of 2004-2006, the average annual returns of the mega funds were approximately 30%, as opposed to the average returns of large ($2 billion to $5 billion in assets under management) and mid-sized funds ($500 million to $2 billion in assets under management) of 21%.

126

*Increasing Size of Private Equity M&A Transactions*

Over the past several years, a number of factors, including larger fund sizes, greater liquidity in the senior and high-yield debt markets, and joint buying power of consortiums, have collectively increased the volume of large, sponsor-driven M&A transactions. Globally, financial sponsors were involved in 115 buyout transactions valued at over $1 billion in 2006, with a significant portion of these transactions resulting in the target going private. Furthermore, six out of the top seven leveraged buyouts to date were announced over the past 12 months with an average transaction value of over $30 billion.

**$1 Billion+ Global Private Equity Buyout Deals**          **Private Equity Buyout Average Deal Size**



Source: Thomson Financial                                Source: Thomson Financial

*Ability to Deliver Non-Correlated and Higher Risk-Adjusted Investment Returns*

Private equity has historically been relatively uncorrelated to the real estate, public debt and equity markets. This low correlation to other asset classes has made private equity an attractive component of a diversified investment portfolio. The combination of low correlation and strong performance of private equity relative to other asset classes has been an important catalyst in the growth of the industry. By including private equity investments in their portfolios, investors often reduce portfolio volatility, increase portfolio duration and contribute to an overall improvement in a portfolio's risk/return profile.

*Increased Sector Scrutiny*

The institutionalization of the alternative asset management industry has required alternative asset managers to develop more advanced internal controls and management information systems, as large institutional investors require greater transparency and robust risk management systems. The larger, more institutionalized alternative asset managers are better positioned to develop these processes and controls. In addition, as the number of investors who invest their funds with alternative asset managers continues to expand, there has been increased regulatory attention to the sector. Particularly, recently introduced tax legislation would, if enacted, preclude alternative asset managers from qualifying for treatment as a partnership for U.S. federal income tax purposes under the publicly traded partnership rules and tax carried interest using income tax rates rather than capital gains tax rates.

127

# BUSINESS

## Overview

Founded in 1976, we are a leading global alternative asset manager. Our 399 employees, including our 139 investment professionals, are led by our founders, Henry Kravis and George Roberts, who are pioneers of the leveraged buyout industry. Our history of landmark achievements in private equity includes the first leveraged buyout in excess of $1 billion, several of the largest leveraged buyouts announced worldwide to date, the first buyout of a public company by tender offer and the largest leveraged buyouts completed or announced in each of the United States, the Netherlands, Denmark, India, Australia, Singapore and France. We have continued our history of innovation by establishing new debt and public equity strategies that leverage the power of our brand and the intellectual capital in our private equity business.

Today, through our offices in New York, Menlo Park, San Francisco, London, Paris, Hong Kong and Tokyo, we sponsor and manage funds that make investments worldwide in private equity and debt transactions on behalf of third-party investors and our firm. We also manage substantial investments in public equity. During our 31-year history, we have raised 16 funds and received approximately $59.7 billion of capital and capital commitments from investors. We have grown our assets under management significantly, from approximately $18.3 billion as of December 31, 2002 to approximately $53.4 billion as of March 31, 2007, representing a compounded annual growth rate of 28.7%. Of our total assets under management, approximately $6.8 billion is permanent capital, which is not required to be returned to investors and is able to be re-deployed as investments are realized.

As a global alternative asset manager, we earn ongoing management fees for providing management and other services to our funds as well as transaction, monitoring, incentive and other potential fees in connection with our private equity and other investments. We also earn investment income from investing our own capital alongside fund investors and from our carried interest in fund investments, which provides us with a disproportionate share of the investment gains generated on third-party capital invested by our private equity funds. We are also selectively pursuing opportunities to develop new investment structures and products that we believe will help us increase the amount of managed capital that we are able to commit to individual transactions, grow our assets under management and capture additional income streams.

We seek to consistently generate attractive investment returns by employing highly qualified professionals, making among the largest private equity investments worldwide and adhering to a disciplined investment approach. Our investment teams are supported by a substantial and diversified capital base, a centrally managed and integrated global investment platform and a worldwide network of business relationships that provide us with a significant source of investment opportunities, specialized knowledge during due diligence and substantial resources for creating and realizing value for investors. We also believe that these aspects of our business will help us continue to grow our assets under management and deliver strong investment performance in a variety of economic and financial conditions.

In connection with this offering, we will complete a series of transactions pursuant to which our business will be reorganized into a holding company structure. Following our reorganization and this offering, we will have a right to the management, transaction, monitoring and other fees from our existing and future private equity funds and their portfolio companies. In addition, we will have the right to carried interest earned by the general partners of our existing and future private equity funds (other than the 1996 Fund and earlier funds) as well as any returns generated on capital contributions made by the general partners of these funds after the completion of this offering. We will also have a right to the management, incentive and other potential fees for managing our existing and future credit strategy funds as well as incentive fees from these funds. Although our principals have invested their own personal capital in our credit strategy funds, we have not made any direct capital contributions to those funds as a general partner or a fund manager.

128

<div style="text-align:center"><strong>Our Strengths</strong></div>

We believe that we possess a number of strengths that differentiate us from other alternative asset managers and provide us with competitive advantages for raising capital, securing investment opportunities, obtaining financing for transactions, consummating investments, creating value in our portfolio companies and generating attractive investment returns. These strengths include the following:

### One Firm with a Global Reach and Best-in-Class Processes

We are truly a global firm. With offices in seven major financial centers located on three continents, we have created an integrated global platform for sourcing and making investments in multiple asset classes. Our global and diversified operations are supported by our sizeable capital base and our extensive company, industry, asset-specific and local market knowledge, which allow us to deploy capital across a number of geographical markets in a broad range of companies, industry sectors and asset classes. As of March 31, 2007, 34% of our investment professionals were based outside the United States and 63% of the unrealized value of our private equity portfolio consisted of investments in companies outside the United States. Although our operations span multiple continents and business lines, we are still managed as one firm with a common culture and are highly focused on sharing knowledge, experience, resources and best practices throughout our offices and across our various investment classes. Our investment processes are overseen by three committees that operate globally, which consist of our equity investment committee, which reviews all investments made by our private equity funds, our debt investment committee, which reviews all investments made by our credit strategy funds, and our portfolio management committee, which monitors the performance of our private equity investments. Our founders, Henry Kravis and George Roberts, are active members of each of these committees. We believe that operating as a centrally managed firm that is both global and diversified enhances the growth and stability of our business and helps us make informed decisions across asset classes and geographies.

### Distinguished Track Record Across Economic Cycles

During our 31-year history, we have successfully invested under all types of economic and financial conditions, developing a track record that we believe distinguishes our firm. From our inception through March 31, 2007, our ten private equity funds that had invested for at least 30 months had achieved a cumulative gross IRR of 26.3%. During 2007, we were named "Best Private Equity Firm" by *Global Finance* and "European Large Buyout Firm of the Year" by *Financial New* s and the KKR Strategic Capital Funds were named "Hedge Fund Launch of the Year" by *Alternative Investment News.* Our other accomplishments include completing or announcing more than 60 leveraged buyouts valued in excess of $1 billion, including the first leveraged buyout in excess of $1 billion and sponsoring or co-sponsoring many of the largest leveraged buyouts completed anywhere to date.

### Alignment of Interests

One of our fundamental philosophies has been to align our interests and the interests of our people with those of our fund investors. Since our inception, our investment professionals, senior advisors and other executives have invested or committed to invest approximately $1.5 billion of their personal capital in or alongside our funds. In structuring this offering, we have sought to achieve the same alignment of interests between our unitholders and our people through their significant and long-term ownership of our equity. Our principals will not receive any of the proceeds from this offering. Our principals will collectively own more than          % of the equity in our business immediately following this offering and they will benefit from the financial success of our business in the form of distributions and payments received from KKR Holdings, the entity through which they will hold their equity, and the potential appreciation in the value of the equity that KKR Holdings owns. Our other employees are expected to receive equity grants at the time of this offering, which we believe will similarly align their interests. To promote long-term alignment of interests, the equity directly or indirectly held by our principals and

<div style="text-align:center">129</div>

employees will be subject to significant forfeiture and transfer restrictions that require such persons to remain actively employed by us in order to realize the full value of their equity interests.

### Experienced Investment Professionals and Continuity of Senior Leadership

We have built our firm with the intellectual capital of our people, and we are guided daily by the diversity, depth and breadth of their collective knowledge and experience. We currently employ 139 investment professionals who are led by our founders, Henry Kravis and George Roberts and supported by 19 senior advisors and 25 Capstone consultants. Our investment professionals have demonstrated an ability to address the challenges of cyclical markets by effectively adapting our investment strategies, financial structures and operational resources to existing market conditions. Our investment professionals come from a variety of financial and operational backgrounds, which when combined with the extensive expertise of our senior principals provide us with a significant competitive advantage. We have also benefited from a high degree of continuity in our senior leadership.

### Distinct Ability to Source Proprietary Investments

We believe that we are able to source new investment opportunities as a result of our internal deal generation strategies and our global network of business relationships with leading executives from major companies, commercial and investment banks, financial intermediaries, other investment and advisory institutions and former political leaders. Our investment professionals are organized into global industry teams and have developed a thorough understanding of their industries by meeting with management teams, attending product seminars and industry conferences and conducting their own primary research. Our industry teams work across our offices to develop a list of industry themes and trends, to identify companies that will benefit from those trends and to determine which of those companies would make an attractive investment. When team members identify an investment opportunity, they leverage our network of global relationships with the goal of winning exclusive or limited access to the investment. We believe that our industry focus, when combined with our global network and the industry-specific knowledge that we have developed over time, provides us with an important source of proprietary investments.

### Strong Relationships With Financial Leaders

We actively cultivate our relationships with major investment banking firms and other financial intermediaries and are among those firms' most significant clients. Our investment professionals meet regularly with major investment banking firms concerning potential investment opportunities, and we often work with the same group of financial institutions when seeking financing arrangements for our transactions. We believe our repeated and consistent dealings with the major financial services firms over a long period of time, and our completion of a significant number of larger transactions, have led to our being one of the first parties considered for potential investments. We also believe that our relationships with financial institutions and the credibility that we have established through our past successes help us obtain financing for our transactions at attractive prices and with favorable terms.

### Focus on Value Creation

We have developed an institutionalized process for creating value in our investments. As part of our effort, we utilize the services of Capstone Consulting, a team of operational consultants that works exclusively with our investment professionals and portfolio company management teams. In addition, we have hired senior advisors to assist us, including the former chairmen or chief executive officers of Proctor & Gamble, Wells Fargo, HSBC, Eastman Kodak and Accenture. Our investment professionals, senior advisors and consultants work with our portfolio companies to address issues relating to top-line growth, cost optimization and efficient capital allocation and assist management in designing and implementing strategic and operational changes that drive value creation. In most cases, the work initially involves developing operating and financial metrics for tracking progress and identifying problems during the early stages of an investment. Ultimately, the focus shifts to capitalizing on business opportunities to

130

drive value creation over the long term. The objective of these measures is to drive growth in revenue, cash flows and operating margins, which allows us to reduce the leverage in our portfolio companies, and create value for our investors.

### Long-Standing Investor Relationships

Over our 31-year history, we have established strong relationships with investors that have allowed us to raise significant amounts of capital for investment in a broad range of asset classes. Our fund investors consist of a diversified group of some of the largest public and private pension plans, global financial institutions, university endowments, funds of funds and high net worth individuals, many of whom have invested with us for decades across multiple funds that we have sponsored. For example, our 10 largest investors have invested with us for an average of 16 years. More recently, through the listing of two of our funds, we have expanded our investor base to include public market investors, such as mutual funds and hedge funds, providing us with an additional source of capital. We believe that the strength, breadth, duration and diversity of our investor relationships provide us with a significant advantage for raising capital from existing and new sources and will help us continue to grow our assets under management.

### Long-Term Capital Base with a Significant Amount of Permanent Capital

As of March 31, 2007, we had $53.4 billion of assets under management, making us one of the largest independent alternative asset managers in the world. These assets were invested or available for investment in private equity, debt and public equity transactions. We have created two listed permanent capital funds that are able to grow organically through the continuous investment and reinvestment of capital, which we believe provides us with stability and with a valuable potential source of long-term income.

### Proven Ability to Innovate

We pioneered the development of the leveraged buyout and have worked throughout our history on creating innovative financing structures that allow us to compete aggressively for transactions while maintaining ongoing financial flexibility. Examples of recent innovative financing structures include using a complex power hedging program in connection with our acquisition of Texas Genco and structuring our acquisition of Capmark Financial Group in a manner that allowed the company to achieve an investment grade credit rating. More recently, our ability to innovate has allowed us to grow our permanent capital base and diversify our operations through the establishment of two permanent capital vehicles, KKR Private Equity Investors and KFN, that have the flexibility to invest across asset classes.

## Our Growth Strategy

We believe the "KKR" name is associated with the successful execution of many of the largest and most complex private equity transactions worldwide; a focus on operational value creation; a strong investor base; a global network of strong business relationships; a reputation for integrity and fair dealing; and a distinguished track record of generating attractive investment returns. We intend to capitalize on the name recognition that we have developed and leverage the strength of our brand as we seek to grow our business.

### Deliver Attractive Returns Through Strong Investment Performance

We intend to adhere to the disciplined investment approach that we have developed over our 31-year history, focusing in particular on driving value creation from the time an investment is made. Our investment approach will continue to emphasize company, industry and economic fundamentals and the operational and strategic aspects of the companies in which we invest, and we will continue to subject our investments to the same stringent due diligence, monitoring and oversight practices that we have developed over time, drawing in each case on the company, industry, asset-specific and local market knowledge of our people. We believe that by maintaining investment discipline and taking a "hands-on"

131

approach to our investments, we will be best positioned to continue to generate attractive returns for our funds and create long-term value for our unitholders.

### Grow Globally Across Existing Asset Classes

We intend to pursue opportunities within North America to increase the amount of managed capital that we are able to deploy in private equity and debt investments, while continuing to grow our public equity business. Outside of North America, we intend to focus on increasing the amount of private equity investments that we make in Europe and Asia, while building out our debt and public equity operations in those regions. Since October 2005, we have raised five new funds that received approximately $32.4 billion of capital and capital commitments from investors, including approximately $5.1 billion of permanent capital and a new $4.0 billion private equity fund that is focused on investment opportunities in Asia. These funds provide us with a flexible capital base that we may use to fund investments in a broad range of asset classes throughout the world.

### Selectively Pursue Opportunities to Expand Our Investment Structures and Products

We believe that opportunities exist to develop and sponsor new investment vehicles and structures, including co-investment vehicles, and to raise new types of funds, such as long-oriented public equity funds, structured product funds and industry- or geography-specific funds, that allow us to deploy a greater amount of managed capital in our investments and thereby capture a greater share of the economics generated by these investments. To support these initiatives, we are currently developing a capital markets business in the United States, Europe and Asia, which we believe will provide us with new alternatives and capabilities for distributing our investment products to investors worldwide and to further broaden our investor base. We may also consider selectively partnering or entering into joint venture arrangements with one or more financial intermediaries in order to provide us with access to additional classes of investors.

### Maintain Our Long-Term Focus

We have consistently approached the management of our business and our investments with the goal of creating and realizing value over the long-term. We intend to maintain this long-term focus after we become a public company even though this may lead to increased volatility in our results from period to period. We do not intend to permit the short-term perspectives of some public market investors to influence our investment, operational or strategic decisions, our duties or commitments to our fund investors or our focus on creating long-term value for our unitholders.

## Our Firm

### History and Development

We were founded in 1976 as a private equity firm specializing in leveraged buyouts. We completed our first acquisition in 1977 with capital raised from a small group of investors and, since that time, we have sponsored and managed a total of 16 investment funds and built a brand name, a global franchise, a broad investor base and a diversified investment institution. We now maintain offices in seven major financial centers located across three continents and we have diversified our operations to include actively managing investments across a broad range of major asset classes.

During the first 28 years of our operations, we focused our efforts primarily on building a leading private equity business. Our initial focus on private equity allowed us to develop and refine financial and structuring skills that we believe are prerequisites for success in any investment business. In 2000, we began placing a greater emphasis on the operational aspects of portfolio companies, which we believe is an essential component for creating value. Since then, our operational approach to building value in portfolio companies has become an integral part of our firm and a cornerstone of the way in which we evaluate and approach equity investments. While we manage our firm and our investments differently today than we did during the earlier years of our development, we have not changed our principles, our performance-based culture or our investment objective, which is to generate large multiples of invested capital and attractive IRRs for investors.

132

We have acquired significant credit experience over time by sponsoring investments in financially distressed companies, by using significant amounts of leverage to finance acquisitions and by monitoring investment portfolios of financial services companies acquired by our funds. Commencing in 2004, we began to actively pursue debt investments as a separate asset class through our formation of KFN. To support the operations of KFN, we hired additional investment professionals with significant experience evaluating and managing fixed income investments, including investments in corporate debt, bank loans, asset-backed securities, real estate assets and other credit products, and we built a platform for identifying, assessing, making, monitoring and exiting debt investments. The experience that we gained through our management and operation of KFN and the resources provided by these additional personnel created a strong foundation for growing our debt operations and enabled us to form the KKR Strategic Capital Funds in 2006 to take advantage of larger debt investment opportunities.

Although our business activities have historically focused significantly on private equity and credit investments, we have managed investments in public equity throughout our history. Initially, our public equity investments consisted of minority and structured investments in public companies that were made by our private equity funds. More recently, we formed KKR Private Equity Investors, our private equity-oriented permanent capital fund, and our credit strategy funds, which have provided us with more investment flexibility than traditional private equity funds and an additional capital base for making equity investments in public companies. Our public equity strategies generally seek to leverage, where appropriate, the intellectual capital developed in the course of our traditional private equity business, which may otherwise not be utilized if a private equity transaction is not consummated, to make public equity investments. We believe that significant opportunities exist for us to expand our public equity activities and take advantage of the increasing number of suitable public equity investments that we identify. To achieve these results, we recently hired additional investment personnel who have specialized experience in the public equity markets.

In addition to taking steps to build out our public equity business, during 2007 we began the process of establishing a capital markets business in the United States, Europe and Asia with the objective of increasing the amount of third-party capital that we are able to commit to individual transactions, thereby growing our assets under management and capturing additional income streams. We have hired experienced professionals with long-standing investor relationships to help us build this business. We expect that our capital markets activities initially will focus on syndicating to a broader base of investors a portion of the equity that we commit in our larger private equity transactions, which we believe will help us reduce the need to partner with large consortiums of private equity firms on large leveraged buyouts, retain greater operational control over our portfolio companies and capture a greater portion of the economics that are generated by our private equity investments. Over time, we may expand our capital markets activities in a manner that similarly complements our other business activities. We have not yet commenced our capital markets activities, but expect to do so shortly after we receive all appropriate regulatory approvals and licenses.

### Global Operations

With offices in New York, Menlo Park, San Francisco, London, Paris, Hong Kong and Tokyo, we have established our firm as a leading global alternative asset manager. Our expansion outside of the United States began in 1995, when we made our first investment in Canada. Since that time, we have taken a long-term strategic approach to investing globally and have established a presence in Europe and Asia with multilingual and multicultural investment teams that have local market knowledge and significant business, investment and operational experience in the countries in which we invest. We believe that our global capabilities have assisted us in raising capital and capturing a greater number of investment opportunities, while enabling us to diversify our operations. From January 1, 1996 through March 31, 2007, our 1996 Fund and subsequent funds collectively invested more than $11.3 billion of capital outside of North America.

133

The following table presents information concerning the composition of our investment portfolio by country as of March 31, 2007.

| Country | Private Equity Portfolio | |
| | Number of Investments | Fair Value |
| --- | --- | --- |
| | | *($ in millions)* |
| United States | 18 | $ 6,176.0 |
| France | 3 | 4,247.6 |
| Netherlands | 5 | 3,420.9 |
| Germany | 6 | 2,676.6 |
| Australia | 2 | 787.9 |
| Singapore | 1 | 672.7 |
| Denmark | 1 | 512.2 |
| Canada | 1 | 428.5 |
| India | 1 | 269.7 |
| Italy | 1 | 243.5 |
| Bermuda | 1 | 126.8 |
| Total | 40 | $ 19,562.4 |

While our operations span multiple continents and asset classes, our investment professionals are supported by a centralized and integrated infrastructure and operate under a common set of principles and business practices that are monitored by our global committees. We believe that we have created a single culture that rewards investment discipline, creativity, determination and patience and the sharing of information, resources, expertise and best practices across our offices. When appropriate, we staff transactions across multiple offices in order to take advantage of the industry-specific expertise of our investment professionals, and we hold regular meetings in which investment professionals throughout our offices share their knowledge and experiences. We believe that the ability to draw on the local cultural fluency of our investment professionals while maintaining a centralized and integrated global infrastructure distinguishes us from other alternative asset managers and has been a substantial contributing factor to our ability to raise funds and invest internationally.

### *Our Team*

#### *Equity Investment Professionals*

We currently employ approximately 119 investment professionals who focus primarily on equity investments. These individuals come from diverse backgrounds in private equity, operations, strategic consulting and finance and include some of the most experienced equity investors in the world. Over the past six years, we have focused our senior-level equity recruiting efforts on executives with significant operating experience, including former chief executive officers and chief financial officers of companies operating in a wide range of industry sectors. As a group, our equity investment professionals provide us with a powerful global team for identifying businesses with durable competitive advantages; developing capital structures for portfolio companies that support their business strategies; working with management teams to create value for unitholders; providing portfolio companies with access to a global network of resources that strengthen their operations; and generating superior investment returns.

#### *Debt Investment Professionals*

We currently employ more than 20 investment professionals who focus primarily on corporate debt investments. These individuals have backgrounds in debt investments, risk management, asset liability management, capital markets, finance and portfolio management and provide us with significant experience for managing our credit strategy funds. Our six most experienced debt investment professionals

134

have on average 17 years of credit experience, including experience investing in and trading leveraged bank loans, second lien loans, high yield bonds, subordinated bonds, mezzanine bonds, preferred stock, credit and interest rate derivative instruments, structured products, real-estate investments and other debt and equity investments. Together, they provide us with significant expertise for evaluating and managing credit risks and creating diversified investment portfolios of corporate debt investments that have the ability to generate attractive leverage-adjusted returns.

*Senior Advisors*

To complement the expertise of our investment professionals, we have retained a team of senior advisors to provide us with additional operational and strategic insights. The responsibilities of our senior advisors include serving on the boards of our portfolio companies, helping us evaluate individual investment opportunities and assisting our portfolio companies with operational matters. Our team of senior advisors currently includes Edwin L. Artzt (the former Chairman and Chief Executive Officer of Proctor & Gamble), Sir John Bond (the former Group Chairman of HSBC Holdings plc), Richard L. Clemmer (the former Chief Executive Officer of Agere Systems), George M.C. Fisher (the former Chairman, Chief Executive Officer and President of Eastman Kodak Company), Hirashi Hosokawa (the former Japanese Vice Minister for International and Economic Affairs), and Dr. Edward Tian Suning (the Chairman of China Broadband Capital L.P. and the Vice Chairman and former Chief Executive Officer of China Netcom Group) as well as other individuals who have held leading positions in major corporations and public agencies worldwide. Five of our senior advisors also participate on our portfolio management committee, which monitors the performance of our private equity investments.

*Operating Consultants*

We have developed an institutionalized process for creating value in our investments. As part of our effort, we utilize the services of Capstone Consulting, a team of operational consultants that works exclusively with our investment professionals and portfolio company management teams. Capstone, which has approximately 25 consultants located in New York, Menlo Park and London, provides us with additional expertise for assessing investment opportunities and assisting managers of our portfolio companies in defining strategic priorities and implementing operational changes. During the initial phases of an investment, Capstone's team seeks to implement our thesis for value creation. Its consultants may assist our portfolio companies in addressing top-line growth, cost optimization and efficient capital allocation and in developing operating and financial metrics. Over time, Capstone's work shifts to identifying challenges and taking advantage of business opportunities that arise during the life of an investment. While we do not require our portfolio companies to engage Capstone, in our experience most portfolio company managers embrace its involvement as a result of the operational expertise and bottom-line focus of its consultants. In addition, to assist us with investments in the insurance industry, we have established an exclusive relationship with Fisher Capital, an insurance advisory firm that was founded by Jim Fisher after the successful sale of our investment in American Re-insurance, where Mr. Fisher served as the Chief Financial Officer.

### Global Committees

Our investment processes are overseen by three committees that operate globally. These committees consist of separate investment committees for our private equity and credit strategy funds and a portfolio management committee for our private equity funds. Our equity investment committee and our debt investment committee are responsible for reviewing and approving all investments made by our funds; monitoring due diligence practices; and providing advice in connection with the structuring, negotiation, execution and pricing of investments. Our portfolio management committee is responsible for working with our investment professionals from the date on which an investment is made by a private equity fund until the time the investment is exited in order to ensure that strategic and operational objectives are

135

accomplished and that the performance of the investment is closely monitored. Our founders, Henry Kravis and George Roberts, are active members of our three committees. Other members consist of our senior principals. Our portfolio management committee is also advised by certain of our senior advisors and consultants from Capstone.

## Private Equity

Our private equity business involves sponsoring and managing a group of investment funds that make primarily control-oriented investments in connection with leveraged buyouts and build-ups and other similar investment opportunities. These funds, which we refer to as private equity funds, are managed by Kohlberg Kravis Roberts & Co. L.P. and currently consist of a number of private equity funds that have a finite life and investment period, which we refer to as traditional private equity funds, and a private equity-oriented permanent capital fund that has a perpetual existence and investment period. We also sponsor and manage credit strategy funds that sometimes make private equity investments alongside our private equity funds, although we include those funds in our credit segment for management reporting purposes. As of March 31, 2007, our private equity funds had $44.1 billion of assets under management, including $5.2 billion of permanent capital, making us one of the largest private equity fund sponsors in the world.

### Private Equity Experience

We are a world leader in private equity, having sponsored and managed 14 private equity funds that have received more than $56.9 billion of capital and capital commitments during our 31-year history. Our private equity funds focus on investing in large capitalization companies. We believe this focus allows us to invest in industry-leading franchises with global operations, attract world class management teams, deploy large amounts of capital in individual transactions and optimize amounts of income that we earn on a per transaction basis. Our approach leverages our capital base, infrastructure, skill set, global network and industry and operating expertise, which we believe sets us apart from others. From our inception through March 31, 2007, our private equity funds invested $30.5 billion of capital in more than 150 separate private equity transactions with a total transaction value of more than $280 billion. As of March 31, 2007, these investments had generated $74.4 billion of realized and unrealized value, of which $56 billion had been distributed in the form of cash.

As of March 31, 2007, our private equity funds had investments in 40 companies with more than $100 billion of annual revenues and more than 560,000 employees worldwide. Those portfolio companies were based in more than 10 countries and operated in 11 industries, which has provided us with broad and deep industry and operating experience. These investments do not include commitments we have entered into to acquire an additional 10 portfolio companies in transactions having an aggregate value of $140 billion. We expect that these acquisitions will close during the second half of 2007 and we anticipate that our total equity investment in the transactions will be approximately $11.6 billion. Whether and when these transactions will be consummated depends on a number of factors, some or all of which may be outside of our control.

136

The following charts present information concerning the amount of capital invested by our 1996 Fund and our subsequent funds by geography and industry through March 31, 2007.



The following table presents information concerning the investments that our private equity funds have made or committed to make since January 1, 2004, some of which have been significantly or fully realized.

| Company | Year | Industry | Country | Equity Investment(1) | Transaction Value |
|---|---|---|---|---|---|
| | | | | *($ in millions)* | |
| **Investments** | | | | | |
| Jazz Pharmaceuticals, Inc | 2004 | Health Care | United States | $ 130.0 | $ 250 |
| Sealy Corporation | 2004 | Consumer Products | United States | 327.6 | 1,566 |
| Maxeda* | 2004 | Retail | Netherlands | 531.1 | 3,061 |
| Dynamit Nobel AG | 2004 | Chemicals | Germany | 265.6 | 2,967 |
| PanAmSat Holdings Corporation* | 2004 | Media | United States | 134.5 | 4,343 |
| Auto-Teile-Unger Holding AG | 2004 | Retail | Germany | 534.8 | 1,843 |
| Visant Corp. | 2004 | Media | United States | 156.3 | 2,322 |
| Texas Genco Holdings, Inc.* | 2004 | Energy | United States | 120.5 | 3,813 |
| Duales System Deutschland GmbH* | 2005 | Recycling | Germany | 46.9 | 393 |
| Masonite International Corporation | 2005 | Industrial | Canada | 428.6 | 2,576 |
| Toys "R" Us, Inc | 2005 | Retail | United States | 418.3 | 7,575 |
| Sungard Data Systems, Inc | 2005 | Technology | United States | 482.5 | 11,969 |
| SBS Broadcasting S.a r.l | 2005 | Media | Pan European | 412.3 | 2,664 |
| Accellent Inc | 2005 | Health Care | United States | 448.3 | 1,342 |
| Avago Technologies, Ltd. | 2005 | Technology | Singapore | 426.5 | 2,787 |
| Fl Selenia S.p.A | 2005 | Chemicals | Italy | 243.5 | 1,033 |
| TDC A/S | 2005 | Telecom | Denmark | 512.2 | 14,953 |
| Capmark Financial Group Inc | 2006 | Financial Services | United States | 673.0 | 16,770 |
| AVR Bedrijven N.V | 2006 | Recycling | Netherlands | 139.1 | 1,579 |
| The Nielsen Company B.V. | 2006 | Media | Netherlands | 698.5 | 12,031 |
| BIS/Cleanaway | 2006 | Recycling | Australia | 260.0 | 1,372 |
| Aricent, Inc (f/k/a SDS) | 2006 | Technology | United States | 269.7 | 936 |
| NXP B.V. | 2006 | Technology | Netherlands | 1,254.0 | 10,973 |
| PagesJaunes Groupe S.A. | 2006 | Media | France | 787.0 | 4,044 |
| HCA Inc | 2006 | Health Care | United States | 1,166.0 | 33,030 |
| Kion Group GmbH | 2006 | Industrial | Germany | 613.0 | 5,479 |
| Seven Media Group | 2006 | Media | Australia | 528.0 | 3,218 |

| ProSeibenSat.1 Media | 2007 | Media | Germany | 849.0 | 4,235 |

137

| Tarkett S.A. | 2007 | Industrial | France | 640.0 | 1,949 |
| Yageo Corporation | 2007 | Technology | Taiwan | 125.0 | 307 |
| Dollar General Corporation | 2007 | Retail | United States | 1,150.0 | 7,600 |
| U.S. Foodservice | 2007 | Retail | United States | 1,125.0 | 7,300 |
| Tianrui Group Cement Co., Ltd. | 2007 | Industrial | China | 125.0 | 300 |
| MMI Holdings Limited | 2007 | Industrial | Singapore | 175.0 | 757 |
| Alliance Boots plc | 2007 | Retail | United Kingdom | 2,100.0 | 24,900 |
| Laureate Education, Inc. | 2007 | Media | United States | 400.0 | 4,100 |
| Biomet, Inc. | 2007 | Health Care | United States | 1,300.0 | 11,600 |

**Pending Investments(2)**

| Harman International Industries, Inc. | 2007 | Technology | United States | 1,000.0 | 8,000 |
| First Data Corporation | 2007 | Financial Services | United States | 2,100.0 | 29,000 |
| TXU Corp. | 2007 | Energy | United States | 2,100.0 | 46,500 |

(*)     Indicates that the investment has been significantly or fully realized.

(1)     Equity invested consists of the amount of equity invested or committed to be invested by our private equity funds. See "Certain Relationships and Related Party Transactions—Side-by-Side and Other Investments."

(2)     We expect that the pending investments will be consummated in the second half of 2007. We have received contractual commitments from financial institutions to provide the requisite debt financing for these transactions. However, whether and when those transactions will be consummated depends on a number of other factors, such as shareholder or regulatory approvals, some or all of which may be outside of our control.

We believe that our broad and deep experience and long-term track record of investing large amounts of capital in a wide range of industry sectors and geographical regions and economic and financial conditions are among the many factors that distinguish our private equity business. We have also achieved a number of other milestones that we believe differentiate us. These accomplishments include:

•     completing or announcing more than 60 private equity transactions valued in excess of $1 billion, including the first leveraged buyout in excess of $1 billion ever completed;

•     sponsoring the first private equity transaction using a tender offer structure;

•     sponsoring or co-sponsoring many of the largest private equity transactions completed worldwide and the largest private equity transaction announced anywhere to date; and

•     sponsoring or co-sponsoring the three largest private equity transactions completed in Canada, the two largest leveraged buyouts completed in France and the largest leveraged buyouts completed in each of Denmark, the Netherlands, Australia, India and Singapore.

We take a long-term approach to private equity investments and measure the success of our investments over a period of years rather than months. Given the duration of our private equity investments, we focus on generating large multiples of invested capital and attractive IRRs when deploying capital in private equity transactions.

138

The following charts present information concerning the amount of capital invested and the amounts of realized and unrealized returns generated by our traditional private equity funds from our inception through March 31, 2007.



Additionally, because our emphasis on generating large multiples of invested capital and attractive IRRs has produced significant cash flows for our fund investors, we believe that our private equity approach has also been an important contributor to the extended relationships that we have developed with our investor base. The following table presents information concerning the total distributions to investors made by our traditional private equity funds during the periods indicated.

| Year | Year Ended December 31, | | | | | Three Months Ended March 31, 2007 | Total |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | | |
| | *($ in millions)* | | | | | | |
| Distributions to Investors | $ 897 | $ 3,016 | $ 7,035 | $ 3,569 | $ 5,251 | $ 780 | $ 20,548 |

From our inception through March 31, 2007, our first ten traditional private equity funds (representing all of our private equity funds that have invested for at least 30 months) achieved a multiple of invested capital of 2.7x and a cumulative gross IRR of 26.3%, compared to the 13.6% gross IRR achieved by the S&P 500 Index over the same period. The S&P 500 Index is an unmanaged index and its returns assume reinvestment of dividends and do not reflect any fees or expenses. The table below presents information as of March 31, 2007 relating to the historical performance of each of our traditional private equity funds since our inception, which we believe illustrates the benefits of our approach to making private equity investments. This data has been adjusted to give effect to subsequent commitments to the 2006 Fund and the Asian Fund, but does not otherwise reflect acquisitions or disposals of investments, changes in investment values or distributions occurring after March 31, 2007.

We encourage you to review the cautionary note below for a description of reasons why the future results of our private equity funds may differ from the historical results of our private equity funds. You should also see "Private Equity Valuations and Related Data" for a description of how the values below were calculated.

139

| Private Equity Fund(1)(2) | Amount | | Fair Value of Investments | | | Assets Under Management | Gross IRR | Net IRR | Multiple of Invested Capital |
| | Committed | Invested | Realized | Unrealized | Total | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | *($ amounts in millions)* | | | | |
| ***Historical Excluded Funds(3):*** | | | | | | | | | |
| 1976 Fund | $ 31 | $ 31 | $ 537 | $ — | $ 537 | $ — | 39.5% | 35.4% | 17.1x |
| 1980 Fund | 357 | 357 | 1,828 | — | 1,828 | — | 29.0 | 25.8 | 5.1 |
| 1982 Fund | 328 | 328 | 1,290 | — | 1,290 | — | 48.1 | 39.2 | 3.9 |
| 1984 Fund | 1,000 | 1,000 | 5,963 | — | 5,963 | — | 34.6 | 28.9 | 6.0 |
| 1986 Fund | 672 | 672 | 9,081 | — | 9,081 | — | 34.4 | 28.9 | 13.5 |
| 1987 Fund | 6,130 | 6,130 | 14,746 | 252 | 14,997 | 252 | 12.2 | 9.0 | 2.5 |
| 1993 Fund | 1,946 | 1,946 | 4,124 | 33 | 4,157 | 33 | 23.6 | 16.8 | 2.1 |
| 1996 Fund | 6,012 | 6,012 | 10,183 | 2,039 | 12,222 | 2,039 | 18.5 | 13.8 | 2.0 |
| ***Included Funds:*** | | | | | | | | | |
| European Fund (1999) (4) | 3,085 | 3,085 | 3,942 | 3,694 | 7,636 | 3,694 | 30.9 | 23.3 | 2.5 |
| Millennium Fund (2002) | 6,000 | 5,881 | 4,264 | 6,991 | 11,255 | 7,110 | 53.6 | 40.6 | 1.9 |
| European Fund II (2005)(5) | 5,650 | 3,857 | — | 4,218 | 4,218 | 6,011 | * | * | * |
| 2006 Fund | 16,625 | 1,236 | — | 1,236 | 1,236 | 16,625 | * | * | * |
| Asian Fund (2007) | 4,000 | — | — | — | — | 4,000 | * | * | * |
| Total Funds(6) | $ 51,836 | $ 30,535 | $ 55,958 | $ 18,463 | $ 74,421 | $ 39,764 | 26.3% | 20.2% | 2.7x |
| Total Funds in Accounting Predecessor(3) | $ 41,372 | $ 20,038 | $ 18,389 | $ 18,145 | $ 36,534 | * | 23.9% | 18.3% | 1.8x |
| Total Included Funds | $ 35,360 | $ 14,059 | $ 8,206 | $ 16,139 | $ 24,345 | * | 36.5% | 27.5% | 1.7x |

(1)     We will not acquire interests in the 1996 Fund and prior funds in connection with the Reorganization Transactions and this offering, because the general partners of those funds are not expected to receive meaningful proceeds from further realizations. The predecessor combined financial statements included in this prospectus consolidate the 1996 Fund and subsequent traditional private equity funds. In addition, we will not be allocated any of the capital contributions made by the general partners of our funds prior to the completion of the Reorganization Transactions and this offering or any returns generated on those contributions. See "Organizational Structure" and "Unaudited Pro Forma Financial Information."

(2)     None of our private equity funds are registered as investment companies under the Investment Company Act. The management company for each of our private equity funds is Kohlberg Kravis & Roberts & Co. L.P., the entity through which the management company generally receives management fees from our traditional private equity funds. These management fees are calculated based on the amount of capital committed to a fund during the investment period and thereafter on the cost basis of the fund's remaining investments. We also generally receive periodic monitoring fees in exchange for providing our portfolio companies with management, consulting and other services, and we typically receive transaction fees from portfolio companies for providing them with financial advisory and other services in connection with specific transactions. Each fund's general partner is generally entitled to a carried interest that allocates to it 20% of the net profits realized from the fund's investments. See "—Traditional Private Equity Funds."

(3)     The last investment for each of the 1976 Fund, 1980 Fund, the 1982 Fund, the 1984 Fund and the 1986 Fund was liquidated on May 14, 2003, July 11, 2003, August 15, 1988, July 17, 1998 and December 29, 2004, respectively. The 1987 Fund and the 1993 Fund currently each have one investment, and it is not known when those funds will be liquidated.

(4)     The European Fund's capital commitments include euro-denominated commitments of €196.5 million. We have converted these amounts into U.S. dollars based on the exchange rate prevailing on the dates on which capital was

called.

140

(5)    The European Fund II's capital commitments include euro-denominated commitments of €2,597,160,000. We have converted these amounts into U.S. dollars based on the exchange rate prevailing on (i) the dates on which capital was called in the case of funded commitments and (ii) March 31, 2007 in the case of unfunded commitments.

(6)    The gross IRRs, net IRRs, and multiple of invested capital are calculated based on our first ten traditional private equity funds, which represent all of our private equity funds that have invested for at least 30 months.

### *Private Equity Investment Approach*

Our approach to making private equity investments focuses on achieving large multiples of invested capital and attractive IRRs by selecting high-quality investments that may be made at attractive prices, applying rigorous standards of due diligence when making investment decisions, implementing strategic and operational changes that drive value creation in the businesses we acquire, carefully monitoring investments and making informed decisions when developing investment exit strategies. We believe that we have achieved a leading position in the private equity industry by applying a disciplined investment approach and by building strong partnerships with highly motivated management teams who put their own capital at risk. When making private equity investments, we seek out large capitalization companies with strong business franchises, attractive growth prospects, defensible market positions and the ability to generate attractive returns. We do not participate in "hostile" transactions that are not supported by a target company's board of directors.

### *Sourcing and Selecting Investments*

We have access to significant opportunities for making private equity investments as a result of our sizeable capital base, our global infrastructure and our worldwide network of contacts at major companies, commercial and investment banks, financial intermediaries, other investment and advisory institutions and political leaders. Members of our global network frequently contact us with new investment opportunities, including a substantial number of exclusive investment opportunities and opportunities that are made available to only a very limited number of other firms, which has generated substantial deal flow for us. We also proactively pursue business development strategies that are designed to generate deals internally based on the depth of our industry knowledge and our reputation as a leading financial sponsor.

To enhance our ability to identify and consummate private equity investments, we have organized our private equity professionals in industry-specific teams that focus on the nine industry sectors in which we are most active: chemicals; consumer products; energy and natural resources; financial services; health care; industrial; media and communications; retail and technology. The investment professionals in each of our industry teams are responsible for developing a network of industry experts and an in-depth understanding of their industry's economic drivers, inherent risks and opportunities for value creation. Each team is led by one of our principals and staffed with three to five other investment professionals. Industry teams work together across our offices and hold frequent conference calls to share ideas and identify potential acquisition candidates. Former operating executives have recently joined our firm to augment our industry teams and lend an additional operating perspective to our investment analyses.

We believe that our industry-specific expertise provides us with important proprietary investment opportunities. We believe that our deep and broad industry expertise enables us to identify market opportunities and trends and provides us with a significant advantage when investing in more complex and regulated industries, such as banking, insurance and power generation and transmission. Utilizing our insights and industry contacts to access new markets or target strategic acquisitions also helps us when we work with managers to develop value-creating strategies and, in some instances, can lead to additional revenue opportunities for our portfolio companies.

141

*Due Diligence and the Investment Decision*

Once a private equity investment opportunity has been identified, the investment team that is responsible for the investment introduces the opportunity to our other equity professionals during one of our weekly video conference calls. These calls provide a forum in which investment teams may leverage the collective skills, experiences and resources of all of our equity professionals in connection with the investment decision process. When an investment team determines that an investment proposal is worth serious consideration, the proposal is formally presented to our equity investment committee and the due diligence process commences.

The objective of the due diligence process is to identify attractive investment opportunities based on the facts and circumstances surrounding an investment and to prepare a framework that may be used from the date of an acquisition to drive operational achievement and value creation. When conducting due diligence, our investment teams evaluate a number of important business, financial, tax, accounting, environmental and legal issues in order to determine whether an investment is suitable. In connection with the due diligence process, our investment professionals spend significant amounts of time meeting with a company's management and operating personnel, visiting plants and facilities and speaking with customers and suppliers in order to understand the opportunities and risks associated with the proposed investment. Our investment professionals also use the services of outside accountants, consultants, lawyers, investment banks and industry experts as appropriate to assist them in this process. These due diligence practices are monitored by our equity investment committee, which must approve an investment before it may be made, and often provide important insights for creating value once an investment is completed.

*Building a Successful Business*

Once an investment is made in a portfolio company, we and our outside consultants closely monitor the company's performance with the objective of driving growth, enhancing profitability and optimizing long-term value for shareholders. We work closely with management teams to define strategic priorities and develop operating budgets and encourage our portfolio companies to invest for future competitiveness, improve operating efficiencies, make strategic acquisitions and incentivize employees by giving them ownership in the business. We establish clear monitoring guidelines to measure a portfolio company's performance and frequently meet with members of management to review the company's financial and operating results and strategic priorities. Our investment teams and the managers of our portfolio companies appear before our portfolio management committee at regular intervals to report on their progress and to discuss potential areas of concern and proposed solutions for addressing any issues that are identified.

*Realizing Investments*

We have developed substantial expertise for realizing private equity investments. From our inception through March 31, 2007, we generated approximately $56.0 billion of cash proceeds from the sale of our portfolio companies in initial public offerings, secondary offerings, recapitalizations and sales to strategic buyers. When we exit an investment, our objective is to structure the exit in a manner that optimizes returns for investors and, in the case of publicly traded companies, minimizes the impact that the exit has on the trading price of the company's securities. We believe that our ability to successfully realize investments is attributable in part to the strength and discipline of our portfolio management committee and our longstanding relationships with corporate buyers and members of the investment banking and investing communities.

<div align="center">142</div>

***Traditional Private Equity Funds***

*Overview*

Most of the private equity funds that we sponsor and manage have finite lives and investment periods. These funds are organized as limited partnerships and are controlled by a general partner. Fund investors are limited partners who agree to contribute capital to the fund from time to time for use in qualifying investments during the investment period, which generally lasts up to six years depending on how quickly we are able to deploy the capital. Each fund's general partner is entitled to a carried interest that allocates to it 20% of the net profits realized from the fund's investments. The instruments governing our traditional private equity funds include clawback provisions that require the general partner of a fund to repay any excess amounts previously received in respect of its carried interest if, upon liquidation of the fund, the general partner has received carried interest distributions in excess of the amount to which it is entitled under the governing documents of the fund. This feature operates only with respect to the investments of an individual fund and does not provide for netting of gains and losses across funds.

We enter into management agreements with our traditional private equity funds pursuant to which we generally receive management fees in exchange for providing the funds with management and other services. These management fees are calculated based on the amount of capital committed to a fund during the investment period and thereafter on the cost basis of the fund's investments, which causes the fees to be reduced over time as investments are liquidated. These management fees are paid by our fund investors, who generally contribute capital to the fund in order to allow the fund to pay the fees to us. Our funds generally allocate management fees across individual investments and, as and when an investment generates returns, 20% of the allocated management fee is deducted from the carried interest that we would otherwise receive.

We also generally enter into monitoring agreements with our portfolio companies pursuant to which we receive periodic monitoring fees in exchange for providing them with management, consulting and other services, and we typically receive transaction fees from portfolio companies for providing them with financial advisory and other services in connection with specific transactions. In some cases, we may be entitled to other potential fees that are paid by an investment target when a potential investment is not consummated. The terms of our fund documents typically require us to share a portion of any monitoring, transaction and other potential fees that are allocable to a fund with fund investors in the form of a management fee reduction after reduction for certain expenses. These management fee reductions typically amount to 80% of the amount of the monitoring, transaction and other potential fees that are reasonably allocable to a fund.

In addition, the governing agreements of our funds enable investors in those funds to reduce their capital commitments available for further investments, on an investor-by-investor basis, in the event certain "key persons" in our investment funds (for example, both of Messrs. Kravis and Roberts) generally cease to actively manage the fund. The occurrence of such an event with respect to any of our funds would likely have a significant negative impact on our revenue, net income and cash flow.

Because fund investors typically are unwilling to invest their capital in a fund unless the fund's manager also invests its own capital in the fund's investments, our private equity fund documents generally require the general partners of our traditional private equity funds to make minimum capital commitments to the funds. The amounts of these commitments, which are negotiated by fund investors, generally range from 2% to 3% of a fund's total capital commitments at final closing. When investments are made, the general partner contributes capital to the fund based on its fund commitment percentage and acquires a capital interest in the investment that is not subject to a carried interest. Historically, these capital contributions have been funded with cash from operations that otherwise would be distributed to our principals and by our principals. In addition, our principals and certain other qualifying employees are permitted to invest and have invested their own capital in side-by-side investments with our private equity

143

funds. Side-by-side investments are investments made on the same terms and conditions as those available to the applicable fund, except that these side-by-side investments are not subject to management fees or a carried interest. In connection with the Reorganization Transactions, we will not be allocated any of the capital contributions made by the general partners of our funds prior to the completion of the Reorganization Transactions and this offering or any returns generated on those contributions. We will, however, be required to fund the general partners' obligations with respect to future investments and we will record investment income to the extent that those investments generate profits. In addition, we will not acquire any interest in any side-by-side investments in our portfolio companies that our personnel have made alongside our funds.

To the extent investors in our private equity funds suffer losses resulting from fraud, gross negligence, willful misconduct or other similar misconduct, investors may have remedies against us, our private equity funds, our principals or our affiliates under the federal securities law and state law. While the general partners and investment advisers to our private equity funds, including their directors, officers, other employees and affiliates, are generally indemnified by the private equity funds to the fullest extent permitted by law with respect to their conduct in connection with the management of the business and affairs of our private equity funds, such indemnity does not extend to actions determined to have involved fraud, gross negligence, willful misconduct or other similar misconduct.

The table below presents information as of March 31, 2007 relating to the traditional private equity funds that we will acquire an interest in as part of the Reorganization Transactions. This data has been adjusted to give effect to subsequent commitments to the 2006 Fund and the Asian Fund, but does not otherwise reflect acquisitions or disposals of investments, changes in investment values or distributions occurring after March 31, 2007.

|  | As of March 31, 2007 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Investment Period | | Amount | | | | | Outstanding Investments | |
| Private Equity Fund | Commencement Date | End Date | Committed | % Committed by General Partner | Invested | Realized | Cost | Fair Value | Fair Value Allocable to General Partner |
|  | ($ in millions) | | | | | | | | |
| Asian Fund* | — | — | $ 4,000.0 | 2.5% | — | — | $ — | $ — | $ — |
| 2006 Fund* | 9/2006 | 9/2012 | 16,625.0 | 2.3 | $ 1,236.4 | — | $ 1,236.2 | $ 1,236.2 | $ 29.3 |
| European Fund II | 11/2005 | 11/2011 | 5,650.0 | 2.2 | 3,856.9 | — | 3,856.9 | 4,218.2 | 162.4 |
| Millennium Fund | 12/2002 | 12/2008 | 6,000.0 | 2.5 | 5,881.0 | $ 4,263.7 | 5,127.6 | 6,990.4 | 538.9 |
| European Fund | 12/1999 | 12/2005 | 3,085.4 | 3.2 | 3,085.4 | 3,942.4 | 1,674.7 | 3,693.9 | 507.9 |

\*     The committed amounts give effect to commitments received subsequent to March 31, 2007.

*Asian Fund*

The Asian Fund is our newest private equity fund and was formed to make private equity investments in Asia. The fund is expected to hold its final closing in the third quarter of 2007 with an aggregate of $4.0 billion of capital commitments from fund investors, including a $100 million commitment from the fund's general partner.

The investment period for the fund will commence on the date of the fund's first investment and will remain open for a period of up to six years, unless terminated earlier in accordance with the fund's governing documents.

*2006 Fund*

The 2006 Fund is one of the largest private equity funds ever raised and was formed to make private equity investments in the United States and Canada, although the fund is permitted to invest up to 25% of capital in other jurisdictions. The fund has an aggregate of $16.6 billion of capital commitments from fund

144

investors, including a $375 million commitment from the fund's general partner and a $1.975 billion commitment from our private equity-oriented permanent capital fund.

The investment period for the fund commenced in September 2006 and will remain open for a period of up to six years, unless terminated earlier in accordance with the fund's governing documents. As of March 31, 2007, the fund had invested $1.2 billion of capital in six transactions, and the fund had $15.0 billion of unfunded capital commitments that could be used to fund additional investments. As of that date, the fund's outstanding investments were diversified across six portfolio companies (all of which were privately held) operating in four industry sectors and had a fair value of $1.2 billion and a cost basis of $1.2 billion. As of March 31, 2007, the fund had entered into agreements to acquire four additional portfolio companies.

*European Fund II*

The European Fund II was formed to make private equity investments primarily in Europe, although the fund is permitted to invest in other jurisdictions (excluding the United States and Canada). The fund held its final closing in October 2005, at which time it had received an aggregate of $5.7 billion of capital commitments from fund investors, including an approximately $121 million commitment from the fund's general partner. Our private equity-oriented permanent capital fund has acquired a commitment of approximately $100 million in the European Fund II through secondary market transactions.

The investment period for the fund commenced in November 2005 and will remain open for a period of up to six years, unless terminated earlier in accordance with the fund's governing documents. As of March 31, 2007, the fund had invested $3.9 billion of capital in 12 transactions, and the fund had $1.8 billion of unfunded capital commitments that could be used to fund additional investments. As of that date, the fund's outstanding investments were diversified across 12 portfolio companies (11 of which were privately held) operating in five industry sectors and had a fair value of $4.2 billion and a cost basis of $3.9 billion. As of March 31, 2007, the fund had not entered into any agreements to acquire additional portfolio companies.

*Millennium Fund*

The Millennium Fund was formed to make private equity investments in the United States and Canada, although the fund was permitted to invest up to 20% of capital in other jurisdictions. The fund received an aggregate of $6 billion of capital commitments from fund investors. The fund's capital commitments (all but $119 million of which have been funded) include a $150 million commitment from the fund's general partner. Our private equity-oriented permanent capital fund has acquired a commitment of $235 million in the Millennium Fund through secondary market transactions.

The investment period for the fund commenced in December 2002 and will expire in December 2008, unless terminated earlier in accordance with the fund's governing documents. During its investment period, the Millennium Fund has invested $5.9 billion of capital in 31 transactions through March 31, 2007. As of March 31, 2007, the fund's outstanding investments were diversified across 26 portfolio companies (22 of which were privately held and five of which were publicly traded) operating in 11 industry sectors and had a fair value of $7.1 billion and a cost basis of $5.1 billion.

*European Fund*

The European Fund was formed to make private equity investments primarily in Europe, although the fund was permitted to invest in other jurisdictions (excluding the United States and Canada). The fund received an aggregate of $3.1 billion of capital commitments from fund investors. The fund's capital commitments (all of which have been funded) include a $100 million commitment from the fund's general partner. Our private equity-oriented permanent capital fund has acquired a commitment of $320 million through secondary market transactions. The investment period for the fund commenced in December 1999 and ended in November 2005 when the fund's capital commitments became fully drawn.

145

During its investment period, the European Fund invested $3.1 billion of capital in 14 transactions. As of March 31, 2007, the fund's outstanding investments were diversified across eight portfolio companies (six of which were privately held and two of which were publicly traded) operating in six industry sectors and had a fair value of $3.7 billion and a cost basis of $1.7 billion.

*Legacy Funds*

We currently manage three additional private equity funds (the 1987 Fund, the 1993 Fund and the 1996 Fund) whose investment periods have ended. Because the general partners of those funds are not expected to receive meaningful proceeds from further realizations, we will not acquire general partner interests in them in connection with the Reorganization Transactions. We will, however, continue to provide the legacy funds with management and other services until their liquidation. While we do not expect to receive meaningful fees for providing these services, we do not believe that the ongoing administration of the funds will interfere with our operations or cause us to incur any material costs.

**KKR Private Equity Investors**

*Overview*

KKR Private Equity Investors is an entity listed on Euronext Amsterdam and focused primarily on making private equity investments through or alongside our private equity funds but with the flexibility to make other types of "opportunistic investments," including credit and public equity investments. Unlike our other private equity funds, KKR Private Equity Investors has a perpetual investment period and is considered by to be a permanent capital vehicle, in that fund investors generally are not entitled to have their capital returned, although we have adopted a policy to make limited cash distributions from the fund to allow fund investors to pay certain tax liabilities resulting from the fund's investments. The closed-ended nature of the fund allows us to continuously reinvest the fund's capital as new investment opportunities arise.

The fund consists of an upper-tier limited partnership, which we refer to as the feeder fund, that makes all of its investments through a lower-tier limited partnership, which we refer to as the master fund, of which it is the sole limited partner. Fund investors consist of limited partners of the feeder fund and hold interests representing approximately $5.1 billion of cash contributions that the feeder fund received in connection with the fund's initial capitalization. Other than amounts used to pay the fund's capitalization costs, the feeder fund contributed substantially all of these capital contributions to the master fund for investment following the fund's capitalization. The master fund makes investments for the fund on its own, which we refer to as direct investments, and indirectly as a limited partner of our other funds, which we refer to as indirect investments.

*Management Fees and Carried Interest*

The feeder fund and master fund that comprise the fund are controlled by separate general partners that are legally distinct from one another. The feeder fund general partner generally does not have an economic interest in the fund. The master fund general partner, on the other hand, has an economic interest in the fund that will entitle it to share in the profits generated by the fund's direct investments after the fund's capitalization costs have been recouped as described under "— Creditable Amount." This economic interest will consist of:

- a carried interest that generally will allocate to the master fund general partner 20% of the gain that is realized on direct private equity investments that are made with fund investors' capital (after any realized losses on other direct private equity investments have been recovered); and

- a carried interest that generally will allocate to the master fund general partner 20% of the annual increase in the net asset value of all other direct investments that are made with fund investors' capital above the highest net asset value at which an amount was previously received pursuant to the carried interest.

146

Because the general partners of our other funds are allocated a portion of the gain that is generated by their investments, the master fund general partner will not be entitled to a carried interest with respect to the fund's indirect investments. However, if the master fund acquires a partner interest in one of our other funds from a third party, the amount of carried interest that the master fund general partner receives pursuant to its carried interest may be adjusted to reflect realized gains or losses relating to the value of the acquired limited partner interest.

We have entered into a services agreement with the feeder fund and master fund, their general partners and certain entities that hold the fund's investments pursuant to which we have agreed to provide them with management and other services. In exchange for providing these services, we generally are paid a quarterly base management fee that is equal to approximately one-fourth of the sum of (i) 1.25% of the fund's net asset value up to and including $3 billion plus (ii) 1% of the fund's net asset value in excess of $3 billion. We are required to reduce the amount of the base management fees that we charge by any other management fees that the fund pays in connection with its investments and certain other amounts that we receive in connection with the fund's investments as described under "—Creditable Amount." The services agreement provides that we may not be removed as the service provider under the services agreement unless we materially breach the provisions of the agreement, engage in certain acts of willful misconduct or gross negligence, become bankrupt or insolvent or are dissolved.

*Creditable Amount*

The master fund general partner has agreed to generally forego receiving a carried interest on the fund's direct investments until profits on investments we would be entitled to receive a carried interest or incentive payment on equal the fund's capitalization costs, which we refer to as the creditable amount. When calculating the fund's profits for the purposes of this requirement, we were not permitted to take into account the profits that the fund recorded on temporary investments during the first year of its operations. Until the creditable amount is reached, we have also generally agreed to reduce the management fee that is payable under our services agreement by any profits on the fund's indirect private equity investments that are allocated to general partners of our private equity funds. As of March 31, 2007, $53.3 million of realized profits generated by the fund's investments had been credited towards the creditable amount, and the creditable amount had a remaining balance of $230.4 million.

*Investment Agreement*

Because fund investors typically are unwilling to invest their capital in a fund unless the fund manager also invests capital in the fund's investments, we have entered into an investment agreement with the fund pursuant to which we have agreed to periodically acquire limited partner interests in the feeder fund in an amount equal to 25% of the pre-tax distributions on the fund's investments that are allocated to us or our affiliates pursuant to a carried interest. As a result of the investment agreement, we expect to periodically acquire newly issued limited partner interests in the feeder fund from time to time in the future with a portion of the amounts that we receive pursuant to a carried interest that we receive in connection with the fund's investments.

In addition, in connection with the fund's initial capitalization, the master fund general partner contributed $10 million to the master fund and a group of our principals and senior advisors contributed $65 million of cash to the feeder fund in exchange for limited partner interests in the feeder fund. We will not be allocated these contributions in connection with the Reorganization Transactions or any profits generated by their investment.

*Investment Activities*

The fund's investment activities focus primarily on making private equity investments, although the fund has the flexibility to devote a portion of its capital to opportunistic investments in other asset classes, including credit and public equity investments. The fund's current investment policies and procedures provide for the investment of at least 75% of the fund's adjusted assets in private equity investments and

147

no more than 25% of the fund's adjusted assets in opportunistic investments. The fund's "adjusted assets" consist of the master fund's assets less the amount of indebtedness that the master fund records as a liability in its financial statements.

The feeder fund received approximately $5.1 billion of cash contributions from fund investors in connection with the fund's initial capitalization, of which approximately $283.7 million was used to pay the fund's capitalization costs and approximately $4.8 billion was contributed to the master fund for investment. From the commencement of the fund's operations on May 10, 2006 through March 31, 2007, the master fund invested $2.4 billion of capital in 33 private equity investments and $884 million of capital in opportunistic investments, while making temporary fixed income investments with the fund's surplus capital. During this period, the master fund generated $407.4 million of net income and made $38.9 million of distributions, and the net assets of the master fund that were allocable to fund investors increased by $367.7 million to $5.2 billion as of March 31, 2007.

Excluding temporary investments, the master fund's outstanding investments had a fair value of $3.6 billion as of March 31, 2007, of which 56% was attributable to investments in North America, 39% was attributable to investments in Europe and 5% was attributable to investments in Asia. The following table presents information concerning the cost basis and fair value of these investments as of the date indicated.

| | As of March 31, 2007 | | | | | |
| | Direct Investments | | Indirect Investments | | All Investments | |
| Investment Type | Cost Basis | Fair Value | Cost Basis | Fair Value | Cost Basis | Fair Value |
| | ($ in millions) | | | | | |
| Private equity investments | $ 2,085 | $ 2,199 | $ 644 | $ 739 | $ 2,729 | $ 2,938 |
| Opportunistic investments | | | | | | |
| Credit | — | — | 118 | 129 | 118 | 129 |
| Public equity | 543 | 539 | — | — | 543 | 539 |
| Total | 2,628 | 2,738 | 762 | 868 | 3,390 | 3,606 |
| Temporary investments | 1,964 | 1,964 | — | — | 1,964 | 1,964 |
| Total investments | $ 4,592 | $ 4,702 | $ 762 | $ 868 | $ 5,354 | $ 5,570 |

In order to maximize the amount of capital that is invested by the fund at any time, the master fund has adopted an over-commitment approach for making investments. As of March 31, 2007, the master fund had entered into contractual commitments pursuant to which it had committed to invest an additional $3.1 billion of the fund's capital in future transactions. These commitments consisted of commitments to fund future capital calls by our other funds in which the master fund had invested as well as commitments to make direct co-investments in portfolio companies that our other funds have agreed to acquire. The following table presents information concerning these commitments. Whether and when these commitments will be consummated depends on a number of factors, some or all of which may be outside of our control, and we cannot assure you that any of these commitments will be funded.

| | As of March 31, 2007 | | |
| Commitment Type | Direct Investments | Indirect Investments | All Investments |
| | ($ in millions) | | |
| Private equity commitments | $ 1,217 | $ 1,855 | $ 3,072 |
| Credit opportunistic commitments | — | 58 | 58 |
| Total commitments | $ 1,217 | $ 1,913 | $ 3,130 |

**Credit**

   We believe the intellectual capital of our people, our integrated global investment platform and our ability to effectively adapt our investment strategies to market conditions allow us to capitalize on investment opportunities at every level of a company's capital structure. Commencing in 2004, we began to

148

actively pursue debt investments as a separate asset class and we now sponsor and manage a group of private and publicly traded investment funds that invest primarily in corporate debt investments and manage structured finance vehicles. These funds, which we refer to as credit strategy funds, currently consist of KFN, a New York Stock Exchange-listed debt vehicle and the KKR Strategic Capital Funds, three side-by-side private credit strategy funds that invest primarily in the debt and equity of performing and distressed companies, and various debt securitization vehicles. Our private equity-oriented permanent capital fund, KKR Private Equity Investors, has the flexibility to make debt investments on an opportunistic basis, including investments made through or alongside our credit strategy funds, although we do not consider it to be part of our credit strategy for management reporting purposes.

As of March 31, 2007, our credit strategy funds had approximately $8.2 billion of corporate debt investments, $11.9 billion of residential mortgage investments, and $297.3 million of equity investments. We earn a management fee for managing our credit strategy funds based on the amount of capital under management in each fund. As of March 31, 2007, our credit strategy funds had $2.8 billion of capital, of which $1.6 billion is related to KFN and consists of permanent capital and our credit strategy funds currently manage $6.5 billion in structured finance vehicles. We have a right to earn management fees for managing our structured finance vehicles based on the amount of investments under management within each vehicle.

*Credit Experience*

We have developed significant expertise analyzing the operations, performance and financial condition of companies to determine their suitability for leverage and related investments in their debt. For example, since our inception, we have sponsored transactions that raised more than $250 billion in initial debt, preferred stock and other fixed income financing, and our funds have acquired several financial services companies with significant fixed income investment portfolios. In connection with these activities, we have gained significant expertise in managing credit risk and making credit determinations based on a review of the operations, capital structures, financial statements, quality of earning and liquidation values and other factors that are relevant to the extension of credit. Additionally, we have been responsible for identifying the investment, performing due diligence and determining the appropriate leverage for, and coordinating the capital structure of, the investment.

We commenced our credit investing operations in August 2004 with the formation of KFN in order to develop a permanent capital base, diversify our operations and capture opportunities to make debt investments in fixed income investments. In connection with the formation of KFN, we hired additional investment professionals with significant experience evaluating and managing debt investments, including investments in corporate loans and debt securities, residential mortgage investments and other credit products, and we built a platform for identifying, assessing, executing, monitoring and realizing debt investments. In October 2006 we launched the KKR Strategic Capital Funds, three private side-by-side credit strategy funds. To continue this growth, we are currently expanding our debt operations in both Europe and Asia.

The table below presents information relating to the historical performance of our credit strategy funds as of March 31, 2007. We encourage you to review the cautionary note below for a description of

149

reasons why the future results of our credit strategy funds may differ from the historical results of our credit strategy funds.

| Fund(1) | Inception | Assets Under Management | Annualized Gross IRR | Annualized Net IRR(2) | Total Investments(3) | Annualized Benchmark Return | |
|---|---|---|---|---|---|---|---|
| | | | | | | Lehman Aggregate Bond Index | Merrill Lynch High Yield Index |
| | | | | ($ in millions) | | | |
| KFN(4)(5) | 2004 | $    1,610.4 | 19.5% | 17.1% $ | 5,692.7 | 3.7% | 9.1% |
| KKR Strategic Capital Funds(6) | 2006 | 1,141.0 | 41.3 | 34.8% $ | 2,809.5 | 5.6 | 14.7 |
| Total | | 2,751.4 | | | 8,502.2 | | |

(1)   Although our principals have invested their own personal capital in our credit strategy funds, we have not made any direct capital contributions to those funds as a general partner or fund manager.

(2)   The annualized net IRR represents the return on invested equity after giving effect to payments of management fees, incentive fees and carried interest, as applicable, assumes reinvestment of all distributions and excludes non-investment expenses. Returns for the KKR Strategic Capital Funds, which were organized in October 2006, have been annualized based on actual returns from inception through March 31, 2007 of 15.8%, which compares to actual returns for the Lehman Aggregate Bond Index and the Merrill Lynch High Yield Index of 2.8% and 7.0%, respectively, for the same period.

(3)   Total investments include investments held directly and synthetically through total rate of return swaps and credit default swaps and also includes both funds' pro rata interest in the holdings of an unconsolidated affiliate.

(4)   KFN is a registered finance company listed on the New York Stock Exchange. KFN's management company, KKR Financial Advisors LLC, has entered into a management agreement with the fund pursuant to which it has agreed to provide the fund with management and other services. In exchange for providing these services, KKR Financial Advisors LLC is entitled to receive a monthly base management fee and a quarterly incentive fee. See "—KFN—Management and Incentive Fees."

(5)   Excludes investments by KFN in residential mortgage-backed securities, which totaled $11.9 billion as of March 31, 2007. In connection with its restructuring, KFN has announced that it is evaluating various alternatives to reducing these types of investments.

(6)   The KKR Strategic Capital Funds consist of three side-by-side private credit strategy funds. The management company to the KKR Strategic Capital Funds, KKR Strategic Capital Management, L.L.C., has entered into a management agreement with the funds pursuant to which it has agreed to provide the funds with management and other services. In exchange for providing these services, KKR Strategic Capital Management L.L.C. is entitled to receive a monthly management fee and an annual incentive fee. See "—KKR Strategic Capital Funds—Management and Incentive Fees."

        When considering the data presented above, you should bear in mind that the historical results of our credit strategy funds are not indicative of the future results that our funds may achieve and that the unrealized values presented above may not be realized in the future. For example, as described below under "—KFN," in May 2007 KFN consummated a restructuring plan that may significantly affect the allocation of the fund's investments among various asset classes and could result in the early disposition of some or all of the fund's mortgage-related investments or a sale of the fund's REIT subsidiary, KKR Financial Corp. In addition, unlike most of our private equity funds, our credit strategy funds invest in a wide variety of asset classes, which may generate a broad range of yields and cause future results to differ from time to time based on relative asset allocations. You should also see "Private Equity Valuations and Related Data" for a description of how the values in the table below were calculated.

150

*Debt Investment Approach*

Our approach to making debt investments focuses on creating investment portfolios that generate attractive leveraged risk-adjusted returns on invested capital by using leverage, allocating capital across multiple asset classes, selecting high-quality investments that may be made at attractive prices, applying rigorous standards of due diligence when making investment decisions, subjecting investments to regular monitoring and oversight and making buy and sell decisions based on price targets and relative value parameters. We employ both "top-down" and "bottom-up" analyses when making debt investments. Our top-down analysis involves a macro analysis of relative asset valuations, long-term industry trends, business cycles, interest rate expectations, credit fundamentals and technical factors to target specific industry sectors and asset classes in which to invest. Our bottom-up analysis includes a rigorous analysis of the credit fundamentals and capital structure of each credit considered for investment and a thorough review of the impact of credit and industry trends and dynamics and dislocation events on such potential investment.

*Sourcing and Selecting Investments*

We source debt investment opportunities through a variety of channels, including our internal deal generation strategies and our access to a global network of contacts at major companies and corporate executives, commercial and investment banks, financial intermediaries, other investment and advisory institutions and political leaders. Our credit strategy funds are also regularly provided with opportunities to invest in debt that our portfolio companies incur in connection with our private equity investments. These opportunities may be significant. As of March 31, 2007, our two credit strategy funds held investments totaling $2.0 billion in senior and subordinated corporate loans, bridge loans and debt securities of portfolio companies of our private equity funds.

*Due Diligence and the Investment Decision*

Once a potential investment has been identified, our credit professionals screen the opportunity and make a preliminary determination concerning whether we should proceed with a due diligence investigation. When evaluating the suitability of a debt investment, we employ a relative value framework and subject the investment to a rigorous credit analysis. Our review considers, among other things, pricing terms, expected returns, credit structure, credit ratings, historical and projected financial data, the company's competitive position, the quality and track record of the company's management team, margin stability and industry and company trends. Our credit professionals use the services of outside accountants, consultants, lawyers, investment banks and industry experts as appropriate to assist them in the due diligence process and, when relevant and permitted, leverage the knowledge and experience of our equity professionals. These due diligence practices are monitored by our debt investment committee, which must approve an investment before it may be made.

*Monitoring Investments*

We monitor our portfolios of debt investments using daily, quarterly and annual analyses. Our daily analyses includes morning market meetings, industry and company pricing runs, industry and company reports and discussions with our equity investment professionals on an as-needed basis. Our quarterly analyses include the preparation of quarterly operating results, reconciliations of actual results to projections, updates to financial models (baseline and stress cases) and reviews of portfolios of debt by our debt investment committee. Our annual analyses involve preparing annual credit memoranda, conducting internal audits and testing compliance with monitoring and documentation requirements.

**KFN**

*Overview*

KFN is a finance company that commenced operations in July 2004 to invest in a broad range of investments. Since its formation, the fund has issued over $1.6 billion of common stock to investors

151

through public and private offerings and is traded on the New York Stock Exchange under the symbol "KFN." This capital includes $82.9 million of capital that was contributed by our investment professionals in their personal capacity. As of March 31, 2007, insiders consisting principally of KKR investment professionals owned 12.1% of KFN's outstanding common stock on a fully-diluted basis. As described under "—Restructuring of the Fund from a REIT; Diversification of Investments," prior to May 4, 2007, KFN was organized as a real estate investment trust, or REIT, and subsequent to May 4, 2007 is organized as a limited liability company. This change in corporate structure will permit KFN to invest up to 100% of its investments in corporate loans and debt securities and equity securities in the future.

*Management and Incentive Fees*

We have entered into a management agreement with the fund pursuant to which we have agreed to provide it with management and other services. In exchange for providing these services, we are entitled to receive:

- a monthly base management fee of 1.75% that is computed based on the fund's equity (which generally is calculated as the sum of (i) the aggregate net proceeds from the issuance of the fund's common or preferred shares, (ii) subsequent to June 15, 2007, the issuance of trust preferred securities, and (iii) retained earnings adjusted for stock-based compensation); and

- a quarterly incentive fee that is generally equal to the amount by which the fund's (i) net income (before incentive fees and stock-based compensation expenses) per weighted average share of the fund's common stock for the quarter exceeds (ii) an amount equal to (A) the weighted average price at which the fund's common stock was issued multiplied by the (B) greater of (1) 2% and (2) 0.5% plus one-fourth of the average of the weekly average yield to maturity for 10-year Treasury securities during the quarter.

Our management agreement with KFN will automatically be renewed for successive one-year terms following December 31, 2007 unless the agreement is terminated in accordance with its terms. The management agreement provides that the fund may terminate the agreement only if:

- the termination is approved at least 180 days prior to the expiration date by at least two-thirds of the fund's independent directors or by the holders of a majority of the outstanding shares of the fund's common stock and the termination is based upon (i) a determination that our performance has been unsatisfactory and materially detrimental to the fund or (ii) a determination that the management and incentive fees payable to us are not fair (subject to our right to prevent a termination by reaching an agreement to reduce our management and incentive fees), in which case a termination fee is payable to us; or

- our subsidiary that manages the fund experiences a "change of control" or we materially breach the provisions of the agreement, engage in certain acts of willful misconduct or gross negligence, become bankrupt or insolvent or are dissolved, in which case a termination fee is not payable to us.

The fund uses structured finance vehicles to provide term financing for its investments. In connection with these transactions, we have entered into collateral management agreements with the structured finance vehicles where we earn a management fee for providing management services. As of March 31, 2007, we have permanently waived approximately $7.7 million in management fees. We evaluate such waivers on a quarterly basis and do not expect to waive all such management fees in the future.

*Investment Activities*

KFN's investment activities have historically been influenced by the fund's election to be taxed as a REIT. While the fund's investment guidelines impose limited restrictions on the amount of capital that the fund may invest in any specific asset class, industry or investment, in order to maintain its qualification as a REIT, the fund has been required to invest at least 75% of its assets in real estate assets as defined in the Internal Revenue Code and to generate at least 75% of its gross income from real estate sources and at least 95% of its gross income from real estate sources and other permitted passive sources, such as

152

dividends and interest. Due to these requirements, the fund historically has held a significant amount of residential mortgage loans and mortgage-backed securities on its statement of financial condition, while using investments in corporate debt and equity and applying varying degrees of leverage to enhance returns.

As of March 31, 2007, the fund's investment portfolio included multiple asset classes and industries. The following table presents information concerning the amortized cost and fair value of these investments by asset class as of the date indicated.

| | As of March 31, 2007 | |
| Investment Type(1) | Amortized Cost Basis | Fair Value |
|---|---|---|
| | ($ in thousands) | |
| Residential mortgage loans and mortgage-backed securities | $ 11,932,698 | $ 11,878,238 |
| Corporate loans and debt securities | 3,818,762 | 3,874,797 |
| Commercial real estate loans and debt securities | 137,328 | 138,251 |
| Marketable equity securities | 84,561 | 88,979 |
| Non-marketable equity securities(2) | 173,823 | 173,823 |
| Total | $ 16,147,172 | $ 16,154,088 |

(1)     Investments exclude KFN's pro rata interest in corporate loans and debt securities of an unconsolidated affiliate totaling $739.1 million and synthetic investments through total rate of return and credit default swap contracts.

(2)     Non-marketable equity securities consist primarily of private equity investments that the fund has made alongside our private equity funds.

*Restructuring of the Fund from a REIT; Diversification of Investments*

In May 2007, KKR Financial Corp. consummated the implementation of a restructuring plan pursuant to which shares of common stock in KKR Financial Corp. were exchanged for common shares in KFN, which became the parent company of KKR Financial Corp. following the exchange. The purpose of the fund restructuring was to provide the fund with the flexibility to reallocate a significant portion of its capital to non-real estate investments, such as corporate loans and debt securities and marketable and non-marketable equity investments. Compared to real estate investments, these types of investments historically have generated significantly greater returns on equity for the fund.

As of March 31, 2007, we estimate that approximately 34% of the fund's raised equity capital was invested in residential real estate-related investments, approximately 54% of its raised equity capital was invested in non-real estate-related investments, excluding marketable and non-marketable equity securities, and approximately 12% of its raised equity capital was invested in marketable and non-marketable equity securities, including its private equity investments. For the three months ended March 31, 2007, the fund's annualized return on its raised equity capital invested in residential real estate investments was approximately 8% and its annualized return on its raised equity capital invested in its non-real estate investments, excluding marketable and non-marketable equity securities, was approximately 21%. Since the fund's inception and through March 31, 2007, the fund has not realized any gains, losses, or income on its non-marketable equity security investments which consist primarily of private equity investments.

We are evaluating various alternatives to reducing the fund's residential real estate-related investments, including allowing our residential real estate-related investments to pay down in the ordinary course or selling residential real estate-related investments (which may include the sale of all or part of the common stock of KKR Financial Corp.). We believe that, if we were to allow the fund's residential real estate-related assets to pay down in the ordinary course, the reallocation of capital would occur over three

153

or four years as our residential real estate-related investments pay down as a result of both scheduled amortization and prepayments, although it could take longer absent other liquidation strategies. Estimating the prepayment rates on our residential real estate-related investments is very difficult because of factors that we cannot control or accurately predict such as future interest rates and housing prices. The fund will also consider selling certain residential real estate-related investments.

### KKR Strategic Capital Funds

*Overview*

The KKR Strategic Capital Funds consist of three side-by-side private credit strategy funds. The KKR Strategic Capital Funds make investments primarily in corporate debt and marketable and non-marketable equity securities. Investors in these funds consist of equity holders who had previously contributed an aggregate of $1.1 billion of capital to the side-by-side funds as of March 31, 2007. These include $87.7 million of capital contributed by our investment professionals in their personal capacity and $175.0 million of capital contributed by our private equity-oriented permanent capital fund. The funds will be open to additional capital contributions from outside investors effective as of January 1, 2008.

Each of the individual funds comprising the KKR Strategic Capital Funds has a perpetual life and investment period and is permitted to reinvest its capital and earnings. Fund investors are entitled to have their equity returned to them through redemptions of their equity interests (at prices based on the relevant individual fund's prevailing net asset value) only after the expiration of an applicable lock-up period or upon the occurrence of certain other redemption events. The lock-up period is at least 25 months from the date of the capital contribution in the case of investors who have agreed to pay higher management and incentive fees and 60 months from the date of the capital contribution in the case of investors who have agreed to pay lower fees and carried interests, as described below. Each individual fund generally has the ability to limit the amount of equity that may be redeemed at any time to interests representing no more than 15% of its net asset value at such time, and fund investors are required to comply with certain notice provisions in order to redeem their equity.

*Management and Incentive Fees*

We have entered into management agreements with each primary fund comprising the KKR Strategic Capital Funds pursuant to which we have agreed to provide the primary fund with management and other services. Under the management agreement that we have entered into with each primary fund (and, in some cases, other documents governing the individual fund), we generally are entitled to receive:

- with respect to investors who have agreed to a 25 month lock-up period, (i) a monthly management fee that is equal to 0.1667% (or 2.0% annualized) of the net asset value of the individual fund that is allocable to those investors and (ii) an annual incentive fee or carried interest that is equal to 20% of the increase in the net asset value of the individual fund that is allocable to those investors above the highest net asset value at which an incentive fee has previously been paid; and

- with respect to investors who have agreed to a 60 month lock-up period, (i) a monthly management fee that is equal to 0.1250% (or 1.5% annualized) of the net asset value of the primary fund that is allocable to those investors and (ii) an annual incentive fee or carried interest that is equal to 15% of the increase in the net asset value of the individual fund that is allocable to those investors above the highest net asset value at which an incentive fee has previously been paid.

Our management agreements with the individual funds comprising the KKR Strategic Capital Funds will automatically be renewed for successive one-year terms unless the agreements are terminated in accordance with their terms.

154

*Investment Activities*

    The KKR Strategic Capital Funds' governing documents do not impose any asset diversification requirements or limit the amount of capital that may be invested in a single company, industry or geographic region. The funds' investment portfolio, however, is generally expected to consist of between 15 and 25 core investments that arise in connection with event-driven and value-driven investment opportunities. These investments are expected to consist primarily of the debt and equity of performing and non-performing companies, including leveraged bank loans, high yield bonds, subordinated bonds, mezzanine bonds, preferred stock and marketable and non-marketable equity instruments. The funds may also opportunistically invest a portion of its capital from time to time in other asset classes, such as real estate assets, other physical assets and risk transfer or assumption instruments.

    As of March 31, 2007, the funds' outstanding investments primarily consisted of corporate loans and debt securities and marketable and non-marketables equity securities. These investments were diversified across over thirty industries and had an aggregate fair value of $2.9 billion, of which 73% was attributable to investments in North America, 20% was attributable to investments in Europe and 5% was attributable to investments in Asia. The following table presents information concerning the cost and fair value of these investments.

| Investment Type | As of March 31, 2007 | |
| --- | --- | --- |
| | Cost Basis | Fair Value |
| | *($ in millions)* | |
| Corporate loans | $ 2,207.8 | $ 2,242.9 |
| Corporate debt securities | 464.0 | 486.9 |
| Marketable equity securities | 20.5 | 22.0 |
| Non-marketable equity securities | 18.4 | 18.4 |
| Other asset classes (1) | 82.0 | 82.0 |
| Total | $ 2,792.7 | $ 2,852.2 |

(1)    Other asset classes consist primarily of credit default swaps where the KKR Strategic Capital Funds have either purchased or sold protection.

**Cautionary Note Regarding Historical Fund Performance**

    The historical results for our private equity and credit strategy funds included above may not be indicative of the future results that you should expect from us. In particular, our funds' future results may differ significantly from their historical results for the following reasons:

- the rates of returns of our funds reflect unrealized gains as of the applicable valuation date that may never be realized, which may adversely affect the ultimate value realized from those funds' investments;

- you will not benefit from any value that was created in our funds prior to your investment in the common units to the extent such value has been realized;

- the historical returns of our funds and their future performance has been and will be affected by macroeconomic factors, including factors that may not have been prevalent in the periods relevant to the return data above;

- in the past few years, the rates of returns of some of our funds have been positively influenced by a number of investments that experienced a substantial decrease in the average holding period of such investments and rapid and substantial increases in value following the dates on which those investments were made, trends and rates of return that are not expected to continue;

155

Case 1:07-cv-01757-RWR　　　Document 21-15　　　Filed 07/03/2008　　　Page 190 of 199

- our funds' returns have benefited from investment opportunities and general market conditions that may not repeat themselves, including favorable borrowing conditions in the debt markets, and there can be no assurance that our current or future funds will be able to avail themselves of comparable investment opportunities or market conditions or that such market conditions will continue; and

- we may create new funds in the future that reflect a different asset mix in terms of allocations among funds, investment strategies, and geographic and industry exposure.

## New Business Initiatives

Our principal growth strategy throughout our firm's 31-year history has been to expand our existing private equity business and to enter attractive new businesses. While most of our recent growth has come from our private equity and debt activities, we believe significant growth opportunities exist for developing new business areas.

### Public Equity

Although our private equity-oriented permanent capital fund and our credit strategy funds are permitted to make investments in public equity, we are currently in the process of expanding our public equity capabilities and operations in order to take advantage of a larger number of the investment opportunities that we identify globally and to further grow and diversify our assets under management. To achieve these results, we have hired additional investment personnel who have specialized experience in the public equity markets.

### Public Equity Experience

Although our funds have historically focused on private equity and debt investments, we have managed investments in public equity throughout our history. Initially, our public equity investments consisted of minority and structured investments in public companies that were made by our private equity funds. More recently, our private equity-oriented permanent capital fund and our two credit strategy funds have provided us with more flexibility than traditional private equity funds and an additional capital base for making equity investments in public companies. Using this capital base, we have been able to build a new portfolio of public equity and equity-linked securities that had a market value of $1.3 billion as of March 31, 2007.

### Public Equity Investment Approach

Our approach to making public equity investments generally seeks to leverage the intellectual capital developed in the course of our traditional private equity business and focuses on achieving attractive multiples of invested capital and IRRs by selecting fundamentals-driven investment opportunities, applying rigorous standards of due diligence when making investment decisions, adding value to portfolio companies where possible, subjecting investments to regular monitoring and oversight and making informed buy and sell decisions when realizing investments. When making public equity investments, we seek out companies that have management teams who are willing to consider our suggestions, strong business franchises, attractive growth prospects, sustainable competitive advantages, defensible market positions and the potential to generate attractive returns. We generally take a long-term approach when investing in public equity and avoid making investment decisions based on short-term market volatility.

*Sourcing and Selecting Investments.*     We believe that our public equity activities benefit significantly from our private equity business as a result of both the company, industry and market knowledge and experience that we have developed as a private equity sponsor and the source of public equity opportunities that our private operations provide. In particular, through our private equity activities we periodically identify opportunities to make suitable public equity investments that fall outside the investment scopes of our traditional private equity funds due to such reasons as the relative size of the

156

investment or the fact that the target may be unwilling to sell control or has elected to pursue an alternative transaction. Because our private equity professionals and public equity specialists are integrated and share information, resources, expertise and best practices with one another, we are able to leverage these opportunities when we believe a public equity investment would be appropriate for a fund that has a broader investment mandate.

*Due Diligence and the Investment Decision.*     When evaluating the suitability of a public equity investment, we consider critical business, financial, tax, accounting, environmental and legal issues in order to determine whether we should proceed with the investment. Our equity professionals perform a detailed financial analysis of the target company and a comprehensive "bottom-up" and "top-down" review of the target company and the industry in which it operates. This review is often supported by field research and, when appropriate, meetings with management, operating personnel, customers and suppliers and, at times, visits to plants and facilities. Our equity professionals use the services of outside accountants, consultants, lawyers, investment banks and industry experts to assist them in this process. These due diligence practices are monitored by our equity investment committee, which must approve an investment before it may be made.

*Creating Value.*     Once a public equity investment has been made, we seek to work with the management team when possible to implement strategies that are designed to enhance shareholder value. While public equity investments typically do not offer the potential for us to take an active role in the oversight of management and operations of a portfolio company, we believe that it is possible to drive value by sharing our ideas, experience and suggestions with managers, particularly with respect to strategic initiatives. We believe that the experience of our equity professionals, who have direct experience working with management teams to improve operating and financial performance, helps us identify areas of potential improvement in a company and provides us with a degree of credibility that increases the willingness of managers to consider implementing our suggestions.

*Monitoring Investments.*     We monitor public equity investments with the objective of detecting changes in underlying business fundamentals of portfolio companies as soon as practicable. When monitoring an equity investment in a public company, we conduct regular reviews of the financial and operating performance of the company and apply a benchmarking analysis that we use to compare its performance to the performance of its competitors. When possible, we seek to meet with management to review the results of our assessments. We also monitor events and issues that are important to the companies in which our funds have made public equity investments and the industry sectors in which they operate.

*Buy and Sell Discipline.*     We avoid making buy and sell determinations for public equity investments based on short-term volatility in market prices. Instead, we make buy and sell decisions based on achieving price targets, changes in business and industry fundamentals, changes in our assessment of management credibility, macro-economic factors and other relevant considerations. If the share price of a public company in which a fund has made an investment declines, we re-examine the investment to determine whether our investment thesis is still intact. If the thesis is still intact but the share price has declined moderately, we may consider the price decline as an attractive buying opportunity. If the thesis is still intact but the share price has declined significantly, we may consider the price decline as creating an opportunity to engage in a leveraged buyout. If the thesis is not intact, we may consider exiting the investment. When we exit a public equity investment, our objective is to structure the exit in a manner that optimizes our returns and minimizes the impact that the exit has on the trading price of the company's securities.

## Capital Markets Activities

Capital markets activities represent an opportunity to efficiently increase our available investment capital, capture certain financing fees otherwise paid to third parties and earn incremental margins on committed capital. We are currently building this business in the United States, Europe and Asia, which we believe will complement our asset management activities. We launched this new business initiative in order

to permit us to syndicate a portion of the equity of our portfolio companies, which we believe will help us increase the amount of third-party capital that we are able to commit to individual transactions, grow our third-party assets under management and capture additional income streams. Further, by syndicating a portion of our committed equity to a broader investor base, we can avoid partnering in certain investments with large consortiums of private equity funds, thereby retaining more operational and economic control for ourselves. Over time, we may expand our capital markets activities in a manner that complements our other business activities. We have not yet commenced our capital markets activities, but expect to do so shortly after we receive all appropriate regulatory approvals and licenses. See "Business—Regulation."

*Syndication and New Product Development*

We intend to use our capital markets business primarily to supplement our existing capital-raising capabilities and the underwriting and advisory services that our funds and portfolio companies currently receive from large investment banks. We anticipate that these activities initially will focus on syndicating a portion of the equity that we commit to provide in our larger private equity transactions to a broader base of investors, which we believe will enable us to retain greater control over our portfolio companies and help us capture a greater portion of the economics that are generated by our private equity investments. Our capital markets professionals will also focus on developing new products that we believe will allow us to attract new investors to the various asset classes that we manage.

*Principal Investments*

We do not intend to make principal investments with our capital markets business' capital in the near term. Over time, we may consider using our capital markets business to buy and hold securities for investment purposes provided that we have sufficient regulatory capital to do so. In those circumstances, we would expect to act more as an investor than as a market-maker. Our ability to make principal investments will depend on our ability to grow the capital of our capital markets business over time. See "—Regulation—United States—Regulation as a Broker-Dealer."

**Competition**

We compete with other alternative asset managers for both investors and investment opportunities. Our competitors consist primarily of sponsors of public and private investment funds, business development companies, investment banks, commercial finance companies and operating companies acting as strategic buyers. We believe that competition for investors is based primarily on investment performance; business reputation; the duration of relationships with investors; the quality of services provided to investors; pricing; and the relative attractiveness of the types of investments that have been or are to be made. We believe that competition for investment opportunities is based primarily on the pricing, terms and structure of a proposed investment and certainty of execution.

Some of the entities that we compete with as an alternative asset manager have greater financial, technical, marketing and other resources and more personnel than we do, and some of the entities that we compete with when managing credit and public equity investments may have longer operating histories, more established relationships or greater experience than we have with respect to those types of investments. Several of our competitors also have recently raised, or are expected to raise, significant amounts of capital and have investment objectives that are similar to the investment objectives of our funds, which may create additional competition for investment opportunities. Some of these competitors may also have lower costs of capital and access to funding sources that are not available to us, which may create competitive disadvantages for us when sourcing investment opportunities. In addition, some of these competitors may have higher risk tolerances, different risk assessments or lower return thresholds, which could allow them to consider a wider range of investments and to bid more aggressively than us for investments. Strategic buyers may also be able to achieve synergistic cost savings or revenue enhancements

with respect to a targeted portfolio company, which may provide them with a competitive advantage in bidding for such investments.

We expect to compete as a capital markets business primarily with investment banks and independent broker-dealers in the United States, Europe and Asia and intend to focus our capital markets activities initially on syndicating and underwriting offerings of our portfolio companies' securities. While we intend to target customers with whom we have an existing relationship, we expect that those customers will have pre-existing relationships with our competitors, many or all of whom will have access to competing securities transactions, greater financial, technical or marketing resources or more established reputations than us. Our lack of an operating history as a capital markets business could make it difficult for us to compete with broker-dealers, participate in capital markets transactions of unaffiliated issuers or successfully grow our capital markets business over time.

## Employees

We believe that one of our primary strengths and a principal reason for our success is the quality and dedication of our people. As of June 30, 2007, we employed approximately 400 people worldwide. The following table presents information concerning these employees by functional area.

| Type | As of June 30, 2007 |
| --- | --- |
| Equity and Credit Professionals | 139 |
| Finance, Accounting, Legal, Human Resources and Information Technology Personnel | 98 |
| Administrative Support Staff | 162 |
| Total | 399 |

The following table presents information concerning our most senior investment professionals. Messrs. Kravis and Roberts and the 23 other equity professionals named in the table are referred to elsewhere in this prospectus as our "senior principals."

| | Location | Age | Years at KKR | Committee Membership |
| --- | --- | --- | --- | --- |
| **Equity and Credit:** | | | | |
| Henry R. Kravis | New York | 63 | 31 | Equity Investment Committee<br>Debt Investment Committee<br>Portfolio Management Committee |
| George R. Roberts | Menlo Park | 63 | 31 | Equity Investment Committee<br>Debt Investment Committee<br>Portfolio Management Committee |
| **Equity:** | | | | |
| Paul E. Raether | New York | 60 | 27 | Portfolio Management Committee |
| Michael W. Michelson | Menlo Park | 55 | 26 | Equity Investment Committee |
| James H. Greene, Jr. | Menlo Park | 56 | 21 | — |
| Perry Golkin | New York | 53 | 21 | — |
| Johannes P. Huth | London | 46 | 8 | Equity Investment Committee |
| Todd A. Fisher | London | 41 | 14 | Equity Investment Committee |
| Alexander Navab | New York | 41 | 14 | Equity Investment Committee |
| Jacques Garaïalde | London | 50 | 4 | — |
| Marc S. Lipschultz | New York | 38 | 12 | — |
| Reinhard Gorenflos | London | 45 | 5 | Portfolio Management Committee |
| Michael M. Calbert | Menlo Park | 44 | 7 | — |
| Scott C. Nuttall | New York | 34 | 10 | Debt Investment Committee |
| Joseph Y. Bae | Hong Kong | 35 | 10 | — |
| Brian F. Carroll | New York | 35 | 10 | — |
| Adam H. Clammer | Menlo Park | 36 | 10 | — |

159

| Frederick M. Goltz | Menlo Park | 36 | 11 | — |
| Oliver Haarmann | London | 39 | 8 | — |
| Dominic P. Murphy | London | 39 | 2 | — |
| John L. Pfeffer | London | 38 | 6 | — |
| John K. Saer, Jr. | New York | 50 | 6 | — |
| Clive Hollick | London | 61 | 2 | — |
| David H. Liu | Hong Kong | 36 | 1 | — |
| Ming Lu | Hong Kong | 48 | 1 | — |

**Credit:**

| Saturnino S. Fanlo | San Francisco | 47 | 3 | Debt Investment Committee |
| David A. Netjes | San Francisco | 48 | 3 | Debt Investment Committee |
| Ryan J. Marshall | San Francisco | 39 | 1 | |
| Mark D. Lerdal | San Francisco | 48 | 1 | |

**Regulation**

Our operations are subject to regulation and supervision in a number of jurisdictions. The level of regulation and supervision to which we are subject varies from jurisdiction to jurisdiction and is based on the type of business activity involved. We, in conjunction with our outside advisers and counsel, seek to manage our business and operations in compliance with such regulation and supervision. The regulatory and legal requirements that apply to our activities are subject to change from time to time and may become more restrictive, which may make compliance with applicable requirements more difficult or expensive or otherwise restrict our ability to conduct our business activities in the manner in which they are now conducted. Changes in applicable regulatory and legal requirements, including changes in their enforcement, could materially and adversely affect our business and our financial condition and results of operations. As a matter of public policy, the regulatory bodies that regulate our business activities are responsible for safeguarding the integrity of the securities and financial markets and protecting investors who participate in those markets rather than protecting the interests of our unitholders.

*United States*

*Regulation as an Investment Advisor*

We have not registered as an investment advisor under the Investment Advisers Act, although we are in the process of doing so. After we register as an investment advisor, we will be subject to federal and state laws and regulations primarily intended to benefit the investor or client of the adviser. These laws and regulations impose various requirements that relate, among other things, to fiduciary duties that are owed to investors and clients, maintaining an effective compliance program, recordkeeping and reporting requirements, disclosure requirements, limitations on agency cross- and principal-transactions between an investment advisor and its clients. These laws and regulations generally grant supervisory agencies and bodies broad administrative powers, including the power to limit or restrict a registered investment adviser from conducting advisory activities in the event the adviser fails to comply with those laws and regulations. Sanctions that may be imposed for a failure to comply with applicable legal requirements include the suspension of individual employees, limitations on the ability of an investment advisor to engage in various advisory activities for specified periods of time, the revocation of registrations, other censures and fines.

*Regulation as a Broker-Dealer*

KKR Global Markets LLC, one of our subsidiaries, has filed applications to become a member of the NASD and to become registered as a broker-dealer with the SEC under the Exchange Act and with the New York Securities Commission under New York state securities laws. A broker-dealer is subject to legal requirements covering all aspects of the securities business, including sales and trading practices, public

offerings, use and safekeeping of customers' funds and securities, capital structure, record-keeping and retention and the conduct and qualifications of directors, officers, employees and other associated persons. These requirements include the SEC's "uniform net capital rule," which specifies the minimum level of net capital that a broker-dealer must maintain, requires a significant part of the broker-dealer's assets to be kept in relatively liquid form, imposes certain requirements that may have the effect of prohibiting a broker-dealer from distributing or withdrawing its capital and subjects any distributions or withdrawals of capital by a broker-dealer to notice requirements. These requirements also include rules that limit a broker-dealer's ratio of subordinated debt to equity in its regulatory capital composition, constrain a broker-dealer's ability to expand its business under certain circumstances and impose additional requirements when the broker-dealer participates in securities offerings of affiliated entities. Violations of these requirements may result in censures, fines, the issuance of cease-and-desist orders, revocation of licenses or registrations, the suspension or expulsion from the securities industry of the broker-dealer or its officers or employees or other similar consequences by regulatory bodies.

### United Kingdom

Kohlberg Kravis Roberts & Co. Ltd., one of our subsidiaries, is authorised in the United Kingdom under the Financial Services and Markets Act 2000, or "FSMA," and has permission to engage in a number of corporate finance activities regulated under FSMA, including advising, dealing as principal or agent and arranging deals in relation to certain types of investments. FSMA and related rules govern most aspects of investment business, including sales, research and trading practices, provision of investment advice, corporate finance, use and safekeeping of client funds and securities, regulatory capital, record keeping, margin practices and procedures, approval standards for individuals, anti-money laundering, periodic reporting and settlement procedures. The Financial Services Authority is responsible for administering these requirements and our compliance with them. Violations of these requirements may result in censures, fines, imposition of additional requirements, injunctions, restitution orders, revocation or modification of permissions or registrations, the suspension or expulsion from certain "controlled functions" within the financial services industry of officers or employees performing such functions or other similar consequences.

### Other Jurisdictions

KKR Private Equity Investors, our private equity-oriented permanent capital fund, is licensed as a Guernsey closed-end fund and is subject to the ongoing supervision of the Guernsey Financial Services Commission, the Netherlands Authority for the Financial Markets and the Luxembourg Commission de Surveillance du Secteur Financier. Under applicable legal requirements, the fund is required to give written notice to the Guernsey Financial Services Commission in respect of the occurrence of certain matters relating to the fund, including a change in our role as the fund's service provider or a change in the feeder fund's governing documents or general partner.

One of the KKR Strategic Capital Funds is regulated as a mutual fund by the Cayman Islands Monetary Authority. As a regulated mutual fund, the fund is required to comply with certain registration, filing, information delivery and notice requirements and is subject to the ongoing supervision of the Cayman Islands Monetary Authority. The Cayman Islands Monetary Authority may subject a regulated mutual fund to special audits and require the fund to provide access to information or records from time to time. Failure to comply with requests by the Cayman Islands Monetary Authority may result in substantial fines or may result in the Cayman Islands Monetary Authority applying to a court to have the fund terminated.

161

**Properties**

Our principal executive and administrative offices are located in New York. We maintain additional offices in Menlo Park, San Francisco, London, Paris, Hong Kong and Tokyo. The following table presents information concerning these properties.

| Location | As of March 31, 2007 | |
| | Area | Lease Expiration Date |
| --- | --- | --- |
| | (square feet) | |
| New York | 63,170 | 4/2010-12/2014 |
| Menlo Park | 33,498 | 8/2008-3/2011 |
| San Francisco | 25,076 | 7/2016 |
| London | 18,325 | 3/2019-10/2018 |
| Paris | 4,758 | 10/2011 |
| Hong Kong | 9,789 | 9/2008-12/2011 |
| Tokyo | 8,012 | 3/2009-12/2016 |

We believe that our facilities are adequate for us to conduct our business activities. All of our office space is leased. The most significant terms of the lease arrangements for our office space are the length of the lease and the amount of the rent. Our leases have terms varying in duration. The rent payable under our office leases varies significantly from location to location as a result of differences in prevailing market conditions in different geographic locations. We do not believe that any single office lease is material to our business, results of operations or financial condition. In addition, we believe there is adequate alternative office space available at acceptable rental rates to meet our needs, although adverse movements in rental rates in some markets may negatively affect us when we enter into new leases.

**Legal Proceedings**

We may be subject to potential liability under various legal actions that are pending or may be asserted against us in our ordinary course of business. We believe that any liability that could be imposed on us in connection with the disposition of such lawsuits would not have a material effect on our business, results of operations, cash flows or financial condition.

162

# MANAGEMENT

## Directors and Executive Officers

As is commonly the case with limited partnerships, our partnership agreement provides for the management of our business and affairs by a general partner rather than a board of directors. Our Managing Partner which serves as our sole general partner has a board of directors that is responsible for the oversight of our business and affairs and executive officers that are authorized by the board to act on behalf of our Managing Partner in its capacity as our general partner. Prior to the closing of this offering, we expect that three additional, independent directors will be appointed to the board of directors of our Managing Partner so that a majority of the board of directors will consist of independent directors.

The following table presents certain information concerning the board of directors and executive officers of our Managing Partner.

| Name | Age | Position with Managing Partner |
|------|-----|-------------------------------|
| Henry R. Kravis | 63 | Co-Chief Executive Officer and Co-Chairman |
| George R. Roberts | 63 | Co-Chief Executive Officer and Co-Chairman |
| William J. Janetschek | 45 | Chief Financial Officer |

**Henry R. Kravis** co-founded KKR in 1976 and serves as Co-Chairman and Co-Chief Executive Officer of our Managing Partner. Currently, he participates in all the investment activities of our business and serves on the Equity Investment, Debt Investment and Portfolio Management Committees. He is also a member of the board of directors of Legrand, KKR Private Equity Investors and Accel-KKR Company. Prior to founding KKR, Mr. Kravis was a Partner in the Corporate Finance Department of Bear Stearns & Company, where he pioneered the use of leverage in acquisitions. He earned a B.A. from Claremont McKenna College, and an M.B.A. from Columbia Graduate School of Business.

**George R. Roberts** co-founded KKR in 1976 and serves as Co-Chairman and Co-Chief Executive Officer of our Managing Partner. Currently, he participates in all the investment activities of our business and serves on the Equity Investment, Debt Investment and Portfolio Management Committees. He is also a member of the board of directors of KKR Private Equity Investors and Accel-KKR Company. Prior to founding KKR, Mr. Roberts was in the Corporate Finance Department of Bear Stearns & Company, where he became a partner at 29 and where he pioneered the use of leverage in acquisitions. He earned a B.A. from Claremont McKenna College, and a J.D. from the University of California (Hastings) Law School.

**William J. Janetschek** joined our firm in 1997 and serves as Chief Financial Officer of our Managing Partner. Prior to joining us, he was a Tax Partner with the New York office of Deloitte & Touche LLP. Mr. Janetschek was with Deloitte & Touche for 13 years. He holds a B.S. from St. John's University and an M.S., Taxation, from Pace University, and is a Certified Public Accountant.

## Managing Partner Board Structure and Practices

Matters relating to the structure and practices of our Managing Partner's board of directors are governed by provisions of our Managing Partner's limited liability company agreement and the Delaware Limited Liability Company Act. The following description is a summary of those provisions and does not contain all of the information that you may find useful. For additional information, you should read the copy of our Managing Partner's amended and restated limited liability company agreement that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

### Independence and Composition of the Board of Directors

Upon the completion of this offering, we expect our Managing Partner's board of directors will consist of five directors. While we are exempt from New York Stock Exchange rules relating to board

163

independence, our Managing Partner intends to maintain a board of directors that consists of at least a majority of directors who are independent under New York Stock Exchange rules relating to corporate governance matters.

### Election and Removal of Directors

  The directors of our Managing Partner may be elected and removed from office only by the vote of a majority of the Class A shares of our Managing Partner that are then outstanding. Each person elected as a director will hold office until a successor has been duly elected and qualified or until his or her death, resignation or removal from office, if earlier. Class A shareholders are not required to hold meetings for the election of directors with any regular frequency and may remove directors, with or without cause, at any time.

  All of our Managing Partner's outstanding Class A shares are held by our senior principals. Under our Managing Partner's limited liability company agreement, each Class A share is non-transferable without the consent of the holders of a majority of the Class A shares that are then outstanding and each Class A share will automatically be redeemed and cancelled upon the holder's death, disability or withdrawal as a member of either our Managing Partner or KKR Holdings. Upon the completion of the offering, Henry Kravis and George Roberts, the Managing Partner's Co-Chairmen and Co-Chief Executive Officers, will collectively hold Class A shares representing  % of the total voting power of the outstanding Class A shares. While neither of them acting alone will be able to direct the election or removal of directors, they will be able to control the composition of the board if they act together. While Messrs. Kravis and Roberts historically have acted with unanimity when managing our business, they have not entered into any agreement relating to the voting of their Class A shares following the completion of this offering. See "Security Ownership."

### Limited Matters Requiring a Class B Shareholder Vote

  Through our subsidiaries, we will hold voting interests in the general partners of a number of funds that were formed outside of the United States. Under our Managing Partner's limited liability company agreement, our Managing Partner's board of directors will be required to inform the holders of our Managing Partner's Class B shares of any matter that is submitted to a vote of the holders of such voting interests and to cause any voting interests that we hold through subsidiaries to be voted in accordance with directions received from the holders of a plurality of the Class B shares providing such instructions. Our principals, including Messrs. Kravis and Roberts, collectively hold 100% of our Managing Partner's outstanding Class B shares. See "Security Ownership."

### Action by the Board of Directors

  Our Managing Partner's board of directors may take action in a duly convened meeting in which a quorum is present or by a written resolution signed by all directors then holding office. When action is to be taken at a meeting of the board of directors, the affirmative vote of two-thirds of the directors then holding office is required for any action to be taken other than with respect to a matter in which a director has an interest. A matter in which a director has an interest, if considered at a meeting of the board of directors, may be decided by the vote of two-thirds of the disinterested directors then holding office to the extent that the interested director abstains from voting on the matter.

### Board Committees

  Prior to the completion of this offering, we expect that our Managing Partner's board of directors will establish an audit committee, a conflicts committee, a nominating and corporate governance committee and an executive committee that will operate pursuant to written charters as described below. Because we are a limited partnership, our Managing Partner's board is not required by New York Stock Exchange rules

to establish a compensation committee or to cause its nominating and corporate governance committee to consist solely of independent directors or to meet other substantive New York Stock Exchange corporate governance requirements. While the board will establish a nominating and governance committee, we intend to rely on available exemptions concerning the committee's composition and mandate.

### Audit Committee

Our Managing Partner's board of directors will establish an audit committee that will be responsible for assisting the board of directors in overseeing and monitoring (i) the quality and integrity of our financial statements; (ii) our compliance with legal and regulatory requirements; (iii) our independent registered public accounting firm's qualifications and independence and (iv) the performance of our independent registered public accounting firm. The members of the audit committee will be required to meet the independence standards for service on an audit committee of a board of directors pursuant to Rule 10A-3 under the Exchange Act and New York Stock Exchange rules relating to corporate governance matters, and the charter for the audit committee will comply with those requirements.

### Conflicts Committee

Our Managing Partner's board of directors will establish a conflicts committee that will be responsible for reviewing specific matters that the board of directors believes may involve a conflict of interest. The conflicts committee will determine if the resolution of any conflict of interest submitted to it is fair and reasonable to our partnership. Any matters approved by the conflicts committee will be conclusively deemed to be fair and reasonable to our partnership and not a breach of any duties that may be owed to our unitholders. In addition, the conflicts committee may review and approve any related person transactions, other than those that are approved pursuant to our related person policy, as described under "Certain Relationships and Related Party Transactions—Statement of Policy Regarding Transactions with Related Persons," and may establish guidelines or rules to cover specific categories of transactions. The members of the conflicts committee will be required to meet the independence standards for service on an audit committee of a board of directors pursuant to Exchange Act and New York Stock Exchange rules relating to corporate governance matters.

### Nominating and Governance Committee

Our Managing Partner's board of directors will establish a nominating and governance committee that will be responsible for identifying and recommending candidates for appointment to the board of directors and for assisting and advising the board of directors with respect to matters relating to the general operation of the board and corporate governance matters.

### Executive Committee

Our Managing Partner's board of directors will establish an executive committee that will act, when necessary, in place of our Managing Partner's full board of directors during periods in which the board is not in session. The executive committee will be authorized and empowered to act as if it were the full board of directors in overseeing our business and affairs, except that it will not be authorized or empowered to take actions that have been specifically delegated to other board committees or to take actions with respect to (i) the declaration of distributions on our units; (ii) a merger or consolidation of our partnership with or into another entity, (iii) a sale, lease or exchange of all or substantially all of our assets; (iv) a dissolution of our partnership; (v) any action that must be submitted to a vote of our Managing Partner's unitholders or our unitholders; or (vi) any action that may not be delegated to a board committee under our Managing Partner's limited liability company agreement or the Delaware Limited Liability Company Act. We expect that the executive committee will consist of Messrs. Kravis and Roberts.

165

**Compensation Committee Interlocks and Insider Participation**

Because we are a limited partnership, our Managing Partner's board of directors is not required by New York Stock Exchange rules to establish a compensation committee. Our founders, Messrs. Kravis and Roberts, will serve as Co-Chairmen of the board of directors of our Managing Partner. For a description of certain transactions between us and our founders, see "Certain Relationships and Related Party Transactions."

**Executive Compensation**

*Compensation Discussion and Analysis*

A primary objective of many companies when designing executive compensation arrangements has been to align the interests of top executives with the interests of shareholders. As a private firm, one of our fundamental philosophies has been to align the interests of our people with the interests of our fund investors. We have sought to achieve such an alignment in the past through the investment of a significant amount of our own capital and the capital of our principals in and alongside of the funds that we manage and the ownership by our principals of interests in the general partners of our funds that entitle them to a portion of the carried interest that we receive with respect to fund investments.

As a result, our Managing Partner's Co-Chief Executive Officers and our other senior principals have not been paid any salary or bonus and have instead received only cash distributions in respect of their ownership interests in the general partners of our funds and investments that they have made in or alongside our funds. Our Managing Partner's Co-Chief Executive Officers and our other senior principals also receive distributions in respect of their ownership interests in the management companies of our funds, which earn management, transaction, monitoring, incentive and other potential fees. While our Managing Partner's Chief Financial Officer and other principals have received salaries and bonuses, the compensation that they have been paid has been significantly based on the performance of our funds' investments and our management companies and those individuals generally have derived a substantial amount of their financial benefits through their ownership interests in the general partners of our funds and investments that they have made in or alongside our funds. In addition, in establishing compensation for our Managing Partner's Chief Financial Officer, we have taken into account his performance for prior years, the length of time he has been with us and his overall contribution to our business. Moreover, his overall compensation is significantly performance-based, which we believe aligns his interests with the interests of our fund investors.

We believe that our philosophy of aligning the interests of our principals with the interests of our fund investors through equity ownership has been an important contributor to the growth and successful performance of our firm. Because we believe that such an approach will further our goal of creating long-term value for our unitholders, we intend to continue to adhere to this philosophy when designing compensation arrangements as a public company. Following the offering, our principals will hold equity interests in our business through KKR Holdings and, as a result, will receive financial benefits from our business in the form of distributions and payments received from KKR Holdings and the appreciation in the value of the Group Partnership units that KKR Holdings owns.

Our Managing Partner's board of directors intends to review our compensation policies periodically. While the board of directors does not have any plans to modify the compensation philosophy or arrangements described above, its directors may make changes to the compensation policies and decisions relating to one or more individuals based on the outcome of such a review.

*Summary Compensation Table*

The following table presents summary information concerning compensation that we paid or accrued for services rendered by our three executive officers, consisting of our two Co-Chief Executive Officers and

166

our Chief Financial Officer, in all capacities during the fiscal year ended December 31, 2006. We refer to these individuals in other parts of this prospectus as our "named executive officers." As discussed above under "—Compensation Discussion and Analysis," our Managing Partner's Co-Chief Executive Officers historically have not received salary or bonus and, instead, have received financial benefits only through their ownership interests in the general partners and management companies of our funds and investments that they have made in or alongside our funds. While our Managing Partner's Chief Financial Officer has received a salary and bonus, the compensation paid to him has been significantly based on the performance of our funds' investments and he generally has derived a substantial amount of his financial benefits through his ownership interests in the general partners of our funds and investments that he has made in or alongside our funds.

## Summary Compensation Table

| Name and Principal Position | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Nonqualified Deferred Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| Henry R. Kravis Co-Chief Executive Officer | — | — | — | — | — | — | $ | $ |
| George R. Roberts Co-Chief Executive Officer | — | — | — | — | — | — | | |
| William J. Janetschek Principal Financial Officer | | | | | | | | |

### Director Compensation

Our Managing Partner was formed on June 25, 2007 and has not paid any compensation to its directors for their board service. Following the completion of this offering, we intend to limit the individuals who receive compensation for their board service to our Managing Partner's independent directors. We expect to establish customary compensation practices for our Managing Partner's independent directors.

### Non-Competition, Non-Solicitation and Confidentiality Agreements

In connection with this offering, we will enter into a non-competition and non-solicitation agreement with each of Messrs. Kravis and Roberts, our principals, most of our other professional employees and specified senior administrative personnel. These agreements will supersede and replace any other non-competition and non-solicitation agreements with such individuals. The contracting employees have also entered into confidentiality agreements with us, which will not be replaced. A description of the material terms of those agreements is included under "Certain Relationships and Related Party Transactions—Non-Competition, Non-Solicitation and Confidentiality Agreements."

### 2007 Equity Incentive Plan

The board of directors of our Managing Partner intends to adopt the KKR & Co. L.P. 2007 Equity Incentive Plan, or the 2007 Equity Incentive Plan, before the effective date of this offering. The 2007 Equity Incentive Plan will allow us to grant to certain of our employees non-qualified options, unit appreciation rights, restricted common units, phantom restricted common units and other awards based on our common units and Group Partnership units.

### IPO Date Equity Awards

At the time of this offering, we intend to grant to our employees who are not principals an aggregate of        restricted common units under our equity incentive plan, which restricted common units will be allocated based on each employee's seniority. We will settle the restricted common units granted to our non-principal employees in the form of unrestricted common units or in cash. Holders of restricted common units will not be entitled to any voting rights with respect to such restricted common units. We refer to these grants as "IPO Date Equity Grants."

167

# SECURITY OWNERSHIP

## Our Common Units and the Group Partnership Units

The following table sets forth the beneficial ownership of our common units and the Group Partnership units, which are exchangeable for our common units up to four times each year after the completion of this offering on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and reclassifications and compliance with other applicable transfer restrictions, by:

- each person known to us to beneficially own more than 5% of any class of the outstanding voting securities of our partnership;

- each of the directors, director nominees and named executive officers of our Managing Partner; and

- the directors, director nominees and executive officers of our Managing Partner as a group.

The numbers of common units and Group Partnership units outstanding and the percentage of beneficial ownership before this offering set forth below are based on          common units and          Group Partnership units to be issued and outstanding immediately prior to the offering after giving effect to the Reorganization Transactions. The numbers of common units and Group Partnership units outstanding and the percentage of beneficial ownership after the offering set forth below are based on          common units and          Group Partnership units to be issued and outstanding immediately after the completion of the offering and assume that the underwriters do not exercise their option to purchase up to an additional          common units from us. Beneficial ownership is in each case determined in accordance with the rules of the SEC.

| Name(1) | Common Units Beneficially Owned† | | | | Group Partnership Units and Special Voting Units Beneficially Owned†† | | | | Percentage of Combined Voting Power†† | |
| | Prior to Offering | | After the Offering | | Prior to Offering | | After the Offering | | Prior to Offering | After Offering |
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | | |
| Henry R. Kravis | — | — | — | — | | | | | | |
| George R. Roberts | — | — | — | — | | | | | | |
| William J. Janetschek | — | — | | | | | | | | |
| Directors, director nominees and executive officers as a group (6 persons) | — | — | | | | | | | | |

* Less than 1%.

† Group Partnership units are exchangeable (together with the corresponding special voting units) for our common units on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and reclassifications and compliance with applicable transfer restrictions. See "Certain Relationships and Related Party Transactions—Exchange Agreement." Beneficial ownership of Group Partnership units reflected in this table has not also been reflected as beneficial ownership of our common units for which such Group Partnership units may be exchanged.

†† On any matters that may be submitted to a vote of our unitholders, the special voting units will provide their holders with a number of votes that is equal to the aggregate number of Group Partnership units that such holders then hold and will entitle such holders to participate in the vote on the same basis as our unitholders. See "Description of Our Partnership Agreement—Meetings; Voting."

(1) The address of each beneficial owner is c/o KKR Management LLC, 9 West 57th Street, 42nd Floor, New York, New York 10019.

**Our Managing Partner**

Our Managing Partner's outstanding limited liability company interests consist of Class A shares, which are entitled to vote on the election and removal of directors and all other matters that have not been delegated to the board of directors or reserved for the vote of Class B shareholders, and Class B shares, which are entitled to vote only with respect to the manner in which our subsidiaries vote any voting interests that they hold in the general partners of our foreign funds. Our founders, Messrs. Kravis and Roberts, will each own    % of the Class A shares outstanding upon completion of the offering. All of our Managing Partner's other Class A shares will be held by our other senior principals upon the completion of the offering. Our Managing Partner's Class B shares will be divided equally among        principals, each of whom will hold less than 10% of the voting power of the Class B shares. None of these shares provide these holders with economic interests in our business.

168

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

*The forms of the agreements described in this section are filed as exhibits to the registration statement of which this prospectus forms a part, and the following descriptions are qualified by reference to all of the provisions of those agreements.*

**Reorganization Transactions**

Prior to the completion of this offering, we will undertake the Reorganization Transactions pursuant to which KKR Holdings will contribute to the Group Partnerships the interests in the entities described under "Organizational Structure— Group Partnerships" in exchange for Group Partnership units. The amount of Group Partnership units that our existing owners will receive for these interests will represent         % of the Group Partnership units that will be outstanding upon the completion of this offering, assuming that the underwriters do not exercise their option to purchase additional common units from us. In connection with the Reorganization Transactions, the Group Partnerships will make one or more cash and in-kind distributions to our principals representing substantially all of the cash-on-hand and certain personal property of the management company for our private equity funds. If the offering had occurred on March 31, 2007, we estimate that the aggregate amount of such distributions would have been $       million. However, the actual amount of such distributions will depend on the amount of the management company's cash-on-hand at the time of the offering.

**Exchange Agreement**

In connection with the Reorganization Transactions, we will enter into an exchange agreement with KKR Holdings, the entity through which our existing owners, including Messrs. Kravis and Roberts, our Managing Partner's co-Chief Executive Officers, and Mr. Janetschek, our Managing Partner's Chief Financial Officer will hold their Group Partnership units, pursuant to which KKR Holdings or transferees of its Group Partnership units may up to four times each year (subject to the terms of the exchange agreement) exchange Group Partnership units held by them (together with corresponding special voting units) for our common units on a one-for-one basis, subject to customary conversion rate adjustments for splits, unit distributions and reclassifications. The Group Partnership units are also subject to applicable transfer restrictions, and will not be exchangeable before              . We have not yet determined how any such future exchanges will be accounted for in our consolidated financial statements. To the extent that Group Partnership units held by KKR Holdings or its transferees are exchanged for our common units, our interests in the Group Partnerships will be correspondingly increased. Any common units received upon such an exchange will be subject to any restrictions that were applicable to the exchanged Group Partnership units, including any applicable transfer restrictions.

**Registration Rights Agreement**

Prior to the completion of the offering, we will enter into a registration rights agreement with KKR Holdings pursuant to which we will grant KKR Holdings, its affiliates and transferees of its Group Partnership units, including Messrs. Kravis, Roberts and Janetschek, the right, under certain circumstances and subject to certain restrictions, to require us to register under the Securities Act our common units (and other securities convertible into or exchangeable or exercisable for our common units) held or acquired by them. Under the registration rights agreement, holders of registration rights will have the right to request us to register the sale of their common units and also have the right to require us to make available shelf registration statements permitting sales of common units into the market from time to time over an extended period. In addition, holders of registration rights will have the ability to exercise certain piggyback registration rights in connection with registered offerings requested by other holders of registration rights or initiated by us.

169

**Tax Receivable Agreement**

We and our intermediate holding company, a taxable corporation for U.S. federal income tax purposes, may be required to acquire Group Partnership units from time to time pursuant to our exchange agreement with KKR Holdings. Certain of the Group Partnerships intend to have elections under Section 754 of the Internal Revenue Code in effect for each taxable year in which an exchange of Group Partnership units for common units occurs, which may result in an increase in our intermediate holding company's share of the tax basis of the assets of the Group Partnerships at the time of an exchange of Group Partnership units. These exchanges are expected to result in an increase in our intermediate holding company's share of the tax basis of the tangible and intangible assets of the Group Partnerships, primarily attributable to a portion of the goodwill inherent in our business, that would not otherwise have been available. This increase in tax basis may increase (for tax purposes) depreciation and amortization and therefore reduce the amount of income tax our intermediate holding company would otherwise be required to pay in the future. This increase in tax basis may also decrease gain (or increase loss) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

We will enter into a tax receivable agreement with KKR Holdings requiring our intermediate holding company to pay to KKR Holdings or transferees of its Group Partnership units, including Messrs. Kravis, Roberts and Janetschek, 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax that the intermediate holding company actually realizes (or is deemed to realize, in the case of an early termination payment by our intermediate holding company or a change of control) as a result of this increase in tax basis, as well as 85% of the amount of any such savings the intermediate holding company actually realizes (or is deemed to realize) as a result of increases in tax basis that arise due to future payments under the agreement. This payment obligation is an obligation of our intermediate holding company and not of either Group Partnership. We expect our intermediate holding company to benefit from the remaining 15% of cash savings, if any, in income tax that it realizes. In the event that other of our current or future subsidiaries become taxable as corporations and acquire Group Partnership units in the future, or if we become taxable as a corporation for U.S. federal income tax purposes, we expect that each will become subject to a tax receivable agreement with substantially similar terms. For purposes of the tax receivable agreement, cash savings in income tax will be computed by comparing the actual income tax liability of our subsidiary to the amount of such taxes that the intermediate holding company would have been required to pay had there been no increase to the tax basis of the tangible and intangible assets of the Group Partnerships as a result of the exchanges of Group Partnership units and had the intermediate holding company not entered into the tax receivable agreement. The term of the tax receivable agreement will commence upon the completion of this offering and will continue until all such tax benefits have been utilized or expired, unless the intermediate holding company exercises its right to terminate the tax receivable agreement for an amount based on the agreed payments remaining to be made under the agreement. Estimating the amount of payments that may be made under the tax receivable agreement is by its nature imprecise, insofar as the calculation of amounts payable depends on a variety of factors. The actual increase in tax basis, as well as the amount and timing of any payments under the tax receivable agreement, will vary depending upon a number of factors, including:

- the timing of exchanges—for instance, the increase in any tax deductions will vary depending on the fair market value, which may fluctuate over time, of the Group Partnership units, which will depend on the fair market value of the depreciable or amortizable assets of the Group Partnerships at the time of the transaction;

- the price of our common units at the time of the exchange—the increase in any tax deductions, as well as the tax basis increase in other assets, of the Group Partnerships, is directly proportional to the price of our common units at the time of the exchange;

- the extent to which such exchanges are taxable—if an exchange is not taxable for any reason (for instance, in the case of a charitable contribution), increased deductions will not be available; and

170

- the amount, if any, our intermediate holding company is required to pay and the timing of any such payment. If our intermediate holding company does not have taxable income, it will not be required to make payments under the tax receivable agreement for that taxable year because no tax savings will have been actually realized.

We expect that as a result of the amount of the increases in the tax basis of the tangible and intangible assets of the Group Partnerships, assuming no material changes in the relevant tax law and that we earn sufficient taxable income to realize the full tax benefit of the increased amortization of our assets, future payments under the tax receivable agreement will be substantial. The payments under the tax receivable agreement are not conditioned upon our existing owners' continued ownership of us.

The intermediate holding company may terminate the tax receivable agreement at any time by making an early termination payment to KKR Holdings or its transferees, based upon the net present value (based upon certain assumptions in the tax receivable agreement) of all tax benefits that would be required to be paid by the intermediate holding company to KKR Holdings or its transferees. In addition, the tax receivable agreement provides that upon certain mergers, asset sales, other forms of business combinations or other changes of control, the minimum obligations of our intermediate holding company or its successor with respect to exchanged or acquired Group Partnership units (whether exchanged or acquired before or after such transaction) would be based on certain assumptions, including that our intermediate holding company would have sufficient taxable income to fully utilize the increased tax deductions and increased tax basis and other benefits related to entering into the tax receivable agreement.

Decisions made by our senior principals in the course of running our business, such as with respect to mergers, asset sales, other forms of business combinations or other changes of control, may influence the timing and amount of payments that are received by an exchanging or selling holder of partner interests in the Group Partnerships under the tax receivable agreement. For example, the earlier disposition of assets following an exchange or acquisition transaction will generally accelerate payments under the tax receivable agreement and increase the present value of such payments, and the disposition of assets before an exchange or acquisition transaction will increase an existing owner's tax liability without giving rise to any rights of an existing owner to receive payments under the tax receivable agreement.

Although we are not aware of any issue that would cause the IRS to challenge a tax basis increase, our intermediate holding company will not be reimbursed for any payments previously made under the tax receivable agreement if such basis increase is successfully challenged by the IRS. As a result, in certain circumstances, payments could be made under the tax receivable agreement in excess of our intermediate holding company's cash tax savings.

**Group Partnership Agreements**

As a result of the Reorganization Transactions, we will be the sole general partner of KKR Fund Holdings L.P., and our intermediate holding company will be the sole general partner of KKR Management Holdings L.P. Accordingly, we will operate and control all of the business and affairs of the Group Partnerships and, through the Group Partnerships and their subsidiaries, conduct our business. We will have unilateral control over all of the affairs and decision making of the Group Partnerships. Furthermore, we cannot be removed as the general partner of KKR Fund Holdings L.P., and our intermediate holding company cannot be removed as the general partner of KKR Management Holdings L.P., without, in either case, the approval of KKR Holdings or its intermediate holding companies. Because our Managing Partner will operate and control our business, our Managing Partner's board of directors and officers will be responsible for all operational and administrative decisions of the Group Partnerships and the day-to-day management of the Group Partnerships' business.

Pursuant to the partnership agreements of the Group Partnerships, we, as the general partner of KKR Fund Holdings L.P., and our intermediate holding company, as the general partner of KKR Management Holdings L.P., will have the right to determine when distributions will be made to the holders of Group Partnership units and the amount of any such distributions. See "Distribution Policy."

171

The partnership agreements of the Group Partnerships will provide for tax distributions to the holders of Group Partnership units if the general partners of the Group Partnerships determine that distributions from the Group Partnerships would otherwise be insufficient to cover the tax liabilities of a holder of a Group Partnership unit. Generally, these tax distributions will be computed based on our estimate of the net taxable income of the relevant partnership allocable to a holder of a Group Partnership unit multiplied by an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax rate prescribed for an individual or corporate resident in New York, New York (taking into account the nondeductibility of certain expenses and the character of our income).

The partnership agreements of the Group Partnerships authorize the general partners of the Group Partnerships to issue an unlimited number of additional securities of the Group Partnerships with such designations, preferences, rights, powers and duties that are different from, and may be senior to, those applicable to the Group Partnerships units, and which may be exchangeable for our common units.

**Firm Use of Private Aircraft**

Certain of our senior principals, including Messrs. Kravis and Roberts, own aircraft that we use for business purposes in the ordinary course of our operations. They paid for the purchase of these aircraft with their personal funds and bear all operating, personnel and maintenance costs associated with their operation. The hourly rates that we pay for the use of these aircraft are based on current market rates for chartering private aircraft of the same type. We paid $6.5 million for the use of these aircraft during the year ended December 31, 2006, of which $          million was paid to entities collectively controlled by Messrs. Kravis and Roberts.

**Side-By-Side and Other Investments**

As described under "Business," because fund investors typically are unwilling to invest their capital in a fund unless the fund's manager also invests its own capital in the fund's investments, our private equity fund documents generally require the general partners of our traditional private equity funds to make minimum capital commitments to the funds. The amount of these commitments, which are negotiated by fund investors, generally range from 2% to 3% of a fund's total capital commitments at final closing. When investments are made, the general partner contributes capital to the fund based on its fund commitment percentage and acquires a capital interest in the investment that is not subject to a carried interest. Historically, these capital contributions have been funded with cash from operations that otherwise would be distributed to our principals and by our principals. With respect to investments in our private equity portfolio as of March 31, 2007, Messrs. Kravis and Roberts and their investment vehicles have funded $          million of capital contributed by the general partners towards those investments.

In connection with the Reorganization Transactions, we will not acquire capital interests in investments that were funded by our principals or others involved in our business prior to this offering. Rather, those capital interests will be allocated to our principals or others involved in our business and will be reflected in our financial statements as a non-controlling interest in a consolidated entity to the extent that we hold the general partner interest in the fund. Following the completion of this offering, any capital contributions that our private equity fund general partners are required to make to a fund will be funded by us and we will be entitled to receive our allocable share of the gain thereon.

In addition, our principals and certain other qualifying employees are permitted to invest and have invested their own capital in side-by-side investments with our private equity funds. Side-by-side investments are investments made on the same terms and conditions as those available to the applicable fund, except that these side-by-side investments are not subject to management fees or a carried interest. The cash invested by our executive officers and their investment vehicles aggregated to $34.0 million for the year ended December 31, 2006, of which $          million, $          million and $          million was invested by Messrs. Kravis, Roberts and Janetschek, respectively. These investments are not included in the accompanying combined financial statements. Certain of these individuals also own equity interests in KFN, the KKR Strategic Capital Funds and KKR Private Equity Investors, which they hold in a personal capacity on the same terms that have been extended to unrelated third-party investors.

172

**Indemnification of Directors, Officers and Others**

Under our partnership agreement, in most circumstances we will indemnify the following persons, to the fullest extent permitted by law, from and against all losses, claims, damages, liabilities, joint or several, expenses (including legal fees and expenses), judgments, fines, penalties, interest, settlements or other amounts: our Managing Partner; any departing Managing Partner; any person who is or was an affiliate of a Managing Partner or any departing Managing Partner; any person who is or was a member, partner, tax matters partner, officer, director, employee, agent, fiduciary or trustee of our partnership or our subsidiaries, the general partner or any departing general partner or any affiliate of us or our subsidiaries, the Managing Partner or any departing Managing Partner; any person who is or was serving at the request of a Managing Partner or any departing Managing Partner or any affiliate of a Managing Partner or any departing Managing Partner as an officer, director, employee, member, partner, agent, fiduciary or trustee of another person; or any person designated by our Managing Partner. We have agreed to provide this indemnification unless there has been a final and non-appealable judgment by a court of competent jurisdiction determining that these persons acted in bad faith or engaged in fraud or willful misconduct. We have also agreed to provide this indemnification for criminal proceedings. Any indemnification under these provisions will only be out of our assets. Unless it otherwise agrees, the Managing Partner will not be personally liable for, or have any obligation to contribute or loan funds or assets to us to enable us to effectuate, indemnification. We may purchase insurance against liabilities asserted against and expenses incurred by persons in connection with our activities, regardless of whether we would have the power to indemnify the person against liabilities under our partnership agreement. See "Conflicts of Interest and Fiduciary Responsibilities—Fiduciary Duties."

**Guarantee of Contingent Obligations to Fund Partners; Indemnification**

Our senior principals, including Messrs. Kravis and Roberts, have personally guaranteed, on a several basis and subject to a cap, the contingent obligations of the general partners of our private equity funds to repay amounts to fund limited partners pursuant to the general partners' equity clawback obligations. As of March 31, 2007, Messrs. Kravis and Roberts (in each case together with related investment vehicles) had personally guaranteed approximately $      million and $      million, respectively, with respect to our funds' clawback provisions. See "Business—Private Equity Investments—Traditional Private Equity Funds—Overview." These guarantees, which are limited to the amount of the actual clawback obligation, will remain outstanding following the completion of the Reorganization Transactions and this offering. As of March 31, 2007, approximately $1.0 billion of carried interest previously paid to the general partners of our traditional private equity funds remained subject to a potential future clawback obligation. Based on the investment performance of our traditional private equity funds as of March 31, 2007, none of the general partners of those funds would have had to make any payment under such a clawback obligation as of such date. However, in connection with those transactions, we will enter into an agreement with each of our personnel who has entered into such a guarantee pursuant to which we will agree to indemnify such person for any liabilities incurred with respect to the guarantee. This indemnification will not apply with respect to the legacy funds in which we will not acquire an interest in connection with the Reorganization Transactions.

**Facilities**

Certain of our senior principals are partners in a real-estate based partnership that maintains an ownership interest in our Menlo Park location. Payments made from us to this partnership aggregated $1.8 million for the year ended December 31, 2006 of which $      was allocable to each of Messrs. Kravis and Roberts and their investment vehicles.

173

**Non-Competition, Non-Solicitation and Confidentiality Agreements**

In connection with this offering, we expect to enter into a non-competition and non-solicitation agreement with our principals and certain other personnel. These agreements will supersede and replace any other non-competition and non-solicitation agreements with such individuals. Each of our employees, whether or not a contracting employee under a non-competition and non-solicitation agreement, is required, whether during or after his or her employment with us, to protect and only use "confidential information" in accordance with strict restrictions placed by us on its use and disclosure pursuant to firm policy and a confidentiality agreement entered into by our employees.

**Statement of Policy Regarding Transactions with Related Persons**

Prior to the completion of this offering, the board of directors of our Managing Partner will adopt a written statement of policy for our partnership regarding transactions with related persons, which we refer to as our related person policy. Our related person policy requires that a "related person" (as defined as in Item 404(a) of Regulation S-K) must promptly disclose to our Chief Financial Officer or other designated person any "related person transaction" (defined as any transaction, arrangement or relationship, or series of similar transactions, arrangements or relationships, including, without limitation, any loan, guarantee of indebtedness, transfer or lease of real estate, or use of company property) that is reportable by us under Item 404(a) of Regulation S-K in which we were or are to be a participant and the amount involved exceeds $120,000 and in which any related person had or will have a direct or indirect material interest) and all material facts with respect thereto. Those individuals will then promptly communicate that information to the board of directors of our Managing Partner. No related person transaction will be consummated or will continue without the approval or ratification of the board of directors or any committee of the board consisting exclusively of at least three disinterested directors. It is our policy that directors interested in a related person transaction will recuse themselves from any vote on a related person transaction in which they have an interest.

<center>174</center>

## CONFLICTS OF INTEREST AND FIDUCIARY RESPONSIBILITIES

**Conflicts of Interest**

Conflicts of interest exist and may arise in the future as a result of the relationships between our Managing Partner and its affiliates, including each party's respective owners, on the one hand, and our partnership and our limited partners, on the other hand. Whenever a potential conflict arises between our Managing Partner or its affiliates, on the one hand, and us or any limited partner, on the other hand, our Managing Partner will resolve that conflict. Our partnership agreement contains provisions that reduce and eliminate our Managing Partner's duties, including fiduciary duties, to our unitholders. Our partnership agreement also restricts the remedies available to unitholders for actions taken that without those limitations might constitute breaches of duty, including fiduciary duties.

Under our partnership agreement, our Managing Partner will not be in breach of its obligations under the partnership agreement or its duties to us or our unitholders if the resolution of the conflict is:

- approved by the conflicts committee, although our Managing Partner is not obligated to seek such approval;

- approved by the vote of a majority of the outstanding common units, excluding any common units owned by our Managing Partner or any of its affiliates, although our Managing Partner is not obligated to seek such approval;

- on terms no less favorable to us than those generally being provided to or available from unrelated third parties; or

- fair and reasonable to us, taking into account the totality of the relationships among the parties involved, including other transactions that may be particularly favorable or advantageous to us.

Our Managing Partner may, but is not required to, seek the approval of such resolution from the conflicts committee or our unitholders. If our Managing Partner does not seek approval from the conflicts committee or our unitholders and its board of directors determines that the resolution or course of action taken with respect to the conflict of interest satisfies either of the standards set forth in the third and fourth bullet points above, then it will be presumed that in making its decision the board of directors acted in good faith, and in any proceeding brought by or on behalf of any limited partner or us or any other person bound by our partnership agreement, the person bringing or prosecuting such proceeding will have the burden of overcoming such presumption. Unless the resolution of a conflict is specifically provided for in our partnership agreement, our Managing Partner or the conflicts committee may consider any factors it determines in good faith to consider when resolving a conflict. Our partnership agreement provides that our Managing Partner will be conclusively presumed to be acting in good faith if our Managing Partner subjectively believes that the decision made or not made is in the best interests of the partnership.

**Potential Conflicts**

Conflicts of interest could arise in the situations described below, among others.

***Actions taken by our Managing Partner may affect the amount of cash flow from operations to our unitholders.***

The amount of cash flow from operations that is available for distribution to our unitholders is affected by decisions of our Managing Partner regarding such matters as:

- the amount and timing of cash expenditures, including those relating to compensation;

- the amount and timing of investments and dispositions;

- levels of indebtedness;

175

- tax matters;

- levels of reserves; and

- issuances of additional partnership securities.

In addition, borrowings by our partnership and our affiliates do not constitute a breach of any duty owed by our Managing Partner to our unitholders. Our partnership agreement provides that we and our subsidiaries may borrow funds from our Managing Partner and its affiliates on terms that are fair and reasonable to us. Under our partnership agreement, those borrowings will be deemed to be fair and reasonable if (i) they are approved in accordance with the terms of the partnership agreement; (ii) the terms are no less favorable to us than those generally being provided to or available from unrelated third parties or (iii) the terms are fair and reasonable to us, taking into account the totality of the relationships between the parties involved, including other transactions that may be or have been particularly favorable or advantageous to us.

### *We will reimburse our Managing Partner and its affiliates for expenses.*

We will reimburse our Managing Partner and its affiliates for costs incurred in managing and operating our partnership and our business. For example, we do not elect, appoint or employ any directors, officers or other employees. All of those persons are elected, appointed or employed by our Managing Partner on our behalf. Our partnership agreement provides that our Managing Partner will determine the expenses that are allocable to us.

### *Our Managing Partner intends to limit its liability regarding our obligations.*

Our Managing Partner intends to limit its liability under contractual arrangements so that the other party has recourse only to our assets, and not against our Managing Partner, its assets or its owners. Our partnership agreement provides that any action taken by our Managing Partner to limit its liability or our liability is not a breach of our Managing Partner's fiduciary duties, even if we could have obtained more favorable terms without the limitation on liability.

### *Our unitholders will have no right to enforce obligations of our Managing Partner and its affiliates under agreements with us.*

Any agreements between us on the one hand, and our Managing Partner and its affiliates on the other, will not grant our unitholders, separate and apart from us, the right to enforce the obligations of our Managing Partner and its affiliates in our favor.

### *Contracts between us, on the one hand, and our Managing Partner and its affiliates, on the other, will not be the result of arm's-length negotiations.*

Our partnership agreement allows our Managing Partner to determine in its sole discretion any amounts to pay itself or its affiliates for any services rendered to us. Our Managing Partner may also enter into additional contractual arrangements with any of its affiliates on our behalf. Neither our partnership agreement nor any of the other agreements, contracts and arrangements between us on the one hand, and our Managing Partner and its affiliates on the other, are or will be the result of arm's-length negotiations. Our Managing Partner will determine the terms of any of these transactions entered into after this offering on terms that it considers are fair and reasonable to us. Our Managing Partner and its affiliates will have no obligation to permit us to use any facilities or assets of our Managing Partner and its affiliates, except as may be provided in contracts entered into specifically dealing with such use. There will not be any obligation of our Managing Partner and its affiliates to enter into any contracts of this kind.

176

*Our common units are subject to our Managing Partner's limited call right.*

Our Managing Partner may exercise its right to call and purchase common units as provided in our partnership agreement or assign this right to one of its affiliates or to us. Our Managing Partner may use its own discretion, free of fiduciary duty restrictions, in determining whether to exercise this right. As a result, a unitholder may have his common units purchased from him at an undesirable time or price. See "Description of Our Partnership Agreement—Limited Call Right."

*We may choose not to retain separate counsel for ourselves or for the holders of common units.*

The attorneys, independent accountants and others who have performed services for us regarding this offering have been retained by our Managing Partner. Attorneys, independent accountants and others who will perform services for us are selected by our Managing Partner or the conflicts committee, and may perform services for our Managing Partner and its affiliates. We may retain separate counsel for ourselves or our unitholders in the event of a conflict of interest between our Managing Partner and its affiliates on the one hand, and us or our unitholders on the other, depending on the nature of the conflict, but are not required to do so.

*Our Managing Partner's affiliates may compete with us.*

Our partnership agreement provides that our Managing Partner will be restricted from engaging in any business activities other than activities incidental to its ownership of interests in us. Except as provided in the non-competition, non-solicitation and confidentiality agreements to which our principals will be subject, affiliates of the Managing Partner, including its owners, are not prohibited from engaging in other businesses or activities, including those that might compete directly with us.

*Certain of our subsidiaries have obligations to investors in our investment funds and may have obligations to other third parties that may conflict with your interests.*

Our subsidiaries that serve as the general partners of our investment funds have fiduciary and contractual obligations to the investors in those funds and some of our subsidiaries may have contractual duties to other third parties. As a result, we expect to regularly take actions with respect to the allocation of investments among our investment funds (including funds that have different fee structures), the purchase or sale of investments in our investment funds, the structuring of investment transactions for those funds, the advice we provide or otherwise that comply with these fiduciary and contractual obligations. In addition, our principals have made personal investments in a variety of our investment funds, which may result in conflicts of interest among investors in our funds or our unitholders regarding investment decisions for these funds. Some of these actions might at the same time adversely affect our near-term results of operations or cash flow.

*U.S. federal income tax considerations of our principals may conflict with your interests.*

Because our principals will hold their Group Partnership units directly or through entities that are not subject to corporate income taxation and we hold Group Partnership units directly through a subsidiary that is subject to taxation as a corporation in the United States, conflicts may arise between our principals and our partnership relating to the selection and structuring of investments. Our unitholders will be deemed to expressly acknowledge that our Managing Partner is under no obligation to consider the separate interests of such holders, including among other things the tax consequences to our unitholders, in deciding whether to cause us to take or decline to take any actions.

**Fiduciary Duties**

Our Managing Partner is accountable to us and our unitholders as a fiduciary. Fiduciary duties owed to our unitholders by our Managing Partner are prescribed by law and our partnership agreement. The

177

Delaware Limited Partnership Act provides that Delaware limited partnerships may in their partnership agreements expand, restrict or eliminate the duties, including fiduciary duties, otherwise owed by a Managing Partner to limited partners and the partnership.

Our partnership agreement contains various provisions modifying, restricting and eliminating the duties, including fiduciary duties, that might otherwise be owed by our Managing Partner. We have adopted these restrictions to allow our Managing Partner or its affiliates to engage in transactions with us that would otherwise be prohibited by state-law fiduciary duty standards and to take into account the interests of other parties in addition to our interests when resolving conflicts of interest. Without these modifications, our Managing Partner's ability to make decisions involving conflicts of interest would be restricted. These modifications are detrimental to our unitholders because they restrict the remedies available to our unitholders for actions that without those limitations might constitute breaches of duty, including a fiduciary duty, as described below, and they permit our Managing Partner to take into account the interests of third parties in addition to our interests when resolving conflicts of interest.

The following is a summary of the material restrictions of the fiduciary duties owed by our Managing Partner to our unitholders:

| State Law Fiduciary Duty Standards | Fiduciary duties are generally considered to include an obligation to act in good faith and with due care and loyalty. In the absence of a provision in a partnership agreement providing otherwise, the duty of care would generally require a general partner to act for the partnership in the same manner as a prudent person would act on his own behalf. In the absence of a provision in a partnership agreement providing otherwise, the duty of loyalty would generally prohibit a general partner of a Delaware limited partnership from taking any action or engaging in any transaction that is not in the best interests of the partnership where a conflict of interest is present. |
|---|---|
| Partnership Agreement Modified Standards | *General* |
| | Our partnership agreement contains provisions that waive or consent to conduct by our Managing Partner and its affiliates that might otherwise raise issues about compliance with fiduciary duties or applicable law. For example, our partnership agreement provides that when our Managing Partner, in its capacity as our Managing Partner, is permitted to or required to make a decision in its "sole discretion" or "discretion" or that it deems "necessary or appropriate" or "necessary or advisable" then our Managing Partner will be entitled to consider only such interests and factors as it desires, including its own interests, and will have no duty or obligation (fiduciary or otherwise) to give any consideration to any |

178

factors affecting us or any limited partners, including our unitholders, and will not be subject to any different standards imposed by the partnership agreement, the Delaware Limited Partnership Act or under any other law, rule or regulation or in equity. In addition, when our Managing Partner is acting in its individual capacity, as opposed to in its capacity as our Managing Partner, it may act without any fiduciary obligation to us or the unitholders whatsoever. These standards reduce the obligations to which our Managing Partner would otherwise be held.

In addition to the other more specific provisions limiting the obligations of our Managing Partner, our partnership agreement further provides that our Managing Partner and its officers and directors will not be liable to us, our limited partners, including our unitholders, or assignees for errors of judgment or for any acts or omissions unless there has been a final and non-appealable judgment by a court of competent jurisdiction determining that the Managing Partner or its officers and directors acted in bad faith or engaged in fraud or willful misconduct.

### Special Provisions Regarding Affiliated Transactions

Our partnership agreement generally provides that affiliated transactions and resolutions of conflicts of interest not involving a vote of unitholders and that are not approved by the conflicts committee of the board of directors of our Managing Partner or by our unitholders must be:

- on terms no less favorable to us than those generally being provided to or available from unrelated third parties; or

- "fair and reasonable" to us, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to us).

179

If our Managing Partner does not seek approval from the conflicts committee or our unitholders and the board of directors of our Managing Partner determines that the resolution or course of action taken with respect to the conflict of interest satisfies either of the standards set forth in the bullet points above, then it will be presumed that in making its decision, the board of directors acted in good faith, and in any proceeding brought by or on behalf of any limited partner, including our unitholders, or our partnership or any other person bound by our partnership agreement, the person bringing or prosecuting such proceeding will have the burden of overcoming such presumption. These standards reduce the obligations to which our Managing Partner would otherwise be held.

**Rights and Remedies of Unitholders**

The Delaware Limited Partnership Act generally provides that a limited partner may institute legal action on behalf of the partnership to recover damages from a third-party where a general partner has refused to institute the action or where an effort to cause a general partner to do so is not likely to succeed. In addition, the statutory or case law of some jurisdictions may permit a limited partner to institute legal action on behalf of himself and all other similarly situated limited partners to recover damages from a general partner for violations of its fiduciary duties to the limited partners.

By purchasing our common units, each unitholder will automatically agree to be bound by the provisions in our partnership agreement, including the provisions described above. This is in accordance with the policy of the Delaware Limited Partnership Act favoring the principle of freedom of contract and the enforceability of partnership agreements. The failure of a unitholder to sign our partnership agreement does not render our partnership agreement unenforceable against that person.

We have agreed to indemnify our Managing Partner and any of its affiliates and any member, partner, tax matters partner, officer, director, employee, agent, fiduciary or trustee of our partnership, our Managing Partner or any of our affiliates and certain other specified persons, to the fullest extent permitted by law, against any and all losses, claims, damages, liabilities, joint or several, expenses (including legal fees and expenses), judgments, fines, penalties, interest, settlements or other amounts incurred by our Managing Partner or these other persons. We have agreed to provide this indemnification unless there has been a final and non-appealable judgment by a court of competent jurisdiction determining that these persons acted in bad faith or engaged in fraud or willful misconduct. We have also agreed to provide this indemnification for criminal proceedings. Thus, our Managing Partner could be indemnified for its negligent acts if it met the requirements set forth above. To the extent these provisions purport to include indemnification for liabilities arising under the Securities Act, in the opinion of the SEC such indemnification is contrary to public policy and therefore unenforceable. See "Description of Our Partnership Agreement—Indemnification."

180

## DESCRIPTION OF OUR COMMON UNITS

**Common Units**

Our common units represent limited partner interests in us. Our unitholders are entitled to participate in our distributions and exercise the rights or privileges available to limited partners under our partnership agreement. We will be dependent upon the Group Partnerships to fund any distributions we may make to our unitholders. As described under "Distribution Policy," the partnership agreements of the Group Partnership will provide that until　　　　　, distributions from the Group Partnerships, if any, will be allocated first to us and our intermediate holding company until sufficient amounts have been so allocated to permit us to make aggregate distributions to our unitholders of $　　　　　 per common unit on an annualized basis for such year. For a description of the relative rights and preferences of holders of our unitholders in and to our distributions, see "Distribution Policy." For a description of the rights and privileges of limited partners under our partnership agreement, including voting rights, see "Description of Our Limited Partnership Agreement."

Unless our Managing Partner determines otherwise, we will issue all our common units in uncertificated form.

**Transfer of Common Units**

By acceptance of the transfer of our common units in accordance with our partnership agreement, each transferee of our common units will be admitted as a unitholder with respect to the common units transferred when such transfer and admission is reflected in our books and records. Additionally, each transferee of our common units:

- will represent that the transferee has the capacity, power and authority to enter into our partnership agreement;

- will become bound by the terms of, and will be deemed to have agreed to be bound by, our partnership agreement;

- will give the consents, approvals, acknowledgements and waivers set forth in our partnership agreement, such as the approval of all transactions and agreements that we are entering into in connection with the Reorganization Transactions and this offering.

A transferee will become a substituted limited partner of our partnership for the transferred common units automatically upon the recording of the transfer on our books and records. Our Managing Partner will cause any transfers to be recorded on our books and records no less frequently than quarterly.

Common units are securities and are transferable according to the laws governing transfers of securities. In addition to other rights acquired upon transfer, the transferor gives the transferee the right to become a substituted limited partner in our partnership for the transferred common units.

Until a common unit has been transferred on our books, we and the transfer agent, notwithstanding any notice to the contrary, may treat the record holder of the common unit as the absolute owner for all purposes, except as otherwise required by law or stock exchange regulations. A beneficial holder's rights are limited solely to those that it has against the record holder as a result of any agreement between the beneficial owner and the record holder.

**Transfer Agent and Registrar**

　　　　　will serve as registrar and transfer agent for our common units. You may contact the registrar and transfer agent at the following address:　　　　　.

181

## DESCRIPTION OF OUR LIMITED PARTNERSHIP AGREEMENT

*The following is a description of the material terms of our limited partnership agreement and is qualified in its entirety by reference to all of the provisions of our limited partnership agreement, which we have included in Appendix A to this prospectus. Because this description is only a summary of the terms of our limited partnership agreement, it does not contain all of the information that you may find important. For additional information, you should read the limited partnership agreement included in Appendix A to this prospectus, "Description of Common Units—Transfer of Common Units" and "Material U.S. Federal Tax Considerations."*

**Managing Partner**

Our general partner, or Managing Partner, will manage all of our operations and activities. Our Managing Partner will be authorized in general to perform all acts that it determines to be necessary or appropriate to carry out our purposes and to conduct our business. Our Managing Partner will be wholly-owned by our principals and certain of our former personnel and controlled by our founders. See "Organizational Structure." Our unitholders will have only limited voting rights relating to certain matters affecting your investment and therefore will have limited ability to influence management's decisions regarding our business.

**Organization**

We were formed on June 25, 2007 and have a perpetual existence.

**Purpose**

Under our partnership agreement we will be permitted to engage, directly or indirectly, in any business activity that is approved by our Managing Partner and that lawfully may be conducted by a limited partnership organized under Delaware law.

**Power of Attorney**

Each limited partner, and each person who acquires a limited partner interest in accordance with our partnership agreement, grants to our Managing Partner and, if appointed, a liquidator, a power of attorney to, among other things, execute and file documents required for our qualification, continuance, dissolution or termination. The power of attorney will also grant our Managing Partner the authority to amend, and to make consents and waivers under, our partnership agreement and certificate of limited partnership, in each case in accordance with our partnership agreement.

**Capital Contributions**

Our unitholders will not be obligated to make additional capital contributions, except as described below under "—Limited Liability." Our Managing Partner will not be obliged to make any capital contributions.

**Limited Liability**

Assuming that a limited partner does not participate in the control of our business within the meaning of the Delaware Limited Partnership Act and that he otherwise acts in conformity with the provisions of our partnership agreement, his liability under the Delaware Limited Partnership Act will be limited, subject to possible exceptions, to the amount of capital he is obligated to contribute to us for his common units plus his share of any undistributed profits and assets. If it were determined however that the right, or exercise of the right, by the limited partners as a group:

- to approve some amendments to our partnership agreement, or

182

- to take other action under our partnership agreement,

constituted "participation in the control" of our business for the purposes of the Delaware Limited Partnership Act, then our limited partners could be held personally liable for our obligations under the laws of Delaware to the same extent as our Managing Partner. This liability would extend to persons who transact business with us who reasonably believe that the limited partner is a Managing Partner. Neither our partnership agreement nor the Delaware Limited Partnership Act specifically will provide for legal recourse against our Managing Partner if a limited partner were to lose limited liability through any fault of our Managing Partner. While this does not mean that a limited partner could not seek legal recourse, we know of no precedent for this type of a claim in Delaware case law.

Under the Delaware Limited Partnership Act, a limited partnership may not make a distribution to a partner if, after the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partner interests and liabilities for which the recourse of creditors is limited to specific property of the partnership, would exceed the fair value of the assets of the limited partnership. For the purpose of determining the fair value of the assets of a limited partnership, the Delaware Limited Partnership Act provides that the fair value of property subject to liability for which recourse of creditors is limited will be included in the assets of the limited partnership only to the extent that the fair value of that property exceeds the non-recourse liability. The Delaware Limited Partnership Act provides that a limited partner who receives a distribution and knew at the time of the distribution that the distribution was in violation of the Delaware Limited Partnership Act will be liable to the limited partnership for the amount of the distribution for three years. Under the Delaware Limited Partnership Act, a substituted limited partner of a limited partnership is liable for the obligations of his assignor to make contributions to the partnership, except that such person is not obligated for liabilities unknown to him at the time he became a limited partner and that could not be ascertained from the partnership agreement.

Moreover, if it were determined that we were conducting business in any state without compliance with the applicable limited partnership statute, or that the right or exercise of the right by the limited partners as a group to remove or replace our Managing Partner, to approve some amendments to our partnership agreement or to take other action under our partnership agreement constituted "participation in the control" of our business for purposes of the statutes of any relevant jurisdiction, then the limited partners could be held personally liable for our obligations under the law of that jurisdiction to the same extent as our Managing Partner. We intend to operate in a manner that our Managing Partner considers reasonable and necessary or appropriate to preserve the limited liability of the limited partners.

### Issuance of Additional Securities

Our partnership agreement authorizes us to issue an unlimited number of additional partnership securities and options, rights, warrants and appreciation rights relating to partnership securities for the consideration and on the terms and conditions established by our Managing Partner in its sole discretion without the approval of any limited partners.

In accordance with the Delaware Limited Partnership Act and the provisions of our partnership agreement, we may also issue additional partner interests that have designations, preferences, rights, powers and duties that are different from, and may be senior to, those applicable to common units.

### Distributions

Distributions will be made to the partners pro rata according to the percentages of their respective partner interests. See "Distribution Policy."

183

**Amendment of the Partnership Agreement**

*General*

Amendments to our partnership agreement may be proposed only by or with the consent of our Managing Partner. To adopt a proposed amendment, other than the amendments that do not require limited partner approval discussed below, our Managing Partner must seek approval of a majority of our outstanding voting units (as defined below) in order to approve the amendment or call a meeting of the limited partners to consider and vote upon the proposed amendment. On any matter that may be submitted for a vote of our unitholders, the holders of Group Partnership units will hold special voting units in our partnership that provide them with a number of votes that is equal to the aggregate number of Group Partnership units that they then hold and entitle them to participate in the vote on the same basis as our unitholders. See "—Meetings; Voting." The Group Partnership units, other than the Group Partnership units held by us, will initially be owned by KKR Holdings, which is owned by our principals and certain of our former personnel and controlled by our founders.

*Prohibited Amendments*

No amendment may be made that would:

(1)   enlarge the obligations of any limited partner without its consent, except that any amendment that would have a material adverse effect on the rights or preferences of any class of partner interests in relation to other classes of partner interests may be approved by at least a majority of the type or class of partner interests so affected, or

(2)   enlarge the obligations of, restrict in any way any action by or rights of, or reduce in any way the amounts distributable, reimbursable or otherwise payable by us to our Managing Partner or any of its affiliates without the consent of our Managing Partner, which may be given or withheld in its sole discretion.

The provision of our partnership agreement preventing the amendments having the effects described in clauses (1) or (2) above can be amended upon the approval of the holders of at least    % of the outstanding voting units.

*No Limited Partner Approval*

Our Managing Partner may generally make amendments to our partnership agreement or certificate of limited partnership without the approval of any limited partner to reflect:

(1)   a change in the name of the partnership, the location of the partnership's principal place of business, the partnership's registered agent or its registered office,

(2)   the admission, substitution, withdrawal or removal of partners in accordance with the partnership agreement,

(3)   a change that our Managing Partner determines is necessary or appropriate for the partnership to qualify or to continue our qualification as a limited partnership or a partnership in which the limited partners have limited liability under the laws of any state or other jurisdiction or to ensure that the partnership will not be treated as an association taxable as a corporation or otherwise taxed as an entity for U.S. federal income tax purposes,

(4)   an amendment that our Managing Partner determines to be necessary or appropriate to address certain changes in U.S. federal income tax regulations, legislation or interpretation,

(5)   an amendment that is necessary, in the opinion of our counsel, to prevent the partnership or our Managing Partner or its directors, officers, agents or trustees, from having a material risk of being in any manner subjected to the provisions of the Investment Company Act, the Investment Advisers

184

Act or "plan asset" regulations adopted under ERISA, whether or not substantially similar to plan asset regulations currently applied or proposed by the U.S. Department of Labor,

(6) an amendment that our Managing Partner determines in its sole discretion to be necessary or appropriate for the creation, authorization or issuance of any class or series of partnership securities or options, rights, warrants or appreciation rights relating to partnership securities,

(7) any amendment expressly permitted in our partnership agreement to be made by our Managing Partner acting alone,

(8) an amendment effected, necessitated or contemplated by an agreement of merger, consolidation or other business combination agreement that has been approved under the terms of our partnership agreement,

(9) any amendment that in the sole discretion of our Managing Partner is necessary or appropriate to reflect and account for the formation by the partnership of, or its investment in, any corporation, partnership, joint venture, limited liability company or other entity, as otherwise permitted by our partnership agreement,

(10) a change in our fiscal year or taxable year and related changes,

(11) a merger with or conversion or conveyance to another limited liability entity that is newly formed and has no assets, liabilities or operations at the time of the merger, conversion or conveyance other than those it receives by way of the merger, conversion or conveyance,

(12) an amendment effected, necessitated or contemplated by an amendment to any partnership agreement of the Group Partnerships that requires unitholders of any partnership of the Group Partnerships to provide a statement, certification or other proof of evidence regarding whether such unitholder is subject to U.S. federal income taxation on the income generated by the partnership of the Group Partnerships; or

(13) any other amendments substantially similar to any of the matters described in (1) through (12) above.

In addition, our Managing Partner may make amendments to our partnership agreement without the approval of any limited partner if those amendments, in the discretion of our Managing Partner:

(1) do not adversely affect our limited partners considered as a whole (including any particular class of partner interests as compared to other classes of partner interests) in any material respect,

(2) are necessary or appropriate to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state or non-U.S. agency or judicial authority or contained in any federal or state or non-U.S. statute (including the Delaware Limited Partnership Act),

(3) are necessary or appropriate to facilitate the trading of limited partner interests or to comply with any rule, regulation, guideline or requirement of any securities exchange on which the limited partner interests are or will be listed for trading,

(4) are necessary or appropriate for any action taken by our Managing Partner relating to splits or combinations of units under the provisions of our partnership agreement, or

(5) are required to effect the intent expressed in the registration statement of which this prospectus forms a part or the intent of the provisions of our partnership agreement or are otherwise contemplated by our partnership agreement.

185

*Opinion of Counsel and Limited Partner Approval*

Our Managing Partner will not be required to obtain an opinion of counsel that an amendment will not result in a loss of limited liability to the limited partners if one of the amendments described above under "—No Limited Partner Approval" should occur. No other amendments to our partnership agreement (other than an amendment pursuant to a merger, sale or other disposition of assets effected in accordance with the provisions described under "—Merger, Sale or Other Disposition of Assets") will become effective without the approval of holders of at least          % of the outstanding voting units, unless we obtain an opinion of counsel to the effect that the amendment will not affect the limited liability under the Delaware Limited Partnership Act of any of our limited partners.

In addition to the above restrictions, any amendment that would have a material adverse effect on the rights or preferences of any type or class of partner interests in relation to other classes of partner interests will also require the approval of the holders of at least a majority of the outstanding partner interests of the class so affected.

In addition, any amendment that reduces the voting percentage required to take any action must be approved by the affirmative vote of limited partners whose aggregate outstanding voting units constitute not less than the voting requirement sought to be reduced.

**Merger, Sale or Other Disposition of Assets**

Our partnership agreement will provide that our Managing Partner may cause us to, among other things, sell, exchange or otherwise dispose of all or substantially all of our assets in a single transaction or a series of related transactions, including by way of merger, consolidation or other combination, or approve the sale, exchange or other disposition of all or substantially all of the assets of our subsidiaries, in each case, without the prior approval of the holders of our outstanding voting units. In addition, our Managing Partner in its sole discretion may mortgage, pledge, hypothecate or grant a security interest in all or substantially all of our assets (including for the benefit of persons other than us or our subsidiaries) without the prior approval of the holders of our outstanding voting units. Our Managing Partner may also sell all or substantially all of our assets under any forced sale of any or all of our assets pursuant to the foreclosure or other realization upon those encumbrances without the prior approval of the holders of our outstanding voting units.

If conditions specified in our partnership agreement are satisfied, our Managing Partner may convert or merge us or any of our subsidiaries into, or convey some or all of our assets to, a newly formed entity if the sole purpose of that merger or conveyance is to effect a mere change in our legal form into another limited liability entity. The unitholders will not be entitled to dissenters' rights of appraisal under our partnership agreement or the Delaware Limited Partnership Act in the event of a merger or consolidation, a sale of substantially all of our assets or any other similar transaction or event.

**Election to be Treated as a Corporation**

If our Managing Partner, in its sole discretion, determines that it is no longer in our interests to continue as a partnership for U.S. federal income tax purposes, our Managing Partner may elect to treat us as an association or as a publicly traded partnership taxable as a corporation for U.S. federal (and applicable state) income tax purposes or may chose to convert to a corporation.

**Dissolution**

We will dissolve upon:

     1)   the election of our Managing Partner to dissolve us, if approved by the holders of a majority of the voting power of our outstanding voting units,

186

2)   there being no limited partners, unless we are continued without dissolution in accordance with the Delaware Limited Partnership Act,

3)   the entry of a decree of judicial dissolution of us pursuant to the Delaware Limited Partnership Act, or

4)   the withdrawal or removal of our Managing Partner or any other event that results in its ceasing to be our Managing Partner other than by reason of a transfer of general partner interests or withdrawal or removal of our Managing Partner following approval and admission of a successor, in each case in accordance with our partnership agreement.

Upon a dissolution under clause (4), the holders of a majority of the voting power of our outstanding voting units may also elect, within specific time limitations, to continue our business without dissolution on the same terms and conditions described in the partnership agreement by appointing as a successor Managing Partner an individual or entity approved by the holders of a majority of the voting power of the outstanding voting units, subject to our receipt of an opinion of counsel to the effect that the action would not result in the loss of limited liability of any limited partner.

**Liquidation and Distribution of Proceeds**

Upon our dissolution, the Managing Partner shall act, or select one or more persons to act, as liquidator. Unless we are continued as a new limited partnership, the liquidator authorized to wind up our affairs will, acting with all of the powers of our Managing Partner that the liquidator deems necessary or appropriate in its judgment, liquidate our assets and apply the proceeds of the liquidation first, to discharge our liabilities as provided in the partnership agreement and by law and thereafter to the limited partners pro rata according to the percentages of their respective partner interests as of a record date selected by the liquidator. The liquidator may defer liquidation of our assets for a reasonable period of time or distribute assets to partners in kind if it determines that an immediate sale or distribution of all or some of our assets would be impractical or would cause undue loss to the partners.

**Withdrawal or Removal of the Managing Partner**

Except as described below, our Managing Partner will agree not to withdraw voluntarily as the Managing Partner prior to    , 2017 without obtaining the approval of the holders of at least a majority of the outstanding voting units, excluding voting units held by our Managing Partner and its affiliates, and furnishing an opinion of counsel regarding tax and limited liability matters. On or after    , 2017, our Managing Partner may withdraw as Managing Partner without first obtaining approval of any common unitholder by giving 90 days' advance notice, and that withdrawal will not constitute a violation of the partnership agreement. Notwithstanding the foregoing, our Managing Partner may withdraw at any time without unitholder approval upon 90 days' advance notice to the limited partners if at least 50% of the outstanding common units are beneficially owned or owned of record or controlled by one person and its affiliates other than our Managing Partner and its affiliates.

Upon the withdrawal of our Managing Partner under any circumstances, the holders of a majority of the voting power of our outstanding voting units may select a successor to that withdrawing Managing Partner. If a successor is not elected, or is elected but an opinion of counsel regarding limited liability and tax matters cannot be obtained, we will be dissolved, wound up and liquidated, unless within 180 days after that withdrawal, the holders of a majority of the voting power of our outstanding voting units agree in writing to continue our business and to appoint a successor Managing Partner. See "—Dissolution" above.

Our Managing Partner may not be removed without its consent. Any removal of our Managing Partner is also subject to the approval of a successor Managing Partner by the vote of the holders of    % of the voting power of our outstanding voting units. Upon completion of this offering, our principals will

have    % of the voting power in any vote of our unitholders and will accordingly be able to prevent the removal of our Managing Partner. See "—Meetings; Voting" below.

In the event of removal or withdrawal of a Managing Partner, the departing Managing Partner will have the option to require the successor Managing Partner to purchase the general partner interest of the departing Managing Partner for a cash payment equal to its fair market value. This fair market value will be determined by agreement between the departing Managing Partner and the successor Managing Partner. If no agreement is reached within 30 days of the Managing Partner's departure, an independent investment banking firm or other independent consultant selected by the departing Managing Partner and the successor Managing Partner will determine the fair market value. If the departing Managing Partner and the successor Managing Partner cannot agree upon an expert within 45 days of the Managing Partner's departure, then an expert chosen by agreement of the experts selected by each of them will determine the fair market value.

If the option described above is not exercised by either the departing Managing Partner or the successor Managing Partner, the departing Managing Partner's general partner interest will automatically convert into common units pursuant to a valuation of those interests as determined by an investment banking firm or other independent consultant selected in the manner described in the preceding paragraph.

In addition, we will be required to reimburse the departing Managing Partner for all amounts due the departing Managing Partner, including without limitation all employee-related liabilities, including severance liabilities, incurred for the termination of any employees employed by the departing Managing Partner or its affiliates for our benefit.

**Transfer of General Partner Interests**

Except for transfer by our Managing Partner of all, but not less than all, of its general partner interests in us to an affiliate of our Managing Partner, or to another entity as part of the merger or consolidation of our Managing Partner with or into another entity or the transfer by our Managing Partner of all or substantially all of its assets to another entity, our Managing Partner may not transfer all or any part of its general partner interest in us to another person prior to    , 2017 without the approval of the holders of at least a majority of the voting power of our outstanding voting units, excluding voting units held by our Managing partner and its affiliates. On or after    , 2017, our Managing Partner may transfer all or any part of its general partner interest without first obtaining approval of any unitholder. As a condition of this transfer, the transferee must assume the rights and duties of the Managing Partner to whose interest that transferee has succeeded, agree to be bound by the provisions of our partnership agreement and furnish an opinion of counsel regarding limited liability matters. At any time, the members of our Managing Partner may sell or transfer all or part of their limited liability company interests in our Managing Partner without the approval of the unitholders.

**Limited Call Right**

If at any time

    (i)    less than    % of the then issued and outstanding limited partner interests of any class (other than special voting units), including our common units, are held by persons other than our Managing Partner and its affiliates, or

    (ii)    any of the Partnership, or the Managing Partner or its directors, officers, trustees or agents are in any manner subjected to the provisions of the Investment Company Act

our Managing Partner will have the right, which it may assign in whole or in part to any of its affiliates or to us, to acquire all, but not less than all, of the remaining limited partner interests of the class held by

188

unaffiliated persons as of a record date to be selected by our Managing Partner, on at least ten but not more than 60 days notice. The purchase price in the event of this purchase is the greater of:

(1) the current market price as of the date three days before the date the notice is mailed, and

(2) the highest cash price paid by our Managing Partner or any of its affiliates acting in concert with us for any limited partner interests of the class purchased within the 90 days preceding the date on which our Managing Partner first mails notice of its election to purchase those limited partner interests.

As a result of our Managing Partner's right to purchase outstanding limited partner interests, a holder of limited partner interests may have his limited partner interests purchased at an undesirable time or price. The tax consequences to a unitholder of the exercise of this call right are the same as a sale by that unitholder of his common units in the market. See "Material U.S. Federal Tax Considerations—U.S. Taxes—Consequences to U.S. Holders of Common Units—Sale or Exchange of Common Units."

## Sinking Fund; Preemptive Rights

We will not establish a sinking fund and we will not grant any preemptive rights with respect to our limited partner interests.

## Meetings; Voting

Except as described below regarding a person or group owning          % or more of our common units then outstanding, record holders of common units or of the special voting units to be issued to holders of Group Partnership units on the record date will be entitled to notice of, and to vote at, meetings of our limited partners and to act upon matters as to which holders of limited partner interests have the right to vote or to act.

Except as described below regarding a person or group owning          % or more of our common units then outstanding, each record holder of a common unit of our partnership will be entitled to a number of votes equal to the number of common units held. In addition, we will issue special voting units to each holder of Group Partnership units that provide them with a number of votes that is equal to the aggregate number of Group Partnership units that they then hold and entitle them to participate in the vote on the same basis as our unitholders. We refer to our common units and our special voting units as "voting units." If the ratio at which Group Partnership units are exchangeable for our common units changes from one-for-one as described under "Certain Relationships and Related Party Transactions—Exchange Agreement," the number of votes to which the holders of the special voting units are entitled will be adjusted accordingly. Additional limited partner interests having special voting rights could also be issued. See "—Issuance of Additional Securities" above.

In the case of common units held by our Managing Partner on behalf of non-citizen assignees, our Managing Partner will distribute the votes on those common units in the same ratios as the votes of partners in respect of other limited partner interests are cast. Our Managing Partner does not anticipate that any meeting of unitholders will be called in the foreseeable future. Any action that is required or permitted to be taken by the limited partners may be taken either at a meeting of the limited partners or without a meeting, without a vote and without prior notice if consents in writing describing the action so taken are signed by limited partners owning not less than the minimum percentage of the voting power of the outstanding limited partner interests that would be necessary to authorize or take that action at a meeting. Meetings of the limited partners may be called by our Managing Partner or by limited partners owning at least 50% or more of the voting power of the outstanding limited partner interests of the class for which a meeting is proposed. Unitholders may vote either in person or by proxy at meetings. The holders of a majority of the voting power of the outstanding limited partner interests of the class for which a meeting has been called, represented in person or by proxy, will constitute a quorum unless any action by

189

the limited partners requires approval by holders of a greater percentage of such limited partner interests, in which case the quorum will be the greater percentage.

However, if at any time any person or group (other than our Managing Partner and its affiliates, or a direct or subsequently approved transferee of our Managing Partner or its affiliates) acquires, in the aggregate, beneficial ownership of          % or more of any class of our common units then outstanding, that person or group will lose voting rights on all of its common units and the common units may not be voted on any matter and will not be considered to be outstanding when sending notices of a meeting of unitholders, calculating required votes, determining the presence of a quorum or for other similar purposes. Common units held in nominee or street name account will be voted by the broker or other nominee in accordance with the instruction of the beneficial owner unless the arrangement between the beneficial owner and his nominee provides otherwise.

## Status as Limited Partner

By transfer of common units in accordance with our partnership agreement, each transferee of common units will be admitted as a limited partner with respect to the common units transferred when such transfer and admission is reflected in our books and records. Except as described under "—Limited Liability" above, in our partnership agreement or pursuant to Section 17-804 of the Delaware Limited Partnership Act (which relates to the liability of a limited partner who receives a distribution of assets upon the winding up of a limited partnership and who knew at the time of such distribution that it was in violation of this provision) the common units will be fully paid and non-assessable.

## Non-Citizen Assignees; Redemption

If we are or become subject to federal, state or local laws or regulations that in the determination of our Managing Partner create a substantial risk of cancellation or forfeiture of any property in which the partnership has an interest because of the nationality, citizenship or other related status of any limited partner, we may redeem the common units held by that limited partner at their current market price. To avoid any cancellation or forfeiture, our Managing Partner may require each limited partner to furnish information about his nationality, citizenship or related status. If a limited partner fails to furnish information about his nationality, citizenship or other related status within 30 days after a request for the information or our Managing Partner determines, with the advice of counsel, after receipt of the information that the limited partner is not an eligible citizen, the limited partner may be treated as a non-citizen assignee. A non-citizen assignee does not have the right to direct the voting of his common units and may not receive distributions in kind upon our liquidation.

## Indemnification

Under our partnership agreement, in most circumstances we will indemnify the following persons, to the fullest extent permitted by law, from and against all losses, claims, damages, liabilities, joint or several, expenses (including legal fees and expenses), judgments, fines, penalties, interest, settlements or other amounts:

- our Managing Partner;

- any departing Managing Partner;

- any person who is or was an affiliate of a Managing Partner or any departing Managing Partner;

- any person who is or was a member, partner, tax matters partner, officer, director, employee, agent, fiduciary or trustee of us or our subsidiaries, the Managing Partner or any departing Managing Partner or any affiliate of us or our subsidiaries, the Managing Partner or any departing Managing Partner;

190

- any person who is or was serving at the request of a Managing Partner or any departing Managing Partner or any affiliate of a Managing Partner or any departing Managing Partner as an officer, director, employee, member, partner, agent, fiduciary or trustee of another person; or

- any person designated by our Managing Partner.

We will agree to provide this indemnification unless there has been a final and non-appealable judgment by a court of competent jurisdiction determining that these persons acted in bad faith or engaged in fraud or willful misconduct. We will also agree to provide this indemnification for criminal proceedings. Any indemnification under these provisions will only be out of our assets. Unless it otherwise agrees, the Managing Partner will not be personally liable for, or have any obligation to contribute or loan funds or assets to us to enable us to effectuate indemnification. We may purchase insurance against liabilities asserted against and expenses incurred by persons for our activities, regardless of whether we would have the power to indemnify the person against liabilities under our partnership agreement.

**Books and Reports**

Our Managing Partner is required to keep appropriate books of the partnership's business at our principal offices or any other place designated by our Managing Partner. The books will be maintained for both tax and financial reporting purposes on an accrual basis. For tax and financial reporting purposes, our year ends on December 31.

As soon as reasonably practicable after the end of each fiscal year, we will furnish to each partner tax information (including a Schedule K-1), which describes on a U.S. dollar basis such partner's share of our income, gain, loss and deduction for our preceding taxable year. It will require longer than 90 days after the end of our fiscal year to obtain the requisite information from all lower-tier entities so that Schedule K-1s may be prepared for us. Consequently, holders of common units who are U.S. taxpayers should anticipate the need to file annually with the IRS (and certain states) a request for an extension past April 15 or the otherwise applicable due date of their income tax return for the taxable year. In addition, each partner will be required to report for all tax purposes consistently with the information provided by us. See "Material U.S. Federal Tax Considerations—U.S. Taxes—Administrative Matters—Information Returns."

**Right to Inspect Our Books and Records**

Our partnership agreement will provide that a limited partner can, for a purpose reasonably related to his interest as a limited partner, upon reasonable written demand and at his own expense, have furnished to him:

- Schedule K-1s, to the extent applicable and available;

- promptly after becoming available, a copy of our U.S. federal, state and local income tax returns; and

- copies of our partnership agreement, the certificate of limited partnership of the partnership, related amendments and powers of attorney under which they have been executed.

Our Managing Partner may, and intends to, keep confidential from the limited partners trade secrets or other information the disclosure of which our Managing Partner believes is not in our best interests or which we are required by law or by agreements with third parties to keep confidential.

191

## COMMON UNITS ELIGIBLE FOR FUTURE SALE

### General

Prior to this offering, there has not been a public market for our common units. We cannot predict the effect, if any, future sales of common units, or the availability for future sale of common units, will have on the market price of our common units prevailing from time to time. The sale of substantial amounts of our common units in the public market, or the perception that such sales could occur, could harm the prevailing market price of our common units.

Upon completion of this offering we will have a total of          common units outstanding, or          common units assuming the underwriters fully exercise their option to purchase additional common units. All of the common units will have been sold in this offering and will be freely tradable without restriction or further registration under the Securities Act by persons other than our "affiliates." Under the Securities Act, an "affiliate" of a company is a person that directly or indirectly controls, is controlled by or is under common control with that company.

In addition, upon completion of this offering, KKR Holdings, which is owned by our principals and certain of our former personnel, will own          Group Partnership units. Over time, KKR Holdings may distribute to its members these Group Partnership units. These members would then have the right to compel the Group Partnerships to redeem these Group Partnership units for cash or interests in KKR & Co. L.P., at the option of the Group Partnerships. When a member of KKR Holdings gives the Group Partnerships notice of his intention to compel a redemption, KKR & Co. L.P., with respect to interests in KKR Fund Holdings L.P., and our intermediate holding company, with respect to interests in KKR Management Holdings L.P., will have superseding rights to instead acquire Group Partnership units for cash or interests in KKR & Co. L.P. Any common units that we issue upon such exchanges will be "restricted securities" as defined in Rule 144 unless we register such issuances under the Securities Act and will be subject to transfer restrictions that are similar to those that were applicable to the Group Partnership units so exchanged. However, we will enter into a registration rights agreement with KKR Holdings that will require us to register under the Securities Act our issuance of these common units. See "— Registration Rights."

In addition, at the time of this offering we intend to grant          unvested restricted common units to certain employees under our equity incentive plan that will settle in unrestricted common units or in cash. These restricted common units will generally vest, and the underlying common units will be delivered, in          equal annual installments commencing one year after the grant date. We intend to file one or more registration statements on Form S-8 under the Securities Act to register common units issued or covered by our 2007 Equity Incentive Plan. Any such Form S-8 registration statements will automatically become effective upon filing. Accordingly, common units registered under such registration statements will be available for sale in the open market. We expect that the initial registration statement on Form S-8 will cover          common units.

Our partnership agreement authorizes us to issue an unlimited number of additional partnership securities and options, rights, warrants and appreciation rights relating to partnership securities for the consideration and on the terms and conditions established by our Managing Partner in its sole discretion without the approval of any limited partners. See "Description of Our Partnership Agreement—Issuance of Additional Securities."

### Registration Rights

We will enter into a registration rights agreement with KKR Holdings pursuant to which we will grant it, its affiliates and transferees of its Group Partnership units the right, under certain circumstances and subject to certain restrictions, to require us to register under the Securities Act our common units (and other securities convertible into or exchangeable or exercisable for our common units) held or acquired by them. Securities registered pursuant to such registration rights under any such registration statement will

192

be available for sale in the open market unless restrictions apply. See "Certain Relationships and Related Party Transactions—Registration Rights Agreement."

**Lock-Up Arrangements**

KKR Holdings and all of the directors and officers of our Managing Partner have agreed that without the prior written consent of          on behalf of the underwriters, we and they will not, during the period ending          days after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any common units or any securities convertible into or exercisable or exchangeable for common units; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the common units;

whether any such transaction described above is to be settled by delivery of common units or such other securities, in cash or otherwise. In addition, we have agreed that, during the same          -day period without the prior written consent of          on behalf of the underwriters, we will not file any registration statement with the SEC relating to the offering of any common units or any securities convertible into or exercisable or exchangeable for common units (other than any registration statement on Form S-8 to register common units issued or reserved for issuance under our 2007 Equity Incentive Plan). All of the directors and officers of our Managing Partner have also agreed that, without the prior written consent of          on behalf of the underwriters, they will not during the period ending          days after the date of this prospectus, make any demand for, or exercise any right with respect to, the registration of any common units or any securities convertible into or exercisable or exchangeable for common units.

The          -day restricted period described in the preceding paragraph will be extended if:

- during the last 17 days of the          -day restricted period we issue an earnings release or material news or a material event relating to KKR occurs; or

- prior to the expiration of the          -day restricted period, we announce that we will release earnings results during the 16-day period beginning on the last day of the          -day period,

in which case the restrictions described in the preceding paragraph will continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event. These restrictions do not apply to certain sales, issuances, distributions and transfers.

We also have instituted an internal policy that prohibits all of our employees from selling short or trading in derivative securities relating to the common units.

**Rule 144**

In general, under Rule 144 a person, or a group of persons whose common units are aggregated, including any person who may be deemed our affiliate, is entitled to sell within any three-month period a number of restricted securities that does not exceed the greater of 1% of the then outstanding common units and the average weekly trading volume during the four calendar weeks preceding each such sale, provided that at least one year has elapsed since such common units were acquired from us or any affiliate of our partnership and certain manner of sale, notice requirements and requirements as to availability of current public information about us are satisfied. Any person who is deemed to be our affiliate must comply with the provisions of Rule 144 (other than the one-year holding period requirement) in order to sell common units which are not restricted securities (such as common units acquired by affiliates either in this offering or through purchases in the open market following this offering). In addition, under Rule 144(k), a person who is not our affiliate, and who has not been our affiliate at any time during the 90 days preceding any sale, is entitled to sell common units without regard to the foregoing limitations, provided that at least two years have elapsed since the common units were acquired from us or any affiliate of ours. The SEC has a proposal pending to shorten both the one year and two year holding periods referred to above to six months.

193

## MATERIAL U.S. FEDERAL TAX CONSIDERATIONS

**U.S. Taxes**

This summary discusses the material U.S. federal income tax considerations related to the purchase, ownership and disposition of our common units as of the date hereof. This summary is based on provisions of the Internal Revenue Code, on the regulations promulgated thereunder and on published administrative rulings and judicial decisions, all of which are subject to change at any time, possibly with retroactive effect. This discussion is necessarily general and may not apply to all categories of investors, some of which, such as banks, thrifts, insurance companies, persons liable for the alternative minimum tax, dealers and other investors that do not own their common units as capital assets, may be subject to special rules. Tax-exempt organizations and mutual funds are discussed separately below. The actual tax consequences of the purchase and ownership of common units will vary depending on your circumstances. This discussion, to the extent that it states matters of U.S. federal tax law or legal conclusions and subject to the qualifications herein, represents the opinion of Simpson Thacher & Bartlett LLP. Such opinion is based in part on facts described in this prospectus and on various other factual assumptions, representations and determinations. Any alteration or incorrectness of such facts, assumptions, representations or determinations could adversely affect such opinion. However, opinions of counsel are not binding upon the IRS or any court, and the IRS may challenge the conclusions herein and a court may sustain such a challenge.

For purposes of this discussion, a "U.S. Holder" is a beneficial holder of a common unit that is for U.S. federal income tax purposes (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (4) a trust which either (A) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (B) has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. A "non-U.S. Holder" is a holder that is not a U.S. Holder.

Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. On June 14, 2007, legislation was introduced that would tax as corporations publicly traded partnerships that directly or indirectly derive income from investment adviser or asset management services. Similar legislation was introduced on June 20, 2007. On June 22, 2007, legislation was introduced that would treat income received by a partner with respect to an investment services partnership interest as ordinary income received for the performance of services. See "Risk Factors—Risks Related to Our Business—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units."

If a partnership holds common units, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our common units, you should consult your tax advisors. This discussion does not constitute tax advice and is not intended to be a substitute for tax planning.

**Prospective holders of common units should consult their own tax advisors concerning the U.S. federal, state and local income tax and estate tax consequences in their particular situations of the purchase, ownership and disposition of a common unit, as well as any consequences under the laws of any other taxing jurisdiction.**

194

*Taxation of our Partnership and the Group Partnerships*

An entity that is treated as a partnership for U.S. federal income tax purposes is not a taxable entity and incurs no U.S. federal income tax liability. Instead, each partner is required to take into account its allocable share of items of income, gain, loss and deduction of the partnership in computing its U.S. federal income tax liability, regardless of whether or not cash distributions are then made. Investors in this offering will become limited partners of KKR & Co. L.P. Distributions of cash by a partnership to a partner are generally not taxable unless the amount of cash distributed to a partner is in excess of the partner's adjusted basis in its partner interest.

An entity that would otherwise be classified as a partnership for U.S. federal income tax purposes may nonetheless be taxable as a corporation if it is a "publicly traded partnership," unless an exception applies. An entity that would otherwise be classified as a partnership is a publicly traded partnership if (i) interests in the partnership are traded on an established securities market or (ii) interests in the partnership are readily tradable on a secondary market or the substantial equivalent thereof. We will be publicly traded. However, an exception to taxation as a corporation, referred to as the "Qualifying Income Exception," exists if at least 90% of such partnership's gross income for every taxable year consists of "qualifying income" and the partnership is not required to register under the Investment Company Act. Qualifying income includes certain interest income, dividends, real property rents, gains from the sale or other disposition of real property, and any gain from the sale or disposition of a capital asset or other property held for the production of income that otherwise constitutes qualifying income.

Our Managing Partner will adopt a set of investment policies and procedures that will govern the types of investments we can make (and income we can earn), including structuring certain investments through entities classified as corporations for U.S. federal income tax purposes (as discussed further below), to ensure that we will meet the Qualifying Income Exception in each taxable year. It is the opinion of Simpson Thacher & Bartlett LLP that we will be treated as a partnership and not as a corporation for U.S. federal income tax purposes based on certain assumption and factual statements and representations made by us, including statements and representations as to the manner in which we intend to manage our affairs, the composition of our income, and that our Managing Partner will ensure that we comply with the investment policies and procedures put in place to ensure that we meet the Qualifying Income Exception in each taxable year. However, this opinion is based solely on current law and does not take into account any proposed or potential changes in law (including the proposed legislation described in "Risk Factors—Risks Related to Our Business—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units.") which may be enacted with retroactive effect. Moreover, opinions of counsel are not binding upon the IRS or any court, and the IRS may challenge this conclusion and a court may sustain such a challenge.

If we fail to meet the Qualifying Income Exception, other than a failure that is determined by the IRS to be inadvertent and that is cured within a reasonable time after discovery, or if we are required to register under the Investment Company Act, we will be treated as if we had transferred all of our assets, subject to liabilities, to a newly formed corporation, on the first day of the year in which we fail to meet the Qualifying Income Exception, in return for stock in that corporation, and then distributed the stock to the holders of common units in liquidation of their interests in us. This contribution and liquidation should generally be tax-free to holders so long as we do not have liabilities in excess of the tax basis of our assets. Thereafter, we would be treated as a corporation for U.S. federal income tax purposes.

If we were treated as a corporation in any taxable year, either as a result of a failure to meet the Qualifying Income Exception or otherwise, our items of income, gain, loss and deduction would be reflected only on our tax return rather than being passed through to holders of common units, and we would be subject to U.S. corporate income tax on our taxable income. Distributions made to our

195

unitholders would be treated as either taxable dividend income, which may be eligible for reduced rates of taxation, to the extent of our current or accumulated earnings and profits, or in the absence of earnings and profits, as a nontaxable return of capital, to the extent of the holder's tax basis in the common units, or as taxable capital gain, after the holder's basis is reduced to zero. In addition, in the case of non-U.S. Holders, distributions would be subject to withholding tax. Accordingly, treatment as a corporation would materially reduce a holder's after-tax return and thus could result in a reduction of the value of the common units.

If at the end of any taxable year we fail to meet the Qualifying Income Exception (assuming that we are not taxed as a corporation from our inception), we may still qualify as a partnership if we are entitled to relief under the Internal Revenue Code for an inadvertent termination of partnership status. This relief will be available if (i) the failure is cured within a reasonable time after discovery, (ii) the failure is determined by the IRS to be inadvertent, and (iii) we agree to make such adjustments (including adjustments with respect to our partners) or to pay such amounts as are required by the IRS. It is not possible to state whether we would be entitled to this relief in any or all circumstances. It also is not clear under the Internal Revenue Code whether this relief is available for our first taxable year as a publicly traded partnership. If this relief provision is inapplicable to a particular set of circumstances involving us, we will not qualify as a partnership for federal income tax purposes. Even if this relief provision applies and we retain our partnership status, we or our unitholders (during the failure period) will be required to pay such amounts as are determined by the IRS.

The remainder of this section assumes that we and the Group Partnerships will be treated as partnerships for U.S. federal income tax purposes.

### Taxation of Our Intermediate Holding Company

Our intermediate holding company is taxable as a corporation for U.S. federal income tax purposes and therefore, as the holder of our intermediate holding company's common stock, we will not be taxed directly on its earnings or the earnings of entities we hold through our intermediate holding company. Distributions of cash or other property that our intermediate holding company pays to us will constitute dividends for U.S. federal income tax purposes to the extent paid from its current or accumulated earnings and profits (as determined under U.S. federal income tax principles). If the amount of a distribution by our intermediate holding company exceeds its current and accumulated earnings and profits, such excess will be treated as a tax-free return of capital to the extent of our tax basis in our intermediate holding company's common stock, and thereafter will be treated as a capital gain.

As general partner of KKR Management Holdings L.P., our intermediate holding company will incur U.S. federal income taxes on its proportionate share of any net taxable income of KKR Management Holdings L.P. In accordance with the applicable partnership agreement, we will cause KKR Management Holdings L.P. to distribute cash on a pro rata basis to holders of its units (that is, our intermediate holding company and KKR Holdings) in an amount at least equal to the maximum tax liabilities arising from their ownership of such units, if any.

Our intermediate holding company's liability for U.S. federal income taxes and applicable state, local and other taxes could be increased if the IRS were to successfully reallocate income or deductions of the related entities conducting our business.

If we form, for other purposes, a U.S. corporation or other entity treated as a corporation for U.S. federal income tax purposes, that corporation would be subject to U.S. federal income tax on its income.

196

*Personal Holding Companies*

Our intermediate holding company could be subject to additional U.S. federal income tax on a portion of its income if it is determined to be a personal holding company, or "PHC," for U.S. federal income tax purposes. A U.S. corporation generally will be classified as a PHC for U.S. federal income tax purposes in a given taxable year if (i) at any time during the last half of such taxable year, five or fewer individuals (without regard to their citizenship or residency and including as individuals for this purpose certain entities such as certain tax-exempt organizations and pension funds) own or are deemed to own (pursuant to certain constructive ownership rules) more than 50% of the stock of the corporation by value and (ii) at least 60% of the corporation's adjusted ordinary gross income, as determined for U.S. federal income tax purposes, for such taxable year consists of PHC income (which includes, among other things, dividends, interest, royalties, annuities and, under certain circumstances, rents). The PHC rules do not apply to non-U.S. corporations.

Due to applicable attribution rules, it is likely that five or fewer individuals or tax-exempt organizations will be treated as owning actually or constructively more than 50% of the value of units in our intermediate holding company. Consequently, our intermediate holding company could be or become a PHC, depending on whether it fails the PHC gross income test. If, as a factual matter, the income of our intermediate holding company fails the PHC gross income test, it will be a PHC. Certain aspects of the gross income test cannot be predicted with certainty. Thus, no assurance can be given that our intermediate holding company will not become a PHC following this offering or in the future.

If our intermediate holding company is or were to become a PHC in a given taxable year, it would be subject to an additional 15% PHC tax on its undistributed PHC income, which generally includes the company's taxable income, subject to certain adjustments. For taxable years beginning after December 31, 2010, the PHC tax rate on undistributed PHC income will be equal to the highest marginal rate on ordinary income applicable to individuals (currently 35%). If our intermediate holding company were to become a PHC and had significant amounts of undistributed PHC income, the amount of PHC tax could be material; in that event, distribution of such income would generally cause the PHC tax not to apply.

*Certain State, Local and Non-U.S. Tax Matters*

We and our subsidiaries may be subject to state, local or non-U.S. taxation in various jurisdictions, including those in which we or they transact business, own property or reside. For example, we and our subsidiaries may be subject to New York City unincorporated business tax. We may be required to file tax returns in some or all of those jurisdictions. The state, local or non-U.S. tax treatment of us and our unitholders may not conform to the U.S. federal income tax treatment discussed herein. We will pay non-U.S. taxes, and dispositions of foreign property or operations involving, or investments in, foreign property may give rise to non-U.S. income or other tax liability in amounts that could be substantial. Any non-U.S. taxes incurred by us may not pass through to unitholders as a credit against their U.S. federal income tax liability.

**Consequences to U.S. Holders of Common Units**

The following is a summary of the material U.S. federal income tax consequences that will apply to you if you are a U.S. Holder of common units.

For U.S. federal income tax purposes, your allocable share of our items of income, gain, loss, deduction or credit, and our allocable share of those items of the Group Partnerships, will be governed by the limited partnership agreements for our partnership and the Group Partnerships if such allocations have "substantial economic effect" or are determined to be in accordance with your interest in our partnership. We believe that for U.S. federal income tax purposes, such allocations will have substantial economic effect or be in accordance with your interest in KKR & Co. L.P., and our Managing Partner intends to prepare tax returns based on such allocations. If the IRS successfully challenges the allocations made pursuant to

197

the limited partnership agreements, the resulting allocations for U.S. federal income tax purposes might be less favorable than the allocations set forth in the limited partnership agreements.

We may derive taxable income from an investment that is not matched by a corresponding distribution of cash. This could occur, for example, if we used cash to make an investment or to reduce debt instead of distributing profits. In addition, special provisions of the Internal Revenue Code may be applicable to certain of our investments, and may affect the timing of our income, requiring us to recognize taxable income before we receive cash attributable to such income. Accordingly, although we intend to make tax distributions (see "Distribution Policy") it is possible that the U.S. federal income tax liability of a holder with respect to its allocable share of our income for a particular taxable year could exceed the cash distribution to the holder for the year, thus giving rise to an out-of-pocket tax liability for the holder.

*Basis*

You will have an initial tax basis for your common unit equal to the amount you paid for the common unit plus your share of our liabilities, if any. That basis will be increased by your share of our income and by increases in your share of our liabilities, if any. That basis will be decreased, but not below zero, by distributions from us, by your share of our losses and by any decrease in your share of our liabilities.

Holders who purchase common units in separate transactions must combine the basis of those units and maintain a single adjusted tax basis for all those units. Upon a sale or other disposition of less than all of the common units, a portion of that tax basis must be allocated to the common units sold.

*Limits on Deductions for Losses and Expenses*

Your deduction of your share of our losses will be limited to your tax basis in your common units and, if you are an individual or a corporate holder that is subject to the "at risk" rules, to the amount for which you are considered to be "at risk" with respect to our activities, if that is less than your tax basis. In general, you will be at risk to the extent of your tax basis in your common units, reduced by (1) the portion of that basis attributable to your share of our liabilities for which you will not be personally liable and (2) any amount of money you borrow to acquire or hold your common units, if the lender of those borrowed funds owns an interest in us, is related to you or can look only to the common units for repayment. Your at risk amount will generally increase by your allocable share of our income and gain and decrease by cash distributions to you and your allocable share of losses and deductions. You must recapture losses deducted in previous years to the extent that distributions cause your at risk amount to be less than zero at the end of any taxable year. Losses disallowed or recaptured as a result of these limitations will carry forward and will be allowable to the extent that your tax basis or at risk amount, whichever is the limiting factor, subsequently increases. Any excess loss above that gain previously suspended by the at risk or basis limitations may no longer be used. It is not entirely free from doubt whether you would be subject to additional loss limitations imposed by newly enacted Section 470 of the Internal Revenue Code. The IRS has not yet issued final guidance limiting the scope of this anti-abuse provision. You should therefore consult your own tax advisors about the possible effect of this provision.

We will not generate income or losses from "passive activities" for purposes of Section 469 of the Internal Revenue Code. Accordingly, income allocated by us to a holder may not be offset by the Section 469 passive losses of such holder and losses allocated to a holder generally may not be used to offset Section 469 passive income of such holder. In addition, other provisions of the Internal Revenue Code may limit or disallow any deduction for losses by a holder of our common units or deductions associated with certain assets of the partnership in certain cases. Holders should consult with their tax advisors regarding their limitations on the deductibility of losses under applicable sections of the Internal Revenue Code.

*Limitations on Deductibility of Organizational Expenses and Syndication Fees*

In general, neither we nor any U.S. Holder may deduct organizational or syndication expenses. An election is available to our partnership to amortize organizational expenses over a 15-year period, but we do not intend to make such an election. Syndication fees (which would include any sales or placement fees or commissions or underwriting discount payable to third parties) must be capitalized and cannot be amortized or otherwise deducted.

198

*Limitations on Interest Deductions*

Your share of our interest expense is likely to be treated as "investment interest" expense. If you are a non-corporate U.S. Holder, the deductibility of "investment interest" expense is generally limited to the amount of your "net investment income." Your share of our dividend and interest income will be treated as investment income, although "qualified dividend income" subject to reduced rates of tax in the hands of an individual will only be treated as investment income if you elect to treat such dividend as ordinary income not subject to reduced rates of tax. In addition, state and local tax laws may disallow deductions for your share of our interest expense.

The computation of your investment interest expense will take into account interest on any margin account borrowing or other loan incurred to purchase a common unit. Net investment income includes gross income from property held for investment and amounts treated as portfolio income under the passive loss rules less deductible expenses, other than interest, directly connected with the production of investment income, but generally does not include gains attributable to the disposition of property held for investment. For this purpose, any long-term capital gain or qualifying dividend income that is taxable at long-term capital gain rates is excluded from net investment income, unless the U.S. holder elects to pay tax on such gain or dividend income at ordinary income rates.

*Deductibility of Partnership Investment Expenditures by Individual Partners and by Trusts and Estates*

Subject to certain exceptions, all miscellaneous itemized deductions of an individual taxpayer, and certain of such deductions of an estate or trust, are deductible only to the extent that such deductions exceed 2% of the taxpayer's adjusted gross income. Moreover, the otherwise allowable itemized deductions of individuals whose gross income exceeds an applicable threshold amount are subject to reduction by an amount equal to the product of $2/3$ and the lesser of (1) 3% of the excess of the individual's adjusted gross income over the threshold amount, or (2) 80% of the amount of the itemized deductions. Such reductions are being reduced on a phased basis through 2009. The operating expenses of the Group Partnerships, including any management fees paid, may be treated as miscellaneous itemized deductions subject to the foregoing rule. Alternatively, it is possible that we will be required to capitalize the management fees. Accordingly, if you are a non-corporate U.S. Holder, you should consult your tax advisors with respect to the application of these limitations.

*Treatment of Distributions*

Distributions of cash by us generally will not be taxable to you to the extent of your adjusted tax basis (described above) in your common units. Any cash distributions in excess of your adjusted tax basis generally will be considered to be gain from the sale or exchange of your common units (as described below). Under current laws, such gain would generally be treated as capital gain and would be long-term capital gain if your holding period for your common units exceeds one year. A reduction in your allocable share of our liabilities, and certain distributions of marketable securities by us, are treated similar to cash distributions for U.S. federal income tax purposes.

*Sale or Exchange of Common Units*

You will recognize gain or loss on a sale of common units equal to the difference, if any, between the amount realized and your tax basis in the common units sold. Your amount realized will be measured by the sum of the cash or the fair market value of other property received plus your share of our liabilities, if any.

Gain or loss recognized by you on the sale or exchange of a common unit will generally be taxable as capital gain or loss and will be long-term capital gain or loss if the common unit was held for more than one year on the date of such sale or exchange. Assuming we have not made an election, referred to as a "QEF election," to treat our interest in a PFIC as a "qualified electing fund," or QEF, gain attributable to such an interest would be taxable as ordinary income and would be subject to an interest charge. In

addition, certain gain attributable to our investment in a controlled foreign corporation, or CFC, may be ordinary income and certain gain attributable to "unrealized receivables" or "inventory items" would be characterized as ordinary income rather than capital gain. For example, if we hold debt acquired at a market discount, accrued market discount on such debt would be treated as "unrealized receivables." The deductibility of capital losses is subject to limitations.

Holders who purchase units at different times and intend to sell all or a portion of the units within a year of their most recent purchase are urged to consult their tax advisors regarding the application of certain "split holding period" rules to them and the treatment of any gain or loss as long-term or short-term capital gain or loss.

*Foreign Tax Credit Limitations*

You will generally be entitled to a foreign tax credit with respect to your allocable share of creditable foreign taxes paid on our income and gains. Complex rules may, depending on your particular circumstances, limit the availability or use of foreign tax credits. Gains from the sale of our foreign investments may be treated as U.S. source gains. Consequently, you may not be able to use the foreign tax credit arising from any foreign taxes imposed on such gains unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from foreign sources. Certain losses that we incur may be treated as foreign source losses, which could reduce the amount of foreign tax credits otherwise available.

*Section 754 Election*

We currently do not intend to make the election permitted by Section 754 of the Internal Revenue Code with respect to us. KKR Management Holdings L.P. currently intends to make such an election and KKR Fund Holdings L.P. may make such an election. The election, if made, is irrevocable without the consent of the IRS, and would generally require us to adjust the tax basis in our assets, or "inside basis," attributable to a transferee of common units under Section 743(b) of the Internal Revenue Code to reflect the purchase price of the common units paid by the transferee. However, this election does not apply to a person who purchases common units directly from us, including in this offering, but would apply, if made, to our acquisition of interests in KKR Management Holdings L.P. and KKR Fund Holdings L.P. pursuant to the exchange agreement. For purposes of this discussion, a transferee's inside basis in our assets will be considered to have two components: (1) the transferee's share of our tax basis in our assets, or "common basis," and (2) the Section 743(b) adjustment to that basis.

If no Section 754 election is made, there would be no adjustment for the transferee of common units, or for us upon our acquisition of interests in KKR Management Holdings L.P. or KKR Fund Holdings L.P., even if the purchase price of those common units, or interests, as applicable, is higher than the common units' or interests' share of the aggregate tax basis of our assets or the assets of those Group Partnerships immediately prior to the transfer. In that case, on a sale of an asset, gain allocable to the transferee would include built-in gain allocable to the transferee at the time of the transfer, which built-in gain would otherwise generally be eliminated if a Section 754 election had been made.

Even assuming no Section 754 election is made, if common units were transferred at a time when we had a "substantial built-in loss" inherent in our assets, we would be obligated to reduce the tax basis in the portion of such assets attributable to such common units.

*Foreign Currency Gain or Loss*

Our functional currency will be the U.S. dollar, and our income or loss will be calculated in U.S. dollars. It is likely that we will recognize "foreign currency" gain or loss with respect to transactions involving non-U.S. dollar currencies. In general, foreign currency gain or loss is treated as ordinary income or loss. You should consult your tax advisor with respect to the tax treatment of foreign currency gain or loss.

200

*Passive Foreign Investment Companies*

You may be subject to special rules applicable to indirect investments in foreign corporations, including an investment in a passive foreign investment company, or PFIC.

A PFIC is defined as any foreign corporation with respect to which either (1) 75% or more of the gross income for a taxable year is "passive income" or (2) 50% or more of its assets in any taxable year (generally based on the quarterly average of the value of its assets) produce "passive income." There are no minimum stock ownership requirements for PFICs. Once a corporation qualifies as a PFIC it is, subject to certain exceptions, always treated as a PFIC, regardless of whether it satisfies either of the qualification tests in subsequent years. Any gain on disposition of stock of a PFIC, as well as income realized on certain "excess distributions" by the PFIC, is treated as though realized ratably over the shorter of your holding period of common units or our holding period for the PFIC. Such gain or income is taxable as ordinary income and, as discussed above, dividends paid by a PFIC to an individual will not be eligible for the reduced rates of taxation that are available for certain qualifying dividends. In addition, an interest charge would be imposed on you based on the tax deferred from prior years.

Although it may not always be possible, we expect to make a QEF election where possible with respect to each entity treated as a PFIC to treat such non-U.S. entity as a QEF in the first year we hold shares in such entity. A QEF election is effective for our taxable year for which the election is made and all subsequent taxable years and may not be revoked without the consent of the IRS. If we make a QEF election under the Internal Revenue Code with respect to our interest in a PFIC, in lieu of the foregoing treatment, we would be required to include in income each year a portion of the ordinary earnings and net capital gains of the QEF called "QEF Inclusions," even if not distributed to us. Thus, holders may be required to report taxable income as a result of QEF Inclusions without corresponding receipts of cash. However, a holder may elect to defer, until the occurrence of certain events, payment of the U.S. federal income tax attributable to QEF Inclusions for which no current distributions are received, but will be required to pay interest on the deferred tax computed by using the statutory rate of interest applicable to an extension of time for payment of tax. Our tax basis in the shares of such non-U.S. entities, and a holder's basis in our common units, will be increased to reflect QEF Inclusions. No portion of the QEF Inclusion attributable to ordinary income will be eligible for reduced rates of taxation. Amounts included as QEF Inclusions with respect to direct and indirect investments generally will not be taxed again when actually distributed. You should consult your tax advisors as to the manner in which QEF Inclusions affect your allocable share of our income and your basis in your common units.

Alternatively, in the case of a PFIC that is a publicly-traded foreign portfolio company, an election may be made to "mark to market" the stock of such foreign portfolio company on an annual basis. Pursuant to such an election, you would include in each year as ordinary income the excess, if any, of the fair market value of such stock over its adjusted basis at the end of the taxable year. You may treat as ordinary loss any excess of the adjusted basis of the stock over its fair market value at the end of the year, but only to the extent of the net amount previously included in income as a result of the election in prior years.

We may make certain investments, including for instance investments in specialized investment funds or investments in funds of funds through non-U.S. corporate subsidiaries of the Group Partnerships or through other non-U.S. corporations. Such an entity may be a PFIC for U.S. federal income tax purposes. In addition, certain of our investments could be in PFICs. Thus, we can make no assurance that some of our investments will not be treated as held through a PFIC or as interests in PFICs or that such PFICs will be eligible for the "mark to market" election, or that as to any such PFICs we will be able to make QEF elections.

If we do not make a QEF election with respect to a PFIC, Section 1291 of the Internal Revenue Code will treat all gain on a disposition by us of shares of such entity, gain on the disposition of common units by a holder at a time when we own shares of such entity, as well as certain other defined "excess

201

distributions," as if the gain or excess distribution were ordinary income earned ratably over the shorter of the period during which the holder held its common units or the period during which we held our shares in such entity. For gain and excess distributions allocated to prior years, (i) the tax rate will be the highest in effect for that taxable year and (ii) the tax will be payable generally without regard to offsets from deductions, losses and expenses. Holders will also be subject to an interest charge for any deferred tax. No portion of this ordinary income will be eligible for the favorable tax rate applicable to "qualified dividend income" for individual U.S. persons.

*Controlled Foreign Corporations*

A non-U.S. entity will be treated as a controlled foreign corporation, or CFC, if it is treated as a corporation for U.S. federal income tax purposes and if more than 50% of (i) the total combined voting power of all classes of stock of the non-U.S. entity entitled to vote or (ii) the total value of the stock of the non-U.S. entity is owned by U.S. Shareholders on any day during the taxable year of such non-U.S. entity. For purposes of this discussion, a "U.S. Shareholder" with respect to a non-U.S. entity means a U.S. person that owns 10% or more of the total combined voting power of all classes of stock of the non-U.S. entity entitled to vote.

When making investment or other decisions, we will consider whether an investment will be a CFC and the consequences related thereto. If we are a U.S. Shareholder in a non-U.S. entity that is treated as a CFC, each common unitholder may be required to include in income its allocable share of the CFC's "Subpart F" income reported by us. Subpart F income generally includes dividends, interest, net gain from the sale or disposition of securities, non-actively managed rents and certain other generally passive types of income. The aggregate Subpart F income inclusions in any taxable year relating to a particular CFC are limited to such entity's current earnings and profits. These inclusions are treated as ordinary income (whether or not such inclusions are attributable to net capital gains). Thus, an investor may be required to report as ordinary income its allocable share of the CFC's Subpart F income reported by us without corresponding receipts of cash and may not benefit from capital gain treatment with respect to the portion of our earnings (if any) attributable to net capital gains of the CFC.

The tax basis of our common units of such non-U.S. entity, and a holder's tax basis in our common units, will be increased to reflect any required Subpart F income inclusions. Such income will be treated as income from sources within the United States, for certain foreign tax credit purposes, to the extent derived by the CFC from U.S. sources. Such income will not be eligible for the reduced rate of tax applicable to "qualified dividend income" for individual U.S. persons. See "— Consequences to U.S. Holders of Common Units." Amounts included as such income with respect to direct and indirect investments generally will not be taxable again when actually distributed.

Regardless of whether any CFC has Subpart F income, any gain allocated to a unitholder from our disposition of stock in a CFC will be treated as ordinary income to the extent of the holder's allocable share of the current and/or accumulated earnings and profits of the CFC. In this regard, earnings would not include any amounts previously taxed pursuant to the CFC rules. However, net losses (if any) of a non-U.S. entity owned by us that is treated as a CFC will not pass through to our holders. Moreover, a portion of a U.S. Holder's gain from the sale or exchange of common units may be treated as ordinary income. Any portion of any gain from the sale or exchange of a common unit that is attributable to a CFC may be treated as an "unrealized receivable." See "—Sale or Exchange of Common Units."

If a non-U.S. entity held by us is classified as both a CFC and a PFIC during the time we are a U.S. Shareholder of such non-U.S. entity, a holder will be required to include amounts in income with respect to such non-U.S. entity pursuant to this subheading, and the consequences described under the subheading "Passive Foreign Investment Companies" above will not apply. If our ownership percentage in a non-U.S. entity changes such that we are not a U.S. Shareholder with respect to such non-U.S. entity, then unitholders may be subject to the PFIC rules. The interaction of these rules is complex, and prospective holders are urged to consult their tax advisors in this regard.

202

*Investment Structure*

To manage our affairs so as to meet the "qualifying income" exception for the publicly traded partnership rules (discussed above) and comply with certain requirements in our Limited Partnership Agreement, we may need to structure certain investments through an entity classified as a corporation for U.S. federal income tax purposes. Such investment structures will be entered into as determined in the sole discretion of the Managing Partner in order to create a tax structure that generally is efficient for our unitholders. However, because our unitholders will be located in numerous taxing jurisdictions, no assurances can be given that any such investment structure will be beneficial to all our unitholders to the same extent, and may even impose additional tax burdens on some of our unitholders. As discussed above, if the entity were a non-U.S. corporation it may be considered a PFIC. If the entity were a U.S. corporation, it would be subject to U.S. federal income tax on its operating income, including any gain recognized on its disposal of its investments. In addition, if the investment involves U.S. real estate, gain recognized on disposition would generally be subject to U.S. federal income tax, whether the corporation is a U.S. or a non-U.S. corporation.

*Taxes in Other State, Local, and Non-U.S. Jurisdictions*

In addition to U.S. federal income tax consequences, you may be subject to potential U.S. state and local taxes because of an investment in us in the U.S. state or locality in which you are a resident for tax purposes or in which we have investments or activities. You may also be subject to tax return filing obligations and income, franchise or other taxes, including withholding taxes, in state, local or non-U.S. jurisdictions in which we invest, or in which entities in which we own interests conduct activities or derive income. Income or gains from investments held by us may be subject to withholding or other taxes in jurisdictions outside the United States, subject to the possibility of reduction under applicable income tax treaties. If you wish to claim the benefit of an applicable income tax treaty, you may be required to submit information to tax authorities in such jurisdictions. You should consult your own tax advisors regarding the U.S. state, local and non-U.S. tax consequences of an investment in us.

*Transferor/Transferee Allocations*

In general, our taxable income and losses will be determined and apportioned among investors using conventions we regard as consistent with applicable law. As a result, if you transfer your common units, you may be allocated income, gain, loss and deduction realized by us after the date of transfer.

Although Section 706 of the Internal Revenue Code generally provides guidelines for allocations of items of partnership income and deductions between transferors and transferees of partner interests, it is not clear that our allocation method complies with its requirements. If our convention were not permitted, the IRS might contend that our taxable income or losses must be reallocated among the investors. If such a contention were sustained, your respective tax liabilities would be adjusted to your possible detriment. Our Managing Partner is authorized to revise our method of allocation between transferors and transferees (as well as among investors whose interests otherwise vary during a taxable period).

*U.S. Federal Estate Taxes*

If common units are included in the gross estate of a U.S. citizen or resident for U.S. federal estate tax purposes, then a U.S. federal estate tax might be payable in connection with the death of such person. Prospective individual U.S. Holders should consult their own tax advisors concerning the potential U.S. federal estate tax consequences with respect to our common units.

*U.S. Taxation of Tax-Exempt U.S. Holders of Common Units*

A holder of common units that is a tax-exempt organization for U.S. federal income tax purposes and therefore generally exempt from U.S. federal income taxation, will nevertheless be subject to "unrelated business taxable income," or UBTI, to the extent, if any, that its allocable share of our income consists of UBTI. A tax-exempt partner of a partnership that regularly engages in a trade or business which is unrelated to the exempt function of the tax-exempt partner must include in computing its UBTI its pro rata share (whether or not distributed) of such partnership's gross income and deductions derived from such unrelated trade or business. Moreover, a tax-exempt partner of a partnership will be treated as earning UBTI to the extent that such partnership derives income from "debt-financed property," or if the partner interest itself is debt financed. Debt-financed property means property held to produce income with respect to which there is "acquisition indebtedness" (that is, indebtedness incurred in acquiring or holding property).

In light of our investment activities, we will likely derive income that constitutes UBTI, because we will likely incur acquisition-related indebtedness. Because we are under no obligation to minimize UBTI, tax-exempt U.S. Holders of common units should consult their own tax advisors regarding all aspects of UBTI.

*Investments by U.S. Mutual Funds*

U.S. mutual funds that are treated as regulated investment companies, or RICs, for U.S. federal income tax purposes are required, among other things, to meet an annual 90% gross income and a quarterly 50% asset value test under Section 851(b) of the Internal Revenue Code to maintain their favorable U.S. federal income tax status. The 90% gross income test generally requires that, for a corporation to qualify as a RIC, at least 90 percent of such corporation's annual income must be "qualifying income," which is generally limited to investment income of various types. The 50% asset value test generally requires that, for a corporation to qualify as a RIC, at the close of each quarter of the taxable year, at least 50 percent of the value of such corporation's total assets must be represented by cash and cash items (including receivables), Government securities, securities of other RICs, and other securities generally limited in respect of any one issuer to an amount not greater in value than 5 percent of the value of the total assets of the corporation and to not more than 10 percent of the outstanding voting securities of such issuer.

The treatment of an investment by a RIC in common units for purposes of these tests will depend on whether we are treated as a "qualifying publicly traded partnership." If our partnership is so treated, then the common units themselves are the relevant assets for purposes of the 50% asset value test and the net income from the common units is the relevant gross income for purposes of the 90% gross income test. RICs may not invest greater than 25% of their assets in one or more qualifying publicly traded partnerships. All income derived from a qualifying publicly traded partnership is considered qualifying income for purposes of the RIC 90% gross income test above. However, if we are not treated as a qualifying publicly traded partnership for purposes of the RIC rules, then the relevant assets for the RIC asset test will be the RIC's allocable share of the underlying assets held by us and the relevant gross income for the RIC income test will be the RIC's allocable share of the underlying gross income earned by us. Whether we will qualify as a "qualifying publicly traded partnership" depends on the exact nature of our future investments, but it is likely that we will not be treated as a "qualifying publicly traded partnership." In addition, as discussed above under "—Consequences to U.S. Holders of Common Units," we may derive taxable income from an investment that is not matched by a corresponding cash distribution. Accordingly, a RIC investing in our common units may recognize income for U.S. federal income tax purposes without receiving cash with which to make distributions in amounts necessary to satisfy the distribution requirements under Sections 852 and 4982 of the Internal Revenue Code for avoiding income and excise tax. RICs should consult their own tax advisors about the U.S. tax consequences of an investment in common units.

204

*Consequences to Non-U.S. Holders of Common Units*

*U.S. Income Tax Consequences*

We may be, or may become, engaged in a U.S. trade or business for U.S. federal income tax purposes, including by reason of our investments in U.S. real property holding corporations, in which case some portion of our income would be treated as effectively connected income with respect to non-U.S. holders, or "ECI". If a non-U.S. Holder were treated as being engaged in a U.S. trade or business in any year because of an investment in our common units in such year, such non-U.S. Holder generally would be (1) subject to withholding by us on such non-U.S. Holder's distributions of income, (2) required to file a U.S. federal income tax return for such year reporting its allocable share, if any, of income or loss effectively connected with such trade or business, including certain income from U.S. sources not related to KKR & Co. L.P. and (3) required to pay U.S. federal income tax at regular U.S. federal income tax rates on any such income. Moreover, a corporate non-U.S. Holder might be subject to a U.S. branch profits tax on its allocable share of its ECI. Any amount so withheld would be creditable against such non-U.S. Holder's U.S. federal income tax liability, and such non-U.S. Holder could claim a refund to the extent that the amount withheld exceeded such non-U.S. Holder's U.S. federal income tax liability for the taxable year. Finally, if we were treated as being engaged in a U.S. trade or business, a portion of any gain recognized by a holder who is a non-U.S. Holder on the sale or exchange of its common units could be treated for U.S. federal income tax purposes as ECI, and hence such non-U.S. Holder could be subject to U.S. federal income tax on the sale or exchange.

Although each non-U.S. Holder is required to provide an IRS Form W-8, we may not be able to provide complete information related to the tax status of our investors to the Group Partnerships for purposes of obtaining reduced rates of withholding on behalf of our investors. Accordingly, to the extent we receive dividends from a U.S. corporation including the intermediate holding company through the Group Partnerships and its investment vehicles, your allocable share of distributions of such dividend income will be subject to U.S. withholding tax at a rate of 30%. Distributions to you may also be subject to withholding to the extent they are attributable to the sale of a U.S. real property interest or if the distribution is otherwise considered fixed or determinable annual or periodic income under the Internal Revenue Code. You may need to take additional steps to receive a credit or refund of any excess withholding tax paid on your account, which may include the filing of a non-resident U.S. income tax return with the IRS. Among other limitations, if you reside in a treaty jurisdiction which does not treat our partnership as a pass-through entity, you may not be eligible to receive a refund or credit of excess U.S. withholding taxes paid on your account. You should consult your tax advisors regarding the treatment of U.S. withholding taxes.

Special rules may apply in the case of a non-U.S. Holder that (1) has an office or fixed place of business in the U.S., (2) is present in the U.S. for 183 days or more in a taxable year or (3) is a former citizen of the U.S., a foreign insurance company that is treated as holding a partner interest in us in connection with their U.S. business, a PFIC or a corporation that accumulates earnings to avoid U.S. federal income tax. You should consult your tax advisors regarding the application of these special rules.

*U.S. Federal Estate Tax Consequences*

The U.S. federal estate tax treatment of our common units with regards to the estate of a non-citizen who is not a resident of the United States is not entirely clear. If our common units are includable in the U.S. gross estate of such person, then a U.S. federal estate tax might be payable in connection with the death of such person. Prospective individual non-U.S. Holders who are non-citizens and not residents of the United States should consult their own tax advisors concerning the potential U.S. federal estate tax consequences with regard to our common units.

<div align="center">205</div>

*Administrative Matters*

*Taxable Year*

We currently intend to use the calendar year as our taxable year for U.S. federal income tax purposes. Under certain circumstances which we currently believe are unlikely to apply, a taxable year other than the calendar year may be required for such purposes.

*Tax Matters Partner*

Our Managing Partner will act as our "tax matters partner." As the tax matters partner, the Managing Partner will have the authority, subject to certain restrictions, to act on our behalf in connection with any administrative or judicial review of our items of income, gain, loss, deduction or credit.

*Information Returns*

We have agreed to furnish to you, as soon as reasonably practicable after the close of each calendar year, tax information (including Schedule K-1), which describes on a U.S. dollar basis your share of our income, gain, loss and deduction for our preceding taxable year. It will require longer than 90 days after the end of our fiscal year to obtain the requisite information from all lower-tier entities so that K-1s may be prepared for the Partnership. Consequently, holders of common units who are U.S. taxpayers should anticipate the need to file annually with the IRS (and certain states) a request for an extension past April 15 or the otherwise applicable due date of their income tax return for the taxable year. In addition, each partner will be required to report for all tax purposes consistently with the information provided by us for the taxable year.

In preparing this information, we will use various accounting and reporting conventions, some of which have been mentioned in the previous discussion, to determine your share of income, gain, loss and deduction. The IRS may successfully contend that certain of these reporting conventions are impermissible, which could result in an adjustment to your income or loss.

We may be audited by the IRS. Adjustments resulting from an IRS audit may require you to adjust a prior year's tax liability and possibly may result in an audit of your own tax return. Any audit of your tax return could result in adjustments not related to our tax returns as well as those related to our tax returns.

*Tax Shelter Regulations*

If we were to engage in a "reportable transaction," we (and possibly you and others) would be required to make a detailed disclosure of the transaction to the IRS in accordance with recently issued regulations governing tax shelters and other potentially tax-motivated transactions. A transaction may be a reportable transaction based upon any of several factors, including the fact that it is a type of tax avoidance transaction publicly identified by the IRS as a "listed transaction" or that it produces certain kinds of losses in excess of $2 million. An investment in us may be considered a "reportable transaction" if, for example, we recognize certain significant losses in the future. In certain circumstances, a unitholder who disposes of an interest in a transaction resulting in the recognition by such holder of significant losses in excess of certain threshold amounts may be obligated to disclose its participation in such transaction. Our participation in a reportable transaction also could increase the likelihood that our U.S. federal income tax information return (and possibly your tax return) would be audited by the IRS. Certain of these rules are currently unclear and it is possible that they may be applicable in situations other than significant loss transactions.

Moreover, if we were to participate in a reportable transaction with a significant purpose to avoid or evade tax, or in any listed transaction, you may be subject to (i) significant accuracy-related penalties with a broad scope, (ii) for those persons otherwise entitled to deduct interest on federal tax deficiencies, nondeductibility of interest on any resulting tax liability, and (iii) in the case of a listed transaction, an extended statute of limitations.

206

Unitholders should consult their tax advisors concerning any possible disclosure obligation under the regulations governing tax shelters with respect to the dispositions of their interests in us.

*Constructive Termination*

Subject to the electing large partnership rules described below, we will be considered to have been terminated for U.S. federal income tax purposes if there is a sale or exchange of 50% or more of the total interests in our capital and profits within a 12-month period.

Our termination would result in the close of our taxable year for all holders of common units. In the case of a holder reporting on a taxable year other than a fiscal year ending on our year-end, the closing of our taxable year may result in more than 12 months of our taxable income or loss being includable in the holder's taxable income for the year of termination. We would be required to make new tax elections after a termination. A termination could also result in penalties if we were unable to determine that the termination had occurred. Moreover, a termination might either accelerate the application of, or subject us to, any tax legislation enacted before the termination.

*Withholding and Backup Withholding*

For each calendar year, we will report to you and the IRS the amount of distributions we made to you and the amount of U.S. federal income tax (if any) that we withheld on those distributions. The proper application to us of rules for withholding under Section 1441 of the Internal Revenue Code (applicable to certain dividends, interest and similar items) is unclear. Because the documentation we receive may not properly reflect the identities of partners at any particular time (in light of possible sales of common units), we may over-withhold or under-withhold with respect to a particular holder of common units. For example, we may impose withholding, remit that amount to the IRS and thus reduce the amount of a distribution paid to a non-U.S. Holder. It may turn out, however, the corresponding amount of our income was not properly allocable to such holder, and the withholding would have been less than the actual withholding. Such holder would be entitled to a credit against the holder's U.S. tax liability for all withholding, including any such excess withholding, but if the withholding exceeded the holder's U.S. tax liability, the holder would have to apply for a refund to obtain the benefit of the excess withholding. Similarly, we may fail to withhold on a distribution, and it may turn out the corresponding income was properly allocable to a non-U.S. Holder and withholding should have been imposed. In that event, we intend to pay the under-withheld amount to the IRS, and we may treat such under-withholding as an expense that will be borne by all partners on a pro rata basis (since we may be unable to allocate any such excess withholding tax cost to the relevant non-U.S. holder).

Under the backup withholding rules, you may be subject to backup withholding tax (at the applicable rate, currently 28%) with respect to distributions paid unless: (1) you are a corporation or come within another exempt category and demonstrate this fact when required or (2) you provide a taxpayer identification number, certify as to no loss of exemption from backup withholding tax and otherwise comply with the applicable requirements of the backup withholding tax rules. If you are an exempt holder, you should indicate your exempt status on a properly completed IRS Form W-9. A non-U.S. Holder may qualify as an exempt recipient by submitting a properly completed IRS Form W-8BEN. Backup withholding is not an additional tax. The amount of any backup withholding from a payment to you will be allowed as a credit against your U.S. federal income tax liability and may entitle you to a refund.

If you do not timely provide us (or the clearing agent or other intermediary, as appropriate) with IRS Form W-8 or W-9, as applicable, or such form is not properly completed, you may become subject to U.S. backup withholding taxes in excess of what would have been imposed had we received certifications from all investors. Such excess U.S. backup withholding taxes may be treated by us as an expense that will be borne by all investors on a pro rata basis (since we may be unable to allocate any such excess withholding tax cost to the holders that failed to timely provide the proper U.S. tax certifications).

207

*Nominee Reporting*

Persons who hold an interest in our partnership as a nominee for another person are required to furnish to us:

a.   the name, address and taxpayer identification number of the beneficial owner and the nominee;

b.   whether the beneficial owner is (1) a person that is not a U.S. person, (2) a foreign government, an international organization or any wholly-owned agency or instrumentality of either of the foregoing, or (3) a tax-exempt entity;

c.   the amount and description of common units held, acquired or transferred for the beneficial owner; and

d.   specific information including the dates of acquisitions and transfers, means of acquisitions and transfers and acquisition cost for purchases, as well as the amount of net proceeds from sales.

Brokers and financial institutions are required to furnish additional information, including whether they are U.S. persons and specific information on common units they acquire, hold or transfer for their own account. A penalty of $50 per failure, up to a maximum of $100,000 per calendar year, is imposed by the Internal Revenue Code for failure to report that information to us. The nominee is required to supply the beneficial owner of the common units with the information furnished to us.

*New Legislation or Administrative or Judicial Action*

The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process, the IRS and the U.S. Treasury Department, frequently resulting in revised interpretations of established concepts, statutory changes, revisions to regulations and other modifications and interpretations. No assurance can be given as to whether, or in what form, any proposals affecting us or our unitholders will be enacted. The present U.S. federal income tax treatment of an investment in our common units may be modified by administrative, legislative or judicial interpretation at any time, and any such action may affect investments and commitments previously made. Changes to the U.S. federal income tax laws and interpretations thereof could make it more difficult or impossible to be treated as a partnership that is not taxable as a corporation for U.S. federal income tax purposes, affect or cause us to change our investments and commitments, affect the tax considerations of an investment in us, change the character or treatment of portions of our income (including, for instance, the treatment of carried interest as ordinary income rather than capital gain) and adversely affect an investment in our common units. See "Risk Factors—Risks Related to Our Business—Our structure involves complex provisions of U.S. federal income tax law for which no clear precedent or authority may be available. Our structure also is subject to potential legislative, judicial or administrative change and differing interpretations, possibly on a retroactive basis," and "—Legislation has been introduced that would, if enacted, preclude us from qualifying as a partnership for U.S. federal income tax purposes. If this or any similar legislation or regulation were to be enacted and apply to us, we would incur a material increase in our tax liability that could result in a reduction in the value of our common units." We and our unitholders could be adversely affected by any such change in, or any new, tax law, regulation or interpretation. Our organizational documents and agreements permit the board of directors to modify the amended and restated operating agreement from time to time, without the consent of the unitholders, in order to address certain changes in U.S. federal income tax regulations, legislation or interpretation. In some circumstances, such revisions could have a material adverse impact on some or all of our unitholders.

**THE FOREGOING DISCUSSION IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. THE TAX MATTERS RELATING TO KKR AND ITS UNITHOLDERS ARE COMPLEX AND ARE SUBJECT TO VARYING INTERPRETATIONS. MOREOVER, THE MEANING AND IMPACT OF TAX LAWS AND OF PROPOSED CHANGES WILL VARY WITH THE PARTICULAR CIRCUMSTANCES OF EACH PROSPECTIVE UNITHOLDER. PROSPECTIVE UNITHOLDERS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF ANY INVESTMENT IN THE COMMON UNITS.**

208

# UNDERWRITING

We and the underwriters named below, for whom Morgan Stanley & Co. Incorporated and Citigroup Global Markets Inc. are acting as representatives, have entered into an underwriting agreement covering the common units to be sold in this offering. Subject to the terms and conditions of the underwriting agreement, we have agreed to sell to the underwriters, and each underwriter has severally agreed to purchase, at the initial public offering price less the underwriting discounts and commissions set forth on the cover page of this prospectus, the number of common units listed next to its name in the following table:

| Underwriters | Number of Common Units |
|---|---|
| Morgan Stanley & Co. Incorporated | |
| Citigroup Global Markets Inc. | |
| | |
| Total | |

The underwriters are offering the common units subject to their acceptance of the common units from us and subject to prior sale. The underwriting agreement provides that the obligations of the several underwriters to pay for and accept delivery of the common units offered by this prospectus are subject to the approval of certain legal matters by their counsel and to certain other conditions. The underwriters are obligated to take and pay for all of the common units offered by this prospectus if any such common units are taken. However, the underwriters are not required to take or pay for the common units covered by the underwriters' over-allotment option described below.

The underwriters initially propose to offer part of the common units directly to the public at the public offering price listed on the cover page of this prospectus and part to certain dealers at a price that represents a concession not in excess of $          per unit under the public offering price. After the initial offering of the common units, the offering price and other selling terms may from time to time be varied by the representatives.

We have granted to the underwriters an option, exercisable for 30 days from the date of this prospectus, to purchase up to an aggregate of          additional common units at the public offering price listed on the cover page of this prospectus, less underwriting discounts and commissions. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with the offering of the common units offered by this prospectus. To the extent the option is exercised, each underwriter will become obligated, subject to specified conditions, to purchase approximately the same percentage of additional common units as the number listed next to the underwriter's name in the preceding table bears to the total number of common units listed next to the names of all underwriters in the preceding table. If the underwriters' option is exercised in full, the total price to the public would be $                    , the total underwriters' discounts would be $                    and the total proceeds to us would be $          .

We and all of the directors and officers of our Managing Partner have agreed that without the prior written consent of          on behalf of the underwriters, we and they will not, during the period ending          days after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any common units or any securities convertible into or exercisable or exchangeable for common units; or

209

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the common units;

whether any such transaction described above is to be settled by delivery of common units or such other securities, in cash or otherwise. In addition, we have agreed that, without the prior written consent of          on behalf of the underwriters, we will not file any registration statement with the SEC relating to the offering of any common units or any securities convertible into or exercisable or exchangeable for common units (other than any registration statement on Form S-8 to register common units issued or reserved for issuance under our 2007 Equity Incentive Plan). All of the directors and officers of our Managing Partner have also agreed that, without the prior written consent of          on behalf of the underwriters, they will not during the period ending          days after the date of this prospectus, make any demand for, or exercise any right with respect to, the registration of any common units or any securities convertible into or exercisable or exchangeable for common units.

The   -day restricted period described in the preceding paragraph will be extended if:

- during the last 17 days of the   -day restricted period we issue an earnings release or material news or a material event relating to KKR occurs; or

- prior to the expiration of the   -day restricted period, we announce that we will release earnings results during the 16-day period beginning on the last day of the   -day period,

in which case the restrictions described in the preceding paragraph will continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event. These restrictions do not apply to certain sales, issuances, distributions and transfers. See "Common Units Eligible for Future Sale—Lock-Up Arrangements."

The following table shows the per common unit and total underwriting discounts payable by us. The amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase up to          additional common units.

| | Paid by Us | |
| --- | --- | --- |
| | No Exercise | Full Exercise |
| Per common unit | $ | $ |
| Total | $ | $ |

In addition, we estimate that the expenses of this offering payable by us, other than underwriting discounts, will be approximately $          .

In order to facilitate the offering of the common units, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the common units. The underwriters may sell more common units than they are obligated to purchase under the underwriting agreement, creating a short position. A short sale is "covered" if the short position is no greater than the number of common units available for purchase by the underwriters under their over-allotment option. The underwriters can close out a covered short sale by exercising their over-allotment option or purchasing common units in the open market. In determining the source of common units to close out a covered short sale, the underwriters will consider, among other things, the open market price of common units compared to the price available under their over-allotment option. The underwriters may also sell common units in excess of their over-allotment option, creating a "naked short" position. The underwriters must close out any naked short position by purchasing common units in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common units in the open market after pricing that could adversely affect investors who purchase in the offering. In addition, to stabilize the price of the common units, the underwriters may bid for and purchase common units in the open market. Finally, the underwriting syndicate may reclaim selling concessions allowed to an underwriter or a dealer for distributing the common units in the offering, if the syndicate

210

repurchases previously distributed common units to cover syndicate short positions or to stabilize the price of the common units. These activities may raise or maintain the market price of the common units above independent market levels or prevent or retard a decline in the market price of the common units. The underwriters are not required to engage in these activities, and may end any of these activities at any time.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because          has repurchased common units sold by or for the account of such underwriter in stabilizing or short covering transactions.

Purchases to cover a short position and stabilizing transactions may have the effect of preventing or retarding a decline in the market price of common units, and together with the imposition of the penalty bid, may stabilize, maintain or otherwise affect the market price of the common units. As a result, the price of the common units may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued at any time. These transactions may be effected on the New York Stock Exchange, in the over-the-counter market or otherwise.

We intend to apply to list the common units on the New York Stock Exchange under the symbol "KKR."

Affiliates of some of the underwriters own limited partner interests in some of our investment funds. Affiliates of the underwriters have participated, or in the future may participate, in co-investments with our investment funds in portfolio companies of these investment funds. In addition, each of the underwriters or their respective affiliates have performed, and are likely to continue in the future to perform, various investment banking, financial advisory and lending services for us, our investment funds and our funds' portfolio companies, for which they have received and are likely to continue in the future to receive customary fees and such fees in the aggregate may be substantial.

A prospectus in electronic format may be made available on the websites maintained by one or more underwriters. The representatives may agree to allocate a number of common units to underwriters for sale to their online brokerage account holders. Internet distributions will be allocated by the representatives to underwriters that may make Internet distributions on the same basis as other allocations. Other than the prospectus in electronic format, the information on any underwriter's or selling group member's website and any information contained in any other website maintained by an underwriter or selling group member is not part of the prospectus or the registration statement of which this prospectus forms a part, has not been approved or endorsed by us or any underwriter or selling group member in its capacity as underwriter or selling group member and should not be relied upon by investors. In addition, common units may be sold by the underwriter to securities dealers who resell common units to online brokerage account holders.

We and the underwriters have agreed to indemnify each other against certain liabilities, including liabilities under the Securities Act.

**Directed Sale Program**

At our request, the underwriters have reserved for sale, at the initial public offering price, up to          common units offered in this prospectus for our principals, employees, limited partners in our investment funds and others having a significant business relationship with KKR. Persons who purchase such reserved common units will be required to agree, during the period ending     days after purchasing such common units, not to sell, transfer, assign, pledge or hypothecate such common units. This lock-up period will be extended if during the last 17 days of the lock-up period we issue a release about earnings or material news or events relating to us occurs, or, prior to the expiration of the lock-up period, we announce that we will release earnings results during the 16-day period beginning on the last day of the lock-up period, in which case the restrictions described above will continue to apply until the expiration of the     -day period beginning on the issuance of the release or the occurrence of the material news or material event.

211

The number of common units available for sale to the general public will be reduced to the extent such persons purchase such reserved common units. Any reserved common units that are not so purchased will be offered by the underwriters to the general public on the same basis as the other common units offered in this prospectus.

**Pricing of the Offering**

Prior to this offering, there has been no public market for our common units. The initial public offering price will be determined by negotiations between us and the representatives. Among the factors to be considered in determining the initial public offering price will be our future prospects and those of our industry in general, our sales, earnings and other financial operating information in recent periods, and the price-earnings ratios, price-sales ratios, market prices of securities and financial and operating information of companies engaged in activities similar to ours. The estimated initial public offering price range set forth on the cover page of this preliminary prospectus is subject to change as a result of market conditions and other factors.

212

## LEGAL MATTERS

The validity of the common units will be passed upon for us by Simpson Thacher & Bartlett LLP, New York, New York, and Simpson Thacher & Bartlett LLP has opined as to certain U.S. federal income tax matters with respect to us. Certain partners of Simpson Thacher & Bartlett LLP, members of their families and related persons have an interest representing less than 1% of the capital commitments of investment funds that we manage. Certain legal matters in connection with this offering will be passed upon for the underwriters by Davis Polk & Wardwell, New York, New York.

## EXPERTS

The statement of financial condition of KKR & Co. L.P. as of June 29, 2007, included in this prospectus has been audited by Deloitte & Touche LLP, independent registered public accounting firm, as stated in their report appearing elsewhere herein, and is included in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

The statement of financial condition of KKR Management LLC as of June 29, 2007, included in this prospectus has been audited by Deloitte & Touche LLP, independent registered public accounting firm, as stated in their report appearing elsewhere herein, and is included in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

The combined financial statements of KKR Group as of December 31, 2006 and 2005, and for each of the three years in the period ended December 31, 2006, included in this prospectus have been audited by Deloitte & Touche LLP, independent registered public accounting firm, as stated in their report appearing elsewhere herein, and are included in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the common units offered in this prospectus. This prospectus, filed as part of the registration statement, does not contain all of the information set forth in the registration statement and its exhibits and schedules, portions of which have been omitted as permitted by the rules and regulations of the SEC. For further information about us and our common units, we refer you to the registration statement and to its exhibits and schedules. Statements in this prospectus about the contents of any contract, agreement or other document are not necessarily complete and, in each instance, we refer you to the copy of such contract, agreement or document filed as an exhibit to the registration statement.

Anyone may inspect the registration statement and its exhibits and schedules without charge at the public reference facilities the SEC maintains at 100 F Street, N.E., Washington, D.C. 20549. You may obtain copies of all or any part of these materials from the SEC upon the payment of certain fees prescribed by the SEC. You may obtain further information about the operation of the SEC's Public Reference Room by calling the SEC at 1-800-SEC-0330. You may also inspect these reports and other information without charge at a website maintained by the SEC. The address of this website is http://www.sec.gov.

Upon completion of this offering, we will become subject to the informational requirements of the Exchange Act and will be required to file reports and other information with the SEC. You will be able to inspect and copy these reports and other information at the public reference facilities maintained by the SEC at the address noted above. You also will be able to obtain copies of this material from the Public Reference Room of the SEC as described above, or inspect them without charge at the SEC's website. We intend to furnish our unitholders with annual reports containing consolidated financial statements audited by our independent registered public accounting firm.

213

## INDEX TO FINANCIAL STATEMENTS

|  | Page |
|---|---|
| **KKR & Co. L.P.:** | |
| Report of Independent Registered Public Accounting Firm | F-3 |
| Statement of Financial Condition as of June 29, 2007 | F-4 |
| Notes to Statement of Financial Condition | F-4 |
| **KKR Management LLC:** | |
| Report of Independent Registered Public Accounting Firm | F-5 |
| Statement of Financial Condition as of June 29, 2007 | F-6 |
| Notes to Statement of Financial Condition. | F-6 |
| **KKR Group*:** | |
| Report of Independent Registered Public Accounting Firm | F-7 |
| Combined Financial Statements—December 31, 2006, 2005 and 2004 | |
| Combined Statements of Financial Condition as of December 31, 2006 and 2005 | F-8 |
| Combined Statements of Income for the Years Ended December 31, 2006, 2005 and 2004 | F-9 |
| Combined Statements of Changes in Partner's Capital for the Years Ended December 31, 2006, 2005 and 2004 | F-10 |
| Combined Statements of Cash Flows for the Years Ended December 31, 2006, 2005 and 2004 | F-11 |
| Notes to Combined Financial Statements | F-12 |
| Unaudited Condensed Combined Financial Statements—March 31, 2007 and 2006 | |
| Condensed Combined Statements of Financial Condition as of March 31, 2007 and December 31, 2006 | F-43 |
| Condensed Combined Statements of Income for the Three Months Ended March 31, 2007 and 2006 | F-44 |
| Condensed Combined Statements of Changes in Partner's Capital for the Three Months Ended March 31, 2007 and 2006 | F-45 |
| Condensed Combined Statements of Cash Flows for the Three Months Ended March 31, 2007 and 2006 | F-46 |
| Notes to Condensed Combined Financial Statements | F-47 |

\*     The combined financial statements reflect the historical results of operations and financial position of the KKR Group for all periods presented. Accordingly, the historical financial statements do not reflect what the results of operations and financial position of the KKR Group would have been had the KKR Group been a stand-alone, public company for the periods presented.

The KKR Group has operated in the U.S. through various limited liability companies and partnerships. As a result, the KKR Group's income has generally not been subject to U.S. federal income taxes. Taxes related to income earned by partnerships represent obligations of the individual partners. Income taxes shown on the KKR Group's historical combined statements of income are attributable to taxes incurred in non-U.S. entities and to New York City unincorporated business tax attributable to the KKR Group's operations apportioned to New York City. Unaudited pro forma taxes based on the Reorganization Transactions are provided within the Unaudited Pro Forma Financial Information section of this prospectus.

F-1

The KKR Group's business is presently conducted through a large number of entities which are under the common control of our senior principals and the common ownership of our existing owners, and for which there is no single holding entity. Accordingly, the KKR Group has not presented historical earnings per unit of the combined entities. Unaudited pro forma earnings per unit, based on the Reorganization Transactions, are provided within the Unaudited Pro Forma Financial Information section of this prospectus.

Payment for services rendered by the principals, which as a result of the KKR Group operating as a partnership, historically has been accounted for as distributions from partner's capital rather than as compensation and benefits expense. As a result, the KKR Group's net income historically has not reflected payments for services rendered by its principals. After this offering the KKR Group will include all payments for services rendered by its principals in employee compensation and benefits expense.

F-2

## Report of Independent Registered Public Accounting Firm

To the Partners of KKR & Co. L.P.:

We have audited the accompanying statement of financial condition of KKR & Co. L.P. (the "Partnership") as of June 29, 2007. This financial statement is the responsibility of the Partnership's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statement is free of material misstatement. The Partnership is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such financial statement presents fairly, in all material respects, the financial position of KKR & Co. L.P. as of June 29, 2007, in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte & Touche LLP

New York, New York
July 3, 2007

F-3

# KKR & CO. L.P.

## Statement of Financial Condition as of June 29, 2007

| | | |
|---|---|---|
| **Assets** | | |
| Cash | $ | 1,000 |
| | | |
| | | |
| **Partners' Capital** | | |
| Partners' Capital | $ | 1,000 |

## Notes to Statement of Financial Condition

### 1.   ORGANIZATION

KKR & Co. L.P. (the "Partnership") was formed as a Delaware limited partnership on June 25, 2007. Pursuant to a series of transactions, the Partnership will become a holding partnership and its sole assets are expected to consist of controlling equity interests in KKR Management Holdings Corp. and KKR Fund Holdings L.P. Through those equity interests, the Partnership will operate and control all of the businesses and affairs of those entities and their subsidiaries. KKR Management LLC is the general partner of the Partnership.

### 2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Accounting** —The accompanying Statement of Financial Condition has been prepared in accordance with accounting principles generally accepted in the United States of America. Separate Statements of Income, Changes in Partners' Capital and Cash Flows have not been presented in the financial statement because there have been no activities of the Partnership.

### 3.   PARTNERS' CAPITAL

An organizational limited partner of the Partnership contributed $1,000 to the Partnership in connection with the Partnership's formation.

F-4

### Report of Independent Registered Public Accounting Firm

To the Members of KKR Management LLC:

We have audited the accompanying statement of financial condition of KKR Management LLC (the "Company") as of June 29, 2007. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statement is free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such financial statement presents fairly, in all material respects, the financial position of KKR Management LLC as of June 29, 2007, in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte & Touche LLP

New York, New York
July 3, 2007

F-5

# KKR MANAGEMENT LLC

## Statement of Financial Condition as of June 29, 2007

| | | |
|---|---|---:|
| **Assets** | | |
| Cash | $ | 1,000 |
| | | |
| **Members' Capital** | | |
| Members' Capital | $ | 1,000 |

## Notes to Statement of Financial Condition

### 1. ORGANIZATION

KKR Management LLC (the "Company") was formed as a Delaware limited liability company on June 25, 2007. The Company has been established to serve as the general partner of KKR & Co. L.P.

### 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Accounting** —The accompanying Statement of Financial Condition has been prepared in accordance with accounting principles generally accepted in the United States of America. Separate Statements of Income, Changes in Members' Capital and Cash Flows have not been presented in the financial statement because there have been no activities of the Company.

### 3. MEMBERS' CAPITAL

Organizational members of the Company contributed $1,000 to the Company in connection with its formation.

F-6

**Report of Independent Registered Public Accounting Firm**

To the Partners of the KKR Group:

    We have audited the accompanying combined statements of financial condition of the KKR Group (the "Company") as of December 31, 2006 and 2005, and the related combined statements of income, changes in partners' capital and of cash flows for each of the three years in the period ended December 31, 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

    We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion . An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

    In our opinion, such combined financial statements present fairly, in all material respects, the combined financial position of the KKR Group as of December 31, 2006 and 2005, and the combined results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte & Touche LLP

New York, New York
July 3, 2007

F-7

**KKR GROUP**

**Combined Statements of Financial Condition**

**As of December 31, 2006 and 2005**

**(Dollars in Thousands)**

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |
| **Assets** | | |
| Cash and Cash Equivalents | $ 92,991 | $ 96,293 |
| Cash and Cash Equivalents Held at Consolidated Entities | 2,299,650 | 193,708 |
| Restricted Cash and Cash Equivalents | 108,295 | — |
| Investments, at Fair Value | 20,538,247 | 12,961,281 |
| Due from Affiliates | 115,561 | 50,087 |
| Other Assets | 138,039 | 68,043 |
| **Total Assets** | $ 23,292,783 | $ 13,369,412 |
| **Liabilities and Partners' Capital** | | |
| Debt Obligations | $ 948,803 | $ 249,439 |
| Accounts Payable, Accrued Expenses and Other Liabilities | 333,120 | 169,339 |
| **Total Liabilities** | 1,281,923 | 418,778 |
| **Commitments and Contingencies** | | |
| **Non-Controlling Interests in Consolidated Entities** | 20,201,548 | 11,413,885 |
| **Partners' Capital** | | |
| Partners' Capital | 1,801,686 | 1,530,615 |
| Accumulated Other Comprehensive Income | 7,626 | 6,134 |
| **Total Partners' Capital** | 1,809,312 | 1,536,749 |
| **Total Liabilities and Partners' Capital** | $ 23,292,783 | $ 13,369,412 |

See notes to combined financial statements.

F-8

**KKR GROUP**

**Combined Statements of Income**

**For the Years Ended December 31, 2006, 2005 and 2004**

**(Dollars in Thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| **Revenues** | | | |
| Fee Income | $ 410,329 | $ 232,945 | $ 183,462 |
| | | | |
| **Expenses** | | | |
| Employee Compensation and Benefits | 131,667 | 79,643 | 69,956 |
| Occupancy and Related Charges | 19,295 | 13,534 | 10,688 |
| General, Administrative and Other | 78,154 | 54,336 | 36,931 |
| Fund Expenses | 38,350 | 20,778 | 16,470 |
| **Total Expenses** | 267,466 | 168,291 | 134,045 |
| **Investment Income** | | | |
| Net Gains from Investment Activities | 3,105,523 | 2,984,504 | 3,026,396 |
| Dividend Income | 714,069 | 729,926 | 14,611 |
| Interest Income | 210,872 | 27,166 | 54,060 |
| Interest Expense | (29,542) | (697) | (524) |
| **Total Investment Income** | 4,000,922 | 3,740,899 | 3,094,543 |
| **Income before Non-Controlling Interests in Income of Consolidated Entities and Income Taxes** | 4,143,785 | 3,805,553 | 3,143,960 |
| **Non-Controlling Interests in Income of Consolidated Entities** | 3,026,913 | 2,861,186 | 2,364,309 |
| **Income Before Taxes** | 1,116,872 | 944,367 | 779,651 |
| **Income Taxes** | 4,163 | 2,900 | 6,265 |
| **Net Income** | $ 1,112,709 | $ 941,467 | $ 773,386 |

See notes to combined financial statements.

F-9

**KKR GROUP**

**Combined Statements of Changes in Partners' Capital**

**For the Years Ended December 31, 2006, 2005 and 2004**

**(Dollars in Thousands)**

| | Partners' Capital | Accumulated Other Comprehensive Income (Loss) | Total Partners' Capital |
|---|---|---|---|
| **Balance at January 1, 2004** | $ 827,046 | $ 2,880 | $ 829,926 |
| Comprehensive Income | | | |
| Net Income | 773,386 | | 773,386 |
| Other Comprehensive Income— | | | |
| Currency Translation Adjustment | | 4,284 | 4,284 |
| Total Comprehensive Income | | | 777,670 |
| Capital Contributions | 156,116 | | 156,116 |
| Capital Distributions | (632,969) | | (632,969) |
| **Balance at December 31, 2004** | 1,123,579 | 7,164 | 1,130,743 |
| Comprehensive Income | | | |
| Net Income | 941,467 | | 941,467 |
| Other Comprehensive Income— | | | |
| Currency Translation Adjustment | | (1,030) | (1,030) |
| Total Comprehensive Income | | | 940,437 |
| Capital Contributions | 146,344 | | 146,344 |
| Capital Distributions | (680,775) | | (680,775) |
| **Balance at December 31, 2005** | 1,530,615 | 6,134 | 1,536,749 |
| Comprehensive Income | | | |
| Net Income | 1,112,709 | | 1,112,709 |
| Other Comprehensive Income: | | | |
| Currency Translation Adjustment | | 1,489 | 1,489 |
| Net Change in Unrealized Gain on Securities Available for Sale | | 3 | 3 |
| Total Comprehensive Income | | | 1,114,201 |
| Capital Contributions | 267,117 | | 267,117 |
| Capital Distributions | (1,108,755) | | (1,108,755) |
| **Balance at December 31, 2006** | $ 1,801,686 | $ 7,626 | $ 1,809,312 |

See notes to combined financial statements.

F-10

**KKR GROUP**

**Combined Statements of Cash Flows**

**For the Years Ended December 31, 2006, 2005 and 2004**

**(Dollars in Thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| **Cash Flows from Operating Activities** | | | |
| Net Income | $ 1,112,709 | $ 941,467 | $ 773,386 |
| Adjustments to Reconcile Net Income to Net Cash (Used in) Provided By Operating Activities: | | | |
| Non-Controlling Interests in Income of Consolidated Entities | 3,026,913 | 2,861,186 | 2,364,309 |
| Net Realized Gains on Investments | (3,244,931) | (1,567,312) | (2,932,802) |
| Change in Unrealized Gains on Investments Allocable to KKR Group | (3,835) | (274,712) | (56,410) |
| Change in Unrealized Losses (Gains) on Investments Allocable to Non-Controlling Interests | 143,243 | (1,142,480) | (37,184) |
| Other Non-Cash Amounts Included in Net Income | (16,063) | (7,023) | (13,899) |
| Cash Flows Due to Changes in Operating Assets and Liabilities: | | | |
| Change in Cash and Cash Equivalents Held at Consolidated Entities | (2,105,942) | (143,941) | 16,966 |
| Change in Due from Affiliates | (65,474) | (22,284) | (14,650) |
| Change in Other Assets | (68,718) | (18,022) | 152,114 |
| Change in Accounts Payable, Accrued Expenses and Other Liabilities | 60,189 | 30,026 | (12,838) |
| Investments Purchased | (9,555,635) | (3,399,748) | (3,081,992) |
| Cash Proceeds from Sale of Investments | 5,186,400 | 2,636,395 | 4,642,767 |
| Net Cash (Used In) Provided By Operating Activities | (5,531,144) | (106,448) | 1,799,767 |
| **Cash Flows from Investing Activities** | | | |
| Change in Restricted Cash and Cash Equivalents | (108,295) | — | — |
| Purchase of Furniture, Equipment and Leasehold Improvements | (21,815) | (5,052) | (2,575) |
| Net Cash Used in Investing Activities | (130,110) | (5,052) | (2,575) |
| **Cash Flows from Financing Activities** | | | |
| Distributions to Non-Controlling Interests in Consolidated Entities | (5,675,567) | (3,333,371) | (4,469,240) |
| Contributions from Non-Controlling Interests in Consolidated Entities | 11,430,568 | 3,633,699 | 3,173,926 |
| Distributions to Partners | (1,063,530) | (561,840) | (598,311) |
| Contributions from Partners | 267,117 | 146,344 | 156,116 |
| Proceeds from Debt Obligations | 3,722,379 | 273,841 | 54,462 |
| Repayment of Debt Obligations | (3,023,015) | (24,402) | (54,462) |
| Net Cash Provided By (Used in) Financing Activities | 5,657,952 | 134,271 | (1,737,509) |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | (3,302) | 22,771 | 59,683 |
| Cash and Cash Equivalents, Beginning of Year | 96,293 | 73,522 | 13,839 |
| Cash and Cash Equivalents, End of Year | $ 92,991 | $ 96,293 | $ 73,522 |

| | | | | | |
|---|--:|---|--:|---|--:|
| **Supplemental Disclosures of Cash Flow Information** | | | | | |
| Payments for Interest | $ | 16,962 | $ | 114 | $ | 457 |
| Payments for Income Taxes | $ | 5,939 | $ | 2,527 | $ | 3,067 |
| **Supplemental Non-Cash Financing Activities** | | | | | |
| Non-Cash Distributions to Non-Controlling Interests in Consolidated Entities | $ | 10,060 | $ | 4,705 | | — |
| Non-Cash Distributions to Partners | $ | 45,225 | $ | 118,935 | $ | 34,658 |
| Restricted stock grant from affiliate | | — | $ | 45,656 | $ | 23,877 |
| Stock option grant from affiliate | | — | | — | $ | 1,740 |

See notes to combined financial statements.

F-11

**KKR GROUP**

**Notes to Combined Financial Statements**

**(All Dollars Are in Thousands Except Where Otherwise Noted)**

## 1. ORGANIZATION AND BASIS OF PRESENTATION

The KKR Group (the "Company") is a global alternative asset manager with principal executive offices in New York and Menlo Park, California. The Company's alternative asset management business involves sponsoring and managing investment funds that make investments worldwide in private equity and debt transactions on behalf of third-party investors and the Company's owners ("Principals"), including its founders. In connection with these activities, the Company also manages substantial investments in public equity. With respect to certain funds that it sponsors, the Company commits to contribute a specified amount of equity as the general partner of the fund (ranging from approximately 2% to 3% of the funds' total capital commitments) to fund a portion of acquisition price for the fund's investments.

The accompanying combined financial statements of the Company include the results of six of the Company's private equity funds and two of the Company's credit strategy funds (the "KKR Funds") and the general partners and management companies of those funds. The Company operates as a single professional services firm and carries out its investment activities under the "KKR" brand name. The entities comprising the Company are under the common control of our senior Principals (the "Senior Principals"). The Senior Principals are actively involved in the Company's operations and management.

The accompanying combined financial statements include the accounts of the management companies: Kohlberg Kravis Roberts & Co. L.P. and KKR Financial LLC, and the general partners of the private equity funds (the "Common Control Entities") and their respective consolidated funds: KKR 1996 Fund; KKR European Fund; KKR Millennium Fund; KKR European Fund II; KKR 2006 Fund; KKR Private Equity Investors and certain of the KKR Strategic Capital Funds.

KKR Financial Holdings LLC ("KFN") is a publicly traded credit strategy fund whose limited liability Company interests are listed on the New York Stock Exchange under the symbol "KFN." KFN is managed by the Company but is not under the common control of the Senior Principals or otherwise consolidated by the Company as control is maintained by third-party investors. KFN was organized in August 2004 and completed its initial public offering on June 24, 2005. As of December 31, 2006 and 2005, KFN had consolidated assets of $17.6 billion and $15.3 billion, respectively, and stockholders' equity of $1.7 billion. Shares of KFN held by the Company are accounted for as trading securities (see Note 2) and represented approximately 2.0% and 3.3% of KFN's outstanding shares as of December 31, 2006 and 2005, respectively.

For management reporting purposes, the Company operates through two reportable business segments:

- **Private Equity—** The Company's private equity segment involves sponsoring and managing a group of funds that make primarily control-oriented investments in connection with leveraged buyouts and other similar investment opportunities. These funds are managed by Kohlberg Kravis Roberts & Co. L.P. and currently consist of a number of private equity funds that have a finite life and investment period ("Traditional Private Equity Funds") and KKR Private Equity Investors, a private equity-oriented permanent capital fund that has a perpetual existence and investment period ("KPE").

- **Credit—** The Company's credit segment involves sponsoring and managing a group of private and publicly traded investment funds that invests primarily in corporate debt ("Credit Strategy Funds") and managing four structured finance vehicles which were established to complete secured financing transactions. The Credit Strategy Funds are managed by subsidiaries of KKR Financial

F-12

LLC and currently consist of KFN and the KKR Strategic Capital Funds (the "SCF"), which are comprised of three side-by-side private credit strategy funds. Two of the side-by-side funds in the SCF and one of the structured finance vehicles managed by the Company have been consolidated in the accompanying combined financial statements of the Company. The third side-by-side fund is not consolidated by the KKR Group. This fund is owned and controlled by third-party investors and the KKR Group holds no economic or voting interests. The KKR Group receives management and incentive fees for managing the assets held by this fund. See note 2 to the combined financial statements for the Company's accounting policy regarding Fee Income. Three of the four structured finance vehicles are not consolidated by the KKR Group as KFN holds the majority of the economic and voting interests. Accordingly, these structured finance vehicles are consolidated by KFN.

The instruments governing the Traditional Private Equity Funds provide that the funds will continue in existence for a varying term (generally up to 18 years from the date of initial funding), unless the funds are terminated by the Principals or through an event of dissolution, as defined in the applicable governing instruments. The instruments governing KPE and the Credit Strategy Funds generally provide that those funds will continue in existence indefinitely, unless the funds are terminated earlier as provided in the applicable governing instruments.

The Company has three primary sources of income: (i) fee income (consisting primarily of management, transaction and monitoring fees); (ii) amounts received from the Company's funds in the form of a carried interest or other distribution that entitles the Company to a disproportionate share of the gains generated by the funds; and (iii) investment income generated through the investment of the Company's own capital in its funds and other proprietary investments.

The KKR Funds are consolidated pursuant to accounting principles generally accepted in the United States of America ("GAAP") as described in Note 2, notwithstanding the fact that the Company has only a minority economic interest in the those funds. Specifically, the general partners of the KKR Funds consolidate their respective funds and certain of their respective entities in accordance with Emerging Issues Task Force ("EITF") No. 04-5, "Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights." Consequently, the Company's combined financial statements reflect the assets, liabilities, revenues, expenses, investment income and cash flows of the consolidated KKR Funds on a gross basis, and the majority of the economic interests in those funds, which are held by third-party investors, are reflected as non-controlling interests in consolidated entities in the accompanying combined financial statements. Substantially all of the management fees and certain other amounts earned by the Company from those funds are eliminated in combination. However, because the eliminated amounts are earned from, and funded by, non-controlling interest holders, the Company's allocable share of the net income from those funds is increased by the amounts eliminated. Accordingly, the combination of the KKR Funds has no net effect on the Company's net income or partners' capital. See Note 2.

F-13

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*General*

    **Basis of Accounting** —The accompanying combined financial statements are prepared in accordance with GAAP.

    **Principles of Consolidation—** The Company's policy is to consolidate those entities in which it, through the Senior Principals, has control. Hereinafter, all entities that are included in the accompanying combined financial statements are referred to as consolidated entities.

    The consolidated entities are under the common control of the Senior Principals. The accompanying combined financial statements include the accounts of the Company and its consolidated entities, which are comprised of (i) those entities in which the Company, directly or through the Senior Principals, has majority ownership and has control over significant operating, financial and investing decisions, and (ii) the consolidated KKR Funds, which are those entities in which the Company, through the Senior Principals, holds substantive, controlling general partner or managing member interests. With respect to the consolidated KKR Funds, the Company generally has operational discretion and control, and fund investors have no substantive rights to impact ongoing governance and operating activities of the fund.

    The KKR Funds do not consolidate their majority-owned and controlled investments in portfolio companies ("Portfolio Companies"). Rather, those investments are accounted for as investments and carried at fair value as described below.

    Intercompany transactions and balances have been eliminated.

    **Non-Controlling Interests in Consolidated Entities—** Non-controlling interests in consolidated entities represent the ownership interests in consolidated entities, including consolidated KKR Funds, held by entities or persons other than the Principals. Non-controlling interest holders in the Company have a substantial ownership position in the Company's combined total assets (approximately 87% as of December 31, 2006).

    Allocation of income to non-controlling interests in consolidated KKR Funds is based on the respective funds' governing instruments.

    In the case of the Traditional Private Equity Funds, profits on capital invested on behalf of limited partners are allocated to the limited partners in an amount equal to 80% of the ratio of their capital contributions to the total capital contributed by all partners with respect to each investment. The general partners of the funds receive the remaining portion of the profits in the form of a carried interest. Losses on a fund's investments are first applied to the excess of any prior income over such losses. Any remaining fund losses are applied to the equity accounts of the partners in proportion to their capital contributed with respect to each individual investment, until the partners' equity accounts have been reduced to zero. Any remaining fund losses are allocated to the fund's general partner.

    In the case of KPE, one of the fund's general partners holds an economic interest in the fund that will entitle it to a disproportionate share of the gains generated by the fund's direct investments once the fund's

F-14

capitalization costs (the "Creditable Amount") have been recouped as described below. This economic interest consists of:

- a carried interest that generally will allocate to the general partner 20% of the gain that is realized on direct private equity investments that are made with fund investors' capital after any realized losses on other direct private equity investments have been recovered; and

- a distribution right that generally will allocate to the general partner 20% of the annual increase in the net asset value of all other direct investments that are made with fund investors' capital above the highest net asset value at which an incentive amount was previously made.

The general partner is not entitled to a carried interest or incentive distribution right with respect to the fund's indirect investments, which consist of investments made through other funds that the Company sponsors. However, if the fund acquires a partner interest in one of the Company's other funds from a third party, the amount of distributions that the general partner receives pursuant to its distribution right may be adjusted to reflect realized gains or losses relating to the value of the acquired partner interest. As noted above, the general partner of KPE has agreed to forego receiving a carried interest or distribution until the profits on investments with respect to which it would be entitled to receive a carried interest or distribution equal the Creditable Amount. As of December 31, 2006, the Creditable Amount had a remaining balance of $244,449.

**Use of Estimates** —The preparation of the combined financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenues, expenses and investment income during the reporting periods. Such estimates include but are not limited to the valuation of Portfolio Companies owned by the KKR Funds, financial instruments owned and other matters that affect reported amounts of assets and liabilities. Actual results could differ from those estimates and such differences could be material to the combined financial statements.

### Income Statement Measurements

**Fee Income** —Fee income is comprised of (i) transaction fees received from Portfolio Companies, (ii) monitoring fees received from Portfolio Companies, (iii) management fees received from unconsolidated funds and (iv) incentive fees received from unconsolidated funds. Such fees are based upon the contractual terms of fund management and related agreements and are recognized in the period during which the related services are performed and the amounts have been contractually earned.

<div align="center">F-15</div>

For the years ended December 31, 2006, 2005 and 2004, fee income consists of the following:

| | Year Ended December 31, | | |
| | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| Transaction Fees Received from Portfolio Companies | $ 258,033 | $ 135,251 | $ 139,500 |
| Monitoring Fees Received from Portfolio Companies | 81,974 | 58,244 | 35,702 |
| Management Fees Received from Unconsolidated Funds | 55,756 | 39,450 | 8,260 |
| Incentive Fees Received from Unconsolidated Funds | 14,566 | — | — |
| Total Fee Income | $ 410,329 | $ 232,945 | $ 183,462 |

*Management fees received from consolidated and unconsolidated funds* —For the Traditional Private Equity Funds, gross management fees generally range from 1% to 1.5% of committed capital during the fund's investment period and approximately .75% of invested capital after the expiration of the fund's investment period. Typically, an investment period is defined as a period of up to six years. The actual length of the period may be shorter based on the timing and use of committed capital.

For KPE, management fees are determined quarterly based on 25% of the sum of (i) that fund's equity up to and including $3 billion multiplied by 1.25% plus (ii) that fund's equity in excess of $3 billion multiplied by 1%. For purposes of calculating the management fee, equity is an amount defined in the management agreement. Until the Creditable Amount is reached, the Company has generally agreed to reduce the amount of management fees payable by the fund in any period by amounts that the Company or its affiliates receive during the period pursuant to a carried interest in a private equity fund in which KPE invests

Management fees received from consolidated KKR Funds are eliminated in combination. However, because these amounts are funded by, and earned from, non-controlling interest holders, the Company's allocated share of the net income from consolidated KKR Funds is increased by the amount of fees that are eliminated. Accordingly, the elimination of the fees does not have a net effect on the Company's net income or partners' capital.

The Company's management agreement with KFN provides, among other things, that KFN is responsible for paying to the Company certain fees and reimbursements, consisting of a base management fee, an incentive fee and reimbursement for out-of-pocket and certain other costs and expenses incurred by the Company on behalf of KFN. The Company earns an annual base management fee, computed monthly in arrears, in an amount equal to adjusted equity multiplied by 1.75%. For purposes of calculating the base management fee, adjusted equity is an amount defined in the management agreement.

F-16

The Company's management agreement with KFN will automatically be renewed for successive one-year terms following December 31, 2007 unless the agreement is terminated in accordance with its terms. The management agreement provides that the fund may terminate the agreement only if:

- the termination is approved at least 180 days prior to the expiration date by at least two-thirds of the fund's independent directors or by the holders of a majority of the outstanding shares of the fund's common stock and the termination is based upon (i) a determination that the Company's performance has been unsatisfactory and materially detrimental to the fund or (ii) a determination that the management and incentive fees payable to us are not fair (subject to our right to prevent a termination by reaching an agreement to reduce the Company's management and incentive fees), in which case a termination fee is payable to the Company; or

- the Company's subsidiary that manages the fund experiences a "change of control" or we materially breach the provisions of the agreement, engage in certain acts of willful misconduct or gross negligence, become bankrupt or insolvent or are dissolved, in which case a termination fee is not payable to the Company.

The Company has received restricted common stock and common stock options from KFN as a component of compensation for management services to that fund. The restricted common stock and stock options vest ratably over applicable vesting periods and are initially recorded as deferred revenue at their estimated fair values at the date of grant. Subsequently, the Company re-measures the restricted common stock and stock options to the extent that they are unvested, with a corresponding adjustment to deferred revenue. Income from restricted common stock and common stock options is recognized ratably over the vesting period as a component of fee income and amounted to $24,667, $18,468 and $3,147 for the years ended December 31, 2006, 2005 and 2004, respectively.

The Company has entered into management agreements with the side-by-side funds comprising the KKR Strategic Capital Funds pursuant to which it has agreed to provide them with management and other services. Under the management agreement and, in some cases, other documents governing the individual funds, the Company is entitled to receive:

- with respect to investors who have agreed to a 25 month lock-up period, a monthly management fee that is equal to 0.1667% (or 2.0% annualized) of the net asset value of the individual fund that is allocable to those investors; and

- with respect to investors who have agreed to a 60 month lock-up period, a monthly management fee that is equal to 0.1250% (or 1.5% annualized) of the net asset value of the primary fund that is allocable to those investors.

Vested common stock that is received as a component of compensation for management services are carried as trading securities, because the Company generally intends to distribute the common stock subsequent to vesting. Vested common stock is recorded at estimated fair value with changes in fair value recognized in Net Gains from Investment Activities.

Vested stock options received as a component of compensation for management services meet the characteristics of derivative investments. Subsequent to vesting, these options continue to be measured at estimated fair value with changes in fair value recognized in current income as an unrealized gain or loss.

F-17

Both vested and unvested common stock options are valued using a Black-Scholes pricing model as of the end of each period.

*Incentive fees received from unconsolidated funds—* The Company's management agreement with KFN provides that KFN is responsible for paying a quarterly incentive fee when the return on assets under management exceeds certain benchmark returns or other performance targets. This incentive fee is accrued quarterly, after all contingencies have been removed, based on performance to date versus the performance benchmark stated in the management agreement. Once earned, there are no clawbacks of incentive fees received from KFN.

As part of the Company's management agreements with the side-by-side funds comprising the KKR Strategic Capital Funds the Company is entitled to receive incentive fees as follows:

• with respect to investors who have agreed to a 25 month lock-up period, an annual incentive fee equal to 20% of the increase in the net asset value of the individual fund that is allocable to those investors above the highest net asset value at which an incentive fee has previously been received; and

• with respect to investors who have agreed to a 60 month lock-up period, an annual incentive fee equal to 15% of the increase in the net asset value of the individual fund that is allocable to those investors above the highest net asset value at which an incentive fee has previously been received.

These incentive fees are accrued annually, after all contingencies have been removed, based on performance to date versus the performance benchmark stated in the management agreement. Since performance can fluctuate during interim periods, no incentive fees are recognized on a quarterly basis. Once earned, there are no clawbacks of incentive fees received from the side-by-side funds comprising the KKR Strategic Capital Funds.

*Transaction fees received from Portfolio Companies* —Transaction fees are earned by the Company primarily in connection with successful acquisitions of Portfolio Companies by private equity funds and with respect to certain other negotiated investments. Transaction fees are recorded in fee income upon closing of the transaction. Fees are typically paid by Portfolio Companies on or around the closing date and generally approximate 1% of the total transaction value to which the Company is entitled to its proportionate share. Transaction-related expenses associated with successful Portfolio Company investments are deferred and recorded in Other Assets until the transaction is consummated. See our description under "—Reimbursement of Transaction-Related Expenses" below. Transaction-related expenses associated with investigating Portfolio Company investments that are not consummated are recorded in fund expenses when facts and circumstances indicate that the transactions are unlikely to be consummated.

*Monitoring fees received from Portfolio Companies* —Monitoring fees are earned by the Company for services provided to the Portfolio Companies of private equity funds. These fees are paid based on a fixed periodic schedule by the Portfolio Companies either in advance or in arrears and are separately negotiated for each Portfolio Company.

**Reimbursement of Transaction-Related Expenses** —In pursuing successful Portfolio Company investments for private equity funds, the Company receives reimbursement for certain transaction-related expenses. Transaction-related expenses, which are billable to third parties, are deferred until the

F-18

transaction is consummated and recorded in other assets on the date the expense is incurred. Upon reimbursement from a third party, the cash receipt is recorded and the deferred amounts are relieved. No fee income or expense is recorded for these reimbursements.

   **Reimbursement of Monitoring Costs** —In connection with the monitoring of Portfolio Companies, the Company receives reimbursement for certain expenses incurred on behalf of these entities. Billable monitoring expenses are recognized as revenue in accordance with EITF 01-14, "Income Statement Characterization of Reimbursement Received for Out of Pocket Expenses Incurred," These expense reimbursements are classified as monitoring fee income and amounted to $14,799, $10,037 and $8,026 for the years ended December 31, 2006, 2005, and 2004, respectively.

   **Investment Income** —Investment income consists primarily of unrealized and realized gains and losses on private equity investments as well as dividends and interest received primarily from the Portfolio Companies, after giving effect to interest expense incurred primarily by the Company's Credit Strategy Funds and foreign exchange gains and losses relating to mark-to-market activity on foreign exchange forward contracts. The amount of investment income retained in net income, after allocation to non-controlling interests in consolidated entities, represents investment income allocable to the Company resulting from earnings on its investments and its carried interest and similar distribution rights. Carried interests and similar distribution rights generally entitle the Company to a disproportionate share of the gains generated by a fund as described below. Unrealized gains or losses result from changes in fair value of investments during the period, and are included in Net Gains from Investment Activities. Upon disposition of an investment, previously recognized unrealized gains or losses are reversed and a realized gain or loss is recognized. Net Gains from Investment Activities earned by the consolidated KKR Funds amounted to $3,041,318, $2,889,835 and $2,962,907 for the years ended December 31, 2006, 2005 and 2004, respectively.

   Carried interests entitle the general partner of a fund to a greater allocable share of these fund's earnings from investments relative to the capital contributed by the general partner and correspondingly reduce non-controlling interests' allocable share of those earnings. Amounts earned pursuant to carried interests in Traditional Private Equity Funds are included in investment income and are earned by the general partner of those funds to the extent that investment returns are positive. If these investment returns decrease or turn negative in subsequent periods, recognized carried interest will be reduced and reflected as investment losses. Recognized carried interest amounted to approximately $719 million, $705 million and $587 million for the years ended December 31, 2006, 2005 and 2004, respectively. In the case of a Traditional Private Equity Fund, a carried interest is calculated as a percentage of the gains of the fund, subject to the achievement by the fund of positive investment returns, which, if not achieved, subjects previously distributed carried interest to a contingent repayment. A carried interest that is subject to contingent repayment may be paid to a fund's general partner as particular investments made by the fund are sold or otherwise realized. However, if upon liquidation of the fund, the aggregate amount paid to the general partner pursuant to a carried interest exceeds the amount actually due to the general partner based upon the aggregate performance of the applicable fund, the excess is required to be repaid by the general partner (a "clawback") to the fund. Carried interest subject to contingent repayment is recognized as earned based on the contractual formula set forth in the instruments governing the fund as if the fund was terminated at that date with the then estimated fair values of the investments realized. Due to the extended durations of the Traditional Private Equity Funds, management believes that this approach results in income recognition that best reflects the periodic performance of the Company in the

F-19

management of those funds. As of December 31, 2006, approximately $958.9 million of carried interest has been paid to certain of the general partners of the KKR Funds that is subject to contingent repayment. See Note 8, Related Party Transactions.

Dividend income is recognized by the Company on the ex-dividend date, or in the absence of a formal declaration, on the date it is received. For the years ended December 31, 2006, 2005 and 2004, all dividends were earned by the consolidated KKR Funds.

Interest income is recognized as earned. Interest income earned by the consolidated KKR Funds amounted to $198,632, $18,238 and $50,532 for the years ended December 31, 2006, 2005 and 2004, respectively.

**Profit Sharing—** The Company has various profit sharing arrangements which provide for a sharing of the income earned on its investments and carried interests in the KKR Funds. Amounts payable under such arrangements are charged to compensation expense or professional fees expense when payment is probable and amounts owed are reasonably estimable. See note 11.

### Statement of Financial Condition Measurements

**Cash and Cash Equivalents** —The Company considers all highly liquid short-term investments with original maturities of 90 days or less when purchased to be cash equivalents.

**Cash and Cash Equivalents Held at Consolidated Entities** —Cash and cash equivalents held at consolidated entities represents cash that, although not legally restricted, is not available to fund general liquidity needs of the Company as the use of such funds is generally limited to the investment activities of the KKR Funds.

**Restricted Cash and Cash Equivalents** —Restricted cash and cash equivalents represent amounts that are held by third parties under certain of the Company's financing and derivative transactions.

**Investments, at Fair Value—** The Company's investments consist primarily of private equity investments, debt investments and other investments. See Note 3 for information relating to the Company's investments.

*Private Equity Investments* **—** Private equity investments consist of investments in Portfolio Companies of consolidated KKR Funds that are, for GAAP purposes, investment companies under the AICPA Audit and Accounting Guide—"Investment Companies." The KKR Funds reflect investments at their estimated fair values, with unrealized gains or losses resulting from changes in fair value reflected as a component of Net Gains from Investment Activities in the combined statements of income. Fair value is the amount at which the investments could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale. The Company has retained the specialized accounting of these investments pursuant to EITF No. 85-12, "Retention of Specialized Accounting for Investments in Consolidation."

Private equity investments that have readily observable market prices (such as those traded on a securities exchange) are stated at the last reported sales price on the statement of financial condition date.

As of December 31, 2006, approximately 72% of our private equity investments have been valued by the Company in the absence of readily observable market prices. The determination of fair value may differ materially from the values that would have resulted if a ready market had existed. For these investments, fair value is determined after giving consideration to a range of factors, including the price at

F-20

which the investment was acquired, the nature of the investment, local market conditions, trading values on public exchanges for comparable securities and financing transactions subsequent to the acquisition of the investment, if available. Additionally, the Company evaluates fair value with internal models utilizing current and projected operating performance and cash flows.

Investments denominated in currencies other than the U.S. dollar are valued based on the spot rate of the respective currency at the end of the respective reporting period with changes related to exchange rate movements reflected as a component of Net Gains from Investment Activities.

*Corporate Securities* — Corporate securities consist of fixed income securities and are carried as available-for-sale as the Company may sell them prior to maturity and does not hold them principally for the purpose of selling them in the near term. These investments are carried at estimated fair value, with unrealized gains and losses reported in accumulated other comprehensive income.

Estimated fair values are based on quoted market prices, when available, or on estimates provided by independent pricing sources or dealers who make markets in such securities. Upon the sale of a security, the realized net gain or loss is computed on a specific identification basis. Substantially all unrealized gains and losses associated with available-for-sale securities are reflected in non-controlling interests in consolidated entities in the accompanying combined statements of financial condition.

The Company monitors its available-for-sale securities portfolio for impairments. A loss is recognized when it is determined that a decline in the estimated fair value of a security below its amortized cost is other-than-temporary. The Company considers many factors in determining whether the impairment of a security is deemed to be other-than-temporary, including but not limited to, the length of time the security has had a decline in estimated fair value below its amortized cost, the amount of the unrealized loss, the intent and ability of the Company to hold the security for a period of time sufficient for a recovery in value, recent events specific to the issuer or industry, and external credit ratings and changes therein.

*Fixed Income Securities*— Fixed income securities of Portfolio Companies that are listed on a securities exchange are classified as trading securities and are valued at their last quoted sales price. Securities that are not listed on an exchange and traded over the counter are valued at the mean of bid and ask quotations. Investments in corporate debt, including syndicated bank loans, high yield securities and other fixed income securities, are valued at the mean of the "bid" and "asked" prices obtained from third-party pricing services. In the event that third-party pricing service quotations are unavailable, values are obtained from dealers or market makers. Investments where third-party values are not available are valued by the Company and the Company may engage a third-party valuation firm to assist in such valuations.

*Corporate Loans*— The Company invests in corporate loans held for investment and the Company initially records such loans at their purchase prices. The Company subsequently accounts for corporate loans based on their outstanding principal plus or minus unaccreted purchase discounts and unamortized purchase premiums (amortized cost). In certain instances, where the credit fundamentals underlying a particular corporate loan have materially changed in such a manner that the Company's expected return may decrease, the Company may elect to sell a corporate loan held for investment due to adverse changes in credit fundamentals. If the Company determines that it will no longer hold the corporate loan for investment, the Company accounts for the corporate loan at the lower of amortized cost or estimated fair value.

F-21

Interest income on corporate loans includes interest at stated coupon rates adjusted for accretion of purchase discounts and the amortization of purchase premiums. Unamortized premiums and discounts are recognized in interest income over the contractual life of the loans, adjusted for actual prepayments, using the effective interest method.

The Company's investments in corporate loans are not homogeneous and the Company individually reviews each corporate loan for impairment using relevant information in its analysis, including current estimated fair values, current valuation multiples, estimated fair values and quality of collateral, projected operating cash flow and projected liquidation cash flows. The Company considers a corporate loan to be impaired when, based on current information and events, the Company believes it is probable that it will be unable to collect all amounts due based on the contractual terms of the loan. When a corporate loan is impaired, an allowance for loan losses is created in an amount equal to the excess of the loan's amortized cost basis over its estimated fair value. Increases in the allowance for loan losses are recognized currently in the Company's results of operations. When the Company makes a determination that some or all of a corporate loan is uncollectible, the Company charges-off or writes-down the loan through a reduction in the allowance for loan losses. As of December 31, 2006 and 2005, there were no corporate loans requiring an allowance for loan losses.

An impaired corporate loan may be left on accrual status during the period the Company is pursuing repayment of the loan; however, the loan is placed on non-accrual status when: (i) management believes that scheduled debt service payments may not be paid when contractually due; (ii) the loan becomes 90 days delinquent; (iii) management determines the borrower is incapable of, or has ceased efforts toward, curing the cause of the impairment; or (iv) the net realizable value of the underlying collateral securing the loan decreases below the Company's carrying value of such loan. While on non-accrual status, previously recognized accrued interest is reversed and interest income is recognized only upon actual receipt. As of December 31, 2006 and 2005, there were no corporate loans on non-accrual status.

*Derivatives* —The Company invests in derivative financial instruments, including total rate of return swaps and credit default swaps. In a total rate of return swap, the Company receives the sum of all interest, fees and any positive economic change in fair value amounts from a reference asset with a specified notional amount and pays interest on the referenced notional amount plus any negative change in fair value amounts from such asset. Credit default swaps, when purchasing protection, involve the payment of a fixed rate premium for protection against the loss in value of an underlying debt instrument in the event of a defined credit event, such as payment default or bankruptcy. Under a credit default swap, one party acts as a guarantor by receiving the fixed periodic payment in exchange for the commitment to purchase the underlying security at par if a credit event occurs. Derivative contracts, including total rate of return swap contracts and credit default swap contracts, are recorded at estimated fair value with changes in fair value recorded as unrealized gains or losses in Net Gains from Investment Activities in the accompanying combined statements of income.

*Time Deposits* —The Company maintained a $1 billion time deposit at December 31, 2006, which related to a short-term deposit with an original maturity of greater than 90 days. This investment is carried at fair market value and interest was earned at a rate of 5.5% in connection with the time deposit for the year ended December 31, 2006.

*Opportunistic Investments in Publicly Traded Securities* —The Company's opportunistic investments in publicly traded securities represent equity securities, which are carried at fair market value. Changes in the

F-22

fair market value of trading securities are reported within Net Gains from Investment Activities. These investments represent investments of KPE identified by the Company in the ordinary course of business other than debt, investments in governmental bonds and other similar investments.

**Due from and Due to Affiliates** —For purposes of classifying amounts, the Company considers its Principals, employees, non-consolidated funds and the Portfolio Companies of its funds to be affiliates. Receivables from and payables to affiliates are recorded at their current settlement amount.

**Foreign Exchange Derivatives and Hedging Activities** —The Company enters into derivative financial instruments primarily to manage foreign exchange risk arising from certain assets and liabilities. All derivatives are recognized as either assets or liabilities in the combined statements of financial condition and measured at fair value with changes in fair value recorded in Net Gains from Investment Activities in the accompanying combined statements of income. The Company does not apply "hedge accounting" under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities". The Company's derivative financial instruments contain credit risk to the extent that its bank counterparties may be unable to meet the terms of the agreements. The Company minimizes this risk by limiting its counterparties to major financial institutions with strong credit ratings.

**Fixed Assets, Depreciation and Amortization** —Fixed assets consist primarily of leasehold improvements, furniture, fixtures and equipment, and computer hardware and software. Such amounts are recorded at cost less accumulated depreciation and amortization. Depreciation and amortization are calculated using the straight-line method over the assets' estimated useful lives, which are the life of the related lease for leasehold improvements, and three to seven years for other fixed assets.

**Repurchase Agreements and Warehouse Facilities—** The majority of the Company's debt obligations consist of borrowing arrangements entered into by the Credit Strategy Funds in order to finance the acquisition of investments, primarily through the use of secured borrowings in the form of repurchase agreements and warehouse facilities. The Company recognizes interest expense on all borrowings on an accrual basis.

**Capital Distributions—** Capital distributions to partners take the form of cash distributions and, in certain cases, non-cash distributions. Non-cash distributions consist primarily of shares in Portfolio Companies which have been exited as well as vested common stock and common stock options of KFN. Historically, all distributions on investments held by our partners have been accounted for as distributions from partners' capital, or in some cases as minority interest, and therefore no compensation expense has been recognized with respect to distributions made to our Principals.

**Comprehensive Income** —Comprehensive income is defined as the change in equity of a business enterprise during a period from transactions and other events and circumstances, excluding those resulting from contributions and distributions to owners. For the Company's purposes, comprehensive income represents Net Income, as presented in the accompanying combined statements of income, net foreign currency translation adjustments, and unrealized gains and losses on securities available for sale.

**Foreign Currency** —Foreign currency denominated assets, liabilities and operations are primarily held through the KKR Funds. Assets and liabilities relating to foreign investments are translated using the exchange rates prevailing at the end of each reporting period. Results of foreign operations are translated at the weighted average exchange rate for each reporting period. Translation adjustments are included in current income to the extent that unrealized gains and losses on the related investment are included in

F-23

income, otherwise they are included as a component of accumulated other comprehensive income until realized. Foreign currency gains or losses resulting from transactions outside of the functional currency of a consolidated entity are recorded in income as incurred and were not material during the years ended December 31, 2006, 2005 and 2004.

**Income Taxes** —No federal income taxes have been provided for by the Company in the accompanying combined financial statements as each existing partner is individually responsible for reporting income or loss based upon their respective share of an entity's income and expenses as reported for income tax purposes. However, certain consolidated entities of the Company are subject to either New York City unincorporated business tax on their trade and business activities conducted in New York City or other foreign, state or local income taxes.

**Recent Accounting Pronouncements** —In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123 (R), "Share-Based Payment" ("SFAS 123 (R)"), which requires all equity-based payments to employees to be recognized using a fair value based method. On January 1, 2006, the Company adopted SFAS No. 123 (R) using the prospective method and therefore there was no impact on prior period amounts. The adoption of SFAS 123 (R) did not impact the Company's combined financial statements.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments" ("SFAS 155"). Key provisions of SFAS No. 155 include: (1) a broad fair value measurement option for certain hybrid financial instruments that contain an embedded derivative that would otherwise require bifurcation; (2) clarification that only the simplest separations of interest payments and principal payments qualify for the exception afforded to interest-only strips and principal-only strips from derivative accounting under paragraph 14 of SFAS No. 133, thereby narrowing such exception; (3) a requirement that beneficial interests in securitized financial assets be analyzed to determine whether they are freestanding derivatives or whether they are hybrid instruments that contain embedded derivatives requiring bifurcation; (4) clarification that concentrations of credit risk in the form of subordination are not embedded derivatives; and (5) elimination of the prohibition on a qualifying special purpose entity holding passive derivative financial instruments that pertain to beneficial interests that are or contain a derivative financial instrument. In general, these changes will reduce the operational complexity associated with bifurcating embedded derivatives, and increase the number of beneficial interests in securitization transactions, including interest-only strips and principal-only strips, required to be accounted for in accordance with SFAS No. 133. SFAS 155 is effective for all financial instruments acquired, issued or subject to remeasurement after the beginning of an entity's first fiscal year that begins after September 15, 2006. The adoption of SFAS 155 is not expected to have a material impact on the Company's combined financial statements.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value, and expands disclosures about fair value measurements. SFAS 157 applies to reporting periods beginning after November 15, 2007. The Company is currently assessing the impact of adopting SFAS 157 on the combined financial statements.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS 159"). SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value, with changes in fair value recognized in earnings.

F-24

SFAS 159 applies to reporting periods beginning after November 15, 2007. The Company is currently assessing the impact of adopting SFAS 159 on the combined financial statements.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 requires companies to recognize the tax benefits of uncertain tax positions only where the position is "more likely than not" to be sustained assuming examination by tax authorities. The tax benefit recognized is the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. FIN 48 is effective for fiscal years beginning after December 15, 2006. The adoption of FIN 48 will not have a material impact on the Company's combined financial statements.

In June 2007, the AICPA issued Statement of Position No. 07-1, "Clarification of the Scope of the Audit and Accounting Guide Investment Companies and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies" ("SOP 07-1"), for issuance. SOP 07-1 addresses whether the accounting principles of the AICPA Audit and Accounting Guide Investment Companies may be applied to an entity by clarifying the definition of an investment company and whether those accounting principles may be retained by a parent company in consolidation or by an investor in the application of the equity method of accounting. Generally, in order for an entity to retain investment company accounting for a subsidiary or equity method investee, (i) the subsidiary or equity method investee should meet the definition of an investment company pursuant to the guidance in SOP 07-1, (ii) the entity should follow established policies that effectively distinguish the nature and type of investments made by the investment company from the nature and type of investments made by other entities within the consolidated group that are not investment companies, and (iii) the entity (through the investment company) should be investing for current income, capital appreciation, or both, rather than for strategic operating purposes. SOP 07-1 applies to the later of (i) reporting periods beginning on or after December 15, 2007 or (ii) the first permitted early adoption date of SFAS 159. The Company is currently assessing the impact of adopting SOP 07-1 on the Company's combined financial statements including the potential impact if we were unable to retain investment company accounting.

## 3. INVESTMENTS

Investments, at fair value consist of the following:

|  | Fair Value | |
|---|---|---|
|  | December 31, | |
|  | 2006 | 2005 |
| Private Equity Investments | $ 17,862,535 | $ 12,626,857 |
| Debt Investments | 1,230,202 | 69,480 |
| Other Investments | 1,445,510 | 264,944 |
|  | $ 20,538,247 | $ 12,961,281 |

Investments, at fair value held by the consolidated KKR Funds amounted to $20,247,113 and $12,479,738 as of December 31, 2006 and 2005, respectively.

F-25

*Private Equity Investments*

The following table presents information concerning private equity investments held by the consolidated KKR Funds:

| | Fair Value | | Fair Value as a Percentage of Total | |
| --- | --- | --- | --- | --- |
| | December 31, | | December 31, | |
| | 2006 | 2005 | 2006 | 2005 |
| **Private Equity Investments, at Fair Value** | | | | |
| **North America** | | | | |
| Health Care | $ 1,852,959 | $ 738,181 | 10.4% | 5.8% |
| Consumer Products | 1,340,252 | 1,059,003 | 7.5% | 8.4% |
| Chemicals | 942,868 | 733,388 | 5.3% | 5.8% |
| Financial Services | 833,986 | 221,754 | 4.7% | 1.8% |
| Technology | 739,608 | 469,909 | 4.1% | 3.7% |
| Manufacturing | 514,505 | 526,028 | 2.9% | 4.2% |
| Media | 424,255 | 1,226,871 | 2.4% | 9.7% |
| Energy | 300,471 | 1,680,197 | 1.7% | 13.3% |
| Hotels/Leisure | 198,425 | 219,511 | 1.1% | 1.7% |
| Telecom | 37,237 | 38,184 | 0.2% | 0.3% |
| **North America Total (Cost: 2006, $6,175,691; 2005, $4,672,899)** | 7,184,566 | 6,913,026 | 40.3% | 54.7% |
| **Europe** | | | | |
| Manufacturing | 4,062,553 | 3,638,673 | 22.7% | 28.8% |
| Media | 2,330,801 | 404,024 | 13.0% | 3.2% |
| Technology | 1,289,394 | — | 7.2% | 0.0% |
| Retail | 761,799 | 487,499 | 4.3% | 3.9% |
| Telecom | 537,348 | 263,471 | 3.0% | 2.1% |
| Recycling | 287,338 | 322,178 | 1.6% | 2.6% |
| **Europe Total (Cost: 2006, $6,385,892; 2005, $3,325,518)** | 9,269,233 | 5,115,845 | 51.8% | 40.6% |
| **Australia, Bermuda, Singapore and Other Locations** | | | | |
| Media | 531,158 | — | 3.0% | 0.0% |
| Technology | 498,182 | 475,958 | 2.8% | 3.7% |
| Recycling | 270,321 | — | 1.5% | 0.0% |
| Financial Services | 109,075 | 122,028 | 0.6% | 1.0% |
| **Australia, Bermuda, Singapore and Other Locations, Total (Cost: 2006, $1,551,650; 2005, $855,208)** | 1,408,736 | 597,986 | 7.9% | 4.7% |
| **Private Equity Investments, at Fair Value** | $ 17,862,535 | $ 12,626,857 | 100.0% | 100.0% |

F-26

As of December 31, 2006, investments which represented greater than 5% of the net assets of consolidated private equity funds consisted of investments in: (i) Legrand S.A. valued at $2,268,249, (ii) NXP valued at $1,289,394 (iii) HCA Inc. valued at $1,145,750 and (iv) Rockwood Holdings, Inc. valued at $942,868. As of December 31, 2005, investments which represented greater than 5% of consolidated private equity investments included: (i) Texas Genco LLC valued at $1,286,918, (ii) Legrand S.A. valued at $1,736,996, (iii) PanAmSat Corporation valued at $764,281 and (iv) Rockwood Holdings, Inc. valued at $733,388.

Substantially all of the securities underlying the Company's private equity investments represent equity securities. As of December 31, 2006 and 2005, the aggregate amount of investments that were other than equity securities was less than 5% of the net assets of consolidated private equity funds.

All Portfolio Companies included in private equity investments are deemed affiliates due to the nature of the ownership interests and the Company's ability to control, direct or substantially influence management and the operations of such Portfolio Companies.

Net Gains from Investment Activities on the combined statements of income include net realized gains from sales of investments and the net change in unrealized gains resulting from changes in fair value of the KKR Funds' investments (including foreign exchange gains and losses attributable to foreign-denominated investments). The following table presents the Company's realized and net change in unrealized gains relating to its private equity investments.

|  | Year Ended December 31, | | |
|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Realized Gains | $ 3,242,342 | $ 1,521,681 | $ 2,917,019 |
| Net Change in Unrealized Gains | (171,151) | 1,454,268 | 45,887 |
|  | $ 3,071,191 | $ 2,975,949 | $ 2,962,906 |

F-27

*Debt Investments*

The following table presents the Company's debt investments held by the consolidated KKR Funds.

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |
| Debt Investments, carried at fair value: | | |
| Corporate Securities of Portfolio Companies | $ 294,488 | $ — |
| Fixed Income Securities of Portfolio Companies | 123,040 | — |
| Restricted Stock | 44,149 | 64,075 |
| Vested Options | 8,617 | 2,885 |
| Unvested Options | 1,685 | 2,520 |
| Derivatives | 8,435 | — |
| Total | 480,414 | 69,480 |
| Corporate Loans | 749,788 | — |
| Total Credit Investments (Cost: 2006, $1,147,014; 2005, $0) | $ 1,230,202 | $ 69,480 |

Investments in corporate securities are held primarily by consolidated Credit Strategy Funds and are classified as available for sale. The following table summarizes the Company's corporate securities as of December 31, 2006, which are carried at estimated fair value:

| Description | Principal | Net Unaccreted Discount | Net Unrealized Gains | Estimated Fair Value |
|---|---|---|---|---|
| Corporate securities | $ 282,000 | $ (3,321) | $ 15,809(a) | $ 294,488 |

(a)　　$15,806 of the Net Unrealized Gains is allocable to Non-Controlling Interests in Consolidated Entities.

All of these securities have maturities between five and ten years. The weighted average coupon of the securities as of December 31, 2006 is 9.07%. There were no sales or transfers of corporate securities during the year ended December 31, 2006.

F-28

*Other Investments*

The following table presents the Company's other investments at fair value:

| | Fair Value | |
|---|---|---|
| | December 31, | |
| | **2006** | **2005** |
| Time Deposits(a) | $ 1,000,000 | $ — |
| Opportunistic Investments in Publicly Traded Securities | 158,462 | — |
| Bonds and Other Debt Instruments held at Private Equity Funds | 95,542 | 101,343 |
| Government and Government Agency Bonds | 88,466 | 29,130 |
| Municipal Bonds | 38,112 | 75,870 |
| Corporate Bonds | 10,341 | 2,049 |
| Other | 54,587 | 56,552 |
| Total (Cost: 2006, $1,438,021; 2005, $261,215) | $ 1,445,510 | $ 264,944 |

(a) Represents a short-term deposit with an original maturity of greater than 90 days which earned interest at an annual rate of approximately 5.5% as of December 31, 2006.

F-29

## 4. OTHER ASSETS AND OTHER LIABILITIES

Other assets consist of the following:

|  | December 31, | |
|  | 2006 | 2005 |
|---|---|---|
| Interest Receivable | $ 51,857 | $ — |
| Furniture and Fixtures(a) | 27,284 | 16,852 |
| Leasehold Improvements(a) | 23,206 | 14,280 |
| Accounts Receivable | 11,568 | 6,365 |
| Prepaid Expenses | 2,001 | 1,317 |
| Escrow Receivable | — | 15,932 |
| Other Assets | 22,123 | 13,297 |
|  | $ 138,039 | $ 68,043 |

(a) Net of accumulated depreciation and amortization of $30,525 and $27,222 for the years ended December 31, 2006 and 2005, respectively. Depreciation and amortization expense totaled $3,044, $1,951 and $1,770 for the years ended December 31, 2006, 2005 and 2004, respectively.

Accounts Payable, Accrued Expenses and Other Liabilities consist of the following:

|  | December 31, | |
|  | 2006 | 2005 |
|---|---|---|
| Unrealized Losses on Foreign Exchange Forward Contracts(a) | $ 202,750 | $ 57,426 |
| Deferred Revenue | 35,747 | 71,832 |
| Accounts Payable | 31,074 | 11,167 |
| Accrued Benefits and Compensation | 14,095 | 19,366 |
| Interest Payable | 12,292 | — |
| Other Liabilities | 37,162 | 9,548 |
|  | $ 333,120 | $ 169,339 |

(a) Represents derivative financial instruments used to manage foreign exchange risk arising from certain assets and liabilities. Such instruments are measured at fair value with changes in fair value recorded in Net Gains from Investment Activities in the accompanying combined statements of income. See Notes 2 and 5.

## 5. FAIR VALUE OF FINANCIAL INSTRUMENTS

In the normal course of business, the Company primarily encounters two significant types of economic risk: credit and market. Credit risk is the risk of default on the Company's investments in debt securities, loans, leases and derivatives that results from a borrower's, lessee's or derivative counterparty's inability or unwillingness to make required or expected payments. Market risk reflects changes in the value of investments in loans, securities, portfolio companies or derivatives, as applicable, due to changes in interest rates, credit spreads or other market factors, including the value of the collateral underlying loans and the valuation of equity and debt securities. Management believes that the carrying values of its investments are

F-30

reasonable taking into consideration these risks along with estimated collateral values, payment histories, and other borrower information.

The Company makes investments outside of the United States. The Company's non-U.S. investments are subject to the same risks associated with its U.S. investments as well as additional risks, such as fluctuations in foreign currency exchange rates, unexpected changes in regulatory requirements, heightened risk of political and economic instability, difficulties in managing non-U.S. investments, potentially adverse tax consequences and the burden of complying with a wide variety of foreign laws.

The Company is exposed to economic risk concentrations insofar as it is dependent on the ability of the KKR Funds to compensate it for the services which the Company provides to these funds. Further, the carried interest and incentive income component of this compensation is based on the ability of the KKR Funds to generate adequate returns on their investments. In addition, substantially all of the Company's net assets, after deducting the portion attributable to non-controlling interests, are comprised of investments in these funds.

Furthermore, the Company is exposed to economic risk concentrations related to certain large investments as well as concentrations of investments in certain industries and geographic locations, as disclosed in Note 3.

Due to the inherent uncertainty of valuations of investments which are illiquid and/or without a public market, which constitute a substantial portion of the Company's investments, the estimates of fair value may differ from the values that are ultimately realized by the Company, and those differences could be material.

The carrying amounts of cash and cash equivalents, restricted cash and cash equivalents, due from affiliates, debt obligations, and accounts payable, accrued expenses and other liabilities approximate fair value due to their short-term maturities. All investments are carried at fair value (as described in Note 2), with the exception of corporate loans, which are carried at amortized cost.

The carrying amounts and estimated fair values of the Company's other financial instruments as of December 31, 2006 and 2005 are as follows:

| | Carrying Value | | Estimated Fair Value | |
| --- | --- | --- | --- | --- |
| | December 31, | | | |
| | 2006 | 2005 | 2006 | 2005 |
| **Assets** | | | | |
| Corporate loans | $ 749,788 | $ — | $ 759,339 | $ — |
| **Liabilities** | | | | |
| Unrealized loss on foreign exchange contracts | $ 202,750 | $ 57,426 | $ 202,750 | $ 57,426 |

F-31

## 6. DEBT OBLIGATIONS

Debt obligations consist of the following:

|  | December 31, | |
|---|---|---|
|  | **2006** | **2005** |
| Warehouse Facilities | $ 851,736 | $ — |
| Repurchase Agreements | 52,385 | — |
| Short-term Lines of Credit | 44,682 | 249,439 |
|  | $ 948,803 | $ 249,439 |

The Company's Credit Strategy Funds leverage their portfolios of securities and loans through the use of short-term borrowings in the form of warehouse facilities and repurchase agreements. Each of the borrowings used by the Company bears interest at floating rates based on a spread above the London Interbank Offered Rate ("LIBOR"). As of December 31, 2005, consolidated Credit Strategy Funds did not have any borrowings under repurchase agreements or warehouse facilities.

The following table presents summarized information with respect to borrowings in the Company's consolidated Credit Strategy Funds as of December 31, 2006:

|  | Outstanding Borrowings | Weighted Average Borrowing Rate | Weighted Average Remaining Maturity (in days) | Estimated Fair Value of Collateral(1) |
|---|---|---|---|---|
| Warehouse facilities | $ 851,736 | 5.82% | 7 | $ 1,050,374 |
| Repurchase agreements | 52,385 | 5.63% | 5 | 63,472 |
| Total | $ 904,121 | | | $ 1,113,846 |

(1)     Collateral for borrowings consists of fixed income securities, corporate securities and corporate loans (see Note 3).

As of December 31, 2006, the Company had repurchase agreements and warehouse facilities with the following counterparties:

| Counterparty(1) | Amount At Risk(2) | Weighted Average Maturity (Days) | Weighted Average Interest Rate |
|---|---|---|---|
| Morgan Stanley & Co. Inc. | $ 84,307 | 2 | 5.83% |
| Citigroup Global Markets Ltd. | 70,956 | 2 | 5.85% |
| J.P. Morgan Chase Bank, N.A. | 50,368 | 29 | 5.85% |
| Credit Suisse First Boston LLC | 4,787 | 2 | 5.55% |
| Bank of America Securities LLC | 1,149 | 8 | 5.55% |
| Total | $ 211,567 | | |

(1)     Includes subsidiaries and affiliates of each counterparty listed.

(2)　　Computed as an amount equal to the estimated fair value of securities or loans sold, plus accrued interest income, minus the sum of repurchase agreement liabilities plus interest expense.

The three special purpose entities formed by the Company during 2006 to complete secured financing transactions are KKR Financial CLO 2007-1, Ltd. ("CLO 2007-1"), KKR Financial CLO 2007-2, Ltd. ("CLO 2007-2"), and KKR Financial CLO 2007-3 ("CLO 2007-3). During August 2006, CLO 2007-1, CLO 2007-2 and CLO 2007-3 each entered into separate warehouse facilities, with a maximum commitment amount of $600.0 million, $500.0 million and $600.0 million, respectively. Each of these facilities bears interest at a rate of one-month LIBOR plus 0.50%. The aggregate amount of borrowings outstanding under these facilities is $851.7 million as of December 31, 2006.

As of December 31, 2006, all of the Company's borrowings were due in fewer than 365 days.

The Company maintains a $25 million line of credit (the "Line") with a major financial institution that expires in 2008. The Line is available for general corporate purposes and the Company may re-borrow amounts repaid under the Line from time to time prior to its expiration or earlier termination. Outstanding amounts under the Line bear interest at the "prime rate" as defined in the agreement. There are no fees associated with the Line. As of December 31, 2006 and 2005, no amounts were outstanding under the Line.

From time to time, the Company may borrow amounts to satisfy general short-term needs of the business by opening short-term lines of credit with established financial institutions. These amounts may be incremental to, or in lieu of, borrowings made under the Line, and are generally repaid within 30 days, at which time the line of credit is closed. Amounts outstanding under short-term lines of credit amounted to $44,682 and $249,439 as of December 31, 2006 and 2005, respectively. These borrowings bear interest at floating rates as defined in the respective agreements. There are no fees associated with these lines of credit.

## 7. INCOME TAXES

The Company has provided for New York City unincorporated business tax for certain entities based on a statutory rate of 4%. Certain consolidated entities of the Company are subject to income tax of the

F-33

foreign countries in which they conduct business. The Company's effective income tax rate was approximately .37%, .31% and .80% for the years ended December 31, 2006, 2005 and 2004, respectively.

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| **Current** | | | |
| Foreign Income Tax | $ 3,206 | $ 2,132 | $ 3,507 |
| State and Local Income Tax | 700 | 710 | 2,600 |
| **Subtotal** | 3,906 | 2,842 | 6,107 |
| **Deferred** | | | |
| Foreign Income Tax | 257 | 58 | 158 |
| **Subtotal** | 257 | 58 | 158 |
| Total Income Taxes | $ 4,163 | $ 2,900 | $ 6,265 |

Income taxes are provided at the applicable statutory rates. The tax effects of the changes in the temporary differences in the areas listed below resulted in deferred tax assets and liabilities:

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| **Deferred Tax Assets** | | |
| Asset Retirement Obligations | $ 186 | $ — |
| Other | 74 | — |
| **Total Deferred Tax Assets** | $ 260 | $ — |
| **Deferred Tax Liabilities** | | |
| Depreciation | $ 1,315 | $ 686 |
| **Total Deferred Tax Liabilities** | $ 1,315 | $ 686 |

A deferred tax asset has not been recognized for certain foreign timing differences as it is more likely than not that the asset will not be recognized. As of December 31, 2006, the amount of the asset not recognized is approximately $6 million.

The Company's Deferred Tax Assets and Deferred Tax Liabilities are included in the combined financial statements within Other Assets and Accounts Payable, Accrued Expenses and Other Liabilities, respectively.

F-34

The following table reconciles the provision for income taxes to the U.S. federal statutory tax rate:

|  | Year Ended December 31, | | |
|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Statutory U. S. Federal Income Tax Rate | 35.00% | 35.00% | 35.00% |
| Income Passed Through to Partners | (35.00) | (35.00) | (35.00) |
| Foreign Income Taxes | 0.31 | 0.23 | 0.47 |
| State and Local Income Taxes | 0.06 | 0.08 | 0.33 |
| Effective Income Tax Rate | 0.37% | 0.31% | 0.80% |

## 8. RELATED PARTY TRANSACTIONS

As of December 31, 2006 and 2005, Due from Affiliates was comprised of the following:

|  | December 31, | |
|  | 2006 | 2005 |
|---|---|---|
| Due from Portfolio Companies | $ 48,596 | $ 7,992 |
| Due from Principals | 34,969 | 5,305 |
| Due from Related Entities | 13,790 | 26,621 |
| Due from Unconsolidated Funds | 13,105 | 3,673 |
| Loans to Principals | 5,101 | 6,496 |
|  | $ 115,561 | $ 50,087 |

*Discretionary Investments*

Certain of the Company's investment professionals, including its Principals and other qualifying employees, are permitted to invest and have invested their own capital in side-by-side investments with its Traditional Private Equity Funds. Side-by-side investments are investments in Portfolio Companies that are made on the same terms and conditions as those acquired by the applicable fund, except that the side-by-side investments are not subject to management fees or a carried interest. The cash invested by these individuals aggregated $110.4 million, $63.0 million and $13.9 million for the years ended December 31, 2006, 2005 and 2004, respectively. These investments are not included in the accompanying combined financial statements.

*Contingent Repayment Guarantee*

Certain Company personnel who have received carried interest distributions with respect to Traditional Private Equity Funds have personally guaranteed, on a several basis and subject to a cap, the contingent obligations of the general partners of the Traditional Private Equity Funds to repay amounts to fund limited partners pursuant to the general partners' equity clawback obligations, if any, as described in Note 2.

F-35

*Loans to Principals*

From time-to-time and as conditions warrant, the Company lends amounts to its Principals to fund short-term liquidity needs. These loans earn interest at floating rates that approximate market rates and such interest aggregated $678, $263 and $154, for the years ended December 31, 2006, 2005 and 2004, respectively.

*Aircraft and Other Services*

Certain of the Senior Principals own aircraft that the Company uses for business purposes in the ordinary course of our operations. These Senior Principals paid for the purchase of these aircraft with their personal funds and bear all operating, personnel and maintenance costs associated with their operation. The hourly rates that the Company pays for the use of these aircraft are based on current market rates for chartering private aircraft of the same type. The Company paid $6,518, $5,764 and $5,348 for the use of these aircraft during the years ended December 31, 2006, 2005 and 2004, respectively.

*Facilities*

Certain of the Senior Principals are partners in a real-estate based partnership that maintains an ownership interest in our Menlo Park location. Payments made to this partnership aggregated $1,821, $1,683 and $1,637, for the years ended December 31, 2006, 2005 and 2004, respectively.

## 9. SEGMENT REPORTING

The Company operates through two reportable business segments. These segments, which are differentiated primarily by their investment focuses and strategies, consist of the following:

- **Private Equity** —The Company's private equity segment involves sponsoring and managing a group of funds that make primarily control-oriented investments in connection with leveraged buyouts and other similar investment opportunities. These funds are managed by Kohlberg Kravis Roberts & Co. L.P. and currently consist of a number of Traditional Private Equity Funds and KPE.

- **Credit** —The Company's credit segment involves sponsoring and managing a group of private and publicly traded Credit Strategy Funds. These funds are managed by KKR Financial Advisors LLC and currently consist of KFN and the SCF, which is comprised of three side-by-side private credit strategy funds. Two of the side-by-side funds in the SCF and one of the structured finance vehicles managed by the Company have been consolidated in the accompanying combined financial statements of the Company.

Economic Net Income ("ENI") and Fee Related Earnings ("FRE") are key performance measures used by management. ENI is a measure of profitability for the Company's reportable segments and represents income before taxes. FRE represents income before taxes adjusted to (i) exclude the expenses of consolidated funds, (ii) include management fees earned from consolidated funds that were eliminated in consolidation (iii) exclude investment income and (iv) exclude non-controlling interests in income of consolidated entities. These measures are used by management for the Company's segments in making resource deployment and other operational decisions.

F-36

Management makes operating decisions and assesses the performance of each of the Company's business segments based on financial and operating metrics and data that is presented excluding the impact of any of the KKR Funds that are consolidated into the combined financial statements. Consequently, all segment data excludes the assets, liabilities and operating results related to the KKR Funds.

The following table presents the financial data for the Company's reportable segments and the reconciliation to the combined financial statements as of December 31, 2006 and for the year then ended:

|  | Year Ended December 31, 2006 | | | | |
|  | Private Equity | Credit Oriented | Total Reportable Segments | Combination Adjustments | Combined |
|---|---|---|---|---|---|
| Fee Income(a) | $ 361,467 | $ 80,726 | $ 442,193 | $ (31,864) | $ 410,329 |
| Expenses(b) | (214,277) | (30,855) | (245,132) | (22,334) | (267,466) |
| Fee Related Earnings | 147,190 | 49,871 | 197,061 | (54,198) | 142,863 |
| Investment Income(c) | 935,136 | 10,103 | 945,239 | 3,055,683 | 4,000,922 |
| Income before Non-Controlling Interests in Income of Consolidated Entities and Income Taxes | 1,082,326 | 59,974 | 1,142,300 | 3,001,485 | 4,143,785 |
| Non-Controlling Interests in Income of Consolidated Entities | — | (25,428) | (25,428) | (3,001,485) | (3,026,913) |
| Economic Net Income | $ 1,082,326 | $ 34,546 | $ 1,116,872 | $ — | $ 1,116,872 |
| Total Assets(d) | $ 1,795,642 | $ 72,034 | $ 1,867,676 | $ 21,425,107 | $ 23,292,783 |

(a)   The Fee Income adjustment represents the elimination of intercompany transactions upon consolidation of the KKR Funds and other adjustments necessary to reconcile from our segment reporting measures to our consolidated financial results.

(b)   The Expenses adjustment primarily represents the inclusion of certain operating expenses upon consolidation of the KKR Funds.

(c)   The Investment Income adjustment primarily represents the inclusion of investment income allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

(d)   The Total Assets adjustment primarily represents the inclusion of private equity and credit investments that are allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

F-37

The following table presents the financial data for the Company's reportable segments and the reconciliation to the combined financial statements as of December 31, 2005 and for the year then ended:

| | Private Equity | Credit Oriented | Total Reportable Segments | Combination Adjustments | Combined |
|---|---|---|---|---|---|
| | | | **Year Ended December 31, 2005** | | |
| Fee Income(a) | $ 202,106 | $ 44,484 | $ 246,590 | $ (13,645) | $ 232,945 |
| Expenses(b) | (139,098) | (17,881) | (156,979) | (11,312) | (168,291) |
| Fee Related Earnings | 63,008 | 26,603 | 89,611 | (24,957) | 64,654 |
| Investment Income(c) | 864,812 | 3,268 | 868,080 | 2,872,819 | 3,740,899 |
| Income before Non-Controlling Interests in Income of Consolidated Entities and Income Taxes | 927,820 | 29,871 | 957,691 | 2,847,862 | 3,805,553 |
| Non-Controlling Interests in Income of Consolidated Entities | — | (13,324) | (13,324) | (2,847,862) | (2,861,186) |
| Economic Net Income | $ 927,820 | $ 16,547 | $ 944,367 | $ — | $ 944,367 |
| Total Assets(d) | $ 1,739,668 | $ 74,362 | $ 1,814,030 | $ 11,555,382 | $ 13,369,412 |

(a)     The Fee Income adjustment represents the elimination of intercompany transactions upon consolidation of the KKR Funds and other adjustments necessary to reconcile from our segment reporting measures to our consolidated financial results.

(b)     The Expenses adjustment primarily represents the inclusion of certain operating expenses upon consolidation of the KKR Funds.

(c)     The Investment Income adjustment primarily represents the inclusion of investment income allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

(d)     The Total Assets adjustment primarily represents the inclusion of private equity and credit investments that are allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

F-38

The following table presents the financial data for the Company's reportable segments and the reconciliation to the combined financial statements as of December 31, 2004 and for the year then ended:

| | Year Ended December 31, 2004 | | | | |
| | Private Equity | Credit Oriented | Total Reportable Segments | Combination Adjustments | Combined |
|---|---|---|---|---|---|
| Fee Income(a) | $ 172,808 | $ 10,085 | $ 182,893 | $ 569 | $ 183,462 |
| Expenses(b) | (119,744) | (4,359) | (124,103) | (9,942) | (134,045 |
|   Fee Related Earnings | 53,064 | 5,726 | 58,790 | (9,373) | 49,417 |
| Investment Income(c) | 723,700 | — | 723,700 | 2,370,843 | 3,094,543 |
| Income before Non-Controlling Interests in Income of Consolidated Entities and Income Taxes | 776,764 | 5,726 | 782,490 | 2,361,470 | 3,143,960 |
| Non-Controlling Interests in Income of Consolidated Entities | — | (2,839) | (2,839) | (2,361,470) | (2,364,309 |
| Economic Net Income | $ 776,764 | $ 2,887 | $ 779,651 | $ — | $ 779,651 |
| Total Assets(d) | $ 1,132,032 | $ 30,496 | $ 1,162,528 | $ 8,538,950 | $ 9,701,478 |

(a)　　The Fee Income adjustment represents the elimination of intercompany transactions upon consolidation of the KKR Funds and other adjustments necessary to reconcile from our segment reporting measures to our consolidated financial results.

(b)　　The Expenses adjustment primarily represents the inclusion of certain operating expenses upon consolidation of the KKR Funds.

(c)　　The Investment Income adjustment primarily represents the inclusion of investment income allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

(d)　　The Total Assets adjustment primarily represents the inclusion of private equity and credit investments that are allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

## 10. COMMITMENTS AND CONTINGENCIES

### Debt Covenants

Borrowings of the KKR Funds contain various customary loan covenants. These covenants do not, in management's opinion, materially restrict KKR's investment or financing strategy. The Company is in compliance with all of its loan covenants as of December 31, 2006.

F-39

*Investment Commitments*

The KKR Funds had signed investment commitments with respect to private equity investments of approximately $3.4 billion as of December 31, 2006. Individually, only Biomet, Inc. with a total equity commitment of $1,428,000, is expected to exceed 5% of the net assets of consolidated private equity funds as of December 31, 2006. As of December 31, 2006 the KKR Funds have provided guarantees related to signed investment commitments, which would require the payment of up to $200 million in the event that such commitments were withdrawn by the Company without cause.

The general partners of the Traditional Private Equity Funds had unfunded general partner capital commitments to such funds of approximately $413 million as of December 31, 2006.

*Indemnifications*

In the normal course of business, the Company and its subsidiaries enter into contracts that contain a variety of representations and warranties and provide general indemnifications. The Company's maximum exposure under these arrangements is unknown as this would involve future claims that may be made against the Company's that have not yet occurred. However, based on experience, the Company expects the risk of material loss to be remote.

*Litigation*

The Company is, from time to time, a defendant in legal actions from transactions conducted in the ordinary course of business. Management believes the ultimate liability arising from such actions that existed as of December 31, 2006, if any, will not materially affect the Company's results of operations, liquidity or financial position.

In early 2007, thirteen private equity firms, including the Company, were named as defendants in a purported class action complaint by shareholders in public companies recently acquired by private equity firms. The complaint alleged that the defendant firms engaged in certain cooperative behavior during the bidding process in going-private transactions in violation of antitrust laws and that this purported behavior suppressed the price paid by the private equity firms for the plaintiffs' shares in the acquired companies below that which would otherwise have been paid in the absence of such behavior. The complaint sought treble damages of an unspecified amount. In June 2007, this suit was dismissed by the plaintiffs without prejudice.

In addition, in the ordinary course of business, the Company is and can be both the defendant and the plaintiff in numerous actions with respect to bankruptcy, insolvency and other types of proceedings. Such lawsuits may involve claims that adversely affect the value of certain investments owned by the KKR Funds. Although the ultimate outcome of actions cannot be ascertained with certainty, the Company believes that the resolution of any such actions will not have a material adverse effect on its financial condition, liquidity or results of operations.

As of December 31, 2006 and 2005, no amounts were accrued relating to threatened or pending litigation.

F-40

*Operating Leases*

The Company leases office space under non-cancelable lease agreements in New York, Menlo Park, London, Paris, Hong Kong, Tokyo and San Francisco. There are no rent holidays, contingent rent, rent concessions or leasehold improvement incentives associated with any of our property leases. The following is a summary of our major lease terms:

|  | Lease End Dates | Current Annual Rent | Scheduled Rent Increases | Escalations | Renewal Periods |
|---|---|---|---|---|---|
| New York | 4/10-12/14 | $    6,408 | None | None | 5 Year Option |
| Menlo Park | 8/08-04/11 | 1,781 | Initial: monthly, annual thereafter | 2.5%-3.0% | 10 Year Option |
| London | 3/19-10/20 | 2,974 | None | None | None |
| Paris | 10/11 | 401 | None | None | None |
| Hong Kong | 9/09-12/11 | 1,564 | None | None | 3 Year Option |
| Tokyo | 3/09-12/10 | 1,113 | None | None | None |
| San Francisco | 7/16 | 1,337 | Bi-annual thereafter | None | None |

As of December 31, 2006, the approximate aggregate minimum future payments, net of sublease income, required on the operating leases are as follows:

| Year Ending December 31, | Amount |
|---|---|
| 2007 | $    14,851 |
| 2008 | 14,826 |
| 2009 | 13,789 |
| 2010 | 13,450 |
| 2011 | 11,438 |
| Thereafter | 48,336 |
| Total minimum payments required | $    116,690 |

Rent expense recognized on a straight-line basis for the years ended December 31, 2006, 2005 and 2004, was $13,315, $10,425 and $8,574, respectively.

## 11. BENEFIT PLANS

The Company provides a 401(k) plan (the "Plan") for eligible employees in the United States. For certain finance and administrative professionals who are participants in the Plan, the Company may, in its discretion, contribute an amount after the end of the Plan year, however the amount may not be more than $20 per employee per Plan year. For the years ended December 31, 2006, 2005 and 2004, the Company incurred expenses of $2,430, $1,896 and $1,927, respectively, in connection with the Plan.

In order to align the interests of certain of its employees and external advisors with those of the Company, the Company maintains various profit sharing arrangements which provide for a sharing of the income earned on the Company's investments and carried interests in the KKR Funds. Portfolio

F-41

investment losses do not reduce the awards made on profitable portfolio investments regardless of whether they are realized or unrealized. For the years ended December 31, 2006, 2005 and 2004, the Company incurred costs of $19,113, $15,572 and $10,983, respectively, in connection with these plans.

## 12. SUBSEQUENT EVENTS

### Asian Fund

In 2007, the Asian Fund was formed to make private equity investments in Asia. The fund is expected to hold its final closing in the third quarter of 2007 with an aggregate of $4.0 billion of capital commitments from fund investors, including a $100 million commitment from the fund's general partner. The investment period for the fund will commence on the date of the fund's first investment and will remain open for a period of up to six years, unless terminated earlier in accordance with the fund's governing documents.

### Investments

During 2007, the KKR Funds made private equity investments in an aggregate amount of approximately $1.5 billion. Individually, none of these investments exceeded 5% of the net assets of consolidated private equity investments.

### Investment Commitments

As of July 2, 2007, the KKR Funds committed to approximately $10.5 billion in nine private equity investments. Such funds have provided guarantees related to certain signed investment commitments which would require the payment of up to $1.7 billion in the event that such commitments were withdrawn by the Company without cause.

### Long-Term Debt

During the quarter ended March 31, 2007, KPE entered into a financing arrangement with a major financial institution with respect to $350 million of a $700 million convertible notes investment.

<div align="center">F-42</div>

**KKR GROUP**

**Combined Statements of Financial Condition (Unaudited)**

**As of March 31, 2007 and 2006**

**(Dollars in Thousands)**

| | March 31, 2007 | December 31, 2006 | Pro forma March 31, 2007 |
|---|---|---|---|
| **Assets** | | | |
| Cash and Cash Equivalents | $ 97,169 | $ 92,991 | $ 97,169 |
| Cash and Cash Equivalents Held at Consolidated Entities | 1,851,718 | 2,299,650 | 1,851,718 |
| Restricted Cash and Cash Equivalents | 174,141 | 108,295 | 174,141 |
| Investments, at Fair Value | 23,568,572 | 20,538,247 | 23,568,572 |
| Due from Affiliates | 78,163 | 115,561 | 78,163 |
| Other Assets | 117,541 | 138,039 | 117,541 |
| **Total Assets** | $ 25,887,304 | $ 23,292,783 | $ 25,887,304 |
| **Liabilities and Partners' Capital** | | | |
| Debt Obligations | $ 1,685,687 | $ 948,803 | $ 1,685,687 |
| Accounts Payable, Accrued Expenses and Other Liabilities | 394,044 | 333,120 | 394,044 |
| **Total Liabilities** | 2,079,731 | 1,281,923 | 2,079,731 |
| **Commitments and Contingencies** | | | |
| **Non-Controlling Interests in Consolidated Entities** | 21,907,784 | 20,201,548 | 23,807,573 |
| **Partners' Capital** | | | |
| Partners' Capital | 1,892,527 | 1,801,686 | — |
| Accumulated Other Comprehensive Income | 7,262 | 7,626 | — |
| **Total Partners' Capital** | 1,899,789 | 1,809,312 | — |
| **Total Liabilities and Partners' Capital** | $ 25,887,304 | $ 23,292,783 | $ 25,887,304 |

See notes to combined financial statements.

F-43

**KKR GROUP**

**Combined Statements of Income (Unaudited)**

**For the Three Months Ended March 31, 2007 and 2006**

**(Dollars in Thousands)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Revenues** | | |
| Fee Income | $ 68,840 | $ 93,798 |
| | | |
| **Expenses** | | |
| Employee Compensation and Benefits | 27,345 | 22,601 |
| Occupancy and Related Charges | 4,624 | 6,482 |
| General, Administrative and Other | 31,555 | 15,934 |
| Fund Expenses | 16,810 | 4,778 |
| **Total Expenses** | 80,334 | 49,795 |
| | | |
| **Investment Income** | | |
| Net Gains from Investment Activities | 1,482,054 | 933,407 |
| Dividend Income | 19,471 | 51,725 |
| Interest Income | 68,269 | 11,119 |
| Interest Expense | (15,593) | (1,366) |
| **Total Investment Income** | 1,554,201 | 994,885 |
| | | |
| **Income before Non-Controlling Interests in Income of Consolidated Entities and Income Taxes** | 1,542,707 | 1,038,888 |
| **Non-Controlling Interests in Income of Consolidated Entities** | 1,161,162 | 777,505 |
| **Income Before Taxes** | 381,545 | 261,383 |
| **Income Taxes** | 627 | 767 |
| **Net Income** | $ 380,918 | $ 260,616 |

See notes to combined financial statements.

F-44

**KKR GROUP**

**Combined Statements of Changes in Partners' Capital (Unaudited)**

**For the Three Months Ended March 31, 2007**

**(Dollars in Thousands)**

|  | Partners' Capital | Accumulated Other Comprehensive Income (Loss) | Total Partners' Capital |
|---|---|---|---|
| **Balance at January 1, 2007** | $  1,801,686 | $  7,626 | 1,809,312 |
| Comprehensive Income: | | | |
| Net Income | 380,918 | | 380,918 |
| Other Comprehensive Income— | | | |
| Currency Translation Adjustment | | (364) | (364) |
| Total Comprehensive Income | | | 380,554 |
| Capital Contributions | 69,233 | | 69,233 |
| Capital Distributions | (359,310) | | (359,310) |
| **Balance at March 31, 2007** | $  1,892,527 | $  7,262 | $  1,899,789 |

See notes to combined financial statements.

F-45

**KKR GROUP**

**Combined Statements of Cash Flows (Unaudited)**

**For the Three Months Ended March 31, 2007 and 2006**

**(Dollars in Thousands)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Cash Flows from Operating Activities** | | |
| Net Income | $ 380,918 | $ 260,616 |
| Adjustments to Reconcile Net Income to Net Cash (Used in) Provided By Operating Activities: | | |
| Non-Controlling Interests in Income of Consolidated Entities | 1,161,162 | 777,505 |
| Net Realized Gains on Investments | (417,997) | (1,651,340) |
| Change in Unrealized (Gains) Losses on Investments Allocable to KKR Group | (219,362) | 150,942 |
| Change in Unrealized (Gains) Losses on Investments Allocable to Non-Controlling Interests | (844,695) | 566,991 |
| Other Non-Cash Amounts Included in Net Income | (13,471) | (8,308) |
| Cash Flows Due to Changes in Operating Assets and Liabilities: | | |
| Change in Cash and Cash Equivalents Held at Consolidated Entities | 447,932 | (104,730) |
| Change in Due from Affiliates | 37,398 | (5,772) |
| Change in Other Assets | 25,221 | (102,186) |
| Change in Accounts Payable, Accrued Expenses and Other Liabilities | 73,930 | 22,728 |
| Investments Purchased | (3,177,768) | (1,200,438) |
| Cash Proceeds from Sale of Investments | 1,953,463 | 1,684,574 |
| Net Cash (Used In) Provided By Operating Activities | (593,269) | 390,582 |
| **Cash Flows from Investing Activities** | | |
| Change in Restricted Cash and Cash Equivalents | (65,846) | — |
| Purchase of Furniture, Equipment and Leasehold Improvements | (5,586) | (2,933) |
| Net Cash Used in Investing Activities | (71,432) | (2,933) |
| **Cash Flows from Financing Activities** | | |
| Distributions to Non-Controlling Interests in Consolidated Entities | (1,004,782) | (1,552,958) |
| Contributions from Non-Controlling Interests in Consolidated Entities | 1,536,370 | 1,656,877 |
| Distributions to Partners | (318,826) | (338,278) |
| Contributions from Partners | 69,233 | 79,210 |
| Proceeds from Debt Obligations | 387,766 | 614 |
| Repayment of Debt Obligations | (882) | (249,439) |
| Net Cash Provided By (Used in) Investing Activities | 668,879 | (403,974) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 4,178 | (16,365) |
| Cash and Cash Equivalents, Beginning of Period | 92,991 | 96,293 |
| Cash and Cash Equivalents, End of Period | $ 97,169 | $ 79,928 |
| **Supplemental Disclosures of Cash Flow Information** | | |
| Payments for Interest | $ 2,207 | $ 1,762 |
| Payments for Income Taxes | $ 1,171 | $ 889 |
| **Supplemental Non-Cash Financing Activities** | | |
| Non-Cash Distributions to Partners | — | $ 35,985 |

| | | | |
|---|---|---|---|
| Increase in Debt Obligations | $ | 350,000 | — |
| Capital Contributions Received in Advance from Non-Controlling Interest Holders in Consolidated Entities | $ | 15,081 | — |

See notes to combined financial statements.

F-46

**KKR GROUP**

**Notes to Condensed Combined Financial Statements (Unaudited)**

**(All Dollars Are in Thousands Except Where Otherwise Noted)**

## 1. ORGANIZATION AND BASIS OF PRESENTATION

The KKR Group (the "Company") is a global alternative asset manager with principal executive offices in New York and Menlo Park, California. The Company's alternative asset management business involves sponsoring and managing investment funds that make investments worldwide in private equity and debt transactions on behalf of third-party investors and the Company's owners ("Principals"), including its founders. In connection with these activities, the Company also manages substantial investments in public equity. With respect to certain funds that it sponsors, the Company commits to contribute a specified amount of equity as the general partner of the fund (ranging from approximately 2% to 3% of the funds' total capital commitments) to fund a portion of acquisition price for the fund's investments.

The accompanying combined financial statements of the Company include the results of six of the Company's private equity funds and two of the Company's credit strategy funds (the "KKR Funds") and the general partners and management companies of those funds. The Company operates as a single professional services firm and carries out its investment activities under the "KKR" brand name. The entities comprising the Company are under the common control of our senior Principals (the "Senior Principals"). The Senior Principals are actively involved in the Company's operations and management.

The accompanying combined financial statements include the accounts of the management companies: Kohlberg Kravis Roberts & Co. L.P. and KKR Financial LLC, and the general partners of the private equity funds (the "Common Control Entities") and their respective consolidated funds: KKR 1996 Fund, KKR European Fund, KKR Millennium Fund, KKR European Fund II, KKR 2006 Fund, and certain of the KKR Strategic Capital Funds.

KKR Financial Holdings LLC ("KFN") is a publicly traded credit strategy fund whose limited liability company interests are listed on the New York Stock Exchange under the symbol "KFN." KFN is managed by the Company but is not under the common control of the Senior Principals or otherwise consolidated by the Company as control is maintained by third-party investors. KFN was organized in August 2004 and completed its initial public offering on June 24, 2005. As of March 31, 2007 and December 31, 2006, KFN had consolidated assets of $16.7 billion and $17.6 billion, respectively, and stockholders' equity of $1.7 billion at both March 31, 2007 and December 31, 2006. Shares of KFN held by the Company are accounted for as trading securities (see note 2) and represented approximately 2.0% of KFN's outstanding shares as of March 31, 2007 and December 31, 2006.

For management reporting purposes, the Company operates through two reportable business segments:

- **Private Equity** —The Company's private equity segment involves sponsoring and managing a group of funds that make primarily control-oriented investments in connection with leveraged buyouts and other similar investment opportunities. These funds are managed by Kohlberg Kravis Roberts & Co. L.P. and currently consist of a number of private equity funds that have a finite life and investment period ("Traditional Private Equity Funds") and KKR Private Equity Investors, a private equity-oriented permanent capital fund that has a perpetual existence and investment period ("KPE").

- **Credit** —The Company's credit segment involves sponsoring and managing a group of private and publicly traded investment funds that invests primarily in corporate debt ("Credit Strategy Funds") and managing four structured finance vehicles which were established to complete secured financing transactions. The Credit Strategy Funds are managed by subsidiaries of KKR Financial LLC and currently consist of KFN and the KKR Strategic Capital Funds (the "SCF"), which are comprised of three side-by-side private credit strategy funds. Two of the side-by-side funds in the

F-47

SCF and one of the structured finance vehicles managed by the Company have been consolidated in the accompanying combined financial statements of the Company. The third side-by-side fund is not consolidated by the KKR Group. This fund is owned and controlled by third-party investors and the KKR Group holds no economic or voting interests. The KKR Group receives management fees for managing the assets held by this fund. See note 2 to the combined financial statements for the Company's accounting policy regarding Fee Income. Three of the four structured finance vehicles are not consolidated by the KKR Group as KFN holds the majority of the economic and voting interests. Accordingly, these structured finance vehicles are consolidated by KFN.

The instruments governing the Traditional Private Equity Funds provide that the funds will continue in existence for a varying term (generally up to 18 years from the date of initial funding), unless the funds are terminated by the Principals or through an event of dissolution, as defined in the applicable governing instruments. The instruments governing KPE and the Credit Strategy Funds generally provide that those funds will continue in existence indefinitely, unless the funds are terminated earlier as provided in the applicable governing instruments.

The Company has three primary sources of income: (i) fee income (consisting primarily of management, transaction and monitoring fees); (ii) amounts received from the Company's funds in the form of a carried interest or other distribution that entitles the Company to a disproportionate share of the gains generated by the funds; and (iii) investment income generated through the investment of the Company's own capital in its funds and other proprietary investments.

The KKR Funds are consolidated by the Company pursuant to accounting principles generally accepted in the United States of America ("GAAP") as described in Note 2, notwithstanding the fact that the Company has only a minority economic interest in those funds. Specifically, the general partners of the KKR Funds consolidate their respective funds and certain of their respective entities in accordance with Emerging Issues Task Force ("EITF") No. 04-5, "Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights." Consequently, the Company's combined financial statements reflect the assets, liabilities, revenues, expenses, investment income and cash flows of the consolidated KKR Funds on a gross basis, and the majority of the economic interests in those funds, which are held by third-party investors, are reflected as non-controlling interests in consolidated entities in the accompanying combined financial statements. Substantially all of the management fees and certain other amounts earned by the Company from those funds are eliminated in combination. However, because the eliminated amounts are earned from, and funded by, non-controlling interest holders, the Company's allocable share of the net income from those funds is increased by the amounts eliminated. Accordingly, the combination of the KKR Funds has no net effect on the Company's net income or partners' capital. See Note 2.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### General

    **Basis of Accounting** —The accompanying combined financial statements are prepared in accordance with GAAP. The condensed combined financial statements and these notes are unaudited and exclude some of the disclosures required in annual financial statements. Management believes it has made all necessary adjustments (consisting of only normal recurring items) so that the condensed combined financial statements are presented fairly and that estimates made in preparing its condensed combined

F-48

financial statements are reasonable and prudent. The operating results presented for interim periods are not necessarily indicative of the results that may be expected for any other interim period or for the entire year. These condensed combined financial statements should be read in conjunction with the combined financial statements of the Company included elsewhere in this prospectus.

   **Principles of Consolidation** —The Company's policy is to consolidate those entities in which it, through the Senior Principals, has control. Hereinafter, all entities that are included in the accompanying combined financial statements are referred to as consolidated entities.

   The consolidated entities are under the common control of the Senior Principals. The accompanying combined financial statements include the accounts of the Company and its consolidated entities, which are comprised of (i) those entities in which the Company, directly or through the Senior Principals, has majority ownership and has control over significant operating, financial and investing decisions, and (ii) the consolidated KKR Funds, which are those entities in which the Company, through the Senior Principals, holds substantive, controlling general partner or managing member interests. With respect to the consolidated KKR Funds, the Company generally has operational discretion and control, and fund investors have no substantive rights to impact ongoing governance and operating activities of the fund.

   The KKR Funds do not consolidate their majority-owned and controlled investments in portfolio companies ("Portfolio Companies"). Rather, those investments are accounted for as investments and carried at fair value as described below.

   Intercompany transactions and balances have been eliminated.

   **Non-Controlling Interests in Consolidated Entities** — Non-controlling interests in consolidated entities represent the ownership interests in consolidated entities, including consolidated KKR Funds, held by entities or persons other than the Principals. Non-controlling interest holders in the Company have a substantial ownership position in the Company's combined total assets (approximately 85% as of March 31, 2007).

   Allocation of income to non-controlling interests in consolidated KKR Funds is based on the respective funds' governing instruments.

   In the case of the Traditional Private Equity Funds, profits on capital invested on behalf of limited partners are allocated to the limited partners in an amount equal to 80% of the ratio of their capital contributions to the total capital contributed by all partners with respect to each investment. The general partners of the funds receive the remaining portion of the profits in the form of a carried interest. Losses on a fund's investments are first applied to the excess of any prior income over such losses. Any remaining fund losses are applied to the equity accounts of the partners in proportion to their capital contributed with respect to each individual investment, until the partners' equity accounts have been reduced to zero. Any remaining fund losses are allocated to the fund's general partner.

   In the case of KPE, one of the fund's general partners holds an economic interest in the fund that will entitle it to a disproportionate share of the gains generated by the fund's direct investments once the fund's

F-49

capitalization costs (the "Creditable Amount") have been recouped as described below. This economic interest consists of:

- a carried interest that generally will allocate to the general partner 20% of the gain that is realized on direct private equity investments that are made with fund investors' capital after any realized losses on other direct private equity investments have been recovered; and

- a distribution right that generally will allocate to the general partner 20% of the annual increase in the net asset value of all other direct investments that are made with fund investors' capital above the highest net asset value at which an incentive amount was previously made.

The general partner is not entitled to a carried interest or incentive distribution right with respect to the fund's indirect investments, which consist of investments made through other funds that the Company sponsors. However, if the fund acquires a partner interest in one of the Company's other funds from a third party, the amount of distributions that the general partner receives pursuant to its distribution right may be adjusted to reflect realized gains or losses relating to the value of the acquired partner interest. As noted above, the general partner of KPE has agreed to forego receiving a carried interest or distribution until the profits on investments with respect to which it would be entitled to receive a carried interest or distribution equal the Creditable Amount. As of March 31, 2007, the Creditable Amount had a remaining balance of $230,358.

**Use of Estimates** —The preparation of the combined financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenues, expenses and investment income during the reporting periods. Such estimates include but are not limited to the valuation of Portfolio Companies owned by the KKR Funds, financial instruments owned and other matters that affect reported amounts of assets and liabilities. Actual results could differ from those estimates and such differences could be material to the combined financial statements.

### *Income Statement Measurements*

**Fee Income** —Fee income is comprised of (i) transaction fees received from Portfolio Companies, (ii) monitoring fees received from Portfolio Companies and (iii) management fees received from unconsolidated funds and (iv) incentive fees received from unconsolidated funds. Such fees are based upon the contractual terms of fund management and related agreements and are recognized in the period during which the related services are performed and the amounts have been contractually earned.

F-50

For the three months ended March 31, 2007 and 2006, fee income consists of the following:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2007 | 2006 |
| Transaction Fees Received from Portfolio Companies | $ 26,716 | $ 62,165 |
| Monitoring Fees Received from Portfolio Companies | 17,221 | 18,471 |
| Management Fees Received from Unconsolidated Funds | 18,532 | 12,489 |
| Incentive Fees Received from Unconsolidated Funds | 6,371 | 673 |
| Total Fee Income | $ 68,840 | $ 93,798 |

*Management fees received from consolidated and unconsolidated funds* —For the Traditional Private Equity Funds, gross management fees generally range from 1% to 1.5% of committed capital during the fund's investment period and approximately .75% of invested capital after the expiration of the fund's investment period. Typically, an investment period is defined as a period of up to six years. The actual length of the period may be shorter based on the timing and use of committed capital.

For KPE, management fees are determined quarterly based on 25% of the sum of (i) that fund's equity up to and including $3 billion multiplied by 1.25% plus (ii) that fund's equity in excess of $3 billion multiplied by 1%. For purposes of calculating the management fee, equity is an amount defined in the management agreement. Until the Creditable Amount is reached, the Company has generally agreed to reduce the amount of management fees payable by the fund in any period by any carried interest or incentive distributions that the Company or its affiliates receive during the period pursuant to a carried interest in a private equity fund in which KPE invests.

Management fees received from consolidated KKR Funds are eliminated in consolidation. However, because these amounts are funded by, and earned from, non-controlling interest holders, the Company's allocated share of the net income from consolidated KKR Funds is increased by the amount of fees that are eliminated. Accordingly, the elimination of the fees does not have a net effect on the Company's net income or partners' capital.

The Company's management agreement with KFN provides, among other things, that KFN is responsible for paying to the Company certain fees and reimbursements, consisting of a base management fee, an incentive fee and reimbursement for out-of-pocket and certain other costs and expenses incurred by the Company on behalf of KFN. The Company earns an annual base management fee, computed monthly in arrears, in an amount equal to adjusted equity multiplied by 1.75%. For purposes of calculating the base management fee, adjusted equity is an amount defined in the management agreement.

The Company's management agreement with KFN will automatically be renewed for successive one-year terms following December 31, 2007 unless the agreement is terminated in accordance with its terms. The management agreement provides that the fund may terminate the agreement only if:

• the termination is approved at least 180 days prior to the expiration date by at least two-thirds of the fund's independent directors or by the holders of a majority of the outstanding shares of the fund's common stock and the termination is based upon (i) a determination that the Company's performance has been unsatisfactory and materially detrimental to the fund or (ii) a determination that the management and incentive fees payable to the Company are not fair (subject to the

F-51

Company's right to prevent a termination by reaching an agreement to reduce the Company's management and incentive fees), in which case a termination fee is payable to the Company; or

- the Company subsidiary that manages the fund experiences a "change of control" or we materially breach the provisions of the agreement, engage in certain acts of willful misconduct or gross negligence, become bankrupt or insolvent or are dissolved, in which case a termination fee is not payable to the Company.

The Company has received restricted common stock and common stock options from KFN as a component of compensation for management services to that fund. The restricted common stock and stock options vest ratably over applicable vesting periods and are initially recorded as deferred revenue at their estimated fair values at the date of grant. Subsequently, the Company re-measures the restricted common stock and stock options to the extent that they are unvested, with a corresponding adjustment to deferred revenue. Income from restricted common stock and common stock options is recognized ratably over the vesting period as a component of fee income and amounted to $8,053 and $5,251 for the three months ended March 31, 2007 and 2006, respectively.

The Company has entered into management agreements with the side-by-side funds comprising the KKR Strategic Capital Funds pursuant to which it has agreed to provide them with management and other services. Under the management agreement and, in some cases, other documents governing the individual funds, the Company is entitled to receive:

- with respect to investors who have agreed to a 25 month lock-up period, a monthly management fee that is equal to 0.1667% (or 2.0% annualized) of the net asset value of the individual fund that is allocable to those investors; and

- with respect to investors who have agreed to a 60 month lock-up period, a monthly management fee that is equal to 0.1250% (or 1.5% annualized) of the net asset value of the primary fund that is allocable to those investors.

Vested common stock that is received as a component of compensation for management services are carried as trading securities, because the Company generally intends to distribute the common stock subsequent to vesting. Vested common stock is recorded at estimated fair value with changes in fair value recognized in Net Gains from Investment Activities.

Vested stock options received as a component of compensation for management services meet the characteristics of derivative investments. Subsequent to vesting, these options continue to be measured at estimated fair value with changes in fair value recognized in current income as an unrealized gain or loss. Both vested and unvested common stock options are valued using a Black-Scholes pricing model as of the end of each period.

*Incentive fees received from unconsolidated funds*— The Company's management agreement with KFN provides that KFN is responsible for paying a quarterly incentive fee when the return on assets under management exceeds certain benchmark returns or other performance targets. This incentive fee is accrued quarterly, after all contingencies have been removed, based on performance to date versus the performance benchmark stated in the management agreement. Once earned, there are no clawbacks of incentive fees received from KFN.

F-52

As part of the Company's management agreements with the side-by-side funds comprising the KKR Strategic Capital Funds the Company is entitled to receive incentive fees as follows:

- with respect to investors who have agreed to a 25 month lock-up period, an annual incentive fee equal to 20% of the increase in the net asset value of the individual fund that is allocable to those investors above the highest net asset value at which an incentive fee has previously been received; and

- with respect to investors who have agreed to a 60 month lock-up period, an annual incentive fee equal to 15% of the increase in the net asset value of the individual fund that is allocable to those investors above the highest net asset value at which an incentive fee has previously been received.

These incentive fees are accrued annually, after all contingencies have been removed, based on performance to date versus the performance benchmark stated in the management agreement. Since performance can fluctuate during interim periods, no incentive fees are recognized on a quarterly basis. Once earned, there are no clawbacks of incentive fees received from the side-by-side funds comprising the KKR Strategic Capital Funds.

*Transaction fees received from Portfolio Companies* —Transaction fees are earned by the Company primarily in connection with successful acquisitions of Portfolio Companies by private equity funds and with respect to certain other negotiated investments. Transaction fees are recorded in fee income upon closing of the transaction. Fees are typically paid by Portfolio Companies on or around the closing date and generally approximate 1% of the total transaction value to which the Company is entitled to its proportionate share. Transaction-related expenses associated with successful Portfolio Company investments are deferred and recorded in Other Assets until the transaction is consummated. See our description under "—Reimbursement of Transaction-Related Expenses" below. Transaction-related expenses associated with investigating Portfolio Company investments that are not consummated are recorded in fund expenses when facts and circumstances indicate that the transactions are unlikely to be consummated.

*Monitoring fees received from Portfolio Companies* —Monitoring fees are earned by the Company for services provided to the Portfolio Companies of private equity funds. These fees are paid based on a fixed periodic schedule by the Portfolio Companies either in advance or in arrears and are separately negotiated for each Portfolio Company.

**Reimbursement of Transaction-Related Expenses** —In pursuing successful Portfolio Company investments for private equity funds, the Company receives reimbursement for certain transaction-related expenses. Transaction-related expenses, which are billable to third parties, are deferred until the transaction is consummated and recorded in other assets on the date the expense is incurred. Upon reimbursement from a third party, the cash receipt is recorded and the deferred amounts are relieved. No fee income or expense is recorded for these reimbursements.

**Reimbursement of Monitoring Costs** —In connection with the monitoring of Portfolio Companies, KFN and the KKR Strategic Capital Funds, the Company receives reimbursement for certain expenses incurred on behalf of these entities. Billable monitoring expenses are recognized as revenue in accordance with EITF 01-14, "Income Statement Characterization of Reimbursement Received for Out of Pocket Expenses Incurred." These expense reimbursements are classified as monitoring fee income and amounted to $3,303 and $3,795 for the three months ended March 31, 2007 and 2006, respectively.

F-53

   **Investment Income** —Investment income consists primarily of unrealized and realized gains and losses on private equity investments as well as dividends and interest received primarily from the Portfolio Companies, after giving effect to interest expense incurred primarily by the Company's Credit Strategy Funds and foreign exchange gains and losses relating to mark-to-market activity on foreign exchange forward contracts. The amount of investment income retained in net income, after allocation to non-controlling interests in consolidated entities, represents investment income allocable to the Company resulting from earnings on its investments and its carried interest and similar distribution rights. Carried interests and similar distribution rights generally entitle the Company to a percentage of the profits generated by a fund as described below. Unrealized gains or losses result from changes in fair value of investments during the period, and are included in Net Gains from Investment Activities. Upon disposition of an investment, previously recognized unrealized gains or losses are reversed and a realized gain or loss is recognized. Net Gains from Investment Activities earned by the consolidated KKR Funds amounted to $1,442,137 and $932,336 for the three months ended March 31, 2007 and 2006, respectively.

   Carried interests entitle the general partner of a fund to a greater allocable share of these fund's earnings from investments relative to the capital contributed by the general partner and correspondingly reduce non-controlling interests' allocable share of those earnings. Amounts earned pursuant to carried interests in Traditional Private Equity Funds are included in investment income and are earned by the general partner of those funds to the extent that investment returns are positive. If these investment returns decrease or turn negative in subsequent periods, recognized carried interest will be reduced and reflected as investment losses. Recognized carried interest amounted to approximately $265 million and $191 million for the three months ended March 31, 2007 and 2006, respectively. In the case of a Traditional Private Equity Fund, a carried interest is calculated as a percentage of the gains of the fund, subject to the achievement by the fund of positive investment returns, which, if not achieved, subjects previously distributed carried interest to a contingent repayment. A carried interest that is subject to contingent repayment may be paid to a fund's general partner as particular investments made by the fund are sold or otherwise realized. However, if upon liquidation of the fund, the aggregate amount paid to the general partner pursuant to a carried interest exceeds the amount actually due to the general partner based upon the aggregate performance of the applicable fund, the excess is required to be repaid by the general partner (a "clawback") to the fund. Carried interest subject to contingent repayment is recognized as earned based on the contractual formula set forth in the instruments governing the fund as if the fund was terminated at that date with the then estimated fair values of the investments realized. Due to the extended durations of the Traditional Private Equity Funds, management believes that this approach results in income recognition that best reflects the periodic performance of the Company in the management of those funds. As of March 31, 2007, approximately $1,027 million of carried interest has been paid to certain of the general partners of the KKR Funds that is subject to contingent repayment. See Note 7, Related Party Transactions.

   Dividend income is recognized by the Company on the ex-dividend date, or in the absence of a formal declaration, on the date it is received. For the three months ended March 31, 2007 and 2006, all dividends were earned by the consolidated KKR Funds.

   Interest income is recognized as earned. Interest income earned by the consolidated KKR Funds amounted to $65,618 and $8,964 for the three months ended March 31, 2007 and 2006, respectively.

   **Profit Sharing** —The Company has various profit sharing arrangements which provide for a sharing of the income earned on its investments and carried interests in the KKR Funds. Amounts payable under such arrangements are charged to compensation expense or professional fees expense when payment is probable and amounts owed are reasonably estimable.

F-54

*Statement of Financial Condition Measurements*

   **Cash and Cash Equivalents** —The Company considers all highly liquid short-term investments with original maturities of 90 days or less when purchased to be cash equivalents.

   **Cash and Cash Equivalents Held at Consolidated Entities** —Cash and cash equivalents held at consolidated entities represents cash that, although not legally restricted, is not available to fund general liquidity needs of the Company as the use of such funds is generally limited to the investment activities of the KKR Funds.

   **Restricted Cash and Cash Equivalents** —Restricted cash and cash equivalents represent amounts that are held by third parties under certain of the Company's financing and derivative transactions.

   **Investments, at Fair Value** —The Company's investments consist primarily of private equity investments, debt investments and other investments. See Note 3 for information relating to the Company's investments.

   *Private Equity Investments* —Private equity investments consist of investments in Portfolio Companies of consolidated KKR Funds that are, for GAAP purposes, investment companies under the AICPA Audit and Accounting Guide— "Investment Companies." The KKR Funds reflect investments at their estimated fair values, with unrealized gains or losses resulting from changes in fair value reflected as a component of Net Gains from Investment Activities in the combined statements of income. Fair value is the amount at which the investments could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale. The Company has retained the specialized accounting of these investments pursuant to EITF No. 85-12, "Retention of Specialized Accounting for Investments in Consolidation."

   Private equity investments that have readily observable market prices (such as those traded on a securities exchange) are stated at the last reported sales price on the statement of financial condition date.

   As of March 31, 2007, approximately 67% of our private equity investments have been valued by the Company in the absence of readily observable market prices. The determination of fair value may differ materially from the values that would have resulted if a ready market had existed. For these investments, fair value is determined after giving consideration to a range of factors, including the price at which the investment was acquired, the nature of the investment, local market conditions, trading values on public exchanges for comparable securities and financing transactions subsequent to the acquisition of the investment, if available. Additionally, the Company evaluates fair value with internal models utilizing current and projected operating performance and cash flows.

   Investments denominated in currencies other than the U.S. dollar are valued based on the spot rate of the respective currency at the end of the respective reporting period with changes related to exchange rate movements reflected as a component of Net Gains from Investment Activities.

   *Corporate Securities* — Corporate securities consist of fixed income securities and are carried as available-for-sale as the Company may sell them prior to maturity and does not hold them principally for the purpose of selling them in the near term. These investments are carried at estimated fair value, with unrealized gains and losses reported in accumulated other comprehensive income.

   Estimated fair values are based on quoted market prices, when available, or on estimates provided by independent pricing sources or dealers who make markets in such securities. Upon the sale of a security,

F-55

the realized net gain or loss is computed on a specific identification basis. Substantially all unrealized gains and losses associated with available-for-sale securities are reflected in non-controlling interests in consolidated entities in the accompanying statement of financial condition.

The Company monitors its available-for-sale securities portfolio for impairments. A loss is recognized when it is determined that a decline in the estimated fair value of a security below its amortized cost is other-than-temporary. The Company considers many factors in determining whether the impairment of a security is deemed to be other-than-temporary, including but not limited to, the length of time the security has had a decline in estimated fair value below its amortized cost, the amount of the unrealized loss, the intent and ability of the Company to hold the security for a period of time sufficient for a recovery in value, recent events specific to the issuer or industry, and external credit ratings and changes therein.

*Fixed Income Securities—* Fixed income securities of Portfolio Companies that are listed on a securities exchange are classified as trading securities and are valued at their last quoted sales price. Securities that are not listed on an exchange and traded over the counter are valued at the mean of bid and ask quotations. Investments in corporate debt, including syndicated bank loans, high yield securities and other fixed income securities, are valued at the mean of the "bid" and "asked" prices obtained from third-party pricing services. In the event that third-party pricing service quotations are unavailable, values are obtained from dealers or market makers. Investments where third-party values are not available are valued by the Company and the Company may engage a third-party valuation firm to assist in such valuations.

*Corporate Loans—* The Company invests in corporate loans held for investment and the Company initially records such loans at their purchase prices. The Company subsequently accounts for corporate loans based on their outstanding principal plus or minus unaccreted purchase discounts and unamortized purchase premiums (amortized cost). In certain instances, where the credit fundamentals underlying a particular corporate loan have materially changed in such a manner that the Company's expected return may decrease, the Company may elect to sell a corporate loan held for investment due to adverse changes in credit fundamentals. If the Company determines that it will no longer hold the corporate loan for investment, the Company accounts for the corporate loan at the lower of amortized cost or estimated fair value.

Interest income on corporate loans includes interest at stated coupon rates adjusted for accretion of purchase discounts and the amortization of purchase premiums. Unamortized premiums and discounts are recognized in interest income over the contractual life of the loans, adjusted for actual prepayments, using the effective interest method.

The Company's investments in corporate loans are not homogeneous and the Company individually reviews each corporate loan for impairment using relevant information in its analysis, including current estimated fair values, current valuation multiples, estimated fair values and quality of collateral, projected operating cash flow and projected liquidation cash flows. The Company considers a corporate loan to be impaired when, based on current information and events, the Company believes it is probable that it will be unable to collect all amounts due based on the contractual terms of the loan. When a corporate loan is impaired, an allowance for loan losses is created in an amount equal to the excess of the loan's amortized cost basis over its estimated fair value. Increases in the allowance for loan losses are recognized currently in the Company's results of operations. When the Company makes a determination that some or all of a corporate loan is uncollectible, the Company charges-off or writes-down the loan through a reduction in

F-56

the allowance for loan losses. As of March 31, 2007 and December 31, 2006, there were no corporate loans requiring an allowance for loan losses.

An impaired corporate loan may be left on accrual status during the period the Company is pursuing repayment of the loan; however, the loan is placed on non-accrual status when: (i) management believes that scheduled debt service payments may not be paid when contractually due; (ii) the loan becomes 90 days delinquent; (iii) management determines the borrower is incapable of, or has ceased efforts toward, curing the cause of the impairment; or (iv) the net realizable value of the underlying collateral securing the loan decreases below the Company's carrying value of such loan. While on non-accrual status, previously recognized accrued interest is reversed and interest income is recognized only upon actual receipt. As of March 31, 2007 and December 31, 2006, there were no corporate loans on non-accrual status.

*Derivatives* —The Company invests in derivative financial instruments, including total rate of return swaps and credit default swaps. In a total rate of return swap, the Company receives the sum of all interest, fees and any positive economic change in fair value amounts from a reference asset with a specified notional amount and pays interest on the referenced notional amount plus any negative change in fair value amounts from such asset. Credit default swaps, when purchasing protection, involve the payment of a fixed rate premium for protection against the loss in value of an underlying debt instrument in the event of a defined credit event, such as payment default or bankruptcy. Under a credit default swap, one party acts as a guarantor by receiving the fixed periodic payment in exchange for the commitment to purchase the underlying security at par if a credit event occurs. Derivative contracts, including total rate of return swap contracts and credit default swap contracts, are recorded at estimated fair value with changes in fair value recorded as unrealized gains or losses in Net Gains from Investment Activities in the accompanying combined statements of income.

*Time Deposits* —The Company maintained a $350 million time deposit at March 31, 2007, which related to a short-term deposit with an original maturity of greater than 90 days. This investment is carried at fair market value and interest was earned at a rate of 5.4% in connection with the time deposit as of March 31, 2007.

*Opportunistic Investments in Publicly Traded Securities* —The Company's opportunistic investments in publicly traded securities represent equity securities, which are classified as trading securities and carried at fair market value. Changes in the fair market value of trading securities are reported within Net Gains from Investment Activities in the accompanying Combined Statements of Income. These investments represent investments of KPE identified by the Company in the ordinary course of business other than debt, investments in governmental bonds and other similar investments.

**Due from and Due to Affiliates** —For purposes of classifying amounts, the Company considers its Principals, employees, non-consolidated funds and the Portfolio Companies of its funds to be affiliates. Receivables from and payables to affiliates are recorded at their current settlement amount.

**Foreign Exchange Derivatives and Hedging Activities** —The Company enters into derivative financial instruments primarily to manage foreign exchange risk arising from certain assets and liabilities. All derivatives are recognized as either assets or liabilities in the combined statements of financial condition and measured at fair value with changes in fair value recorded in Net Gains from Investment Activities in the accompanying combined statements of income. The Company does not apply "hedge accounting"

F-57

under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities". The Company's derivative financial instruments contain credit risk to the extent that its bank counterparties may be unable to meet the terms of the agreements. The Company minimizes this risk by limiting its counterparties to major financial institutions with strong credit ratings.

**Fixed Assets, Depreciation and Amortization** —Fixed assets consist primarily of leasehold improvements, furniture, fixtures and equipment, and computer hardware and software. Such amounts are recorded at cost less accumulated depreciation and amortization. Depreciation and amortization are calculated using the straight-line method over the assets' estimated useful lives, which are the life of the related lease for leasehold improvements, and three to seven years for other fixed assets.

**Repurchase Agreements and Warehouse Facilities** —The majority of the Company's debt obligations consist of borrowing arrangements entered into by the Credit Strategy Funds in order to finance the acquisition of investments, primarily through the use of secured borrowings in the form of repurchase agreements and warehouse facilities. The Company recognizes interest expense on all borrowings on an accrual basis.

**Capital Distributions** —Capital distributions to partners take the form of cash distributions and, in certain cases, non-cash distributions. Non-cash distributions consist primarily of shares in Portfolio Companies which have been exited as well as vested common stock and common stock options of KFN. Historically, all distributions on investments held by our partners have been accounted for as distributions from partners' capital, or in some cases as minority interest, and therefore no compensation expense has been recognized with respect to distributions made to our Principals.

**Comprehensive Income** —Comprehensive income is defined as the change in equity of a business enterprise during a period from transactions and other events and circumstances, excluding those resulting from contributions and distributions to owners. For the Company's purposes, comprehensive income represents Net Income, as presented in the accompanying combined statements of income, net foreign currency translation adjustments, and unrealized gains and losses on securities available for sale.

**Foreign Currency** —Foreign currency denominated assets, liabilities and operations are primarily held through the KKR Funds. Assets and liabilities relating to foreign investments are translated using the exchange rates prevailing at the end of each reporting period. Results of foreign operations are translated at the weighted average exchange rate for each reporting period. Translation adjustments are included in current income to the extent that unrealized gains and losses on the related investment are included in income, otherwise they are included as a component of accumulated other comprehensive income until realized. Foreign currency gains or losses resulting from transactions outside of the functional currency of a consolidated entity are recorded in income as incurred and were not material during the three months ended March 31, 2007 and 2006.

**Income Taxes** —No federal income taxes have been provided for by the Company in the accompanying combined financial statements as each existing partner is individually responsible for reporting income or loss based upon their respective share of an entity's income and expenses as reported for income tax purposes. However, certain consolidated entities of the Company are subject to either New York City unincorporated business tax on their trade and business activities conducted in New York City or other foreign, state or local income taxes.

<div align="center">F-58</div>

**Recent Accounting Pronouncements** —In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123 (R), "Share-Based Payment" ("SFAS 123 (R)"), which requires all equity-based payments to employees to be recognized using a fair value based method. On January 1, 2006, the Company adopted SFAS No. 123 (R) using the prospective method and therefore there was no impact on prior period amounts. The adoption of SFAS 123 (R) did not impact the Company's combined financial statements.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments," ("SFAS 155"). Key provisions of SFAS No. 155 include: (1) a broad fair value measurement option for certain hybrid financial instruments that contain an embedded derivative that would otherwise require bifurcation; (2) clarification that only the simplest separations of interest payments and principal payments qualify for the exception afforded to interest-only strips and principal-only strips from derivative accounting under paragraph 14 of SFAS No. 133, thereby narrowing such exception; (3) a requirement that beneficial interests in securitized financial assets be analyzed to determine whether they are freestanding derivatives or whether they are hybrid instruments that contain embedded derivatives requiring bifurcation; (4) clarification that concentrations of credit risk in the form of subordination are not embedded derivatives; and (5) elimination of the prohibition on a qualifying special purpose entity holding passive derivative financial instruments that pertain to beneficial interests that are or contain a derivative financial instrument. In general, these changes will reduce the operational complexity associated with bifurcating embedded derivatives, and increase the number of beneficial interests in securitization transactions, including interest-only strips and principal-only strips, required to be accounted for in accordance with SFAS No. 133. SFAS 155 is effective for all financial instruments acquired, issued or subject to remeasurement after the beginning of an entity's first fiscal year that begins after September 15, 2006. The adoption of SFAS 155 did not have a material impact on the Company's combined financial statements.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value, and expands disclosures about fair value measurements. SFAS 157 applies to reporting periods beginning after November 15, 2007. The Company is currently assessing the impact of adopting SFAS 157 on the combined financial statements.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS 159"). SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value, with changes in fair value recognized in earnings. SFAS 159 applies to reporting periods beginning after November 15, 2007. The Company is currently assessing the impact of adopting SFAS 159 on the combined financial statements.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 requires companies to recognize the tax benefits of uncertain tax positions only where the position is "more likely than not" to be sustained assuming examination by tax authorities. The tax benefit recognized is the largest amount of benefit that is greater than 50 percent likely of being realized upon ultimate settlement. FIN 48 is effective for fiscal years beginning after December 15, 2006. The adoption of FIN 48 did not have a material impact on the Company's combined financial statements.

F-59

In June 2007, the AICPA issued Statement of Position No. 07-1, "Clarification of the Scope of the Audit and Accounting Guide Investment Companies and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies" ("SOP 07-1"), for issuance. SOP 07-1 addresses whether the accounting principles of the AICPA Audit and Accounting Guide Investment Companies may be applied to an entity by clarifying the definition of an investment company and whether those accounting principles may be retained by a parent company in consolidation or by an investor in the application of the equity method of accounting. Generally, in order for an entity to retain investment company accounting for a subsidiary or equity method investee, (i) the subsidiary or equity method investee should meet the definition of an investment company pursuant to the guidance in SOP 07-1, (ii) the entity should follow established policies that effectively distinguish the nature and type of investments made by the investment company from the nature and type of investments made by other entities within the consolidated group that are not investment companies, and (iii) the entity (through the investment company) should be investing for current income, capital appreciation, or both, rather than for strategic operating purposes. SOP 07-1 applies to the later of (i) reporting periods beginning on or after December 15, 2007 or (ii) the first permitted early adoption date of the FASB's fair value option statement. The Company is currently assessing the impact of adopting SOP 07-1 on the Company's combined financial statements including the potential impact if we were unable to retain investment company accounting.

## 3. INVESTMENTS

Investments, at fair value consist of the following:

|  | Fair Value | |
|---|---|---|
|  | March 31, 2007 | December 31, 2006 |
| Private Equity Investments | $ 20,030,415 | $ 17,862,535 |
| Debt Investments | 1,723,076 | 1,230,202 |
| Other Investments | 1,815,081 | 1,445,510 |
|  | $ 23,568,572 | $ 20,538,247 |

Investments, at fair value held by the consolidated KKR Funds amounted to $23,340,827 and $20,247,113 as of March 31, 2007 and December 31, 2006, respectively.

F-60

*Private Equity Investments*

The following table presents information concerning private equity investments held by the consolidated KKR Funds:

| | Fair Value | | Fair Value as a Percentage of Total | |
| --- | --- | --- | --- | --- |
| | March 31, 2007 | December 31, 2006 | March 31, 2007 | December 31, 2006 |
| **Private Equity Investments, at Fair Value** | | | | |
| **North America** | | | | |
| Health Care | $ 1,882,563 | $ 1,852,962 | 9.4% | 10.4% |
| Consumer Products | 1,491,076 | 1,340,252 | 7.4% | 7.5% |
| Chemicals | 1,034,541 | 942,868 | 5.2% | 5.3% |
| Financial Services | 974,400 | 833,986 | 4.9% | 4.7% |
| Technology | 833,590 | 739,608 | 4.2% | 4.1% |
| Manufacturing | 539,737 | 514,505 | 2.7% | 2.9% |
| Media | 512,680 | 424,255 | 2.6% | 2.4% |
| Hotels/Leisure | 96,719 | 198,425 | 0.5% | 1.1% |
| Telecom | 36,636 | 37,237 | 0.2% | 0.2% |
| Energy | 2,282 | 300,471 | 0.0% | 1.7% |
| **North America Total (Cost: March 31, 2007, $6,088,343; December 31, 2006, $6,175,691)** | **7,404,224** | **7,184,569** | **37.0%** | **40.3%** |
| **Europe** | | | | |
| Manufacturing | 4,700,549 | 3,949,348 | 23.5% | 22.1% |
| Media | 3,036,833 | 2,330,801 | 15.2% | 13.0% |
| Technology | 1,320,141 | 1,289,394 | 6.6% | 7.2% |
| Telecom | 866,592 | 537,348 | 4.3% | 3.0% |
| Retail | 770,950 | 761,799 | 3.8% | 4.3% |
| Recycling | 215,761 | 287,338 | 1.1% | 1.6% |
| Industrial | 114,532 | 113,202 | 0.6% | 0.6% |
| **Europe Total (Cost: March 31, 2007, $7,653,459; December 31, 2006, $6,385,892)** | **11,025,358** | **9,269,230** | **55.0%** | **51.8%** |
| **Australia, Bermuda, Singapore and Other Locations** | | | | |
| Technology | 672,698 | 498,182 | 3.4% | 2.8% |
| Media | 538,744 | 531,158 | 2.7% | 3.0% |
| Recycling | 262,592 | 270,321 | 1.3% | 1.5% |
| Financial Services | 126,799 | 109,075 | 0.6% | 0.6% |
| **Australia, Bermuda, Singapore and Other Locations, Total (Cost: March 31, 2007, $1,551,650; December 31, 2006, $1,551,650)** | **1,600,833** | **1,408,736** | **8.0%** | **7.9%** |
| **Private Equity Investments, at Fair Value** | **$ 20,030,415** | **$ 17,862,535** | **100.0%** | **100.0%** |

As of March 31, 2007, investments which represented greater than 5% of the net assets of consolidated private equity funds included; (i) Legrand S.A. valued at $2,600,059, (ii) NXP valued at

F-61

$1,320,141, (iii) HCA Inc. valued at $1,165,750, and (iv) Rockwood Holdings, Inc. valued at $1,034,541. As of December 31, 2006, investments which represented greater than 5% of the net assets of consolidated private equity funds consisted of investments in: (i) Legrand S.A. valued at $2,268,249, (ii) HCA Inc. valued at $1,145,750 and (iii) Rockwood Holdings, Inc. valued at $942,868.

Substantially all of the securities underlying the Company's private equity investments represent equity securities. As of March 31, 2007 and December 31, 2006, the aggregate amount of investments that were other than equity securities was less than 5% of the net assets of consolidated private equity funds.

All Portfolio Companies included in private equity investments are deemed affiliates due to the nature of the ownership interests and the Company's ability to control, direct or substantially influence management and the operations of such Portfolio Companies.

Net Gains from Investment Activities on the combined statements of income include net realized gains from sales of investments and the net change in unrealized gains resulting from changes in fair value of the KKR Funds' investments (including foreign exchange gains and losses attributable to foreign-denominated investments). The following table presents the Company's realized and net change in unrealized gains relating to its private equity investments.

|  | Three Months Ended March 31, | |
|  | 2007 | 2006 |
|---|---|---|
| Realized Gains | $ 422,275 | $ 1,650,330 |
| Net Change in Unrealized Gains (Losses) | 1,053,727 | (717,350) |
|  | $ 1,476,002 | $ 932,980 |

### Debt Investments

The following table presents the Company's debt investments held by the consolidated KKR Funds.

|  | March 31, 2007 | December 31, 2006 |
|---|---|---|
| Debt Investments, carried at fair value: |  |  |
| Corporate Securities of Portfolio Companies | $ 296,411 | $ 294,488 |
| Fixed Income Securities of Portfolio Companies | 154,784 | 123,040 |
| Restricted Stock | 45,203 | 44,149 |
| Vested Options | 9,429 | 8,617 |
| Unvested Options | 2,235 | 1,685 |
| Derivatives | 11,368 | 8,435 |
| Total | 519,430 | 480,414 |
| Corporate Loans | 1,203,646 | 749,788 |
| Total Credit Investments (Cost: March 31, 2007 $1,614,580; December 31, 2006 $1,147,014) | $ 1,723,076 | $ 1,230,202 |

F-62

Investments in corporate securities are held primarily by consolidated Credit Strategy Funds and are classified as available for sale. The following table summarizes the Company's corporate securities as of March 31, 2007, which are carried at estimated fair value:

| Description | Principal | Net Unaccreted Discount | Net Unrealized Gains | Estimated Fair Value |
|---|---|---|---|---|
| Corporate securities | $ 282,000 | $ (3,210) | $ 17,621(a) | $ 296,411 |

(a)    $17,621 of the Net Unrealized Gains is allocable to Non-Controlling Interests in Consolidated Entities.

All of these securities have maturities between five and ten years. The weighted average coupon of the securities as of March 31, 2007 is 9.07%. There were no sales or transfers of corporate securities during the three months ended March 31, 2007.

### Other Investments

The following table presents the Company's other investments at fair value:

| | Fair Value | |
|---|---|---|
| | March 31, 2007 | December 31, 2006 |
| Time Deposits(a) | $ 350,000 | $ 1,000,000 |
| Convertible Senior Notes | 732,374 | — |
| Opportunistic Investments in Publicly Traded Securities | 540,300 | 158,462 |
| Bonds and Other Debt Instruments held at Private Equity Funds | 66,117 | 95,542 |
| Government and Government Agency Bonds | 63,251 | 88,466 |
| Municipal Bonds | 15,503 | 38,112 |
| Corporate Bonds | — | 10,341 |
| Other | 47,536 | 54,587 |
| Total (Cost: March 31, 2007, $1,783,217; December 31, 2006, $1,438,021) | $ 1,815,081 | $ 1,445,510 |

(a)    Represents a short-term deposit with an original maturity of greater than 90 days which earned interest at an annual rate of approximately 5.4% for the three months ended March 31, 2007.

F-63

## 4. OTHER ASSETS AND OTHER LIABILITIES

Other assets consist of the following:

| | March 31, 2007 | | December 31, 2006 | |
|---|---|---|---|---|
| Furniture and Fixtures | $ | 28,632 | $ | 27,284 |
| Leasehold Improvements | | 25,058 | | 23,205 |
| Interest Receivable | | 21,482 | | 51,857 |
| Accounts Receivable | | 7,281 | | 11,568 |
| Prepaid Expenses | | 6,841 | | 2,001 |
| Foreign Currency Options | | 6,440 | | — |
| Other Assets | | 21,807 | | 22,124 |
| | $ | 117,541 | $ | 138,039 |

(a)    Net of accumulated depreciation and amortization of $31,489 and $30,525 for the period ended March 31, 2007 and December 31, 2006, respectively. Depreciation and amortization expense totaled $938 and $542 for the three months ended March 31, 2007 and 2006, respectively.

Accounts Payable, Accrued Expenses and Other Liabilities consist of the following:

| | March 31, 2007 | | December 31, 2006 | |
|---|---|---|---|---|
| Unrealized Losses on Foreign Exchange Forward Contracts(a) | $ | 201,151 | $ | 202,750 |
| Accrued Benefits and Compensation | | 47,107 | | 14,095 |
| Accounts Payable | | 42,887 | | 31,076 |
| Deferred Revenue | | 29,212 | | 35,747 |
| Interest Payable | | 26,591 | | 12,292 |
| Other Liabilities | | 47,096 | | 37,160 |
| | $ | 394,044 | $ | 333,120 |

(a)    Represents derivative financial instruments used to manage foreign exchange risk arising from certain assets and liabilities. Such instruments are measured at fair value with changes in fair value recorded in Net Gains from Investment Activities in the accompanying combined statements of income. See Note 2.

F-64

## 5. DEBT OBLIGATIONS

Debt obligations consist of the following:

|  | March 31, 2007 | December 31, 2006 |
|---|---|---|
| Warehouse Facilities | $  1,263,005 | $  851,736 |
| Repurchase Agreements | 42,682 | 52,385 |
| Short-term Lines of Credit | 30,000 | 44,682 |
| Other Financing Arrangements | 350,000 | — |
|  | $  1,685,687 | $  948,803 |

The Company's Credit Strategy Funds leverage their portfolios of securities and loans through the use of short-term borrowings in the form of warehouse facilities and repurchase agreements. Each of the borrowings used by the Company bears interest at floating rates based on a spread above the London Interbank Offered Rate ("LIBOR").

The following table presents summarized information with respect to borrowings in the Company's Consolidated Credit Strategy Funds as of March 31, 2007:

|  | Outstanding Borrowings | Weighted Average Borrowing Rate | Weighted Average Remaining Maturity (in days) | Estimated Fair Value of Collateral(1) |
|---|---|---|---|---|
| Warehouse facilities | $  1,263,005 | 5.82% | 4 | $  1,511,626 |
| Repurchase agreements | 42,682 | 5.53% | 11 | 50,075 |
| Total | $  1,305,687 |  |  | $  1,561,701 |

(1)     Collateral for borrowings consists of fixed income securities, corporate securities and corporate loans (see Note 3).

The three special purpose entities formed by the Company during 2006 to complete secured financing transactions are KKR Financial CLO 2007-1, Ltd. ("CLO 2007-1"), KKR Financial CLO 2007-2, Ltd. ("CLO 2007-2"), and KKR Financial CLO 2007-3 ("CLO 2007-3"). During August 2006, CLO 2007-1, CLO 2007-2 and CLO 2007-3 each entered into separate warehouse facilities, with a maximum commitment amount of $600.0 million, $500.0 million and $600.0 million, respectively. Each of these facilities bears interest at a rate of one-month LIBOR plus 0.50%. The aggregate amount of borrowings outstanding under these facilities is $1.3 billion as of March 31, 2007.

The Company maintains a $25 million line of credit (the "Line") with a major financial institution that expires in 2008. The Line is available for general corporate purposes and the Company may re-borrow amounts repaid under the Line from time to time prior to its expiration or earlier termination. Outstanding amounts under the Line bear interest at the "prime rate" as defined in the agreement. There are no fees associated with the Line. As of March 31, 2007 and December 31, 2006, no amounts were outstanding under the Line.

From time to time, the Company may borrow amounts to satisfy general short-term needs of the business by opening short-term lines of credit with established financial institutions. These amounts may be

incremental to, or in lieu of, borrowings made under the Line, and are generally repaid within 30 days, at which time the line of credit is closed. Amounts outstanding under short-term lines of credit amounted to $30,000 and $44,682 as of March 31, 2007 and December 31, 2006, respectively. These borrowings bear interest at floating rates as defined in the respective agreements. There are no fees associated with these lines of credit.

During the quarter ended March 31, 2007, the Company entered into a financing arrangement with a major financial institution with respect to $350 million of its $700 million convertible notes investment in Sun Microsystems, Inc. ("Sun").

The financing was structured through the use of total return swaps. Pursuant to the terms of the financing arrangement, $350 million of the Sun convertibles notes are directly held by the Company and have been pledged to the financial institution as collateral (the "Pledged Notes") and the remaining $350 million of the Sun convertible notes are directly held by the financial institution (the "Other Notes"). Pursuant to the security agreements with respect to the Pledged Notes, the Company has the right to vote the Pledged Notes and the financial institution is obligated to follow the instructions of the Company, subject to certain exceptions, so long as default does not exist under the security agreements or the underlying swap agreements. The Company is also restricted from transferring the Pledged Notes without the consent of the financial institution.

At settlement, the Company will be entitled to receive payment equal to any appreciation on the value of the Other Notes and the Company will be obligated to pay to the financial institution any depreciation on the value of the Other Notes. In addition, the financial institution is obligated to pay the Company any interest that would be paid to a holder of the Other Notes when payment would be received by the financial institution. The per annum rate of interest payable by the Company for the financing is equivalent to three-month LIBOR plus 0.90%, which accrues during the term of the financing and is payable at settlement. The financing provides for early settlement upon the occurrence of certain events, including an event based on the value of the collateral and other events of default.

The Company believes the carrying value of this debt approximates fair value as of March 31. 2007.

## 6. INCOME TAXES

The Company has provided for New York City unincorporated business tax for certain entities based on a statutory rate of 4%. Certain consolidated entities of the Company are subject to income tax of the

F-66

foreign countries in which they conduct business. The Company's effective income tax rate was approximately .18% and .29% for the three months ended March 31, 2007 and 2006, respectively.

|  | Three Months Ended March 31, | |
|  | 2007 | 2006 |
| --- | --- | --- |
| **Current** | | |
| Foreign Income Tax | $ 483 | $ 591 |
| State and Local Income Tax | 105 | 129 |
| **Subtotal** | 588 | 720 |
| **Deferred** | | |
| Foreign Income Tax | 39 | 47 |
| Total Income Taxes | $ 627 | $ 767 |

Income taxes are provided at the applicable statutory rates. The Company's deferred tax assets and liabilities did not change materially from December 31, 2006.

## 7. RELATED PARTY TRANSACTIONS

As of March 31, 2007 and December 31, 2006, Due from Affiliates was comprised of the following:

|  | March 31, 2007 | December 31, 2006 |
| --- | --- | --- |
| Due from Portfolio Companies | $ 35,901 | $ 47,442 |
| Due from Principals | 19,115 | 34,969 |
| Due from Unconsolidated Funds | 11,898 | 14,259 |
| Due from Related Entities | 6,148 | 13,790 |
| Loans to Principals | 5,101 | 5,101 |
|  | $ 78,163 | $ 115,561 |

### Discretionary Investments

Certain of the Company's investment professionals, including its Principals and other qualifying employees, are permitted to invest and have invested their own capital in side-by-side investments with its Traditional Private Equity Funds. Side-by-side investments are investments in Portfolio Companies that are made on the same terms and conditions as those acquired by the applicable fund, except that the side-by-side investments are not subject to management fees or a carried interest. The cash invested by these individuals aggregated $18.9 million and $29.4 million for the three months ended March 31, 2007 and 2006, respectively. These investments are not included in the accompanying combined financial statements.

F-67

*Contingent Repayment Guarantee*

Certain Company personnel who have received carried interest distributions with respect to Traditional Private Equity Funds have personally guaranteed, on a several basis and subject to a cap, the contingent obligations of the general partners of the Traditional Private Equity Funds to repay amounts to fund limited partners pursuant to the general partners' equity clawback obligations, if any, as described in Note 2.

*Loans to Principals*

From time-to-time and as conditions warrant, the Company lends amounts to its Principals to fund short-term liquidity needs. These loans earn interest at floating rates that approximate market rates and such interest aggregated $81 and $170, for the three months ended March 31, 2007 and 2006, respectively.

*Aircraft and Other Services*

Certain of the Senior Principals own aircraft that the Company uses for business purposes in the ordinary course of our operations. These Senior Principals paid for the purchase of these aircraft with their personal funds and bear all operating, personnel and maintenance costs associated with their operation. The hourly rates that the Company pays for the use of these aircraft are based on current market rates for chartering private aircraft of the same type. The Company paid $568 and $310 for the use of these aircraft during the three months ended March 31, 2007 and 2006, respectively.

*Facilities*

Certain of the Senior Principals are partners in a real-estate based partnership that maintains an ownership interest in our Menlo Park location. Payments made to this partnership aggregated $481 and $455, for the three months ended March 31, 2007 and 2006, respectively.

F-68

## 8. SEGMENT REPORTING

The Company operates through two reportable business segments. These segments, which are differentiated primarily by their investment focuses and strategies, consist of the following:

- **Private Equity** —The Company's private equity segment involves sponsoring and managing a group of funds that make primarily control-oriented investments in connection with leveraged buyouts and other similar investment opportunities. These funds are managed by Kohlberg Kravis Roberts & Co. L.P. and currently consist of a number of Traditional Private Equity Funds and KPE.

- **Credit** —The Company's credit segment involves sponsoring and managing a group of private and publicly traded Credit Strategy Funds. These funds are managed by KKR Financial Advisors LLC and currently consist of KFN and the SCF, which is comprised of three side-by-side private credit strategy funds. Two of the side-by-side funds in the SCF and one of the structured finance vehicles managed by the Company have been consolidated in the accompanying combined financial statements of the Company.

Economic Net Income ("ENI") and Fee Related Earnings ("FRE") are key performance measures used by management. ENI is a measure of profitability for the Company's reportable segments and represents income before taxes. FRE represents income before taxes adjusted to (i) exclude the expenses of consolidated funds, (ii) include management fees earned from consolidated funds that were eliminated in consolidation (iii) exclude investment income and (iv) exclude non-controlling interests in income of consolidated entities. These measures are used by management for the Company's segments in making resource deployment and other operational decisions.

Management makes operating decisions and assesses the performance of each of the Company's business segments based on financial and operating metrics and data that is presented excluding the impact of any of the KKR Funds that are consolidated into the combined financial statements. Consequently, all segment data excludes the assets, liabilities and operating results related to the KKR Funds.

F-69

The following table presents the financial data for the Company's reportable segments and the reconciliation to the combined financial statements as of March 31, 2007 and for the three months then ended:

|  | Private Equity | Credit Oriented | Total Reportable Segments | Combination Adjustments | Combined |
|---|---|---|---|---|---|
| **Three Months Ended March 31, 2007** | | | | | |
| Fee Income(a) | $ 117,288 | $ 27,121 | $ 144,409 | $ (75,569) | $ 68,840 |
| Expenses(b) | (71,004) | (9,181) | (80,185) | (149) | (80,334) |
| Fee Related Earnings | 46,284 | 17,940 | 64,224 | (75,718) | (11,494) |
| Investment Income(c) | 322,687 | 2,490 | 325,177 | 1,229,024 | 1,554,201 |
| Income before Non-Controlling Interests in Income of Consolidated Entities and Income Taxes | 368,971 | 20,430 | 389,401 | 1,153,306 | 1,542,707 |
| Non-Controlling Interests in Income of Consolidated Entities | — | (7,856) | (7,856) | (1,153,306) | (1,161,162) |
| Economic Net Income | $ 368,971 | $ 12,574 | $ 381,545 | $ — | $ 381,545 |
| Total Assets(d) | $ 1,856,974 | $ 70,660 | $ 1,927,634 | $ 23,959,670 | $ 25,887,304 |

(a)     The Fee Income adjustment represents the elimination of intercompany transactions upon consolidation of the KKR Funds and other adjustments necessary to reconcile from our segment reporting measures to our consolidated financial results.

(b)     The Expenses adjustment primarily represents the inclusion of certain operating expenses upon consolidation of the KKR Funds.

(c)     The Investment Income adjustment primarily represents the inclusion of investment income allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

(d)     The Total Assets adjustment primarily represents the inclusion of private equity and credit investments that are allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

The following table presents the financial data for the Company's reportable segments and the reconciliation to the combined financial statements as of March 31, 2006 and for the three months then ended:

| | Three Months Ended March 31, 2006 | | | | |
| | Private Equity | Credit Oriented | Total Reportable Segments | Combination Adjustments | Combined |
|---|---|---|---|---|---|
| Fee Income(a) | $ 69,364 | $ 15,469 | $ 84,833 | $ 8,965 | $ 93,798 |
| Expenses(b) | (40,734) | (5,810) | (46,544) | (3,251) | (49,795) |
| Fee Related Earnings | 28,630 | 9,659 | 38,289 | 5,714 | 44,003 |
| Investment Income(c) | 227,078 | 456 | 227,534 | 767,351 | 994,885 |
| Income before Non-Controlling Interests in Income of Consolidated Entities and Income Taxes | 255,708 | 10,115 | 265,823 | 773,065 | 1,038,888 |
| Non-Controlling Interests in Income of Consolidated Entities | — | (4,440) | (4,440) | (773,065) | (777,505) |
| Economic Net Income | $ 255,708 | $ 5,675 | $ 261,383 | $ — | $ 261,383 |
| Total Assets(d) | $ 1,469,658 | $ 72,479 | $ 1,542,137 | $ 12,456,996 | $ 13,999,133 |

(a)     The Fee Income adjustment represents the elimination of intercompany transactions upon consolidation of the KKR Funds and other adjustments necessary to reconcile from our segment reporting measures to our consolidated financial results.

(b)     The Expenses adjustment primarily represents the inclusion of certain operating expenses upon consolidation of the KKR Funds.

(c)     The Investment Income adjustment primarily represents the inclusion of investment income allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

(d)     The Total Assets adjustments primarily represents the inclusion of private equity and credit investments that are allocable to non-controlling interests in consolidated entities upon consolidation of the KKR Funds.

## 9. COMMITMENTS AND CONTINGENCIES

### *Debt Covenants*

Borrowings of the KKR Funds contain various customary loan covenants. These covenants do not, in management's opinion, materially restrict KKR's investment or financing strategy. The Company is in compliance with all of its loan covenants as of March 31, 2007.

### *Investment Commitments*

The KKR Funds had signed investment commitments with respect to four private equity investments of approximately $6.1 billion as of March 31, 2007. As of March 31, 2007 the KKR Funds have provided

F-71

guarantees related to signed investment commitments, which would require the payment of up to $705 million in the event that such commitments were withdrawn by the Company without cause.

The general partners of the Traditional Private Equity Funds had unfunded general partner capital commitments to such funds of approximately $390 million as of March 31, 2007.

### Indemnifications

In the normal course of business, the Company and its subsidiaries enter into contracts that contain a variety of representations and warranties and provide general indemnifications. The Company's maximum exposure under these arrangements is unknown as this would involve future claims that may be made against the Company's that have not yet occurred. However, based on experience, the Company expects the risk of material loss to be remote.

### Litigation

The Company is, from time to time, a defendant in legal actions from transactions conducted in the ordinary course of business. Management believes the ultimate liability arising from such actions that existed as of March 31, 2007, if any, will not materially affect the Company's results of operations, liquidity or financial position.

In early 2007, thirteen private equity firms, including the Company, were named as defendants in a purported class action complaint by shareholders in public companies recently acquired by private equity firms. The complaint alleged that the defendant firms engaged in certain cooperative behavior during the bidding process in going-private transactions in violation of antitrust laws and that this purported behavior suppressed the price paid by the private equity firms for the plaintiffs' shares in the acquired companies below that which would otherwise have been paid in the absence of such behavior. The complaint sought treble damages of an unspecified amount. In June 2007, this suit was dismissed by the plaintiffs without prejudice.

In addition, in the ordinary course of business, the Company is and can be both the defendant and the plaintiff in numerous actions with respect to bankruptcy, insolvency and other types of proceedings. Such lawsuits may involve claims that adversely affect the value of certain investments owned by the KKR Funds. Although the ultimate outcome of actions cannot be ascertained with certainty, the Company believes that the resolution of any such actions will not have a material adverse effect on its financial condition, liquidity or results of operations.

As of March 31, 2007 and December 31, 2006, no amounts were accrued relating to threatened or pending litigation.

### Operating Leases

The Company leases office space under non-cancelable lease agreements in New York, Menlo Park, London, Paris, Hong Kong, Tokyo and San Francisco. There are no rent holidays, contingent rent, rent concessions or leasehold improvement incentives associated with any of our property leases. The related lease commitments have not changed materially since December 31, 2006.

F-72

**10. PRO FORMA COMBINED STATEMENT OF FINANCIAL CONDITION**

The Company is contemplating an initial public offering of common units representing limited partner interests of KKR & Co. L.P. In connection with the initial public offering, the Company also plans to consummate a reorganization into a holding partnership structure. As a result of the reorganization our existing Partners' Capital will be reclassified to Non-Controlling Interest. The pro forma consolidated statement of financial condition as of March 31, 2007 gives pro forma effect to this reclassification in the amount of $1,899,789, as if the reorganization had been effected as of March 31, 2007.

The unaudited pro forma combined statement of financial condition is presented for illustrative purposes only and does not purport to represent the Company's combined financial condition had the reorganization been effected on March 31, 2007 or to project the Company's combined financial condition for any future date.

**11. SUBSEQUENT EVENTS**

*Asian Fund*

In 2007, the Asian Fund was formed to make private equity investments in Asia. The fund is expected to hold its final closing in the third quarter of 2007 with an aggregate of $4.0 billion of capital commitments from fund investors, including a $100 million commitment from the fund's general partner. The investment period for the fund will commence on the date of the fund's first investment and will remain open for a period of up to six years, unless terminated earlier in accordance with the fund's governance documents.

*Investments*

During 2007, the KKR Funds made private equity investments in an aggregate amount of approximately $1.5 billion. Individually, none of these investments exceeded 5% of the net assets of consolidated private equity investments.

*Investment Commitments*

Since March 31, 2007, the KKR Traditional Private Equity Funds committed to approximately $7.7 billion in seven private equity investments.

During 2007, the KKR Funds have provided guarantees related to signed investment commitments which would require the payment of up to $977 million in the event that such commitments were withdrawn by the Company without cause.

*Secured Financing Transaction*

During May 2007, a subsidiary of the Company was dissolved and its underlying net assets were redeemed at fair value and transferred to a special-purpose entity. KFN is the primary beneficiary of this special-purpose entity and, accordingly, will consolidate its assets and liabilities. These assets and liabilities were previously consolidated by the Company. As of March 31, 2007 and December 31, 2006, these assets were $1.5 billion and $1.0 billion, respectively, and borrowings under warehouse facilities as of March 31, 2007 and December 31, 2006, were $1.3 billion and $0.9 billion, respectively.

F-73

**APPENDIX A**
**FORM OF AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

A-1

Through and including                , 2007 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.



**Common Units
Representing Limited Partner Interests**

---

**PRELIMINARY PROSPECTUS**

---

# Morgan Stanley

# Citi

**, 2007**

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

**ITEM 13.   OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION.**

The following table sets forth the expenses payable by the Registrant in connection with the issuance and distribution of the common units being registered hereby. All of such expenses are estimates, other than the filing and listing fees payable to the Securities and Exchange Commission, the New York Stock Exchange and the National Association of Securities Dealers, Inc.

| | |
|---|---:|
| Filing Fee—Securities and Exchange Commission | $    38,375 |
| Listing Fee—New York Stock Exchange | 250,000 |
| Fee—National Association of Securities Dealers | 75,500 |
| Fees and Expenses of Counsel | * |
| Printing Expenses | * |
| Fees and Expenses of Accountants | * |
| Blue Sky Fees and Expenses | * |
| Transfer Agent Fees and Expenses | * |
| Miscellaneous Expenses | * |
| Total | $          * |

*      To be provided by amendment.

**ITEM 14.   INDEMNIFICATION OF DIRECTORS AND OFFICERS.**

Subject to any terms, conditions or restrictions set forth in the applicable partnership agreement, Section 17-108 of the Delaware Limited Partnership Act empowers a Delaware limited partnership to indemnify and hold harmless any partner or other persons from and against all claims and demands whatsoever. The section of the prospectus entitled "Description of Our Partnership Agreement—Indemnification" discloses that we will generally indemnify our Managing Partner and the officers, directors and affiliates of our Managing Partner, to the fullest extent permitted by law, against all losses, claims, damages or similar events and is incorporated by reference herein.

We currently maintain liability insurance for our directors and officers. In connection with this offering, we will obtain additional liability insurance for our directors and officers. Such insurance would be available to our directors and officers in accordance with its terms.

Reference is also made to the Underwriting Agreement to be filed as an exhibit to this registration statement pursuant to which we and our Managing Partner will agree to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended, and to contribute to payments that may be required to be made in respect of such liabilities and pursuant to which the underwriters will agree to indemnify the officers, directors and controlling persons of our Managing Partner against certain liabilities, including liabilities under the Securities Act of 1933, as amended, and to contribute to payments that may be required to be made in respect of such liabilities.

**ITEM 15.   RECENT SALES OF UNREGISTERED SECURITIES.**

None.

II-1

## ITEM 16.    EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

### *Exhibit Index*

1.1     Underwriting Agreement*

3.1     Certificate of Limited Partnership of the Registrant**

3.2     Form of Amended and Restated Limited Partnership Agreement of the Registrant*

3.3     Certificate of Formation of the Managing Partner of the Registrant**

3.4     Form of Amended and Restated Limited Liability Company Agreement of the Managing
        Partner of the Registrant*

5.1     Opinion of Simpson Thacher & Bartlett LLP*

8.1     Opinion of Simpson Thacher & Bartlett LLP regarding certain tax matters*

10.1    Form of Amended and Restated Limited Partnership Agreement of KKR Management
        Holdings L.P.*

10.2    Form of Amended and Restated Limited Partnership Agreement of KKR Fund Holdings
        L.P.*

10.3    Form of Tax Receivable Agreement*

10.4    Form of Exchange Agreement*

10.5    Form of Registration Rights Agreement*

10.6    Form of 2007 Equity Incentive Plan*

21.1    Subsidiaries of the Registrant*

23.1    Consent of Deloitte & Touche LLP

23.2    Consent of Simpson Thacher & Bartlett LLP (included as part of Exhibit 5.1)*

24.1    Power of Attorney**

99.1    Consent of Duff & Phelps, LLC*

\*       To be filed by amendment.

\*\*      Previously filed.

II-2

**ITEM 17.   UNDERTAKINGS**

(a)   The undersigned Registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreements certificates in such denominations and registered in such names as required by the underwriter to permit prompt delivery to each purchaser.

(b)   The undersigned Registrant hereby undertakes that:

    (1)   For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

    (2)   For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(c)   Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act of 1933 and will be governed by the final adjudication of such issue.

<center>II-3</center>

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in New York, New York, on the 10th day of August, 2007.

KKR & Co. L.P.

By:     KKR Management LLC
       Its General Partner

By:     /s/  WILLIAM J. JANETSCHEK

Name:   William J. Janetschek
Title:    Chief Financial Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities indicated on the 10th day of August, 2007.

| Signature | Title |
| --- | --- |
| * <br> Henry R. Kravis | Co-Chairman and Co-Chief Executive Officer <br> (principal executive officer) <br> of KKR Management LLC |
| * <br> George R. Roberts | Co-Chairman and Co-Chief Executive Officer <br> (principal executive officer) <br> of KKR Management LLC |
| /s/  WILLIAM J. JANETSCHEK <br> William J. Janetschek | Chief Financial Officer <br> (principal financial and accounting officer) <br> of KKR Management LLC |

*By:   /s/  WILLIAM J. JANETSCHEK

Name:   William J. Janetschek
Title:   Attorney-in-fact

II-4

QuickLinks

TABLE OF CONTENTS
CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS
MARKET AND INDUSTRY DATA
SUMMARY
Our Company
Our Investment Approach
Private Equity
Credit
New Business Initiatives
Our Values
Our Strengths
Our Growth Strategy
Investment Risks
Cautionary Note Regarding Historical Fund Performance
Our Common Units Are Not Intended for Investors with a Short-Term Focus
Organizational Structure
Reorganization Transactions
Distributions to Existing Owners and Unitholders
Exchange Agreement
Tax Receivable Agreement
About KKR Holdings
The Offering
Summary Historical Financial Data
Summary Pro Forma Financial Data
RISK FACTORS
USE OF PROCEEDS
DISTRIBUTION POLICY
CAPITALIZATION
DILUTION
ORGANIZATIONAL STRUCTURE
UNAUDITED PRO FORMA FINANCIAL INFORMATION
Unaudited Pro Forma Condensed Statement of Financial Condition As of March 31, 2007
Unaudited Pro Forma Condensed Consolidated Statement of Income Year Ended December 31, 2006
Unaudited Pro Forma Condensed Consolidated Statement of Income Three Months Ended March 31, 2007
Notes to Unaudited Pro Forma Condensed Financial Information
SELECTED HISTORICAL FINANCIAL AND OTHER DATA
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
PRIVATE EQUITY VALUATIONS AND RELATED DATA
INDUSTRY
Private Equity and Public Market Returns As of December 31, 2006
BUSINESS
Our Strengths
Our Growth Strategy
MANAGEMENT
Summary Compensation Table
SECURITY OWNERSHIP
CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS
CONFLICTS OF INTEREST AND FIDUCIARY RESPONSIBILITIES
DESCRIPTION OF OUR COMMON UNITS
DESCRIPTION OF OUR LIMITED PARTNERSHIP AGREEMENT
COMMON UNITS ELIGIBLE FOR FUTURE SALE
MATERIAL U.S. FEDERAL TAX CONSIDERATIONS
UNDERWRITING
LEGAL MATTERS
EXPERTS
WHERE YOU CAN FIND MORE INFORMATION
INDEX TO FINANCIAL STATEMENTS

Report of Independent Registered Public Accounting Firm
KKR & CO. L.P. Statement of Financial Condition as of June 29, 2007
Notes to Statement of Financial Condition
Report of Independent Registered Public Accounting Firm
KKR MANAGEMENT LLC Statement of Financial Condition as of June 29, 2007
Notes to Statement of Financial Condition
Report of Independent Registered Public Accounting Firm
KKR GROUP Combined Statements of Financial Condition As of December 31, 2006 and 2005 (Dollars in Thousands)
KKR GROUP Combined Statements of Income For the Years Ended December 31, 2006, 2005 and 2004 (Dollars in Thousands)
KKR GROUP Combined Statements of Changes in Partners' Capital For the Years Ended December 31, 2006, 2005 and 2004 (Dollars in Thousands)
KKR GROUP Combined Statements of Cash Flows For the Years Ended December 31, 2006, 2005 and 2004 (Dollars in Thousands)
KKR GROUP Notes to Combined Financial Statements (All Dollars Are in Thousands Except Where Otherwise Noted)
KKR GROUP Combined Statements of Financial Condition (Unaudited) As of March 31, 2007 and 2006 (Dollars in Thousands)
KKR GROUP Combined Statements of Income (Unaudited) For the Three Months Ended March 31, 2007 and 2006 (Dollars in Thousands)
KKR GROUP Combined Statements of Changes in Partners' Capital (Unaudited) For the Three Months Ended March 31, 2007 (Dollars in Thousands)
KKR GROUP Combined Statements of Cash Flows (Unaudited) For the Three Months Ended March 31, 2007 and 2006 (Dollars in Thousands)
KKR GROUP Notes to Condensed Combined Financial Statements (Unaudited) (All Dollars Are in Thousands Except Where Otherwise Noted)
APPENDIX A FORM OF AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT
PART II INFORMATION NOT REQUIRED IN PROSPECTUS
SIGNATURES

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the use in this Registration Statement of KKR & Co. L.P. on Form S-1 of:

Our report dated July 3, 2007 relating to the combined financial statements of the KKR Group as of December 31, 2006, appearing in the Prospectus, which is part of this Registration Statement.

Our report dated July 3, 2007 relating to the statement of financial condition of KKR & Co. L.P. as of June 29, 2007, appearing in the Prospectus, which is part of this Registration Statement.

Our report dated July 3, 2007 relating to the statement of financial condition of KKR Management LLC as of June 29, 2007, appearing in the Prospectus, which is part of this Registration Statement.

We also consent to the reference to us under the heading "Experts" in such Prospectus.

/s/ Deloitte & Touche LLP

New York, New York
August 10, 2007

QuickLinks

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**KKR PRIVATE EQUITY INVESTORS EARNINGS CONFERENCE CALL (Q2 2007)**
**WED, AUG 15, 2007, 12:30 PM EASTERN**

Operator:  Good afternoon ladies and gentlemen and thank you for standing by.  Welcome to today's KKR Private Equity Investors Second Quarter 2007 Conference Call at this time all participants are in a listen only mode.  Following presentation we will conduct a question and answer session.  Instructions will be provided at that time for you to queue up your question.  And as a reminder, today's conference is being recorded.  And I would like to turn the conference over to Ms. Kate Becker.  Please go ahead.

Kate Becker:  Thank you operator and welcome everyone to KKR Private Equity Investors Second Quarter 2007 Conference Call to discuss the results for the period ending June 30th 2007.  I am Kate Becker the Investor Relations Manager for KPE.  Before we begin we would like to remind everyone that the prepared remarks contain forward looking statements regarding future events and the future performance of the company and its representatives may make additional forward looking statements in response to your questions.  These statement do not guarantee future events or performance therefore undue reliance should not be placed upon them.  We refer all of you to the KKR Private Equity Investors Website, which can be found at www.kkrpiw.com, for KPE's Annual Report, Interim Financial Report and other information.  KPE assumes no obligation to revise any forward-looking remarks that may be made in today's release or call.  With that I would like to turn the call over to George Roberts.

George Roberts:  O.k.  Thank you Kate.  Good afternoon and good evening and welcome to KKR Private Equity Conference Call to discuss our results for the Second Quarter in the June 30th 2007.  My name is George Roberts.  I am a co-founder of KKR and co-chairman of the Board of Directors of KPE's general partners.  I'm joined today by chief financial officer of KPE's general partners Kendra _____, KKR member Scott _____, KKR managing director Gregg _____, and KKR CFO Bill _____.  On today's call I will give you my views on the private equity environment and to discuss our strong group at _____ and update you on the progress of our investments.  Kendra will then take you through the quarter in more detail.  I want to start with the market environment.  As you know corporate credit spreads began to widen significantly in June and continued to widen in July and August.  The current supply and demand of balance for buy-out debt concerns the impact of the sub-prime mortgage sector on the economy and other factors have created volatility and uncertainty in the credit and the equity markets.  Our corporate credit fundamentals are good, default rates are at historical lows, and the overall economy is healthy.  We do think that we are seeing a re-rating of the credit risk to a level more in line with historical credits risk.  In this environment, we think it's important to KPE investors to keep the following in mind: first, we have committed investing for all of the transactions that had been announced and although we cannot give, uh, any guarantees, we expect that all of these transactions will close; secondly, short-term market dislocations have very little impact on the returns of our private equity investments.  Our investment professionals have extensive experience in investing successfully in high and low interest rates, liquid and illiquid credit markets and periods of economic expansion and recession.  Our consistent and disciplined approach to value creation has allowed our investments to prosper during periods where economic and financial _____ were strong including the dramatic market declines in 81, 87, East Asian currency prices of 97 and the Russian financial crisis in the fall of long-term credit capital management in 1998 among others.

I'd like to elaborate a little bit on these points. When a KPE portfolio investment is made, the price paid is based on the long-term financing locked down at the time of the transaction. With an appropriate capital structure in place, the real work of creating value over an average of five years investment horizon begins. This value principally derives from a proven portfolios companies operations in such areas as manufacturing, purchasing and marketing and sales. To help these companies make these improvements, a wide-range of resources is deployed, including our industry teams, our dedicated capital, uh, consulting team – Capstone and the KKR Transaction team with management – to create a hundred day plan designated to optimize the organizational structure benchmarked against a set of established _____ and implement tracking procedures that quantify operational improvements. Thus leverage presides/provides some of the level or returns. But _____ in KPE portfolio companies is a potential driver of value creation not leverage. We do not model multiple expansions into return expectations. In fact, in the last several eight/announced deals, multiple contraction, not expansion, was built in the return expectations. Because we realized the credit conditions and purchase multiples were likely to change. A great advantage in an appropriately financed controlled position is that investment can be exited at the appropriate time when the work has been done. Let me now turn to a brief overview of KK's recent performance. I am pleased to report that KPE has put all of its capital work as of August 10th 2007 and investments total 4.9 billion and commitments to announce transactions total another 1.4 billion for a total actual _____ investments of 6.3 billion dollars. As we have frequently mentioned, KPE has pursued an over committed strategy and managed to _____ in a funding our commitments KPE has _____ to 1 billion filing credit with a syndicate of financial institutions in June of this year. KPE has invested in extremely high caliber companies—that's the last quarter. You have read the press releases and know the names, but it's worth spending a minute reflecting on the quality of these organizations. _____ General, a Fortune 500 retailer with extremely long reach, 8,000 plus stores and growing. Buy _____ a leading international designer and manufacturer of reconstructive, uh, products. Alliance Boots, Europe's leading pharmacy, health and beauty aids group. U.S. Food Service, a leading distributor of food, uh, to restaurants, hospitals and schools throughout the country. _____ Education an accredited provider of higher education--240 thousand students in fifteen countries. KPE's pipe line is a equally strong names. Solid franchise investments are lined-up as first data which provides a commerce of payment solutions to businesses around the globe. Harmon, a leading manufacturer of electronic products and TXU the largest non-regulated, um, retail electricity provider in Texas and also a provider of regulated energy transmission as well as distribution and co-generation. KPE's transaction in _____ technical support is worth _____. It is not only a terrific investment, but one that really underscores the flexibility inherent in KPE's business model and the unique way in which KPE is definitely able to access and benefit from deals. This investment source, this KPE only deal in _____ connections to _____ capital, private investment firm run by KKR Partners. KRKPE in _____ to 70% of Air Canada's maintenance and repair business and have already created a solid plan for expanding the business beyond the Canadian border to capture the almost 18 billion dollar market for aircraft maintenance service for North and South America. Let's turn for a moment back to KPE's numbers, KPE's _____ per unit was $25.12 as of June 30, 2007, that's our initial offering last year KPE's annualized returns has risen from 4.5% in the first quarter of operation to 11.6 % for the quarter June 30th. What is impressive about the second quarters, uh, returns, is that on average 25% of KPE's assets were held in cash and 25% of the private equity investments were held in cost. In other words, 11.6%

return for the Quarter was driven primarily by only 50% of KPE's assets. The continuing increase of KPE's NAV is a reflection of a growing portfolio of private equity and opportunistic investments. Some of KPE's investments and earlier private equity funds have started to mature with positive increases in valuation. This increase has a direct impact on the composition of NAV, but NAV grow in lock step with investment growth. While NAV can and does, of course, benefit from a realization of the portfolio, there's not have to be a realization to recognize that an increase of the value of a portfolio Company. We are very optimistic about the world class companies that KPE has investments in and has agreed to purchase and the potential to create value in these businesses. Now I going to turn the call over to Kendra _____ who will discuss our investments and financial results in more detail.

Kendra _____: Thank you George. Since the first quarter, we have continued our strong pace of investing activity. As of June 30th 2007, we had a total of 3.9 billion dollars, _____ related financing invested in private equity and opportunistic investments. Since June 30th we have invested another 900 million for a total of 4.8 billion dollars to date. As George discussed, we also have commitments on identified transactions for 1.4 billion dollars. That results in total actual in identified investments of approximately 6.2 billion. We follow an over-commitment strategy to dynamically manage investment levels so as to maximize the capital of work at any given time. It takes place over a period of years, as commitments to investments funds are drawn and returned. Because there may be instances where commitments exceeds cash available for immediate investments, the investment partnerships times investments and manages cash to fund capital commitments when capital calls are made as well as monetized investments to raise cash when the situation warrants. Thus we take expected cash flows from investments in revolver capacity into account when planning cash management activities to ensure that the investment partnership can honor its commitments to funds when they become due. For the quarter ended June 30th, KPE's net assets from operations increased by 150 million dollars. This increase was the result of 127 million in realized and unrealized gains primarily from net higher valuations of certain portfolio companies and opportunistic investments. In 23 million dollars of net investment income for the sixth months ended June 30th net assets increased by 307 million. The increase of NAV during the first half of 2007 resulted from 259 million dollars in realized and unrealized gains again, primarily from appreciation in underlying portfolio companies and opportunistic investments and 48 million dollars of net investment income. Since our commencement of operations, NAV has grown by 551 million dollars grossed of distributions of 39 million. On a per unit basis as of June 30th 2007, KPE's NAV was $26.12 per unit. After deducting the 19¢ per unit distribution paid on December 15th of last year. That is compared to $23.61 cents on May 10, 2006 on a pro forma basis as if the over allotment option was exercised on such date. Our annualized returns were 11.6 and 12.3 percent for the quarter in six months ended June 30th, 2007, respectively. As a reminder, KPE invests its capital as the sole limited partner of KKRPPI and _____ Investments LP, which we refer to as the investment partnership. As of June 30th, 2007 the investment partnership held 1.4 billion dollars of temporary investments. The 4 billion dollar portfolio of private equity and opportunistic investment and that of related financing included the following as of June 30th. Our investments at fair value through KKR's private equity funds were 934 million dollars. During the quarter, KPE acquired an additional secondary investment in KKR's Millennium Fund 83 million. Our co-investments in portfolio companies KKR's private equity fund at fair value totaled 1.6 billion dollars including investments in Alliance Foods, PathMark Financial, HCA, _____, The Nielsen Company, NFP, _____, and Pro Seasons. Since June

30th, we contributed a further 1.4 billion dollars in net capital at cost to KKRs private equity fund and certain co-investments. These included contributions to three prior KKR private equity funds as well as to the new KKR Asian Fund and co-investments in Dollar General, Alliance Foods, Biomet and U.S. Food Service. As of June 30th, we also held negotiated equity investments valued at 493 million dollars net of long-term financing at 350 million. Negotiated equity investments are equity investments in equity or equity-linked securities issued to the investment partnership. As of June 30th, opportunistic investments were valued at 915 million dollars consisting of 193 million in KKR's Strategic Capital Institutional Fund Limited, a KKR sponsored opportunistic credit fund referred to as SCS. 138 million of a fixed income investment and 584 million of publicly traded securities and related derivative transactions. Subsequent to June 30th, over half of this public equity portfolio has been sold. Locking in the prior unrealized gains. Investments held by the investment partnership, excluding temporary investments were well diversified by both geography and industry at the close of the second quarter. Geographically 51% of dollars invested were in North America, 40% in Europe, and 9% in the Asia Pacific region. In terms of industry, our investments span nine distinct industry groups from technology and media telecom to healthcare and consumer products. As of August 10th, 2007, the investment partnership expects to fund an aggregate of approximately 1.4 billion dollars of additional capital with respect to previously announced transactions by KKR's private equity fund. Including related co-investments. These include investments in First Data, Harmon International Industries, and TXU. And also the 113 million dollar negotiated equity investment in Air Canada Technical Services that George referenced earlier. Whether these investments will be consummated depends on the satisfaction or waiver of a number of conditions; some or all of which may not be in the control of KPE, the Investment Partnership or KKR. No assurances can be made as to whether or when, or the actual amounts that which any of these investments will be consummated. In the second quarter, we established a senior secured credit facility with certain lenders for the purpose of providing an additional source of liquidity. The credit facility has a five year term and provides for borrowings of up to 1 billion dollars. KPE has an option to seek an additional 1 billion under the terms of the agreement. After taking into account the subsequent investment activity and pending transactions described above, the Investment Partnership would have remaining undrawn capital commitments the KKR's investment funds of approximately 963 million as of August 10th. This remaining commitment includes the new 285 million dollar commitment to the Asian Fund. Net of the funded amount at August 10th. Finally, based upon estimated taxable income, we have calculated accumulative mid-year tax distribution of 24¢ per common unit. This distribution is payable on or about September 17th, 2007. The unit holders of record, as of the close of business on August 31st, 2007. Thank you all for your attention. Now I would like to open up the call to questions. Patty…

Patty: Thank you. Today's question and answer session will be conducted electronically. If you would like to ask a question, please do so by pressing the star key followed by the digit 1 on your touch tone telephone. If you are using a speakerphone, please make sure your mute button's turned off, delay your signal to reach our equipment. We'll take as many questions as time permits. Once again, please press *1 on you touchtone telephone to ask a question. We'll pause for just a moment to give everyone an opportunity to signal. ***Pause***Our first question today is from Arnold _____ from Merrill Lynch.

Arnold _____: Uh, good afternoon, I have three questions, if I may. My first question would be, um, what expectations do you have in terms of repricing in, um, debt markets in terms

of spreads and, um, what sort of impact may that have, on, on purchase _____ and tax activity going forth and even realization activity?

Answerer: O.k., well that's a good question. I think with respect to the current transactions that, um, um we have closed or have in the process of being closed, uh, we don't anticipate any repricing of, of the debt commitments that we have. We made our investments in these companies based on commitments for major financial institutions, and, um, we made commitments to the boards of directors of those companies and we expect our transactions to close based on the terms we have. With respect to new transactions, um, the market is still open today for business, um, but what has not happened is the stock market, uh, has not fully reflected what has taken place in the credit markets today. Uh, as a result, many of the companies that we track and follow today, um, the stock prices are higher, uh, than potentially when we could pay satisfactory principle, uh, I mean premium, uh, in today's financing world. But, but the markets are open on the right basis for the right companies. In terms of future prices and in terms of access, you know, today, uh, you know, you basically have a lot of chaos in the credit markets. So its very hard for people to get financing. Uh, and, you know, what will happen is that multiples for companies will go down and the exits and in all the cases of all the businesses we bought, we never assumed that we were going to get at or higher multiples than we pay for. We always look at a grid of returns, for different exit multiples and that's really pretty much how me make our investment decisions so... I feel very good about what we own, uh, the prices we paid, the financing. Um with respect to what goes on in the future, you know we've seen this... Uh, I've been doing this now for 40 years and there was a period of time in 1981 when um, the country had 10% unemployment and we had 21% prime rate and we have 14% on most long bond rate and you could still get transactions done, and quite frankly that was some of the best we ever did. So, um, you know, I think that life will go on. Um, markets will adjust themselves. Um, to the current environment that we're in. We've just come off a period of, of, um major _____ market for corporate credit um, that's subsiding a little bit and things will get adjusted appropriately, as they always do.

??: Okay, thank you. Another question, could you please run me through how you've marked your markets at Capmark and Orien Corp.?

??: Ah, do we have Scott or Craig on the call?

??: [inaudible] Do you want to run through the Capmark?

??: Sure. On Capmark it's really no different from the process that we've described before which is again, its starts with the deal team, they look at the particular company, they look at the fundamentals of it. They look at operational improvements that's been generated or not within the specific portfolio company come up with a valuation, again, taking all factors into account, sometimes there's actually been an evaluation done in order, recently, in order to value employees' stock options, for example, and I'm talking generally right now. Then, from that stage it goes through a couple layers of review within KKR by a group of senior partners where adjustments may be made further in the valuations and then finally, again, we have the process that _____ felt comes in and gives up an opinion that the valuation is not unreasonable. So in the case of Capmark, I think you probably remember _____ that in the first quarter we moved it up to 110% of cost and in this quarter we've moved it up to 150% of cost, so we added

an additional turn of 0.4 during the quarter. And that was, I think, really just based again on the positive changes that have been made operationally within Capmark.

_____: Yeah, those were primarily due to the get income increase that we saw on the business relative to budget.

_____: . . . and this is _____ on the book values grown since closing so it's reflective of that as well in the finance company.

_____: And then on Orrico[sp?] that is a convertible secured and it had a mechanism in the security which basically was a ratchet, which _____ the conversion price to adjust for the recent decline in Orrico that you see in the market and so what we did do there _____ take three investment banks and ask for an independent valuation on the security on took the average of that valuation but as of June 30, the conversion price was able to be ratcheted down because of the mechanism that we built into the initial investment.

_____: And, we also in that case _____ also looked, gave us, I'm sorry, that our valuation was not an unreasonable opinion with respect to our valuation of Orrico and that is, as Craig mentioned since it is a convertible, it's convertible preferred stock. We do value that like a derivative and so it is a simulation model that we use and, as Craig mentioned, there is a lot of downside protection in the way that that particular investment is structured.

_____: Okay, but, the ratchet now is . . . are there further possibilities to ratchet down further, or is the conversion price now fixed and what is our conversion price here if you disclose it?

_____: As of June 30, there was still room in the ratchet as we've seen since the June 30 stock prices continue to fall and we're now approaching that 0.4, or in or around that 0.4 now, no?

_____: So . . . okay . . . so there's no more further ratcheting down now?

_____: There is . . . there will be after June 30, but by the time we do our next ratchet, it's going to really skinny down with additional room.

_____: Alright, thank you.

_____: We'll go next to Ian _____ from UBS.

Ian _____: Hello there. I have a couple of questions. Firstly, on the revaluation of the companies in the portfolio I see a negative that appears to be about $65 million which is 100% leveraged, um, the increase in value that more than offset _____ _____ _____ reverts the fairly broadly spread or was it a small number of investments that should have been increased and then the second question is really on the discounted, no doubt you're, at this point you're in Australia with the discount that's corrected, um, despite the _____ to the first year, um, do you have any thoughts on enhancing shareholder value such as a unit buy back program?

_____: Why don't I take the second question, Kendra and you and Craig and Scott take the first question. With respect to unit back buys and ways of enhancing shareholder value we look at this all the time, we will continue to look at it and yes, we are disappointed about the discount

to _____, but we told investors when we raised this capital that it was going to take eighteen months to deploy it all. We've been able to do that sooner and we've been able to invest in the kind of businesses today that are world class quality companies and we continue to work very hard on increasing value in those businesses through good and bad times. That's what our job is and we feel that eventually those results will come through and, you know, the discount will go away. All we can really do is control our job which is to find good investments and work our tails off to make sure that those investments turn out in a very positive way for all of us. Kendra, why don't you all go through the details of the first question.

Kendra: Sure. Thank you for your question, Ian. With respect to the quarter, as you pointed out, yes, we did recognize a decrease in valuation of Sun during the quarter and as, you know that also is a convertible, that's a convertible note into potentially into common stock. So, we were expecting that there would be some volatility in that particular investment and that is what we have seen recently, um, the other changes that we've had in the portfolio include the Capmark adjustments that we discussed, which was approximately $54 million increased during the quarter. We also had increases in our opportunistic portfolio primarily in our public equity sector of a little shy of $60 million. And then, finally, we had about $70 million of appreciation within the private equity funds. And that was primarily driven again from the more mature funds. The investments that we bought through secondary interests in both the European funds and the millennium funds and that is spread across a number of different investments although Capmark is in the millennium fund, and so that was part of that increase.

This is Bill Janicek, with regard to the millennium fund Capmark increase was a small part of the $70 million increase with regard to the private equity positions that we had in both the European fund and millennium fund. I would say if you took a look at the underlying investments, they were probably close to 15 increases in value of the underlying portfolio investments, so it was well diversed.

Craig: Just on Sun, one other thing to add is, as we mentioned, we made the investment this is a company with say with a lot of cash on the balance sheet today, with a lot of downside protection in the convertible structure and that's what the convertible, we think has allowed us to contain that downside protection with the stock price volatility and then with today's increase in volatility in the equity markets _____ actually increases in value because of the implied volatility in instrument, so I think we, again, feel very comfortable with that structure.

_____: Basically, the way we looked at this, it was an investment with very, very, very small amount of downside and with an option on the improving results of a good company.

_____: Thank you very much.

_____: And we will pick a question from Chris Brown, from K_____.

Chris Brown: Hi there, yes, just a quick question about currency impact. Obviously, the euro is strong and still _____ the quarter, um, just wanted to know what magnitude that was?

_____: Chris, I did have a little bit of a hard time hearing you, but, are you asking about kind of our foreign currency exposure?

Chris Brown: Yeah, I just, um, you said that you _____, you had 40% in Europe, um, the euro's been strong _____ the reporting period, so I wanted to know what the positive impact _____?

_____: One thing I guess I would clarify is 40% investment in European companies doesn't mean, necessarily that 40% of our investments are exposed to the euro. KPE actually makes the vast majority of its investments in US dollars and some of those within KKR's private equity funds certainly within those companies might have foreign currency exposure and that is managed with, by KKR within those individual private equity funds on a portfolio basis. With respect to the kind of true foreign currency exposure that we have within KPE itself, we have about $1.2 billion of our investments are actually, our co-investments, are denominated in foreign currency and we have forward on most of those investments and so actually are net cumulative foreign currency effect in the financials is currently about $13 million dollars of appreciation. Now, is your . . . so that kind of answers maybe part of the question about . . .

Chris Brown: Yeah, it kind of does.

_____: . . . are you also asking about the euro just with respect to the operating companies?

Chris Brown: It was more with the translation effect really, because, . . .

_____: Okay.

Chris Brown: . . . _____ make it clearer statements how much is the gain that's come from positive currency movements when you translate back into dollars, rather than the underlying, um, so, it sounds like you hedge most of that _____ and therefore it's a very small number.

_____: That's correct.

Chris Brown: Okay, that's the first question. The second question is a more general one really. I just wondered, um, you know, what's IRR _____ would normally be going for and the extent to which you think it might have changed in recent market conditions?

_____: Well I think what we've told people for a long period of time that the _____ rates of return that you can expect over a long period of time. It's over one or two years, or even three year kind of period of time, because you're going to have aberrations or anywhere from 500 to 700 basis points higher than if you took a model of the S&P or the Russell in Nexus. And I would put that over a long period of time. There are going to be periods where returns are quite good, all you have to do is look at what results of our ability in _____ have been, you know those results are quite high. But I think over a long period of time, 500 to 700 basis points over, this is on a net basis after all fees, expenses, _____ interest, everything else. Is it appropriate rate of return of, you know, for this industry.

Chris Brown: Okay, thank you.

_____: And, we'll take a question from Victor Livingston, from Morgan Stanley. We need Victor to resignal, that would be star 1. Next, we'll go to Alex Harbinder(sp?) from _____.

Alex Harbinder:  Hi, this is Alex Harbinder(Sp?) from _____ _____.  A little bit of follow-up on the question regarding returns.  I guess if you lowered your exit multiple grid on the current pending deals and I guess, does that imply lower terms on the current pending deals.  The second question is:  How much pushback have you received from the investment banks that are sitting on billion dollars of paper losses on the pending debt _____?

_____:  Well, let's second the second question first.  I think that with respect to pushbacks from the investment banks, what we have is firm commitments from the investment banks to fund our deals and we've gone out and we've made firm commitments to the boards of directors of major worldwide companies that we've going to buy their company for a price of x.  So we expect . . . we're going to honor our commitments and we expect the investment banks and the commercial banks to honor their commitments as priced.  To the extent that there's things that we can do that are mutually beneficial to both of us with respect to those directors, we will listen.  But barring that, we expect these commitments to all be honored.  With respect to your first question about our return expectations, we priced a lot of this into it when we look at a deal.  We think the investments we've made in the companies that we've outlined today and the ones we've made prior to that are reflective of what the returns for the risk that we would get from a _____ portfolio as we have.  And as you look through the portfolio, there's some companies with higher risk and you might assume they might have a little higher return even with lower multiples and these are with substantial lower risk, you know, that are blended in there too.  So we have, in addition to some good quality names, we have a really well-balanced, diversified portfolio.  Both with respect to businesses and _____ reward.  So, I don't see any of that changing over a period of time.

_____:  Thank you.

_____:  Just a reminder, it is star 1 if you do have a question today.  We will take a question from _____ Sadiki from Springbrook Capital.

_____:  Good afternoon, just wanted to get some more color on the _____ in opportunistic investments there is a $192 million in the strategic capital additional fund and then $130 million in a "fixed income" investment.  On the strategic capital institutional fund, the only description I've found is the companion fund to KKR Financial Corp., which is somewhat disheartening, but I just wanted to understand what are the securities that the fund is currently invested in and then what is the outlook for a _____ liquidity standpoint as well as from a recovery standpoint?  Um, and then, lastly, I want to understand what is the fixed income investment, $138 million and again, what's the outlook for it?

Scott _____:  This is Scott _____.  With respect to the first question on the strategic capital fund.  It invests in corporate debt securities, largely as senior secured _____ loans and some subordinated mezzanine loans.  The fund itself is financed with long-term liabilities, largely through 12 to 14 year COO funding structures.  So there's no issues with respect to capital calls or otherwise it's got a long-term funding base.  So, that's the first question, unfortunately, either the prospects we think are quite good, 'cause frankly the corporate debt mark right now is offering some very attractive investment opportunities.  On the fixed income investment, given the size of the investment, we actually do not disclose what the investment has been made in.  But, suffice it to say, it's a senior secured _____ and a capital structure.

_____: Thank you.

_____: And once again, it's star 1 for questions. We'll pause for a moment. And we have a question from Jeff Nathan, private investor.

Jeff Nathan: Could you tell me after you get fully invested according to the schedule you submitted today following the $2 billion, what do you do next for money if you want to continue growing the company?

_____: Well, if we want to continue to grow the company we need to look at all sorts of financing sources to be able to do that and we also will have, I would hope, over some period of time, some realizations in the investments we had. Capital writ can be deployed, ah, redeployed, as well. So we'll have to do what any other business does. We'll have to generate cash internally and we'll have to look at outside sources of funding, just like any other business does if we want to grow.

Jeff Nathan: Procedures and underlying assumption here that if cost of money goes up that the cost of your investments will go down and then sellers will take a lesser price. Is that an assumption that's built into the model?

_____: As we said earlier, we looked at all sorts of ranges of valuations when we make an investment and one of which is lower exit multiples and that's built into our model, yes.

Jeff Nathan: What are you . . . how would you analyze it, if you didn't grow much in the future beyond the commitments you have and then beyond the $2 billion in loan commitments you talked about, how would the portfolio look going forward just as a more static portfolio or a very slow growth portfolio?

_____: Well, you know, you can do that model as well as we can. But, whatever kind of rates of return you want from the existing portfolio, you'll, you know, figure out what the exit years of gonna be. You'll see the build up in cash that will take place. You'll see the reinvestment of that money and you can pick whatever kind of reinvestment rate you want to put on it. And then you can run your own model and do your own analysis of that.

Jeff Nathan: One other question: Do you see yourself investing, say more in debt, if you saw businesses that needed capital and that was a more attractive route to go than the traditional buying the company?

_____: Of course.

Jeff Nathan: So, you're open to various things in . . . how does this investment relate to your fund raising in your other methodologies of raising private equity fund, how will we play within that structure?

_____: Ah, one of you guys want to take how this . . . the formula works and what we've been doing.

Scott: Sure, sure, this is Scott again. The way it works is that KPE basically has the ability to invest in the funds themselves and so we would anticipate, you know, obviously subject to liquidity over time that KPE will continue to, as it has in the past, invest in KKR's private equity funds and so have access to all of our underlying investments by virtue of an investment in funds and then, obviously there's the co-investment strategy, but the basic answer to your question is we anticipate that KPE will continue to make investments at KKR's private equity funds directly.

Jeff Nathan: So I guess there's an underlying assumptions you'll be able to raise more equity and reduce more debt as you build the business?

Scott: I think there's, sure, there's a underlying assumption we'll have access to capital but I think we should also remember that we do have a mature . . . a portfolio, some of which is relatively mature, by virtue of the secondary investments and, you know, there's gonna be some internally generated liquidity as well as some of those investments are monetized. So that could also fund those commitments.

Jeff Nathan: Okay and I guess, one question that's always been asked is that do you feel that any of your investments were made in the heat of competition and you may have been more aggressive in what you bid for business?

_____: Well, no, I don't feel that way at all. In fact, if you go through the list, many of the investments we made were exclusive. As exclusive to us with maybe one or two with the market test in it. And these were companies that we've know about and been working on for three and four and sometimes longer period of time. We feel very good about the quality of the businesses we've invested in and the risk, the reward in those businesses. You know, we don't do things in the heat of the battle. We tend to be very disciplined investors and what you don't read and you don't see is all the deals we walk away from or we don't participate in or we pull back that others have done as well. So, I don't think you can create a portfolio with the names that we've got in it and the quality of it, you know, if that's how we operate our business. So a lot of this is disclosed _____ so the companies are put out and you know you can read those for yourself, but we're very disciplined investors, we always have been and we don't plan to stop in that.

Kate Becker: This is Kate Becker jumping back in, we're gonna turn the call back over to George for some concluding remarks and the Q&A session as we're out of time.

George: Okay, thank you, Kate, appreciate it. This is George again. I want to thank all of you for participating in our call, for your support and interest in KPE. We continue to be quite pleased with KPE's investments and firmly believe that we are on track to built long-term value for our _____ holders. Thank you again for all your support.

_____: That does conclude today's conference call, thank you for your participation, you may now disconnect.

THE WALL STREET JOURNAL.

*Friday, September 2*

## LEADING THE NEWS

# Harman's Suitors Sour on Buyout

*Will New Discovery Prompt KKR, Goldman to Pull Out Of $8 Billion Agreement?*

**By Dennis K. Berman And Dana Cimilluca**

The private-equity buyers of **Harman International Industries** Inc. are balking at completing the $8 billion purchase of the audio-equipment maker, people familiar with the matter said, as yet another leveraged buyout falls into a hostile tête-à-tête between buyer and seller.

**Kohlberg Kravis Roberts** & Co. and **Goldman Sachs Group** Inc.'s private-equity arm agreed to buy Harman in April, at a time when the private-equity boom was hitting its peak. When striking the deal, KKR's lead partner, Henry Kravis, lauded Harman's "unparalleled portfolio" of brands and the "exceptional vision" of its founder, Dr. Sidney Harman, who built the Washington, D.C., company that produces such audio nameplates as JBL, Harman Kardon and Infinity.

Amid a credit crunch and lackluster financial results from Harman, Mr. Kravis and other investors in the deal have soured on

the transaction, say people familiar with the matter. In particular, says one of these people, the buyers have come across new information that makes them less sanguine about the deal. It is unclear what that information is, however, and whether it could have direct bearing on breaking the deal or would be used to negotiate a lower purchase price.

Harman's shares were down five cents at $112.25 yesterday in 4 p.m. New York Stock Exchange composite trading, a relatively wide spread from the buyers' $120 a-share buyout offer. Some investors have focused on the fact that the company has yet to issue a proxy statement with full details on the proposal five months since its first announcement.

In August, Harman officials said they expected the deal to close in the third or fourth quarter of this year. The company posted revenue that fell short of analyst expectations.

A KKR spokesman declined to comment as did a spokeswoman for Goldman Sachs. Harman representatives didn't return requests for comment.

Breaking a deal presents a delicate reputational, financial and legal quandary for private-equity buyers. These firms tout their reliability to corporate boards, who depend on the buyout firms to fund and close a transaction. Backing out of a trans-

action could give the buyers a stigma when going before new buyout targets.

The issue is even more sensitive for KKR, which earlier this summer filed for an initial public stock offering. KKR said in its filing that part of its success comes from "repeated and consistent dealings with" Wall Street firms that flows from the "completion of a significant number of large transactions."

The Harman agreement contains language known as the "material adverse effect" clause, which declares under what circumstances a buyer can walk away. The Harman language leaves little room for KKR and Goldman, saying they can't walk for events "generally affecting the consumer or professional audio, automotive audio, information, entertainment or infotainment industries, or the economy or the financial, credit or securities markets."

Should KKR and Goldman choose to break the deal, they would have to pay a $225 million termination fee, according to corporate filings. That fee is about 2.86% of the deal's value, which is somewhat lower than other transactions of a similar size, according to an analysis by MergerMetrics.com.

KKR has solicited some of the lending banks to help pay part of that fee, said one person familiar with the matter, but the banks have resisted the effort.

# Why Pump Price May Soon Join Crude's Arc

**By Ana Campoy**

ple of cents to $2.79 in

of the rise in crude-oil


Bloomberg Anywhere | Software Support | Feedback

LOG IN/REGISTER

# Bloomberg.com

**Updated: New York, Sep 22 12:56**
**London, Sep 22 17:56**

**Tokyo**, Sep 23 01:56

Search News | GO

? | Enter Symbol | QUOTE | CHART | NEWS | SYMBOL LOOKUP

Al Hunt Decodes Washington on 'Political Capital': Weeke


COVIDIEN    click here to learn more

■ HOME   ■ NEWS   ■ MARKET DATA   ■ INVESTMENT TOOLS   ■ TV and RADIO   ■ ABOUT BLOOMBERG

## news




**Bloomberg**

0.01 444 K   Most A

- Exclusive
- Worldwide
- Regions
- Markets
- Economy
- Politics
- Industries
- Opinion
- Sports
- Muse
- Spend
- Audio/Video Reports
- Bloomberg Markets Magazine
- Special Report

**RESOURCES**

- Bloomberg TV
- Bloomberg Radio
- Bloomberg Podcasts
- Bloomberg Press

## Cynosure, Evergreen, Sirtris, Sonic, Terra: U.S. Equity Movers

By Lu Wang

Sept. 21 (Bloomberg) -- The following is a list of companies whose shares are having unusual price changes in U.S. exchanges. Stock symbols are in parentheses after company names. Share prices are as of 11:50 a.m. in New York.

3Com Corp. (COMS US) fell the most since Aug. 28, losing 20 cents, or 5.4 percent, to $3.54. The maker of computer-networking equipment forecast earnings excluding some items of as much as 3 cents a share for the fiscal second quarter. The average estimate from analysts in a Bloomberg survey was 4 cents.

ArcelorMittal (MT US) climbed $2.24, or 3.1 percent, to $75.68, the highest since its 1997 initial public offering. The world's biggest steelmaker was rated ``overweight'' in new coverage at Lehman Brothers Holdings Inc. Analyst Dana Guido cites cost savings from the merger of Arcelor and Mittal and growing iron ore production.

Cynosure Inc. (CYNO US) gained the most since December 2005, adding $3.95, or 13 percent, to $35.40. The cosmetics laser company's Smartlipo system may not face competition from a rival product, Sciton Prolipo, until the first quarter of next year, Cowen & Co. analysts Eli Kammerman and Krishna Gurijala wrote in a note to clients. The analysts boosted their earnings forecasts for this year through 2009.

Cytomedix Inc. (GTF US) soared the most since December 1998, rallying $1.40, or more than doubled to $2.57. The U.S. Food and Drug Administration approved its AutoloGel system for treating wounds.

Diana Shipping Inc. (DSX US) gained $1.11, or 4.4 percent, to $26.26. The shipper of commodities such as coal and iron ore was raised to ``outperform'' from ``peer perform'' at Bear Stearns & Co. Analyst G. Scott Burk cited the likely addition of two new Capesize vessels later this year and the ``probability of no more equity offerings near term.''

Evergreen Energy Inc. (EEE US) rose the most since March 30, adding 64 cents, or 13 percent, to $5.56. The coal refiner said it was hired by a unit of

state-owned China Power Investment Corp. to design a plant in that country.

Family Dollar Stores Inc. (FDO US) slid $1.22, or 4.3 percent, to $27.07, the lowest since Aug. 28. The retailer known for selling items priced at $1 or less was cut to ``underweight'' from ``neutral'' by at JPMorgan. Analysts including Charles Grom cited decreasing profit margins, higher energy costs and rising competition from Wal-Mart Stores Inc. (WMT US) and Dollar General Corp. (DG US).

Harman International Industries Inc. (HAR US) slumped the most since March 1997, losing $20.70, or 18 percent, to $91.55. Kohlberg Kravis Roberts & Co. and Goldman Sachs Group Inc. are reluctant to complete their $8 billion buyout of the maker of JBL and Infinity audio equipment, the Wall Street Journal reported, citing people familiar with the matter. Officials of KKR and Goldman Sachs wouldn't comment and Harman representatives didn't return calls, the Journal said.

IHS Inc. (IHS US) gained $4.54, or 8.7 percent, to $56.89, the highest since November 2005. The data provider to oil and gas producers and their bankers boosted its revenue forecast, predicting sales during the current fiscal year will grow as much as 24 percent.

Lululemon Athletica Inc. (LULU US) rose $1.30, or 3.3 percent, to $41.09, the highest since July 25. The Canadian yoga- clothing retailer was recommended by CNBC ``Mad Money'' host Jim Cramer, who said it was a growth stock. The company is appealing beyond its base of yoga enthusiasts, to women generally, and plans to open hundreds of new stores, he said.

Maxygen Inc. (MAXY US) fell the most since May 2000, losing $1.19, or 14 percent, to $7.05. Roche Holding AG (ROG VX), its partner, voluntarily suspended development of an experimental hepatitis treatment following an ``unexpected reduction'' in the effects of the compound, called MAXY-alpha, in a majority of subjects after the second dose, Maxygen said.

Nike Inc. (NKE US) rose 63 cents, or 1.1 percent, to $58.95, the highest since July 23. The world's largest athletic-shoe maker said first-quarter profit jumped 51 percent on higher international sales and a tax gain. Excluding a 20 cent tax benefit, profit beat estimates by 5 cents, according to a Bloomberg survey of analysts.

Optium Corp. (OPTM US) rose the most since October 2006, gaining $1.78, or 25 percent, to $9. The maker of optical gear for communications and cable networks forecast revenue of as much as $35 million in the fiscal first quarter. That exceeded the average estimate of $29 million by analysts in a Bloomberg survey.

Oracle Corp. (ORCL US) gained 89 cents, or 4.2 percent, to $21.93, the highest since February 2001. The world's third- largest software maker reported first-quarter profit that topped some analysts' estimates on higher sales of business-management programs and database products.

Pool Corp. (POOL US) fell the most since August 1999, dropping $3.17, or 11 percent, to $24.92. The distributor of swimming pool supplies lowered its full-year profit estimate to $1.45 to $1.55 a share. The company previously forecast earnings of as much as $1.85.

RTW Inc. (RTWI US) rose the most since April 2002, jumping $3.90, or 48 percent, to $12. The provider of disability insurance to employers agreed to be

Sirtris Pharmaceuticals Inc. (SIRT US) rose $1.43, or 9.9 percent, to $15.93, the highest since its May initial public offering. The biotechnology company focused on diseases of aging said it discovered two enzymes that protect against cell damage.

Sonic Solutions (SNIC US) rose the most since July 2003, climbing $1.58, or 20 percent, to $9.37. The maker of software used to produce videodiscs was boosted to ``buy'' from ``hold'' by Canaccord Adams Inc. analyst Steven Frankel, who said the DVD Copy Control Association's approval on a DVD burning standard may help the company.

Tektronix Inc. (TEK US) fell the most since December, dropping $1.70, or 5.3 percent, to $30.60. The maker of test equipment for electronics manufacturers said that, excluding some items, profit for the fiscal second quarter will be as much as 42 cents a share. That missed the 44-cent average estimate by analysts in a Bloomberg survey.

Terra Industries Inc. (TRA US) rose $2.14, or 7.7 percent, to $30, the highest since July 1983. The fertilizer maker will benefit from higher prices and continued global demand, Merrill Lynch & Co. analyst Don Carson wrote in a note. The analyst boosted his 12-month share-price estimate to $35 from $28.

Transmeta Corp. (TMTA US) fell the most since April 2, losing $1.28, or 17 percent, to $6.27, the lowest since its November 2000 initial public offering. The chipmaker once backed by billionaires George Soros and Paul Allen plans to sell $12.8 million in shares and warrants. More stock may dilute existing shareholders' stakes.

To contact the reporter on this story: Lu Wang in New York at lwang8@bloomberg.net .

*Last Updated: September 21, 2007 12:01 EDT*

News tools    ✉ Email this article    🖨 Printer friendly format
Advertisement: A surprising prediction by Ken Fisher - Get his forecast here!

Sponsored links

**Countrywide® Home Loans**
No Closing Cost++ Refinance Loan. Fast Approvals. Low Payments**.
www.Countrywide.com

**Profit from Gold Stocks**
The Secret Formula for Picking Profitable Gold Stocks. New Report.
www.GoldWorld.com/Gold_Stock_Report

**Gold Bullion Market**
Invest in gold bullion. Get info on Gold Return vs. The Stock Market.
www.BlanchardOnline.com

©2007 BLOOMBERG L.P. ALL RIGHTS RESERVED.

Explore Harman Brands ▼

Explore Product Categories ▼

| HOME | ABOUT US | PRODUCT INFORMATION | INVESTOR INFORMATION | NEWS CENTER | EXPERIENCE HARMAN | SHOP ONLINE |

## PRESS

**CORPORATE NEWS :**

05/15/2008
**Harman International Outsources Global It Infrastructure Services To Wipro Technologies**
Full Story >>

05/06/2008
**Harman International Strengthens Management with Key Executive Appointments**
Full Story >>

05/06/2008
**Harman International Reports Third Quarter Results**
Full Story >>

04/24/2008
**Harman International Industries, Incorporated Announces Quarterly Cash Dividend**
Full Story >>

04/17/2008
**Harman International To Announce Third Quarter Fiscal 2008 Results**
Full Story >>

04/11/2008
**Harman International Completes Accelerated Share Repurchases**
Full Story >>

04/03/2008
**Harman International Outsources Warehousing And Distribution Operations To Ryder**
Full Story >>

02/05/2008
**Harman International Reports Higher Sales For Second Quarter Fiscal Year 2008; Earnings Down On Pnd, Product Mix And Costs**
Full Story >>

01/31/2008
**Harman International Appoints Robert V. Lardon As Vice President, Strategy And Investor Relations**
Full Story >>

01/29/2008
**Harman International Appoints John Stacey As Chief Human Resources Officer**
Full Story >>

01/24/2008
**Harman International To Announce Second Quarter Fiscal 2008 Results**
Full Story >>

01/23/2008
**Harman International Industries, Incorporated Announces Quarterly Cash Dividend**
Full Story >>

09/21/2007

**Harman Comments On Previously Announced Merger**

WASHINGTON, D.C. September 21, 2007 - Harman International Industries, Incorporated (NYSE: HAR) announced that it was informed this afternoon that Kohlberg Kravis Roberts & Co. L.P. (KKR) and GS Capital Partners VI Fund, L.P. (GSCP) no longer intend to complete the previously announced acquisition of Harman by a company formed by investment funds affiliated with or sponsored by KKR and GSCP. KKR and GSCP have informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger. Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement.

Forward Looking Information

This communication contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Those forward looking statements include all statements other than those made solely with respect to historical fact. Numerous risks, uncertainties and other factors may cause actual results to differ materially from those expressed in any forward-looking statements.

These factors include, but are not limited to, (1) the occurrence of any event, change or other circumstance that could give rise to the termination of the merger agreement; (2) the outcome of the discussions relating to the status of the proposed merger; (3) the inability to complete the proposed merger due to the failure to obtain stockholder approval or the failure to satisfy other conditions to the merger; (4) the failure to obtain the necessary financing arrangements set forth in the commitment letter received in connection with the proposed merger, including as a result of the current condition of the debt capital markets; (5) the inability to complete the proposed merger on the terms set forth in the merger agreement; (6) risks that the proposed merger disrupts current plans and operations of Harman and the potential difficulties in employee retention as a result of the merger; (7) the outcome of any legal proceedings that may be instituted by or against Harman and others following the announcement of the merger agreement; and (8) other factors described in Harman's filings with the SEC, including its reports on Forms 10-K, 10-Q and 8-K. Many of the factors that will determine the outcome of the subject matter of this communication are beyond Harman's ability to control or predict. Harman undertakes no obligation to revise or update any forward-looking statements, or to make any other forward-looking statements, whether as a result of new information, future results or otherwise.

Harman International designs, manufactures and markets a wide range of products for the automotive, consumer and professional markets. Its brands include Harman Kardon®, JBL®, Revel®, Mark Levinson®, Infinity®, Lexicon®, Soundcraft-Studer®, AKG®, Becker® and QNX®. The company maintains a strong presence in the Americas, Europe and Asia and employs more than 10,500 people. Harman International Industries, Incorporated (www.harman.com) is a leading manufacturer of high-quality, high-fidelity audio products and electronic systems for the automotive, consumer and professional markets. The company's stock is traded on the New York Stock Exchange under the Symbol: HAR.

**Bloomberg.com**



LOG IN/REGIST

Updated: **New York**, Sep 22 10:01
**London**, Sep 22 15:01

**Tokyo**, Sep 22 23:01

Search News [                    ] GO

? | Enter Symbol [                ]  QUOTE  CHART  NEWS  SYMBOL LOOKUP    Mexico Holds Rate Steady at 7.25 Percent on Signs of Slow

Some think surfing the internet.
We think research.

CREDIT SUISSE
Thinking New Perspectives.

■HOME  ■NEWS  ■MARKET DATA  ■INVESTMENT TOOLS  ■TV and RADIO      ■ABOUT BLOOMBERG

## news

- Exclusive
- Worldwide
- Regions
- Markets
- Economy
- Politics
- Industries
- Opinion
- Sports
- Muse
- Spend
- Audio/Video Reports
- Bloomberg Markets Magazine
- Special Report

**RESOURCES**

- Bloomberg TV
- Bloomberg Radio
- Bloomberg Podcasts
- Bloomberg Press

### Goldman, KKR May Abandon Harman Buyout, People Say (Update3)

By Jason Kelly and Justin Baer

Sept. 21 (Bloomberg) -- Goldman Sachs Group Inc. and Kohlberg Kravis Roberts & Co. may scuttle their pending $8 billion buyout of audio-equipment maker Harman International Industries Inc., two people familiar with the matter said.

Goldman's private-equity arm, and KKR, the buyout firm run by Henry Kravis, may walk away after discovering details about Washington-based Harman that raised concerns about its business, said the people, who declined to be identified because discussions between the firms aren't public. They also declined to say what new information the buyers have found.

Trading in Harman shares was halted at 2:13 p.m. in New York pending an announcement.

The stock plunged 21 percent earlier today, on pace for its biggest one-day drop in a decade, after the Wall Street Journal reported that the sale is in peril. A July decline in demand for high-yield debt and the prospect of a slowing U.S. economy have led private-equity firms and their banks to forsake deals or renegotiate terms more palatable to investors.

When a buyer sees ``a deterioration of earnings, or the industry has shifted, you try to go back to the seller,'' said James Hill, co-chair of the private-equity group at Benesch, Friedlander, Coplan & Aronoff LLP, a Cleveland-based law firm. ``It's a lot easier to do that between when you've executed a letter of intent and when you've signed a purchase agreement, than between when you signed it and the closing.''

Harman spokesman Robert Ryan didn't return two phone calls seeking comment. Officials from KKR and Goldman, which manages the world's second-largest buyout fund, declined to comment. Both firms are based in New York.

Big Board Request

Related Media on Dema

- Hoffmann Intervi



The New York Stock Exchange, citing ``unusual market activity'' in Harman shares, said it ``asked the company if it is aware of any reason why'' the stock is trading as it is ``or whether there are any corporate developments which may explain'' the trading.

``The company stated that its policy is not to comment on unusual market activity or rumors,'' NYSE said in a statement.

Goldman and KKR agreed to purchase Harman in April for $120 a share. The sale agreement would require the buyers to pay the company a so-called break-up fee of $225 million should they refuse to proceed with the transaction.

The agreement, filed with the U.S. Securities and Exchange Commission in April, limits the circumstances in which KKR and Goldman can abandon the deal. The contract rules out a slowdown in the audio industry and the overall economy as permissible excuses, along with missed forecasts that result in a drop in the company's shares.

Locked in Negotiations

Harman, whose brands include JBL, Lexicon and Harman Kardon, fell $24.08 to $88.17 at 2:59 p.m. on the NYSE before the trading halt. The stock opened at $97.70, more than $14 below yesterday's close, after the Journal said KKR and Goldman had ``soured'' on the deal.

Debt investors have balked at buying loans and bonds slated to fund a record $742.2 billion in private-equity deals announced so far this year, arguing the terms of the debt don't adequately compensate them for risks. KKR, founded by Kravis and George Roberts in 1976, is locked in negotiations with investment banks over how to fund other transactions, including its purchase of First Data Corp.

Goldman and KKR have asked the banks that agreed to finance the Harman acquisition to contribute to the break-up fee if they decide to drop the deal, the Journal said.

Harman's first product was an FM radio tuner in 1953. It went public in 1958, the year it began selling the world's first stereo radio receiver. It was founded by Sidney Harman and Bernard Kardon.

To contact the reporters on this story: Jason Kelly in New York at jkelly14@bloomberg.net ; Justin Baer in New York at jbaer1@bloomberg.net .

*Last Updated: September 21, 2007 15:47 EDT*

News tools        Email this article   Printer friendly format

Advertisement: dbFX: Online FX Trading.

Sponsored links

**Countrywide® Home Loans**
No Closing Cost++ Refinance Loan. Ask the Experts at
Countrywide®.
www.Countrywide.com

**Hedge Fund Failures**
We represent investors who lost money in Bear Stearns
hedge funds
BearStearnsHedgeFundLitigation.com

Bloomberg.com   NEWS | MARKET DATA | INVESTMENT TOOLS | TV AND RADIO | ABOUT BLOOMBERG | CAR
LOG IN/REGISTER

©2007 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks | Site Map | Help | Feedback | Advert

Harman International

PRESS RELEASE



September 24, 2007

**FOR IMMEDIATE RELEASE**
Contact:  Robert C. Ryan
Vice President – Treasurer
Harman International Industries, Incorporated
202.393.1101

## HARMAN PROVIDES GUIDANCE FOR FISCAL 2008

### Announces Analyst and Investor Conference Call

WASHINGTON, D.C. – September 24, 2007 – Harman International Industries, Incorporated (NYSE: HAR) is releasing its forecast for the first quarter and for the year ending June 30, 2008. It will hold an investor call on Thursday, September 27, 2007.

"Harman International is a sound company with exceptional market position and strong future prospects.  It is important for investors and our other constituents to be reminded of this, particularly in light of last Friday's decision by our former merger partners," said Dr. Sidney Harman, Executive Chairman.

Dinesh Paliwal, Vice Chairman and Chief Executive Officer said, "In my early days at Harman I am impressed with the Company's technology, customer relationships and talented people. While we have some near-term challenges, this remains a great company and I am committed to do whatever it takes to help us realize our full potential.  To get there, we will be looking critically at each of our divisions, and we expect to accelerate the restructuring of under performing business units."

*Forecast Information*

The Company expects fiscal 2008 performance to be impacted by a number of factors including increased R&D to support the development of several new infotainment platforms and associated launch costs.  We now expect fiscal 2008 sales to reach $4.1 billion ($3.55 billion in 2007). The Company expects operating income and diluted EPS before merger related costs to equal or exceed last year's record performance.  In 2007, operating income was $397 million and diluted EPS were $4.14 adjusted for non-recurring restructuring charges, merger costs and tax items.

For the quarter ending September 30, 2007 we estimate net sales of $950 million, operating profit of $40 million and diluted EPS of  $0.50 before merger-related costs.  As previously disclosed, the fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards.  We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs and begin the launching of new infotainment platforms."

"In light of increases in material costs and faster ramp-up of R&D resources to work on new business awards, equaling the record operating performance of fiscal 2007 is an achievement. The benefits of common platform synergy and scalability will be realized in fiscal 2009 and beyond. Those benefits will strengthen our operating profits," said Paliwal.

### Investor Call on September 27th

At 4:30 p.m. EDT on September 27, 2007, Harman's management will host an analyst and investor conference call to discuss the Company's current expectations for fiscal 2008. A question and answer session will follow. In light of matters disclosed in the Company's September 21, 2007 press release, Harman's management cannot accept questions about the proposed merger with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners VI Fund, L.P. Those who wish to participate in the call should dial (800) 398-9379 (US) or (612) 332-0107 (International), and reference Harman International.

A replay of the call will also be available following the completion of the call at approximately 8:00 p.m. EDT. The replay will be available through October 4, 2007. To listen to the replay, dial (800) 475-6701 (US) or (320) 365-3844 (International), Access Code: 888651.

AT&T will also be web-casting the presentation. The web-cast can be accessed at http://65.197.1.5/att/confcast enter the Conference ID: 888651, then enter the pass code: Harman and click Go. There will also be a link to the web-cast at www.harman.com. Participation through the web-cast will be in listen-only mode.

### General Information

Harman International designs, manufactures and markets a wide range of products for the automotive, consumer and professional markets. Its brands include Harman Kardon®, JBL®, Revel®, Mark Levinson®, Infinity®, Lexicon®, Soundcraft-Studer®, AKG®, Becker® and QNX®. The company maintains a strong presence in the Americas, Europe and Asia and employs more than 10,500 people. Harman International (www.harman.com) is a leading manufacturer of high-quality, high-fidelity audio products and electronic systems for the automotive, consumer and professional markets. The company's stock is traded on the New York Stock Exchange under the Symbol: HAR.

### Non-GAAP Financial Measures

The Company's forecasts for operating profit and diluted earnings per share for the first quarter and full fiscal 2008 year are presented on a non-GAAP, forward-looking basis. The most directly comparable forward-looking GAAP measures are operating profit and diluted earnings per share. The Company is unable to provide a quantitative reconciliation of these forward-looking non-GAAP measures with the comparable forward-looking GAAP measures because it cannot reliably forecast all costs related to the proposed merger with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners VI Fund, L.P. Those costs are difficult to predict and estimate. Please note that these costs could significantly impact Harman's future financial results.

Harman International has provided a reconciliation of fiscal 2007 non-GAAP operating income, diluted EPS and other measures in order to provide stockholders with a better understanding of our fiscal 2007 restructuring charges, merger costs and tax items. These non-GAAP measures are not measurements under accounting principles generally accepted in the United States. These measurements should be considered in addition to, but not as a substitute for, the information contained in our financial statements prepared in accordance with GAAP.

### Forward-Looking Information

Except for historical information contained herein, the matters discussed are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act. One should not place undue reliance on these statements. We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current market conditions, current economic data, expected future developments and other factors that we believe are appropriate under the circumstances. These statements involve risks and uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements, including but not limited to (1) the outcome of any legal proceedings that have or may be instituted by or against Harman and others related to the proposed merger with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners VI Fund, L.P.; (2) the effect of changes in consumer confidence; (3) a change in interest rates affecting consumer spending; (4) automobile industry sales and production rates; (5) the loss of one or more significant customers, including our automotive customers; (6) model-year changeovers and customer acceptance in the automotive industry; (7) our ability to satisfy contract performance criteria; (8) availability of key components for the products we manufacture; (9) customer acceptance of our consumer and professional products; (10) fluctuations in currency exchange rates; (11) the outcome of pending or future litigation and other claims relating to our business, labor disputes at our facilities and those of our customers or common carriers; and (12) general economic conditions and other risks detailed in Harman's Annual Report on Form 10-K for the fiscal year ended June 30, 2007 and other filings made by Harman with the Securities and Exchange Commission.

HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND
RECONCILIATION OF GAAP TO NON-GAAP RESULTS
(000s omitted except per share amounts)
(unaudited)

|  | Year Ended June 30, 2007 | | |
|  | GAAP | Adjustments | Non-GAAP |
|---|---|---|---|
| Net sales | $ 3,551,144 | --- | 3,551,144 |
| Cost of sales | 2,339,938 | --- | 2,339,938 |
| Gross profit | 1,211,206 | --- | 1,211,206 |
| Selling, general and Administrative expenses | 824,819 | (10,879) (a) | 813,940 |
| Operating income | 386,387 | 10,879 | 397,266 |
| Other expenses: | | | |
| Interest expense, net | 1,500 | --- | 1,500 |
| Miscellaneous, net | 2,682 | --- | 2,682 |
| Income before income taxes | 382,205 | 10,879 | 393,084 |
| Income tax expense | 70,186 | 49,413 (b) | 119,599 |
| Minority interest | (1,944) | --- | (1,944) |
| Net income | $   313,963 | (38,534) | 275,429 |
| Basic earnings per share | $     4.81 | (0.59) | 4.22 |
| Diluted earnings per share | $     4.72 | (0.58) | 4.14 |
| Shares outstanding – Basic | 65,310 | 65,310 | 65,310 |
| Shares outstanding – Diluted | 66,449 | 66,449 | 66,449 |

(a) Restructuring charges in the amount of $7.1 million were recorded during fiscal 2007 to increase efficiency in manufacturing and engineering.   Merger costs related to the proposed transaction with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners VI Fund, L.P. were incurred during the fourth quarter in the amount of $3.8 million.

(b) Income tax expense includes $46.7 million of tax items, net, resulting from a recent court decision that allows certain tax payers to recognize foreign tax credits.  The tax effects of the restructuring charges and merger costs were $2.5 million and $0.2 million, respectively.

#   #   #

1 of 1 DOCUMENT

Copyright 2007 Voxant, Inc.
All Rights Reserved.
Copyright 2007 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

September 27, 2007 Thursday

**TRANSCRIPT:** 092707an.718

**LENGTH:** 8589  words

**HEADLINE:** Harman International Industries Guidance Announcement - Final

**BODY:**

OPERATOR: Ladies and gentlemen, thank you very much for standing by. We do appreciate your patience today while the conference assembled, and good afternoon. Welcome to Harman International Industries' analyst and investor conference call. At this point and during management's prepared remarks, we do have all of your phone lines muted or in a listen-only mode. However, later there will be opportunities for your questions. (OPERATOR INSTRUCTIONS).

As a reminder today's call is being recorded. And ladies and gentlemen, if I may have your full attention, please be aware that certain statements made by the Company during this call are forward-looking statements. These statements include the Company's beliefs and expectations as to future events and trends affecting the Company's business and are subject to risks and uncertainties. Persons participating on the call today are advised to review the reports filed by Harman International with the Securities and Exchange Commission regarding these risks and uncertainties. So with that being said, let's get right to this quarter's agenda. Here with our opening locks, it's my personal pleasure to turn it over to Harman International Industries' Founder and Executive Chairman, Dr. Sydney Harman. Good afternoon, doctor, and please go ahead.

SIDNEY HARMAN, EXECUTIVE CHAIRMAN, HARMON INTERNATIONAL INDUSTRIES: Thank you, Brent. Good afternoon. I am Sidney Harman. Joining me today in Washington are Dinesh Paliwal, our Chief Executive; Kevin Brown, our Chief Financial Officer; and Rob Ryan, our Treasurer and Principal Investor Relations Officer. Because we have limited time in which to conduct the conference and because I am certain that there are many questions to be asked, I will keep my introduction brief.

You are, of course, aware of the decision by KKR and Goldman Sachs not to proceed with our previously announced merger. We have stated publicly that we disagree strongly with that decision and the judgment that led to it and that we will be vigorous in pressing our position. With that comment, I have said everything I am free to say about the matter and we will not respond to questions about it on this call. I do hope you understand.

Our performance in the first quarter of the current year and our expectations for the full year have raised a number of questions. Dinesh will deal in detail with both periods, but before he does, I wish to identify a number of significant internal and external events that affected and will affect both periods.

Our CEO transition process was long and difficult. Bernie Girod, who had been my effective colleague for two decades retired, and his initial successor left the company after three months. We learned a great deal from that

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

experience and we were determined to find the right man. That proved a very lengthy process, but we did indeed find him.

Dinesh Paliwal began on July 1, 2007. He has developed a thorough understanding of our business and he has done it at breathtaking speed. As a result of that prolonged process, however, we were effectively without a CEO for the better part of one year.

Coincidence with the CEO succession process, a number of other pressures developed. In our extraordinarily successful Automotive business, we have typically processed one or two major new programs each fiscal year. This year, we are launching seven new programs. The needs and the demands in hiring, training, and integrating hundreds of new engineers have been extraordinary.

Further, as almost all other manufacturing businesses, we have encountered increases in material costs, which placed pressure on margins. During that period, we have built, staffed and opened a new manufacturing facility in the United States and we are ramping up a new plant in China. The startup of those facilities has represented a consequential challenge. The extraordinary time and attention required by senior management to advance and process the KKR/Goldman merger, that entire process with which you are familiar, including the diligence and the negotiations, consumed a significant portion of management's time. The confluence of these events in a six- to eight-month period generated what might be called the perfect storm. Now that storm is over and we are again in full command of our circumstances and our extraordinary future.

Analysts' consensus EPS for the first quarter was approximately $1.00. We now believe it will be approximately $0.50. Over the past two fiscal years, we have not generally provided quarterly guidance and we did not provide first-quarter guidance until the sponsors indicated to us that our results for the fourth quarter and our expectations for the first quarter had been an influence on their judgment. When we learned it, we issued a press release on September 24th containing our best current information for the quarter.

We have always characterized our consumer business as uneven but controllable. We have said and I reaffirm that our professional business is strong and growing and I say now that although we face some real challenges in our OEM business, it is fundamentally sound. We have that $14 billion backlog and our customers are with us. We are building on a strong foundation and we look to the future with renewed confidence. Here is Dinesh Paliwal.

DINESH PALIWAL, CEO, HARMON INTERNATIONAL INDUSTRIES: Thank you, Dr. Harman. Ladies and gentlemen, let me say I have arrived at the Company at a very interesting time. I have spent a large portion of my first three months doing my own learning, my own diligence. As anyone, and this is a good thing, I have found things that need immediate attention and things we should address over time.

First, let me say that I have confirmed the belief that prompted me to accept this position as the Company's CEO and let me say that this is a superb company, possessed of world-class brands, world-class products, world-class innovation, and world-class technology. It is a company of good and dedicated people with splendid customer relations around the world. Just today, I spent 45 minutes with our corporate technology council, a group of about 20 senior scientists and engineers from around the world, led by our Chief Technology Officer, Dr. Geiger. What I heard and saw, what was going on, the dynamics in that meeting, the technology, the new solutions discussed, it absolutely blew my mind and enthused me a great deal.

This Company grew at a truly remarkable pace, as you all know. It made a number of wise, strategic acquisitions and it proceeded to grow them. Over the past six years, the Company has doubled the size; clearly that has put strain on the organization and those strains were aggravated by the absence of a CEO for the better part of a year. The addition of the distractions and stress generated by the demands of the merger transactions itself have been costly. But stress and strain is subject to rapid remedy. And that I believe is the first reason I'm here and that I will get done promptly.

The Company I came from raised business processes to a very high standard and I bring those standards with me.

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

Let me offer some specifics.

We will simplify our manufacturing and engineering footprint. Well before I arrived, Harman management had intended last year to do a restructuring and spoke about a 10 to $15 million onetime charge in the fourth quarter. Management was so occupied with the merger transaction that the plan was not implemented. We will now detail a restructuring to simplify the manufacturing and engineering footprint and a range of internal business processes. While we complete the detail, I expect a onetime charge of 25 to $30 million over the next six months. The plan will, of course, require tough decisions on jobs, real estate, and global footprint optimization. We will present it to the Board of Directors for their approval as promptly as we are able to complete this plan.

Along with footprint simplification, we will act to reconcile a diverse mix of internal processes, spanning such functions such as finance and accounting, human resources services, legal and more. We have now reached a size where significant synergies in these areas are achievable. The real focus will not be just new tools, but a process-driven culture that drives the logic off those tools. The objective will not be just reduced functional costs, but better reporting, greater consistency, and faster communications.

As I have traveled the Harman world, and I have done it, I have identified several other areas where we can sharpen our performance. They include cost control, improved approach to managing risk, and the further expansion of our product offerings to the mid-range markets.

In the area of cost, we must maintain a predictable source of supply for the skills, that's the human skill, and the materials from which we craft our products. I come from an industry where commodities such as aluminum, copper, plastics and electrical steel are purchased in the lots ranging up to thousands of tons. Although most Harman products use some much smaller quantities, the lessons I learned still apply here.

We will become more disciplined in shopping smart. When I say shopping smart, I mean shopping around the world, combining the purchasing power of multiple Harman units into a world-class supply chain that matches our world-class products.

Risk management is another opportunity. Whether we are launching a new product line, taking on a major product project, or refining our global footprint, my approach will be to improve the Company's business processes for identifying potential risks and moving responsibility higher into the organization fast. Harman's global footprint will become a sharp focus in both controlling costs and putting resources close to new and our existing customers.

We are proud of Harman quality. That is implied by our products manufactured in anyplace, be it Germany, Switzerland, and the U.S. or China. But achieving that Harman quality does not mean we must procure every component, service or skill locally. Our value chain must reach across geographic and business boundaries to ensure both reliability and competitive cost. While supporting this value chain, the emerging markets will play a key role in opening new horizons for customer relationships. I have had the privilege to live and work in six countries on four continents and I have a deep respect for the opportunities created as billions of new consumers open their wallets to achieve lifestyle outgrowth. We will seize these opportunities through new consumer and automotive products that improve our volume leverage and through professional products that further extend our dominant position in that area, especially the developing world.

I am encouraged by the support received from many key customers in recent days and it meant a lot to me. We are privileged to serve the leading names in the automotive, retail, and entertainment fields and they have shown their true character in encouraging us to [resolve] the distractions of the past few months and focus on doing what we do best. We will deliver on that commitment.

As I shared with you during our August call, a global network company needs a globally networked team. This week, I completed my second monthly review with Harman's division and functional managers. We took a deep dive into the performance of each area, reviewed our business processes, challenges, and opportunities and defined the

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007 Thursday

ground rules for clear actions and accountability. It is often said that what gets measured gets done right and I have agreed with my senior management team on a set of key measurements that will clearly chart our progress. Living up to the goals embodied in these measurements will be a prerequisite for membership in the team, as will cascading this sense of accountability deeper into the organization.

Many of you were surprised with our guidance earlier this week when compared to first quarter 2007. The year-over-year difference is primarily due to lower gross profit, research and development and SG&A expense, which are higher on a dollar basis. However, both R&D and SG&A are lower on percent of sales basis. They were not as much lower as we had forecasted.

In April 2007, we did offer guidance for 2008. For the full year 2008, gross profit is expected to be lower than anticipated in April 2007. On September 24, we reflected the change in modified guidance. The change is due to higher material prices, and more than expected ramp-up costs for the two new manufacturing plants in China and the U.S. These events might have been forecast better and we are improving the way we model and forecast our growing business.

Ladies and gentlemen, the events of the past few days have been disappointing, but I could not be more proud of the response by our team or more satisfied with my decision to join Harman just three months ago. I have come to a flourishing entrepreneurial Company at a time when it needs further discipline in process and management. I will provide it. I am here to stay and I have taken charge. I have Dr. Harman's and the Board's full support and considerable help. Dr. Harman and I work well and comfortably together.

I thank you for your attention and now I introduce our Chief Financial Officer, Kevin Brown, to you.

KEVIN BROWN, CFO, HARMON INTERNATIONAL INDUSTRIES: Thank you, Dinesh. We provided guidance for the first quarter and the full year '08 in our press release of September 24th. I will provide further detail and I note that we have not yet completed the first quarter, therefore, I am reviewing our estimates. This information is on a non-GAAP basis before transaction-related costs. I will compare these estimates to fiscal year '07 actual results, excluding nonrecurring transaction restructuring and tax items. A reconciliation of the fiscal year '07 GAAP to non-GAAP results was included in our September 24th, 2007 press release, which is available on our website.

First quarter fiscal '08 sales are forecast to be $950 million, an increase of 15% compared to the first quarter of fiscal '07. Gross profit is forecast to be approximately 28% of sales, down about 7 points from the prior year's quarter. Operating expenses are forecast to be $227 million, an increase of $27 million. Operating income is forecast to be $40 million, down from $87 million in the first quarter of fiscal '07. Forecast diluted earnings per share before transaction, legal and restructuring costs of $0.50 are $0.35 below last year's first quarter of $0.85. First-quarter sales are projected to increase in each of our three operating segments compared to the prior year. We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe.

Consumer sales are expected to increase about 25%, supported by new product introductions. We expect professional sales to increase 10% as new products are introduced to the market, incorporating our HiQnet protocol.

As I mentioned, gross profit for the first quarter is forecast to decline about 7 percentage points from 34.8% in the record first quarter of fiscal '07 to 27.9% this quarter. The variance is primarily driven by our Automotive segment. We expect gross profit to decline as we enter the mid infotainment segment and the ramp-up of our PND business. However, the planned decline was exacerbated by higher than expected material costs and, as Dr. Harman mentioned, the launch of new infotainment programs and new manufacturing facilities.

The ramp-up in our facility in Missouri was slower than we had expected because over the course of the quarter, our Automotive customers slowed its 2008 model introductions to clear out unsold 2007 models. We expect this to be resolved during the second quarter. We believe our material costs will improve going forward and our new

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007 Thursday

manufacturing facilities will gain efficiencies as they approach full production. Operating expenses are forecast to be $227 million in the quarter, an increase of $27 million from fiscal '07.

Absolute operating expenses increased in both R&D and other SG&A. Automotive gross R&D is $20 million higher compared to the prior year, reflecting the resources added in the third and fourth quarter of fiscal '07. The additional R&D or engineering bulge we discussed in detail in our January and April earnings calls. It's necessary to support our many new business awards, invest in new areas of technologies such as Driver Assist and to ensure the delivery of the record number of new programs launching in the next several years. We expect these costs to decline over the course of the year.

Excluding R&D, we expect other operating expenses to be higher than last year. In particular, marketing costs will be above the prior year's quarter due to promotions associated with new infotainment system and PND introductions. There have been several recent developments that have tempered our view of fiscal '08. While our sales growth remains strong, several factors will influence our operating performance.

Full-year sales for fiscal '08 are forecast to be $4.1 billion, an increase of 16% compared to $3.5 billion in fiscal '07. We expect each of our three operating segments to produce higher sales than the prior year. Full-year gross profit margin is expected to be 31% of sales, approximately 3 percentage points lower than fiscal '07. Lower gross profit margin is forecasted Automotive, primarily due to new model and plant launch costs and increases in material prices. As Dinesh said, we continue to pursue savings in material costs that we have historically achieved early in a new fiscal year. We will take steps to mitigate the higher costs manufacturers are experiencing, but this will be an ongoing process.

Operating expenses are forecast to be $870 million for the full year fiscal '08. Within operating expenses, we expect R&D costs to improve each quarter but remain high in dollar terms and higher than our record fiscal '07 level. As a percent of sales, we expect R&D costs to decline about 1 percentage point from fiscal '07's record 10% of sales. Total operating expenses including R&D are forecast to increase about $55 million from fiscal '07. On a percent of sales basis operating expenses should decrease about 1.5 points.

Finally, we expect fiscal '08 earnings per share before transaction, legal and restructuring costs to meet or exceed the $4.14 reported for fiscal '07. We will now take your questions.

OPERATOR: Indeed. Well thank you very much gentleman for your time today. (OPERATOR INSTRUCTIONS). Peter Barry, Bear Stearns.

PETER BARRY, ANALYST, BEAR STEARNS: Good morning -- or good afternoon, gentlemen. Sidney or Dinesh, could you speak more specifically to the materials cost reference that you've made several times?

DINESH PALIWAL: We certainly can. Peter, first of all, that's a good question you ask because as our CFO said, every year, we set reasonable targets for material price savings and we achieved those. What we encountered earlier this year, as a two-pronged answer, one is you need to go out and renegotiate and get the pricing, the price reductions from the marketplace. Secondly, you need to put it in the new product which has to be certified and quality tested by your OEM customers. If you miss that, which happens once or twice a year, then you may have a lag. And both of these things are a little bit on the time scale behind and that's what happened to explain what happened in first quarter.

We also said earlier, and Kevin Brown confirmed that we feel very comfortable for our full-year material price savings targets for fiscal 2008.

PETER BARRY: Could you give us an idea, Dinesh, what materials we're talking about?

DINESH PALIWAL: This is actually across the board. It's electronics. It's mechanical components. It's engineering -- all of that.

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

PETER BARRY: Next question. Could you give us an update on both Chrysler and the C Class, please?

DINESH PALIWAL: Yes. We have said in the past that we had two launches. These are the new SOPs and we had two launches going on at that time when we talked to you earlier. And the C Class with Mercedes was supposed to be fully ramped up in fourth quarter of fiscal '07 and for a variety of reasons, it was slowed. It's fully ramped up as we speak in first quarter, and both Mercedes and us, we're happy and we are, in fact, pursuing several new business opportunities with Mercedes as we speak.

Chrysler was another thing which was mentioned by you and here we have some slowdown primarily due to the slow ramp-up by our OEM due to clearing some of their own inventory. And as we speak, it is being ramped up, since we were ready for fully ramped up production, so we had already our fixed overhead and some variable costs associated and that's where we had some material overhead costs, which has reflected in our first quarter.

PETER BARRY: Is it fair to say that new Chrysler management is as enthusiastic about infotainment as that enterprise was under the Daimler banner?

SIDNEY HARMAN: I think I can speak to that. Every bit and more. We have met with them numbers of times in the last numbers of weeks and we have presented to them what we regard as significant new technology, which can inform their new offerings and give them an opportunity to establish leadership, which certainly I am confident they wish to do.

PETER BARRY: So the numbers that we have had in the past, Sidney, are still quite realistic in terms of revenue opportunity at Chrysler?

SIDNEY HARMAN: Yes, I would call them realistic.

PETER BARRY: Just one final for me. I couldn't help but observe that in what is the lowest seasonal quarter for the year historically, the $950 million of revenue expectation is the highest number you've ever achieved. One, is that observation correct? And to what degree did the spillover of C Class revenues influence that number?

DINESH PALIWAL: Kevin?

KEVIN BROWN: Yes, Peter, you are correct that that is a very strong first quarter on the top line for us, reflecting getting fully up the ramp curve on Mercedes C Class but also reflecting the fact that we are bringing additional business on-stream at Chrysler as we ramp up our Missouri plant and in the PND business, where we continue the growth and expansion of that business primarily in Europe.

OPERATOR: David Leiker, Robert W. Baird.

DAVID LEIKER, ANALYST, ROBERT W. BAIRD: Good afternoon, everybody. I just thought I'd clarify a couple of things here first. On the Chrysler, is that volume running at the level you would have expected it to for the vehicles that you are on? Or is that still behind where you expect it to be?

DINESH PALIWAL: It's being ramped up, David. And it's fairly close to the level we expected. As I mentioned, we expected it to ramp up already in early of the first quarter and it's very close to where it should have been.

DAVID LEIKER: Great. And then one of the things that had been floating around here and going back to last Friday is a lot of talk about a lot of different things, but one of them that seemed pretty consistent was some loss of business that either you currently had, that was in your pipeline that you were going after; can you address that at all for us?

DINESH PALIWAL: I certainly will do that. This is very near and ear to me. The relationship with these OEMs and future business we leave off because it was a long-term relationship we have. First of all, let me state firmly there

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

isn't a single loss of business which I know of. As a matter of fact, both Chrysler and Mercedes, particularly Mercedes, since we had a slow ramp-up from our side as I said and I reiterate we're working on several new business opportunities with them and we are progressing very well.

DAVID LEIKER: Okay. And did you look at these issues that Dr. Harman went through initially? It sounds like those issues are mostly behind you in the first quarter and going into the second quarter they certainly are smaller, but are almost gone. Is that fair? I guess the launch (technical difficulty) is probably still an issue.

DINESH PALIWAL: Look, we have to see this picture in totality. We have shared that we had a pretty steep ramp-up of our R&D to handle new awards and several new start of production on new launches. Therefore, we had started the fiscal '08 at fairly high research and development costs and we expect it to come down in absolute as well as in percent of sales. Fiscal '08 should be about 120 basis points lower as a percent of sales when we are all done with it, so that is something we'll have to manage and we feel comfortable.

And secondly, these new plans which Kevin and Dr. Harman mentioned, one in China and one in Missouri, these are being ramped up and we continue to look for efficiency gains (technical difficulty) all ahead of us.

And thirdly, which is a more long-term -- it's not a short-term fiscal '08 issue, the opportunity issue angle, opportunity angle on engineering and manufacturing footprint and something which I'm very high on is low-cost sourcing, be it Mexico, Eastern Europe or Asia, it's the lowest hanging fruit. Without disrupting any business processes or doing anything massive, these are the opportunities which we will go after.

DAVID LEIKER: Okay. And then if you look at the R&D spend six, nine months ago, we talked about an incremental $45 million for the new BMW business, the Mercedes S Class refresh and the Driver Assistant. Is that number still an accurate number or had that changed at all?

KEVIN BROWN: David, the number for the impact on fiscal year '08 that we project at that time of about 46 million is the accurate number and we are working at that and toward that level.

DAVID LEIKER: Okay and then one last thing, Kevin, it's probably most appropriate for you. What do you think the total of these special items are that are going to run through the P&L here in the quarter? Probably just looking for a ballpark number.

KEVIN BROWN: The guidance that we have given excludes onetime special items, especially related to the transaction. My best guess now and we haven't closed the quarter, is that those are about in the neighborhood of $5 million.

DAVID LEIKER: Okay. Thank you very much.

OPERATOR: Chris Ceraso, Credit Suisse.

CHRIS CERASO, ANALYST, CREDIT SUISSE: Thanks. Good afternoon. A few things. First, if we can start on the Chrysler business, if you can just refresh us on your expected timing of which vehicles will be coming on, the revenue buildup as you walk from '08 to '09 to 2010 because if I recall, the program got bigger each year as new vehicles came in and new programs from you started to get up to speed.

SIDNEY HARMAN: Chris, I would say hello to you, while I'm pausing for Kevin, who will respond to that question.

KEVIN BROWN: Chris, let me remind us of the sequence of events on Chrysler. Late in fiscal '07, we launched the high-end navigation product on a select number of vehicles in a fairly slow ramp-up. And the ramp-up of that product continues on a larger number of platforms throughout fiscal '08.

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

We also at the beginning of fiscal '08 now have launched the other product, the second product of the two that we produce for Chrysler, and we will be ramped up on almost all Chrysler platforms by the end of fiscal '08 on those two products. We don't hit our full volume, our full annual sales volume until fiscal '09, and at that time, I expect the full annual sales volume is going to be about $100 million higher than we will experience in '08. So we are on the build. The products are launched now and there's a gradual expansion through the year as the new programs and platforms roll out.

CHRIS CERASO: And once everything is fully ramped up, I just want to make sure I'm thinking about the right numbers here, is this still a program that's worth about 500 million? Is that the right number?

KEVIN BROWN: Yes.

DINESH PALIWAL: It's about right.

CHRIS CERASO: Okay. Next question, and this is -- this goes back over the past few years where you'd maintained that the Automotive business should be able to do a 16% operating margin even as you go down market with customers like Chrysler and some lower-priced vehicles; is that still the right number? Do you still think that you can get the Automotive business back up to a 16% operating margin?

DINESH PALIWAL: Yes, let me explain that. First of all, the answer is yes. And let me explain how our strategy works because this is a question which brings our strategy.

We have talked in the past about [missed] segment market penetration. That's a high-volume business. That's a growth initiative for us and there are too different businesses. One, the premium business which we have been doing is a high contribution margin also produced high operating profit margins. And the mid segment market business would not be at the same relatively high margin contribution margins. At the same time, mid segment infotainment business does not require the same level of high research and development costs as well as SG&A.

Most importantly, mid segment infotainment business leverages the common platforms which we have developed and scalability which we have talked about. So our strategy is and actually it works out the way it has already worked out, even if we have this business as lower contribution margin, with reduced R&D and reduced SG&A, our operating margins will be protected and hopefully even increased. So in net-net, our total portfolio of OEM business, we should be able to and we aspire to maintain or grow the historic high operating profit margins.

CHRIS CERASO: Okay. How long do you think it takes to get back there? Because of my math is right, you could be as low as maybe 7% in the first quarter and I understand there are a lot of headwinds facing you, but you surely won't be there for the full year of '08. Will you be back to 16% by full-year '09?

DINESH PALIWAL: I think I would hesitate to give a forward-looking assessment at this point for '09.

CHRIS CERASO: Okay. Is it fair though at least for '08 to acknowledge that you won't quite be back to that level?

DINESH PALIWAL: We certainly aspire and I can assure you this is where all our energy would be to make an '09 a better year in operating margins as well as in all other areas.

CHRIS CERASO: Okay. Dr. Harman, I'm interested in your comments with regard to what I would see as a potential competitive threat posed by the acquisition of Siemens VDO by Continental, particularly as it relates to the evolving Driver Assist technology.

SIDNEY HARMAN: There will be, Chris, many players in the driver assist field. It is very difficult to assess how any acquisition works out and I would be loathe, particularly now, to offer a view of the other than to say that history suggests that digesting and incorporating an acquisition is generally a good deal more difficult than anticipated.

We have been through this history before. There will undoubtedly be many firms aspiring to a significant role in

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

that world and why the world would they not?

Our scale in the past years has not been so much that we could develop a component or an aspect of the system. Our scale has been in the integration of that work and we have demonstrated time and again that A, it is underestimated by most others and B, we are darn good at it. I expect that to be a distinguishing characteristic in the driver assist area.

CHRIS CERASO: Okay, great, thanks. Thanks, everybody, that's helpful.

OPERATOR: Jeff Kessler, Lehman Brothers.

JEFF KESSLER, ANALYST, LEHMAN BROTHERS: Thank you. Dr. Harman and Dinesh, I'm interested in finding out about, you mentioned the middle market strategy that you are attempting. What are -- what are the opportunities there? And obviously what are some of the hurdles both economic and competitive that you face in developing a middle market strategy for the Automotive business?

DINESH PALIWAL: That's a very good question. It's perhaps two-part question. One is a strategy and one is the comparative situation. Jeff, let me answer the second part first. The good thing is that mid segment doesn't necessarily come from brand-new customers altogether. Mid segment business is part and parcel of some of our well-established proven relationship customers. Those who have the desire to have an infotainment system which is scalable and can answer lower-priced vehicles they are supplying all or will supply in a growing demand. So I think from their point of view it is fundamentally important that they do not have multiple vendors and multiple platforms from the technology obsolesce (sic) point of view and to technology maintenance point of view. It is very much aligned with our goals. I mentioned earlier the scalability and common platforms so I think from that perspective, it puts us in a better position to penetrate mid segment strategy with our existing customers. Which I would not be able to say for some of the competitors if they are already not in the big worlds of established OEM as we are.

Then the first part, you mentioned was related to the strategy. Well several years ago, we came to the conclusion that for our top-line growth, we have to expand our segment penetration and that's where this mid segment, which we have mentioned in the past, the PSA and some of the opportunities, we are doing because that is a fairly large segment of the market not addressed in the past and there is a great need from the consumers to demand infotainment system which addresses almost what five years ago was considered a premium package. So from that perspective, it is good market to go after. However, contribution margins on mid segment strategy growth would not be as high as we have enjoyed at the premium market level. But as I said earlier, reduced R&D and reduced SG&A and taking advantage of our existing common platforms and scalability, we would be able to control that cost to result into margins which we expect at the bottom line and protect our margins at the operating profit level.

JEFF KESSLER: Is there a geographic focus or skew toward this mid market strategy? Is this aimed at the United States or is this basically worldwide? And is it evenly worldwide or is it skewed toward one geographic area?

DINESH PALIWAL: Jeff, I will certainly turn to Dr. Harman but before I do that, my instinct and my knowledge from my past -- previous company because I was also dealing with automotive industry, from robotics side, that instinct tells me it is pretty uniformly distributed in Western world, where the starting base is fairly high. And you would also expect this to grow rapidly in [Brit] companies, the Brazil, the Russia, in China and India. So I will have Dr. Harman to add something to it.

SIDNEY HARMAN: I believe that we have seen that begin among the European makers. We saw it in the Audi awards. We saw it in PSA. So I think the answer to your question is really before us, Jeff, that has already begun first there. There is no question, and here I share Dinesh's view, it will spread through the world.

I remind you that there was a time when infotainment was considered something of a wrinkle, a fad. The question as to whether it had legs was always around a year, two, three years ago. Nobody questions it today. It is widely, universally, it seems to me, accepted as fundamentals of the car. And how well you developed these systems, how well

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

you move into the new opportunities in driver assist and the like, not only consequential to us, but enormously consequential to the automotives. So I think it fair to say it is both self evident and irresistible. It will become fundamental to the full range of automobiles around the world.

DINESH PALIWAL: Thank you, Dr. Harman.

JEFF KESSLER: Thank you and good luck.

OPERATOR: Scot Ciccarelli, RBC Capital.

SCOT CICCARELLI, ANALYST, RBC CAPITAL MARKETS: Good afternoon, guys. A couple of questions. Given the magnitude of the gross margin reductions, can you just maybe quantify or at least order the impact? Because I guess what I'm confused about is you guys source materials all the time. You've put up manufacturing facilities before. You have launched new programs before. I guess I'm just trying to understand why the delta is so large versus what you've experienced before. And it seems to have caught you guys and obviously your previous suitors by surprise. And any more detail on that, that might be helpful for everyone.

DINESH PALIWAL: Scot, first, I would not comment on the suitors but I would say it's not a surprise. We have shared with you that we have launched two brand-new manufacturing plants. We don't start new plants every year and I hope not in future either. We are used to and very experienced in bringing out new startup production via new launches from the existing production lines. And these two new plants, obviously, we anticipated some level of under-absorption and learning curve, which generates some inefficiency and cost. And you heard one in China and one in the United States and we had some under-absorption longer than we expected, and we explained to you partly our OEM customer was not prepared for the full ramp-up and we ended up taking some costs.

Secondly, the material price savings which were planned for first quarter did not flow to the bottom line because there was a time delay.

Thirdly, as a newcomer to the Company, I would say we're going to get a bit more prudent and forward-looking in terms of sharing more commodity price increases with our customer base. More transparency you create the more they have understanding how their customers like Harman International are faring and we would have a better chance to either command slightly higher premium on the sales or we'll be able to pass on some of that, which, in the past we have done but not necessarily every time.

SIDNEY HARMAN: I must add, Scot, that although we are not happy about this, these events are quite familiar in the normal course of business. We will resolve them and move on in the conduct of our work.

SCOT CICCARELLI: Understood. Any commentary regarding early experiences with Chrysler in terms of application rates? Especially given some of the price decreases and technology improvements we've seen from some of the portable markets, obviously people are concerned about the automotive market, consumer spending in general; just in terms of customer appetite to adopt some of your infotainment technology?

SIDNEY HARMAN: I wish we had that information; we simply don't. And I tell you with confidence that we don't have it because it hasn't come to us and that undoubtedly because it is just too early to develop that information.

SCOT CICCARELLI: Okay, understood. And then the last question is, obviously you guys are coming off a significant distraction. Do you guys start to put your thoughts behind some sort of a capitalization change whether it is reimplementing buyback, etc. just to kind of show investors what you guys think about the long-term prospects of the business? Thank you.

SIDNEY HARMAN: The answer is you are darn right.

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

SCOT CICCARELLI: Thank you.

OPERATOR: Jairam Nathan, Banc of America Securities.

JAIRAM NATHAN, ANALYST, BANC OF AMERICA SECURITIES: Thank you. If I kind of think about your 16% Automotive operating margin target, gross margins in the process run in like the 34% range in Automotive, operating expenses in the 20% range. And from all you're saying, I guess the 34% comes down so like -- and I believe that kind of drives the focus on cost. I'm just wondering how should we think about the 20% in operating expenses going forward? Is that where most of the improvement needs to be to get to the 16%? And what are some of the companies that you will be benchmarking when you are trying to reduce costs?

DINESH PALIWAL: Let me try to take a shot at it and our CFO might help me from the historic point of view. First of all, I think you helped me answer. It's not just the below the line and above the line. It is both. In contribution margin where we have material of cost of goods we're going to go try to get more savings by, as I said earlier, by leveraging our volume and leveraging the global sourcing mechanism, which is available to us and we will certainly benchmark well-run efficient automotive companies. Those are the best in the world from my past experience and there are some good benchmarks for that.

Secondly, we've got to have very disciplined execution approach in R&D, engineering and SG&A.

Look when you are doing so well you continue to -- you have the great R&D initiatives going on, we do have good discipline base in terms of [get] model, Gate 1, Gate 2, Gate 3, Gate 4. But in terms of rigors of evaluating follow-up month-to-month, so that we can have it quick and early decisions, where do we slow down and where do we expedite certain programs? That's where the cost efficiencies will come in as well so we will improve both at the contribution margin level as well as at SG&A level so that our operating margins stay healthy at the historic levels or improve.

JAIRAM NATHAN: Next question, again, with the mid segment level, what kind of penetration do you require to get those economies of scale? Currently I guess penetration is kind of running at that low double-digit rate.

DINESH PALIWAL: Look, while my colleagues are looking for it, there is a number to share with you I will certainly do, but fundamentally, we should always remember that mid segment market is not breaking new ground. It is using existing platforms. It is using our scalability, taking advantage of the R&D and engineering we have already done. This is repackaging. As I said, [mid-market] infotainment system is, in my simple words, and I'm still learning, is not much different from what the premier system was five years ago. So by nature, this will not carry the heavy R&D, the heavy SG&A impact so even if it has slightly lower contribution margin, our operating margins will be pretty healthy.

So in terms of scale, you ask me what is the cash flow which we must hit to achieve the savings, I think larger the volume the better off we will be because we're going to be spreading that fixed or rather close to fixed, although it's a variable cost, over a larger volume so that our SG&A would be even lower. Do we have the number, Kevin, in terms of threshold?

KEVIN BROWN: I mean, let me provide you a little bit of context and range on the mid segment vehicles. The penetration rate varies significantly by the type and class of the vehicle in the mid segment and it can range from 10% on a niche car, but the penetration rate can be significantly higher than that, 20, 30% on a family car or a higher contented vehicle, like a minivan, for example. And when you get up to 20 or 30% of the very high volumes that those mass-market cars sell at, you get to extremely -- you get to very high volumes compared to our luxury systems and you get to very high dollar sales that are generated.

DINESH PALIWAL: (multiple speakers) please go ahead.

JAIRAM NATHAN: Sorry, Kevin, just one more question for you on CapEx. Do you have a number for us for '08 or --?

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

KEVIN BROWN: While we're not going to provide specific CapEx guidance at this time, I will tell you directionally where we see CapEx in fiscal '08. CapEx spending for the full year '08 should be less than the 175 million we spent in fiscal '07, as our new Missouri plant is complete now and the spending for many of the new programs that we will be launching is well underway. CapEx for '07, as you will recall, was back-end loaded as we launched the Missouri plant, as we started the new programs. And for similar reasons, we expect fiscal '08 CapEx spending will be front-end loaded, as we spend on the new China plant and the program spending continues. So I think that gives you a pretty good sense of where it's going to go.

JAIRAM NATHAN: Thank you.

SIDNEY HARMAN: Gentlemen, we have almost run out of time and I am therefore going to recognize that Peter Barry and David Leiker have asked to be requeued, and I ask each of you, if you will, Peter, if you will first in that order, to be brief.

OPERATOR: Certainly and thank you, doctor, and Mr. Barry, your line is open.

PETER BARRY: Thank you, Sidney. Sidney, in your opening remarks, you referred to seven new programs to be launched this year. Could you very briefly go through what they are?

DINESH PALIWAL: Yes, I can try to do that. We have talked about that in the past we had typically done one or two SOPs or start of production. In '08, we have an all-time high, a record, seven launches, we will be conducting or actually going about and these are with Chrysler, with Hyundai, [Samyung], Audi, Porsche, BMW and PSA. Peter, does that answer your question?

PETER BARRY: That's certainly seven, Dinesh.

DINESH PALIWAL: Thank you.

PETER BARRY: Let me ask you, you referenced key measuring devices that you would use going forward. But I don't think you developed what they were. Could you provide us with that detail please?

DINESH PALIWAL: You meant the measurement metrics?

PETER BARRY: Yes.

DINESH PALIWAL: Well, you know, there is no new rocket science. The Company has been running rather successfully and they have been managing and they have been following up. What I intend to do is the [rigor], I don't know whether it's a fashionable thing to say, but when the CEO takes time, a whole week of business reviews, operational reviews, capital expenditures spending review, different programs, launch review, whether it's the consumer, whether it's the OEM, gate model review, these are all KPIs in technology, into engineering, into R&D, and also in sales side, what contribution margins are coming in, what are the future forecasts, what are the projections, what the probability are. And then most importantly, what is the up and down side analysis for every business forcing people to think out of the box that there are in business risks we are here to manage. Things do go wrong. Are you thinking proactively? What should go very well too. What are the opportunities to offset if something goes wrong, so irrespective, those are the KPIs I would follow on a monthly basis, in some places on a weekly basis by telephone or others, so that's what I meant.

PETER BARRY: Thank you, Dinesh. Sidney, thank you for the accommodation.

SIDNEY HARMAN: Thank you Peter and David.

OPERATOR: And thank you, very much, Mr. Barry. And yes, here is Mr. Leiker. Please go ahead with your follow-up.

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007
Thursday

DAVID LEIKER: Thank you, Dr. Harman, for the opportunity. I have got two -- I hope simple questions. One is, as you go through the course of the year by quarter and you work through these costs, are you at the point at the end of the fourth quarter that these unusual items that you are working your way through are behind you and you're back to more business as usual going 12 months from now? Or are those costs going to carry over into 2009?

KEVIN BROWN: No, I think by the end of the year, as we discussed, David, we will have worked through the material cost recovery for the most part. We will have worked through the R&D and started to leverage that down and we will be leveraging down our other functional costs, so I think you're back to a more normalized level by the end of the year.

DAVID LEIKER: And as we go through the quarters, is that kind of a linear pace of recovery or is there a steep recovery in the second half versus the first half?

DINESH PALIWAL: I think, here, let me just add, Kevin -- please feel free to comment. As we said, our fiscal '07 was back loaded for R&D as well as capital expenditure because we were ramping up, we were preparing for seven new start of productions. And same is the case for the first half of 2008, where our R&D costs are high and we know why they are high and we have no problem with it. So these will be ramped down so they are not linear in that fashion.

DAVID LEIKER: Okay and then the last item here, is there anything related to whatever course of action you take regarding KKR and Goldman Sachs that would preclude you from stepping in the market and buying stock back today?

DINESH PALIWAL: I will have Dr. Harman answer that.

SIDNEY HARMAN: I will say only that we must respect the agreement which, as I, as far as I know, continues now. If that agreement precludes us from buying stock, we have the option of buying it or seeking relief from that provision and we will do one of those.

DAVID LEIKER: Has that agreement formally been terminated?

SIDNEY HARMAN: We are not free and you can well imagine, David, that the attorneys are saying to me make no comment about the agreement.

DAVID LEIKER: Okay. I understand that. I'll respect it. Thank you.

SIDNEY HARMAN: Thank you all, and --

OPERATOR: And with that, Dr. Harman, any closing remarks, sir?

SIDNEY HARMAN: Yes, I must say that all of this has been a real challenge to the character of our Company and its people. Although we are a bit tired, we are stronger now because of it. We know who we are and what we can do and we will do it. We will continue to build a superb company and we will enhance our reputation. Thank you all very much.

OPERATOR: And we thank you, Dr. Harman, for those nice words and your time today and to our executive team. We appreciate that. And ladies and gentlemen, as you know, Dr. Harman is making today's call available for digitized replay. It's for one full week and also the Web replay for seven days as well. To access AT&T's Executive Replay Service, please dial 800-475-6701 and at the voice prompt, enter today's conference ID of 888651. Alternatively, you may go to www.Harman.com to listen to the replay, as well and once again, enter today's access code, 888651.

That does conclude our call for this quarter. Thank you very much for your participation as well as for using AT&T's Executive Teleconference Service. You may now disconnect.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site

Harman International Industries Guidance Announcement - Final FD (Fair Disclosure) Wire September 27, 2007 Thursday

without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** December 17, 2007

Explore Harman Brands

Explore Product Categories

HOME | ABOUT US | PRODUCT INFORMATION | INVESTOR INFORMATION | NEWS CENTER | EXPERIENCE HARMAN | SHOP C

## PRESS

CORPORATE NEWS :

05/15/2008
Harman International Outsources Global It Infrastructure Services To Wipro Technologies
Full Story >>

05/06/2008
Harman International Strengthens Management with Key Executive Appointments
Full Story >>

05/06/2008
Harman International Reports Third Quarter Results
Full Story >>

04/24/2008
Harman International Industries, Incorporated Announces Quarterly Cash Dividend
Full Story >>

04/17/2008
Harman International To Announce Third Quarter Fiscal 2008 Results
Full Story >>

04/11/2008
Harman International Completes Accelerated Share Repurchases
Full Story >>

04/03/2008
Harman International Outsources Warehousing And Distribution Operations To Ryder
Full Story >>

02/05/2008
Harman International Reports Higher Sales For Second Quarter Fiscal Year 2008; Earnings Down On Pnd, Product Mix And Costs
Full Story >>

01/31/2008
Harman International Appoints Robert V. Lardon As Vice President, Strategy And Investor Relations
Full Story >>

01/29/2008
Harman International Appoints John Stacey As Chief Human Resources Officer
Full Story >>

01/24/2008
Harman International To Announce Second Quarter Fiscal 2008 Results
Full Story >>

01/23/2008
Harman International Industries, Incorporated Announces Quarterly Cash Dividend
Full Story >>

01/14/2008
**Harman International Revises Fiscal Year 2008 Earnings Guidance**

### HARMAN INTERNATIONAL REVISES FISCAL YEAR 2008 EARNINGS

WASHINGTON, D.C. January 14, 2008 – Harman International Industries, Incorporate today revised its previously announced guidance for the current fiscal year ending June Company now expects non-GAAP diluted EPS for the 2008 fiscal year to be between $ before after-tax merger related costs of $8.0 million, or $0.13 per diluted share but inclu the Company's ongoing accelerated share repurchase (ASR). Because the accounting in previously announced restructuring charges has not been determined, it is not included in estimate and, therefore, no GAAP diluted EPS for the fiscal 2008 year is provided.

The change in guidance was prompted primarily by a major shift in the market for Porta Devices (PNDs). In recent months this sector has experienced significant pricing pressu affecting the entire industry.

"While the growth fundamentals of our core business remain sound, the difficult PND c presents a challenge.  As we have indicated previously, we will be launching a record n automotive infotainment platforms in 2008.  Although, we are not happy with the highe R&D engineering and material costs, the additional investment is necessary to deliver t to our valued customers," said Dinesh Paliwal, Vice Chairman and Chief Executive Off continues to have excellent business prospects, and we are confident that we will capita opportunities as we position our Company to achieve its full potential."

The Company is implementing a series of strategic initiatives to optimize its global foo manufacturing, engineering and sourcing, to drive profitable growth and to enhance sha The Company will provide further details on these initiatives during its quarterly earnin on February 5, 2008.

### General Information

Harman International designs, manufactures and markets a wide range of products for t consumer and professional markets.  Its brands include Harman Kardon®, JBL®, Reve Levinson®, Infinity®, Lexicon®, Soundcraft-Studer®, AKG®, Becker® and QNX®. 1 maintains a strong presence in the Americas, Europe and Asia and employs more than I Harman International (www.harman.com) is a leading manufacturer of high-quality, hig products and electronic systems for the automotive, consumer and professional markets stock is traded on the New York Stock Exchange under the Symbol: HAR.

01/14/2008
**Harman International Revises Fiscal Year 2008 Earnings Guidance**

12/27/2007
**Harman International Appoints Gary Steel As Board Member**
Full Story >>

12/17/2007
**Richard Sorota Appointed President Of Harman Consumer Division**
Full Story >>

12/14/2007
**Harman's Ken Yasuda re-elected as head of IASJ**
Full Story >>

12/04/2007
**Gina Harman to Move from Harman Consumer Group to Accion NY-NJ**
Full Story >>

11/09/2007
**Harman Attends Baird 2007 Industrial Conference**
Full Story >>

10/31/2007
**Harman International Completes $400 Million Share Repurchase**
Full Story >>

10/30/2007
**Harman International Industries, Incorporated Announces Quarterly Cash Dividend**
Full Story >>

10/29/2007
**Harman Announces New Board Members**
Full Story >>

10/25/2007
**Harman International Reports First Quarter Results**
Full Story >>

10/22/2007
**KKR And GS Capital Partners To Invest In Harman International**
Full Story >>

10/18/2007
**Harman International To Announce First Quarter Fiscal 2008 Results**
Full Story >>

09/24/2007
**Harman Provides Guidance For Fiscal 2008**
Full Story >>

09/21/2007
**Harman Comments On Previously Announced Merger**
Full Story >>

09/14/2007
**Harman International Industries Names Brad A. Hoffman as Vice President, Corporate Communications**
Full Story >>

08/29/2007
**Harman International Files Fiscal 2007 Annual Report On Form 10-K**
Full Story >>

08/14/2007
**Harman International Reports Fourth Quarter And Full Year Results**
Full Story >>

## Forward-Looking Information

Note: Except for historical information contained herein, the matters discussed are for
statements within the meaning of Section 21E of the Securities Exchange Act. You sho
undue reliance on these statements. We base these statements on particular assumption
made in light of our industry experience, as well as our perception of historical trends,
conditions, operating expectations, current economic data, expected future development
that we believe are appropriate under the circumstances. These statements involve risk
that could cause actual results to differ materially from those suggested in the forward-
including but not limited to our ability to successfully develop and implement cost sav
to gain procurement, engineering and manufacturing efficiencies to deliver improved n
of competitive pressure on the market for PNDs, the effect of changes in consumer con
interest rates affecting consumer spending, automobile industry sales and production ra
or more significant customers, including our automotive customers, model-year chang
customer acceptance in the automotive industry, our ability to satisfy contract perform
availability of key components to the products we manufacture, competitive products,
acceptance of our consumer and professional products, fluctuations in currency exchar
outcome of pending or future litigation and other claims, including the litigation result
Kravis Roberts & Co. L.P. and GS Capital Partners VI Fund L.P., labor disputes at our
of our customers or common carriers, general economic conditions and other risks det
made by Harman International with the Securities and Exchange Commission, includir
Report on Form 10-K for the fiscal year ended June 30, 2007.

# # #

# Seeking Alpha α

# Harman International Industries Inc. F2Q08 (Qtr End 12/31/07) Earnings Call Transcript

posted on: February 06, 2008 | about stocks: HAR

Harman International Industries Inc. (HAR)

F2Q08 Earnings Call Transcript

February 5, 2008 4:30 pm ET

**Executives**

Dinesh Paliwal – CEO

Kevin Brown – CFO

**Analysts**

Jeffrey Kessler – Lehman Brothers

Peter Barry – Bear Stearns

Scot Ciccarelli – RBC Capital Markets

Chris Ceraso – Credit Suisse

Peter Friedland – Soleil

David Niederman – Pacific Crest Securities

David Leiker – Robert W. Baird

**Presentation**

**Operator**

Ladies and gentlemen, thank you for standing by, good afternoon and welcome to the Harman International Industries second quarter fiscal 2008 earnings release conference call. At this point all of your phone lines are muted or in a listen only mode. However, later during the conference there will be opportunities for questions and those instructions will be given at that time. As a reminder, today's conference is being recorded. And ladies and gentlemen, if I may have your attention, certain statements made by the company during this call are forward looking statements.

These statements include the company's beliefs and expectations as to future events and trends affecting the company's business and are subject to risks and uncertainties. Actual results may differ materially from the statements about the company's current beliefs and expectations. Persons participating on the call today are advised to review the

company's earnings release issued today and reports filed by Harman International with the Securities and Exchange Commission regarding these risks and uncertainties. With that being said, here with our opening remarks is Harman International Industries' Chief Executive Officer Dinesh Paliwal. Please go ahead Mr. Paliwal.

**Dinesh Paliwal**

Thank you Kathy and good afternoon ladies and gentlemen on this wonderful Super Tuesday afternoon and I thank you for joining the Harman second quarter fiscal year 2008 investor and analyst call. The past weeks have been very eventful and our discussion today is intended to reinforce a spirit of decisive action as we strategically address the challenges facing our company. I'm joined today by Kevin Brown, our Chief Financial Officer, Rob Ryan, our Vice President Tresurer and Robert Lardon who recently joined the company as Vice President Strategy and Investor Relations.

Our Chairman Dr. Harman and I have agreed that it is appropriate that I lead the earnings review and discussion with you this afternoon. He has asked me to extend his regards to the many analysts and investors with whom he has worked over the years and I very much appreciate his counsel and support. As reference for our discussion, I'll call your attention to the company's press release dated today and to a set of slides which provide an overview of our automotive division landscape and margin outlook for the company. I hope you have had access to these slides as well. Both of these are available on our corporate website at www.harman.com.

Harman results for the quarter ending December 31, 2007 show continued top line growth coupled with some distinct challenges that are impacting profitability. Net sales for the quarter were $1.1 billion, a 14% increase compared to $932 million for the same period last year. Earnings per diluted share in the second quarter were $0.68 compared to $1.22 in the same period last year. Excluding merger related costs, earnings per diluted share were $0.73. Gross profit as a percent of net sales decreased 6% points to 28.3% for the quarter ended December 31.

Operating income for the quarter ended December 31 was $61 million or 5.7% of sales compared to $116 million or 12.4% of sales in the same period last year. Our Chief Financial Officer, Kevin Brown, will take you deeper into the numbers later in the call. As we shared with you in our press release today, we expect to face continuing bottom line pressure through 2008 and well into the next year. This challenge is largely due to factors which I will explain in some detail along with actions we are taking. In January we announced revised earnings guidance for the year which included a decrease in operating profit of more than $100 million.

The primary drivers of this deterioration are P&D, engineering and material cost and I'll take you through in detail later. The P&D margin outlook for the year has declined by about $60 million, this is divided almost equally across three factors. One-third was driven by a 60% decline in average market prices, another one-third was due to delayed product introductions and lower volume of new generation products for us and the rest of the one-third was the inventory clearance of prior generation models at a loss. Needless to say, we have learned some key lessons and I'll share later.

Engineering cost will continue to run higher than expected into fiscal 09 to support the 13 new product launches this year and next for which we simply underestimated the magnitude and complexity. We originally planned for a decline in engineering cost in the second half of fiscal 08 but we cannot risk the timely launch of customer programs and therefore will incur about $30 million of additional engineering this year. Material cost will be about $20 million higher than forecast due to delayed implementation of planned material cost improvements.

Once again, we are unwilling to risk such changes amidst an unprecedented concentration of new program launches. Although we continue to view P&D as an important tool for driving future sales of OEM infotainment systems, it is clear that we must sharpen our strategy in this business. However, Harman markets in the past had two lines of P&D, ones sold primarily in the United States under the Harman Kardon brand and the other mostly in Europe under the Becker brand. We are improving our leverage across these two parallel product lines through the creation of a global business unit responsible for all P&D activities worldwide.

An experienced manager has been appointed to lead this business unit and he has full P&L responsibilities. He has been tasked with creating one, one line of Harman P&D, achieving significant synergies in development, supply chain, time to market, distribution channels and of course all for one brand, not two. These experiences also reinforce the need for timely action in raising productivity and optimizing the cost base for our automotive operations globally. We took several additional steps in this process within the past weeks, announcing the closure of our automotive manufacturing facilities in North Ridge, California and Martinsville, Indiana.

These are the first of multiple actions that will improve our cost structure while shifting [some] resources to other sites in both mature and emerging markets. As we evolve our structure, I have made it clear to my senior management team

that personal accountability will be a prerequisite going forward and have redesigned our compensation programs accordingly. Beginning this fiscal year, compensation for many senior managers will be based on Harman group wide performance. This will help our businesses to strengthen the mindset of accountability, not only within each division but also across business lines that impact their Harman peers. Ladies and gentlemen, we have a lot of hard work ahead and this work is underway in earnest. I will comment further on significant recent events after first asking our CFO, Kevin Brown, to provide a closer look at the numbers underlying our second quarter results. Kevin.

**Kevin Brown**

Thank you Dinesh. I will provide certain information on a non GAAP basis, give you a better understanding of our results exclusive of merger related costs. These costs were $9 million and $14 million for the three and six months ending December 31, 2007. A reconciliation of our GAAP to non GAAP results was included in our press release earlier today which is available today on our website. Net sales for the second quarter were $1.1 billion, an increase of 14.4% compared to the same quarter last year.

Gross profit margin was 28.3% compared to 34.3% a year ago. Operating income was $61 million compared to $116 million last year. Excluding merger related costs, second quarter operating income was $70 million. Net income for the second quarter was $43 million and earnings per diluted share were $0.68. Excluding merger related costs, net income for the quarter was $46 million and earnings per diluted share were $0.73. For the six months ended December 31, 2007, net sales were $2.0 billion compared to $1.8 billion for the same period last year, an increase of 14%.

Gross profit margin was 28.1% compared to 34.5% last year. Operating income was $102 million versus $203 million a year ago. Excluding merger related costs, operating income was $116 million, net income for the six month period was $79 million and earnings per diluted share were $1.23. Excluding merger related cost, net income was $87 million and earnings per diluted share were $1.35. In the second quarter, net sales continued to grow across all three divisions. The growth in overall sales was primarily due to increased shipments of infotainment systems to automotive customers and higher sales of consumer and professional products.

Gross profit as a percentage of net sales decreased 6% points to 28.3% for the quarter. The margin decline was in the automotive division which experienced lower margins on P&D products, product mix range change including higher sales of infotainment systems to mid level vehicles and higher than expected material costs. Selling general and administrative expenses were $240 million for the quarter, an increase of $36 million from the second quarter of fiscal 2007. SG&A expenses for the quarter include $9 million of merger related costs.

SG&A was also impacted by higher engineering costs and foreign currency translation. Operating income for the quarter was $61 million or 5.7% of sales compared to $116 million or 12.4% of sales in the same period last year. The decrease in operating income was driven by P&D, product mix, higher engineering material and merger related costs. The effective tax rate for the second quarter was 25.6% compared to 29.5% during the same period last year. The termination of the merger agreement in the second quarter allowed merger costs to be tax deductible, lowering the effective tax rate.

Foreign currency translation positively impacted quarterly results as the Euro strengthened approximately 12% compared to the same quarter last year. The Euro averaged $1.45 in the second quarter compared to $1.29 last year. As a result, foreign currency translation improved sales by approximately $75 million and contributed $0.15 to earnings per share in the quarter. Our December 31 balance sheet was strong with a cash balance of $159 million and total debt of $581 million.

The debt balance includes proceeds from the issuance of $400 million of convertible notes which were used to purchase and retire 4.8 million shares of the company's stock. We expect to retire an additional 2 million shares of stock in the third quarter as we complete the share repurchase program. During the second quarter we also used cash to make capital expenditures of $35 million and we made tax payments of $17 million. Accounts receivable at December 31 were $541 million and inventory was $435 million.

Compared to our fiscal year end in June, accounts receivable balance was higher primarily due to the holiday selling season. Our inventory balance was lower. I will now provide some additional information regarding the performance of our three divisions, first with automotive. Automotive net sales for the quarter were up 15.5% from the same period last year, excluding currency effects, sales were 5.4% higher. Sales continued to be strong to key automotive customers, including Audi, BMW, Chrysler, Toyota Lexus and Porsche.

Gross profit as a percentage of sales fell by 9.2 points to 26.5%. The gross margin decline was a result of lower margins on P&Ds, product mix and material costs. Operating income as a percentage of sales for the automotive

division was down 9.6 points due to the gross margin impacts and higher engineering and SG&A. The majority of the P&D business is in the automotive division. In the second quarter, P&D sales and margin were down about $30 million and $20 million respectively compared to the same quarter last year.

Both P&D sales and margin were significantly lower due to aggressive price reductions by competitors, the sale of older products at substantial discounts and the delay of new product introductions. In the quarter we reduced P&D inventory by over 30% as we sold down prior generation products, but many of those were sold at a loss. Professional division nets sales for the quarter ended December 31 were up 11.2% from the same period a year ago.

Excluding currency effects, second quarter net sales were nearly 9% higher than the same period in 2007. Professional sales grew across a number of the division's vertical markets, particularly the touring and installed sound markets. Gross profit as a percentage of sales increased by 1.3 points due to more favorable product mix and lower expenses. Operating income as a percentage of sales was up by 0.5 percentage points to 15.2% in the quarter. Consumer division net sales for the quarter increased $21 million or 12.7% compared to the same period last year.

Excluding currency effects, second quarter consumer sales were nearly 6% higher than the same period in fiscal 2007. The sales growth was primarily in international operations where multimedia and home theatre systems continue to be strong. Gross profit as a percentage of sales in consumer was 26.4%, consistent with the same period last year. For the quarter, operating margins were 9.5% of sales, up 0.5 points from the same period a year ago. Dinesh will now offer a closer look at ongoing strategic initiatives.

**Dinesh Paliwal**

Thank you Kevin. Well ladies and gentlemen, we have been working on a number of strategic actions and initiatives. Let me start with the top, Harman's Board of Directors has been expanded to eight members, bringing new expertise and global range. Brian Carroll had joined from KKR, bringing strong financial expertise, Dr. Harald Einsmann, a German national who has worked with such industry leaders as Proctor & Gamble, the Wallenberg Group and the Carlson Group, brings international business experience, Gary Steel, a Scottish national brings experience from Europe's Shell and ABB Groups, including deep expertise in human resources, restructuring and corporate governance. We have also announced several significant additions to our senior management team in recent weeks.

Richard Sorota, an experienced executive with premium consumer brand companies Procter & Gamble and Royal Phillips had joined the company as consumer division president. John Stacey with 20 years of experience in employee and organizational development across the Americas and Europe is joining Harman this month as vice president of human resources worldwide.

Robert Lardon had joined the company as vice president strategy and investor relations. In addition to Robert's experience as a management consultant at PWC, Accenture and Booz Allen, he was chief strategy officer at Porter Novelli, a global top ten communications agency. Kent Moerk, a Danish national has been appointed to manage the newly established global portable navigation device business which will integrate the company's two lines of portable navigation devices worldwide with full P&L accountability.

Dr. Wolfgang Ptacek, who has held senior management positions at Deutsche Telecom and Bosch, was appointed chief technology officer for Harman automotive operations worldwide. Bronson Reed, an experienced international finance executive at ABB joined the company as vice president and group controller. In order to strengthen the leadership and to improve common processes across multiple Harman business, we have created the new position of country manager in the United States and Japan and will extend this concept shortly to Germany, China, India and Russia. Blake Augsburger, who leads the global professional division, has taken this additional role in the US. Ken Yasuda, president of Harman consumer group assumes the additional group-wide country role in Japan.

During the fiscal second quarter, we initiated an extensive review of our global footprint and launched a number of key initiatives to improve simplicity and cost. As noted earlier, restructuring our automotive footprint has been accelerated with the decision to close our automotive plants in North Ridge, California and Martinsville, Indiana. We have also decided to close two smaller facilities in Massachusetts, serving the consumer division. These operations will be integrated with other Harman facilities in California and New York.

Closures and consolidations of additional Harman manufacturing and engineering facilities in Europe and Africa are under review. As a matter of fact, I was in Germany last week speaking with [works counsel] and [eagel matel] and our [buld] as well as employees to bring them the reality check and prepare them for the strategic actions to follow. These actions are expected to result in restructuring charges of $25-$30 million in the third quarter and additional $5-$10 million restructuring charge in the fourth quarter of fiscal 2008. About 1,400 jobs will be affected of which 500 jobs will

be eliminated in high cost countries and the balance transferred to other Harman facilities in the United States, Germany, China and Mexico. This will generate more than $50 million in sustainable annual savings.

During this period, we have added several hundred new jobs at our plants in Mexico and China and extensive job training is now underway. We have also decided to add capacity to our plant in Hungary in order to expand production of audio electronics and speakers. We have also taken several important steps to optimize our functional processes. Beginning with the launch of a shared financial service center for our units across North America, this step will consolidate accounting people and processes from some 20 plus Harman locations into one functional team for cost efficiency, common practices and more consistent reporting on time.

We expect to complete full integration within the current calendar year. And then we'll move on to achieve the same synergy in Europe and in Asia. The company is in the final stage of completing an agreement to outsource its information technology back office infrastructure services. This step will blend an outside service provider solution expertise with emerging country resources to bring us significant gains in both agility and most importantly cost for the same or better quality of services. This initiative will also help us take a closer look at alternative resources for projects related software systems and other related cost. In the third quarter we also decided to consolidate corporate resources from Washington DC and North Ridge, California to our new corporate headquarters in Stamford, Connecticut. This will accelerate the speed of decision making and improve coordination across key company functions.

We expect continued growth in sales across our three divisions, although the economic slowdown may impact some of this growth. Fiscal 2008 performance will be adversely affected by lower P&D margin, as I mentioned earlier, product mix and higher engineering and materials cost associated with new platform launches. We anticipated this and we are reiterating the guidance provided on January 14, 2008. Ladies and gentlemen, in the slice distributed today and they have available on Harman website, we have provided a reconciliation of GAAP to non GAAP guidance for fiscal year 2008. We also expect 2009 to be challenging as we complete the launch of this record number of infotainment platforms.

We are currently at an inflection point in our automotive business with a number of high margin platforms reaching the end of their life cycle and about 70% of our 2009 volume will come from new projects launched in 2008 and 2009. That's the great news, because we will have a brand new portfolio going forward. Now, some of these will be in mixed segment platforms launched at relatively lower margins and at the same time I should remind ourself and to you, we have traditionally seen an improvement of 100-150 basis points annually every year as these new platforms ramp up. [As of essence] for this, I call your attention to slide number five which titled as automotive profitability through 2013. Please make reference to that.

To reach well beyond this traditional margin growth, we are acting decisively with a companywide restructuring program to improve our productivity and cost structure. Our expectation for this series of initiatives are summarized on slide number nine with the title automotive margin improvement beyond 2010. We estimate that improvements in supply chain, engineering, manufacturing and product mix will yield an additional margin improvement of a minimum of 7%. Ladies and gentlemen, as I look around the broader Harman organization, I am encouraged, not only by our response to current challenges but also by the continued spirit of our people to help in raising the bar.

I have launched a series of regular all employee communications to outline key restructuring principles and the high stakes for achieving them. Employees at many levels across the company are responding with suggestions and support. Three weeks ago, I spoke to a group of some 400 global distributors and channel partners from our professional business in Huntington Beach, California. I came away with a new sense of the spirit that has made this division a consistent profit leader.

Harman professional systems were on hand for Sunday's Super Bowl halftime show and the others will support the 50th annual Grammy Awards in California this coming Sunday. Work is continuing in Beijing, China on equipping more than a dozen key venues for the 2008 summer Olympics, with Harman audio systems. In our automotive division, we have successfully launched our first infotainment platform, one of the seven for this year, for the leading Korean automaker Hyundai and it was introduced at the Detroit International Auto Show last month.

This new Hyundai luxury sports sedan named Genesis features a state of the art navigation system and a 17 speaker surround sound system from our Lexicon brand. It is worth noting that Harman Lexicon supplies a similar system for the Rolls Royce Phantom. JBL and Infinity consumer brands are stepping up the volume beginning this month with new advertising to the home theatre and whole house audio markets. These target both high end audio enthusiasts and dealer installers from the related trades.

To help in capturing this diverse energy, we launched a new corporate website on February 1, this new site is designed

for greater interaction with our brand sites from the three divisions and to help stakeholders chart our progress across this rich landscape. I sincerely encourage all of you to visit our new website which I'm very proud of at www.hamran.com and please take a closer look. Thank you for your attention ladies and gentlemen and I must say I want to say this, I know many of you have been asking us to give you greater details, more information.

I hope I'll pass at least one test that I have fulfilled that request and we have given you, this is a new day, this is a new environment we're given you a lot more information, lot more details and we hope this will continue based on your advice and as inputs we will receive. Secondly I'll remind you that restructuring and strategic initiatives which we have begun. I've done it more than once in my life at much more complex environment and a much more distributed environment across hundred countries at ABB. I'm ready for it, my team is ready for it. It's going to be hard work but we are all up to it. With that, once again, I think you for your attention and we will now open up for your comments and questions. Thank you.

## Question-and-Answer Session

### Operator

Thank you and ladies and gentlemen if you'd like to ask a question please press star then one on your touchtone phone. You'll hear a tone indicating you have been placed in queue. You may remove yourself from queue at any time by pressing the pound key. If you're using a speakerphone, please pick up your handset before dialing. Our first question is from the line of Jeffrey Kessler with Lehman Brothers, go ahead please.

### Jeffrey Kessler – Lehman Brothers

Thank you very much, can we delve into a little more detail on the P&D issue with regard to number one, because obviously a rather small piece of business inside automotive had a very large effect on the quarter, while it was not the entire effect, it was a good portion of that effect.

Number one, are you in a position now where you feel you know where your market share is, is the competitive environment so tough that it hearts back to let's say consumer electronics of ten years ago when it was impossible to make any money and is that division, are the products so integral to the brand or identification with Harman automotive that trying to sell as much P&D as you are trying to do now is that the right strategy?

### Dinesh Paliwal

Jeffrey, it's a great question and I'm happy pleased to share my views with you and rest of the colleagues there. You are absolutely right, the P&D is rather small component of our total portfolio. We did have great ambition to grow in 2008 and of course we learned how this market is evolving. With that said, we plan this business to be around $300 million out of about $4 billion sales we will have in this fiscal year and majority of that $300 million was planned in automotive business.

Market did change rather significantly because when we gave you the forecast if I recall correctly in September, we did check with all our employees and sales and distributors bottom up and we found out that they were enough confidence in the marketplace for the new products and functionality we were bringing that we could sustain those volumes. However, word got completely upside down during the month of October, November, December, 60% price decline even more and don't need to remind that few of our competitors have felt the heat too.

We got burned couple ways, one, we did not introduce some of the newer generation products on time. So we ended up selling the older generation product at heavy discount. Secondly, market had five, six suppliers in this space and if you look at, I still have a German newspaper in my office, 19 suppliers were pushing their products in the month of December. So everybody was going after the same pie so our volumes shrunk and our margins shrunk and inventories started to be also a bit of a challenge.

So second quarter was effected as our CFO mentioned, but we also have seen now what is the market scenario going forward, we have estimated that impact with our external internal auditors so we have taken a $60 million hit on this business which was supposed to be $300 million. Big hit, lot of lessons learn, you reminded me very correctly that this is, reminds us of consumer electronics in the past. I think we have figured out consumer electronics at least in some sense that we are learning where to play and where not to play.

With that said I will say that our strategy going forward in P&D business is be very prudent, very smart, we're not going to have ambitious targets to grow this business but we will be in this business, very decisively because it's a business where we will learn the latest technology being deployed which we will be able to integrate in our in dash business and vice versa, we have heck of a lot of confidence in in dash and I must share this because learning in dash business in terms of what components have to go through the testing at minus 40 degrees Celsius. I don't think my competitors in P&D space have a clue on that, we do.

And what kind of connectivity we need to understand, we're talking combination from [adation] of thousands of tickets, failure or bugs which you have to debug them when you integrate. So we do bring lot of knowledge, so with that said, Jeffrey, we will run this business from Far East, we will run this business as a single business, on brand. We'll run this business with one set of distributors, one strategy and very decisive P&L management who has built a great business in the past and now he has been appointed as general manager worldwide.

So I think with that said, I feel comfortable at this point that 2009 when we are making our plan, we would be prudent and yet challenger in this space. And market share wise you also asked, we still hold a respectable position in German market, we are right around number three or number four depending on which model are we looking at. We certainly like to improve on it but we will be selective. We're not going to go after low end stuff but we will go after high functionality, yeah.

**Jeffrey Kessler – Lehman Brothers**

So market share will be less important than having the P&D business be integral to the automotive business itself and driving the brand. I mean you're not going to go for just, you're not going for revenue at any cost because clearly it has cost you in the last couple quarters.

**Dinesh Paliwal**

Jeffrey you couldn't say better. It's absolute no for the revenue at any price. We will decline business but we will not even plan business based on ambitions, we will have a very clear strategy and right now team is working on together with Dr. Geiger who is our chief technology officer that what can we plan, what components would go in, what software would go in and how do we launch so that come September, October 08 we are ready to go and people will be also held accountable either contract manufacturers or if we are doing something ourself that we launch these things on time. That's one lesson I've learned, can't allow this to repeat. So you're right, not revenue but the brand and the learning both ways in dash versus P&D and P&D to in dash.

**Jeffrey Kessler – Lehman Brothers**

Thank you very much.

**Operator**

And we'll go next to Peter Barry with Bear Stearns, please go ahead.

**Peter Barry – Bear Stearns**

Good afternoon Dinesh, I don't think any of us on this end of the phone could mistake your sense of urgency and I'd like to ask you a question that directly relates to that. Were you ever in danger of indeed did you lose any infotainment business that was included in that $14 billion of backlog that prompted you to clearly accelerate a great deal of consolidation and integration activity?

**Dinesh Paliwal**

Peter, let me give a very clear answer. This is a very relevant question and get asked repeatedly. No, we have not lost any customer, we continue to enjoy the great relationship and I'm glad you asked because otherwise somebody else will be thinking of that question. We have defined our backlog and our automotive sales estimate of ours were received and in the past Peter we have taken the line that we wanted to sort of [tuject] the market and the visibility for seven years which has served us very well but I also take this opportunity to bring in a little flavor of my own.

I come from a very large project business myself, a power plant and large industrial plants, while this $13, $14, $15

billion backlog is great and we'll continue to grow that, I would like to start my team to start think in terms of what percent of revenue they have secured for current year, year after, years to follow, because that sort of a schedule I like to follow as if part of the monthly reviews and the quarterly reviews. What is prompting that thinking and change with frequent technology changes coming in, our OEM customers are also start to look traditionally the life cycle for infotainment platform was five, six years.

That matched the vehicle life cycle. Now, what we are starting to see a new phenomena that if an infotainment award was given to any supplier, in four years time or five years time or sometimes even three and a half years, OEMs are asking can we have a refresh. Of course, once we are in it, we're likely to get that refresh. But I don't want to count six years every time once we get award. We have to ask the tough questions from our customers in future, do you have an intention to look for a refresh in four year's time and if that's the case, our calculation in future will reflect that. That's the clarify I wanted to share with you.

**Peter Barry – Bear Stearns**

Let me take that one step further, were there any performance issues that basically prompted the acceleration if not explosion in R&D and engineering expenses?

**Dinesh Paliwal**

Can you repeat the first part please?

**Peter Barry – Bear Stearns**

Any performance issues as it related to the infotainment systems that you were delivering.

**Dinesh Paliwal**

Well I will turn it around and say we grossly underestimated the effort, so one can say our efficiency and our assessment of complexity and the magnitude of seven very complex infotainment platform was not up to the mark. I remind the slide in the package we have given, if you look at the slide number seven, it shows clearly in 05, we had two infotainment platform, we had zero infotainment platform in 6, we had two in 7 and now here we are for 08 and 09, we have 13 platform. I don't know any company out there who has undertaken even half of that load.

With that said, Peter, organization at Harman did not comprehend the reality, did not perhaps plan earlier and that's a lesson learned. We did not do it, we did not leave it because we, we knew that we had to do it, we did not, this is where I said we grossly underestimated the effort in complexity. Therefore, I am forced to say whether I like it or not that I have to continue to keep the higher R&D cost, engineering cost for full fiscal 08 and well into 09.

Last week I was visiting with large OEMs and I promised them that you should be well assured that your SOP, your platforms are my priority and these will be delivered on time within your schedule. We will not cut the resources, as a matter of fact, if I have to I'll bring in a few more additional external resources to help us. So it's not a performance issue it is the planning issue, it is the underestimation issue which we have learned a great deal.

**Peter Barry – Bear Stearns**

So your systems lived up to your expectations even during this very difficult period?

**Dinesh Paliwal**

Well, Peter, see that's another topic which I can also elaborate. When the organization is used to delivering one or two or even no platform in a year, and all of the sudden you've got seven and six thirteen, you discover the holes in your business processes and inefficiencies built into the system which were not exposed when you had one or two a year.

And with that, why did I say in my introductory comments that I was in front of works counsel in [ega metal], believe me I don't have any desire to be in front of these people, they're a feisty group of people but I did because I wanted to prepare them that this organization in Germany needs efficiency gain which means we have to review our consolidation because if you listen to my customers they're telling me what I should do, which is good. They're saying Mr. Paliwal, for

you to be efficient and deliver large complex projects, you must do it from fewer centers but strong centers of confidence.

Right now we are spreading ourself too thin in Germany, probably ten sites and that's something as a core determination topic according to German law, I will sit down with my colleagues at the Board as well as works counsel and union to determine what is the right way to consolidate sites and create stronger fewer confidence centers to prepare ourself for better efficiency and gain. That's the big lesson for Harman International. Nothing new for me, I've been through this before.

**Peter Barry – Bear Stearns**

Last one from me Dinesh and maybe this is for Kevin but your slide nine speaks to margin improvement of 7-10.5%, could you tell me, and this is beyond 2010, so should we, one, could we conclude that margins will be under pressure right through fiscal 2009? And could you tell us where that margin improvement, what the base number is that you're improving from?

**Dinesh Paliwal**

Peter, let me try to take shot at it and my CFO can jump in. We worked as a team for several weeks, this is a bottom up approach, it didn't happen overnight. We did a key strategic initiative this organization must embrace. This is going to be hard. This is going to break some relationships with suppliers, with 50 mile radius sourcing, stuff like that has to be challenged. But what we have done here is, I would say in my view as other conservative approach to three main buckets, global supply chain initiative, global footprint initiative in manufacturing and engineering, I think engineering has lot more to squeeze juice out of than we have shown here and product mix. Let me start backward from product mix.

Product mix is what we've got. I have over the holidays, fun holidays, but we worked together to analyze the entire backlog to the Nth decimal. We have done that, entire backlog, spread not just in 12, 13 but for some 35 sublevel SOPs. So we know exactly what the contribution margin we have in our backlog. That can only improve and will improve as we saved 100-150 basis point on each new platform as we ramp up, we'll see annual gain in contribution margin. So that's given. Now as we bring these conclusion to these 13 SOPs or platforms, we will not carry the high level of engineering cost and mind that I'm not going to sit quiet. I'm pretty restless right now to get alternative engineering setups in Ukraine, Poland and India and China.

My chief software architect has been in India for two weeks and right now he's in other parts of Asia talking to people and we're not going to start from scratch. We're going to cooperate with some companies who can give us running start fairly soon. So as we bring engineering costs down, simultaneously with the SOPs completion, that is back end of 2009, so in 2010 we would expect margin improvement from contribution margin, product mix is changing, cost is coming down and that is shown actually on slide five Peter if you see.

Our operating income is growing, our contribution margins are deflected what they are. But operating income is the end result of contribution margin and the slide next to which says total functional cost and total engineering. And in addition we have these three big buckets which we're going to be initiating and we have team coming together who will take on one of these initiatives each. So that's what I believe that 9 being challenging, more like a transition year. Lot of hard work year. But with the backlogs secured, with quality of backlog well defined, come 2010 we start to see a clear and significant improvement in our operating performance.

**Operator**

Thank you we'll now move to the line of Scot Ciccarelli with RBC Capital Markets, go ahead please.

**Scot Ciccarelli – RBC Capital Markets**

Hi guys, Scot Ciccarelli, I had a question about slide number five. I know it's not scaled, but it looks like you're looking for automotive profitability to decline again in 09 from 08 and since that's really the main profit driver and Dinesh given your cautionary comments about 09 already, should we be assuming at this point full year earnings decline in 09 verse 08?

**Dinesh Paliwal**

I would not go that far because it has been a single biggest profit driver but I think we are building excellent business in [at pro] which unfortunately we don't get to talk about much. It's a great business and we are growing that very nicely, double digit and with a clear market position we have leadership and with certain initiatives we are planning I think this business will become one of the major contributor if not the contributor in near future.

But coming back to automotive I would say we are not giving any guidance for 2009, 2009 we are saying will be a challenging tough year, while we work through, but the good news is we do have the backlog and we know the quality of that backlog and second good news is we have seven plus six, thirteen and many of them are high end infotainment platforms, they are launching, so 70% of the mix will be brand new and as it ramps up every year we will get 100-150 basis point improvement in that, so profitability will grow. So in [at nat] 2009 is going to be challenging year not given any guidance right now.

### Scot Ciccarelli – RBC Capital Markets

Okay, fair enough and then another question. You had talked about some of your customers and I know you said you haven't lost any but Mercedes who's still your biggest customer, they were conspicuously absent in your list of strong customers and by our math, sales to Mercedes were down about 10-12% after adjusting for currency in the first quarter, can you help us understand what's going on with that because it's pretty material to the overall revenue of the company.

### Dinesh Paliwal

Absolutely, in fact I was with Daimler last week in Germany. They are, if they are absent from our list then I'll make sure that they're not absent anymore in the future because they remain a very strategic and key customer. As a matter of fact we are building on their new S class refresh as we speak and we have ongoing relationship. I do admit that one of the infotainment platform with Mercedes which began perhaps what three, four years ago, that in next couple years would be coming towards end of its life cycle. Having said that, there are other businesses which are starting to happen or will happen with Mercedes. We are well aligned, we have excellent relationship with Daimler and I feel good about that customer for future.

### Scot Ciccarelli – RBC Capital Markets

Okay, great, thanks a lot guys.

### Operator

We now have a question from Chris Ceraso with CS[ST], please go ahead.

### Chris Ceraso – Credit Suisse

Hey, thanks, good evening. I've got 25 questions, how much time do you have? Alright, maybe we can start with an update on the Chrysler program. A few points there, can you give us a feel for how far along the way you are on ramping that program, maybe what the customer take rates are on the nav system on the new minivans and then just trying to compare the revenue versus the cost. Are you still losing money on that program and when do you think the revenue will match the cost and eventually do you think you'll still get back to a 15-16% margin on that program?

### Dinesh Paliwal

You mean on Chrysler?

### Chris Ceraso – Credit Suisse

Yeah.

### Dinesh Paliwal

Alright, Chris let me start, you've asked already your 18 questions in one question, but let me try.

### Chris Ceraso – Credit Suisse

That's just one. I've had three weeks to stew on this guys.

**Dinesh Paliwal**

No problem, let me start. First of all, Chrysler relationship is solid and sound. I was with their senior management last Friday in Detroit because not only we are successfully ramped up with the current program but we are also working on new generation very high end infotainment platform which Cerberus the new owners would love to see a differentiation and they have turned to us as a leader in this space and we are very happy with the progress so far. With that said, Chrysler volume in the second quarter was up 50%, five zero, since quarter one of 2008 as the [my gig] infotainment system is now installed on more than a dozen platforms across Chrysler portfolio.

And in fiscal year 2009, we will launch on the Ram truck and Cavalier Compass, the remaining. So when you talk about the take rate, the family oriented vehicles and SUVs, they're running anywhere from 10-35% depending on the model which is pretty good penetration when you say 35%. And sedans are running 5-20%. But we are satisfied with the development with Chrysler and we expect by fiscal year 2008 end of the year, we would be fairly close to the targeting number of infotainment platforms we will be shipping to them.

Now comes the challenging part of making some money out of Chrysler, I hope they're listening because we don't make much money out of them. As a matter of fact, half of our business with Chrysler is slightly profitable and the other half is not profitable. So in net net when you add everything, it's probably break even, slightly below zero. I can call it maybe just a black zero if not a red zero. So that's where we are. So taking a zero to 15-16, I think I should not dream of that, it won't happen in near term. It may happen under different programs where different technology and different feature functionality will be packed, that's what we're working on, so this one, the only way we can improve our profitability is to work with Chrysler diligently with their processes and find creative design changes to improve their functionality and take the cost out. That's the only thing we are doing and we're working on that's going to be tough but this is the only way we'll approach.

**Chris Ceraso – Credit Suisse**

Was it just bidding inappropriately or why is this unprofitable if you're up to kind of your full rate now?

**Dinesh Paliwal**

Well, you know hindsight is always 20/20. When we got into this relationship it was all good intentions and we actually got awarded one mixed segment business and one high end business and high end is profitable for us. It's the mixed segment business where we thought we would be able to scale it down from the top infotainment and bring it down and fit the mold of the cost of the mixed segment. We failed.

We delivered first class functionality, they love it, but we did not get the cost level we thought. With that said, you're prompting me to say, I've also done a heck of a lot of analysis, the mixed segment infotainment development and entry level development would not be run in Germany, it would effective very near future under the leadership of Dr. Geiger will begin in [Sanjeng] China and in Beijing China. That is the way we're going to grab the latest technology, the efficiency, the speed and the cost level while take all our competence from Germany and United States in terms of navigation and the debugging, the testing approach, the processes. I think that is going to create a differentiator for us but that doesn't help immediately in Chrysler.

**Chris Ceraso – Credit Suisse**

Back to one of your earlier comments in your remarks, you said that in the breakdown of what happened, the $100 plus million hit to EBIT as you went from $4.00 to $3.00, $60 million was P&D. Did you say how much was R&D and engineering and how much [overlay].

**Dinesh Paliwal**

Yes Chris, I said that $30 million is engineering out of that. $60 was P&D and $20 is in material cost.

**Chris Ceraso – Credit Suisse**

And when you talk about material cost, it's not commodities per se, like you said you've had your regular price downs

but you've missed your window or were unable to recapture that through resourcing and other efforts. Is that right?

**Dinesh Paliwal**

Absolutely right, thanks for guiding yourself the answer. It's not the commodity driven, not at all. It's the window missing, number one. Number two, you know these new platforms which we are launching like Genesis, the fantastic Hyundai launch we just had and others to come, we had anticipated that we will have enough time and flexibility to design in a few more substitutions of component.

When we are running so tight and crammed and running with significantly higher load than we expected, you know our organization is not willing to risk by replacing or substituting components and risk the big picture. And so therefore we are also proactively not pushing some of the substitutions. One is the customers window and another one is our own proactive decision to delay it until we have launched them all successfully. As I have said again, this estimation of the complexity and magnitude, that's what really added up to this $20 million.

**Chris Ceraso – Credit Suisse**

That's what's different from the previous conference call, because you had already highlighted this as an issue, right?

**Dinesh Paliwal**

We highlighted this issue but we did not until then, this is the December, I can share in the spirit of absolute full openness with all of you guys and that's what I stand for, if Peter is listening, Peter [Seperstorn] who said that we want you to follow like ABB used to while I'm here and we're going to do that, that's how my team will work. You know we highlighted but we had no clue that complexity of these programs when we start to test the full system in December that we will discover that we have quite a bit of testing and debugging, testing and debugging to be done and that's what is driving us right now, our people didn't even have proper holidays and we are deploying more resources. During that time, you don't want to throw one additional element of complexity by substituting the component, that's what happened here. Lesson learned.

**Chris Ceraso – Credit Suisse**

Okay.

**Operator**

We'll go next to Peter Friedland with Soleil, please go ahead.

**Peter Friedland – Soleil**

Hi, when you talk about your pipeline going forward like 2011 beyond, how much of that business includes refreshes that you haven't won yet?

**Dinesh Paliwal**

Hi, Peter, thank you. Let me start, when you say pipeline for 2013 right? Maybe I should try to use my approach which I was saying, I like to use going forward. Let's start with fiscal 08 which is of course 100% secured in our backlog. Fiscal 09 I think we are very close to 90%. Fiscal 10 is about 80%. Fiscal 11 is 60 and it goes on into 13 and 14. So when I say fiscal 10 is 80%, so we need to secure additional 20% of the business to deliver in fiscal 10.

So that's where we are and other part of your question is refresh. If traditionally we had let's say two or three refresh in three year's time, we expect now probably double that number going forward because there will be more refresh which I think is exciting for us because we do want to have refreshes and that allows us to not only take advantage of the new technology but also allows us to do the engineering changes, material changes and also keep our customers current with our technology. So that's what is going to happen, but to answer your question, we have fairly good coverage for our revenues in out years here.

**Peter Friedland – Soleil**

Great, thank you.

**Dinesh Paliwal**

Have I answered your question?

**Peter Friedland – Soleil**

Yup.

**Dinesh Paliwal**

Excellent, thank you.

**Operator**

And we'll go then to David Niederman with Pacific Crest Securities, please go ahead.

**David Niederman – Pacific Crest Securities**

Thank you, good afternoon, so just a couple of quick clarifications. So when did it become apparent that the challenges in the P&D business were really coming to bear? Was it October?

**Dinesh Paliwal**

No, it became apparent during holiday periods. Already started, look we had interesting times. I hope those are times will not be repeated at least with us in our company. We sold and then our last distributors like companies in Germany, they could not push the volume out so we had to get some of the products, help them out, either [score] protection, price protection, all of those things which we are aware of that in consumer words you do but we started to discover that market was getting flooded in November, December timeframe and we started to get feedback from our wholesalers or distributors or stores that the take rate from them to the end users was slowing down or there was a glut with the price pressure and we had not issued them instructions to drop the prices significantly.

But then we started to see the volume not clearing up, inventory buildup, then we started to actually take the price hit. Or actually secure one or two wholesalers to take the stock back and resell it at lower prices or at a discount or even at a loss. So this became or started to become apparent in November and in December it was almost very clear that we had a problem with that business, late December. That's where we started to see that we needed to think about going to the market immediately, we analyzed that, beginning first week of January and we could not even wait for three weeks to come to February 5.

I proposed to the Board and unanimously Board supported that I you already know something go right now, don't wait for the February 5, which we did. I know a lot of you are unhappy with me that we did not give hell of a lot of information that time. I hope you will forgive me for acting immediately in the spirit, if I know I'm going to share this with you even if I'm not 100% prepared with all the answers. So we knew about it around December timeframe.

**David Niederman – Pacific Crest Securities**

Great and again I was hoping you could provide maybe a little clarification into the motivation behind the buyback and the timing of the buyback. You know as you look at the stock price in say the low 80's with the pressures mounting, maybe they weren't quite apparent in October that the P&D pressures were mounting to the rate they were going to, but still, was it the appropriate thing to do at that time to lever up the balance sheet in this way?

**Dinesh Paliwal**

Right, I'll start but I think I may need my CFO's help. But based on when the program ASI was launched, at that pricing we knew that we were going to get some 4.7 million shares. Of course price has been depressed since then and we know already at this point that we will have surplus cash which will allow us probably additional 2 million shares to be bought. So we will be north of 6 million shares we'll be acquiring with this current ASI program when it completes. But

as such, our current program will be complete around the end of this month.

**David Niederman – Pacific Crest Securities**

Thank you.

**Operator**

Thank you our final question will come from David Leiker with Robert W. Baird, please go ahead.

**David Leiker – Robert W. Baird**

Hi, good evening. Handful of things here. First, a numbers question, Kevin I believe, do you have an R&D number for the quarter?

**Dinesh Paliwal**

David I can hardly hear you clearly, can you come close to the speaker perhaps?

**David Leiker – Robert W. Baird**

Do you have an R&D number for the quarter? What the R&D expense was?

**Kevin Brown**

Yes, David, R&D net R&D expense for the quarter was right at $100 million or about 9.4% of sales.

**Dinesh Paliwal**

This is for the whole company.

**David Leiker – Robert W. Baird**

Okay and then, given the discussion you had with Chris on the Chrysler business, the comment had always been that if you moved at a mid level and have lower gross profit that the SG&A cost is lower as operating margins are comparable. Is that no longer the case?

**Kevin Brown**

Well I think part of that is the cycle and the timing as Dinesh explained that we are in. We're in the high investment phase right now. In addition, when we initially launched these programs, typically launches the lowest margin point of the cycle of that business. So we've not been able to implement all the plan cost initiatives that we've had on the mid segment programs given the work load we've had. We're in the early phase of that cycle. So we think and as we showed in the slides, we expect that business to progress as we go forward. I think that answers your question or was there more to that question?

**David Leiker – Robert W. Baird**

No, I don't want to put words in your mouth but is it fair to say it's too early to tell?

**Dinesh Paliwal**

No, I would not say it's too early to tell. I think we know the quality of the backlog and we know for sure that what are the levers we have to push and pull and we have started, we're not just talking. So I think David it's fair to say that hard work ahead but we'll start to see improvements as we move forward.

**David Leiker – Robert W. Baird**

And then I want to reconcile slide six and seven. On slide seven you have a line on there showing R&D engineering, I'm assuming that's a dollar number?

**Dinesh Paliwal**

It is a dollar number, that is correct. Well, no, no, let me take back. This is a percent of sales number.

**David Leiker – Robert W. Baird**

On slide seven?

**Dinesh Paliwal**

In slide seven, sorry, that is not a dollar number, these are just numbers. These are number of infotainment launches.

**David Leiker – Robert W. Baird**

What's the line that's on there that's labeled R&D

**Dinesh Paliwal**

The line is percent R&D of sales. Percent of sales.

**David Leiker – Robert W. Baird**

Okay so you have your revenues going up because of new business?

**Dinesh Paliwal**

That is correct.

**David Leiker – Robert W. Baird**

Your R&D costs in 09 are coming down?

**Dinesh Paliwal**

09, be careful, this line might not be drawn properly. I would expect this line to start to taper down and really get tapered down in 010, but 09, back end of 09 will start to come down. It will come down because the revenue going up number one but we will be also optimizing R&D both by changing the R&D footprint and also not allowing absolute R&D dollars to grow while revenue grows.

**Kevin Brown**

Yeah, I think the chart on slide six is the better chart for the R&D line which shows it staying fairly high through 09 as Dinesh said, back half 09 we start to see progress but 010's where you see real improvement.

**Dinesh Paliwal**

Right, if you see slide six, Robert, that might be a little better representation in terms of direction.

**David Leiker – Robert W. Baird**

Great and then if we look at the timeline of things that you have to do Dinesh in terms of identifying things, actions to take, putting actions in place to implement that and realizing the benefits, where, what do you think that timeline looks like as we go through those phases?

**Dinesh Paliwal**

You know, depending on different actions, like the current restructuring in the Q3 and Q4 we're announcing, that will happen fast, 12-18 months you start to see annual savings and I have said in the script which I shared with you that we're going to see north of $50 million annual savings from the restructuring we're doing, but that's a very small piece. Then comes the heavy lifting in terms of global manufacturing footprint. Optimizing between high cost and low cost. Right now, Robert, we are close to 80% of our manufacturing is in high cost countries and 20% in low cost.

When it comes to engineering, let me have a little break here, I will say 99% in high cost country and 1% in low cost country, it's not 100. So moving those competence, takes time, it won't happen in 12, 18, 24 months because you're dealing with competence. You move competence, you develop competence in locations in Eastern Europe so those will take some time. They will begin already in calendar year 2008. Some of them have already started the work but by the time you see them complete and you see the net impact, we're talking 2010 and beyond. That's why the slide number nine, when we say company wide margin improvement, 2010 and beyond.

**David Leiker – Robert W. Baird**

Okay and then one last follow up that slide, on slide ten, I don't, unless that you talked about it, but the base period that you're using is what level of profitability? What's the margin number you're using as a starting point?

**Dinesh Paliwal**

The base level we are looking at 2008, the guidance we have given you.

**David Leiker – Robert W. Baird**

Okay and that's, okay, thank you.

**Dinesh Paliwal**

Kathy, I would like to say a few concluding comments quickly to our attendees and analysts and other investors.

**Operator**

Thank you please go ahead.

**Dinesh Paliwal**

Well ladies and gentlemen it's been a wonderful session at least a lot of hope and you're understanding that we're not sitting idle. We are at work, very aggressively and very decisively. But I hope this detailed review helps to illustrate that we are committed to change. Committed to change, that's the message I want to get away with and that change is defined as taking the steps necessary to build a strong Harman International. We recognize that a lot of hard work lies ahead to restore our company's remarkable momentum. And I'm personally committed to timely and decisive action towards this goal. And I truly look forward to continuing our communication and to your support as we work together in helping Harman to achieve its full potential which is out there, we can see it and it and we're going to get there. Thank you very much, have a great evening.

**Operator**

Thank you Mr. Paliwal. Ladies and gentlemen your host is making today's conference available by digitized replay for two weeks and by web replay for two weeks. The digitized replay is available starting at 6:30 PM Eastern time, February 5, 2008. Simply dial 1-800-475-6701 and at the voice prompt enter today's conference access code, 908855. You may also go to www.harman.com to listen to the web replay. You will need to enter the access code 908855. That does conclude our earnings release call for this quarter, thank you very much for your participation as well as for using AT&T

executive teleconference service. You may now disconnect.

**Copyright policy:** All transcripts on this site are the copyright of Seeking Alpha. However, we view them as an important resource for bloggers and journalists, and are excited to contribute to the democratization of financial information on the Internet. (Until now investors have had to pay thousands of dollars in subscription fees for transcripts.) So our reproduction policy is as follows: **You may quote up to 400 words of any transcript on the condition that you attribute the transcript to Seeking Alpha and either link to the original transcript or to www.SeekingAlpha.com.** All other use is prohibited.

THE INFORMATION CONTAINED HERE IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL, CONFERENCE PRESENTATION OR OTHER AUDIO PRESENTATION, AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE AUDIO PRESENTATIONS. IN NO WAY DOES SEEKING ALPHA ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S AUDIO PRESENTATION ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

If you have any additional questions about our online transcripts, please contact us at: transcripts@seekingalpha.com. Thank you!

Case 1:07-cv-01757-RWR     Document 21-25     Filed 07/03/2008     Page 18 of 18



Harman International

PRESS RELEASE

February 5, 2008

**FOR IMMEDIATE RELEASE**
Contact:  Robert C. Ryan
Vice President – Treasurer
Harman International Industries, Incorporated
(202) 393-1101

## HARMAN INTERNATIONAL REPORTS HIGHER SALES FOR SECOND QUARTER FISCAL YEAR 2008; EARNINGS DOWN ON PND, PRODUCT MIX AND COSTS

### Announces Analyst and Investor Conference Call

WASHINGTON, D.C., February 5, 2008 – Harman International Industries, Incorporated (NYSE: HAR) today announced results for the second quarter ending December 31, 2007.  Net sales for the quarter were $1.066 billion, a 14.4 percent increase compared to $932 million for the same period last year.  Earnings per diluted share in the second quarter were $0.68 compared to $1.22 in the same period last year.  Excluding merger-related costs, earnings per diluted share were $0.73.

"Although we continue to increase sales across all divisions, our automotive earnings are under pressure due to portable navigation devices (PND), product mix, and higher engineering and material costs during a period of record launch activity," said Dinesh Paliwal, Harman's Chief Executive Officer.  "We are accelerating a number of strategic actions to improve our cost structure and optimize our global footprint in the automotive sector, while flattening our broader organization to instill a strong culture of execution."

| FY 2008 Second Quarter Key Figures | Three Months Ending December 31, 2007 | | | |
|---|---|---|---|---|
| | | | Increase (Decrease) | |
| *$ millions unless otherwise indicated* | **2007** | **2006** | Including Currency Changes | Excluding Currency Changes[2] |
| Net sales | 1,066 | 932 | 14.4% | 5.9% |
| Gross profit | 301 | 320 | (5.8%) | |
|    Percent of net sales | 28.3% | 34.3% | | |
| Operating income | 61 | 116 | (47.4%) | (53.0%) |
|    Percent of net sales | 5.7% | 12.4% | | |
| Net income | 43 | 81 | (47.3%) | (53.0%) |
|    Percent of net sales | 4.0% | 8.7% | | |
| GAAP diluted earnings per share ($) | 0.68 | 1.22 | | |
| Non-GAAP diluted earnings per share[1] ($) | 0.73 | 1.22 | | |
| Shares outstanding - diluted | 63 | 67 | | |

[1] Adjusted for costs associated with the terminated merger.
[2] Non-GAAP measure. See reconciliation later in this release.

**Summary of Operations**

Net sales continued to grow across all three divisions.  The growth in overall net sales was primarily due to increased shipments of infotainment systems to automotive customers and higher sales of consumer and professional products to major distributors.  Gross profit, as a percentage of net sales, decreased 6.0 percentage points to 28.3 percent for the quarter ending December 31, 2007.  The gross margin decline was primarily in the Automotive division which experienced lower margins on PND products, product mix change, including higher sales of lower-margin infotainment systems for mid-level vehicles, and higher than expected material costs.

Selling, general and administrative (SG&A) expenses were $240 million for the quarter, an increase of $36 million from the second quarter of fiscal 2007.  SG&A expenses in the quarter include $9 million of merger-related costs.  SG&A was also impacted by higher engineering costs and foreign currency translation.

Operating income for the quarter ending December 31, 2007 was $61 million, or 5.7 percent of sales, compared to $116 million, or 12.4 percent of sales, in the same period last year.  The decrease in operating income was driven by PND, product mix, and higher engineering, material and merger costs.

The effective tax rate for the second quarter fiscal 2008 was 25.6 percent compared to 29.5 percent during the same period last year.  The lower effective tax rate was a result of the termination of the merger agreement in the second quarter, which allowed merger costs to be tax deductible, and lower corporate tax rates in Germany.

For the quarter, net income was $43 million and earnings per diluted share were $0.68.  Excluding merger-related costs, net income was $46 million and earnings per diluted share were $0.73 compared to last year's record $1.22.

Foreign currency translation positively impacted quarterly results as the Euro strengthened approximately 12 percent compared to the same quarter last year.  The Euro averaged $1.45 in the second quarter compared to $1.29 in the same period last year.  As a result, foreign currency translation improved sales by approximately $75 million and contributed $0.15 to earnings per diluted share in the quarter.

**Divisional Performance Q2 FY2008**

**Automotive Division**

| | Three Months Ending December 31, 2007 | | | |
|---|---|---|---|---|
| **FY 2008 Second Quarter Key Figures** | | | Increase (Decrease) | |
| *$ millions unless otherwise indicated* | **2007** | **2006** | Including Currency Changes | Excluding Currency Changes[1] |
| Net sales | 730 | 632 | 15.5% | 5.4% |
| Gross profit | 194 | 225 | (14.1%) | |
| Percent of net sales | 26.5% | 35.7% | | |
| Operating income | 36 | 92 | (60.0%) | (64.3%) |
| Percent of net sales | 5.0% | 14.6% | | |
| [1]Non-GAAP measure. See reconciliation later in this release. | | | | |

Automotive net sales for the quarter were up 15.5 percent from the same period one year ago. Excluding currency effects, sales were 5.4 percent higher compared to the same period last year. Sales continued to be strong to key automotive customers including Audi, BMW, Chrysler, Toyota/Lexus, and Porsche. Gross profit, as a percentage of sales, fell by 9.2 percentage points to 26.5 percent. The gross margin decline was a result of lower margins on PND, product mix, and material costs. Operating income, as a percentage of net sales, for the division was down 9.6 percentage points due to gross margin effects, higher engineering, and other SG&A.

The majority of PND sales are recorded in the Automotive division. PND sales fell by $29 million compared to the same period last year. Both PND sales and margins decreased due to aggressive price reductions by competitors, the delay of new products, and the sale of older products at substantial discounts.

**Professional Division**

| | Three Months Ending December 31, 2007 | | | |
|---|---|---|---|---|
| **FY 2008 Second Quarter Key Figures** | | | Increase (Decrease) | |
| *$ millions unless otherwise indicated* | **2007** | **2006** | Including Currency Changes | Excluding Currency Changes[1] |
| Net sales | 152 | 136 | 11.2% | 8.6% |
| Gross profit | 60 | 52 | 14.7% | |
| Percent of net sales | 39.7% | 38.4% | | |
| Operating income | 23 | 20 | 16.2% | 13.7% |
| Percent of net sales | 15.2% | 14.7% | | |
| [1]Non-GAAP measure. See reconciliation later in this release. | | | | |

Professional division net sales for the quarter ending December 31, 2007 were up 11.2 percent from the same period one year ago. Excluding currency effects, second quarter sales were 8.6 percent higher than the same period in fiscal 2007. Sales grew across a number of the division's vertical markets, particularly the touring and installed sound markets. Gross profit, as a percentage of sales, increased by 1.3 points due to a more favorable product mix and lower

variable expenses.  Operating income, as a percentage of sales, was up by 0.5 of a percentage point to 15.2 percent.

The Professional division continues to report strong customer response to its portfolio of solutions for performing artists and facilities.  Second quarter projects included Harman Professional division bookings for Boston's Four Seasons Hotel, Shanghai TV, the Jewish Museum of Berlin, AIDA Cruise Lines, and the Sydney, Australia Conservatorium of Music. Work is continuing in Beijing, China to equip more than a dozen key venues for the 2008 Summer Olympics with Harman professional audio systems.

**Consumer Division**

| FY 2008 Second Quarter Key Figures | Three Months Ending December 31, 2007 | | | |
|---|---|---|---|---|
| | | | Increase (Decrease) | |
| *$ millions unless otherwise indicated* | | | Including Currency Changes | Excluding Currency Changes[1] |
| | **2007** | **2006** | | |
| Net sales | 184 | 163 | 12.7% | 5.6% |
| Gross profit | 49 | 43 | 12.8% | |
| Percent of net sales | 26.4% | 26.4% | | |
| Operating income | 17 | 15 | 20.6% | 8.6% |
| Percent of net sales | 9.5% | 9.0% | | |
| [1]Non-GAAP measure. See reconciliation later in this release. | | | | |

Consumer division net sales for the quarter ending December 31, 2007 increased $21 million, or 12.7 percent, compared to the same period last year.  Excluding currency effects, second quarter sales were 5.6 percent higher than the same period in fiscal 2007.  The sales growth was primarily in international operations where multimedia and home theater systems continue to be strong.  Gross profit, as a percentage of sales, was 26.4 percent, consistent with the same period last year.  For the quarter, operating margins were 9.5 percent of sales, up 0.5 of a percentage point from the same period a year ago.

In the Consumer division, market trends continue to show additional focus on the integration of large flat screens, iPod music players and wireless applications.  Key Harman rollouts in 2008 will offer greater integration and connectivity of audio and entertainment systems.  These include the Harman Digital Lounge, a "store within a store" merchandising concept for retailers, and the Harman/Kardon DMC 1000 Media Server that delivers content to as many as four separate household zones.

**Strategic Appointments**

Harman's Board of Directors has been expanded to eight members, bringing new expertise and global range.  Brian Carroll has joined from KKR, bringing strong financial expertise.  Dr. Harald Einsmann, a German national who has worked with such industry leaders as Procter & Gamble, the Wallenberg Group, and the Carlson Group, brings international business experience. Gary Steel, a Scottish national with experience from Europe's Shell and ABB Groups, adds deep expertise in human resources, restructuring, and corporate governance.

The Company has also announced several significant additions to its senior management team in recent weeks.

- Richard Sorota, an experienced executive with premium consumer brand companies, Procter & Gamble and Royal Phillips, has joined the Company as Consumer Division President.
- John Stacey, with 20 years of experience in employee and organizational development across the Americas and Europe, is joining Harman as Vice President of Human Resources.
- Robert Lardon has joined the Company as Vice President, Strategy and Investor Relations.  In addition to his experience as a management consultant at PwC, Accenture, and Booz Allen, Mr. Lardon was Chief Strategy Officer at Porter Novelli, a global Top 10 communications agency.
- Kent Moerk, a Danish national, has been appointed to manage the newly established global PND business unit which will integrate the Company's two lines of portable navigation devices.
- Dr. Wolfgang Ptacek, who has held senior management positions at T-Mobile and Bosch, has been appointed Chief Technology Officer for Harman automotive operations worldwide.
- Bronson Reed, an experienced international finance executive at ABB, joined the Company as Vice President, Group Controller.

In order to strengthen the leadership and to improve common processes across multiple Harman businesses, the Company has created the new position of Country Manager in the United States and Japan, and will extend this concept shortly to Germany, China, India, and Russia.  Blake Augsburger, who leads the global Professional division, has taken this additional role in the US.  Ken Yasuda, President of Harman Consumer Japan, assumes the additional group-wide country role in Japan.  These individuals will serve as country champion for functional best practices, and will directly participate in such business activities as project risk reviews, large supply or investment proposals, restructurings, and key human resource decisions.

**Strategic Initiatives**

During the fiscal second quarter, the Company initiated an extensive review of its global footprint and launched a number of key initiatives to improve simplicity and cost.  In the third quarter, restructuring of the Company's automotive footprint was accelerated with the decision to close plants in Northridge, California and Martinsville, Indiana.

Also during the third quarter, the Company decided to shut down two smaller facilities in Massachusetts serving the Consumer division.  These operations will be integrated with other Harman facilities in California and New York.  Consolidations of additional Harman manufacturing and engineering facilities in Europe and Africa are under review.

These actions are expected to result in restructuring charges of $25 to $30 million in the third quarter and $5 to $10 million in the fourth quarter of fiscal 2008. About 1400 jobs will be affected, of which 500 jobs will be eliminated and the balance transferred to other Harman facilities in the United States, Germany, China, and Mexico.

The Company has added several hundred new jobs at its plants in Mexico and China and extensive job training is now being completed. The Company has also decided to add capacity to its plant in Hungary in order to expand production of audio electronics and speakers.

The Company is in the final stage of completing its plan to outsource its information technology infrastructure. This step will blend an outside service provider's solutions expertise with emerging-country resources to bring us significant gains in both agility and cost. This initiative will also help us take a closer look at alternative resources for project-related software, systems and costs.

In the third quarter, the Company also decided to consolidate resources from Washington, DC and Northridge, California to its new corporate headquarters in Stamford, Connecticut. This will accelerate the speed of decision making and improve coordination across key company functions.

**Outlook**

The Company expects continued growth in sales across its three divisions, although the economic slowdown may affect some of this growth. Fiscal 2008 performance will be adversely affected by lower PND margins, product mix, and higher engineering and material costs due to several new infotainment platform launches.

"We expect the remainder of 2008 and 2009 to be difficult as we complete the launch of a record number of infotainment platforms and face continued pricing pressures," said Dinesh Paliwal. "Management is responding aggressively to address these issues with a company-wide restructuring program to improve productivity and cost structure across manufacturing, engineering, and sourcing."

**Investor Call on February 5, 2008**

At 4:30 p.m. EST today, Harman management will host an analyst and investor conference call to discuss the second quarter results for the fiscal year 2008. To participate in the conference call, please dial (800) 230-1766 (US) or (612) 332-0107 (International), and reference Harman International.

A replay of the call will also be available following the completion of the call at approximately 6:30 p.m. EST. The replay will be available through February 19, 2008. To listen to the replay, dial (800) 475-6701 (US) or (320) 365-3844 (International), Access Code: 908855.

AT&T will also be web-casting the presentation. The web-cast can be accessed at http://65.197.1.5/att/confcast, enter the Conference ID: 908855, then enter the pass code: Harman and click Go. There will also be a link to the web-cast at www.harman.com. Participation through the web-cast will be in listen-only mode. If you need technical assistance, call the toll-free AT&T Conference Casting Support Help Line at (888) 793-6118 (US) or (678) 749-8002 (International).

The Company is making slides available on its website, www.harman.com, which provide an overview of its Automotive division landscape.

**General Information**

Harman International (www.harman.com) designs, manufactures and markets a wide range of audio and infotainment products for the automotive, consumer and professional markets. The Company maintains a strong presence in the Americas, Europe and Asia and employs more than 11,000 people worldwide. The Harman International family of brands spans some 15 leading names including AKG, Audioaccess, Becker, BSS, Crown, dbx, DigiTech, DOD, Harman Kardon, Infinity, JBL, Lexicon, Mark Levinson, Revel, QNX, Soundcraft and Studer.  The Company's stock is traded on the New York Stock Exchange under the Symbol HAR.

A reconciliation of the non-GAAP measures included in this press release to the most comparable GAAP measures is provided in the tables contained at the end of this press release.

*Forward-Looking Information*

*Except for historical information contained herein, the matters discussed are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act.  One should not place undue reliance on these statements.  We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current market conditions, current economic data, expected future developments and other factors that we believe are appropriate under the circumstances.  These statements involve risks and uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements, including but not limited to (1) changes in consumer confidence and general economic conditions in the U.S. and Europe; (2) the effect of changes in consumer confidence; (3) a change in interest rates affecting consumer spending; (4) automobile industry sales and production rates; (5) the loss of one or more significant customers, including our automotive customers; (6) model-year changeovers and customer acceptance in the automotive industry; (7) our ability to satisfy contract performance criteria at expected profit margins; (8) availability of key components for the products we manufacture; (9) customer acceptance of our consumer and professional products; (10) competition in the automotive, consumer or professional markets in which the Company operates, including pricing pressure in the market for PNDs and other products; (11) fluctuations in currency exchange rates; (12) the outcome of pending or future litigation and other claims, including, but not limited to the current stockholder and ERISA lawsuits or any claims or litigation arising out of our business, labor disputes at our facilities and those of our customers or common carriers; and (13) other risks detailed in Harman's Annual Report on Form 10-K for the fiscal year ended June 30, 2007 and other filings made by Harman with the Securities and Exchange Commission.*

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**GAAP CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(000s omitted except per share amounts)**
**(unaudited)**

|  | Three Months Ended December 31, | | Six Months Ended December 31, | |
|  | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|
| Net sales | $ 1,065,610 | 931,717 | 2,012,572 | 1,757,260 |
| Cost of sales | 764,486 | 612,079 | 1,446,873 | 1,150,333 |
| Gross profit | 301,124 | 319,638 | 565,699 | 606,927 |
| Selling, general and administrative expenses | 240,285 | 203,918 | 463,419 | 404,289 |
| Operating income | 60,839 | 115,720 | 102,280 | 202,638 |
| Other expenses: | | | | |
|    Interest expense, net | 2,907 | 498 | 4,317 | 637 |
|    Miscellaneous, net | 982 | 484 | 1,653 | 1,345 |
| Income before income taxes | 56,950 | 114,738 | 96,310 | 200,656 |
| Income tax expense, net | 14,596 | 33,839 | 18,253 | 63,474 |
| Minority interest | (526) | (490) | (1,352) | (815) |
| Net income | $ 42,880 | 81,389 | 79,409 | 137,997 |
| Basic earnings per share | $ 0.69 | 1.25 | 1.25 | 2.11 |
| Diluted earnings per share | $ 0.68 | 1.22 | 1.23 | 2.07 |
| Shares outstanding – Basic | 62,051 | 65,285 | 63,646 | 65,401 |
| Shares outstanding – Diluted | 62,882 | 66,525 | 64,623 | 66,592 |

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**GAAP CONDENSED CONSOLIDATED BALANCE SHEETS**
**(000s omitted)**
**(unaudited)**

|  | December 31, 2007 | December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 159,275 | $ 171,108 |
| Accounts receivable | 540,641 | 480,408 |
| Inventories | 435,324 | 454,682 |
| Other current assets | 191,107 | 193,389 |
| **Total current assets** | 1,326,347 | 1,299,587 |
| Property, plant and equipment, net | 611,139 | 511,618 |
| Goodwill | 421,898 | 396,219 |
| Other assets | 290,725 | 198,558 |
| **Total assets** | $ 2,650,109 | $ 2,405,982 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short-term borrowings | $ --- | $ 3,977 |
| Current portion of long-term debt | 587 | 17,012 |
| Accounts payable | 279,150 | 293,677 |
| Accrued liabilities | 401,543 | 561,288 |
| **Total current liabilities** | 681,280 | 875,954 |
| Borrowings under revolving credit facility | 177,950 | 118,495 |
| Long-term debt | 402,504 | 2,882 |
| Other non-current liabilities | 149,689 | 83,503 |
| **Total shareholders' equity** | 1,238,686 | 1,325,148 |
| **Total liabilities and shareholders' equity** | $ 2,650,109 | $ 2,405,982 |

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND**
**RECONCILIATION OF GAAP TO NON-GAAP RESULTS**
(000s omitted except per share amounts)
(unaudited)

|  | Three Months Ended December 31, 2007 | | | Three Months Ended December 31, 2006 |
|---|---|---|---|---|
|  | GAAP | Adjustments | Non-GAAP | GAAP |
| Net sales | $ 1,065,610 | --- | 1,065,610 | 931,717 |
| Cost of sales | 764,486 | --- | 764,486 | 612,079 |
| Gross profit | 301,124 | --- | 301,124 | 319,638 |
| Selling, general and administrative expenses | 240,285 | (9,146) (a) | 231,139 | 203,918 |
| Operating income | 60,839 | 9,146 | 69,985 | 115,720 |
| Other expenses: | | | | |
| Interest expense, net | 2,907 | --- | 2,907 | 498 |
| Miscellaneous, net | 982 | --- | 982 | 484 |
| Income before income taxes | 56,950 | 9,146 | 66,096 | 114,738 |
| Income tax expense, net | 14,596 | 5,847 | 20,443 | 33,839 |
| Minority interest | (526) | --- | (526) | (490) |
| Net income | $ 42,880 | 3,299 | 46,179 | 81,389 |
| Basic earnings per share | $ 0.69 | 0.05 | 0.74 | 1.25 |
| Diluted earnings per share | $ 0.68 | 0.05 | 0.73 | 1.22 |
| Shares outstanding – Basic | 62,051 | 62,051 | 62,051 | 65,285 |
| Shares outstanding – Diluted | 62,882 | 62,882 | 62,882 | 66,525 |

(a) **Merger costs, principally investment banking and professional fees, related to our transaction with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners were incurred during the second quarter in the amount of $9.1 million.**

*Harman International has provided a reconciliation of non-GAAP measures in order to provide the users of the financial statements accompanying this press release with a better understanding of our merger related costs incurred during the second quarter of fiscal 2008. These non-GAAP measures are not measurements under accounting principles generally accepted in the United States. These measurements should be considered in addition to, but not as a substitute for, the information contained in our financial statements prepared in accordance with GAAP.*

HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND
RECONCILIATION OF GAAP TO NON-GAAP RESULTS
(000s omitted except per share amounts)
(unaudited)

| | Six Months Ended December 31, 2007 | | | Six Months Ended December 31, 2006 |
| | GAAP | Adjustments | Non-GAAP | GAAP |
| --- | --- | --- | --- | --- |
| Net sales | $ 2,012,572 | --- | 2,012,572 | 1,757,260 |
| Cost of sales | 1,446,873 | --- | 1,446,873 | 1,150,333 |
| Gross profit | 565,699 | --- | 565,699 | 606,927 |
| Selling, general and administrative expenses | 463,419 | (13,844) (a) | 449,575 | 404,289 |
| Operating income | 102,280 | 13,844 | 116,124 | 202,638 |
| Other expenses: | | | | |
| Interest expense, net | 4,317 | --- | 4,317 | 637 |
| Miscellaneous, net | 1,653 | --- | 1,653 | 1,345 |
| Income before income taxes | 96,310 | 13,844 | 110,154 | 200,656 |
| Income tax expense, net | 18,253 | 5,847 | 24,100 | 63,474 |
| Minority interest | (1,352) | --- | (1,352) | (815) |
| Net income | $ 79,409 | 7,997 | 87,406 | 137,997 |
| Basic earnings per share | $ 1.25 | 0.12 | 1.37 | 2.11 |
| Diluted earnings per share | $ 1.23 | 0.12 | 1.35 | 2.07 |
| Shares outstanding – Basic | 63,646 | 63,646 | 63,646 | 65,401 |
| Shares outstanding – Diluted | 64,623 | 64,623 | 64,623 | 66,592 |

(a) **Merger costs, principally investment banking and professional fees, related to our terminated merger with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners were incurred during the six months ended December 31, 2007 in the amount of $13.8 million.**

*Harman International has provided a reconciliation of non-GAAP measures in order to provide the users of the financial statements accompanying this press release with a better understanding of our merger related costs incurred during the first half of fiscal 2008. These non-GAAP measures are not measurements under accounting principles generally accepted in the United States. These measurements should be considered in addition to, but not as a substitute for, the information contained in our financial statements prepared in accordance with GAAP.*

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**RECONCILIATION OF NON-GAAP MEASURES EXCLUDING EFFECT OF FOREIGN**
**CURRENCY TRANSLATION**
**($000s omitted)**

| | Three Months Ended December 31, | | Increase (Decrease) |
|---|---|---|---|
| | **2007** | **2006** | |
| **GAAP Net Sales** | $  1,065,610 | 931,717 | **14.4%** |
| **Effect of foreign currency translation[1]** | — | 74,974 | **8.5%** |
| **Net Sales, excluding effect of foreign currency translation** | 1,065,610 | 1,006,691 | **5.9%** |
| **GAAP Operating Income** | 60,839 | 115,720 | **(47.4%)** |
| **Effect of foreign currency translation[1]** | — | 13,767 | **(5.6%)** |
| **Operating Income, excluding effect of foreign currency translation** | 60,839 | 129,487 | **(53.0%)** |
| **GAAP Net Income** | 42,880 | 81,389 | **(47.3%)** |
| **Effect of foreign currency translation[1]** | — | 9,771 | **(5.7%)** |
| **Net Income, excluding effect of foreign currency translation** | $  42,880 | 91,160 | **(53.0%)** |

[1]2006 actual results translated at 2007 foreign exchange rates.

*Harman International has provided a reconciliation of the non-GAAP measures in the table above to provide the users of the financial statements accompanying this press release with a better understanding of the Company's performance. Because changes in exchange rates effect the rates of change of our financial results, we show the rates of change both including and excluding the effect of these changes in exchange rates and we encourage readers of our financial statements to evaluate our financial performance excluding the impact of foreign currency translation. These non-GAAP measures are not measurements under accounting principles generally accepted in the United States. These measurements should be considered in addition to, but not as a substitute for, the information contained in our financial statements prepared in accordance with GAAP.*

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**Form 10–Q**

x       **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
For the quarterly period ended **March 31, 2007**

Commission File Number: **1–9764**

**Harman International Industries, Incorporated**
*(Exact name of registrant as specified in its charter)*

| **Delaware** | **11–2534306** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. EmployerIdentification No.)* |

| **1101 Pennsylvania Avenue, NW,** | |
| **Suite 1010** | |
| **Washington, DC** | **20004** |
| *(Address of principal executive offices)* | *(Zip code)* |

**(202) 393–1101**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    x Yes    o No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. (Check one):

Large accelerated filer  x                    Accelerated filer  ¨                    Non–accelerated filer  ¨

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act).    o Yes    x No

As of April 30, 2007, there were 65,147,777 shares of common stock, par value $0.01, outstanding.

1

*Harman International Industries, Incorporated and Subsidiaries*
*Form 10−Q*

*TABLE OF CONTENTS*

| Part I | FINANCIAL INFORMATION | Page Number |
|--------|----------------------|-------------|
| Item 1. | Financial Statements | |
| | Condensed Consolidated Balance Sheets March 31, 2007 (unaudited) and June 30, 2006 | 5 |
| | Condensed Consolidated Statements of Operations (unaudited) Three and Nine months ended March 31, 2007 and 2006 | 6 |
| | Condensed Consolidated Statements of Cash Flows (unaudited) Nine months ended March 31, 2007 and 2006 | 7 |
| | Notes to Condensed Consolidated Financial Statements (unaudited) | 8 |
| Item1A. | Risk Factors | 18 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 28 |
| Item 4. | Controls and Procedures | 29 |
| Part II | OTHER INFORMATION | |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 30 |
| Item 6. | Exhibits | 31 |
| | Signatures | 32 |

The page numbers in this Table of Contents reflect actual page numbers, not EDGAR page tag numbers.

References to "Harman International," the "Company," "we," "us" and "our" in this Form 10−Q refer to Harman International Industries, Incorporated and its subsidiaries unless the context requires otherwise.

*Forward–Looking Statements*

This report contains forward–looking statements within the meaning of Section 27A of the Securities Act of 1933 and 21E of the Securities Exchange Act of 1934. You should not place undue reliance on these statements. Forward–looking statements include information concerning possible or assumed future results of operations, capital expenditures, the outcome of pending legal proceedings and claims, including environmental matters, goals and objectives for future operations, including descriptions of our business strategies and purchase commitments from customers. These statements are typically identified by words such as "believe," "anticipate," "expect," "plan," "intend," "estimate" and similar expressions. We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current conditions, expected future developments and other factors that we believe are appropriate under the circumstances. As you read and consider the information in this report, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. In light of these risks and uncertainties, there can be no assurance that the results and events contemplated by the forward–looking statements contained in this report will in fact transpire.

You should carefully consider the risks described below and the other information in this report. Our operating results may fluctuate significantly and may not meet our expectations or those of securities analysts or investors. The price of our common stock would likely decline if this occurs. In addition, the proposed acquisition of our Company by affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners ("GSCP"), as reported on our current report on Form 8–K filed with the Securities and Exchange Commission on April 26, 2007, may cause the price of our common stock to fluctuate significantly.

Factors that may cause fluctuations in our operating results and/or the price of our common stock include, but are not limited to, the following:

- the occurrence of any event, change or other circumstance that could give rise to the termination of the merger agreement providing for the acquisition of our Company by affiliates of KKR and GSCP;

- the inability to complete the proposed acquisition due to the failure to obtain stockholder approval or the failure to satisfy other conditions to the consummation of the acquisition;

- the failure of the proposed acquisition of our Company by affiliates of KKR and GSCP to close for any other reason;

- risks that the proposed acquisition disrupts current plans and operations, as well as relationships with key customers and suppliers, and the potential difficulties in employee retention as a result of the proposed acquisition;

- the impact of the substantial indebtedness incurred to finance the proposed acquisition of our Company;

- the amount of costs, fees, expenses and charges related to the proposed acquisition of our Company and the actual terms of certain financings that will be obtained for the acquisition of our Company;

- automobile industry sales and production rates and the willingness of automobile purchasers to pay for the option of a premium audio system and/or a multi–functional infotainment system;

- changes in consumer confidence and spending;

- fluctuations in currency exchange rates and other risks inherent in international trade and business transactions;

- our ability to satisfy contract performance criteria, including technical specifications and due dates;

*Forward−Looking Statements (continued)*

• our ability to design and manufacture our products profitably under our long−term contractual commitments;

• the loss of one or more significant customers, including our automotive manufacturer customers;

• competition in the automotive, consumer or professional markets in which we operate;

• model−year changeovers in the automotive industry;

• changes in general economic conditions and specific market conditions;

• our ability to enforce or defend our ownership and use of intellectual property;

• our ability to effectively integrate acquisitions made by our Company;

• strikes, work stoppages and labor negotiations at our facilities or at a facility of one of our significant customers; or work stoppages at a common carrier or a major shipping location;

• the outcome of pending or future litigation and administrative claims, including patent and environmental matters; and

• world political stability.

Although we believe that these forward−looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results, results of operations and/or the price of our common stock and could cause actual results to differ materially from those expressed in the forward−looking statements. As a result, the forgoing factors should not be construed as exhaustive and should be read together with the other cautionary statements included in this and other reports we file with the Securities and Exchange Commission, including the information in Item 1A, "Risk Factors" of Part I to our Annual Report on Form 10−K for the fiscal year ended June 30, 2006.

*Part I.*     **FINANCIAL INFORMATION**

*Item 1.*     **Financial Statements**

### Condensed Consolidated Balance Sheets
Harman International Industries, Incorporated and Subsidiaries
($000s omitted except share amounts)

|  | | March 31, 2007 (Unaudited) | June 30, 2006 |
|---|---|---|---|
| *Assets* | | | |
| Current assets | | | |
| Cash and cash equivalents | $ | 96,961 | 291,758 |
| Receivables (less allowance for doubtful accounts of $9,147 at March 31, 2007 and $8,738 at June 30, 2006) | | 529,719 | 444,474 |
| Inventories | | 480,179 | 344,957 |
| Other current assets | | 170,114 | 168,168 |
| Total current assets | | 1,276,973 | 1,249,357 |
| | | | |
| Property, plant and equipment, net | | 529,456 | 521,935 |
| Goodwill | | 400,123 | 381,219 |
| Other assets | | 192,482 | 202,150 |
| Total assets | $ | 2,399,034 | 2,354,661 |
| | | | |
| *Liabilities and Shareholders' Equity* | | | |
| Current liabilities | | | |
| Short–term borrowings | $ | 3,084 | 1,751 |
| Current portion of long–term debt | | 17,020 | 16,337 |
| Accounts payable | | 270,421 | 320,327 |
| Accrued liabilities | | 396,673 | 414,093 |
| Income taxes payable | | 125,843 | 116,493 |
| Total current liabilities | | 813,041 | 869,001 |
| | | | |
| Borrowings under revolving credit facility | | 136,702 | 159,900 |
| Senior notes | | 2,751 | 19,566 |
| Minority interest | | 1,439 | 2,716 |
| Other non–current liabilities | | 81,216 | 75,314 |
| Shareholders' equity | | | |
| Preferred stock, $.01 par value. Authorized 5,000,000 shares; none issued and outstanding | | —— | —— |
| Common stock, $.01 par value. Authorized 200,000,000 shares; issued and outstanding 83,345,859 at March 31, 2007 and 82,754,909 at June 30, 2006 | | 833 | 827 |
| Additional paid–in capital | | 578,241 | 544,871 |
| Accumulated other comprehensive income (loss): | | | |
| Unrealized loss on hedging derivatives | | (1,896) | (3,267) |
| Minimum pension liability adjustment | | (11,811) | (11,789) |
| Cumulative foreign currency translation adjustment | | 87,464 | 64,280 |
| Retained earnings | | 1,350,662 | 1,144,070 |
| Less common stock held in treasury (18,198,082 shares at March 31, 2007 and 16,690,182 at June 30, 2006) | | (639,608) | (510,828) |
| Total shareholders' equity | | 1,363,885 | 1,228,164 |
| Total liabilities and shareholders' equity | $ | 2,399,034 | 2,354,661 |

See accompanying notes to condensed consolidated financial statements.

5

***Condensed Consolidated Statements of Operations***
Harman International Industries, Incorporated and Subsidiaries
(000s omitted except per share amounts)
(Unaudited)

|  |  | Three months ended March 31, | | Nine months ended March 31, | |
|  |  | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|---|
| Net sales | $ | 882,771 | 801,487 | 2,640,031 | 2,388,780 |
| Cost of sales |  | 577,396 | 519,870 | 1,727,729 | 1,535,099 |
| Gross profit |  | 305,375 | 281,617 | 912,302 | 853,681 |
| Selling, general and administrative expenses |  | 203,052 | 182,827 | 607,341 | 560,838 |
| Operating income |  | 102,323 | 98,790 | 304,961 | 292,843 |
| Other expenses: |  |  |  |  |  |
|   Interest expense, net |  | 340 | 2,492 | 977 | 10,889 |
|   Miscellaneous, net |  | 543 | 857 | 1,888 | 2,627 |
| Income before income taxes and minority interest |  | 101,440 | 95,441 | 302,096 | 279,327 |
| Income tax expense, net |  | 30,895 | 31,775 | 94,369 | 89,516 |
| Minority interest |  | (498) | (360) | (1,313) | (717) |
| Net income | $ | 71,043 | 64,026 | 209,040 | 190,528 |
| Basic earnings per share | $ | 1.09 | 0.96 | 3.20 | 2.88 |
| Diluted earnings per share | $ | 1.07 | 0.94 | 3.14 | 2.80 |
| Weighted average shares – basic |  | 65,239 | 66,428 | 65,348 | 66,103 |
| Weighted average shares – diluted |  | 66,327 | 68,109 | 66,501 | 68,164 |

See accompanying notes to condensed consolidated financial statements.

6

*Condensed Consolidated Statements of Cash Flows*
Harman International Industries, Incorporated and Subsidiaries
($000s omitted)
(Unaudited)

| | | Nine months ended March 31, | |
| --- | --- | --- | --- |
| | | 2007 | 2006 |
| Cash flows from operating activities: | | | |
| Net income | $ | 209,040 | 190,528 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | | 93,395 | 92,126 |
| Loss on disposition of assets | | 1,691 | 51 |
| Stock option expense | | 11,844 | 11,725 |
| Excess tax benefits from share–based payment arrangements | | (7,763) | (42,952) |
| Changes in working capital, net of acquisition/disposition effects: | | | |
| Decrease (increase) in: | | | |
| Receivables | | (68,120) | (5,571) |
| Inventories | | (123,436) | (25,144) |
| Other current assets | | (8,481) | (13,744) |
| Increase (decrease) in: | | | |
| Accounts payable | | (57,142) | (31,151) |
| Accrued liabilities | | (26,996) | 42,245 |
| Income taxes payable | | 3,051 | 17,420 |
| Other operating activities | | 12,248 | 5,777 |
| Net cash provided by operating activities | $ | 39,331 | 241,310 |
| Cash flows from investing activities: | | | |
| Payment for purchase of companies, net of cash acquired | $ | (6,660) | (11,811) |
| Proceeds from asset dispositions | | 1,340 | 1,024 |
| Capital expenditures | | (84,364) | (74,972) |
| Other items, net | | (983) | (1,603) |
| Net cash used in investing activities | $ | (90,667) | (87,362) |
| Cash flows from financing activities: | | | |
| Net increase (decrease) in short–term borrowings | $ | 1,347 | (833) |
| Net repayments under revolving credit facility | | (25,660) | ––– |
| Repayment of long–term debt | | (13,168) | ––– |
| Other increase (decrease) in long–term debt | | (4,770) | 1,637 |
| Repurchase of common stock | | (128,780) | (118,972) |
| Dividends paid to shareholders | | (2,448) | (2,485) |
| Exercise of stock options | | 21,532 | 26,031 |
| Excess tax benefits from share–based payment arrangements | | 7,763 | 42,952 |
| Other | | ––– | 108 |
| Net cash used in financing activities | $ | (144,184) | (51,562) |
| Effect of exchange rate changes on cash | | 723 | 3,499 |
| Net increase (decrease) in cash and cash equivalents | $ | (194,797) | 105,885 |
| Cash and cash equivalents at beginning of period | | 291,758 | 291,214 |
| Cash and cash equivalents at end of period | $ | 96,961 | 397,099 |
| | | | |
| Supplemental disclosure of cash flow information: | | | |
| Interest paid | $ | 2,649 | 14,249 |
| Income taxes paid | $ | 91,058 | 81,779 |
| Supplemental schedule of non–cash investing activities: | | | |
| Fair value of assets acquired | $ | ––– | 12,102 |
| Cash paid for the assets | | ––– | 6,503 |
| Liabilities assumed | $ | ––– | 5,599 |

See accompanying notes to condensed consolidated financial statements.

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED AND SUBSIDIARIES**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

*Note 1.  Basis of Presentation*

Our unaudited, condensed consolidated financial statements at March 31, 2007 and for the three and nine months ended March 31, 2007 and 2006, have been prepared pursuant to rules and regulations of the Securities and Exchange Commission ("SEC"). These unaudited condensed consolidated financial statements do not include all information and footnote disclosures included in our audited financial statements. In the opinion of management, the accompanying unaudited condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments and accruals, necessary to present fairly, in all material respects, the consolidated financial position, results of operations and cash flows for the periods presented. Operating results for the three and nine months ended March 31, 2007 are not necessarily indicative of the results that may be expected for the full fiscal year ending June 30, 2007 due to seasonal, economic and other factors.

Where necessary, information for prior periods has been reclassified to conform to the consolidated financial statement presentation for the corresponding periods in the current fiscal year.

These unaudited condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements and accompanying notes included in our Annual Report on Form 10–K for the fiscal year ended June 30, 2006.

*Note 2.  Inventories*

Inventories consist of the following:

| ($000s omitted) | | March 31, 2007 | June 30, 2006 |
|---|---|---|---|
| Finished goods | $ | 267,473 | 147,663 |
| Work in process | | 55,488 | 45,954 |
| Raw materials | | 157,218 | 151,340 |
| Total | $ | 480,179 | 344,957 |

Inventories are stated at the lower of cost or market value. Cost is determined principally by the first–in, first–out method. The valuation of inventory requires us to make judgments and estimates regarding obsolete, damaged or excess inventory as well as current and future demand for our products. The estimates of future demand along with analysis of usage data that we use in the valuation of inventory are the basis for our inventory reserves and have an effect on our results of operations. We calculate inventory reserves using a combination of a lower of cost or market analysis, an analysis of historical usage data, forecast demand data and historical disposal rates. Lower of cost or market analysis is typically applied to those items of inventory that represent a substantial portion of the total value of inventory on–hand. The high–value units typically represent a small percentage of the total inventory items, so identification of obsolescence or valuation reserve requirements for the balance of the inventory on–hand is accomplished using either historical or forecast usage to identify slow–moving or obsolete items.

8

*Note 3.  Warranty Liabilities*

We warrant our products to be free from defects in materials and workmanship for periods generally ranging from one to five years from the date of purchase, depending on the product. The warranty is a limited warranty, and it may impose certain shipping costs on the customer and excludes deficiencies in appearance except for those evident when the product is delivered. Our dealers and warranty service providers normally perform warranty service for loudspeakers and electronics in the field, using parts supplied on an exchange basis by our company. Estimated warranty liabilities are based upon past experience with similar types of products, the technological complexity of certain products, replacement cost and other factors. We take these factors into consideration when assessing the adequacy of our warranty provisions for periods still open to claim.

Details of the estimated warranty liabilities are as follows:

| | | Nine months ended March 31, | |
|---|---|---|---|
| ($000s omitted) | | 2007 | 2006 |
| Beginning balance (June 30) | $ | 60,768 | 48,582 |
| Warranty provisions | | 44,148 | 37,476 |
| Warranty payments (cash or in–kind) | | (45,467) | (25,952) |
| Ending balance | $ | 59,449 | 60,106 |

The warranty liabilities are included in accrued liabilities on our Condensed Consolidated Balance Sheets. Our warranty payments in the 2007 period included approximately $12 million paid to a customer for prior period warranty claims. Payments were delayed to this customer due to a change in the customer's collection process system.

*Note 4.  Comprehensive Income*

The components of comprehensive income are as follows:

| | | Three months ended March 31, | | Nine months ended March 31, | |
|---|---|---|---|---|---|
| ($000s omitted) | | 2007 | 2006 | 2007 | 2006 |
| Net income | $ | 71,043 | 64,026 | 209,040 | 190,528 |
| Other comprehensive income (loss): | | | | | |
|    Foreign currency translation | | 4,569 | 17,904 | 23,184 | 2,865 |
|    Unrealized gains (losses) on hedging | | 15 | (3,453) | 1,371 | (3,846) |
|    Minimum pension liability adjustment | | (6) | (54) | (22) | (4) |
| Total other comprehensive income | $ | 75,621 | 78,423 | 233,573 | 189,543 |

The components of accumulated other comprehensive income (loss) as of March 31, 2007 and June 30, 2006, and the activity for the nine months ended March 31, 2007 are presented below:

| ($000s omitted) | Unrealized gain (loss) on hedging derivatives | Minimum pension liability adjustment | Cumulative foreign currency translation adjustment | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|
| June 30, 2006 | $ (3,267) | (11,789) | 64,280 | 49,224 |
| Foreign currency translation adjustments | ——— | ——— | 23,184 | 23,184 |
| Change in fair value of foreign currency cash flow hedges | 1,371 | ——— | ——— | 1,371 |
| Minimum pension liability adjustment | ——— | (22) | ——— | (22) |
| March 31, 2007 | $ (1,896) | (11,811) | 87,464 | 73,757 |

## Note 5.  Earnings Per Share

The following table presents the calculation of basic and diluted earnings per common share outstanding:

| (000s omitted except per share amounts) | Three months ended March 31, | | | |
|---|---|---|---|---|
| | 2007 | | 2006 | |
| | Basic | Diluted | Basic | Diluted |
| Net income | $ 71,043 | 71,043 | 64,026 | 64,026 |
| Weighted average shares outstanding | 65,239 | 65,239 | 66,428 | 66,428 |
| Employee stock options | ——— | 1,088 | ——— | 1,681 |
| Total weighted average shares outstanding | 65,239 | 66,327 | 66,428 | 68,109 |
| Earnings per share | $ 1.09 | 1.07 | 0.96 | 0.94 |

| (000s omitted except per share amounts) | Nine months ended March 31, | | | |
|---|---|---|---|---|
| | 2007 | | 2006 | |
| | Basic | Diluted | Basic | Diluted |
| Net income | $ 209,040 | 209,040 | 190,528 | 190,528 |
| Weighted average shares outstanding | 65,348 | 65,348 | 66,103 | 66,103 |
| Employee stock options | ——— | 1,153 | ——— | 2,061 |
| Total weighted average shares outstanding | 65,348 | 66,501 | 66,103 | 68,164 |
| Earnings per share | $ 3.20 | 3.14 | 2.88 | 2.80 |

Certain options were outstanding and not included in the computation of diluted earnings per share because the assumed exercise of these options would have been antidilutive. Options to purchase 540,922 shares of our common stock with exercise prices ranging from $78.00 to $126.94 per share during the quarter ended March 31, 2007 and options to purchase 217,972 shares of our common stock at prices ranging from $82.00 to $126.94 per share during the quarter ended March 31, 2006, were outstanding and not included in the computation of diluted earnings per share because the exercise of these options would have been antidilutive.

10

Options to purchase 1,023,284 shares of our common stock at prices ranging from $78.00 to $126.94 per share during the nine months ended March 31, 2007 and options to purchase 833,303 shares of common stock at prices ranging from $82.00 to $126.94 per share during the nine months ended March 31, 2006, were outstanding and not included in the computation of diluted earnings per share because the exercise of these options would have been antidilutive.

*Note 6.  Stock Options*

On March 31, 2007 we had one share−based compensation plan with shares available for future grants, the 2002 Stock Option and Incentive Plan (the "2002 Plan"). The 2002 Plan permits the grant of stock options, restricted stock and restricted stock units. In 2006, the Company's Board of Directors approved amendments to the 2002 Plan. The amendments provide for the issuance of restricted stock units under the 2002 Plan, to reduce the number of options granted annually to non−management directors from a maximum of 9,000 to a fixed number of 5,000 and increase the initial one−time grant of options to new non−management directors from 6,000 to 8,000.

Share−based compensation expense was $3.6 million and $3.8 million for the quarters ended March 31, 2007 and 2006, respectively, and $11.8 million and $11.7 million for the nine months ended March 31, 2007 and 2006, respectively. Share−based compensation expense has been recorded in selling, general and administrative expense for the quarter and nine months ended March 31, 2007 and 2006. The total income tax benefit recognized in the income statement for share−based compensation arrangements was $1.0 million for each of the quarters ended March 31, 2007 and 2006, respectively, and $3.5 million and $3.2 million for the nine months ended March 31, 2007 and 2006, respectively.

*Fair Value Determination*

The fair value of each option award is estimated on the date of grant using the Black−Scholes option valuation model, which uses the assumptions noted in the following table:

|  | Nine months ended March 31, | |
|  | 2007 | 2006 |
| --- | --- | --- |
| Expected volatility | 35.0% − 42.0% | 38.0 − 42.0% |
| Weighted−average volatility | 39.1% | 38.5% |
| Expected annual dividend | $0.05 | $0.05 |
| Expected term (in years) | 1.55 − 7.69 | 4.24 − 6.33 |
| Risk−free rate | 4.4% − 5.0% | 3.9 − 4.3% |

Groups of option holders (directors, executives and non−executives) that have similar historical behavior are considered separately for valuation purposes. Expected volatilities are based on historical closing prices of our common stock over the expected option term. We use historical data to estimate option exercises and employee terminations within the valuation model. The expected term of options granted is derived using the option valuation model and represents the estimated period of time from the date of grant that the option is expected to remain outstanding. The risk−free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

11

*Stock Option Activity*

A summary of option activity under our stock option plans as of March 31, 2007 and changes during the nine months ended March 31, 2007 is presented below:

| | Shares | Weighted average exercise price | Weighted average remaining contractual term (years) | Aggregate intrinsic value ($000s omitted) |
|---|---|---|---|---|
| Outstanding at June 30, 2006 | 3,299,720 | $ 47.04 | | |
| Granted | 331,000 | 80.91 | | |
| Exercised | (596,868) | 38.41 | | |
| Forfeited or expired | (145,340) | 81.85 | | |
| Outstanding at March 31, 2007 | 2,888,512 | 50.95 | 5.99 | $ 131,966 |
| Exercisable at March 31, 2007 | 1,608,732 | $ 32.02 | 4.56 | $ 103,620 |

The weighted–average grant–date fair value of options granted during the quarter ended March 31, 2007 was $34.27. There were no options granted during the quarter ended March 31, 2006. The weighted–average grant–date fair value of options granted during the nine months ended March 31, 2007 and 2006 was $34.98 and $30.24, respectively. The total intrinsic value of options exercised during the quarters ended March 31, 2007 and 2006 was $20.3 million and $116.0 million, respectively. The total intrinsic value of options exercised during the nine months ended March 31, 2007 and 2006 was $35.6 million and $140.7 million, respectively.

A summary of the status of our nonvested shares of restricted stock as of March 31, 2007 and changes during the nine months ended March 31, 2007 is presented as follows:

| | Shares | Weighted average grant–date fair value |
|---|---|---|
| Nonvested at June 30, 2006 | 37,000 | $ 85.36 |
| Granted | ––– | ––– |
| Vested | ––– | ––– |
| Forfeited | (25,000) | 86.98 |
| Nonvested at March 31, 2007 | 12,000 | 82.00 |

As of March 31, 2007, there was $0.4 million of total unrecognized compensation cost related to nonvested restricted share–based compensation arrangements granted under the 2002 Plan. The weighted average recognition period is 1.38 years. No shares of restricted stock vested in the nine months ended March 31, 2007.

During the nine months ended March 31, 2007, 25,000 restricted share units were granted with a zero–value exercise price and an aggregate intrinsic value of $2.4 million. As of March 31, 2007, there was $1.4 million of total unrecognized compensation cost related to restricted share unit compensation arrangements granted under the 2002 Plan. The weighted average recognition period is 2.51 years. No restricted share units vested or were exercisable in the nine months ended March 31, 2007.

*Note 7.  Business Segment Data*

We design, manufacture and market high–quality, high–fidelity audio products and electronic systems for the automotive, consumer and professional markets. We organize our businesses into reporting segments based upon the end–user markets served. Our chief operating decision makers evaluate performance and allocate resources primarily based on net sales, operating income and working capital in each of the reporting segments. We report on the basis of three segments: Automotive, Consumer and Professional.

Our Automotive segment designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications primarily to be installed as original equipment by automotive manufacturers. Our automotive products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Becker, Logic 7 and Mark Levinson. Our premium branded audio, video, navigation and infotainment systems are offered to automobile manufacturers through engineering and supply agreements. See Note 12 "Significant Customers." Our Automotive segment also produces personal navigation devices ("PNDs") and other electronic equipment that are sold to aftermarket retailers.

Our Consumer segment designs, manufactures and markets audio, video and electronic systems for home, mobile and multimedia applications. Our Consumer home products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Lexicon, Mark Levinson and Revel. Our audio and electronic products are offered through audio/video specialty and retail chain stores. Our branded audio products for multimedia applications are focused on retail customers that sell products designed to enhance sound for computers, Apple's iPods and other MP3 players.

The Professional segment designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, houses of worship, airports and other public spaces. We also create products for recording, broadcast, cinema and music reproduction applications. Our Professional products are marketed worldwide under brand names including JBL Professional, AKG, Crown, Soundcraft, Lexicon, Digitech, dbx and Studer. We provide high–quality products to the sound reinforcement, music instrument support and broadcast and recording segments of the professional audio market. We offer complete systems solutions for professional installations and users around the world.

The following table reports net sales and operating income (loss) by each reporting segment:

| ($000s omitted) | | Three months ended March 31, | | Nine months ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | | 2007 | 2006 | 2007 | 2006 |
| Net sales: | | | | | |
| Automotive | $ | 624,855 | 567,340 | 1,858,156 | 1,635,220 |
| Consumer | | 117,960 | 106,810 | 374,097 | 373,186 |
| Professional | | 139,956 | 127,337 | 407,778 | 380,374 |
| Total | $ | 882,771 | 801,487 | 2,640,031 | 2,388,780 |
| | | | | | |
| Operating income (loss): | | | | | |
| Automotive | $ | 92,107 | 91,003 | 274,683 | 252,961 |
| Consumer | | 1,727 | 5,215 | 11,979 | 37,786 |
| Professional | | 18,857 | 13,526 | 56,030 | 41,377 |
| Other | | (10,368) | (10,954) | (37,731) | (39,281) |
| Total | $ | 102,323 | 98,790 | 304,961 | 292,843 |

Other operating loss is comprised of activity related to our corporate operations, net of reporting segment allocations.

13

*Note 8.  Derivatives*

We use foreign currency forward contracts to hedge a portion of our forecasted foreign currency denominated purchase transactions and the settlement of the associated payables. These forward contracts are designated as foreign currency cash flow hedges and recorded at fair value in the accompanying consolidated balance sheet with a corresponding entry to accumulated other comprehensive income (loss) until the underlying forecasted foreign currency transaction occurs.

When the transaction occurs, the gain or loss from the derivative designated as a hedge of the transaction is reclassified from accumulated other comprehensive income (loss) to the same income statement line item in which the foreign currency gain or loss on the underlying hedged transaction is recorded. When it becomes apparent that an underlying forecasted transaction will not occur, the amount recorded in accumulated other comprehensive income (loss) related to the hedge is reclassified to the miscellaneous, net line of the income statement in the then–current period.

Changes in the fair value of the derivatives are highly effective in offsetting change in the cash flows of the hedged items because the amounts and the maturities of the derivatives approximate those of the forecasted exposures. When it has been determined that a hedge has become ineffective, the ineffective portion of the hedge is recorded in current earnings.

At March 31, 2007, we had forward contracts maturing through June 2008 to sell Euros and buy U.S. dollars of approximately $87.0 million, and through June 2007 to buy Canadian dollars and sell U.S. dollars of approximately $2.0 million to hedge future foreign currency purchases. At March 31, 2007, the amount associated with these hedges that is expected to be reclassified from accumulated other comprehensive income (loss) to earnings within the next twelve months is a loss of approximately $1.6 million and thereafter a slight loss. This amount represents the fair market value of foreign currency forward contracts at March 31, 2007. In the nine months ended March 31, 2007, we recognized approximately $2.6 million in net losses from cash flow hedges of forecasted foreign currency transactions compared to $5.3 million in net gains in the same period last year. As of March 31, 2007, we recognized a net gain of $0.2 million in other non–operating income related to the portion of the change in fair value of the derivative instrument attributable to the forward points excluded from the assessment of hedge effectiveness. During the period, there was no amount of ineffectiveness recognized in earnings.

As of March 31, 2007, we also had contracts maturing through June 2007 to purchase and sell the equivalent of $53.4 million of various currencies to hedge foreign currency denominated loans to foreign subsidiaries. These loans are of a long–term investment nature. Adjustments to the carrying value of the foreign currency forward contracts offset the gains and losses on the underlying loans. At March 31, 2007, the market value of these contracts was a net loss of $0.2 million. These forward contracts are not designated as hedge accounting relationships.

In February 2007, we entered into an interest rate swap to effectively convert interest on an operating lease from a variable rate to a fixed rate in order to hedge the component of rent expense related to forecasted interest payments. The objective of the swap is to offset changes in forecasted interest payments caused by interest rate fluctuations. The interest rate swap is designated as a cash flow hedge and recorded at fair value in the accompanying consolidated balance sheet with a corresponding entry to accumulated other comprehensive income ("OCI").

At the end of each reporting period the discounted fair value of the swap is calculated. The fair value is recorded as an asset or liability. The accrued but unpaid net interest on the swap is recorded in rent expense. The Company assesses the effectiveness of the hedge and based upon the results the hedging relationship is highly effective in achieving offsetting cash flows attributable to the changes in the interest

rate. The effective income (loss) is recorded in accumulated other comprehensive income. If the hedge is determined to be ineffective, the changes in the fair value for the period will be recorded in earnings as part of rent expense.

As of March 31, 2007 the notional amount of the swap was $27.3 million and the amount recorded in other comprehensive income was a slight loss. As of March 31, 2007 the amount associated with the swap that is expected to be recorded in rent expense within the next twelve months is a loss of $0.1 million. There was no amount of ineffectiveness recognized on this hedge contract during the three and nine month periods ended March 31, 2007.

### Note 9.  Commitments and Contingencies

As of March 31, 2007, we were involved in several legal actions. The outcome of these legal actions cannot be predicted with certainty; however, management, based upon advice from legal counsel, believes such actions are either without merit or will not have a material adverse effect on our financial position or results of operations. In fiscal 2005, we recorded a $6 million liability for probable unasserted claims. There were no changes in the status of these claims at March 31, 2007.

As of March 31, 2007, our Board of Directors has authorized the repurchase of a total of up to 20 million shares of common stock. During the nine months ended March 31, 2007, we repurchased 1,507,900 shares of our common stock at a total cost of $128.8 million. Through March 31, 2007, we had acquired and placed in treasury a total of 18,198,082 shares of our common stock at a cost of $639.6 million. We have suspended the share repurchase program due to the proposed acquisition of our Company. See Note 14. "Subsequent Events."

### Note 10.  Recent Accounting Pronouncements

In February 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities*. The statement permits entities to choose to measure many financial instruments and certain warranty and insurance contracts at fair value on a contract–by–contract basis. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. We are currently assessing the impact of SFAS No. 159 on our consolidated financial statements upon adoption in fiscal 2009.

In September 2006, FASB issued SFAS No. 157, *Fair Value Measurements*. The statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles in the United States of America ("GAAP"), and enhances disclosures about fair value measurements. This statement applies when other accounting pronouncements require fair value measurements. It does not require new fair value measurements. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. We do not expect SFAS No. 157 to have a material impact on our consolidated financial statements upon adoption in fiscal 2009.

In September 2006, FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*. This statement requires an employer to recognize on its balance sheet the overfunded or underfunded status of a defined benefit postretirement plan measured as the difference between the fair value of plan assets and the benefit obligation. Employers must also recognize as a component of accumulated other comprehensive income, net of tax, the actuarial gains and losses and the prior service costs and credits that arise during the period. SFAS No. 158 requires companies to apply the requirement to recognize the funded status of a benefit plan and the disclosure requirements as of the end of the fiscal years ending after December 15, 2006. We are currently assessing the impact of the adoption of SFAS No. 158 for the 2007 fiscal year end.

In September 2006, the SEC released SEC Staff Accounting Bulletin ("SAB") No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, which addresses how uncorrected errors in previous years should be considered when quantifying errors in current–year financial statements. SAB No. 108 requires registrants to consider the effect of all carry over and reversing effects of prior–year misstatements when quantifying errors in current–year financial statements. SAB No. 108 allows registrants to record the effects of adopting the guidance as a cumulative–effect adjustment to retained earnings. This adjustment must be reported as of the beginning of the first fiscal year ending after November 15, 2006. We do not expect SAB No. 108 to have a material impact on our consolidated financial statements upon adoption on July 1, 2007.

### Note 11.  Pensions and Other Postretirement Benefits

We provide defined benefit pension and other postretirement benefits to certain eligible employees. In Europe, we have business units that maintain defined benefit pension plans for certain current and former employees. Generally, plan benefits are based on age, years of service and average compensation during the final years of service. In the United States, other postretirement benefits are comprised of an unfunded Supplemental Executive Retirement Plan (SERP) that provides retirement, pre–retirement and termination benefits, as defined, to certain key executives designated by our Board of Directors.

On April 26, 2007, we entered into an Agreement and Plan of Merger with affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners ("GSCP"). Due to the occurrence of a potential change in control, we presently anticipate making a contribution of between $15 and $20 million to the SERP during the fourth quarter of fiscal 2007. If, however, within the three–year period following the closing of the proposed acquisition of our Company by affiliates KKR and GSCP any of these key executives terminates employment for any reason other than death, such executive will vest in the right to receive his full benefit accrued under the SERP, without regard to the executive's length of service. This benefit will commence upon the executive reaching age 65 or, if later, his termination of employment.

Our pension and other postretirement benefit plans are more fully disclosed in Notes 1 and 12 to our Consolidated Financial Statements included in Item 8. "Financial Statements and Supplementary Data" of Part II to our Annual Report on Form 10–K for the fiscal year ended June 30, 2006. The following table presents the components of net periodic benefit costs for the three months ended March 31, 2007 and 2006:

|  | | Pension benefits | | Other postretirement benefits | |
| --- | --- | --- | --- | --- | --- |
| ($000s omitted) | | 2007 | 2006 | 2007 | 2006 |
| **Components of net periodic benefit cost:** | | | | | |
| Service cost | $ | 386 | 303 | 373 | 400 |
| Interest cost | | 602 | 473 | 788 | 587 |
| Expected return on plan assets | | (33) | (24) | ––– | ––– |
| Amortization of prior service cost | | ––– | ––– | 215 | 182 |
| Amortization of net loss | | ––– | 13 | 303 | 368 |
| Net periodic benefit cost | $ | 955 | 765 | 1,679 | 1,537 |

16

The following table presents the components of net periodic benefit costs for the nine months ended March 31, 2007 and 2006.

| ($000s omitted) | | Pension benefits | | Other postretirement benefits | |
|---|---|---|---|---|---|
| Components of net periodic benefit cost: | | 2007 | 2006 | 2007 | 2006 |
| Service cost | $ | 1,142 | 910 | 1,149 | 1,200 |
| Interest cost | | 1,775 | 1,419 | 2,020 | 1,761 |
| Expected return on plan assets | | (93) | (72) | ––– | ––– |
| Amortization of prior service cost | | ––– | ––– | 579 | 546 |
| Amortization of net loss | | ––– | 40 | 1,179 | 1,104 |
| Net periodic benefit cost | $ | 2,824 | 2,297 | 4,927 | 4,611 |

During the three and nine months ended March 31, 2007, we made an insignificant contribution to the defined benefit pension plans and expect full year contributions to be immaterial.

*Note 12.  Significant Customers*

Presented below are the percentages of net sales to and receivables due from customers who represent 10 percent or more of our net sales or accounts receivable:

| | Net sales | | Receivables | |
|---|---|---|---|---|
| | Nine months ended March 31, | | March 31, | |
| | 2007 | 2006 | 2007 | 2006 |
| DaimlerChrysler | 26 % | 25 | 20 % | 20 |
| Toyota/Lexus | 10 | 9 | 7 | 6 |
| Audi/VW | 10 | 8 | 8 | 10 |
| BMW | 9 | 10 | 7 | 8 |
| Other Customers | 45 | 48 | 58 | 56 |
| Total | 100 % | 100 | 100 % | 100 |

We anticipate that DaimlerChrysler, Toyota/Lexus, Audi/VW and BMW will continue to account for a significant portion of our net sales and accounts receivable for the foreseeable future. These automotive customers are not obligated to any long–term purchase of our products. The loss of sales to DaimlerChrysler, Toyota/Lexus, Audi/VW or BMW would have a material adverse effect on our total consolidated net sales, earnings and financial position.

*Note 13.  Income Taxes*

Income tax expense for the quarter ended March 31, 2007 was $30.9 million, compared to $31.8 million for the same period last year. The effective tax rate for the three months ended March 31, 2007 was 30.5 percent, compared to 33.3 percent in the prior year period. Income tax expense for the nine months ended March 31, 2007 was $94.4 million, compared to $89.5 million for the same period last year. The effective tax rate for the nine months ended March 31, 2007 was 31.2 percent, compared to 32.0 percent in the prior year period. The tax rate for the prior year quarter included a $1.7 million charge for the repatriation of cash from our non–U.S. subsidiaries under the American Jobs Creation Act of 2004. The current year tax rate includes the benefit of the reinstatement of the research and development credit in the United States. We currently expect the tax rate for the full fiscal year 2007 to be approximately 31 to 32 percent.

17

In June 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in accordance with SFAS No. 109 *Accounting for Income Taxes* and prescribes a recognition threshold and measurement attribute for financial statement recognition and measurement for a tax position taken or expected to be taken in a tax return. FIN 48 will be effective for fiscal 2008. We are currently reviewing the effect of FIN 48 on our financial statements.

### Note 14.  Subsequent Events

On April 26, 2007, we entered into an Agreement and Plan of Merger with affiliates of KKR and GSCP. Under the Agreement and Plan of Merger, we can solicit bids for alternative transactions for a 50–day period ending on June 15, 2007. Completion of the transaction is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals. For more detailed information, see our Current Report on Form 8–K filed on April 27, 2006.

### Item 1A. Risk Factors

In connection with our proposed acquisition by affiliates of KKR and GSCP, the information included in Item 1A, "Risk Factors" of Part 1 to our Annual Report on Form 10–K for the fiscal year ended June 30, 2006 is updated to include the following:

**We cannot provide any assurance that the proposed acquisition will be consummated.**

Consummation of the proposed acquisition is subject to the satisfaction of various conditions, including approval of the acquisition by a vote of a majority of the outstanding shares of our common stock, expiration or termination of applicable waiting periods under the Hart–Scott–Rodino Antitrust Improvements Act of 1976, and other non–U.S. competition laws, and other customary closing conditions described in the acquisition agreement. We cannot guarantee that these closing conditions will be satisfied, that we will receive the required approvals or that the proposed acquisition will be successfully completed. In the event that the proposed acquisition is not completed:

- management's and our employees' attention from our day–to–day business may be diverted because matters related to the proposed acquisition may require substantial commitments of their time and resources;

- we may lose key employees;

- our relationships with customers and vendors may be substantially disrupted as a result of uncertainties with regard to our business and prospects;

- certain costs related to the proposed acquisition, such as legal and accounting fees, are payable by us whether or not the proposed acquisition is completed;

- under certain circumstances, if the proposed acquisition is not completed, we may be required to pay a termination (break–up) fee of up to $225 million; and

- the market price of shares of our common stock may decline to the extent that the current market price of those shares reflects a market assumption that the proposed acquisition will be completed.

Any of these events could have a material negative impact on our results of operations and financial condition and could adversely affect the price of our common stock.

***We may not be able to attract or retain officers or key employees.***

The announcement of the proposed acquisition may have a negative impact on our ability to attract and retain officers and other key employees and/or maintain relationships with key customers and suppliers. These events could have a material negative impact on our results of operations and financial condition.

***As a result of the proposed acquisition, we will have substantially more debt.***

We will have substantial indebtedness if the proposed acquisition is consummated. There can be no assurance that our businesses will be able to generate sufficient cash flows from operations to meet our anticipated debt service obligations. Our level of indebtedness will have important consequences, including limiting our ability to invest operating cash flow to expand our businesses or execute our strategies, to capitalize on business opportunities and to react to competitive pressures, because we will need to dedicate a substantial portion of these cash flows to service our debt. In addition, we could be unable to refinance or obtain additional financing because of market conditions, high levels of debt and the debt restrictions expected to be included in the debt instruments executed in connection with the consummation of the proposed acquisition. This new indebtedness is expected to contain restrictive covenants, which may adversely affect our ability operate our businesses.

***The downgrade in our credit ratings resulting from the announcement of the proposed acquisition could negatively affect our ability to access capital.***

In connection with the announcement of the proposed acquisition, Standard & Poor's Rating Services (S&P) downgraded our corporate credit ratings. Downgrades in our corporate credit ratings generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease and may have other negative consequences on our business.

Most of our large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions with us. As our corporate credit ratings decline, particularly below investment grade, counterparties may decline to do business with us.

***In the future, we could have liquidity needs that could be difficult to satisfy under some circumstances.***

The inability to raise capital on favorable terms, particularly during times of uncertainty in the financial markets, could impact our ability to sustain and grow our businesses, which would increase our capital costs. Our access to the financial markets could be adversely impacted by the announcement of the proposed acquisition and various other factors, such as:

- changes in credit markets that reduce available credit or the ability to renew existing liquidity facilities on acceptable terms;

- changes in interest rates;

- a deterioration of our credit or a reduction in our credit ratings;

- a material breakdown in our risk management procedures; and

- the occurrence of material adverse changes in our businesses that restrict our ability to access the credit markets.

A lack of necessary capital and cash reserves could adversely impact the evaluation of our creditworthiness by counterparties and rating agencies, and would likely increase our capital costs. An increase in our capital costs could have a material negative impact on our results of operations and financial condition.

**Item 2.**     *Management's Discussion and Analysis of Financial Condition and Results of Operations*

*General*

*The following discussion should be read in conjunction with the accompanying unaudited condensed consolidated financial statements and the related notes included in Item 1 of this Quarterly Report on Form 10–Q, together with Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10–K for the fiscal year ended June 30, 2006 ("2006 Form 10–K"). This discussion contains forward–looking statements. See the information under the caption "Forward–Looking Statements" on page 3 of this report.*

We begin our discussion with an overview of our company to give you an understanding of our business and the markets we serve. This is followed with a discussion of our results of operations for the three and nine months ended March 31, 2007 and 2006. This discussion includes an analysis of certain significant period–to–period variances in our consolidated statements of operations. We also provide specific information regarding our three reportable business segments. Our liquidity, capital resources and cash flows are discussed under the caption Financial Condition.

*Overview*

We design, manufacture and market high–quality, high–fidelity audio products and electronic systems for the automotive, consumer and professional markets. We have developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names in our principal markets. Our three reportable business segments, Automotive, Consumer and Professional, are based on the end–user markets we serve.

Automotive designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications. Our systems are generally shipped directly to our automotive customers for factory installation. Infotainment systems are a combination of information and entertainment components with features including or controlling GPS navigation, traffic information, cellular phone service, wireless Internet access, security, climate control, driver cameras, digital audio playback and rear seat entertainment. These systems are increasingly developed using scaleable software allowing us to better serve a full range of vehicles from luxury through entry–level. Automotive also markets aftermarket PNDs that are currently sold in Europe. Our PNDs leverage many of the applications developed by our Automotive segment.

Consumer designs, manufactures and markets audio, video and electronic systems for home, mobile and multimedia applications. Home product applications include systems to provide high–quality audio throughout the home and to enhance home theatre performance. Our aftermarket mobile products, including in–vehicle iPod adaptors, deliver audio entertainment in the vehicle. Our multimedia products include accessories for computers and portable electronic devices, such as the iPod and other MP3 players. Our consumer systems are primarily distributed through retail outlets.

Professional designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, houses of worship, airports and other public spaces. We also create products for recording, broadcast, cinema and music reproduction applications. These products are increasingly linked by our HiQnet network protocol that provides a central digital network giving audio professionals control of a complex system from a central location.

Our products are sold worldwide, with the largest markets being in the United States and Germany. In the United States, our primary manufacturing facilities are located in California, Indiana, Kentucky, Missouri and Utah. Outside of the United States, we have significant manufacturing facilities in Germany, Austria, the United Kingdom, Mexico, Hungary, France and Switzerland. Our businesses operate using local currencies. Therefore, we are subject to currency fluctuations that are partially mitigated by the fact that we purchase raw materials and supplies locally when possible. Our operating results are especially affected by changes in the exchange rates of the Euro compared to the U.S. dollar since a significant percentage of our sales are in countries where the local currency is the Euro.

We experience seasonal fluctuations in sales and earnings. Historically, our first quarter ending September 30 is generally the weakest due to automotive model changeovers and the summer holidays in Europe. Our sales and earnings may also vary due to customer acceptance of our products, product offerings by our competitors and general economic conditions, including fluctuations in currency exchange rates.

Our Automotive and Professional business segments reported solid results when compared to the prior year periods, while our Consumer segment experienced lower operating income due primarily to increased competition in the North America multimedia market.

On April 26, 2007, we announced that we entered into an agreement to be acquired by affiliates of KKR and GSCP, as described above. Under this agreement, we can solicit bids for alternative transactions for a 50–day period ending on June 15, 2007. Completion of the transaction is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals.

### Critical Accounting Policies

Our critical accounting policies are described under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our 2006 Form 10–K. These policies include inventory valuation, allowance for doubtful accounts, warranty liabilities, income taxes, pre–production and development costs, goodwill and stock–based compensation. Also see Note 1 "Summary of Significant Accounting Policies" to our Consolidated Financial Statements included in our 2006 Form 10–K.

### Results of Operations

#### Sales

Our net sales for the quarter ended March 31, 2007 were $882.8 million compared to $801.5 million in the same period last year, an increase of 10 percent. For the nine months ended March 31, 2007, net sales were $2.640 billion compared to net sales of $2.389 billion in the same period last year, an increase of 11 percent. Foreign currency translation contributed approximately $45 million and $107 million, respectively, for the three and nine months ended March 31, 2007. Each of our three operating groups reported higher sales for the three and nine months ended March 31, 2007 when compared to the prior year period as described below.

Presented below is a summary of our net sales by reporting segment:

| ($000s omitted) | | Three months ended March 31, | | | | | Nine months ended March 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2007 | % | 2006 | % | | 2007 | % | 2006 | % |
| Net sales: | | | | | | | | | | |
| Automotive | $ | 624,855 | 71% | 567,340 | 71% | $ | 1,858,156 | 70% | 1,635,220 | 68% |
| Consumer | | 117,960 | 13% | 106,810 | 13% | | 374,097 | 14% | 373,186 | 16% |
| Professional | | 139,956 | 16% | 127,337 | 16% | | 407,778 | 16% | 380,374 | 16% |
| Total | $ | 882,771 | 100% | 801,487 | 100% | $ | 2,640,031 | 100% | 2,388,780 | 100% |

*Automotive* – Net sales for the quarter ended March 31, 2007 increased $57.5 million, or 10 percent, compared to the same period last year. Foreign currency translation contributed approximately $39 million to the increase in sales. Because a significant percentage of our automotive sales are to customers in Europe, The majority of our foreign currency exposure is in Automotive. Increased sales of our infotainment systems to European automakers also contributed to the increase in sales over the prior period quarter. The primary contributors were higher sales of our audio systems to Toyota/Lexus to support higher production for the new Lexus LS460 and Toyota Camry, higher sales of infotainment systems to Audi for its new Q7 platform and sales increases to Porsche to support higher production for the Cayenne. Net sales increases were offset by lower infotainment sales to Mercedes–Benz due to the phase–out of the current C–Class platform and lower production of the R–Class.

Net sales for the nine months ended March 31, 2007 increased $222.9 million, or 14 percent, compared to the same period last year. Foreign currency translation contributed approximately $90 million to the increase in sales. The primary contributors were strong sales of our infotainment systems to Mercedes–Benz for the S–Class and GL–Class platforms and higher sales to Audi for its new Q7 platform. Sales of audio systems to Toyota/Lexus increased due to a ramp up for the new Lexus LS460 and strong sales of the Toyota Camry. These higher sales were partially offset by lower sales to BMW due to lower vehicle production for the 7–Series. Sales of our aftermarket products were higher due to the introduction of Becker PNDs in Europe.

*Consumer* – Net sales for the quarter ended March 31, 2007 increased $11.2 million, or 10 percent, compared to the same period last year. Foreign currency translation contributed approximately $4 million to the increase in sales compared to the prior year period. The increase in net sales was primarily due to higher sales of multimedia products in Europe, including OnStage and OnTime, which are accessories for the Apple iPod, and higher sales of Harman/Kardon home electronic products. These sales increases were partially offset by lower North America sales of Infinity loudspeakers and Harman/Kardon electronics due to the decision to exit distribution through a major North American retailer and a decline in multimedia sales in North America due to increased competition.

Net sales for the nine months ended March 31, 2007 increased $0.9 million compared to the same period last year. Foreign currency translation contributed approximately $11 million to the sales increase compared to the prior year period. Sales on a constant dollar basis declined due to lower North America multimedia sales due to increased competition and lower Infinity loudspeaker and Harman/Kardon electronics sales due to the decision to exit distribution through a major retailer in North America. These sales decreases were partially offset by strong multimedia sales in Europe.

*Professional* – Net sales for the quarter ended March 31, 2007 increased $12.6 million, or 10 percent, compared to the same period last year. Foreign currency translation contributed approximately $2 million to the increase in sales compared to the prior year. The increase in sales compared to the same period last year was primarily due to higher sales of products utilizing the HiQnet protocol due to the introduction of the JBL Professional and Crown line of powered speakers. Recently introduced digital consoles from Soundcraft and Studer also added to the sales increase.

Net sales for the nine months ended March 31, 2007 increased $27.4 million, or 7 percent, compared to the same period last year. Foreign currency translation contributed approximately $6 million to the increase in sales compared to the prior year. Professional sales were higher due to an increase in sales of JBL Professional and Crown products to our major US retailers. These increases were partially offset by lower DigiTech and BSS sales due to a softer domestic retail market and the delayed release of several new musician products.

*Gross Profit*

Gross profit as a percentage of net sales decreased 0.5 percentage points to 34.6 percent for the quarter ended March 31, 2007 compared to 35.1 percent of net sales in the same period last year. Gross profit as a percentage of net sales was 34.6 percent for the nine months ended March 31, 2007 compared to 35.7 percent of net sales in the same period in the prior year.

Presented below is a summary of our gross profit by reporting segment:

| ($000s omitted) | Three months ended March 31, | | | | Nine months ended March 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007 | Percent of net sales | 2006 | Percent of net sales | 2007 | Percent of net sales | 2006 | Percent of net sales |
| Gross Profit: | | | | | | | | |
| Automotive | $ 221,310 | 35.4% | 200,575 | 35.4% | $ 661,470 | 35.6% | 591,757 | 36.2% |
| Consumer | 30,978 | 26.3% | 33,426 | 31.3% | 97,521 | 26.1% | 124,492 | 33.4% |
| Professional | 54,337 | 38.8% | 48,866 | 38.4% | 157,061 | 38.5% | 142,105 | 37.4% |
| Other | (1,250) | ––– | (1,250) | ––– | (3,750) | ––– | (4,673) | ––– |
| Total | $ 305,375 | 34.6% | 281,617 | 35.1% | $ 912,302 | 34.6% | 853,681 | 35.7% |

*Automotive* – For the quarter ended March 31, 2007, gross profit as a percentage of net sales was the same as the prior year period. Gross profit as a percentage of net sales decreased 0.6 percentage points for the nine months ended March 31, 2007 compared to the same period in the prior year. The gross margin percentage decrease for the nine month period was primarily related to changes in product mix due to increased sales of lower margin products compared to the prior year period.

*Consumer* – Gross profit as a percentage of net sales decreased 5.0 percentage points for the quarter ended March 31, 2007 compared to the same period in the prior year. Gross profit as a percentage of net sales decreased 7.3 percentage points for the nine months ended March 31, 2007 compared to the same period in the prior year. For the three and nine months, gross margins were lower primarily due to increased competition in the North American and International multimedia markets.

*Professional* – Gross profit as a percentage of net sales increased 0.4 percentage points for the three months ended March 31, 2007 compared to the same period in the prior year. For the three months, gross margins as a percentage of net sales were higher primarily due to the introduction of new products with higher margins. Gross profit as a percentage of net sales increased 1.1 percentage points for the nine months ended March 31, 2007 compared to the same period in the prior year. For the nine months, gross margins as a percentage of net sales were higher due to the positive effect of new product introductions.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses ("SG&A"), as a percentage of net sales, increased 0.2 percentage points for the quarter ended March 31, 2007 compared to the same period in the prior year. The increase is primarily due to higher research and development costs incurred to support new infotainment system programs for automotive customers. Research and development costs were $90.1 million or 10.2 percent of net sales for the quarter ended March 31, 2007 compared to $73.7 million or 9.2 percent of net sales, in the same period last year. For the nine–month period ended March 31, 2007, SG&A expenses decreased 0.5 percentage points compared to the same period last year. The decrease is primarily due to cost controls in selling, general and administrative, advertising and promotion expenses offset by higher research and development costs. Research and development costs for the nine months ended March 31, 2007 were $263.0 million or 10 percent of net sales compared to $217.4 million or 9.1 percent of net sales for the same period last year. We presently expect research and development costs to decrease as a percentage of net sales in fiscal 2008.

During the fourth quarter of fiscal 2006, we initiated a restructuring program designed to increase efficiencies in our manufacturing facilities and to realign our engineering organization. SG&A expenses associated with this program were $0.5 million for the three months ended March 31, 2007. We also made cash payments, primarily for severance, of $1.7 million under this program during the third quarter ended March 31, 2007. Since the inception of the restructuring program, we have incurred costs of approximately $12 million. We presently expect to record an additional $4 million in future periods in connection for this program for total restructuring costs of approximately $16 million.

Presented below is a summary of SG&A expenses by reporting segment:

| ($000s omitted) | Three months ended March 31, | | | | Nine months ended March 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007 | Percent of net sales | 2006 | Percent of net sales | 2007 | Percent of net sales | 2006 | Percent of net sales |
| SG&A Expenses: | | | | | | | | |
| Automotive | $ 129,203 | 20.7% | 109,572 | 19.3% | $ 386,787 | 20.8% | 338,796 | 20.7% |
| Consumer | 29,251 | 24.8% | 28,211 | 26.4% | 85,542 | 22.9% | 86,706 | 23.2% |
| Professional | 35,480 | 25.4% | 35,340 | 27.8% | 101,031 | 24.8% | 100,728 | 26.5% |
| Other | 9,118 | ––– | 9,704 | ––– | 33,981 | ––– | 34,608 | ––– |
| Total | $ 203,052 | 23.0% | 182,827 | 22.8% | $ 607,341 | 23.0% | 560,838 | 23.5% |

24

*Automotive* – SG&A expenses as a percentage of net sales increased 1.4 percentage points for the quarter ended March 31, 2007 compared to the same period last year. SG&A expenses increased due to higher research and development costs. Research and development expenses were $71.9 million, or 11.5 percent of net sales, for the quarter ended March 31, 2007 compared to $55.4 million, or 9.8 percent of net sales, in the prior year. SG&A expenses as a percentage of net sales for the nine months ended March 31, 2007 were approximately the same as the nine months ended March 31, 2006. SG&A as a percentage of net sales included higher research and development costs offset by reductions in other administrative expenses.  For the nine months ended March 31, 2007, research and development expenses were $210.4 million, or 11.3 percent of net sales, compared to $165.6 million, or 10.1 percent of net sales, for the same period in the prior year.

*Consumer* – SG&A expenses as a percentage of net sales decreased 1.6 percentage points for the quarter ended March 31, 2007 compared to the same period last year. SG&A expenses as a percentage of net sales decreased due to lower research and development costs. For the quarter ended March 31, 2007, research and development expenses were $8.8 million, or 7.5 percent of net sales compared to $9.3 million, or 8.7 percent of net sales for the same period last year. For the nine months ended March 31, 2007, SG&A expenses as a percentage of net sales decreased 0.3 percentage points compared to the same period last year. For the nine month period, SG&A as a percentage of net sales decreased primarily due to lower personnel costs and research and development expenses partially offset by higher selling and advertising expenses. For the nine–month period ended March 31, 2007, research and development expenses were $26.0 million compared to $26.9 million, in the same period last year.

*Professional* – SG&A expenses as a percentage of net sales decreased 2.4 percentage points for the quarter ended March 31, 2007 when compared to the prior year. SG&A as a percentage of net sales decreased primarily due to lower research and development expenses as a percentage of net sales and higher expenses in the prior year related to a distribution realignment at AKG. Research and development expenses were $9.4 million, or 6.7 percent of net sales for the quarter ended March 31, 2007 compared to $9.0 million, or 7.1 percent of net sales in the same period last year. SG&A expenses as a percentage of net sales decreased 1.7 percentage points for the nine months ended March 31, 2007 compared to the same period last year. SG&A as a percentage of net sales decreased primarily due to higher expenses in the prior year related to a distribution and manufacturing realignment at AKG. Research and development expenses were $26.4 million or 6.5 percent of net sales for the nine months ended March 31, 2007 compared to $24.8 million or 6.5 percent in the same period last year.

*Other* – Corporate SG&A expenses decreased by $0.6 million in both the three and nine months periods ended March 31, 2007, when compared to the same periods in the prior year.

## Operating Income

Operating income for the quarter ended March 31, 2007 was $102.3 million, or 11.6 percent of net sales compared to $98.8 million, or 12.3 percent of net sales in the same period last year. Operating income for the nine months ended March 31, 2007 was $305.0 million, or 11.6 percent of net sales compared to $292.8 million, or 12.3 percent of net sales in the same prior year period. The decrease in operating margins as a percentage of net sales for the three and nine months was primarily the result of higher research and development costs.

*Interest Expense, Net*

Interest expense is reported net of interest income in our consolidated statements of operations. Net interest expense for the three and nine months ended March 31, 2007 was $0.3 million and $1.0 million, respectively. In the same periods last year, net interest expense was $2.5 million and $10.9 million, respectively. For the quarter, interest expense, net, included $2.4 million of gross interest expense and $2.1 million of interest income. For the same period in the prior year, interest expense, net, included $6.1 million of gross interest expense and $3.6 million of interest income. For the nine months ended March 31, 2007, interest expense, net, included $7.1 million of gross interest expense and $6.1 million of interest income. For the same period last year, interest expense net, included $18.2 million of gross interest expense and $7.3 million of interest income.

Interest expense, net decreased primarily due to the repayment of debt. Weighted average borrowings outstanding were $176.0 million for the quarter ended March 31, 2007 compared to $344.4 million for the same period in the prior year. Weighted average borrowings outstanding were $175.3 million for the nine months ended March 31, 2007 compared to $361.0 million for the same period in the prior year. For the three and nine months ended March 31, 2006, the weighted average borrowings excluded the average fair value of the interest rate swaps of $1.4 million, and $3.2 million, respectively. There were no interest rate swaps on our outstanding debt at March 31, 2007.

The weighted average interest rate on borrowings was 5.4 percent for the three and nine months ended March 31, 2007. The weighted average interest rates for the comparable periods in the prior year were 7.1 percent and 6.7 percent, respectively. The weighted average interest rate decreased due to lower rates on current outstanding debt and the repayment of fixed–rate debt with higher interest rates.

*Miscellaneous Expenses*

Miscellaneous, net expenses were $0.5 million for the quarter ended March 31, 2007 and $1.9 million for the nine months ended March 31, 2007 compared to $0.9 million and $2.6 million, respectively, in the same periods last year. Miscellaneous net, primarily consists of bank charges for the three and nine months ended March 31, 2007.

*Income Taxes*

Income tax expense for the quarter ended March 31, 2007 was $30.9 million compared to $31.8 million for the same period last year. The effective tax rate for the three months ended March 31, 2007 was 30.5 percent compared to 33.3 percent in the prior year period. Income tax expense for the nine months ended March 31, 2007 was $94.4 million compared to $89.5 million for the same period last year. The effective tax rate for the nine months ended March 31, 2007 was 31.2 percent compared to 32.0 percent in the prior year period. The tax rate for the prior year quarter included a $1.7 million charge for the repatriation of cash from our non–U.S. subsidiaries under the American Jobs Creation Act of 2004. Current year rates reflect the benefit of the reinstatement of the research and development credit in the United States. We currently expect the tax rate for the full fiscal year 2007 to be approximately 31 to 32 percent.

*Financial Condition*

*Liquidity and Capital Resources*

We primarily finance our working capital requirements through cash generated by operations, trade credit and borrowings under our revolving credit facility. Cash and cash equivalents were $97.0 million at March 31, 2007 compared to $291.8 million at June 30, 2006. During the nine–month period, cash was primarily used to repurchase shares of our common stock, meet our working capital needs, pay income taxes and reduce our outstanding debt.

We will continue to have cash requirements to support seasonal working capital needs, capital expenditures, interest, principal and dividend payments, capital expenditures and debt repurchases. We intend to use cash on hand, cash generated by operations and borrowings under our revolving credit facility to meet these requirements. We believe that cash from operations and our borrowing capacity will be adequate to meet our operating cash requirements prior to the closing of the proposed acquisition of our Company by affiliates of KKR and GSCP, and if the closing does not occur, over the next twelve months. We present below a more detailed discussion of our cash flow activities during the nine months ended March 31, 2007.

*Operating Activities*

For the nine months ended March 31, 2007, our cash flows from operations were $47.1 million compared to $241.3 million during the same period last year. The decrease in operating cash flows was primarily due to higher working capital requirements and significant tax payments, primarily in Germany.

At March 31, 2007, net working capital, excluding cash and short term debt, was $387.1 million compared to $106.7 million at June 30, 2006. The $280.4 million increase was primarily due to higher inventory levels to support increased sales to our automotive customers and to support our newly developed PND market in Europe. Higher accounts receivable due to higher sales during the nine months ended March 31, 2007 also contributed to the working capital increase.

*Investing Activities*

We had capital expenditures of $84.4 million during the nine months ended March 31, 2007 compared to $75.0 million for the same period last year. The increase is primarily due to investments in our manufacturing facilities and ramp–up of production at our manufacturing facility in Missouri. We anticipate total capital expenditures for fiscal 2007 to be approximately $150 million.

*Financing Activities*

During the nine months ended March 31, 2007, we paid $128.8 million to repurchase 1,507,900 shares of our common stock. Since the inception of our share repurchase program in June 1998, we have acquired and placed into treasury 18,198,082 shares. At March 31, 2007, we had the authority to purchase up to 1.8 million additional shares of our common stock under our current share repurchase program. We have suspended the share repurchase program due to the proposed acquisition of our Company by affiliates of KKR and GSCP.

Our total debt at March 31, 2007 was $159.6 million, primarily comprised of $136.7 million of borrowings under our revolving credit facility. Also included in total debt was $16.5 million principal amount of 7.32 percent senior notes due July 1, 2007 and capital leases and other short–term borrowings of $6.4 million.

27

We have a $300 million committed multi–currency revolving credit facility that expires in June 2010. The interest rate on the revolving credit facility at March 31, 2007 is LIBOR plus 40 basis points. At June 30, 2006, we had outstanding borrowings of $159.9 million under our revolving credit facility. At March 31, 2007, we had reduced the balance by $23.2 million to $136.7 million. At March 31, 2007 we had borrowings of $136.7 million and outstanding letters of credit of $5.4 million under this facility. Unused availability under the revolving credit facility was $157.9 million at March 31, 2007.

Our long–term debt agreements contain financial and other covenants that, among other things, limit our ability to incur additional indebtedness, restrict subsidiary dividends and distributions, limit our ability to encumber certain assets and restrict our ability to issue capital stock of our subsidiaries. Our long–term debt agreements permit us to pay dividends or repurchase our capital stock without any dollar limitation provided that we would be in compliance with the financial covenants in our revolving credit facility after giving effect to such dividend or repurchase. At March 31, 2007, we were in compliance with the terms of our long–term debt agreements.

*Equity*

Total shareholders' equity at March 31, 2007 was $1.364 billion compared with $1.228 billion at June 30, 2006. The increase is primarily due to net income of $209.0 million and favorable foreign currency translation increase of $23.2 million offset by share repurchases of $128.8 million.

*Item 3.*     ***Quantitative and Qualitative Disclosures About Market Risk***

We are required to include information about potential effects of changes in interest rates and currency exchange rates in our periodic reports filed with the Securities and Exchange Commission. Since June 30, 2006, there have been no material changes in the quantitative or qualitative aspects of our market risk profile.

***Interest Rate Sensitivity/Risk***

At March 31, 2007, interest on approximately 10 percent of our borrowings was determined on a fixed–rate basis. The interest rates on the balance of our debt are subject to changes in U.S. and European short–term interest rates. To assess exposure to interest rate changes, we have performed a sensitivity analysis assuming a hypothetical 100 basis point increase or decrease in interest rates across all outstanding debt and investments.

Our analysis indicates that, based on our March 31, 2007 positions, the impact of such changes in interest rates would increase or decrease net income by approximately $0.3 million for the nine months ended March 31, 2007.

*Foreign Currency Risk*

We maintain significant operations in Germany, the United Kingdom, France, Austria, Hungary, Mexico and Switzerland. As a result, we are subject to market risks arising from changes in foreign currency exchange rates, principally the change in the value of the Euro compared to the U.S. dollar. Our subsidiaries purchase products and raw materials in various currencies. As a result, we may be exposed to the cost changes relative to local currencies in the markets to which we sell our products. To mitigate these transactional risks, we enter into forward foreign exchange contracts. Also, foreign currency positions are partially offsetting and are netted against one another to reduce exposure.

The effect of changes in currency exchange rates, principally the change in the value of the Euro compared to the U.S. dollar, has an impact on our reported results when the financial statements of non–U.S. subsidiaries are translated into U.S. dollars. Over half of our sales are now denominated in Euros. Currency translation for the Euro versus the U.S. dollar had a significant impact on earnings for the nine months ending March 31, 2007 compared to the same period in the prior year due to the strengthening of the Euro relative to the U.S. dollar. The nine month average exchange rate for the Euro versus the U.S. dollar increased seven percent from the prior year's nine month average exchange rate.

To assess exposure to changes in currency exchange rates, we prepared an analysis assuming a hypothetical 10 percent change in currency exchange rates across all currencies used by our subsidiaries. This analysis indicated that a 10 percent increase or decrease in exchange rates would have increased or decreased income before income taxes by approximately $28 million for the nine months ended March 31, 2007.

Competitive conditions in the markets in which we operate may limit our ability to increase prices in the event of adverse changes in currency exchange rates. For example, certain products made in the U.S. are sold outside of the U.S. Sales of these products are affected by the value of the U.S. dollar relative to other currencies. Any long–term strengthening of the U.S. dollar could depress the demand for these U.S. manufactured products and reduce sales. However, due to the multiple currencies involved in our business and the netting effect of various simultaneous transactions, our foreign currency positions are partially offsetting.

Actual gains and losses in the future may differ materially from the hypothetical gains and losses discussed above based on changes in the timing and amount of interest rate foreign currency exchange rate movements and our actual exposure and hedging transactions.

**Item 4.        Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures* – Under the supervision and with the participation of our management, including our Executive Chairman and Chief Executive Officer and our Chief–Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a–15(e) and 15d–15(e) promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10–Q. Based on that evaluation, our Executive Chairman and Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. We note that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving our stated goals under all potential future conditions.

*Change in Internal Control Over Financial Reporting* – There has not been any change in our internal control over financial reporting (as defined in Rules 13a–15(f) and 15d–15(f) as promulgated by the Securities and Exchange Commission under the Securities Act of 1934) during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Part II.        OTHER INFORMATION**

**Item 2.        Unregistered Sales of Equity Securities and Use of Proceeds**

The following table sets forth our repurchases of common stock for each month in the third quarter of fiscal 2007:

### Issuer Purchases of Equity Securities

| | Total number of shares purchased | Average price paid per share | Total number of shares purchased as part of publicly announced plans or programs | Maximum number of shares that may yet be purchased under the plans or programs | |
|---|---|---|---|---|---|
| January 1, 2007 through January 31, 2007 | 90,000 | $96.06 | 90,000 | 2,298,718 | |
| February 1, 2007 through February 28, 2007 | 496,800 | 94.78 | 496,800 | 1,801,918 | |
| March 1, 2007 through March 31, 2007 | ––– | ––– | ––– | 1,801,918 | |
| | 586,800 | $94.98 | 586,800 | 1,801,918 | (1) |

(1)  Our share repurchase program was first publicly announced on June 16, 1998. In August 2005, the Board authorized the purchase of up to an additional four million shares, bringing the total authorized to 20 million shares. The total number of shares repurchased through March 31, 2007 was 18,198,082. We have suspended the share repurchase program due to the proposed acquisition of our Company by affiliates of KKR and GSCP.

For a description of limitations on repurchases of shares and on the payment of dividends, see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Financial Condition."

*Item 6. Exhibits*

Exhibits required by Item 601 of Regulation S–K

| | |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of April 26, 2007, among Harman International Industries, Incorporated, KHI Parent Inc. and KHI Merger Sub Inc. (filed as Exhibit 2.1 to the Current Report on Form 8–K filed with the Commission on April 27, 2007 and hereby incorporated by reference). |
| 10.1 | Benefit Agreement of Kevin Brown, dated April 30, 2007, under our Supplemental Executive Retirement Plan. |
| 31.1 | Certification of Sidney Harman pursuant to Section 302 of the Sarbanes–Oxley Act of 2002. |
| 31.2 | Certification of Kevin L. Brown pursuant to Section 302 of the Sarbanes–Oxley Act of 2002. |
| 32.1 | Certification of Sidney Harman and Kevin L. Brown, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002. |

*SIGNATURES*

Pursuant to the requirements of the Securities Exchange Act of 1934, Harman International Industries, Incorporated has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Harman International Industries, Incorporated**
(Registrant)

Date:  May 10, 2007                                    By: /s/ Kevin L. Brown
                                                       Kevin L. Brown
                                                       Executive Vice President and Chief Financial Officer
                                                       (Principal Financial Officer)


Date:  May 10, 2007                                    By: /s/ Sandra B. Robinson
                                                       Sandra B. Robinson
                                                       Vice President – Financial Operations and Chief Accounting Officer
                                                       (Principal Accounting Officer)

*Exhibit 10.1*

April 30, 2007

Mr. Kevin Brown
350 Tierra Mar Lane
Sarasota, FL 34242

Dear Kevin:

As you know, you are eligible to participate in the Harman International Industries, Incorporated Supplemental Executive Retirement Plan, as amended and restated as of October 1, 1999, and as further amended effective September 24, 2002 (the "SERP"). Enclosed is a copy of the SERP. Please confirm by signing below that you have read and understand the provisions of the SERP and that you agree, on your behalf and on behalf of your Beneficiaries, to be bound by the terms and conditions of this Benefit Agreement and the SERP, as modified by this Benefit Agreement. This Benefit Agreement supersedes any earlier Benefit Agreement or other agreements on this subject; and the terms in this Benefit Agreement have the same meanings as defined in the SERP as of the date of this Benefit Agreement. Your participation in the SERP in accordance with the terms of this Benefit Agreement will be effective on the date that you sign this Benefit Agreement below.

*Benefit Agreement*

Your Annual Benefit Percentage pursuant to Section 5.01 of the SERP is equal to 50%. For purposes of determining your Termination Benefit pursuant to Section 5.02 of the SERP, your Applicable Percentage is equal to 30% of Average Compensation, increased by 4% of Average Compensation for each year of service over 15 years, up to a maximum of 50% of Average Compensation. Your Pre–Retirement Death Benefit pursuant to Section 6.02 of the SERP is equal to three hundred percent (300%) of your Compensation for the Year of Service in which your Compensation was the highest.

Sincerely,

*Harman International Industries Incorporated*

By: /s/ Sidney Harman
    Sidney Harman
    Executive Chairman of the Board


Confirmed and agreed to:

/s/ Kevin Brown        May 1, 2007
Kevin Brown            [Date]

*Exhibit 31.1*

**PRINCIPAL EXECUTIVE OFFICER'S CERTIFICATION
PURSUANT TO SECTION 302 OF THE SARBANES–OXLEY ACT OF 2002**

I, Sidney Harman, certify that:

1. I have reviewed this Quarterly Report on Form 10–Q of Harman International Industries, Incorporated;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report ) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  May 10, 2007       /s/  Sidney Harman
                          Sidney Harman
                          Executive Chairman and Chief Executive Officer

*Exhibit 31.2*

### PRINCIPAL EXECUTIVE OFFICER'S CERTIFICATION
### PURSUANT TO SECTION 302 OF THE SARBANES–OXLEY ACT OF 2002

I, Kevin L. Brown, certify that:

1. I have reviewed this Quarterly Report on Form 10–Q of Harman International Industries, Incorporated;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  May 10, 2007        /s/  Kevin L. Brown
                           Kevin L. Brown
                           Executive – Vice President, Chief Financial Officer and Assistant Secretary

*Exhibit 32.1*

Certification Pursuant to 18 U.S.C. § 1350, as Adopted Pursuant to
Section 906 of the Sarbanes−Oxley Act of 2002

In connection with the Quarterly Report on Form 10−Q of Harman International Industries, Incorporated (the "Company") for the period ended March 31, 2007, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes−Oxley Act of 2002, that, to such officer's knowledge:

1). The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2). The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report.

Date:  May 10, 2007

/s/ Sidney Harman
Name:  Sidney Harman
Title:  Executive Chairman and Chief Executive Officer

/s/ Kevin L. Brown
Name:  Kevin L. Brown
Title:  Executive – Vice President, Chief Financial Officer and Assistant Secretary
(Principal Financial Officer)

The foregoing certification is being furnished solely pursuant to 18 U.S.C. § 1350 and is not being filed as part of the Report or as a separate disclosure document.

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

### Form 10−Q

[X]    **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
For the quarterly period ended **September 30, 2007**

Commission File Number: **1−9764**

### Harman International Industries, Incorporated

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **11−2534306** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **1101 Pennsylvania Avenue, NW, Suite 1010 Washington, DC** | **20004** |
| *(Address of principal executive offices)* | *(Zip code)* |

**(202) 393−1101**

*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.        [X] Yes          [ ] No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non−accelerated filer.  See definition of "accelerated filer and large accelerated filer" in Rule 12b−2 of the Exchange Act. (Check one):

Large accelerated filer ☒    Accelerated filer ☐    Non−accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Exchange Act).        [ ] Yes          [X] No

As of October 31, 2007, 60,475,102 shares of common stock, par value $.01, were outstanding.

*Harman International Industries, Incorporated and Subsidiaries*
*Form 10−Q*

**TABLE OF CONTENTS**

|  |  | Page Number |
|---|---|---|
| **Part I** | **FINANCIAL INFORMATION** |  |
| Item 1. | Financial Statements |  |
|  | Condensed Consolidated Balance Sheets *September 30, 2007* (unaudited) *and June 30, 2007* | 4 |
|  | Condensed Consolidated Statements of Operations (unaudited) *Three months ended September 30, 2007 and 2006* | 5 |
|  | Condensed Consolidated Statements of Cash Flows (unaudited) *Three months ended September 30, 2007 and 2006* | 6 |
|  | Notes to Condensed Consolidated Financial Statements (unaudited) | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 27 |
| Item 4. | Controls and Procedures | 28 |
| **Part II** | **OTHER INFORMATION** |  |
| Item 1. | Legal Proceedings | 28 |
| Item 1A. | Risk Factors | 29 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 30 |
| Item 6. | Exhibits | 31 |
|  | Signatures | 33 |

The page numbers in this Table of Contents reflect actual page numbers, not EDGAR page tag numbers.

References to "Harman International," the "Company," "we," "us," and "our" in this Form 10–Q refer to Harman International Industries, Incorporated and its subsidiaries unless the context requires otherwise.

### *Forward–Looking Statements*

This report contains forward–looking statements within the meaning of Section 27A of the Securities Act of 1933 and 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). You should not place undue reliance on these statements. Forward–looking statements include information concerning possible or assumed future results of operations, capital expenditures, the outcome of pending legal proceedings and claims, including environmental matters, goals and objectives for future operations, including descriptions of our business strategies and purchase commitments from customers. These statements are typically identified by words such as "believe," "anticipate," "expect," "plan," "intend," "estimate" and similar expressions. We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current conditions, expected future developments and other factors that we believe are appropriate under the circumstances. As you read and consider the information in this report, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. In light of these risks and uncertainties, there can be no assurance that the results and events contemplated by the forward–looking statements contained in, or incorporated by reference into, this report will in fact transpire.

You should carefully consider the risks described below and the other information in this report. Our operating results may fluctuate significantly and may not meet our expectations or those of securities analysts or investors. The price of our stock would likely decline if this occurs. Factors that may cause fluctuations in our operating results include, but are not limited to, the following:

•   automobile industry sales and production rates and the willingness of automobile purchasers to pay for the option of
      a premium audio system and/or a multi–functional infotainment system;

•   changes in consumer confidence and spending;

•   fluctuations in currency exchange rates and other risks inherent in international trade and business transactions;

•   our ability to satisfy contract performance criteria, including technical specifications and due dates;

•   our ability to design and manufacture our products profitably under our long–term contractual commitments;

•   the loss of one or more significant customers, including our automotive manufacturer customers;

•   competition in the automotive, consumer or professional markets in which we operate;

•   model–year changeovers in the automotive industry;

•   our ability to enforce or defend our ownership and use of intellectual property;

•   our ability to effectively integrate acquisitions made by our company;

•   strikes, work stoppages and labor negotiations at our facilities, or at a facility of one of our significant customers; or work
      stoppages at a common carrier or a major shipping location;

•   the outcome of pending or future litigation and administrative claims, including the outcome of any litigation that has been
      or may be instituted against our company and others relating to the formerly proposed acquisition of our company by KHI
      Parent Inc., a company formed by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. and GS Capital
      Partners VI Fund, L.P. and its related funds, which are sponsored by Goldman, Sachs & Co.;

•   changes in general economic conditions and specific market conditions; and

•   world political stability.

Although we believe that these forward–looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those expressed in the forward–looking statements.  As a result, the forgoing factors should not be construed as exhaustive and should be read together with the other cautionary statements included in this and other reports we file with the Securities and Exchange Commission, including the information in Item 1A, "Risk Factors" of Part I to our Annual Report on Form 10–K for the fiscal year ended June 30, 2007 and Item 1A, "Risk Factors" of this report.

## Part I.  FINANCIAL INFORMATION

### Item 1.  Financial Statements

**Condensed Consolidated Balance Sheets**
Harman International Industries, Incorporated and Subsidiaries
($000s omitted except share amounts)

| | | September 30, 2007 | June 30, 2007 |
|---|---|---|---|
| | | (Unaudited) | |
| **Assets** | | | |
| Current assets | | | |
| Cash and cash equivalents | $ | 77,126 | 106,141 |
| Receivables (less allowance for doubtful accounts of $7,078 at September 30, 2007 and $6,040 at June 30, 2007) | | 580,167 | 486,557 |
| Inventories | | 475,155 | 453,156 |
| Other current assets | | 186,798 | 187,299 |
| Total current assets | | 1,319,246 | 1,233,153 |
| Property, plant and equipment, net | | 605,641 | 591,976 |
| Goodwill | | 415,386 | 403,749 |
| Other assets | | 281,554 | 279,990 |
| Total assets | $ | 2,621,827 | 2,508,868 |
| **Liabilities and Shareholders' Equity** | | | |
| Current liabilities | | | |
| Short–term borrowings | $ | –––– | 1,838 |
| Current portion of long–term debt | | 573 | 17,029 |
| Accounts payable | | 325,676 | 356,763 |
| Accrued liabilities | | 385,565 | 350,164 |
| Income taxes payable | | 8,884 | 90,187 |
| Total current liabilities | | 720,698 | 815,981 |
| Borrowings under revolving credit facility | | 179,869 | 55,000 |
| Senior debt | | 2,591 | 2,661 |
| Minority interest | | 87 | 878 |
| Other non–current liabilities | | 142,472 | 140,307 |
| Shareholders' equity | | | |
| Preferred stock, $.01 par value.  Authorized 5,000,000 shares; none issued and outstanding | | ––– | ––– |
| Common stock, $.01 par value.  Authorized 200,000,000 shares; issued and outstanding 83,448,733 at September 30, 2007 and 83,436,983 at June 30, 2007 | | 834 | 834 |
| Additional paid–in capital | | 601,632 | 595,853 |
| Accumulated other comprehensive income (loss): | | | |
| Unrealized loss on hedging derivatives | | (3,790) | (510) |
| Pension benefits | | (15,787) | (15,778) |
| Cumulative foreign currency translation adjustment | | 135,126 | 98,479 |
| Retained earnings | | 1,497,703 | 1,454,771 |
| Less common stock held in treasury (18,198,082 shares at September 30, 2007 and June 30, 2007) | | (639,608) | (639,608) |
| Total shareholders' equity | | 1,576,110 | 1,494,041 |
| Total liabilities and shareholders' equity | $ | 2,621,827 | 2,508,868 |

See accompanying notes to condensed consolidated financial statements.

4

***Condensed Consolidated Statements of Operations***
Harman International Industries, Incorporated and Subsidiaries
(000s omitted except per share amounts)
(Unaudited)

|  | | Three months ended September 30, | |
|---|---|---|---|
|  | | 2007 | 2006 |
| Net sales | $ | 946,962 | 825,543 |
| Cost of sales | | 682,387 | 538,254 |
| Gross profit | | 264,575 | 287,289 |
| Selling, general and administrative expenses | | 223,134 | 200,371 |
| Operating income | | 41,441 | 86,918 |
| Other expenses: | | | |
| Interest expense, net | | 1,410 | 139 |
| Miscellaneous, net | | 671 | 861 |
| Income before income taxes and minority interest | | 39,360 | 85,918 |
| Income tax expense, net | | 3,657 | 29,635 |
| Minority interest | | (826) | (325) |
| Net income | $ | 36,529 | 56,608 |
| Basic earnings per share | $ | 0.56 | 0.86 |
| Diluted earnings per share | $ | 0.55 | 0.85 |
| Weighted average shares outstanding – basic | | 65,242 | 65,517 |
| Weighted average shares outstanding – diluted | | 66,363 | 66,676 |

See accompanying notes to condensed consolidated financial statements.

5

### Condensed Consolidated Statements of Cash Flows
Harman International Industries, Incorporated and Subsidiaries
($000s omitted)
(Unaudited)

| | Three months ended September 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Cash flows from operating activities:** | | |
| Net income | $ 36,529 | 56,608 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 34,149 | 29,863 |
| Loss on disposition of assets | 81 | 1,378 |
| Stock option expense | 4,946 | 3,697 |
| | | |
| Changes in working capital, net of acquisition/disposition effects: | | |
| Decrease (increase) in: | | |
| Receivables | (76,602) | (18,940) |
| Inventories | (6,790) | (36,464) |
| Other current assets | 2,658 | (12,874) |
| Increase (decrease) in: | | |
| Accounts payable | (40,871) | (67,214) |
| Accrued liabilities | 19,875 | (10,755) |
| Income taxes payable | (75,499) | 8,468 |
| Other operating activities | (89) | 2,710 |
| Net cash used in operating activities | $ (101,613) | (43,523) |
| | | |
| **Cash flows from investing activities:** | | |
| Contingent purchase price consideration | $ (3,347) | (2,130) |
| Proceeds from asset dispositions | 164 | 389 |
| Capital expenditures | (27,469) | (12,430) |
| Other items, net | (1,910) | 1,055 |
| Net cash used in investing activities | $ (32,562) | (13,116) |
| | | |
| **Cash flows from financing activities:** | | |
| Net (decrease) increase in short−term borrowings | $ (1,838) | 1,053 |
| Net borrowings under revolving credit facility | 120,532 | (8,567) |
| Repayment of long−term debt | (16,486) | (13,168) |
| Other decrease in long−term debt | (529) | (2,397) |
| Repurchase of common stock | ––– | (73,024) |
| Dividends paid to shareholders | (816) | (819) |
| Exercise of stock options | 833 | 634 |
| Net cash flow provided by (used in) financing activities | $ 101,696 | (96,288) |
| | | |
| Effect of exchange rate changes on cash | 3,464 | (3,848) |
| | | |
| Net decrease in cash and cash equivalents | (29,015) | (156,775) |
| Cash and cash equivalents at beginning of period | $ 106,141 | 291,758 |
| Cash and cash equivalents at end of period | $ 77,126 | 134,983 |
| | | |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Interest paid | $ 2,194 | 2,109 |
| Income taxes paid | $ 73,377 | 20,877 |

See accompanying notes to consolidated financial statements.

6

### HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED AND SUBSIDIARIES
Notes to Condensed Consolidated Financial Statements
(Unaudited)

#### Note 1.  Basis of Presentation

Our unaudited, condensed consolidated financial statements at September 30, 2007 and for the three months ended September 30, 2007 and 2006, have been prepared pursuant to rules and regulations of the Securities and Exchange Commission ("SEC").  These unaudited condensed consolidated financial statements do not include all information and footnote disclosures included in our audited financial statements.  In the opinion of management, the accompanying unaudited, condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments and accruals, necessary to present fairly, in all material respects, the consolidated financial position, results of operations and cash flows for the periods presented.  Operating results for the three months ended September 30, 2007 are not necessarily indicative of the results that may be expected for the full fiscal year ending June 30, 2008 due to seasonal, economic and other factors.

Where necessary, information for prior periods has been reclassified to conform to the consolidated financial statement presentation for the corresponding periods in the current fiscal year.

The methods, estimates and judgments we use in applying our accounting policies, in conformity with generally accepted accounting principles in the United States ("GAAP"), have a significant impact on the results we report in our financial statements.  We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances.  The estimates affect the carrying values of assets and liabilities.  Actual results may differ from these estimates under different assumptions or conditions.

These unaudited condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements and accompanying notes included in our Annual Report on Form 10–K for the fiscal year ended June 30, 2007.

#### Note 2.  Inventories

Inventories consist of the following:

| ($000s omitted) | September 30, 2007 | June 30, 2007 |
|---|---|---|
| Finished goods | $    224,940 | 235,736 |
| Work in process | 61,607 | 52,682 |
| Raw materials | 188,608 | 164,738 |
| Total | $    475,155 | 453,156 |

Inventories are stated at the lower of cost or market.  Cost is determined principally by the first–in, first–out method.  The valuation of inventory requires us to make judgments and estimates regarding obsolete, damaged or excess inventory as well as current and future demand for our products.  The estimates of future demand along with analysis of usage data that we use in the valuation of inventory are the basis for our inventory reserves and have an effect on our results of operations.  We calculate inventory reserves using a combination of a lower of cost or market analysis, analysis of historical usage data, forecast demand data and historical disposal rates.  Lower of cost or market analysis is typically applied to those items of inventory that represent a

7

substantial portion of the total value of inventory on–hand.  The high–value units typically represent a small percentage of the total inventory items, so identification of obsolescence or valuation reserve requirements for the balance of the inventory on–hand is accomplished using either historical or forecast usage to identify slow–moving or obsolete items.

### Note 3.  Property, Plant and Equipment

Property, plant and equipment are composed of the following:

| ($000s omitted) | September 30, 2007 | June 30, 2007 |
|---|---|---|
| Land | $        13,664 | 14,738 |
| Buildings and improvements | 272,881 | 269,968 |
| Machinery and equipment | 965,484 | 905,293 |
| Furniture and fixtures | 43,601 | 41,386 |
| | 1,295,630 | 1,231,385 |
| Less accumulated depreciation and amortization | (689,989) | (639,409) |
| Property, plant and equipment, net | $      605,641 | 591,976 |

### Note 4.  Warranty Liabilities

We warrant our products to be free from defects in materials and workmanship for periods ranging from six months to six years from the date of purchase, depending on the business segment and product.  The warranty is a limited warranty, and it may impose certain shipping costs on the customer and exclude deficiencies in appearance except for those evident when the product is delivered.  Our dealers and warranty service providers normally perform warranty service for loudspeakers and electronics in the field, using parts supplied on an exchange basis by our company.  Estimated warranty liabilities are based upon past experience with similar types of products, the technological complexity of certain products, replacement cost and other factors.  We take these factors into consideration when assessing the adequacy of our warranty provisions for periods still open to claim.

Details of the estimated warranty liabilities are as follows:

| ($000s omitted) | Three months ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| Beginning balance  (June 30) | $        48,148 | 60,768 |
| Warranty provisions | 20,579 | 12,545 |
| Warranty payments (cash or in–kind) | (6,874) | (9,830) |
| Ending balance | $        61,853 | 63,483 |

The warranty liabilities are included in accrued liabilities.

## Note 5.  *Comprehensive Income*

The components of comprehensive income are as follows:

|  | Three months ended September 30, | |
|---|---|---|
| ($000s omitted) | 2007 | 2006 |
| Net income | $  36,529 | 56,608 |
| Other comprehensive income (loss): | | |
|    Foreign currency translation | 36,647 | (5,912) |
|    Unrealized gains on hedging | (3,280) | 1,438 |
|    Change in pension benefits | (9) | 4 |
| Total comprehensive income | $  69,887 | 52,138 |

The components of accumulated other comprehensive income (loss) as of September 30, 2007 and June 30, 2007 and the activity for the three months ended September 30, 2007 are presented below:

| ($000s omitted) | Unrealized loss on hedging derivatives | Pension benefits | Cumulative foreign currency translation adjustment | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|
| June 30, 2007 | $     (510) | (15,778) | 98,479 | 82,191 |
|   Foreign currency translation adjustments | ––– | ––– | 36,647 | 36,647 |
|   Change in fair value of foreign currency cash flow hedges | (3,280) | ––– | ––– | (3,280) |
|   Change in pension benefits | ––– | (9) | ––– | (9) |
| September 30, 2007 | $  (3,790) | (15,787) | 135,126 | 115,549 |

## Note 6.  *Earnings Per Share*

The following table presents the calculation of basic and diluted earnings per common share outstanding:

| (000s omitted except per share amounts) | Three months ended September 30, | | | |
|---|---|---|---|---|
|  | 2007 | | 2006 | |
|  | Basic | Diluted | Basic | Diluted |
| Net income | $   36,529 | 36,529 | 56,608 | 56,608 |
| Weighted average shares outstanding | 65,242 | 65,242 | 65,517 | 65,517 |
| Employee stock options | ––– | 1,121 | ––– | 1,159 |
| Total weighted average shares outstanding | 65,242 | 66,363 | 65,517 | 66,676 |
| Earnings per share | $     0.56 | 0.55 | 0.86 | 0.85 |

Certain options were outstanding and not included in the computation of diluted net earnings per share because the assumed exercise of these options would have been antidilutive. Options to purchase 617,796 shares of our common stock with exercise prices ranging from $85.36 to $126.94 per share during the quarter ended September 30, 2007, were outstanding and not included in the computation of diluted earnings per share because the exercise of these options would have been antidilutive.

Options to purchase 1,338,043 shares of our common stock with exercise prices ranging from $75.22 to $126.94 per share during the quarter ended September 30, 2006 were outstanding and not included in the computation of diluted earnings per share because the exercise of these options would have been antidilutive.

### Note 7. Stock Options

On September 30, 2007, we had one share–based compensation plan with shares available for future grants, the 2002 Stock Option and Incentive Plan (the "2002 Plan"). The 2002 Plan permits the grant of stock options, stock appreciation rights, restricted stock and restricted stock units for up to 6,000,000 shares of our common stock. During the quarter ended September 30, 2007, options to purchase 100,000 shares of our common stock and 15,000 shares of restricted stock were granted under the 2002 Plan. In addition, 49,579 shares of restricted stock and 32,291 restricted stock units were granted outside of the 2002 Plan. The 32,291 restricted stock units are required to be settled in cash. As such, the restricted stock units were excluded from share–based compensation expense and accounted for as bonus compensation, accrued ratably over the period of service.

Share–based compensation expense was $4.9 million and $3.7 million for the quarters ended September 30, 2007 and 2006, respectively. The total income tax benefit recognized in the income statement for share–based compensation arrangements was $1.4 million and $1.0 million for the quarters ended September 30, 2007 and 2006, respectively.

### Fair Value Determination

The fair value of each option award is estimated on the date of grant using the Black–Scholes option valuation model, which uses the assumptions noted in the following table.

| | Three months ended September 30, | |
| | 2007 | 2006 |
| --- | --- | --- |
| Expected volatility | 35.1%–40.8% | 36.0%–42.0% |
| Weighted–average volatility | 37.0% | 39.4% |
| Expected annual dividend | $0.05 | $0.05 |
| Expected term (in years) | 2.71 – 6.71 | 1.55 – 7.65 |
| Risk–free rate | 4.9%–5.0% | 4.6%–5.0% |

Groups of option holders (directors, executives and non–executives) that have similar historical behavior are considered separately for valuation purposes. Expected volatilities are based on historical closing prices of our common stock over the expected option term. We use historical data to estimate option exercises and employee terminations within the valuation model. The expected term of options granted is derived using the option valuation model and represents the estimated period of time from the date of grant that the option is expected to remain outstanding. The risk–free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

10

*Stock Option Activity*

A summary of option activity under our stock option plans as of September 30, 2007 and changes during the fiscal year is presented below:

| | Shares | Weighted average exercise price | Weighted average remaining contractual term(years) | Aggregate intrinsic value ($000s) |
|---|---|---|---|---|
| Outstanding at July 1, 2007 | 3,214,238 | $ 61.11 | | |
| Granted | 100,000 | 116.65 | | |
| Exercised | (11,750) | 70.91 | | |
| Forfeited or expired | (6,400) | 85.84 | | |
| Outstanding at September 30, 2007 | 3,296,088 | 62.71 | 6.27 | $ 101,580 |
| Exercisable at September 30, 2007 | 1,861,238 | $ 36.61 | 4.54 | $ 94,847 |

The weighted–average grant–date fair value of options granted during the quarters ended September 30, 2007 and 2006 was $45.08 and $34.43, respectively. The total intrinsic value of options exercised during the quarters ended September 30, 2007 and 2006 was $2.2 million and $3.1 million, respectively.

A summary of the status of our nonvested restricted stock as of September 30, 2007 and changes during the quarter ended September 30, 2007, is presented as follows:

| | Shares | Weighted average grant–date fair value |
|---|---|---|
| Nonvested at July 1, 2007 | 12,000 | $ 82.00 |
| Granted | 64,579 | 116.65 |
| Vested | ––– | ––– |
| Forfeited | ––– | ––– |
| Nonvested at September 30, 2007 | 76,579 | $ 111.22 |

As of September 30, 2007, there was $5.8 million of total unrecognized compensation cost related to nonvested restricted stock–based compensation arrangements. The weighted average recognition period is 2.10 years.

At September 30, 2007, the aggregate intrinsic value of the restricted stock unit grant was $2.2 million. As of September 30, 2007, there was $1.1 million of total unrecognized compensation cost related to restricted stock unit compensation arrangements granted under the 2002 Plan. The weighted average recognition period is 2.01 years.  Other than 32,291 restricted stock units that are required to be settled in cash, no restricted stock units were granted, vested or exercisable in the three months ended September 30, 2007 and 2006.

## Note 8.  Business Segment Data

We design, manufacture and market high–quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets.  We organize our businesses into reporting segments by the end–user markets served.  Our chief operating decision makers evaluate performance and allocate resources primarily based on net sales, operating income and working capital in each of the reporting segments.  We report on the basis of three segments:  Automotive, Consumer and Professional.

Our Automotive segment designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications primarily to be installed as original equipment by automotive manufacturers.  Our automotive products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Becker, Logic 7 and Mark Levinson.  Our premium branded audio, video, navigation and infotainment systems are offered to automobile manufacturers through engineering and supply agreements.  See Note 13, *Significant Customers.*

Our Consumer segment designs, manufactures and markets audio, video and electronic systems for home, computer and multimedia applications.  Our Consumer home products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Lexicon, Mark Levinson and Revel.  Our audio and electronic products are offered through audio/video specialty and retail chain stores.  Our branded audio products for computer and multimedia applications are focused on retail customers with products designed to enhance sound for computers, Apple's iPods and other music control players.

The Professional segment designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, airports and other buildings and for recording, broadcast, cinema and music reproduction applications.  Our Professional products are marketed worldwide under brand names including JBL Professional, AKG, Crown, Soundcraft, Lexicon, DigiTech, dbx and Studer.  We provide high–quality products to the sound reinforcement, music instrument support and broadcast and recording segments of the professional audio market.  We offer complete systems solutions for professional installations and users around the world.

The following table reports net sales and operating income (loss) by each reporting segment:

| ($000s omitted) | | Three months ended September 30, | |
| --- | --- | --- | --- |
| | | 2007 | 2006 |
| Net sales: | | | |
| Automotive | $ | 682,303 | 600,998 |
| Consumer | | 119,438 | 93,126 |
| Professional | | 145,221 | 131,419 |
| Total | $ | 946,962 | 825,543 |
| | | | |
| Operating income (loss): | | | |
| Automotive | $ | 45,979 | 90,168 |
| Consumer | | (3,093) | (4,449) |
| Professional | | 20,388 | 17,075 |
| Other | | (21,833) | (15,876) |
| Total | $ | 41,441 | 86,918 |

Other operating loss is comprised of activity related to our corporate operations, net of reporting segment allocations.

12

## Note 9.  Derivatives

We use foreign currency forward contracts to hedge a portion of our forecasted transactions.  These forward contracts are designated as foreign currency cash flow hedges and recorded at fair value in the accompanying consolidated balance sheet with a corresponding entry to accumulated other comprehensive income (loss) until the underlying forecasted foreign currency transaction occurs.

When the transaction occurs, the gain or loss from the derivative designated as a hedge of the transaction is reclassified from accumulated other comprehensive income (loss) to the same income statement line item in which the foreign currency gain or loss on the underlying hedged transaction is recorded.  When it becomes apparent that an underlying forecasted transaction will not occur, the amount recorded in accumulated other comprehensive income (loss) related to the hedge is reclassified to the miscellaneous, net line of the income statement in the then−current period.

Changes in the fair value of the derivatives are highly effective in offsetting changes in the cash flows of the hedged items because the amounts and the maturities of the derivatives approximate those of the forecasted exposures.  Any ineffective portion of the derivative is recognized in current earnings to the same income statement line item in which the foreign currency gain or loss on the underlying hedged transactions is recorded.  When it has been determined that a hedge has become ineffective, the ineffective portion of the hedge is recorded in current earnings.  For the three months ending September 30, 2007 and 2006 we recognized no ineffectiveness.

We elected to exclude forward points from the effectiveness assessment.  At the end of the period we calculate the fair value relating to the change in forward points which is recorded to current earnings as other non−operating income.  For the three months ended September 30, 2007, we recognized $0.8 million in net gains related to the change in forward points.

At September 30, 2007, we had forward contracts maturing through June 2008 to sell Euros and buy US Dollars of approximately $60 million, and through December 2007 to buy Canadian dollars and sell US Dollars of approximately $2.6 million to hedge future foreign currency purchases.  At September 30, 2007, the amount associated with these hedges that is expected to be reclassified from accumulated other comprehensive income (loss) to earnings within the next twelve months is a loss of approximately $4.2 million.  The fair market value of the forward contracts as of September 30, 2007 was a loss of $3.4 million.  In the three months ended September 30, 2007, we recognized less than $0.1 million net losses from cash flow hedges of forecasted foreign currency transactions compared to $0.4 million in net losses in the same period last year.

As of September 30, 2007, we had forward contracts maturing through January 2008 to purchase and sell the equivalent of $41.2 million of various currencies to hedge foreign currency denominated inter−company loans.  At September 30, 2007, the fair value on these contracts was a net loss of $0.3 million.  Adjustments to the carrying value of the foreign currency forward contracts offset the gains and losses on the underlying loans in other non−operating income.

In February 2007 we entered into an interest rate swap contract to effectively convert interest on an operating lease from a variable rate to a fixed rate.  The objective of the swap is to offset changes in rent expenses caused by interest rate fluctuations.  The interest rate swap is designated as a cash flow hedge.  At the end of each reporting period the discounted fair value of the swap is calculated and recorded to other comprehensive income.  The accrued but unpaid net interest on the swap is recorded in rent expense, which is included in selling, general and administrative expenses in our consolidated statement of operations.  Changes in the fair value of the interest rate swap are highly effective in offsetting changes in the hedged item.  Effectiveness is

13

tested using a hypothetical swap that replicates the actual cash flows of the interest portion of rent expense regressed against the interest rate swap. If the calculated correlation factor shows a high degree of correlation, the interest rate swap is deemed to be highly effective. If the hedge is determined to be ineffective, the ineffective portion will be reclassified from other comprehensive income and recorded as rent expense. For the three months ended September 30, 2007, we recognized no ineffectiveness.

As of September 30, 2007, the notional amount of the swap contract was $28.6 million and the amount recorded in other comprehensive income was a gain of $0.4 million. The amount associated with the swap contract that is expected to be recorded as rent expense over the next twelve months is a gain of $0.1 million.

### Note 10. Commitments and Contingencies

On May 8, 2007, Helen Rodgers Living Trust ("Plaintiff") filed a putative class action lawsuit against the Company and all of its directors in the Superior Court of the District of Columbia seeking declaratory and injunctive relief, damages and costs. The original complaint alleged that the Company's directors breached their fiduciary duties to the Company's stockholders by entering into a merger agreement with a company ("Parent") formed by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners VI Fund, L.P. and its related funds, which are sponsored by Goldman, Sachs & Co. ("GSCP"). According to Plaintiff, the consideration to be offered to the Company's stockholders under the merger agreement was "inadequate" and the merger agreement "inequitably favor[ed] . . . insiders" of the Company. The original complaint also alleged that the termination fee in the merger agreement was excessive, that the Company's directors purportedly would not "fairly and adequately" evaluate any alternative bids, and that the provision in the merger agreement that allowed the Company to solicit proposals for alternative bidders during a 50–day period ending in June 2007 was "illusory."

On June 29, 2007, Plaintiff filed its first amended complaint. While the first amended complaint continued to raise the allegations made in the original complaint, the new focus of Plaintiff's case was that the merger agreement "inequitably favor[ed] . . . insiders" of the Company by allowing such insiders to exchange otherwise worthless "underwater" options for Parent shares on a "one option for one Parent share basis," and by allowing them to separately negotiate with Parent for more favorable treatment of their options. The first amended complaint also alleged that the disclosures contained in the Company's preliminary proxy statement/prospectus were inadequate.

On June 29, 2007, Plaintiff filed a motion for preliminary injunction. The motion sought to enjoin the conversion of the "underwater" options into Parent shares, and also sought to "unw[i]nd or otherwise cancel[]" the challenged options. In the motion, Plaintiff did not seek to enjoin the shareholder vote or the merger. After Defendants filed their opposition to the motion for preliminary injunction on July 23, 2007, Plaintiff agreed to voluntarily withdraw its motion.

Thereafter, on September 4, 2007, Plaintiff was granted leave to file a second amended complaint. The second amended complaint narrows Plaintiff's claims by eliminating, among other things, most of its disclosure claims and allegations relating to "underwater" options. Defendants answered Plaintiff's second amended complaint on September 21, 2007, denying Plaintiff's claims for breach of fiduciary duty and disclosure deficiencies.

We believe the lawsuit is without merit and intend vigorously to defend against it.

At September 30, 2007, we were involved in several additional legal actions. The outcome of these legal actions cannot be predicted with certainty; however, management, based upon advice from legal counsel, believes such actions are either without merit or will not have a material adverse effect on our financial position or results of operations. In fiscal 2005, we recorded a $6 million liability for probable unasserted claims. There was no change in the status of these claims at September 30, 2007. As such, this amount continues to be accrued at September 30, 2007.

At September 30, 2007, our Board of Directors had authorized the repurchase of a total of up to 20 million shares of common stock. Through September 30, 2007, we had acquired and placed in treasury a total of 18,198,082 shares of our common stock at a total cost of $639.6 million. Our program was suspended upon the announcement in April 2007 of our proposed merger with a company formed by investment funds affiliated with KKR and GSCP. No determination has been made regarding when this program will be reinstated. See Note 15 *Subsequent Events* for additional information regarding the termination of the proposed merger and an accelerated share repurchase program effected in October 2007.

### Note 11.   Recent Accounting Pronouncements

In June 2006, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in accordance with Statement of Financial Accounting Standards ("SFAS") No. 109, *Accounting for Income Taxes*. It also prescribes a recognition threshold and measurement attribute for financial statement recognition and measurement for a tax position taken or expected to be taken in a tax return. FIN 48 is effective for fiscal years beginning after December 15, 2006. We adopted the provisions of FIN 48 on July 1, 2007. See Note 14, *Income Taxes* to review the effect of adoption on our consolidated financial statements.

In May 2007, the FASB issued FASB Staff Position ("FSP") No. FIN 48–1, *Definition of Settlement in FASB Interpretation No. 48* ("FSP FIN 48–1") which amends FIN 48, to provide guidance about how an enterprise should determine whether a tax position is effectively settled for the purpose of recognizing previously unrecognized tax benefits. Under FSP FIN 48–1, a tax position is considered to be effectively settled if the taxing authority completed its examination, the enterprise does not plan to appeal, and it is remote that the taxing authority would reexamine the tax position in the future. We adopted the provisions of FSP FIN 48–1 on July 1, 2007. See Note 14, *Income Taxes* to review the effect of adoption on our consolidated financial statements.

The FASB recently issued proposed FSP APB 14–a, *"Accounting for Convertible Debt Instruments That May Be Settled in Cash upon Conversion (Including Partial Cash Settlement)"* which would require issuers of convertible debt that may be settled wholly or partly in cash to account for the debt and equity components separately. The proposed FSP would require separate accounting to be applied retrospectively to both new and existing convertible instruments within the proposal's scope and would thereby affect our net income and earnings per share. See Note 15, *Subsequent Events* for additional information regarding our recently issued convertible notes.

## Note 12.  Retirement Benefits

We have certain business units in Europe that maintain defined benefit pension plans for many of our current and former employees. The coverage provided and the extent to which the retirees' share in the cost of the program vary by business unit. Generally, plan benefits are based on age, years of service, and average compensation during the final years of service. The measurement date used for determining pension benefits is the last day of our fiscal year–end, June 30.  In the United States, we have a Supplemental Executive Retirement Plan ("SERP") that provides retirement, death and termination benefits, as defined, to certain key executives designated by the Board of Directors.

Our retirement benefits are more fully disclosed in Notes 1 and 12 of our Consolidated Financial Statements included in Item 8 of our Annual Report on Form 10–K for the fiscal year ended June 30, 2007.

The following table presents the components of net periodic benefit costs:

|  | | Three months ended September 30, | |
|---|---|---|---|
| ($000s omitted) | | 2007 | 2006 |
| Service cost | $ | 917 | 809 |
| Interest cost | | 1,588 | 1,267 |
| Amortization of prior service cost | | 215 | 182 |
| Amortization of net loss | | 303 | 467 |
| Net periodic benefit cost | $ | 3,023 | 2,725 |

During the three months ended September 30, 2007, we made an insignificant contribution to the defined benefit pension plans and expect full year contributions to be immaterial.

## Note 13.  Significant Customers

Presented below are the percentages of net sales to and receivables due from the customer that represented 10 percent or more of our net sales or accounts receivable for the periods presented:

|  | Net Sales | | Accounts Receivable | |
|---|---|---|---|---|
|  | Three months ended September 30, | | September 30 | |
|  | 2007 | 2006 | 2007 | 2006 |
| Daimler AG | 21% | 26% | 15% | 16% |
| Other Customers | 79 | 74 | 85 | 84 |
| Total | 100% | 100% | 100% | 100% |

We anticipate that Daimler AG will continue to account for a significant portion of our net sales and accounts receivable for the foreseeable future.  Our automotive customers are not obligated to any long–term purchase of our products.  The loss of Daimler AG as a customer would have a material adverse effect on our total consolidated net sales, earnings and financial position.

16

### Note 14.  Income Taxes

Our provision for income taxes is based on an estimated annual tax rate for the year applied to federal, state and foreign income.  The projected effective tax rate of 27 percent for 2008 differs from the U.S. statutory rate primarily due to foreign rates, which differ from those in the U.S., the realization of certain business tax credits including R&D, favorable permanent differences between book and tax treatment for items, and the benefit from the conclusion of a tax audit.  This rate is expected to be greater than the full year 2007 effective tax rate of 18.36 percent because the 2007 rate included the recognition of certain federal tax credits.

We adopted the provisions of FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"), on July 1, 2007.  FIN 48 clarifies the accounting for income tax uncertainties. The company has developed and implemented a process based on the guidelines of FIN 48 to ensure that uncertain tax positions are identified, analyzed and properly reported in the company's financial statements in accordance with SFAS 109. Based on all known facts and circumstances and current tax law, the company believes that the total amount of unrecognized tax benefits as of June 30, 2007 was $31.2 million.  As a result of the implementation of FIN 48, we recognized a $6.9 million reduction to the $31.2 million unrecognized tax benefit due to the fact that the tax position was at a more likely than not threshold at July 1, 2007.  This reduction was included as an increase to the July 1, 2007 balance of retained earnings.  Additionally, the company effectively settled a German tax audit for fiscal tax years up to and including June 30, 2004.  During the three months ended September 30, 2007, we recognized $5.7 million in previously unrecognized tax benefits due to the effective settlement criteria of FSP FIN 48–1.

The unrecognized tax benefits at July 1, 2007 are tax positions that are permanent in nature and, if recognized, would reduce the effective tax rate.  However, the Company's federal, certain state and certain non–U.S. income tax returns are currently under various stages of audit or potential audit by applicable tax authorities and the amounts ultimately paid, if any, upon resolution of the issues raised by the taxing authorities may differ materially from the amounts accrued for each year.  The material tax jurisdictions for the company are Germany and the United States.  The tax years subject to exam for Germany are fiscal years 2005 through the current year.  The tax years subject to exam in the United States are fiscal years 2004 through the current year. Due to provisions allowed in the tax law, we may recognize $3.4 million in unrecognized tax benefits within the next 12 months.

We recognize interest and penalties related to unrecognized tax benefits in income tax expense.  We had $2.5 million accrued at July 1, 2007 for the payment of any such interest and penalties.

Income tax expense for the quarter ended September 30, 2007 was $3.7 million, compared to $29.6 million for the same period last year.  The effective tax rate for the three months ended September 30, 2007 was 9.3 percent, compared to 34.5 percent in the prior year period.  The tax rate for the quarter ended September 30, 2007 includes $5.7 million of previously unrecognized tax benefits resulting from the effective settlement of a German tax audit.  Additionally, the tax rate for the quarter was lower due to a $4.4 million benefit related to a change in German tax law which lowered the German effective tax rate.

We currently expect the tax rate for the full fiscal year 2008 to be approximately 27 percent.

### Note 15.  Subsequent Events

On October 1, 2007, a purported class action lawsuit was filed against the Company and certain of its officers in the United States District Court for the District of Columbia seeking compensatory damages and costs on behalf of all persons who purchased the Company's common stock between April 26, 2007 and September 24, 2007 (the "Class Period").  The

complaint purports to allege claims for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The complaint alleges that defendants omitted to disclose material adverse facts about the Company's financial condition and business prospects. The complaint contends that had these facts not been concealed at the time the merger agreement was entered, there would not have been a merger agreement, or it would have been at a much lower price, and the price of the Company's common stock therefore would not have been artificially inflated during the Class Period. The plaintiff alleges that, following the reports that the proposed merger was not going to be completed, the price of the Company's common stock declined causing the plaintiff class significant losses.

We believe the lawsuit is without merit and intend vigorously to defend against it.

On October 22, 2007, the Company entered into a Termination and Settlement Agreement (the "Termination Agreement") with KKR, KHI Parent Inc., KHI Merger Sub Inc. and GSCP. Under the Termination Agreement, effective on October 23, 2007, each of (a) the Agreement and Plan of Merger, dated April 26, 2007, among the Company, KHI Parent Inc. and KHI Merger Sub Inc. (the "Merger Agreement"), (b) the related guarantees (the "Guarantees") and (c) the Election Agreement, dated April 26, 2007, between KHI Parent Inc. and Dr. Sidney Harman, was terminated in its entirety. Under the Termination Agreement, the Company and affiliates of KKR and GSCP agreed to release each other from all claims and actions arising out of or related to the Merger Agreement, the Guarantees and the transactions contemplated thereby.

In connection with the Termination Agreement, on October 22, 2007, the Company entered into a note purchase agreement under which it sold $400 million aggregate principal amount of its 1.25 percent Convertible Senior Notes due 2012 (the "Notes") to an affiliate of KKR, GSCP, Citibank, N.A. and HSBC USA, Inc. The Notes are convertible at a conversion price of $104 per share into cash, and at Harman's option, if applicable, shares of Harman common stock. The agreement contains a settlement provision commonly referred to as a "net share settlement." Net settlement provisions are currently under review by the FASB. If the FASB adopts the proposed new accounting standard, we would incur higher interest expense and thus lower earnings per share.

On October 30, 2007, the Company used the proceeds from the issuance and sale of the Notes to repurchase and retire for accounting purposes approximately 4.8 million shares of the Company's common stock for a total purchase price of approximately $400 million from Bear, Stearns International Limited and J.P. Morgan Securities Inc., as agent for JPMorgan Chase Bank, National Association, London Branch, under two separate accelerated share repurchase (ASR) programs. The 4.8 million shares represented approximately 7 percent of the then outstanding shares of the Company's common stock.

For more detailed information, see our Current Reports on Form 8–K filed with the Securities and Exchange Commission on October 25, 2007 and October 31, 2007.

*Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations*

*General*

*The following discussion should be read in conjunction with the accompanying unaudited condensed consolidated financial statements and the related notes included in Item 1 of this Quarterly Report on Form 10−Q, together with Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10−K for the year ended June 30, 2007 ("2007 Form 10−K").  This discussion contains forward−looking statements which are based on our current expectations and experience and our perception of historical trends, current market conditions, including customer acceptance of our new products, current economic data, expected future developments, including foreign currency exchange rates, and other factors that we believe are appropriate under the circumstances.  These statements involve risks and uncertainties that could cause actual results to differ materially from those suggested in the forward−looking statements, including the litigation resulting from the terminated merger agreement with a company formed by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners VI Fund, L.P.*

We begin our discussion with an overview of our company to give you an understanding of our business and the markets we serve.  We then discuss our critical accounting policies.  This is followed by a discussion of our results of operations for the three months ended September 30, 2007 and 2006.  We include in this discussion an analysis of certain significant period−to−period variances in our consolidated statements of operations.  We also provide specific information regarding our three reportable business segments: Automotive, Consumer and Professional.  Our liquidity, capital resources and cash flows are discussed under the caption Financial Condition.  We complete our discussion with a business outlook for future periods.

*Overview*

We design, manufacture and market high−quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets.  We have developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names in our principal markets.  These brand names have a heritage of technological leadership and product innovation.  Our three reportable business segments, Automotive, Consumer and Professional, are based on the end−user markets we serve.

Automotive designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications.  Our systems are generally shipped directly to our automotive customers for factory installation.  Infotainment systems are a combination of infotainment and entertainment components that may include or control GPS navigation, traffic information, voice−activated telephone and climate control, rear seat entertainment, wireless Internet access, hard disk recording, MP3 playback and a high−end branded audio system.  These systems include scaleable software to allow us to better serve a full range of vehicles from luxury through the entry−level vehicles.  Future infotainment systems may also provide driver safety capabilities such as lane guidance, pre−crash emergency braking, adaptive cruise control and night vision.  Automotive also provides aftermarket products such as personal navigation devices ("PNDs") to customers primarily in Europe.  Our PNDs leverage many of the successful applications developed by our Automotive segment.

Consumer designs, manufactures and markets audio, video and electronic systems for home, mobile and multimedia applications. Home product applications include systems to provide high–quality audio throughout the home and to enhance in–home video systems such as home theatres. Our aftermarket mobile products, such as iPod adaptors, speakers and amplifiers, deliver audio entertainment in the vehicle. Additionally, aftermarket mobile products include PNDs that provide GPS navigation, video and other infotainment capabilities. Our multimedia applications include loudspeaker accessories for personal computers, music phones, and portable electronic devices such as the iPod and other MP3 players. Our consumer products are primarily distributed through retail outlets.

Professional designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, airports, houses of worship and other public spaces. We also develop products for recording, broadcast, cinema, touring and music reproduction applications. In addition, we have leading shares of both the portable PA market and musician vertical markets serving small bands, DJ's and other performers. These products are increasingly linked by our proprietary HiQnet network protocol which provides centralized monitoring and control of both complex and simple professional audio systems.

Our products are sold worldwide, with the largest markets being the United States and Germany. In the United States, our primary manufacturing facilities are located in California, Indiana, Kentucky, Missouri and Utah. Outside of the United States, we have significant manufacturing facilities in Germany, Austria, the United Kingdom, Mexico, Hungary, France and China. Our businesses operate using local currencies. Therefore, we are subject to currency fluctuations that are partially mitigated by the fact that we purchase raw materials and supplies locally when possible. We are especially affected by Euro exchange rates since a significant percentage of our sales are made in Euros.

We experience seasonal fluctuations in sales and earnings. Historically, our first quarter ending September 30 is generally the weakest due to the production schedules of our automotive customers and summer holidays in Europe. Our sales and earnings may also vary due to customer acceptance of our products, the timing of new product introductions, product offerings by our competitors and general economic conditions. Our reported sales and earnings may also fluctuate due to foreign currency exchange rates, especially for the Euro.

We achieved solid results for the first quarter ended September 30, 2007. Each of our three reportable business segments reported sales growth for the first quarter. Our initiative to develop cost saving strategies is underway and we expect to gain procurement, engineering and manufacturing efficiencies that we believe will improve margins over the course of this fiscal year. We continue to be a strong company with exceptional technology, products and market position. With the termination of the Merger Agreement behind us, we now look forward to turning our full attention to operating and improving our business.

### Recent Developments

On October 22, 2007, we announced that we entered into an agreement with KKR, GSCP and companies formed by investment funds affiliated with KKR and GSCP to terminate the Merger Agreement dated April 26, 2007 without litigation or payment of a termination fee. In connection with the termination of the Merger Agreement, we sold $400 million of our 1.25 percent Convertible Senior Notes due 2012, convertible at a conversion price of $104 per share into cash, and at our option, if applicable, shares of our common stock.

On October 30, 2007, we entered into an accelerated share repurchase ("ASR") agreement with Bear, Stearns International Limited and a separate ASR agreement with J.P. Morgan Securities Inc., as agent for JPMorgan Chase Bank, National Association, London Branch. Pursuant to these agreements, we purchased, in the aggregate, 4,775,549 shares of our common stock for a total purchase price of approximately $400 million, subject to adjustment.

### Critical Accounting Policies

Our critical accounting policies are described under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our 2007 Form 10–K. These policies include allowance for doubtful accounts, inventory valuation, goodwill, pre–production and development costs, warranty liabilities, income taxes, and stock–based compensation. Also see Note 1, *Summary of Significant Accounting Policies* to our Consolidated Financial Statements included in our 2007 Form 10–K.

### Results of Operations

#### Sales

Our net sales for the quarter ended September 30, 2007 were $947.0 million, a 15 percent increase compared to the prior year period. All three of our reporting segments reported higher sales compared to the same period in the prior year. The effects of foreign currency translation contributed approximately $42 million to the increase in sales. Exclusive of foreign currency, net sales were 9 percent higher than the prior year period. The growth in overall net sales was primarily due to increased shipments of infotainment systems to automotive customers, higher sales of personal navigation devices in Europe, and higher sales of consumer and professional products to major retailers.

Presented below is a summary of our net sales by reporting segment:

| ($000s omitted) | | Three months ended September 30, | | | |
|---|---|---|---|---|---|
| | | 2007 | % | 2006 | % |
| Net sales: | | | | | |
| Automotive | $ | 682,303 | 72% | 600,998 | 73% |
| Consumer | | 119,438 | 13% | 93,126 | 11% |
| Professional | | 145,221 | 15% | 131,419 | 16% |
| Total | $ | 946,962 | 100% | 825,543 | 100% |

*Automotive* – Net sales for the quarter ended September 30, 2007 increased $81.3 million, or 14 percent compared to the same period last year. Foreign currency translation contributed approximately $36 million to the increase in sales. Since a significant percentage of our automotive sales are to customers in Europe, Automotive incurs most of our foreign currency translation exposure. New introductions of infotainment systems including Chrysler's MyGig infotainment systems in North America, the roll–out of our first mid–level infotainment system for BMW and the extension of our Multi Media Interface infotainment system for the Audi A4 and A5 were primary factors contributing to the higher sales. A strong demand for Traffic Assist, our European aftermarket PND, also contributed significantly to the increase in sales over the prior year period.

*Consumer* – Net sales for the quarter ended September 30, 2007 increased $26.3 million, or 28 percent, compared to the same period last year. Foreign currency translation contributed approximately $4 million to the increase in sales compared to the prior year. New product introductions and strong Harman/Kardon and multimedia sales contributed significantly to the sales increase at Consumer. Higher sales of consumer products for home applications including Harman/Kardon electronics and JBL loudspeakers, multimedia products and our consumer mobile PNDs, each contributed to the sales growth over the prior year period.

*Professional* – Net sales for the quarter ended September 30, 2007 increased $13.8 million, or 11 percent compared to the same period last year. Foreign currency translation contributed approximately $2 million to the increase in sales compared to the prior year period. The increase in sales compared to the same period last year was primarily due to new installed sound product introductions, higher JBL Professional sales to major US retailers and recently introduced digital consoles from Soundcraft and Studer.

*Gross Profit*

Gross profit as a percentage of net sales decreased 6.9 percentage points to 27.9 percent for the quarter ended September 30, 2007 compared to 34.8 percent of sales in the same period last year. The decrease was due to lower margins in our Automotive and Consumer business segments.

Presented below is a summary of our gross profit by reporting segment:

| ($000s omitted) | | Three months ended September 30, | | |
|---|---|---|---|---|
| | 2007 | Percent of net sales | 2006 | Percent of net sales |
| Gross Profit: | | | | |
| Automotive | $ 181,836 | 26.7% | 214,740 | 35.7% |
| Consumer | 28,107 | 23.5% | 23,507 | 25.2% |
| Professional | 55,882 | 38.5% | 50,292 | 38.3% |
| Other | (1,250) | | (1,250) | |
| Total | $ 264,575 | 27.9% | 287,289 | 34.8% |

*Automotive*– Gross profit as a percentage of net sales decreased 9.0 percentage points for the quarter ended September 30, 2007 compared to the same period in the prior year. The gross margin decline was primarily due to higher costs incurred related to the ramp–up of mid–level infotainment systems for mass market vehicles. Margins were also affected by product mix, sales of PNDs with lower margins, higher fixed overhead expenses primarily due to the ramp–up of new manufacturing facilities to support new business and material cost increases.

*Consumer*– Gross profit as a percentage of net sales decreased 1.7 percentage points for the quarter ended September 30, 2007 compared to the same period in the prior year. Gross margins were affected by strong competition in the multimedia market. Sales of lower margin Harman/Kardon electronics, lower margin iPod docking stations and the discontinuance of mobile multimedia products contributed to the decrease in gross margins.

*Professional–* Gross profit as a percentage of net sales increased a modest 0.2 percentage points for the quarter ended September 30, 2007 compared to the same period in the prior year. The slight gross margin improvement resulted from the introduction of new products.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses ("SG&A"), as a percentage of net sales, decreased 0.7 percentage points for the quarter ended September 30, 2007 compared to the same period in the prior year. The decrease primarily relates to lower research and development ("R&D") costs as a percent of sales. Research and development costs were $87.8 million, or 9.3 percent of net sales, for the quarter ended September 30, 2007 compared to $82.8 million, or 10.0 percent of net sales, in the same period last year. We expect R&D costs, as a percentage of net sales, to decrease during the year due to the increasing scalability of our infotainment systems and the beginning of production for certain automotive programs. Our SG&A expenses include $4.7 million of merger–related costs for the quarter ended September 30, 2007. We expect significant additional costs related to the resolution of the merger termination in the second quarter of fiscal 2008.

In June 2006, we initiated a restructuring program designed to increase efficiencies in our manufacturing, engineering and administrative organizations. Since the inception of the restructuring program, we have incurred restructuring charges of $16.9 million and made cash payments of $10.8 million.

Presented below is a summary of SG&A expenses by reporting segment:

| ($000s omitted) | | Three months ended September 30, | | |
|---|---|---|---|---|
| | 2007 | Percent of net sales | 2006 | Percent of net sales |
| SG&A Expenses: | | | | |
| Automotive | $    135,857 | 19.9% | 124,572 | 20.7% |
| Consumer | 31,200 | 26.1% | 27,956 | 30.0% |
| Professional | 35,494 | 24.4% | 33,217 | 25.3% |
| Other | 20,583 | ––– | 14,626 | ––– |
| Total | $    223,134 | 23.6% | 200,371 | 24.3% |

*Automotive–* SG&A expenses as a percentage of sales decreased 0.8 percentage points for the quarter ended September 30, 2007 compared to the same period last year. The decrease as a percentage of sales is due primarily to a decrease in R&D costs as a percent of net sales. R&D expenses were $69.6 million, or 10.2 percent of sales, for the quarter ended September 30, 2007 compared to $65.4 million, or 10.9 percent of sales, in the prior year period. The increase in the dollar amount of R&D expenses was due primarily to higher spending to support new automotive infotainment systems for programs launching in fiscal years 2008 and 2009.

*Consumer*– SG&A expenses as a percentage of sales decreased 3.9 percentage points for the quarter ended September 30, 2007 compared to the same period last year. The decrease was primarily due to a decrease in R&D costs as a percent of net sales. Research and development expenses were $8.9 million, or 7.4 percent of sales, for the quarter ended September 30, 2007 compared to $8.9 million, or 9.5 percent of sales, in the same period last year.

*Professional*– SG&A expenses as a percentage of sales decreased 0.9 percentage points for the quarter ended September 30, 2007 compared to the same period last year. The decrease is related to leveraging the fixed portion of SG&A expenses over a higher sales base. Research and development expenses were $9.2 million, or 6.4 percent of sales, for the quarter ended September 30, 2007 compared to $8.5 million, or 6.5 percent of sales, in the same period last year.

*Other*– Corporate SG&A expenses for the three months ended September 30, 2007 increased $6.0 million compared to the same period last year. SG&A expenses increased primarily due to $4.7 million of merger–related costs and increased compensation expenses. We expect significant additional costs related to the resolution of the merger termination in the second quarter of fiscal 2008.

*Operating Income*

Operating income for the quarter ended September 30, 2007 was $41.4 million, or 4.4 percent of sales, compared to $86.9 million, or 10.5 percent of sales in the same period last year. The decrease in operating income was primarily driven by lower gross profit margins, primarily in our Automotive and Consumer segments.

*Interest Expense, Net*

Interest expense, net, was $1.4 million for the quarter ended September 30, 2007 compared to $0.1 million in the same quarter last year. Our first quarter fiscal 2008 interest expense, net, included $3.1 million of gross interest expense and $1.7 million of interest income. For the same period in the prior year, gross interest expense was $2.3 million and interest income was $2.2 million. Weighted average borrowings outstanding were $162.7 million for the quarter ended September 30, 2007 compared to $172.7 million for the same period in the prior year.

The weighted average interest rate on our revolver borrowings was 6.1 percent for the quarter ended September 30, 2007 compared to 5.4 percent in the same quarter last year. The weighted average interest rate increased due to an increase in LIBOR combined with an increase in the interest rate spread on our revolving credit facility from 40 basis points to 70 basis points that resulted from a change in our credit rating.

*Miscellaneous Expenses*

Miscellaneous, net expenses were $0.7 million for the quarter ended September 30, 2007 compared to $0.9 million in the same period last year. For the quarters ended September 30, 2007 and 2006, miscellaneous expenses were primarily bank charges.

*Income Taxes*

Income tax expense for the quarter ended September 30, 2007 was $3.7 million compared to $29.6 million for the same period last year. The effective tax rate for the quarter ended September 30, 2007 was 9.3 percent compared to 34.5 percent in the prior year period. The tax rate reduction for the quarter ended September 30, 2007 includes $5.7 million in previously unrecognized tax benefits as a result of a tax audit in Germany. We also realized a $4.4 million tax benefit related to a change in German tax laws. We currently expect the tax rate for the full fiscal year 2008 to be approximately 27 percent.

### Financial Condition

*Liquidity and Capital Resources*

We primarily finance our working capital requirements through cash generated by operations, borrowings under our revolving credit facility and trade credit. Cash and cash equivalents were $77.1 million at September 30, 2007 compared to $106.1 million at June 30, 2007. During the three–month period ended September 30, 2007, cash was used to make tax payments (primarily in Germany), repay our senior notes, make investments in our manufacturing facilities and meet the working capital needs of our business segments.

We will continue to have cash requirements to support seasonal working capital needs, investments in our manufacturing facilities, interest and principal payments, dividend payments and stock option activity. We intend to use cash on hand, cash generated by operations and borrowings under our revolving credit facility to meet these requirements. We believe that cash from operations and our borrowing capacity, if needed, will be adequate to meet our normal cash requirements over the next twelve months. Below is a more detailed discussion of our cash flow activities during the quarter ended September 30, 2007.

*Operating Activities*

For the three months ended September 30, 2007, our net cash used for operations was $101.6 million compared to net cash used in operations of $43.5 million in the same period last year. The reduction in operating cash flows was primarily due to increased tax payments, decreased accounts payable and an increase in accounts receivable. At September 30, 2007, working capital, excluding cash and short–term debt, was $522.0 million, compared with $329.9 million at June 30, 2007. The $192.1 million increase was primarily due to higher inventories and accounts receivable, a decrease in taxes payable due to tax payments primarily in Germany and a decrease in accounts payable due to timing of vendor payments.

*Investing Activities*

Net cash used in investing activities was $32.6 million for the three months ended September 30, 2007 compared to $13.1 million in the same period last year. Capital expenditures for the three months ended September 30, 2007 were $27.5 million compared to $12.4 million for the same period last year. The increase in capital spending is primarily due to the launch of new automotive programs and a new manufacturing facility in China. We anticipate making significant investments in facilities, manufacturing equipment and tooling in fiscal 2008 to support the continued growth in our automotive infotainment systems business.

*Financing Activities*

Our total debt at September 30, 2007 was $183.0 million, primarily comprised of $179.9 million of borrowings under our revolving credit facility and capital leases and other short–term borrowings of $3.1 million.

We are party to a $300 million committed multi–currency revolving credit facility with a group of banks.  This facility expires in June 2010.  At September 30, 2007 we had borrowings of $179.9 million and outstanding letters of credit of $5.5 million under this facility.  Unused availability under the revolving credit facility was $114.6 million at September 30, 2007.

Our long–term debt agreements contain financial and other covenants that, among other things, limit our ability to incur additional indebtedness, restrict subsidiary dividends and distributions, limit our ability to encumber certain assets and restrict our ability to issue capital stock of our subsidiaries.  Our long–term debt agreements permit us to pay dividends or repurchase our capital stock without any dollar limitation provided that we would be in compliance with the financial covenants in our revolving credit facility after giving effect to such dividend or repurchase.  At September 30, 2007, we were in compliance with the terms of our long–term debt agreements.

On October 22, 2007, we entered into a note purchase agreement with affiliates of KKR and GSCP, as well as two financial institutions under which they purchased $400 million of our 1.25 percent Convertible Senior Notes due 2012.  The Notes are convertible into cash and, at the Company's option, if applicable, shares of the Company's common stock, based on a conversion rate of 9.6154 shares of common stock per $1,000 principal amount of Notes (which is equal to an initial conversion price of approximately $104 per share) only in certain circumstances as set forth in the Indenture.  The conversion rate is subject to adjustment in certain circumstances as described in the Indenture.  The notes include a settlement provision commonly referred to as a "net share settlement."  Net share settlements are currently under review by the FASB.  If FASB adopts the proposed new accounting standard, we would incur higher interest expense and thus lower earnings per share.

*Equity*

Total shareholders' equity at September 30, 2007 was $1.576 billion compared with $1.494 billion at June 30, 2007.  The increase is primarily due to net income of $36.5 million and favorable foreign currency translation increase of $36.6 million. As a result of the implementation of FIN 48, we recognized a $6.9 million reduction to our unrecognized tax benefit.  The $6.9 million reduction was included in our balance sheet as an adjustment to the July 1, 2007 retained earnings.  There were no shares of our common stock repurchased during the three months ended September 30, 2007.

*Business Outlook*

Our first quarter sales were a record and reflect continued top–line strength.  We believe all three of our core business segments will continue to produce higher sales for the remainder of this fiscal year.  For the full fiscal year ending June 30, 2008, we currently believe our net sales will be approximately $4.1 billion, an increase of 16 percent.  We expect earnings per share before transaction, legal and restructuring costs to meet or exceed the prior fiscal year.

On October 30, 2007, we entered into an accelerated share repurchase ("ASR") agreement with Bear, Stearns International Limited and a separate ASR agreement with J.P. Morgan Securities Inc., as agent for JPMorgan Chase Bank, National Association, London Branch. Pursuant to these agreements, we purchased, in the aggregate, 4,775,549 shares of our common stock for a total purchase price of approximately $400 million,

subject to adjustment. We immediately retired for accounting purposes the 4,775,549 shares of our common stock, which represented approximately 7 percent of the then outstanding shares of our common stock. We expect that the share repurchase will improve our fiscal 2008 earnings per share by approximately 4 percent.

Our current expectations for fiscal 2008 could be affected by the potential impact of changes in currency exchange rates, softness in automobile sales and increases in research and development costs to support new infotainment business.

### Item 3.   *Quantitative and Qualitative Disclosures About Market Risk*

We are required to include information about potential effects of changes in interest rates and currency exchange rates in our periodic reports filed with the Securities and Exchange Commission.  Since June 30, 2007, there have been no material changes in the quantitative or qualitative aspects of our market risk profile.

### *Interest Rate Sensitivity/Risk*

At September 30, 2007, none of our borrowings had interest determined on a fixed–rate basis.  The interest rates on the balance of our debt are subject to changes in U.S. and European short–term interest rates.  To assess exposure to interest rate changes, we have performed a sensitivity analysis assuming a hypothetical 100 basis point increase or decrease in interest rates across all outstanding debt and investments.  Our analysis indicates that the effect on net income at September 30, 2007 of such an increase or decrease in interest rates would be approximately $0.2 million.

### *Foreign Currency Risk*

We maintain significant operations in Germany, the United Kingdom, France, Austria, Hungary, Mexico, Switzerland and Sweden.  As a result, we are subject to market risks arising from changes in foreign currency exchange rates, principally the change in the value of the Euro compared to the U.S. dollar.  Our subsidiaries purchase products and raw materials in various currencies.  As a result, we may be exposed to the cost changes relative to local currencies in the markets to which we sell our products.  To mitigate these risks, we enter into forward foreign exchange contracts.  Also, foreign currency positions are partially offsetting and are netted against one another to reduce exposure.

We presently estimate the effect of changes in currency exchange rates, principally the change in the value of the Euro compared to the U.S. dollar, has an impact on our reported results when the financial statements of foreign subsidiaries are translated into U.S. dollars.  Over half of our sales are currently denominated in Euros.  Currency translation for the Euro versus the U.S. dollar had a significant impact on earnings for the first quarter of fiscal 2007 compared to the prior year first quarter due to the strengthening of the Euro relative to the U.S. dollar.  The first quarter average exchange rate for the Euro versus the U.S. dollar increased 7.89 percent from the prior year's first quarter average exchange rate.

To assess exposure to changes in currency exchange rates, we prepared an analysis assuming a hypothetical 10 percent change in currency exchange rates across all currencies used by our subsidiaries.  This analysis indicated that a 10 percent increase or decrease in exchange rates would have increased or decreased income before income taxes by approximately $5.0 million for the three months ended September 30, 2007.

Competitive conditions in the markets in which we operate may limit our ability to increase prices in the event of adverse changes in currency exchange rates. For example, certain products made in Europe are sold in the U.S. Sales of these products are affected by the value of the Euro relative to other currencies. Any long–term strengthening of the Euro could depress the demand for these European manufactured products and reduce sales. However, due to the multiple currencies involved in our business and the netting effect of various simultaneous transactions, our foreign currency positions are partially offsetting.

Actual gains and losses in the future may differ materially from the hypothetical gains and losses discussed above based on changes in the timing and amount of interest rate foreign currency exchange rate movements and our actual exposure and hedging transactions.

### Item 4.   Controls and Procedures

*Evaluation of Disclosure Controls and Procedures* – Under the supervision and with the participation of our management, including our Executive Chairman, Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a–15(e) and 15d–15(e) promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10–Q. Based on that evaluation, our Executive Chairman, Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. We note that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving our stated goals under all potential future conditions.

*Change in Internal Control Over Financial Reporting* – There has not been any change in our internal control over financial reporting (as defined in Rules 13a–15(f) and 15d–15(f) as promulgated by the Securities and Exchange Commission under the Securities Act of 1934) during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### Part II.   OTHER INFORMATION

### Item 1.   Legal Proceedings

### *Helen Rodgers Living Trust v. Harman International Industries, Incorporated*

On May 8, 2007, Helen Rodgers Living Trust ("Plaintiff") filed a putative class action lawsuit against the Company and all of its directors in the Superior Court of the District of Columbia seeking declaratory and injunctive relief, damages and costs. The original complaint alleged that the Company's directors breached their fiduciary duties to the Company's stockholders by entering into a merger agreement with a company ("Parent") formed by investment funds affiliated with KKR and GSCP. According to Plaintiff, the consideration to be offered to the Company's stockholders under the merger agreement was "inadequate" and that the merger agreement "inequitably favor[ed] . . . insiders" of the Company. The original complaint also alleged that the termination fee in the merger agreement was excessive, that the Company's directors purportedly would not "fairly and adequately" evaluate any alternative bids, and that the provision in the merger agreement that allowed the Company to solicit proposals for alternative bidders during a 50–day period ending in June 2007 was "illusory."

On June 29, 2007, Plaintiff filed its first amended complaint. While the first amended complaint continued to raise the allegations made in the original complaint, the new focus of Plaintiff's case was that the merger agreement "inequitably favor[ed] . . . insiders" of the Company by allowing such insiders to exchange otherwise worthless "underwater" options for Parent shares on a "one option for one Parent share basis," and by allowing them to separately negotiate with Parent for more favorable treatment of their options. The first amended complaint also alleged that the disclosures contained in the Company's preliminary proxy statement/prospectus were inadequate.

On June 29, 2007, Plaintiff filed a motion for preliminary injunction. The motion sought to enjoin the conversion of the "underwater" options into Parent shares, and also sought to "unw[i]nd or otherwise cancel[]" the challenged options. In the motion, Plaintiff did not seek to enjoin the shareholder vote or the merger. After Defendants filed their opposition to the motion for preliminary injunction on July 23, 2007, Plaintiff agreed to voluntarily withdraw its motion.

Thereafter, on September 4, 2007, Plaintiff was granted leave to file a second amended complaint. The second amended complaint narrows Plaintiff's claims by eliminating, among other things, the vast majority of its disclosure claims and the allegations relating to "underwater" options. Defendants answered Plaintiff's second amended complaint on September 21, 2007, denying Plaintiff's claims for breach of fiduciary duty and disclosure deficiencies.

We believe the lawsuit is without merit and intend vigorously to defend against it.

### *Cheolan Kim v. Harman International Industries, Incorporated*

On October 1, 2007, a purported class action lawsuit was filed against the Company and certain of its officers in the United States District Court for the District of Columbia seeking compensatory damages and costs on behalf of all persons who purchased the Company's common stock between April 26, 2007 and September 24, 2007 (the "Class Period"). The complaint purports to allege claims for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The complaint alleges that defendants omitted to disclose material adverse facts about the Company's financial condition and business prospects. The complaint contends that had these facts not been concealed at the time the merger agreement was entered, there would not have been a merger agreement, or it would have been at a much lower price, and the price of the Company's common stock therefore would not have been artificially inflated during the Class Period. The plaintiff alleges that, following the reports that the proposed merger was not going to be completed, the price of the Company's common stock declined causing the plaintiff class significant losses.

We believe the lawsuit is without merit and intend vigorously to defend against it.

### *Item 1A.  Risk Factors*

On October 22, 2007, the Company entered into a Termination and Settlement Agreement with KKR, KHI Parent Inc., KHI Merger Sub Inc. and GSCP. Under the agreement, effective on October 23, 2007, each of (i) the Agreement and Plan of Merger, dated April 26, 2007, among the Company, KHI Parent Inc. and KHI Merger Sub Inc., (ii) the related guarantees and (iii) the Election Agreement, dated April 26, 2007, between KHI Parent Inc. and Dr. Sidney Harman, was terminated in its entirety. As a result, the risk factors included in Item 1A "Risk Factors – Risks Related to the Merger with Parent" of our Annual Report on Form 10–K for the fiscal year ended June 30, 2007 are no longer applicable.

The risk factors applicable to Harman as a stand alone company included in Item 1A "Risk Factors – Risks Related to Harman" of our Annual Report on Form 10–K for the fiscal year ended June 30, 2007 are updated to include the following:

**We are engaged in ongoing litigation and may be the subject of additional litigation that may result in payments to third parties, which could harm our business and financial results.**

As more fully described in Part II, Item 1 "Legal Proceedings," of this report, we are currently involved in litigation arising from the proposed merger with a company formed by investment funds affiliated with KKR and GSCP that was terminated in October 2007. In addition, additional litigation may be initiated against us and others based on activities and disclosures related to the proposed merger and its termination. We cannot predict the outcome of any such proceeding or the likelihood that further proceedings will be instituted against us. In the event that there is an adverse ruling in any legal proceeding, we may be required to make payments to third parties that could harm our business or financial results. Furthermore, regardless of the merits of any claim, the continued maintenance of these legal proceedings may result in substantial legal expense and could also result in the diversion of our management's time and attention away from our other business.

*Item 2. Unregistered Sales of Equity Securities and Use of Proceeds*

We did not repurchase any shares of our common stock in the quarter ended September 30, 2007. Our share repurchase program was first publicly announced on June 16, 1998. In August 2005, the Board authorized the purchase of up to an additional four million shares, bringing the total authorized to 20 million shares. The total number of shares repurchased through September 30, 2007 was 18,198,082. A maximum of 1,801,918 shares may yet be purchased under our share repurchase program. We suspended our share repurchase program due to the formerly proposed merger with a company formed by investment funds affiliated with KKR and GSCP. No determination has been made regarding when the program will be reinstated. For a description of limitations on repurchases of shares and on the payment of dividends, see *Management's Discussion and Analysis of Financial Condition and Results of Operations – Financial Condition.*

30

*Item 6.*  ***Exhibits***

Exhibits required by Item 601 of Regulation S–K

4.1  Indenture, related to the 1.25 percent Convertible Senior Notes due 2012, dated as of October 23, 2007, between Harman International Industries, Incorporated and Wells Fargo Bank, National Association, as trustee (including the form of 1.25 percent Convertible Senior Note due 2012) (filed as Exhibit 4.1 to the Current Report on Form 8–K filed with the Securities and Exchange Commission on October 25, 2007, Commission File No. 001–09764, and hereby incorporated by reference).

4.2  Registration Rights Agreement, dated as of October 23, 2007, between Harman International Industries, Incorporated, KKR I–H Limited, GS Capital Partners VI Fund, L.P., GS Capital Partners VI Parallel, L.P., GS Capital Partners VI Offshore Fund, L.P., GS Capital Partners VI GmbH & Co. KG, Citibank, N.A. and HSBC USA Inc. (filed as Exhibit 4.2 to the Current Report on Form 8–K filed with the Securities and Exchange Commission on October 25, 2007, Commission File No. 001–09764, and hereby incorporated by reference).

10.1  Note Purchase Agreement, dated October 22, 2007, by and among Harman International Industries, Incorporated, KKR I–H Limited, GS Capital Partners VI Fund, L.P., GS Capital Partners VI Parallel, L.P., GS Capital Partners VI Offshore Fund, L.P., GS Capital Partners VI GmbH & Co. KG, Citibank, N.A., HSBC USA Inc. and, for limited purposes, Kohlberg Kravis Roberts & Co. L.P. (filed as Exhibit 10.1 to the Current Report on Form 8–K filed with the Securities and Exchange Commission on October 25, 2007, Commission File No. 001–09764, and hereby incorporated by reference).

10.2  Termination and Settlement Agreement, dated October 22, 2007, by and among Harman International Industries, Incorporated, KHI Parent Inc., KHI Merger Sub Inc., KKR 2006 Fund L.P., Kohlberg Kravis Roberts & Co. L.P., GS Capital Partners VI Fund, L.P., GS Capital Partners VI Parallel, L.P., GS Capital Partners VI Offshore Fund, L.P. and GS Capital Partners VI GmbH & Co. KG (filed as Exhibit 10.2 to the Current Report on Form 8–K filed with the Securities and Exchange Commission on October 25, 2007, Commission File No. 001–09764, and hereby incorporated by reference).

10.3  Confirmation between Harman International Industries, Incorporated and Bear, Stearns International Limited, dated October 30, 2007 (filed as Exhibit 10.1 to the Current Report on Form 8–K filed with the Securities and Exchange Commission on October 31, 2007, Commission File No. 001–09764, and hereby incorporated by reference).

10.4   Confirmation between Harman International Industries, Incorporated and J.P. Morgan Securities Inc., as agent for JPMorgan Chase Bank, National Association, London Branch, dated October 30, 2007 (filed as Exhibit 10.2 to the Current Report on Form 8−K filed with the Securities and Exchange Commission on October 31, 2007, Commission File No. 001−09764, and hereby incorporated by reference).

31.1   Certification of Sidney Harman pursuant to Section 302 of the Sarbanes−Oxley Act of 2002.

31.2   Certification of Dinesh C. Paliwal pursuant to Section 302 of the Sarbanes−Oxley Act of 2002.

31.3   Certification of Kevin L. Brown pursuant to Section 302 of the Sarbanes−Oxley Act of 2002.

32.1   Certification of Sidney Harman, Dinesh C. Paliwal and Kevin L. Brown, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes−Oxley Act of 2002.

***SIGNATURES***

Pursuant to the requirements of the Securities Exchange Act of 1934, Harman International Industries, Incorporated has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

*Harman International Industries, Incorporated*
(Registrant)

Date:  November 9, 2007

By:/s/ Kevin L. Brown

Kevin L. Brown
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

*Exhibit 31.1*

## PRINCIPAL EXECUTIVE OFFICER'S CERTIFICATION
### PURSUANT TO SECTION 302 OF THE SARBANES−OXLEY ACT OF 2002

I, Sidney Harman, certify that:

1.  I have reviewed this Quarterly Report on Form 10−Q of Harman International Industries, Incorporated;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report,

    fairly present in all material respects the financial condition, results of operations and cash flows of the

    registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure

    controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control

    over financial reporting (as defined in Exchange Act  Rules 13a−15(f) and 15d−15(f)) for the registrant and

    have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures

          to be designed under our supervision, to ensure that material information relating to the registrant,

          including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial

          reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in

          accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this

          report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end

          of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that

          occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the

          case of an annual report ) that has materially affected, or is reasonably likely to materially affect, the

          registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of

internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over

financial reporting which are reasonably likely to adversely affect the registrant's ability to record,

process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    November 9, 2007    /s/ Sidney Harman
                              Sidney Harman
                              Executive Chairman

*Exhibit 31.2*

### PRINCIPAL EXECUTIVE OFFICER'S CERTIFICATION
### PURSUANT TO SECTION 302 OF THE SARBANES−OXLEY ACT OF 2002

I, Dinesh C. Paliwal, certify that:

    1.   I have reviewed this Quarterly Report on Form 10−Q of Harman International Industries, Incorporated;

    2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3.   Based on my knowledge, the financial statements, and other financial information included in this report,

fairly present in all material respects the financial condition, results of operations and cash flows of the

registrant as of, and for, the periods presented in this report;

    4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure

controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control

over financial reporting (as defined in Exchange Act  Rules 13a−15(f) and 15d−15(f)) for the registrant and

have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures

to be designed under our supervision, to ensure that material information relating to the registrant,

including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial

reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in

accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this

report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end

of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that

occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the

case of an annual report) that has materially affected, or is reasonably likely to materially affect, the

registrant's internal control over financial reporting; and

    5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of

internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over

financial reporting which are reasonably likely to adversely affect the registrant's ability to record,

process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   November 9, 2007      /s/ Dinesh C. Paliwal
                             Dinesh C. Paliwal
                             President, Chief Executive Officer and Vice Chairman

*Exhibit 31.3*

### PRINCIPAL EXECUTIVE OFFICER'S CERTIFICATION
### PURSUANT TO SECTION 302 OF THE SARBANES−OXLEY ACT OF 2002

I, Kevin L. Brown, certify that:

1.   I have reviewed this Quarterly Report on Form 10−Q of Harman International Industries, Incorporated;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of

internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over

financial reporting which are reasonably likely to adversely affect the registrant's ability to record,

process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   November 9, 2007     /s/  Kevin L. Brown
                                              Kevin L. Brown
                                              Executive – Vice President, Chief Financial Officer and Assistant Secretary

*Exhibit 32.1*

Certification Pursuant to 18 U.S.C. § 1350, as Adopted Pursuant to
Section 906 of the Sarbanes–Oxley Act of 2002

In connection with the Quarterly Report on Form 10–Q of Harman International Industries, Incorporated (the "Company") for the period ended September 30, 2007, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the Company certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes–Oxley Act of 2002, that, to such officer's knowledge:

    1).          The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    2).          The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report.

Date:  November 9, 2007

/s/ Sidney Harman
_____
Name:  Sidney Harman
  Title:  Executive Chairman

/s/ Dinesh C. Paliwal
_____
Name:  Dinesh C. Paliwal
  Title:  President, Chief Executive Officer and Vice Chairman

/s/ Kevin L. Brown
_____
Name:  Kevin L. Brown
  Title:  Executive – Vice President, Chief Financial Officer and Assistant Secretary
        (Principal Financial Officer)

The foregoing certification is being furnished solely pursuant to 18 U.S.C. § 1350 and is not being filed as part of the Report or as a separate disclosure document.

Harman International
PRESS RELEASE



October 25, 2007

FOR IMMEDIATE RELEASE
Contact:  Robert C. Ryan
Harman International Industries, Incorporated
202-393-1101

## HARMAN INTERNATIONAL REPORTS FIRST QUARTER RESULTS

Washington, D.C., October 25, 2007– Harman International Industries, Incorporated (NYSE:  HAR) today announced results for the first quarter ended September 30, 2007. Net sales for the three months were $947.0 million, a 15 percent increase compared to $825.5 million for the same period last year.  Earnings per diluted share were $0.55 compared to $0.85 last year.  Excluding merger-related costs, earnings per diluted share were $0.62.

All three divisions reported double-digit sales growth for the first quarter.  Automotive net sales for the three months were $682.3 million compared to $601.0 million last year, an increase of 14 percent.  Consumer net sales increased 28 percent from $93.1 million a year ago to $119.4 million this quarter.  Professional net sales were $145.2 million compared to $131.4 million last year, an increase of 11 percent.

Dr. Sidney Harman, Executive Chairman, and Dinesh Paliwal, Vice Chairman and Chief Executive Officer, commented:

"We achieved good results during the first quarter of fiscal 2008.  Sales growth was strong due to the ramp up of an infotainment system for Chrysler and robust sales of personal navigation devices in Europe.  Our initiative to develop cost saving strategies is underway and we expect to gain procurement, engineering and manufacturing efficiencies that will improve margins over the course of this fiscal year."

October 25, 2007
Page 2

At 4:30 p.m. EDT today, Harman International will host an analyst and investor conference call to discuss the results for the three months ended September 30, 2007 and management's outlook for future periods.  To participate in the conference call, please dial (800) 230-1092 or for international calls dial (612) 234-9960 prior to 4:30 p.m. EDT. Please let the operator know that you would like to join the Harman International call.

A replay of the conference call will be available following the completion of the call at approximately 8:00 p.m. EDT.  The replay will be available through November 8, 2007. Please call (800) 475-6701 to access the replay.  For international calls please call (320) 365-3844.  The access code number is 891629.

AT&T will be web-casting the conference call.  The web-cast can be accessed at http://65.197.1.5/att/confcast, enter the conference ID:  891629, then enter a passcode: Harman and click Go.  There will also be a link to the web-cast at www.harman.com. Participation through the web-cast will be in listen-only mode.

Harman International Industries, Incorporated (www.harman.com) is a leading manufacturer of high-quality, high-fidelity audio products and electronic systems for the automotive, consumer and professional markets.  The Company's stock is traded on the New York Stock Exchange under the symbol:  HAR.

*Note:  Except for historical information contained herein, the matters discussed are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act.  You should not place undue reliance on these statements.  We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current market conditions, current economic data, expected future developments and other factors that we believe are appropriate under the circumstances.  These statements involve risks and uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements, including but not limited to our ability to successfully develop and implement cost saving strategies and to gain procurement, engineering and manufacturing efficiencies to deliver improved margins, the effect of changes in  consumer confidence, changes in interest rates affecting consumer spending, automobile industry sales and production rates, the loss of one or more significant customers, including our automotive customers, model-year changeovers and customer acceptance in the automotive industry, our ability to satisfy contract performance criteria, availability of key components to the products we manufacture, competitive products, customer acceptance of our consumer and professional products, fluctuations in currency exchange rates, the outcome of pending or future litigation and other claims, including the litigation resulting from the terminated merger agreement with a company formed by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners VI Fund L.P., labor disputes at our facilities and those of our customers or common carriers, general economic conditions and other risks detailed in filings made by Harman International with the Securities and Exchange Commission, including our Annual Report on Form 10-K for the fiscal year ended June 30, 2007.*

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**GAAP CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(000s omitted except per share amounts)**
**(unaudited)**

|  | Three Months Ended September 30, | |
| --- | --- | --- |
|  | 2007 | 2006 |
| Net sales | $946,962 | $825,543 |
| Cost of sales | 682,387 | 538,254 |
| Gross profit | 264,575 | 287,289 |
| Selling, general and administrative expenses | 223,134 | 200,371 |
| Operating income | 41,441 | 86,918 |
| Other expense: | | |
|    Interest expense, net | 1,410 | 139 |
|    Miscellaneous, net | 671 | 861 |
| Income before income taxes | 39,360 | 85,918 |
| Income tax expense | 3,657 | 29,635 |
| Minority interest | (826) | (325) |
| Net income | $ 36,529 | $ 56,608 |
| Basic earnings per share | $ 0.56 | $ 0.86 |
| Diluted earnings per share | $ 0.55 | $ 0.85 |
| Shares outstanding – basic | 65,242 | 65,517 |
| Shares outstanding – diluted | 66,363 | 66,676 |

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**GAAP CONDENSED CONSOLIDATED BALANCE SHEETS**
**(000s omitted)**
**(unaudited)**

| | September 30, 2007 | September 30, 2006 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 77,126 | $ 134,983 |
| Accounts receivable | 580,167 | 461,004 |
| Inventories | 475,155 | 379,299 |
| Other current assets | 186,798 | 198,766 |
| **Total current assets** | 1,319,246 | 1,174,052 |
| | | |
| Property, plant and equipment | 605,641 | 501,448 |
| Goodwill | 415,386 | 381,517 |
| Other assets | 281,554 | 201,084 |
| **Total assets** | $ 2,621,827 | $ 2,258,101 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short-term borrowings | $ 0 | $ 2,786 |
| Current portion of long-term debt | 573 | 16,989 |
| Accounts payable | 325,676 | 251,672 |
| Accrued liabilities | 394,449 | 542,811 |
| **Total current liabilities** | 720,698 | 814,258 |
| | | |
| Borrowings under revolving credit facility | 179,869 | 150,108 |
| Long-term debt | 2,591 | 2,917 |
| Other non-current liabilities | 142,559 | 80,028 |
| **Total shareholders' equity** | 1,576,110 | 1,210,790 |
| **Total liabilities and shareholders' equity** | $ 2,621,827 | $ 2,258,101 |

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND**
**RECONCILIATION OF GAAP TO NON-GAAP RESULTS**
**(000s omitted except per share amounts)**
**(unaudited)**

| | Three-Months Ended September 30, | | | |
| | 2007 | | | 2006 |
| | GAAP | Adjustments | Non-GAAP | GAAP |
|---|---|---|---|---|
| Net sales | $ 946,962 | --- | 946,962 | 825,543 |
| Cost of sales | 682,387 | --- | 682,387 | 538,254 |
| Gross profit | 264,575 | --- | 264,575 | 287,289 |
| Selling, general and Administrative expenses | 223,134 | (4,698) (a) | 218,436 | 200,371 |
| Operating income | 41,441 | 4,698 | 46,139 | 86,918 |
| Other expenses: | | | | |
| Interest expense, net | 1,410 | --- | 1,410 | 139 |
| Miscellaneous, net | 671 | --- | 671 | 861 |
| Income before income taxes | 39,360 | 4,698 | 44,058 | 85,918 |
| Income tax expense | 3,657 | --- | 3,657 | 29,635 |
| Minority interest | (826) | --- | (826) | (325) |
| Net income | $ 36,529 | 4,698 | 41,227 | 56,608 |
| Basic earnings per share | $ 0.56 | 0.07 | 0.63 | 0.86 |
| Diluted earnings per share | $ 0.55 | 0.07 | 0.62 | 0.85 |
| Shares outstanding – Basic | 65,242 | 65,242 | 65,242 | 65,517 |
| Shares outstanding – Diluted | 66,363 | 66,363 | 66,363 | 66,676 |

(a) Merger costs, principally investment banking and professional fees, related to our transaction with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners were incurred during the first quarter in the amount of $4.7 million.

*Harman International has provided a reconciliation of non-GAAP measures in order to provide the users of these financial statements with a better understanding of our merger related costs incurred during the first quarter of fiscal 2008. These non-GAAP measures are not measurements under accounting principles generally accepted in the United States. These measurements should be considered in addition to, but not as a substitute for, the information contained in our financial statements prepared in accordance with GAAP.*



# Final Transcript

> **HARMAN INTERNATIONAL INDUSTRIES: Harman Quarterly Press Release**
>
> August 14, 2007/4:30 p.m. EDT

## SPEAKERS

Dr. Sidney Harman, Executive Chairman
Dinesh Paliwal, CEO
Kevin Brown, CFO

## ANALYSTS

## PRESENTATION

| | |
|---|---|
| Moderator | Ladies and gentlemen, thank you for standing by. Good afternoon and welcome to Harman International Industries 4th Quarter Fiscal 2007 Earnings Release Conference call. At this point all of your phone lines are in a listen-only mode. Later during the conference there will be an opportunity for questions and instructions will be given at that time. As a reminder today's conference is being recorded. |

If I may have your attention, certain statements made by the company during this call are forward-looking statements. These statements include the company's beliefs and expectations as do future events and trends affecting the company's business and are subject to risks and uncertainties. Persons participating on the call today are advised to review the report filed by Harman International with the Securities & Exchange Commission regarding these risks and uncertainties. With that being said, here with our opening remarks is Harman International Industries Executive Chairman, Dr. Sidney Harman. Please go ahead, Dr. Harman.

Dr. Harman      Good afternoon. Joining me at Northridge are Dinesh Paliwal, our Chief Executive Officer; Kevin Brown, our CFO; and Rob Bryan our Treasurer and Principal Officer for Investor Relations.

Fiscal 2007 was a challenging but successful year. And we completed it with an exemplary balance sheet. Sales rose 9% to $3.551 billion. Earnings per share before restructuring, merger and unusual tax items were $4.14, a 10% increase over a year ago. Earnings including restructuring, merger and unusual tax benefits were $4.72 per share. Earnings a year ago were $3.75 per share.

HARMAN INTERNATIONAL INDUSTRIES
Host: Dr. Sidney Harman
August 14, 2007/4:30 p.m. EDT
Page 3

Our dominance in the automotive space was solidified through the past year where we had earlier confronted doubt about our ability to move effectively beyond the luxury car market for our Infotainment systems. That doubt has been erased.  With earlier awards to us from PSA, Audi and Chrysler we established our leadership in the mid-range and entry levels.  With last year's major awards from BMW we erased any remaining questions.

We are moving from an era in which each new Infotainment system represented a virtually original effort with all new R&D to a new era in which the major automotive makers are committing to a common electronics platform applicable across the full range of car lines.  That growing set of decisions represents a dramatic shift from the traditional emphasis by auto makers on multiple suppliers to a readiness to commit across the board to a single supplier.  That dramatic decision is driven overwhelmingly by new technology and by the advantages in cost and performance available from a common scalable electronics platform.

Moving into fiscal 2008 our position is further enhanced by our developing technology partnership with Intel and the exclusive opportunity it provides us to employ Intel's powerful new mobile

processor in our new designs.  Implicit in that application is greater speed,
significant improvement in graphic realization and impressibly useful
extension of our functionality.  We believe that we are in unique position
to move quickly and impressively to build our auto book for the 2nd
decade of the 21st century.

In the Infotainment world connectivity is king.  The ability to seamlessly
connect the vast outside world of communications and entertainment to
the car, the home or the consumer on foot has been the Holy Grail.  And
the work that we have been doing in partnership with Intel places us in
position to truly accomplish it.  This will be no modest development
because it opens up enormous opportunities to the auto maker for
customer relations management opportunities to sell revenue producing
services of many kinds.

As I contemplate the possibilities implicit in connectivity and the
additional possibilities and driver assist developments I see rich
opportunities for further growth.  Although our consumer group had a
difficult time in 2007, sales for the year were $5 million higher than last
year's $493 million.

It was in the margin area that the year disappointed with operating margin of $14 million compared with margin of $53 million a year earlier.  That significant change reflects the tremendous crowding that developed in the multi-media portion of the business.  Crowding that drove retail prices in margins to unacceptably low levels.  The contrast is particularly dramatic because 2006 was so robust a year in both multi-media revenues and multi-media margins.

We anticipate a substantial margin recovery as the cell phone and MP3 player business is about to be transformed by the arrival of the stunning Apple iPhone and by a series of splendid music enabled cell phones from Nokia.  We are working closely with each of these key makers.  And their marketing confirms our own assessment that a resurgent market for multi-functional music phones will be attracting higher priced buyers and with those purchases higher priced accessories.

It is worth noting, by the way, that our consumer international activities were quite vigorous this year.  Sales increased in international strong 23% over sales a year ago.  Our professional business was again a source of growing ratification in fiscal 2007.  Sales grew to $560 million, an

increase of 8% over a year ago. Operating profit reached $81 million, an impressive 37% increase over the prior year.

Pro is benefiting from a confluence of good things, its new technology permits the design of complex systems operated, controlled and monitored and simplified centralized fashion. We have turned around the two units which were burdens a year ago. Our microphone maker, AKG, has swung from a nearly $6 million operating loss in 2006 to a $4.6 million operating profit in 2007. And our Soundcraft Studer console division moved from a million dollar operating profit a year ago to a $7 million dollar plus profit in 2007. With its command of the newly developed audio/video Bridge technology, our professional group is in splendid posture for further advance.

This report would be incomplete without reviewing the merger agreement we announced in April. As you know the transaction headed by KKR and Goldman Sachs cuts relatively new ground by providing an equities stub opportunity for all investors, an opportunity to exchange their holdings of Harman stock for a combination of cash and equity in the new Harman.

The architecture of the transaction has received a great deal of positive press attention and a number of major investors in Harman stock have spoken admiration for it.  We have advised our employees, our suppliers and our customers that in practical operating terms nothing will have changed.  We will in effect exchange one set of world class investors for another.  We intend to exploit every technological and market opportunity before us and we intend to continue to build an exemplary company.  I will continue full-time as the company's executive chairman and I am delighted that Dinesh Paliwal has joined us as President and Chief Executive Officer.

In the short time he has been on board Dinesh has established his leadership, made clear his remarkable combination of enthusiasm, experience, intelligence and appetite for horrid work.  He and I work easily and well together and I look forward to a long partnership with him.  Here is Harman's Chief Executive Officer, Dinesh Paliwal.

D. Paliwal          Thank you, Dr. Harman and good afternoon, ladies and gentlemen.  I joined Harman International six weeks ago and I thought it would be good to share my early thoughts with you.  I have been welcomed and received very positively by Harman employees.  Harman employees are motivated

and enthusiastic about the future of the company as well as the potential

linkup with KKR and Goldman Sachs.

As you all know, Harman is a well run company with a tax record of

generating shareholder value year after year.  Our technology base and

new product pipeline clearly set us apart from competition.  Harman

enjoyed strong strategic relationships with original accoutrement

manufacturers in the automotive business and with other distribution in the

professional and the consumer business which allows us to do long term

business planning in research and development, engineering and

procurement.

As in any company there are opportunities at Harman which can be further

exploited.  I believe that we can do more and take better advantage of this

globally network economy.  Particularly in the areas of sourcing,

manufacturing, engineering and most important in make or buy decisions

across our value chain.

We will establish clear goals and accountability where it does not exist.

And effective immediately I will start monthly operational reviews with

division presidents and functional heads.  This discipline will help us

manage our costs and capital tightly and enable us to focus on tactical and strategic business issues.

During the past few weeks I visited several key Harman business locations and met with several hundred employees in Europe and North America. Although it is still relatively early to form opinions, several positive aspects of this company which were the basis of my decision to join Harman have been validated. I'm excited. Actually I'm excited about the opportunities in the premium automotive and professional sectors of our business. I'm equally excited about the growth rates and growing market size of the mid-market segments in the developed world and emerging markets in Eastern Europe and so-called BRIC, Brazil, Russia, India and China countries.

Harman is a potent global brand and I'm determined to penetrate these markets. And I feel pretty strongly about it. Our product portfolio is robust and our R&D in close collaboration with leading customers will keep us ahead of competition. Converting these opportunities into profitable business will require a strong management team and clear accountability at all levels.

In summary, my first six weeks have been exciting and energizing. And I look forward to helping Harman move forward and progress in the coming months and years. I'm happy to tell you that I've found a terrific partner in our chairman, Dr. Sidney Harman, and we are working very well together. With this, let me now hand it over to our Chief Financial Officer, Kevin Brown. After Kevin's commentary we will be available for questions. Kevin.

K. Brown          Thank you, Dinesh. Net sales for the 4th quarter were $911 million, an increase of 6.1% compared to the same quarter last year. Gross profit margin was 32.8% compared to 34.8% in the prior year. Operating income of $81.4 million was impacted by restructuring in transaction costs which I will detail in a moment. Net income for the 4th quarter was $104.9 million.

In the quarter we recorded a gain on foreign tax credits. Earnings per share as reported were $1.58 in the quarter excluding non-recurring restructuring transaction in tax items which were a net gain of $0.60 in the quarter. Earnings per share would have been $0.98. A reconciliation to U.S. GAAP reporting was included with the press release.

For the full 2007 fiscal year sales were $3.55 billion, an increase of 9.3%
over the prior year. Gross profit margin was 34.1% compared to 35.5% in
the previous year. Operating income of $386 million was affected by
restructuring in transaction costs. For the full year the tax rate was 18.4%,
reflecting the gain on foreign tax credits. Full year earnings per shares
reported were $4.72 excluding restructuring transaction in tax items which
provided a net gain of $0.58 for the full year. Earnings per share would
have been $4.14.

In June 2006 and January 2007 we announced our intention to initiate
restructuring to increase efficiency in our manufacturing, engineering and
administrative organizations. Restructuring costs of $4.6 million in the 4th
quarter and $7.1 million for the year reflect those actions. Restructuring
costs reduced reported earnings per share by $0.05 in the 4th quarter and
$0.07 in the full year.

In the fourth quarter we incurred costs related to the merger of Harman
International into a new company to be financed by KKR and Goldman
Sachs. Transaction costs of $3.8 million were primarily legal fees.
Transaction costs reduced reported earnings per share by $0.05 in the 4th
quarter and full year.

Gross profit, which declined 2 points to 32.8% of sales in the 4th quarter, was adversely affected by 3 matters.  First, the well reviewed change in the iPod multi-media business from last year's vigorous sales and healthy margins to the fourth quarters enormously competitive margin compromised market.  That is of course the nature of the consumer electronics business and we are hopeful that with a long awaited and finally realized new iPhone from Apple and new offerings from Nokia a robust new market will develop.  We are well positioned to reassert our dominance in this area.

The second factor with the impact of the delayed Mercedes C-class system scheduled to be fully ramped in the fourth quarter it was substantially delayed until the start of the new fiscal year.  And it is now in full production.  Our C-class sales in the quarter were about half of those in the prior year.

The third factor which had a substantial and again one time effect on gross profit in the quarter with the manufacturing ramp up to ready our automotive operations for the surge of production in the New Year. Compared to a year ago, 4th quarter factory costs were up over 9%.  Even as margins were affected in the fourth quarter, operating expenses were up

$23 million or 1.3 points quarter to quarter.  Approximately half of this increase is in the R&D bulge we have reviewed in previous conference calls.  Total Harman International R&D spending was $94 million or 10.3% of sales in the quarter.  That bulge was primarily generated by the need to process the engineering for the $14 billion backlog of which a significant billion dollar plus had been unanticipated.

Furthermore, fourth quarter operating expenses reflect the cost associated with our determination to pursue vigorously a significant market share in the P&D business in Europe.  We spent the money in the fourth quarter which was necessary to cultivate that field for our engagement in the New Year.

Fourth quarter and full year net income were impacted by non-recurring tax items including a significant tax gain resulting from a recent court decision that allows certain tax payers to recognize foreign tax credits. The tax items resulted in a net gain of $47 million which improved 4th quarter and full year earnings per share by $0.70.  For the full year, the tax rate of 18% would have been 30% excluding the one time items.

Foreign currency translation affected our results in the quarter and the full year as the euro strengthened approximately 7% versus the U.S. dollar in both periods compared to the prior year.  For the 4th quarter the euro averaged $1.35 compared to $1.26 in the 4th quarter of fiscal year '06.  For the full year the euro averaged $1.31 versus $1.22 in fiscal '06.  For the quarter, currency translation had a positive impact on sales of about $37 million and improved earnings per share by $0.08.  For the full year, currency translation affected sales by approximately $144 million and earnings per share by $0.25.

The weakening U.S. dollar negatively impacts our results when sales of European luxury cars are adversely affected as manufacturers raise prices to offset currency change.  As their sales decline, our sales and profit are impacted.  Furthermore, as the manufacturers feel the pinch of currency they push harder on suppliers for relief in terms of pricing.  While it is not possible to precisely quantify the sales and profit impact, it represents an offset to the reported gains in profit and revenue driven by foreign currency translation.

All three of our operating segments reported higher sales for the fourth quarter compared to the prior year.  Automotive sales were $635 million,

an increase of 6%.  Consumer sales grew 2% to $124 million.

Professional sales were $153 million, 12% higher than last year's quarter.

Prior to restructuring transaction and tax items, automotive operating income for the 4th quarter was $69.6 million or 11% of sales.  Automotive operating income was impacted by lower volume on the Mercedes C-class, higher manufacturing costs, higher R&D spending and increased marketing and promotion activities associated with product introductions.

Consumer operating income was $1.8 million or 1.5% of sales in the quarter.  As Sidney mentioned, consumer margins have been depressed by increased competition in the multi-media space.

Professional operating income was $25.1 million equal to 16.4% of sales. Pro has continued to benefit from the turnaround at AKG and Soundcraft Studer as well as the increasing penetration of Hi-Qnet enabled products. Sales of which have more than doubled this year.

Our balance sheet at June 30th was strong.  Inventory was $453 million. Accounts receivable were $487 million and accounts payable were $357 million.  Cash at June 30th was $106 million despite share repurchases of

$129 million in the year and $121 million reduction in debt. Total debt at June 30th was $76 million and cash and cash equivalence exceeded debt by $30 million. Fourth quarter depreciation and amortization was $34 million and capital expenditures were $90million. We expensed $3.6 million for stock options during the quarter. We will now take your questions.

Moderator            Thank you.

Dr. Harman           If there are no questions then we will wait another minute. We will close this call. Would you check one more time?

Moderator            Yes.

Dr. Harman           Well, thank you very much.

Moderator            Thank you, Dr. Harman. Ladies and gentlemen, your host is making today's conference available by digitized replay for one week and by Web replay for seven days. The digitized replay is available starting at 8:00 p.m. today through midnight Tuesday, August 21st. Simply dial 1-800-475-6701 and at the voice prompt enter today's conference access code

882301.  Alternatively you may go to www.harman.com to listen to the

Web replay.  You will need to enter the access code 882301.  That does

conclude our press release call for this quarter.  Thank you very much for

your participation as well as for using AT&T Executive Teleconference

service.  You may now disconnect.



**Harman International** | 2006 Annual Report

**THE ANNUAL REPORT ILLUSTRATIONS**



Only four times in JBL's 60-year history have engineers been given a free hand to pursue pure sonic accuracy, unconstrained by cost considerations and other inhibiting factors. The Project Everest DD6600 loudspeaker system is more than just the most lifelike musical instrument JBL® has ever built. It forcefully reasserts JBL's technological leadership, setting a performance benchmark that will stand for years to come.

Page 2



Drive + Play™ from Harman/Kardon® gives drivers total and safe control of their iPods® in any vehicle. The large, backlit display mounts on the dash or windshield where it is always just a quick glance away. A separate iPod navigator mounts within easy reach. Drive + Play is the award-winning car audio solution for iPod, and it is just one of Harman's growing catalog of innovative multimedia products.

Page 4



MyGIG™, the marvelous new multimedia infotainment system, designed and produced for Chrysler, provides Hard Disk Drive (HDD) GPS Navigation with real time traffic updates, a Video Entertainment System, HDD Music Jukebox & Media Storage capabilities, a Voice Dialog System for Audio, Navigation, and Phone, USB and Bluetooth compatibility.

Page 6



Gracing the 2007 Mercedes S-Class is the Harman/Kardon LOGIC 7® premium surround sound system. State-of-the-art loudspeakers offer unsurpassed excellence while listening to CD, MP3, DTS music discs, and DVD audio and video formats. The Mercedes COMAND Navigation System offers security and efficiency with the most detailed map display.

Page 7



Stade de Suisse is a new 32,000 seat stadium which the Swiss regard as a "meeting point, shopping and business center—a gourmet temple." Completed this year, the stadium boasts an 80,000 watt HiQnet Harman system with JBL, Crown,® BSS® and Soundcraft® products.

Page 8



JBL extends its lineup of best-in-class aftermarket car-audio products with CS Series muti-element loudspeakers. Bass response is an essential performance characteristic in this category, and the CS Series extends deep bass output with its patented Plus One. At the other end of the audio spectrum, dome tweeters, a proven JBL technology in professional and home-audio loudspeakers, supply the clean, distinct highs usually associated with much more expensive systems.

Page 10



The AKG® C747 is a tiny shotgun microphone designed for exacting orchestral, choir, podium and boardroom applications.

Page 13



The Rolling Stones Super Bowl XL half-time show utilized JBL VerTec® loudspeakers. System supplier: ATK AudioTek. The Super Bowl XL stadium venue was Ford Field in Detroit, Michigan, which is equipped with a permanent JBL loudspeaker system.

Page 18



Harman/Kardon takes the "one-box" home theater system to a new level with 7.1-channel surround-sound systems that look, sound and function like nothing else available. Featuring advanced A/V receivers with proprietary LOGIC 7 audio process-ing and EZSet equalization, high-fidelity DVD players with both HDMI video and SACD audio output, and compact speakers engineered to work together as a system with the electronics, Harman/Kardon delights audiophiles and videophiles alike.

Back Cover

**Financial Highlights**

**Five-Year Summary**

(in thousands, except per share data, for the fiscal years ended June 30)

|  | 02 | 03 | 04 | 05 | 06 |
|---|---|---|---|---|---|
| Net Sales | $ 1,826,188 | $ 2,228,519 | $ 2,711,374 | $ 3,030,889 | $ 3,247,897 |
| Operating Income | 103,221 | 166,894 | 254,465 | 350,981 | 397,241 |
| Income Before Income Taxes | 80,177 | 142,471 | 227,520 | 335,337 | 376,187 |
| Net Income | 57,513 | 105,428 | 157,883 | 232,848 | 255,295 |
| Diluted EPS | 0.85 | 1.55 | 2.27 | 3.31 | 3.75 |
| Total Assets | 1,480,280 | 1,703,658 | 1,988,810 | 2,187,203 | 2,354,661 |
| Total Debt | 474,679 | 503,068 | 394,925 | 333,917 | 197,554 |
| Cash and Cash Equivalents | 71,203 | 109,361 | 286,708 | 291,214 | 291,758 |
| Shareholders' Equity | 526,629 | 655,785 | 874,996 | 1,060,948 | 1,228,164 |

**Net Sales**
(in billions)



**Earnings Per Share**
(diluted)





Message from **The Executive Chairman**

## It is critical to know when the technology is ready and when the market is ripe. Today more than at any time in industrial history, that is the test of management.

Our Company set new records for sales and earnings last year. Sales increased 7% to $3.248 billion. Earnings per share reached $3.75, a solid 13% increase above last year. Included in those earnings was a $0.14 per share charge to cover the cost of restructuring, principally at our European operations to increase efficiency and productivity, and costs associated with the repurchase of $282 million of bonds. Excluding the restructuring charge, and bond repurchase costs, earnings per share were $3.89, an 18% increase above the prior year.

We accomplished these excellent results in a turbulent and increasingly complex business environment. In that world, dramatically changing technology and equally dramatically changing marketplaces dictate more creative and shorter product cycles. Those shorter cycles carry significant challenges and risks. Both the analysis of cost v. benefit and the forecasting of return on investment become much more difficult.

Shorter and more frequent product cycles clearly demand more and "newer" engineering. They require far tighter control of costs and, no less significantly, of time. It is the most demanding and complex challenge to management today. A lengthy time ago, Paul Getty suggested that the key to success is: "Get up early, work hard—find oil." It is a good joke but I think today's version would more likely read: "Develop the new product—have a great hit—stay with it for the right length of time."

That last piece is so crucial. Stay too long with an otherwise attractive product and management risks the loss of all the profit it originally generated. Along with that loss of profit, equal dangers—the loss of momentum, the loss of reputation.

It is, therefore, critical to know when the technology is ready and when the market is ripe. Today more than at any time in industrial history, that is the test of management. When to get on—when to get off. Those judgments drive decisions on investment in factories, in locations, inventories, tooling—in virtually every aspect of the business process.

To dramatize the thought, I suggest the image of the surf and the surfer. The surf can be turbulent and seemingly unpredictable. The surfer had better be alert, responsive and decisive. In surfing, the alignment of the contours relative to the swell direction determines the duration of the breaking process. Instinctively, intuitively, the surfer knows this. In our business, understanding the alignment of the cultural contours relative to the direction of the technology and the competitive environment pretty well determines the duration of a successful product. Reading that swell, riding the swell, getting off and anticipating and interpreting the next swell are the essence of the technology/product/marketing continuum. Thus, the cover of this Annual Report.



Now Playing

Robot Parade
They Might Be Giants
                    0:27

harman/kardon

Introducing Drive + Play,™ the smarter way to bring the music on your iPod® to life.

Drive + Play is your in-car audio solution, giving you all of the music-browsing capability of your iPod without ever taking your eyes off the road.
Just mount the display for maximum visibility, position the controller within easy reach and plug in your iPod. With better control capabilities and
continual battery charging, Drive + Play is music to your ears. For more information, visit us at driveandplay.com. **harman/kardon**

## The surf can be turbulent and seemingly unpredictable. The surfer had better be alert, responsive and decisive.

Permit me to illustrate my theme:

**Our Automotive division** continued to lead the Company and the industry throughout the year. Its brilliant new system for the all-new Mercedes S-Class has been lauded as truly advancing the state-of-the-art. Our long-demonstrated leadership in the automotive field was made more secure through wise employment of the technology, even as we continued to enhance it. The opportunity to produce multi-functional Infotainment Systems that service mid-range and entry-level vehicles has broadened the scope of our business and increased substantially the potential market.

Our report illustrates the new Chrysler "MyGIG" Infotainment System. It is fair to characterize it as state-of-the-art and very important because it is the first true Infotainment System to be offered by one of the traditional Big 3 American automakers.  We know that it is a superb system and we are encouraged by the enormous enthusiasm for it at Chrysler. "MyGIG" is an excellent expression of the theme of this report.

**In our Consumer electronics business,** the development of the personal navigation device (PND) is important. We know a great deal about navigation. We are the world leaders in designing and manufacturing Infotainment Systems for the automakers. Our systems provide many other services to the riders in the automobile. They include audio, video, voice

recognition, climate control and Internet access. PNDs provide some version of those same services in a hand-held portable device. We see the PND as a stimulant; not a threat, to our OEM business. Many buyers of the PND are introduced through that device to the value of navigation and other functions provided in the car. Frequently, that introduction leads to a decision to purchase an automobile with one of our Infotainment Systems installed. Our analysis led us to the decision that we should be in the PND business precisely because we see it as companion to our OEM activity. Here is a good example of what I think of as "effective surfing." The Consumer group developed a PND approach from its own perspective. Harman Becker, in our Automotive group, has generated PND product offerings with a different emphasis. In Europe, this group has sold over 250,000 units since December 2005. They are branded "Traffic Assist High Speed." We conclude that there is market opportunity for both organizations. In some ways, this defies business orthodoxy. Still, we have prospered for decades with both Infinity and JBL loudspeaker products and with Harman/Kardon and Mark Levinson electronics. Seen in traditional terms, these brands are competing but, in our view, they serve different customers with different needs.



No doubt, some buyers of PNDs will use them for navigation in the car. We don't think that is a great idea because we see enormous advantage in having







**SOUND THAT MOVES**

The **CS loudspeaker** range is specially developed by JBL® for the car audio enthusiast who doesn't want to compromise on performance, but is on a tight budget. The CS Series' patented Plus One® (patent pending) cone material, which provides extended deep bass response, and its titanium-laminate tweeter domes are features normally found only in more costly models. And the deliberately classic styling and standard installation dimensions ensure they'll work well in virtually any vehicle. Visit www.jbl.com.



## Our role is to develop, produce and market products that enhance those produced by the cell phone makers and by companies such as Apple and Microsoft.

all entertainment, communication and navigation functions represented on a single graphic user interface in the car. Further, as we have studied the intersection of the culture and the technology, we conclude that, down the road, it will be less a matter of bringing the personal navigation device into the car and more a matter of bringing the personal navigation device out of the car and into other life activities. We are, therefore, designing future automotive systems to permit the car owner to do just that—to, in effect, unplug the navigation instrumentation and carry it with him wherever he goes.

Nothing speaks more vividly of opportunity coming in waves than the history of the MP3 player and the music-enabled phone. The MP3 player responded to consumers' need for a truly portable device with which they could record, store and playback their favorite music. That appetite spread across generations and reached a dramatic moment with the arrival of Apple's iPod. Since its introduction, iPod has sold over fifty million units and it is going strong. iPod moved beyond the MP3 to provide far more facility in storage, titling, ease of use and quality of reproduction. And its industrial design resonated across those generations.

No surprise that the success of the iPod has stirred the imagination and appetites of all cell phone makers. And no surprise that great expectations are developing for the so-called music-enabled phone. Clearly, if that phone can provide immaculate communication plus

the facility offered by the iPod, a powerful new wave of consumer response will undoubtedly develop. The best estimates in the industry suggest that upwards of one billion (think of it, one billion) music-enabled phones will be sold annually beginning in the year 2009. The first generation of such phones has already appeared from Motorola, Sony and Nokia. For numerous technical reasons, they have not met the benchmark iPod. Until they do, that enormous opportunity will not be realized. We are working with the cell phone makers and we are confident that they will overcome the present obstacles. At the same time, it is predictable that Apple will not sit by as observer. There are audio and video opportunities available to that very creative company. And then there is Microsoft. It has just announced its entry with its totally new "Zune," a product meant to be directly competitive with the iPod. We sit in an attractive place. Our role is to develop, produce and market products that enhance those produced by the cell phone makers and by companies such as Apple and Microsoft. It is, of course, not a simple matter and, it can be said that there is a series of nearly simultaneous waves which define the opportunity. The challenge to us is to anticipate and interpret this new expression of opportunity in terms that respond directly to the consumer interest. That is what we are about.

**In our Professional business,** we are enjoying a similar experience. For decades, our products—and the products of competitors—were designed to be hooked

*We do not avoid poor practice because we may be penalized for it. Rather, we proceed with the conviction that good, clean practice serves the Company and its shareholders best.*

together to provide audio coverage in theaters, hospitals, stadia and in other venues such as outdoor concerts. The systems were large, heavy and limited in functionality. With the introduction of our HiQnet networking protocol, we are transforming the professional business. Our approach configures, connects and controls a complete professional sound system, from microphone to speaker, on one unified, digital network. It eliminates duplication and confusion and it facilitates realtime problem diagnosis and correction. For hardware to work, in a HiQnet system, it must be designed to engage the HiQnet. We have been very active all year, making the necessary modifications to our amplifiers, speakers, microphones and processors to permit that engagement. During the year, we shipped in excess of forty thousand units of HiQnet-compatible product to end users. They represented a full ten percent of our total Professional sales in the year. HiQnet will become a substantially larger component of our revenue in the new year as we add thirteen additional new compatible product lines. I am particularly pleased that our AKG microphone company has played an active role in this development. That participation has contributed to an impressive turn-around of this Austrian subsidiary.

There were many important new HiQnet professional installations during the year. They included the new 50,000 seat Stanford University Stadium, the Arizona Diamondback Major League Baseball team's Chase Field in Phoenix, the system for the grand opening of the recently concluded World Cup Soccer tournament in Germany, Ford Field in Detroit, site of Super Bowl XL, and Stade de Suisse, an impressive new soccer stadium in Switzerland.

Now, a few words about our Company, its character and its people. I think you know that we were one of the first public companies to voluntarily expense the cost of stock options. We did this at a time when the matter was quite controversial and when important elements in American industry were arguing that the practice might bankrupt many companies and surely inhibit the creative work that characterized Silicon Valley. Since the expensing of options became mandatory, it has become clear that the doomsayers had seriously exaggerated concerns. There has been no trace of the predicted debacle. In the meantime, our earnings reports have been conservative, accurate and transparent.

Today's papers carry frequent stories of the eighty companies now under review by the Securities and Exchange Commission for possibly back-dating the issuance of stock options to senior executives. Such a practice would have been at the expense of shareholders and fundamentally unfair. We have never done it. We have always issued options on a scheduled basis following careful review and approval by our Board of Directors.





LEFT TO RIGHT IN PHOTO:

Kevin Brown, Executive Vice President and Chief Financial Officer
Erich Geiger, Executive Vice President and Chief Strategy and Technology Officer and
formerly Chief Executive Officer of the Automotive Group
Helmut Schinagel, incoming Chief Executive Officer of the Automotive Group
Sidney Harman, Executive Chairman
Blake Augsburger, President of the Professional Group
Gina Harman, President of the Consumer Group
Bernard A. Girod, Vice Chairman and Chief Executive Officer

Bernie Girod has served our company superbly for twenty years.
He has earned our respect and our admiration. When he retires at the end of the year,
he will leave the company a splendid legacy and he will depart with the
board's and the employees' deep affection.

Sidney Harman

I think this matter is pertinent because it speaks to a fundamental in our Company. We do not avoid poor practice because we may be penalized for it. Rather, we proceed with the conviction that good, clean practice serves the Company and its shareholders best. We spend no time looking for edges or questioning whether we can "get away with it." We can—and we do—devote all of our time and attention to the honorable and constructive operation of the business.

Finally, a word on management. We are in a period of important transition, a transition intended to provide optimum leadership in the next decades. As you know, Bernie Girod has served this Company superbly for twenty years. He plans to retire as our Chief Executive Officer at the end of this calendar year. Although our recent appointment of a replacement did not work out, we have inititated a new search for a world-class successor and expect to have that position filled before Bernie departs.

Helmut Schinagel will succeed Erich Geiger as Chief Executive Officer of our Automotive group on October 1, 2006. Helmut has had a rich career in the automotive industry and will join us after years at BMW in Germany. There, he has been our "customer," leading the interior development programs for that mar-velously creative automobile company. Helmut joins us with goodwill from BMW. With his successor at Harman/Becker in place, Erich Geiger will be free to direct his formidable talent and creativity to the role of worldwide Chief Strategy and Technology Officer. Helmut and Erich are working a smooth transition at the Automotive group. I am confident that it will prove seamless and productive.

After an outstanding career as President of our Professional group, Mark Terry has been obliged to retire for personal health reasons. He has been succeeded by Blake Augsburger who served with distinction over the last five years as Chief Executive Officer of our Professional Crown subsidiary. Blake knows our business and our personnel thoroughly. He has moved from Elkhart, Indiana to Northridge, California and the transition there has been accomplished quickly and effectively. Mark Graham has moved up from his position as Marketing and Engineering head at Crown to succeed Blake as its CEO. Kevin Brown is entering his second year as Chief Financial Officer of the Corporation. He is doing that job beautifully—and has been promoted to Executive Vice President and Chief Financial Officer. With Helmut on board to run Automotive, Erich free to exercise his remarkable talent as Chief Strategy and Technology Officer and with Blake Augsburger and Gina Harman in full control of the Professional and Consumer divisions, we are stanced for the next decades of company leadership.

In summary, we pay rapt attention to the remarkable set of dynamics which are creating challenges and opportunities in the world of technology and in an ever-expanding set of global markets. We look forward to continuing to interpret and to ride that surf.

Sincerely,

Sidney Harman
*Executive Chairman*

Message from **The Chief Technology Officer**

### Infotainment and Portable Connectivity

Last year, I described the seamless integration of "Driver Assist" functionality into a modern Infotainment System facilitated by the unique architecture and technical capacity of our scaleable platform. This year, I am pleased to report we have made significant progress in realizing this objective. We have completed the prototype of an IR pulse modulated detector (3D PMD Camera) which generates a 3-dimensional video image and enables full control of the spatial environment inside and around the car. Enabled by our high-speed network technologies, we are able to transport the critical digital video signals to our powerful computing platform with minimum latency, avoiding the extra electronic control units used in a typical, non-networked system.

Concurrently, we have developed a scaleable approach which uniquely transports the important functionality of portable connectivity to our next generation of automotive Infotainment Systems.

Infotainment Systems were previously designed as networked or "one box" systems and were controlled through body electronic buses. Connectivity to the car was enabled through BUS-Gateways and to the outside world through network access devices.

Once the car was produced, the Infotainment System was limited to those two channels to obtain useful information for "Driver Assist" functionality or to inform and entertain the driver.

Performance and features were thus dependent upon the vehicle option package selection at the time of purchase and remained throughout the life of the vehicle. The approach served the industry well, but clearly there is need for a more digital, future oriented approach.

The new automotive infotainment business model must consider the key aspects of the consumer market, where connectivity, portability, scalability and upgradeability are implicit. We approach the next generation of OEM infotainment as the "Harman Personal Connectivity System."

### Driver Recognition




15 feet

0 feet

The first device is an integrated automotive infotainment processing unit that provides base functionality, in-vehicle network connectivity and provisions for an external interface to a second device.

The second device—a personal connectivity device or PCD, is a portable and upgradeable processing device that attaches, wired or wireless, to the installed device. This pairing of these two plus devices generates the potential for virtually unlimited scalable functionality with unparalleled personal portability and connectivity.

By operating both the Head-Unit and the PCD on our QNX Operating System, we will utilize our powerful Q-Net technology to connect the portable device to the Head-Unit, providing new, enhanced functional modes in both units. When the portable connectivity device is removed from the car environment, each device will continue to operate in its own domain, with its individual on-board functionality.

The eternal problem of fast aging consumer products and permanently changing formats can be overcome by adding the latest PCD to the car. Then the Infotainment System remains permanently up to date.

This innovative infotainment model allows the end consumer point-of-sale feature selection that is independent of the vehicle base hardware. Furthermore, this system solution presents the OEM industry with an enormously valuable opportunity for post-sale products and functional upgrades.

Dr. Erich Geiger
*Executive Vice President and*
*Chief Technology Officer*

**Mobile Device Integration**







Message from **The Vice Chairman and Chief Executive Officer**

The Company achieved record results for the fifth year in a row. Sales increased 7% to $3.248 billion. Operating income, excluding restructuring and debt repurchase costs, rose 90 basis points, from 11.6% of sales in fiscal 2005 to 12.5% in fiscal 2006. Earnings per share from operations, excluding restructuring and debt repurchase costs, increased 18% from last year's level to $3.89. Against that EPS level of $3.89, we applied a restructuring charge and had debt repurchase costs that totaled $0.14 per share in the fourth quarter. Thus, the net result for the year is $3.75, up 13% from fiscal 2005. The restructuring charge includes cost reduction programs at several manufacturing sites. The debt repurchase costs include the premium paid for repurchasing a substantial amount of our senior notes. Strong operating results were achieved despite record spending for R&D to develop systems for the substantial new Automotive awards which will launch over the next three years.

In the last five years, the Company's sales have grown at an average annual rate of 14%. Operating income has grown from 4.1% of sales to 12.2%. Earnings per share increases have averaged more than 50% annually. Shareholders' equity has grown from $423 million in 2001 to more than $1.2 billion in 2006.

The Company's balance sheet continued to improve. Investment in working capital from operations, which excludes cash and debt, decreased from $166 million to $107 million, representing only 3.3% of sales. Capital expenditures were $130 million, down $42 million from last year. Capital expenditures represent 4% of sales versus our historical average of more than 5%. Total debt declined $136 million to $198 million. Our cash balance now exceeds debt by more than $94 million. This debt reduction was achieved even after spending $193 million to repurchase our stock. Cash flow from operations was $400 million for the year. Shareholders' equity increased to more than $1.2 billion, an increase of $805 million since 2001.

Operating results for each of the Company's three groups were very strong. The Consumer group achieved record results, as sales grew 18% to $494 million. Operating income grew 87% to $50 million, representing 10.1% of sales. An important part of this stunning performance was the success of the new Multimedia products. This category continues to show promise, and we are optimistic about continuing success in 2007 as we launch new products for portable music systems including music-enabled cell phones.

The Automotive group had a 5% increase in sales, driven in part by the successful launch of a very sophisticated electronic system in the new Mercedes-Benz S-Class. The Automotive group also introduced Personal Navigation Devices which achieved promising results in their first year. The group's operating results were moderated by a substantial increase in R&D spending, a necessity to develop the systems for which we have received awards launching in the next three years. Operating income was $338 million, representing 15.1% of sales.

Strong operating results were achieved despite record spending for R&D to develop systems for the substantial new Automotive awards which will launch over the next three years.

The Professional group had a very good year. Sales increased 6% to $517 million. Operating income increased 30% to $59 million, representing 11.5% of sales. The Professional group produced new systems using its HiQnet protocol which greatly facilitates the integration and operation of complex audio systems. Its European operations continued improvements in profitability. We expect them to make further contributions in 2007 as they launch new wireless microphones and digital mixing consoles.

We continue to build for the future. During the year, we received a significant new award from PSA Peugeot/Citroën for its infotainment systems beginning in our 2009 fiscal year. We were also awarded the prestigious L-6 platform at BMW and several other awards from Hyundai, SsangYong Motors and others. The Company's competitive position has never been stronger.

We are encouraged by our progress in 2006, take pride in our return to shareholders in the last five years, and look forward to continuing improvement in 2007.

*B. Girod*

Bernard A. Girod
*Vice Chairman and Chief Executive Officer*

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

---

**FORM 10-K**

---

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended June 30, 2006
Commission File Number 001-9764

---

# Harman International Industries, Incorporated

(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **11-2534306** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **1101 Pennsylvania Ave., N.W., Suite 1010, Washington, D.C.** | **20004** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code:  202-393-1101

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, par value $.01 per share | New York Stock Exchange |
| Preferred Stock Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one)

Large accelerated filer ☒   Accelerated filer ☐   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the voting common stock held by non-affiliates of the Registrant as of December 31, 2005 (the last business day of the Registrant's most recently completed second fiscal quarter) was $5,936,403,038, based upon the closing price of the shares on the New York Stock Exchange on that date.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: 65,173,877 shares of common stock, par value $.01 per share, as of August 31, 2006.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement relating to the 2006 Annual Meeting of Shareholders to be held November 2, 2006 are incorporated by reference into Part III.

**Forward–Looking Statements**

*This report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and 21E of the Securities Exchange Act of 1934. You should not place undue reliance on these statements. Forward-looking statements include information concerning possible or assumed future results of operations, capital expenditures, the outcome of pending legal proceedings and claims, including environmental matters, goals and objectives for future operations, including descriptions of our business strategies and purchase commitments from customers, among other things. These statements are typically identified by words such as "believe," "anticipate," "expect," "plan," "intend," "estimate" and similar expressions. We base these statements on particular assumptions that we have made in light of our industry experience, as well as our perception of historical trends, current conditions, expected future developments and other factors that we believe are appropriate under the circumstances. As you read and consider the information in this report, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. In light of these risks and uncertainties, there can be no assurance that the results and events contemplated by the forward-looking statements contained in, or incorporated by reference into, this report will in fact transpire.*

*Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those expressed in the forward-looking statements. For additional information regarding certain factors that may cause our actual results to differ from those expected or anticipated, see the information under the caption "Risk Factors" which is located in Item 1A of Part I of this report.*

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| **Part I** |  |  |  |
| Item | 1. | Business | 1 |
| Item | 1A. | Risk Factors | 8 |
| Item | 1B. | Unresolved Staff Comments | 12 |
| Item | 2. | Properties | 13 |
| Item | 3. | Legal Proceedings | 14 |
| Item | 4. | Submission of Matters to a Vote of Security Holders | 14 |
|  |  | Executive Officers of the Registrant | 14 |
| **Part II** |  |  |  |
| Item | 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 15 |
| Item | 6. | Selected Financial Data | 16 |
| Item | 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Item | 7A. | Quantitative and Qualitative Disclosures About Market Risk | 30 |
| Item | 8. | Financial Statements and Supplementary Data | 32 |
| Item | 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 61 |
| Item | 9A. | Controls and Procedures | 61 |
| Item | 9B. | Other Information | 61 |
| **Part III** |  |  |  |
| Item | 10. | Directors and Executive Officers of the Registrant | 61 |
| Item | 11. | Executive Compensation | 62 |
| Item | 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 62 |
| Item | 13. | Certain Relationships and Related Transactions | 62 |
| Item | 14. | Principal Accounting Fees and Services | 62 |
| **Part IV** |  |  |  |
| Item | 15. | Exhibits and Financial Statement Schedules | 62 |
| **Signatures** |  |  | 65 |

The page numbers in this Table of Contents reflect actual page numbers, not EDGAR page tag numbers.

References to "Harman International," the "Company," "we," "us" and "our" in this Form 10-K refer to Harman International Industries, Incorporated and its subsidiaries unless the context requires otherwise.

## Part I

### Item 1.  Business

Harman International Industries, Incorporated was incorporated in Delaware in 1980.

We believe we are a worldwide leader in the development, manufacture and marketing of high-quality, high fidelity audio products and electronic systems. We have developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names in our principal markets. We believe that we are a leader in digitally integrated infotainment systems for the automotive industry. We believe our JBL, Infinity, Harman/Kardon, Mark Levinson and Becker brand names are well known worldwide for premium quality and performance. We have built these brands by developing our world-class engineering, manufacturing and marketing competences and have employed those resources to establish our company as a worldwide leader in the markets we serve.

We report our business on the basis of three segments: Automotive, Consumer and Professional. For additional information about these segments, see *Management's Discussion and Analysis of Financial Condition and Results of Operations* included in Item 7 of Part II of this report and Note 13 in the *Consolidated Financial Statements* located in Item 8 of Part II of this report.

Our Automotive segment designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications primarily to be installed as original equipment by automotive manufacturers. Our automotive products are marketed worldwide under brand names including JBL, Infinity, Mark Levinson, Harman/Kardon, Logic 7, Lexicon and Becker. Through engineering and supply agreements, our premium audio systems and infotainment product offerings are sold to a number of global automotive manufacturers including DaimlerChrysler, the BMW Group, Toyota/Lexus, Audi/VW, Porsche, Land Rover, Hyundai, Kia and Peugeot/Citroën. We also produce a Harman/Kardon branded infotainment system for Harley-Davidson touring motorcycles. Our infotainment systems are a combination of information and entertainment components which may include or control GPS navigation, traffic information, voice-activated telephone and climate control, rear seat entertainment, wireless Internet access, hard disk recording, MP3 playback, backup camera and a high-end branded audio system. These systems include scaleable software allowing us to better serve a range of vehicles from luxury through entry-level. We also produce aftermarket personal navigation devices that are currently being sold in Europe.

Our Consumer segment designs, manufactures and markets audio, video and electronic systems for home, mobile and multimedia applications. Our Consumer products are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Lexicon, Mark Levinson and Revel. Our audio, video and electronic systems are recognized throughout the world for superior sound quality and high performance. Our home product applications include systems to provide high-quality audio throughout the home and our mobile products include an array of aftermarket systems to deliver audio entertainment in the vehicle. Our home audio and electronic products are offered primarily through audio/video specialty stores and retailers such as Circuit City, Best Buy, MediaMarkt and Fnac. Our branded audio products for multimedia users are primarily focused on retail customers. Our multimedia products are geared towards providing an enhanced sound for Apple's iPod and other digital audio players and are sold in retail stores such as the Apple stores, Best Buy and Target.

Our Professional segment designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, airports, houses of worship and theme attractions. We also

design products for recording, broadcast, cinema and music reproduction applications. In addition, we provide high-quality products to the sound reinforcement, music instrument support and broadcast and recording segments of the professional audio market.

We offer complete systems solutions for professional installations and users around the world. Our products can be linked by our HiQnet™ network protocol providing a central digital network for audio professionals to control different aspects of a complex system. Our Professional brands include JBL Professional, Crown, Soundcraft, DigiTech, dbx, AKG, Lexicon, BSS and Studer. We believe that we are uniquely equipped to provide turnkey systems solutions for professional audio applications that offer the customer improved performance, reliability, ease of installation and reduced cost.

Our results of operations depend on our sales of audio products and electronic systems in the automotive, consumer and professional markets. Our products are sold worldwide, with the largest markets being the United States and Germany. A significant portion of our revenues are Euro denominated.

We believe significant growth opportunities continue to exist with automotive manufacturers through increases in the number of models offering our audio, navigation and infotainment systems, supply agreements with additional automakers, increases in per-vehicle content through the provision of integrated infotainment systems with premium branded audio systems and higher penetration levels of audio and infotainment systems within existing models. We believe significant growth opportunities exist in the consumer electronics market as the home and multimedia technologies continue to converge. We also believe growth opportunities exist in professional markets and expect that our HiQnet system protocol will allow us to capitalize on these opportunities as this technology simplifies the interaction of our products and provides users with an incentive to purchase complete HiQnet compatible systems.

*Products*

*Automotive*

We believe that we are a leader in developing and manufacturing high-quality, high fidelity digitally-integrated infotainment systems and premium branded audio systems for automobiles.

The automotive market is currently experiencing unprecedented consumer demand for information and entertainment in the car. We have developed leading technical competencies to address this demand. These competencies take the form of highly integrated infotainment systems that provide and manage audio, radio, video, navigation, telephone and climate control through efficient hardware solutions and scalable software architectures. In fiscal 2006, we supplied infotainment systems for vehicles manufactured by Mercedes-Benz, BMW, Porsche, Audi, Renault and Land Rover. Our business objective is to maintain our leadership position in the infotainment business.

We continue to leverage our expertise in the design and manufacture of premium branded audio systems, as well as the reputation for quality associated with our JBL, Infinity, Harman/Kardon, Mark Levinson and Lexicon brand names. As a result of our well-established relationships with automobile manufacturers, our engineers are engaged early in the vehicle design process to develop systems that optimize acoustic performance and minimize weight and space requirements. Our Infinity branded car audio systems are offered by DaimlerChrysler's Chrysler Division as well as Mitsubishi and Hyundai/Kia (in North America). DaimlerChrysler's Mercedes-Benz Division, the BMW Group, Land Rover, Porsche, GM and Saab provide Harman/Kardon branded audio systems in their vehicles. Our premium Mark Levinson digital audio system is offered by Lexus. Rolls Royce vehicles come standard with a Lexicon

branded audio system. Toyota, the Peugeot/Citroën Group and Hyundai/Kia (in Asia) offer JBL branded audio systems.

*Consumer*

In the multimedia market, we offer branded products such as JBL On Stage II,™ JBL Creature II,™ JBL® On Time,® JBL Radial™ and Harman/Kardon Soundsticks II.™ Our products add greater functionality for computers and Apple's successful iPod® as well as other MP3 players. Our new Harman/Kardon Drive + Play™ provides full music control and interface along with a highly visible display in automobiles. Music management allows for choice by artist, album, song, genre, composer and play list. We believe our products facilitate the easy transfer of music and data from the home to the car and back.

We manufacture loudspeakers under the JBL, Infinity, Harman/Kardon and Revel brand names for the consumer home audio market. These loudspeaker lines include models designed for two-channel stereo and multi-channel surround sound applications in the home and in a wide range of performance choices, including floor standing, bookshelf, powered, low frequency, in-wall, wireless and all-weather as well as in styles and finishes ranging from high gloss lacquers to genuine wood veneers. The JBL and Infinity product lines also include car loudspeakers, amplifiers, subwoofers and crossover products sold in the aftermarket as well as marine speakers intended for use on boats.

We offer a broad range of consumer audio electronics under the Harman/Kardon, Mark Levinson and Lexicon brand names. Our Harman/Kardon home electronics line includes audio/video receivers featuring Logic 7, Dolby Digital and DTS surround sound processing capabilities and multi-channel amplifiers, multi-disc DVD players and CD players. We design and manufacture high-end electronics, including amplifiers, digital signal processors, compact disc players and transports, DVD transports and surround sound processors that we market under the renowned Mark Levinson brand. We believe that we are a leader in the design and manufacture of high-quality home theater surround sound processors and amplifiers under the Lexicon name. Lexicon was a pioneer in the development of digital signal processors for the professional audio market and has successfully transferred its professional audio expertise to produce excellent consumer products.

*Professional*

Our professional products include loudspeakers and electronic equipment that are marketed under what we believe are some of the most respected brand names in the industry, including JBL Professional, Crown, Soundcraft, Lexicon, DigiTech, AKG, BSS, dbx and Studer.

The professional market is increasingly moving to digital technology. We believe that we are a leader in this market. Our Professional segment derives value from its ability to share research and development, engineering talent and other digital resources among its business units. Soundcraft, Studer, Crown, Lexicon, DigiTech, dbx and BSS each have substantial digital engineering resources and work together to achieve common goals by sharing resources and technical expertise.

Our professional loudspeakers are well known for high-quality and superior sound. JBL Professional branded products include studio monitors, loudspeaker systems, powered loudspeakers, sound reinforcement systems, cinema systems, surround sound systems and industrial loudspeakers.

Our professional electronic products are recognized for high quality and reliability. We market these products on a worldwide basis under various trade names, including Crown, Soundcraft, Lexicon,

3

DigiTech, AKG, BSS, dbx and Studer. These products are often sold in conjunction with our JBL Professional loudspeakers and in certain products are integrated into JBL loudspeakers.

We produce sound mixing consoles which range from automated multi-track consoles for professional recording studios to compact professional mixers for personal recording, home studios and sound reinforcement. Our consoles are sold to four main market areas: sound reinforcement, recording studios, broadcast studios and musical instrument dealers. Our mixing consoles are sold primarily under the Soundcraft and Studer brands. We produce many types of signal processing products, equalizers, and special effects devices that are used in live sound applications and in recording studios to produce sound effects and refine final mixes. These products are sold under the Lexicon, DigiTech, dbx and BSS brand names.

We produce microphones, audio headphones, surround-sound headphones and other professional audio products, which are marketed under the AKG brand name.

We also produce professional amplifiers and powered loudspeakers under the Crown and JBL brand names. We believe the integration of loudspeakers and electronics enhances our ability to provide complete systems solutions to the professional audio market. Our other professional products include switching systems, digital audio workstations and turnkey broadcasting studio installations marketed primarily under the Studer brand name.

With our HiQnet network protocol we can configure, connect and control a complete professional sound system from microphone to speaker on one unified digital network. This system provides enhanced productivity and facilitates real-time problem diagnosis and correction from a central location.

*Manufacturing*

We believe that our world-class manufacturing capabilities are essential to maintaining and improving product quality and performance. Our manufacturing facilities are located in North America, Europe and Asia.

Our Automotive manufacturing facilities in Europe are located in Germany, the United Kingdom, Sweden, France and Hungary. Our European facilities are primarily used to manufacture automotive navigation and infotainment systems and audio systems. In North America, we manufacture loudspeakers in Indiana, Kentucky and Mexico and manufacture electronics in California, Kentucky and Missouri.

Our Consumer manufacturing facilities are located in California, Massachusetts, Mexico and China. Our loudspeaker manufacturing capabilities include the production of high-gloss lacquer and wooden veneer loudspeaker enclosures, wire milling, voice coil winding and the use of computer controlled lathes and other machine tools to produce precision components.

Our principal Professional facilities in North America include the manufacturing of loudspeakers in California and electronic products, including amplifiers and effects devices, in Utah and Indiana. European professional electronics manufacturing includes mixing consoles in the United Kingdom and Switzerland, professional recording and broadcast equipment in Switzerland and microphones and headphones in Austria.

Our facilities have been designed to emphasize worker safety and compliance with environmental and safety regulations.

*Suppliers*

We use externally sourced microchips in many of our products. A significant disruption in our microchip supply chain and an inability to obtain alternative sources would have a material impact on our consolidated results of operations.

Several independent suppliers manufacture electronic products designed by Harman/Kardon and certain Consumer and Professional loudspeakers and electronics. We do not believe the loss of any one of these suppliers would have a material impact on our consolidated results of operations or consolidated financial position.

*Trademarks and Patents*

We market our products under numerous brand names that are protected by both pending and registered trademarks around the world. Our brands include JBL,® Infinity,® Harman/Kardon,® Lexicon,® Mark Levinson,® Revel,® Crown,® Becker,® Soundcraft,® DigiTech,® AKG,® Studer,® BSS® and dbx.® Our trademark registrations cover use of trademark rights in connection with various products, such as loudspeakers, speaker systems, speaker system components and other electrical and electronic devices. We have registered or taken other protective measures for many of these trademarks in substantially all major industrialized countries. As of June 30, 2006, we had 1,915 trademark registrations and 278 pending trademark applications around the world. On that date, we also had 1,397 United States and foreign patents and 2,033 pending patent applications covering various audio, infotainment and software products.

*Seasonality*

We experience seasonal fluctuations in sales and earnings. Historically, our first fiscal quarter ended September 30 is generally the weakest due to automotive model year changeovers and the summer holidays in Europe. Our sales and earnings may also vary due to customer acceptance of our products, product offerings by our competitors and general economic conditions, including fluctuations in foreign currency exchange rates.

*Customers/Industry Concentration*

We are subject to various risks related to dependence on key customers. Sales to DaimlerChrysler and BMW accounted for 25 percent and 10 percent, respectively, of our total consolidated net sales for the fiscal year ended June 30, 2006. Accounts receivable due from DaimlerChrysler and BMW accounted for 20 percent and 7 percent, respectively, of total consolidated accounts receivable at June 30, 2006.

We anticipate that DaimlerChrysler and BMW will continue to account for a significant portion of our net sales and accounts receivables for the foreseeable future. These automotive customers are not obligated to any long-term purchase of our products.

The loss of sales to DaimlerChrysler or BMW would have a material adverse effect on our total consolidated net sales, earnings and financial position. For the fiscal year ended June 30, 2006, approximately 64 percent of our sales were to automobile manufacturers.

*Backlog Orders*

We manufacture automotive products and systems on a just-in-time basis and maintain sufficient inventories of finished goods to fill Consumer and Professional customer orders promptly; therefore we do not consider

the level of backlog to be an important indication of our future performance. Our order backlog was approximately $31 million at June 30, 2006. We expect to deliver these products within the next twelve months. Our backlog was approximately $18 million at June 30, 2005.

*Warranty Liabilities*

We warrant our products to be free from defects in materials and workmanship for a period ranging from one year to five years from the date of purchase, depending on the business segment and product. The warranty is a limited warranty, and it may impose certain shipping costs on the customer and exclude deficiencies in appearance except for those evident when the product is delivered. Dealers and warranty service providers normally perform warranty service for loudspeakers and electronics in the field, using parts we supply on an exchange basis. Estimated warranty liabilities are based upon past experience with similar types of products, the technological complexity of certain products, replacement cost and other factors. We take these factors into consideration when assessing the adequacy of our warranty provisions for periods still open to claim.

*Competition*

The audio industry is fragmented and competitive and includes numerous manufacturers offering audio products that vary widely in price, quality and distribution methods. Consumer home, multimedia and mobile aftermarket products are offered through audio specialty stores, discount stores, department stores, mail order firms and Internet merchants. Automotive and computer manufacturers also offer branded audio products as options. Music instrument retailers, professional audio dealers, contractors and installers offer professional products and customers can also purchase these products on a contract bid basis. We concentrate primarily on the higher-quality, higher-priced segments of the audio market and compete based upon the strength of our brand names, the quality of our products, our ability to provide integrated systems and our comprehensive marketing, engineering and manufacturing resources.

In the automotive audio market, we compete with Bose, Pioneer ASK, Foster Electric and Panasonic in the sale of audio systems to automotive manufacturers and Alpine, Bosch, Panasonic, Siemens VDO, Visteon, Mitsubishi Electronics, Aisin Seiki and Denso in the sale of electronics and infotainment systems to automotive manufacturers. We compete based upon the strength of our brand names and the quality of our products.

We believe our competitive position is enhanced by our technical expertise in designing and integrating acoustics, navigation, speech recognition and human-machine interfaces into complete infotainment systems uniquely adapted to the specific requirements of each automobile model.

We believe that we currently have a significant share of the consumer market for loudspeakers, primarily as a result of the strength of our brand names and our technology. We believe JBL and Infinity are two of the most recognized loudspeaker brands in the world. By developing our high-end loudspeaker brand, Revel, over the past several years, we have extended our market position. Our principal competitors in the consumer loudspeaker market include Bose, Klipsch, Polk Audio, B&W and Boston Acoustics.

Competition in the consumer home electronics market remains intense, dominated by large Asian manufacturers. This market is characterized by the short life cycle of products and a need for continuous design and development efforts. Our competitive strategy is to compete in the higher-quality segments of this market and to continue to emphasize our ability to provide system solutions to customers, including a combination of loudspeakers, electronics products, integrated surround sound and home theater systems. Our principal electronic competitors include Yamaha, Sony, Denon, Onkyo, Pioneer and Marantz.

6

We also compete in the luxury consumer electronics market with our Mark Levinson and Lexicon brands. Our principal competitors in this high-end market include Krell, McIntosh, Audio Research, Meridian, Linn and Accuphase.

In the multimedia market, we supply Apple stores and other retailers with JBL and Harman/Kardon speaker systems that serve Apple's successful iPod as well as other MP3 players. Our principal competitors for these products are Bose, Altec Lansing and Klipsch. We also offer Harman/Kardon and JBL speaker systems to personal computer retailers. In this market, our principal competitors are Creative Labs, Altec Lansing, Logitech, Klipsch and Cyber Acoustics. Additionally, Harman/Kardon audio systems are built into certain Toshiba laptops. The new Harman/Kardon Drive + Play mobile product provides full MP3 control and interface for Apple's iPod and includes a highly visible display. Our principal competitor in the MP3 mobile accessory market is Alpine.

The market for professional sound systems is highly competitive. We believe that we have historically held a leading market position in the professional loudspeaker market and have complemented our professional loudspeaker line by adding digital professional electronic products and broadcast and recording equipment. We compete by utilizing our ability to provide systems solutions to meet the complete audio requirements of our professional customers. With our HiQnet networking protocol software, our professional brand products can communicate and operate together. We offer products for most professional audio applications.

We compete in the sound reinforcement market using many of our brand names, including JBL Professional, AKG, Crown, Soundcraft, dbx and BSS. Our principal competitors in the sound reinforcement market include Telex, Electro Voice, Mackie, QSC, Meyer Sound Laboratories, Sennheiser, Peavey, Shure, Audio Technica, and Yamaha. Our Studer, AKG, Soundcraft, JBL Professional and Lexicon branded products compete in the recording and broadcast markets. Principal competitors in these markets include Yamaha, Sennheiser, Loud Technologies, Inc., Lawo, Harris Corporation, DigiDesign/M-Audio, Genelec, KRK, TC Electronics, Stagetec and Sony. In the music instrument market, competitors for our JBL Professional, DigiTech, dbx, Crown, Soundcraft and AKG products include Yamaha, Peavey, QSC, Shure, Sennheiser, Line 6, Dunlop, Zoom, Audio Technica and Roland. We also compete in the industrial and architectural sound market. Competitors within this market include Siemens, Peavey and Tannoy.

We are subject to various Federal, state, local and international environmental laws and regulations, including those governing the use, discharge and disposal of hazardous materials. We believe that our facilities are in substantial compliance with current laws and regulations. The cost of compliance with current environmental laws and regulations has not been, and is not expected to be, material.

### *Research and Development*

Expenditures for research and development were $302.0 million, $222.6 million and $216.9 million for the fiscal years ended June 30, 2006, 2005 and 2004, respectively.

### *Number of Employees*

At June 30, 2006, we had 11,246 full-time employees, including 5,155 employees located in North America and 6,091 located outside of North America.

*Website Information*

Our corporate website is located at www.harman.com. Through our website we make available, free of charge, access to our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K filed or furnished by the Company pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. Our website also provides access to reports filed by our directors, executive officers and certain significant shareholders pursuant to Section 16 of the Securities Exchange Act of 1934. In addition, our Corporate Governance Guidelines, Ethics Code and charters for three committees of our Board of Directors are available on our website. The information on our website is not incorporated by reference into this report. In addition, the Securities and Exchange Commission ("SEC") maintains a website, www.sec.gov, that contains reports, proxy and information statements and other information that we file electronically with the SEC.

**Item 1A.  Risk Factors**

You should carefully consider the risks described below and the other information in this report.

***Our operating results are subject to fluctuations, and if we fail to meet the expectations of securities analysts or investors, our stock price may decrease significantly.***

Our operating results may fluctuate significantly and may not meet our expectations or those of securities analysts or investors. The price of our stock will likely decline if this occurs. Factors that may cause fluctuations in our operating results include, but are not limited to, the following:

- automobile industry sales and production rates and the willingness of automobile purchasers to pay for the option of a premium audio system and/or a multi-function infotainment system;
- changes in consumer confidence and spending;
- fluctuations in currency exchange rates and other risks inherent in international trade and business transactions;
- the ability to satisfy contract performance criteria, including technical specifications and due dates;
- the loss of one or more significant customers, including our automotive manufacturer customers;
- competition in the automotive, consumer or professional markets in which we operate;
- model-year changeovers in the automotive industry;
- changes in general economic conditions and specific market conditions;
- our ability to enforce or defend our ownership and use of intellectual property;
- our ability to effectively integrate acquisitions;
- strikes, work stoppages and labor negotiations at our facilities, or at a facility of one of our significant customers; or work stoppages at a common carrier or a major shipping location;
- the outcome of pending or future litigation and administrative claims, including patent and environmental matters; and
- world political stability.

***Currency fluctuations may reduce profits on our foreign sales or increase our costs, either of which could adversely affect our financial results.***

A significant amount of our assets and operations are located outside the United States. Consequently, we are subject to fluctuations in foreign currency exchange rates, especially the Euro. Translation losses

resulting from currency fluctuations may adversely affect the profits from our foreign operations and have a negative impact on our financial results. In addition, we purchase certain foreign-made products. Although we hedge a portion of our foreign currency exposure and, due to the multiple currencies involved in our business, foreign currency positions partially offset and are netted against one another to reduce exposure, we cannot assure you that fluctuations in foreign currency exchange rates will not make these products more expensive to purchase. Increases in our cost of purchasing these products could negatively impact our financial results if we are not able to pass those increased costs on to our customers.

*Failure to maintain relationships with our largest customers and failure by our customers to continue to purchase expected quantities of our products due to changes in market conditions would have an adverse effect on our operations.*

We anticipate that DaimlerChrysler and BMW will continue to account for a significant portion of our sales for the foreseeable future. However, DaimlerChrysler and BMW are not obligated to any long-term purchases of our products. The loss of sales to DaimlerChrysler or BMW would have a material adverse effect on our consolidated sales, earnings and financial position.

*Our products may not satisfy shifting consumer demand or compete successfully with competitors' products.*

Our business is based on the demand for audio and video products and our ability to introduce distinctive new products that anticipate changing consumer demands and capitalize upon emerging technologies. If we fail to introduce new products, misinterpret consumer preferences or fail to respond to changes in the marketplace, consumer demand for our products could decrease and our brand image could suffer. In addition, our competitors may introduce superior designs or business strategies, impairing our distinctive image and our products' desirability. If any of these events occur, our sales could decline.

*A decrease in discretionary spending would likely reduce our sales.*

Our sales are dependent on discretionary spending by consumers, which may be adversely impacted by economic conditions affecting disposable consumer income and retail sales. In addition, our sales of audio, electronic and infotainment products to automotive customers are dependent on the overall success of the automobile industry, as well as the willingness of automobile purchasers to pay for the option of a premium branded automotive audio system or a multi-function digital infotainment system.

*Our business could be adversely affected if we are unable to obtain raw materials and components from our suppliers on favorable terms.*

We are dependent upon third party suppliers, both in the United States and other countries, for various components, parts, raw materials and finished products. Some of our suppliers may produce products that compete with our products. We use externally sourced microchips in many of our products. A significant disruption in our supply chain and an inability to obtain alternative sources could have a material impact on our consolidated results of operations.

*Our business could be adversely affected by a strike or work stoppage at one of our manufacturing plants or at a facility of one of our significant customers or at a common carrier or major shipping location.*

One of our manufacturing facilities in the United States operates under a collective bargaining agreement, which was renewed in fiscal 2004. The current contract is scheduled to expire in March 2009. Certain of our automotive customers are unionized and may incur work stoppages or strikes. A work stoppage at our facilities or those of our automotive customers could have a material adverse effect on our consolidated

sales, earnings and financial condition. In addition, a work stoppage at a common carrier or a major shipping location could also have a material adverse effect on our consolidated sales, earnings and financial condition.

*We may lose market share if we are unable to compete successfully against our current and future competitors.*

The audio and video product markets that we serve are fragmented, highly competitive, rapidly changing and characterized by intense price competition.

Many manufacturers, large and small, domestic and foreign, offer audio and video systems that vary widely in price and quality and are marketed through a variety of channels, including audio and video specialty stores, discount stores, department stores, mail order firms, and the Internet. Some of our competitors have financial and other resources greater than ours. We cannot assure you that we will continue to compete effectively against existing or new competitors that may enter our markets. We also compete indirectly with automobile manufacturers that may improve the quality of original equipment audio and electronic systems, reducing demand for our aftermarket mobile audio products, or change the designs of their cars to make installation of our aftermarket products more difficult or expensive.

*If we do not continue to develop, introduce and achieve market acceptance of new and enhanced products, our sales may decrease.*

In order to increase sales in current markets and gain entry into new markets, we must maintain and improve existing products, while successfully developing and introducing new products. Our new and enhanced products must respond to technological developments and changing consumer preferences. We may experience difficulties that delay or prevent the development, introduction or market acceptance of new or enhanced products. Furthermore, despite extensive testing, we may be unable to detect and correct defects in some of our products before we ship them. Delays or defects in new product introduction may result in loss of sales or delays in market acceptance. Even after introduction, our new or enhanced products may not satisfy consumer preferences and product failures may cause consumers to reject our products. As a result, these products may not achieve market acceptance. In addition, our competitors' new products and product enhancements may cause consumers to defer or forego purchases of our products.

*Our operations could be harmed by factors including political instability, natural disasters, fluctuations in currency exchange rates and changes in regulations that govern international transactions.*

The risks inherent in international trade may reduce our international sales and harm our business and the businesses of our distributors and suppliers. These risks include:

- changes in tariff regulations;
- political instability, war, terrorism and other political risks;
- foreign currency exchange rate fluctuations;
- establishing and maintaining relationships with local distributors and dealers;
- lengthy shipping times and accounts receivable payment cycles;
- import and export licensing requirements;
- compliance with foreign laws and regulations, including unexpected changes in taxation and regulatory requirements;

- greater difficulty in safeguarding intellectual property than in the United States; and
- difficulty in staffing and managing geographically diverse operations.

These and other risks may increase the relative price of our products compared to those manufactured in other countries, reducing the demand for our products.

*If we are unable to enforce or defend our ownership and use of our intellectual property, our business may decline.*

Our future success will depend, in substantial part, on our intellectual property. We seek to protect our intellectual property rights, but our actions may not adequately protect the rights covered by our patents, patent applications, trademarks and other proprietary rights and prosecution of our claims could be time consuming and costly. In addition, the intellectual property laws of some foreign countries do not protect our proprietary rights, as do the laws of the United States. Despite our efforts to protect our proprietary information, third parties may obtain, disclose or use our proprietary information without our authorization, which could adversely affect our business. From time to time, third parties have alleged that we infringe their proprietary rights. These claims or similar future claims could subject us to significant liability for damages, result in the invalidation of our proprietary rights, limit our ability to use infringing intellectual property or force us to license third-party technology rather than dispute the merits of any infringement claim. Even if we prevail, any associated litigation could be time consuming and expensive and could result in the diversion of our time and resources.

*Covenants in our debt agreements could restrict our operations.*

Our revolving credit facility contains certain provisions that could restrict our operating and financing activities. They restrict our ability to, among other things:

- create or assume liens;
- enter into sale-leaseback transactions; and
- engage in mergers or consolidations.

Because of the restrictions on our ability to create or assume liens, we may have difficulty securing additional financing in the form of additional indebtedness. In addition, our revolving credit facility contains other and more restrictive covenants, including financial covenants that will require us to achieve specified financial and operating results and maintain compliance with specified financial ratios. We may have to curtail some of our operations to maintain compliance with these covenants.

*If we fail to comply with the covenants contained in our debt agreements, the related debt incurred under those agreements could be declared immediately due and payable, which could also trigger a default under other agreements.*

Our ability to meet the covenants or requirements in our credit facilities may be affected by events beyond our control, and we cannot assure you that we will satisfy these covenants and requirements. A breach of these covenants or our inability to comply with the financial ratios, tests or other restrictions could result in an event of default under our revolving credit facility. Upon the occurrence of an event of default under our revolving credit facility, the lenders could elect to declare all amounts outstanding under our revolving credit facility, together with accrued interest, to be immediately due and payable. If the payment of our indebtedness is accelerated, we cannot assure you that we will be able to make those payments or borrow sufficient funds from alternative sources to make those payments. Even if we were to obtain additional financing, that financing may be on unfavorable terms.

11

*Harman International is a holding company with no operations of its own and therefore our cash flow and ability to service debt is dependent upon distributions from our subsidiaries.*

Our ability to service our debt and pay dividends is dependent upon the operating earnings of our subsidiaries. The distribution of those earnings, or advances or other distributions of funds by those subsidiaries to Harman International, all of which could be subject to statutory or contractual restrictions, are contingent upon the subsidiaries' earnings and are subject to various business considerations.

Any of the foregoing factors could have a material adverse effect on our business, results of operations and financial condition. In light of these risks and uncertainties, there can be no assurance that the results and events contemplated by the forward-looking statements contained in this report will in fact transpire.

**Item 1B.  Unresolved Staff Comments**

None.

**Item 2.  Properties**

Our corporate headquarters are located at 1101 Pennsylvania Avenue, N.W., Washington, D.C. 20004.

Certain information regarding our principal facilities are described in the table below.

| Location | Segment | Size (Sq. Ft.) | Owned or leased | Percentage utilization |
|---|---|---|---|---|
| Northridge, California | Automotive Consumer Professional | 589,000 | Leased | 96% |
| Ittersbach, Germany | Automotive | 561,000 | Owned | 100% |
| Straubing, Germany | Automotive | 235,000 | Owned | 100% |
| Elkhart, Indiana | Professional | 223,000 | Owned | 86% |
| Chateau du Loir, France | Automotive Consumer | 221,000 | Owned | 90% |
| Martinsville, Indiana | Automotive | 221,000 | Owned | 100% |
| Rancho Cucamonga, California | Professional | 212,000 | Leased | 100% |
| Worth-Schaitt, Germany | Automotive | 204,000 | Owned | 100% |
| Tijuana, Mexico | Consumer | 198,000 | Leased | 98% |
| Vienna, Austria | Professional | 193,000 | Leased | 100% |
| Potters Bar, United Kingdom | Professional | 160,000 | Leased | 100% |
| Franklin, Kentucky | Automotive | 152,000 | Owned | 100% |
| Sandy, Utah | Professional | 127,000 | Leased | 100% |
| Bridgend, United Kingdom | Automotive | 125,000 | Leased | 100% |
| Szekesfehervar, Hungary | Automotive | 117,000 | Owned | 100% |
| Juarez, Mexico | Automotive | 109,000 | Leased | 90% |
| Regensdorf, Switzerland | Professional | 108,000 | Leased | 100% |

We also own or lease other facilities which are not considered principal properties. We believe that our facilities are suitable and adequate for our present needs and suitable additional or substitute facilities will be available, if required.

**Item 3.  Legal Proceedings**

At June 30, 2006, we were involved in several legal actions. The outcome of these legal actions cannot be predicted with certainty; however, management, based upon advice from legal counsel, believes such actions are either without merit or will not have a material adverse effect on our financial position or results of operations. In fiscal 2005, we recorded a $6 million liability for probable unasserted claims. There was no change in the status of these claims at June 30, 2006.

**Item 4.  Submission of Matters to a Vote of Security Holders and Executive Officers of the Registrant**

**Submission of Matters to a Vote of Security Holders**

None.

**Executive Officers of the Registrant**

Executive officers are elected annually by our Board of Directors and hold office at the pleasure of the Board until the next annual election of officers or until their successors are elected and qualified. Each of our current executive officers is identified below together with information about each officer's age, position and employment history for the last five years.

| Name | Position | Age |
|------|----------|-----|
| Sidney Harman | Executive Chairman of the Board | 88 |
| Bernard A. Girod | Vice Chairman of the Board of Directors and Chief Executive Officer | 64 |
| Erich A. Geiger | Executive Vice President and Chief Technology Officer | 59 |
| Kevin L. Brown | Executive Vice President – Chief Financial Officer and Assistant Secretary | 46 |
| William S. Palin | Vice President – Controller | 64 |
| Sandra B. Robinson | Vice President – Financial Operations and Chief Accounting Officer | 47 |
| Edwin C. Summers | Vice President – General Counsel and Secretary | 59 |
| Floyd E. Toole | Vice President – Acoustics | 68 |

Sidney Harman has been Executive Chairman of the Board since July 2000 and served as Chairman of the Board and as a director of our company since 1980. Dr. Harman also served as our Chief Executive Officer from 1980 to 1998.

Bernard A. Girod joined our company in 1986. Mr. Girod has been Vice Chairman of the Board since July 2000, Chief Executive Officer from 1998 to May 2006 and a director of our Company since 1993. He resumed the role of Chief Executive Officer in August 2006. Mr. Girod also served as President from 1994 to 1998, Chief Operating Officer from 1993 to 1998, Secretary from 1992 to 1998 and Chief Financial Officer from 1986 to 1995 and from 1996 to 1997.

Erich A. Geiger joined our company in 1996 as Managing Director of Harman/Becker GmbH. He was named Chief Technology Officer of Harman International in 2003. In 2004, Dr. Geiger was named Executive Vice President and Chief Technology Officer of Harman International and Executive Chairman of Harman/Becker Automotive Systems. The Board of Directors has appointed Dr. Geiger Chief Strategy and Technology Officer effective October 1, 2006.

Kevin L. Brown joined our company in August 2003 as the Chief Financial Officer of Harman/Becker Automotive Systems. Mr. Brown was promoted to Executive Vice-President and Chief Financial Officer in August 2006. He has served as Vice President, Chief Financial Officer and Assistant Secretary of Harman

International since July 2005. Prior to joining our company, Mr. Brown served as Senior Vice President and Chief Financial Officer of Donnelly Corporation, an automotive parts supplier, from April 2001 to March 2003.

William S. Palin has served as Vice President – Controller of our company since March 1994.

Sandra B. Robinson has been employed with our company since 1984 and has served as Vice President – Financial Operations since November 1992. Ms. Robinson became Chief Accounting Officer in July 2005.

Edwin C. Summers has been employed with our company as Vice President, General Counsel and Assistant Secretary since July 1998. He became Secretary in November 2005.

Floyd E. Toole has been employed with our company as Vice President – Acoustics since November 1991.

## Part II

**Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Our Common Stock is listed on the New York Stock Exchange and is reported on the New York Stock Exchange Composite Tape under the symbol HAR. As of August 31, 2006, there were approximately 150 record holders of our Common Stock.

The table below sets forth the reported high and low sales prices at the market close for our Common Stock, as reported on the New York Stock Exchange, for each quarterly period for fiscal years ended June 30, 2006 and 2005.

| Market Price | Fiscal 2006 | | Fiscal 2005 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| First quarter ended September 30 | $   108.28 | 79.92 | 107.75 | 77.97 |
| Second quarter ended December 31 | 105.25 | 94.81 | 130.72 | 103.47 |
| Third quarter ended March 31 | 115.85 | 95.52 | 128.15 | 84.45 |
| Fourth quarter ended June 30 | 109.18 | 80.30 | 91.14 | 70.25 |

We paid cash dividends during fiscal years 2006 and 2005 of $.05 per share, with a dividend of $.0125 per share paid in each of the four quarters.

The following table sets forth our repurchases of Common Stock for each month in the fourth quarter of fiscal 2006:

| Period | Total number of shares purchased | Average price paid per share | Total number of shares purchased as part of publicly announced plans or programs | Maximum number of shares that may yet be purchased under the plans or programs |
|---|---|---|---|---|
| April 1, 2006 – April 30, 2006 | --- | --- | --- | 4,199,218 |
| May 1, 2006 – May 31, 2006 | 249,400 | $83.38 | 249,400 | 3,949,818 |
| June 1, 2006 – June 30, 2006 | 640,000 | 82.51 | 640,000 | 3,309,818 |
| | 889,400 | 82.75 | 889,400 | 3,309,818 (1) |

(1) Our share repurchase program was first publicly announced on June 16, 1998. In August 2005, the Board authorized the purchase of up to an additional four million shares, bringing the total authorized to 20 million shares.  Total shares repurchased through June 30, 2006 were 16,690,182.

For a description of limitations on the payment of dividends, see *Management's Discussion and Analysis of Financial Condition and Results of Operations – Financial Condition* included in Item 7 of Part II of this report.

## Item 6.  Selected Financial Data

The following table summarizes certain selected financial data that should be read in conjunction with the consolidated financial statements and accompanying notes thereto for the fiscal year ended June 30, 2006 included in this report.

| (In thousands except per share data) | Years Ended June 30, | | | | |
| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Net sales | $3,247,897 | 3,030,889 | 2,711,374 | 2,228,519 | 1,826,188 |
| Operating income | $   397,241 | 350,981 | 254,465 | 166,894 | 103,221 |
| Income before income taxes | $   376,187 | 335,337 | 227,520 | 142,471 | 80,177 |
| Net income | $   255,295 | 232,848 | 157,883 | 105,428 | 57,513 |
| Diluted earnings per share (a) | $       3.75 | 3.31 | 2.27 | 1.55 | 0.85 |
| Weighted average shares outstanding – diluted (a) | 68,105 | 70,399 | 69,487 | 68,048 | 67,806 |
| Total assets | $2,354,661 | 2,187,203 | 1,988,810 | 1,703,658 | 1,480,280 |
| Total debt | $   197,554 | 333,917 | 394,925 | 503,068 | 474,679 |
| Shareholders' equity | $1,228,164 | 1,060,948 | 874,996 | 655,785 | 526,629 |
| Dividends per share (a) | $       0.05 | 0.05 | 0.05 | 0.05 | 0.05 |

(a)  Share and per share data has been adjusted to reflect the two-for-one stock split in November 2003.

**Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations**

*This discussion should be read in conjunction with the information presented in other sections of this Annual Report on Form 10-K, including "Item 1. Business," "Item 6. Selected Financial Data," and "Item 8. Financial Statements and Supplementary Data." This discussion contains forward-looking statements which are based on our current expectations and industry experience, as well as our perception of historical trends, current market conditions, including customer acceptance of our new products, current economic conditions, expected future developments, including foreign currency exchange rates, and other factors that we believe are appropriate under the circumstances. These statements involve risks and uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements. See "Risk Factors" included in Part 1, Item 1A. of this report.*

We begin this discussion with an overview of our company to give you an understanding of our business and the markets we serve. We then discuss our critical accounting policies. This is followed by a discussion of our results of operations for the fiscal years ended June 30, 2006, 2005 and 2004. We include in this discussion an analysis of certain significant year-to-year variances included in our results of operations. We also provide specific information regarding our three reportable business segments: Automotive, Consumer and Professional. We then discuss our financial condition at June 30, 2006 with a comparison to June 30, 2005. This section contains information regarding our liquidity and capital resources, cash flows and equity balances. We complete our discussion with a business outlook for future periods.

**Overview**

We design, manufacture and market high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets. We have developed, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names in our principal markets. Our three reportable business segments, Automotive, Consumer and Professional, are based on the end-user markets we serve.

Automotive designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications. Our systems are generally shipped directly to our automotive customers for factory installation. Infotainment systems are a combination of information and entertainment components with features including or controlling GPS navigation, traffic information, cellular phone service, wireless Internet access, security, climate control, backup camera, digital audio playback and rear seat entertainment. These systems are increasingly developed using scaleable software allowing us to better serve luxury-range vehicles through the entry-level. Automotive also produces aftermarket personal navigation devices that are currently sold in Europe.

Consumer designs, manufactures and markets audio, video and electronic systems for home, mobile and multimedia applications. Home product applications include systems to provide high-quality audio throughout the home and to enhance in-home video systems such as home theatres. Our aftermarket mobile products, including in-vehicle iPod adaptors, deliver audio entertainment in the vehicle. Our multimedia products include accessories for portable electronic devices such as the iPod and other MP3 players. Our consumer systems are primarily distributed through retail outlets.

Professional designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, airports and other public spaces. We also create products for recording, broadcast, cinema and music reproduction applications. These products are increasingly linked

by our HiQnet network protocol that provides a central digital network that allows audio professionals to control a complex system from a central location.

Our products are sold worldwide, with the largest markets being the United States and Germany. In the United States, our primary manufacturing facilities are located in California, Indiana, Kentucky and Utah. Outside of the United States, we have significant manufacturing facilities in Germany, Austria, the United Kingdom, Mexico, Hungary, France and Switzerland. Our businesses operate using local currencies. Therefore, we are subject to currency fluctuations that are partially mitigated by the fact that we purchase raw materials and supplies locally when possible. We are especially affected by changes in Euro exchange rates since a significant percentage of our sales are made in Euro denominated countries.

We experience seasonal fluctuations in sales and earnings. Historically, our first quarter ending September 30 is generally the weakest due to automotive model changeovers and the summer holidays in Europe. Our sales and earnings may also vary due to customer acceptance of our products, product offerings by our competitors and general economic conditions, including fluctuations in foreign currency exchange rates.

In fiscal 2006, we achieved record sales and earnings for the fifth consecutive year. Each of our three reportable business segments produced improved results compared to the prior year. These results were achieved despite unfavorable foreign currency translation due to the strengthening of the U.S. dollar versus the Euro. Our balance sheet at June 30, 2006 was strengthened by repurchasing a substantial amount of our outstanding senior notes that were due in February and July 2007. We also repurchased a substantial number of shares of our common stock in fiscal 2006. During the fourth quarter, we initiated a restructuring program to increase efficiency in our manufacturing and engineering organizations.

**Critical Accounting Policies**

The methods, estimates and judgments we use in applying our accounting policies, in conformity with generally accepted accounting principles in the United States of America ("GAAP"), have a significant impact on the results we report in our consolidated financial statements. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. The estimates affect the carrying values of assets and liabilities. Actual results may differ from these estimates under different assumptions or conditions. Our accounting policies and recent accounting pronouncements are more fully described in Note 1, *Summary of Significant Accounting Policies*, which is located in Item 8 of Part II, *Consolidated Financial Statements and Supplementary Data*. However, we believe the following policies merit discussion due to their higher degree of judgment, estimation, or complexity.

*Allowance for Doubtful Accounts*

Our products are sold to customers in many different markets and geographic locations. Methodologies for estimating the allowance for doubtful accounts are primarily based on specific identification of account balances deemed to be uncollectible. Historical write-off experience is also employed to validate the adequacy of account balances. We must make judgments and estimates regarding account receivables that may become uncollectible. These estimates affect our allowance for doubtful accounts and results of operations. We base these estimates on many factors including historical collection rates, the financial stability and size of our customers as well as the markets they serve and our analysis of accounts receivable aging. Our judgments and estimates regarding collectibility of account receivables have an impact on our consolidated financial statements.

*Inventory Valuation*

The valuation of inventory requires us to make judgments and estimates regarding excess, obsolete or damaged inventories including raw materials, finished goods and spare parts. Our determination of adequate reserves requires us to analyze the aging of inventories and the demand for spare parts and to work closely with our sales and marketing staff to determine future demand for our products. We make these evaluations on a regular basis and adjustments are made to the carrying value of inventories as needed. These estimates and the methodologies that we use have an impact on our consolidated financial statements.

*Goodwill*

We perform a goodwill impairment test on an annual basis. At June 30, 2006, our goodwill balance of $381.2 million was not impaired. We made this determination based upon a valuation of our reporting units, as defined by Statement of Financial Accounting Standards ("SFAS") No. 142, *Goodwill and Other Intangible Assets*. The valuation took into consideration various factors such as our historical performance, future discounted cash flows, performance of our competitors and overall market conditions. We cannot, however, predict the occurrence of events that might adversely affect the reported value of goodwill. These events may include, but are not limited to, strategic decisions made in response to economic and competitive conditions, the impact of the economic environment on our customer base, or a material negative change in our relationships with significant customers. See Note 4, *Goodwill*, of our consolidated financial statements for additional information regarding our goodwill balance and annual impairment test.

*Pre-Production and Development Costs*

We incur pre-production and development costs primarily related to infotainment systems that we develop for automobile manufacturers pursuant to long-term supply agreements. Portions of these costs are reimbursable under the separate agreements and are recorded as unbilled costs on our balance sheet in *other current assets* and *other assets*. We believe that the terms of our supply contracts and our established relationships with these automobile manufacturers reasonably assure that we will collect the reimbursable portions of these contracts. Accounting for development costs under the percentage-of-completion method requires us to make estimates of costs to complete projects. We review these estimates on a quarterly basis. Unforeseen cost overruns or difficulties experienced during development could cause losses on these contracts. Such losses are recorded once a determination is made that a loss will occur. These estimates and the methodologies that we use have an impact on our consolidated financial statements.

*Warranty Liabilities*

We warrant our products to be free from defects in materials and workmanship for a time period ranging from one year to five years from the date of purchase, depending on the business segment and product. These warranties require us to make estimates regarding the amount and costs of warranty repairs we expect to make over a period of time. Several factors influence this estimate including historical analysis of warranty repair by product category, the technological complexity of certain products, replacement costs and other factors. The estimates we use have an impact on our consolidated financial statements.

19

*Income Taxes*

Deferred income tax assets or liabilities are computed based on the temporary differences between the financial statement and income tax basis of assets and liabilities using the statutory marginal income tax rate in effect for the years in which the differences are expected to reverse. Deferred income tax expenses or credits are based on the changes in the deferred income tax assets or liabilities from period to period. We record a valuation allowance to reduce our deferred tax assets to the amount that we believe is more likely than not to be realized. In determining the need for, and amount of, a valuation allowance, we consider our ability to forecast earnings, future taxable income, carryback losses, if any, and tax planning strategies. We believe the estimate of our income tax assets, liabilities and expenses are "critical accounting estimates" because if the actual income tax assets, liabilities and expenses differ from our estimates the outcome could have a material impact on our results of operations.

*Stock-Based Compensation*

On July 1, 2005, we adopted SFAS No. 123R, *Accounting for Stock-Based Compensation*, using the modified prospective method. Accordingly, prior period amounts presented herein have not been restated to reflect the adoption of SFAS No. 123R. Prior to fiscal 2006, we used a fair value based method of accounting for share-based compensation provided to our employees in accordance with SFAS No. 123. The adoption of this revised standard did not have a material impact on our results of operations as we have recorded stock compensation expense on a fair value basis for all awards granted on or after July 1, 2002. As of June 30, 2006, there was $2.2 million of total unrecognized compensation cost related to nonvested restricted stock compensation arrangements granted under the plans. This cost is expected to be recognized over a weighted-average period of 2.6 years. The revised standard did require certain changes in our calculations and disclosures. See Note 11, *Stock Option and Incentive Plan*, to our consolidated financial statements included in this report for additional information regarding our stock-based compensation.

**Results of Operations**

*Sales*

Fiscal 2006 net sales were a record $3.248 billion, an increase of 7 percent compared to the prior year. The unfavorable effects of foreign currency translation reduced fiscal 2006 net sales by approximately $85 million during the year. Exclusive of foreign currency, net sales were 10 percent higher than last year. The growth in net sales was primarily due to higher sales of infotainment systems to automotive customers, strong sales of multimedia products in the consumer market, and increased sales in the professional market strengthened by our HiQnet protocol providing a digital network linking separate audio products.

We currently expect fiscal 2007 net sales to increase approximately 7 percent supported by sales growth in all three of our business segments. Automotive net sales will increase due to higher shipments of audio and infotainment systems to an expanding automotive platform base. We will begin to ship new systems during fiscal 2007, and accelerating in fiscal years 2008 and 2009, to Chrysler, Hyundai, Peugeot/Citroën and BMW. We also expect higher automotive aftermarket sales of personal navigation devices in Europe. We believe Consumer net sales will increase primarily due to the introduction of new products for home, mobile and multimedia applications. These products include accessories for digital music players such as the iPod, personal navigation devices, and system-centric media solutions for home applications. Professional net sales are expected to grow primarily due to new product introductions incorporating the HiQnet networking protocol.

Net sales in fiscal 2005 increased 12 percent above the prior year. The effects of foreign currency translation contributed approximately $126 million to the increase compared to the prior year. The increase in fiscal 2005 net sales, compared to fiscal 2004, was primarily due to higher sales of audio, electronic and infotainment systems to automotive customers. Strong sales of multimedia products also contributed to our net sales growth.

We present below a summary of our net sales by reportable business segment:

| ($000s omitted) | Fiscal 2006 | | Fiscal 2005 | | Fiscal 2004 | |
|---|---|---|---|---|---|---|
| Automotive | $ 2,236,379 | 69% | 2,125,566 | 70% | 1,873,047 | 69% |
| Consumer | 494,230 | 15% | 418,347 | 14% | 356,611 | 13% |
| Professional | 517,288 | 16% | 486,976 | 16% | 481,716 | 18% |
| *Total* | $ 3,247,897 | 100% | 3,030,889 | 100% | 2,711,374 | 100% |

*Automotive* – Automotive net sales grew 5 percent in fiscal 2006 compared to the prior year. The unfavorable effects of foreign currency translation reduced fiscal 2006 net sales by $70 million during the year. Exclusive of foreign currency, net sales were 9 percent higher than last year. The net sales growth was primarily due to the success of our infotainment system for the new Mercedes-Benz S-Class. Also in Europe, net sales to Audi were higher due to sales to support the new Q7 platform and increased shipments for the A6 compared to last year. Sales to Porsche and Range Rover were also higher than the prior year and sales to BMW were slightly lower than the prior year. Strong sales of our new aftermarket navigation product, *Traffic Assist,* also contributed to the sales growth. In North America, we had higher sales to Toyota, Lexus and Hyundai/Kia, offset by lower sales to Chrysler. We expect sales to Chrysler to increase in future periods as we begin shipping infotainment systems to support new platforms during fiscal 2007 and accelerating in fiscal 2008.

In fiscal 2005, Automotive net sales increased $253 million over the prior year, an increase of 13 percent. The effects of foreign currency translation contributed approximately $106 million to fiscal 2005 net sales. The strong sales growth during fiscal 2005 was primarily due to higher sales of infotainment systems to Audi for their new A6 platform. Net sales to Mercedes-Benz and Porsche were also higher than the prior year. Net sales to BMW in fiscal 2005 were lower due to the prior year launch of a revised 5-Series platform, which included our infotainment system. Our fiscal 2004 shipments for the BMW 5- Series exceeded our expectations due to the inability of a competitor to meet their obligations for the program. In North America, we had higher fiscal 2005 sales of Mark Levinson digital audio systems to Lexus and increased sales of JBL branded audio systems to Toyota, compared to fiscal 2004. Fiscal 2005 net sales to Chrysler, Hyundai and Mitsubishi were below the previous year.

*Consumer* – Consumer net sales were 18 percent higher in fiscal 2006 compared to the prior year. The unfavorable effects of foreign currency translation reduced fiscal 2006 net sales by $9 million during the year. The sales growth was primarily due to continued strong demand in the United States and Europe for our multimedia products, especially the JBL On Stage and On Tour, which are accessories for the Apple iPod. Sales of consumer products for home applications including Harman/Kardon electronics and JBL and Infinity loudspeakers were also higher compared to the prior year, partially offset by slightly lower sales of high-end audio systems. New product introductions for mobile applications also resulted in higher sales compared to the prior year.

Fiscal 2005 sales were $62 million higher than the prior year, an increase of 17 percent. Foreign currency translation contributed approximately $12 million to fiscal 2005 net sales. The significant sales increase

was primarily due to strong sales of our multimedia products. Sales of these products were strong in both the United States and Europe. Specialty Group net sales, which include our high-end electronics and loudspeakers for home audio systems, also increased over the prior year.

*Professional* – Professional net sales increased 6 percent in fiscal 2006 compared to the prior year. The unfavorable effects of foreign currency translation reduced fiscal 2006 net sales by $6 million during the year. Higher sales of JBL Professional, Crown and Harman Music Group products were partially offset by lower sales of AKG and Mixer Group products. Our professional business units benefited from an increased number of products that are enabled with the HiQnet networking protocol. AKG and Mixer Group net sales were lower due to our decision to concentrate on a smaller number of higher-margin core products.

In fiscal 2005, Professional net sales were slightly higher than the previous year. Foreign currency translation contributed approximately $9 million to the increase in fiscal 2005 net sales. Professional sales were adversely affected by our decision in fiscal 2004 to exit AKG's cellular telephone microphone capsule business. Exclusive of AKG, our professional business units reported a $45 million increase in net sales over fiscal 2004, or 12 percent.

### Gross Profit

Gross profit margin increased 1.5 percentage points in fiscal 2006 to 35.5 percent. The increase was due to gross margin improvements across all of our reportable business segments. Each of our three business segments was able to leverage fixed factory costs against higher sales. Our restructuring program, initiated during the fourth quarter, did not affect our gross profit margins since the efficiencies will primarily be achieved through workforce reductions. The costs associated with the workforce reductions are reported in our selling, general and administrative expenses. The restructuring program is discussed in more detail under the caption, *Selling, General and Administrative Expenses*. We presently expect that gross margins will remain relatively consistent through the 2007 fiscal year.

Fiscal 2005 gross margin increased 1.2 percentage points compared to fiscal 2004. The improvement was primarily due to substantial Consumer and Professional gross margin improvements, partially offset by lower Automotive gross profit margins.

A summary of our gross profit by reportable business segment is presented below:

| ($000s omitted) | Fiscal 2006 | Percent of net sales | Fiscal 2005 | Percent of net sales | Fiscal 2004 | Percent of net sales |
|---|---|---|---|---|---|---|
| Automotive | $ 803,906 | 35.9% | 738,172 | 34.7% | 666,119 | 35.6% |
| Consumer | 161,458 | 32.7% | 125,557 | 30.0% | 79,559 | 22.3% |
| Professional | 193,129 | 37.3% | 172,973 | 35.5% | 147,938 | 30.7% |
| Other/Unallocated | (5,923) | --- | (5,000) | --- | (5,024) | --- |
| *Total* | $ 1,152,570 | 35.5% | 1,031,702 | 34.0% | 888,592 | 32.8% |

*Automotive* – Automotive gross profit margin increased 1.2 percentage points in fiscal 2006 compared to the prior year. The increase is primarily due to leveraging fixed factory costs against the 5 percent increase in net sales in fiscal 2006. We also incurred lower warranty costs in fiscal 2006, which benefited our gross profit margins. The improvement in gross profit margin occurred despite continuing capital investments to facilitate significant new audio and infotainment systems for automotive platforms that will launch during fiscal 2007 and accelerate in fiscal years 2008 and 2009.

Gross profit margin decreased 0.9 percentage points in fiscal 2005 compared to the prior year. The decrease from fiscal 2004 to fiscal 2005 primarily related to favorable material pricing in fiscal 2004 and our costs in fiscal 2005 to meet the needs of new infotainment system programs for automotive customers. These investments included construction of a factory in Missouri that began manufacturing systems for Chrysler in late fiscal 2006.

*Consumer* – Fiscal 2006 Consumer gross profit margin improved 2.7 percentage points from a year ago. The improvement is primarily due to increased sales of high-margin multimedia products, including the JBL On Stage and On Tour, and the leveraging of fixed factory costs against an 18 percent increase in Consumer sales compared to the prior year. Warranty costs were lower in fiscal 2006 due primarily to costs incurred last year to extend warranty periods on certain products and to replace a faulty chip in one of our products.

The gross profit margin increased 7.7 percentage points in fiscal 2005 compared to fiscal 2004. The increase was primarily due to strong sales of higher margin multimedia products. Gross profit margin was negatively affected in fiscal 2004 due to restructuring costs at our Specialty Group. During fiscal 2004 we also closed a factory in Europe and moved production to our other manufacturing facilities.

*Professional* – Professional gross profit margin increased 1.8 percentage points in fiscal 2006. The improvement was primarily due to lower factory overhead costs and improved factory efficiencies, leveraged against higher sales. AKG and our mixing console businesses have made significant progress over the past year to increase manufacturing efficiencies and concentrate on selling higher margin core products. In prior years, these business units have incurred substantial costs to improve factory operations and eliminate lower margin products.

Fiscal 2005 gross profit margin increased 4.8 percentage points compared to the prior year. The improvement was partially due to our decision in fiscal 2004 to exit the lower margin cellular telephone capsule business. We also incurred significant costs in fiscal 2004 to initiate the consolidation of our European mixing console operations and to restructure our AKG business. Gross profit margins improved at JBL Professional, Crown and Harman Music Group due to higher sales of more profitable products and improved efficiencies at our factories manufacturing professional products.

### Selling, General and Administrative Expenses

Fiscal 2006 selling, general and administrative ("SG&A") expenses were 23.3 percent of net sales, an increase of 0.8 percentage points compared to last year. Excluding restructuring charges, SG&A expenses were 23.0 percent of net sales. The increase is primarily due to higher research and development costs ("R&D") to support significant new automotive infotainment system programs that will begin production during fiscal 2007. These programs include new systems for Chrysler, Hyundai, Peugeot/Citroën and BMW. R&D costs were $302.0 million in fiscal 2006, or 9.3 percent of net sales. In fiscal 2005, R&D costs were $222.6 million, or 7.3 percent of sales. SG&A expenses also include employee compensation and benefit costs. We have recorded stock-based compensation expense under the fair value based method since fiscal 2003. Stock option expense in fiscal 2006 was $16.6 million compared to $14.3 million in fiscal 2005. Stock option expense in fiscal 2004 was $10.9 million. In fiscal 2007, we believe SG&A expenses, as a percentage of sales, will approximate fiscal 2006.

Our fiscal 2006 SG&A expenses include $9.5 million of costs related to our restructuring program initiated during the fourth quarter. We presently expect to record an additional $6.5 million, for total restructuring costs of $16.0 million, in future periods to complete our previously announced restructuring

program. This program is designed to increase efficiencies in our manufacturing facilities and to realign our engineering organization. Over the past several years, our company has grown considerably due primarily to market acceptance of our infotainment systems developed for automotive customers. This growth required us to add manufacturing capacity and to internally develop and acquire additional engineering resources. In order for us to prepare for the next generation of infotainment systems for automakers and other products, we decided to realign these resources to meet the changing needs and demands of our customers. Since our restructuring program was initiated during the fourth quarter of fiscal 2006, the amount of cash paid under the restructuring program in fiscal 2006 was minimal.

In fiscal 2005, SG&A expenses were 22.5 percent of net sales, which was 0.9 percentage points lower than the prior year. The decrease primarily related to lower R&D costs, as a percentage of sales. R&D costs were $222.6 million in fiscal 2005, or 7.3 percent of net sales. In fiscal 2004, R&D costs were $216.9 million, or 8.0 percent of sales. The decrease is due to lower costs incurred for infotainment systems for automotive customers, partially offset by higher costs to develop consumer retail products and the acquisition of QNX Software Systems, a developer of automotive operating systems. SG&A expenses, as a percentage of sales, also decreased due to better control of general management, selling and marketing costs during the year.

Below is a summary of our SG&A expenses by reportable business segment:

| ($000s omitted) | Fiscal 2006 | Percent of net sales | Fiscal 2005 | Percent of net sales | Fiscal 2004 | Percent of net sales |
|---|---|---|---|---|---|---|
| Automotive | $ 466,160 | 20.8% | 390,095 | 18.4% | 357,196 | 19.1% |
| Consumer | 111,596 | 22.6% | 98,842 | 23.6% | 92,588 | 26.0% |
| Professional | 133,851 | 25.9% | 127,475 | 26.2% | 138,046 | 28.7% |
| Other/Unallocated | 43,722 | --- | 64,309 | --- | 46,297 | --- |
| *Total* | $ 755,329 | 23.3% | 680,721 | 22.5% | 634,127 | 23.4% |

*Automotive* – R&D is the largest cost component of SG&A in the Automotive segment. These costs are incurred to develop audio, electronic and infotainment systems for a growing number of automotive customer platforms. Our infotainment systems have added considerable functionality over the past several years and many are increasingly based on scaleable software. This enables us to service a full range of vehicles in a cost efficient manner, from luxury to entry-level. In Europe, we develop systems for Mercedes-Benz, BMW, Audi, Peugeot/Citroën, Porsche and others. We develop systems for Toyota, Lexus, Hyundai, Chrysler, Harley-Davidson and others in the United States and Asia. R&D costs increased in fiscal 2006 primarily due to higher spending on significant new infotainment system programs that will begin production during fiscal 2007 and accelerate in fiscal years 2008 and 2009. Our Automotive R&D costs for the fiscal years ended 2006, 2005 and 2004 were $232.2 million, $161.3 million and $167.5 million, respectively.

*Consumer* – The significant SG&A cost components for Consumer are R&D and selling expenses. R&D costs for the fiscal years 2006, 2005 and 2004 were $36.3 million, $29.9 million and $18.9 million, respectively. These year-to-year increases were primarily due to development of new multimedia products such as JBL On Time, On Stage and On Tour, which are accessories for Apple's iPod. We are also developing personal navigation devices ("PND") that will leverage many of our successful applications developed in the Automotive segment. Selling expenses include salaries and benefits for the sales personnel, marketing costs, trade show and product literature costs. Selling expenses were $32.1 million, $30.7 million and $27.9 million in the fiscal years 2006, 2005 and 2004, respectively.

*Professional* – SG&A expense for Professional is primarily comprised of selling expenses and R&D costs. Selling expenses are incurred to support a broad range of branded products. Professional products are marketed to audio professionals for use in public places such as concert halls and stadiums. These products are also used for recording, broadcasting and music reproduction systems. Selling expenses were $49.3 million, $47.0 million and $47.7 million in the fiscal years 2006, 2005 and 2004, respectively. We incur significant R&D costs to support new products. We have developed the HiQnet networking protocol to enhance the functionality of our professional systems. This protocol allows an audio professional to control a complete sound system from microphones through amplifiers to speakers on one digital network. Professional R&D costs in the fiscal years 2006, 2005 and 2004 were $33.2 million, $31.3 million and $30.3 million, respectively.

*Other* – Other SG&A expenses primarily include compensation, benefit and occupancy costs for corporate employees. These expenses decreased in fiscal 2006 due primarily to certain unusual costs recorded in fiscal 2005, including a $6 million expense on a swap contract related to the termination of an operating lease and a $6 million expense for an unasserted claim.

### Operating Income

Our fiscal 2006 operating income was $397.2 million, or 12.2 percent of net sales. This represents an improvement of 0.6 percentage points above the prior year. Excluding restructuring charges of $9.5 million, operating income was $406.7 million, or 12.5 percent of net sales. The improvement in operating income was achieved as a result of strong performance in our Consumer and Professional business segments, partially offset by lower Automotive operating margins. We expect fiscal 2007 operating income to increase by over 10 percent compared to fiscal 2006.

Operating income in fiscal 2005 was $351.0 million, or 11.6 percent of sales, representing a 2.2 percentage point increase over fiscal 2004. The improvement in operating income was achieved by our development of new infotainment systems for automotive customers, the turnaround in the Consumer business and the elimination of lower margin Professional products.

We present below a summary of our operating income by reportable business segment:

| ($000s omitted) | Fiscal 2006 | Percent of net sales | Fiscal 2005 | Percent Of net sales | Fiscal 2004 | Percent of net sales |
|---|---|---|---|---|---|---|
| Automotive | $ 337,746 | 15.1% | 348,077 | 16.4% | 308,923 | 16.5% |
| Consumer | 49,862 | 10.1% | 26,715 | 6.4% | (13,029) | (3.7%) |
| Professional | 59,278 | 11.5% | 45,498 | 9.3% | 9,892 | 2.1% |
| Other | (49,645) | --- | (69,309) | --- | (51,321) | --- |
| *Total* | $ 397,241 | 12.2% | 350,981 | 11.6% | 254,465 | 9.4% |

*Automotive* – Automotive fiscal 2006 operating income was $337.7 million, or 15.1 percent of sales. This represents a 1.3 percentage point decrease compared to last year. Our Automotive results include $7.3 million of restructuring charges to increase efficiency at four manufacturing facilities and realign our engineering organization. Automotive has also incurred substantial R&D costs due to required development for new business awards from automotive customers. We are currently developing these systems and the sales will not be generated until these programs begin production during fiscal year 2007 and continuing into fiscal 2008. We expect Automotive operating margins to approach 16 percent during fiscal years 2007 and 2008.

*Consumer* – Consumer achieved operating income of $49.9 million in fiscal 2006, or 10.1 percent of sales. This represents a 3.7 percentage point increase compared to last year. The growth is primarily due to strong sales of our multimedia products during the year that have higher margins than other consumer products.

*Professional* – Professional had operating income of $59.3 million in fiscal 2006, or 11.5 percent of sales. This represents a 2.2 percentage point increase compared to last year. The increase is primarily due to higher sales of branded products with the capability of integrating with our HiQnet protocol and discontinuance of lower margin mixing console and AKG products.

### Interest Expense, Net

Interest expense, net, was $13.0 million compared to $10.5 million last year. Our net interest expense increased primarily due to higher weighted average interest rates. Our fiscal 2006 interest expense, net, included $12.2 million of interest income primarily related to interest on our cash and cash equivalents and short-term investment balances. In fiscal 2005 and 2004, interest income was $7.6 million and $3.5 million, respectively.

We had average borrowings of $342.0 million in fiscal 2006 compared to $340.3 million and $453.0 million in fiscal years 2005 and 2004, respectively. We used interest rate swaps during each of these years to effectively convert fixed-rate debt to variable-rate debt. The weighted average borrowings exclude the average fair value of the interest rate swaps of $2.5 million, $11.8 million and $22.8 million in fiscal years 2006, 2005 and 2004.

Our weighted average interest rate in fiscal 2006 was 7.4 percent. In fiscal 2005 and 2004, the weighted average interest rates were 5.3 percent and 4.6 percent, respectively. Our fiscal 2006 weighted average interest rates have increased because interest rates increased over the prior year and a majority of our outstanding debt was based on floating rates after giving effect to interest rate swap contracts.

We expect fiscal 2007 interest expense, net, to be substantially lower than fiscal 2006 due to our fourth quarter repurchase of $281.9 million of our outstanding senior notes. Our total debt at June 30, 2006 was $197.6 million compared to $333.9 million a year ago.

### Miscellaneous Expenses

We recorded miscellaneous expenses, net, of $8.0 million compared to $5.1 million and $9.7 million in fiscal years 2005 and 2004, respectively. The fiscal 2006 expense includes $4.9 million for repurchase premiums associated with the fiscal 2006 repurchase of over 90 percent of our senior notes due in February and July 2007, respectively, and a charge associated with the termination of interest rate swap contracts. The fiscal 2005 expense includes $3.0 million for repurchase premiums, net of gain, on the termination of interest rate swap contracts in connection with the repurchase of $49.9 million of our outstanding public debt. Also included in fiscal 2005 were charitable contributions of $1.0 million for Tsunami relief. Bank charges were $2.5 million, $2.7 million and $2.3 million in fiscal years 2006, 2005 and 2004, respectively.

*Income Taxes*

In fiscal 2006, our effective tax rate was 32.4 percent. Our effective tax rate for fiscal 2005 and 2004 was 30.6 percent. During the year ended June 30, 2006, we repatriated $500 million of cash from our foreign subsidiaries under the American Jobs Creation Act of 2004. This decision resulted in $3.4 million of tax charges during fiscal 2006. We also made cash tax payments of $135.7 million, primarily in Germany. We currently expect the fiscal 2007 effective tax rate to be approximately 34 percent.

**Financial Condition**

*Liquidity and Capital Resources*

We primarily finance our working capital requirements through cash generated by operations, trade credit and borrowings under our revolving credit facility. Cash and cash equivalents were $291.8 million at June 30, 2006 compared to $291.2 million at June 30, 2005. During fiscal 2006, cash was primarily used to repurchase shares of our common stock and a significant portion of our outstanding senior notes, make investments in our manufacturing facilities, make tax payments primarily in Germany, and meet the working capital needs of our business segments.

During the fourth quarter of fiscal 2006, we borrowed under our revolving credit facility in Germany to meet seasonal working capital needs. This was necessary due to our repatriation of $500 million from subsidiaries in Germany to the U.S. under the American Jobs Creation Act of 2004. At June 30, 2006, the balance of our revolving credit facility was $159.9 million. We expect to reduce this bank debt with cash generated from our German businesses in fiscal 2007.

During fiscal 2005, cash was primarily used to purchase QNX Software Systems, repurchase shares of our common stock, repurchase outstanding senior notes, purchase fixed assets held by the lessor under operating leases and make tax payments in Germany.

We will continue to have cash requirements to support seasonal working capital needs, capital expenditures, interest and principal payments, and dividend payments. We intend to use cash on hand, cash generated by operations and borrowings under our revolving credit facility to meet these requirements. We also intend to continue repurchasing shares of our common stock, evaluating buy levels quarter to quarter, and reducing our debt. We believe that cash from operations and our borrowing capacity will be adequate to meet our cash requirements over the next twelve months.

Below is a more detailed discussion of our cash flow activities during fiscal 2006.

*Operating Activities*

Our cash flows from operations were $399.9 million in fiscal 2006, compared to $419.7 million in the prior year. The decrease was primarily due to tax benefits attributable to stock option exercises and other changes to our deferred tax assets, partially offset by record net income for the year.

Working capital, excluding cash and short-term debt, was $106.7 million at June 30, 2006. This was a significant decrease from $166.1 million at June 30, 2005. The June 30, 2006 and 2005 amounts represent 3.3 percent and 5.5 percent of net sales, respectively. The decrease is primarily due to improved accounts receivable and accounts payable management offset by slightly higher inventory balances to support the development of new infotainment systems for automotive customers.

*Investing Activities*

We had capital expenditures, net of acquisitions, of $130.5 million in fiscal 2006 compared to $172.3 million in fiscal 2005 and $135.5 million in fiscal 2004. Fiscal 2006 capital expenditures included the completion of a new manufacturing facility in Missouri and substantial investments in Europe for customer tooling and other manufacturing equipment to support our infotainment system programs for automotive customers. Capital expenditures were also made for new product tooling for consumer and professional products. Fiscal 2005 capital expenditures included $28.4 million paid for fixed assets purchased from operating leases. We also made investments in buildings, machinery and tooling, especially in Europe, to support new infotainment systems for automotive customers. We anticipate fiscal 2007 capital expenditures of approximately $150 million, primarily to make significant investments in tooling and manufacturing equipment to support anticipated growth in our Automotive infotainment systems business. Firm commitments of $20.2 million existed at June 30, 2006 for fiscal 2007 capital expenditures.

We paid $13.8 million, net of cash acquired, in fiscal 2006 to purchase businesses to provide additional engineering resources and invest in a joint venture in Korea. In fiscal 2005, we acquired QNX Software Systems. The purchase price, net of cash acquired, was $139.2 million. QNX is a provider of real-time operating system software, development tools, and services for embedded design systems. Since the acquisition, QNX has been involved in developing our infotainment systems for automotive customers by optimizing our software to fully integrate the operating system, basic framework and the applications.

*Financing Activities*

In fiscal 2006, we paid $192.6 million to repurchase 2.2 million shares of our common stock. Since the inception of our share repurchase program in June 1998, we have acquired and placed in treasury 16.7 million shares at a cost of $510.8 million through June 30, 2006. Our Board of Directors has authorized the repurchase of up to a total of 20 million shares. We presently intend to continue our share repurchase program in fiscal 2007, evaluating the buy levels on a quarter-to-quarter basis.

Our total debt was $197.6 million at June 30, 2006, primarily comprised of $159.9 million of borrowings under our revolving credit facility. Also included in total debt was $13.2 million principal amount of 7.125 percent senior notes due February 15, 2007 and $16.5 million principal amount of 7.32 percent senior notes due July 1, 2007. We also had capital leases and other long-term borrowings of $6.2 million. Short-term borrowings included in debt are $1.8 million.

At June 30, 2005, our total debt was $333.9 million primarily comprised of $171.2 million principal amount of 7.125 percent senior notes due February 15, 2007 and $140.0 million principal amount of 7.32 percent senior notes due July 1, 2007. We also had capital leases, the carrying value of interest rate hedges and other long-term borrowings of $20.1 million. We had short-term borrowings of $2.6 million.

During the past two fiscal years, we used cash from operations to repurchase a substantial amount of our outstanding senior notes. In fiscal 2006, we purchased and retired $158.4 million of our 7.125 percent senior notes, reducing the outstanding principal amount from $171.2 million to $13.2 million. The senior notes were repurchased at an average premium of 0.895 percent, resulting in a non-operating charge of $1.6 million. We also terminated $170.0 million in interest rate swaps that hedged the 7.125 percent senior notes, resulting in a non-operating charge of $0.3 million. We also purchased and retired $123.5 million of our 7.32 percent senior notes, reducing the outstanding principal amount from $140.0 million to

$16.5 million. The senior notes were repurchased at an average premium of 1.628 percent, resulting in a non-operating charge of $2.3 million. We also terminated $140.0 million in interest rate swaps that hedged the 7.32 percent senior notes, resulting in a non-operating charge of $0.8 million. In June 2006, we announced the redemption of the remaining $13.2 million principal amount of our 7.125 percent senior notes. The redemption was completed in July 2006. At June 30, 2006, we had authorization to repurchase all of our remaining outstanding senior notes.

During fiscal 2005, we purchased and retired $49.9 million of our 7.125 percent senior notes, reducing the outstanding principal amount from $220.6 to $171.2 million. The senior notes were repurchased at an average premium of 9.18 percent, resulting in a non-operating charge of $4.6 million. We also terminated $30.0 million in interest rate swaps that hedged the 7.125 percent senior notes, resulting in a non-operating gain of $1.6 million.

On June 28, 2005, we entered into a $300 million multi-currency revolving credit facility with a group of banks. This facility expires in June 2010 and replaced the $150 million revolving credit facility that expired on August 14, 2005. On June 22, 2006, we amended and restated our multi-currency revolving credit facility. The restated credit agreement, among other things, added Harman Holding GmbH & Co. KG ("Harman Holding"), a German limited partnership and a wholly owned subsidiary of the Company, as an additional borrower. The maximum principal amount of borrowings permitted under the restated credit agreement remains at $300 million. The restated credit agreement also permits the maximum aggregate revolving commitment amount to be increased to $550 million under certain circumstances. At June 30, 2006, we had $159.9 million borrowings under the $300 million revolving credit facility and outstanding letters of credit of $6.7 million. Unused availability under the revolving credit facility was $133.4 million at June 30, 2006.

Our long-term debt agreements contain financial and other covenants that, among other things, limit our ability to incur additional indebtedness, restrict subsidiary dividends and distributions, limit our ability to encumber certain assets and restrict our ability to issue capital stock of our subsidiaries. Our long-term debt agreements permit us to pay dividends or repurchase our capital stock without any dollar limitation provided that we would be in compliance with the financial covenants in our revolving credit facility after giving effect to such dividend or repurchase. We were in compliance with the terms of our long-term debt agreements at June 30, 2006, 2005 and 2004.

*Equity*

Our shareholders' equity was $1.228 billion at June 30, 2006, an increase of $167.2 million compared to the prior year. The increase was primarily due to net income of $255.3 million offset by stock repurchases of $192.6 million.

At June 30, 2005, we had total shareholders' equity of $1.061 billion, an increase of $186.0 million compared to the prior year. The increase was primarily due to net income of $232.8 million and the tax benefit attributable to stock options of $74.1 million, partially offset by $146.4 million used to repurchase shares of our common stock during fiscal 2005.

*Contractual Obligations*

We have obligations and commitments to make future payments under debt agreements and operating leases. The following table details our financing obligations by due date:

| ($000s) | 2007 | 2008 | 2009 | 2010 | 2011 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Short-term borrowings (a) | $  1,751 | --- | --- | --- | --- | --- | 1,751 |
| Senior notes (b) | 13,168 | 16,486 | --- | --- | --- | --- | 29,654 |
| Capital leases (c) | 427 | 434 | 450 | 468 | 386 | 390 | 2,555 |
| Other long-term obligations (b) | 2,742 | 86 | 90 | 159,995 | 100 | 581 | 163,594 |
| Firm commitments for capital expenditures | 20,216 | --- | --- | --- | --- | --- | 20,216 |
| Purchase obligations (d) | 123,847 | 57 | 12 | --- | 859 | --- | 124,775 |
| Non-cancelable operating leases (c) | 39,966 | 38,677 | 31,320 | 24,955 | 17,755 | 14,253 | 166,926 |
| *Total contractual cash obligations* | $202,117 | 55,740 | 31,872 | 185,418 | 19,100 | 15,224 | 509,471 |

The header above the years reads: *Fiscal Years Ending June 30,*

(a) As described in Note 5 to our Consolidated Financial statements.
(b) As described in Note 6 to our Consolidated Financial statements.
(c) As described in Note 7 to our Consolidated Financial statements.
(d) Includes amounts committed under legally enforceable agreements for purchase of goods and services with defined terms as to quantity, price and timing of delivery.

*Business Outlook*

We achieved record results in fiscal 2006 and look forward to the opportunities that lie ahead. During the past fiscal year, we introduced an infotainment system for the redesigned Mercedes-Benz S-Class luxury vehicle. The launch of the new S-Class was an overwhelming success. We have incurred substantial R&D costs to develop the next generation of infotainment systems for an expanding array of automotive platforms and to develop new consumer and professional products. Automotive has received significant contract awards, including a recent award for the refresh on the Mercedes-Benz 2009 S-Class, and will begin producing new audio and infotainment systems for Chrysler, Hyundai, Peugeot/Citroën and BMW beginning in fiscal 2007. These programs will then accelerate production in fiscal years 2008 and 2009. Consumer will continue to develop new products that emphasize mobility such as personal navigation devices and will introduce new multimedia products that are accessories for portable music players such as the Apple iPod.® We believe music-enabled cell phones will provide us a substantial market to offer these accessories in future periods. We expect Professional to develop more products that are HiQnet enabled thus expanding the capabilities of this digital network protocol.

**Item 7A.  Quantitative and Qualitative Disclosures About Market Risk**

We are required to include information about potential effects of changes in interest rates and currency exchange rates in our periodic reports filed with the Securities and Exchange Commission.

*Interest Rate Sensitivity/Risk*

At June 30, 2006, interest on approximately 15 percent of our borrowings was determined on a fixed rate basis. The interest rates on the balance of our debt are subject to changes in U.S. and European short-term interest rates. To assess exposure to interest rate changes, we have performed a sensitivity analysis assuming a hypothetical 100 basis point increase or decrease in interest rates across all outstanding debt and investments. Our analysis indicates that the effect on fiscal 2006 net income of such an increase and decrease in interest rates would be approximately $0.9 million. Based on June 30, 2005 positions, the impact of such changes in interest rates was approximately $0.2 million to fiscal 2005 net income.

The following table provides information as of June 30, 2006 about our financial instruments that are sensitive to changes in interest rates and debt obligations. The table presents principal cash flows and related average interest rates by contractual maturity dates. Weighted average variable rates are generally based on LIBOR as of the reset dates. Unless otherwise indicated, the information is presented in U.S. dollar equivalents as of June 30, 2006.

**Principal Payments and Interest Rates by Contractual Maturity Dates**

| ($millions) | \multicolumn{5}{c}{Fiscal Years Ending June 30,} | Thereafter | Total | Fair value (assets)/ liabilities |
| | 2007 | 2008 | 2009 | 2010 | 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| Debt obligation (US$) | $17.7 | 16.5 | 0.1 | 160.0 | 0.1 | 0.6 | 195.0 | 195.3 |
| Average interest rate | 6.61% | 7.31% | 5.00% | 3.48% | 5.00% | 5.00% | --- | --- |

*Foreign Currency Risk*

We maintain significant operations in Germany, the United Kingdom, France, Austria, Hungary, Mexico, Switzerland and Sweden. As a result, we are subject to market risks arising from changes in foreign currency exchange rates, principally the change in the value of the Euro compared to the U.S. dollar. Our subsidiaries purchase products and raw materials in various currencies. As a result, we may be exposed to cost changes relative to local currencies in the markets to which we sell our products. To mitigate these transactional risks, we enter into forward foreign exchange contracts. Also, foreign currency positions are partially offsetting and are netted against one another to reduce exposure.

We presently estimate the effect on projected 2007 income before income taxes, based upon a recent estimate of foreign exchange transactional exposure, of a uniform strengthening or uniform weakening of the transaction currency rates of 10 percent would be to increase or decrease income before income taxes by approximately $21 million. As of June 30, 2006, we had hedged a portion of our estimated foreign currency transactions using forward exchange contracts.

We presently estimate the effect on projected 2007 income before income taxes, based upon a recent estimate of foreign exchange translation exposure (translating the operating performance of our foreign subsidiaries into U.S. dollars), of a uniform strengthening or weakening of the U.S. dollar by 10 percent would be to increase or decrease income before income taxes by approximately $34 million.

Competitive conditions in the markets in which we operate may limit our ability to increase prices in the event of adverse changes in currency exchange rates. For example, certain products made in the U.S. are sold outside of the U.S. Sales of these products are affected by the value of the U.S. dollar relative to other currencies. Any long-term strengthening of the U.S. dollar could depress the demand for these U.S. manufactured products and reduce sales. However, due to the multiple currencies involved in our business and the netting effect of various simultaneous transactions, our foreign currency positions are partially offsetting.

Actual gains and losses in the future may differ materially from the hypothetical gains and losses discussed above based on changes in the timing and amount of interest rate and foreign currency exchange rate movements and our actual exposure and hedging transactions.

**Item 8.  Consolidated Financial Statements and Supplementary Data**

<u>Management's Report on Internal Control over Financial Reporting</u>

The management of Harman International is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system was designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and the fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

We assessed the effectiveness of our internal control over financial reporting as of June 30, 2006. In making this assessment, we used the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in "Internal Control-Integrated Framework." Our assessment included an evaluation of such elements as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, overall control environment and information systems control environment. Based on our assessment, we have concluded that, as of June 30, 2006, our internal control over financial reporting was effective.

Our assessment of the effectiveness of our internal control over financial reporting, as of June 30, 2006, has been audited by KPMG LLP, an independent registered public accounting firm. KPMG's report on our internal controls over financial reporting is included herein.

<u>/s/  Bernard A. Girod</u>
Bernard A. Girod
Vice Chairman and Chief Executive Officer

<u>/s/ Kevin L. Brown</u>
Kevin L. Brown
Executive Vice President and Chief Financial Officer

<u>Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting</u>

The Board of Directors and Shareholders
Harman International Industries, Incorporated:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control over Financial Reporting appearing under Item 8, that Harman International Industries, Incorporated maintained effective internal control over financial reporting as of June 30, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The management of Harman International Industries, Incorporated is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Harman International Industries, Incorporated maintained effective internal control over financial reporting as of June 30, 2006, is fairly stated, in all material respects, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also, in our opinion, Harman International Industries, Incorporated maintained, in all material respects, effective internal control over financial reporting as of June 30, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Harman International Industries, Incorporated and subsidiaries as of June 30, 2006 and 2005, and the related consolidated statements of operations, cash flows and shareholders' equity and comprehensive income for each of the years in the three-year period ended June 30, 2006 and our report dated September 6, 2006 expressed an unqualified opinion on those consolidated financial statements.

**/s/ KPMG LLP**

Los Angeles, California
September 6, 2006

33

<u>Report of Independent Registered Public Accounting Firm</u>

The Board of Directors and Shareholders
Harman International Industries, Incorporated:

We have audited the accompanying consolidated balance sheets of Harman International Industries, Incorporated and subsidiaries as of June 30, 2006 and 2005, and the related consolidated statements of operations, cash flows and shareholders' equity and comprehensive income for each of the years in the three-year period ended June 30, 2006. In connection with our audits of the consolidated financial statements, we also have audited the related financial statement schedule for each of the years in the three-year period ended June 30, 2006. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Harman International Industries, Incorporated and subsidiaries as of June 30, 2006 and 2005, and the results of their operations and their cash flows for each of the years in the three-year period ended June 30, 2006, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Harman International Industries, Incorporated's internal control over financial reporting as of June 30, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated September 6, 2006 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

**/s/ KPMG LLP**

Los Angeles, California
September 6, 2006

**Consolidated Balance Sheets**
Harman International Industries, Incorporated and Subsidiaries
($000s omitted except share amounts)

| | | June 30, | |
| --- | --- | --- | --- |
| | | 2006 | 2005 |
| **Assets** | | | |
| Current assets | | | |
| Cash and cash equivalents | $ | 291,758 | 291,214 |
| Receivables (less allowance for doubtful accounts of $8,738 in 2006 and $8,975 in 2005) | | 444,474 | 433,041 |
| Inventories (note 2) | | 344,957 | 312,950 |
| Other current assets | | 168,168 | 146,088 |
| Total current assets | | 1,249,357 | 1,183,293 |
| Property, plant and equipment, net (notes 3, 6 and 7) | | 521,935 | 491,619 |
| Goodwill (note 4) | | 381,219 | 345,071 |
| Other assets | | 202,150 | 167,220 |
| Total assets | $ | 2,354,661 | 2,187,203 |
| **Liabilities and Shareholders' Equity** | | | |
| Current liabilities | | | |
| Short-term borrowings (notes 5) | $ | 1,751 | 2,593 |
| Current portion of long-term debt (note 6) | | 16,337 | 533 |
| Accounts payable | | 320,327 | 274,145 |
| Accrued liabilities | | 414,093 | 345,941 |
| Income taxes payable (note 10) | | 116,493 | 105,858 |
| Total current liabilities | | 869,001 | 729,070 |
| Borrowings under revolving credit facility (note 6) | | 159,900 | --- |
| Senior notes (note 6) | | 19,566 | 330,791 |
| Minority interest (note 17) | | 2,716 | --- |
| Other non-current liabilities | | 75,314 | 66,394 |
| Shareholders' equity (note 11) | | | |
| Preferred stock, $.01 par value. Authorized 5,000,000 shares; none issued and outstanding | | --- | --- |
| Common stock, $.01 par value. Authorized 200,000,000 shares; issued 82,754,909 shares in 2006 and 81,122,026 in 2005 | | 827 | 811 |
| Additional paid-in capital | | 544,871 | 455,158 |
| Accumulated other comprehensive income (loss): | | | |
| Unrealized gain (loss) on hedging derivatives | | (3,267) | 5,548 |
| Minimum pension liability adjustment | | (11,789) | (14,147) |
| Cumulative foreign currency translation adjustment | | 64,280 | 39,702 |
| Retained earnings | | 1,144,070 | 892,096 |
| Less common stock held in treasury (16,690,182 shares in 2006 and 14,459,482 shares in 2005) | | (510,828) | (318,220) |
| Total shareholders' equity | | 1,228,164 | 1,060,948 |
| Commitments and contingencies (notes 7, 8 and 14) | | | |
| Total liabilities and shareholders' equity | $ | 2,354,661 | 2,187,203 |

See accompanying notes to consolidated financial statements.

**Consolidated Statements of Operations**
Harman International Industries, Incorporated and Subsidiaries
($000s omitted except per share amounts)

|  | | Years Ended June 30, | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
| Net sales | $ 3,247,897 | 3,030,889 | 2,711,374 |
| Cost of sales | 2,095,327 | 1,999,187 | 1,822,782 |
| Gross profit | 1,152,570 | 1,031,702 | 888,592 |
| Selling, general and administrative expenses | 755,329 | 680,721 | 634,127 |
| Operating income | 397,241 | 350,981 | 254,465 |
| Other expenses: | | | |
|   Interest expense, net | 13,027 | 10,516 | 17,207 |
|   Miscellaneous, net | 8,027 | 5,128 | 9,738 |
| Income before income taxes and minority interest | 376,187 | 335,337 | 227,520 |
| Income tax expense, net | 121,877 | 102,489 | 69,637 |
| Minority interest | (985) | --- | --- |
| Net income | $ 255,295 | 232,848 | 157,883 |
| Basic earnings per share | $ 3.85 | 3.47 | 2.40 |
| Diluted earnings per share | $ 3.75 | 3.31 | 2.27 |
| Weighted average shares outstanding – basic | 66,260 | 67,120 | 65,779 |
| Weighted average shares outstanding – diluted | 68,105 | 70,399 | 69,487 |

See accompanying notes to consolidated financial statements.

**Consolidated Statements of Cash Flows**
Harman International Industries, Incorporated and Subsidiaries
($000s omitted)

| | Years Ended June 30, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| Cash flows from operating activities: | | | |
| Net income | $ 255,295 | 232,848 | 157,883 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 129,949 | 118,665 | 106,032 |
| Deferred income taxes | (8,011) | (83,057) | (17,119) |
| Loss on disposition of assets | 1,480 | 3,381 | 13,358 |
| Stock option expense | 16,586 | 14,318 | 10,942 |
| Excess tax benefit attributable to stock options | (45,493) | 74,107 | 9,819 |
| Changes in working capital, net of acquisition/disposition effects: | | | |
| Decrease (increase) in: | | | |
| Receivables | 4,877 | (3,015) | (44,459) |
| Inventories | (21,433) | (25,291) | 65,679 |
| Other current assets | (23,446) | (7,370) | 5,294 |
| Increase (decrease) in: | | | |
| Accounts payable | 37,274 | 35,396 | 56,761 |
| Accrued liabilities | 41,762 | 62,555 | 33,182 |
| Income taxes payable | 5,303 | (19,075) | 66,429 |
| Other operating activities | 5,731 | 16,282 | 18,650 |
| Net cash provided by operating activities | $ 399,874 | 419,744 | 482,451 |
| Cash flows from investing activities: | | | |
| Payment for purchase of companies, net of cash acquired | $ (13,808) | (145,680) | (34,281) |
| Proceeds from asset dispositions | 1,574 | 2,128 | 9,048 |
| Capital expenditures | (130,548) | (172,326) | (135,493) |
| (Purchase) sale of investments | --- | 91,000 | (52,450) |
| Other items, net | (3,793) | 4,485 | 1,354 |
| Net cash used in investing activities | $ (146,575) | (220,393) | (211,822) |
| Cash flows from financing activities: | | | |
| Decrease in short-term borrowings | $ (828) | (1,699) | (750) |
| Borrowings under revolving credit facility | 158,294 | --- | --- |
| Repayment of long-term debt | (281,945) | (49,921) | (88,480) |
| Other decrease in long-term debt | (13,250) | (1,077) | (15,587) |
| Repurchase of common stock | (192,608) | (146,369) | --- |
| Dividends paid to shareholders | (3,321) | (3,354) | (3,289) |
| Exercise of stock options | 27,650 | 11,278 | 10,358 |
| Excess tax benefits from share-based payment arrangements | 45,493 | --- | --- |
| Other | 462 | --- | --- |
| Net cash used in financing activities | $ (260,053) | (191,142) | (97,748) |
| Effect of exchange rate changes on cash | 7,298 | (3,703) | 4,466 |
| Net increase in cash and cash equivalents | 544 | 4,506 | 177,347 |
| Cash and cash equivalents at beginning of period | $ 291,214 | 286,708 | 109,361 |
| Cash and cash equivalents at end of period | $ 291,758 | 291,214 | 286,708 |
| Supplemental schedule of non-cash investing activities: | | | |
| Fair value of assets acquired | $ 12,102 | 155,939 | 35,678 |
| Cash paid for the assets | 6,503 | 139,213 | 27,545 |
| Liabilities assumed | $ 5,599 | 16,726 | 8,133 |

See accompanying notes to consolidated financial statements.

## Consolidated Statements of Shareholders' Equity and Comprehensive Income
Harman International Industries, Incorporated and Subsidiaries
Years Ended June 30, 2006, 2005 and 2004

| ($000s omitted) | Common Stock Number of shares | $0.01 Par value | Additional paid-in capital | Accumulated other comprehensive income (loss) | Retained earnings | Treasury stock | Total share-holders' equity |
|---|---|---|---|---|---|---|---|
| **Balance, June 30, 2003** | 32,609,633 | $ 390 | 324,757 | (5,519) | 508,008 | (171,851) | 655,785 |
| Comprehensive income: | | | | | | | |
| Net income | — | — | — | — | 157,883 | — | 157,883 |
| Foreign currency translation adjustment | — | — | — | 31,631 | — | — | 31,631 |
| Unrealized gain on hedging derivatives | — | — | — | 2,784 | — | — | 2,784 |
| Minimum pension liability | — | — | — | (917) | — | — | (917) |
| Total comprehensive income | | | | 33,498 | 157,883 | | 191,381 |
| Stock issue: two-for-one split | 32,609,633 | 390 | (390) | — | — | — | — |
| Exercise of stock options, net of shares received | 870,756 | 9 | 10,349 | — | — | — | 10,358 |
| Tax benefit attributable to stock options | — | — | 9,819 | — | — | — | 9,819 |
| Stock option compensation | — | — | 10,942 | — | — | — | 10,942 |
| Dividends ($.05 per share) | — | — | — | — | (3,289) | — | (3,289) |
| **Balance, June 30, 2004** | 66,090,022 | $ 789 | 355,477 | 27,979 | 662,602 | (171,851) | 874,996 |
| Comprehensive income: | | | | | | | |
| Net income | — | — | — | — | 232,848 | — | 232,848 |
| Foreign currency translation adjustment | — | — | — | (3,477) | — | — | (3,477) |
| Unrealized gain on hedging derivatives | — | — | — | 13,369 | — | — | 13,369 |
| Minimum pension liability | — | — | — | (6,768) | — | — | (6,768) |
| Total comprehensive income | — | — | — | 3,124 | 232,848 | | 235,972 |
| Exercise of stock options, net of shares received | 2,250,422 | 22 | 11,256 | — | — | — | 11,278 |
| Tax benefit attributable to stock option plan | — | — | 74,107 | — | — | — | 74,107 |
| Stock option compensation | — | — | 14,318 | — | — | — | 14,318 |
| Treasury shares purchased | (1,677,900) | — | — | — | — | (146,369) | (146,369) |
| Dividends ($.05 per share) | — | — | — | — | (3,354) | — | (3,354) |
| **Balance, June 30, 2005** | 66,662,544 | $ 811 | 455,158 | 31,103 | 892,096 | (318,220) | 1,060,948 |
| Comprehensive income: | | | | | | | |
| Net income | — | — | — | — | 255,295 | — | 255,295 |
| Foreign currency translation adjustment | — | — | — | 24,578 | — | — | 24,578 |
| Unrealized gain on hedging derivatives | — | — | — | (8,815) | — | — | (8,815) |
| Minimum pension liability | — | — | — | 2,358 | — | — | 2,358 |
| Total comprehensive income | — | — | — | 18,121 | 255,295 | | 273,416 |
| Exercise of stock options, net of shares received | 1,632,883 | 16 | 27,634 | — | — | — | 27,650 |
| Tax benefit attributable to stock option plan | — | — | 45,493 | — | — | — | 45,493 |
| Stock option compensation | — | — | 16,586 | — | — | — | 16,586 |
| Treasury shares purchased | (2,230,700) | — | — | — | — | (192,608) | (192,608) |
| Dividends ($.05 per share) | — | — | — | — | (3,321) | — | (3,321) |
| **Balance, June 30, 2006** | 66,064,727 | $ 827 | 544,871 | 49,224 | 1,144,070 | (510,828) | 1,228,164 |

See accompanying notes to consolidated financial statements.

## Notes to Consolidated Financial Statements
Harman International Industries, Incorporated and Subsidiaries

*Note 1 - Summary of Significant Accounting Policies*

**Principles of Consolidation.** The consolidated financial statements include the accounts of Harman International and our subsidiaries after the elimination of significant intercompany transactions and accounts.

**Reclassifications.** Where necessary, prior years' information has been reclassified to conform to the fiscal 2006 financial statement presentation.

**Use of Estimates.** The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results may differ from those estimates, and the differences may be material to the consolidated financial statements.

Among the most significant estimates used in the preparation of our financial statements are estimates associated with the valuation of inventory, depreciable lives of fixed assets, accounting for business combinations, the evaluation of the recoverability of goodwill, evaluation of the recoverability of pre-production and development contract costs, warranty liability, litigation and taxation. In addition, estimates form the basis for our reserves for sales discounts, sales allowances, accounts receivable, inventory, and postretirement and other employee benefits. Various assumptions go into the determination of these estimates. The process of determining significant estimates requires consideration of factors such as historical experience, current and expected economic conditions, and actuarial methods. We re-evaluate these significant factors and makes changes and adjustments where facts and circumstances indicate that changes are necessary.

**Revenue Recognition.** Revenue is generally recognized at the time of product shipment or delivery, depending on when the passage of title to goods transfers to unaffiliated customers, when all of the following have occurred: a firm sales agreement is in place, pricing is fixed or determinable and collection is reasonably assured. Sales are reported net of estimated returns, discounts, rebates and incentives. Substantially all of our revenue transactions involve the delivery of a physical product.

**Sales Discounts.** We offer product discounts and sales incentives including prompt payment discounts, volume incentive programs, rebates and dealer order incentives. We report revenues net of discounts and other sales incentives in accordance with Emerging Issues Task Force ("EITF") Issue No. 01-09, *Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)*.

**Cost of Sales.** Cost of sales includes material, labor and overhead for products manufactured by us and cost of goods produced for us on a contract basis. Expenses incurred for manufacturing depreciation and engineering, warehousing, shipping and handling, sales commissions, warranty and customer service are also included in cost of sales.

**Allowance for Doubtful Accounts.** We reserve an estimated amount for accounts receivable that may not be collected. Methodologies for estimating allowance for doubtful accounts are primarily based on specific identification of uncollectible accounts. Historical collection rates and customer credit worthiness are considered in determining specific reserves. At June 30, 2006 and 2005, we had $8.7 million and

39

$9.0 million, respectively, reserved for possible uncollectible accounts receivable. As with many estimates, management must make judgments about potential actions by third parties in establishing and evaluating our allowance for doubtful accounts.

**Warranty Liabilities.** We warrant our products to be free from defects in materials and workmanship for a period ranging from one to five years from the date of purchase, depending on the product. The warranty is a limited warranty, and it may impose certain shipping costs on the customer and excludes deficiencies in appearance except for those evident when the product is delivered. Our dealers and warranty service providers normally perform warranty service for loudspeakers and electronics in the field, using parts supplied on an exchange basis by our company. Estimated warranty liabilities are based upon past experience with similar types of products, the technological complexity of certain products, replacement cost and other factors. See Note 9, *Warranty Liabilities,* for additional information regarding our warranties.

**Selling, General and Administrative Expenses.** Selling, general and administrative expenses include non-manufacturing salaries and benefits, stock option expense, occupancy costs, professional fees, research and development costs, amortization of intangibles, advertising and marketing costs and other operating expenses.

**Advertising Costs.** We expense advertising costs as incurred. When production costs are incurred for future advertising, these costs are recorded as an asset and subsequently expensed when the advertisement is first put into service.

**Amortization of Intangibles.** Amortization of intangibles primarily includes amortization of intangible assets such as patents, trademarks and distribution agreements and amortization of costs, other than interest costs. Intangibles are amortized over 10 months to 17 years. In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets,* goodwill was not amortized after July 1, 2002.

**Research and Development.** Research and development costs are expensed as incurred. Our expenditures for research and development were $302.0 million, $222.6 million and $216.9 million for the fiscal years ending June 30, 2006, 2005 and 2004, respectively.

**Interest Expense, Net.** Interest expense, net, includes interest expense and amortization of original issue discount on debt securities, net of interest income.

**Cash and Cash Equivalents.** Cash and cash equivalents includes cash on hand and short-term investments with original maturities of less than three months.

**Inventories.** Inventories are stated at the lower of cost or market. Cost is determined principally by the first-in, first-out method. The valuation of inventory requires us to make judgments and estimates regarding obsolete, damaged or excess inventory as well as current and future demand for our products. The estimates of future demand along with analysis of usage data that we use in the valuation of inventory are the basis for our inventory reserves and have an effect on our results of operations. See Note 2, *Inventories*, for additional information.

**Property, Plant and Equipment.** Property, plant and equipment is stated at cost or, in the case of capitalized leases, at the present value of the future minimum lease payments. Depreciation and amortization of property, plant and equipment is computed primarily using the straight-line method over useful lives estimated from 3 to 30 years or over the term of the lease, whichever is shorter. Buildings and improvements are depreciated over 3 to 30 years, machinery and equipment are depreciated over 5 to 10

years and furniture and fixtures are depreciated over 3 years. See Note 3, *Property, Plant and Equipment*, for additional information.

**Goodwill.** Effective July 1, 2002, we adopted SFAS No.142, *Goodwill and Other Intangible Assets*. Under SFAS No.142, goodwill and other intangible assets deemed to have indefinite lives are no longer amortized, but are subject to an annual impairment test. The goodwill balance at June 30, 2006 was $381.2 million. During our annual impairment test in fiscal 2006, we determined that goodwill was not impaired based on a valuation of our reporting units at the April 30, 2006 test date. The valuation took into consideration various factors such as our historical performance, future discounted cash flows, performance of our competitors and overall market conditions.

We cannot predict the occurrence of certain events that might adversely affect the reported value of goodwill. Such events may include, but are not limited to, strategic decisions made in response to economic and competitive conditions, the impact of the economic environment on our customer base, or a material adverse change in our relationship with one or more significant customers. See Note 4, *Goodwill*, for additional information.

**Pre-Production and Development Costs.** We incur pre-production and development costs primarily related to infotainment systems that we develop for automobile manufacturers pursuant to long-term supply agreements. We record certain costs incurred pursuant to these agreements as unbilled costs in accordance with EITF Issue No. 99-5, *Accounting for Pre-Production Costs Related to Long-Term Supply Agreements*, or the percentage-of-completion method of AICPA Statement of Position ("SOP") 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts.* Unbilled costs at June 30, 2006 were $34.4 million, including $4.2 million of pre-production costs and $30.2 million of costs under development contracts. Unbilled costs reimbursable in the next twelve months total $11.5 million and are recorded in *Other current assets*. Unbilled costs reimbursable in subsequent years total $22.9 million and are recorded in *Other assets*. At June 30, 2006, we had fixed assets of $17.8 million for molds, dies and other tools which our customers will eventually purchase and own pursuant to long-term supply contracts.

At June 30, 2005, total unbilled costs were $35.8 million, including $5.2 million of pre-production costs and $30.6 million of costs under development contracts. At June 30, 2005, unbilled costs reimbursable in the next twelve months totaled $11.9 million and were recorded in *Other current assets*. Unbilled costs reimbursable in subsequent years totaled $23.9 million and were recorded in O*ther assets*.

**Purchased and Deferred Software Costs.** Software costs that are related to conceptual formulation and incurred prior to the establishment of technological feasibility are expensed as incurred. Costs incurred to purchase software to be sold as an integral component of a product are deferred until the product is sold. Software development costs incurred subsequent to establishment of technological feasibility and which are considered recoverable by management are deferred in compliance with SFAS No. 86, *Accounting for the Costs of Computer Software to Be Sold, Leased, or Otherwise Marketed*, and amortized over the product's life, usually three years. At June 30, 2006, deferred costs were $0.4 million, net of accumulated amortization of $35.2 million. At June 30, 2005, deferred costs were $1.4 million, net of accumulated amortization of $34.2 million. Deferred costs, net, are included in *Other assets* on the balance sheet. Historically, deferred costs were comprised of costs to acquire or develop automotive infotainment system software.

**Income Taxes.** Deferred income tax assets or liabilities are computed based on the temporary differences between the financial statement and income tax basis of assets and liabilities using the statutory marginal

income tax rate in effect for the years in which the differences are expected to reverse. The deferred income tax asset or liability is determined by applying currently enacted tax laws and rates to the expected reversal of the cumulative temporary differences between the carrying value of assets and liabilities for financial statement and income tax purposes. Deferred income tax expense is measured by the change in the net deferred income tax asset or liability during the year. We have not made provision for U.S. Federal or foreign withholding taxes on foreign subsidiary undistributed earnings as of June 30, 2006, because such earnings are intended to be permanently invested, with the exception of $500 million in earnings that were repatriated in fiscal 2006 under the American Jobs Creation Act of 2004. It is not practicable to determine the U.S. Federal income tax liability, if any, which would be payable if such earnings were not reinvested indefinitely. Additional information regarding income taxes appears in Note 10, *Income Taxes*.

**Pension and Other Postretirement benefits.** We provide postretirement benefits to certain employees. Employees in the United States are covered by a defined contribution plan. Our contributions to this plan are based on a percentage of employee contributions and, with approval of the Board of Directors, profit sharing contributions may be made as a percentage of employee compensation. These plans are funded on a current basis.

Certain employees outside the United States are covered by non-contributory defined benefit plans. The defined benefit plans are funded in conformity with the funding requirements of applicable government regulations. Generally, benefits are based on age, years of service, and the level of compensation during the final years of service.

We also have an unfunded Supplemental Executive Retirement Plan (SERP) that provides retirement, death and termination benefits, as defined, to certain key executives designated by the Board of Directors. Pension and Other Postretirement benefits are discussed further in Note 12, *Pension and Other Postretirement Benefits*.

**Foreign Currency Translation.** The financial statements of subsidiaries located outside of the United States generally are measured using the local currency as the functional currency. Assets, including goodwill, and liabilities of these subsidiaries are translated at the rates of exchange at the balance sheet date. The resulting translation adjustments are included in accumulated other comprehensive income (loss). Income and expense items are translated at average monthly exchange rates. Gains and losses from foreign currency transactions of these subsidiaries are included in net income.

**Derivative Financial Instruments.** We are exposed to market risks arising from changes in interest rates, commodity prices and foreign currency exchange rates. We use derivatives in our management of interest rate and foreign currency exposure. We do not utilize derivatives that contain leverage features. On the date that we enter into a derivative that qualifies for hedge accounting the derivative is designated as a hedge of the identified exposure. We document all relationships between hedging instruments and hedged items and assess the effectiveness of our hedges at inception and on an ongoing basis.

For each derivative instrument that is designated and qualifies as a fair value hedge, the gain or loss on the derivative instrument as well as the offsetting loss or gain on the hedged item attributable to the hedged risk are recognized in current earnings during the period of the change in fair values. For each derivative instrument that is designated and qualifies as a cash flow hedge, the effective portion of the gain or loss on the derivative instrument is reported as a component of other comprehensive income and reclassified into earnings in the period during which the hedged transaction affects earnings. For derivatives that are designated and qualify as hedges of net investments in subsidiaries located outside the United States, the gain or loss is reported in other comprehensive income as a part of the cumulative translation adjustment

if the derivative is effective. For derivative instruments not designated as hedging instruments, the gain or loss is recognized in current earnings during the period of change. For additional information regarding derivatives, see Note 15, *Derivatives*.

**Interest Rate Management.** During the current fiscal year, we had in place interest rate swaps, which were designated as fair value hedges of the underlying fixed rate obligations. The fair value of the interest rate swaps were recorded in other assets or other long-term liabilities with a corresponding increase or decrease in the fixed rate obligations. The changes in the fair value of the interest rate swaps and the underlying fixed rate obligations were recorded as equal and offsetting unrealized gains and losses in interest expense. As of June 30, 2006 all interest rates swaps were terminated in connection with the repurchase of the majority of our senior debt. For additional information, see Note 6, *Long-Term Debt and Current Portion of Long-Term Debt*.

**Foreign Currency Management.** The fair value of foreign currency related derivatives is included in the Consolidated Balance Sheet in other current assets and accrued liabilities. The earnings impact of cash flow hedges relating to forecasted purchases of inventory is generally reported in cost of sales to match the underlying transaction being hedged. Unrealized gains and losses on these instruments are deferred in other comprehensive income until the underlying transaction is recognized in earnings. The earnings impact of cash flow hedges relating to the variability in cash flows associated with foreign currency denominated assets and liabilities is reported in cost of sales or other expense depending on the nature of the assets or liabilities being hedged. The amounts deferred in other comprehensive income associated with these instruments generally relate to foreign currency spot-rate to forward-rate differentials that are recognized in earnings when the hedged transaction takes place.

**Stock-Based Compensation.** Effective July 1, 2005, we adopted SFAS No. 123R, *Accounting for Stock-Based Compensation*, using the modified prospective method. Under SFAS No. 123R, our compensation expense is recognized based on the estimated fair value of stock options and similar equity instruments awarded to employees. Prior to fiscal 2006, we accounted for stock-based compensation according to the fair-value method of stock-based compensation per SFAS No. 123, *Accounting for Stock-Based Compensation,* for all grants made on or after July 1, 2002. As such, an expense based on service attribution recognized in accordance with Financial Accounting Standards Interpretation ("FIN") No. 28, *Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans,* and the fair value of stock options granted in fiscal 2005, 2004 and 2003 have been reflected in net income. Stock-based compensation is discussed further in Note 11, *Stock Option and Incentive Plan*.

**Recent Accounting Pronouncements.**

In June 2006, the Financial Accounting Standards Board ("FASB") issued FIN 48, *Accounting for Uncertainty in Income Taxes*. FIN 48 is an interpretation of SFAS No. 109, *Accounting for Income Taxes,* and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. We are currently evaluating the future impact, if any, of the adoption of FIN 48 on our financial statements.

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections*. SFAS No. 154 replaces Accounting Principles Board ("APB") Opinion No. 20, *Accounting Changes*, and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements*. SFAS No. 154 requires retrospective application to prior period financial statements of changes in accounting principle, unless it is

impracticable to determine either the period-specific effects or the cumulative effect of the change. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. We do not expect SFAS No. 154 to have a material impact on our consolidated financial statements upon adoption in fiscal 2007.

In April 2005, the FASB issued EITF Issue No. 06-3, *How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement*. EITF No. 06-3 discusses how to present various types of taxes in the income statement (Gross versus Net Presentation). EITF No. 06-3 is effective for reporting periods beginning after December 15, 2006. We are currently evaluating the reporting impact of the adoption of EITF No. 06-3 and do not expect it to have a material impact on our financial statements upon adoption in fiscal 2007.

In December 2004, the FASB issued FASB Staff Position ("FSP") No. FAS 109-2, *Accounting and Disclosure Guidance for Foreign Earnings Repatriation Provision within the American Jobs Creation Act of 2004*. The American Jobs Creation Act of 2004 (the Act) introduces a special one-time dividends received deduction on the repatriation of certain foreign earnings to a U.S. taxpayer, provided certain criteria are met. FSP FAS No. 109-2 allows an entity to evaluate the effect of the Act on its plans to reinvest or repatriate foreign earnings for purposes of applying SFAS No. 109, *Accounting for Income Taxes*, and provides accounting and disclosure guidance for the repatriation provision. During the fiscal year ended June 30, 2006, management approved a plan to repatriate $500 million of cash from our foreign subsidiaries resulting in a $3.4 million tax charge. The $500 million of cash was repatriated during fiscal 2006. See Note 10, *Income Taxes*.

### Note 2 - Inventories

Inventories consist of the following:

| ($000s omitted) | | June 30, | |
|---|---|---|---|
| | | 2006 | 2005 |
| Finished goods | $ | 147,663 | 132,426 |
| Work in process | | 45,954 | 48,083 |
| Raw materials and supplies | | 151,340 | 132,441 |
| *Total* | $ | 344,957 | 312,950 |

Inventories are stated at the lower of cost or market. Cost is determined principally by the first-in, first-out method. The valuation of inventory requires us to make judgments and estimates regarding obsolete, damaged or excess inventory as well as current and future demand for our products. The estimates of future demand along with analysis of usage data that we use in the valuation of inventory are the basis for our inventory reserves and have an effect on our results of operations. We calculate inventory reserves using a combination of a lower of cost or market analysis, an analysis of historical usage data, forecast demand data and historical disposal rates. Lower of cost or market analysis is typically applied to those items of inventory that represent a substantial portion of the total value of inventory on-hand. The high-value units typically represent a small percentage of the total inventory items, so identification of obsolescence or valuation reserve requirements for the balance of the inventory on-hand is accomplished using either historical or forecast usage to identify slow-moving or obsolete items.

*Note 3 - Property, Plant and Equipment*

Property, plant and equipment are composed of the following:

| ($000s omitted) | | June 30, | |
|---|---|---|---|
| | | 2006 | 2005 |
| Land | $ | 11,737 | 12,085 |
| Buildings and improvements | | 244,960 | 213,442 |
| Machinery and equipment | | 764,969 | 651,454 |
| Furniture and fixtures | | 53,187 | 97,567 |
| | | 1,074,853 | 974,548 |
| Less accumulated depreciation and amortization | | (552,918) | (482,929) |
| *Property, plant and equipment, net* | $ | 521,935 | 491,619 |

*Note 4 - Goodwill*

Goodwill was $381.2 million at June 30, 2006 compared with $345.1 million at June 30, 2005. The increase is due primarily to the acquisition of PhatNoise and our investment in a joint venture in Korea in fiscal 2006. Contingent consideration associated with the acquisition of Innovation Systems in a prior fiscal year also contributed to the increase in goodwill. Our SFAS 142 annual impairment test concluded that goodwill was not impaired as of the test date, April 30, 2006. There was no amortization of goodwill in fiscal years 2006, 2005 and 2004 in accordance with SFAS No.142.

In fiscal 2005, goodwill increased $93.4 million, which was mainly due to the acquisition of QNX Software Systems Ltd. This acquisition added $110.1 million to the goodwill balance. The increase in goodwill during 2005 was slightly offset by $15.3 million due to realized acquired deferred tax assets. These pre-acquisition deferred tax assets had not been previously recognized due to uncertainty regarding our ability to utilize the related tax loss carryforwards.

*Note 5 - Short-Term Borrowings*

At June 30, 2006, we had outstanding short-term borrowings of $1.8 million with a weighted average interest rate of 5.3 percent. The short-term borrowings were under unsecured lines of credit totaling $20.7 million in Japan, China and the UK. We had $2.6 million of outstanding short-term borrowings with a weighted average interest rate of 4.3 percent at June 30, 2005.

*Note 6 - Long-Term Debt and Current Portion of Long Term-Debt*

Long-term debt is comprised of the following:

| ($000s omitted) | | June 30, | |
|---|---|---|---|
| | | 2006 | 2005 |
| Senior notes, unsecured, due February 15, 2007 interest due semiannually at 7.125% | $ | 13,168 | 171,154 |
| Senior notes, unsecured, due July 1, 2007 interest due semiannually at 7.32% | | 16,486 | 140,000 |
| Carrying value of interest rate hedge | | --- | 7,480 |
| Revolving credit facility | | 159,900 | --- |
| Obligations under capital leases (note 7) | | 2,555 | 2,950 |
| Other unsubordinated variable rate loans due through 2016, bearing interest at an average effective rate of 5.00% at June 30, | | 3,694 | 9,740 |
| Total | | 195,803 | 331,324 |
| Less current installments | | (16,337) | (533) |
| *Long-term debt* | $ | 179,466 | 330,791 |

Our long-term debt of $179.5 million at June 30, 2006, consisted of $159.9 million in borrowings under the revolving credit facility and $16.5 million principal amount of 7.32 percent senior notes due July 1, 2007 and $3.1 million of other obligations. Our current portion of long-term debt of $16.3 million consisted of $13.2 million principal amount of 7.125 percent senior notes due February 15, 2007, and $3.1 million of other obligations.

During the fiscal year ended June 30, 2006, we purchased and retired $158 million of our 7.125 percent senior notes due February 2007 at an average premium of 0.895 percent, reducing the outstanding principal amount from $171.2 million at June 30, 2005 to $13.2 million at June 30, 2006 and resulting in an other non-operating expense of $1.6 million. During the fiscal year ended June 30, 2006, we purchased and retired $123.5 million of our 7.32 percent senior notes due July 2007 at an average premium of 1.628 percent, reducing the outstanding principal amount from $140.0 million to $16.5 million and resulting in an other non-operating expense of $2.3 million.

We are a party to a $300 million multi-currency revolving credit facility with a group of banks. This facility expires in June 2010. The interest rate on the revolving rate facility is based upon LIBOR plus 37 to 90 basis points and we pay a commitment fee of 8 to 22.5 basis points. The interest rate spread and commitment fee are determined based upon our interest coverage ratio and senior unsecured debt rating. At June 30, 2006, we had $159.9 million in borrowings under the revolving credit facility and outstanding letters of credit of $6.7 million. Unused availability under the revolving credit facility was $133.4 million at June 30, 2006.

Our long-term debt agreements contain financial and other covenants that, among other things, limit our ability to incur additional indebtedness, restrict subsidiary dividends and distributions, limit our ability to encumber certain assets and restrict our ability to issue capital stock of our subsidiaries. Our long-term debt agreements permit us to pay dividends or repurchase our capital stock without any dollar limitation provided that we would be in compliance with the financial covenants in our revolving credit facility after giving effect to such dividend or repurchase. At June 30, 2006 and 2005, we were in compliance with the terms of our long-term debt agreements.

Weighted average borrowings were $342.0 million, $340.3 million and $453.0 million for fiscal years ended June 30, 2006, 2005 and 2004, respectively. The weighted average interest rate was 7.4 percent, 5.3 percent and 4.6 percent in fiscal years 2006, 2005 and 2004, respectively. Our average interest rate has increased over the last two years. This is due to an increase in the U.S. Dollar denominated short-term LIBOR base rates over this period. The majority of our interest expense is linked to the U.S. Dollar short-term LIBOR rates.

Interest expense is reported net of interest income in our consolidated statement of operations. Gross interest expense was $25.2 million, $18.1 million and $20.7 million for the fiscal years ended June 30, 2006, 2005 and 2004 respectively. Interest income was $12.2 million, $7.6 million and $3.5 million for the fiscal years ended June 30, 2006, 2005 and 2004.

Cash paid for interest was $18.8 million, $10.2 million, and $18.7 million during the fiscal years ended June 30, 2006, 2005 and 2004, respectively.

Long-term debt, including obligations under capital leases, maturing in each of the next five fiscal years is as follows ($000s omitted):

| | | |
|---|---|---:|
| 2007 | $ | 16,337 |
| 2008 | | 17,006 |
| 2009 | | 540 |
| 2010 | | 160,463 |
| 2011 | | 486 |
| Thereafter | | 971 |

*Note 7 - Leases*

The following analysis represents property under capital leases:

| | | June 30, | |
|---|---|---|---|
| ($000s omitted) | | 2006 | 2005 |
| Capital lease assets | $ | 6,680 | 13,009 |
| Less accumulated amortization | | (4,151) | (5,687) |
| *Net* | $ | 2,529 | 7,322 |

At June 30, 2006, we are obligated for the following minimum lease commitments under terms of noncancelable lease agreements:

| ($000s omitted) | | Capital leases | | Operating leases |
|---|---|---:|---|---:|
| 2007 | $ | 500 | $ | 39,966 |
| 2008 | | 507 | | 38,677 |
| 2009 | | 495 | | 31,320 |
| 2010 | | 497 | | 24,955 |
| 2011 | | 399 | | 17,755 |
| Thereafter | | 390 | | 14,253 |
| Total minimum lease payments | | 2,788 | $ | 166,926 |
| Less interest | | (233) | | |
| *Present value of minimum lease payments* | $ | 2,555 | | |

Operating lease expense was $42.0 million, $50.1 million and $65.4 million for the years ended June 2006, 2005 and 2004, respectively.

*Note 8 - Fair Value of Financial Instruments*

The estimated fair value of our financial instruments was determined using market information. The fair values of cash and cash equivalents, investments, receivables, accounts payable, accrued liabilities and short-term borrowings approximate their carrying values due to the short-term nature of these items.

Fair values of long-term debt are based on market prices where available. When quoted market prices are not available, fair values are estimated using discounted cash flow analysis, based on our current incremental borrowing rates for similar types of borrowing arrangements.

The carrying value and fair value of long-term debt were $195.8 million and $196.1 million, respectively, at June 30, 2006.

*Note 9 - Warranty Liabilities*

Details of the estimated warranty liability are as follows:

| ($000s omitted) | | Years Ended June 30, | |
| | | 2006 | 2005 |
|---|---|---|---|
| Beginning balance | $ | 48,582 | 40,745 |
| Warranty provisions | | 55,925 | 49,919 |
| Warranty payments (cash or in-kind) | | (43,739) | (42,082) |
| *Ending balance* | $ | 60,768 | 48,582 |

The warranty liabilities are included in accrued liabilities.

*Note 10 - Income Taxes*

The tax provisions and analysis of effective income tax rates are comprised of the following items:

| ($000s omitted) | | Years Ended June 30, | | |
| | | 2006 | 2005 | 2004 |
|---|---|---|---|---|
| Provision for Federal income taxes before credits at statutory rate | $ | 131,665 | 117,368 | 79,632 |
| State income taxes | | 211 | 984 | 8 |
| Difference between Federal statutory rate and foreign effective rate | | (2,401) | (8,551) | (2,311) |
| Dividend repatriation | | 3,350 | --- | --- |
| IRS settlement | | (1,081) | --- | --- |
| Permanent differences | | (524) | (4,224) | 707 |
| Tax benefit from export sales | | (2,186) | (2,116) | (4,777) |
| Loss on foreign investment | | --- | --- | (1,910) |
| Change in valuation allowance | | 61 | 544 | 1,423 |
| Change in other tax liabilities | | (2,611) | (2,210) | (1,277) |
| Reduction in deferred asset due to tax rate changes in foreign jurisdiction | | --- | 3,429 | --- |
| Difference between Federal and financial accounting for incentive stock option grants | | 853 | 895 | 752 |
| Federal income tax credits | | (5,168) | (3,600) | (3,000) |
| Other | | (292) | (30) | 390 |
| *Total* | $ | 121,877 | 102,489 | 69,637 |

We recorded a net release of tax contingency reserves of $2.6 million for the fiscal year ended June 30, 2006 related to a favorable U.S. tax settlement.

Income tax expense (benefit) consists of the following:

| ($000s omitted) | | Years Ended June 30, | | |
| | | 2006 | 2005 | 2004 |
|---|---|---|---|---|
| Current: | | | | |
| Federal | $ | (3,692) | 5,226 | 1,216 |
| State | | 325 | 275 | 362 |
| Foreign | | 134,610 | 104,658 | 77,601 |
| | | 131,243 | 110,159 | 79,179 |
| Deferred: | | | | |
| Federal | | (47,105) | (80,183) | (7,912) |
| State | | --- | 709 | (343) |
| Foreign | | (7,754) | (2,302) | (11,106) |
| | | (54,859) | (81,776) | (19,361) |
| Charge in lieu of taxes attributable to tax benefit from employee stock options | | 45,493 | 74,106 | 9,819 |
| *Total* | $ | 121,877 | 102,489 | 69,637 |

48

Deferred taxes are recorded based upon differences between the financial statement and tax basis of assets and liabilities and available tax loss and credit carryforwards.

The following deferred taxes are recorded:

Assets/(liabilities)

| | | June 30, | |
|---|---|---|---|
| ($000s omitted) | | 2006 | 2005 |
| Federal net operating loss carryforwards | $ | 31,087 | 36,356 |
| Federal tax credits | | 26,515 | 10,782 |
| Inventory costing differences | | 8,350 | 7,056 |
| Capitalized research and development | | 45,659 | 34,573 |
| Foreign net operating loss carryforwards | | 13,727 | 15,802 |
| Non-qualified stock options – GAAP deductions | | 10,441 | 7,934 |
| Valuations and other allowances | | 63,550 | 32,351 |
| Total gross deferred tax asset | $ | 199,329 | 144,854 |
| Less valuation allowance | | (3,674) | (3,613) |
| Deferred tax asset | $ | 195,655 | 141,241 |
| | | | |
| Total gross deferred tax liability from fixed asset depreciation | $ | (7,327) | (9,096) |
| Foreign statutory accounting including royalty payments | | (15,148) | (12,469) |
| Total gross deferred tax liability | $ | (22,475) | (21,565) |
| | | | |
| Net deferred tax asset | $ | 173,180 | 119,676 |

We have Federal research credit, alternative minimum tax credit and foreign income tax credit carryforwards valued at $14.1 million, $1.5 million and $11.0 million, for the fiscal years 2006, 2005, and 2004, respectively. The research credit carryforward will begin to expire in 2021. The alternative minimum tax credit does not expire. The foreign tax credit will expire in 2016. We have U.S. Federal net operating loss carryforwards of $88.8 million that will expire in 2026. Additionally, we have an Austrian net operating loss carryforward of $24.4 million that will not expire and other foreign net operating loss carryforwards of $21.2 million that begin to expire in 2009. A valuation allowance has been established for certain of the foreign net operating loss carryforwards. Management believes the results of future operations will generate sufficient taxable income to realize the net deferred tax asset.

The American Jobs Creation Act ("AJCA") provided a deduction of 85 percent on certain non-U.S. earnings that were repatriated prior to our most recent fiscal year end. We repatriated $500 million from our German operations to the United States during fiscal 2006. The total tax expense related to the repatriation was $3.4 million.

Cash paid for Federal, state and foreign income taxes was $135.7 million, $130.3 million and $8.5 million, during fiscal years ended June 30, 2006, 2005 and 2004, respectively.

Accrued income taxes payable were $116.5 million and $105.9 million as of June 30, 2006 and 2005, respectively. The deferred tax asset is recorded in other current assets and other assets on the balance sheet.

During the fiscal year ended June 30, 2006, we generated income before income taxes of $47.5 million from our operations in the United States and $328.7 million from our international operations.

### Note 11 - Stock Option and Incentive Plan

On June 30, 2006, we had one share-based compensation plan with shares available for future grants, the 2002 Option Plan, which is described below. The compensation expense for share-based compensation

was $16.6 million, $14.3 million and $10.9 million for the years ended June 30, 2006, 2005 and 2004, respectively. The total income tax benefit recognized in the income statement for share-based compensation arrangements was $4.8 million, $4.1 million and $3.2 million for the years ended June 30, 2006, 2005 and 2004, respectively.

*Option Plan*

Our 2002 Option Plan, which was approved by our shareholders, permits the grant of stock options, stock appreciation rights and restricted stock for up to 6,000,000 shares of our common stock. These shares may be issued as original issuances, treasury shares or a combination of both. We believe that such awards better align the interests of our employees with those of our shareholders. Option awards are granted with an exercise price equal to the market price of our stock on the date of the grant. The option awards generally vest over five years of continuous service commencing one year from the date of the grant, and expire after ten years. At June 30, 2006, a total of 4,186,392 shares of Common Stock were available for grant under the 2002 Plan.

A grant of restricted stock involves the immediate transfer of ownership of a specified number of shares of Common Stock with a "substantial risk of forfeiture" for a period of at least three years. The participant that receives a restricted stock grant is entitled immediately to voting, dividend and other share ownership rights associated with the restricted stock. At June 30, 2006, a total of 37,000 shares of Restricted Common Stock were granted pursuant to the terms of the 2002 Plan.

Stock appreciation rights allow the holders to receive a predetermined percentage of the spread between the option price and the fair market value of the shares on the date of exercise. A performance unit is the equivalent of $100 and is awarded for the achievement of specified management objectives as a condition to the payment of the award. The performance period will not be less than three years. No stock appreciation right or performance unit grants have been made under the 2002 Plan.

We also have options outstanding under our 1992 Plan. Shares under the 1992 Plan can be issued as original issuances or treasury shares or a combination of both. Options to purchase 1,746,670 shares with expiration dates ranging from September 5, 2006 to November 8, 2012 are outstanding under our 1992 Plan. The 1992 Plan was approved by our shareholders and had no shares available for grant on June 30, 2006.

*Adoption of SFAS No. 123R*

Effective July 1, 2005, we adopted SFAS No. 123R, *Accounting for Stock-Based Compensation*, using the modified prospective method. Under SFAS No. 123R, our compensation expense is recognized based on the estimated fair value of stock options and similar equity instruments awarded to employees. The effect of adopting SFAS No. 123R was not material to our income from continuing operations and net income for the year ended June 30, 2006, and the cumulative effect of adoption using the modified-prospective method was similarly not material. Prior to fiscal 2006, we have been recording compensation expense associated with stock options in accordance with SFAS No. 123 since July 1, 2002. The primary impact of SFAS No. 123R was on our disclosure and certain calculations as we now are required to use estimated forfeitures rather than actual forfeitures as we had prior to the adoption of SFAS No. 123R.

Prior to the adoption of SFAS No. 123R, we presented all tax benefits of deductions resulting from the exercise of stock options as operating cash flows in the consolidated statements of cash flows. SFAS No. 123R requires the cash flows related to tax benefits resulting from tax deductions in excess of the compensation cost recognized for those options (excess tax benefits) to be classified as financing cash

flows. Accordingly, we have classified the $45.5 million excess tax benefit realized in the year ended June 30, 2006 as cash flow from financing activity in the accompanying consolidated statements of cash flows.

FASB issued FSP No. FAS 123R-3, *Transition Election Related to Accounting for Tax Effects of Share-Based Payment Awards*, on November 10, 2005. We elected to adopt the alternative transition method provided in the FASB Staff Position for calculating the tax effects of stock-based compensation pursuant to SFAS 123R. The alternative transition method includes simplified methods to establish the beginning balance of the additional paid-in capital pool ("APIC pool") related to the tax effects of employee stock-based compensation, and to determine the subsequent impact on the APIC pool and consolidated statements of cash flows of the tax effects of employee stock-based compensation awards that are outstanding upon adoption of SFAS 123R.

*Fair Value Determination*

The fair value of each option award is estimated on the date of grant using the Black-Scholes option valuation model, which uses the assumptions noted in the following table.

|  | Years ended June 30, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
| Expected volatility | $35.0\% - 43.0\%$ | 41.0% | 41.0% |
| Weighted-average volatility | 38.7% | 41.0% | 41.0% |
| Expected annual dividend | $0.05 | $0.05 | $0.05 |
| Expected term (in years) | $1.90 - 8.33$ | 6.13 | 6.17 |
| Risk-free rate | $4.05\% - 5.24\%$ | 3.69% | 3.29% |

Groups of option holders (directors, executives and non-executives) that have similar historical behavior are considered separately for valuation purposes. Expected volatilities are based on historical closing prices of our common stock over the expected option term. We use historical data to estimate option exercises and employee terminations within the valuation model. The expected term of options granted is derived using the option valuation model and represents the estimated period of time from the date of grant that the option is expected to remain outstanding. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

*Stock Option Activity*

A summary of option activity under our stock option plans as of June 30, 2006 and changes during the year is presented below:

|  | Shares | Weighted average exercise price | Weighted average remaining contractual term(years) | Aggregate intrinsic value |
|---|---|---|---|---|
| Outstanding at July 1, 2005 | 4,624,000 | $    32.09 |  |  |
| Granted | 673,000 | 83.65 |  |  |
| Exercised | (1,693,000) | 19.80 |  |  |
| Forfeited or expired | (304,000) | 52.14 |  |  |
| Outstanding at June 30, 2006 | 3,300,000 | 47.04 | 6.40 | $132,326 |
| Exercisable at June 30, 2006 | 1,523,000 | $    24.14 | 4.65 | $ 94,096 |

The weighted-average grant-date fair value of options granted during the years ended June 30, 2006, 2005 and 2004 was $31.87, $45.49 and $26.72, respectively. The total intrinsic value of options exercised during the years ended June 30, 2006, 2005 and 2004 was $147.2 million, $231.7 million and $41.8 million, respectively.

A summary of the status of our nonvested restricted stock shares as of June 30, 2006 and changes during the year ended June 30, 2006, is presented as follows:

|  | Shares | Weighted average grant-date fair value |
|---|---|---|
| Nonvested at July 1, 2005 | --- | --- |
| Granted | 37,000 | $85.36 |
| Vested | --- | --- |
| Forfeited | --- | --- |
| Nonvested at June 30, 2006 | 37,000 | $85.36 |

As of June 30, 2006, there was $2.2 million of total unrecognized compensation cost related to nonvested restricted share-based compensation arrangements granted under the plan. The weighted average recognition period is 2.61 years. No restricted shares vested in the years ended June 30, 2006, 2005 and 2004.

*Pro Forma Disclosure*

We adopted SFAS No. 123R in July 2005 and SFAS No. 123 in July 2002. Prior to fiscal 2003, we accounted for expense under the stock option plans according to the provisions of APB No. 25 and related interpretations. During fiscal 2004 and 2005 under SFAS No. 123, options granted in fiscal years prior to fiscal 2003 were accounted for using the intrinsic value method as described in APB No. 25, *Accounting for Stock Issued to Employees.* The following table illustrates the effect on net income and earnings per share if we had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock Based Compensation*, to all of our outstanding and unvested awards in fiscal 2004 and 2005. For fiscal 2006 we expensed all options under SFAS No. 123R.

|  |  | Years Ended June 30, | |
|---|---|---|---|
| ($000s omitted except per share amounts) |  | 2005 | 2004 (a) |
| Reported net income | $ | 232,848 | 157,883 |
| Add: Stock based employee compensation expense included in reported net income, net of tax |  | 10,345 | 7,906 |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards, net of tax |  | 11,449 | 9,802 |
| Net income, pro forma | $ | 231,744 | 155,987 |
| Basic earning per share, as reported | $ | 3.47 | 2.40 |
| Basic earnings per share, pro forma |  | 3.45 | 2.37 |
| Diluted earnings per share, as reported | $ | 3.31 | 2.27 |
| Diluted earnings per share, pro forma |  | 3.29 | 2.24 |

(a) Basic and diluted earnings per share have been adjusted to reflect the two-for-one stock split in November 2003.

*Note 12 - Pension and Other Postretirement Benefits*

We provide a Retirement Savings Plan for certain employees in the United States. Under the plan, employees may contribute up to 50 percent of their pretax compensation subject to certain limitations. Each business unit will make a safe harbor non-elective contribution in an amount equal to three percent of a participant's eligible contribution. Upon approval of the Board of Directors, each business unit may make a matching contribution of up to three percent (50 percent on the first six percent of an employee's tax-deferred contribution) and a profit sharing contribution. Matching and profit sharing contributions vest at a rate of 25 percent for each year of service with the employer, beginning with the second year of service. Expenses related to the Retirement Savings Plan for the years ended June 30, 2006, 2005 and 2004 were $13.3 million, $11.6 million and $10.1 million, respectively.

In addition, we provide defined benefit pension and other postretirement benefits to certain eligible employees. The measurement date used for determining pension and other postretirement benefits is the last day of our fiscal year-end, June 30.

**Pension benefits**. We have certain business units outside the United States that maintain defined benefit pension plans for many of our current and former employees. The coverage provided and the extent to which the retirees' share in the cost of the program vary by business unit. Generally, plan benefits are based on age, years of service, and average compensation during the final years of service.

The accumulated benefit obligation for the defined benefit pension plans was $49.1 million at June 30, 2006 and $43.8 million at June 30, 2005. The accumulated benefit obligation is the actuarial present value of benefits attributed to employee services rendered to date excluding assumptions about future compensation levels.

At June 30, 2006, the defined benefit pension plan assets were invested in equity securities. During fiscal 2007, our business units outside of the United States expect to contribute an immaterial amount to the defined benefit pension plans. The benefits that we expect to pay in each fiscal year from 2007 to 2011 are $1.5 million, $2.4 million, $1.8 million, $1.9 million and $2.0 million, respectively. The aggregate benefits that we expect to pay in the five fiscal years from 2012 to 2016 are $11.3 million.

**Other postretirement benefits**. We have an unfunded Supplemental Executive Retirement Plan ("SERP") that provides retirement, death and termination benefits, as defined, to certain key executives designated by the Board of Directors. The accumulated benefit obligation for the SERP was $50.2 million at June 30, 2006 and $43.9 million at June 30, 2005.

Our expenses related to the SERP for the years ended June 30, 2006, 2005 and 2004 were $6.5 million, $6.3 million and $4.4 million, respectively. The benefits that we expect to pay in each fiscal year from 2007 to 2011 are $2.2 million, $3.8 million, $3.8 million, $3.8 million and $3.8 million, respectively. The aggregate benefits we expect to pay in the five fiscal years from 2012 to 2016 are $22.8 million.

The following is a reconciliation of the benefit obligations, plan assets and funded status of the plans as well as the amounts recognized on the balance sheet:

| June 30,  ($000s omitted) | Pension benefits | | Other postretirement benefits | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| **Change in benefit obligation:** | | | | |
| Benefit obligation at beginning of year | $ 45,402 | 37,952 | 48,244 | 34,767 |
| Service cost | 1,126 | 1,180 | 1,553 | 1,503 |
| Interest cost | 1,889 | 2,047 | 2,465 | 2,356 |
| Amendments | --- | (677) | 2,380 | 1,114 |
| Actuarial (gain) loss | (1,508) | 6,947 | (938) | 9,213 |
| Asset transfer | 3,423 | --- | --- | --- |
| Benefits paid | (1,694) | (1,358) | (1,037) | (709) |
| Foreign currency exchange rate changes | 2,754 | (689) | --- | --- |
| Benefit obligation at end of year | $ 51,392 | 45,402 | 52,667 | 48,244 |
| **Change in plan assets:** | | | | |
| Fair value of assets at beginning of year | $ 2,159 | 1,782 | --- | --- |
| Actual return on plan assets | 302 | 317 | --- | --- |
| Asset transfer | (409) | --- | --- | --- |
| Employer contributions | 22 | 74 | 1,037 | 709 |
| Benefits paid | --- | --- | (1,037) | (709) |
| Foreign currency exchange rate changes | 122 | (14) | --- | --- |
| Fair value of assets at end of year | $ 2,196 | 2,159 | --- | --- |
| **Reconciliation of funded status:** | | | | |
| Funded status | $ (49,196) | (43,243) | (52,667) | (48,244) |
| Unrecognized prior service cost | --- | --- | 7,100 | 5,449 |
| Unrecognized net loss | 3,083 | 4,854 | 19,812 | 22,500 |
| Accrued pension cost | $ (46,113) | (38,389) | (25,755) | (20,295) |
| **Amounts recognized on the balance sheet:** | | | | |
| Other current assets | $ --- | 387 | --- | --- |
| Accrued liabilities | (46,934) | (42,540) | (50,202) | (43,891) |
| Other assets | --- | --- | 7,100 | 5,449 |
| Accumulated other comprehensive income | 821 | 3,764 | 17,347 | 18,147 |
| Accrued pension cost | $ (46,113) | (38,389) | (25,755) | (20,295) |

Presented below are the components of net periodic pension and other postretirement benefit costs for fiscal years ending June 30, 2006, 2005 and 2004:

| ($000s omitted) | Pension benefits | | | Other postretirement benefits | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| **Components of net periodic benefit cost:** | | | | | | |
| Service cost | $ 1,126 | 1,180 | 999 | 1,553 | 1,503 | 1,274 |
| Interest cost | 1,889 | 2,047 | 1,827 | 2,465 | 2,356 | 1,618 |
| Expected return on plan assets | (99) | (330) | (176) | --- | --- | --- |
| Amortization of prior service cost | --- | (676) | 304 | 728 | 693 | 764 |
| Amortization of net loss | 252 | 106 | 2,529 | 1,751 | 1,778 | 708 |
| Net periodic benefit cost | $ 3,168 | 2,327 | 5,483 | 6,497 | 6,330 | 4,364 |

54

The following table presents the assumptions used to determine our benefit obligations and net periodic pension and other postretirement benefit costs:

| June 30, | Pension benefits | | | Other postretirement benefits | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| **Assumptions:** | | | | | | |
| Weighted average used to determine benefit obligations at June 30: | | | | | | |
| Discount rates for pension plans may vary between foreign subsidiaries | 4.6% to 4.75% | 4.2% to 4.75% | 5.0% to 5.5% | 6.25% | 5.1% | 6.2% |
| Rate of compensation increase for pension plans may vary between foreign subsidiaries | 2.0% to 3.0% | 2.0% to 3.0% | 2.0% to 4.5% | 4.0% | 4.0% | 4.0% |
| Weighted average used to determine net periodic benefit cost at June 30: | | | | | | |
| Discount rates for pension plans may vary between foreign subsidiaries | 4.6% to 4.75% | 4.2% to 4.75% | 5.0% to 5.5% | 5.1% | 6.2% | 5.9% |
| Expected long-term return on plan assets | 5.5% | 5.5% | 5.5% | --- | --- | --- |
| Rate of compensation increase for pension plans may vary between foreign subsidiaries | 2.0% to 3.0% | 2.0% to 3.0% | 2.0% to 4.5% | 4.0% | 4.0% | 4.0% |

We rely on historical long-term rates of return by asset class, the current long-term U.S. Treasury bond rate, and the current and expected asset allocation strategy to determine the expected long-term rate of return assumptions. The discount rate used for our pension benefits are primarily based on yields for German federal bonds and Euro denominated bonds provided by Deutsche Bundesbank. The discount rate for other postretirement benefits was derived based on the anticipated cash flow of the plan and the spot yields on corporate bonds published in the Citigroup Pension Liability Index as of June 30, 2006. The rates used represent the single rate which produces the same percent value of cash flow as the bond yield curve in the Index.

*Note 13 – Business Segment Data*

We design, manufacture and market high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets. We organize our businesses into reporting segments by the end-user markets served. Our chief operating decision maker evaluates performance and allocates resources based on net sales, operating income and working capital in each of the reporting segments. We report on the basis of three segments: Automotive, Consumer and Professional.

Our Automotive segment designs, manufactures and markets audio, electronic and infotainment systems for vehicle applications primarily to be installed as original equipment by automotive manufacturers. Our automotive products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Becker, Logic 7 and Mark Levinson. Our premium branded audio, video, navigation and infotainment systems are offered to automobile manufacturers through engineering and supply agreements.

Net sales to DaimlerChrysler accounted for approximately 24.9 percent, 25.5 percent and 28.5 percent of consolidated net sales for the years ended June 30, 2006, 2005 and 2004, respectively. Accounts receivable

due from DaimlerChrysler accounted for 19.5 percent and 21.7 percent of total consolidated accounts receivable at June 30, 2006 and 2005, respectively.

Net sales to BMW accounted for approximately 10.0 percent, 10.9 percent and 12.8 percent of consolidated net sales for the years ended June 30, 2006, 2005 and 2004, respectively. Accounts receivable due from BMW accounted for 6.7 percent and 8.2 percent of total consolidated accounts receivable at June 30, 2006 and 2005, respectively.

Our Consumer segment designs, manufactures and markets audio, video and electronic systems for home, computer and multimedia applications. Our Consumer home products and systems are marketed worldwide under brand names including JBL, Infinity, Harman/Kardon, Lexicon, Mark Levinson and Revel. Our audio and electronic products are offered through audio/video specialty and retail chain stores. Our branded audio products for computer and multimedia applications are focused on retail customers with products designed to enhance sound for computers, Apple's iPod and other music control players.

The Professional Group designs, manufactures and markets loudspeakers and electronic systems used by audio professionals in concert halls, stadiums, airports and other buildings and for recording, broadcast, cinema and music reproduction applications. Our Professional products are marketed worldwide under brand names including JBL, Professional, AKG, Crown, Soundcraft, Lexicon, Digitech, dbx and Studer. We provide high-quality products to the sound reinforcement, music instrument support and broadcast and recording segments of the professional audio market. We offer complete systems solutions for professional installations and users around the world.

The following table reports net sales, operating income (loss), assets, goodwill, capital expenditures and depreciation and amortization by each reporting segment:

| ($000s omitted) | | Years Ended June 30, | | |
| --- | --- | --- | --- | --- |
| | | 2006 | 2005 | 2004 |
| Net sales: | | | | |
| Automotive | $ | 2,236,379 | 2,125,566 | 1,873,047 |
| Consumer | | 494,230 | 418,347 | 356,611 |
| Professional | | 517,288 | 486,976 | 481,716 |
| Total | $ | 3,247,897 | 3,030,889 | 2,711,374 |
| | | | | |
| Operating income (loss): | | | | |
| Automotive | $ | 337,746 | 348,077 | 308,923 |
| Consumer | | 49,862 | 26,715 | (13,029) |
| Professional | | 59,278 | 45,498 | 9,892 |
| Other | | (49,645) | (69,309) | (51,321) |
| Total | $ | 397,241 | 350,981 | 254,465 |
| | | | | |
| Assets: | | | | |
| Automotive | $ | 1,454,846 | 1,445,943 | 1,214,768 |
| Consumer | | 279,045 | 233,482 | 208,254 |
| Professional | | 291,155 | 250,931 | 269,812 |
| Other | | 329,615 | 256,847 | 295,976 |
| Total | $ | 2,354,661 | 2,187,203 | 1,988,810 |
| | | | | |
| Goodwill: | | | | |
| Automotive | $ | 301,499 | 270,695 | 176,938 |
| Consumer | | 35,531 | 30,782 | 30,903 |
| Professional | | 44,189 | 43,594 | 43,881 |
| Total | $ | 381,219 | 345,071 | 251,722 |
| | | | | |
| Capital expenditures: | | | | |
| Automotive | $ | 105,544 | 138,373 | 107,448 |
| Consumer | | 8,549 | 8,037 | 7,895 |
| Professional | | 15,492 | 24,035 | 19,838 |
| Other | | 963 | 1,881 | 312 |
| Total | $ | 130,548 | 172,326 | 135,493 |
| | | | | |
| Depreciation and amortization: | | | | |
| Automotive | $ | 99,261 | 87,445 | 69,650 |
| Consumer | | 11,490 | 9,602 | 18,215 |
| Professional | | 17,181 | 19,073 | 15,706 |
| Other | | 2,017 | 2,545 | 2,461 |
| Total | $ | 129,949 | 118,665 | 106,032 |

Other primarily includes activity related to our corporate accounts.

Below we present sales, long-lived assets and net assets by geographic area as of and for the years ended June 30, 2006, 2005 and 2004. Net sales are attributable to geographic areas based upon the location of the business unit executing the sale.

| ($000s omitted) | | Years Ended June 30, | |
| | 2006 | 2005 | 2004 |
| --- | --- | --- | --- |
| Net sales: | | | |
| U.S. | $ 708,564 | 633,780 | 645,762 |
| Germany | 1,415,871 | 1,335,720 | 1,149,862 |
| Other Europe | 578,401 | 573,133 | 468,222 |
| Other | 545,061 | 488,256 | 447,528 |
| Total | $ 3,247,897 | 3,030,889 | 2,711,374 |
| | | | |
| Long-lived assets: | | | |
| U.S. | $ 383,406 | 303,806 | 244,658 |
| Germany | 444,063 | 412,979 | 402,330 |
| Other Europe | 113,288 | 118,651 | 114,639 |
| Other | 164,547 | 168,474 | 23,148 |
| Total | $ 1,105,304 | 1,003,910 | 784,775 |
| | | | |
| Net Assets | | | |
| U.S. | $ 385,096 | 23,706 | 176,847 |
| Germany | 353,572 | 632,383 | 462,439 |
| Other Europe | 276,738 | 211,759 | 194,724 |
| Other | 212,758 | 193,100 | 40,986 |
| Total | $ 1,228,164 | 1,060,948 | 874,996 |

### Note 14 - Commitments and Contingencies

At June 30, 2006, we were involved in several legal actions. The outcome of these legal actions cannot be predicted with certainty. However, management, based upon advice from legal counsel, believes such actions are either without merit or will not have a material adverse effect on our financial position or results of operations. In fiscal 2005, we recorded a $6 million liability for probable unasserted claims. There was no change in the status of these claims at June 30, 2006. As such, this amount continues to be accrued at June 30, 2006.

At June 30, 2006, our Board of Directors had authorized the repurchase of a total of up to 20 million shares of common stock. Through June 30, 2006, we had acquired and placed in treasury 16,690,182 shares of our common stock at a total cost of $510.8 million. We expect future share repurchases to be funded primarily with cash generated by operations.

### Note 15 - Derivatives

We use foreign currency forward contracts to hedge a portion of our forecasted transactions. These forward contracts are designated as foreign currency cash flow hedges and recorded at fair value in the accompanying consolidated balance sheet with a corresponding entry to other accumulated comprehensive income (loss) until the underlying forecasted foreign currency transaction occurs.

When the transaction occurs, the gain or loss from the derivative designated as a hedge of the transaction is reclassified from accumulated other comprehensive income (loss) to the same income statement line item in which the foreign currency gain or loss on the underlying hedged transaction is recorded. When it

becomes apparent that an underlying forecasted transaction will not occur, the amount recorded in accumulated other comprehensive income (loss) related to the hedge is reclassified to the miscellaneous, net line of the income statement in the then-current period.

Because the amounts and the maturities of the derivatives approximate those of the forecasted exposures, changes in the fair value of the derivatives are highly effective in offsetting changes in the cash flows of the hedged items. Any ineffective portion of the derivative is recognized in current earnings. When it has been determined that a hedge has become ineffective, the ineffective portion of the hedge is recorded in current earnings.

At June 30, 2006, we had contracts designated as foreign currency cash flow hedges maturing through June 2007 to sell Euros and purchase US Dollars of approximately $67.5 million to hedge future foreign currency purchases. At June 30, 2006, the amount associated with these hedges that is expected to be reclassified from accumulated other comprehensive income (loss) to earnings within the next twelve months is a loss of approximately $3.3 million. This amount also represents the fair market value of foreign currency forward contracts at June 30, 2006. In fiscal 2006, we recognized approximately $6.1 million in net gains from cash flow hedges of forecasted foreign currency transactions compared to $2.7 million in net losses during fiscal 2005.

The swap contracts to effectively convert interest on $140 million of the principal amount of our 7.32 percent senior notes due July 1, 2007, from a fixed rate to a floating rate, were terminated in June 2006 in conjunction with our tender offer for the 7.32 percent senior notes, resulting in a net loss recorded of $0.8 million.

The swap contracts to effectively convert interest on $170 million of the principal amount of our 7.125 percent senior notes due February 15, 2007, from a fixed rate to a floating rate, were terminated in June 2006 in conjunction with our tender offer for the 7.125 percent notes, resulting in a net loss recorded of $0.3 million.

As of June 30, 2006, we had contracts maturing through June 2007 to purchase and sell the equivalent of $31.6 million of various currencies to hedge foreign currency denominated loans to foreign subsidiaries. These loans are of a long-term investment nature and are not designated as cash flow hedges. Adjustments to the carrying value of the foreign currency forward contracts offset the gains and losses on the underlying loans. At June 30, 2006, the market value on these contracts was a net loss of $0.6 million.

*Note 16 - Acquisitions*

In July 2005, we acquired PhatNoise, Inc. located in Los Angeles, California. PhatNoise develops integrated digital media systems for the automotive environment. The acquisition of PhatNoise is not material to our consolidated financial statements.

In November 2004, we acquired QNX Software Systems Ltd, which is headquartered in Ottawa, Canada. QNX is a provider of real time operating system software, development tools, and services for embedded design systems. Our infotainment systems utilize the QNX operating system. The acquisition allows the optimization of our software by fully integrating the operating system, the basic framework and the applications. The purchase price, net of cash acquired, was $139 million. Approximately $110 million was allocated to goodwill and $5 million was allocated to amortizable intangibles.

## Note 17 - Investment in Joint Venture

In October 2005, we formed Harman Navis Inc., a joint venture located in Korea, to engage in the design and development of navigation systems for Asian markets. We evaluated the joint venture agreement under FIN No. 46R, *Consolidation of Variable Interest Entities*, and determined that the newly formed joint venture was a variable interest entity requiring consolidation. We own a 50 percent equity interest in the joint venture. We are not obligated to fund any joint venture losses. At June 30, 2006, the net assets of the joint venture were approximately $19 million. The minority interest is approximately $3 million. Our investment in this joint venture is not material to our consolidated financial statements.

## Note 18 - Earnings Per Share Information

| ($000s omitted except per share amounts) | Years Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2006 | | 2005 | | 2004 | |
| | Basic | Diluted | Basic | Diluted | Basic | Diluted |
| Net income | $ 255,295 | 255,295 | 232,848 | 232,848 | 157,883 | 157,883 |
| Shares of common stock outstanding | 66,260 | 66,260 | 67,120 | 67,120 | 65,779 | 65,779 |
| Employee stock options | --- | 1,845 | --- | 3,279 | --- | 3,708 |
| Total average equivalent shares | 66,260 | 68,105 | 67,120 | 70,399 | 65,779 | 69,487 |
| *Earnings per share* | $ 3.85 | 3.75 | 3.47 | 3.31 | 2.40 | 2.27 |

For all periods presented, share and per share amounts have been restated to reflect the two-for-one stock split in November 2003.

Certain options were outstanding and not included in the computation of diluted net earnings per share because the assumed exercise of these options would have been antidilutive. Options to purchase 867,808 shares of our common stock with exercise prices ranging from $75.22 to $126.94 per share at June 30, 2006 were outstanding and not included in the computation of diluted earnings per share because the exercise of these options would have been antidilutive.

Options to purchase 385,275 shares of our common stock with exercise prices ranging from $75.22 to $126.94 per share were not included at June 30, 2005; options to purchase 498,889 shares with exercise prices ranges from $50.03 to $75.22 per share were not included at June 30, 2004, in each case because the exercise of these options would have been antidilutive.

## Note 19 - Quarterly Summary of Operations (unaudited)

The following is a summary of operations by quarter for fiscal 2006 and 2005:

| ($000s omitted except per share amounts) | Three months ended | | | |
|---|---|---|---|---|
| Fiscal 2006 | September 30 | December 31 | March 31 | June 30 |
| Net sales | $ 754,648 | 832,645 | 801,487 | 859,117 |
| Gross profit | $ 266,295 | 305,769 | 281,617 | 298,889 |
| Net income | $ 53,967 | 72,535 | 64,026 | 64,767 |
| Earnings per share – basic | $ 0.82 | 1.10 | 0.96 | 0.97 |
| Earnings per share – diluted | $ 0.79 | 1.07 | 0.94 | 0.95 |
| Fiscal 2005 | | | | |
| Net sales | $ 691,706 | 788,587 | 742,564 | 808,032 |
| Gross profit | $ 221,399 | 278,490 | 249,992 | 281,821 |
| Net income | $ 33,672 | 65,425 | 63,516 | 70,235 |
| Earnings per share – basic | $ 0.51 | 0.97 | 0.94 | 1.05 |
| Earnings per share – diluted | $ 0.48 | 0.92 | 0.90 | 1.01 |

**Item 9.  Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.  Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures:*

Under the supervision and with the participation of our management, including our Executive Chairman, Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934) as of the end of the period covered by this Annual Report on Form 10-K. Based on that evaluation, our Executive Chairman, Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. We note that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving our stated goals under all potential future conditions.

*Change in Internal Control Over Financial Reporting:*

There has not been any change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) as promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934) during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.  Other Information**

None.

# Part III

**Item 10.  Directors and Executive Officers of the Registrant**

Certain information required by Part III, Item 10 with respect to our directors is incorporated by reference to the information included under the caption "Proposal for Election of Directors" in our Proxy Statement for the 2006 Annual Meeting of Shareholders. Information required by Item 10 with respect to our executive officers is included in Part I of this report.

The information required by Part III, Item 10 with respect to compliance with Section 16 of the Securities Exchange Act of 1934, as amended, is incorporated by reference to the information included under the caption "Section16(a) Beneficial Ownership Reporting Compliance" in our Proxy Statement for the 2006 Annual Meeting of Shareholders.

The information required by Part III, Item 10 with respect to our audit committee and our audit committee financial expert is set forth in our Proxy Statement for the 2006 Annual Meeting of Shareholders in the first paragraph under the caption "The Board, its Committees and its Compensation – Audit Committee," which paragraph is incorporated herein by reference.

The information required by Part III, Item 10 with respect to our Code of Ethics for Executive and Financial Officers and Directors is posted on our website at www.harman.com in the Investor Relations section under Corporate Governance – "Code of Ethics for Senior Management and the Board." We will post information regarding any amendment to, or waiver from, our Code of Ethics for Executive and Financial Officers and Directors on our website in the Investor Relations section under Corporate Governance.

### Item 11.  Executive Compensation

The information required by Part III, Item 11 is incorporated by reference to the information provided under the captions "Compensation of Executive Officers" and "The Board, its Committees and its Compensation – Director Compensation" in our Proxy Statement for the 2006 Annual Meeting of Shareholders.

### Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The information required by Part III, Item 12 is incorporated by reference to the information provided under the captions "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" in our Proxy Statement for the 2006 Annual Meeting of Shareholders.

### Item 13.  Certain Relationships and Related Transactions

The information required by Part III, Item 13 is incorporated by reference to the information provided under the caption "Compensation of Executive Officers – Certain Relationships and Related Transactions" in our Proxy Statement for the 2006 Annual Meeting of Shareholders.

### Item 14.  Principal Accountant Fees and Services

The information required by Part III, Item 14 with respect to the fees and services of KPMG LLP, our independent auditor, is incorporated by reference to the information included under the caption "Independent Auditor" in our Proxy Statement for the 2006 Annual Meeting of Shareholders.

## Part IV

### Item 15.  Exhibits and Financial Statement Schedules

We will furnish you, without charge, a copy of any exhibit upon written request. Written requests to obtain any exhibit should be sent to the Company's Secretary at 8500 Balboa Boulevard, Northridge, California 91329.

The following consolidated financial statements are filed as part of this report under "Part II, Item 8 – Financial Statements and Supplementary Data":

| Financial Statements: | Page |
|---|---|
| Management's Report on Internal Control over Financial Reporting | 32 |
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | 33 |
| Report of Independent Registered Public Accounting Firm | 34 |
| Consolidated Balance Sheets as of June 30, 2006 and 2005 | 35 |
| Consolidated Statements of Operations for the years ended June 30, 2006, 2005 and 2004 | 36 |
| Consolidated Statements of Cash Flows for the years ended June 30, 2006, 2005 and 2004 | 37 |
| Consolidated Statements of Shareholders' Equity and Comprehensive Income for the years ended June 30, 2006, 2005 and 2004 | 38 |
| Notes to Consolidated Financial Statements. | 39 |

**Financial Statement Schedules:**

| | |
|---|---|
| Schedule II - Consolidated Valuation and Qualifying Accounts and Reserves. | 66 |

(Schedules I, III, IV and V are not applicable and have therefore been omitted.)

**Exhibits:**

3.1   Restated Certificate of Incorporation of the Company, as amended. (filed as Exhibit 3.1 to the Quarterly Report on Form 10-Q for the quarter ended December 31, 2003, Commission File No. 001-09764, and hereby incorporated by reference)

3.2   By-Laws of the Company, as amended, dated June 10, 2004. (filed as Exhibit 3.2 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2004, Commission File No. 001-09764, and hereby incorporated by reference)

4.3   Rights Agreement, dated as of December 13, 1999, between the Company and ChaseMellon Shareholder Services, L.L.C., as rights agent (including a Form of Certificate of Designation of Series A Junior Participating Preferred Stock, a Form of Right Certificate and a Summary of Rights to Purchase Preferred Stock). (filed as Exhibit 4.1 to the Form 8-A filed with the Commission on December 16, 1999, Commission File No. 001-09764, and hereby incorporated by reference)

4.4   Certificate of Designation of Series A Junior Participating Preferred Stock of the Company, dated January 11, 2000. (filed as Exhibit 4.3 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2000, Commission File No. 001-09764, and hereby incorporated by reference)

10.1   Amended and Restated Multi-Currency, Multi-Option Credit Agreement, dated June 22, 2006, among the Company, Harman Holding GmbH & Co. KG and the several lenders and agents from time to time parties thereto. (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on June 26, 2006, Commission File No. 001-09764, and hereby incorporated by reference)

10.2   Guarantee, dated June 22, 2006, in favor of JPMorgan Chase Bank, N.A., as administrative agent for the several banks and other financial institutions or entities from time to time parties to the Amended and Restated Multi-Currency, Multi-Option Credit Agreement, dated as of June 22, 2006. (filed as Exhibit 10.2 to the Current Report on Form 8-K filed with the Commission on June 26, 2006, Commission File No. 001-09764, and hereby incorporated by reference)

10.3   Share Purchase Agreement, dated October 26, 2004, among Harman Canada Co. and certain shareholders of QNX Software Systems Ltd. (filed as Exhibit 10-1 to the Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, Commission File No. 001-09764, and hereby incorporated by reference)

10.4   Harman International Industries, Incorporated 1992 Incentive Plan, as amended and restated. (filed as Exhibit B to the Company's 1999 Proxy Statement, Commission File No. 001-09764, and hereby incorporated by reference) **

10.5   Harman International Industries, Incorporated Amended and Restated 2002 Stock Option and Incentive Plan. ** +

10.6   Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Nonqualified Stock Option Agreement for Non-Officer Directors. (filed as Exhibit 10.11 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2005, Commission File No. 001-09764, and hereby incorporated by reference) **

10.7   Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Incentive Stock Option Agreement for Officers and Key Employees. (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on August 22, 2005, Commission File No. 001-09764, and hereby incorporated by reference) **

10.8   Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Nonqualified Stock Option Agreement for Officers and Key Employees. (filed as Exhibit 10.2 to the Current Report on Form 8-K filed with the Commission on August 22, 2005, Commission File No. 001-09764, and hereby incorporated by reference) **

10.9    Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Restricted Stock Agreement for Officers and Key Employees. (filed as Exhibit 10.3 to the Current Report on Form 8-K filed with the Commission on August 22, 2005, Commission File No. 001-09764, and hereby incorporated by reference) **

10.10    Form of Harman International Industries, Incorporated 2002 Stock Option and Incentive Plan Restricted Share Unit Agreement for Officers and Key Employees. (filed as Exhibit 10.3 to the Current Report on Form 8-K filed with the Commission on August 15, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.11    Harman International Industries, Incorporated 2002 Key Executive Officers Bonus Plan. (filed as Exhibit A to the Company's 2002 Proxy Statement, Commission File No. 001-09764, and hereby incorporated by reference) **

10.12    Harman International Industries, Incorporated Supplemental Executive Retirement Plan, as amended and restated as of October 1, 1999. (filed as Exhibit 10.27 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2000, Commission File No. 001-09764, and hereby incorporated by reference) **

10.13    Amendment No. 1 to the Harman International Industries, Incorporated Supplemental Executive Retirement Plan, dated September 24, 2002. (filed as Exhibit 10.5 to the Quarterly Report on Form 10-Q for the quarter ended December 31, 2002, Commission File No. 001-09764, and hereby incorporated by reference) **

10.14    Form of Benefit Agreement under the Supplemental Executive Retirement Plan. ** +

10.15    Harman International Industries, Inc. Deferred Compensation Plan, effective June 1, 1997. (filed as Exhibit 4 to the Registration Statement on Form S-8 (Reg. No. 333-28793) filed with the Commission June 9, 1997, and hereby incorporated by reference) **

10.16    Amendment No. 1 to the Harman International Industries, Inc. Deferred Compensation Plan dated October 1, 1999. (filed as Exhibit 10.46 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2000, Commission File No. 001-09764, and hereby incorporated by reference) **

10.17    Amendment No. 2 to the Harman International Industries, Inc. Deferred Compensation Plan, effective December 16, 2003. (filed as Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended December 31, 2003, Commission File No. 001-09764, and hereby incorporated by reference) **

10.18    Employment Agreement between Harman Management GmbH and Helmut Schinagel (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on August 15, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

10.19    Letter Agreement, dated June 3, 2005, between Harman International Industries, Incorporated and Kevin L. Brown **+

10.20    Employment Agreement between the Company and Dr. Erich A. Geiger, effective as of July 1, 2003. (filed as Exhibit 10.27 to the Annual Report on form 10-K for the fiscal year ended June 30, 2003, Commission File No. 001-09764, and hereby incorporated by reference) **

10.21    Amendment to Employment Agreement between the Company and Dr. Erich A. Geiger, effective as of August 1, 2004. (filed as Exhibit 10.24 to the Annual Report on form 10-K for the fiscal year ended June 30, 2004, Commission File No. 001-09764, and hereby incorporated by reference) **

10.22    Employment Agreement between the Company and William S. Palin, dated as of October 24, 2003. (filed as Exhibit 10.1 to the Quarterly Report on Form 10-Q for the quarter ended September 30, 2003, Commission File No. 001-09764, and hereby incorporated by reference) **

10.23    Form of Severance Agreement between the Company and each of Sidney Harman, Bernard A. Girod, and Kevin L. Brown. (filed as Exhibit 10.71 to the Annual Report on Form 10-K for the fiscal year ended June 30, 2000, Commission File No. 001-09764, and hereby incorporated by reference) **

10.24    Letter Agreement, dated April 24, 2006, between Harman International Industries, Incorporated and Douglas A. Pertz. (filed as Exhibit 10.1 to the Current Report on Form 8-K filed with the Commission on April 28, 2006, Commission File No. 001-09764, and hereby incorporated by reference) **

21.1    Subsidiaries of the Company. +

23.1    Consent of Independent Registered Public Accounting Firm. +

31.1    Certification of Sidney Harman filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. +

31.2    Certification of Bernard A. Girod filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. +

31.3    Certification of Kevin L. Brown filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. +

32.1    Certification of Sidney Harman, Bernard A. Girod and Kevin L. Brown filed pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. +

**    Management contract, compensatory plan or arrangement.

+    Filed herewith.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED

Date:   September 6, 2006          By:     /s/ Bernard A. Girod
                                          Bernard A. Girod
                                          Vice Chairman of the Board and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of Harman International on September 6, 2006 in the capacities indicated below.

| | |
|---|---|
| /s/ Sidney Harman<br>Sidney Harman | Executive Chairman of the Board |
| /s/ Bernard A. Girod<br>Bernard A. Girod | Vice Chairman of the Board and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Kevin L. Brown<br>Kevin L. Brown | Executive Vice President, Chief Financial Officer and Assistant Secretary<br>(Principal Financial Officer) |
| /s/ Sandra B. Robinson<br>Sandra B. Robinson | Vice President − Financial Operations and Chief Accounting Officer<br>(Principal Accounting Officer) |
| /s/ Gina Harman<br>Gina Harman | Director |
| /s/ Shirley M. Hufstedler<br>Shirley M. Hufstedler | Director |
| /s/ Ann McLaughlin Korologos<br>Ann McLaughlin Korologos | Director |
| /s/ Edward H. Meyer<br>Edward H. Meyer | Director |
| /s/ Stanley A. Weiss<br>Stanley A. Weiss | Director |

**Schedule II**

HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED
Valuation and Qualifying Accounts and Reserves
Years Ended June 30, 2006, 2005 and 2004
($000s omitted)

| Classification | | Balance at beginning of period | Charged to costs and expenses | Charged to other accounts describe (1) | Deductions | Balance at end of period |
|---|---|---|---|---|---|---|
| **Year ended June 30, 2004** | | | | | | |
| Allowance for doubtful accounts | $ | 13,785 | 3,751 | 233 | 9,112 | 8,657 |
| **Year ended June 30, 2005** | | | | | | |
| Allowance for doubtful accounts | $ | 8,657 | 2,516 | 78 | 2,276 | 8,975 |
| **Year ended June 30, 2006** | | | | | | |
| Allowance for doubtful accounts | $ | 8,975 | 2,167 | 256 | 2,660 | 8,738 |

(1) Net effect of acquisitions, dispositions and foreign currency translation.

## Corporate Officers

Sidney Harman
Executive Chairman

Bernard A. Girod
Vice Chairman and Chief Executive Officer

Erich Geiger
Executive Vice President and
Chief Strategy and Technology Officer

Kevin L. Brown
Executive Vice President and
Chief Financial Officer

William S. Palin
Vice President–Controller

Sandra B. Robinson
Vice President–Financial Operations and
Chief Accounting Officer

Edwin Summers
Vice President–General Counsel and Secretary

Floyd E. Toole
Vice President–Acoustics

## Securities Traded

New York Stock Exchange
Symbol: HAR

## Corporate Headquarters

1101 Pennsylvania Avenue, NW
Suite 1010
Washington, D.C. 20004
202-393-1101
www.harman.com

## Directors

Bernard A. Girod

Gina Harman

Sidney Harman

Shirley Mount Hufstedler [1] [2] [3]

Ann McLaughlin Korologos [1] [3]

Edward H. Meyer [1] [3]

Stanley A. Weiss [1] [2] [3]

[1] Audit Committee member
[2] Compensation and Option Committee member
[3] Nominating and Governance Committee member

## Annual Meeting

The Annual Meeting will be held on
November 2, 2006 at 11:00 a.m.
at the JPMorgan Chase Building,
270 Park Avenue, New York, NY 10017.
A proxy statement will be sent to shareholders
on or about September 11, 2006.

## Registrar and Transfer Agent

Mellon Investor Services
400 South Hope Street, 4th Floor
Los Angeles, CA 90071
213-553-9720

## Independent Auditor

KPMG LLP
355 South Grand Avenue
Los Angeles, CA 90071
213-972-4000

The certifications of our Executive Chairman, Chief Executive Officer and Chief Financial Officer required under Section 302 of the Sarbanes-Oxley Act
have been filed as Exhibits 31.1, 31.2 and 31.3 to our Annual Report on Form 10-K for the fiscal year ended June 30, 2006.



**Harman International Industries, Incorporated**
1101 Pennsylvania Avenue, NW, Suite 1010
Washington, DC 20004
202-393-1101   www.harman.com

# Seeking Alpha<sup>α</sup>

# Harman F1Q07 (Qtr End 9/30/06) Earnings Call Transcript

posted on: October 25, 2006 | about stocks: HAR

Harman International Industries Inc (HAR)
F1Q07 Earnings Call
October 25, 2006 4:30 pm ET

**Executives**

Sidney Harman - Executive Chairman
Kevin L. Brown - Chief Financial Officer, Executive Vice President
Bernard A. Girod - Chief Executive Officer

**Analysts**

Scott Merlis - Thomas Weisel Partners
Scot Ciccarelli - RBC Capital Markets
Chris Ceraso - Credit Suisse
Ronald Tadross - Bank of America Securities
Jon Rogers – Citigroup
David Leiker - Robert W. Baird
Steve Lidberg - Pacific Crest Securities
Douglas Pratt - Mesa Capital Management
Brad Lundy - Ivory Capital
Peter Barry - Bear Stearns

**Presentation**

**Operator**

Ladies and gentlemen thank you very much for standing by. Good afternoon, welcome to the Harman International Industries First Quarter Fiscal 2007 Earnings Release Conference Call. [Operator Instructions] Please be aware that certain statements made by the company during the call are forward-looking statements. These statements include the company's beliefs and expectations as of future events and trends affecting the company's business and are subject to risks and uncertainties.

Persons participating on the call today are advised to review the reports filed by Harman International with the Securities and Exchange Commission regarding these risks and uncertainties. So with that being said, we'll get right to this first quarter agenda. Please join me in welcoming Harman International Industries Executive Chairman, Dr. Sidney Harman. Please go ahead, doctor.

**Sidney Harman - Executive Chairman**

Good afternoon, everyone. Joining me in Northridge today are Bernie Girod, our CEO, and Kevin Brown, our CFO, in attendance too is Greg Henry, our Principle Officer for Investor Relations. We had a very strong first quarter. The sales totaled $825,543,000, a 9% increase above the same quarter a year ago. EPS of $0.85, represents both a record for the quarter and an effective increase of 20% over last year's first quarter. I'll remind you the $0.79 reported then

included a one time $0.08 tax pick up.

Our earnings exceeded financial community estimates for the quarter by a very comfortable percentage. But I urge restraints. We are operating in awkward times and our expectations for the year remain unchanged. Those awkward days are manifest in the consumer group where operations for the quarter, the first quarter, clearly reflect the difficulties of the time. As we entered the year, we anticipated growth in both our core audio business and in our multimedia businesses and we will see growth. But we encounter increased competition, a stubborn decline in price points for multimedia products and a slower to materialize multimedia niche above $300 than we had hoped for.

Pressure on margins has developed and it will likely intensify through the selling season. We will still do well. We will still be profitable but our earlier enthusiasm needs to be promptly tempered. Our mobile business will be enhanced by the introduction of our first North American PND products in the second half, this too is less than a walk in the park. The dominant players in the space are pushing serious price reductions. Yet, we expect to be a factor in this category, even as we remain focused both on manufacturing and maintaining margins and on providing customers with what they truly value. That is genuine ease of use and the right assembly of functions.

We're confident that our approach to industrial design and a uniquely friendly interface will achieve our objective. Again, moderation is appropriate. We do draw encouragement from our PND success in Europe, where Harmon/Becker has has sold over 250,000 units since we entered the field. First quarter sales this year support our expectation that we will sale well over 500,000 units in Europe this year.

Now, permit me to speak the PND business more generally. In earlier calls, I had said that we regard the PND as complementary to our integrated infotainment system business, and it is. It is added a significant and growing dimension to the consumer electronics world and the opportunities there are very large. The PND is also an interesting development in the automotive OEM world, but its role in that world is relatively more limited and temporary.

Because many car makers have been slow to recognize that buyers of mid-range and entry-level vehicles want and would purchase systems that provide video, MP3, navigation, telephone and bluetooth connectivity, those manufacturers have until recently failed to make infotainment systems available in their vehicles. That has created a real but relatively temporary opportunity for non-integrated PND products and for non-integrating PND manufacturers.

Now as vehicle makers across the world realized that those functions do belong in mid-range and entry-level vehicles, they have committed to such integrated systems and those systems, for the most part, go into production starting in fiscal 2008. Excellent examples of that commitment are Audi across the board. PSA across the board, and Chrysler. And as I will note later, at least one additional major manufacturer is making that commitment now.

When the enormously-important services provided by pedestrian safety and driver-assistance programs begin to appear in automobiles, the limitations of the PND for that environment will be evident. Advanced driver assistance systems will provide night vision, 360-degree visibility around the car and airbag sensor systems that react to who is in the car where those people are sitting, what their personal architecture is. And the systems will automatically adjust their vehicle to soften the impact of a collision.

Pedestrian safety and driver assistance programs will be first introduced at the high-end because that is typical in the auto industry. But pedestrian safety and driver assistance is not only for the rich. I am certain that those systems will move rapidly through the mid-range and entry-level vehicles. Then those systems will provide all of the functionality familiar in present infotainment systems, including control of climate in the car, the behavior of the seats and the behavior of the headlights and pedestrian safety and driver assistance added together and you have the inescapable requirement for a genuinely integrated system, a system that is interoperable with all of the other systems in the car. The PND cannot do it, the PND will not do it. The only way that integration and interoperability can occur without interference is through a factory-installed system of the kind we manufacture.

The PND will serve usefully for the next two or three years in those cars in the low and medium range where car makers didn't have the foresight to provide infotainment systems. That will change rapidly however beginning in 2008, when systems such as those we would build for PSA, Audi and Chrysler are available through the entire range of their cars. Then the sensible choice in terms of technology, ease of use, total facility and cost will be the fully-integrated interoperable system.

Going forward, our integrated systems will be presented in affect in two parts. The base system will provide the access gateway into the car and the PCD, our personal connectivity device, which will provide gateway to the outside world. To manage that connectivity, one must really know both worlds. The car with its networks and infotainment systems and the outside world with its internet access, its protocols, its software stacks.

In the meantime, our auto book is full for the 2007, 2008, and now 2009 years. And our backlog is now well over $14 billion. We have confidence it will continue to grow vigorously. Our traditional consumer business continues healthy in a generally softer market. Considered in Japan we're launching our new top-of-the-line JBL Everest, a $60,000 pair of loudspeakers. We introduced Everest in a special showing in Japan during the quarter and we welcome the members of the Toyota team as we did so that. That introduction of the Everest generated firm purchase commitments for well-over 300 pair of a $60,000 loudspeakers set. I find that remarkable.

In summary, the consumer business continues that interesting combination of difficulty and progress. As of today, we expect it to grow 10% from last year's total revenues of $493 million to an expected $540 million. And we expect consumer operating profits for the year to be above 8%, our professional group reported another excellent quarter. Sales were 7% above the year ago. Where this time last year, both the Soundcraft group and AKG represented significant burdens in this year's first quarter they were both profitable. We expect that progress to continue.

In total pro produced 13% of operating profit in the quarter without question, it's headed to a really splendid year. As it has been, our automotive group was the primary engine in the first quarter and will be so through the year. Sales in the quarter were over 15% above a year ago and operating earnings kept pace. In recent earnings calls, I have emphasized two significant growth and development levers for our OEM business. I noticed that our success in infotainment was driven by our commitments to integrating in the single, coherent digital system that growing body of functions which had earlier and in some regions of the world, continue to simply be patched together. That integration and the company's unique ability to thoroughly debug the systems before production has made us the truly reliable supplier.

I commented that the growing interest in driver assistance and pedestrian safety carried the promise of the new overlay of business, which in the years upcoming could match the revenue levels of infotainment that is our Dr. Eric Geiger's vision for the next generation and we're making significant progress in realizing that objective. We had, for example, completed the prototype of a pulse modulated detector which, generates a 3-dimensional video image and provides full visibility and control of the spatial environment, both inside and outside of the vehicle. As we moved along that path, the result will be a system of virtually unlimited scalability, functionality and connectivity.

My second emphasis in recent calls is been on what I can safely call a new automotive paradigm. We are convinced that the work we have been doing will encourage more automotive companies to overcome their historic reluctance to concentrate a serious majority of their awards in one source. The scalability, which we pioneered, encourages the adoption of a common electronic platform and with it the special benefits arriving from enhanced and elegant scalability. Those very benefits moved Audi and PSA to assign their business across the board. Those special benefits persuaded Chrysler to concentrate its new infotainment activity with Harman and I'm pleased to tell you today that we have been notified of a major new award from a major European automotive maker. I am not free to identify the company but the award will represent incremental business of 200 to $250 million and the start of production will be scheduled for September 2008. I mentioned the award today. Because of the striking confirmation of the earlier predictions. We have no doubt the word of it would be widely disseminated before our next call.

In summary, our year is off to a good start. We reiterate our guidance for the year at $4.25, and sales of $3.5 billion. Now, just a couple of personal personnel highlights. Greg Henry has been promoted effective November 1 to Chief Financial Officer of the professional group. He will be moving from Washington, D.C. to California to assume his new duties. Rob Brian, who has done a superb job heading our internal audit group, will succeed Greg as Treasurer and Investor Relations Officer. Rob is with us today.

Finally, a note on succession. This will be Bernie Girod's last earnings call as he moves to retirement on December 31. Our search for his successor is in full process now and we intend to do it thoroughly and to get it right. Here now is Kevin Brown.

**Kevin L. Brown - Chief Financial Officer, Executive Vice President**

Thank you, Sidney. Net sales for the first quarter were $825.5 million, an increase of 9% compared to the same quarter last year. Gross profit margin was 34.8%. Operating income was $886.9 million, 11% higher than the first quarter last year. Earnings per share were $0.85 compared to $0.79 in the prior year and an increase of 8%. The tax rate for the quarter was 34.5%, compared to 26.8% for the first quarter of last year.

The tax rate for the prior-year first quarter included a $5.3 million tax credit, due to a joint committee on taxation approval on an IRS audit settlement, which improved quarter results by $0.08 per share. Foreign currency translation had a favorable affect on our first quarter results, due to the weakening of the U.S. dollar versus the Euro, the Euro averaged $1.27 during the first quarter, compared to $1.22 during the same period last year. This contributed approximately $20 million to first quarter sales and improved EPS by $0.02 per share.

Our balance sheet remained strong in September 30. Inventory was 379.3 million and accounts receivable were 461 million. Accounts payable were 251.7 million. For the first quarter, capital expenditures were 12.4 million, while depreciation and amortization were 29.9 million. Cash at September 30th was $135 million despite $73 million of share repurchases and a $24.8 million reduction of debt during the quarter.

Total debt was $172.8 million at September 30th. We repurchased 921,100 shares of common stock during the first quarter or $73 million. We plan to continue our share repurchase program, evaluating the bi-levels on a quarter-by-quarter basis. The company has expensed employee stock options since fiscal year 2003. We expensed $3.7 million for stock options during the first quarter, equivalent to $0.04 per share. I now turn the call to Bernie Girod.

**Bernard A. Girod - Chief Executive Officer**

Thank you very much, Kevin. We had a very good first quarter we were all, it was ahead of street estimates and ahead of our own expectations. As stated previously taxes and currency affected our results. During the prior-year first quarter, we recorded a tax credit which increased earnings per share by $0.08. Favorable currency translation contributed $0.02 per share this year adjusting for both earnings per share increased by more than 16% compared to last year.

The consumer group had a tough quarter with a loss of $4.4 million compared with a profit of $10.6 million last year. We did not expect to achieve last year's exceptional results in the first or second quarter but Q1 results were below our own expectations. Sidney described the reasons for this loss in his presentation.

The consumer group for the next 9 months is good. Fueled by a large number of new products; We expect the group to return to profitability in Q2 with double-digit operating profits, but somewhat below last year's exceptional performance of 14.2% operating profits. The group should exceed last year's results in the second half.

The automotive group had a great quarter. Sales were up 16%. Sales to Mercedes were particularly strong, driven in part by strong S-class sales. Sales to Audi were up more than 30%. Sales to Toyota-Lexus, Hyundai Kia, and Harley-Davidson were up a double-digit-rates. After-market sales were also robust. We sold 95,000 PNDs in the quarter, operating earnings for the group were up 22%, representing 15% of sales, up 80 basis points over last year.

R&D expense for the group represented 10.9% of sales, up 100 basis points from last year to resource a large number of new programs launching in fiscal '08 and '09. The professional group also had a very good quarter. Sales were up 7%, operating profits was up 33% representing 13% of sales up 250 basis points from last year. The largest improvement came from European operations, both AKG and Soundcraft reported a profit this year versus a loss last year.

Both units are launching significant new products this quarter. We believe that pro group will achieve excellent results again this year. So, our overall expectations for fiscal '07 have not changed. The sales should grow close to 10%, operating profits should increase 50 basis points resulting in earnings per share of $4.35. We expect continued control of working capital and capital expenditures, and therefore, good cash generation and we will continue to buy back our stock. And we will now take your questions.

**Question-and-Answer Session**

**Operator**

Indeed, thank you very much, Mr. Girod, Mr. Harman and our panel for your time, we do appreciate that. [Operator Instructions] And representing Thomas Weisel Partners, our first question go to the line of Scott Merlis. Please go ahead, sir.

**Scott Merlis - Thomas Weisel Partners**

Thank you very much, congratulations, Greg and Rob and Bernie.

**Kevin Brown**

Thank you.

**Sidney Harman**

Nothing for me, Scott?

**Scott Merlis - Thomas Weisel Partners**

And Sidney. Always.

**Sidney Harman**

All right. All right.

**Scott Merlis - Thomas Weisel Partners**

Good quarter. The -- just one bookkeeping question to get out of the way, the 16, the sales growth in automotive, did you mention what portion of that would be currency or what percent growth on a constant currency basis?

**Sidney Harman**

That's 15.5% sales growth in total, would have been about 13% excluding the impact of foreign exchange.

**Scott Merlis - Thomas Weisel Partners**

That makes sense. And the congratulations on the new business, the European business. Does that starts in 2008?

**Sidney Harman**

Fiscal 2009, in September of '08.

**Scott Merlis - Thomas Weisel Partners**

That answers my question there. And getting back to the double-digit-growth at Lexus is -- is that mostly Marc Levenson adding 19 speakers per vehicle or go into surround sound? Is it penetrate, more penetration of Toyota?

**Sidney Harman**

It's more penetration of Lexus. It's more elaborate system. It's the serious engagement of Lexus in Europe.

**Scott Merlis - Thomas Weisel Partners**

And the more general question I had about the legacy. The legacy audio business growing faster and becoming more attractive because of surround sound and the digital enablers that go with surround sound. You read about the 19 speakers of Marc Levinson.

**Sidney Harman**

It's growing not only because the systems are more elaborate, and that more elaborate is always, invariably more service. Not just cosmetics, but it's also growing because there is a broader recognition and acceptance of those superior systems in the cars.

**Scott Merlis - Thomas Weisel Partners**

And it's, you know, to sum it up -- up, is the speaker business becoming more attractive fundamentally and a better growth business?

**Bernard A. Girod**

Yes, although it's more than speakers as you well know.

**Scott Merlis - Thomas Weisel Partners**

Right. Right. But -- and the final question, more of a big-picture question, you, you have had a very significant lead over your competitors in the integration of most and the, especially execution Siemens have slipped up and the Japanese just haven't done a lot of that. Does one argue that over time they're catching up with your integration capabilities with most or can you build a case that most has become more complex for different reasons with our disk drive that your gap, your le ad is widening, Is your lead widening on a cost basis because of the scalability that you mentioned? There is two ways to look at what is going on, given the passage of time.

**Sidney Harman**

Well, as you report your report indicated, Lexus decided to adopt the electrical version of our moes system and what that gives them and their suppliers is more access to the network. Now we had over 10 years of experience riding software to work with that network and as soon as they catch up with that, they will have the same capabilities that we have. Of course, we're not going to stand still over the 10-year period. It's a wonderful system that mostly a wonderful system, gives them greater capabilities and gives them the potential of eliminating all the duplication that they have in their systems, which are largely stand-alone at the pleasant time.

Scott, let me add in particular response to the central question, I would say that we're number one in gaining. I don't mean that to, vis-a-vis, be too clever, certainly not to be arrogant, but the very fact that an increasing number of major automakers are ready to commit the vast majority of this business to us and over the full-range of their lines is the most powerful evidence we or you could find of the fact that we're getting stronger, other competitors, some of whom you named, are losing traction.

**Scott Merlis - Thomas Weisel Partners**

Well, the new European business certainly did just that. Congratulations.

**Sidney Harman**

Thank you again.

**Scott Merlis - Thomas Weisel Partners**

Thank you very much.

**Operator**

Thank you Merlis. Next in queue, we go to the line of Scot Ciccarelli with RBC Capital Markets. Please go ahead, sir.

**Scot Ciccarelli - RBC Capital Markets**

Hey, guys, how are you?

**Sidney Harman**

Good, Scot.

**Scot Ciccarelli - RBC Capital Markets**

Good. One clarification. Bernie, could you say what the operating margin in auto was? Was it 15%?

**Bernard A. Girod**

Yes.

**Scot Ciccarelli - RBC Capital Markets**

Okay. What was the 22% then?

**Bernard A. Girod**

It's a 22% increase in operating profit from last year. Last year's operating profits, automotive was $73.9 million. This year it was $90.2 million, an increase of 22% and the $90 million represents 15% operating profits.

**Scot Ciccarelli - RBC Capital Markets**

I got it. I apologize for that.

**Bernard A. Girod**

No problem.

**Scot Ciccarelli - RBC Capital Markets**

Regarding the commentary about the personal safety systems, I just want to be clear that I'm understanding that Sidney, are you suggesting these personal safety systems will be integrated into the infotainment, so you'll be moving out of multimedia type applications into safety?

**Sidney Harman**

Not at all. What I'm saying is that it's important, new additional layer. That increased functionality is extraordinarily promising from my point of view, both in terms of the amount of business that it will represent and in terms of the fact that it responds to our particular unique capabilities of integration.

**Scot Ciccarelli - RBC Capital Markets**

Okay, you're suggesting you will participate on the integration process of these personal safety systems.

**Sidney Harman**

I am saying that absolutely and I'm saying that there is an interesting parallel here, Scott. You will remember that this infotainment business was really in affect invented on the basis that originally there existed a number of relatively small companies doing just pieces of this work. The particular facilities that this company brought to that work at the time was the bringing into house of the many areas of technology that in total represent an infotainment system. But more important than that, the particular – the peculiar ability to integrate them to make them whole and debug the systems.

When this additional layer of driver assistance and pedestrian safety is built into the systems, the need to make those systems compatible with all the other electronic systems in the car gets to be crucially important. Our experience, the first time around, in bringing together and integrating those many functions which were if you will, multimedia functions, audio functions, video functions and the like is going to be duplicated as we bring additional processes such as the kind of camera and processing units that I referred to in my original set of observations, integrating all of that into a single comprehensive system is going to be our big future opportunity and we're getting ready to do it.

**Scot Ciccarelli - RBC Capital Markets**

All right, so this is something that you guys have been working on for a while and unveiling it to the investment community at this point. Is that the right way to interpret it?

**Bernard A. Girod**

We've been working on it for awhile and we've made some reference to it before. We'll make continues reference because it takes years for this kind of work to fully develop, but we're at it.

**Scot Ciccarelli - RBC Capital Markets**

Understood. And the last question, if I may, you know, the estimates. Obviously you guys had a nice quarter, you beat the first quarter by a couple of cents, maintain the full-year, even though it sounds like the rest of the businesses are doing pretty well. The share count's down. Is there something else we should be looking out for or is it just kind of taking a cautionary stance at this stage?

**Bernard A. Girod**

No, I think the precaution has been quite particular. Although we expect good year consumer, that's a rough, rough field and exercising caution is appropriate for us. It's appropriate for you. I think we were probably $0.04 above the street estimates for the first quarter and I don't expect to be $0.04 above the street estimate for the year.

**Scot Ciccarelli - RBC Capital Markets**

Fair enough. Thank you very much, guys.

**Sidney Harman**

Thank you, Scott.

**Operator**

And representing Credit Suisse, we go to the line of Chris Ceraso. Please go ahead, sir.

**Chris Ceraso - Credit Suisse**

Hi, thanks. Good afternoon.

**Sidney Harman**

Hi, Chris.

**Chris Ceraso - Credit Suisse**

First, can you remind us of the R&D level and how much above normal it's running currently to Europe for all of these programs and if and when that should come down to a lower level and by how much so we can frame what the potential there is?

**Bernard A. Girod**

Okay, our R&D expectations really are unchanged from what we talked about last quarter. For the quarter in total, we ran at 10% of sales in R&D compared to 9.1% in the first quarter of the prior year. So that was up, by the way, sequentially, it was about flat with the fourth quarter of last year. We have previously said we expect the full-year of this year to be about the same as last year. Last year was about 9.3% of sales and on a percent-of-sales basis, that's the neighborhood we expect to be in this year and then we have said as the new business that we're engineering now comes onscreen and fiscal a wait, we expect that engineering as a percent of sales to start to fall.

**Chris Ceraso - Credit Suisse**

To what kind of range?

**Bernard A. Girod**

We said 100 basis points. We would expect that to come down in fiscal '08.

**Chris Ceraso - Credit Suisse**

Okay. Very good. Can we get some update on the restructuring efforts as they progressed so far, have these efforts yielded cross savings to date and as you go through this process, are you finding more opportunities?

**Bernard A. Girod**

We initiated the restructuring efforts in the fourth quarter as you recall. There have not been significant savings to date as many of these efforts were in Europe and the notification period in the working with the union periods that are required, it takes time to work through those and then actually effect the actions, so I don't anticipate we'll see significant savings really until the second half of the year as we work through that. We'll continue to have some low-level restructuring activity that goes on in this year as well, but nothing worth talking about explicitly. So, I would say we're on track, we're where we expect to be. I don't look for significant savings. There were not any in the first quarter and there will be little in the second quarter.

**Chris Ceraso - Credit Suisse**

Okay. Can we get a little more color on the strength in the automotive business you referenced, the S-Class Dr. Harman, the revenue strength at a bunch of different makers. Maybe if we can drill down one level and talk about some specific vehicles where things were strong or where penetration rate let's were better than you thought?

**Sidney Harman**

Okay, let's start with the S-Class. The S-Class as you know last year was just launching and it's terrific. And our installation rate is virtually 100%. We benefit from the success of the vehicle and it's been above expectations. The E-Class has been refreshed and is also doing very, very well. The E-Class was above our expectation as does the M-Class. They're strong vehicles where the S, E and the M with some moderation of the old C-Class is being replaced. At Audi, the big improvement is in the Q7. It's doing very well worldwide, its actually doing better in Europe than it is in the U.S., more expensive than Europe than it is in the U.S., interestingly enough and it's been a real strong vehicle for them. Other than that, Toyota, Lexus continue to gain share and recited Harley-Davidson, Hyundai-Kia, Toyota-Lexus. These are very strong players right now.

**Chris Ceraso - Credit Suisse**

Okay, and then lastly the new business award that starts in the second half of calendar '08. Is that with an existing customer along the lines of what you said about growing your, your business across regions with existing companies or is that with new customer?

**Bernard A. Girod**

Would say that is an absolutely wonderful -- we said everything we're going to say about that award.

**Chris Ceraso - Credit Suisse**

Very good. Thanks.

**Bernard A. Girod**

You bet.

**Operator**

Thank you very much, Mr. Ceraso. Next, in queue we go to the line of Ronald Tadross representing Bank of America Securities. Please go ahead.

**Ronald Tadross - Bank of America Securities**

Case 1:07-cv-01757-RWR          Document 21-32          Filed 07/03/2008          Page 10 of 22

Good afternoon.

**Bernard A. Girod**

Hello, Ron.

**Ronald Tadross - Bank of America Securities**

Hi. Maybe I can finish off on that point as two others, too, but I know you don't want to talk too much about that program. But you did say, Sidney, the confirmation of earlier predictions. Can you just be little more specific about which earlier predictions?

**Sidney Harman**

Yes, the earlier predictions was that manufacturers would move against, if you will, the historic culture of the automotive industry to concentrate the majority of their infotainment awards in a single supplier. That's the confirmation I am talking about. PSA did it, Audi did it, Chrysler did it in infotainment and now this new award represents and affect such a commitment from another major automotive maker.

**Ronald Tadross - Bank of America Securities**

That's, that's great. Congratulations. A couple of other quick things here, on the automotive revenue unit with a 95,000 PND units in automotive?

**Bernard A. Girod**

Yes.

**Ronald Tadross - Bank of America Securities**

That's pretty much from 0 last year?

**Bernard A. Girod**

Yeah, that's about right. As I indicated, our expectation this year is going to be for half a million units there.

**Ronald Tadross - Bank of America Securities**

Okay. And then, you know, I agree with you on the PND picture you laid out. I guess the issue is that that market is a very fragmented market, at least more fragmented that the in-dash market and it does seems like the growth rate is slowing a little bit and NAVTEC kind of indicated that. And I am wondering it looks like the price war has to be brewing in that market and I'm wondering if that happens what, does that mean for pricing (inaudible) If we do get a price war on PND, just assuming we do.

**Sidney Harman**

If you do, and I think there is still evidence of that, whether it's price war or simply a vigorous and even reasonable driving of the prices down that. That will have some influence but I note for you that part of the infotainment system is part of a more complete, fully-functional and elaborated system and those elaborated systems are going to include the kind of functionality, the PND has no place in. Not because I say it has no place in it, bah -- but because that's simply not the world of PND. That's the world that requires the interoperability with the other activities, the other systems in the car. That's particular to our special.

**Ronald Tadross - Bank of America Securities**

I'm just wondering more little specifically on your contracts, would it, could it affect the pricing on your existing contracts or would we be pricing three and four years out, as it relates to?

**Bernard A. Girod**

I would say you're talking about tracing to the extent that this conversation has any relevance; you're talking about pricing well-beyond three years out.

**Ronald Tadross - Bank of America Securities**

You don't have an opportunity to respond on the call side, hopefully.

**Bernard A. Girod**

Of course. We have our commitments for, as I pointed out to you, our book is full for seven, for 8 and for 9 and those commitments are reflected in the pricing that the automakers are themselves committed to and in terms of MSRP I think that's in close to enviable as it gets. You're talking about the possible affects in the out years, 10 and out.

**Ronald Tadross - Bank of America Securities**

Just a few other quick things, do you have -- are you working on a prototype of the safety system integrated with the infotainment?

**Bernard A. Girod**

Yes.

**Ronald Tadross - Bank of America Securities**

Have you started showing that to customers?

**Bernard A. Girod**

They know something about this, that's about as much as I should we -- see.

**Ronald Tadross - Bank of America Securities**

And then just one last thing on the consumer segment. This is the first quarter we have seen down year-over-year revenues and it looks like the profits are lost in this quarter. I'm wondering what is beyond like a new product rollout gets revenue going over the next few quarters?

**Bernard A. Girod**

Well, first let me point out that the quarter of reference, the pace was remarkable --'s remarkable quarter and the quarter at the time that we cautioned about using as a base. But the anticipated business is both a reflection of business we know we have surrounding a whole series of new products and the reasonable expectations we have for other of the new products in the realistic world that we now confront. I don't think you hear in us any unsophisticated, understanding of that consumer space, so it's a combination of commitments that we've got, new products that we have weighed very, very carefully in the multimedia arena. On top of that new media servers, new products in our legacy world and a growing custom business.

**Sidney Harman**

I would also add, Ron, that seasonably the second fiscal quarter is by far the strongest quarter for the consumer business. The Christmas season is included in it, so you will see much more vigorous number just because of the seasonal factor, in addition to all the factors that Sidney stated.

**Ronald Tadross - Bank of America Securities**

Is that when most of the new products hit?

**Sidney Harman**

That's when 14 new products hit and there are another 12 behind that with a balance of the year.

**Ronald Tadross - Bank of America Securities**

Great. Okay, thanks. Congrats, Bernie and Greg. Thank you. And then Sidney.

**Sidney Harman**

Thank you, Ron.

**Operator**

And representing Citigroup, a question now from the line of Jon Rogers.

**Sidney Harman**

Jon, you got out of the traffic?

**Jon Rogers – Citigroup**

Yes, I have. How are you, Sidney?

**Sidney Harman**

Fine, Jon.

**Jon Rogers – Citigroup**

I am just wondering, maybe the follow on Ron's question, was there something unique going on in this quarter and is a portion in addition to the new products and the consumer group is a portion of the snap backs that you expect, just add some of Apple's new products? How does that docking station this quarter?

**Sidney Harman**

Okay, the only unique one-time event for the quarter is our withdrawal from Circuit City. We don't think Circuit can really provide the kind of distribution that we are looking for longer-term. They returned inventory and actually we did not sell to them. We'll recover all of that volume and more by the time we finish the year, but it caused a one-time impact in the first quarter. Other than that, it was pretty much of a normal quarter as expected and we're confident our new products will drive our business well in the second quarter.

**Bernard A. Girod**

You're aware, too, I'm sure, in addition to the magnificent performance at Apple, Microsoft, new zoom entry is on the Horizon and we're going to be considerable players there and that's something we are certain and that's built into our expectations.

**Jon Rogers – Citigroup**

And then Bernie can you give us what the impact of the consumer business to the circuit city inventory issue was?

**Bernard A. Girod**

Yeah, it hit sales by about $6 million.

**Jon Rogers – Citigroup**

Okay. And then if we switch gears to the automotive business, it seems like this, and congratulations on the new award. But it seems like this is potentially a little bit earlier than what we would have seen for a total new award. Have you guys just been working on this for a longer-time and you're announcing it now or is there something in the sales cycle for these awards or maybe in the complexity of the particular new product that would leave the lead time to be be shorter than it usually usually is.

**Bernard A. Girod**

I think the best answer I can give you there was what I'm free to. If we're work -- working on this and other stuff all the time, some expressions of product require a longer lead time than others. Others require somewhat lesser lead time. Ron, I would love to tell you more. I'm constrained and really shouldn't be pressed any further. We would tell you everything we know if we can. And when we can.

**Jon Rogers – Citigroup**

Okay. Thank you very much.

**Bernard A. Girod**

Best to you.

**Operator**

Representing Robert W. Baird, a question from David Leiker. Please go ahead.

**David Leiker - Robert W. Baird**

Hi, good afternoon, everyone. When -- your backlog number Sidney as you talked about is $14 billion, could you remind us what that number was prior to this?

**Sidney Harman**

It's well over 14 and it was 13 the last time I spoke of it.

**David Leiker - Robert W. Baird**

Okay. And is that, that's probably out in the '09, '10, '11 time period?

**Sidney Harman**

It lease -- goes through fiscal '13.

**David Leiker - Robert W. Baird**

In terms of the incremental business, that's probably not enough to hit '08 at all, is it?

**Sidney Harman**

No, not '08. The incremental business hits in '09 and beyond.

**David Leiker - Robert W. Baird**

Okay. Great. Thank you. Where are you in the process of kind of the renewal of programs that you have launched three or four years ago. The initial programs of BMW and Mercedes.

**Sidney Harman**

Well, they come one at a time. We announce the extension of the S-Class in our last conference call, I believe.

**David Leiker - Robert W. Baird**

Right.

**Sidney Harman**

That's a done deal.

**Bernard A. Girod**

By the way, the S-class has been every bit the success we predicted it would be: BMW, you know that we announced being the award, the DL 6 award, which is the large car platform and we picked up some pretty good shape. We haven't yet say Audi, we also announce that if we have all of their business and that Audi really ramps up significantly a -- in '09, so we haven't yet begun that cycle. Chrysler begins later this year. We haven't yet begun to play. Well, PSA hasn't yet begun to launch. We launch in late '08 and we'll see the impact of the volume, primarily '09 and we sit in pretty good shape in terms of the renewal and that's why we're so confident about our book for '07, '08, and '09 and frankly beyond.

**David Leiker - Robert W. Baird**

You have done an impressive job of building that fire. What do you think the timing is of adopting these new functions into the most infotainment unit. Is that something that's out in 2010, '11,'12?

**Sidney Harman**

In '09, yeah it beginning -- begins really in '09. But you will see it's a real emergence in 10 or 11.

**David Leiker - Robert W. Baird**

In this backlog and new business, is there anything that would incorporate those types of functions or is that not yet awarded?

**Sidney Harman**

Modest. Modest piece.

**David Leiker - Robert W. Baird**

Okay. And then the last question here is obviously the functions that you have integrated within your most infotainment units, there are multiple ways of delivering the same function in the vehicle. You just talk about other technologies and where they are in the competitive landscape? Is there any advances there for people like Microsoft or folks along those lines?

**Sidney Harman**

In fact, this is an arena that our guys not only watch very carefully but for various reasons, find themselves engaged in. Probably the most important development in that world in current and recent times has been the remarkable development of Qunix. I think it's recognized today as the most relevant, most affective operating system for the automobile. With all respects and mighty Microsoft, there has been interest in this world a very, very long time. Go -- further engaged now than they were several years ago.

**David Leiker - Robert W. Baird**

Okay. Thank you very much.

**Operator**

And thank you, Mr. David Leiker. And next, representing -- Pacific Crest Securities, we go to Steve Lidberg. Go ahead, sir.

**Steve Lidberg - Pacific Crest Securities**

Good afternoon. First of all, with regards to the PND and the success you have seen in Europe, have you any new thoughts with regards to the introduction of PND products into North America?

**Sidney Harman**

Only that they will be introduced as we have indicated. We think we have a combination of good things going for us. Is they include what we have learned and continue to learn through our work in Europe. Things we learned that we should be doing and things we have learned we shouldn't be doing. Things we recognize are particular to Europe as distinguished from emphasis required in the United States. I said in my formal presentations that we placed particular emphasis on a highly, friendly HMI and on the industrial design of these products. And we bring some very special brand recognition to that world. We're entering the PND business in the states with a -- appropriate caution and I would suggest it's much too early either for us to hang very solid numbers around the scale of it or to encourage anybody else to. When we're more sure-footed about it, we'll speak with much more certainty.

**Steve Lidberg - Pacific Crest Securities**

Great, and Sidney was wondering, we're starting to see you some initial thoughts in the press with regards to new Chrysler models that we'll start to introduce the Harman infotainment systems. And was wondering if your observation Chryslers planned rollout through the back half for this year have changed or what do you think of, kind of the initial push on Chrysler's part?

**Bernard A. Girod**

Our expectation is they're enhanced by two things. First by the tests that have been underway in Europe. They are the preliminary tests of the launching of the European version and they have gone very, very well. Second, by the growing awareness through the Chrysler organization of the powerful importance of these new systems. You see that in the launch of their Sebring. You see in every discussion and conversation we have with them. These guys as -- everybody certainly on this side of the Atlantic on the automotive business are struggling for sales. They placed every emphasis on the increased value of the cars represented by the systems and I tell you I think they're right.

**Steve Lidberg - Pacific Crest Securities**

Great. Thank you.

**Bernard A. Girod**

Good to talk to you.

**Operator**

And thank you very much, Mr. Lidberg. Next to go to the line of Douglas Pratt, representing Mesa Capital Management. Please go ahead.

**Douglas Pratt - Mesa Capital Management**

Thanks very much, a few quick questions. The first, there was a great increase in Audi, was that up -- was last year first quarter unusually low?

**Bernard A. Girod**

The, the increase in Audi was really driven by the Q7, which was not launched in last year's first quarter, so almost all that Q7 volume in this quarter was incremental on a year-over-year basis.

**Douglas Pratt - Mesa Capital Management**

I meant the Audi last year in the first quarter, was that down prior to the September of '04?

**Sidney Harman**

It was, it was way up. You than we have been launching Audi vehicles.

**Douglas Pratt - Mesa Capital Management**

Right.

**Sidney Harman**

About every nine months or so we started with the auto Audi A-8, a very good vehicle and then the A-6 has been an extraordinary vehicle. Setting new sales records, a recorder and those volumes have stays solid through the period. So as we launched new vehicles like the Q7, we obviously -- we obviously get nice incremental volume because the basis are strong.

**Douglas Pratt - Mesa Capital Management**

Okay, and on the consumer side, should we expect that to be up year-over-year in the December quarter? I know it's strong and seems like going from third quarter to fourth but year-over-year, you think that will be positive growth?

**Sidney Harman**

The -- I'll give you an informed response. In the second quarter, the top-line will be up over the prior year. The bottom line will be close to where it was last year.

**Douglas Pratt - Mesa Capital Management**

Okay. And was there anything unusual in the interest expense line? Was it only a hundred and some thousand dollars, looks like it was barely a 0.5% on the average debt. Was there an offset to that or should we expect that level of expense going forward?

**Bernard A. Girod**

The unusual activity actually occurred in the fourth quarter when we bought in the vast major of our public debt. So our interest expense is lower than it was and should stay low going forward.

**Douglas Pratt - Mesa Capital Management**

So it -- okay, I think even using the lower debt for the full -- full quarter, that is only like 40 basis points interest rate.

**Bernard A. Girod**

Keep in mind we have -- we also have a lot of cash that's working for us.

**Douglas Pratt - Mesa Capital Management**

Okay. The net number. Okay.

**Sidney Harman**

That's right.

**Bernard A. Girod**

We have more cash than debt.

**Douglas Pratt - Mesa Capital Management**

Right. Great. Thank you very much.

**Sidney Harman**

You bet.

**Operator**

Next, we'll go to the line of Brad Lundy, representing Ivory Capital. Please go ahead.

**Brad Lundy - Ivory Capital**

Yes, my questions have been answered. Thank you.

**Operator**

Okay. Thank you.

**Sidney Harman**

Since Brad's questions have been answered, I wonder whether the old lion is in the queue? I would welcome questions, comments from Peter Barry as we bring this session to a close if he's with us.

**Operator**

Well, your technology just amazes me, doctor in fact, Peter Barry is the next participant in queue. How can you see through the mobile network, I'll never know but that's why you're where you are Peter Barry with Bear Stearns, you're next.

**Peter Barry - Bear Stearns**

Thank you very much. And thank you for this opportunity because I did want to, before I go to questions, I wanted to extend my sincere congratulations to Greg, Rob, I hope to meet you in the not terribly distant future, but especially Bernie, after all of these years, I wanted to wish you god speed. It's truly has been a privilege.

**Bernard A. Girod**

Thank you very much, Peter, likewise.

**Peter Barry - Bear Stearns**

Kevin, if I could ask you to repeat the Q1 Cap Ex, maybe give us a sense of what the year looks like and how might that number change as we look out over the next couple of years.

**Kevin Brown**

Okay, first quarter was low for capital expenditures as it typically is for us. It was 12.4 million and actually that was even lower than the prior-year's first quarter, which was 21. We gave guidance last quarter, which is still valid for Cap Ex. And

typically as you know in the past, we targeted about 5% of sales. We ran less than that last year. We're probably going to run more than we spent last year. Last year, we spent $130 million or 4% of sales. I think we're go to be between 4% and 5% this year and a good number is about $150 million for the year, which replaces in the mid-4% range.

**Peter Barry - Bear Stearns**

That's probably that – the percentage is the operative number, I would gather.

**Kevin Brown**

Yup.

**Peter Barry - Bear Stearns**

Sidney, just to focus on PND for a month, is the Harman becker brand going to be the identity for the product in North America?

**Sidney Harman**

In Europe, it's the Becker brand and in North America, it will be the Harman -- harmon cardin bond and they're different products.

**Peter Barry - Bear Stearns**

And certainly differentiable from -- .

**Sidney Harman**

From each other and from other competitors.

**Peter Barry - Bear Stearns**

Is a $400 ASP still a good target?

**Sidney Harman**

Well, it's a good target. I think by the time we launch, that might be somewhat modified.

**Peter Barry - Bear Stearns**

Bernie in your discussion about automotive, you mentioned Toyota ,Lexus, Hyundai, Kia and Harley-Davidson. Some of those we do know are infotainment users, but others are not. Could you clarify the role that these companies are playing, these are the infotainment if any?

**Bernard A. Girod**

Sure, Toyota, Lexus is all audio but its very high-end audio, as you know it's a Mark Leinson system, the average selling price is quite high, because of the content of the system and what it is but it's all branded audio. As far as Hyundai Kia, currently, it's branded audio but quickly moving to infotainment into next couple of years. We have announced the awards from Hyundai of two very high-end systems, which were launched beginning in '08 and Harley-Davidson is also next -- a mix, it's a mix of audio and infotainment as well.

**Peter Barry - Bear Stearns**

As it relates to forecasts, you, you re-enforced your 435 but I didn't hear any mention of 525 for fiscal '08.

**Bernard A. Girod**

That remains unchanged.

**Peter Barry - Bear Stearns**

In tact. Today, I don't want to split hairs on backlog but, you know, $14 billion plus versus the earlier 13 billion gives us a $1 billion worth of wiggle room and I was wondering if there were any -- and the only, I assume the 200 million to 250 million of new business is in that 14 billion plus. Are there some other contracts, agreements that have been added to the backlog number that we haven't heard about.

**Sidney Harman**

Not anything of real consequence and to split a hair with you, if that's your closing thrust, my friend -- [ Laughter ] -- I'll put it to you this way: Our backlog has increased over 10%. Do the arithmetic. By the way, $200 million in four years, $200 million to $250 million times four years gets pretty close to a $1 billion.

**Peter Barry - Bear Stearns**

Yeah, and starts that up to real money.

**Sidney Harman**

Money.

**Peter Barry - Bear Stearns**

That major European manufacturer.

**Sidney Harman**

That's correct.

**Peter Barry - Bear Stearns**

Gentlemen, I thank you so very much and we'll see you soon.

**Sidney Harman**

Thank you.

**Bernard A. Girod**

Thank you, Peter.

**Operator**

And thank you, Mr. Barry with that -- that, Dr., I would turn back to you for your closing remarks.

**Sidney Harman**

Thank you, Brent. I have a few things I would like to say. First, I think it's worth noting that over the years we have on occasion made predictions about upcoming significant trends. And I think our record of delivering on those predictions has been pretty darn good. I make a -- another prediction today and it is, as you know, that this important new overlay of driver assistance and pedestrian safety is going to be big time and we are going to be its principle proponents. If anyone had any questions about where this business, this industry is headed in the next decade and more, you will find

it -- its answer there. These are vibrant times, there are big challenges and I think I am more than comfortable that we have the right answers to those challenges. And make a further point that there are -- there are useful lessons in history, they are not always absolutely valid, but there is a remarkable echo in this PND infotainment conflating that is worth noting. I think for all of us.

I have no difficulty remembering the time when the audio after market business was vibrant. He had a stereo shop on virtually every corner and it came into existence overwhelmingly because the automakers continued to provide very modest radios in the cars and nothing else. Once we and others finally persuaded automakers and some automakers independent of our assistance, and our encouragement, came to the conclusion themselves that there was serious business for them to be had in offering serious audio systems in the cars, those two worlds have changed. The audio business for the automakers has been a very serious moneymaker and that after market industry that flourished because the automakers made it possible, if it's not disappear is now very much a niche activity.

The PND has been given an opportunity by the fact that automakers have been slower to come to the decision that infotainment systems should be available through the range of cars, but as we pointed out, the carmakers overwhelmingly have concluded that infotainment systems are not just for the luxury cars, not just for the rich, they belong to the full-range of cars and when they are available, they make ever much -- more sense than and the PND and when the new layer is added, that layer of driver assistance and pedestrian safety, then you will be looking at the PND world as I think it properly should be seen and absolutely wonderful consumer opportunity and one in which we have every expectation that we're going to be a vigorous player.

I'd close my comment by one last time saying to Bernie that it's been a pleasure and it's been wonderfully profitable for all of us to, as we engaged them over the years, he ain't going too far. We'll have our hands on him as he sales the Mediterranean, so all of us give him our love and wish him our best. And I thank you all for staying with us through, I think, a very interesting earnings call.

**Operator**

Indeed, doctor. Simply stellar as all, very nicely said and Mr. Girod, I know all the analysts and private investors and employees joining us on the call today join me in congratulating you on your stellar career and all of the good work that you have done. It will stand the test of time and be felt for many, many years to come. We do congratulate you, sir.

**Sidney Harman**

Thank you very much, Brent.

**Operator**

And, Ladies and gentlemen, Dr. Harman's making today's conference available for digitized replay its for one full week and also by the web for seven days. The digitized replay is available starting at 5:00 p.m. Pacific time October the 25. Please dial 800-475-6701 and at the voice prompt enter today's conference access code of 845306. Alternatively, you may go to www.harman.com to listen to the web replay. You will need to enter the access code again of 845306.

And that does conclude our release for this first quarter. Thank you very much for your participation as well as for using AT&T's executive teleconference service. You may now disconnect

**Copyright policy:** All transcripts on this site are copyright Seeking Alpha. However, we view them as an important resource for bloggers and journalists, and are excited to contribute to the democratization of financial information on the Internet. (Until now investors have had to pay thousands of dollars in subscription fees for transcripts.) So our reproduction policy is as follows: **You may quote up to 400 words of any transcript on the condition that you attribute the transcript to Seeking Alpha and either link to the original transcript or to www.SeekingAlpha.com.** All other use is prohibited.

THE INFORMATION CONTAINED HERE IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES SEEKING ALPHA ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR

OTHER DECISIONS.

Case 1:07-cv-01757-RWR        Document 21-32        Filed 07/03/2008        Page 22 of 22



Want to be smart about
Fidelity Advisor Series I Fifty Fund?

Scottrade *SmartText*™

DISCLAIMER ▲

0%

-4.2%
Percent-Change Over 1 Week





PRINT THIS

Powered by Clickability

JANUARY 24 2008: 9:25 AM EST

# An old hand in a strange new world

**In the heat of the private equity boom, the octogenarian audio pioneer Sidney Harman agreed to sell his company to KKR and Goldman Sachs. Then they ditched him. Now he has a stock worth one-third of what it was. A tale from the dark side.**

By Carol J. Loomis, senior editor-at-large

(Fortune) -- A year ago, when he was only 88 and not yet jilted, Sidney Harman was autocratically doing what he likes best: running Harman International Industries, a company he built pretty much from scratch. His business, headquartered five blocks from the White House, makes upscale audio and electronic gear that goes by such household names as Harman/Kardon, JBL, and Infinity. Sidney, executive chairman by title and a founding father of audio high fidelity by reputation, along the way constructed an unusually interesting personal life. He is married to U.S. Representative Jane Harman, 62, a California Democrat whose relationship to the very rich Sidney, plus Harman stock she controls herself, makes her No. 1 on the list of wealthiest members of Congress. Sidney - we will call him that to distinguish him from the company - is a patron of the arts, an author of a very readable management book ("Mind Your Own Business"), and the holder of a Ph.D. He is both a fitness nut and a diehard golfer, regularly walking 18 holes, which not many super-seniors do, and often shooting scores lower than his age.

A good, vigorous life - but as an upper octogenarian, Sidney was forced now and then to reflect uncomfortably on his lack of a real plan for the next stage in his company's life. As 2006 ended, he didn't exactly even have a CEO to act as his No. 2. One longtime CEO had left the job earlier that year; a replacement had lasted only three months, and the longtimer had returned briefly before firmly retiring. A search was on for the next contender, but one hadn't been found.

Into this ripe situation, in November 2006, walked Henry Kravis, co-head of Kohlberg Kravis Roberts. That firm and all its private equity brethren were then awash in money and burning to do deals. Or to put it in Sidney-speak, which can be professorial, "The azimuth was straight up." Kravis proposed that KKR take Harman International private. Sidney says he initially resisted, reluctant to see his creation leveraged up and not eager to cede control. Speaking recently to *Fortune* in his office, from whose half-moon windows he can look down on Pennsylvania Avenue, he dwelled on the primacy of his work: "This is how I define myself. This is my life."

But money talks, and Kravis had plenty in mind, so Sidney ultimately began to negotiate. And on April 26, 2007, he announced that Harman International (HAR) would be acquired by KKR and a Goldman Sachs fund, GS Capital Partners, for a price valuing the company at $8 billion, which was more than 25 times earnings and 20% higher than it had been valued at in the public market. The price - $120 per share - also solidified Jane Harman's position as the wealthiest Congressperson, since the 5.4% share of Harman that she and Sidney controlled was to become worth $425 million.

But that was April. You haven't read since about this deal closing, because it dramatically didn't. As late as June 20, Harman and KKR filed a preliminary registration and proxy statement contemplating that the company would be merged into a new KKR entity by Sept. 30. But in August the horrors of the credit crisis struck Wall Street. And on Sept. 21, the buyers leaned on an escape clause in the merger contract to "declare a MAC," saying in effect that Harman had breached the merger agreement and that therefore they were killing the deal. MAC stands for "material adverse change," and that was what the KKR group claimed had happened - quite suddenly, obviously - to Harman International's business. This accusation was conveyed by KKR's lawyers to Harman's lawyers without specifics. Nor did KKR issue a press release explaining its exit. Next day, news stories reported vaguely that "the buyers" were influenced by a worsening in Harman's business, in particular by a capital expenditure problem.

Privately, Sidney may have broken a few golf clubs over his sudden sacking. Publicly, he simply said he "disagreed strongly" with the buyers' action, meaning he did not think - and he still doesn't - that his company had suffered a "material adverse effect" (the precise wording in the contract, though MAC is the common term). He added that Harman would "be vigorous in defending its position."

The strange, and even occasionally absurd, tale of how Harman and the KKR group got to this standoff and what happened next captures a mood of financial extravagance we won't see again for quite some time. Buyouts worth a total of $522 billion closed last year in the United States, according to Dealogic, more than double the previous year's volume. But many deals launched in the carefree atmosphere of spring started collapsing in the chill of autumn. Harman does not win the prize for biggest announced deal wrecked by the credit crisis - the $26 billion nonacquisition of Sallie Mae (SLM, Fortune 500) claims that distinction. But the matchup of two pioneers, Sidney in sound and KKR in private equity, makes this failed merger a parable of old hands caught up in a weird new world.

Of the two parties, Sidney is the earlier pioneer, having gone to work in 1940 for a New York producer of amplifiers for TVs and, in time, high-fidelity speakers. In 1953 (a full 11 years before another audio name, Bose, entered the scene) Sidney and engineer Bernard Kardon, both in their 30s, left to form Harman/Kardon, whose stylish equipment soon became a cult brand in a burgeoning hi-fi industry. Kardon quit within a few years, and Sidney went on to spend decades building the business, serially selling it, and then recapturing it. In his truly memorable sale, he offloaded publicly owned Harman International in 1976 to an omnivorous acquirer, Beatrice Foods, for $98 million, while himself going off to embellish his Renaissance-man résumé by serving as deputy secretary of commerce in the Carter administration. Then, in 1980, Beatrice sold the part of Harman it still owned back to Sidney and a group of investors for $55 million, in a deal financed largely by Beatrice. To Sidney, as he thought about it much later, this debt-heavy, equity-light 1980 deal seemed an early example of a leveraged buyout. Early indeed - because private equity pioneer KKR was then only four years old and six years way from its own brush with Beatrice, which it took private in 1986.

MACs are extremely rare

It bears stressing, as we inspect the 2007 deal that put Harman and KKR on the same stage, that the event bringing the curtain down was a true anomaly. MACs are extremely rare. That is true, to begin with, because when companies are selling themselves, they insist on tightly written contracts that give buyers only the narrowest possible openings to back out of a deal while it is moving to a close. The openings almost never include a mere swoon in profits. A second reason MACs seldom occur is that a private equity buyer finds it both embarrassing and potentially expensive to go back on its contractual word. On the face of it, a retreat of that kind makes the buyer's due diligence look sloppy. And down the road, sellers could conceivably shy away from the buyer or seek special terms to protect themselves from still another broken deal.

Just how rare are MACs? One New York private equity veteran recalls that he was selling a company when 9/11 occurred. The buyers, he remembers with enduring amazement, did not call a MAC. Today's credit crisis, however, has produced a few cases of buyers pulling the MAC lever. In the most noteworthy, a private equity group led by J.C. Flowers & Co. attempted to lower the price on its deal to acquire Sallie Mae by declaring a MAC, claiming that new congressional legislation had shattered the prospects for student lenders. Sallie Mae has sued the Flowers group, contending that it is owed a termination fee of $900 million. Similarly, the contract between Harman and the KKR group provided that if each side had dutifully complied with certain covenants, the termination of the deal would require the terminator - the KKR camp in this instance - to pay the other side a fee of $225 million. KKR never publicly said whether it would or wouldn't. But the $225 million became the stake on the table. Add another stake as well - Sidney Harman's pride.

One important note: Despite our repeated requests, Henry Kravis would not talk to *Fortune* for this story. Nor would Brian Carroll, now 36, the KKR partner who led the due-diligence work at Harman. A reason, said KKR's Kekst & Co. spokeswoman, was that an agreement between the two sides barred each from talking about the other. In truth, the agreement simply forbade each side to "disparage, denigrate, or malign" the other.

Despite KKR'S silence, a lot is crystal clear about this deal. In a sense, its chronology begins even before Henry Kravis called on Sidney Harman, because Sidney was then in early talks with a man slated to be his next CEO, Dinesh Paliwal, now 50. A native of India, Paliwal is a high-energy, straightforward man who, when Sidney began talking to him, was a U.S.-based executive who had the No. 2 job at the Swiss power-systems giant ABB Group (ABB).

It took until May 2007 for Paliwal to be hired and until July for him to begin work. But through it all he was another rare case. He was hired by a public company that was scheduled to become a private company, and he had to measure up not only with the existing brass, Sidney Harman and board, but also with Henry Kravis and the crew coming on. So with KKR, Paliwal worked out a handsome arrangement that would give him equity in the private entity, Harman, and a chance to make a mint if it did well. (When the deal blew up, Harman had to redo Paliwal's compensation contract to match what KKR had offered him.)

Sidney Harman, meanwhile, was to stay on as executive chairman of the private Harman. Beyond that, he successfully pushed a highly unusual plan whereby he and other Harman shareholders were to have the option of not taking cash for their stock but instead trading it for as much as 27% of the acquiring KKR company. That would have been a $1 billion equity stake. The remaining financing (which covered $296 million in fees as well as the price, with $83 million of the fees going to the KKR group) was to be $2.7 billion in equity from the KKR group and $4.6 billion in debt from five lenders, principally Bank of America, Credit

Suisse, Goldman Sachs, and Lehman Brothers. Naturally the lenders expected to quickly syndicate the debt to others.

A few stutters were expected

As the deal was going forward last spring, it is clear that all the participants thought Harman International was a fine asset - "a great company," one Wall Street analyst called it in April. Harman had five straight years of earnings increases behind it - with profits reaching $255 million in fiscal 2006 on revenues of $3.2 billion - and expected another in fiscal 2007. The company anticipated that the audio and other electronic systems it sold for luxury cars like Mercedes-Benz (DAI) and BMW (BMW) (anchors of a big business Harman does in Europe) could be gradually introduced into lower-priced models. Harman was also building a nascent GPS business. According to CEO Paliwal, KKR was enthusiastic about Harman's long-term prospects. He says KKR people told him the firm had no intention of quickly "flipping" the business but instead saw large expansion possibilities, capable of tripling Harman's market value.

Near term, true, a few stutters were expected. Sidney Harman had told analysts in January that a heavy automotive backlog - $14 billion of business to be booked as revenues over time - was causing research and development costs to "bulge." Sidney said $80 million of extra R&D costs would hurt the last quarter of fiscal 2007 (ending in June) and the first quarter of fiscal 2008. Unfazed, KKR kept pressing for a deal. It also carried out (with Carroll taking the lead) more than two months of "due diligence" - from mid-February through April - and found nothing that scared it off. So on April 26, as noted, the deal was announced, and on June 20, the preliminary merger proxy was filed with the SEC.

The importance of that date can scarcely be discounted: On June 20, when the KKR group surely had a general picture of a June quarter just about to end and at least an inkling of results for the September quarter, KKR was still poised to do the deal. Even two months later, on Aug. 14, Sidney Harman led an earnings conference call for analysts in which he spoke confidently of the merger, expressing his expectation of exchanging "one set of world-class investors for another."

And yet both KKR's world and Harman's position in it had by then been jolted severely. For KKR the trouble was the August freezing of the credit markets. For Harman the grief was two bad quarters in a row - June and September. Among Harman's problems was not only some of that "bulge" in R&D spending but also a general surge in costs, among them inefficiencies at new plants in China and Missouri. A very low tax rate and a strong euro cushioned the bottom line in both quarters and actually gave Harman its sixth year of rising earnings. But operating profits, which private equity buyers crave, told the dismal story: For the June quarter they were down 22%, and for the September quarter 53%.

A "perfect storm"

Overall, Harman seemed during this period to be out of control. Or at the least, it looked like the operation it was: a company that until very recently had lacked a CEO and whose boss, Sidney, had been spending outsized amounts of his time negotiating a merger. In a September analyst call, Sidney himself characterized Harman's recent experience as a "perfect storm," though he thought it would blow over.

One ill wind in that storm, never before publicly explained, was a bizarre episode involving capital expenditures. Soon after Harman's 2007 fiscal year ended, Sidney and the newly installed Paliwal learned to their discomfited surprise that their Harman-Becker division, headquartered in Germany, had binged on capital spending in June, spending $60 million in that one month. And why? Because, Sidney explained reluctantly to *Fortune* late last year, the division's executives were afraid that Harman's prospective owners might restrict capital outlays when they took control; so the executives were inspired to spend. They engaged, says Sidney, in "exuberant behavior." No, there weren't controls then in place to prevent this - as a German might put it - Überschwang. Paliwal says, in fact, that Harman lacks certain widely accepted management "processes" and that he is now busy installing them.

The Becker binge, in any case, caused Harman's capital expenditures for the year to hit $175 million, vs. a $150 million forecast only three months earlier - and that $25 million overrun became evidence that KKR cited as a justification to kill the deal. Semantics pervaded this argument. According to Sidney, KKR maintained that the $175 million infringed the merger agreement because it exceeded the 2007 "plan" for capital expenditures. But neither "plan" nor "forecast" is the operative word in the agreement's covenants; "budget" is. And, assert both Sidney and Paliwal, the $175 million was within the companywide capex "budget" for fiscal 2007. Therefore, the two men say, the merger agreement was not infringed.

In court, who knows how this argument would have come out? But it is clear that the question of whether $25 million was "material" in an $8 billion deal would have been argued, and it is hard to see how KKR could have prevailed there. Three different private equity veterans *Fortune* talked to about this broken deal said they couldn't imagine $25 million being grounds for a MAC. Sidney says it is "silly stuff" to think of the capex matter as consequential.

But the seizing up of the credit markets unarguably was momentous, and before long KKR had arrived, says Sidney, at a fixed opinion: "They definitely wanted out of the deal." The September ax then fell. On that morning of Sept. 21, Kravis and Carroll met with Sidney and Paliwal at KKR's offices in New York, both sides flanked by aides, with the two parties facing each other across a long table. The proceedings, which Sidney says were "gracious" and "gentlemanly," began with a lengthy discussion of answers

that Harman had previously provided in writing to a string of business questions KKR had asked. Sidney says the meeting seemed less a "let's spread it out and review it together" session than it did a situation in which the KKR representatives had already formed their judgments.


A company whose good looks may have faded


Further along in the meeting, Kravis talked about the credit crisis. The bankers scheduled to back the deal were nervous about Harman's deteriorated profits, and financing looked hard to get. That, it should be noted, was not Harman's immediate problem; it was KKR's. The firm was permitted by its agreement with Harman to delay the merger's closing because of financing problems but could not lean on them to kill the merger altogether. So the KKR group was seemingly on the hook to complete this deal - this high-priced, capital-hungry deal for a company whose good looks had at least temporarily faded - or to pay the $225 million termination fee.

The meeting concluded with Kravis saying that KKR was uncomfortable with Harman's financials and that it did not expect to proceed with the merger. Both Sidney and Paliwal say Kravis did not mention a MAC, but that is unlikely to have been something he imaginatively thought up in the next few hours. That same afternoon, a KKR lawyer called a Harman lawyer and said a MAC was being declared. The reaction at Harman? "A lot of emotion," answers Paliwal. The stock market reacted emotionally too, sending Harman stock from $112 a share to $80 in two days. More market angst was to come: In the wake of the bad results for the September quarter and a mid-January announcement by Harman that it was lowering its 2008 earnings expectation, the stock price has sunk drastically, to around $40.

There remained the question of whether Sidney would stick with his vow to vigorously defend Harman's position - hello, litigation - or would instead choose compromise. The calculations will sound familiar to anyone who has weighed a lawsuit. Sidney avers that Harman would have proved that no MAC was justified and would have been awarded the $225 million fee. But $50 million to $70 million of that, he thinks, would have gone to lawyers and the company's investment banker, Bear Stearns - and then the remainder would have been taxed. Beyond money was the question of time: perhaps a year and a half in which the attention of Harman's executives would have been diverted, just when the company needed maximum care.

As often happens in business, compromise won: On Oct. 22, the two parties, filing a "termination agreement," announced that the KKR group would buy $400 million of Harman senior convertible notes, with a term of five years. The notes are convertible at $104 per share, 21% above Harman's price at the time the bargain was struck, and pay only nominal interest, 1.25%. Another provision of the agreement, which Sidney says he requested, placed a KKR representative, who turned out to be Brian Carroll, on Harman's board. Showing only bridled enthusiasm, Sidney says Carroll is "an admirable young man who will bring financial competence to our board." He chuckles, "I can hardly have the greatest affection for him."

You can look at the $400 million in various ways. First, it is obviously more than the $225 million breakup fee the KKR group might have had to pay. But that fee would have been a straight-out expense, whereas the $400 million is an investment that, though a limp thing now, could in time pay off. And ironically, the very term "investment" means that KKR still has its own investors tied up with this company it didn't think worth owning.

Another perspective on the $400 million concerns what it bought. A senior convertible note paying only 1.25% interest (far below a market rate) and convertible 21% above the market when issued was not then worth par. So the $400 million was exchanged for a security worth less. By now, with Harman's stock down another 50%, the value of the notes has fallen also, because the option to convert is at least temporarily irrelevant.

At bottom, the $400 million should probably be viewed as simply the hammered-out, hard-won tangible result of two parties trying to make the best of a messy deal. Residue of the hammering may be seen, in fact, in the termination agreement filed with the SEC. The KKR group still maintains that there was a "material adverse effect" and that Harman "violated the capital expenditures covenant in the Merger Agreement." In near-duplicative words, Harman denies - no, "steadfastly denies" - both allegations.

Today, about nine months after the deal was announced and four after it was killed, Sidney Harman no doubt thinks often about the $120-per-share price that flew out the window. But in conversation, his doctorate in social psychology seems an influence, leading him to muse about the "philosophical tapestry of this thing." There are, he says, "no villains, just victims, with all of us caught in a well-intended web." The year's events remind him of a John Fowles novel ("The Magus," for example) in which there is "something intertwining, this serpent wrapped around a serpent" and there is "this riddle" and "the almost unimaginable complexity of it with so many players and so many moving parts." And yet, Sidney says slowly and reflectively, "all of us are pawns."

It is a stretch to move from that to real life - a real life indeed in which Harman is priced at only a third of what it once was. Sidney nonetheless congratulates himself for having emerged from this tangled year with a CEO, Paliwal, whom he thinks both "stunningly" talented and easy to work with. Paliwal's presence even led Sidney, in the year he turned 89, to give up the title "executive chairman" for just "chairman." He told analysts recently that the shift in title probably wouldn't change his working habits. Sidney also said it was wonderful, after unremitting distractions, to be "breathing clean, fresh air" and doing "serious work." And then he went back to walking 18 holes on the course, in still fresher air, and shooting better than his age.

Case 1:07-cv-01757-RWR    Document 21-33    Filed 07/03/2008    Page 5 of 5

*Research associates Patricia A. Neering and Susan M. Kaufman contributed to this article.* ✿

Harman's noisy collapse
Merrill's kitchen sink approach fails

**Find this article at:**
http://money.cnn.com/2008/01/21/news/companies/harmon_kardon.fortune/index.htm

☐  Check the box to include the list of links referenced in the article.

© 2007 Cable News Network LP, LLP.

# Seeking Alpha$^{\alpha}$

# Harman International Industries F1Q08 (Qtr End 9/30/07) Earnings Call Transcript

posted on: October 26, 2007 | about stocks: HAR

Harman International Industries Inc. (HAR)

 F1Q08 Earnings Call

October 25, 20074:30 pm ET

**Executives**

Sidney Harman - Executive Chairman

Dinesh Paliwal - Chief Executive Officer, Vice Chairman and President

Kevin Brown - Chief Financial Officer and Executive Vice President

Robert Ryan – Vice President and Treasurer

**Analysts**

Scot Ciccarelli - RBC Capital Markets

Chris Ceraso - Credit Suisse

Peter Barry - Bear Stearns

Peter Friedland - Soleil Securities

David Niederman - Pacific Crest Securities

Jairam Nathan - Banc of America Securities

Jeff Kessler - Lehman Brothers

David Leiker – Robert W. Baird

**Presentation**

**Operator**

Good afternoon. Welcome to Harman International Industries First Quarter Fiscal 2008 Earnings Release. (Operator Instructions).

Ladies and gentlemen, if I may have your full attention: please be aware that certain statements made by the company during this call are forward-looking statements. These statements include the company's beliefs and expectations as to future events and trends affecting the company's business and are subject to risks and uncertainties.

Persons participating on the call today are advised to review the reports filed by Harman International with the Securities and Exchange Commission regarding these risks and uncertainties.

So with that being said, let's get right to this first quarter agenda. Here with our opening remarks, it's always my pleasure and privilege to introduce Harman International Industries' Executive Chairman, Dr. Sidney Harman.

**Sidney Harman**

Thank you, Brent, and good afternoon. I am Sidney Harman. Joining me today in Washington, D.C. are Dinesh Paliwal, our Chief Executive Officer, Kevin Brown, our Chief Financial Officer; and Rob Ryan, our Principal Investor Relations Officer.

In our conference call of September 27th, I said that we disagreed strongly with the decision by KKR and Goldman Sachs not to proceed with the previously announced merger. And I said that we would be vigorous in pressing our position--that we have been, and I am genuinely pleased with the results.

As you undoubtedly know, on Monday of this week, October 22, we announced the resolution of the disagreement. That resolution provides the company with $400 million atan interest rate of 1.25%. The notes will be convertible at $104 a share, and the sponsors have agreed neither to sell nor hedge their position for at least one year. Further, and at our request, Brian Carroll, a member of KKR and the member who led the diligence effort, will be nominated to join our Board.

I repeat, we proposed this step because we expect Brian to bring a meticulously developed diligence and knowledge of our business. And we expect that he will learn those critical management nuances that distinguish and build a great company.

Today our employees, our customers, and our largest investors are enthused and reinvigorated by the agreement. We and our Board have no doubt from Harman's point of view, this is an admirable settlement. And we are now back at work, enthusiastically undistracted.

And I add, that inthe process we have learned a rather great deal about our company, learning we will put to effective use. Although I would never have chosen such an indoctrination for our new CEO, Dinesh Paliwal has demonstrated his stunning capacity for analysis and appropriate action and his contagious enthusiasm for hard work.

We have chosen a true leader and I am delighted to call him partner. In recognition of Dinesh's role, I am pleased to forgo the title of Executive Chairman and to work with him and our Board as its full-time Chairman of the Board. It will become effective at our annual shareholders meeting on December 17th.

Now, after that quite modest introduction, I encourage Dinesh to speak for himself.

**Dinesh Paliwal**

Thank you, Dr. Harman. Thank you very much. Before I comment on our performance during the quarter, let me also tell you, ladies and gentlemen, that I truly share Dr. Harman's enthusiasm for the fact the recent investment agreement with KKR will have on our company.

The real impact is far more significant than avoiding the time and cost of potential litigation. This agreement facilitates the return of wealth to our investor base through share repurchase, and we will benefit from KKR's expertise as a skilled financial partner.

I'm very pleased with the early reaction from key customers, investors, and our employees. A number of direct calls I have received from our large customers worldwide and they were very, very positive. They were very happy to see that we have put this behind so that we can move on with bigger and better and serious things they want us to focus on.

With this foundation in place, we can truly turn our full attention to strengthening our business, as Dr. Harman said. We will implement strategic initiatives for controlling costs, managing risks better, simplifying our global footprint, and expanding our activities in the mid-range markets. Each of these offers tremendous opportunity, and we will pursue them aggressively.

First quarter sales of $947 million were a record, I remind all time high record, and reflect continued top-line strength with double-digit growth for each of our three businesses.

Automotive sales for the quarter, up 14%, were supported by several factors, including higher sales of portable navigation devices, we call PND, the ramp-up of Chrysler Infotainment systems, and sales increased to luxury automakers, including Audi and BMW.

Consumer net sales were up sharply, 28% from the same period last year, as we continue to expand our product offering and leverage the merchandising power of leading retailers such as Best Buy inAmerica and Media Mart in Europe.

Our professional sales continue to grow, up 11% for the quarter, as we serve the leading names in sports and entertainment, particularly in large speaker areas and mixing equipment for touring artists and facilities.

In a few moments, our Chief Financial Officer, Kevin Brown, will review our profitability in three divisions. But I must say I take a great deal of pleasure in sharing at least at the outset, that the guidance we gave you a few weeks ago, we have come out better than that. And Kevin will share with you the details.

It goes without saying, however, that improving this element of our performance inthe Consumer business remains a high priority in terms of profitability margins. Inthe Consumer sector, our strategic relationship with companies such as Apple, Nokia, and Motorola often provide first-to-market opportunities for us. And that is a valuable reward for engaging them in our up-front R&D.

We are among the top sellers through e-commerce sites, such as Amazon and eBay. And we are supporting leading retailers through modular merchandising concepts, such as the Harman Entertainment Lounge. We actually kicked off this great concept of Harman Entertainment Lounge in IFA, Berlin, and there was a tremendous feedback from thousands or hundreds of customers who visited us.

We recently met with more than 1,000 top sales people from Best Buy locations across theU.S. ata multi-day event that brings Best Buy's top achievers face-to-face with their key vendors and new products. We were told and we believe that Harman stole the show. The positive feedback continued after the show, and we're very, very pleased with the prospect that has established for us going forward.

Our professional systems continue to bethe choice of both world-class entertainers and facilities. Inthe first quarter, we delivered Harman systems for such prestigious venues as Gucci inJapan, the Alamo Dome in Texas, and Atlantis Hotel in Dubai.

For the 2008 Summer Olympics inBeijing, we are installing systems for nearly every major venue, including the National Stadium, National Aquatic Center, Olympic Sports Center Gymnasium, Shanghai soccer stadium and Hong Kong equestrian venues.

I'm personally excited by the energy these world-class customers bring to Harman's business. We will continue to serve them with focus and enthusiasm, leveraging both Harman's traditional market strengths and a renewed corporate spirit. We are energized, committed, and moving to reach our full potential at pretty rapid pace.

Ladies and gentlemen, thank you for your attention. And now I will hand over to our Chief Financial Officer, Kevin Brown, for a closer look at first quarter results. And then we will open up for Q&A.

**Kevin Brown**

Thank you, Dinesh. I will provide certain information on a non-GAAP basis to give you a better understanding of our results, exclusive of merger-related costs. These costs, primarily advisory legal fees, were $4.7 million during the quarter. A reconciliation of first quarter GAAP to non-GAAP results was included in our press release, which is available on our website.

Net sales for the first quarter were $947 million, an increase of 15% compared to the same quarter last year. Gross profit margin was 27.9%, compared to 34.8% last year. Operating income was $41.4 million, compared to $86.9 million inthe prior year period. Excluding merger-related costs, operating income was $46.1 million.

Net income for the quarter was $36.5 million, and earnings per diluted share were $0.55. Excluding merger-related costs, net income was $41.2 million and earnings per share were $0.62, compared to last year's record $0.85.

Foreign currency translation affected our first quarter results as the Euro strengthened about 8% compared to the same quarter last year. The Euro averaged $1.37 inthe quarter compared to $1.27 last year. As a result, foreign currency translation improved sales by approximately $42 million and contributed $0.07 to earnings per share in the quarter.

Gross profit margin was 27.9% during the first quarter, a decrease of 6.9 percentage points compared to the same period last year. During our September 27th conference call, we discussed Automotive's changing product mix and its effect on gross margins. We expected gross profit to decline as we entered the mid-infotainment segment and ramped up our PND business. However, the planned decline was burdened by higher than expected material costs and the launch of new infotainment programs and new manufacturing facilities.

The ramp up at our facility in Missouri was slower than we had expected because over the course of the quarter, our automotive customers slowed its 2008 model introductions to clear out unsold 2007 model inventory. We expect this to be resolved in the second quarter. We believe our material costs will improve going forward and our new manufacturing facilities will gain efficiencies as they approach full production.

Operating expenses were $223 million for the quarter, an increase of $23 million from fiscal '07. Operating expenses inthe quarter include the $4.7 million of merger-related costs mentioned previously. We expect significant additional costs related to the resolution of the merger in the second quarter.

Absolute operating expenses increased in both R&D and other SG&A. Automotive gross R&D is $13 million higher compared to the prior year, reflecting the resources added in the third and fourth quarter of fiscal 2007.

The additional R&D or engineering bulge we discussed in detail in our January and April earnings calls, is necessary to support our many new business awards, invest in new areas of technology such as Driver Assist, and to ensure the delivery of the record number of new programs launching inthe next several years.

The first quarter tax rate was 9.3% compared to 34.5% during the same period last year. The lower tax rate reflects a credit from the settlement of a prior period tax audit inGermany.

As Dinesh said, first quarter sales increased in each of our three operating segments compared to the prior year. Automotive sales increased $81 million or 14% during the quarter. Automotive gross profit, down nine points from the prior year, was affected by product mix, material costs, and new programs. Automotive operating income of 6.7% of sales was impacted by the gross profit decline.

Consumer sales increased $26 million or 28%, driven by new product introductions and strong international sales. Consumer gross profit was 1.7 points below the same quarter last year, as competition inthe multimedia space has depressed margins. Consumer reported an operating loss in the traditionally weak first quarter of negative 2.6% of sales; however, that was a 2.2 point improvement compared to the prior year.

Professional sales increased $14 million or 11%, due to new product introductions atJBL Pro and Soundcraft Studer. Professional gross profit exceeded the prior year in both dollar terms and as a percent of sales. Professional operating profit improved 1 point to 14% of sales.

At September 30th, our cash balance was $77 million and total debt was $183 million. During the quarter we made tax payments of $73 million, primarily inGermany, and paid $18 million to retire our remaining senior debt. Capital expenditures during the quarter were $27 million. And depreciation and amortization was $34 million.

Accounts receivable at September 30th were $580 million. Inventory was $475 million. And accounts payable were $326 million. As we reviewed inthe September call, sales growth remains strong but several factors will affect full-year operating performance.

Full-year sales for fiscal '08 are forecast to be $4.1 billion, an increase of 16% compared to $3.5 billion in fiscal '07. We

expect each of our three operating segments to produce higher sales than the prior year.

Full-year gross profit margin is expected to be 31% of sales, approximately 3 percentage points lower than fiscal '07. Lower gross profit margin is forecasted in Automotive, primarily due to product mix, new model and plant launch costs and increases in material costs. Operating expenses before transaction costs are forecast to be $870 million for fiscal '08.

Within operating expenses, we expect R&D costs to improve each quarter but remain higher in dollar terms than our FY '07 record. As a percent of sales, we expect R&D costs to be lower than fiscal '07. Total operating expenses including R&D are forecast to increase about $55 million from fiscal '07. On a percent of sales basis, operating expenses should decrease from fiscal '07.

Finally, we expect fiscal year '08 earnings per share before transaction, legal, and restructuring costs, to meet or exceed the $4.14 reported for fiscal '07.

As announced on Monday, we will implement an accelerated stock repurchase program. An accelerated stock repurchase program allows us to immediately retire over 4 million shares or about 6% of the outstanding shares of the company. We expect that accelerated share repurchase will improve fiscal '08 earnings per share by about 4%.

We will now take your questions.

**Question-and-Answer Session**

**Operator**

Representing RBC Capital Markets, our first question comes from the line of Scot Ciccarelli.

**Scot Ciccarelli - RBC Capital Markets**

Wanted to ask about the gross margin on the auto side. Obviously it was down about 9 points, according to Kevin's commentary. Can you give us an idea of what is an ongoing pressure on the margin, because we're moving into mid- and entry level programs? And what is what you have termed sort of one-time-ish that we should get past?

**Dinesh Paliwal**

Yes, Scot, let me share my view on that. As we have said, inthe long run, we may have pressure on the contribution margin. But we have also said before, and I said it, and I repeat again, we are aspiring and feel pretty confident to hold on to good profitable operating margins we have maintained. And we're not there yet.

What has happened in last quarter or actually a short period here, we had couple of brand-new plants started up, one in U.S. and one in China; we had also PND portable navigation device business taking off on a very good level; from 2006 to 2007 to 2008, we're seeing phenomenal growth and here we have a lot more material price increase, which has impacted on a short-term basis.

Also, material substitution in our OEMs, which allows us once a year, typically, to take it to our customers for cost reduction or design changes, which will take costs out; typically allows us once a year, but we are in vigorously trying and actually succeeding to do that twice a year. So we missed that in first quarter and we actually ended up taking material price variance inthe wrong direction, which should not happen going forward.

And similar things could be said for some of the ramp-ups, which we had said that the plant start-up in the United States had a slower ramp-up due to our customers' request as they had some unsold old inventory and they wanted us to slow down, so we ended up taking some cost--overhead fixed cost as well as some variable cost--which otherwise wouldn't have hit the bottom line.

So, those are some of the one-offs that put a lot of pressure on our bottom line, which we don't believe should continue, going forward.

**Scot Ciccarelli - RBC Capital Markets**

I guess what I'm trying to get to, Dinesh , is, as a 9 point decline, was two-thirds of it kind of one-time-ish, the factory costs, et cetera, and one-third was just kind of the structural pressure? I guess I'm just trying to size that?

**Dinesh Paliwal**

Sure.

**Kevin Brown**

Sure, Scot. And I think you've captured it accurately.

**Scot Ciccarelli - RBC Capital Markets**

Two-thirds to one-third?

**Kevin Brown**

Two-thirds to one-third; the majority were the one-time impacts.

**Dinesh Paliwal**

Yes, about that, yes.

**Kevin Brown**

And as I noted for the full company, we were down 7 points in gross profit in the quarter, but we expect that to only be 3 points for the full-year. We anticipated some of that gross profit decline inthe full-year in our planning, based on our product mix change. But some of is the effect of the one-time factors Dinesh discussed.

**Scot Ciccarelli - RBC Capital Markets**

Very helpful. And just a question about the balance sheet, receivables, inventory up pretty markedly. Is that just a function of the new programs? Or is there something else that might be impacting account that? Thanks a lot.

**Dinesh Paliwal**

Yes, sure. I think none of us like to see inventory build up but there are times in the year, that particularly now, where we had some inventory build up on purpose. We had a number of new product launches coming up prior to Christmas in our Consumer business that actually put some inventory.

And also Chrysler ramp-up, which was not planned by us, and we had a customer slowdown and that has also forced some inventory with us, and that added a little pressure on. And then receivables and payables, that's another thing and I think we're working on that. So I think we can balance that out between receivables and payables.

So that's pretty much on our radar screen. Every month, Scot, we review that. In fact, next week is our fourth monthly review, half a day with each division President and their CFO and management team. And working capital, particularly these three items, one-by-one, with clear action plan is being pursued.

**Operator**

Next in queue, we go to the line of Chris Ceraso of Credit Suisse.

**Chris Ceraso - Credit Suisse**

A couple of things. First, Dinesh, maybe, can you outline for us in any more detail the restructuring plans that you are putting in place, in terms of specific actions, the timing of those actions, and what you expect in terms of cost savings?

**Dinesh Paliwal**

Yes, I'll certainly respond to that. It's a great question, Chris. Restructuring was something we already talked, even prior to my arrival here. And we started and we did some restructuring in fourth quarter, fairly small. And typically, our experience is you will seethe full payback inthe following 12 to 18 months for the restructuring you do.

Now I come back to specifics. We gave you guidance of about $25 million to $30 million in restructuring in next six months. And that was based on a number of things, which we would like to achieve, assuming our Board of Directors approve the plan management is putting together right now.

And these arein the area of consolidation of manufacturing or assembly sites, both inEurope and inNorth America. Secondly, we would also like to consolidate our supply base, which would have almost--well, I shouldn't say almost--but it had a faster payback because sourcing can really impact your bottom line rapidly.

And right now, we don't necessarily take full leverage of group purchasing done atthe group level. So those are the areas. These restructuring programs will be decided, approved by the board and hopefully, we can start triggering them in second quarter.

And therefore, the payback we will not seein fiscal '08. We will expect those paybacks to start to come and then stay with us from '09 onwards.

**Chris Ceraso - Credit Suisse**

And that's on a base of $25 million to $30 million that you'll start to pick up in '09?

**Dinesh Paliwal**

That is correct.

**Chris Ceraso - Credit Suisse**

Okay. Kevin, what was the magnitude of the tax settlement? And what should we think about on a full-year view for '08, as the normal tax rate for you?

**Kevin Brown**

The magnitude of the tax settlement was about $8 million, $0.12 or $0.13 per share. For the full-year, we expect the tax rate to be 27%, 28%, running a little lower than what our full-year rate was last year, but Germany also lowered their corporate tax rates inthe past six months or so. So 27%, 28% is what you had to think about on a full-year basis.

**Chris Ceraso - Credit Suisse**

Okay. And then, the last question, I think on the last call you mentioned that there were 7 new programs launching this year. Can you just give us a quick rundown on the specific models, the timing? And then maybe any ones where you're sort of the co-supplier and who the other co-supplier is?

**Dinesh Paliwal**

Yes, sure. First of all, let me stress that these are historic times for the company fiscal 2008 and fiscal 2009, which are exciting in some sense and I think they are. Because we traditionally have had start of production, as we say SOP, or the new program launch, one or two a year. And now, we are fortunate to have significantly large portion of business, which was available inthe market, came to us. And that triggered a number of these SOPs. So 2008, we will have 7 of these, they are with Chrysler, Hyundai, SsangYong inKorea, Audi, Porsche, BMW, and PSA.

What is most appealing to me, personally, is that these programs, some of them are mixed segment strategy program, like PSA, which is very good because that's the area where we have tremendous future potential for growth and once we start to take full benefit of scalability of our platform and also amortize the absolute research and development dollars.

Even if we will have lower contribution margin on mixed segment business, our bottom line would benefit from the scale and scalability and the size of this business and also R&D, because we will not require the same level of R&D for the mixed segment.

For '09, we will have, again, pretty strong historic year in terms of number of new platform or new product launches we will have in OEM business. And these are going to be BMW L6, PSA [], Hyundai will have another one, Porsche, Mercedes E-Class mid-segment, and Mercedes S-Class facelift.

So again, '08 and '09 are historically very busy, cost intensive. That's why the R&D cost has been there and also pretty taxing on all management and employees worldwide, but exciting for future potential.

**Operator**

Next in queue, we go to the line of Peter Barry with Bear Stearns.

**Peter Barry - Bear Stearns**

Kevin, can I take you back to your R&D comments, please? You mentioned the gross increase was $13 million in the quarter, is that right?

**Kevin Brown**

In Automotive, yes, Peter.

**Peter Barry - Bear Stearns**

Okay. Could I ask you just to drill down a little bit more, as it relates to R&D. Is it more a QNX or is it a broader Auto unit phenomenon?

**Dinesh Paliwal**

It is a broader automotive phenomenon. We are investing on R&D across the board on these new launches. They are in navigation area, they are in speech area, multimedia, and of course, the software platform. But it's not just QNX.

**Peter Barry - Bear Stearns**

But is QNX a large portion of that number, Dinesh?

**Dinesh Paliwal**

I would not say that. No. I think, it's equally, perhaps in proportion, QNX would not be one of the major ones.

**Sidney Harman**

Tell me, Peter, why you ask the question. You may be seeking information different from the clear direct answer you got to the question as you asked it.

**Peter Barry - Bear Stearns**

It has to do with the software initiative, Sidney. And is it growing more and more; is its momentum growing more and more and is it becoming more and more important a part of your outlay effort?

**Sidney Harman**

It is growing. It becomes more and more important, and without question, it is a significant key to the future of this company. But the real growth in R&D has been driven by the needs to satisfy this enormous set of new undertakings

that Dinesh has reviewed with you.

**Peter Barry - Bear Stearns**

And could I ask, in that regard, Sidney, is it sort of the front-end? Or is it back-end? Middleware? I'm looking for a little more color that in regard, that's all.

**Sidney Harman**

I want to give what you you're asking for. What is it that you're asking about, is it front-end or middle-end?

**Peter Barry - Bear Stearns**

Spiking R&D budget.

**Sidney Harman**

I'll let Dinesh respond to that.

**Dinesh Paliwal**

These programs, they are not just a couple of months or so in duration, they go on more than one year. I would say the SOPs, which we have planned for '08 we are pretty much at the peak and slightly declining, in absolute as well as percent of sales.

For the 6 SOPs we'll have in '09, they are already being ramped up but they are not, in terms of magnitude of absolute dollars, as large as fiscal '08 SOPs are. So, to answer a bit more specific, I would say for '08 we are already from the peak down, and for '09, we are just about getting up there at the peak level.

**Peter Barry - Bear Stearns**

One more cost question, if I may. You referred to materials cost several times during your comments, Dinesh. Could you give us a little more detail on that score?

**Dinesh Paliwal**

Sure. Material costs, I mentioned in two areas. One is, as our PND business starts to grow--which is good news--PND has a lot more material cost in build up material than you would have, because we buy a lot. There is a lot of hardware in it and some software embedded, but we buy it.

So that becomes a greater portion of our material cost overall. So that's why we will see and if you are not fast enough to move with the market sometimes, there might be some lag from your replacement of the cost and passing onto the marketplace.

Second item I mentioned is to do with traditional OEM business, where you supply infotainment system and there are a lot of components. As other industry does, we do the same. We are constantly aspiring to find innovative engineering design changes to bring the cost down and simultaneously finding better, high quality, lower-cost component, which we can replace.

Traditionally, car industry allows us once a year an opportunity where we have fully tested and proven that the substitutions are perfectly fine and then they allow us to do it, and if you missed that window of once a year, then you start with expensive components, which you are using. So that's what actually happened in first quarter, to some extent.

And third element, in all fairness, our supply chain people are vigorously trying every year to negotiate better prices, better negotiations. And first quarter, when you set the targets, not necessarily you're able to get the full benefit, which you start to see in second and third quarter.

**Sidney Harman**

And, Peter, I want to add to that both because of the specifics of the questions and the general implications. You've been around us along time. The hard truth is that we have taken on a very substantial set of challenges and the circumstances of the last year, no one had planned it to be this way, but the hard reality is those circumstances have made it much more difficult to getthe balance that you need to deal with that assembly of challenges.

I am amazed at how easy deep breathing is coming to all of us right now and what a pleasure it is to be back focused entirely on the business. There's work to be done in the areas that Dinesh has reviewed. We can do it now and having gotten through that necessary balance encompassing this significant series of new undertakings, I think you're going to find us a darn sight stronger company than we had been.

**Peter Barry - Bear Stearns**

Sidney, I'd like to close with two questions for you. One, I was wondering if you, maybe perhaps Dinesh as well, might give us an update on Helmuch Shinagle and how he's doing at Automotive OEM?

**Sidney Harman**

I am pleased to yield to Dinesh on this one, for a couple of reasons. First, because he's our CEO and second, I am going to enjoy hearing what I know he's going to say.

**Peter Barry - Bear Stearns**

And one more question for you, when he's finished, Sidney.

**Sidney Harman**

Okay.

**Dinesh Paliwal**

Okay. Well, that's a good question, because being new to the company; my personal priority has been to build a very close relationship with the top management team. Helmuch Shinagle is one of the closest and top partners, very large business he runs, and very important business for our company.

And he was brought in the company with the background he has that's second to none. And last week I had the pleasure of traveling with him to major key customers of ours in Germany, and also visiting together a number of key locations of Harman International.

I got to know him a bit more. And also, he was able to share his vision with me and also share his plans how the R&D would be scaled in terms of mixed segment strategy and how we will use the scalability and what our plans are for long-term consolidation in western versus emerging markets.

I will conclude, I'm extremely pleased with him on my team. I would not trade him for anyone right now.

**Sidney Harman**

Your question to me, Peter.

**Peter Barry - Bear Stearns**

Yes, first a statement, Sidney. I wanted to wish you all the best of good luck in your new role as non-Executive Chairman. And if you would share with us what the meaning and significance of that change in title might be?

**Sidney Harman**

Oh, fair enough. I intend to reduce my workweek by at least 50%. I'm only going to work 23 hours a day. Listen, you know me well. You know that work is mother's milk to me. I would have offered you a more qualified answer if I were not enthusiastic as I can be, not only about Dinesh's talent, but about the easy way in which we work together.

I forgo the Executive part of the title, principally as a tribute to him. And you must seeit in my readiness, my eagerness, my pleasure in deferring to him as you ask questions. But the hard reality is that he encourages me to beat it and you know I love being at it.

**Peter Barry - Bear Stearns**

Good luck, Sidney.

**Sidney Harman**

Thank you very much, Peter.

**Peter Barry - Bear Stearns**

Thank you, sir.

**Operator**

Next in queue, we go to the line of Peter Friedland with Soleil Securities.

**Peter Friedland - Soleil Securities**

Hi. A few questions, first on the PND side of things, if you could talk about unit volumes for the quarter and what you're expecting for the year?

**Dinesh Paliwal**

Sure. As I said earlier that PND is an exciting business, where we understand this business and we are driving it pretty rapidly. And we are actually pleased with the growth and the trajectory we are seeing.

In '06, we had 150,000 units sold. And in '07, we sold 425,000 units. And I'm quite happy to share with you, just in first quarter of fiscal '08, we have sold 250,000 units and we expect a significant growth to continue throughout '08.

It might be a good opportunity for me to add, this business is very exciting and attractive, both from the defensive and offensive point of view. One, offensive, more PND business grows more awareness and the knowledge of infotainment develops in consumers out there. And more they seeit the more they want to had in-dash, fully-integrated, fully-functional infotainment system in their next car they buy.

At the same time, we know this business because we've been doing infotainment for long time before our competitors started to dip their toes in. And large OEMs have expectation from us but we drive this business aggressively, so that millions of cars out there who do not have fully integrated infotainment system, they become our targets. So that same OEMs, when they're selling their new car, would be able to sell our infotainment system, which is fully integrated. So it's an exciting business.

**Peter Friedland - Soleil Securities**

And as far as that 250,000 number, it's a pretty big jump over what you did in the fourth quarter. So was that ramp in theU.S.? Or what was the big driver there?

**Kevin Brown**

It was a number of things. First of all, we ramped inGermany. And inGermany, we arein the position of closing out some of our first generation technology as we replace with it higher functionality new technology, so we had some closeout

sales in those numbers.

But in addition, in our Consumer business, where we've had an effort underway for about six months now, we're now starting to see some traction there as we lead into the holiday season. And we had some consequential volume in the Consumer segment as well for PNDs this quarter.

**Sidney Harman**

And I think it's fair to say is that we have every reason to continue to expect, by far, the dominant part of that business is going to be the European markets. And we are very pleased with the level of product that we're bringing to it. That, more than anything, explains why we look stronger in the first quarter.

**Dinesh Paliwal**

I think, it's fair to say that this PND business, as you would expect, with our very strong foothold in European auto industry, that's where we had the larger portion of our PND sales, while we're growing very rapidly in North America and other places as well.

**Peter Friedland - Soleil Securities**

Well, then, maybe this is a good segue, but if you could give more color on what was the key driver of growth in the Consumer segment?

**Dinesh Paliwal**

Well, Consumer business, first of all, it's different in terms of cycles. Cycles are shorter here and if you can be successful in riding the wave and tagging along with the new product introductions of the products like iPhone and iPod in the past, then you have a great time and a great year. And this is what I think we have seen in first quarter and we expect to see for rest of the year.

Our growth in Consumer business was very, very good. We're very happy to see that. And we have a number of new product introductions planned for Consumer business. Double-digit new product introductions coming up for Christmas season, and again, double-digit new product launches, we'll see in calendar year 2008. And the whole game is to hit them on time, on budget, ahead of every other competitor, and that's what I think we intend to do. And so far, we are on track.

**Sidney Harman**

And I want to add, Peter, that what may not be obvious in the raw numbers, but is very important and compelling to me, is our continued growth in Europe. More than anything, that is where you see our Consumer business taking on more and more muscle. It clearly is influenced by new products.

But it is more influenced by the fact that we're penetrating those markets very, very effectively, and generating relationships with key accounts that produce volume. Europe is a very, very big piece of our Consumer story.

**Dinesh Paliwal**

And I think Consumer business growth helps our OEM business growth in many ways, in terms of the brand building and massive awareness it creates in the hands of consumers.

**Operator**

David Niederman with Pacific Crest Securities has our next question.

**David Niederman - Pacific Crest Securities**

Thanks, good afternoon, just a couple of questions. First, hoping you can comment on the DAs development. You

talked a lot about the SOPs, but just curious as to where we are with the DAs?

**Dinesh Paliwal**

Well, this is an exciting area and this was further validated during my trip last week with these big OEMs I personally visited. Our Driver Assist development activities are ongoing. And this is one area where we think tremendous future opportunities are there for us to grow, and also to differentiate from average competitor in future. And we are working pretty closely with an OEM on a development program, but as you may already know, David, this is not to deliver in next couple of years.

This is a fiscal 2012-and-beyond program, but this is where we are putting our R&D now, up-front, capturing early ideas, concepts, and testing those with the OEMs we're working with. And we do not actually break out R&D expense by program, or by customer, but this is one area where we're not holding back.

**David Niederman - Pacific Crest Securities**

Great. And hoping you could just provide a little color or information as to, there's a lot of headline noise around Chrysler and also soft sales from Hyundai, at least in the U.S., and just […]

**Sidney Harman**

I'm sorry, we're having a little trouble hearing your question. You wanted a little background on Chrysler and what else?

**David Niederman - Pacific Crest Securities**

Just confidence in ability to meet sales projections for Chrysler as they're going through their turmoil, at least here in the U.S.?

**Sidney Harman**

Let me speak to Chrysler in general terms. There is a new, as you well know, ownership and management at Chrysler. That brings with it some problems, and it brings with it some opportunities. Our experience with this group is that they are surprisingly knowledgeable and eager to embrace new technology.

I need not remind you, the tradition in Chrysler, certainly as I was growing up, was that this was the engineering company. It's a joy to find ourselves encountering guys there, who want to understand the technology and want to embrace it.

Obviously, the turmoil you talk about goes on in any situation such as theirs. We think they're dealing with it well, and we are very optimistic about where things are going between them and us. Their sales are disappointing to them, but that's hardly surprising.

You and we will have to take our measure of them over the next couple of years. I expect it to be pretty doing positive.

**Operator**

Thank you very much.

**Sidney Harman**

Gentlemen, we're beginning to run out of time. I just want to make the observation that I'm holding a couple of the good gray beards for the last questions. I mean you no disservice when I say that, Mr. Nathan.

**Operator**

Thank you very much, Dr. Indeed, it is Jairam Nathan of Banc of America Securities.

**Jairam Nathan - Banc of America Securities**

Hi, thanks. Can you explain for the record, what is your cost structure look like on the growth side? We want to try to understand that better, just to get the idea of what the economies of scale could be?

**Dinesh Paliwal**

Nathan, if I understand, please help me. You're talking on a broad base cost structure, how it all would amortize as we grow?

**Jairam Nathan - Banc of America Securities**

On the infotainment systems. What does the cost structure look like? And how much is materials, how much is labor - that kind of information?

**Dinesh Paliwal**

Nathan, first of all, we don't necessarily break out like that, at that level. But, I could give you a broad brush answer, which hopefully, will suffice. We have been pretty generous, and knowingly so, that we have invested in R&D due to 7 in 2008 and 6 in 2009, SOPs - so 13, versus perhaps 2 or 3 in that period, traditionally.

So that has put quite a bit of burden on R&D budget, as we have talked about. But that's something we invested for the future because R&D and revenue cycles are very different. You invest R&D in either one, and by the time you see revenue, it's probably year three or year four, sometimes. So, you will see a percent of sales based on our overall cost, on R&D the big chunk of overall SG&A. That should slide down as we go forward.

Number two, I like to make, which is important to me personally, before even I came to Harman, we have to push scalability of platform, common architecture of software and we need to bring the culture of inventing every time new for the new SOP. We can't afford to do that and we are pushing that culture. That's great for us, and even great for our customers.

Even BMW and Audi and Mercedes, they want to see that we have more and more common architecture supporting their multiple new SOPs so that lifecycle cost for them is lower. But that helps us overall cost structure to bring down, in absolute as well as in percent of sales. But, these are the long-term strategic direction I'm sharing with you; we're not there yet in 100%.

**Jairam Nathan - Banc of America Securities**

Okay. Secondly on working capital, it was big use in fiscal '07, as you were ramping up the PNDs. How should we think about this for fiscal '08? Would you continue to see some use, just because you'll be ramping up in North America?

**Kevin Brown**

Yes, I think in working capital in this particular quarter, we're in the cyclically high quarter for working capital as we build into our Christmas selling season. And as our sales are growing, in particular, we're ramping up the Chrysler business, which is driving up some of our inventory and receivable levels.

I think once, we get through the early part of the year, we should begin to leverage our working capital better than we've done in the past 12 months. We don't expect a repeat of, for example, the inventory levels that we had in PND in the past year. And we've worked those down pretty successfully. You'll be able to see the results of that, I think, in the bottom line, once we get past the Christmas quarter.

**Operator**

Representing Lehman Brothers, Jeff Kessler.

**Jeff Kessler - Lehman Brothers**

The question that I have to ask, Sidney and Dinesh, the growth in Consumer was quite high. Normally, Consumer is going to be negative, at least from an operating income perspective in the first quarter, for seasonal reasons and for ramp-up reasons as well.

Your forward bookings in Consumer, are they strong enough to sustain the type of growth that you saw inthe first quarter? Because it does become material in the second and third quarters of your year, particularly the second quarter, when we're dealing with Consumer. And obviously, it makes a difference if you can sustain that type of growth rate into the second quarter.

**Sidney Harman**

Well, Jeff, I would like to tell that you our bookings confirm it. But, I remind you that the Consumer business for us, for everybody, simply doesn't work that way. There virtually is no forward-booking. You work it day-by-day, account-by-account. You read the marketplace, you see how well your products are doing, and you generate the business as a consequence of it.

So forward-booking isn't going to be your answer. The only answer you're going to get from us is how confident are we in the first quarter is reflective of how the year is developing. We're pretty damn confident.

**Dinesh Paliwal**

In this business is not the business where you build backlog. You actually getthe order and you ship it very fast. That's why I said this business is probably one of the most challenging in some aspects and wonderful, because you actually cash in fast. You have a new products; you have the money coming in, too through fast.

**Sidney Harman**

That's right. If you're building backlog, there's something wrong with you.

**Dinesh Paliwal**

Exactly.

**Jeff Kessler - Lehman Brothers**

Okay. Final question. You kept those brands in Consumer to get the brands into the automotive area. What is the payback right now? What is the technology you're taking from Automotive and using in Consumer that is palpable, that is tangible right now that you're going to be using to market with over the course of this and next year?

**Sidney Harman**

It's a good question, Jeff. The reality is that we are growing in confidence and we will say this in our annual report, that we are getting very close to what everybody has thought to be the Golden Grail of instant, seamless connectivity. We don't and we're never going to have a Consumer business large enough to support the engineering base required for that.

But the transfer of that know-how from OEM and now I'm pleased to point out to you that the large expenditures in R&D that some have condemned are probably the biggest assurance you or any observer may have about our future. That work will transfer and effectively in products we otherwise could not manage.

As for the value of the brands, oh my goodness, it is being confirmed over and over and over again. I've just been reading half a dozen articles on this, including in last week's 'New York Times,' how brand has gotten to be the elixir of the business, and one of the things that the article made reference to was that marvelous summer TV advertising program by Lexus.

They almost forgot to mention that the system they were selling the Mark Levinson sound system, promoted by the likes of Elvis Costello and Diana Krall are contained in an automobile. They almost forgot to mention the automobile.

Brand is crucial. We do more business, I say this, perhaps to the awkwardness, the embarrassment of some of our guys; we do more business with Lexus on Mark Levinson than we do everywhere else in the rest of the world. Brand is king.

**Jeff Kessler - Lehman Brothers**

Sidney; instant, seamless connectivity, that's a nice phrase for Consumer. What does it mean?

**Sidney Harman**

It means, my boy, that wherever you want your music, it's immediately at hand. You move from the office to the car and you bring it with you, you move from the car on a hike, you bring it with you. You take a holiday with your wife or your girlfriend, whichever you choose and you bring it instantly and seamlessly with you. That's what it means. Everybody's been looking for it. Everybody's closer today than they were. We suspect we're closer than most.

**Operator**

Representing Robert W. Baird, David Leiker.

**David Leiker – Robert W. Baird**

First a comment on the guidance. I just want to clarify this, Kevin. Your guidance, you gave us GAAP guidance of $4.14 or better, correct?

**Kevin Brown**

That was excluding restructuring and transaction costs. So, on an operating basis.

**David Leiker - Robert W. Baird**

Are you putting any share repurchase in there?

**Kevin Brown**

No.

**David Leiker - Robert W. Baird**

Okay. And then two other questions here. Chrysler, as a follow-up to what you talked about before, Dr. Harman--but wondering if we could get some more detail on it--that there are a number of vehicles at Chrysler they're looking at discontinuing. And whether that puts that $500 million of business at risk at all? Is that $475 or $450, or do we not know yet? If you can address that?

**Sidney Harman**

We really don't know yet. And, of course, we hear the same stuff you do. I suppose it is less a matter of how many vehicles and how effectively those vehicles contain the kind of systems that we're interested in.

**David Leiker - Robert W. Baird**

Right.

**Sidney Harman**

We'd settle for fewer vehicles and higher penetration rates.

**David Leiker - Robert W. Baird**

I would understand that. And then the last item here is and a little contradictory here, given that you have a fair book of business that you're launching here today; but what do you think the timing might be on the next wave of new business opportunities for you, that you'd be in a position to talk about something?

**Sidney Harman**

It's difficult to answer precisely for the reason that you suggested, we've got such a heavy book. But new stuff is in the works. And I would think that though we'd see little exciting new reports, really exciting new awards in the course of this year. I think next year you're going to see some serious work let out. And we expect to play our part in that.

**David Leiker - Robert W. Baird**

Okay. It wouldn't be fair to assume that some of your engineering efforts to get new business have been redirected to launching business, that that pace continues in terms of going after new pieces of business?

**Dinesh Paliwal**

Absolutely. Look again, this is a continuous relationship with customer-base OEMs. They have worked with us for so many years. They want to continue that relationship. And they also have their breathers to take breathing room when they're launching new business a few years. It's a cycle in auto industry, and it's worked very well so far. So we will definitely take our fair share, as we have in the past, as the new business opportunities are launched.

**Operator**

Dr. Harman, back to you for any closing remarks.

**Sidney Harman**

Well, first let me to take a small personal privilege. I want to comment on our first quarter. There's been, I believe, an unseemly amount of noise about it being a poor first quarter, a disappointing first quarter. I didn't hear it in this conference, but I've read it. And I just respectfully disagree.

In our September 27th conference call, we noted that we had never provided guidance on the first quarter. The Street had almost a year ago. And the Street spoke about $1 plus. Our record is clear on this, we would typically have cautioned restraint when estimates are running beyond what we thought to be reality.

You've often heard me urge analysts to restrain your enthusiasm. We failed to do it when those ambitious estimates were made about the first quarter, because we were headed to being a private company status, and virtually everyone had dropped coverage on the company.

Now, consider just a month ago, we did forecast the first quarter at $0.50. Today, we reported earnings, excluding transaction costs of $0.62. That's a pleasant $0.12, or 24% higher than our own forecast. In that same 27 of September call, we forecast actual operating earnings of $40 million, and today we've reported them at $46 million, again, without the transaction costs.

This year's first quarter is going to represent about 12% to 13% of our estimated full-year earnings. With the exception of the last two uniquely and I think, especially strong first quarters, that's absolutely consistent with our lengthy history.

My view is that we're off to a pretty darn good start with this first quarter. Not as strong as last year's, but consistent with history, consistent with our expectations.

And finally, I'll tell you all that we're--all of us--very happy to be back in normal mode. There's no way we can estimate or tell you how much the distractions of the past year have cost us. But we are breathing clean, fresh air, and we are happy to be back at serious work. I thank you all.

**Operator**

And the passion certainly comes through. Very nicely said as always, Dr. Harman.

And ladies and gentlemen, your host is making today's call available for digitized replays for one week and also by the web replay for seven days. The digitized replay is available starting at 8:00 pm Eastern Time, October 25th. Please dial 800-475-6701, and at the voice prompt, enter today's conference ID of 891-629. Alternatively, you may go to www.harman.com to listen to the web replay. You will need to enter the access code, once again, of 891-629.

And that does conclude our press release for this quarter. Thank you very much for your participation.

**Copyright policy:** All transcripts on this site are the copyright of Seeking Alpha. However, we view them as an important resource for bloggers and journalists, and are excited to contribute to the democratization of financial information on the Internet. (Until now investors have had to pay thousands of dollars in subscription fees for transcripts.) So our reproduction policy is as follows: **You may quote up to 400 words of any transcript on the condition that you attribute the transcript to Seeking Alpha and either link to the original transcript or to www.SeekingAlpha.com.** All other use is prohibited.

THE INFORMATION CONTAINED HERE IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL, CONFERENCE PRESENTATION OR OTHER AUDIO PRESENTATION, AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE AUDIO PRESENTATIONS. IN NO WAY DOES SEEKING ALPHA ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S AUDIO PRESENTATION ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

If you have any additional questions about our online transcripts, please contact us at: transcripts@seekingalpha.com. Thank you!

Case 1:07-cv-01757-RWR    Document 21-34    Filed 07/03/2008    Page 19 of 19

245 of 916 DOCUMENTS

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved



**factiva**

(Copyright (c) 2007, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

July 27, 2007 Friday

**SECTION:** Heard on the Street; Pg. C1

**LENGTH:** 981 words

**HEADLINE:** Debt Crunch Hits Deals, Deal Makers and Key IPO --- KKR May Find It Hard To Launch Stock Offer, Let Alone Its Financings

**BYLINE:** By Henny Sender, Dennis K. Berman and Gregory Zuckerman

**BODY:**

KKR's hardest deal just may be its own.

As flagging debt markets bring the private-equity boom to a halt, the likelihood that Kohlberg Kravis Roberts & Co. will have to postpone its initial public offering is increasing.

Jeff Arricale, who runs a financial-stock mutual fund for T. Rowe Price Group Inc., said he doubts KKR will be able to find enough investors to pull off an IPO if current market conditions continue. "Sure, at some price it is possible to do it, but I'd be shocked if they end up doing this IPO."

Five blocks south of KKR's New York headquarters overlooking Central Park, rival firm Blackstone Group LP is learning just how tough this market has become. Shares of its own initial public offering -- priced just over a month ago -- are now 17% below their $31 debut, and closed yesterday in 4 p.m. New York Stock Exchange composite trading at $25.70, up 19 cents, or 0.7%.

KKR is more vulnerable than Blackstone to the credit-market turmoil. Blackstone is more diversified than KKR, thanks to its real-estate, hedge fund of funds and restructuring-advisory business. About 40% of Blackstone's $88 billion of assets under management, by comparison, aren't in standard private-equity funds. It also has a more consistent history than KKR.

Meanwhile, KKR said in its first filing July 3 that it was trying to complete financing on 11 transactions valued at $140 billion, struck during a deal-making tear begun last year.

Each of these deals -- be it the $44 billion takeover of utility TXU Corp., the $28 billion buyout of First Data Corp., or the $8 billion takeover of Harman International Industries Inc. -- is hitting resistance from debt investors

Debt Crunch Hits Deals, Deal Makers and Key IPO --- KKR May Find It Hard To Launch Stock Offer, Let Alone Its Financings The Wall Street Journal July 27, 2007 Friday

needed to fund their closing.

Should they reject these deals, it won't translate into actual losses for KKR. Instead, Wall Street banks will be on the hook.

But to keep the overall private-equity business going, banks will put pressure on KKR to reduce terms, contribute more equity or bring in new investors. All of these steps increase KKR's risk while also reducing its returns.

That will leave previous valuation estimates in tatters, which could be enough to stop the IPO in its tracks and potentially tarnish KKR's reputation.

Consider the effects of terms -- later rejected, in part -- in proposed financing for the $22 billion buyout of British retailer Alliance Boots PLC, also a KKR transaction. Last week, banks offered to pay an extra half-percentage point annually to investors on a $10 billion term loan, or an additional $50 million a year.

So far, the underwriters say there has been no pullback on timing or commitment for KKR's IPO, according to a senior executive at one of the investment banks underwriting the offering.

The firm declined to comment yesterday. A person close to KKR, however, said the IPO was expected to hit the market sometime in late September. By then, he added, conditions may have calmed. "Markets go up and markets go down. It may make sense to hold off. A lot of work still has to be done," this person said.

Another factor that doesn't bode well for KKR's IPO: Apollo Management LP executives are being asked questions about deteriorating credit markets as they begin meeting with investors in connection with their own planned initial public offering. And this is occurring despite the fact that Apollo is asking for a far more modest valuation than KKR is expected to seek -- likely between $6 billion and $8 billion. Moreover, Apollo is attractive because of its history of successful investing in troubled companies and in times of market distress.

The ripple effects of the tightening deal and credit markets are expected to exert large influence on KKR, which has built its business model by striking the largest big-ticket deals. While some KKR deals have been postponed, the deals that have been completed have left both buyers and the banks bloodied. For instance, KKR paid $7.2 billion for retailer Dollar General in an auction in which Bain Capital Partners LLC, Blackstone and TPG all dropped out over price.

To get Dollar General completed, the banks had to rejigger the offer, divide the loans into two separate pieces and sell the debt at a big discount. Underwriters took back most of the $725 million of junior notes, selling them into the market at below 90 cents on the dollar.

Also sure to weigh on IPO prospects, KKR founder Henry Kravis has a long history of berating the banks. Many investors still recall an appearance Mr. Kravis made at a Merrill Lynch & Co. high-yield conference in 1990, where he criticized the banks for not supporting the RJR Nabisco deal, which remains the largest deal ever when adjusted for inflation. Moreover, the preliminary offer memo for KKR is full of plans to develop a global capital-markets business that would result in far fewer fees going to Wall Street.

But KKR needs Wall Street's help to ensure the deals are pulled off. KKR is having a hard time, for instance, attracting equity commitments on its recent deals, such as the planned buyout of First Data.

Many fund investors such as endowments and pension funds -- known as limited partners -- say they have so much exposure to KKR deals they can't take any more. They have since come up with a new plan. These investors are looking to sell off some of their holdings in old KKR funds to the banks. These banks would then sell those interests to new investors, offering to pay a guaranteed rate of return.

Using this maneuver, the institutional investors can drop their overall exposure to KKR deals, thus freeing more

Debt Crunch Hits Deals, Deal Makers and Key IPO --- KKR May Find It Hard To Launch Stock Offer, Let Alone Its Financings The Wall Street Journal July 27, 2007 Friday

capital to get into such transactions as  First Data.

Still, while the underwriters of KKR's IPO plan to go forward, the senior executive at one of the underwriters said, "In this kind of market, you have to ask what is happening."



## Henry Kravis

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** July 28, 2007

189 of 916 DOCUMENTS

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved



**factiva**

(Copyright (c) 2007, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

August 14, 2007 Tuesday

**SECTION:** Pg. C5

**LENGTH:** 455 words

**HEADLINE:** Deals & Dealmakers: KKR's Road to Offering Appears Bumpy --- Costs for Deals Soar, Crimping Prospects Of High Returns

**BYLINE:** By Dana Cimilluca

**BODY:**

Kohlberg Kravis Roberts & Co. made it clearer to prospective investors just how many challenges it faces as it plans to go public.

In a Securities and Exchange Commission filing yesterday, the private-equity firm said the cost of financing deals has "increased significantly" following recent convulsions in the high-yield debt markets. It said, "More costly and restrictive financing may adversely impact the returns of our leveraged buyout transactions." The filing was an amendment to the initial public offering document KKR filed with the SEC on July 3.

KKR also acknowledged publicly for the first time that it has received a request for documents and other information from the Justice Department, which is investigating possible anticompetitive behavior in the buyout industry's use of club deals in which several buyout firms team up for acquisitions. The previous filing discussed the investigation of the industry in much broader terms.

The unprecedented prosperity that private-equity firms have enjoyed in the past few years has come under increasing threat. In addition to the investigation, which came to light last year, Congress is contemplating raising the tax rate on private-equity firms.

The greatest threat is a financing market for leveraged buyouts that now is effectively shut. Investors' refusal to finance deals at the same low rates and easy terms they extended just a few months ago will likely weigh more heavily on KKR than any of its rivals given the sheer volume of deals it has agreed to this year. With the $32 billion pending buyout of Texas utility TXU Corp. and the $26 billion purchase of credit-card processor First Data Corp., KKR has agreed to more than $100 billion of deals. In the filing, KKR says it has more than $80 billion of deals that are expected to close in the second half.

Deals & Dealmakers: KKR's Road to Offering Appears Bumpy --- Costs for Deals Soar, Crimping Prospects Of High
Returns The Wall Street Journal August 14, 2007 Tuesday

Even though banks such as Citigroup Inc. are obligated by terms of these deals to finance the transactions if institutional investors balk, such financing could be "significantly more costly, with terms that may be significantly more restrictive" than what was recently available, KKR said. That, in turn, may hamper the private-equity firm's buyout returns, according to the filing.

KKR made it clear in the July 3 filing that continuing the roughly 20% annual net returns it has racked up would be difficult.

The rising list of challenges, combined with the decline in the price of rival Blackstone Group LP's stock since that firm went public in late June, has led to predictions by some analysts that KKR will be forced to shelve the planned IPO. Yesterday's filing indicates the firm is pressing ahead. KKR declined to comment.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** August 14, 2007