## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE HARMAN INTERNATIONAL INDUSTRIES, INC. SECURITIES LITIGATION | ) ) ) ) | Case No. 1:07-cv-01757 (RWR) |

## LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ............................................................. 1

II.     STATEMENT OF FACTS ................................................................... 5

     A.    The MyGIG Radio ................................................................... 5

     B.    The PND Sales and Margins ..................................................... 6

     C.    Harman's Failed Merger .......................................................... 9

III.    THE APPLICABLE PLEADING STANDARDS ON A MOTION TO DISMISS.. 10

IV.    THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS ................... 11

     A.    The Complaint Alleges Statements of Historical Fact As False and Misleading ............................................................................. 11

     B.    Defendants' Forward-Looking Statements Are Not Protected by the PSLRA's Safe Harbor ............................................................ 13

          1.    Defendants Had Actual Knowledge that Their Statements Were False And Misleading When Made ........................................ 14

          2.    Vague, Boilerplate Language Does Not Trigger Protection from the PSLRA's Safe-Harbor ........................................ 17

     C.    Lead Plaintiff Does Not Rely on Inactionable Puffery ....................... 20

V.     PLAINTIFF HAS ADEQUATELY PLED SCIENTER UNDER THE PSLRA AND TELLABS ..................................................................................... 22

     A.    The Standard for Pleading Scienter ................................................ 22

     B.    Lead Plaintiff's Confidential Sources Are Knowledgeable and Reliable and Give Rise to a Strong Inference of Scienter ................................. 24

     C.    Dr. Harman's Own Admissions Give Further Rise to a Strong Inference of Scienter ....................................................................................... 26

     D.    The Closeness in Time Between the Announcement of the Abandonment of the Merger to the False and Misleading Statements Touting the Merger Contributes to a Strong Inference of Scienter ....................................... 27

# TABLE OF CONTENTS
(continued)

**Page**

E.      Defendants Had Powerful Motives to Conceal the Fraud ................................... 28

VI.      PLAINTIFF HAS ADEQUATELY PLED LOSS CAUSATION........................... 30

A.      The Standard for Pleading Loss Causation........................................................ 30

B.      Loss Causation is Properly Alleged With Respect to Misstatements
Regarding the Proposed Acquisition .................................................... 31

C.      Loss Causation is Properly Alleged With Respect to Defendants' Failure
to Disclose Increased R&D Costs and Lower Margins on Sales of MyGIG
Radios ............................................................................................ 35

D.      Loss Causation is Properly Alleged With Respect to Defendants' Failure
to Disclose Lower Margins on PND Sales, Product Delays, and Obsolete
Inventory ........................................................................................ 37

VII.      THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON
LIABILITY..................................................................................... 38

VIII.      CONCLUSION................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Alliance Pharmaceutical Corp. Sec. Litig.*,
    279 F. Supp. 2d 171 (S.D.N.Y. 2003) ....................................................................................14

*Anderson v. Abbott Labs*,
    140 F. Supp. 2d 894 (N.D. Ill. 2001) ....................................................................................20

*Atlas v. Accredited*,
    No. 07-488, 2008 WL 80949 (S.D. Cal. Jan. 4, 2008) ..........................................................13

*In re Baan Co. Sec. Litig.*,
    103 F. Supp. 2d 1 (D.D.C. 2000) ..........................................................................................39

*In re Baker Hughes Sec. Litig.*,
    136 F. Supp. 2d 630 (S.D. Tex. 2001) ..................................................................................29

*Basic, Inc. v. Levison*,
    485 U.S. 224 (1988)..............................................................................................................21

*Bell Atl. Corp. v. Twombly*,
    127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007) ............................................................................10

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ................................................................................................27

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ............................................................................................34

*Burman v. Phoenix Worldwide Indus., Inc.*,
    384 F. Supp. 2d 316 (D.D.C. 2005) ................................................................................14, 28

*Burman v. Phoenix Worldwide Indus., Inc.*,
    No. 04-1276, 2006 U.S. Dist. LEXIS 46071 (D.D.C. July 7, 2006) ......................................23

*In re Champion Enters.,Inc., Sec. Litig.*,
    144 F. Supp. 2d 848 (E.D. Mich. 2001)................................................................................17

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)...................................................................................... *passim*

*In re Enron Corp. Sec.*,
    No. MDL-1446, 2005 U.S. Dist. LEXIS 41240 (S.D. Tex. Dec. 22, 2005)...........33

*In re Espeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)..............................................................33, 37

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006).................................................................18, 19

*In re Flag Telecom Holdings. Ltd. Sec. Litig.*,
    No. 02 Civ. 3400 (WCC), 2007 U.S. Dist. LEXIS 67173 (S.D.N.Y. Sept. 4, 2007) ..............33

*Feiner v. SS&C Techs., Inc.*,
    11 F. Supp. 2d 204 (D. Conn. 1998)......................................................................13

*Florida State Bd. of Admin v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) .................................................................................25

*Freeland v. Iridium World Communications, Ltd.*,
    545 F. Supp. 2d 59 (D.D.C. 2008) ........................................................................33

*In re GeoPharma Inc. Sec. Litig.*,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005)....................................................................29

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985)................................................................................21

*Hall v. Children's Place Retail Stores, Inc.*,
    2008 U.S. Dist. LEXIS 54790 (S.D.N.Y. July 18, 2008) ......................................11

*Hennessy v. Penril Datacomm Networks, Inc.*,
    69 F.3d 1344 (7th Cir. 1995) ................................................................................34

*In re Initial Pub. Offering Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)....................................................................38

*In re Intelligroup Sec. Litig.*,
    468 F. Supp. 2d 670 (D.N.J. 2006) .......................................................................33

*In re Loudeye Corp. Sec. Litig.*
    2007 U.S. Dist. LEXIS 60624 (W.D. Wash. Aug. 17, 2007) .................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) ...................................................21

*In re Metawave Communs Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003).............................17

*In re Miller Indus. Sec. Litig.*,
  12 F. Supp. 2d 1323 (N.D. Ga. 1998) .....................................21

*In re Motorola Sec. Litig.*,
  No. 03 C 287, 2007 U.S. Dist. LEXIS 9530 (N.D. Ill. Feb. 8, 2007).....................................32

*\*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...........................................22, 24

*Marsden v. Select Med. Corp.*,
  No. 04-4020, 2007 U.S. Dist. LEXIS 42924 (E.D. Pa. June 12, 2007)..................................33

*Merrill Lynch & Co. Research Reports Sec. Litig.*,
  2008 U.S. Dist. LEXIS 37993 (S.D.N.Y. May 8, 2008) ........................................35

*In re Newbridge Networks Sec. Litig.*,
  926 F. Supp. 1163 (D.D.C. 1996) ...........................................39

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................25

*Nursing Home Pension Fund v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ................................................26

*In re Omnicom Group Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008)......................................35

*Payne v. DeLuca*,
  433 F. Supp. 2d 547 (W.D. Pa. 2006)......................................18

*Powers v. Eichen*,
  977 F. Supp. 1031 (S.D. Cal. 1997)........................................27

*Premiere Techs., Inc. Sec*. Litig.,
  No. 1:98-CV-1804-JOF, 2000 WL 33231639 (N.D. Ga. Dec. 8, 2000)................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Pub. Sch. Teachers Pension & Retirement Fund v. Ford Motor Co. (In re Ford Motor Co. Sec. Litig.)*,
381 F.3d 563 (6th Cir. 2004) ..............................................................................11

*In re Ramp Networks, Inc. Secs. Litig.*,
201 F. Supp. 2d 1051 (N.D. Cal. 2002) ...............................................................29

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004).....................................................................28

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)................................................................................17

*Ross v. Abercrombie & Fitch Co.*,
No. 2:05cv819, 2007 U.S. Dist. LEXIS 58313 (S.D. Ohio Aug. 9, 2007) .............23

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ................................................................................17

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002) ................................................................21

*Schleicher v. Wendt*,
No. 1:02cv1332, 2007 U.S. Dist. LEXIS 67924 (S.D. Ind. Sept. 12, 2007) ..........23

*Scritchfield v. Paolo*,
274 F. Supp. 2d 163 (D.R.I. 2003).......................................................................22

*Sloman v. Presstek, Inc.*,
No. 06cv377, 2007 U.S. Dist. LEXIS 69475 (D.N.H. Sept. 18, 2007) ..................23

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
365 F.3d 353 (5th Cir. 2004) ..............................................................................17

*St. Clare v. Gilead Scis., Inc.*
*(In re Gilead Scis. Secs. Litig.)*, No. 06-16185, 2008 U.S. App. LEXIS 17076 (9th Cir. Aug. 11, 2008) ..........................................................................................30

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
128 S. Ct. 761 (2008)..........................................................................................11

*In re Trex Co. Sec. Litig.*,
454 F. Supp. 2d 560 (W.D. Va. 2006) ..................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*\*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) ................................................................................ *passim*

*TSC Indus. v. Northway, Inc.,*
    426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ................................... 11, 21

*In re UnumProvident Corp. Sec. Litig.,*
    396 F. Supp. 2d 858 (E.D. Tenn. 2005) ............................................................ 34

*Virginia Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991) ............................................................................ 20, 21, 22

*In re Winstar Commc'ns,*
    No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618 ..................................... 33

*In re XM Satellite Radio Holdings Sec. Litig.,*
    479 F. Supp. 2d 165 (D.D.C. 2007) ............................................................ 22, 28

*Yellen v. Hake,*
    437 F. Supp. 2d 941 (S.D. Iowa 2006) ....................................................... 18, 20

**STATUTES AND RULES**

15 U.S.C. § 78u-4(b)(2) ..................................................................................... 22

15 U.S.C. § 78u-4(b)(4) ..................................................................................... 30

15 U.S.C. §78u-5 .............................................................................................. 14

Federal Rule of Civil Procedure 15(a) ............................................................. 39

Federal Rule of Civil Procedure 9(b) ............................................................... 13

Federal Rule of Civil Procedure 12(b)(6) .............................................. 10, 21, 31

Lead Plaintiff, Arkansas Public Employees' Retirement System ("Lead Plaintiff")
respectfully submits this Memorandum in Opposition to Defendants' Motion to Dismiss the
Consolidated Class Action Complaint.[1]  For the reasons set forth herein, the Court should deny
Defendants' Motion in its entirety.

