**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |  |
|---|---|---|---|
| | : | | |
| IN RE HARMAN INTERNATIONAL | : | Civil Action No.: | 07-1757 (RC) |
| INDUSTRIES, INC. SECURITIES | : | | |
| LITIGATION | : | Re Document Nos.: | 21, 49 |
| | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING DEFENDANTS' MOTION TO DISMISS**

## I. INTRODUCTION

This securities fraud class action litigation comes before the Court on Defendants' motion

to dismiss Plaintiffs' consolidated class action complaint.  Plaintiffs are shareholders who

purchased shares of Harman International Industries, Inc. common stock between April 26, 2007,

and February 5, 2008.  They have filed a class action lawsuit against the company and its senior

executives, alleging that Plaintiffs bought shares during the Class Period in reliance on

Defendants' misrepresentations about the company's financial condition, and that they incurred

damages as a result.  Plaintiffs claim that Defendants engaged in securities fraud in violation of

section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (2012), and its

implementing regulation, rule 10b-5, 17 C.F.R. § 240.10b-5 (2012).  Plaintiffs also claim that the

company's senior executives qualify as control persons under section 20(a) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78t(a) (2012), and are therefore individually liable for the

underlying section 10(b) violation.

Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure

12(b)(6), asserting that the complaint does not properly allege a material misrepresentation or

omission, scienter under the heightened pleading requirements for private securities fraud

lawsuits, loss causation, or control person liability under section 20(a). For the reasons discussed below, the Court will grant Defendants' motion.

## II. BACKGROUND

Harman International Industries, Inc. ("Harman") is a manufacturer of high-quality, high-fidelity audio products and electronic systems for the automotive, consumer, and professional markets in the Americas, Europe, and Asia. *See* Consol. Class Action Compl. ¶ 2, ECF No. 20.[1] Shares of Harman's common stock are publicly traded on the New York Stock Exchange. *See id.* Plaintiffs are shareholders who purchased shares of Harman common stock between April 26, 2007, and February 5, 2008 (the "Class Period"). *See id.* ¶ 9. They allege that throughout the Class Period, Harman and several of its officers knowingly or recklessly propped up Harman's stock price by issuing false and misleading disclosures regarding the company's financial state and failing to disclose material adverse facts about its true financial condition. *See id.* ¶ 3. Specifically, the alleged misrepresentations fall into three broad categories: statements related to Harman's anticipated acquisition by two private equity firms; statements related to the sales and quality of its mid-level infotainment systems; and statements related to the sales of its aftermarket personal navigation devices in Europe. *See generally id.* ¶¶ 28–56.

### A. Acquisition by KKR and Goldman

On April 26, 2007, the beginning of the Class Period, Harman announced that it would be acquired by Kohlberg Kravis Roberts & Co. L.P. ("KKR") and an affiliate of Goldman Sachs & Co. ("Goldman") (collectively, the "Purchasing Companies") in a merger valued at approximately $8 billion. *See* Consol. Class Action Compl. ¶ 5, ECF No. 20. Pending

---

[1] When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true Plaintiffs' version of events. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

completion of the transaction, Harman and the Purchasing Companies entered into an agreement (the "Merger Agreement") that would govern the period leading up to the close of the deal. Harman stated in a press release that the acquisition would allow shareholders the opportunity to participate in Harman's future growth. *See id.* ¶ 30.  Over seven million shares of Harman stock were traded that day, with the stock closing at $122.50 per share, 19 percent higher than the previous day's close. *See id.*

However, on September 21, 2007, the Purchasing Companies abandoned the acquisition, stating that they believed that Harman had experienced a "material adverse change" in violation of the Merger Agreement. *See id.* ¶ 6.  That day, Harman's share price fell to $85.00, a drop of $27.34.  *See id.* ¶ 7.  According to Plaintiffs' allegations, Harman had engaged in excessive capital spending and "burn[ed] through cash" in order to ramp up its new plant in Missouri to manufacture its new mid-level infotainment system.  *See id.* ¶ 72; *see also infra* Part II.B. Plaintiffs allege that the resulting cost overruns at this and other facilities caused Harman to breach a Merger Agreement covenant (the "CapEx Covenant") that prohibited Harman from making capital expenditures exceeding the capital expenditure budget before the merger.  *See* Consol. Class Action Compl. ¶¶ 33, 72.  In addition, the Merger Agreement included a clause (the "MAC Clause") that allowed the Purchasing Companies to terminate the acquisition in the event of a material adverse change in Harman's business.  *See id.* ¶¶ 34–35.  According to Plaintiffs, Harman "binged" on capital spending in June of 2007, spending $60 million in one month, causing Harman's capital expenditures to exceed $90 million in the fourth quarter of FY2007, violating the CapEx Covenant.  *See id.* ¶ 72.  Plaintiffs also allege that the capital spending was a material adverse change that violated the MAC Clause.  *See id.* ¶ 71.

According to Plaintiffs' allegations, Defendants made the following misrepresentations during the Class Period regarding the merger, or failed to disclose material facts necessary to make the following statements about the merger not misleading:

- In an August 14, 2007, press release: "We anticipate completing the transaction during the third or fourth quarter of this calendar year." *Id.* ¶ 70.

- In Harman's August 29, 2007, Form 10-K: "We presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007." *Id.* ¶ 78.

- In a September 21, 2007, press release: "Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement." *Id.* ¶ 87.

According to Plaintiffs' allegations, these statements were materially false or misleading when made because Defendants knew—but failed to disclose—that Harman had breached the CapEx Covenant and MAC Clause, giving the Purchasing Companies an opportunity to terminate the Merger Agreement. *See id.* ¶¶ 71, 79, 96.

## B.  MyGIG Radio

Plaintiffs also allege that Defendants violated securities laws in issuing statements about Harman's "MyGIG radio" product—an infotainment system made to be installed in personal vehicles.  In 2005, prior to the Class Period, Dr. Sidney Harman personally negotiated a contract between Harman and automotive corporation DaimlerChrysler ("Chrysler"), whereby Harman would manufacture MyGIG radios for installation in many Chrysler vehicles.  *See* Consol. Class Action Compl. ¶ 36, ECF No. 20.  However, Plaintiffs allege that, despite being touted as a state-of-the-art infotainment system, the MyGIG radio was "problematic from a profitability standpoint" and was "plagued with various technical and cosmetic issues," which led to a one-

year delay in producing the radios and Harman's inability to fulfill production needs.  *See id.*

¶¶ 39, 41.  Chrysler subsequently decreased its order for the radios.  *See id.* ¶ 42.  This reduced

the need for parts required to make the radios, which, in turn, decreased the number of parts that

Harman ordered, causing the parts suppliers to raise their prices.  *See id.*  Further, the contract

with Chrysler failed to include costs for integrated circuits—very expensive electronic devices

that were essential to operating the MyGIG radio.  *See id.* ¶ 47.  This omission left the contract

underbid and generated losses for the company.  *See id.* ¶ 13.  The combination of these factors

meant that Harman would lose $164 on each of the 200,000 radios that it had committed to sell

to Chrysler, for a total annual loss of $32 million from MyGIG production and sales.  *See id.*

¶¶ 43–44.  Plaintiffs claim that this scenario also caused Harman's relationship with Chrysler to

"deteriorate[] beyond repair."  *Id.* ¶ 13.

According to Plaintiffs' allegations, Defendants made the following misrepresentations

during the Class Period regarding the MyGIG radios, or failed to disclose material facts

necessary to make the following statements about the MyGIG radios not misleading:

- In Harman's May 10, 2007, Form 10-K:  "We anticipate that DaimlerChrysler, Toyota/Lexus, Audi/VW, and BMW will continue to account for a significant portion of our net sales and accounts receivable for the foreseeable future."  *Id.* ¶ 66.

- On Harman's August 14, 2007, earnings release conference call:  "Our dominance in the automotive space was solidified through the past year . . . .  With earlier awards to us from PSA, Audi and Chrysler, we established our leadership in the mid-range and entry levels, with last year's major awards from BMW, we erased any remaining questions."  *Id.* ¶ 74.

- On Harman's September 27, 2007, earnings release conference call: "We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program . . . ." *Id.* ¶ 100.

- Also on Harman's September 27, 2007, earnings release conference call: "[W]e are bringing additional business on-stream at Chrysler as we ramp up our Missouri plant . . . ." *Id.* ¶ 101.

- In Harman's November 9, 2007, Form 10-Q: "New introductions of infotainment systems including Chrysler's MyGIG infotainment systems in North America, the roll-out of [other systems] were primary factors contributing to higher sales." *Id.* ¶ 105.

According to Plaintiffs' allegations, these statements were materially false or misleading when made because Defendants knew—but failed to disclose—that Harman's relationship with Chrysler was strained due to the quality and delays in producing its MyGIG radios, and that the Chrysler contract required Harman to sell MyGIG radios at a net loss. *See id.* ¶¶ 64, 69, 76, 86, 102, 106.

### C.  PNDs

In early 2006, Harman began selling personal navigation devices ("PNDs") in Europe and sold 35,000 units between January and April of that year. *See* Consol. Class Action Compl. ¶ 49, ECF No. 20.  The company then launched a new model, expecting that it would double or triple sales. *See id.*  By October 2006, the fourth month of FY2007, Harman had sold an additional 95,000 units. *See id.* ¶ 50.  Dr. Harman stated then that the company anticipated selling well over 500,000 total units in Europe during that fiscal year. *See id.*  In January 2007, Dr. Harman reported that almost 250,000 units had been sold in the previous six months, from

July through December of 2006.  *See id.* ¶ 51.  He stated that the company's PND sales were accelerating, and that Harman expected PND sales to exceed 650,000 in Europe for FY2007. *See id.*

Plaintiffs contend, however, that Harman was in a "dire situation" regarding its PNDs. *See id.* ¶¶ 51–52.  It was not selling PNDs in the numbers that it had anticipated in 2006, and thus many units were being stored in a warehouse.  *See id.* ¶ 53.  This was partly because Harman released five versions of the same PND between March 2006 and July 2007, which priced the units too high to compete with other PNDs and thereby slowed sales.  *See id.* ¶ 54. The company was therefore one year late in releasing a saleable PND.  *See id.*  Further, in early 2007, Harman dropped the price of its PNDs substantially and made a modification that rendered obsolete the growing inventory in the warehouse.  *See id.* ¶ 53.  Consequently, the company missed projected PND sales by more than 200,000 units in FY2007.  *See id.* ¶ 56.  In June 2007, Harman agreed to sell 100,000 PNDs to a customer named Paragon at a significant discount from the prices that it had originally disclosed at the beginning of the Class Period.  *See id.*

According to Plaintiffs' allegations, Defendants made the following misrepresentations during the Class Period regarding Harman's PNDs, or failed to disclose material facts necessary to make the following statements about the PNDs not misleading:

- On Harman's April 26, 2007, earnings release conference call:  "The plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding."  *Id.* ¶ 57.

- In Harman's May 10, 2007, Form 10-Q:  "[S]ales of our aftermarket products were higher due to the introduction of Becker PNDs in Europe."  *Id.* ¶ 67.

- Also in Harman's May 10, 2007, Form 10-Q:  Stating that Harman intentionally accumulated "higher inventory levels . . . to support [Harman's] newly developed PND market in Europe."  *Id.* ¶ 67.

- In Harman's August 29, 2007, Form 10-K:  "Sales of aftermarket products, particularly PNDs, were very strong during fiscal 2007."  *Id.* ¶ 82.

