**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE HARMAN INTERNATIONAL INDUSTRIES, INC. SECURITIES LITIGATION | Case No. 07-cv-1757-RC |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................ 2

III.  ARGUMENT ................................................................................................... 4

      A.   The Rule 23(a) Requirements Are Satisfied ........................................ 5

            1.   The Class Is So Numerous That Joinder of All Members Is
                 Impracticable ................................................................................ 5
            2.   There Are Common Questions of Law or Fact ............................ 6
            3.   Lead Plaintiff's Claims Are Typical of the Class ....................... 6
            4.   Lead Plaintiff Will Fairly and Adequately Protect the Class's
                 Interests ........................................................................................ 7

      B.   The Rule 23(b)(3) Requirements Are Satisfied .................................... 8
            1.   Common Questions of Law or Fact Predominate ....................... 8
                 a.   Harman Traded in an Efficient Market .............................. 11
                      i.    Harman Traded on the NYSE, a Major Stock
                            Exchange ................................................................. 11
                      ii.   *Cammer* Factors .................................................... 12
                      iii.  *Krogman* Factors ................................................... 20
                 b.   Damages Can Be Calculated on a Class-Wide Basis .................. 21

            2.   A Class Action Is Superior to Other Available Methods of
                 Adjudication ................................................................................ 22
                      i.    Any Individual Interest in Controlling This
                            Litigation Is Minimal .............................................. 23
                      ii.   Other Related Litigation Will Not Protect the
                            Class's Interests ...................................................... 24
                      iii.  Litigating All Claims in This Forum Is Desirable ............ 24
                      iv.   The Court Can Effectively Manage This Class
                            Action ...................................................................... 24
            3.   The Class Is Ascertainable .......................................................... 25

IV.   CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

CASES                                                                                                     PAGES

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ..............................................................5, 10, 14

*Alvarez v. Keystone Plus Constr. Corp.*,
    303 F.R.D. 152 (D.D.C. 2014)..............................................................................22

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..............................................................................................8, 9

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013).....................................................................................6, 9, 11

*\*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)......................................................................................2, 10, 11

*Billhofer v. Flamel Techs., S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) .............................................................14, 20, 24

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ..................................................................................9

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) .......................................................................22, 23

*Bynum v. District of Columbia*,
    214 F.R.D. 27 (D.D.C. 2003)..........................................................................5, 6, 7

*\*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................. *passim*

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) ................................................................................24

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................................20

*Charron v. Pinnacle Grp. N.Y. LLC*,
    269 F.R.D. 221 (S.D.N.Y. 2010) ..........................................................................25

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003)...........................................................................21

*\*Coleman through Bunn v. D.C.*,
    306 F.R.D. 68 (D.D.C. 2015)......................................................................5, 6, 8, 25

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ................................................................4, 21

*In re Computer Scis. Corp. Sec. Litig.*,
   288 F.R.D. 112 (E.D. Va. 2012) .........................................................14, 15

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639
   F.3d 623 (3d Cir. 2011) .....................................................................13

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2011) ............................................................11, 14

*In re Fed. Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) ..........................................................12

*Första AP-Fonden v. St. Jude Med., Inc.*,
   312 F.R.D. 511 (D. Minn. 2015) ....................................................12, 20, 23

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
   301 F.R.D. 116 (S.D.N.Y. 2014) ..........................................................22

*Freeland v. Iridium World Commc'ns, Ltd.*,
   233 F.R.D. 40 (D.D.C. 2006) ...............................................................4

*In re Frontier Ins. Grp., Sec. Litig.*,
   172 F.R.D. 31 (E.D.N.Y. 1997) ............................................................5

*In re Groupon, Inc. Sec. Litig.*,
   No. 12 C 2450, 2014 WL 2035853 (N.D. Ill. May 16, 2014) ..................................9

*In re Groupon, Inc. Sec. Litig.*,
   No. 12 cv 2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ...............................................................2, 10, 11

*In re Initial Public Offering Sec. Litig.*,
   471 F.3d 24 (2nd Cir. 2006) ...............................................................25

*In re Juniper Networks Sec. Litig.*,
   264 F.R.D. 584 (N.D. Cal. 2009) ..........................................................11

*Kottaras v. Whole Foods Mkt., Inc.*,
   281 F.R.D. 16 (D.D.C. 2012) ...............................................................8

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ..........................................................22

*Lehocky v. Tidel Techs., Inc.*,
 220 F.R.D. 491 (S.D. Tex. 2004) ........................................................................19

*In re Livent, Inc. Noteholders Sec. Litig.*,
 210 F.R.D. 512 (S.D.N.Y. 2002) .........................................................................23

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
 No. 11 Civ. 3658(SAS), 2013 WL 3486990 (S.D.N.Y. July 11, 2013) ....................9

*Lumen v. Anderson*,
 280 F.R.D. 451 (W.D. Mo. 2012) ........................................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
 131 S. Ct. 1309 (2011) .....................................................................................6, 9

*McCarthy v. Kleindienst*,
 741 F.2d 1406 (D.C. Cir. 1984) ..........................................................................21

*In re Merrill Lynch Tyco Research Sec. Litig.*,
 249 F.R.D. 124 (S.D.N.Y. 2008) ........................................................................22

*In re Moody's Corp. Sec. Litig.*,
 274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................................11

*Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*,
 551 F.2d 340 (D.C. Cir. 1976) .............................................................................7

*In re NII Holdings, Inc. Sec. Litig.*,
 311 F.R.D. 401 (E.D. Va. 2015) .....................................................................12, 23

*O'Neil v. Appel*,
 165 F.R.D. 479 (W.D. Mich. 1996) .....................................................................13

*Richardson v. L'Oreal USA, Inc.*,
 991 F. Supp. 2d 181 (D.D.C. 2013) ....................................................................5, 7

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
 185 F. Supp. 2d 389 (S.D.N.Y. 2002) ..................................................................11

*Rocco v. Nam Tai Elecs., Inc.*,
 245 F.R.D. 131 (S.D.N.Y. 2007) ...........................................................................5

