**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE HARMAN INTERNATIONAL INDUSTRIES, INC. SECURITIES LITIGATION | Case No. 07-cv-1757-RC |

**MEMORANDUM IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT .................................................................................... 1

HISTORY OF THE ACTION ..................................................................................... 3

I.      LEAD PLAINTIFF UNDERTOOK SUBSTANTIAL INVESTIGATION PRIOR TO
        FILING THE CONSOLIDATED CLASS ACTION COMPLAINT ................................ 3

II.     THE PARTIES ENGAGED IN MOTION TO DISMISS BRIEFING ............................. 4

III.    LEAD PLAINTIFF APPEALS THE COURT'S DISMISSAL OF THE
        CONSOLIDATED COMPLAINT AND THE CASE IS REMANDED TO THIS COURT
        ................................................................................................................. 5

IV.     DEFENDANTS SEEK SUPREME COURT REVIEW AND A STAY OF THE
        PROCEEDINGS ........................................................................................... 5

V.      THE PARTIES COMMENCE EXTENSIVE DISCOVERY ............................................ 6

VI.     LEAD PLAINTIFF MOVES FOR CLASS CERTIFICATION ...................................... 6

VII.    THE PARTIES ENGAGE IN MEDIATION IN ADVANCE OF THE PROPOSED
        SETTLEMENT ............................................................................................. 7

ARGUMENT ........................................................................................................ 7

I.      THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ......................... 7

        A.      The Fact That the Settlement Is the Result of Non-Collusive,
                Arm's-Length Negotiations Favors Approval ........................................... 9

        B.      The Terms of the Settlement in Relation to the Strength of the Case
                Favor Approval ...................................................................................... 10

        C.      The Advanced Status of the Litigation Favors Approval ........................ 13

        D.      The Overwhelmingly Positive Reaction of the Class Favors
                Approval ................................................................................................ 13

        E.      The Opinion of Counsel Supports Approval ............................................ 14

II.     THE PLAN OF ALLOCATION SHOULD BE FINALLY APPROVED ...................... 15

III.    NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND
        DUE PROCESS ........................................................................................... 16

IV.     THE COURT SHOULD FINALLY CERTIFY THE CLASS FOR SETTLEMENT
        PURPOSES ................................................................................................ 17

CONCLUSION ..................................................................................................... 18

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

*Alvarez v. Keystone Plus Constr. Corp.*,
  303 F.R.D. 152 (D.D.C. 2014) ....................................................................... *passim*

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) ......................................................................15

*In re Black Farmers Discrimination Litig.*,
  856 F. Supp. 2d 1 (D.D.C. 2011) .............................................................................8

*Ceccone v. Equifax Info. Servs. LLC*,
  No. 13-CV-1314 KBJ, 2016 WL 5107202 (D.D.C. Aug. 29, 2016) ......................8, 10, 12, 14

*In re Chicken Antitrust Litig.*,
  669 F.2d 228 (5th Cir. 1982) ...............................................................................15

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...........................................................................................6

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, and "ERISA" Litig.*,
  4 F. Supp. 3d 94 (D.D.C. 2013) ......................................................................10, 17

*Flinn v. FMC Corp.*,
  528 F.2d 1169 (4th Cir. 1975) .............................................................................14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ......................................................................................6

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  No. 99MS276(TFH), 2003 WL 22037741 (D.D.C. June 16, 2003) ...............................14, 15

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  205 F.R.D. 369 (D.D.C. 2002) .............................................................................15

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................................................................15

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ..........................................................................15

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
  565 F. Supp. 2d 49 (D.D.C. 2008) ...................................................................9, 13, 14

*In re Newbridge Networks Sec. Litig.*,
   No. CIV. A. 94-1678-LFO, 1998 WL 765724 (D.D.C. Oct. 23, 1998)...................................12

*Osher v. SCA Realty I, Inc.*,
   945 F. Supp. 298 (D.D.C. 1996) ...........................................................................................8

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) .........................................................................................15

*Pigford v. Glickman*,
   185 F.R.D. 82 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000)....................................12

*Stephens v. US Airways Grp., Inc.*,
   102 F. Supp. 3d 222 (D.D.C. 2015) ......................................................................................9

*United States v. District of Columbia*,
   933 F. Supp. 42 (D.D.C. 1996) .............................................................................................8

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
   246 F.R.D. 349 (D.D.C. 2007)..............................................................................................8

