**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

IN RE HARMAN INTERNATIONAL
INDUSTRIES, INC. SECURITIES
LITIGATION

Case No. 07-cv-1757-RC

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN
AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION
EXPENSES**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.   Lead Counsel Undertook Substantial Investigation Prior to Filing the
        Consolidated Class Action Complaint ................................................................. 3

    B.   The Parties Engaged in Motion to Dismiss Briefing ............................................ 5

    C.   The Parties Submit Supplemental Authority on the Motion to Dismiss ............... 6

    D.   Lead Plaintiff Appeals the Court's Dismissal with Respect to Three PND-
        Related Statements ............................................................................................... 7

    E.   The Case Is Remanded to This Court .................................................................... 8

    F.   Defendants Seek Supreme Court Review and a Stay of the Proceedings .............. 8

    G.   The Parties Begin Extensive Discovery ............................................................... 9

    H.   Lead Plaintiff Moves for Class Certification ....................................................... 9

    I.   The Parties Engage in Mediation in Advance of the Proposed Settlement .......... 10

ARGUMENT ...................................................................................................................... 12

I.     LEAD COUNSEL IS ENTITLED TO ATTORNEYS' FEES FROM THE
      COMMON FUND ................................................................................................ 12

    A.   The Percentage-of-Recovery Method ................................................................. 13

    B.   The Requested Fees Are Reasonable Under the Percentage Method ..................... 14

        1.   The Size of the Fund Created and the Number of Persons Benefited
           Weighs in Favor of Lead Counsel's Request .............................................. 14

        2.   The Lack of Objections Supports the Requested Fee ................................. 15

        3.   The Skill and Efficiency of the Attorneys Support the Requested Fee ......... 16

        4.   The Complexity and Duration of the Litigation Support the Requested
           Fee ............................................................................................................ 17

        5.   The Risk of Non-Payment Supports the Fee Request ................................. 17

        6.   The Amount of Time Lead Counsel Devoted to This Action Supports
           the Requested Fee ...................................................................................... 20

        7.   Awards in Similar Cases Support the Requested Fee ................................. 20

    C.   A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request ........... 20

II.    LEAD COUNSEL'S EXPENSES ARE REASONABLE AND SHOULD BE
      APPROVED ......................................................................................................... 21

CONCLUSION ................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*In re Alstom SA Sec. Litig.,*
  741 F. Supp. 2d 469 (S.D.N.Y. 2010) .........................................................................19

*Anixter v. Home-Stake Prod. Co.,*
  77 F.3d 1215 (10th Cir. 1996) .....................................................................................19

*In re Baan Co. Sec. Litig.,*
  288 F. Supp. 2d 14 (D.D.C. 2003) ....................................................................... *passim*

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
  472 U.S. 299 (1985) .....................................................................................................13

*Bebchick v. Washington Metro. Area Transit Comm'n,*
  805 F.2d 396 (D.C. Cir. 1986) .....................................................................................14

*In re Black Farmers,*
  953 F. Supp. 2d 82 (D.D.C. 2013) ...............................................................................21

*Boeing Co. v. Van Gemert,*
  444 U.S. 472 (1980) .....................................................................................................13

*Ceccone v. Equifax Info. Servs. LLC,*
  No. 13-CV-1314 KBJ, 2016 WL 5107202 (D.D.C. Aug. 29, 2016) ....................20, 21

*In re China Sunergy Sec. Litig.,*
  No. 07 Civ. 7895(DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011) .....................21

*Cohen v. Chilcott,*
  522 F. Supp. 2d 105 (D.D.C. 2007) .............................................................................14

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) .......................................................................................................10

*Consolidated Edison Co. of N.Y., Inc. v. Abraham,*
  No. Civ.A. 03-1991RMC, 2005 WL 354483 (D.D.C. Jan. 26, 2005) .........................13

*In re Fannie Mae Sec. Litig.,*
  No. 04-cv-1639 (D.D.C.) .......................................................................................15, 16

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.,*
  4 F. Supp. 3d 94 (D.D.C. 2013) .............................................................................18, 20

*In re First Databank Antitrust Litig.*,
  209 F. Supp. 2d 96 (D.D.C. 2002) ...........................................................................13

*In re Flag Telecomm. Holdings, Ltd. Sec. Litig.*,
  No. 02-CV-3400 (CM)(PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .......................17, 20

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000) ...................................................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) .........................................................................................10

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) ...............................................................................19

*In re IMAX Sec. Litig.*,
  No. 06 Civ. 6128(NRB), 2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) .......................20

*In re ITT Sec. Litig.*,
  No. 13-cv-1620, ECF No. 94 (S.D.N.Y. Mar. 8, 2016) ...........................................20

*J.I. Case Co. v. Borak*,
  377 U.S. 426 (1964) ............................................................................................13

*In re JDS Uniphase Corp. Sec. Litig.*,
  No C-02-1486 CW (EDL), 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) ..................19

*In re LivingSocial Mktg. & Sales Practice Litig.*,
  No. 11-CV-0745, 2013 WL 1181489 (D.D.C. Mar. 22, 2013) ...................................21

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  202 F.R.D. 12 (D.D.C. 2001) .................................................................................15

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  No. Civ. 99-0790(TFH), 2003 WL 22037741 (D.D.C. June 16, 2003) .............13, 14, 21

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ............................................................................................19

*In re Newbridge Networks Sec. Litig.*,
  No. CIV. A. 94-1678-LFO, 1998 WL 765724 (D.D.C. Oct. 23, 1998) ..............13, 15, 16