## I.    PRELIMINARY STATEMENT

Harman is a manufacturer of audio products and electronic systems for the automotive,
consumer, and professional markets in the Americas, Europe, and Asia.  ¶2.  The gravamen of
this litigation is that, during the Class Period,[2] Defendants made a series of materially false and
misleading statements regarding the Company's deteriorating financial condition.  Specifically,
unbeknownst to the investing public during the Class Period (but known or recklessly
disregarded by the Defendants), two of Harman's core products, the MyGIG radio and the
Personal Navigation Device ("PND"), were generating material losses for the Company and
Harman's capital expenditures were spiraling out of control.  ¶¶3-4.  In turn, these adverse events
placed Harman in breach of its highly touted Merger Agreement (the "Acquisition") with a
company formed by Kohlberg Kravis Roberts & Co. L.P. ("KKR") and an affiliate of Goldman
Sachs & Co. ("Goldman") (collectively, the "Purchasing Companies"), valued at approximately
$8 billion.  ¶5.

Indeed, at the time they announced the Acquisition and stated that it was in the best
interest of shareholders, Defendants' own internal (yet undisclosed) forecasts for the Company's
operating income and earnings for Harman's key division demonstrated that the Company's

---

[1] The Defendants in this case are:  Harman International Industries, Inc. ("Harman" or the "Company");
founder and former CEO of Harman, Dr. Sidney Harman ("Dr. Harman");  CEO and President of
Harman, Dinesh Paliwal ("Paliwal"); and CFO of Harman, Kevin Brown ("Brown").  Citations to "¶__"
refer to the particular paragraph of the Consolidated Class Action Complaint (the "Complaint") being
cited.

[2] The Class Period runs from April 26, 2007 through February 5, 2008, inclusive.

business conditions had deteriorated and would continue to deteriorate during fiscal 2007 and fiscal 2008.  ¶¶55-56.

Ultimately, however, the Defendants were unable to continue to conceal these adverse facts from the investing public.  On September 21, 2007, the Company announced that the Acquisition had been abandoned by the Purchasing Companies.  ¶87.  According to the Company, the Purchasing Companies "informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the Merger Agreement and that they are not obligated to complete the merger."  ¶6.  On this news, shares of the Company's stock fell from the previous day's closing price of $112.34 to a September 21, 2007 close of $85.00, a drop of $27.34.  ¶7.

Defendants' ability to maintain an illusion of financial soundness continued to deteriorate in the months following the abandonment of the Acquisition.  As fiscal 2008 began, it became increasingly difficult for Defendants to maintain the charade of their false projections of operating income and earnings per share.  On January 14, 2008 and February 5, 2008, Defendants were finally forced to acknowledge that fiscal Second Quarter 2008 results would be far below estimates, and the Company would need to reduce its previously-announced guidance, lowering projected earnings per share for fiscal 2008 by more than 40%.  ¶¶8-9.  In response, shares of the Company's stock fell from a closing price of $45.73 on February 5, 2008 to $38.70 on February 6, 2008, which was more than a 15 percent drop in the stock price per share.  ¶9.

In the face of these allegations, the Defendants make three arguments for dismissal.  First they contend that that the Class Period statements alleged as false and misleading are non-actionable forward looking statements.  As alleged in the Complaint, however, many of

Defendants' statements were statements of purported historical fact (albeit false and misleading). For example:

- In September 2007, Dr. Harman stated to the investing public that the pressure on Harman's margins was "over and we are again in full command of our circumstances and our extraordinary future." ¶98.

Far from over, the pressure on Harman's margins was only getting worse and would ultimately result in the massive shortfalls and revisions of guidance at the end of the Class Period. ¶¶8-9. More importantly, however, statements such as these are not forward-looking, but are statements of present fact, the falsity of which makes them actionable under the federal securities laws.

Even those Class Period statements that were forward-looking are actionable because they were not accompanied by appropriate cautionary language, and indeed, were contrary to the facts known to the Defendants at the time these statements were made. For example:

- In August of 2007, Defendants stated to the investing public regarding the Acquisition that "We anticipate completing the transaction during the third or fourth quarter of this calendar year." ¶¶70, 78.

By August 2007, however, the financial condition of Harman had deteriorated to the point that it was in material breach of the Merger Agreement it was still touting because, as Defendant Paliwal conceded, Harman lacked controls to prevent such binge spending. ¶72. The fact that Defendants had acknowledged to the investing public that there was a risk that the Acquisition would not be completed does not meaningfully disclose the fact that Harman spent $90 million in Fourth Quarter of 2007 which was a violation of the CapEx covenant and the primary basis for the Acquisition's failure. *Id.* Accordingly, Defendants may be held liable for such forward-looking false and misleading statements. *See* Section IV.B, *infra*.

Defendants next contend that the Complaint fails to adequately allege that the Defendants knowingly or recklessly made the alleged false and misleading statements. As the Complaint

makes clear, however, the Defendants were well aware that the Company's financial condition rapidly deteriorated both prior to and throughout the Class Period. ¶¶28-56. Indeed, based on interviews Lead Counsel conducted with the former Harman employees, the Complaint describes this massive internal financial crisis with remarkable particularity and extraordinary detail. For example, the Complaint details that:

- Dr. Harman personally negotiated the MyGIG contract that would result in a material loss and with knowledge that it would do so. ¶146;

- According to Harman's Accounting Manager, monthly and fiscal year-end operating reports (the "Operating Reports") were distributed to Defendants Dr. Harman and Brown, and after July 1, 2007 to Defendant Paliwal, indicating that the Company missed projected sales of PND units in fiscal 2007 by more than 200,000 units. Nevertheless, Defendants touted that sales of the PND units were strong. ¶¶51, 56.

Tellingly, Defendants do not challenge the reliability of the witnesses described in the Complaint, or contend that these senior employees were not in position to know the facts which they described. Taking all of the allegations together (as the Court must), the inference of Defendants' scienter is overwhelming, and at least as strong as any competing inference. Accordingly, Defendants' scienter has been adequately pled. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) ("[T]he [appropriate] inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). *See* Section V, *infra*.

Finally, Defendants contend that the Complaint fails to connect Lead Plainitff's losses with the alleged misconduct. Here too, Defendants' argument fails because the Complaint offers a more than sufficient causal connection between Lead Plaintiff's losses and the alleged false and misleading statements. *See* Section VI, *infra*. Ultimately, there can be no serious dispute that the Complaint sufficiently states a claim for violations of Section 10(b) of the Exchange Act.

Accordingly, for the reasons set forth herein, Defendants' motions to dismiss should be denied in their entirety.

## II.    STATEMENT OF FACTS

Harman is a manufacturer of integrated information and entertainment systems for automobiles.  ¶2.  At the center of the Company's undisclosed deteriorating financial condition prior to and during the Class Period were two new products -- the MyGIG radio and the Personal Navigation Device ("PND").  ¶3.  The effects on Harman's financial performance were both substantial and concealed, ultimately causing Harman to breach the capital expenditure clause of its highly touted Merger Agreement in September 2007 and the continued downward spiral of Harman's fiscal health throughout the Class Period.

### A.    The MyGIG Radio

Suffering from a $400 million revenue shortfall caused by the loss of sales to Mercedes, Defendants entered into a contract prior to the Class Period for Harman to manufacture MyGIG radios for Chrysler.  ¶¶36-37.  Harman's Quality Assurance Engineer stated that the contract Harman signed with Chrysler in 2005 to provide Chrysler with MyGIG radios created a loss for Harman because Harman sold each radio to Chrysler for $800, but spent $964 to build each radio, losing $164 on each radio.  ¶43.  Nonetheless, Harman had committed to produce up to 200,000 MyGIG radios annually for Chrysler.  ¶43.

Additionally, although announced on September 6, 2006, Harman significantly delayed its rollout of the Chrysler MyGIG radio due to supply issues and Harman's inability to fulfill production needs.  ¶38. Even when the radios finally were produced in 2007, they were "plagued" with various technical and cosmetic issues, including failure to produce sound.  ¶¶39-40.  However, by then, it was too late, Chrysler, already disappointed with the MyGIG deal because of the delay and lack of quality, began reducing its order volume for the MyGIG radio in

fiscal 2007.  ¶42.  This decrease in orders and production resulted in reduced needs for parts for

the MyGIG radio to be ordered by Harman, which caused suppliers to raise prices for the parts,

creating a "huge problem for Harman."  ¶42.

Harman's highly-touted MyGIG radio was slated to generate more than 50% of

automotive sales in North America at a substantial loss of approximately $32 million annually –

almost 10% of Harman Automotive's total operating income, based on the commitment to

provide 200,000 units to Chrysler.  Recognizing that the contract with Chrysler was disastrous

for the financial health of Harman, Defendants unsuccessfully attempted to renegotiate the

contract with Chrysler on several ocassions.  Having personally negotiated the original contract

with Chrysler, Dr. Harman took a personal role in these failed attempts to re-negotiate the

MyGIG contract.  ¶45.  Dr. Harman ultimately conceded to the Vice Presidents for the Company

in a meeting in Plymouth, Michigan that he knew that the MyGIG had aggressive price targets

and that the Company was not going to make money on the MyGIG radio deal.  ¶46.

Despite the fact that the MyGIG contract was not structured to be profitable (and indeed

was losing money), during the Class Period Defendants falsely and misleadingly touted the

potential of the Chrysler/MyGIG deal.  For example, in September 27, 2007, Defendant Brown

stated to the public that "we are bringing additional business on-stream at Chrysler as we ramp

up our Missouri plant . . . ."  ¶101.  As alleged in the Complaint and confirmed by former

employees at the Company, by September 2007, Chrysler was *decreasing* its demand for MyGIG

radios, a fact that was known to the Defendants at the time this statement was made.  ¶42.