- On Harman's September 27, 2007, earnings release conference call:  "We expect Automotive sales to increase approximately 15% during the quarter, primarily due to . . . higher PND sales in Europe." *Id.* ¶ 100.

- Also on Harman's September 27, 2007, earnings release conference call:  "[W]e are bringing additional business on-stream . . . in the PND business, where we continue the growth and expansion of that business primarily in Europe."  *Id.* ¶ 101.

According to Plaintiffs' allegations, these statements were materially false or misleading when made because Defendants knew—but failed to disclose—that Harman had a large inventory of obsolete PNDs, and that Harman had no reasonable basis for its PND sales projections.  *See id.* ¶¶ 64, 69, 86, 102, 106, 111.

### D.  Harman's Overall Financial State

Plaintiffs also point to the following alleged misrepresentations about Harman's overall financial condition:

- On Harman's April 26, 2007, earnings release conference call:  "We continue to expect fiscal '08 Automotive OEM revenues at $2.8 billion and EPS of $5.25 . . . ."  *See* Consol. Class Action Compl. ¶ 57, ECF No. 20.

- On Harman's August 14, 2007, earnings release conference call: "Total Harman International R&D spending was $94 million, or 10.3% of sales in the quarter. That bulge was primarily generated by the need to process the engineering for the $14 billion backlog, of which a significant $1 billion-plus had been unanticipated." *Id.* ¶ 73.

- Also on Harman's August 14, 2007, earnings release conference call, Dr. Harman's statement that Harman's balance sheet was "strong" at fiscal year-end. *Id.* ¶ 75.

- Harman then-CEO Dinesh Paliwal's statement to a reporter, which was quoted in a September 25, 2007, article in the *Wall Street Journal*: "The fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards . . . ." *Id.* ¶ 97.

- On Harman's September 27, 2007, earnings release conference call: "The confluence of [ramping up Harman's new plants and overseeing negotiation and diligence related to the merger] in a six- to eight-month period generated what might be called the perfect storm.  Now that storm is over and we are again in full command of our circumstances and our extraordinary future." *Id.* ¶ 98.

- Also on Harman's September 27, 2007, earnings release conference call: "For the full year 2008, gross profit is expected to be lower than anticipated in April 2007 . . . . due to higher material prices, and more than expected ramp-up costs for the two new manufacturing plants in China and the U.S." *Id.* ¶ 99.

According to Plaintiffs, these statements were false or misleading because they failed to disclose

the company's underlying problems related to the merger, MyGIG radios, and PNDs.[2]

### E.  Procedural Background

Multiple putative class action complaints were filed, alleging securities fraud in

connection with the events described above.  Pursuant to section 21D(a)(3)(B) of the Securities

Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act ("PSLRA"),

15 U.S.C. § 78u-4(a)(3)(B) (2012), the Court consolidated the multiple actions and appointed as

---

[2] The complaint also identifies several alleged misrepresentations that Plaintiffs do not even cite in their opposition brief, much less defend.  The Court will thus treat the claims arising from these alleged misrepresentations as conceded or abandoned for purposes of this motion.  Several statements Defendants discussed in their opening motion, but Plaintiffs failed to address in opposition.  *See* Consol. Class Action Compl. ¶ 59 ("[W]e believe that we can rationalize, generate efficiencies such as to permit us to improve that percentage by approximately 100 basis points over the next several years."); *id.* ¶ 60 ("R&D is trending higher than we had anticipated as we work to develop new technologies and new programs.  We expect fiscal 2007 R&D expenses to approximate 10% of full-year sales.  In fiscal 2008, we anticipate R&D will begin to decrease as a percentage of sales."); *id.* ¶ 65 (reporting that net sales for the quarter were $882.8 million, an increase of 10 percent over the same period in 2006, and that for the nine months ended March 31, 2007, net sales were $2.640 billion, an increase of 11 percent over the same period in 2006); *id.* ¶ 67 (stating that Harman intentionally accumulated "higher inventory levels . . . to support [Harman's] newly developed PND market in Europe"); *id.* ¶ 80 ("Our infotainment systems are increasingly based on scalable software allowing us to efficiently design systems for luxury, mid-range and entry-level vehicles."); *id.* ¶ 81 ("During fiscal 2007 we went into full production at our new manufacturing facility in Washington, Missouri. . . . We anticipate our Washington, Missouri factory will operate at full capacity during fiscal 2008."); *id.* ¶ 93 (revising Harman's previously reported forecasted earnings to $4.14 per share); *id.* (stating that R&D expenses would begin to decrease as a percentage of net sales); *id.* ¶ 104 ("Sales growth was strong due to the ramp up of an infotainment system for Chrysler and robust sales of personal navigation devices in Europe."); *id.* ¶ 109 (revising down Harman's FY2008 earnings guidance to between $3.00 and $3.10 per share).  And several other alleged misrepresentations were addressed by neither party.  *See id.* ¶ 86 (statements regarding "total operating income for the Automotive division in fiscal 2007"); *id.* ¶ 97 ("We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs . . . ."); *id.* ¶ 105 ("We expect earnings per share before transaction, legal and restructuring costs to meet or exceed the prior fiscal year."); *id.* ¶ 109 ("The change in guidance was prompted primarily by a major shift in the market for [PNDs].  In recent months this sector has experienced significant pricing pressure which is affecting the entire industry."); *id.* ("Although, we are not happy with the higher than planned R&D engineering and material costs, the additional investment is necessary to deliver the new platforms to our valued customers . . . .").

Lead Plaintiff the Arkansas Public Employees Retirement System, *see* Order, ECF No. 15, which then filed a consolidated class action complaint against Harman, *see* Consol. Class Action Compl., ECF No. 20.  Plaintiffs also named as Defendants Dr. Sidney Harman, the founder of Harman who served as Executive Chairman of its Board of Directors from the beginning of the Class Period until December 17, 2007, and as Harman's CEO from January 1, 2007, until June 30, 2007; Dinesh Paliwal, Harman's President, CEO, and Vice Chairman of the Board of Directors from July 1, 2007, through the end of the Class Period; Kevin Brown, Harman's Executive Vice President and CFO throughout the Class Period; and Sandra Robinson, Harman's Chief Accounting Officer for a period not specified in the complaint.  *See id.* ¶¶ 23–25, 65.

Defendants move to dismiss the consolidated complaint for failure to state a claim upon which relief can be granted, arguing that Plaintiffs have inadequately pleaded a material misrepresentation or omission, scienter, and loss causation.  *See* Defs.' Mot. Dismiss, ECF No. 21.  Following extensive briefing, the Court heard oral argument on Defendants' motion and allowed the parties to submit supplemental authorities to the Court.  The Court now turns to the parties' arguments and the applicable legal standards.

## III.  LEGAL STANDARDS

### A.  Failure to State a Claim

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  A court considering such a motion presumes

that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.

## B.  Fraud and the PSLRA

Because a claim under section 10(b) and rule 10b-5 involves fraud, Federal Rule of Civil Procedure 9(b) requires Plaintiffs to plead with particularity the circumstances constituting fraud.  *See In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 175 (D.D.C. 2007).  The complaint must therefore "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud."  *Kowal v.*

*MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)).

The heightened pleading requirements of the PSLRA further require that the complaint must specify each misleading statement or omission and explain why it was misleading. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007); *In re XM*, 479 F. Supp. 2d at 175. "Thus, while the Federal Rules generally allow a court, in ruling on a motion to dismiss under Rule 12(b)(6), to take into account *any set of facts that could be proved* consistent with the allegations of the complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff *to plead facts* to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) (citing 15 U.S.C. § 78u-4(b)(1) (2006)); *accord In re XM*, 479 F. Supp. 2d at 175. And while in most contexts a court reviewing a Rule 12(b)(6) motion is limited to considering only the facts in the complaint, the PSLRA mandates that "the court shall consider any statement cited in the complaint and any cautionary statement accompanying [a] forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e) (2012).

The PSLRA also heightened the requirement for pleading the element of scienter, requiring that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 511 U.S. at 308 (quoting 15 U.S.C. § 78u-4(b)(2) (2006)). The required state of mind for scienter is "an intent to deceive, manipulate, or defaud," *id.*, or alternatively, as the D.C. Circuit has held, recklessness, *see Kowal*, 16 F.3d at 1276. Thus, in this jurisdiction, a plaintiff must plead facts that give rise to a

strong inference that the defendants either knowingly or recklessly made a false or misleading

statement of material fact.  Recklessness in the rule 10b-5 context is defined as an "extreme

departure from the standards of ordinary care . . . which presents a danger of misleading buyers

or sellers that is either known to the defendant or is so obvious that the actor must have been

aware of it."  *Rockies Fund, Inc. v. S.E.C.*, 428 F.3d 1088, 1093 (D.C. Cir. 2005) (quoting *S.E.C.*

*v. Steadman*, 967 F.2d 636, 641–42 (D.C. Cir. 1992)).  A securities fraud complaint will survive

a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and

at least as compelling as any opposing inference one could draw from the facts alleged."

*Tellabs*, 551 U.S. at 324.

## IV.  SECURITIES FRAUD

Plaintiffs bring their principal claim pursuant to section 10(b) of the Securities Exchange

Act of 1934, 15 U.S.C. § 78j(b) (2012), and rule 10b-5 promulgated thereunder by the Securities

and Exchange Commission, 17 C.F.R. § 240.10b-5 (2012).  To prevail on a claim under section

10(b) and rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the

defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation."  *See Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552

U.S. 148, 157 (2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005));

*accord Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1317 (2011); *In re Baan Co. Sec.*

*Litig.*, 103 F. Supp. 2d 1, 11 (D.D.C. 2000) (citing *In re Newbridge Networks Sec. Litig.*, 767 F.

Supp. 275, 281 (D.D.C. 1991)).  Here, the parties dispute the sufficiency of Plaintiffs' pleading

as to just three of these elements:  material misrepresentation or omission, including whether

certain alleged misrepresentations are inactionable under the PSLRA's "safe harbor"; scienter; and loss causation.

## A.  Material Misrepresentation or Omission

As characterized in the parties' briefing, the alleged fraudulent statements each fall into one of three categories.  The first set of statements is comprised of "forward-looking" statements, such as financial projections and forecasts.  Plaintiffs allege that these statements are actionable because they lacked a reasonable basis when made, and because Defendants failed to provide adequate warning that the projections might not come to fruition.  *See* Lead Pl.'s Mem. Opp'n Mot. Dismiss 13–19, ECF No. 26.  A second set of statements is made up of expressions of opinion, which Plaintiffs allege are actionable because they lacked a reasonable basis when issued.  *See id.* at 20–22.  Third, Plaintiffs identify a few statements of historical fact.  They assert that these statements are actionable because Defendants omitted certain details that render the affirmative statements misleading.  *See id.* at 11–13.  Because each type of statement is governed by a different legal standard, the Court will approach the categories one at a time.

### 1.  Forward-Looking Statements

Without a doubt, the parties' primary legal dispute relates to those alleged misrepresentations that are "forward-looking" in nature.  In enacting the PSLRA, Congress created a "safe harbor" for certain types of forward-looking statements, shielding securities fraud defendants from liability with respect to such statements to the extent that:

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

>  (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

>  (ii) if made by a business entity; was—

>>  (I) made by or with the approval of an executive officer of that entity; and

>>  (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1) (2012).[3]  As defined by the statute, "forward-looking statements" include, among other things, projections of revenues, expenditures, and income; statements of management's plans and objectives for future operations; statements of future economic performance; and the assumptions underlying any of these types of statements.  *See generally id.* § 78u-5(i)(1).