*Schleicher v. Wendt*,
 618 F.3d 679 (7th Cir. 2010) .........................................................................10, 11

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
 571 F. Supp. 2d 1315 (N.D. Ga. 2007) .................................................................21

*ScripsAmerica, Inc. v. Ironridge Glob. LLC,*
    119 F. Supp. 3d 1213, 1252 (C.D. Cal. 2015) ........................................................12

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010)....................................................................................................2

*Strougo v. Barclays PLC,*
    312 F.R.D. 307 (S.D.N.Y. 2016) .........................................................................12, 15

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*
    546 F.3d 196 (2d Cir. 2008)...................................................................................12, 16

*Twelve John Does v. District of Columbia,*
    117 F.3d 571 (D.C. Cir. 1997)......................................................................................7

*Vinh Nguyen v. Radient Pharms. Corp.,*
    287 F.R.D. 563 (C.D. Cal. 2012) ...............................................................................20

*Vista Healthplan v. Warner Holdings Co. III Ltd.,*
    246 F.R.D. 349 (D.D.C. 2007)......................................................................................5

*In re Vivendi Universal, S.A.,*
    242 F.R.D. 76 (S.D.N.Y. 2007) ....................................................................................5

*Wagner v. Barrick Gold Corp.,*
    251 F.R.D. 112 (S.D.N.Y. 2008) ....................................................................11, 14, 22

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) .................................................................................................6

*In re Xcelera.com Sec. Litig.,*
    430 F.3d 503 (1st Cir. 2005).......................................................................................13

STATUTES

Securities Exchange Act of 1934 ................................................................................7, 9, 15

OTHER AUTHORITIES

17 C.F.R. § 239.13 ...............................................................................................................15

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

NEWBERG ON CLASS ACTIONS, § 4:50 (5th ed. 2014) ......................................................8

Wright & Miller, *Federal Practice & Procedure* § 1760A (3d ed. 2014)....................25

Arkansas Public Employees Retirement System ("APERS"), as Court-appointed Lead Plaintiff, respectfully moves for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## I.   INTRODUCTION

This securities class action alleges that beginning on April 26, 2007, Defendants[1] made a series of misleadingly positive statements about the sales results and outlook for personal navigation devices ("PND") manufactured and sold by Harman International Industries, Inc. ("Harman" or the "Company"), while failing to disclose major problems Harman was experiencing with those PNDs. It alleges that when the truth was revealed, over a series of disclosures culminating on February 5, 2008, Harman's stock price dropped, damaging investors.

Lead Plaintiff's Consolidated Class Action Complaint was filed on May 2, 2008. Dkt. 20. Defendants moved to dismiss that complaint on July 3, 2008. Dkt. 21. On January 17, 2014, this Court granted Defendants' motion. Dkt. 57. Lead Plaintiff then filed a limited appeal to the D.C. Circuit, focusing on three specific false and misleading statements. On June 23, 2015, the D.C. Circuit granted Lead Plaintiff's appeal, and reversed the dismissal of those three statements. On remand, this Court entered a scheduling order that, among other things, ordered that Lead Plaintiff file a motion for class certification on or before April 1, 2016. Dkt. 64.

Pursuant to the Court's scheduling order, Lead Plaintiff now moves for certification of this suit as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure. The proposed class ("Class") consists of:

---

[1] The Defendants are Harman International Industries, Inc. ("Harman"), Dr. Sidney Harman's ("Dr. Harman") Estate, Kevin Brown ("Brown"), and Dinesh Paliwal ("Paliwal").

> [A]ll persons or entities who purchased the common stock of Harman between April 26, 2007 and February 5, 2008, inclusive,[2] and who were damaged thereby. Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any Defendant has or had a controlling interest.

¶ 54.[3]

As set forth below, the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—are easily met here. Further, the two requirements of Rule 23(b)(3)—predominance of common questions of law or fact over individual ones, and superiority of a class action over other available methods of adjudication—are also met here. In particular, predominance is met because courts have long held that proving each of the elements of a Section 10(b) claim is susceptible to common, class-wide proof, including the element of reliance, which is presumed for all Class members under the "fraud on the market" theory. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*").

Because all the requirements of Rule 23(a) and Rule 23(b)(3) are met, the class must be certified. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (certification mandatory when Rule 23 requirements are met).

## II.   STATEMENT OF FACTS

Harman is a manufacturer of audio products and electronic systems for the automotive, consumer, and professional markets in the Americas, Europe, and Asia. ¶ 2. This case alleges that, beginning on April 26, 2007, Harman made a series of misleadingly positive statements

---

[2] April 26, 2007 to February 5, 2008, inclusive, is referred to here as the "Class Period."

[3] Citations of the form "¶ __" are to paragraphs of the Amended Consolidated Class Action Complaint ("Complaint"), Dkt. 66.

about the sales results and outlook for its PNDs, while failing to disclose major problems with those PNDs, including that they were largely obsolete.

First, during an earnings call for the third quarter of fiscal year 2007 ("FY2007"),[4] then-CEO Dr. Harman referred to a plan to sell off existing PND inventory that had accumulated over the preceding months and that Dr. Harman said "had been developed to support a vigorous sales effort." ¶ 29. Dr. Harman told investors that the "plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding." *Id.* After an analyst on the call asked whether Harman "still think[s] [it] can do over 600,000 for the fiscal year" even though sales over the preceding nine months were approximately 300,000, Dr. Harman was steadfast: "We do, and we said so." ¶ 30.

Then, in Harman's August 29, 2007 annual report (Form 10-K), Harman told investors that "[s]ales of aftermarket products, particularly PNDs, were very strong during fiscal 2007." ¶ 37.

Finally, in September 2007, during an earnings call for the first quarter of fiscal year 2008 ("FY2008"), then-CFO Brown explained that it was "a very strong first quarter on the top line for us," in part because of "the PND business, where we continue the growth and expansion of that business primarily in Europe." ¶ 42.