*In re Vitamins Antitrust Litig.*,
   No. 99-197 TFH, 2000 WL 1737867 (D.D.C. Mar. 31, 2000)..............................................15

*In re Vitamins Antitrust Litig.*,
   No. MDL 1285, 2001 WL 856290 (D.D.C. July 19, 2001).....................................................13

## STATUTES

15 U.S.C. § 78u-4 .....................................................................................................................16

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ............................................................................................... *passim*

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff[1] Arkansas Public Employees Retirement System ("APERS")[2] respectfully submits this memorandum of law in support of Lead Plaintiff's motion for final approval of the proposed Settlement of this securities class action (the "Action") against Harman International Industries, Inc. ("Harman), the Estate of Dr. Sidney Harman ("Dr. Harman"), Dinesh Paliwal ("Paliwal"), and Kevin Brown ("Brown"),[3] and approval of the proposed Plan of Allocation.

## PRELIMINARY STATEMENT

This securities class action asserts claims under the Securities Exchange Act of 1934 and alleges that in 2007 and early 2008, Defendants misled investors by assuring them that Harman's rapidly growing backlog of personal navigation devices ("PND") was of no concern because rising PND sales in Europe would profitably reduce that inventory, when in fact the truth was that those PNDs were largely obsolete and unsaleable. When the market learned the reality concealed by Defendants' misrepresentations, Harman's stock price declined precipitously, and investors were harmed as a result.

After more than nine years of protracted and hard-fought litigation, the parties agreed to settle the Action. Having successfully secured preliminary approval of the Settlement, ECF No. 100, Lead Plaintiff now moves the Court for final approval. This memorandum discusses the approval of the Settlement and the Plan of Allocation. A separate memorandum discusses Lead

---

[1] Unless otherwise noted, capitalized terms not defined herein are as defined in the Stipulation of Settlement, dated April 19, 2017 ("Stipulation"), ECF No. 99.

[2] The Court is respectfully referred to the accompanying Declaration of Steven J. Toll in Support of Lead Plaintiff's Motion for Final Approval of the Proposed Settlement and Approval of the Plan of Allocation, and Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Toll Declaration" or " Toll Decl."), which is an integral part of this submission, for a detailed description of the facts and history of this case, the claims asserted, the extensive investigation conducted, the substantial motion practice and discovery undertaken, and the settlement negotiations, as well as the numerous risks and uncertainties presented in this litigation.

[3] Dr. Harman, Paliwal, and Brown are collectively referred to as the "Individual Defendants" and the Individual Defendants and Harman are collectively referred to as "Defendants."

Counsel's request for an award of attorneys' fees and reimbursement of Litigation Expenses.

The terms of the Settlement are set forth in the Stipulation, which was previously submitted to the Court. *See* ECF No. 99. In the Court's Preliminary Approval Order, ECF No. 100, the Court preliminarily approved the Settlement, preliminarily certified a Class consisting of all who purchased or otherwise acquired Harman common stock between April 26, 2007 and February 5, 2008, both dates inclusive, and directed that notice of the Settlement be provided to potential Class Members. The $28,250,000 Settlement Amount was deposited into an escrow account by June 30, 2017, and has been invested for the benefit of the Class pursuant to the terms of the Settlement. If and when the Settlement becomes final, the Settlement Amount will be dispersed in accordance with the proposed Plan of Allocation.

Lead Plaintiff and Lead Counsel believe that the Settlement is an outstanding result for Class Members, and Lead Plaintiff fully endorses it. *See* Declaration of Gail Stone ("Stone Decl."), ¶¶ 7-12, attached as Exhibit 2 to the Toll Declaration. The Settlement was achieved only after nearly a decade of exhaustive litigation, at a time when Lead Plaintiff and Lead Counsel had developed a thorough understanding of the strengths and weaknesses of the claims and defenses in the Action and following arm's-length negotiations conducted under the auspices of the Honorable Daniel Weinstein (ret.), a highly-respected mediator with substantial experience overseeing negotiations of complex securities class actions. *See* Toll Decl., ¶¶ 45-48; *see also generally* Declaration of Daniel Weinstein ("Weinstein Decl."), attached as Exhibit 1 to the Toll Declaration. The $28,250,000 Settlement achieved by Lead Plaintiff and Lead Counsel, moreover, avoids all the risks, uncertainties, and expense of continued litigation and provides an immediate, certain, and substantial financial benefit for the Class. Given the significant obstacles to recovery including procuring stale evidence abroad, proving scienter following the death of

2

Dr. Sidney Harman, surviving class certification, surviving summary judgment, prevailing on *Daubert* motions, securing a jury verdict in Lead Plaintiff's favor, and protecting that verdict through any appeals, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is an exceptional result for the Class, and provides a fair and reasonable resolution of the claims against Defendants in this Action.