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ..............................................................................19

*In re Sadia S.A. Sec. Litig.*,
  No. 08 Civ. 9528(SAS), 2011 WL 6825235 (S.D.N.Y. Dec. 28, 2011) .......................20

iii

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999)..............................................................................17

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993) ..................................................................................13

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)................................................................13, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................13

*In re Vitamins Antitrust Litig.*,
    No. MISC. 99-197(TFH), 2001 WL 34312839 (D.D.C. July 16, 2001)...............14, 15

Court-appointed Lead Counsel, Cohen Milstein Sellers & Toll PLLC ("Lead Counsel"), after prosecuting this action (the "Action") for more than nine years and achieving a cash recovery of $28,250,000 for the Class,[1] respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 23(h), for an award of attorneys' fees in the amount of 25% of the Settlement Fund, or $7,062,500, and for reimbursement of $436,964.76 in Litigation Expenses reasonably and necessarily incurred to prosecute and resolve the Action, plus interest at the same rate and for the same period as earned by the Settlement Fund.

## PRELIMINARY STATEMENT

The $28,250,000 Settlement comes nearly a decade after this case first began, after hard-fought litigation that highlights both the diligence exercised and risks assumed by Lead Counsel in pursuing these claims on behalf of the Class. Notably, the course of this litigation saw the Action being dismissed in its entirety more than six years after it had first been filed, an appeal to the D.C. Circuit, further appellate proceedings including a petition for rehearing or rehearing *en banc* before the D.C. Circuit, and a petition for a writ of *certiorari* to the U.S. Supreme Court, all of which ultimately resulted in the case finally proceeding to discovery in late 2015, approximately eight years after Lead Counsel filed the complaint initiating the Action. Lead Counsel then began the process of requesting documents from Defendants and a number of third parties, and eventually reviewed approximately 130,000 pages of documents produced in response; took, defended, and attended a total of six depositions, including Lead Plaintiff's deposition, two expert depositions, and three third-party depositions of Lead Plaintiff's investment managers; and completed briefing on a hard-fought and complex class certification

---

[1] Unless otherwise noted, capitalized terms not defined herein are as defined in the Stipulation of Settlement, dated April 19, 2017 ("Stipulation").

motion. Then, while that motion was pending, the parties entered into formal mediation discussions. In connection with that mediation, Lead Counsel submitted a mediation statement setting out the merits of Lead Plaintiff's case, supported by more than 80 exhibits. Finally, as a result of the mediation, the parties reached the instant $28,250,000 Settlement.

During the course of all this, Lead Counsel has not received compensation of any kind, and indeed, has made considerable outlays to finance the prosecution of the Action. Instead, Lead Counsel's compensation and the reimbursement of those outlays have been wholly contingent on achieving a favorable result for the Class. Without that result, Lead Counsel could very well have received nothing in compensation or reimbursement had the case been dismissed and had appeals not been successful. In light of those risks, and in light of the concrete benefit conferred on the Class by the Settlement, Lead Counsel respectfully submits that its request for an attorneys' fee in the amount of 25% of the Settlement, and its request for reimbursement of Litigation Expenses in the amount of $436,964.76, are reasonable and should be approved.

The requested fee is consistent with the fees awarded in similar actions in this Circuit and throughout the country. The requested fee and reimbursement have also been approved by Lead Plaintiff Arkansas Public Employees Retirement System ("APERS"), a sophisticated institutional investor.[2] Finally, the requested fee and reimbursement have received a positive reaction from the Class, as no Class Member has objected following an extensive notice procedure conducted in accordance with the Court's May 11, 2017 Preliminary Approval Order, ECF No. 100.[3] For these reasons, and for the additional reasons described in more detail below, Lead Counsel submits that its motion should be granted.

---

[2] *See* Declaration of Gail Stone on behalf of Arkansas Public Employees Retirement System ("Stone Decl."), ¶ 12, attached as Exhibit 2 to the Toll Declaration.

[3] Should any objections be received after filing this brief, Lead Counsel will address them in reply papers.

## FACTUAL BACKGROUND

This case began on October 1, 2007 when plaintiff Cheolan Kim filed a class action complaint, Civil Action No. 07-cv-1757, ECF No. 1, against Harman and three of its officers, Dr. Sidney Harman, Kevin Brown, and Sandra B. Robinson, in the United States District Court for the District of Columbia, on behalf of a putative class composed of purchasers of the Company's common stock between April 26, 2007 and September 24, 2007, inclusive, and asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. The case was assigned to the Honorable Richard W. Roberts (ret.). On February 14, 2008, the Court appointed APERS as Lead Plaintiff, and approved Lead Plaintiff's selection of Cohen Milstein as Lead Counsel in the Action. ECF No. 15.

### A.   Lead Counsel Undertook Substantial Investigation Prior to Filing the Consolidated Class Action Complaint

Before filing the Consolidated Class Action Complaint (the "Consolidated Complaint"), Lead Counsel undertook an extensive legal and factual investigation to develop the claims set forth therein and to evaluate possible defenses. Lead Counsel's investigation was wholly independent, and was not assisted by any parallel government investigation, such as by the SEC. Toll Decl., ¶ 15.