**B.**    **The PND Sales and Margins**

At the same time it was suffering fiscal woes associated with the MyGIG Radio, Harman

began selling PNDs.  ¶49.  In October 2006, Harman reported that it had sold 95,000 PND units

in fiscal First Quarter 2007 (July-August 2006).  ¶50.  Based on fiscal First Quarter 2007 sales of

PNDs, Dr. Harman stated that the Company expected to sell "well over 500,000 units" in Europe in fiscal 2007.  ¶50.  In January 2007, Dr. Harman reported that the Company had sold almost 250,000 PNDs for the first half of fiscal 2007 and claimed that Harman's PND sales were accelerating.  ¶51.  Therefore, Defendants raised projections for sales and stated that for the year, Defendants "now expect sales to exceed 650,000 units" – 62% and 400,000 units more than Harman sold in the first six months  ¶51.  On April 26, 2007, Defendant Brown stated that the selling price in Europe on Harman's PND was approximately $350 per unit and that the Company had sold approximately 130,000 units in fiscal Second Quarter 2007.  ¶51.

A former sales engineer at Harman reported, however, that contemporaneous internal reports regarding the highly-touted PNDs presented a dire situation—in stark contrast with the glowing statements about PNDs made by Defendants.  ¶52.  According to the Sales Engineer, Harman's PNDs had not been selling in the numbers that Harman had anticipated in 2006 and, consequently, many of the PNDs were being stored in a warehouse.  ¶53.  The Sales Engineer further explained that Harman had dropped the price approximately $100 and made a modification to the PNDs early in 2007 that "made the PNDs in the warehouse in Germany obsolete."  ¶53.

In fact, the Company missed projected PND sales by more than 200,000 units in fiscal 2007.  ¶55.  According to a former Harman Accounting Manager, Harman's Automotive division distributed monthly and fiscal year-end operating reports (the "Operating Reports") to Harman International Executives, including Defendants Dr. Harman and Brown, and after July 1, 2007 to Defendant Paliwal, as well as to several other executives and numerous lower-level accounting or financial personnel, including the Accounting Manager.  According to these Operating

Reports reviewed by the Accounting Manager when he worked at Harman, the Company missed projected sales of PND units in fiscal 2007 by more than 200,000 units.  ¶55.

To make up for this staggering shortfall, in June 2007 (immediately prior to Harman's fiscal year end), Defendants entered into an agreement to sell 100,000 PND devices to a customer called Paragon for $240 each, a price $110 lower than what Brown had publicly disclosed on April 26, 2007.  ¶56.   Despite this price concession, according to the Accounting Manager, the sale of 100,000 PND units in Fourth Quarter fiscal 2007 did not materialize and the sale to Paragon was not completed before fiscal year end.  ¶56.  Although the Company sold all of the 100,000 PND units to Paragon at $240 each in July 2007, the Operating Reports reflected that Defendants had missed their projected PND sales by at least $85 million in fiscal 2007.  ¶56. Significantly, *all* 100,000 PND units sold to Paragon were returned to Harman four months later and the Company took a $24 million loss for the return of that sale.  ¶86.

Despite the fact that Harman had missed its fiscal 2007 projected sales of PNDs by almost 30% and ultimately had to drastically lower the announced price of the PNDs to offload excess inventory, Defendants falsely and misleadingly touted the performance of PND sales.  For example:

- On April 26, 2007 the Defendants announced that "The plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding," even though by that time the plan was not proceeding in a manner that could result in sales of 618,000 units for fiscal 2007.  ¶57. In fact, PND sales fell by $29 million in 2007 as compared with 2006, ¶113, and the Company missed its sales target for FY07 by more than $85 million, which was one-third of Defendants' forecasted net sales.  ¶86.

- Similarly, on September 27, 2007, Defendant Brown stated to the investing public that "We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe." ¶100.  When this statement was made, however, PND sales *were decreasing, not increasing*, a fact which the Operating Reports that were provided to the Defendants confirmed.  ¶56.

8

### C.     Harman's Failed Merger

On April 26, 2007, Defendants announced that Harman had agreed to be acquired by KKR and Goldman.  ¶28.  Defendants issued a press release to announce that the Purchasing Companies would acquire Harman for $120 per share and stated that the Acquisition was expected to close in the calendar Third Quarter of 2007 (July-September 2007).  ¶29.  The $120 per share price was a 17% premium over the prior day's close of $102.56 per share.  ¶31.  On April 26, 2007, over 7 million shares of Harman's common stock were traded, which was extremely heavy trading, and the stock closed at $122.50 per share – 19% higher than on April 25, 2007.  ¶31.

The Merger Agreement with the Purchasing Companies contained two important conditions that must be met in order for the Purchasing Companies to be bound to the agreement. First, there was a CapEx Covenant whereby Harman was prohibited from making any capital expenditures exceeding (1) the capital expenditure budget for the 2007 fiscal year previously provided to the Purchasing Companies or (2) the 2008 capital expenditure budget.  ¶33.   Second, the Merger Agreement included a "MAC" clause that allowed the Purchasing Companies to terminate the Acquisition in the event of a material adverse change in Harman's business.  ¶¶34-35.

Unbeknownst to the Purchasing Companies and the investing public, Harman was already in breach of both of these provisions at the time the Merger Agreement was entered.  As described above and alleged in the Complaint, at the time of the Merger Agreement, Harman's contract to supply Chrysler with MyGIG radios, was underbid and the product wrought with glitches, causing the Company to lose money, and, consequently, was negatively impacting profit margins.  ¶13.  At the same time, Harman was also experiencing disappointing sales of its PND products in Europe and high levels of PND inventory.  ¶14.  Indeed, the Company had

begun selling obsolete PNDs at deep discounts. ¶14. Thus, the situation with respect to the PNDs was precisely the same as with the MyGIG radio: Harman had invested substantial sums of money in developing, manufacturing, and marketing a product which it either could not sell or was selling at a substantial loss. ¶14. Consequently, at the time of the Merger Agreement, the Company's capital expenditures were already set to spiral out of control and the Company's business was undergoing material adverse change in breach of the covenants in the Merger Agreement. ¶71. Indeed, Dr. Harman later admitted that the Company's Automotive division had "binged on capital spending" and spent "$60 million in one month," and that there were no controls in place to prevent this exuberant spending. ¶72.

Upon discovery of this information, the Purchasing Companies quickly backed out of the Merger Agreement on September 21, 2007, causing Harman's stock to fall more than 24% in a single day. Nonetheless, and likely to prevent the stock price from plummeting further, the Defendants continued to conceal the true financial condition of the Company, denying the fact that there had been breaches of the covenants in the Merger Agreement. Not until February 5, 2008, did the Defendants fully disclose these facts to investors, resulting in further sharp declines in the price of Harman shares and further damaging Lead Plaintiff and the Class.

## III.    THE APPLICABLE PLEADING STANDARDS ON A MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), a complaint need not contain detailed factual allegations, although it must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). In rendering a decision, the Court must "accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509.

IV.     **THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS**

      Defendants contend that the statements alleged in the Complaint as false and misleading are not actionable because they are (1) truthful; (2) puffery; or (3) protected forward-looking statements.  Def. Br. at 16.  As explained below, these contentions are wrong.

      A.     **The Complaint Alleges Statements of Historical Fact As False and Misleading**

      Defendants contend in a footnote that their allegedly false and misleading statements of historical fact are nor actionable because they are "factually true and have never been restated." Def. Br. at 21, n.1, 2 (citing ¶¶65, 67, 73, 97, 99, and 105).  For Defendants to contend that their statements were "true" ignores the fact that these statements were highly misleading to investors because they failed to provide sufficient information to make the statements complete. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc*., 128 S. Ct. 761, 768 (2008) (noting that Rule 10b-5 makes it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").  "An omitted fact is material if there is . . . a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available."  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976).

      Indeed, when Defendants chose to speak, they assumed the duty to tell the entire truth. *Pub. Sch. Teachers Pension & Retirement Fund v. Ford Motor Co. (In re Ford Motor Co. Sec. Litig.)*, 381 F.3d 563, 569-570 (6th Cir. 2004) ("[A] defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths.") (citing *Helwig*, 251 F.3d at 561, 564); *see also Hall v. Children's Place Retail Stores, Inc*., 2008 U.S. Dist. LEXIS 54790, at *17-18 (S.D.N.Y. July 18, 2008) ("Once defendants choose to speak about their

company, they undertake a duty to speak truthfully and to make such additional disclosures as . .

. necessary to avoid rendering the statements misleading.") (internal quotations omitted).

Specifically, Defendants' purportedly "true" statements include:

- An August 14, 2007 statement outlining the factors that had adversely impacted gross profit. ¶73;

- A September 25, 2007 statement by Paliwal that "The fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards." ¶97;

- A September 25, 2007 statement by Paliwal that "For the full year 2008, gross profit is expected to be lower than anticipated in April 2007 . . . due to higher material prices, and more than expected ramp-up costs for the two new manufacturing plants in China and the U.S." ¶99;

- The November 9, 2007 Form 10-Q in which the Company reported that "[n]ew introductions of infotainment systems including Chrysler's MyGIG infotainment systems in North America . . . were primary factors contributing to the higher sales." ¶105.

These statements, however, were false and misleading because Defendants failed to

disclose the true factors impacting Harman's sales, including, *inter alia*, that:

- Harman's contract to manufacture MyGIG radios for mid-level Chrysler vehicles required that Harman produce and sell each MyGIG radio to Chrysler at a loss.

-  the MyGIG radios were "plagued" with technical problems.

- Chrysler's relationship with Harman was rapidly deteriorating, resulting in Chrysler reducing its number of orders for the MyGIG radio.

- Harman had a large inventory of older generation, obsolete PNDs which it could not sell or was forced to sell at a substantial loss, and prospects for future sales of PNDs were being adversely affected by increasing competition and pressures from competitive pricing.

- PNDs had not sold to the Company's expectations in 2006, and many of the devices, consequently, were being stored in a warehouse.

¶¶62-64.

A reasonable investor would certainly have viewed as material the fact that Harman's Merger Agreement was severely jeopardized because Defendants entered into unprofitable contracts and Harman was severely lagging behind projected sales of its core products. Indeed, Harman's Form 10-Q for the Second Quarter of 2008 finally conceded what was well known before the Class Period and contemporaneous with Defendants' falsely positive statements – that the Chrysler's MyGig radio system *was not profitable*. Defendants' contention that their "backwards" looking statements were "true" simply is not consistent with the actual facts alleged in the Complaint.[3] Accordingly, these statements are actionable false and misleading statements.