The parties, however, are not in dispute as to whether any particular statement is "forward-looking" as defined by the PSLRA.[4]  Rather, they dispute whether Defendants' forward-looking statements meet the conditions for protection of the subsection (A)(i) safe harbor.  To qualify for protection under this safe harbor, a forward-looking statement must be (1) "identified as a forward-looking statement," and (2) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ."  *Id.* § 78u-5(c)(1)(A)(i).  Plaintiffs argue that Defendants' forward-looking statements do not trigger the safe harbor because Defendants had

---

[3] In certain contexts, or when made by certain issuers, forward-looking statements are not eligible for protection even if the above conditions for the safe harbor are otherwise met.  *See* 15 U.S.C. § 78u-5(b).  However, no party contends that these exclusions apply in this case.

[4] Plaintiffs do allege that many of the statements were not *identified* as forward-looking when made.  *See* Consol. Class Action Compl. ¶ 171, ECF No. 20.  However, they did not move forward with this theory in their briefing on the motion to dismiss.

actual knowledge that the statements were false and misleading when made, and because the accompanying cautionary language was vague and boilerplate. *See* Lead Pl.'s Mem. Opp'n Mot. Dismiss 14–19, ECF No. 26. It is Defendants' position that an issuer's state of mind is irrelevant, and that the cautionary language was sufficiently specific and meaningful. *See* Defs.' Reply Mem. Supp. Mot. Dismiss 3–8, ECF No. 27.

### *a.  State of Mind*

The parties first dispute whether the issuer's state of mind is relevant to the application of the subsection (A)(i) safe harbor. The D.C. Circuit has not yet weighed in on this thorny issue. Plaintiffs argue that a forward-looking statement accompanied by meaningful cautionary language is not protected by the safe harbor if the issuer had actual knowledge that the statement was false or misleading at the time he made the statement. *See* Lead Pl.'s Mem. Opp'n Mot. Dismiss 14–17. Defendants argue that the issuer's state of mind is wholly irrelevant. *See* Defs.' Reply Mem. Supp. Mot. Dismiss 5–8.

As Plaintiffs acknowledged at oral argument, *see* Mot. Hr'g Tr. 42:10–43:18, Sept. 11, 2012, ECF No. 46, both the statutory text and legislative history are on Defendants' side. While the PSLRA does provide a safe harbor where a plaintiff fails to prove that the issuer of a forward-looking statement had actual knowledge that the statement was false or misleading when made, *see* 15 U.S.C. § 78u-5(c)(1)(B), this provision constitutes a *separate* safe harbor under the statute. The different provisions of the safe harbor are separated by the conjunction "or," signifying a disjunctive test. *See In re XM Satellite Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 186 n.14 (D.D.C. 2007). Thus, a forward-looking statement does not give rise to liability if it is accompanied by meaningful cautionary language, *see* 15 U.S.C. § 78u-5(c)(1)(A)(i), *or* it is immaterial, *see id.* § 78u-5(c)(1)(A)(ii), *or* the plaintiff fails to prove (or plead) that the issuer

had actual knowledge that the statement was false or misleading when made, *see id.*

§ 78u-5(c)(1)(B).  Indeed, every circuit court to directly consider the issue has held that the

statutory text establishes a disjunctive test.  *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758,

766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive; that is, a defendant is not liable

if the forward-looking statement is identified and accompanied by meaningful cautionary

language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge

that it was false or misleading."); *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d

353, 371 (5th Cir. 2004) ("The safe harbor has two *independent* prongs:  one focusing on the

defendant's cautionary statements and the other on the defendant's state of mind." (emphasis

added));[5] *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554–55 & n.2 (6th Cir. 2003) (setting forth a

"formulation [that] is drawn from the statutory text, which is written in the negative

disjunctive"), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

U.S. 308 (2007); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) ("The difficulty

with [a conjunctive reading] is that it ignores the plain language of the statute, which is written in

the disjunctive as to each subpart."); *Edward J. Goodman Life Income Trust v. Jabil Circuit,*

*Inc.*, 594 F.3d 783, 795 (11th Cir. 2010) ("The statute offers several ways for a defendant to

avoid liability, all written in the disjunctive.").  As the Ninth Circuit noted, the presence of an

---

[5] Curiously, the Fifth Circuit has once suggested that the safe harbor is conjunctive.  In
*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), the court stated that "[e]ven if the
plaintiff had failed to plead actual knowledge, the safe harbor provision still would not apply
here, because the alleged misrepresentations are not accompanied by 'meaningful cautionary
language.'"  *Id.* at 244.  This statement appears to be in conflict with *Southland*, which the court
cited several times without overturning or criticizing it.  *See id.* at 243–45, 250 n.14.  In any
event, the Fifth Circuit's statement in *Lormand* is not vital to its conclusion, as the plaintiff there
adequately pleaded actual knowledge *and* the defendant's cautionary statements were
insufficiently meaningful.  *See id.* at 244–48.  Thus, the safe harbor would have been
inapplicable under either a disjunctive or conjunctive reading.  The Court will therefore treat the
statement in *Lormand* as dicta and the holding in *Southland* as current Fifth Circuit law on this
point.

"immateriality" safe harbor, *see* 15 U.S.C. § 78u-5(c)(1)(A)(ii), demonstrates that the statute can only be read in the disjunctive—"[i]t would be anomalous indeed if a false but immaterial statement would fall outside of the safe harbor, but that is the result of [a conjunctive] construction." *In re Cutera*, 610 F.3d at 1113.  This reading of the statute comports with the legislative history, which describes the provision as "a *bifurcated* safe harbor that permits greater flexibility to those who may avail themselves of safe harbor protection."  H.R. Rep. No. 104-369, at 43 (1995) (Conf. Rep.) (emphasis added), *reprinted in* 1995 U.S.C.C.A.N. 730, 742.

Despite their agreement that the safe harbor is disjunctive, however, the circuits are split as to whether there is room to consider the issuer's state of mind in determining whether cautionary language is sufficiently "meaningful" under the subsection (A)(i) safe harbor.  The Sixth, Ninth, and Eleventh Circuits have all held that the issuer's state of mind is irrelevant to whether his cautionary language is meaningful.  *See Miller v. Champion Enters., Inc.*, 346 F.3d 660, 678 (6th Cir. 2003) ("[S]ince we conclude that the statements . . . were accompanied by meaningful cautionary language, the statements are subject to the safe harbor provisions of the PSLRA and are therefore not actionable.  No investigation of defendant's state of mind is required."); *In re Cutera*, 610 F.3d at 1112 ("Under subsection (A)(i), . . . if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."); *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999) ("[W]e need not in this case enter the thicket of the PSLRA's new pleading requirements for scienter; if a statement is accompanied by 'meaningful cautionary language,'

the defendant's state of mind is irrelevant.").[6]  The Seventh Circuit has held that meaningful

cautionary language must, at a minimum, disclose "the major risks [the issuer] objectively faced"

at the time of its forward-looking statement.  *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734

(7th Cir. 2004) ("This raises the possibility . . . that Baxter omitted important variables from the

cautionary language and so made projections more certain than its internal estimates at the time

warranted.  Thus this complaint could not be dismissed under the safe harbor, though we cannot

exclude the possibility that if after discovery Baxter establishes that the cautions did reveal what

were, *ex ante*, the major risks, the safe harbor may yet carry the day.").  As the Second Circuit

has noted, such a rule may "require[] an inquiry into what the defendants knew because in order

to determine what risks the defendants faced, [a court] must ask of what risks they were aware."

*Slayton*, 604 F.3d at 771.  The D.C. Circuit has not yet considered the question, but the Court

notes that other judges sitting in this district have reached conflicting conclusions.  *Compare*

*Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 72 (D.D.C. 2008) (Laughrey, J.,

visiting) ("In this case, the Court does not believe that the [subsection (A)(i)] safe-harbor

provision necessarily protects statements that were knowingly false at the time they were

made."), *with In re XM*, 479 F. Supp. 2d at 186 n.14 (Huvelle, J.) ("[C]ourts have held that once

---

[6] As noted above, the Fifth Circuit has also held that the PSLRA safe harbor bifurcates
consideration of state of mind from evaluation of meaningful cautionary language, but the court
may have since retreated from that holding.  *See supra* note 5 (comparing the *Lormand* and
*Southland* cases).

Defendants, citing *Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010), assert that
the Second Circuit has joined those that have found state of mind irrelevant.  *See* Defs.' Notice
Suppl. Auth. 2, ECF No. 53.  But the court did not go quite so far.  Although it did find that the
safe harbor is disjunctive, *see Slayton*, 604 F.3d at 766, it expressly refrained from deciding
whether cautionary language can be "meaningful" if the speaker knows the forward-looking
statement to be false or misleading when made, *see id.* at 772 ("May an issuer be protected by
the meaningful cautionary language prong of the safe harbor even where his cautionary
statement omitted a major risk that he knew about at the time he made the statement?  In this
case, however, we need not decide that thorny issue because we conclude that at any rate the
cautionary statement the defendants point to here was vague.").

the first clause of the provision is satisfied, the defendants' state of mind is not relevant." (internal quotation marks omitted)).

In determining how to apply the relevant subsection, the Court notes as a preliminary matter that the statutory text makes no explicit reference to the consideration of an issuer's state of mind. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). The legislative history, however, does. When the final bill was reported by a joint committee of Congress, the framers advised that "[t]he use of the words 'meaningful' and 'important factors' are intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, *without examining the state of mind of the defendant*." H.R. Rep. No. 104-369, at 44, 1995 U.S.C.C.A.N. at 743 (emphasis added). The framers then emphasized: "The first prong of the safe harbor requires courts to examine *only* the cautionary statement accompanying the forward-looking statement. Courts *should not* examine the state of mind of the person making the statement." *Id.* (emphases added).

This reading not only comports with the text and legislative history of the safe harbor, but also adheres to the PSLRA's instructions for resolving motions to dismiss. The statute mandates that, "[o]n any motion to dismiss based upon [the safe harbor], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e). In order to block a defendant from invoking the subsection (B) safe harbor, a plaintiff must *always* plead—and later prove—that a defendant's forward-looking statements were made with actual knowledge that they were false or misleading. *See id.* § 78u-5(c)(1)(B). Thus, as the Eleventh Circuit has observed, if a defendant's actual knowledge renders cautionary language meaningless as a matter of law, a defendant would never be able to avail himself of the

subsection (A)(i) safe harbor at the pleadings stage, and courts would never have occasion to apply the section 78u-5(e) mandate that courts consider cautionary language in ruling upon a motion to dismiss.  *See Edward J. Goodman Life Income*, 594 F.3d at 796 ("[N]ot only must a plaintiff prove actual knowledge of falsity when contesting forward-looking statements, but under the shareholders' rationale, by so pleading the plaintiff precludes the defendant from utilizing the safe harbor at the pleadings stage entirely.  In light of Congress's specific provision for courts to evaluate disputes over forward-looking statements at the pleadings stage, we cannot reach the conclusion that a properly formed complaint prohibits us from doing so." (citation omitted)).  "Absent a statutory text or structure that requires [a court] to depart from normal rules of construction, [a court] should not construe the statute in a manner that . . . would render a statutory term superfluous."  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476–77 (2003) (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992), and *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 (1993)).  The text, legislative history, and canons of statutory interpretation therefore lead the Court to the same conclusion put forward by Defendants and a majority of the circuit courts that have ruled on the issue:  The issuer's state of mind is irrelevant as to the subsection (A)(i) safe harbor.