What investors were not told, however, was that at the time the statements were made, not only had Harman's PND inventories ballooned, but much of that inventory had become unsalable, in large part due to obsolescence as a result of modifications made by Harman itself. ¶¶ 24-28, 32, 39. Indeed, Harman had missed internal PND sales projections for FY2007 by approximately 200,000 units, or $85 million below target, ¶¶ 27-28.

---

[4] Harman's fiscal year runs from July 1 to June 30.

The truth only began to emerge in 2008. First, on January 14, 2008, Harman issued a press release reducing its earnings guidance for FY2008. ¶ 46. Harman attributed the reduction "primarily" to the poor performance of PNDs. *Id.* On that news, Harman's stock fell from the previous trading day's close of $68.97 to close at $43.00 per share. ¶ 47.

Then, on February 5, 2008, Harman issued a press release announcing disappointing financial results for the second quarter of FY2008, due in large part to the poor performance of PNDs, which in turn was largely blamed on "the sale of older [PNDs] at substantial discounts." ¶ 49. On that news, Harman's stock fell from a closing price of $45.73 on February 5, 2008 to a closing price of $38.70 on February 6, 2008. On February 11, 2008, Harman elaborated, explaining that the "the inventory clearance of prior generation models at a loss" was a "primary factor" in poor PND performance. ¶ 51.

## III.    ARGUMENT

To certify the class, Lead Plaintiff must satisfy the four requirements of Rule 23(a) and one of the subsections of Rule 23(b), in this case, Rule 23(b)(3). Rule 23(a)

> requires the putative class representatives to prove (1) that the class is so numerous as to make joinder of all members impracticable, (2) that there are common questions of fact or law, (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) that the representative parties will fairly and adequately protect the interests of the class.

*Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 42 (D.D.C. 2006).

The two requirements of Rule 23(b)(3) are that "questions of fact or law common to the whole class predominate over any questions affecting only individual members, and that the class action is a superior method for adjudicating the controversy." *See id.*; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). As discussed below, all the requirements of Rules 23(a) and 23(b)(3) are met here.

## A.      The Rule 23(a) Requirements Are Satisfied

### 1.      The Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "In this district, courts have found that numerosity is satisfied when a proposed class has at least forty members." *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 196 (D.D.C. 2013) (citing *Vista Healthplan v. Warner Holdings Co. III Ltd.*, 246 F.R.D. 349, 357 (D.D.C. 2007) and *Bynum v. District of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2003)); *see also Coleman through Bunn v. D.C.*, 306 F.R.D. 68, 80 (D.D.C. 2015) (joinder of more than forty potential class members is "presumptively impracticable").

Other courts have held that "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 275 (S.D.N.Y. 2008) (quoting *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007)).

At the beginning of the Class Period, Harman had more than 65 million shares outstanding. Expert Report of Professor Stephen E. Christophe, Ph.D., dated April 1, 2016 ("Christophe Report"), attached as Exhibit 1 to the Declaration of Steven J. Toll, dated April 1, 2016 ("Toll Decl."), ¶ 15 n. 8. Harman also had an approximate weekly average trading volume of more than 4 million shares. *Id.*, ¶ 22. Courts have held that similar numbers of outstanding shares, combined with the trading volume, satisfied the numerosity requirement. *See, e.g.*, *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 134 (S.D.N.Y. 2007) (finding numerosity given more than 12 million shares outstanding); *see also In re Frontier Ins. Grp., Sec. Litig.*, 172 F.R.D. 31,

40 (E.D.N.Y. 1997) ("[c]ommon sense suggests" that 13 million shares outstanding makes

joinder impracticable).  Accordingly, the numerosity requirement is met here.

## 2.   *There Are Common Questions of Law or Fact*

To establish that "there are questions of law or fact common to the class," Fed. R. Civ. P.

23(a)(2), "'even a single common question will do.'" *Coleman*, 306 F.R.D. at 82 (citing *Wal-

Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2556 (2011)). Here, each Class

member's claim under Section 10(b) involves questions of whether: (1) there was a material

misrepresentation or omission by Defendants; (2) Defendants acted with scienter; (3); there was

a connection between the misrepresentation or omission and the purchase or sale of a security;

(4) there was reliance on the part of each Class member, which can be presumed under the "fraud

on the market" theory (on which Lead Plaintiff relies here, as discussed below); (5) an economic

loss exists; and (6) loss causation exists. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S.

Ct. 1184, 1191-92 (2013) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317-

18 (2011)). Among other things, here, the questions of whether Defendants made material

misrepresentations or omissions with scienter, whether the price of Harman stock was artificially

inflated during the Class Period, and what is the proper measure and extent of damages, are

common questions, amenable to class-wide proof, the "answers to which will significantly drive

the resolution of this case." *Coleman*, 306 F.R.D. at 83. The commonality requirement is

therefore satisfied.

## 3.   *Lead Plaintiff's Claims Are Typical of the Class*

The typicality requirement assesses whether a "[class] representative's 'claims are based

on the same legal theory as the claims of the other class members' and her 'injuries arise from

the same course of conduct that gives rise to the other class members' claims.'" *Coleman*, 306

F.R.D. at 83 (citing *Bynum*, 214 F.R.D. at 35). However, "demonstrating typicality does not

mean showing that there are no factual variations between the claims of the plaintiffs." *Bynum*, 214 F.R.D. at 35.

Here, typicality is satisfied because each Class member's claims "are based on the same legal theory," *i.e.*, that Defendants' actions violated the Securities Exchange Act of 1934, and because each Class member's "injuries arise from the same course of events that gives rise to the other class members' claims," namely Defendants' false and misleading statements and omissions." *Id*. As such, the typicality requirement is met.

### 4.    *Lead Plaintiff Will Fairly and Adequately Protect the Class's Interests*

"Two criteria for determining the adequacy of representation [under Rule 23(a)(4)] are generally recognized: 1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997) (citing *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 345 (D.C. Cir. 1976)) (internal citation omitted). At this stage, the court should not "base a finding of inadequate representation on … unfounded assertion[s] that the interests of the class members might potentially be at odds." *Bynum*, 214 F.R.D. at 36.