## HISTORY OF THE ACTION

This Action commenced on October 1, 2007, when plaintiff Cheolan Kim filed a class action complaint, Civil Action No. 07-cv-1757, ECF No. 1, against Harman and three of its officers, Dr. Sidney Harman, Kevin Brown, and Sandra B. Robinson, in the United States District Court for the District of Columbia, on behalf of a putative class composed of purchasers of the Company's common stock between April 26, 2007 and September 24, 2007, inclusive, and asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. Toll Decl., ¶ 13. The case was assigned to the Honorable Richard W. Roberts (ret.). *Id.*

On February 14, 2008, the Court appointed APERS as Lead Plaintiff, and approved Lead Plaintiff's selection of Cohen Milstein as Lead Counsel in the Action. ECF No. 15; Toll Decl., ¶ 14.

## I.     LEAD PLAINTIFF UNDERTOOK SUBSTANTIAL INVESTIGATION PRIOR TO FILING THE CONSOLIDATED CLASS ACTION COMPLAINT

Before filing the Consolidated Class Action Complaint ("Consolidated Complaint"), Lead Counsel undertook an extensive and independent legal and factual investigation to develop the claims set forth therein and to evaluate possible defenses. The investigation included, *inter alia*: (1) reviewing and analyzing numerous documents filed by Harman with the Securities

Exchange Commission ("SEC"); (2) compiling a list of over 130 former employees who may have had knowledge of the claims; (3) interviewing 12 former employees; and (4) reviewing and analyzing other public documents including Harman's quarterly conference calls, Harman's press releases, and other relevant news concerning the Company. Toll Decl., ¶¶ 15-16.

The result of this exhaustive investigation was a 71-page, 186-paragraph Consolidated Complaint that described the true facts about numerous aspects of Harman's business, facts that rendered a number of Harman's representations to the investing public misleading. *Id.* ¶ 17. Notably, the entirety of the investigation was done without the benefit of subpoena power or of any parallel investigation, such as by the SEC; Lead Counsel relied on its diligence and creativity to craft the case. *Id.* ¶ 18.

## II.   THE PARTIES ENGAGED IN MOTION TO DISMISS BRIEFING

Following its exhaustive investigation, Lead Counsel filed the Consolidated Complaint on May 2, 2008, naming Harman, Dr. Sidney Harman, Dinesh Paliwal, and Kevin Brown as Defendants. ECF No. 20; Toll Decl., ¶ 19. The Consolidated Complaint sought relief on behalf of purchasers of Harman common stock between April 26, 2007 and February 5, 2008, inclusive (the "Class Period"). Toll Decl., ¶ 19.

On July 3, 2008, Defendants moved to dismiss the Consolidated Complaint. ECF No. 21; Toll Decl., ¶ 21. On September 2, 2008, Lead Plaintiff filed its opposition to Defendants' motion to dismiss. ECF No. 26; Toll Decl., ¶ 22. On October 2, 2008, Defendants filed their reply. ECF No. 27; Toll Decl., ¶ 22. After two and a half years, the Court had yet to adjudicate the motion to dismiss, prompting Lead Plaintiff to file a motion for hearing on March 8, 2011. Toll Decl., ¶ 24. On April 12, 2012, the case was reassigned to Judge Rudolph Contreras and on September 5, 2012, oral argument was held on Defendants' motion to dismiss. *Id.* ¶ 25. Following oral

argument, the parties submitted supplemental briefing on the motion to dismiss. *Id.* ¶¶ 25, 26. On

January 17, 2013, the Court granted Defendants' motion to dismiss in its entirety. *Id.* ¶ 27.