Lead Counsel's investigation included, *inter alia*, the following:

(a)   reviewing and analyzing numerous documents filed by Harman with the SEC before, during, and after the Class Period, including, but not limited to, submissions on Forms 8-K, 10-Q, and 10-K;

(b)   conducting an in-depth investigation of the facts surrounding a variety of topics relating to Harman's business, including Harman's MyGig radio product line, its personal navigation device

("PND") product line, its proposed acquisition led by Kohlberg Kravis Roberts & Co. L.P. ("KKR"), and certain covenants it had entered into in connection with the proposed acquisition, and its relationship with Chrysler, a key customer, and whether the facts supported Harman's representations on these topics to the investing public;

(c)     preparing to interview, attempting to contact, and interviewing 12 individuals from a list of 131 former employees of the Company, compiled by Lead Counsel through its own investigation, regarding the claims alleged in the Complaint;

(d)     reviewing and analyzing public documents made or distributed by Harman, including, but not limited to, conference calls, announcements, and wire and press releases; and

(e)     reviewing and analyzing other information obtainable on the Internet.

*Id.* ¶ 16.

Lead Counsel and support staff, including an investigator, expended considerable time and effort in conducting the investigation and drafting the 71-page, 186-paragraph Consolidated Complaint that described the true facts about numerous aspects of Harman's business – facts that rendered a number of Harman's representations to the investing public misleading. *Id.* ¶ 17. For instance, the Consolidated Complaint alleged facts showing that Harman's MyGig radio and PND product lines had experienced significant setbacks on a number of fronts, contrary to Harman's rosy statements about those product lines to investors. *Id.* As another example, the Consolidated Complaint alleged facts showing that Harman had been devoting so much money to research and development that it was in breach of covenants it had entered into with KKR, leading to the collapse of the proposed acquisition. *Id.*

Notably, all of these investigative efforts were undertaken without the benefit of subpoena power due to the automatic stay provision of the Private Securities Litigation Reform Act ("PSLRA"). *Id.* ¶ 18. Accordingly, Lead Counsel was forced to rely upon its creativity and

diligence to build the case, even though much of the relevant information was in the hands of Defendants and, therefore, inaccessible to Lead Plaintiff prior to filing the Consolidated Complaint.

**B.    The Parties Engaged in Motion to Dismiss Briefing**

Following this extensive investigation by Lead Counsel, Lead Plaintiff filed the Consolidated Complaint on May 2, 2008, against Harman and three of its officers, Dr. Sidney Harman, Dinesh Paliwal, and Kevin Brown. ECF No. 20; Toll Decl., ¶ 19. The Consolidated Complaint alleged a class period of April 26, 2007 through February 5, 2008, inclusive (the "Class Period").

The Consolidated Complaint alleged that Defendants misled investors in a number of ways, including by concealing production delays and quality control problems with its MyGig radio product line and the fact that its contract with Chrysler for the MyGig radio was generating material losses to the Company; by concealing the fact that Harman's capital expenditures had spiraled out of control and would cause the proposed KKR acquisition to fail; and by touting its PND product line and allegedly booming sales in Europe, but concealing the fact that those same PNDs were experiencing rapid and self-inflicted obsolescence. Toll Decl., ¶ 20.

On July 3, 2008, Defendants moved to dismiss the Consolidated Complaint. ECF No. 21; Toll Decl., ¶ 21. Defendants argued that the alleged misrepresentations were not actionable because they were protected by the PSLRA's safe harbor for forward-looking statements and the related "bespeaks caution" doctrine; that the Consolidated Complaint had failed to adequately allege scienter; and that loss causation was not adequately alleged. *Id.*

On September 2, 2008, Lead Plaintiff filed its opposition to Defendants' motion to dismiss. ECF No. 26; Toll Decl., ¶ 22. On October 2, 2008, Defendants filed their reply. ECF No. 27; Toll Decl., ¶ 22.

### C.    The Parties Submit Supplemental Authority on the Motion to Dismiss

Thereafter, the parties provided updates on supplemental authority that had developed in the case law since the briefing on Defendants' motion to dismiss had been completed. ECF Nos. 28-33, 36-38, 41; Toll Decl., ¶ 23.

On March 8, 2011, Lead Plaintiff filed a motion for a hearing on Defendants' motion to dismiss, which had been pending for two and a half years. ECF No. 34; Toll Decl., ¶ 24. Lead Plaintiff's motion was denied on May 6, 2011. Minute Order dated May 6, 2011; Toll Decl., ¶ 24. On April 12, 2012, the case was reassigned to Judge Rudolph Contreras. ECF No. 42. The Court then held oral argument on Defendants' motion to dismiss on September 5, 2012. Toll Decl., ¶ 25. During oral argument, the Court requested further briefing on the timeline of Defendants' representations about its PND business as compared to the timing of Lead Plaintiff's allegations based on confidential witness statements. *Id.* The parties submitted such briefing on September 24, 2012. ECF Nos. 48-49; Toll Decl., ¶ 25.

On October 1, 2013, the Court informed the parties that it would be ruling on Defendants' motion to dismiss shortly, and permitted the parties to submit additional briefing if the parties so desired. Minute Order dated October 1, 2013; Toll Decl., ¶ 26. The parties submitted additional briefing on October 18, 2013, ECF Nos. 52-53, and responses thereto on October 25, 2013. ECF Nos. 54-55; Toll Decl., ¶ 26.