### B.    Defendants' Forward-Looking Statements Are Not Protected by the PSLRA's Safe Harbor

Defendants further assert that their forward-looking Class Period statements are inactionable because of the PSLRA's safe harbor. *See* Def. Br. at 16-29. Defendants argue that every forward-looking statement made during the Class Period was also accompanied by cautionary language. Def. Br. at 23. Contrary to their arguments, Defendants are not entitled to safe harbor protection. First, the PSLRA safe harbor does not protect forward-looking statements that were known to be false or misleading when made. Second, the cautionary language that accompanied Defendants' forward-looking statements was neither substantive nor tailored and therefore cannot be considered "meaningful."

---

[3] Defendants also suggest that because the Company did not restate its financial statements, Defendants' statements cannot be false and misleading. Def. Br. at 21, n.1, 2. To plead falsity, however, there is no prerequisite that the Company admit its financials were false by issuing a restatement. *See, e.g.*, *Atlas v. Accredited*, No. 07-488, 2008 WL 80949 (S.D. Cal. Jan. 4, 2008) (upholding Section 10(b) accounting claims under the heightened pleading standards of Rule 9(b) and the PSLRA against subprime lender that did not restate its audited financial results). Indeed, as numerous courts have held, "the fact that [the Company] has not elected to restate or reverse its earnings or revenue figures . . . does not indicate, much less prove, the accuracy of those figures." *Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998).

1.    **Defendants Had Actual Knowledge that Their Statements Were False And Misleading When Made**

The PSLRA established a "safe harbor" provision shielding forward-looking statements from liability under Rule 10b-5. *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316, 334 (D.D.C. 2005). To qualify for protection under the safe harbor provision of the PSLRA, a statement must both be identified as forward-looking and be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5. "This safe harbor provision shields 'forward-looking statements' from Rule 10b-5 liability where such a statement is made by a 'natural person' unless plaintiffs prove that it was made with 'actual knowledge . . . that the statement was false and misleading.'" *Burman*, 384 F. Supp. 2d at 334 (quoting 15 U.S.C. §78u-5); *Freeland v. Iridium World Communications, Ltd.*, 545 F. Supp. 2d 59, 71 (D.D.C. 2008) ("[s]uch vaguely pessimistic generalities, however, do not shield the defendants from liability for specific statements which were blatantly false"). *See also In re Alliance Pharmaceutical Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003).

Here, the Complaint alleges the following statements, related to Harman's PND sales, were false and misleading when made:

- An April 26, 2007 statement that "The plan forecasts total unit sales of 618,000 [PND] units for the fiscal '07 year [ending June 2007], and that plan is proceeding." ¶57

- A November 9, 2007 statement that "A strong demand for Traffic Assist, our European aftermarket PND, also contributed significantly to the increase in sales over the prior year period." ¶105.

When Defendants spoke of increasing PND sales for fiscal 2007 and a strong demand for PNDs, Defendants had contemporaneous knowledge of the following facts undermining their statements: (i) in early 2007, Harman was told by large customers that its PND pricing was not competitive (¶52); (ii) Harman missed PND sales by more than 200,000 units and at least $85

million, well before the November 9, 2007 statement about increased sales and strong demand (¶¶55-56); and (iii) Defendants knew that they had hundreds of millions of dollars of obsolete PNDs in inventory and, again before November 9, 2007, that 100,000 obsolete models had been returned, reversing a $24 million sale (¶¶63, 86).  Notwithstanding these problems with the European PND market, it was not until February 5, 2008, that Defendants finally disclosed what they knew all along – PND sales had fallen by $29 million as compared with the same period the prior year and PND sales and margins had decreased due to competitive pricing pressures and the sale of older inventory at substantial discounts.  ¶113.

Likewise, the Complaint alleges the Defendants made actionable statements related to MyGIG and Harman's relationship with Chrysler, including the following:

- A May 10, 2007 statement that "We anticipate that Daimler Chrysler, Toyota/Lexus, Audi/VW and BMW will continue to account for a significant portion of net sales and accounts receivable for the foreseeable future."  ¶66.

- A September 27, 2007 statement that "We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe." ¶100.

- A September 27, 2007 statement that "we are bringing additional business on-stream at Chrysler as we ramp up our Missouri plant and in the PND business, where we continue the growth and expansion of that business primarily in Europe."  ¶101.

While Defendants told investors that their relationship with Chrysler was expected to "ramp up" and that Chrysler was providing "additional business" (¶100), they knew specific but undisclosed facts that materially undermined Harman's ability to achieve growth or profitability from its MyGIG sales.  For example, on several occasions in 2006 and 2007, Chrysler had refused to renegotiate a contract that would allow Harman to sell MyGIG radios at a profit and therefore, each unit was sold at a $164 loss.  ¶¶39, 45-46.  Furthermore, Harman failed to tell investors that the MyGIG radios were plagued with software problems which resulted in major production

delays (¶63).  The production delays as well as Harman's unauthorized changes to the MyGIG

radios substantially harmed Harman's relationship with Chrysler.  *Id.* As a result, Chrysler

reduced the volume of its order for MyGIG radios, which increased Harman's cost for parts and

caused Harman to sell the radios for an even greater loss. ¶¶42, 63.  Indeed, as early as June

2007, Harman knew it would not get the MyGIG radio contract for Chrysler's Jeep Grand

Cherokee and Durango vehicles in 2010.  ¶ 86.  In sum, Harman's statements that its business

with Chrysler was increasing and that Chrysler would continue to account for a significant

portion of net sales were unquestionably false and misleading when made because the Chrysler

contract was not and would not be profitable, and because the relationship with Chrysler had

soured beyond repair.

Finally, Defendants' announcements that the Merger would be completed in the third or

fourth quarter similarly does not warrant safe-harbor protection.  In connection with the merger,

defendants made the following statements:

- An August 14, 2007 statement that "We anticipate completing the [Merger] transaction
  during the third or fourth quarter of this calendar year."  (¶70), and

- An August 29, 2007 that "We presently anticipate that the merger will be completed in the
  fourth quarter of calendar year 2007.  ¶78.

Defendants made such statements knowing that the Company's increased costs and decreasing

profit margins would, if they had not already, cause the Company to trigger the terms of the

MAC clause in the Merger Agreement.  ¶70.  Moreover, Defendants were well aware that they

had "binged on capital spending" as a part of the Company's effort to ramp up the new Missouri

plant, which caused the Company to breach the CapEx covenant in the Merger Agreement.  ¶71.

As a result, while Defendants were encouraging investors to believe that the merger would close,

they were well aware of their failure to control expenses incurring expenditures as high as $90

million in a single quarter. *Id.* It simply is not credible for Harman to state that no material adverse change occurred that breached the Merger Agreement. ¶87.

### 2. Vague, Boilerplate Language Does Not Trigger Protection from the PSLRA's Safe-Harbor

Even assuming *arguendo* that Defendants were unaware that their statements were false and misleading, which is not the case here, the statements would still be actionable because the cautionary language that accompanied those statements was neither meaningful nor substantive. Cautionary language cannot be general or unspecific to the statements made; routine listings of broad, ordinary, competitive, and political factors fail to bespeak caution. *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known, material adverse facts."); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (the "requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."). Rather, the cautionary language must identify those factors that could cause results to differ from those projected. *In re Metawave Communs Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1086 (W.D. Wash. 2003).[4] Even if a statement is considered forward-looking, the federal securities laws provide "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty the Grand Canyon lies one foot away." *Rombach v. Chang*,

---

[4] "In order to be meaningful, a cautionary statement must be more than a recitation of mere generalized risks or mere boilerplate language which could be applicable to any business venture. *In re Champion Enters.,Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 859 (E.D. Mich. 2001), *aff'd by Miller v. Champion Enters., Inc.*, 346 F.3d 660 (6th Cir. 2003).

355 F.3d 164, 173 (2d Cir. 2004) (quoting *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)).

Here, Defendants argue that they identified factors that might give rise to termination of the merger agreement, including "the inability to complete the merger due to failure to obtain stockholder approval or the failure to satisfy other conditions" Def. Br. at 25. Such a warning is wholly insufficient where Defendants knew that they were spending exuberantly and well-beyond budget. This was not merely a "failure to satisfy other conditions." Rather, the Harman Defendants knew the Company was in violation of the Merger Agreement at the same time the Harman Defendants advised investors that they expected the merger would soon be completed.[5]

With respect to PNDs, Defendants claim that they provided meaningful cautionary language when the Company advised that products "may not" satisfy customer demand or successfully compete. However, the law is clear that Defendants must not only warn investors that risk factors "may" exist, but also that they are not hypothetical. *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102-3 (S.D.N.Y. 2006) ("'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit.'") (quoting *In re Prudential*, 930 F. Supp. at 72). Here, large customers advised Harman in early 2007 that the Company's PND pricing was not competitive. ¶52. Harman was forced to release five versions

---

[5]  The cases Defendants cite for the proposition that the warnings they provided are sufficient are inapposite because the risk disclosures in each of them provided far more specificity than those given by Harman. For example, despite Defendants' assertion, the court in *Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006) did not find a general statement that "actual amounts realized could be materially different" to be sufficient alone. Rather, the court approved of this statement *in addition* to more specific warnings, including that a new "claims resolution strategy" had already led to reduced revenue projections. *Id.* at 585. Defendants' other cited cases also involved warnings more specific and cautionary than Harman's. *See Yellen v. Hake*, 437 F. Supp. 2d 941, 962 (S.D. Iowa 2006) (company warning of "$90 to $100 million of unfavorable commodity price economics"); *In re Synovis Life Techs., Inc., Sec. Litig.*, Civil No. 04-3008 ADM/AJB, 2005 U.S. Dist. LEXIS 18187, at *30-31 (D. Minn. Aug. 25, 2005) (warning of risk that much of company's revenue came from a few customers).

of the same PND between March 2006 and July 2007. ¶54.  And, Harman reduced its price on the PNDs by $110 in June 2007 just so that it could sell obsolete inventory.  ¶56.  Accordingly, to state that Harman's products "may not" successfully compete was hardly meaningful when Defendants were well aware that the risk had come into fruition – and did so to the tune of 200,000 units and at least $85 million less than budgeted.¶¶55-56, 86.