The Court notes that this interpretation is consistent with the manner in which cautionary language was considered even before the PSLRA came into effect.  "[U]nder the 'bespeaks caution' doctrine—the judicially-created counterpart of the PSLRA's safe harbor provisions— 'when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading.  The substantial disclosure of specific risks may render alleged misrepresentations concerning soft information *immaterial* and thus nonactionable as securities fraud.'"  *In re XM*,

479 F. Supp. 2d at 177–78 (emphasis added) (quoting *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1404 (7th Cir. 1995)); *see also* H.R. Rep. No. 104-369, at 43, 1995 U.S.C.C.A.N. at 742 ("The [PSLRA] safe harbor . . . is based on aspects of SEC Rule 175 and the judicial [sic] created 'bespeaks caution' doctrine.").  As with cautionary language under the bespeaks caution doctrine, the subsection (A)(i) safe harbor has been linked not to scienter, but to materiality—a separate element of the securities fraud cause of action, and one governed by the *objective* standard of a reasonable investor.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) ("The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor."); *Edward J. Goodman Life Income*, 594 F.3d at 796 (noting that the bespeaks caution doctrine is the "equivalent" of the subsection (A)(i) safe harbor and that, under that doctrine, "a forward-looking statement is rendered immaterial as a matter of law when accompanied by meaningful cautionary language").  Because the subsection (A)(i) safe harbor is linked to the materiality of a forward-looking statement, consideration of the issuer's state of mind would blur the materiality and scienter elements.  But "[t]he anti-fraud provisions of the securities laws are plainly disinterested with immaterial statements, no matter the state of mind of the speaker." *Edward J. Goodman Life Income*, 594 F.3d at 796 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). And although some courts have considered the state of mind of the speaker in evaluating whether cautionary language is sufficient to shield a defendant under the judicially created bespeaks caution doctrine, *see In re Prudential Sec. Inc. Ltd. P'ships Litig*., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."), the Court concludes for the reasons noted

above that the text, legislative history, and logical structure of the PSLRA safe harbor do not afford courts that same flexibility.  Because the safe harbor is linked to materiality, the Court will evaluate Defendants' cautionary language based on its sufficiency and materiality to a reasonable investor without considering Defendants' state of mind.

### b.  Application of the Subsection (A)(i) Safe Harbor

The Court next considers whether the statements at issue were identified as forward-looking and accompanied by meaningful cautionary language.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).  To determine whether a statement is adequately identified as forward-looking, courts look to the facts and circumstances of the language used.  *See Slayton*, 604 F.3d at 769.  Courts also adhere to "the common-sense proposition that words such as 'expect' identify forward-looking statements."  *Id.* (citing *Harris*, 182 F.3d at 804–06).

If a statement is identified as forward-looking, it must also be accompanied by meaningful cautionary language in order to fall within the subsection (A)(i) safe harbor.  "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the [publications] which the plaintiffs challenge."  *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371–72 (3d Cir. 1993); *accord In re XM*, 479 F. Supp. 2d at 185 (applying the standard set forth in the *Trump* case to the PSLRA safe harbor). "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation."  *In re Trump*, 7 F.3d at 371. The safe harbor "does not require a listing of *all* factors" that may present a risk, nor "must the cautionary language explicitly mention *the* factor that ultimately belies a forward-looking statement . . . ."  *Harris*, 182 F.3d at 807.  Rather, "when an investor has been warned of risks *of a significance similar to that actually realized*, she is sufficiently on notice of the danger of the

investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.* (emphasis added).

The forward-looking statements at issue are contained in five different publications. In order to consider the statements in their full context, with their accompanying cautionary language, the Court will proceed to analyze the statements one publication at a time.

*i.  April 26, 2007, Conference Call*

Plaintiffs allege that there were two false or misleading forward-looking statements in Dr. Harman's prepared remarks during the company's April 26, 2007, conference call.  First, Plaintiffs point to Dr. Harman's statement that Harman "continue[s] to expect fiscal '08 automotive OEM revenues at $2.8 billion and EPS of $5.25, subject to the probability that [Harman] will not be able to absorb the $46 million engineering bulge . . . ."  Will Decl. Ex. 8 at 3, ECF No. 21-11.  Second, they point to his assertion that the company's PND plan "forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding." *Id.* at 7. Dr. Harman's use of the words "expect" and "forecast" sufficiently identify the statements as forward-looking, as these words inherently imply a reference to the future.

According to Plaintiffs' allegations, the statement about Harman's Automotive revenues and projected earnings per share was false or misleading because Harman's Automotive sales and margins "were being adversely affected in fiscal 2007 by much more than bulging R&D expenses," and because the projection had "no reasonable basis" at the time.  Consol. Class Action Compl. ¶ 62, ECF No. 20.[7]  They allege that the projected PND sales were false or

---

[7] The latter allegation relates not to the alleged falsity of Dr. Harman's statement or any undisclosed risk, but rather to the state of mind with which Defendants operated when making the projections at issue.  Because state of mind is irrelevant for purposes of the subsection (A)(i) safe harbor, *see supra* Part IV.A.3.a, the Court will not weigh any cautionary language against Plaintiffs' allegation that Defendants had "no reasonable basis" for the projections.

misleading because Harman released five modified versions of the same PND over a 16-month period, one of its modifications rendered the older-generation PNDs obsolete, and the company had a large inventory of obsolete PNDs that it had to sell at a material loss. *See id.* ¶ 64. To determine whether the safe harbor applies, the Court must assess whether the cautionary language "warned of risks of a significance similar to" those alleged in the complaint to have actually materialized. *Harris*, 182 F.3d at 807.

At the beginning of the call, the moderator warned listeners that the call would include forward-looking statements that are subject to assumptions and risks, directing participants "to review the reports filed by Harman International with the Securities and Exchange Commission regarding these risks and uncertainties." Will Decl. Ex. 8 at 1. In its then-most recent annual report, Harman included several pages of disclaimers detailing risks upon which its forward-looking statements are based. *See* Will Decl. Ex. 26 at 8–12, ECF No. 21-30. In relevant part, Harman's Form 10-K warned that "DaimlerChrysler and BMW are not obligated to any long-term purchases of [Harman] products"; "[i]f [Harman] fail[s] to introduce new products, misinterpret consumer preferences or fail[s] to respond to changes in the marketplace, consumer demand for [its] products could decrease and [its] brand image could suffer"; "the audio and video product markets that [Harman] serve[s] are fragmented, highly competitive, rapidly changing and characterized by intense price competition"; Harman "may be unable to detect and correct defects in some of [its] products before [it] ship[s] them"; and "[d]elays or defects in new product introduction may result in loss of sales or delays in marketplace acceptance." *Id.* at 9–10. There is a special paragraph dedicated to long-term supply agreements for infotainment systems, which notes in part that "cost overruns or difficulties experienced during development could cause losses on these contracts." *Id.* at 19. During the conference call itself, Dr. Harman

also disclosed that "PND inventories in Europe had grown substantially[,]" that "the European PND market ha[d] become extremely competitive[,]" and that the company had to "work[] extraordinarily hard to increase sales and to maintain adequate margins in that environment." Will Decl. Ex. 8 at 7; *see also id.* at 14 (acknowledging "pricing pressure" in the European PND market).

The Court finds that Defendants' cautionary language is sufficient to neutralize the challenged forward-looking statements.  Plaintiffs allege that Harman's projections for its fiscal year 2008 Automotive revenues and earnings per share, subject to its ability to absorb an R&D bulge, were false or misleading because Harman's Automotive sales and margins "were being adversely affected in fiscal 2007 by much more than bulging R&D expenses" including "growing material losses and declining operating margins."  Consol. Class Action Compl. ¶ 62. But Harman did warn that its projections were subject to certain risks, including "changing consumer demands[,]" the "fragmented, highly competitive, rapidly changing" market in which Harman operates, and its ability to timely identify and correct product defects.  Will Decl. Ex. 26 at 9–10.  To the extent that Plaintiffs' allegation relates to alleged losses on the MyGIG Radio, Harman's 10-K expressly warns that cost overruns and material losses could occur under its long-term supply agreements for infotainment systems.  *See id.* at 19.

Defendants also provided sufficient cautionary language to balance Dr. Harman's statement that the company projected total PND unit sales of 618,000 for the fiscal 2007 year. Dr. Harman noted in his prepared remarks that the PND market in Europe was "extremely competitive" and that the company had to work "extraordinarily hard" to increase sales and maintain margins.  Will Decl. Ex. 8 at 7.  These are not merely statements about general market

risks, but are specific to the European PND market of which Plaintiffs complain.[8]  A reasonable investor would know that "extreme" price pressure could substantially affect sales, margins, or both.  And to the extent that Harman's projected PND sales of 618,000 units by fiscal year-end might have seemed overly optimistic in light of the fact that it had only sold 300,000 units in the first nine months of that fiscal year, the prior sales figures were disclosed during the call, allowing investors to evaluate for themselves whether Harman's projection of 318,000 unit sales in the fourth quarter was realistic.  *See id.* at 17.  Indeed, one participant on the earnings call even openly expressed skepticism that the projected sales figure would materialize.  *See id.* ("So 300,000 [in the first three quarters], and you still think you can do over 600,000 for the fiscal year?").  Thus, both alleged misrepresentations from the April 26, 2007, conference call fall within the safe harbor.

*ii.  May 10, 2007, Form 10-Q*

In its May 10, 2007, Form 10-Q, Harman reported that it "anticipate[d] that DaimlerChrysler, Toyota/Lexus, Audi/VW and BMW will continue to account for a significant portion of [its] net sales and accounts receivable for the foreseeable future."  Will Decl. Ex. 22 at 17, ECF No. 21-26.  Harman's use of the word "anticipate" and explicit references to sales for the "foreseeable future" clearly identify the statement as forward-looking, and the parties do not appear to dispute this fact.

---

[8] Dr. Harman also disclosed that the company had amassed a PND inventory of approximately $50 million, which it expected to decrease to a "very normal level" of approximately $15 million within three months.  Will Decl. Ex. 8 at 7.  But the Court further notes that, because the accused misrepresentation deals only with unit sales, it is unclear that failure to disclose the company's large inventory of PNDs would have rendered the statement false or misleading.

Plaintiffs allege that the statement is false or misleading because, in reality, the MyGIG radios Harman was selling to Chrysler had technical and aesthetic problems, Harman was unable to produce the radios in a timely fashion, this confluence of problems was causing Harman's relationship with Chrysler to deteriorate beyond repair, and Harman was selling the MyGIG radios at a net loss.  *See* Consol. Class Action Compl. ¶ 69.  The front of the document includes a long disclaimer stating that the report contains forward-looking statements, which are subject to various risks.  *See* Will Decl. Ex. 22 at 3–4; *see also id.* at 18–19 (identifying risks specific to the proposed merger).  The identified risks include Harman's "ability to satisfy contract performance criteria, including technical specifications and due dates;" and Harman's "ability to design and manufacture [its] products profitably under [its] long-term contractual commitments . . . ."  *Id.* at 3–4.  In the text immediately following the alleged misrepresentation, Harman disclosed:  "These automotive customers are not obligated to any long-term purchase of our products.  The loss of sales to DaimlerChrysler, Toyota/Lexus, Audi/VW or BMW would have a material adverse effect on our total consolidated net sales, earnings and financial position."  *Id.* at 17.