Here, even assuming it has any conflicts at all (and it does not), Lead Plaintiff has no conflicts that are "so great," *Richardson*, 991 F. Supp. 2d at 197, as to warrant a finding of inadequacy. Additionally, Lead Plaintiff has demonstrated its commitment to representing the Class of which it is a member, being actively involved in the litigation, participating in discovery, and being in regular contact with court-appointed lead counsel and proposed class counsel, Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"). Lead Plaintiff, moreover,

"possess[es] the same interest and suffer[ed] the same injury as the Class Members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997).

Further, as evidenced by their zealous prosecution of this case for nearly eight years, including a successful appeal to the D.C. Circuit, Lead Plaintiff and its attorneys have diligently pursued the instant claims. Additionally, Cohen Milstein has been appointed class counsel and has adequately represented classes in many other complex class actions, including securities fraud class actions in this District and throughout the country.[5] Accordingly, the adequacy requirement is met.

## B.    The Rule 23(b)(3) Requirements Are Satisfied

Lead Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to Class members predominate over any questions affecting only individual members" ("predominance"), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" ("superiority"). *Amchem*, 521 U.S. at 623. Here, both requirements are met.

### 1.    Common Questions of Law or Fact Predominate

"The predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Coleman*, 306 F.R.D. at 85 (quoting *Amchem*, 521 U.S. at 623). In analyzing predominance, "the court must 'characterize the issues in the case as common or individual,'" an inquiry which is "'primarily based on the nature of the evidence.'" *Coleman*, 306 F.R.D. at 85 (quoting NEWBERG ON CLASS ACTIONS, § 4:50 (5th ed. 2014)). "Evidence is considered 'common' to the class if the same evidence can be used to prove an element of the cause of action for each member." *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D.

---

[5] *See* Firm Resume of Cohen Milstein attached as Exhibit 2 to the Toll Decl.

16, 22 (D.D.C. 2012) (citing *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). Predominance is "readily met in certain cases alleging . . . securities fraud." *Amchem*, 521 U.S. at 625.

Moreover, all that is required at the class-certification stage is a showing that common *questions* predominate, and a plaintiff need not prove the *answers* to such questions to obtain certification. *See Amgen*, 133 S. Ct. at 1196 (holding that Rule 23 only requires plaintiffs to show that common questions predominate, and does not require plaintiffs to show that such questions "will be answered in their favor").

Here, to prevail on their Section 10(b) and 20(a) claims, all Class members must establish: (1) a material misrepresentation or omission; (2) scienter; (3); a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the part of each Class member; (5) economic loss; and (6) loss causation. *Id*. at 1191-92 (citing *Matrixx*, 131 S. Ct. at 1318).

Courts routinely find that questions of whether there was a material misrepresentation or omission in connection with the purchase of a security, scienter, economic loss, and loss causation are common to the class and predominate in Section 10(b) cases. *See, e.g.*, *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, No. 11 Civ. 3658(SAS), 2013 WL 3486990, at *2 (S.D.N.Y. July 11, 2013) ("Courts routinely find the elements of scienter, materiality and causation to be common issues in federal securities cases."); *In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2014 WL 2035853, at *1 (N.D. Ill. May 16, 2014) ("'[W]hen a company's stock trades in a large and efficient market, the contestable elements of the Exchange Act claim reduce to falsehood, scienter, materiality, and loss. Because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine, if a suitable

representative steps forward.'") (modifications omitted) (quoting *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010)); *In re Alstom*, 253 F.R.D. at 281 ("The critical issues for establishing liability in this case include whether Defendants engaged in a fraudulent scheme and made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants' conduct injured those who purchased Alstom shares during the Proposed Class Period. Plaintiffs will likely rely on similar evidence when establishing each of the foregoing issues of proof at trial, and thus, common issues predominate over individual issues.").

Here, the critical issues for establishing liability include whether Harman made, with scienter, materially false and misleading statements or omissions that injured Class members. At trial, each of these issues will be established using similar, if not the same, evidence. As such, on these elements, common issues predominate over individual ones.

The remaining element—reliance—may be presumed on a class-wide basis through the "fraud on the market" theory adopted in *Basic*, 485 U.S. 224 (1988), and reaffirmed in *Halliburton II*, 134 S. Ct. 2398 (2014). Under that theory "'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Halliburton II* at 2408 (quoting *Basic*, 485 U.S. at 246). Accordingly, a party who purchases stock traded on such a market need not show that it directly relied upon, or even knew about, the alleged misrepresentations.[6] *Amgen*, 133 S. Ct. at 1191. Rather, such

---

[6] For class-certification purposes, stringent definitions of market efficiency are inappropriate. Indeed, the presumption of reliance is "based . . . on the *fairly modest premise* that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton II*, 134 S. Ct. at 2403 (emphasis added) (quoting *Basic*, 485 U.S. at 247 n. 24). Thus, "[d]ebates [among economists] about the precise *degree* to which stock prices accurately reflect public information are thus largely beside

purchasers are entitled to a rebuttable presumption of reliance. As will be demonstrated below,

Harman stock traded on an efficient market. Thus, Class members are entitled to a presumption

of reliance.

### a.      Harman Traded in an Efficient Market

#### i.      *Harman Traded on the NYSE, a Major Stock Exchange*

Although not dispositive of efficiency, federal courts have repeatedly found that a listing

on a major stock exchange, such as NASDAQ, AMEX, or NYSE, weighs in favor of efficiency.

*See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[L]isting of a security on

a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market

efficiency."), *abrogated on other grounds by Amgen*, 133 S. Ct. 1184; *In re Moody's Corp. Sec.