III.    **LEAD PLAINTIFF APPEALS THE COURT'S DISMISSAL OF THE CONSOLIDATED COMPLAINT AND THE CASE IS REMANDED TO THIS COURT**

Lead Plaintiff appealed the dismissal of the Consolidated Complaint on narrow grounds,

seeking reversal only of the Court's dismissal of PND-related statements. *Id.* ¶¶ 29-30. Lead

Plaintiff's appeal presented a novel issue to the D.C. Circuit: whether a forward-looking

statement could fall outside of the PSLRA's safe harbor for forward-looking statements if the

cautionary statements accompanying the statement were not "meaningful." Following full

briefing, the D.C. Circuit held oral argument on February 10, 2015. *Id.* ¶ 31. On June 23, 2015,

the D.C. Circuit issued its opinion reversing the District Court in part, and holding that the three

PND-related statements were actionable. *Id.* ¶ 32. Defendants petitioned for rehearing or

rehearing *en banc* on July 23, 2015. *Id.* ¶ 33. The petition was denied on August 26, 2015 and

the Action was subsequently remanded to this Court. *Id.*

IV.     **DEFENDANTS SEEK SUPREME COURT REVIEW AND A STAY OF THE PROCEEDINGS**

Following remand, Lead Plaintiff filed the Amended Consolidated Class Action

Complaint (the "Amended Complaint") on October 16, 2015. ECF No. 66; Toll Decl., ¶ 36. The

Amended Complaint asserted only those allegations that the D.C. Circuit found actionable and

retained the same Defendants as the Consolidated Complaint, with the exception of substituting

the Estate of Dr. Sidney Harman for Dr. Harman, who passed away in 2011. Toll Decl., ¶ 36.

Brown and Paliwal answered the Amended Complaint on November 25, 2015. *Id.* ¶ 37. The

Estate of Dr. Sidney Harman answered the Complaint on March 29, 2016. *Id.*

On November 24, 2015, Defendants filed a petition for a writ of *certiorari* to the U.S. Supreme Court. *Id.* ¶ 38. That same day, Defendants moved for a stay of proceedings in this Court. ECF No. 68; Toll Decl., ¶ 38. The Court denied Defendants' motion to stay on December 15, 2015. ECF No. 72; Toll Decl., ¶ 38. Following full briefing on Defendants' petition for a writ of *certiorari*, the petition was denied on February 29, 2016. Toll Decl., ¶ 39.

## V.   THE PARTIES COMMENCE EXTENSIVE DISCOVERY

During the pendency of Defendants' petition for a writ of *certiorari* the parties commenced extensive written discovery. *Id.* ¶ 40. The parties engaged in extensive negotiations over the scope of document production and Lead Plaintiff subpoenaed numerous third parties. *Id.* Ultimately, 130,000 pages of documents were produced by Defendants and third parties. *Id.* ¶ 41. Lead Counsel put together a team of experienced and skilled attorneys to efficiently review and analyze the documents. *Id.*

## VI.   LEAD PLAINTIFF MOVES FOR CLASS CERTIFICATION

On April 1, 2016, Lead Plaintiff filed its motion for class certification, supported by an expert report from Professor Stephen E. Christophe, a professor of finance at the George Mason University School of Management. ECF No. 75; Toll Decl., ¶ 42. After taking Professor Christophe's deposition on May 27, 2016, Defendants filed a sealed opposition to Lead Plaintiff's class certification motion on June 25, 2016, supported by an expert report from Professor Mark E. Zmijewski, a consultant at Charles River Associates, an economic consulting firm. *See* ECF No. 84; Toll Decl., ¶ 42.

Defendants' opposition to Lead Plaintiff's class certification motion presented extremely complex issues. In particular, Defendants took advantage of two recent Supreme Court class action decisions, *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), to argue that the proposed class could not be certified

for failure to present an adequate damages model and for failure to demonstrate "price impact," respectively. Toll Decl., ¶ 43. And, although Lead Plaintiff and Lead Counsel believed these arguments to be without merit, they nevertheless necessitated a significant amount of work to effectively challenge. *Id*. As part of that effort, Lead Counsel took Professor Zmijewski's deposition on July 27, 2016. *Id.* ¶ 44. Then, relying on testimony elicited during that deposition as well as significant and complex legal and factual arguments, in addition to a supplemental expert report submitted by Professor Christophe, Lead Plaintiff filed a lengthy sealed reply brief in support of class certification on August 5, 2016. *See* ECF No. 89; Toll Decl., ¶ 44.