On January 17, 2014, the Court granted Defendants' motion to dismiss in its entirety. Toll Decl., ¶ 27. The Court held that all of the alleged misrepresentations in the Consolidated

Complaint were non-actionable under the PSLRA's safe harbor for forward-looking statements, were immaterial under the doctrine of puffery, or were non-actionable omissions. ECF No. 57; Toll Decl., ¶ 27. The Court also held that, for all the misrepresentations other than those relating to PNDs, the Consolidated Complaint failed to plead scienter. Toll Decl., ¶ 27. The Court thus dismissed the Consolidated Complaint. *Id.*

### D.   Lead Plaintiff Appeals the Court's Dismissal with Respect to Three PND-Related Statements

On February 18, 2014, Lead Plaintiff filed a notice of appeal. ECF No. 58; Toll Decl., ¶ 28.

Lead Plaintiff's opening appellate brief, which sought reversal of only the Court's dismissal of the PND-related statements, was filed on June 10, 2014. Toll Decl., ¶ 29.

Lead Plaintiff's appeal was significant because it argued, among other things, that a forward-looking statement could not be protected by the PSLRA's safe harbor, despite the fact that Harman had issued warnings about those statements (or "cautionary language" to use the statute's terms), because Harman's warnings were not "meaningful." *Id.* ¶ 30. The D.C. Circuit had never addressed this issue before, and other Circuits had split on the issue of whether a defendant's state of mind was relevant to analyzing the question. *Id.* Yet, Lead Plaintiff and Lead Counsel were able to craft what proved to be a winning legal strategy, in part by sidestepping the state-of-mind issue altogether and focusing on the deficient content of the alleged warnings themselves. *Id.* In particular, Lead Counsel determined that the most persuasive argument was that those warnings failed to warn of the critical facts that rendered Harman's PND-related statements misleading in the first place, namely that, while Harman was touting PND sales prospects, those same PNDs were already obsolete and largely could not be profitably sold. *Id.*

Defendants' response was filed on August 11, 2014. *Id.* ¶ 31. Lead Plaintiff's reply was filed on September 8, 2014. *Id.* Oral argument was held on February 10, 2015. *Id.*

On June 23, 2015, the D.C. Circuit issued its unanimous opinion in favor of Lead Plaintiff, holding that the three PND-related statements were actionable. *Id.* ¶ 32.

On July 23, 2015, Defendants filed a petition for rehearing, or rehearing *en banc*. *Id.* ¶ 33. On August 26, 2015, Defendants' petition was denied. *Id.*

### E.       The Case Is Remanded to This Court

On September 8, 2015, the mandate of the D.C. Circuit issued, and the Court ordered that the parties meet and confer on a discovery plan under Rule 26(f) and Local Civil Rule 16.3. ECF No. 60; Toll Decl., ¶ 34.

On September 29, 2015, the parties submitted a proposed scheduling order and a proposed order governing the exchange of confidential material, ECF No. 63, both of which the Court entered on October 6, 2015. ECF Nos. 64-65; Toll Decl., ¶ 35.

Lead Plaintiff then filed the Amended Consolidated Class Action Complaint ("Amended Complaint") on October 16, 2015, retaining only those allegations that had been appealed and found actionable by the D.C. Circuit. ECF No. 66; Toll Decl., ¶ 36. The Amended Complaint also named the Estate of Dr. Sidney Harman as a defendant, in light of Dr. Harman's death in 2011. Toll Decl., ¶ 36.

Defendants (except the Estate of Dr. Sidney Harman), filed their answer on November 25, 2015. ECF No. 69; Toll Decl., ¶ 37. The Estate of Dr. Sidney Harman filed its answer on March 29, 2016. ECF No. 74; Toll Decl., ¶ 37.

### F.       Defendants Seek Supreme Court Review and a Stay of the Proceedings

On November 24, 2015, Defendants filed a petition for a writ of *certiorari* to the U.S. Supreme Court. Toll Decl., ¶ 38. That same day, Defendants moved for a stay of proceedings in this Court. ECF No. 68; Toll Decl., ¶ 38. Lead Plaintiff filed an opposition to Defendants' motion on December 1, 2015. ECF No. 70; Toll Decl., ¶ 38. The Court denied Defendants' motion on December 15, 2015. ECF No. 72; Toll Decl., ¶ 38.

The parties also submitted briefing on Defendants' petition for a writ of *certiorari*. Toll Decl., ¶ 39. On February 29, 2016, Defendants' petition was denied. *Id.*

### G.   The Parties Begin Extensive Discovery

Meanwhile, the parties began extensive written discovery focused on, among other things, Harman's PNDs. *Id.* ¶¶ 40-41. Before producing documents, both sides engaged in extensive negotiations over the scope of the production. *Id.* Lead Plaintiff also subpoenaed documents from a number of third parties, including KKR and Goldman Sachs, who advised on the failed going-private acquisition, as well as KPMG, Harman's independent auditor. *Id.*

Ultimately, approximately 130,000 pages of documents were produced by Defendants and third parties. *Id.* ¶ 41. To ensure an efficient and effective review of these documents, Lead Counsel formed a team of experienced attorneys and trained them on the facts and law at issue. *Id.* To further promote efficiency, Lead Counsel employed a technologically advanced discovery vendor, as well as litigation-specific case-management software. *Id.* These technologies allowed the document review to proceed quickly, and the evidence to be analyzed and disseminated to the broader litigation team efficiently. *Id.*

### H.   Lead Plaintiff Moves for Class Certification

On April 1, 2016, Lead Plaintiff filed its motion for class certification, supported by an expert report from Professor Stephen E. Christophe, a professor of finance at the George Mason

University School of Management. ECF No. 75; Toll Decl., ¶ 42. After taking Professor Christophe's deposition on May 27, 2016, Defendants filed a sealed opposition to Lead Plaintiff's class certification motion on June 25, 2016, supported by an expert report from Professor Mark E. Zmijewski, a consultant at Charles River Associates, an economic consulting firm. ECF No. 84; Toll Decl., ¶ 43.