Finally, Defendants' argument that they provided meaningful cautionary language with respect to the MyGIG radios also falls short.  Defendants note that they warned investors "[u]nforseen cost overruns or difficulties experienced during development could cause losses on these contracts." Def. Br. at 28.  This hardly warns investors of the reality that the Company expected Harman would not make any money on MyGIG radios (¶48) and, indeed, was losing $164 on each radio.  ¶43.  Significantly, nowhere did Harman advise investors that its relationship with Chrysler had soured to the point where Harman knew it had lost its contract for Chrysler vehicles in the future.  ¶86.

In sum, Defendants' purported cautionary language was far too vague and general to meaningfully put investors on notice of known, material risks to the Company.   As explained in *EVCI College Holdings*, "I agree with plaintiffs that this allegation, if proven, would take the forward-looking disclosures out of the PSLRA's Safe Harbor – not because defendants did not identify the correct risk factors, but because the disclosures failed to warn investors that the risk factors were not hypothetical – which, of course, dramatically increased the possibility of adverse consequences."  469 F. Supp. 2d at 102-03.  Where, as here, investors are not provided with material information and only warned of hypothetical risks although such risks had become a reality, immunity under the PSLRA's safe-harbor is not available.[6]

---

[6] Defendants are wrong in claiming that this case is similar to *XM Satellite Radio*, 479 F. Supp. 2d at 176, where the defendant company merely "r[an] into difficulties that ultimately prevent[ed] it from meeting

C.    **Lead Plaintiff Does Not Rely on Inactionable Puffery**

Defendants further claim that certain statements about Harman's financial condition are

nothing more than inactionable statements of "puffery." *See* Def. Br. at 22 n.3. These

statements include Defendants' announcements that:

- "Our dominance in the automotive space was solidified through the past year . . . ." ¶74.

- Harman's balance sheet was "strong" at fiscal year-end. ¶75.

- "Sales of aftermarket products, particularly PNDs, were very strong during fiscal 2007." ¶82.

- "Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement." ¶87.

- "The confluence of these events [increases in material costs, startup of new facilities and the KKR/Goldman merger] in a six- to eight-month period generated what might be called the perfect storm. Now that storm is over and we are again in full command of our circumstances and our extraordinary future." ¶98.

Defendants are wrong, as statements about Harman's dominance, balance sheet, sales and the

reasons for the abandonment of the Merger were all highly important factors that investors

considered when evaluating Harman's stock.

As the Supreme Court explained in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S.

1083, 1091 (1991), even "statements of reasons, opinions, or beliefs" are actionable. *Id.* at 1093

("indefinite and unverifiable" terms such as "high value" or "fair" are actionable). Indeed,

investors pay close attention to the opinions of corporate insiders who "usually have knowledge

and expertness far exceeding the normal investor's resources." *Id.* at 1091; *see also In re*

---

its financial goals." Here, in contrast, Lead Plaintiff alleges that Harman had *already* run into known difficulties, and made false statements about those specific facts. *See, e.g.*, ¶¶12, 55-56, 72, 171. Likewise, these allegations set this case apart from Defendants' other cited cases that found forward-looking statements to fall within the protections of the safe harbor. *See In re Trex Co. Sec. Litig.*, 454 F. Supp. 2d 560, 574-75 (W.D. Va. 2006) (statements merely projected revenue growth); *Yellen v. Hake*, 437 F. Supp. 2d 941, 960-61 (S.D. Iowa 2006) (vague statement boasting "strong visibility into our quarterly revenue"); *Anderson v. Abbott Labs*, 140 F. Supp. 2d 894, 907 (N.D. Ill. 2001) ("[S]tatements which plaintiffs allege to be fraudulent focus on general corporate performance").

*Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) ("A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available.").[7]

Consistent with *Virginia Bankshares*, courts have determined that opinions are actionable if "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994); *In re Premiere Techs., Inc. Sec*. Litig., No. 1:98-CV-1804-JOF, 2000 WL 33231639, at *15 (N.D. Ga. Dec. 8, 2000) ("To the extent that Defendants argue these statements are not actionable because they reflect the Defendants' opinions or 'subjective assessment,' the Supreme Court has held that statements of opinion or belief may be actionable.").[8]

---

[7] A plaintiff sufficiently pleads materiality by identifying information that would be considered significant to a reasonable investor. *Basic, Inc. v. Levison*, 485 U.S. 224, 234 (1988). Materiality, however, is a question of fact not typically resolved on a motion to dismiss. *Newbridge II*, 962 F. Supp. at 180 (citing *TSC Indus.*, 426 U.S. at 450); *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ("Materiality is a mixed question of law and fact, and a complaint may not properly be dismissed pursuant to Rule 12(b)(6) (or even pursuant to Rule 56) on the ground that the alleged misstatement or omission are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."); *see also In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323, 1330 (N.D. Ga. 1998) (same).

[8] Indeed, courts have found many types of statements of opinion to be actionable. *See, e.g., ValuJet*, 984 F. Supp. at 1477-78 (statement that airline's safety record was "certifiably among the very best in the airline industry" was material and actionable); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-73 (6th Cir. 2005) cert. denied 126 S. Ct. 423 (2005) (representation regarding superior quality of product was actionable) (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken per se, are sufficiently 'vague' so as to constitute puffery")).

Therefore, Defendants' Class Period statements that (1) their "dominance in the automotive space was solidified through the past year," (2) their balance sheet was "strong" at fiscal year-end, (3) "Sales of aftermarket products, particularly PNDs, were very strong during fiscal 2007," and (4) their financial "storm" was now "over" were far more than inactionable statements of puffery or vague generalizations. None of these statements can be reconciled with the known, but undisclosed, financial state of the Company at the time the statements were made. When these statements were made, Harman's dominance and strength were dwindling and the "storm" surrounding the Company's fiancial health was only beginning. ¶¶112-114. Applying *Virginia Bankshares*, the statements at issue are actionable because they lack "a factual basis that justifies them as accurate, the absence of which renders them misleading." 501 U.S. at 1093. Accordingly, Defendants' arguments regarding these statements should be rejected.

## V.    PLAINTIFF HAS ADEQUATELY PLED SCIENTER UNDER THE PSLRA AND *TELLABS*

### A.    The Standard for Pleading Scienter

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court recently set forth the scienter pleading requirements under the PSLRA in *Tellabs, Inc. v. Makor Issues and Rights*, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).[9] *Tellabs* holds that scienter allegations must be considered collectively:

> The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

*            *            *

---

[9] Prior to the Supreme Court's opinion in *Tellabs*, the District of Columbia Circuit had not, itself, addressed how the PLSRA's scienter requirement may be met. *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 176 (D.D.C. 2007).

We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.

*Id.* at 2509, 168 L. Ed. at 193 (emphasis added). "Many factors can be relevant in evaluating allegations of scienter depending on the circumstances." *Schleicher v. Wendt*, No. 1:02cv1332, 2007 U.S. Dist. LEXIS 67924, at *34 (S.D. Ind. Sept. 12, 2007); *see also, e.g., Ross v. Abercrombie & Fitch Co.*, No. 2:05cv819, 2007 U.S. Dist. LEXIS 58313, at *12 (S.D. Ohio Aug. 9, 2007) (noting that the Supreme Court "stressed" scienter allegations are to be viewed holistically); *In re Loudeye Corp. Sec. Litig*. 2007 U.S. Dist. LEXIS 60624, at *19 (W.D. Wash. Aug. 17, 2007) (allegations of scienter must be considered "holistically" and "collectively").

After *Tellabs*, these allegations must be viewed together to determine whether the inference is "strong," *i.e.*, "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510, 168 L. Ed. at 194.[10] "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even 'the most plausible of competing inferences.'" *Id.  See also Darquea v. Jarden Corp.*, 06cv0722, 2007 U.S. Dist. LEXIS 65739, at *4 (S.D.N.Y. Sept. 5, 2007) (holding inference of scienter must be "cogent and compelling, thus strong in light of other explanations" in denying defendants' motion to dismiss); *Sloman v. Presstek, Inc.*, No. 06cv377, 2007 U.S. Dist. LEXIS 69475, at *24-25 (D.N.H. Sept. 18, 2007) (scienter requirement met where "viewing the complaint as a whole, the inference of scienter is at least as compelling as any 'nonculpable explanations for the defendant's conduct.' *In other words, a tie now goes to the plaintiff*.") (internal citations omitted) (emphasis added).

---

[10] Left unaffected by the *Tellabs* decision is the fact that the scienter requirement may also be met by a showing of recklessness. *Tellabs*, 127 S. Ct. at 2507 n.3. *See also Burman v. Phoenix Worldwide Indus., Inc.*, No. 04-1276, 2006 U.S. Dist. LEXIS 46071, at *11 (D.D.C. July 7, 2006) ("To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege that the defendant knowingly or recklessly made a false or misleading statement of material fact…")

Here, Lead Plaintiff claims Defendants knowingly or recklessly failed to disclose material adverse facts about the Company's financial condition including, *inter alia*, that capital expenditures were spiraling out of control; that the Company's sales of MyGIG radios and PNDs were causing and would continue to cause operating margins to decline; and that, as a result of the Company's financial condition, the Company had likely breached the Merger Agreement with the Purchasing Companies. Lead Plaintiff has pled a cogent inference of scienter, and this inference is at least as compelling as any opposing inferences, as required under *Tellabs*. *See id.*

**B.      Lead Plaintiff's Confidential Sources Are Knowledgeable and Reliable and Give Rise to a Strong Inference of Scienter**

The Complaint sets forth detailed allegations based on multiple sources, including accounts from several witnesses. These witnesses are all former Harman employees in positions giving them considerable access to the facts alleged in the Complaint. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008). Tellingly, Defendants do not dispute, and therefore concede, that the Complaint describes these witnesses with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. Indeed, Defendants ignore the accounts of these witnesses altogether. However, these accounts make clear that Defendants' Class Period statements were made with knowledge or reckless disregard of their falsity at the time they were made.