With respect to the alleged delays and technical problems with the MyGIG radio, Harman provided sufficient cautionary language.  The report specifically warns that projections are subject to Harman's "ability to satisfy contract performance criteria, including technical specifications and due dates . . . ."  *Id.* at 3.  Similarly, the risk that the relationship with Chrysler may not continue was disclosed in the sentence immediately following the alleged misrepresentation.  *See id.* at 17 ("These automotive customers are not obligated to any long-term purchase of our products.  The loss of sales to DaimlerChrysler, Toyota/Lexus, Audi/VW or BMW would have a material adverse effect on our total consolidated net sales, earnings and financial position.").  Although this language could be widely applicable in any financial quarter,

it nonetheless "convey[s] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *In re XM*, 479 F. Supp. 2d at 185; *see also id.* at 185–86 (finding that "[o]ur costs may exceed or our revenues may fall short of our estimates, our estimates may change, and future developments may affect our estimates" was among the cautionary language sufficient to satisfy the subsection (A)(i) safe harbor). Indeed, it speaks directly to some of the specific risks of which Plaintiffs complain.

The report also provided cautionary language putting investors on notice of the risk that products sold under long-term contracts might generate a net loss. Harman identifies its "ability to design and manufacture [its] products profitably under [its] long-term contractual commitments" as a factor that may cause its stock price to fluctuate. Will Decl. Ex. 22 at 4. Moreover, even if this language were not present, it is not clear that undisclosed risk would actually render the targeted statement false or misleading. The alleged misrepresentation speaks only of "net sales" and "accounts receivable," which are figures that account only for money paid or owed by customers and do not include offsetting production costs. Thus, the Court is not convinced that a net loss on the Chrysler contract would be relevant in evaluating the truth of a statement about Harman's net sales and accounts receivable to a number of automotive companies in any event. This alleged misrepresentation, therefore, does not satisfy the "material misrepresentation" element of the securities fraud claim.

### iii. August 14, 2007, Press Release

On August 14, 2007, Harman issued a press release announcing its fourth quarter and full fiscal year results. *See generally* Will Decl. Ex. 10, ECF No. 21-13. The release also briefly discussed the merger, including the alleged misrepresentation that Harman "anticipate[d]

completing the transaction during the third or fourth quarter of th[e] calendar year." *Id.* at 2. The statement is identified as forward-looking through its use of the inherently forward-looking word "anticipate."

The next page of the release contains a disclaimer warning that the forward-looking statements contained in the document are subject to risks, including Harman's "failure to complete the transaction with affiliates of [KKR] and [Goldman], . . . and other risks detailed in filings made by Harman International with the Securities and Exchange Commission." *Id.* at 3. Harman's warning that it may "fail[] to complete the transaction" is insufficient, as it essentially warns that "if we fail to close the deal, the deal will not close." *Cf. Slayton*, 604 F.3d at 772 (rejecting as boilerplate a similarly circular warning that essentially said, "if our portfolio deteriorates, then there will be losses in our portfolio"). But the case law allows issuers to incorporate by reference cautionary language made in other public statements. *See, e.g.*, *Inst. Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 257–58 (3d Cir. 2009) (noting that the defendant's conference calls and press releases directed listeners and readers to the company's SEC filings).[9] Harman's Registration Statement (SEC Form S-4) for the proposed merger, which had been filed just two months earlier, included several pages of disclosures describing risks related to the merger. *See* Will Decl. Ex. 4 at 28–38, ECF No. 21-7. Among those were several warnings disclosing specific risks that the deal may not close, including the failure to obtain stockholder

---

[9] Indeed, the Seventh Circuit has found that, in a fraud-on-the-market case such as this one, all prior cautionary language "must be treated as if attached to every one of [the defendant's] oral and written statements" even if it is not expressly incorporated by reference. *Asher*, 377 F.3d at 732. This is so, because the fraud-on-the-market theory assumes that all public information is reflected in the stock price in order to establish causation, and only an inefficient market would incorporate an allegedly false statement but not the cautionary disclosures. *See id.* But because the press release explicitly references Harman's SEC filings, which contain sufficient cautionary language, the Court need not go so far as to adopt the Seventh Circuit's position.

approval, inability to obtain the necessary regulatory approvals, and failure to satisfy the

conditions of the Merger Agreement.  *See id.* at 28–30.  The same risks were also disclosed in

Harman's May 10, 2007, Form 10-Q.  *See* Will Decl. Ex. 22 at 18.  These warnings disclose

"risks of a significance similar to" that allegedly realized, *Harris*, 182 F.3d at 807—namely,

Harman's alleged failure to satisfy the CapEx and MAC conditions of the Merger Agreement.

Because the Merger Agreement was made publicly available, investors could see for themselves

the specific closing conditions that may not be satisfied.  *See* Consol. Class Action Compl. ¶ 32.

The accused statement in Harman's August 14, 2007, press release is therefore inactionable.

*iv.  August 29, 2007, Form 10-K*

In Harman's August 29, 2007, Form 10-K, Harman stated that it "presently anticipate[d]

that the merger will be completed in the fourth quarter of calendar year 2007."  Will Decl. Ex. 1

at 3, ECF No. 21-4.  Plaintiffs allege that this, too, constitutes a material misrepresentation.  *See*

Consol. Class Action Compl. ¶ 79.  As with the similarly worded statement in Harman's August

14, 2007, press release, the statement uses the inherently forward-looking word "anticipate."  *See*

*supra* Part IV.A.3.b.iii.  The disclosure also contains cautionary language about the merger that

repeats the same relevant risks noted in the merger Registration Statement regarding stockholder

approval, regulatory approvals, and the obligation to meet closing conditions.  *Compare* Will

Decl. Ex. 1 at ii, 14, *with supra* Part IV.A.3.b.iii.  Because the disclosures are the same, this

alleged misrepresentation is similarly inactionable.

*v.  September 27, 2007, Conference Call*

During Harman's September 27, 2007, investor conference call, Harman CFO Kevin

Brown made two forward-looking statements that Plaintiffs identify as misrepresentations.

During his prepared remarks, Mr. Brown stated that Harman "expect[s] Automotive sales to

increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment

system program and higher PND sales in Europe."  Will Decl. Ex. 18 at 4, ECF No. 21-22.

During the question-and-answer portion of the call, Mr. Brown made a similar remark, stating

that Harman was "bringing additional business on-stream as [it] ramp[s] up [its] Missouri plant

and in the PND business, where [it] continue[s] the growth and expansion of that business

primarily in Europe."  *Id.* at 6.  Mr. Brown's first statement is identified as forward-looking

through its use of the inherently forward-looking word "expects."  And although the second

statement does not contain any similar language, the parties do not dispute that the statement is

forward-looking and identified as such.

Again, at the beginning of the call, the operator warned listeners that the call would

contain forward-looking statements that "include the Company's beliefs and expectations as to

future events and trends affecting the Company's business and are subject to risks and

uncertainties."  *Id.* at 1.  The operator then advised listeners "to review the reports filed by

Harman International with the Securities and Exchange Commission regarding those risks and

uncertainties."  *Id.*  In its then-most recent annual report, Harman included detailed warnings

regarding its forward-looking statements.  In relevant part, the company noted that

"DaimlerChrysler [and Harman's] other automotive customers are not obligated to any long-term

purchases of [Harman's] products"; Harman's business is based on its "ability to introduce

distinctive new products that anticipate changing consumer demands"; Harman sells its products

in a "fragmented, highly competitive, rapidly changing" market "characterized by intense price

competition"; and, "despite extensive testing, [Harman] may be unable to detect and correct

defects in some of [its] products before [it] ship[s] them."  Will Decl. Ex. 1 at 10–11.  And with

specific regard to its infotainment systems, Harman warned:  "We incur pre-production and

development costs related to infotainment systems that we develop for automobile manufacturers pursuant to long-term supply agreements. . . . Unforeseen cost overruns or difficulties experienced during development could cause losses on these contracts." *Id.* at 24.

The accused statements relate to sales of both the MyGIG Radios and PNDs. With respect to the MyGIG radios, the cautionary language is quite specific. It warns that Chrysler was not obligated to a long-term relationship; Harman products may contain defects that could cause delays or diminish market acceptance; and production of infotainment systems requires significant development costs and long-term supply contracts, which may result in net losses. These risks are of similar significance to those Plaintiffs complain of—indeed, they appear to disclose those very risks. The cautionary language also warns of the rapidly changing PND market and intense price competition, neutralizing Mr. Brown's projections about the PND sales.[10] Moreover, Dr. Harman's prior statements on the extraordinary competition for PNDs in Europe were also readily available to investors at the time. *See supra* Part IV.A.3.b.i.

Plaintiffs thus fail to allege any actionable forward-looking statement, because all of the statements at issue are protected by the subsection (A)(i) safe harbor.

## 2. Puffery

The second set of alleged misrepresentations is comprised of several expressions of opinion. The Supreme Court has held that statements of reasons, opinions, or beliefs may be actionable under securities laws. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991) ("[A] plaintiff is permitted to prove a specific statement of reason knowingly false or misleadingly incomplete, even when stated in conclusory terms."). This is so, because "[s]uch

---

[10] To the extent that Plaintiffs argue that Defendants' projections about PND *sales* are misleading because it amassed a large *inventory* of PNDs, Plaintiffs have not pleaded with specificity how a large inventory would negatively impact sales of a product. *See also supra* note 8.

statements are factual in two senses:  as statements that the directors do act for the reasons given

or hold the belief stated and as statements about the subject matter of the reason or belief

expressed."  *Id.* at 1092.  Even a statement of opinion couched in indefinite, unverifiable, or

conclusory terms may be actionable, because "in a commercial context [conclusory terms] are

reasonably understood to rest on a factual basis that justifies them as accurate, the absence of

which renders them misleading."  *Id.* at 1093.

But to be actionable, statements of opinion must still be material.  *Cf. id.* at 1091.  Where

statements of opinion "are too general to cause a reasonable investor to rely upon them[,]" they

amount to immaterial "puffery" and do not give rise to a securities fraud claim.  *ECA & Local*

*134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir.

2009); *see also In re XM Satellite Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 176 (D.D.C. 2007)

("[I]t is well-established under the 'puffery' doctrine that 'generalized statements of optimism

that are not capable of objective verification' are not actionable 'because reasonable investors do

not rely on them in making investment decisions.'" (quoting *Grossman v. Novell, Inc.*, 120 F.3d

1112, 1119 (10th Cir. 1997))).  Moreover, to be material, a statement must "alter[] the 'total mix'

of information" available to the market.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449

(1976).  Defendants argue that several of the alleged misrepresentations are not actionable

because they are just this sort of "puffery," upon which a reasonable investor would not rely.

*See* Defs.' Mem. P. & A. Supp. Mot. Dismiss 22 n.3, ECF No. 21-1.  Plaintiffs argue that the

representations "were all highly important factors that investors considered when evaluating

Harman's stock."  *See* Lead Pl.'s Mem. Opp'n Mot. Dismiss 20, ECF No. 26.