Litig.*, 274 F.R.D. 480, 489 n. 3 (S.D.N.Y. 2011) ("[T]he NYSE is a paradigmatic efficient

market"); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) ("[I]f a security

is listed on the NYSE . . . the market for that security is presumed to be efficient.") (internal

quotations and citation omitted); *Lumen v. Anderson*, 280 F.R.D. 451, 459-60 (W.D. Mo. 2012)

("[T]he NYSE and NASDAQ are at least entitled to a presumption of efficiency."); *see also

RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 405 (S.D.N.Y. 2002)

("AMEX . . . has always been found efficient"); *see also In re Juniper Networks Sec. Litig.*, 264

F.R.D. 584, 591 (N.D. Cal. 2009) ("Plaintiffs made a *prima facie* showing that the fraud-on-the-

---

the point. 'That the price of a stock may be inaccurate does not detract from the fact that false
statements affect it, and cause loss,' which is 'all that *Basic* requires.'" *Halliburton II*, 134 S. Ct.
at 2410 (emphasis in original) (modifications omitted) (quoting *Schleicher*, 618 F.3d at 687. *See
also In re Groupon, Inc. Sec. Litig.*, No. 12 cv 2450, 2015 WL 1043321, at *3 (N.D. Ill. Mar. 5,
2015) (holding that under *Basic* and *Halliburton II*, plaintiffs only needed to show that the stock
price was "quickly affected" by unexpected information and false statements, and not that the
stock price was "accurate" or that it "accurately reflected *all* information") (emphasis in
original).

market presumption of reliance applied because . . . Juniper's stock was actively traded on an efficient market—the NASDAQ.").

*ii.*     Cammer *Factors*

To analyze market efficiency in securities class actions, federal courts typically apply the factors enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (the "*Cammer* factors"). *See, e.g.*, *Strougo v. Barclays PLC*, 312 F.R.D. 307 (S.D.N.Y. 2016) (applying *Cammer* factors); *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 409 (E.D. Va. 2015) (same); *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1252 (C.D. Cal. 2015) (same); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511 (D. Minn. 2015) (same, and collecting cases describing "[t]he five *Cammer* factors [that] are commonly analyzed"). Notably, the *Cammer* factors are generally regarded as an "analytical tool" for evaluating efficiency, as opposed to a "checklist" of requirements that must be met. *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n. 11, 210 (2d Cir. 2008); *In re Fed. Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012) (citing *Teamsters*, 546 F.3d at 210).

The five *Cammer* factors are:

- a large weekly trading volume;

- the eligibility of the company to file a Form S-3 registration statement with the SEC;

- the existence of market makers and arbitrageurs;

- the existence of a significant number of analysts following the stock; and

- a cause and effect relationship between unexpected corporate events or financial releases and prices.

12

(a)   Harman Stock Had a Large Weekly Trading
Volume

Trading volume correlates positively with efficiency because it indicates "significant investment interest in the company," and a "likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. During the Class Period, Harman's average weekly trading volume was 7.51%. Christophe Report, ¶ 23. This far exceeds the "the 1% or 2% figures suggested by several courts as the benchmark for supporting a presumption of efficiency." *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514 (1st Cir. 2005) (citing *O'Neil v. Appel*, 165 F.R.D. 479, 508 (W.D. Mich. 1996); *Cammer*, 711 F. Supp. at 1293); *see also Cammer*, 711 F. Supp. at 1293 ("Turnover measured by average weekly trading of . . . one percent would justify a substantial presumption" of market efficiency); *see also In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209 (E.D. Pa. 2008), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) (finding efficiency where average volume was between 1% and 1.70%). Thus, this factor weighs in favor of efficiency here.

(b)   A Significant Number of Analysts Followed
Harman

Analyst coverage is also indicative of market efficiency, because the stock will be "closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." *Cammer*, 711 F. Supp. at 1286. As a result, "the market price of the stock would be bid up or down to reflect" public information about the company, "as interpreted by the securities analysts." *Id.*

Here, there were at least ten different analysts following Harman throughout the Class Period, many of whom regularly participated in Harman's earnings calls. Christophe Report, ¶ 25. In addition, during the Class Period, there were at least 62 analyst reports published about Harman. *Id.*, ¶ 26.

13

These figures exceed those in other cases where courts have found the market to be efficient. *See, e.g.*, *In re Alstom*, 253 F.R.D. at 280 (listing nine brokerage firms); *see also Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153 (S.D.N.Y. 2012) (finding that the existence of eight firms issuing reports about the company and four additional firms participating in conference calls suggested efficiency). Thus, this factor also weighs in favor of efficiency here.

(c)     Harman Traded on the NYSE and Was Assigned a Dedicated Specialist that Served as a Market Maker

According to *Cammer*, the existence of market makers and arbitrageurs favors efficiency, because they provide a market mechanism through which the market receives and incorporates information into the stock price. *Cammer*, 711 F. Supp. at 1286-87. Here, during the Class Period, Harman stock traded on the NYSE, which "employed a dedicated specialist responsible for maintaining a fair and orderly market in Harman common stock, per NYSE Rule 104." *Id.*, ¶ 28. According to the NYSE, "[a] NYSE specialist is a market professional who manages the two-way auction market trading in the specific securities he or she has been assigned… The specialist serves as the 'responsible broker or dealer' on the Exchange." *Id*. For the purposes of analyzing market efficiency, the existence of a dedicated specialist covering Harman has the same effect as the existence of market makers, which is to "ensure completion of the market mechanism." *Cammer*, 711 F. Supp. at 1287; *see* Christophe Report, ¶ 28 (existence of dedicated specialist covering Harman supported "a fair and orderly market" for Harman stock). The NYSE's dedicated specialist system that was in place during the Class Period satisfies this *Cammer* factor, and, indeed, courts routinely find that common stock traded on the NYSE trades in an efficient market. *See, e.g.*, *In re DVI*, 639 F.3d at 635 (finding efficiency where stock traded on NYSE); *Wagner*, 251 F.R.D. at 121 (same); *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 119-20 (E.D. Va. 2012) (same). Indeed, as one court has noted, there is "no case . . .