## VII.   THE PARTIES ENGAGE IN MEDIATION IN ADVANCE OF THE PROPOSED SETTLEMENT

After class certification was fully briefed, the parties agreed to attempt to resolve the Action through mediation and settlement. A mediation session in New York before Judge Weinstein of JAMS was scheduled for September 16, 2016. Toll Decl., ¶ 45. In advance of the mediation, the parties submitted extensive mediation statements setting forth their positions on the case's strengths and weaknesses, with Lead Plaintiff's mediation statement being supported by over 80 exhibits, largely consisting of evidence obtained during discovery. *Id*. The September 16, 2016 mediation session was unsuccessful, but the parties continued settlement negotiations, facilitated by Judge Weinstein. *Id.* ¶ 46. Eventually, on November 17, 2016, Judge Weinstein made a mediator's proposal to settle the Action for $28,250,000. *Id.* ¶ 47. On November 18, 2016, the parties accepted this proposal, thus settling the Action in principle. *Id.* On May 11, 2017, the Court issued an Order granting preliminary approval of the Settlement ("Preliminary Approval Order") and setting a September 28, 2017 hearing date for consideration of final approval. ECF No. 100; Toll Decl., ¶ 49.

## ARGUMENT

I.      THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

Under Rule 23(e) of the Federal Rules of Civil Procedure, the Settlement should be approved if the Court finds it "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2). "In considering whether to approve a proposed class action settlement, the Court must strike a balance between a rubber stamp approval and 'the detailed and thorough investigation that it would undertake if it were actually trying the case.'" *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 357 (D.D.C. 2007) (quoting *United States v. District of Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996)). Further, "there is a long-standing judicial attitude favoring class action settlements," *id.*, and "the discretion of the Court to reject a settlement is restrained by the 'principle of preference' that encourages settlements." *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 30 (D.D.C. 2011), as amended (Nov. 10, 2011); *see also Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 304 (D.D.C. 1996) ("It is well-established that courts assume a limited role when reviewing a proposed class action settlement. They should not substitute their judgment for that of counsel who negotiated the settlement. Rather, courts … strongly encourage settlements [and] [i]n the context of class actions, settlement is particularly appropriate given the litigation expenses and judicial resources required in many such suits." (internal citations omitted)).

Courts in this Circuit have generally considered the following factors in determining whether a settlement is fair, reasonable, and adequate: "'(a) whether the settlement is the result of arm's-length negotiations; (b) the terms of the settlement in relation to the strengths of plaintiffs' case; (c) the status of the litigation proceedings at the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel.'" *Ceccone v. Equifax Info. Servs. LLC*, No. 13-CV-1314 KBJ, 2016 WL 5107202, at *4 (D.D.C. Aug. 29, 2016) (quoting *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 159 (D.D.C. 2014)).

As discussed below, each of these weighs in favor of final approval.

A.     **The Fact That the Settlement Is the Result of Non-Collusive, Arm's-Length Negotiations Favors Approval**

"A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 565 F. Supp. 2d 49, 55 (D.D.C. 2008) (internal citations omitted); *see also Stephens v. US Airways Grp., Inc.*, 102 F. Supp. 3d 222, 227 (D.D.C. 2015).

Here, the Settlement meets these requirements and is entitled to this presumption. The Settlement was reached as a result of months of arm's-length negotiations between highly experienced counsel. Lead Plaintiff was represented by Lead Counsel Cohen Milstein, a highly respected plaintiffs' class action firm with deep experience prosecuting securities class actions. *See* Toll Decl., Exhibit 4 (firm resume). As for Defendants, they were represented by Jones Day, a premier international defense firm. The arm's-length nature of the negotiations is further evidenced by the fact that they were conducted through a highly experienced and well-regarded mediator and former judge, Judge Weinstein. Toll Decl., ¶¶ 45-47. Settlement negotiations, moreover, were hard fought and conducted with zeal. When the parties were unable to come to an agreement during the September 16, 2016 mediation, *Id.* ¶ 46, they promptly began scheduling and preparing for fact depositions. Only after an additional two months of negotiations did the parties finally reach agreement to settle the Action. *Id.* ¶ 47.

Further, nearly a decade of litigation and discovery preceded the Settlement, which allowed the parties to fully understand the strengths and weaknesses of the claims and defenses asserted in the Action. Indeed, the case was initially dismissed in its entirety, but, following a narrow and successful appeal on a subset of the claims, Lead Plaintiff was able to conduct

discovery on the remanded claims. *Id.* ¶¶ 40-41. Discovery yielded approximately 130,000 pages of documents, and an exhaustive review of those documents elucidated the strengths and weaknesses of Lead Plaintiff's claims. *Id.* ¶ 41. That discovery was eventually used in connection with mediation, which included the preparation and presentation to Judge Weinstein of mediation statements accompanied by more than 80 exhibits consisting of evidence produced during discovery. *Id.* ¶ 45. The extensive and hard-fought briefing on Lead Plaintiff's motion for class certification, in addition to two expert depositions, also shed significant light on the strengths and weaknesses of the case, including difficulties Lead Plaintiff would face establishing an adequate damages model and demonstrating loss causation. *Id.* ¶¶ 42-44.