Defendants' opposition to Lead Plaintiff's class certification motion presented extremely complex issues. Toll Decl., ¶ 44. In particular, Defendants took advantage of two recent Supreme Court class action decisions, *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), to argue that the proposed class could not be certified for failure to present an adequate damages model and for failure to demonstrate "price impact," respectively. *Id.* And, although Lead Plaintiff and Lead Counsel believed these arguments to be without merit, they nevertheless necessitated a significant amount of work to effectively challenge. *Id.*

As part of that effort, Lead Counsel took Professor Zmijewski's deposition on July 27, 2016. *Id.* ¶ 44. Then, relying on testimony elicited during that deposition as well as significant and complex legal and factual arguments, in addition to a supplemental expert report submitted by Professor Christophe, Lead Plaintiff filed a lengthy sealed reply brief in support of class certification on August 5, 2016. ECF No. 89; Toll Decl., ¶ 44.

### I.     The Parties Engage in Mediation in Advance of the Proposed Settlement

After class certification was fully briefed, the parties agreed to attempt to resolve the Action through mediation and settlement. Toll Decl., ¶ 45. A mediation session in New York before the Honorable Daniel Weinstein (ret.) of JAMS was scheduled for September 16, 2016. *Id.* In advance of the mediation, the parties submitted extensive mediation statements setting

10

forth their views on the strengths and weaknesses of the case, with Lead Plaintiff's mediation statement being supported by over 80 exhibits, largely consisting of evidence obtained during discovery. *Id.*

The parties were unable to come to an agreement during the September 16, 2016 in-person mediation session, but continued negotiations through email and phone discussions facilitated by Judge Weinstein. *Id.* ¶ 46.

Over the course of these discussions, the difference between the parties' positions began to narrow. *Id.* ¶ 47. Eventually, on November 17, 2016, Judge Weinstein made a mediator's proposal to settle the Action for $28,250,000. *Id.* On November 18, 2016, the parties accepted this proposal, thus settling the Action in principle. *Id.*

Thereafter, the parties entered into extensive negotiations with respect to the specific terms and conditions of the Settlement, exchanging multiple drafts of the Stipulation and Agreement of Settlement (the "Stipulation") and the exhibits thereto. *Id.* ¶ 48. On April 19, 2017, the parties reached agreement on all remaining items, and, that same day, Lead Plaintiff filed a Motion for Preliminary Approval of the Settlement, with supporting documents, including the Stipulation. ECF Nos. 98-99; Toll Decl., ¶ 48.

On May 11, 2017, the Court issued an Order granting preliminary approval of the Settlement ("Preliminary Approval Order") and setting a September 28, 2017 hearing date for consideration of final approval. ECF No. 100; Toll Decl., ¶ 49.

In accordance with the Preliminary Approval Order, Lead Counsel oversaw the dissemination of the Notice of Pendency of Class Action and Proposed Settlement (the "Notice"; ECF No. 100-1) to potential Class Members by the Claims Administrator, A.B. Data Ltd. Toll Decl., ¶¶ 56-61. The Notice informed Class Members that Lead Counsel would be requesting a

fee in the amount of 25% of the Settlement Fund, and would be requesting reimbursement of Litigation Expenses not to exceed $500,000. *Id.* ¶ 97. It also explained how Class Members could object to the Settlement or to the request for attorneys' fees and reimbursement of Litigation Expenses. Declaration of Adam D. Walter ("Walter Decl."), ¶ 12, attached as Exhibit 3 to the Toll Declaration. The Notice was mailed to over 42,000 potential Class Members and nominees, and was also published in *Investor's Business Daily* and transmitted over *PR Newswire*. *Id.* ¶ 8. To date, no objections have been received. The deadline for objections is August 29, 2017.

## ARGUMENT

Lead Counsel applies to the Court for an award of attorneys' fees on a percentage basis. As discussed in more detail below, this method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the U.S. Supreme Court for cases of this nature and represents the overwhelming current trend in the D.C. Circuit and most other circuits.

## I.   LEAD COUNSEL IS ENTITLED TO ATTORNEYS' FEES FROM THE COMMON FUND

"[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).[4] In assessing the reasonableness of

---

[4] Such awards "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore to discourage future alleged misconduct of a similar nature. *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 585 (S.D.N.Y. 2008); *see also In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 18 (D.D.C. 2003). Along these lines, the Supreme Court has emphasized that private securities actions are "an essential

attorneys' fee requests in the common fund context, courts will either look to the percentage of the settlement sought (the "percentage-of-recovery" method) or the size of the attorneys' lodestar in comparison to the fee request (the "lodestar cross check" method). The preferred approach in the D.C. Circuit is the percentage-of-recovery method. *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265, 1271-72 (D.C. Cir. 1993).[5] As described below, Lead Counsel's fee request is reasonable under either method.