For example, one of Harman's Accounting Managers described how the Company had missed projected PND sales by more than 200,000 units in fiscal 2007, a fact which was detailed in monthly and fiscal year-end operating reports (the "Operating Reports") that were distributed to Defendants Dr. Harman and Brown, and after July 1, 2007 to Defendant Paliwal. ¶55. Nevertheless, despite these dismal numbers, Defendants continued to tell the investing public that sales of PNDs would exceed 600,000 units for fiscal 2007. *See* ¶¶57, 58. Similarly, a

24

former Sales Engineer, stated that internal reports prior to July 2007 regarding the highly-touted

PNDs presented a much more dire situation than the upbeat outlook for PNDs as publicly

described by Defendants.  ¶52.  Additionally, Harman's MyGIG Purchasing Manager stated that

Dr. Harman personally negotiated the MyGIG-Chrysler contract, a contract which Dr. Harman

acknowledged would lose money.  ¶¶45, 48.[11]

Each of these instances demonstrates that Defendants were well aware of the true state of

affairs at the Company during the Class Period.  Accordingly, the statements attributed to each

of these witnesses support a strong inference of Defendants' scienter.  *See Novak v. Kasaks*, 216

F.3d 300, 308 (2d Cir. 2000) ("[S]ecurities fraud claims typically have sufficed to state a claim

based on recklessness when they have specifically alleged defendants' knowledge of facts or

access to information contradicting their public statements."); *Florida State Bd. of Admin v.*

*Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (same).  The accounts of the witnesses

attesting to the knowledge and recklessness of the Defendants, especially in combination with

the other facts showing Defendants' scienter, demonstrate that the Defendants knew or recklessly

disregarded that their statements were false and misleading.

C.    **Dr. Harman's Own Admissions Give Further Rise to a Strong Inference of**
       **Scienter.**

Following the abandonment of the Merger by the Purchasing Companies, Dr. Harman

admitted that the Company had not complied with the restrictions on capital expenditures

required by the terms of the Merger Agreement.  Specifically, Dr. Harman admitted that in the

Fourth Quarter of fiscal 2007, the Company had engaged in exuberant spending.  After KKR and

---

[11] A former Harman Administrative Assistant further stated that she had heard that Harman had submitted
the wrong financial figures to the Purchasing Companies – that "they cooked the books" and that when
the Purchasing Companies finally discovered the financial misrepresentation, they backed out of the deal.
¶¶107-108.

Goldman terminated the Merger Agreement, Dr. Harman admitted that the Company had "binged on capital spending" in June 2007, "spending $60 million in one month." ¶72.

Dr. Harman further reported to Fortune magazine that this reckless spending binge caused Harman's capital expenditures to exceed $90 million in fiscal Fourth Quarter 2007 (April 1, 2007 through June 30, 2007) alone and over $174.4 million for fiscal 2007, which was more than $24 million over the $150 million forecast by Defendants three months earlier. ¶72. This capital spending of $60 million in June 2007 and an additional $30 million prior to that between April and May 2007 violated the CapEx covenant of the Merger Agreement. Accordingly, Dr. Harman knew or recklessly disregarded the fact that his statements in August of 2007 that the Acquisition would occur in the third or fourth quarter of 2007 were false and misleading at the time they were made.[12] ¶¶70-72. *Nursing Home Pension Fund v. Oracle Corp*., 380 F.3d 1226, 1232-34 (9th Cir. 2004) (allegations that defendants admitted to knowing of concealed truth sufficient to establish scienter).

    **D.**    **The Closeness in Time Between the Announcement of the Abandonment of the Merger to the False and Misleading Statements Touting the Merger Contributes to a Strong Inference of Scienter**

The abandonment of the Merger was announced to the public on September 21, 2007. ¶87. This announcement came less than one month after the filing of the Company's August 29, 2007 10-K, in which the Defendants continued to tout that the Merger was expected to be

---

[12] In an attempt to undermine the Complaint's allegations of scienter, Defendants point to a self-serving statement in Fortune Magazine post-dating the failed Merger in which Defendants claim that KKR mistakenly claimed a breach of the Merger Agreement based upon a misreading of the Merger Agreement. Def. Br. at 33. In essence, Defendants contend that KKR's belief that the $175 million in capital expenditures exceeded the 2007 "plan" for such expenditures is irrelevant to the terms of the Merger Agreement, which only prohibited exceeding the 2007 "budget." *Id.* Support for this self-serving statement is found nowhere in the allegations of the Complaint. Moreover, the allegations make clear that KKR abandoned the Merger Agreement because it believed the Capex Covenant of the Merger Agreement had been breached. ¶¶89-92. To contend otherwise at this stage of the proceedings is improper as the Court must "accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509.

complete in the fourth quarter of 2007.  ¶78.  The short amount of time between Defendants'
false and misleading statements and the ultimate announcement that the Merger would be
abandoned contributes to a strong inference that the Defendants were aware (or in reckless
disregard) of the fact that the financial conditions at the Company were not in compliance with
the Merger Agreement at the time the August 2007 statements were made.  *See Powers v.
Eichen*, 977 F. Supp. 1031, 1039 (S.D. Cal. 1997) ("[T]he short time lapse between the alleged
false statements and the announcement of [Defendant's] problems indicates that the Defendants
knew the prior statements were false . . . ."); *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982,
988 n.5 (9th Cir. 2008) ("[T]he 'temporal proximity' of the misleading statement and the
subsequent disclosure 'bolster[s]' the inference that defendants knew about the [truth] when they
made the statement . . . .").

Defendants try to turn this inference on its head, contending that that the fact that Harman
and the Purchasing Companies were still publicly touting the Merger close in time to the
abandonment of the merger indicates that the Defendants believed that the Merger would
actually occur.  Def. Br. at 33.  To the contrary, such statements corroborate the allegations that
the Defendants had submitted the wrong financial figures to the Purchasing Companies – that
"they cooked the books" -- and that when the Purchasing Companies finally discovered the
financial misrepresentation, they backed out of the deal.  ¶¶107-108.  Such inference of scienter
(particularly when coupled with the fact that a former Harman employee has corroborated it, *see*
¶¶107-108) is at least as compelling as any non-culpable inference and, therefore, supports a
strong inference that Defendants acted with scienter.

### E.    Defendants Had Powerful Motives to Conceal the Fraud

While Lead Plaintiff does not rely on allegations of Defendants' motive and opportunity
alone to establish scienter, these allegations further support an already strong inference that they

acted with the requisite state of mind. *See, e.g.*, *Tellabs*, 127 S.Ct. at 2511 ("[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 369 (D. Md. 2004) ("[M]otive and opportunity are factors that should be considered collectively with the other allegations in evaluating whether a complaint successfully alleges scienter, but they are not essential . . . .").[13]

Here, Defendants had strong motive to conceal the true financial condition of Harman.[14] First, the Individual Defendants collectively held more than 5 million shares (including options) of Harman's common stock, which the Purchasing Companies had agreed to buy for $120 per share, a substantial 17% premium over the trading price of Harman's stock in April 2007, when the Acquisition was publicly announced.  ¶139.  According to Harman's October 2007 Proxy Statement (the "Proxy"), the stock, restricted stock and units, and options to purchase stock that the Individual Defendants received as compensation for their executive positions and control over the Company, would collectively have been worth over $613 million if the Acquisition had been completed.  ¶140.  Accordingly, if the Defendants had successfully deceived the Purchasing Companies into completing the Merger, the financial benefit that would inure to them would have been staggering.

Confusingly, the Defendants now contend that there could be no motive to deceive, because the Individual Defendants **derived** no actual benefit from the fraud.  Def. Br. at 32.  The

---

[13] "The D.C. Circuit has not yet addressed  how the PSLRA's scienter requirement may be established, . . . . [but certain] circuits have held that scienter is sufficiently pled if plaintiffs 'allege facts that show that defendants had both motive and opportunity to commit fraud' . . . ."  *In re XM Satellite Radio Holdings Secs. Litig.*, 479 F. Supp. 2d 165, 175-176 (D.D.C. 2007) (quoting *Burman v. Phoenix Worldwide Indus.*, 384 F. Supp. 2d 316, 331 (D.D.C. 2005)).

[14] That Defendants had the opportunity to conceal the true financial condition of Harman cannot be in question given the senior positions of the Individual Defendants at the Company.

fact that Defendants' scheme ultimately failed because they were unable to complete the Merger before the Purchasing Companies discovered the truth about the financial condition of the Company, however, does not insulate the Defendants from the more important fact that the scheme harmed the class of investors who justifiably relied on Defendants' false and misleading statements.  In this regard, Defendants' reliance on *In re GeoPharma Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2005) is misplaced.  *GeoPharma* held that the inevitable failure of a scheme negates an inference of scienter.  Here, the failure of Defendants' scheme was not inevitable – indeed, they hoped that their scheme would succeed, resulting in a financial windfall for the Individual Defendants who were heavily invested in the Company.  Accordingly, powerful motives existed for the Individual Defendants to conceal the financial health of the Company from investors.  Such motives contribute to the strong and cogent inference of scienter to which the allegations in the Complaint give rise.[15]

## VI.  PLAINTIFF HAS ADEQUATELY PLED LOSS CAUSATION

Citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), Defendants argue that Lead Plaintiff has failed to satisfy the pleading requirements for loss causation.[16]  Def. Br. at 34.  In particular, Defendants argue that Lead Plaintiff cannot demonstrate a "causal link" between the alleged misstatements and Lead Plaintiff's economic loss.  *Id.*  Defendants

---

[15] Defendants are incorrect that their failure to sell their Harman stock "specifically rebuts" scienter; rather, the case cited for this proposition makes clear that the existence of a stock sale is just one relevant factor in the scienter inquiry. *See In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 647 (S.D. Tex. 2001); *In re Ramp Networks, Inc. Secs. Litig.*, 201 F. Supp. 2d 1051, 1074 (N.D. Cal. 2002) (in light of other allegations, noting that the absence of any allegations concerning insider trading had "little bearing in determining whether plaintiffs [had] adequately pleaded scienter").  Nevertheless, that Defendants did not *succeed* in selling their stock is of no matter because  Defendants *attempted* to dispose of their stock by selling their stake in Harman to KKR and Goldman.  ¶28.  Thus, *Baker Hughes* is entirely inapposite because the defendants in that case made no attempt to sell their shares. 136 F. Supp. 2d at 644-47.