Five alleged misrepresentations fall within the scope of this dispute:  (1) Dr. Harman's

statement about the company's "dominance" in the automotive space having been solidified;

(2) his statement that Harman's balance sheet was "strong" at the 2007 fiscal year-end;

(3) Harman's statement in its FY2007 Form 10-K that "[s]ales of aftermarket products,

particularly PNDs, were very strong during fiscal 2007"; (4) the press release statement in which

Harman "disagree[d] that a material adverse change ha[d] occurred or that it ha[d] breached the

merger agreement"; and (5) Dr. Harman's statement that the confluence of the merger

negotiations and diligence process with the ramping up of the new plants in Missouri and China

had created a "perfect storm" that was now "over."  Consol. Class Action Compl. ¶¶ 74–75, 82,

87, 98, ECF No. 20.

Importantly, courts have found that statements are immaterial puffery where they "lacked

a standard against which a reasonable investor could expect them to be pegged . . . ."  *City of*

*Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005).  Defendants'

statements about Harman's "strong" balance sheet and "very strong" sales of PNDs fall clearly

within the scope of this rule, as the use of the chest-beating adjective "strong" is subjective and

provides no standard against which a comparison can be drawn.  *See, e.g.*, *In re Splash Tech.*

*Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (noting that such

statements "constituted vague assessments of past results, on which no reasonable investor

would rely").  Indeed, the description of Harman's PND sales as "strong" could have signified a

truthful comparison to sales of the products in earlier quarters, and not a comparison to

competitors.  Because Dr. Harman used the term in such a vague manner, it is impossible to

know.  Similarly, Dr. Harman's statement that the "perfect storm" the company had experienced

was "over" and Harman was "again in full command of [its] circumstances and [its]

extraordinary future" is so vague that it is incapable of objective verification.[11]  "[E]xpressions of puffery and corporate optimism do not give rise to securities violations.  Up to a point, companies must be permitted to operate with a hopeful outlook . . . ."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

District courts around the country have split over the materiality of statements regarding a defendant's purported "dominance" in a market.  Some courts have found that the word "dominant" inherently implies a comparison to competitors.  *See, e.g.*, *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175 (D.R.I. 2003).  But in *Davis v. SSPS, Inc.*, 385 F. Supp. 2d 697 (N.D. Ill. 2005), the court found that a defendant's statement that a new partnership would put the company in "[a]n even more dominant position" was merely "a vague positive spin" on the new contract.  *Id.* at 711–12 (alteration in original).  The Court finds that context is key in determining whether the actual statement at issue suggests an objective standard against which a reasonable investor would evaluate it.  Here, Dr. Harman made the following statement about the company's expansion into infotainment systems for mid- and entry-level vehicles:

> Our dominance in the automotive space was solidified through the past year, where we had earlier confronted doubt about our ability to move effectively beyond the luxury car market for our infotainment systems.  That doubt has been erased.  With earlier awards to us from PSA, Audi and Chrysler, we established our leadership in the mid-range and entry levels, with last year's major awards from BMW, we erased any remaining questions.  We are moving from an era in which each new infotainment system represented a virtually original effort with all new R&D to a new era in which the major automotive makers are committing to a common electronics platform, applicable across the full range of car lines.

---

[11] To the extent that Dr. Harman's statement about the "perfect storm" being "over" can be interpreted to refer to something specific, it is still inactionable.  Dr. Harman's statement followed a discussion of the merger negotiations and diligence, and the construction and staffing of Harman's plants in China and Missouri, all of which consumed a significant portion of management's resources over the previous six- to eight-month period.  Plaintiffs' allegations do not suggest that these two significant projects were not in fact "over" at the time Dr. Harman made the statement.

Consol. Class Action Compl. ¶ 74.  Taken in context, Dr. Harman's statement was a "vague positive spin" on Harman's expansion into the mid- and entry-level vehicle market via a more standardized electronics platform and an opportunity to boast of its awards.  The statement makes no comparison to Harman's competitors in terms of revenues, sales, or profitability, and this lack of an objective standard for comparison places the statement squarely on the "puffery" end of the spectrum.

Defendants' denial of breach with respect to the Merger Agreement is similarly immaterial.  Our securities laws "do not create a duty to confess contested charges." *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 906 (N.D. Ill. 2001).  Markets expect parties accused of violating laws and breaching contracts to deny liability, especially where, as here, the company releases a statement on the same day that allegations are first raised.  "Investors can evaluate this sort of posturing for what it's worth." *Id.* at 907.

In sum, Defendants are correct that these five statements amount to inactionable puffery.

### 3.  Material Omissions

The final category of misrepresentations is comprised of statements of historical fact, which Plaintiffs contend are misleading in light of material information Defendants failed to disclose.  As a general matter, there is no duty to reveal information absent a duty to disclose. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  But a duty arises to disclose information "if, *inter alia*, a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir. 1996) (citing *Roeder v. Alpha Indus., Inc.*,

814 F.2d 22, 27 (1st Cir. 1987)), *superseded by statute on other grounds*, 15 U.S.C.

§ 78u-4(b)(2)(A) (2012).  Thus, the PSLRA requires a plaintiff to identify the "statement alleged

to have been misleading, the reason or reasons why the statement is misleading, and . . . with

particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1) (2012).

Plaintiffs assert that four statements are rendered false or misleading due to the issuer's

failure to disclose certain material information:  (1) Dr. Harman's statement that total R&D

spending was $94 million, which was "primarily generated by the need to process the

engineering for the $14 billion backlog, of which a significant $1 billion-plus had been

unanticipated"; (2) Mr. Paliwal's statement, reprinted in the *Wall Street Journal*, that "[t]he

fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D

costs, primarily related to recent automotive platform awards"; (3) Mr. Paliwal's statement that

"[f]or the full year 2008, gross profit is expected to be lower than anticipated in April 2007 . . .

due to higher material prices, and more than expected ramp-up costs for the two new

manufacturing plants in China and the U.S.";[12] and (4) Harman's statement in its Form 10-Q that

"[n]ew introductions of infotainment systems including Chrysler's MyGIG infotainment systems

in North America, the roll-out of [other systems] were primary factors contributing to higher

sales."  *See* Consol. Class Action Compl. ¶¶ 73, 97, 99, 105, ECF No. 20; Lead Pl.'s Mem.

Opp'n Mot. Dismiss 12, ECF No. 26.  They allege that these statements are false or misleading

because, in each instance, the issuer failed to disclose that Harman's contract with Chrysler

required it to produce and sell MyGIG radios at a loss; the radios were plagued with technical

problems; the company had a large inventory of obsolete PNDs, which it had to sell at a loss; and

---

[12] Although Mr. Paliwal's use of the words "is expected" suggests that the statement is forward-looking in nature, the parties characterize the statement, in context, as a representation of historical fact.  *See* Defs.' Mem. P. & A. Supp. Mot. Dismiss 16, ECF No. 21-1; Lead Pl.'s Mem. Opp'n Mot. Dismiss 11, ECF No. 26.

the PNDs had not sold to Harman's expectations in 2006 and were being stored in a warehouse. *See* Consol. Class Action Compl. ¶¶ 62–64; Lead Pl.'s Mem. Opp'n Mot. Dismiss 12.

Plaintiffs do not adequately allege any actionable material omission. Although they point to representations made by Defendants and identify omitted information that they, or perhaps any reasonable investor, would *like* to have known, neither the complaint nor Plaintiffs' opposition brief "specif[ies] the reason or reasons why [each] statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). Both the complaint and Plaintiffs' briefing state that Defendants' affirmative statements were misleading *because* they failed to disclose certain information about the MyGIG radios and PNDs. But they do not explain *how* the omission of that information renders Defendants' affirmative statements themselves "either false, inaccurate, incomplete, or misleading in light of the undisclosed information" such that there was a duty to disclose it. *Gross*, 93 F.3d at 992; *see also Winer Family Trust v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) ("Liability may exist under Rule 10b-5 for misleading or untrue statements, but not for statements that are simply incomplete. Winer fails to specify *why* the assertion that the equity investment made by Smithfield Foods helped facilitate Pennexx's registration of its common stock was misleading or untrue." (emphasis added) (citations omitted)). The Court is left to speculate what misleading conclusions a reasonable investor would draw from Defendants' statements in the absence of these undisclosed facts, and thus what Plaintiffs' theory of liability is in relation to these statements. But the PSLRA places the burden upon Plaintiffs to specifically plead those facts, and not leave them up to the guesswork of the Court.

Moreover, the alleged misrepresentations disclosing specific sales and financial data are independently inactionable. "It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data. The disclosure of accurate

historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Somafor Danek Group, Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997) (citation omitted).  Because Plaintiffs do not allege that the figures contained in Defendants' statements are false statements of historical fact, the disclosures cannot constitute actionable securities fraud on an omission theory.  *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) ("Because plaintiffs have not alleged the historical inaccuracy of Ford's financial and earnings' [sic] statements, such statements are not misrepresentations.").  Plaintiffs' complaint, in its current form, thus fails to allege an actionable material omission.

## B.  Scienter

Although Plaintiffs have not alleged any material misrepresentation or omission, the Court next considers whether the complaint contains adequate allegations of scienter.  As the D.C. Circuit has held, "[t]o state a claim for securities fraud under Rule 10b-5, a plaintiff must allege that the defendant *knowingly or recklessly* made a false or misleading statement of material fact . . . ."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (emphasis added).  For forward-looking statements, however, the PSLRA heightened the substantive measure, requiring a plaintiff to plead that the statement "was made with *actual knowledge* by [the issuer] that the statement was false or misleading . . . ."  15 U.S.C. § 78u-5(c)(1)(B)(i) (2012) (emphasis added).  The PSLRA also heightened the pleading standard by which all scienter allegations are evaluated, requiring that "the complaint shall, with respect to *each* act or omission . . . , state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A) (2012) (emphases added).  Under this rigid standard, a securities fraud complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Importantly, the Supreme Court has made clear that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 325. The Court takes that "holistic" approach here.

Although each of the alleged misrepresentations fails to satisfy the "material misrepresentation or omission" element, the Court will nonetheless address the Plaintiffs' deficient scienter allegations. As set forth below, Plaintiffs have not pleaded enough facts to support a strong inference that Defendants were aware that their statements about the merger and MyGIG Radios were false or misleading. Thus, Plaintiffs' securities fraud claim as to alleged misrepresentations about the merger and MyGIG Radios fails for the additional, independent reason that it fails to comply with the heightened scienter pleading requirements under the PSLRA.[13]

---

[13] Because all of Plaintiffs' claims were dismissed for failure to allege a material misrepresentation or omission, the Court need not decide whether Plaintiffs adequately pleaded scienter for Defendants' representations about Harman's PND products—or any of Defendants' representations, for that matter. Nonetheless, the Court does note without deciding that there appears to be a strong argument in favor of Plaintiffs as to the PND products. In January of 2007, while Harman had sold only 250,000 PNDs during the previous six-month period, it predicted selling 400,000 units in the subsequent six-month period—an increase of 60%. *See* Consol. Class Action Compl. ¶ 51, ECF No. 20. Projecting such a sales spike, especially given that Harman had missed prior sales expectations, appears to have been optimistic and misleading. *See Frank v. Dana Corp.*, 646 F.3d 954, 961–62 (6th Cir. 2011) (determining that the defendant corporation making "gangbuster" projections when the industry was not doing well and sales had been falling short of the predicted range was unrealistic and contributed to a strong inference of scienter); *In re KeySpan Corp.*, No. 01 CV 585(ARR), 2003 WL 21981806, at *12– 13 (E.D.N.Y. July 30, 2003) (holding that the plaintiffs had sufficiently pleaded scienter when alleging that the defendants were aware of the company's financial and operational difficulties, and yet continued to issue "rosy" public statements indicating that "all was well . . . and getting better"). Similarly, in April of 2007, Defendants stated during a conference call with analysts that Harman was "still on track" to sell over 600,000 PNDs for FY2007. *See* Consol. Class Action Compl. ¶ 58. The company said that it had sold 300,000 units in the first three quarters of the fiscal year, in the previous nine months, and forecasted that it could sell another 300,000 in the next three months, or in only a third of that time. *See id.* What seemed more farfetched

1.  Acquisition by KKR and Goldman

Plaintiffs claim that Defendants made several misleading statements about the proposed

merger with KKR and Goldman Sachs.  *See* Consol. Class Action Compl. ¶ 70, ECF No. 20.