14

holding that the NYSE is not an efficient market for shares of common stock traded . . . in substantial volumes," and "no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market." *In re Computer Scis.*, 288 F.R.D. at 119-20. Thus, this factor also weighs in favor of a finding of efficiency.

          (d)     Harman Filed Form S-3 Registration Statements

Eligibility to file SEC Forms S-3 weighs in favor of efficiency. *See Cammer*, 711 F. Supp. at 1271. The SEC permits companies to file Forms S-3, which incorporate other SEC filings by reference, "when, in the SEC's judgment, the market for shares in the company is reasonably efficient at processing information." *Strougo*, 312 F.R.D. at 316.[7]

Here, throughout the Class Period, Harman was eligible to file Forms S-3, *see* Christophe Report, ¶ 29, and indeed, did file Forms S-3 or amended Forms S-3 on May 6, 1996, May 14, 1996, February 3, 1997, June 6, 1997, and June 23, 1997. *Id.* At least some of the shares of Harman common stock traded on the NYSE during the Class Period may be attributable to the shares registered pursuant to these Forms S-3. *Id.* Accordingly, this factor weighs in favor of a finding of efficiency as well.

          (e)     There Was a Causal Connection between Information about Harman and Harman Stock Prices, and There Was No Evidence of Autocorrelation

A causal connection between unexpected news and stock price movement "is often highly probative of efficiency," *Strougo*, 312 F.R.D. at 316, and the *Cammer* court described it as "the essence of an efficient market and the foundation for the fraud on the market theory."

---

[7] To be eligible, a company must be organized and operating in the United States or its territories, have filed reports under the Exchange Act for twelve months, have suffered no default of its obligations, and have at least $75 million in market value of stock held by non-affiliates. 17 C.F.R. § 239.13.

*Cammer*, 711 F. Supp. at 1287. "An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship." *Teamsters*, 546 F.3d at 207-08.

Here, Dr. Christophe performed an event study that analyzed "the cause-and-effect relationship between information disclosure and stock price on (i) days when unanticipated potentially material firm-specific information was released to the market, compared to (ii) days when such information was not disseminated." Christophe Report, ¶ 35.

Dr. Christophe first identified all individual news publications on the Dow Jones and Company Factiva database, a database that is widely used by academic financial economists, containing the term "Harman International." *Id.*, ¶ 13 n. 5. The search was conducted using a time frame of the Class Period plus one day, to account for news items released after trading ended on February 5, 2008, because Harman released its second quarter FY2008 results (which contained one of the corrective disclosures Lead Plaintiff alleges) after trading hours at 4:03 p.m. *Id.*, ¶ 13 n. 6.

Dr. Christophe's search yielded 720 individual news publications over a time horizon of 198 trading days. *Id.*, ¶ 38. There were 47 trading days on which no news was disseminated. *Id*. Then, because an efficient market is not expected to react to news that it already knows of or anticipates, or to news that is not material, Dr. Christophe undertook to remove from the sample of 720 individual news publications news that merely repeated information already known to the market, news that the market was anticipating, or news that was only tangentially related to Harman. *Id.*, ¶ 40. There were 644 such items, and removing them left 76 individual news publications.

16

Dr. Christophe divided these 76 individual news publications into ten categories of news types: (1) Capital Structure Announcements, (2) Harman Financials, (3) Debt Credit Rating Announcements, (4) Expected Dividend Announcements, (5) C-Suite and Board of Director Changes, (6) Equity Analyst Recommendations, (7) Corporate Insider Transactions, (8) Class Action Litigation, (9) Mergers & Acquisition Activity, and (10) Product Advertising Press Releases. *Id.*, ¶ 45. Dr. Christophe then selected the five categories of news that, according to academic research, is likely to contain information that is potentially material to the market, such that, if a market were efficient, one would expect there to be a cause-and-effect relationship between the release of such news and the price of a stock. *Id.*, ¶¶ 46-52. If an event study were not able to detect a relationship between such news and the stock price, that would weigh against a finding of efficiency. If an event study did uncover evidence of such a relationship, that would weigh in favor of efficiency.

The five news classes that were likely to contain potentially material information were (1) Harman Financials, (2) Equity Analyst Recommendations, (3) C-Suite and Board of Director Changes, (4) Class Action Litigation, and (5) Mergers and Acquisition Activity. *Id.* Within these five categories were 28 individual news items, which occurred on 20 trading days. *Id.*, ¶ 53.

Next, in order to detect whether movements in Harman's stock price were a result of news specifically related to Harman, as opposed to market-wide factors, or industry-wide factors not directly related to Harman news, Dr. Christophe used a multivariate regression model to isolate the impact of Harman-specific news on Harman's stock price. *Id.*, ¶ 54. This analysis allowed Dr. Christophe to predict how Harman's stock price could be expected to perform if Harman-specific news had *no* effect on Harman's stock price, and if the only factors that affected Harman's stock price were market- and industry-wide factors. *See generally id.*, ¶¶ 54-58. The

difference between what *actually* happened to Harman's stock price on a given day, and what the model predicted is the "daily residual return." *Id.*, ¶ 58. Dr. Christophe then analyzed the daily residual returns, using a "*t*-test," to see which, if any, were statistically significant. *Id.*, ¶ 59. Statistical significance in this context means that the return "cannot be explained by random chance alone," indicating an "abnormal return due to a material event." *Id.*

Dr. Christophe's analysis revealed that during the period of time encompassing the Class Period plus February 6, 2008, there were 11 such statistically significant, "abnormal" days. Dr. Christophe then analyzed how these 11 days were distributed over the Class Period, and whether (a) that distribution reveals any relationship between potentially material news days ("Material News Days") and "abnormal" price movements, or (b) that distribution was essentially random and unrelated to when potentially material news occurred such that "abnormal" price movements were just as likely to occur on days when there was no potentially material news ("Non-Material News Days") about Harman as on days where there was.