On these facts, "there is no evidence of collusion or coercion on the part of the parties, and no reason for the Court to doubt that the settlement 'was the product of legitimate negotiation on behalf of both sides.'" *Ceccone*, 2016 WL 5107202, at *9 (quoting *Alvarez*, 303 F.R.D. at 163). Thus, this factor weighs in favor of approval, and the Settlement is entitled to a presumption that it is fair, reasonable, and adequate. *Id.*

### B.     The Terms of the Settlement in Relation to the Strength of the Case Favor Approval

"Next, the Court compares the terms of the settlement with the likely recovery plaintiffs would attain if the case proceeded to trial, an exercise which necessarily involves evaluating the strengths and weaknesses of plaintiffs' case." *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, and "ERISA" Litig.*, 4 F. Supp. 3d 94, 103 (D.D.C. 2013). Here, the Settlement provides for the immediate creation of an all-cash settlement fund of $28,250,000. Considered against the strengths and weakness of Lead Plaintiff's case, this is an outstanding result and weighs heavily in favor of approval.

Indeed, the initial dismissal of the case in its entirety highlights the risks faced by Lead

Plaintiff from the outset of the litigation. Toll Decl., ¶ 27. And, although Lead Plaintiff was successful on appeal, it resuscitated only a narrow portion of the case, greatly reducing the maximum recovery available in the Action. *Id.* ¶ 32. At the time of the Settlement, moreover, obstacles abounded before *any* recovery could be secured for the Class. Those obstacles included obtaining evidence in light of failing witnesses' memories and stale or lost evidence given the age of the litigation. *Id.* ¶ 52. Critical witnesses, moreover, were located in Germany and Lead Plaintiff would have been required to navigate complex German privacy laws to secure certain evidence and to depose those witnesses. *Id.* Further, a key witness and Defendant, Dr. Sidney Harman, passed away in 2011, severely limiting Lead Plaintiff's ability to obtain evidence of scienter. *Id.*

In addition to evidentiary obstacles, Lead Plaintiff would also have had to successfully litigate numerous motions to secure any recovery for the Class. At the time of the Settlement, for example, a fully briefed, complex, and hotly contested motion for class certification was pending. *Id.* ¶ 53. Defendants vigorously challenged certification and argued that Lead Plaintiff had not put forth an adequate damages model and had failed to establish loss causation. *Id.* ¶ 43. Defendants' loss causation argument in particular threatened to truncate the Class Period so even if Lead Plaintiff did survive class certification there was a real risk that the maximum recovery in the case would have been further reduced. If Lead Plaintiff did prevail, either in whole or in part, an appeal by Defendants was more than anticipated given the novelty and complexity of the arguments they asserted. *Id.* ¶ 53.

In addition to challenges to class certification, Lead Plaintiff would also likely face *Daubert* challenges and a summary judgment motion on potentially case dispositive issues such as loss causation. *Id.* ¶ 54. And, should the case get to trial, Lead Plaintiff would have to

11

persuade a jury on each element of the claims. *Id.* If Lead Plaintiff successfully navigated all of those obstacles, moreover, it would have only demonstrated liability. The task of quantifying damages presented yet another risk, including that the factfinder could have concluded that the effect of any fraud was smaller than asserted, resulting in a damages award substantially lower than anticipated. *Id*. And, of course, even obtaining favorable judgments on liability and damages is not the end of the story. Lead Plaintiff would also have to successfully protect those judgments through appeal. *Id.*

Against these risks, Lead Counsel respectfully submits that the benefit to the Class of an immediate $28,250,000 cash settlement, which, according to the estimates of a damages expert retained by Lead Counsel, constitutes approximately 9% of the realistically recoverable damages, weighs in favor of approval. *See, e.g.*, *Alvarez*, 303 F.R.D. at 164 (approving settlement in light of "the uncertainty of recovering such damages and the time and money that it would have taken to litigate this case to a verdict"); *Pigford v. Glickman*, 185 F.R.D. 82, 104 (D.D.C. 1999) (considering that "bringing this case to trial likely would have been a very complex, long and costly proposition" in evaluating settlement), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000); *Ceccone*, 2016 WL 5107202, at *10 (weighing guaranteed recovery against the "potential difficulties and uncertainties [that would] reduce the plaintiffs' expected recovery if the case had proceeded to trial" in evaluating settlement); *see also In re Newbridge Networks Sec. Litig.*, No. CIV. A. 94-1678-LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) ("Courts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; but an agreement that secures roughly six to twelve percent of a *potential* trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness.") (emphasis in original).