## A.        The Percentage-of-Recovery Method

In securities class actions, attorneys' fees awarded routinely range from 20% to 33% of the settlement fund. *See* 4 Newberg on Class Actions § 14:6 (4th ed. 2012) ("In the normal range of common fund recoveries in securities and antitrust suits, common fee awards fall in the 20 to 33 percent range"). The D.C. Circuit has also observed that "a majority of common fund class action fee awards fall between twenty and thirty percent." *Swedish Hosp.*, 1 F.3d at 1272. Indeed, cases in this Circuit routinely follow that range. *E.g.*, *In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14 (D.D.C. 2003) (approving 28%); *In re Newbridge Networks Sec. Litig.*, No. CIV. A. 94-1678-LFO, 1998 WL 765724 (D.D.C. Oct. 23, 1998) (approving 30%); *Consolidated Edison Co. of N.Y., Inc. v. Abraham*, No. Civ.A. 03-1991RMC, 2005 WL 354483 (D.D.C. Jan. 26, 2005) (awarding 30%); *In re Vitamins Antitrust Litig.*, No. MISC. 99-197(TFH), 2001 WL 34312839

---

supplement to criminal prosecutions and civil enforcement actions" brought by the SEC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action'") (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

[5] Since *Swedish Hospital*, courts in this Circuit have consistently applied the percentage-of-recovery method to common fund attorneys' fee awards. *See, e.g.*, *In re Baan*, 288 F. Supp. 2d at 17 (noting that "this Circuit has elected to use the percentage method"); *In re Lorazepam & Clorazepate Antitrust Litig.*, No. Civ. 99-0790(TFH), 2003 WL 22037741, at *7 (D.D.C. June 16, 2003) (same); *In re First Databank Antitrust Litig.*, 209 F. Supp. 2d 96, 98 (D.D.C. 2002) (same). The PSLRA itself supports awarding attorneys' fees in securities cases using the percentage method, as it provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount" recovered for the class. 15 U.S.C. § 78u-4(a)(6).

(D.D.C. July 16, 2001) (approving 33 1/3%); *Bebchick v. Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 405 (D.C. Cir. 1986) (approving 25%); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 123 (D.D.C. 2007) (approving 23%); *Lorazepam*, 2003 WL 22037741, at *8-9 (approving 30%).

Lead Counsel's request of 25% is well within this range and is clearly reasonable, including for reasons discussed in more detail below.

**B.      The Requested Fees Are Reasonable Under the Percentage Method**

This Circuit has not set forth a definitive list of factors for assessing reasonableness in percentage-of-recovery cases. Courts in this Circuit, however, have often looked at the following factors: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *E.g.*, *In re Baan*, 288 F. Supp. 2d at 17 (citing *In re Lorazepam*, 2003 WL 22037741, at *8). Each of these factors weighs in favor of approving Lead Counsel's request.

**1.      The Size of the Fund Created and the Number of Persons Benefited Weighs in Favor of Lead Counsel's Request**

The size of the fund created is $28,250,000, and the number of persons benefited potentially exceeds 42,000 investors.[6] Lead Counsel respectfully submits that these are significant figures and support Lead Counsel's requested fee.

---

[6] To date, more than 42,000 Notices have been mailed to potential Class Members. *See* Walter Decl., ¶ 7.

One measure of the significance of the size of the fund is the percentage of maximum theoretical damages it represents. In this case, according to an analysis performed by an economic consultant retained by Lead Counsel, the Settlement Amount of $28,250,000 represents approximately 9% of the realistically recoverable damages available.[7] This compares favorably with other securities class actions. For example, in *In re Fannie Mae Sec. Litig.*, No. 04-cv-1639 (D.D.C.), the recovery represented 4-8% of the best case scenario calculated by the plaintiffs' damages expert. *See id.*, ECF No. 1092-1, ¶ 127. More generally, according to a study performed by NERA Economic Consulting, in cases involving between $200 and $399 million in investor losses, the median settlement value was 2.6% of such losses.[8]

The more than 42,000 investors who will potentially benefit from the Settlement also compares favorably with other cases, including cases in this Circuit. *See, e.g.*, *In re Baan*, 288 F. Supp. 2d at 17 (noting that the class encompassed approximately 18,000 claimants); *In re Newbridge*, 1998 WL 765724, at *2 (same); *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 26 (D.D.C. 2001) (certifying a class of approximately 12,000 members in a case that later settled). Both the size of the fund and the number of persons benefitted by it weigh in favor of Lead Counsel's fee request in this case. *See In re Vitamins*, 2001 WL 34312839, at *11. Accordingly, this factor weighs in favor of Lead Counsel's fee request.

## 2.      The Lack of Objections Supports the Requested Fee

The Notice that was published and mailed in June 2017 specifically stated that Lead Counsel would seek fees in the amount not to exceed 25% of the Settlement Amount, before

---

[7] Based on an estimate performed by Lead Plaintiff's damages consultant that adjusts for, among other things, the estimated impact of the PSLRA's limitation on damages, set forth at 15 U.S.C. § 78u-4(e)(1)-(3).

[8] *See* Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2016 Full-Year Review*, NERA Economic Consulting (January 2017), *available      at*   http://www.nera.com/content/dam/nera/ publications/2017/PUB_2016_Securities_Year-End_Trends_Report_0117.pdf.

deduction of expenses. Lead Counsel recognizes that Class Members have until August 29, 2017 to object to the Settlement or to the request for attorneys' fees and litigation expenses, but believe it is significant that no Class Member has objected to the requested fee pursuant to the process set forth in the Notice thus far. Thus, Lead Counsel submits that this factor supports the fee request.