[16] Defendants' assertion that loss causation must be plead with "particularity," *see* Def. Br. at 34, is mistaken.  In *Dura*, the Supreme Court noted that, with respect to allegations of loss causation, "the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Dura*, 544 U.S. at 346 (quoting Fed. R. Civ. P. 8(a)(2)).

mischaracterize the causation requirement as articulated in *Dura*, however. Indeed, courts interpreting *Dura* have considered and rejected the very same arguments Defendants make here.

### A.    The Standard for Pleading Loss Causation

The PSLRA requires plaintiffs to allege that a defendant's misrepresentations "caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u-4(b)(4). In *Dura*, the Supreme Court elaborated on this requirement, holding that a plaintiff must demonstrate that the "share price fell … after the truth became known." *Dura*, 544 U.S. at 347. The Court cautioned, however, that this requirement was "not meant to impose a great burden upon a plaintiff." *Id.* A plaintiff must only provide a defendant with "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* Contrary to Defendants' assertions, moreover, this is the fundamental – and only – requirement of *Dura*. Indeed, *Dura* expressly refused to address other issues of loss causation, such as how quickly the market must react to disclosure of the fraud, by whom disclosure of the fraud must be made, and what form disclosure of the fraud must take. *Id.* at 346; *see also St. Clare v. Gilead Scis., Inc. (In re Gilead Scis. Secs. Litig.)*, No. 06-16185, 2008 U.S. App. LEXIS 17076, at *23 (9th Cir. Aug. 11, 2008) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."). Defendants' "rigid" interpretation of *Dura* is unfounded, and this Court, like legions of other courts, should decline to adopt it. *Bradley*, 421 F. Supp. 2d at 828 (rejecting defendants' "rigid and dogmatic interpretation of *Dura*").

### B.    Loss Causation is Properly Alleged With Respect to Misstatements Regarding the Proposed Acquisition

On September 21, 2007, news surfaced that Harman's much-acclaimed merger with the Purchasing Companies would not take place as planned. Not only did Harman issue its own press release to that effect, ¶87, but both Reuters and Forbes, among other news agencies,

published articles announcing that the Purchasing Companies had decided to "dump" the

Company.  ¶¶89-92.  According to Reuters, "the buyers [were] worried about the company's

financial conditions"; their concerns "stemmed less from broad credit market worries and more

from internal conditions within the company."  ¶¶89-90.  Among the "hurdles Harman faced,"

Reuters added, was the Company's troubled relationship with Daimler-Chrysler, a relationship

which "accounted for 25 percent of Harman's total consolidated net sales," the loss of which

"would have a 'material adverse effect' on sales."  ¶91.  Likewise, according to Forbes, the

Purchasing Companies "sought to squash the deal over questions about Harman's financial

health, not because of any financing difficulties in a tight credit market." ¶92.

The market reacted swiftly to this news.  During the Class Period, Defendants maintained

the trading prices of Harman shares at artificially inflated levels by, *inter alia*, consistently

representing to shareholders that the Company would "complet[e] the transaction during the third

or fourth quarter of [the 2007] calendar year."  *See*, *e.g.*, ¶70.  All the while, however,

Defendants knew or recklessly disregarded that the Company's increased costs and decreasing

operating margins had caused or likely would cause Harman to breach the terms of the proposed

acquisition.  ¶71.  In particular, Defendant Harman later *admitted* that the Company's automotive

division had binged on capital spending, spending $60 million in June 2007 alone – 40% of the

amount budgeted for the entire fiscal year.  ¶72.  Many of these costs were incurred as a result of

the Company's efforts to build and ramp up its Missouri plant to manufacture the MyGIG radio

for Chrysler – a deal that was losing the Company money.  ¶¶63, 72.  When news emerged on

September 21 that the proposed acquisition had fallen through because of concerns about the

Company's financial health – including rising inventories, declining cash flows, and the jeopardy

of the Chrysler deal, *id.* at ¶ 91 – the Company's share price plummeted. Shares of the

Company's stock declined from a closing price of $112.34 on the prior day to close at $85.00 on September 21 – a drop of more than 24% – as the stock collapsed from its artificially inflated price.  ¶ 88.

Defendants claim immunity from the September 21 loss in share value by arguing that the drop was caused "not by any alleged corrective disclosure by Harman, but by a *Wall Street Journal* article published before any Harman statement that day."  Def. Br. at 37.  In *Dura*, the Supreme Court imposed no requirement that the *Defendant* make the corrective disclosure, and neither should this Court.  Significantly, the Supreme Court in *Dura* never even used the term "corrective disclosure." *In re Motorola Sec. Litig.*, No. 03 C 287, 2007 U.S. Dist. LEXIS 9530, at *106 (N.D. Ill. Feb. 8, 2007). As noted above, *Dura* held only that plaintiffs must allege, in some fashion, that "'facts … [became] generally known' and 'as a result' share value 'depreciate[d].'" *Dura*, 544 U.S. at 344 (internal citations omitted). The Court did not indicate "what form a disclosure must take, how completely it should reveal previously misrepresented or concealed information, or how specifically it must refer to that information." *Motorola*, 2007 U.S. Dist. LEXIS 9530, at *107. Similarly, the Court did not specify "who may serve as the source of the information" and left open the possibility that "a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous misrepresentation that proclaims its falsity." *Id.* at *108 (citing, *inter alia*, *Freedland v. Iridium World Comm'cns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) (agreeing that "the Supreme Court stopped short of requiring plaintiffs to prove that they sold after a complete, corrective disclosure resulting in a large price decline")).

Consequently, courts interpreting *Dura* have held that so-called "corrective disclosures" may take a variety of forms. "[I]n addition to formal disclosure by a defendant, 'the market may

learn of possible fraud [from] a number of sources: *e.g.*, from whistleblowers, analysts' questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc."). *In re Enron Corp. Sec.*, No. MDL-1446, 2005 U.S. Dist. LEXIS 41240, at *59 (S.D. Tex. Dec. 22, 2005).[17] In *Dura*, the "Supreme Court spoke in terms of the 'relevant truth' and the 'truth' making its way into the marketplace." *In re Winstar Commc'ns*, No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at * 45 (S.D.N.Y. Feb. 27, 2006). Thus, it was "the inherent veracity of the information that [was] of paramount concern" in *Dura*, not "the means by which the information is imparted to the public." *Id.* Notably, Defendants have not, and cannot cite any source holding that the market must learn of a prior misstatement from their own mouths.[18] Accordingly, its is sufficient for Lead Plaintiff to allege, as it has here, that before the share price fell, the facts became generally known to the market by both news reports and the Company's own announcement.

Defendants also argue, moreover, that the September 21 *Wall Street Journal* article – the "true" corrective disclosure – was not corrective of any misstatement about Harman's financial condition, but, rather, attributed the Purchasing Companies' rejection of the deal to "the current Wall Street credit crisis." Def. Br. at 37.[19] A close reading of the *Wall Street Journal* article

---

[17] *See also In re Flag Telecom Holdings. Ltd. Sec. Litig.*, No. 02 Civ. 3400 (WCC), 2007 U.S. Dist. LEXIS 67173, at *77 (S.D.N.Y. Sept. 4, 2007); *Marsden v. Select Med. Corp.*, No. 04-4020, 2007 U.S. Dist. LEXIS 42924, at *12 (E.D. Pa. June 12, 2007); *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 684 (D.N.J. 2006); *In re Esped, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006).

[18] Defendants cite *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670 (D. N.J. 2006) for their claim that there cannot be a corrective disclosure because the truth first came out through the Wall Street Journal article. But *Intelligroup* expressly rejects Defendants' theory, holding that disclosure of fraud may come from various third-party sources. *See id.* at 683-684; *id.* n. 11 ("The truth may be revealed to the investing public through means other than defendant's corrective disclosure. For instance, in addition to formal disclosure by a defendant, the market may learn of possible fraud from . . . newspapers and journals") (internal citations omitted).

[19] Defendants ask this Court to take judicial notice of certain documents referenced in the Complaint and/or filed in connection with Defendants' motion to dismiss. Def. Br. at 4-5. "[T]he general rule is that courts are prohibited from considering matters outside the pleadings in ruling on a motion to dismiss and

shows that this is simply untrue. Nowhere does the article state that the credit crisis was responsible for disrupting the deal. *See* Will Decl. Ex. 13. At most, the Purchasing Companies' motives for rejecting the deal are described as "unspecified." *Id.* This is fully consistent with other, concurrent articles which attributed rejection of the deal to concerns about Harman's financial health. Notably, other news reports specifically *rejected* the notion that failure of the deal was a result of the credit crisis.[20] *See, e.g.*, ¶92 (reporting that "the private equity firms

---

must confine their analysis to the four corners of the complaint." *In re UnumProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875 (E.D. Tenn. 2005) ("the Court is careful to note it is only taking judicial notice of the existence of these documents and the specific statements and/or allegations contained within the documents. It would be improper for the Court to rely upon these documents to determine disputed factual issues…"). Moreover, the category of documents properly the subject of judicial notice is narrow. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999) ("We stress that our holding [permitting judicial notice] relates to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings."). Here, Defendants have asked the Court to take judicial notice of a host of documents in ruling on the motion to dismiss, including SEC filings, Press Releases and magazine articles. Lead Plaintiff does not object to the Court taking judicial notice of the existence of thee documents. Lead Plaintiff does object, however, to the extent that Defendants seek judicial notice of these documents to prove the truth of the matters asserted therein. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995) (holding district court properly refused to take judicial notice of Form 10-K to decide facts in dispute). While Defendants may cite to these documents, they cannot ask the Court to use those documents to draw inferences in their favor, particularly at the pleadings stage.