Specifically, Plaintiffs contend that Defendants confidently predicted that the merger would

close within a few months, despite having made excessive capital expenditures that violated the

Merger Agreement and threatened the merger's completion.  *See id.*  Because these statements

comprise predictions, they are only actionable if Plaintiffs have pleaded enough facts to support

a strong inference that they were made with *actual knowledge* that they were false or misleading.

*See* 15 U.S.C. § 78u-5.  In the securities fraud context, "[t]he strength of an inference cannot be

decided in a vacuum," and thus, "a court must consider plausible, nonculpable explanations for

the defendant's conduct, as well as inferences favoring the plaintiff."  *Tellabs*, 551 U.S. at 324.

A complaint alleging securities fraud will only survive a motion to dismiss if a reasonable person

---

about that prediction, though, was that of the 300,000 units that had been sold in the prior 9
months, only 50,000 had been sold in the previous 3 months.  *See id.* ¶ 51.  Thus, Harman
projected a 500 percent increase in its PND sales from the previous quarter.  It is difficult to
fathom how there could have been a reasonable basis to expect that sales would skyrocket so
dramatically, even if they had been increasing.  In July of 2007, Defendants were informed that
Harman had missed projected PND sales for fiscal 2007 by more than 200,000 units, or by $85
million.  *See id.* ¶¶ 55, 83.  Further, between March of 2006 and July of 2007, the company had
produced five versions of the PND, each time rendering older versions obsolete and relegating
them to being stockpiled in a warehouse.  *See id.* ¶ 53.  Given these conditions, the company was
one year late in releasing a saleable PND.  *See id.* ¶ 54.  In addition, sales were slow because the
new units were priced too high to compete with other PNDs.  *See id.*  Yet despite just having
missed PND sales projections by 200,000 units, the rising numbers of obsolete PNDs in storage,
and severe pricing competition, Harman projected on August 15, 2007, that it would have a
"surge of production in the new year."  *Id.* ¶ 73.  It predicted an "increase in the PND market"
and resulting growth, anticipating sales in the Automotive division to grow by more than seven
percent.  *See id.* ¶ 83.  Considering Defendants' repeated projections of exponentially rising PND
sales, based on the allegations in the consolidated complaint, it appears that Harman "painted too
rosy a picture of [its] current performance and future prospects," *Novak v. Kasaks*, 216 F.3d 300,
311–12 (2d Cir. 2000), despite having "knowledge of facts or access to information
contradict[ing] [such] public statements," *id.* at 308.

would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.  *See id.*

According to Plaintiffs, Defendants had "binged on capital spending" in June of 2007, spending $60 million in one month, such that capital expenditures exceeded $90 million in fiscal fourth quarter 2007 and nearly $175 million overall by the end of fiscal 2007.  *See* Consol. Class Action Compl. ¶ 72.  Plaintiffs further assert that Dr. Harman later admitted that the company had engaged in such "exuberant spending" during fiscal 2007.  *See* Lead Pl.'s Mem. Opp'n Mot. Dismiss 25–26, ECF No. 26.  By August of 2007, Plaintiffs contend, Defendants were "burning through cash" to ramp up the Missouri plant to manufacture the MyGIG radio.  *See* Consol. Class Action Compl. ¶ 72.  Plaintiffs assert that Defendants' August 14, 2007, statements that they anticipated completing the merger during the third or fourth quarter of the calendar year were thus misleading.  *See id.* ¶ 71.  Plaintiffs claim Harman's spending violated the CapEx Covenant and MAC Clause, breaching the Merger Agreement and allowing the Purchasing Companies the opportunity to abandon the merger.  *See id.* ¶¶ 71–72; *see also* Mot. Hr'g Tr. 45:1–46:6, Sept. 11, 2012, ECF No. 46 (clarifying that Plaintiffs do not contend that Defendants knew the deal would not happen, but rather that the Purchasing Companies "*could* walk away from the deal" (emphasis added)).  In September of 2007, the Purchasing Companies stated that Harman's excessive capital expenditures and resulting violation of the Merger Agreement caused them to abandon the acquisition.  *See id.* ¶ 71.

Plaintiffs do not allege sufficient facts to give rise to a strong inference that Defendants knowingly or recklessly made misleading statements about the merger.  The CapEx Covenant prohibited expenditures that exceeded the capital expenditure budget for the fiscal year.  *See id.* ¶ 10.  In May of 2007, Harman forecasted that its capital expenditures for the year would be

$150 million.  *See* Defs.' Reply Mem. Supp. Mot. Dismiss 17, ECF No. 27.  On August 29,

2007, Harman disclosed that its capital expenditures for fiscal 2007 were actually $175 million,

$25 million more than the initial projection.  *See id.*  Defendants contend that this $175 million

that Harman spent fell within the fiscal 2007 capital expenditure budget.  *See id.*  Further,

Defendants assert, this spending was carried out by one division of the company, and

Dr. Harman and Mr. Paliwal learned of it only after it had occurred.  *See id.*

Though Plaintiffs characterize the spending as "exuberant," they do not provide any facts

suggesting that it actually exceeded the budget.  They also do not make any allegations

indicating that Defendants actually believed that their spending surpassed the budget or that it

was a violation of Merger Agreement, and that they knew such things when publicly predicting

the merger's imminent closure.  *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020 (5th

Cir. 1996) (determining that the plaintiffs made a conclusory, "bare allegation" in asserting that

because of industry custom, the defendants must have known that suppliers' prior sales had

failed to meet goals, as the plaintiffs' allegation failed to provide facts indicating that the

defendants would have been aware).  Indeed, Plaintiffs' allegation that the company lacked

controls to prevent the spending binge, *see* Consol. Class Action Compl. ¶ 72, weakens the

inference of scienter—without strict controls, it is less likely that the company's senior

executives knew of the overspending in advance.

By contrast, Defendants ask the Court to draw an opposing inference that they were not

aware when making the August 14 statements predicting the merger's imminent closure within a

few months that their expenditures would be deemed as exceeding the budget and violating the

Merger Agreement, and that this would threaten the merger.  *See* Defs.' Reply Mem. Supp. Mot.

Dismiss 23.  Harman contends that even as it forecasted in May of 2007 that the fiscal year

capital expenditures would be $150 million, its August 29, 2007, disclosure that its actual fiscal

2007 capital expenditure was $175 million did not elicit any reaction from the market.  *Id.*  This

disclosure was made 22 days before the Purchasing Companies abandoned the merger on

September 21, 2007, citing as their reason the $25 million that Harman spent over its $150

million projection.  *See* Defs.' Mem. P. & A. Supp. Mot. Dismiss 26, ECF No. 21-1; Defs.'

Reply Mem. Supp. Mot. Dismiss 22, ECF No. 27.  The announcement of the failed merger sent

the stock price plummeting.  *See* Defs.' Reply Mem. Supp. Mot. Dismiss 22.  The market's

failure to react when Harman initially disclosed that its capital expenditures were $25 million

more than initially projected contributes to the inference that Defendants were unaware that this

spending violated the CapEx covenant or would threaten the merger as the market itself did not

seem to treat the $25 million overrun as noteworthy.

Plaintiffs have not alleged sufficient facts to support the inference that Defendants were

actually aware that the merger would likely not go through at the time the alleged

misrepresentations were issued.  Because Plaintiffs' inference of scienter is not as compelling as

Defendants' opposing inference, Plaintiffs have failed to allege facts that give rise to an

inference of scienter as to Defendants' statements about the merger.  *See Stevens v. InPhonic,

Inc.*, 662 F. Supp. 2d 105, 118, 123–24 (D.D.C. 2009) (dismissing a claim when the plaintiff

failed to allege anything indicating that the defendants were aware of the flaws in their revenue

calculations or internal controls, because the allegations did not support an inference of scienter

as compelling as the defendants' opposing inferences); *In re Dell, Inc. Sec. Litig.*, 591 F. Supp.

2d 877, 893–94 (W.D. Tex. 2008) (determining that the plaintiffs had failed to allege facts giving

rise to a strong inference of scienter that the defendants must have known about accounting

violations when publishing statements artificially inflating the stock price, because the plaintiffs

did not provide facts suggesting that the defendants had indeed known, and because the inference

of deception that the plaintiffs offered was not as compelling as the defendants' opposing

inference).

2.  MyGIG Radio

Plaintiffs further allege that Defendants knowingly or recklessly signed a contract to sell

MyGIG radios to Chrysler that ultimately yielded net losses, and that they made misleading

statements about such sales.  *See* Consol. Class Action Compl. ¶¶ 37, 43–44.  Plaintiffs also

contend that Defendants omitted disclosing that they would take losses on the contract, thereby

rendering other statements about MyGIG sales misleading.  *See id.*  A "defendant corporation is

deemed to have the requisite scienter for fraud only if the individual corporate officer making the

statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least

deliberately reckless as to its falsity, at the time he or she makes the statement."  *In re Apple*

*Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) (citing *Nordstrom, Inc.*

*v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995)).