To conduct this analysis, Dr. Christophe divided the 198 trading days between April 26, 2007 and February 6, 2008 into two groups: days on which there was potentially material news and days on which there was not. *Id.*, ¶¶ 62-64. There were 20 days in the former category, and 178 days in the latter. *Id.* Dr. Christophe then observed that on the 178 Non-Material News Days, *i.e.*, days without potentially material news, there were 4 days with statistically significant, or abnormal, residual returns. Thus, there was a 2.25% chance that any given trading day *without* potentially material news experienced an abnormal return. Dr. Christophe then observed that on the 20 Material News Days, *i.e.*, days *with* potentially material news, there were 7 days with statistically significant, or abnormal, residual returns. Thus, there was a 35% chance that any

18

given day *with* potentially material news experienced an abnormal return. A table presenting this analysis is reproduced below:

| | Non-Material News Days | Material News Days | Total |
|---|---|---|---|
| Trading Days | 178 | 20 | 198 |
| Statistically Significant | 4 | 7 | 11 |
| **Percentage** | **2.25%** | **35.00%** | |

Based on these findings, Dr. Christophe observed that Harman common stock was "*16 times more likely* to have a statically significant daily residual return on a Material News Day than on a Non-Material News Day." *Id.*, ¶ 65 (emphasis in original).

Dr. Christophe then tested the "null hypothesis" that Material News Days and Non-Material News Days were, in actuality, equally likely to exhibit statistically significant daily residual returns, but the observed disparity was just a result of random chance. *See generally, id.* This test demonstrated that the likelihood of that being the case was extremely small. *Id.* ("The test results in a *p*-value less than .0001."). Thus, Dr. Christophe's event study found compelling evidence "that there was a strong cause-and-effect relationship between potentially material information and Harman common stock price during the Test Period." *Id.*[8] Accordingly, this *Cammer* factor, evidence of a cause-and-effect relationship between the release of material information and the Company's stock price, weighs strongly in favor of a finding of efficiency.[9]

---

[8] Dr. Christophe also expanded his event study to include *all 76* of the individual news publications mentioning Harman (excluding tangential and repeated news). *Id.*, ¶¶ 67-70. This is a highly conservative approach, because these include a large number of days on which potentially material news was *not* disseminated. *Id.*, ¶ 67. Nevertheless, even this highly conservative analysis yielded strong evidence of a cause-and-effect relationship between the release of non-tangential, non-repetitious Harman news, and Harman's stock price.

[9] Dr. Christophe also analyzed whether Harman's daily residual returns during the Class Period exhibited "autocorrelation," or "serial correlation," which has been found to be inconsistent with efficiency. Dr. Christophe's analysis found that Harman's daily residual returns did *not* exhibit autocorrelation, *id.*, ¶ 71, lending further support to a finding of efficiency here. *See, e.g.*, *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 507 (S.D. Tex. 2004) (lack of

### iii.    Krogman Factors

In addition to the *Cammer* factors, some courts also analyze three additional factors (the "*Krogman* factors") identified in *Krogman*, 202 F.R.D. at 478: (i) the company's market capitalization; (ii) the relative size of the bid-ask spread for the security; and (iii) the company's float. *See, e.g.*, *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015); *Första*, 312 F.R.D. at 519; *Billhofer*, 281 F.R.D. at 160.

Market capitalization, *i.e.*, the number of shares multiplied by share price, may indicate efficiency because there is a "greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478.

At the beginning of the Class Period, on April 26, 2007, Harman's market capitalization was approximately $8 billion. Christophe Report., ¶ 73. Harman's average market capitalization during the Class Period was $6.3 billion. *Id.*  Indeed, during the Class Period, Harman's market capitalization was larger than approximately 70% of companies traded on the NYSE, AMEX, and NASDAQ. *Id*. Thus, this factor weighs in favor of efficiency. *See, e.g.*, *Carpenters Pension Trust Fund*, 310 F.R.D. at 92 (finding that a market capitalization of between $0.5 billion and $3.2 billion weighed in favor of efficiency).

The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell. A large spread is indicative of inefficiency. *Krogman*, 202 F.R.D. at 478. During the Class Period, Harman's daily average percent bid-ask spread was 0.10%. Christophe Report, ¶ 75. This compares favorably to the spreads in other cases where efficiency was found. *See, e.g.*, *Vinh Nguyen v. Radient Pharms.*

---

statistically significant autocorrelation is "a strong . . . indication that the market for [the company's] common stock was efficient.")

*Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012) (spread of 0.58% supported efficiency); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (spread that "never exceeded 1.9%" supported efficiency); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (spread of 2.44% supported efficiency).

Finally, the size of the public float (the degree to which shares of the security are held by non-insiders), is indicative of efficiency, because non-insiders can trade freely without restrictions. *Krogman*, 202 F.R.D. at 478. During the Class Period, Harman's public float averaged $5.9 billion during the Class Period, or about 93% of total market capitalization, more than sufficient to ensure efficiency. Christophe Report, ¶ 76.

### b.  Damages Can Be Calculated on a Class-Wide Basis

Although Lead Plaintiff need not demonstrate the predominance of common questions regarding damages to obtain class certification, *see, e.g.*, *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984) ("[T]he mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification."), here, calculation of damages for the entire Class *is* subject to a common methodology, and thus common damages questions *do* predominate over individual ones. *See Comcast*, 133 S. Ct. at 1432 (2013) (assessing whether damages model was sufficient to show predominance of damages issues); *but see id.* at 1437 (Ginsburg & Breyer, JJ., dissenting) (noting that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal," and collecting authorities). Specifically, as explained by Dr. Christophe, class-wide damages can be calculated by estimating the amount of inflation attributable to the fraud at any given time in the Class Period, constructing a model to approximate the number of shares affected, and using both figures to estimate aggregate damages. Christophe Report, ¶¶ 77-81. Accordingly, predominance is satisfied as to damages as

21

well. *See, e.g.*, *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 162 (D.D.C. 2014) (finding that predominance was met as to damages because "a common formula is used to calculate the individual damages").