12

### C.     The Advanced Status of the Litigation Favors Approval

In considering this factor, courts assess "whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery." *Alvarez*, 303 F.R.D. at 164 (quoting *Chilcott*, 522 F. Supp. 2d at 117) (internal quotation marks omitted). Here, as noted above, the parties engaged in nearly a decade of litigation prior to the Settlement, including vigorous motion to dismiss briefing that included submission of supplemental authority; an appeal to the D.C. Circuit; and a petition for writ of *certiorari* to the Supreme Court. Toll Decl., ¶¶ 19-33; 38. The parties also engaged in extensive discovery, propounding written discovery on Defendants and subpoenaing numerous third parties. *Id.* ¶¶ 40-41. Ultimately, discovery yielded 130,000 pages of documents, all of which Lead Counsel diligently reviewed. *Id.* ¶ 41. The parties also took numerous depositions in connection with class certification, including two expert depositions. *Id.* ¶¶ 42, 44. At the time of the Settlement, the parties were poised to begin fact discovery and Lead Counsel had already begun preparing for fact witness depositions. As a result of Lead Counsel's exhaustive review of documents produced in discovery and preparation for upcoming depositions, Lead Counsel had, at the time of the Settlement, "sufficient information" "to reasonably assess the risks of litigation." *Alvarez*, 303 F.R.D. at 164.

Accordingly, this factor weighs in favor of approval as well, because the Settlement "does not come too early to be suspicious nor too late to be a waste of resources." *In re Vitamins Antitrust Litig.*, No. MDL 1285, 2001 WL 856290, at *3 (D.D.C. July 19, 2001).

### D.     The Overwhelmingly Positive Reaction of the Class Favors Approval

"'The attitude of the members of the class, as expressed directly or by failure to object, after notice, to the settlement, is a proper consideration for the trial court.'" *Ceccone*, 2016 WL 5107202, at *10 (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)). Here, Lead

Plaintiff fully endorses the Settlement. Stone Decl., ¶¶ 7-12. In addition, as of August 24, 2017, the Claims Administrator has disseminated 42,923 copies of the Notice and Proof of Claim Form to potential Class Members and their nominees. Declaration of Adam D. Walter ("Walter Decl."), ¶ 7, attached as Exhibit 3 to the Toll Declaration. Further, the Summary Notice was published once in the *Investor's Business Daily* on June 12, 2017 and disseminated on *PR Newswire*. *Id. ¶* 8. Information regarding the Settlement was also posted on the Settlement website, referenced in the Notice, www.harmansecuritiessettlement.com, *Id. ¶* 10, as well as Lead Counsel's website, www.cohenmilstein.com. To date, there have been no requests for exclusion, *Id. ¶* 11, and no objections to the Settlement. Thus, this factor "unambiguously weighs in favor of approval." *Alvarez*, 303 F.R.D. at 164.[4]

## E. The Opinion of Counsel Supports Approval

"[T]he opinion of experienced counsel should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *Id.* (quoting *Chilcott*, 522 F. Supp. 2d at 121) (internal quotation marks omitted); *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99MS276(TFH), 2003 WL 22037741, at *6 (D.D.C. June 16, 2003) ("[The o]pinion of such experienced and informed counsel should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.").

Here, Lead Counsel has extensive experience with securities class actions, and has submitted the Toll Declaration attesting to Lead Counsel's opinion that the settlement is fair, reasonable, and adequate. *See* Toll Decl., ¶¶ 50-55. Accordingly, this factor also weighs in favor of approval.

---

[4] Class Members have until August 29, 2017 to object to the Settlement. Should any objections be received after filing this brief, Lead Counsel will address them in reply papers.

## II.    THE PLAN OF ALLOCATION SHOULD BE FINALLY APPROVED

"As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate." *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 22037741, at *7 (citing *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 381 (D.D.C. 2002); *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000); and *In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1982)).