### 3. The Skill and Efficiency of the Attorneys Support the Requested Fee

The expertise and experience of counsel are other important factors in setting a fair fee. As demonstrated by Lead Counsel's firm resume, attached to the Toll Declaration as Exhibit 4, the attorneys at Cohen Milstein are experienced and skilled class action securities litigators and have a successful track record in securities cases throughout the country, including within this Circuit in particular. Indeed, Cohen Milstein has been lead or co-lead counsel in several securities class actions in this Circuit, including *In re Fannie Mae Sec. Litig.*, No. 04-cv-1639 (D.D.C.); *In re Baan Co. Sec. Litig.*, No. CIV.A. 98-2465(ESH) (D.D.C.); and *In re Newbridge Networks Sec. Litig.*, No. CIV. A. 94-1678-LFO (D.D.C.).

Lead Counsel's skill is further evidenced by the events in this Action, which included litigating a successful and precedent-setting appeal before the D.C. Circuit, and successfully opposing numerous attempts by Defendants to have the D.C. Circuit's decision reversed.

As for efficiency, throughout the case, including in the labor-intensive fact-discovery phase, Lead Counsel operated with utmost efficiency. For instance, to efficiently conduct document review, Lead Counsel employed cutting-edge software designed to maximize review speed and minimize duplicative review, as described above. More generally, throughout the case, Lead Counsel endeavored to ensure the case was staffed leanly yet appropriately.

Moreover, Lead Counsel achieved all of this in the face of a defense led by Jones Day, one of the largest and most respected international law firms in the world.

### 4. The Complexity and Duration of the Litigation Support the Requested Fee

There can be no question that the litigation in this case was long and complex. As to duration, the initial complaint was filed in 2007, and the Settlement was reached towards the end of 2016, or after more than nine years of litigation. As to complexity, this case was both substantively and procedurally complex.

Substantively, as discussed above in more detail, this case addressed novel issues relating to the PSLRA's safe harbor for forward-looking statements, requiring significant appellate practice. Class certification briefing in this case was extremely complex, in part because of opportunities for novel defense arguments created by recent U.S. Supreme Court precedent.

Procedurally, this case was initially dismissed in its entirety. Then, after Lead Plaintiff successfully appealed part of that dismissal, Lead Plaintiff had to protect that victory against dogged challenges by Defendants in the form of several post-appeal petitions, including a petition for a writ of *certiorari* to the U.S. Supreme Court.

In sum, Lead Counsel submits that the complexity and duration of this securities class action, which courts have recognized are "notably difficult and notoriously uncertain" to prosecute, *In re Flag Telecomm. Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 WL 4537550, at *27 (S.D.N.Y. Nov. 8, 2010) (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)), supports the requested fee.

### 5. The Risk of Non-Payment Supports the Fee Request

Lead Counsel pursued Lead Plaintiff's claims in this complex litigation with no guarantee of ever being compensated for the investment of time and money that the case would require. In

so doing, Lead Counsel dedicated substantial attorney and professional resources, and paid the considerable expenses required by complex cases like this one. Lead Counsel's more than nine-year effort entailed, among other things, conducting an extensive investigation into Defendants' alleged wrongdoing, including by interviewing numerous confidential witnesses; significant appellate practice to resuscitate the case after it was initially dismissed; pursuing extensive document discovery, including the review of more than 130,000 pages of documents; taking, defending, and attending six depositions, including two expert depositions; and litigating a heavily contested class certification motion. All of this was done while facing the possible risk that Defendants would defeat class certification, would be successful in anticipated efforts to disqualify Lead Plaintiff's experts, or would prevail on the merits, either at summary judgment, at trial, or on appeal, on any number of issues, including loss causation and scienter. If any of these were to occur, the Class, and therefore Lead Counsel, would likely have recovered nothing.

The risk of no recovery in complex cases of this type is no empty statement; it is stark reality. There are numerous class actions in which plaintiffs' counsel expended thousands of hours and millions of dollars, and yet received no remuneration whatsoever despite their diligence and expertise. As the court in *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.* recognized, "[p]recedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy." 364 F. Supp. 2d 980, 994 (D. Minn. 2005). The pitfalls are many, and include having a trial verdict overturned on appeal or on a post-trial motion, or because of an intervening change in law.[9]

---

[9] *See, e.g., In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469 (S.D.N.Y. 2010) (after completion of extensive foreign discovery, 95% of plaintiff's damages were eliminated following the U.S. Supreme Court's decision in *Morrison v.*

A high risk of non-payment generally counsels in favor of increasing the fee award to attorneys who secure a recovery for their client. *See In re Baan*, 288 F. Supp. 2d at 18. Courts are aware that without such an incentive, plaintiffs' lawyers might be less willing to take on cases that involve either unsettled legal issues or clients who might otherwise go unrepresented. Public policy is served, therefore, by awarding somewhat higher fees to lawyers who assume the risk of such representation. *E.g.*, *supra* at 13 n.5. Compensating plaintiffs' counsel for the risks they take in bringing these actions is essential.

Moreover, unlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel have not been compensated for any of the more than 8,600 hours they expended, or the $436,964.76 in Litigation Expenses they incurred over more than nine years of litigation. Lead Counsel would not have been compensated for their time or expenses had they been unsuccessful. In undertaking that responsibility, Lead Counsel obligated themselves to ensure that sufficient dollars and attorney resources were dedicated to the prosecution of this litigation. Investment of these resources limited Lead Counsel's ability to staff other matters and to accept new profit-generating matters. When Lead Counsel undertook to act for Lead Plaintiff and the Class, therefore, Lead Counsel was aware that the only way Lead Counsel could be compensated was to achieve a successful result.