[20] The Defendants' only support for their theory that Lead Plaintiff cannot "untangle" the true reason for Harman's stock drop from the credit crisis, *In re Omnicom Group Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008); and *Merrill Lynch & Co. Research Reports Sec. Litig.*, 2008 U.S. Dist. LEXIS 37993 (S.D.N.Y. May 8, 2008), is inapposite. In *Merrill Lynch*, the cause of a stock drop could not be clearly attributed to a corrective disclosure because the stock price had already dropped "nearly 80%" before the disclosure took place. *Merrill Lynch* at *42-43. In contrast, Harman's stock was near its peak when the truth about its fraud came out, and its price plummeted immediately after the disclosure. *See* ¶¶31, 88. *Omnicom*, like this case, involved a stock drop following an unfavorable Wall Street Journal article. *Omnicom*, 541 F. Supp. 2d at 554. The majority of the article, however, covered "facts already known to the market" and thus any consequential loss could not be "attributable to the alleged fraud." *Id.* But in this case, the focus of the article was the revelation of *new* facts which Harman concealed. Indeed, the article barely mentions the "credit crisis" upon which Defendants place so much emphasis. This passing reference in no way "dwarfed any shreds of new information" as in *Omnicom*, *id.* – rather, the new information was the story.

sought to squash the deal over questions about Harman's financial health, not because of any

financing difficulties in a tight credit market"). [21]

Accordingly, the requirements of loss causation have been satisfied as to misstatements

regarding the proposed acquisition.  On September 21, Harman's share price fell when the truth

about these misstatements became known, and Lead Plaintiff was injured as a result.

**C.    Loss Causation is Properly Alleged With Respect to Defendants' Failure to Disclose Increased R&D Costs and Lower Margins on Sales of MyGIG Radios.**

Defendants argue that the Complaint contains no evidence of any economic loss incurred

as a result of "corrective disclosures" made on September 27, 2007; October 22, 2007; October

25, 2007; November 9, 2007; and February 11, 2008.  Def. Br. at 36.  On none of these dates,

however, does Lead Plaintiff allege that "corrective disclosures" were made.  Rather, statements

made on the first four of these dates are alleged to have been <u>continuing misstatements</u> which

failed to disclose, *inter alia*, the truth about the Company's increasing expenses and problems

with its MyGIG and PND sales.  *See* ¶¶97-106.  Moreover, the supposed "corrective disclosure"

on February 11 is alleged to have been a post-Class Period disclosure.  ¶115.

Having incorrectly assumed that Lead Plaintiff alleges the statements made on these five

dates are "corrective disclosures," Defendants then argue that because Lead Plaintiff has not

demonstrated corresponding declines in stock prices on these dates, there is no viable claim for

---

[21] Similarly, Defendants argue that Lead Plaintiff cannot demonstrate loss causation with respect to the Defendants' denial that the Merger Agreement had been breached.  Def. Br. at 37.  Defendants' denial that the Merger Agreement had been breached was carefully designed to continue to hide the ball from the public; Defendants disclosed that the acquisition had collapsed, but did not give a full explanation for the collapse.  Contrary to Defendants' assertions that their denial that they had breached the Merger Agreement was "credible," "unchallenged," and undisturbed by "any decision of opinion by any tribunal," however, Lead Plaintiff's allegations – which the Court is obliged to view in a most favorable light – make clear that news reports circulated widely that Harman had breached the Merger Agreement by, *inter alia*, violating the Merger Agreement's CapEx covenant. ¶72.

any misstatements concerning Harman's MyGIG radio. Def. Br. at 36. Defendants, however, overlook the fact that on both September 24, 2008 and February 5, 2008, the Company released new information which, at least in part, revealed the truth about R&D costs incurred in the development of infotainment platforms including the MyGIG radio and the Company's inability to recover those costs on sales of MyGIG radios. ¶93 (disclosing increases in R&D expenses due to "several new infotainment platforms"), 112 (disclosing "higher sales of lower-margin infotainment systems for mid-level vehicles"). Furthermore, Defendants ignore the fact that in response to each of these disclosures, the Company's stock price declined sharply. ¶¶94, 114. Notably, the first of these disclosures, on September 24, occurred *prior* to either of what Defendants claim to be disclosures related to MyGIG radios, on October 25 and November 9. *See* Def. Br. at 36. Thus, on September 24, the Company indisputably announced information regarding the MyGIG radio and its associated launch costs which was previously unknown to investors.

Accordingly, Lead Plaintiff has adequately pled loss causation as to Defendants' failure to disclose increased R&D costs and the Company's inability to recover those costs through sales of its MyGIG radios. Aspects of the truth about MyGIG radios were disclosed on both September 24 and February 5, the stock price declined as a result, and Lead Plaintiff was injured.

      **D.**      **<u>Loss Causation is Properly Alleged With Respect to Defendants' Failure to Disclose Lower Margins on PND Sales, Product Delays, and Obsolete Inventory.</u>**

Defendants argue that missing a sales projection cannot, as a matter of law, be sufficiently corrective of previous misstatements to establish loss causation, unless some risk is concealed and later materializes. Def. Br. at 40. Here, Defendants say, where the Company "repeatedly warned of competitive pressures in the European PND market and advised investors

that its projections were not a guarantee of actual results in light of this risk," no risk was concealed, and Defendants' PND projects are therefore not actionable.  *Id.*

What Defendants ignore, however, is that their statements about Harman's PNDs were not simply projections that failed.  What Defendants failed to disclose, and what was later revealed to investors on February 5, 2008, was not simply that Harman had sold fewer PNDs than expected; rather, Defendants disclosed that both PND sales *and profit margins* had decreased "due to aggressive price reduction by competitors, *the delay of new products, and the sale of older products at substantial discounts*."  ¶113.  Thus, the challenges Harman faced in its PND business were not simply external, as the Company had previously disclosed; rather, they were internal, and involved delays in bringing new products to market and backlogs of obsolete inventory.  When these facts were disclosed  to the market on February 5, shares of the Company's stock fell some 15%.  ¶114.

*In re eSpeed, Inc. Securities Litigation*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006), does not support Defendants' argument.  In *In re eSpeed*, an announcement of a missed projection was deemed insufficiently corrective because, according to Defendants, it "revealed nothing about the specific fact allegedly concealed from investors."  Def. Br. at 41.  Here, by contrast, Defendants' February 5 disclosure revealed precisely the facts allegedly concealed from investors, namely that not only was the PND market facing competitive pricing in Europe, but Harman also was experiencing delays in getting new PND products to market, and, consequently, had a large inventory of obsolete products which it could not sell.  *Dura* only requires that the allegations "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 337

(U.S. 2005).  These allegations, however, offer more than just some indication that these disclosures triggered the drop in stock price which caused Lead Plaintiff's loss.[22]

Accordingly, Lead Plaintiff has adequately pled loss causation as to Harman's PND-related disclosures.  On February 5, Defendants revealed what had previously been unknown to investors, namely that Harman faced numerous challenges, both internal and external, in its sales of PNDs.  Harman's stock price declined sharply as a result, and Lead Plaintiff was injured.

## VII.    THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

The Individual Defendants do not dispute that they had the power to control Harman during the Class Period.  However, they argue that the control liability claims should be dismissed because the Complaint fails to allege (i) a primary violation by Harman; and (ii) that their participation was knowing or reckless.  Neither of these arguments has merit. As discussed above, the Complaint certainly alleges a primary violation by Harman, supporting the control person claim.

Furthermore, Defendants' request for dismissal of the § 20(a) claim on grounds that the Complaint fails to allege the Individual Defendants' culpable participation is both legally and factually flawed. As a legal matter, contrary to Defendants' assertion, Lead Plaintiff need not allege culpable participation for its case in chief. In *Baan*, the court recognized that "the language of the statute suggests that once plaintiffs have established the defendants' ability to control, it becomes the defendants' burden to show that they did not participate in the fraud, and that they acted in good faith." *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 23 (D.D.C. 2000).

---

[22] Additionally, unlike the plaintiffs in *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005), Lead Plaintiff alleges far more than just that Harman failed to meet earnings forecasts. Lead Plaintiff alleges that Harman, as well as third parties, disclosed concealed facts that caused a stock loss. Therefore, this case is entirely different than *In re IPO*, in which plaintiffs "d[id] not allege any disclosure that would correct . . . omissions or misrepresentations." *Id.* at 266.

*See also In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1174 (D.D.C. 1996). The

*Baan* court further noted that "[r]equiring plaintiffs to establish more would erode the distinction

between direct liability under 10(b) and control person liability under 20(a)." *Id. In re Baan*, 103

F. Supp. 2d at 23.

Even assuming *arguendo* Lead Plaintiff had to allege culpable participation, it has done

so here. In particular, as detailed above, the Complaint demonstrates that Dr. Harman, Paliwal

and Brown (i) were aware or recklessly disregarded the true financial condition of the Company

(*see infra* Section V); and (ii) made false and misleading statements regarding the financial

condition of the Company (*see generally* ¶¶57-111).  Accordingly, the Complaint sufficiently

pleads a claim under Section 20(a) of the Exchange Act.

## VIII.  <u>CONCLUSION</u>

For all of the foregoing reasons, Lead Plaintiff respectfully requests that this Court deny

in its entirety Defendants' motion to dismiss the Complaint.[23]

Dated: September 2, 2008                    **COHEN, MILSTEIN, HAUSFELD &**
                                            **TOLL, P.L.L.C.**

                                            By:          /s/ Daniel S. Sommers
                                                 Steven J. Toll (D.C. Bar No. 225623)
                                                 Daniel S. Sommers (D.C. Bar No. 416549)
                                                 Julie G. Reiser
                                                 Matthew K. Handley (D.C. Bar 489946)
                                                 1100 New York Avenue, N.W.
                                                 Suite 500, West Tower
                                                 Washington, DC  20005
                                                 (202) 408-4600

                                            *Lead Counsel for Lead Plaintiff Arkansas*
                                            *Public Employees' Retirement System*

---

[23] Although Lead Plaintiff believes that the Complaint is sufficient as pled, it requests leave to amend if the Court determines otherwise.  *See* Federal Rules of Civil Procedure 15(a) (leave to amend "should be freely granted").

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ) | |
| ) | |
| IN RE HARMAN INTERNATIONAL ) | |
| INDUSTRIES INC. SECURITIES ) | **CIVIL ACTION** |
| LITIGATION ) | **NO. 1:07-cv-01757-RWR** |
| ) | |

**[PROPOSED] ORDER**

This matter having come before the Court on Defendants' Motion to Dismiss the

Consolidated Class Action Complaint ("Complaint") and the Court having reviewed said motion,

it is this _____ day of _____, 2008,

ORDERED that Defendants' Motion to Dismiss the Complaint is hereby DENIED.

_____
Honorable Richard W. Roberts
United States District Judge

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2008, I electronically filed LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.


/s/ Daniel S. Sommers\_\_\_\_
Daniel S. Sommers, Esq.

319659.1 1