Because Plaintiffs do not allege any facts indicating that Dr. Harman learned of the

alleged losses at any specific point in time after the execution of the contract, Plaintiffs must fall

back on their allegation that Dr. Harman was aware or must have been aware of the risk at the

time that he signed the contract.  *See* Consol. Class Action Compl. ¶ 146.  Though it is

undisputed that Harman did ultimately take losses on the MyGIG contract with Chrysler,

Plaintiffs do not allege sufficient facts indicating that Dr. Harman or any of the other defendants

were aware of the risk of such losses at the time the contract was negotiated and entered into.  It

is unclear from Plaintiffs' allegations when exactly Dr. Harman entered into the contract, but

they do state that it was initiated prior to September 6, 2006, when it was revealed in Harman's

2006 Annual Report.  *See* Consol. Class Action Compl. ¶¶ 36, 38.  Yet Plaintiffs also state that it was only after production of the MyGIG radio began that its technical and aesthetic problems were discovered, including its tendency to lock up on the listener or fail to play sounds.  *See id.* ¶¶ 39–40.  In addition, the "significant[] delay[]" of the MyGIG radio rollout "due to supply issues and Harman's inability to fulfill production needs" did not occur until 2007.  *See id.* ¶ 38. The chain reaction that followed, where Chrysler decreased its order for radios and Harman's parts suppliers raised their prices, was not triggered until after this delay.  *See id.* ¶ 42.  Further, although Plaintiffs allege that the contract failed to include costs for integrated circuits, *see id.* ¶ 47, Plaintiffs have not provided any allegations indicating how or why they were left out, or whether Dr. Harman was aware when finalizing the contract that they had been excluded. Indeed, at oral argument, Plaintiffs conceded that they "can't say . . . now that [they] know Dr. Harman knew it was going to be a loss . . . ."  Mot. Hr'g Tr. 38:16–17, Sept. 11, 2012.[14]

Thus, the combination of factors that forced Harman to ultimately sell the MyGIG radio at a substantial loss occurred well after the contract was initiated.  *See id.* ¶¶ 43–44.  Plaintiffs therefore do not sufficiently allege that when signing the contract, Harman "knew or recklessly disregarded that its earnings would soften in fiscal 2007 and 2008," *see id.* ¶ 37, as it seems that this softening only became apparent after the contract was initiated.  *Cf. Lormand v. US Unwired, Inc.*, 565 F.3d 228, 252 (5th Cir. 2009) (scienter was sufficiently pleaded where the plaintiffs alleged that the defendants endorsed changing the company's program despite being

---

[14] Plaintiffs allege that Dr. Harman attempted to renegotiate the contract with Chrysler— a fact that, if proven, may constitute circumstantial evidence that he learned of the alleged material losses at some point between the contract's execution and Defendants' alleged misrepresentations about the MyGIG Radio.  *See* Consol. Class Action Compl. ¶ 45.  However, Plaintiffs do not provide any supporting allegations showing that the renegotiation attempt was caused by Defendants' realization that the contract was generating losses.  While one might infer that such was the case, that inference is not "at least as compelling as" an inference that the renegotiation was attempted for any other purpose.  *Tellabs*, 551 U.S. at 324.

aware of the harmful effect, because the plaintiffs described various ways in which the defendants knew of the harm at the time they made the statements, including their private admissions).  Because Plaintiffs have failed to allege that Defendants were aware beforehand of the problems that the MyGIG radio would involve, they have not adequately pleaded that Defendants knowingly or recklessly entered into a contract that yielded net losses.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006) (finding no scienter because, given the information available to the defendant at the time that it conducted an audit, it could not be said that it did not have an honest belief that its audits were accurate, and the plaintiff did not plead any facts otherwise); *Lovelace*, 78 F.3d at 1020 (finding no scienter because the plaintiffs did not allege anything suggesting that the defendants knew when making deals with suppliers that earnings would suffer, such as facts about who had knowledge about this harm, when they had it, or any other such details).

In addition, Plaintiffs do not plead enough facts to allege that Defendants knowingly or recklessly omitted information that made some of their statements misleading.  The PSLRA requires a plaintiff to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter.  *See Tellabs*, 551 U.S. at 313.  As noted above, Plaintiffs do not allege facts showing that Defendants were aware that they would take losses on the MyGIG contract when it was signed.  Yet Plaintiffs do not provide enough facts to indicate when Defendants did in fact learn that MyGIG sales to Chrysler would incur losses.  Though Plaintiffs allege that the "MyGIG radio rollout" that was supposed to take place in 2006 was "significantly delayed" until 2007, *see* Consol. Class Action Compl. ¶ 38, and that Harman was forced to reduce its parts order in fiscal 2007 because Chrysler decreased its MyGIG order, *see id.* ¶ 42,

they do not offer any facts suggesting when specifically such things occurred during this timeframe.

Plaintiffs also assert that the MyGIG radios had technical and cosmetic issues, noting that Harman employees joked during the summer of 2007 that the MyGIG radios did not produce sound. *See id.* ¶ 41. Plaintiffs do not allege, however that Defendants were aware of this, or when they learned that these problems would contribute to the net losses on sales. Similarly, while Plaintiffs state that Harman was trying to reduce costs associated with the MyGIG deal in 2006 and 2007, this allegation does not indicate that Defendants necessarily did so because they were aware at the time that the contract would result in losses. *See id.*

Plaintiffs further contend that Dr. Harman explicitly told all of the company's vice presidents in a meeting in Plymouth, Michigan that "although [Harman] was not going to make money on the MyGIG radio deal, it was strategically important to the company." *Id.* ¶ 48. Plaintiffs conspicuously leave out any facts suggesting when this statement was made, however—or even the year in which it was made. Thus, they do not sufficiently allege that Defendants knew that they would take losses on the MyGIG contract when projecting in April of 2007 that Automotive revenues would be $2.8 billion, *see id.* ¶ 57, or when making any other positive statements in 2007 regarding earnings. *See Lovelace*, 78 F.3d at 1019 (finding inadequate a complaint that contained no facts making it reasonable to believe that the defendants knew that their statements were materially false or misleading *when made*). Plaintiffs therefore do not plead facts with particularity to give rise to a strong inference that when making such statements, Defendants knowingly or recklessly omitted disclosing that the MyGIG contract would yield net losses. *See In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 388–89 (4th Cir. 2005) (finding no scienter in allegations that the defendants omitted disclosing that they had lost

a profitable subcontract from a company when making positive projections, as the plaintiffs did not plead with particularity that the defendants knew of the loss, and instead only alleged that the defendants knew that some of the company's subcontractors were being audited, and that one subcontractor's expenses were considered abusive).

Instead, Plaintiffs' facts put forward an opposing inference that, even as Defendants were experiencing difficulties with producing the MyGIG radio, they believed that they could still overcome these setbacks and have successful MyGIG sales. *See Tellabs*, 551 U.S. at 324 (holding that a plaintiff states a claim "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged"). For instance, Plaintiffs allege that Harman was building and "ramp[ing] up" a new plant in Missouri to manufacture the MyGIG radio in hopes of mending its relationship with Chrysler. *See* Consol. Class Action Compl. ¶ 72. Defendants also gave Harman employees a "pep talk" about the MyGIG radio, *see id.* ¶ 46, attempted to renegotiate MyGIG sales with Chrysler, and searched for areas for cost reduction, *see id.* ¶ 41.

Thus, whereas Plaintiffs do not allege enough facts to give rise to an inference of scienter, the facts suggest an opposing inference that Defendants were not aware that the MyGIG contract would yield losses at the time the company made positive projections, and instead believed that they could resolve the MyGIG radio's preliminary issues. *See W. Pa. Elec. Empl. Pension Trust v. Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *4–5 (E.D. Wis. Mar. 6, 2009) (finding that the plaintiffs failed to sufficiently allege that the defendants' revenue projections were misleading and omitted disclosing that the contract was not an extended one, as the court found more compelling the opposing inference that they had expected to receive additional orders to extend the contract and that their expectations were not realized); *Johnson v.*

*Pozen, Inc.*, No. 1:07CV599, 2009 WL 426235, at *14–15 (M.D.N.C. Feb. 19, 2009)

(determining that it was a more compelling inference that the defendant pharmaceutical company

believed that an FDA letter was only a minor setback to its drug being approved when it

projected earnings and did not mention the letter, than the plaintiffs' proposed inference that the

letter indicated to the defendants that the drug would not be approved).

      Finally, although Plaintiffs allege that some of Defendants' statements about MyGIG

sales are actionable in themselves, scienter is not supported because it appears that they had a

reasonable basis when made.  *See Kowal*, 16 F.3d at 1277 (holding that statements of optimism

give rise to a strong inference of scienter if they lacked a reasonable basis when made).

Plaintiffs claim that Defendants made misleading statements about increasing sales and

leadership in the infotainment market, such as their May 10, 2007, statement in Harman's Form

10-Q that the company "anticpate[d] that DaimlerChrysler, Toyata/Lexus, Audi/VW and BMW

[would] continue to account for a significant portion of [Harman's] net sales and accounts

receivable for the foreseeable future."  Consol. Class Action Compl. ¶ 66; *see also id.* ¶ 57

(Harman expected "a further expansion of Infotainment through midrange and entry-level

automobiles"); *id.* ¶ 74 ("With earlier awards . . . from PSA, Audi and Chrysler, [Harman had]

established its leadership in the mid-range and entry levels," which was solidified with the

previous "year's major awards from BMW."); *id.* ¶ 100 (noting that Harman "expect[ed]

Automotive sales to increase approximately 15%").

      There is nothing indicating that these statements lacked a reasonable basis when made, as

they discussed *sales* of the MyGIG radio to an entire automotive *sector* (and not Chrysler in

particular).  Assuming Harman was taking a monetary loss on MyGIG sales to Chrysler, it would

still ultimately make sales of the product.  Its total net sales would therefore increase, even if its

earnings from such sales would not.  Further, Defendants' projections cite sales to several automobile dealers, only one of which is Chrysler.  Plaintiffs do not allege anything indicating that sales from these other contracts would not have allowed Harman to expand into the infotainment market, even with the Chrysler losses.

Because Plaintiffs have not alleged facts indicating that Defendants were aware that the MyGIG contract would be detrimental when entering into it, that they learned of that fact at any other specific point in time before issuing positive statements, or that their statements regarding MyGIG sales lacked a reasonable basis when made, Plaintiffs have not alleged a strong inference of scienter as to their claim about the MyGIG radio.[15]

## V.  CONTROL PERSON LIABILITY

Plaintiffs also claim that Defendants are subject to control person liability under section 20(a) of the Securities Exchange Act of 1934.  Section 20(a) imposes joint and several liability upon individuals who exercise control over a violator of section 10(b), such as a corporation. *See Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 129 (D.D.C. 2009) (citing 15 U.S.C. § 78t(a) (2006)).  A properly pleaded section 20(a) claim must allege that a defendant controlled another person, and that the "controlled person" committed the primary violation of section 10(b).  *See id.* (citing *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004)).  Here, because

---

[15] Defendants contend that Plaintiffs' allegations regarding the MyGIG contract are based on a confidential source who learned information from another person that was present at the negotiations.  *See* Defs.' Reply Mem. Supp. Mot. Dismiss 16, ECF No. 27.  Defendants thus argue that the statements put forward by Plaintiffs constitute triple hearsay and should not be considered, even at the motion to dismiss stage.  In *Tellabs*, the Supreme Court explicitly rejected any standard that would "transpose to the pleadings stage the test that is used at the summary judgment and judgment-as-a-matter-of-law stages." *Tellabs*, 551 U.S. at 324 n.5. Indeed, a "confidential witness report[ing] hearsay does not automatically disqualify his statement from consideration in the scienter calculus." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 n.4 (9th Cir. 2009).  In any event, Defendants' argument is moot, as Plaintiffs' claims regarding the MyGIG contract are dismissed on other grounds.

Plaintiffs have not adequately pleaded a violation of section 10(b) and rule 10b-5 by the defendant corporation, they have not sufficiently alleged that the individual defendants are liable as control persons over Harman.  *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) ("[B]ecause plaintiffs failed to state a Rule 10b-5 claim against the company, its Section 20(a) claim against the Individual Defendants fails as well."), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  Accordingly, Plaintiffs' section 20(a) claims against the individual defendants are dismissed.

## VI.  CONCLUSION

In sum, Plaintiffs' claims against Harman under section 10(b) and rule 10b-5 fail to state a single actionable material misrepresentation or omission.  With respect to Defendants' statements about the proposed merger and the MyGIG radio, Plaintiffs additionally failed to plead enough facts to support a strong inference of scienter.  Because of these failures, the Court need not reach the question of whether Plaintiffs adequately pleaded loss causation.  Moreover, because Plaintiffs have not pleaded a primary securities fraud violation, their claim against the individual defendants under section 20(a) fails as well.  For the foregoing reasons, the Court will dismiss the complaint.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:    January 17, 2014                                    */s/ Rudolph Contreras*
                                                        RUDOLPH CONTRERAS
                                                        United States District Judge