### 2.    A Class Action Is Superior to Other Available Methods of Adjudication

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The rule identifies the factors bearing on superiority as follows:

> (A) The interest of members of the class in individually controlling the prosecution . . . of separate actions; (B) The extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) The desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) The difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

Federal courts routinely conclude "that securities class actions are presumed to be superior to individual suits." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014); *see also, e.g.*, *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999) (noting that the superiority requirement is generally easily satisfied in securities suits); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008) (same); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008) (same); *Wagner*, 251 F.R.D. at 120 (same). Indeed,

> [m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their claims. Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf.

*In re Blech*, 187 F.R.D. at 107; *see also Första*, 312 F.R.D. 522 ("The prohibitive costs of prosecuting a securities class action like this one, compared to the relatively small potential recoveries, make it unlikely that class members would want or be able to prosecute their claims on an individual basis, or that it would be more efficient for them to do so."); *In re NII Holdings, Inc.*, 311 F.R.D. at 414 ("[C]lass members have a limited interest in asserting individual claims because they are geographically dispersed and their damages claims have a negative value insofar as they would be uneconomical to assert individually. . . . Class treatment is the superior method for resolving this action because it would alleviate those problems, allowing the pooling of damages claims so as to make prosecution of the action economically rational.")

Here, the superiority requirement is clearly met.

   i. *Any Individual Interest in Controlling This Litigation Is Minimal*

Under Rule 23(b)(3)(A), courts are to consider "the class members' interests in individually controlling the prosecution . . . of separate actions." Fed. R. Civ. P. 23(b)(3)(A). Given the scope and complexity of this case, individual litigation would be prohibitively difficult and expensive for the vast majority of Class members, especially when weighed against the individual recoveries obtainable. *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 518 (S.D.N.Y. 2002) ("[I]n the absence of class certification, not only would separate and scattered lawsuits be needlessly repetitive and inefficient given the pervasive parallels presented above, many putative class members— particularly, retail investors—would also be discouraged from even seeking legal relief as their potential recovery would be outweighed by the transaction costs of individual litigation."). In addition, given that (1) the case has been pending for over eight years; (2) the allegations were dismissed, but were resuscitated by the D.C. Circuit; and (3)

the Court has already ordered consolidation of all related cases, *see* Dkt. 15, it is exceedingly

unlikely any other Class member would wish to file their own separate action, if they even could.

> ### ii.   Other Related Litigation Will Not Protect the Class's Interests

Rule 23(b)(3)(B) further directs courts to consider "the extent and nature of any litigation

concerning the controversy already begun by . . . class members." Fed. R. Civ. P. 23(b)(3)(B).

Lead Plaintiff is not aware of any other securities fraud lawsuit against Harman related to the

misstatements and omissions alleged in the Complaint, and, in any event, this Court has ordered

the consolidation of any such actions. *See* Dkt. 15. This factor weighs in favor of certification.

> ### iii.   Litigating All Claims in This Forum Is Desirable

Courts are also to consider "the desirability . . . of concentrating the litigation of the

claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). This Court has presided over this

action for over eight years, and has already adjudicated a highly contested motion to dismiss. Re-

litigating these issues would constitute a "significant waste of judicial resources." *Billhofer*, 281

F.R.D. at 164. Thus, concentrating the rest of the litigation in this Court as a class action is

desirable, weighing in favor of certification.

> ### iv.   The Court Can Effectively Manage This Class Action

Finally, courts should consider "the likely difficulties in managing a class action." Fed.

R. Civ. P. 23(b)(3)(D). "[A] class action has to be unwieldy indeed before it can be pronounced

an inferior alternative—no matter how massive the fraud or other wrongdoing that will go

unpunished if class treatment is denied—to no litigation at all." *Carnegie v. Household Int'l,*

*Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). Here, the Court has entered a scheduling order to provide

for the orderly management of the case, *see* Dkt. 54, and this case is clearly not so unwieldy as to

merit denying certification.

### 3.    *The Class Is Ascertainable*

Courts have also recognized that an "an essential prerequisite of an action under Rule 23 is that there must be a 'class.'" *Coleman*, 306 F.R.D. at 75 (citing Wright & Miller, *Federal Practice & Procedure* § 1760A (3d ed. 2014)) (quotation marks omitted); *see also Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (noting "'implied requirement of ascertainability,' which turns on the definition of the proposed class") (quoting *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 30 (2nd Cir. 2006)).

Here, the Class is defined as "all persons or entities who purchased the common stock of Harman between April 26, 2007 and February 5, 2008, inclusive, and who were damaged thereby." This class is "readily ascertainable," *see Coleman*, 306 F.R.D. at 75, and to determine membership therein, only two "objective questions," *see id.*, need be asked and answered, namely whether a person or entity purchased the common stock of Harman during that time period, and whether the person or entity lost money as a result. Accordingly, the implied requirement of ascertainability is met here.

## IV.    CONCLUSION

For the reasons stated herein and in the accompanying supporting documents, Lead Plaintiff respectfully requests that the Court issue an Order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing APERS as class representative, and appointing Cohen Milstein as class counsel.

Dated: April 1, 2016                    Respectfully submitted,

                                        **COHEN MILSTEIN SELLERS & TOLL PLLC**

                                        */s/ Steven J. Toll*
                                        Steven J. Toll (D.C. Bar No. 225623)
                                        Daniel S. Sommers (D.C. Bar No. 416549)
                                        S. Douglas Bunch (D.C. Bar No. 974054)
                                        Times Wang (D.C. Bar No. 1025389)
                                        1100 New York Avenue, N.W.
                                        Suite 500, East Tower
                                        Washington, DC 20005
                                        Telephone: (202) 408-4600
                                        Facsimile: (202) 408-4699

                                        ***Lead Counsel for Lead Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2016, I caused the foregoing document to be

electronically filed via the Court's CM/ECF system, which effected service on all counsel of

record.

*/s/ S. Douglas Bunch*
S. Douglas Bunch