A plan of allocation need not be tailored to fit each and every class member with "mathematical precision," *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), and is "sufficient where…. there is 'a rough correlation' between the settlement distribution and the relative amounts of damages recoverable by Class Members." *In re Chicken*, 669 F.2d at 240; *see also Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) (holding that a plan of allocation is fair and reasonable if it has a "reasonable, rational basis"). Courts also consider the opinion of experienced counsel in evaluating plans of allocation. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) ("In determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel."); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel. … As with other aspects of settlement, the opinion of experienced and informed counsel is entitled to considerable weight.").

Here, Lead Plaintiff's Plan of Allocation is designed to distribute equitably the Settlement proceeds among the members of the Class who were injured by Defendants' misrepresentations and submitted valid Claim Forms that are approved for payment from the Net Settlement Fund ("Authorized Claimants"). Lead Counsel developed the Plan of Allocation in consultation with an economic expert with extensive experience in securities class actions,

including designing plans of allocation. Toll Decl., ¶ 10. The Plan of Allocation, which was set forth in the Notice provided to Class Members, provides for the calculation of a "Recognized Loss" amount for each properly documented purchase or acquisition of Harman common stock during the Class Period. *Id*. An Authorized Claimant's "Recognized Loss" depends on, among other things, when their shares were sold during the Class Period in relation to the disclosure dates alleged in this Action, whether the shares were held through or sold during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e) (providing methodology for limiting damages in securities fraud actions), and the value of the shares when they were sold or held. Thus, Lead Counsel respectfully submits that the Plan provides a fair, reasonable, and rational basis for Class Members to recover their *pro rata* share of the Settlement. To date, moreover, there have been no objections to the Plan of Allocation. Accordingly, the Plan of Allocation should be approved.

## III. NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice provided to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable." Fed. R. Civ. P. 23(e)(1).

Both the substance of the Notice and the method of its dissemination to potential Class Members satisfied these standards. The Notice includes all the information required by Rule 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7), including advising Class members of the essential terms of the Settlement, the Plan of Allocation, how to make a claim, how to object to the Settlement, and the date, time, and location of the Final Approval Hearing. Toll Decl., ¶ 60.

As for dissemination, in accordance with the Court's Preliminary Approval Order, as of August 24, 2017, the Claims Administrator has disseminated 42,923 copies of the Notice to Class Members and their nominees. Walter Decl., ¶ 7. In addition, the Summary Notice was published once in *Investor's Business Daily* on June 12, 2017 and disseminated on *PR Newswire*. *Id.* ¶ 8. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was also posted on a dedicated settlement website maintained by the Claims Administrator, *Id.* ¶ 10, as well as on Lead Counsel's website. This combination of individual mail to Class Members who could be identified with reasonable effort, supplemented by notice in widely-circulated publications and postings on a dedicated settlement website and on Lead Counsel's website, was the "best notice … practicable under the circumstances" and satisfies the requirements of Rule 23 and due process. Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 101 (D.D.C. 2013) (finding notice adequate where the claims administrator "published notice in the *Wall Street Journal* and *PR Newswire*, … set up a dedicated website, email address, and telephone hotline," and where "[t]he Notice advised Class Members of the essential terms of the Settlement Agreement, the Plan of Allocation, how to make a claim, how to object to the settlement, and the date, time, and location of the Fairness Hearing").

## IV.    THE COURT SHOULD FINALLY CERTIFY THE CLASS FOR SETTLEMENT PURPOSES

On April 19, 2017, Lead Plaintiff requested the preliminary certification of the Class for purposes of the Settlement and submitted a memorandum of law, ECF No. 98-1 ("Preliminary Approval Brief"), setting forth reasons in support. On May 11, 2017, the Court granted Lead Plaintiff's request, and preliminarily approved the certification of the Class for purposes of the Settlement. *See* ECF No. 100 ("Preliminary Approval Order"), ¶ 3.

Nothing has changed to alter the propriety of certification since the Court's Preliminary Approval Order, and Lead Plaintiff now requests that the Court grant final certification of the Class for purposes of the Settlement pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for the same reasons as set forth in Lead Plaintiff's Preliminary Approval Brief.

### CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate, and enter the Order and Final Judgment attached as Exhibit B to the Stipulation and Agreement of Settlement and filed herewith.

Dated: August 24, 2017                    Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Steven J. Toll*
Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
S. Douglas Bunch (D.C. Bar No. 974054)
Times Wang (D.C. Bar No. 1025389)
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

***Lead Counsel for Lead Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2017, I caused the foregoing document to be served on all counsel of record by filing using the Court's ECF system.

*/s/ Times Wang*
Times Wang