Accordingly, the risks faced by Lead Counsel from the outset of the Action were high. Lead Counsel's assumption of this risk strongly supports the reasonableness of the requested fee.

---

*Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), which overturned decades of precedent); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict against accounting firm); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (reversing verdict in favor of plaintiffs following two decades of litigation); *In re JDS Uniphase Corp. Sec. Litig.*, No C-02-1486 CW (EDL), 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (defense verdict after four weeks of trial); *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (affirming judgment as a matter of law in favor of defendants following a jury verdict partially in plaintiffs' favor).

*E.g.*, *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 112 (D.D.C. 2013) (finding this factor weighed in favor of fee request because class counsel had spent a significant number of "uncompensated hours" and had incurred substantial litigation expenses, "all of which were at risk in the event of an unsuccessful result").

### 6.   The Amount of Time Lead Counsel Devoted to This Action Supports the Requested Fee

As discussed in more detail in the Toll Declaration, attorneys, paralegals, and other professionals employed by Lead Counsel collectively devoted more than 8,600 hours to this Action. This significant time investment also weighs in favor of Lead Counsel's request. *E.g.*, *Ceccone v. Equifax Info. Servs. LLC*, No. 13-CV-1314 KBJ, 2016 WL 5107202, at *12 (D.D.C. Aug. 29, 2016) ("Thus, counsel have invested significant time in this case, all the while bearing a substantial risk that they would not recover anything.").

### 7.   Awards in Similar Cases Support the Requested Fee

As discussed in Section I.A. above, the 25% fee requested here is similar to, and even below, the awards in other common fund cases in this Circuit. Awards in cases from outside this Circuit similarly support the requested fee.[10]

### C.   A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request

Courts within this and other circuits sometimes use the lodestar as a cross-check on the propriety of fees awarded under the percentage-of-recovery method. *See In re LivingSocial Mktg. & Sales Practice Litig.*, No. 11-CV-0745, 2013 WL 1181489 (D.D.C. Mar. 22, 2013);

---

[10] *E.g.*, *In re IMAX Sec. Litig.*, No. 06 Civ. 6128(NRB), 2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) (awarding 33% of a $12 million settlement); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) (awarding 30% of a $24.4 million settlement); *In re Sadia S.A. Sec. Litig.*, No. 08 Civ. 9528(SAS), 2011 WL 6825235 (S.D.N.Y. Dec. 28, 2011) (awarding 30% of a $27 million settlement); *In re ITT Sec. Litig.*, No. 13-cv-1620, ECF No. 94 (S.D.N.Y. Mar. 8, 2016)  (awarding 27.5% of a $16.9625 million settlement).

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). "No such cross-check is required in this circuit, but 'district courts are free to employ such a cross-check at their direction to confirm the reasonableness of an award.'" *Ceccone*, 2016 WL 5107202, at *13 (quoting *In re Black Farmers*, 953 F. Supp. 2d 82, 101 (D.D.C. 2013)).

Here, Lead Counsel has billed the equivalent of approximately $3.97 million in lodestar, yielding a multiplier of approximately 1.78. This multiplier confirms the reasonableness of a 25% fee award, "given that courts typically apply multipliers 'ranging up to four' to lodestar calculations in common fund cases." *Id.* (quoting *In re Black Farmers*, 953 F. Supp. 2d at 102); *see also In re Lorazepam*, 2003 WL 22037741, at *9 ("multiples ranging up to four are frequently awarded in common fund cases"); *In re Black Farmers*, 953 F. Supp. 2d at 102 (collecting cases); *In re Baan*, 288 F. Supp. 2d at 20 (finding that "a multiplier of 2.0 or less falls well within a range that is fair and reasonable").

Accordingly, a lodestar cross-check further supports Lead Counsel's fee request.

## II.   LEAD COUNSEL'S EXPENSES ARE REASONABLE AND SHOULD BE APPROVED

Lead Counsel requests reimbursement of Litigation Expenses reasonably incurred on behalf of the Class that are regularly recovered by counsel in cases of this type.[11] Lead Counsel incurred $436,964.76 in Litigation Expenses. The expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely

---

[11] *See, e.g.*, *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895(DAB), 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation'") (citation omitted).

21

charged to clients billed by the hour.[12] The Notice informed potential Class Members that Lead Counsel would apply for reimbursement of expenses in an amount not to exceed $500,000. Toll Decl., ¶ 97; Walter Decl., Exhibit A. To date, there has been no objection and reimbursement should be approved. Toll Decl., ¶ 77.

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees of 25% of the Settlement Fund, or $7,062,500, and $436,964.76 in reimbursement for the reasonable Litigation Expenses incurred by Lead Counsel in prosecuting the claims on behalf of the Class, plus interest at the same rate and for the same period as earned by the Settlement Fund. A proposed order to that effect is being submitted herewith.

Dated: August 24, 2017        Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Steven J. Toll*
Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
S. Douglas Bunch (D.C. Bar No. 974054)
Times Wang (D.C. Bar No. 1025389)
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

***Lead Counsel for Lead Plaintiff***

---

[12] These expenses include, among others, expert fees, document management/litigation support, computerized research, mediation costs, travel expenses, photocopying, long distance telephone and facsimile charges, postage and delivery expenses, and filing fees. *See* Toll Decl., ¶ 98.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2017, I caused the foregoing document to be served on all counsel of record by filing using the Court's ECF system.

*/s/ Times Wang*
Times Wang